APPEAL,REDACT,CLOSED

# U.S. District Court
# Southern District of Indiana (Indianapolis)
# CRIMINAL DOCKET FOR CASE #: <u>1:15–cr–00072–TWP–DML</u>–1

Case title: USA v. AL–AWADI
Magistrate judge case number:  1:15–mj–00073–TAB

Date Filed: 04/14/2015
Date Terminated: 06/13/2016

Assigned to: Judge Tanya Walton Pratt
Referred to: Magistrate Judge Debra McVicker Lynch

Appeals court case number: 16–2643 7th Circuit

| | |
|---|---|
| Trial Date: | Final Pretrial Conference: |
| Plea and Sentence: | Sentencing: |
| Change of Plea Hearing: | Accept/Reject Plea Hearing: |
| Initial Appearance: | Pending SRV: |

**<u>Defendant (1)</u>**

**ALI AL–AWADI**
*TERMINATED: 06/13/2016*

represented by **Charles C. Hayes**
SWEENEY HAYES LLC
141 E. Washington
Suite 225
Indianapolis, IN 46204
317–491–1050
Email: charleshayes.atty@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Dylan A. Vigh**
DULIK & VIGH
120 East Market Street
12th Floor
Indianapolis, IN 46204
317–636–0708
Fax: 317–636–1603
Email: dvighlaw@gmail.com
*TERMINATED: 04/23/2015*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

1

**Jane Ruemmele**
HAYES RUEMMELE LLC
141 E. Washington St.
Suite 225
Indianapolis, IN 46204
(317) 491−1050
Fax: (317) 491−1043
Email: janeruemmele@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ross G. Thomas**
3728 N. Delaware Street
Indianapolis, IN 46205−3434
(317) 920−2840
Fax: (317) 920−2875
Email: rossthomas@defenselawyerindiana.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:2251.F  PRODUCTION OF CHILD PORNOGRAHY (1) | SUPERSEDED |
| 18:2251.F  PRODUCTION OF CHILD PORNOGRAPHY (1s−4s) | SUPERSEDED |
| 18:2251.F  PRODUCTION OF CHILD PORNOGRAPHY (1ss−2ss) | Defendant was Found Guilty of Counts 1,2,4,7. IMPRISONMENT: 324 Months Per Count, concurrent. SUPERVISED RELEASE: 15 Years Per Count, Concurrent. S.A. Fee: $400.00. RESTITUTION: $9,000. |
| 18:2251.F  PRODUCTION OF CHILD PORNOGRAPHY (3ss) | NOT GUILTY |
| 18:2251.F  PRODUCTION OF CHILD PORNOGRAPHY (4ss) | Defendant was Found Guilty of Counts 1,2,4,7. IMPRISONMENT: 324 Months Per Count, concurrent. SUPERVISED RELEASE: 15 Years Per Count, Concurrent. S.A. Fee: $400.00. RESTITUTION: $9,000. |
| 18:2251.F  ATTEMPTED PRODUCTION OF CHILD PORNOGRAPHY (5s−8s) | SUPERSEDED |
| 18:2251.F  ATTEMPTED PRODUCTION OF CHILD PORNOGRAPHY (5ss−6ss) | DISMISSED |

| | |
|---|---|
| 18:2251.F  ATTEMPTED PRODUCTION OF CHILD PORNOGRAPHY (7ss) | Defendant was Found Guilty of Counts 1,2,4,7. IMPRISONMENT: 324 Months Per Count, concurrent. SUPERVISED RELEASE: 15 Years Per Count, Concurrent. S.A. Fee: $400.00. RESTITUTION: $9,000. |
| 18:2251.F  ATTEMPTED PRODUCTION OF CHILD PORNOGRAPHY (8ss) | DISMISSED |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| SEXUAL EXPLOITATION OF A CHILD | |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Bradley Paul Shepard** UNITED STATES ATTORNEY'S OFFICE 10 West Market Street Suite 2100 Indianapolis, IN 46204 317–226–6333 Fax: (317) 226–6125 Email: brad.shepard@usdoj.gov *ATTORNEY TO BE NOTICED* *Designation: Government Attorney* |
| | | **Kristina M. Korobov** UNITED STATES ATTORNEY'S OFFICE 10 West Market Street Suite 2100 Indianapolis, IN 46204 (317) 226–6333 Email: kristina.korobov@usdoj.gov |

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/02/2015 | 1 | | COMPLAINT & AFFIDAVIT approved and signed by Judge Magistrate Judge Tim A. Baker, as to ALI AL–AWADI (1). Electronic Notice to USM. (CBU) [1:15–mj–00073–TAB] (Entered: 02/03/2015) |
| 02/02/2015 | 3 | | NOTICE OF ATTORNEY APPEARANCE Steven D. DeBrota appearing for USA. (CBU) [1:15–mj–00073–TAB] (Entered: 02/03/2015) |
| 02/02/2015 | | | NOTICE OF ATTORNEY APPEARANCE Charnette Darlene Garner appearing for USA. (CBU) [1:15–mj–00073–TAB] (Entered: 02/03/2015) |
| 02/03/2015 | 5 | | WAIVER of Preliminary Hearing by ALI AL–AWADI (BAS) [1:15–mj–00073–TAB] (Entered: 02/03/2015) |
| 02/03/2015 | 6 | | Arrest Warrant Returned by US Marshal. Service of Warrant EXECUTED on 2/3/2015 in case as to ALI AL–AWADI. (BAS) [1:15–mj–00073–TAB] (Entered: 02/03/2015) |
| 02/04/2015 | 7 | | MINUTE ORDER for proceedings held before Magistrate Judge Tim A. Baker: Initial Appearance on Complaint held on 2/3/2015. Defendant ALI AL–AWADI appears in person and by FCD counsel Mike Donahoe. Appearance for the USA by AUSA Steve DeBrota. USPO represented by Mandy Burton. Charges, Rights and Penalties explained. Defendant waived his right to a detention hearing and probable cause was found. Government orally moved for pretrial detention and a hearing was granted. Detention Hearing set for 2/6/2015 01:30 PM in room #238, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Criminal Duty Magistrate Judge. Government orally moved to unseal the case file and the same granted. Defendant is remanded to custody of USM. Signed by Magistrate Judge Tim A. Baker. (BAS) [1:15–mj–00073–TAB] (Entered: 02/04/2015) |
| 02/05/2015 | 8 | | NOTICE OF ATTORNEY APPEARANCE: Dylan A. Vigh appearing for ALI AL–AWADI (Retained). (Vigh, Dylan) [1:15–mj–00073–TAB] (Entered: 02/05/2015) |
| 02/05/2015 | 9 | | WAIVER of Detention by ALI AL–AWADI. (Vigh, Dylan) [1:15–mj–00073–TAB] (Entered: 02/05/2015) |
| 02/06/2015 | 10 | | ORDER accepting Waiver of Detention as to ALI AL–AWADI. Defendant ordered detained. Hearing set for 2/6/15 is vacated. (Marginal Notation). Signed by Magistrate Judge Tim A. Baker on 2/6/2015. (MAC) [1:15–mj–00073–TAB] (Entered: 02/06/2015) |
| 02/25/2015 | 11 | | MOTION for Extension of Time to May 1, 2015 *to File an Indictment* by USA as to ALI AL–AWADI. (Attachments: # 1 Text of Proposed Order)(Garner, Charnette) [1:15–mj–00073–TAB] (Entered: 02/25/2015) |
| 02/26/2015 | 12 | | ORDER granting 11 Motion for Extension of Time to File an Indictment or an Information as to ALI AL–AWADI (1) to and including May 1, 2015. Signed by Magistrate Judge Mark J. Dinsmore on 2/26/2015.(MGG) [1:15–mj–00073–TAB] (Entered: 02/27/2015) |
| 03/05/2015 | 13 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Withdraw Attorney Appearance by Charnette D. Garner. by USA as to ALI AL−AWADI. (Attachments: # 1 Text of Proposed Order)(Garner, Charnette) [1:15−mj−00073−TAB] (Entered: 03/05/2015) |
| 03/06/2015 | 14 | | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (Shepard, Bradley) [1:15−mj−00073−TAB] (Entered: 03/06/2015) |
| 03/09/2015 | 16 | | ORDER granting 13 Motion to Withdraw Attorney Appearance. Charnette Darlene Garner withdrawn from case on behalf of the USA. Signed by Magistrate Judge Mark J. Dinsmore on 3/9/2015.(CBU) [1:15−mj−00073−TAB] (Entered: 03/11/2015) |
| 03/10/2015 | 15 | | MOTION to Withdraw Attorney Appearance by Steven D. DeBrota. by USA as to ALI AL−AWADI. (Attachments: # 1 Text of Proposed Order)(DeBrota, Steven) [1:15−mj−00073−TAB] (Entered: 03/10/2015) |
| 03/11/2015 | 17 | | ORDER granting 15 Motion to Withdraw Attorney Appearance. Steven D. DeBrota withdrawn from case as counsel for the USA. Signed by Magistrate Judge Denise K. LaRue on 3/11/2015.(CBU) [1:15−mj−00073−TAB] (Entered: 03/12/2015) |
| 04/08/2015 | 18 | | NOTICE OF ATTORNEY APPEARANCE: Ross G. Thomas appearing for ALI AL−AWADI (Retained). (Thomas, Ross) [1:15−mj−00073−TAB] (Entered: 04/08/2015) |
| 04/14/2015 | 19 | | INDICTMENT as to ALI AL−AWADI (1) count(s) 1. Electronic Notice to USM. (MGG) (Entered: 04/15/2015) |
| 04/14/2015 | 22 | | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (MGG) (Entered: 04/15/2015) |
| 04/15/2015 | 26 | | NOTIFICATION of Assigned Judge, Automatic Not Guilty Plea, Trial Date, Discovery Order and Other Matters as to ALI AL−AWADI. Jury Trial set for 6/15/2015 09:00 AM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt. Electronic Notice to USM. Signed by Judge Tanya Walton Pratt on 4/15/2015. (MGG) (Entered: 04/15/2015) |
| 04/17/2015 | 27 | | SCHEDULING ORDER as to ALI AL−AWADI Initial Appearance set for 4/23/2015 02:30 PM in room #243, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Criminal Duty Magistrate Judge. Signed by Magistrate Judge Debra McVicker Lynch on 4/17/2015. (BAS) (Entered: 04/20/2015) |
| 04/20/2015 | 28 | | MOTION to Withdraw Attorney Appearance by Dylan Vigh. by ALI AL−AWADI. (Vigh, Dylan) (Entered: 04/20/2015) |
| 04/20/2015 | 29 | | SCHEDULING ORDER as to ALI AL−AWADI (1) − The trial by jury in this matter remains set for June 15, 2015 at 9:00 a.m. Accordingly, this matter is set for final pretrial conference on May 27, 2015 at 11:00 a.m. in Room 344, BirchBayh Federal Building and United States Courthouse, Indianapolis, Indiana. Counsel shall be prepared to fully discuss the status of the action in accordance with the agenda for final pretrial conferences set out in this Court's Courtroom Practice and Trial Procedures. The Defendant is ordered to appear at the final pretrial conference. **SEE ORDER**. Signed by Judge Tanya Walton Pratt on 4/20/2015. (MGG) (Entered: 04/21/2015) |

| 04/22/2015 | 30 | | Submission of Proposed Order , re 28 MOTION to Withdraw Attorney Appearance by Dylan Vigh. by ALI AL−AWADI. (Vigh, Dylan) (Entered: 04/22/2015) |
|---|---|---|---|
| 04/23/2015 | 31 | | ORDER granting 28 Motion to Withdraw Attorney Appearance. Dylan A. Vigh withdrawn from case as to ALI AL−AWADI (1). Signed by Judge Tanya Walton Pratt on 4/23/2015.(AH) (Entered: 04/23/2015) |
| 04/23/2015 | 32 | | Arrest Warrant Returned by US Marshal. Service of Warrant EXECUTED on 4/23/2015 in case as to ALI AL−AWADI. (BAS) (Entered: 04/24/2015) |
| 04/23/2015 | 33 | | MINUTE ORDER for proceedings held before Magistrate Judge Denise K. LaRue: Initial Appearance on Indictment held on 4/23/2015. Defendant ALI AL−AWADI appears in person and by retained counsel Ross Thomas. Appearance for the USA by AUSA Cindy Cho for AUSA Brad Shepard. Charges, Rights and Penalties explained. Parties ordered to meet and confer regarding disclosure of evidence on or before 5/7/15. Defendant waived his right to a detention hearing on 2/5/15 and that waiver stands. Defendant waived formal arraignment. Defendant is remanded to custody of USM. Signed by Magistrate Judge Denise K. LaRue. (BAS) (Entered: 04/24/2015) |
| 05/15/2015 | 34 | | MOTION to Continue by USA as to ALI AL−AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) Modified on 5/18/2015 (CKM). (Entered: 05/15/2015) |
| 05/18/2015 | 35 | | ORDER − granting 34 Motion to Continue as to ALI AL−AWADI (1); The June 15, 2015 trial and the May 27, 2015 final pretrial conference are VACATED. Final Pretrial Conference is reset for 10/7/2015 02:30 PM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt. Jury Trial is reset for 10/26/2015 09:00 AM before Judge Tanya Walton Pratt. The Defendant shall appear at the final pretrial conference. The deadlines for pretrial filings are due in accordance with the order at Dkt. 29. Signed by Judge Tanya Walton Pratt on 5/18/2015.(CKM) (Entered: 05/18/2015) |
| 09/21/2015 | 36 | | MOTION *TO CONTINUE PRE−TRIAL CONFERENCE, JURY TRIAL DATE AND ALL ASSOCIATED PRE−TRIAL FILING DEADLINES* by USA as to ALI AL−AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 09/21/2015) |
| 09/22/2015 | 37 | | ORDER granting United States' 36 Motion as to ALI AL−AWADI (1). Scheduling: Jury Trial reset for 2/22/2016 at 09:00 AM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt., Pretrial Conference reset for 2/3/2016 at 03:00 PM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt., Status Conference set for 10/8/2015 10:00 AM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt. Signed by Judge Tanya Walton Pratt on 9/22/2015.(MAC) (Entered: 09/23/2015) |
| 10/08/2015 | 38 | | MINUTE ENTRY for status conference held before Judge Tanya Walton Pratt on 10/8/2015: Defendant ALI AL−AWADI (1) appeared in person and by retained counsel Ross G. Thomas who apeared telephonically. Appearance for the USA by AUSA Brad Shepard. An accept or reject hearing was scheduled for January 14, 2016 at 10:30 a.m. in Courtroom 344. Case remains set for final |

| | | | |
|---|---|---|---|
| | | | pretrial conference on February 3, 2016 at 3:00 p.m. in Courtroom 344 and trial by jury on February 22, 2016 at 9:00 a.m. in Courtroom 344. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 10/08/2015) |
| 01/06/2016 | 39 | | SCHEDULING ORDER – Due to a conflict of the Court's schedule, the accept or reject hearing set for Thursday, January 14, 2016 at 10:30 a.m. is RESCHEDULED to Thursday, January 14, 2016 at 2:00 p.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana. Please make note of this time change. SO ORDERED. Signed by Judge Tanya Walton Pratt on 1/6/2016. (JLS) (Entered: 01/06/2016) |
| 01/06/2016 | 41 | 16 | SUPERSEDING INDICTMENT as to ALI AL−AWADI (1) count(s) 1s−4s, 5s−8s. Electronic Notice to USM. (JLS) (Entered: 01/07/2016) |
| 01/06/2016 | 44 | | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (JLS) (Entered: 01/07/2016) |
| 01/06/2016 | 48 | | PENALTIES Form as to ALI AL−AWADI (1). (JLS) (Entered: 01/07/2016) |
| 01/07/2016 | 40 | | NOTICE OF ATTORNEY APPEARANCE Kristina M. Korobov appearing for USA. (Korobov, Kristina) (Entered: 01/07/2016) |
| 01/13/2016 | 49 | | MOTION for Extension of Time to File Response/Reply as to 29 Scheduling Order *Pre−Trial Filings* by USA as to ALI AL−AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 01/13/2016) |
| 01/14/2016 | 50 | | ORDER FOR EXTENSION OF PRE−TRIAL FILINGS – This matter is before the Court upon Government's Motion to Extend the Pre−Trial Filings, presently set in this cause, and the Court, being duly advised, now finds the Motion well taken, and that the Motion should be GRANTED for the reasons set forth in Government's Motion. IT IS THEREFORE ORDERED that the Court continue ALI AL−AWADI's Pre−Trial filing deadlines until January 22, 2016. Signed by Judge Tanya Walton Pratt on 1/14/2016.(JLS) (Entered: 01/14/2016) |
| 01/14/2016 | 51 | | Arrest Warrant Returned by US Marshal. Service of Warrant EXECUTED on 1/14/2016 in case as to ALI AL−AWADI (1). Electronic Notice to USM.(TRG) (Entered: 01/14/2016) |
| 01/14/2016 | 52 | | PENALTIES Form executed as to ALI AL−AWADI (1). (TRG) (Entered: 01/14/2016) |
| 01/15/2016 | 53 | | MINUTE ENTRY for initial hearing held before Judge Tanya Walton Pratt on 1/14/2016: Defendant ALI AL−AWADI (1) appeared in person and by retained counsel Ross G. Thomas. Appearance for the USA by AUSA Brad Shepard and Kristina Korobov. Initial Appearance on Indictment held on 1/14/2016. Charges, Rights and Penalties explained. Defendant waived formal arraignment. All plea offers rejected. Case remains set for jury trial on February 22, 2016. Defendant is remanded to custody of USM. Case remains set for trial on February 22, 2016. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 01/15/2016) |
| 01/22/2016 | 54 | | *** WITHDRAWN Per Court's 61 order *** Submission *Governments Expert Disclosure* by USA as to ALI AL−AWADI (1). (Shepard, Bradley) Modified |

| | | | |
|---|---|---|---|
| | | | on 1/25/2016 (JLS). Modified on 1/25/2016 (JLS). (Entered: 01/22/2016) |
| 01/22/2016 | 55 | | MOTION to Withdraw Document 54 Submission *Government's Expert Disclosure* by USA as to ALI AL−AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 56 | | Submission *Governments Expert Disclosure* by USA as to ALI AL−AWADI (1). (Attachments: # 1 Exhibit Bates CV, # 2 Exhibit Melton CV, # 3 Exhibit Woodall CV, # 4 Exhibit Hicks CV, # 5 Exhibit Fishburn CV, # 6 Exhibit Hayes−Anderson CV)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 57 | 19 | Submission *Governments Notice of Intent to Use Evidence* by USA as to ALI AL−AWADI (1). (Attachments: # 1 Exhibit Exh A – Center of Hope Records, # 2 Exhibit Exh B – Marion County Forensics, # 3 Exhibit Exh C – Day Care employees Written statements, # 4 Exhibit Exh D – Defendants Interview transcript)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 58 | 248 | Submission *Governments Second Notice of Intent to* by USA as to ALI AL−AWADI (1). (Attachments: # 1 Exhibit Exh A – Excerpt from Bright Horizons Handbook)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 59 | 259 | Submission *Gov't Notce of intent to Use Evidence under F.R.E. 801 and F.R.E. 803* by USA as to ALI AL−AWADI (1). (Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 60 | | EXHIBIT LIST and WITNESS LIST by USA as to ALI AL−AWADI (1) (Shepard, Bradley) Modified on 1/25/2016 (TRG). (Entered: 01/22/2016) |
| 01/25/2016 | 61 | 262 | ORDER – This matter is before the Court on the United States' Motion to Withdraw, Docket Number 54 and the Court being duly advised, now grants the motion. It is hereby ORDERED that the Clerk of Court show this filing as WITHDRAWN. Signed by Judge Tanya Walton Pratt on 1/25/2016.(JLS) (Entered: 01/25/2016) |
| 02/02/2016 | 62 | | ORDER – No later than February 5, 2016, parties shall confer and file a joint set of proposed jury instructions and verdict forms. Signed by Judge Tanya Walton Pratt on 2/2/2016. (TRG) (Entered: 02/02/2016) |
| 02/03/2016 | 63 | | SUPERSEDING INDICTMENT as to ALI AL−AWADI (1) count(s) 1ss−4ss, 5ss−8ss. Electronic Notice to USM. (JLS) (Entered: 02/03/2016) |
| 02/03/2016 | 66 | | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (JLS) (Entered: 02/03/2016) |
| 02/03/2016 | 70 | | PENALTIES Form as to ALI AL−AWADI (1). (JLS) (Entered: 02/03/2016) |
| 02/03/2016 | 71 | | MINUTE ENTRY for final pretrial held before Judge Tanya Walton Pratt on 2/3/2016: Defendant ALI AL−AWADI (1) appeared in person and by retained counsel Ross G. Thomas. The Defendant executed a Waiver of Initial Appearance, Arraignment and Execution of Warrant on Superseding Indictment and a Charges and Penalties sheet in open court. Discussion held regarding pending motions, anticipated witnesses and exhibits. The Court will issue a separate Entry consistent with Federal Rule of Criminal Procedure 17.1. This matter remains set for trial by jury on 2/22/16 at 9:00 a.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) |

| | | | |
|---|---|---|---|
| | | | (TRG) (Entered: 02/03/2016) |
| 02/03/2016 | 72 | | PENALTIES Form executed in open court as to ALI AL−AWADI (1). (JLS) (Entered: 02/04/2016) |
| 02/04/2016 | 73 | | WAIVER of Initial Appearance, Arraignment, and Execution of Warrant on Superseding Indictment by ALI AL−AWADI (1). (JLS) (Entered: 02/04/2016) |
| 02/05/2016 | 74 | 263 | NOTICE *Supplemental Brief in support* by USA as to ALI AL−AWADI (1) re 57 Submission (Shepard, Bradley) (Entered: 02/05/2016) |
| 02/05/2016 | 75 | | Proposed Jury Instructions by USA as to ALI AL−AWADI (1) (Shepard, Bradley) (Entered: 02/05/2016) |
| 02/05/2016 | 76 | | Submission *Verdict Forms* by USA as to ALI AL−AWADI (1). (Shepard, Bradley) (Entered: 02/05/2016) |
| 02/05/2016 | 77 | | ENTRY FOLLOWING FINAL PRETRIAL CONFERENCE – The trial in this matter is scheduled for five days beginning Monday, February 22, 2016, at 9:00 a.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana. The doors to the Courtroom will be unlocked at 7:30 a.m. Attorneys and the Defendant are ordered to appear by 8:00 a.m. The jury is scheduled to arrive at 8:30 a.m., and panel selection will begin at 9:00 a.m. To accommodate counsel, trial will begin on subsequent days at 9:30 a.m. (See order for instructions and further information). Signed by Judge Tanya Walton Pratt on 2/5/2016. (JLS) (Entered: 02/05/2016) |
| 02/19/2016 | 78 | 271 | EXHIBIT LIST by USA as to ALI AL−AWADI (1) (Shepard, Bradley) (Entered: 02/19/2016) |
| 02/23/2016 | 79 | | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/22/2016 (Day 1): Parties appeared by counsel. Jury seated and sworn. Opening statements presented. Government began presentation of case−in−chief. Evidence and testimony presented. Parties instructed to return at 9:00 a.m., Tuesday, February 23, 2016. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/23/2016) |
| 02/23/2016 | 80 | 277 | Preliminary Jury Instructions as to ALI AL−AWADI read into the record. (TRG) (Entered: 02/23/2016) |
| 02/23/2016 | 81 | | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/23/2016 (Day 2): Parties appeared by counsel. Testimony presented and evidence entered. Jury instructed to return at 8:45 a.m., Wednesday, February 24, 2016. Parties instructed to return at 8:30 a.m., Wednesday, February 24, 2016. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/23/2016) |
| 02/25/2016 | 82 | | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/24/2016 (Day 3): Parties appeared by counsel. Testimony presented and evidence entered. Government rested its case−in−chief. Defendant began presentation of his case−in−chief. Jury instructed to return at 10:00 a.m. on 2/25/16. Parties instructed to return at 9:00 a.m. on 2/25/16. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/25/2016) |
| 02/26/2016 | 83 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/25/2016 (Day 4): Parties appeared by counsel. Closing arguments presented. Final instructions read. Jury retired for deliberation. Jury reached a verdict. Jury found the Defendant GUILTY as charged in Counts 1, 2, 4, 5, 6, 7, and 8 and NOT GUILTY as to Count 3 of the Second Superseding Indictment. Counsel disagreed regarding entering judgment. Government shall file a written statement regarding their position on 2/26/2016. Defendant may file his response no later 2/29/2016. USPO directed to prepare PSR. Sentencing set 6/2/2016 at 10:30 a.m. in Courtroom 344. Defendant remanded to custody of USM. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/26/2016) |
| 02/26/2016 | 84 | | MOTION to Vacate *Counts 5, 6 and 8* by USA as to ALI AL−AWADI (1). (Shepard, Bradley) (Entered: 02/26/2016) |
| 02/26/2016 | 85 | | JURY VERDICT as to ALI AL−AWADI (1) Guilty on Count 1ss−2ss,4ss,5ss−8ssALI AL−AWADI (1) Not Guilty on Count 3ss. **Verdict vacated as to Counts 5,6 and 8 pursuant to Order 92 ** (JLS) Modified on 3/2/2016 (JLS). (Entered: 02/26/2016) |
| 02/26/2016 | 87 | 292 | Final Jury Instructions as to ALI AL−AWADI (1) (JLS) (Entered: 02/26/2016) |
| 02/26/2016 | 88 | 325 | EXHIBITS ADMITTED INTO EVIDENCE DURING TRIAL.(JLS) (Entered: 02/26/2016) |
| 02/26/2016 | 89 | | BAILIFF AND MEAL ENTRY THE HONORABLE TANYA WALTON PRATT, DISTRICT JUDGE – IT IS ORDERED that the jury in this cause be committed to the custody of the bailiffs, Tanesa Genier and Kelly Brewer. The Clerk is ORDERED to provide lunch for fourteen (14) jurors. Signed by Judge Tanya Walton Pratt on 2/26/2016. (JLS) (Entered: 02/26/2016) |
| 02/26/2016 | 90 | | ENTRY ON TRIAL EXHIBITS – The Court now ORDERS the Government and its agents to keep and maintain custody and control over the trial exhibits that, due to their size or nature (containing biological or biohazardous material), cannot easily be maintained by the Clerk's Office. The Government shall substitute photographs of these exhibits to stand in place of the originals, which photographs shall then be maintained by the Clerk's Office. Signed by Judge Tanya Walton Pratt on 2/26/2016. (JLS) (Entered: 02/26/2016) |
| 03/01/2016 | 92 | | ORDER – The Defendant was convicted after a trial by jury of Counts 1, 2, 4, 5, 6, 7, and 8. At the conclusion of the proceedings, the Court took under advisement whether it could impose convictions on Counts 5, 6, and 8 because they were lesser included offenses of Counts 1, 2, and 4. Based upon the Supreme Court's holdings in Rutledge v. United States, 517 U.S. 292 (1996) and Rey v. United States, 481 U.S. 736 (1987), the convictions must be vacated. WHEREFOR, the Court vacates the verdict for Counts 5, 6, and 8, and enters a judgment of conviction for Counts 1, 2, 4, and 7. Signed by Judge Tanya Walton Pratt on 3/1/2016.(JLS) (Entered: 03/01/2016) |
| 04/28/2016 | 94 | | MOTION for Extension of Time to May 5, 2016 *to file objections to PSI* by ALI AL−AWADI (1). (Attachments: # 1 Text of Proposed Order)(Thomas, Ross) (Entered: 04/28/2016) |
| 04/29/2016 | 95 | | ORDER ON DEFENDANT'S MOTION TO EXTEND DEADLINE FOR FILING OBJECTIONS TO PRESENTENCE REPORT – The Defendant, Ali |

| | | | |
|---|---|---|---|
| | | | Al−Awadi, by counsel, Ross G. Thomas, having moved to extend the deadline for noting objections to the Presentence Report, and the Court having considered the same and being duly advised, now GRANTS said Motion and extends the deadline to May 5, 2016. Copy to U.S. Probation per distribution list. Signed by Judge Tanya Walton Pratt on 04/29/2016.(JLS) (Entered: 05/02/2016) |
| 05/05/2016 | 97 | | SCHEDULING ORDER – This matter is set for sentencing on June 2, 2016. The hearing will now be held at 8:30 a.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana. Please make note of the time change. Signed by Judge Tanya Walton Pratt on 5/5/2016. Electronic Notice to USPO.(JLS) (Entered: 05/05/2016) |
| 05/24/2016 | 101 | | ORDER directing the Clerk of the Court to docket the letter regarding sentencing as to ALI AL−AWADI (1). Signed by Judge Tanya Walton Pratt on 5/24/2016. (CBU) (Entered: 05/25/2016) |
| 06/02/2016 | 104 | | MINUTE ENTRY for sentencing held before Judge Tanya Walton Pratt on 6/2/2016: Defendant ALI AL−AWADI (1) appeared in person and by retained counsel Ross G. Thomas. Appearance for the USA by AUSA Brad Shepard and AUSA Kristina Korobov. USPO represented by Michelle Fitzgerald. Sentence imposed. Judgment forthcoming. Defendant is remanded to custody of USM. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 06/02/2016) |
| 06/13/2016 | 105 | 327 | JUDGMENT as to ALI AL−AWADI (1). Count(s) 1, 1s−4s, 5s−8s, SUPERSEDED; Defendant was Found Guilty of Counts 1,2,4,7. IMPRISONMENT: 324 Months Per Count, concurrent. SUPERVISED RELEASE: 15 Years Per Count, Concurrent. S.A. Fee: $400.00. RESTITUTION: $9,000.; Count(s) 3ss, NOT GUILTY; Count(s) 5ss−6ss, 8ss, DISMISSED. Signed by Judge Tanya Walton Pratt on 6/13/2016. (JLS) (Entered: 06/13/2016) |
| 06/22/2016 | 107 | 334 | NOTICE OF APPEAL by ALI AL−AWADI (1) re 105 Judgment. (Filing fee $505, receipt number 0756−3939717) (Thomas, Ross) (Entered: 06/22/2016) |
| 06/22/2016 | 108 | 335 | DOCKETING STATEMENT as to ALI AL−AWADI (1) re 107 Notice of Appeal (Thomas, Ross) (Entered: 06/22/2016) |
| 06/23/2016 | 109 | | *** SEE DKT. NUMBER 139 FOR REDACTED TRANSCRIPT *** PARTIAL TRANSCRIPT (Excerpt) of Jury Trial as to ALI AL−AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (420 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916−8209). Please review Local Rule 80−2 for more information on redaction procedures. Redaction Statement due 7/14/2016. Release of Transcript Restriction set for 9/21/2016. (Moxley, David) Released in error on 9/21/2016 (SWM). Modified on 10/17/2016 (SWM). Modified on 11/18/2016 (SWM). (Entered: 06/23/2016) |
| 06/23/2016 | 110 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of Excerpts of Jury Trial held before Judge Tanya Walton Pratt on 02/22/2016 in case as to ALI AL−AWADI (1) (Moxley, David) (Entered: 06/23/2016) |
| 06/24/2016 | 111 | | PARTIES' SHORT RECORD as to ALI AL−AWADI (1) re 107 Notice of Appeal **– Instructions for Attorneys and Designation of Record** |

| | | | |
|---|---|---|---|
| | | | **information attached.** (A paper copy of the Short Record was sent on 6/24/2016 to the defendant, via US Mail, at *Grayson County Detention Center*.) **Docket Sheet containing sealed entries emailed to counsel.** (LBT) (Entered: 06/24/2016) |
| 06/24/2016 | 112 | | Transmission of Notice of Appeal and Docket Sheet as to ALI AL−AWADI (1) to US Court of Appeals re 107 Notice of Appeal. **– for Court of Appeals Use Only.** (LBT) (Entered: 06/24/2016) |
| 06/24/2016 | 113 | | USCA Case Number 16−2643 as to ALI AL−AWADI (1) for 107 Notice of Appeal filed by ALI AL−AWADI. (MAG) (Entered: 06/24/2016) |
| 06/30/2016 | 114 | | NOTICE *OF INTENT TO REDACT TRANSCRIPT AND REQUEST FOR EXTENSION OF TIME TO FILE* by USA as to ALI AL−AWADI (1) re 109 Transcript (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) Modified on 7/1/2016 (TRG). (Entered: 06/30/2016) |
| 07/01/2016 | 115 | | ORDER − granting 114 Motion as to ALI AL−AWADI (1); The Government shall have up to and including August 15, 2016, to file a redaction statement. Signed by Judge Tanya Walton Pratt on 7/1/2016.(CKM) (Entered: 07/01/2016) |
| 07/08/2016 | 116 | 337 | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by ALI AL−AWADI (1) for proceedings held on 2/22/2016, 6/2/2016 before Judge Tonya Walton Pratt, re 107 Notice of Appeal Transcript due by 7/8/2016. (Thomas, Ross) Modified on 7/11/2016 to link to Notice of Appeal (MAG). (Entered: 07/08/2016) |
| 07/22/2016 | 117 | | *** SEE DKT. NUMBER 141 FOR REDACTED TRANSCRIPT *** PARTIAL TRANSCRIPT (Excerpt) of Testimony of Miosotis Georgiana Rodriguez as to ALI AL−AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (36 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916−8209). Please review Local Rule 80−2 for more information on redaction procedures. Redaction Statement due 8/12/2016. Release of Transcript Restriction set for 10/20/2016. (Moxley, David) Modified on 11/18/2016 (SWM). (Entered: 07/22/2016) |
| 07/22/2016 | 118 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of Excerpt – Testimony of Miosotis Georgiana Rodrigrez held before Judge Tanya Walton Pratt on 02/22/2016 in case as to ALI AL−AWADI (1) (Moxley, David) (Entered: 07/22/2016) |
| 08/01/2016 | 119 | | *** SEE DKT. NUMBER 143 FOR REDACTED TRANSCRIPT *** TRANSCRIPT of Jury Trial – Vol. I as to ALI AL−AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (141 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916−8209). Please review Local Rule 80−2 for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) Modified on 11/18/2016 (SWM). (Entered: 08/01/2016) |
| 08/01/2016 | 120 | | *** SEE DKT. NUMBER 144 FOR REDACTED TRANSCRIPT *** TRANSCRIPT of Jury Trial – Vol. II as to ALI AL−AWADI (1) held on 02/23/2016 before Judge Tanya Walton Pratt. (190 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916−8209). Please |

| | | | |
|---|---|---|---|
| | | | review Local Rule 80–2 for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) Modified on 11/18/2016 (SWM). (Entered: 08/01/2016) |
| 08/01/2016 | 121 | | *** SEE DKT. NUMBER 145 FOR REDACTED TRANSCRIPT *** TRANSCRIPT of Jury Trial – Vol. III as to ALI AL–AWADI (1) held on 02/24/2016 before Judge Tanya Walton Pratt. (345 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). Please review Local Rule 80–2 for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) Modified on 11/18/2016 (SWM). (Entered: 08/01/2016) |
| 08/01/2016 | 122 | | *** SEE DKT. NUMBER 146 FOR REDACTED TRANSCRIPT *** TRANSCRIPT of Jury Trial – Vol. IV as to ALI AL–AWADI (1) held on 02/25/2016 before Judge Tanya Walton Pratt. (100 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). Please review Local Rule 80–2 for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) Modified on 11/18/2016 (SWM). (Entered: 08/01/2016) |
| 08/01/2016 | 123 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of Jury Trial held before Judge Tanya Walton Pratt on 02/22/2016 – 02/25/2016 in case as to ALI AL–AWADI (1) (Moxley, David) (Entered: 08/01/2016) |
| 08/02/2016 | 124 | | TRANSCRIPT of Sentencing as to ALI AL–AWADI (1) held on 06/02/2016 before Judge Tanya Walton Pratt. (59 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). Please review Local Rule 80–2 for more information on redaction procedures. Redaction Statement due 8/23/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) (Entered: 08/02/2016) |
| 08/02/2016 | 125 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of Sentencing held before Judge Tanya Walton Pratt on 06/02/2016 in case as to ALI AL–AWADI (1) (Moxley, David) (Entered: 08/02/2016) |
| 08/16/2016 | 126 | | MOTION for Extension of Time to File Redaction Statement to August 23, 2016 re 109 Transcript by USA as to ALI AL–AWADI (1). (Attachments: # 1 Text of Proposed Order) Motions referred to Debra McVicker Lynch.(Shepard, Bradley) (Entered: 08/16/2016) |
| 08/18/2016 | 127 | | ORDER granting 126 Motion for Extension of Time re 121 Transcript as to ALI AL–AWADI (1) Redaction Statement due 8/23/2016. Signed by Judge Tanya Walton Pratt on 8/18/2016.(JLS) (Entered: 08/18/2016) |
| 08/23/2016 | 128 | | MOTION for Extension of Time to October 7, 2016 TO FILE REDACTION STATEMENT by USA as to ALI AL–AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 08/23/2016) |
| 08/24/2016 | 129 | | ORDER – This matter comes before the Court on the Government's motion for extension of time to and including October 7, 2016, to file a Redaction Statement. Upon consideration of the same, and for good cause shown, the Court grants the Government=s request. IT IS THEREFORE ORDERED that |

| | | | |
|---|---|---|---|
| | | | the Government shall have up to and including October 7, 2016, to file a redaction statement. Signed by Judge Tanya Walton Pratt on 8/24/2016.(JLS) (Entered: 08/25/2016) |
| 09/15/2016 | 130 | | TRANSCRIPT of Initial Appearance and Final Pretrial Conference as to ALI AL–AWADI (1) held on 02/03/2016 before Judge Tanya Walton Pratt. (46 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). Please review Local Rule 80–2 for more information on redaction procedures. Redaction Statement due 10/6/2016. Release of Transcript Restriction set for 12/14/2016. (Moxley, David) (Entered: 09/15/2016) |
| 09/15/2016 | 131 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of Initial Appearance and Final Pretrial Conference held before Judge Tanya Walton Pratt on 02/03/2016 in case as to ALI AL–AWADI (1) (Moxley, David) (Entered: 09/15/2016) |
| 09/16/2016 | 132 | | **(Case Participants Document)** REDACTION STATEMENT in case as to ALI AL–AWADI (1) re 130 Transcript filed by attorney Bradley Paul Shepard (Shepard, Bradley) (Entered: 09/16/2016) |
| 09/26/2016 | 133 | | NOTICE OF ATTORNEY APPEARANCE: Charles C. Hayes appearing for ALI AL–AWADI (1) (Retained). (Hayes, Charles) (Entered: 09/26/2016) |
| 09/26/2016 | 134 | 338 | DESIGNATION OF RECORD ON APPEAL by ALI AL–AWADI (1) re 107 Notice of Appeal (Attachments: # 1 Exhibit Exhibit A –Highlighted Docket)(Hayes, Charles) (Entered: 09/26/2016) |
| 10/03/2016 | 135 | | **(Case Participants Document)** REDACTION STATEMENT in case as to ALI AL–AWADI (1) re 120 Transcript, 124 Transcript, 119 Transcript, 122 Transcript, 117 Transcript, 121 Transcript, 109 Transcript filed by attorney Bradley Paul Shepard (Shepard, Bradley) (Entered: 10/03/2016) |
| 10/24/2016 | 136 | | ORDER as to ALI AL–AWADI (1) re 135 Redaction Statement – Transcript. On October 3, 2016, the Government filed its Redaction Statement (Dkt. 135) for the transcripts docketed in the matter. Because of the nature of the matter tried, the names of eight minor children are mentioned throughout the trial record. The Government's redaction statement fails to note numerous instances of names of minors. The Court requires that the minors' names be redacted to both the first and last initial only. The word "minor" need not be included. The Government is ordered to file an amended redaction statement which includes all minor names, and any other items that should be redacted. The amended redaction statement is due November 7, 2016. Any questions should be directed to the Courtroom Deputy. Signed by Judge Tanya Walton Pratt on 10/24/2016. (JLS) (Entered: 10/25/2016) |
| 10/25/2016 | 137 | | NOTICE OF ATTORNEY APPEARANCE: Jane Ruemmele appearing for ALI AL–AWADI (1) (Retained). (Ruemmele, Jane) (Entered: 10/25/2016) |
| 10/31/2016 | 138 | | **(Case Participants Document)** REDACTION STATEMENT in case as to ALI AL–AWADI (1) re 120 Transcript, 124 Transcript, 119 Transcript, 122 Transcript, 117 Transcript, 121 Transcript, 109 Transcript filed by attorney Bradley Paul Shepard (Shepard, Bradley) (Entered: 10/31/2016) |
| 11/17/2016 | 139 | | REDACTED Version of previously filed 109 TRANSCRIPT of Excerpts of Jury Trial as to ALI AL–AWADI (1) held on 02/22/2106 – 02/25/2016 before Judge Tanya Walton Pratt. (420 pages.) Court Reporter/Transcriber: David |

| | | | |
|---|---|---|---|
| | | | Moxley (Telephone: (317) 916–8209). (Moxley, David) Released on 11/18/2016 (SWM). (Entered: 11/17/2016) |
| 11/17/2016 | 140 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of REDACTED VERSION of Excerpts of Jury Trial held before Judge Tanya Walton Pratt on 02/22/2016 – 02/25/2016 in case as to ALI AL–AWADI (1) (Moxley, David) (Entered: 11/17/2016) |
| 11/17/2016 | 141 | | REDACTED Version of previously filed 117 TRANSCRIPT of Excerpt of Jury Trial (Testimony of Miosotis Georgiana) as to ALI AL–AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (36 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). (Moxley, David) Released on 11/18/2016 (SWM). (Entered: 11/17/2016) |
| 11/17/2016 | 142 | | NOTICE of FILING of OFFICIAL TRANSCRIPT of REDACTED VERSION of Excerpt of Jury Trial (Testimony of Miosotis Georgiana) held before Judge Tanya Walton Pratt on 02/22/2016 in case as to ALI AL–AWADI (1) (Moxley, David) (Entered: 11/17/2016) |
| 11/17/2016 | 143 | | REDACTED Version of previously filed 119 TRANSCRIPT of Jury Trial (Vol. I) as to ALI AL–AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (141 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). (Moxley, David) Released on 11/18/2016 (SWM). (Entered: 11/17/2016) |
| 11/17/2016 | 144 | | REDACTED Version of previously filed 120 TRANSCRIPT of Jury Trial (Vol. II) as to ALI AL–AWADI (1) held on 02/23/2016 before Judge Tanya Walton Pratt. (190 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). (Moxley, David) Released on 11/18/2016 (SWM). (Entered: 11/17/2016) |
| 11/17/2016 | 145 | | REDACTED Version of previously filed 121 TRANSCRIPT of Jury Trial (Vol. III) as to ALI AL–AWADI (1) held on 02/24/2016 before Judge Tanya Walton Pratt. (345 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). (Moxley, David) Released on 11/18/2016 (SWM). (Entered: 11/17/2016) |
| 11/17/2016 | 146 | | REDACTED Version of previously filed 122 TRANSCRIPT of Jury Trial (Vol. IV) as to ALI AL–AWADI (1) held on 02/25/2016 before Judge Tanya Walton Pratt. (100 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916–8209). (Moxley, David) Released on 11/18/2016 (SWM). (Entered: 11/17/2016) |
| 11/17/2016 | 147 | | NOTICE of FILING of OFFICIAL TRANSCRIPT (REDACTED VERSION) of Jury Trial held before Judge Tanya Walton Pratt on 02/22/2016 – 02/25/2016 in case as to ALI AL–AWADI (1) (Moxley, David) (Entered: 11/17/2016) |

**Case #: 1:15–cr–00072–TWP–DML–1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2016 JAN -6 PM 4: 13

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Cause No. 1:15-cr-00072-TWP-DML |
| ALI AL-AWADI, | ) |
| Defendant. | ) |

SUPERSEDING INDICTMENT

The Grand Jury charges that:

Counts One – Four
Production of Child Pornography
18 U.S.C. § 2251(a)

1.     On or about August 21, 2014, in Marion County Indiana, within the Southern

District of Indiana, ALI AL-AWADI, defendant herein, did knowingly employ and use Victim

One, a minor, to engage in sexually explicit conduct, namely the lewd and lascivious exhibition

of the genitals, for the purpose of producing visual depictions of such conduct, each visual

depiction being a separate count as set forth below.  Further, the defendant knew, or had reason

to know, said visual depictions would be transported or transmitted using any means or facility

of interstate or foreign commerce, or were produced using materials that had been mailed,

shipped, or transported in interstate or foreign commerce, including a computer.

| COUNT | File Name |
|---|---|
| 1 | imgcache.0_embedded_330.jpg |
| 2 | imgcache.0_embedded_329.jpg |
| 3 | imgcache.0_embedded_332.jpg |

| 4 | imgcache.0_embedded_331.jpg |
|---|---|

2.      All in violation of Title 18, United States Code, Section 2251(a).

Counts Five –Eight
Attempted Production of Child Pornography
18 U.S.C. § 2251(e)

3.      On or about August 21, 2014, in Marion County Indiana, within the Southern District of Indiana, ALI AL-AWADI, defendant herein, did knowingly attempt to employ and use Victim One, a minor, to engage in sexually explicit conduct, namely the lewd and lascivious exhibition of the genitals, for the purpose of producing visual depictions of such conduct, each visual depiction being a separate count as set forth below.  Further, the defendant knew, or had reason to know, said visual depictions would be transported or transmitted using any means or facility of interstate or foreign commerce, or were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce, including a computer.  And in furtherance of these counts, did perpetrate the following substantial steps:  utilization of a cellular telephone to create the following images.

| COUNT | File Name |
|---|---|
| 5 | imgcache.0_embedded_330.jpg |
| 6 | imgcache.0_embedded_329.jpg |
| 7 | imgcache.0_embedded_332.jpg |
| 8 | imgcache.0_embedded_331.jpg |

4.      All in violation of Title 18, United States Code, Section 2251(e).

**FORFEITURE ALLEGATIONS**

The allegations in this Indictment are re-alleged as if fully set forth here, for the purpose of alleging forfeiture, pursuant to Title 18, United States Code, Section 2253.

In accordance with 18 U.S.C. § 2253 and Rules 7(c)(2) and 32.2(a) of the Federal Rules of Criminal Procedure and premised upon the conviction of the defendant of violations of Chapter 110, Title 18, United States Code, Sections 2251 and 2252 as set forth in this Indictment, the defendant herein, shall forfeit to the United States any property, real or personal, used or intended to be used to commit or to promote the commission of any of the offenses set forth in the Indictment of which he is convicted.

A TRUE BILL:

FOREPERSON

Bradley P. Shepard
Assistant United States Attorney

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1 1:15-cr-00072-TWP-DML |
| | ) |
| ALI AL-AWADI, | ) |
| | ) |
| Defendant. | ) |

**Government's Notice of Intent to Use Evidence
under F.R.E. 414 and 404**

The United States of America, by counsel, Josh J. Minkler, United States Attorney for the

Southern District of Indiana, Bradley P. Shepard and Kristina Korobov, Assistant United States

Attorneys, hereby files its notice of intent to introduce evidence pursuant to Federal Rules of

Evidence 414 and 404(b).

**Proffered Evidence**

On or about August 21, 2014, Victim One was taken to the Center of Hope at St.

Vincent's Hospital by her parents, MR and JG, after Victim One disclosed that "Mr. Ali" had

touched her vagina and she was experiencing pain as a result. During the examination at St.

Vincent, Victim One and MR were seen by Angela Bates, RN.  According to her report:

> [MR] reports [Victim One] was picked up from Bright Horizons daycare
> at approximately 1730. [MR] states Victim One told [JG] that 'she hurt down
> there.'  [MR] states [JG] gave [Victim One] some diaper rash cream and told her
> to put it down there.  [MR] states Justo told her [Victim One] complained of pain
> to her 'Tito."  [MR] states she asked [Victim One] "why does it hurt down there?"
> [MR] states "[Victim One] started crying and ran to her room saying No, No,
> No."  [MR] reports she went and picked up [Victim One] and asked "why does it
> hurt down there?" again.  [MR] states this time "[Victim One] just pee'd all over
> me.  She told me Mr. Ali touched me with his finger down there and it hurt."

1

> [MR] states she asked [Victim One] "Why didn't you tell me right away?" [MR] states [Victim One] told her "he said not to tell anybody."

Center of Hope Records of Victim One, redacted attached as Exhibit A.

A physical exam was conducted, finding many things consistent with the reported incident. These included (1) swelling, erythema, and redness noted to Victim One's hymen, and (2) redness of Victim One's peri hymenal and vestibular areas. St. Vincent's also recovered forensic samples from Victim One's "pink and black panties." *Id*. Scientists from the Marion County Forensic Services Agency detected male DNA in the crotch of the pink and black underwear. Indianapolis Marion County Forensic Services Agency, attached as Exhibit B. A Y-STR profile was generated from the male DNA sample. *Id*. The Defendant's DNA profile was compared to the unknown male DNA in the crotch of Victim 1's underwear, using Y-Marker analysis, and the analyst determined that defendant's Y-STR profile is consistent with the profile recovered. The profile developed would be present in 1 of every 8,621 individuals to a 95% certainty. *Id*. The defendant and all of his male relatives cannot be excluded as contributors to the Male DNA sample recovered from Victim One's underwear.[1] *Id*.

The Indianapolis Metropolitan Police Department (IMPD) launched an investigation the following day which included interviewing members of the day care including Tyria Graham, Chiana Harris, and Heidi Conces. All three individuals provided written statements regarding their recollections of Victim One's disclosure of the molesting, their observations of Victim One, and the Defendant's reactions to Victim One's disclosures, including those disclosures that Victim One made in the Defendant's presence. Bright Horizon records, attached as Exhibit C. These statements were also memorialized in the business records of the day care.

---

[1] It should, however, be noted that none of the Defendant's relatives, male or female, are alleged to have had *any* contact with Victim One, let alone touched her underwear.

The Defendant was interviewed in a recorded interview.  Transcript of defendant's interview attached as Exhibit D.  He also provided a written statement to his daycare employer.  Bright Horizon records. The majority of these statements concern what occurred on August 21, 2014.  The Defendant initially made statements of general denial.  Then, the Defendant said that his arm had been between Victim One's legs when *she* was grabbing on to *him*.  Next, the Defendant asserted that perhaps his watch had "pinched" Victim One's vagina (through her clothing).  Finally in his interview with Det. Eli McAlister, the Defendant claimed that Victim One was sexually experimenting with his arm, and that if detectives found any of his DNA on her underpants, it would be there because he had tickled her stomach and put his finger at the top of her underwear to show Victim One that her pants were too big.

Finally, there was a follow-up/confirmation medical exam by Dr. Ralph Hicks.  It is believed that Dr. Hicks would testify that the types of injuries sustained by Victim One are consistent with the contact described by Victim One and inconsistent with the contact described by the Defendant.

After all of the above-listed evidence was obtained and analyzed, IMPD Cyber Crimes conducted a forensic analysis of the Defendant's cell phone.  During this examination, analyst Det. Grant Melton discovered evidence that showed that, during the time of the molesting described by Victim One on August 21, 2014, the Defendant's cell phone camera created four "root paths."  IMPD also recovered four deleted images which were a lascivious exhibition of Victim One's genitals and/or pubic area from the image cache on Defendant's phone.  In these images are what appears to be the black and pink underwear recovered from the sexual assault

kit, a pair of jeans worn by Victim One on August 21, 2014, and a blanket belonging to Victim One, retrieved from the day care[2].

## Law and Argument

The evidence of the molest is direct evidence of the crimes charged and therefore admissible without resort to Fed R. Crim. P. 414 or 404(b). In the alternative, the evidence is allowed under Rule 414 as it is relevant and not more prejudicial than probative. Finally the proffered evidence is not offered for propensity purposes, but rather to show the intent of the defendant, the identity of the person who created the charged images.

### *Charges*

Defendant is charged with four counts of production of child pornography and four counts of attempted production of child pornography in violation of 18 U.S.C. § 2251(a)&(e). Title 18 U.S.C. § 2252(a) has the following elements:

1.　At the time Victim One was under the age of eighteen years; and

2.　The defendant, for the purpose of producing a visual depiction of such conduct employed [used] persuaded] coerced] Victim One to take part in sexually explicit conduct;

3.　The visual depiction was produced using materials that had been mailed, shipped, transported across state lines or in foreign commerce.

Seventh Cir. Pattern Instruction 18 U.S.C. §  2251(a).

The attempt counts add the requirement of a substantial step.

Sexually explicit conduct includes actual or simulated

(1)　sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(2)　bestiality;

(3)　masturbation;

---

2 The Government will make the images available upon request for the Court's review in deciding this motion.

(4)      sadistic or masochistic abuse; or

(5)      lascivious exhibition of the genitals or pubic area of any person.

Seventh Circuit Pattern Instruction 18 U.S.C. § 2256(2)(a).

"A lascivious display is one that draws attention to the genitals or pubic area of the
subject 'in order to excite lustfulness or sexual stimulation in the viewer.'" *United States v.
Russell*, 662 F.3d 831, 864 (7th Cir. 2011).

### *The molest is direct evidence of a matter the Government must prove*

Rule 402 of the Federal Rules of Evidence states that "all relevant evidence is
admissible." Fed. R. Evid. 402. Evidence is relevant if it has the "tendency to make the
existence of any fact that is of consequence to the determination of the action more probable or
less probable." Fed. R. Evid. 401. Relevant evidence should be admitted unless its "probative
value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.
Foundation or contextual evidence may be admissible as relevant evidence, and not "other acts"
evidence under Rule 404(b) when it constitutes direct evidence of the crimes charged. *See
United States v. Vargas*, 689 F.3d 867, 874 (7th Cir. 2012). Evidence is direct when it "tend[s]
to prove the elements of the offense . . . actually charged." *Id*; *see, e.g.*, *United States v. Miller*,
673 F.3d 688 (7th Cir. 2012) (holding that evidence of defendant's prior possession of a gun was
admissible as direct evidence that the defendant possessed the same gun on the date charged);
*United States v. McKibbins*, 656 F.3d 707 (7th Cir. 2011) (determining that it was not an abuse
of discretion for the district court to admit child pornography and profile pictures as direct
evidence of an obstruction charge).

The pattern jury instructions make clear that the Government must prove that "The
defendant, for the purpose of producing a visual depiction of such conduct employed [used]
[persuaded] [coerced] Victim One to take part in sexually explicit conduct." Seventh Cir. Pattern

Instruction 18 U.S.C. § 2251(a). As a result, the Government must prove that the defendant employed, used, persuaded, or coerced Victim One to take part in sexually explicit conduct. Evidence from Victim One and others proves that the Defendant so employed, used, persuaded, or coerced Victim One to engage in sexually explicit conduct.

   a.  Statements made by Victim One about the defendant touching her vagina will be used to prove this element.

   b.  Testimony from Tyria Graham about the Defendant's responses when Victim One stated, in the Defendant's presence, that the defendant had touched her vagina, will be used to prove this element.

   c.  Testimony from medical personnel about the nature of Victim One's vaginal injuries will be used to prove the sexually explicit conduct.

The defendant's intent when creating the images, i.e. that they were created in order to excite lustfulness or sexual stimulation in the viewer (the defendant), is also something the Government must prove in its case in chief. The evidence of the molest proves not only that the Defendant is sexually attracted to children, but specifically to Victim One. As a result, all evidence is direct evidence that the defendant produced the images in order to excite lustfulness and sexual stimulation as he viewed the images, a visual reminder of his molest.[3]

### Evidence Admissible as 414 Evidence

Rule 414 of the Federal Rules of Evidence governs the admission of evidence of similar crimes in child molestation cases, and reads in pertinent part:

---

[3] Although *Gomez* clarifies how the district court should analyze Rule 404(b) evidence, it remains intact that Rule 404(b) does not apply to direct evidence of the crime charged. *United States v. Ferrell*, 2015 WL 6774213, *8 (7th Cir. 2015).

In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

Fed. R. Evid. 414. Thus, in order to be admissible pursuant to Rule 414, the defendant must be accused of child molestation, *and* the evidence offered must be evidence that defendant committed a prior or different offense of child molestation.

An "offense of child molestation" is defined, in pertinent part as, *inter alia*, as a crime under federal or state law that involved conduct proscribed by Chapter 110 of Title 18 the U.S. Code. *Id.* Child pornography and child sexual exploitation offenses clearly fall within this definition, as they are part of Chapter 110. *See* 18 U.S.C. §§ 2251(a), 2252(a)(1), 2252(a)(4)(B), and 2260A. Attempts are also included. Fed. R. Evid. 414(d)(2)(f).

An offense of child molestation also includes an offense where contact occurs "between any part of the defendant's body-or object-and a child's genitals or anus." Fed. R. Evidence 414(d)(2)(D). The proffered evidence falls within this category.

Rule 403 requires the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403. "Unfair prejudice ... means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403, *cited approvingly in Old Chief v. United States*, 519 U.S. 172, 184−85 (1997). Rule 414 constitutes an exception to the rule that evidence of prior bad acts is inadmissible to show a defendant's propensity to commit the offense charged. *See United States v. Rogers*, 587 F.3d 816, 822-23 (7th Cir. 2009) (discussing analogous Rule 413). Rules 413 and 414 effectively override the propensity bar in rule 404(a)(1) in sexual assault cases. *United States v. Stokes*, 726 F.3d 880,896 (7th Cir. 2013).

The evidence of the molest of Victim One by the Defendant is relevant, as it proves motivation and intent on the part of the Defendant in creating the images in question. It is the Government's theory of the case that the defendant was attracted to Victim One, molested her, and created the images to remember the incident. Therefore, the images were created to excite the lustfulness and sexual stimulation of the viewer, namely the defendant.

The evidence of the molest of Victim One by the Defendant is relevant, as it proves the identity of the offender. The Government always must prove who committed the charged crime. The evidence of the molestation of Victim One by the Defendant is also relevant to prove it was the defendant who created the charged images and that it is the body of Victim One captured in the images.

The only other analysis is whether the probative value of the proffered evidence – evidence showing that the Defendant touched the vagina of Victim One on or about August 22, 2014 – is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. The evidence of the sexual touching of Victim One by the Defendant established that the defendant had the opportunity to commit the offense in question, that he was in a physical position to commit the offenses in question, and that he had the motive to commit the offenses in question. Establishing that the defendant put his hand into the underwear of Victim One on or about August 22, 2014 helps the Government to prove the charged offense. There is no danger of unfair prejudice. *United States v. Russell,* 662 F.3d 831, 847–48 (7th Cir.2011) (prior instances of inappropriate touching, by establishing defendant's sexual interest in his minor daughter, were probative of his motive to induce his daughter to create sexually explicit photographs in violation of section 2251(a)); *United States v. Hawpetoss*, 478 F.3d 82, 824-827

(7th Cir. 2007)(admitting evidence under rule 403 of molestation of two uncharged minor victims); *United States v. Roux*, 715 F.3d 1019, 1024 (7th Cir. 2013).

As a result, the evidence is admissible pursuant to Fed. Rule Evid. 414.

### *404(b)*

If this Court were to find that this evidence is subject to Fed. R. Crim. P. 404(b), there are multiple non-propensity uses for the evidence. In *United States v. Gomez*, the Seventh Circuit adopted "a more straightforward rules-based approach," which is summarized as follows:

> [T]o overcome an opponent's objection to the introduction of other-act evidence, the proponent of the evidence must first establish that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way. *See* Fed.R.Evid. 401, 402, 404(b). Other-act evidence need not be excluded whenever a propensity inference can be drawn. But its relevance to "another purpose" must be established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case. If the proponent can make this initial showing, the district court must in every case assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great. The court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.

*Gomez,* 763 F.3d 845, 853, 860 (7th Cir. 2014).

### *Motive/Intent*

The first non-propensity use offered by the Government is the defendant's motive/intent for creating the images.  As stated above, because the Superseding Indictment charges that the images were lascivious exhibitions of Victim One's genitals, it must prove that the images were created "to excite lustfulness or sexual stimulation in the viewer."  It is the Government's theory

of the case that the defendant was attracted to Victim One, molested her, and created the images to remember the incident.  Therefore, the images were created to excite the lustfulness and sexual stimulation of the viewer, namely the defendant.  The evidence of the molest is direct evidence as to why the charged images would excite such passions in the defendant.

This is evidence of motive/intent is derived from a propensity-free chain of reasoning. There is no attempted use of the evidence to say that because the defendant molested another child, he is more likely to have created child pornography of Victim One (although such evidence would be proper under Rule 414).  Rather this is evidence of a sexual attraction to Victim One, the minor depicted in the charged images, and it is evidence of why he created the specific images charged.  As a result the chain from the proffered evidence to the proffered use has no propensity use in it and is therefore proper.

The final analysis is under Rule 403, is whether the probative value of the molest evidence substantially outweighed by the danger of unfair prejudice.  "Unfair prejudice ... means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one."  Advisory Committee's Notes on Fed. R. Evid. 403, *cited approvingly in Old Chief v. United States*, 519 U.S. 172, 184−85 (1997).  The Seventh Circuit has repeatedly held that evidence of a prior molest is not more prejudicial than probative. *United States v. Russell,* 662 F.3d 831, 847–48 (7th Cir.2011) (prior instances of inappropriate touching, by establishing defendant's sexual interest in his minor daughter, were probative of his motive to induce his daughter to create sexually explicit photographs in violation of section 2251(a)); *United States v. Hawpetoss*, 478 F.3d 82, 824-827 (7th Cir. 2007)(admitting evidence under rule 403 of molestation of two uncharged minor victims); *United States v. Roux*, 715 F.3d 1019, 1024 (7th Cir. 2013).

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 29 of 349 PageID #:
3393
Case 1:15-cr-00072-TWP-DML   Document 57   Filed 01/22/16   Page 11 of 12   PageID #: 60

As a result, the evidence is admissible to prove identity.

### *Identity*

The Government also proffers that the evidence is admissible to prove identity. The Government always must prove who it was that committed the charged crime. No one other than Victim One is depicted in the charged images.[4] The evidence of the molest is also relevant to prove it was the defendant who took the pictures.

Specifically, the identification of the Defendant by Victim One as the molester; the timing of the identification occurring during the time in which the Government theorizes the images were created; and the presence of a Y-STR profile consistent with the defendant in material recovered from the inside of the underwear worn by the defendant as depicted in the images all go to establish it was the defendant who created the images. Further, that chain of reasoning does not contain a prohibited hidden propensity reason.

Finally, rule 403, does not preclude the admissions for the same reasons as above. Therefore the evidence is admissible to prove identity.

WHEREFORE the Government requests this Court issue a ruling that the evidence of the molest of Victim One by the defendant is admissible in the Government's case in chief.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:    s/ Bradley P. Shepard
Bradley P. Shepard
Assistant United States Attorney

---

4  In two of the images, what appears to be parts of an adult male hand are depicted holding open Victim One's underwear.

s/ Kristina M. Korobov
Kristina M. Korobov
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2016, a copy of the foregoing Government's Notice

of Intent to Use Evidence under F.R.E. 414 and 404 was filed electronically.  Notice of this filing

will be sent to the parties by operation of the Court's electronic filing system. Parties may access

this filing through the Court's system.

Date:      January 22, 2016                    Respectfully submitted,

                                               JOSH J. MINKLER
                                               United States Attorney


                              By:     s:/  Bradley P. Shepard
                                      Bradley P. Shepard
                                      Assistant United States Attorney
                                      10 West Market Street, Suite 2100
                                      Indianapolis, IN  46204-3048
                                      Telephone:  317-226-6333
                                      Fax:  317-229-6125
                                      Email:  bradley.shepard@usdoj.gov

Aug. 22. 2014  9:21AM                                                                 No. 1450   P. 2

  St.Vincent HEALTH

**ST.VINCENT HOSPITAL** / St.Vincent Health
**INDIANAPOLIS, INDIANA**
**PATIENT FACESHEET**

ET  **GUEVARA-RODRIGU ,MIA MARI   08/21/14**

| REG NO | ADM/REG DT | ADM/REG/TM | BIRTH-DATE | AGE | SEX | MS | RACE | FC | SVC | MED REC NO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1088776123 | 08/21/14 | 20:15 | | 4 | F | S | C | | PER | 000202-64-17 |

| PREREG | PRESENT | REVISE | RM/BED | RM RS | P/T | PRIO | TV | PHONE | INFO R | NTFY? | PREFERRED LANGUAGE | REL/CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | REGKXF | | | E | | | | Y | | 12 | XXX |

| RESP CD | VAL | ADV DIRECTV | SPEC NEEDS | ISOLATION IND | DIAB | LAST VISIT DATE | PREV DSCH DATE | RECUR DEPT | SPEC IND |
|---|---|---|---|---|---|---|---|---|---|
| | | | | N | | 08/21/14 | 10/08/09 | EMR | |

PATIENT INFORMATION                    SS # & PHONE

PATIENT EMPLOYER INFORMATION OCCUPATION/DEPT/PHONE
NO EMPLOYER-EMPLOYER UNKN          CHILD

INDIANAPOLIS    IN   46260
49  MARION

EMERGENCY CONTACT INFORMATION          REL CODE & PHONE
RODRIGUEZ ,MIOSOTIS          M  MOTHER

EMERG CONTACT EMPLOYER INFORMATION        PHONE & EXTENSION

INDIANAPOLIS   IN   46260     317-828-2796

ADDITIONAL CONTACT                  PHONE & EXTENSION

BILL TO/GUARANTOR INFORMATION     GUARANTOR DOB,SSN,PHONE

HOME:
WORK:

ACC/CC CD/DATE/TIME

REFERRAL SOURCE

INDIANAPOLIS   IN   46260

ATTENDING & ADDITIONAL CARE PROVIDERS
Attending Physician   ED PHYSICIAN          999504
Attending Group
Admitting Physician   ED PHYSICIAN          999504
PCP                   PCP UNKNOWN            999806
Care Provider #1
Care Provider #2
Care Provider 3

ADMITTING DIAGNOSIS
COH

DEPARTMENT/PROCEDURE

MEDICAL PLANS

| INS PLAN CODE/PLAN NAME | PRIORITY  CARD EFFECTIVE DATE | POLICY NUMBER | SUBSCRIBER EMPLOYER INFORMATION |
|---|---|---|---|

GRP NAME          INSURANCE CO NAME/ADDRESS          SUBSCRIBER
                                                    DOB :
EMP GRP NO.                                         SSN :
                                                    RELATION:      GENDER    EMPLOYER PHONE:
PRECERT AUTH NUMBER      DAYS                        NAME   :
                   INS PHONE          /             COMMENTS:                              LOS:

| INS PLAN CODE/PLAN NAME | PRIORITY  CARD EFFECTIVE DATE | POLICY NUMBER | SUBSCRIBER EMPLOYER INFORMATION |
|---|---|---|---|

A

GRP NAME          INSURANCE CO NAME/ADDRESS          SUBSCRIBER
                                                    DOB:
EMP GRP NO.                                         SSN:
                                                    RELATION:      GENDER    EMPLOYER PHONE:
PRECERT AUTH NUMBER      DAYS                        NAME   :
                   INS PHONE          /             COMMENTS:                              LOS:

| INS PLAN CODE/PLAN NAME | PRIORITY  CARD EFFECTIVE DATE | POLICY NUMBER | SUBSCRIBER EMPLOYER INFORMATION |
|---|---|---|---|

B

GRP NAME          INSURANCE CO NAME/ADDRESS          SUBSCRIBER
                                                    DOB:
EMP GRP NO.                                         SSN:
                                                    RELATION:      GENDER    EMPLOYER PHONE:
PRECERT AUTH NUMBER      DAYS                        NAME   :
                   INS PHONE          /             COMMENTS:                              LOS:

AD-500
04/00

   R FACE  1346  08/21/14   21:12   IHNL



**ST VINCENT CENTER OF HOPE**
**FEMALE PEDIATRIC**

When did incident occur? Date 8/21/2014 Time "During Nap Time" Approx. 1800

Accompanied by Miosotis Rodriguez and Justo Guevara

Past Medical History: Given By Miosotis Rodriguez

Recent anal-genital injures surgeries, diagnostic procedures or medical treatment ☐ No
Ear Tube approx age 3.

Pertinent medical conditions or pre-existing physical injuries ☒ No

Medications: ☒ No

Allergies: ☒ No

Immunizations up to date ☒ Yes    ☐ No    ☐ Unknown

What word does the child use for :
Buttocks:  "Booty"                    Breasts: "Teta"
Female Sex Organ:    "Tito"                Male Sex Organ:    nothing

**Musculoskeletal Complaints:**
☐ Pain  ☐ Bruising  ☐ Bleeding  ☐ Swelling  ☐ Other   NONE.

If yes describe Onset and Duration
N/A

Other Symptoms:
☐ Abdominal/pelvic pain  ☒ Pain on urination  ☒ Genital discomfort / pain  ☐ Genital itching  ☐ Genital discharge
☐ Genital bleeding  ☐ Rectal discomfort or pain  ☐ Rectal Bleeding  ☐ Constipation  ☐ Vomiting
☒ Other

If yes describe Onset and Duration
Miosotis Rodriguez states "I looked at her down there and it looked red" Miosotis Rodriguez reports      genital pain, pain on urination and genital redness was noticed at approx. 1930.

Initals AB.

**Post Assault Hygiene:**

☒ Urinated  ☐ Defecated  ☐ Genital wipe/wash  ☐ Bath/Shower/Wash  ☐ Brushed Teeth  ☒ Ate or drank

☐ Oral gargle/rinse mouth  ☒ Changed Clothes

## Physical Examination and Evidence Collection

BP: 98/62   P: 112   R: 20   T: 98.1        Height 113 cm   Weight 17.2 kg

Airway: ☒ Patent        Other_____

Breathing : ☒ Regular and Spontaneous        Breath sounds: ☒ Clear  Other_____

Circulation: Skin: Color _____  ☒ Warm  ☒ Dry  ☐ Cool  ☐ Moist
Other_____

Neuro: ☒ Alert  ☒ Oriented  ☐ Other        Pupils: ☒ PERL  ☐ Unequal  R:_____  L:_____

_____

_____

_____

### Head/ Face/ Mouth/Neck
☒ No injury Noted
Pertinent Findings: ☐ See Body Map

_____

### Chest/Breast
☒ No injury Noted
Pertinent Findings: ☐ See Body Map

_____

### Abdomen/Pelvis
☒ No injury Noted
Pertinent Findings: ☐ See Body Map

_____

### Upper Extremities/Hand/Fingers
☒ No injury Noted
Pertinent Findings: ☐ See Body Map

_____

Initals  MB

## Lower Extremities/Feet/Toes
☒ No injury Noted
Pertinent Findings: ☐ See Body Map

## Back /Buttocks
☒ No injury Noted
Pertinent Findings: ☐ See Body Map

## Genital/Anus
☒ No injury Noted  omit AB
Pertinent Findings: ☒ See Body Map

**Exam Positions used:** ☒ frog leg ☒ prone knee chest ☐ caretakers lap ☐ Other _____

**Techniques used:** ☒ Direct Visualization ☒ Labial Traction ☐ Labial separation
Breast Tanner Stage: ☒ 1 ☐ 2 ☐ 3 ☐ 4
Genital Tanner Stage: ☒ 1 ☐ 2 ☐ 3 ☐ 4
Hymen : ☒ Annular ☐ Cresentic ☐ Imperforate ☐ Septate

## Alternative Light Source
☐ Positive Fluorescent ☒ No Findings ☐ See Body Map

## Assessment Notes

Initals ___

**History:** Provided by <u>Miosotis Rodriguez</u>

<u>see typed noted</u>

Initals _AB_

County that Crime occurred in: Marion County _____

Patient reported to law enforcement:  ☐ Yes  ☒ No

Law Enforcement Agency_____

Officer:_____

Case Number_____    Phone numbers_____

Reported to DCS: ☒ Yes  ☐ No  County  Marion County _____

Social Worker: Susan Grant _____     ☐ patient requested not at this time

Pt Advocate:_____     ☒ patient requested not at this time

Assistant_____     ☒ Did not have an assistant

Primary Physician /phone # : Dr. Powell     317·415·8050

Other Notes: See typed Note _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Initals_____

Aug. 22. 2014  9:23AM

FEMALE GENITAL

Name of Photographer: _Angela Bates RN, FNE, SANE_

Right                                   Left



erythema noted

**Injury Description/Photo log**

| Location # | Photo #'s (if applicable) | Description |
|---|---|---|
| #1 | 8930-8939 | Swelling, erythema and redness noted to Hymen at 12°clock. |
| #2 | 8935-8937 | red coloration noted to peri hymenal area Left side and Left vestibulear area. |
| #3 | 8935-8939 | red coloration noted to Hymen between 6°clock and 11°clock Swelling noted at the area between 6°clock and 11°clock on Hymen. Peri hymenal redness noted to Right side. Redness noted to Left vestibulear area. |

August 21, 2014

        arrived at St. Vincent Hospital via private vehicle, accompanied by her mother (Miosotis Rodriguez), father (Justo Guevara) and extended family members. Miosotis Rodriguez and Justo Guevara report      stated "someone touched her down there" and request her to be evaluated. This Sexual Assault Nurse Examiner offered Miosotis Rodriguez and Justo Guevara a Spanish interpreter. Miosotis Rodriguez and Justo Guevara declined Spanish Language services at this time. This Sexual Assault Nurse Examiner informed Miosotis Rodriguez and Justo Guevara of the role and services provided by a Sexual Assault Examiner, including photography. Miosotis Rodriguez and Justo Guevara verbalized an understanding and consents were obtained via protocol and signed per Miosotis Rodriguez.

Miosotis Rodriguez reports       was picked up from Bright Horizons daycare at approximately 1730. Miosotis Rodriguez states       told Justo Guevara that "she hurt down there." Miosotis states Justo gave    some diaper rash cream and told her to put it down there. Miosotis states Justo told her    complained of pain in her "Tito." Miosotis states she asked    "why does it hurt down there?" Miosotis states "    started crying and ran to her room saying No, No, No." Miosotis reports she went and picked up    and asked "why does it hurt down there?" again. Miosotis states this time "    just pee'd all over me. She told me Mr. Ali touched me with his finger down there and it hurt." Miosotis states she asked    "Why didn't you tell me right away?" Miosotis states told her "he said not to tell anybody."

Miosotis states she called Bright Horizons and was informed "yes, we know of the situation, Mr. Ali is suspended and we will investigate this."

Forensic Examination complete. DCS has been notified. IMPD is involved.

*Angela Bates RN, FNE, SANE*

Angela Bates RN, FNE, SANE

St. Vincent Health

**03A Physicians Orders**

Allergies: **NKA**

Weight: **17.2** kg          Patient ID

**Circle Applicable Orders**

Ht _____ cm   Wt _____ kg

BSA _____ m² =

$$\sqrt{\frac{[Height(cm) \times Weight(kg)]}{3600}}$$

Age: _____ weeks/months/years

Do not dispense meds until pregnancy test is confirmed negative.

Do not administer medications until baseline CBC and CMP labs complete and reported

**Consult:**
1. Social Service Consult

**Other:**
1. Please provide educational handout regarding medications

NOT INDICATED
Angela Bates RN, FNE, SANE

**Medications**

**Attention Pharmacist:**
- Please round liquid medications to the nearest ½ ml prior to dispensing
- Dispense a 10 day supply of all medications (liquid & tablets)

1. **Neonates <3months (liquid dosing)**
   a. Zidovudine 10mg/ml (Retrovir)
      i. <6 weeks : _____ mg (2 mg/kg/dose; max 200 mg) po Q6 hr
      ii. ≥6 weeks: _____ mg (200 mg/m²/dose; max 300 mg) po B.I.D.
   b. Lamivudine 10mg/ml (Epivir)
      i. <30days: _____ mg (2 mg/kg/dose; max 150 mg) po B.I.D.
      ii. ≥30 days: _____ mg (4 mg/kg/dose; max 150 mg) po B.I.D.
   c. Lopinavir 80 mg/Ritonavir 20 mg/ml (Kaletra) _____ mg (16 mg LPV/kg/dose + 4 mg RTV/kg/dose) po B.I.D.

2. **Infants/Toddlers (3mo – 3yr) (liquid dosing)**
   a. Zidovudine 10mg/ml (Retrovir) _____ mg (200 mg/m²/dose; max 300 mg) po B.I.D.
   b. Emtricitabine 10mg/ml (Emtriva) _____ mg (6 mg/kg/dose; max 240 mg) po daily
   c. Lopinavir 80mg/Ritonavir 20mg/ml** (Kaletra) po B.I.D.
      i. <6 months: _____ mg (16mg/kg/dose lopinavir / 4 mg/kg/dose ritonavir)
      ii. ≥6 months and <15 kg: _____ mg (12mg/kg/dose lopinavir / 3 mg/kg/dose ritonavir)
      iii. ≥6 months + ≥15 kg: _____ mg (10 mg/kg/dose lopinavir / 2.5 mg/kg/dose ritonavir)
      ** max dose 600 mg lopinavir / 200 mg ritonavir**

3. **Pre-School (3yr – Tanner III) (indicate liquid or tablet)**
   a. Zidovudine 10mg/ml or 300mg capsule (Retrovir)
      i. <12years: _____ mg (200 mg/m²/dose; max 300 mg) po B.I.D.
         1. liquid        2. tablet
      ii. ≥12 years: 300 mg po B.I.D.
         1. liquid        2. tablet
   b. Emtricitabine 10mg/ml or 200mg capsule (Emtriva) _____ mg (6mg/kg/dose) po daily
      i. liquid (max 240 mg)    ii. tablet (max 200 mg)
   c. Efavirenz (Sustiva)*** (50 mg, 100 mg, and 200 mg capsules, 600 mg tablets)
      i.   10 – <15 kg:      200 mg po once daily
      ii.  15 – <20 kg:      250 mg po once daily
      iii. 20 – <25 kg:      300 mg po once daily
      iv.  25 – <32.5 kg:    350 mg po once daily
      v.   32.5 – <40 kg:    400 mg po once daily
      vi.  ≥40 kg:           600 mg po once daily
      *** capsules may be opened and mixed with small amount of food or liquid; tablets CANNOT be crushed

4. **Post-Pubertal (Tanner IV, V or ≥17yrs)**
   a. Efavirenz 600mg + Emtricitabine 200 mg + Tenovir 300mg (Atripla) 1 tablet po daily

**Pediatric HIV non-occupational post-exposure prophylaxis**

Date: _____   Time: _____                          **M.D.**

**USE BALL POINT PEN PRESS FIRMLY**

Page 1 - MEDICAL RECORDS   ❖ Scanned to Pharmacy by _____ @ _____



03A Physicians Orders

**St. Vincent Health**

Allergies:

**NKA**

Weight: **17.2** kg                              | Patient ID

*NOT INDICATED*

*Angela Bates RD, FNE, SANE*

## Circle Applicable Orders

**If any of the following are present, consider screening labs in pre-pubertal children:**

1. History of abuse includes multiple perpetrators
2. Perpetrator has a STD or is at high risk for an STD
3. Patient has an STD
4. Patient's sibling or another child in intimate contact with the patient has an STD
5. Patient has had prior sexual contact
6. Patient has history of genital discharge
7. Parents request it
8. Physical exam is positive for genital discharge or abnormal lesions
9. Physical exam is positive for acute genital injury
10. Physical exam shows evidence of ejaculation

**Labs:**

1. Chlamydia trachomatis culture (Dacron swab in VCM medium; A2K# 09055)
   a. vaginal/peri-urethral
   b. anal/rectal
2. Gonorrhea (GC) culture (Dacron swab in Amies Gel transport medium [blue top swab] OR call lab and have them send a Jembec plate with $CO_2$ transport; A2K# 00116)
   a. throat
   b. vaginal/peri-urethral
   c. anal/rectal
3. Trichomonas screen (+BVS for female)
   a. Male: (Dacron swab in 0.5 ml sterile saline; A2K# 00431)
   b. Female (double-tipped red swab; A2K#00443)
4. HSV
   a. HSV PCR 1, 2 genital lesion (M4/viral transport medium; A2K# 28661)
   b. Rapid HSV culture genital lesion (M4/viral transport medium; A2K#00138)
5. Chlamydia/GC DNA SDA- (A2K#85046)
   a. Urine
6. Routine genital culture (A2K# 00159)
7. Routine anal culture (A2K# 00111)
8. HIV
   a. SUDS rapid HIV (lavender top tube; A2K 20349)
   b. HIV 1, 2 antibody by ELA (SST/gold top tube; A2K 85064)
   c. Consent signed by parent or legal guardian
9. Acute hepatitis panel (SST/gold top tube – 2 tubes; A2K# 20190)
10. Syphilis screen (SST/gold top tube; A2K# 11134)
11. Urine for date rape drug panel (collect as per SANE guidelines)
12. Baseline labs prior to HIV post-exposure prophylaxis medication administration:
    a. CBC with differential
    b. CMP

**Medications:**

1. Lidocaine Cream 4% (LMX-4) apply 30 - 45min prior to all lab draws

2. Hepatitis B Vaccine 0.5mL IM x 1 (non weight based) if immunization not completed
   • Provide Vaccination Information Sheet (VIS) to patient/parent or guardian
   • Documentation:
     • Date of revised VIS: _____
     • Lot #: _____
     • Expiration Date: _____
     • RN signature: _____

3. **Tetanus Vaccine*** for open wounds if no tetanus booster vaccine in previous 5 years or incomplete primary series:
   a. Vaccine (non weight based)
      i. ≥6 months – 10 years: DTaP 0.5 ml IM x 1
      ii. ≥10 years: Tdap 0.5 ml IM x 1
      • Provide Vaccination Information Sheet (VIS) to patient/parent or guardian
      • Documentation:
        • Date of revised VIS: _____
        • Lot #: _____
        • Expiration Date: _____
        • RN signature: _____
   b. Consider Tetanus Immune Globulin (HyperTET) for complicated wounds
      i. <7 years: _____ units (4 units/kg/dose; max 250 units) IM x 1
      ii. ≥7 years: 250 units IM x 1 (non weight based)
   ***Please refer to Red Book Guidelines for further information

4. Acetaminophen (Tylenol) _____ mg       (15 mg/kg/dose; max 500 mg) po x 1 PRN pain

*Note: Pre-pubertal children should receive presumptive treatment ONLY if there are symptoms that require immediate treatment or delay in treatment causes great risk to the child.*

**Pediatric Post-assault Orders: Tanner I, and II**

NOTE:
• SUDS stands for Single Use Diagnostic System
• SANE stands for Sexual Assault Nurse Examiner

Date: _____ | Time: _____ | _____ M.D.

**USE BALL POINT PEN PRESS FIRMLY**

No. 1450    P. 12

Aug. 22. 2014  9:25AM

**IMPD North District Information Card**

PD 14/088487

CAD NUMBER / CASE NUMBER

Child Molest

INCIDENT TITLE

Pero

PATROL OFFICER

A344    8/22/14    0124

UNIT    DATE    TIME

HOW TO CONTACT YOUR ASSIGNED DETECTIVE
TO ADD ADDITIONAL INFORMATION TO YOUR REPORT 327-6100
NORTH DISTRICT TELEPHONE NUMBERS

North District Administrative Number . . . . 327-6100
North District Administrative Fax . . . . . . . 327-6190
North Domestic Violence Advocate . . . . . 327-6156
North Prosecutor's Office . . . . . . . . . . . 327-6116
North Narcotics Tip Line . . . . . . . . . . . 327-6141
Traffic Court . . . . . . . . . . . . . . . . . 327-5738
Traffic Complaints . . . . . . . . . . . . . . 327-6525

Crime Prevention
We need your help! When you see suspicious activity, call 911
immediately. You are our eyes and ears in the community.

Crime Watch
To start a Crime Watch in your neighborhood — 327-3781

Neighborhood Concerns — 327-6168

PLEASE RETAIN THESE NUMBERS FOR REFERENCE

**IMPD North District information Card**

PD 14/088487

CAD NUMBER / CASE NUMBER

Child Molest

INCIDENT TITLE

Pero

PATROL OFFICER

A344    8/22/14    0124

UNIT    DATE    TIME

HOW TO CONTACT YOUR ASSIGNED DETECTIVE
TO ADD ADDITIONAL INFORMATION TO YOUR REPORT 327-6100
NORTH DISTRICT TELEPHONE NUMBERS

North District Administrative Number . . . . . 327-6100
North District Administrative Fax . . . . . . . 327-6190
North Domestic Violence Advocate . . . . . . 327-6156
North Prosecutor's Office . . . . . . . . . . . 327-6116
North Narcotics Tip Line . . . . . . . . . . . 327-6141
Traffic Court . . . . . . . . . . . . . . . . 327-5738
Traffic Complaints . . . . . . . . . . . . . . 327-6525

Crime Prevention
We need your help! When you see suspicious activity, call 911
immediately. You are our eyes and ears in the community.

Crime Watch
To start a Crime Watch in your neighborhood — 327-3781

Neighborhood Concerns — 327-6168

PLEASE RETAIN THESE NUMBERS FOR REFERENCE



Aug. 22. 2014  9:26AM

## Pediatric and Adolescent Center of Hope
## Discharge Instructions

**Exam Date:** 8/21/2014

**Your Forensic Nurse Examiner was:** Angela Bates

**Your Social Worker Today was:** Susan Grant

**Evidence Collected for investigative purposes** ☒ Yes ☐ No

## The following medical tests were completed:

☐ Blood test for Syphilis ☐ Blood test for HIV ☐ Blood Test for Hepatitis A, B, & C
☐ Blood test for Pregnancy ☐ Blood tests for CBC and CMP ☒ Testing for Chlamydia
☒ Testing for Gonorrhea ☒ Screen for Trichomonas and Bacterial Vaginosis
☒ Routine Genital Culture ☐ Routine Anal Culture ☐ Urine for Drug Facilitated Assault

- Most of the above tests are for pre-existing conditions. Pregnancy or infections obtained during your assault cannot be detected at this time. If appropriate, you will be offered medications to prevent pregnancy and /or infections that may result from your assault. You may need to follow-up for further testing to assure that you have not obtained any infection or become pregnant from your assault. Please see below for all recommended follow-up testing.
- A nurse will be contacting you with the results of your tests. We have indicated below the contact number(s) and the name(s) of the person(s) that you have authorized to receive your test results. Please contact Megan at (317) 338-6629 if you have not been contacted with your test results in one week.

  Name(s) _____

  Contact Number(s) _____

## You were given the following medications to either treat or prevent infection:

☐ For Gonorrhea: _____
☐ For Chlamydia: _____
☐ For Trichomonas and Bacterial Vaginosis: _____
☐ Other medication: _____
☐ Other medication: _____
Additional Medication(s): _____

_____
_____

## Pregnancy Prevention:

☐ Your pregnancy results are negative
☐ You have received emergency contraception today called Levonorgestrol (Plan B)
☒ You did NOT receive emergency contraception today because it is not medically indicated or you did not wish to take the medication at this time

---

**Page 1**

42



## Pediatric and Adolescent Center of Hope
## Discharge Instructions

### Hepatitis B prevention:
☒ You did NOT receive the Hepatitis B vaccine today because you have been previously immunized or because you did not wish to receive the vaccine today
☐ You have received your 1ˢᵗ Hepatitis B vaccine today

### Tetanus Vaccination:
☐ You have received a tetanus vaccination today
☒ You did NOT receive a tetanus vaccination today because you have been vaccinated within the past 5 years, you did not wish to receive the vaccine today, or the vaccine is not indicated for you

### HIV Post exposure Prophylaxis:
☐ Your rapid HIV test was negative which means you did NOT have a pre-existing HIV infection
☒ You did NOT receive HIV post-exposure prophylaxis because it was not indicated for you or you did not wish to receive the medications today
☐ You DID receive the following HIV post-exposure prophylactic medications:

_____

_____

## Follow-up care:

Please follow-up with your primary physician for the following:

☒ We recommend that you follow up with your primary physician within 1-2 weeks to detect new infections that may have been acquired from the assault.
☐ You should follow up for pregnancy testing in 2 weeks
☐ You should follow up for repeat Hepatitis B vaccines
   Follow up vaccine schedule:
   2ⁿᵈ dose of the vaccine is due in 1 month
   3ʳᵈ dose of the vaccine is due in 6 months
☐ You **DID NOT** wish to receive the Hepatitis B vaccine today **AND** are not previously immunized. We recommend that you follow up at your PCP or other healthcare provider.
☐ You should follow-up for Syphilis and HIV testing in 6 weeks, 3months and 6 months from today to detect infections that you may have acquired from the assault

☐ You have been given medications to help prevent HIV. It is very important that you take these medications exactly as directed. Please see below for the medication instructions. Call the St Vincent Pediatric Infectious Disease office at (317) 582-8180 on the very next business day to schedule a follow-up appointment.

---

**Page 2**

43



### Pediatric and Adolescent Center of Hope
### Discharge Instructions

**Discharge Medications:**

☒ No new medications. Please resume all prior home medications per your home schedule.

☐ New medications listed below. Take exactly as directed. Do not resume any prior home medications unless discussed with us at this visit or unless directed by your physician or pharmacist.

**Your discharge instructions will be faxed to:**

Your primary physician: Dr. Powell          St. Vincent Medical Group.

Phone # 415 8050          Fax 415·8217

Other physician: _____

Phone # _____ Fax _____

Center of Hope SANE Angela Bates RN, FNE, SANE Date 8/22/2014

Patient Signature _____ Date _____

Parent/Guardian Signature M. Rodriguz NM Date 8/22/2014

**Please call us at 317-338-6629 if you have any questions or concerns. <u>For a quicker response email</u> <u>mdbrown@stvincent.org</u>**

*"Our goal is to provide compassionate and understanding care to a patient who is here because of a sexual assault. We are here to offer the patient psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. The treatment we offer is consistent with our mission and ethical directives."*

Indianapolis

## Documents Review Report

|  |  |  | 4y10m   F |
|---|---|---|---|
| CH Per-Peds ER | 21-Aug-2014 | ADM | MD, Emergency Department |
| 08/21/2014 22:50 | Child Abuse/Neglect Evaluation Note | Grant, Susan W (LCSW) | Entered: 08/21/2014 23:02 |

**Child Inteview:**
**Child Interview:**

- **Childs description of the event (use quotes when possible)**

Mom's Interview:
Mom, Miosotis Rodriguez, reported that dad, Justo Guevara, picked patient up from daycare, Children's Choice Learning Center (317-415-5000), 1795 W 86th Street, 46260, at 1700. He took her and her one-year old sibling to Chick-fil-A. While there he sent patient to the restroom and she came back and stated that it hurt. He gave her some diaper rash cream and told her to go and put in on her vagina, where it hurt. When she returned, he asked her to go play, because she loves the play area at Chick-fil-A and she refused and was clinging to him. He got home around 1900. She fell asleep in the car so he placed her in her bed. Justos then told mom what patient said and mom checked her out and saw that she was little red. Mom thought it was a yeast infection and was planning on taking her to the doctor on Monday when she had her own appointment. Patient woke up around 1930 and came downstairs. Mom asked her why it hurt and patient started crying and ran upstairs. Mom soothed her and coaxed her into telling her why it hurt. Patient reported that "Mr Ali" (a daycare worker_ touched her with his fingers, sown there, and it hurts. Mom stated that client then urinated on herself. Mom proceeded to call the school to inquire about what patient stated. She stated that the school told her that they were aware of it, because patient reported to them, and they will take care of it. They also reported that they suspended "Mr Ali" and were investigating. Mom reported that the school never called her or dad to let them know that patient had reported this incident to them. Mom then brought patient to the ER to be assessed and examined.

**Parent/Guardian/Family Member Interview:**
Interview Mother:

- **Name**

Miosotis Georgina Rodriguez (prefers to be called Georgina)

- **Person Gathering Information**

Susan Grant, LCSW

- **Behavioral Indicators Reported**

Withdrawn

- **Caretaker's Description of Event(use Quotes when possible)**

"SEE CHILD INTERVIEW"

---

Indianapolis
**Documents Review Report**

|  |  |  | 4y10m   F |
|---|---|---|---|
| CH Per-Peds ER | 21-Aug-2014 | ADM | MD, Emergency Department |
| 08/21/2014 22:50 | Child Abuse/Neglect Evaluation Note | Grant, Susan W (LCSW) | Entered: 08/21/2014 23:02 |

- **Sleep Pattern - Before**                    WNL
- **Sleep Pattern - After**                     Unchanged
- **Patient sleeping Arrangement**      Has own bed
- **Hours sleep per night**                   WNL
- **Disturbance**                                      None
- **Nutrition - Before**                          WNL
- **Nutrition - After**                           Unchanged
- **Development milestones (use**        WNL
  **quotes when possible)**
- **Child's typical demeanor (use**      playful, cheerful, happy
  **quotes when possible)**
- **Description of child behavior -**     Clingy, scared, tearful
  **After**

**Legal Custody of Child:**
Legal Custody of Child:
- **Legal Custody of Child**               Parents

**Other Care Takers:**
Other Care Takers:
- **School**                                            None
- **Day Care**                                        Children's Choice Learning Center
- **Babysitter**                                     None

**Resources:**
Resources:
- **Resources currently placed**         Both parents work full-time although dad's is more
                                                            seasonal since he works in construction

**Household:**
Household Member 1:
- **Name**                                             Miosotis Rodriguez
- **Relationship**                                 mother
- **Age**

Household Member 2:
- **Name**                                             Justo Guevara (mainly Spanish speaking and will
                                                            need an interpreter)
- **Relationship**                                 father
- **Age**

Household Member 3:
- **Name**                                             Emily Guevara-Rodriguez
- **Relationship**                                 sister
- **Age**                                               1

Indianapolis
**Documents Review Report**

| | | | 4y10m    F |
|---|---|---|---|
| CH Per-Peds ER | 21-Aug-2014 | ADM | MD, Emergency Department |
| 08/21/2014 22:50 | Child Abuse/Neglect Evaluation Note | Grant, Susan W (LCSW) | Entered: 08/21/2014 23:02 |

**Medical History:**
**Recent Prior Illness:**
- Yes/No                         Yes

**Chronic Illness or Genetic disorders:**
- Yes/No                         No

**History of Prior injuries or accidents:**
- Yes/No                         No

**Medications - OMR:**
*No Current Medications as of 08/21/2014 20:38 documented in Structured Notes*

**Prior hospitalization:**
- Yes/No                         Yes

**Previous surgeries:**
- Yes/No                         Yes
- Treating facility              Unknown

**Immunizations:**
**Immunizations up to date:**
- Yes/No                         Yes
- Treating MD                    Kristy Powell

**Prenatal history:**
**Prenatal care:**
- Yes/No                         Yes

**Complications for mother:**
- Yes/No                         No

**Complications for child:**
- Yes/No                         Yes
- Please describe if Yes         Born at 35 weeks

**Worker safety questions:**
**Live in a rural or remote area ?:**
- Live in a rural or remote area?    No

**Communicable disease ?:**
- Communicable disease           No

**Substance use ?:**
- Substance use?                 No

**Violence in the home ?:**
- Violence in the home ?         No

---

Indianapolis
**Documents Review Report**

| CH Per-Peds ER | 21-Aug-2014 | ADM | 4y10m   F MD, Emergency Department |
|---|---|---|---|

| 08/21/2014 22:50 | Child Abuse/Neglect Evaluation Note | Grant, Susan W (LCSW) | Entered: 08/21/2014 23:02 |
|---|---|---|---|

Aggressive animals ?:
- Aggressive animals ?                    No

Weapons in the home ?:
- Weapons in the home ?                   No

Mental health issues ?:
- Mental Health Issues ?                  No

Assessment Outcome:
Medical Staff Updated:
- Yes/No                                  Yes
- RN Name                                 Angela - COH RN

Intervention Disposition:
Intervention Disposition:
- Intervention Disposition               DCS report indicated

DCS contacted at this time:
- Hotline worker name                    Kate
- County abuse occurred                  Marion
- DCS Case Worker                        Amanda Horton
- Contact Information                     Amanda is the on-call, institutonal investigator and reported that the person assigned to this area will follow-up tomorrow
- Supervisor                             Amanda reported that an institutional abuse worker will be assigned tomorrow and will call for records.

Law enforcement contacted:
- Contact Information                     Department of Child Services will contact law enforcement when scheduling the forensic interview

Visitation Parameters:
Visitation Status:
- Visitation Restricted                  No

Hospital Discharge:
Received verbal release to dc pt:
- Name                                    Amanda Horton
- Contact Information                     Unknown but will have someone call tomorrow
- Supervisor                             Unknown
- Patient released to                    Parent/Guardian

Received written release:
- Provided to Child Protection team       A written release will be faxed tomorrow

Electronic Signatures:
Grant, Susan W (LCSW)  (Signed 08/21/2014 23:57)

---

## Documents Review Report

| CH  Per-Peds ER | | 21-Aug-2014 | ADM | 4y10m   F |
|---|---|---|---|---|
| | | | | MD, Emergency Department |
| 08/21/2014 22:50 | Child Abuse/Neglect Evaluation Note | | Grant, Susan W (LCSW) | Entered: 08/21/2014 23:02 |

*Authored:* Child Inteview, Parent/Guardian/Family Member Interview, Legal Custody of Child, Other Care Takers, Resources, Household, Medical History, Immunizations, Prenatal history, Worker safety questions, Assessment Outcome, Intervention Disposition, Visitation Parameters, Hospital Discharge

*Last Updated:* 08/21/2014 23:57 by Grant, Susan W (LCSW)

St. Vincent Hospitals and Health Service
    Center of Hope
    *Pediatric and Adolescent  Consents*

General Information and Consents

I.  _MR_ (Initials)    I consent to medical examination for evidence of sexual assault to be conducted by a sexual assault nurse examiner to discover and preserve evidence of the assault; and not for the purpose of providing medical treatment that may be required for any injuries that my child may have from the sexual assault. I understand that the examination may include the collection of reference specimens at the time of the examination or at a later date. Knowing this, I consent to a medical examination for evidence of sexual assault. I understand that I may withdraw consent at any time for any portion of the evidential examination. I have received a detailed description of the steps of the examinations process prior to giving my consent.

II. The use of photography can be a means of documentation of injury.  These photographs can be used for evaluation, treatment and legal purposes.

    _MR_ (Initials)    I consent to photography of all body areas *including* genitals

    _____ (Initials)    I consent to photography of body areas *other than* genitals.

III.  _MR_ (Initials) I consent for these photographs to be used for educational purposes; my identity will remain confidential.

IV.  _MR_ (Initials)  I understand that the examination report and any or all forensic evidence obtained will be released to the appropriate agencies, which may include but is not limited to law enforcement authorities and/or the Department of Child Services. I hereby release the St. Vincent Center of Hope employees from any liability that may result from the release of the information.

V.  _MR_ (Initials)    I understand that St. Vincent Hospital will be applying for benefits on my behalf from the Sex Crime Patient Services Fund and that this fund will pay for the sexual assault examination today. I have been informed that victims of crime are eligible to submit crime victim compensation claims.

Signature_M. Roediger_    Initials _MR_ Date _8/21/14_

Relationship to patient: Patient/Parent/Guardian (circle one) Other____ _Mother_

Nurses Signature_Angela Bates RN FNE SANE_ Date _8/21/14_

*Pediatric / Minor*

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

I (the undersigned) hereby authorize the St. Vincent Facility(ies) indicated below to disclose/obtain the following identified information.

Please check all that apply:

☒ Indianapolis      ☐ Carmel      ☐ Women's   ☐ Pediatric Rehabilitation Center

**PATIENT INFORMATION**

| | |
|---|---|
| Name of Patient | 8/21/2014 |
| Maiden Name (if applicable) N/A | |
| Date of Birth | |
| Street Address | |
| City, State, Zip Code  Indpls, IN 46260 | Contact Phone Number |
| Dates of Treatment Requested  8/21/2014 | |
| Purpose of Disclosure  SA | |

**INFORMATION TO BE RELEASED (limit request to the minimum necessary)**

| | | | | | |
|---|---|---|---|---|---|
| ✓ | Admission/Registration Record | ✓ | Operative/Procedure Report | ✓ | Physical Therapy |
| ✓ | Discharge Summary | ✓ | Nurses Notes | | Pathology Report |
| ✓ | ER Report | ✓ | Physician Orders | ✓ | Progress Notes |
| ✓ | History & Physical Report | ✓ | Lab | | Radiology Report |

OTHER  Photographs & Center of Hope Records

I understand that the Protected Health Information in my medical record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services, and treatment for alcohol and drug abuse.

**RELEASE INFORMATION TO (if not patient)**

| | |
|---|---|
| Name | Law Enforcement, Prosecutor, Forensic Nurse |
| Address | Department of Child Services, |
| City, State, Zip Code | Peyton Manning Child Protection Team |

I understand that I have the right to revoke this authorization, in writing, at any time by sending such written notification to Director, Health Information Services, St. Vincent Indianapolis Hospital, 2001 West 86th Street, Indianapolis, Indiana 46260. I understand that a revocation is not effective to the extent that St. Vincent has relied on the use or disclosure of the protected health information. I understand that the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.

I understand that this authorization will expire in sixty (60) days unless otherwise specified.

I understand that information used or disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and may no longer be protected by federal or state law.

St. Vincent will not condition my treatment, payment, enrollment (if applicable) in a health plan or eligibility for benefits on whether I provide authorization for the requested use or disclosure.

I understand that I have the right to refuse to sign this authorization.

By signing this authorization, I acknowledge that I have read and understand this authorization. Further, I authorize the use or disclosure of my Protected Health Information in accordance with the terms of this authorization.

I understand if records are requested by me, that I am responsible for paying the copy fees. Fees are as follows: $20 labor charge (includes the first 10 pages), .50 per page for pages 11 – 50, .25 per page for pages 51 and greater. There are additional charges for postage, stat requests or certifications, if applicable.

| | |
|---|---|
| Signature of Patient, Guardian, Parent, or Health Representative | Date Signed  8/21/14 |
| Relationship to patient, if other than patient  Mother | |

| # Pages | ☐ Mailed  ☐ Faxed  ☐ In Person | Date | HIS Associate |
|---|---|---|---|
| | | | |



51

**Peyton Manning Children's Hospital at St. Vincent**
**Post-Sexual Assault HIV PEP Questionnaire**

Circle the appropriate answer.  Please place this form in the patient's chart after using it to guide in deciding if the patient should be placed on post-exposure prophylaxis for HIV.

| | | Yes | No |
|---|---|---|---|
| 1. | Is the alleged perpetrator known to be HIV negative? | | Next question |
| 2. | Is the alleged perpetrator known to be HIV positive? | | Next question |
| 3. | Is there a clear history of oral penetration with ejaculation, vaginal penetration, or anal penetration with the alleged perpetrator(s)? | Next question | |
| 4. | Did the penetration with the alleged perpetrator(s) occur within the last 72 hours? | Next question | |
| 5. | Did all penetration with the same alleged perpetrator(s) occur within the last 2 weeks? | Next question | |
| 6. | Is there a clear history of condom use with each act of penetration that occurred with the alleged perpetrator(s)? | | Next question |
| 7. | Is the alleged perpetrator(s) known or suspected to have any HIV risk factors (IV drug use, man who has sex with men, history of incarceration, history of any sexually transmitted infection, commercial sex worker, blood transfusion before 1985)? | Next question | Skip to question #13 |
| 8. | Did the alleged perpetrator(s)'s penis enter the victim's anus? | | Next question |
| 9. | Was there traumatic anal or vaginal penetration with the alleged perpetrator(s) resulting in bleeding? | | Next question |
| 10. | Were there traumatic skin wounds with bleeding in the alleged perpetrator(s) and the victim? | | Next question |
| 11. | Was there any of the perpetrator(s)'s blood, vaginal, or seminal fluid on the victim's non-intact skin (eczema, rash, abrasions, open wounds)? | Stop – PEP offered | Next question |
| 12. | Did the alleged perpetrator(s)'s penis enter the victim's vagina? | Stop – PEP offered | |
| 13. | Did the alleged perpetrator(s)'s penis enter the victim's anus? | Stop – PEP offered | Next question |
| 14. | Was there traumatic anal or vaginal penetration with the alleged perpetrator(s) resulting in bleeding? | Stop – PEP offered | Next question |
| 15. | Were there traumatic skin wounds with bleeding in the alleged perpetrator(s) and the victim? | Stop – PEP offered | |

NOT INDICATED

*Ayla Bates RN, FNG, SANE*

Further assistance with HIV PEP decisions can be obtained by called the CPT physician on call, the pediatric ID physician on call, or the National Clinician's Post-Exposure Prophylaxis Hotline at (888) 448-4911.

13A  H & P PROGRESS NOTES

# Peyton Manning
## Children's Hospital

*center of hope*

Your patient, _____ Date of Birth _____

was seen at St. Vincent Hospital Center of Hope on **8/21/2014** in response to

a sexual abuse disclosure.  A medical forensic examination was completed.

The discharge papers are included with our recommendations for follow up testing.

If you should have any questions or concerns, please contact our office during the

hours of 8am- 4pm, Monday thru Friday.  You may also leave a message on our

confidential voice mail at 317-338-6629.

Sincerely,

Megan Brown RN, FNE, SANE-A, SANE-P

Director of St Vincent Center of Hope and the St. Vincent Indinapolis Forensic
Nursing Team



**Indianapolis-Marion County Forensic Services Agency**
**40 S. Alabama Street**
**Indianapolis, IN 46204**
**(317)327-3670     FAX (317)327-3607**

## Laboratory Examination Report            LAB14-05043          Page 1 of 2

**DATE: 08/20/2015**                    **Agency Case #:    DP14088487**

**TO: Indianapolis Metropolitan Police Department**

**FROM: Shea Anderson, Forensic Scientist**

**EXAMINATION REQUESTED: Serology Sexual Assault**

**MATERIAL SUBMITTED:**

| | |
|---|---|
| **Item 004** | Hospital samples and clothing labeled as from ▮▮▮▮▮▮▮▮▮▮ |
| **Item 004.001** | Buccal cell standard |
| **Item 004.002** | Saline dripped over hymen swab(s) |
| **Item 004.003** | Internal genitalia swab(s) |
| **Item 004.004** | External genital swab(s) |
| **Item 004.005** | Oral swab(s) |
| **Item 004.006** | Anal swab(s) |
| **Item 004.007** | Underpants |

**RESULTS AND CONCLUSIONS:**

**Item 004**                    Hospital samples and clothing labeled as from ▮▮▮▮▮▮▮▮▮▮

St. Vincent Hospital, Hospital #: 000202-64-17, Lab Ref. #: 14-08-47
Forensic Evidence Technician: Kent Hedberg

**Item 004.001**                    Buccal cell standard
The sample was packaged for transfer to DNA as item 004.001.01.

**Item 004.002**                    Saline dripped over hymen swab(s)
No seminal material was found.  There was no indication of saliva.
No blood staining was observed.  The sample was packaged for transfer to DNA as item 004.002.01.

**Item 004.003**                    Internal genitalia swab(s)
No seminal material was found.  There was no indication of saliva.
No blood staining was observed.  The sample was packaged for transfer to DNA as item 004.003.01.

**Item 004.004**                    External genital swab(s)
No seminal material was found.  There was no indication of saliva.
No blood staining was observed.  The sample was packaged for transfer to DNA as item 004.004.01.

**Item 004.005**                    Oral swab(s)
No seminal material was found.
The sample was packaged for transfer to DNA as item 004.005.01.

## Laboratory Examination Report          LAB14-05043          Page 2 of 2

**Item 004.006**                              Anal swab(s)
    No seminal material was found.
    The sample was packaged for transfer to DNA as item 004.006.01.

**Item 004.007**                              Underpants
    No seminal material was found.  There was no indication of saliva in select areas.
    No blood staining was observed.  A sample was collected and packaged for transfer to DNA as item
004.007.01 (inside crotch panel).

Portions of pertinent evidence items are being stored frozen pending DNA analysis.  The results of DNA testing will be reported upon completion.

CHAIN OF CUSTODY
Item 004 (collected from the hospital) was received from the Biology Evidence Room on August 7, 2015 and returned on August 11, 2015.

A0976

Signature:

*Shea Hayes Anderson*

**Shea Anderson**
**Forensic Scientist**



**Indianapolis-Marion County Forensic Services Agency**
40 S. Alabama Street
Indianapolis, IN 46204
(317)327-3670      FAX (317)327-3607

# Laboratory Examination Report        LAB14-05043        Page 1 of 2

**DATE: 09/22/2015**                    **Agency Case #:    DP14088487**

**TO: Indianapolis Metropolitan Police Department**

**FROM: Tonya Fishburn, Forensic Scientist**

**EXAMINATION REQUESTED: DNA**

**MATERIAL SUBMITTED:**

| | |
|---|---|
| Item 004.001.01 | Two buccal cell swabs from Mia Guevara-Rodriguez |
| Item 004.002.01 | Two saline dripped over hymen swabs |
| Item 004.003.01 | Two internal genitalia swabs |
| Item 004.004.01 | Two external genital swabs |
| Item 004.005.01 | Two oral swabs |
| Item 004.006.01 | Two anal swabs |
| Item 004.007.01 | Sample collected from inside crotch panel of underpants |
| Item 005.001 | Buccal cell standard labeled as from Ali Al-Awadi |

**RESULTS:**

DNA (Deoxyribonucleic Acid) was characterized using the Polymerase Chain Reaction (PCR) and the AmpFlSTR Identifiler Plus amplification kit. Amplification was performed at genetic loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, FGA and Amelogenin.

Spermatozoa were not observed and no male DNA was detected in the sperm fractions of items 004.002.01, 004.003.01, 004.004.01, 004.005.01 and 004.006.01; therefore, DNA analysis was not conducted on the sperm fractions of these items.

Spermatozoa were not observed in the sperm fraction of item 004.007.01. Male DNA was detected in the sperm fraction of item 004.007.01; therefore, DNA analysis was conducted on the sperm fraction of item 004.007.01.

**CONCLUSIONS:**

Assuming ▆▆▆▆▆▆▆▆▆▆ (004.001.01) is a contributor, the DNA profiles obtained from the epithelial fractions of items 004.002.01, 004.003.01, 004.004.01, 004.005.01, 004.006.01 and 004.007.01 are consistent with the DNA profile of ▆▆▆▆▆▆▆▆ (004.001.01). An additional allele was detected in the epithelial fraction of item 004.007.01 from which no conclusion can be drawn.

The DNA profile obtained from the sperm fraction of item 004.007.01 is a mixture with major and minor contributors. Assuming ▆▆▆▆▆▆▆▆▆ (004.001.01) is a contributor, the DNA profile of the major contributor is consistent with the DNA profile of ▆▆▆▆▆▆▆▆▆ (004.001.01). The

**Laboratory Examination Report**    LAB14-05043        Page 2 of 2

partial DNA profile of the minor contributor is inconclusive.

Portions of pertinent evidence items are being stored frozen.

Results of additional Y-STR analysis will be reported upon completion.

F8760

Signature:

**Tonya Fishburn**
**Forensic Scientist**



**Indianapolis-Marion County Forensic Services Agency**
40 S. Alabama Street
Indianapolis, IN 46204
(317)327-3670    FAX (317)327-3607

## Laboratory Examination Report    LAB14-05043    Page 1 of 2

**DATE: 09/22/2015**    **Agency Case #:    DP14088487**

**TO: Indianapolis Metropolitan Police Department**

**FROM: Tonya Fishburn, Forensic Scientist**

**EXAMINATION REQUESTED: Y-STR Analysis**

**MATERIAL SUBMITTED:**

| | |
|---|---|
| **Item 004.007.01** | Sample collected from inside crotch panel of underpants |
| **Item 005.001** | Buccal cell standard labeled as from Ali Al-Awadi |

**RESULTS:**

Deoxyribonucleic Acid (DNA) was characterized using the Polymerase Chain Reaction (PCR) and the AmpFlSTR Y-filer amplification kit. Amplification was performed at genetic loci DYS456, DYS389I, DYS390, DYS389II, DYS458, DYS19, DYS385, DYS393, DYS391, DYS439, DYS635, DYS392, GATAH4, DYS437, DYS438 and DYS448.

**CONCLUSIONS:**

The Y-STR DNA profile obtained from the epithelial fraction of item 004.007.01 is consistent with the Y-STR DNA profile of Ali Al-Awadi (005.001). Therefore, Ali Al-Awadi (005.001) and all his male paternal relatives cannot be excluded as potential Y-STR contributors to the sample. The Y-STR DNA profile obtained from the epithelial fraction of item 004.007.01 was searched in the U.S. Y-STR database. The DNA profile was not observed in 25,644 individuals. The upper 95% confidence limit on this estimate is 0.000116, or 1 in 8,621 individuals.

No Y-STR DNA profile was obtained from the sperm fraction of item 004.007.01.

Portions of pertinent evidence items are being stored frozen.

Please see the autosomal STR analysis report for results of that examination.

**Laboratory Examination Report**     LAB14-05043     Page 2 of 2

F8760

Signature:

Tonya M. Fishburn

**Tonya Fishburn**
**Forensic Scientist**

August 21, 2014

Ms. Chiana came to me around 3:30 and let me know that she needed to speak with me. She said that Tyria came to her and said that when she got back from lunch break ▌▌ was upset that it burned when she went to the bathroom. She said that ▌▌ said that Mr. Ali touched her down there and pointed to her privates. She said now her privates really hurt. Chiana told Tyria that she would talk to me and we would go from there.


I questioned ▌▌! ▌▌ told me that when she was trying to sleep and that Mr. Ali touched her down here and that he hurt it really bad. I said can you show me what hurts really bad? She said yes and pointed to her vigina. I said did Mr. Ali say why he is doing this to you? She said mommy told me not to put to many bubbles in the tub and when I told Mr. Ali he put his fingers in there and touched me. She said I told him I didn't like it. He said don't lie and not to tell anyone. She said to me it hurts really bad now. I thaked her and told her she could go back to class.

*Heidi Conces*

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 61 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 57-1 Filed 01/22/16 Page 2 of 3 PageID 192
3425

8/20/14

Ms. Tyria came to me around 2:30pm and stated that when she let ████ use the restroom-████ came back and said her private hurt. When she asked her what was wrong. She said Mr. Ali touched her down there. I called ████ over to me and asked her what was wrong & what happened. She said Mr. Ali touched me down there (pointing & touching her private area). Then she said-now it hurts really bad. So I then told Tyria that I would talk to Ms. Heidi about it and we would go from there. & let her talk to Mr. Ali about it.

Chiana Harris

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 62 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 147-1 Filed 12/12/16 Page 3 of 3 PageID #193
3426

8/20/2014

today @ 1233 I Tyria Graham WENT ON
lunch break leaving the children
with Mr Ali
I returned from break @ 138
Mr. Ali left the room to go on break

I sat in the middle of two children
▮▮▮▮▮ + ETHAN ▮▮▮▮▮

＊ ▮▮▮ told me she had to go to the
rest room   I told her to go + hurry
back — she went + came back — sat
next to me + told me that it hurts
when she pees
# why does it hurt?
Mr. Ali touched it all the way + it hurts
real bad
# why he do that?
He just touched it right there + mommy
said I cant let bubbles in the tub get on
me because it will hurt
Ms. Tyria  Mr. Ali just do that to me
all the way + it really hurts

I asked ▮▮▮ to show me where he touched
her + she pointed to her private + said
it hurts

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 63 of 349 PageID #1
Case 1:15-cr-00072-TWP-DML   Document 3-1   Filed 01/22/16   Page 1 of 185   PageID #94
3427

# VOLUNTARY STATEMENT
# IN CUSTODY

## CHILD ADVOCACY CENTER
## 4134 North Keystone Avenue

Date:  August 22, 2014       Place:  Indianapolis Metropolitan       Time Started: 3:46 p.m.
                                     Police Department

I, Ali Al-Awadi, the undersigned, am 20 years of age, my date and place of birth being October 6, 1993, at _____.   I now live at 7322 Camberwood Drive, Indianapolis, Indiana.

I have been informed by Officer Detective Eli McAllister of the Indianapolis Metropolitan Police Department of my **CONSTITUTIONAL RIGHTS** and have voluntarily waived those **RIGHTS** as indicated by my **WAIVER OF RIGHTS.**

I declare that the following statement is being made of my own free will without any promises or threats having been made to me and without pressure or coercion having been used against me and will full knowledge and understanding of my **RIGHTS**.

I have read each page of the statement consisting of ___ pages, each page of which bears my signature, and corrections, if any, bear my initials.  I certify that the facts contained herein are true and correct.

Statement completed at _____ .m. on the _____ day of _____, 201 .

Witnessed:                        Signed:


_____        _____


_____        _____


STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 1 OF 185

THIS IS DETECTIVE ELI MCALLISTER WITH INDIANAPOLIS METRO POLICE

DEPARTMENT, TODAY'S THE 27TH..., 22ND OF AUGUST, 2014, RIGHT NOW IT IS 3:46

P.M.  I'LL BE CONDUCTING AN INTERVIEW REFERENCE IMPD CASE NUMBER

PD14-088487.  I'M HERE AT THE CAC AND I'LL BE SPEAKING WITH MR. ALI

NADEEM AL-AWADI. (UNSURE OF NAME AND SPELLING)

Q:     (DOOR OPENS) HEY.

A:     (INAUDIBLE-UNSURE)

Q:     WHAT'S THAT?

A:     HELLO.

Q:     HELLO, YEAH, SORRY TO MAKE YOU WAIT, MAN. (DOOR CLOSES)

A:     (INAUDIBLE)

Q:     UH, (INAUDIBLE-UNSURE), THIS STUPID THING THAT'S IN THE WAY.  I'M
       GONNA KICK THIS BACK IN THE CORNER IF THAT'S ALRIGHT, I NEVER USE
       THOSE THINGS, I DON'T KNOW WHY THEY PUT 'EM IN HERE. (CHUCKLE)

A:     (CHUCKLE)

Q:     ANYWAYS, OH, OKAY MAN.  SO YEAH, UH, ELI MCALLISTER'S MY NAME
       AND LIKE I SAID I'M A DETECTIVE; MY JOB'S JUST TO BASICALLY LOOK
       INTO THINGS, OKAY?

A:     M-HMM.

Q:     SO THAT'S WHAT I'M HERE TO DO.  UH, WHENEVER I TALK TO SOMEONE I
       ALWAYS RECORD IT, THAT'S WHAT THIS THING IS JUST A LITTLE AUDIO
       RECORDER, UH…

A:     UNDERSTAND.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 2 OF 185

Q:     …OKAY AND YOU PROBABLY NOTICED THERE'S SOME CAMERAS IN HERE, THAT'S JUST TYPICAL, WE ALWAYS…, WE ALWAYS HAVE…, UH, OUR INTERVIEW ROOMS RECORDED.  UH, WHEW, I'VE BEEN BUSY TODAY, (CHUCKLE) HOW'S YOUR DAY BEEN, MAN?

A:     (INAUDIBLE) UH, STRESSFUL EVER SINCE YESTERDAY HONESTLY, COULDN'T SLEEP AT ALL LAST NIGHT BECAUSE…, I MEAN TO BE HONEST WITH YOU IT'S LIKE A NIGHTMARE.

Q:     YEAH.

A:     AND ESPECIALLY IT'S NOT TRUE, IT'S REALLY BEEN BOTHERING ME BECAUSE I MIGHT HAVE TO LIVE THE REST OF MY LIFE WITH THIS HANGING OVER MY HEAD.

Q:     YEAH.

A:     AND HOPEFULLY IT'S ALL CLEARED UP AFTER TODAY.

Q:     OKAY.  WELL MY JOB'S TO FIGURE OUT JUST EXACTLY WHAT HAPPENED, SO IF THIS IS A BIG MISUNDERSTANDING THEN I'M THE GUY THAT'S SUPPOSED TO FIGURE THAT OUT, OKAY.  SO…

A:     AWESOME.

Q:     …UH, UH, SO YOU LIVE HERE IN INDIANAPOLIS?

A:     YES I DO.

Q:     OKAY, UH, DO YOU…, WHERE'D YOU GROW UP?

A:     UH, I ACTUALLY GREW UP HERE; I CAME TO AMERICA WHEN I WAS 2 YEARS OLD.

Q:     M-HMM.

A:      UH, BORN ON A REFUGEE CAMP IN SAUDI ARABIA…

Q:      HMM.

A:      …UH, TO ESCAPE THE TYRANNY OF SADAM HUSSEIN, SO…

Q:      HMM.

A:      …CAME HERE 2 YEARS OLD, PRETTY MUCH AMERICA'S MY HOME…

Q:      YEAH, OKAY.

A:      …THAT'S WHY IF PEOPLE LOOK AT ME THEY DON'T THINK I'M FROM THE

        MIDDLE EAST, THEY'RE LIKE, YOU DON'T HAVE AN ACCENT, YOU DON'T

        HAVE ANYTHING WRONG WITH YOU. (CHUCKLE)

Q:      (CHUCKLE)

A:      I WAS LIKE, WELL I'VE BEEN HERE ALL MY LIFE, SO.

Q:      YEAH, I DON'T KNOW IF BEING FROM THE MIDDLE EAST MEANS

        SOMETHING'S WRONG WITH YOU. (CHUCKLE)

A:      I MEAN SOME PEOPLE…, BECAUSE OF THE WHOLE…, LIKE THE

        TERRORISM GOING ON THERE…

Q:      OH YEAH.

A:      …THE WHOLE…, AFTER 911 EVERYTHING JUST WENT…

Q:      YEAH.

A:      …STRAIGHT…, IT WAS TERRIBLE.

Q:      …YES, IT WAS.  UH, NOW DO YOU STILL HAVE FAMILY IN IRAQ?

A:      YES I DO.

Q:      YEAH, UH…

A:      UH…

Q:     …DO YOU EVER KEEP TOUCH WITH THEM OR IS IT…?

A:     …WE TRY TO, IT'S…, IT'S BEEN GETTING A LOT EASIER NOW BECAUSE SKYPE AND THE…, UH, THEY USED TO HAVE PROBLEMS WITH THEIR…, UH, ELECTRICITY GENERATORS THERE WHERE THEY WERE LIMITED TO ONLY A CERTAIN TIME OF THE DAY THEY CAN…

Q:     UH HUH.

A:     …USE THE ELECTRICITY, BUT NOW IT'S GETTING A LOT BETTER SO WE'RE ABLE TO CALL THEM, UH, VIDEO CHAT THEM, IT'S BEEN A LOT EASIER NOW.

Q:     YEAH, WHAT KIND OF FAMILY DO YOU HAVE OVER THERE STILL?

A:     I HAVE SO MANY UNCLES AND SO MANY…, UH, AUNTS, UH, MY GRANDPA'S OVER THERE…

Q:     OH.

A:     …LOTS OF COUSINS.  UH, THEY PRETTY MUCH JUST STAYED BECAUSE THEY WANTED TO ROUGH IT OUT.  THEY SAID IF IT'S NOT ANY BETTER HERE THEN WHAT MAKES YOU THINK IT'S GONNA BE BETTER TO JUST CHANGE YOUR WHOLE LIFE OVER HERE…

Q:     M-HMM.

A:     …WE JUST WANTED A BETTER LIFE AND IT'S BEEN PRETTY GOOD.

Q:     YEAH, ALRIGHT.  DO YOU FEEL LIKE YOU'RE LIKE…, I MEAN YOU'RE CLEARLY…, IF YOU CAME HERE SINCE YOU WERE…, WHAT DID YOU SAY 2 OR 3?

A:     2 YEARS OLD.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 5 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 68 of 349 PageID #:
3432
Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 6 of 185   PageID #: 99

Q:      SO I MEAN YOU DON'T KNOW ANY DIFFERENT, LIKE YOU DIDN'T…

A:      UH…

Q:      …YOU PROBABLY DON'T HAVE ANY MEMORIES OF IRAQ, DO YOU?

A:      …EXACTLY.

Q:      ARE YOU GLAD YOU CAME?

A:      THEY TELL ME SO MANY STORIES OF ME BEING OUT WITH THE CHICKENS
        AND ALWAYS CHASING THEM AROUND AND LIKE PRETTY MUCH REALLY
        LIKE AGGRESSIVE WITH THE CHICKENS BECAUSE I WASN'T SCARED OF
        THEM.  THEY WOULD ACTUALLY START BITING PEOPLE, WITH ME THEY'D
        BITE ME AND I'M JUST LIKE…, LIKE HITTING THEM.

Q:      YEAH.

A:      BUT THEY TOLD ME ALL THESE STORIES AND I JUST DON'T REMEMBER
        ANYTHING AND HONESTLY I DON'T EVEN REMEMBER UNTIL MAYBE LIKE
        KINDERGARTEN HERE…, WELL ACTUALLY PRESCHOOL HERE.  SO IT'S
        BEEN…, IT'S BEEN A LONG RIDE.

Q:      YEAH, NO KIDDING AND SO I MEAN DO YOU FEEL LIKE A CONNECTION TO
        THE…, YOUR FRIENDS OVER THERE OR YOUR FAMILY OVER THERE OR DO
        YOU FEEL KINDA LIKE…

A:      HONESTLY…

Q:      …I MEAN DO THEY LOOK AT YOU WEIRD OR DIFFERENT OR UH…?

A:      …THEY…, THEY LOOK AT ME DIFFERENT BECAUSE THEY'RE LIKE, AW, HE
        DOESN'T KNOW ANY ARABIC, THE…, WELL EVEN THOUGH I DO THEY…,
        THEY SEE AN ACCENT, BECAUSE SINCE…

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 6 OF 185

Q:      OH REALLY.

A:      …SINCE I WASN'T TALKING OVER THERE AND I SPEAK ENGLISH MOSTLY

        OVER HERE, THEY'RE LIKE WELL HIS ARABIC ISN'T AS STRONG, HE HAS

        A…, A STRONG ACCENT, BUT I DON'T HEAR IT; BUT THEN AGAIN SOME

        PEOPLE FROM TEXAS WON'T HEAR THEIR ACCENT COMPARED TO PEOPLE

        IN NEW YORK, SO.

Q:      YEAH, YEAH.

A:      IT'S JUST ONE OF THOSE THINGS.

Q:      HAVE YOU EVER BEEN BACK OVER FOR A VISIT?

A:      I'VE BEEN PLANNING ON ONE, MY PARENTS WENT MARCH…

Q:      UH HUH.

A:      …THIS YEAR AND UH, THEY TOLD ME I HAVE TO GO, EVERYONE WANTS

        TO SEE ME, THEY WANT TO SEE THE LITTLE BOY WHO USED TO CHASE

        CHICKENS AROUND ALL GROWN UP NOW.

Q:      THAT'S FUNNY, YEAH.  SO, UH, WHO ALL CAME OVER, JUST YOU, YOUR

        MOM AND…

A:      UH…

Q:      …DAD OR…?

A:      …MY GRANDPA CAME OVER FIRST…

Q:      OH REALLY.

A:      …AND HE BROUGHT OVER I THINK 3 OF MY UNCLES WITH HIM AND THEN

        WE WERE SUPPOSED TO FOLLOW HIM AT THE SAME TIME, BUT MY MOM

        WAS PREGNANT WITH MY LITTLE BROTHER…

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 7 OF 185

Q:      M-HMM.

A:      …AND THEY PUT HER AS A RISKY FLIGHT ATTEN…, OR ATTENDEE…

Q:      M-HMM.

A:      …SO THEY WOULDN'T LET US BOARD THE PLAN.  SO UNTIL MY BROTHER WAS AROUND 9 MONTHS THEN WE CAME TO AMERICA.

Q:      M-HMM.

A:      BUT I DON'T REALLY FEEL MUCH OF A CONNECTION TO THEM OVER THERE ONLY BECAUSE…, UH, IT'S LIKE YOU FINDING OUT YOU HAVE FAMILY RIGHT NOW, YOU…, YOU'VE NEVER MET THEM, YOU DON'T KNOW WHAT THEY'RE LIKE, YOU DON'T KNOW WHAT THEIR FAVORITE FOOD IS, WHAT THEY LIKE TO LISTEN TO, STUFF LIKE THAT.  IT'S…

Q:      YEAH, UH HUH.

A:      …JUST ONE OF THOSE THINGS WHERE YOU DON'T KNOW THEM, BUT YOU KNOW THEM.

Q:      (CLEARING THROAT) YEAH, ABSOLUTELY.

A:      M-HMM.

Q:      HUH AND UH, SO YOU GREW UP HERE IN INDIANAPOLIS OR SOMEWHERE ELSE IN THIS…, IN THE COUNTRY?

A:      PRETTY MUCH IN INDIANAPOLIS…

Q:      YEAH.

A:      …UH, I THINK WE LIVED IN APARTMENTS AT FIRST, THEN WE GOT US A LITTLE HOUSE.

Q:      YEAH.

A:   THEN 4TH GRADE YEAR BOUGHT A BIGGER HOUSE AND I REMEMBER THAT BECAUSE IT WAS ONE OF THE HARDEST TRANSITIONS OF MY LIFE GOING FROM SCHOOL TO SCHOOL IT WAS JUST SOMETHING REALLY TRAUMATIC FOR ME AND THEN I WAS JUST LIKE…, IT'S LIKE STARTING ALL OVER, YOU LOSE SO MANY FRIENDS AND THEN YOU GO TO THIS NEW ENVIRONMENT YOU'VE NEVER EVEN BEEN IN.

Q:   HMM.

A:   IT…, IT WAS KINDA TOUGH, BUT IT…

Q:   YEAH.

A:   …I CAN'T SAY I REGRET ANY OF THAT.

Q:   YEAH.  SO WHAT…, WHAT…, WHAT AREA OF TOWN DID YOU END UP MOVING TO WHEN YOU WERE IN THE 4TH GRADE?

A:   UH, JUST…, UH, NORTHWEST SIDE, RIGHT HERE ON…, THE SAME HOUSE THAT THEY CAME AND GOT ME FROM…

Q:   OH OKAY, OKAY.

A:   …THE…, UH, 71ST AND MICHIGAN REALLY.

Q:   OH REALLY, OKAY.

A:   AND WE WERE ON 52ND AND GEORGETOWN, EVEN THOUGH IT WASN'T A REALLY BIG MOVE…

Q:   YEAH.

A:   …EVERYTHING CHANGED, M-HMM.

Q:   DIFFERENT SCHOOL AND THAT.  THE ELEMENTARY SCHOOLS THEY HAVE LIKE ONE EVERY…

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 9 OF 185

A:     EVERY CORNER…

Q:     …YEAH. (CHUCKLE)

A:     …AND THEN THEY'RE LIKE YOU CAN'T GO ALL THE WAY OVER THERE

       BECAUSE THERE'S ONE RIGHT HERE.

Q:     YOU GOT TO PASS 3 JUST TO GET THERE, YEAH…

A:     M-HMM.

Q:     …I REMEMBER HOW IT IS.  UH, (CLEARING THROAT) AND SO WHICH HIGH

       SCHOOL DID YOU END UP GOING TO?

A:     PIKE HIGH SCHOOL.

Q:     OKAY.  DID YOU GRADUATE FROM THERE?

A:     YES I DID.

Q:     OKAY, AWESOME.  UH, SO DID YOU DO ANY SPORTS OR ANY ACTIVITIES

       THERE WHILE YOU WERE OUT THERE?

A:     UH…

Q:     MAYBE NOT SPORTS, BUT ANYTHING LIKE CLUBS OR ANYTHING?

A:     …UH, I DID A LITTLE BPA, THAT'S ABOUT… (UNSURE)

Q:     WHAT'S THAT?

A:     …BUSINESS PROFESSIONALS OF AMERICA.

Q:     OKAY.

A:     IT'S PRETTY MUCH A COMPUTER…, UH, EXPERTEES CLUB…

Q:     OKAY.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 73 of 349 PageID #4
Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 01/22/16 Page 11 of 185 PageID 204
3437

A:    …WHERE YOU GO AND THERE'S NATIONAL CHALLENGES, I NEVER REALLY GOT INTO THOSE, BECAUSE…, UH, WHEN MY GRANDPA PASSED AWAY MY FRESHMAN YEAR, UH, REALLY HIT ME KINDA HARD…

Q:    M-HMM.

A:    …TO THE POINT WHERE I STARTED SLACKING IN SCHOOL AND THE BIGGEST REGRET WAS JUST STARTING TO SLACK, CAUSE IF YOU WOULD'VE SEEN ME DO THAT YOU WOULD'VE REALLY DISAPPROVED.

Q:    M-HMM.

A:    BUT SINCE HE WAS THE ONLY GRANDPARENT I KNEW, IT WAS LIKE REALLY…, WE HAD A REALLY GOOD BOND AND FOR THE LONGEST I FELT LIKE DEPRESSED ABOUT IT ALMOST.

Q:    M-HMM.

A:    AND…

Q:    YOU SAID IT WAS YOUR FRESHMAN YEAR?

A:    …YEAH, MY FRESHMAN YEAR.

Q:    M-HMM.

A:    AND IT WAS REALLY HARD BECAUSE I WAS STILL TRYING TO FIT IN AND UH, IT WAS JUST REALLY TOUGH KNOWING HE WASN'T IN THE PICTURE ANYMORE.  SO, UH, AFTER THAT I STARTED PRETTY MUCH ISOLATING MYSELF FROM A LOT OF THINGS.  THEN MY JUNIOR YEAR I STARTED OPENING BACK UP, I TRIED OUT FOR SOCCER, UH, TOO LATE TO MAKE THE TEAM.  SO AFTER I TRIED OUT BECAUSE WHEN I FIGURED I'LL TRY OUT, IT WAS A LITTLE TOO LATE.

STATEMENT OF ALI AL-AWADI       DP14-0088487       PAGE 11 OF 185

Q:      M-HMM.

A:      THEN I TRIED TRACK AND THEN…, UH, LIKE TORE MY HAM STRING A

        LITTLE BIT, WELL LIKE REALLY PULLED IT AND IT WAS SO PAINFUL I

        DIDN'T GO BACK AFTER THAT.

Q:      AW YEAH.

A:      AND I JUST PLAY INTERMURAL SPORTS PRETTY MUCH, BASKETBALL,

        SOCCER JUST FOR FUN, I'M NOT REAL…

Q:      YEAH, WHAT'S YOUR FAVORITE?

A:      …UH, I'D HAVE TO GO WITH SOCCER ONLY BECAUSE IT'S A LOT MORE

        INTENSE, BECAUSE IT'S NO BRAKES.

Q:      YEAH, YEAH, JUST CONSTANT.

A:      BASKETBALL, YOU'RE SHOOTING THEN YOU GOT TO RUN BACK…, BACK

        AND FORTH.

Q:      M-HMM. (CLEARING THROAT)

A:      PICK UP GAMES ARE A LOT LONGER THAN ACTUAL GAMES, CAUSE YOU

        GET SOME MANY TIME OUTS, YOU GOT…, WELL WE STOPPED THE TIME

        FOR THIS AND THIS, IN SOCCER THERE'S NOT STOPPAGE, YOU JUST…

Q:      YEAH, 45 MINUTES.

A:      …RUN, RUN, RUN, RUN, IT'S…

Q:      PLUS STOPPAGE, 45 MINUTES PLUS STOPPAGE.

A:      …IT'S…, IT'S A LONG DAY.

Q:      YEAH.  DID YOU WATCH MUCH OF THE WORLD CUP?

A:      I…, IT WAS UPSETTING…

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 12 OF 185

Q:     YEAH.

A:     …TO SAY THE LEAST, CAUSE…

Q:     WELL HOW DID…, WELL YOU PROBABLY WERE…, WHO WERE YOU

       CHEERING FOR PRIMARILY?

A:     UH, I…, MY FAVORITE TEAM WAS ARGENTINA AND…

Q:     OH REALLY…

A:     …YEAH.

Q:     …WELL THEN THAT WAS DISAPPOINTING.

A:     ESPECIALLY HOW…

Q:     SO WE KNOW (INAUDIBLE-UNSURE) A BIG FAN OF HIM?

A:     HUGE, HUGE FAN OF HIM.  WELL, UH, THE SIERRA…, (UNSURE) I

       ACTUALLY THOUGHT THE NETHERLANDS WERE GONNA WIN BECAUSE

       THEY'RE A REALLY, REALLY TOUGH TEAM AND I DID NOT EXPECT

       GERMANY TO JUST BLOW OUT BRAZIL LIKE THAT, IT WAS INTENSE.

Q:     UNBELIEVABLE, ISN'T IT?

A:     WELL LIKE I WAS CHECKING MY PHONE AND THEN SOME GUY'S LIKE

       YEAH, THE SCORES STILL ZERO/ZERO, I WAS LIKE I BET IF YOU CHECK IT

       AGAIN THE SCORE'S DIFFERENT, HE'S LIKE I JUST CHECKED IT.  HE

       CHECKS IT, IT'S ONE/ZERO AND I WAS LIKE, YEAH, THE GAME'S

       PROBABLY GONNA END LIKE TWO…, TWO/ONE SOMETHING LIKE THAT.

       HE WAS LIKE, NO AND THEN BY HALFTIME IT WAS FIVE/ZERO, I WAS LIKE,

       NO.

Q:     IT ENDED SEVEN/ZERO, RIGHT?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 13 OF 185

A:     UH, I THINK SO.

Q:     I THINK IT WAS SEVEN.

A:     BUT IT'S…, IT'S TERRIBLE, TERRIBLE LOSS.

Q:     I DON'T REMEMBER WHO ELSE…, I'M TRYING TO THINK WHO ELSE I LIKED WATCHING.  UH, WHO WERE SOME OF THE FAVORITE TEAMS YOU LIKED, YOU SAID NETHERLANDS, YOU ENJOYED THEM?

A:     I ENJOYED THE NETHERLANDS, UH, USA, I REALLY WANTED THEM TO WIN THIS YEAR.

Q:     OH YEAH, I KNOW, ME TOO OBVIOUSLY.

A:     IT WAS…, IT WAS TOUGH AFTER SEEING THEM GET SO FAR THIS YEAR…

Q:     I KNOW.

A:     …BEATING OUR GHANA…, UH, RIVAL AND JUST BARELY SHY…

Q:     JUST SHOULD'VE…, PORTUGAL, MAN, THEY SHOULD'VE BEAT 'EM, RIGHT?

A:     BUT IT WAS…, THAT WAS A LACK OF DEFENSE I WOULD SAY.

Q:     THEY COULD'VE LASTED LIKE 4 SECONDS THOUGH, MAN, IT WAS LIKE 95 MINUTES IN, THEY…

A:     IT WAS…, IT WAS TERR…, I DID NOT EXPECT THAT TO COME AND THEN WELL THE…, YOU CAN'T EXPECT ANY LESS FROM RENARDO, HE IS A BEAST. (UNSURE OF NAME SPELLING)

Q:     OH MAN, ONE FREAKING TO AN HOUR, MAN. (UNSURE) LIKE THE…, THE DEFENSE…, I DON'T KNOW, HE WAS…, HE WAS NUTS.

A:     WELL I MEAN SEEING THAT…, THAT SHOT WITH THE HEADER LOOKED LIKE THE GUY KICKED THE BALL, THAT'S HOW FAST IT WENT IN. SO I DON'T LIKE…

Q:     YOU'RE TALKING ABOUT PORTUGAL'S GOAL?

A:     …YEAH, THAT…, THAT WAS…, IT WENT IN SO FAST I DIDN'T THINK IT EVEN WENT IN, I WAS LIKE, NO WAY.

Q:     YEAH, THAT'S NUTS, THAT'S NUTS. (COUGHING) UH, I'LL TELL YOU WHAT MAN, I…, I…, UH, I'D RATHER JUST SIT AROUND AND WATCH SOCCER… (CHUCKLE)

A:     I…

Q:     …BUT I DON'T THINK THERE'S ANY MATCHES ON RIGHT NOW, PLUS WE KINDA HAVE TO GET TO SOMETHING, MAN, SO.

A:     …OF COURSE.

Q:     UH, I PROBABLY OUGHT TO…, UH, START DOING MY JOB, RIGHT. (CHUCKLE)

A:     (CHUCKLE) NICE LITTLE BREAK.

Q:     LET'S SEE HERE, YEAH, WELL YOU KNOW I…, UH, YOU GOT ME ON A TOPIC I'M QUITE INTERESTED IN.  I WAS LIKE…, AND I'M LIKE 33…

A:     M-HMM.

Q:     …YEAH, SO I'M A LITTLE BIT OLDER AND I WAS LIKE…, AFTER WATCHING ALL THE LITTLE CUP GAMES, I'M LIKE I ALMOST WISH THERE WAS LIKE AN ADULT LEAGUE I COULD GO PLAY IN, MAN, CAUSE THIS WOULD BE FUN. (CHUCKLE)

A:      UH, WELL…

Q:      SOME…

A:      …I DON'T KNOW IF YOU'VE EVER HEARD OF SPORTS ZONE, THEY

         ACTUALLY HAVE INDOOR LEAGUES YOU CAN JUST…

Q:      …OH REALLY.

A:      …PLAY WITH YOUR OWN TEAM AND PLAY, IT'S…, IT'S A LOT OF FUN.

         (UNSURE)

Q:      YEAH, YEAH.

A:      AND I USED TO DO THAT AND THEN…, UH, JUST STARTED GETTING A LOT

         BUSIER AND STOPPED MAKING TIME FOR SOCCER.

Q:      YEAH, THAT SUCKS.  UH, MAN, SOMEBODY'S BLOWING MY PHONE UP, I

         GOT TO GO FIGURE OUT WHAT THEY NEED AND TELL 'EM TO STOP

         CALLING ME, SO…

A:      YEAH.

Q:      …I'LL BE RIGHT BACK, MAN, I'M SORRY FOR THE INTERRUPTION.

A:      IS IT ALRIGHT IF I CHECK MY PHONE OR IS THAT…?

Q:      YEAH, IF YOU NEED TO, THAT'S FINE, MAN. (DOOR OPENS)

A:      OKAY.

Q:      IF IT'S STILL ON…, TYPICALLY…, I'LL BE HONEST WITH YOU TYPICALLY

         WE HAVE A RULE WE'RE NOT ALLOWED TO HAVE ANY PHONES IN THE…,

         IN THE ROOM…

A:      OKAY.

Q:      …SO I MEAN…

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 16 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 79 of 349 PageID #:
3443
Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 01/22/16   Page 77 of 185 PageID #:
10

A:      IF YOU DON'T WANT ME TO CHECK, IT'S FINE.

Q:      …WELL THE THING IS I DON'T REALLY WANT TO GET IN TROUBLE, DO

        YOU MIND…, UH, UH…

A:      YEAH, I CAN TAKE IT OUT, YEAH.

Q:      …OKAY, JUST POWER IT DOWN OR SOMETHING OR…?

A:      YEAH.

Q:      I'LL JUST STICK IT ON MY DESK, I DIDN'T KNOW YOU HAD IT IN THERE,

        USUALLY…, USUALLY THEY…, UH, THEY…, THEY MAKE SURE NO ONE

        COMES IN WITH A CELL PHONE.  SO I'LL…, I'LL GO AHEAD AND STICK IT

        ON MY…, UH…

A:      ALRIGHT.

Q:      …ON MY DESK, IT'LL BE SAFE, BUT…, UH, BUT I'LL RETURN IT TO YOU

        WHEN WE'RE DONE. (UNSURE)

A:      OKAY.

Q:      ALRIGHT, MAN. (DOOR CLOSES)

(PAUSE)

Q:      (DOOR OPENS) HEY, I'M SORRY ABOUT THAT, MAN. (DOOR CLOSES)

A:      THAT'S FINE.

Q:      UH, IF YOU BELIEVE ME IT'S KIND OF A COMPLICATED ORDEAL, MAN,

        TRYING TO GET EVERYTHING FIGURED OUT, YOU KNOW WHAT I MEAN?

A:      M-HMM…

Q:      SO, UH…

A:      …FORTUNATELY.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 17 OF 185

Q:     …SO ANYWAYS MAN, I'D LIKE TO TALK TO YOU IF I COULD.  UH, I KNOW
       THEY DIDN'T GIVE YOU A WHOLE LOT OF CHOICE ABOUT COMING DOWN
       HERE…

A:     NO, NO.

Q:     …BUT…, UH, I THINK WE DO SHARE ONE COMMON GOAL WHICH IS TO GET
       THIS THING FIGURED OUT AND BEHIND US, AM I RIGHT?

A:     YEAH, FOR SURE.

Q:     UH, I…, UH, I'VE GOT SOMEWHERE TO BE THIS WEEKEND, SO I'M
       GONNA…, I…, YOU KNOW I WANT TO GET OUT OF HERE AS QUICK AS WE
       CAN, BUT…, UH…

A:     UH HUH, OF COURSE.

Q:     …BUT AT THE SAME TIME KNOW THIS IS AN IMPORTANT DEAL…

A:     M-HMM.

Q:     …FOR…, FOR YOUR LIFE AND FOR…, UH, FOR…, FOR THE…, THE
       DAYCARE AND FOR THE KIDS AND ALL THAT, IT…, IT MATTERS, RIGHT,
       NO MATTER WHAT HAPPENS…

A:     YEAH, OF COURSE.

Q:     …IT MATTERS FOR EVERYBODY.

A:     I MEAN EVEN IF IT WAS SOMEONE ELSE I'D THINK THE SAME THING.

Q:     YEAH, YEAH.  SO…, SO GIVEN ALL THAT, UH, I REALLY AM INTERESTED IN
       HEARING YOUR SIDE OF IT ALL, UH, I'VE BEEN BUSY TODAY, BEEN
       TALKING TO A BUNCH OF DIFFERENT PEOPLE, LOOKING AT…, YOU KNOW,
       UH, ALL KINDS OF DIFFERENT PIECES OF INFORMATION.

A:    OF COURSE.

Q:    BUT…, UH, BUT I FEEL LIKE NOW WOULD BE A GOOD TIME TO GET YOUR SIDE OF IT AND FIGURE OUT WHAT YOU CAN TELL ME ABOUT ALL THIS, OKAY?

A:    ALRIGHT.

Q:    SO, UH, I'D LIKE TO JUST START BY GETTING SOME BASIC INFORMATION ABOUT YOU.  UH, WHAT'S YOUR FULL NAME?

A:    ALI AL-AWADI, A-L-I.

Q:    UH HUH.

A:    LAST NAME IS A-L…

Q:    UH HUH.

A:    …DASH A-W-A-D-I.

Q:    OKAY, IS THAT YOUR FULL NAME?

A:    YEAH.

Q:    OKAY, DO YOU HAVE A MIDDLE NAME OR ANY…

A:    WELL I HAVE A MIDDLE INITIAL…

Q:    …ADDITIONAL (INAUDIBLE)?

A:    …WHICH IS N.

Q:    WHAT'S THAT STAND FOR?

A:    UH, IT'S MY DAD'S NAME, NADHIN, N-A-D-H-I-N; N-A-D-H-I-N.

Q:    N-A-D-H-I-N?

A:    M-HMM.

Q:    AND THAT'S PRONOUNCED NADHIN?

A:     M-HMM.

Q:     ALRIGHT. SO DO YOU STILL LIVE AT YOUR PARENTS' HOUSE WITH THEM, ARE THEY STILL THERE?

A:     YEAH, YEAH.

Q:     MOM AND DAD?

A:     YEAH.

Q:     YOU SAID SOMETHING ABOUT A LITTLE BROTHER; SHE WAS PREGNANT WHEN YOU GUYS WERE TRYING TO LEAVE?

A:     MY…

Q:     DID SHE HAVE A…, A BRO…, DO YOU HAVE A BROTHER?

A:     …MY BROTHER'S AT I.U. RIGHT NOW.

Q:     OKAY, WHAT'S HE STUDYING?

A:     UH, LAST TIME I TALKED TO HIM HE TOLD ME MICRO-BIOLOGY.

Q:     OH YEAH.

A:     BUT HE WANTS TO BE A GENERAL SURGEON, SO WE SAID IT'S WHICH EVER COMES FIRST.

Q:     OKAY.

A:     HE'S GONNA GO TO MEDICAL SCHOOL AND HE WANTS TO SEE WHICH ONE HE PREFERS.

Q:     ALRIGHT, UH, WHAT'S YOUR DATE OF BIRTH, MAN?

A:     UH, IT'S OCTOBER 6TH…

Q:     UH HUH.

A:     …1993.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 20 OF 185

Q:    OKAY AND SO HE'S JUST DOING HIS UNDERGRAD AT I.U. NOW?

A:    M-HMM.

Q:    OKAY, WHAT'S YOUR HOME ADDRESS?

A:    7322…

Q:    UH HUH.

A:    …CAMBERWOOD, C-A-M-B-E-R-W-O-O-D…

Q:    UH HUH.

A:    …DRIVE, INDIANAPOLIS, INDIANA 46268.

Q:    OKAY, UH, WHAT'S YOUR SOCIAL SECURITY NUMBER?

A:    IT'S 305-…

Q:    UH HUH.

A:    …17-8653.

Q:    OKAY AND DO YOU HAVE A CELL PHONE NUMBER?

A:    YES…

Q:    WHAT'S THAT?

A:    …317-…

Q:    UH HUH?

A:    …319-9601.

Q:    IF I HAD TO GET A HOLD OF YOU AND SOMETHING HAPPENED TO YOUR

       CELL PHONE, YOU WOULDN'T BELIEVE HOW MANY TIMES PEOPLE

       CHANGE THEIR NUMBERS, I KNOW YOU MAY NOT, BUT…

A:    UH HUH.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 21 OF 185

Q:     …PEOPLE DO; WHO WOULD I CALL OR HOW WOULD I GET IN TOUCH WITH YOU IF I COULDN'T REACH YOU AT THIS NUMBER?

A:     UH, YOU COULD CALL THE…, THE HOME.

Q:     WHAT'S THAT NUMBER?

A:     317-298-…

Q:     UH HUH.

A:     …8667.

Q:     8667, OKAY AND THEN ASIDE FROM THE HOME NUMBER IS THERE ANYONE ELSE'S CELL PHONE LIKE YOUR MOM OR DAD OR SOMEBODY LIKE THAT I COULD CALL TO REACH 'EM…, TO REACH YOU?

A:     UH, SURE, I'LL GIVE YOU MY MOM'S, ITS 317-…

Q:     UH HUH.

A:     …319-…

Q:     OKAY.

A:     …4484.

Q:     84 AND THAT'S YOUR MOM, WHAT'S HER NAME?

A:     NAWAL, UH, N-A-W-A-L.

Q:     NAWAL AND THEN WHAT'S HER…, THE REST OF HER NAME?

A:     (CLEARING THROAT) UH, AL-KHAZALI, ITS A-L DASH K-H-A-Z-A-L-I.

Q:     NAWAL AL-KHAZALI?

A:     M-HMM.

Q:     OKAY, (INAUDIBLE-UNSURE)…

A:     M-HMM.

Q:     …I SPOKE SOME FRENCH IN HIGH SCHOOL, SO. (CHUCKLE) SIMILAR…

A:     (INAUDIBLE-UNSURE)

Q:     …AT MOMENTS I'M SURE.  SO, UH, YEAH, DO YOU PREFER ENGLISH OR I…, I'M…

A:     I PREFER ENGLISH.

Q:     …WELL I'M NOT…, I CAN'T TALK TO YOU IN ARABIC IF YOU WANTED TO, I JUST MEAN WHICH…, WHICH LANGUAGE DO YOU LIKE BETTER, YOU THINK IS A COOLER LANGUAGE?

A:     UH, I LIKE SPEAKING ARABIC, BUT IN TERMS OF WHICH ONE'S EASIER IT'S ENGLISH.

Q:     YOU THINK IN…, IN PROCESSING ENGLISH MORE THAN…

A:     FOR SURE BECAUSE…

Q:     …ARABIC?

A:     …ARABIC HAS SO MANY MORE ACCENTS…

Q:     YEAH.

A:     …SO MANY DIFFERENT WAYS YOU PRONOUNCE SOMETHING.  ENGLISH IT DOES HAVE SOME THINGS THAT ARE SILENT, LIKE…, UH, UH, CAN'T EVEN THINK OF ONE OFF THE TOP OF MY HEAD, LIKE SIGNED YOU DON'T HEAR THE LETTER G…

Q:     G, EXACTLY.

A:     …IT'S STUFF LIKE THAT, BUT ARABIC  EVERYTHING IS PRONOUNCED, BUT THERE'S SO MANY DIFFERENT ACCENTS…

Q:     THAT THAT CHANGES, YEAH. (UNSURE)

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 23 OF 185

A:      …THAT IT CAN CHANGE THE WAY THE WORD SOUNDS.

Q:      WOW, YEAH.  UH, IT SOUNDS COOL AND UH, I HEAR PEOPLE SPEAK IT YOU

        KNOW, I LIKE…, I LIKE DIFFERENT LANGUAGES, I'M NOT ALWAYS GREAT

        AT IT, BUT I…, I'VE SPOKEN SOME ENGLISH OBVIOUSLY, (CHUCKLE) I

        MEAN SPANISH AND FRENCH…

A:      I'VE BEEN LEARNING SPANISH SO.

Q:      …AND ITALIAN, YEAH, THERE'S A LOT OF SPANISH SPEAKING PEOPLE IN…

A:      DEFINITELY.

Q:      …IN THE UNITED STATES NOWADAYS AND ALL OVER, BUT…, UH,

        (CLEARING THROAT).  ALRIGHT, UH, UH, AND SO YOU'VE LIVED IN THE

        CAMBERWOOD ADDRESS SINCE YOU WERE IN 4TH GRADE?

A:      YES, ABOUT 2005 I THINK IF I'M CORRECT.

Q:      OKAY.

A:      NO, 2004, I'M SORRY.

Q:      2004, HOW OLD ARE YOU NOW?

A:      I'M 20 YEARS OLD.

Q:      20, SO YOU GOT A BIRTHDAY COMING UP IN 2 MONTHS, RIGHT?

A:      YEAH.

Q:      IN A MONTH AND A HALF, SOMETHING LIKE THAT?

A:      YEAH.

Q:      ALRIGHT, COOL, IT'S IMPORTANT (INAUDIBLE-UNSURE) (CLEARING

        THROAT) ALRIGHT, UH, WHO ALL LIVES IN THE HOUSE WITH YOU, JUST

        YOU AND UH, YOUR PARENTS?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 24 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 87 of 349 PageID #:
3451
Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 01/22/16   Page 25 of 185   PageID #:

A:      AND MY LITTLE SISTER.

Q:      LITTLE SISTER, OKAY.  WHAT'S YOUR DAD'S NAME?

A:      NADHIN.

Q:      OH, SO SAME SPELLING NADHIN?

A:      M-HMM.

Q:      NADHIN…?

A:      SAME LAST NAME AS ME.

Q:      AL-AWADI?

A:      M-HMM.

Q       OKAY AND DOESN'T AL…, DOES THAT MEAN THE, IS THAT RIGHT?
        (UNSURE)

A:      IT'S…, THAT'S WHAT I BELIEVE, UH, MY PARENTS SAY IT'S…, UH, IT'S
        ACTUALLY PART OF OUR LAST NAME…

Q:      OKAY.

A:      …BUT MY COUSIN HE CHANGED HIS LAST NAME TO REMOVE THE A-L,
        JUST BECAUSE HE SAYS IT'S THE FAMILY.

Q:      YEAH.

A:      M-HMM.

Q:      AL-AWADI, OKAY.

A:      M-HMM.

Q:      UH, OKAY. (COUGHING)

A:      YOU NEED MY SISTER'S NAME TOO?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 25 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 88 of 349 PageID #:
3452
Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 11/22/16   Page 26 of 185 PageID #:9

Q:      YEAH, SO NADHIN AL-AWADI IS YOUR DAD'S NAME AND THEN WHAT'S
        YOUR SISTER?

A:      M-HMM, IT IS Z-A-…

Q:      M-HMM.

A:      …H-R-A, ZAHRA AND SAME LAST NAME.

Q:      AL-AWADI, OKAY.

A:      M-HMM.

Q:      ALRIGHT AND HOW OLD IS YOUR SISTER?

A:       SHE IS 13.

Q:      OKAY.  UH, OKAY, UH, ALRIGHT.  UH, HOW OLD WERE YOUR PARENTS
        WHEN THEY CAME OVER, DO YOU REMEMBER?

A:      UH, 18 YEARS AGO, MY DAD WAS BORN 1965, UH, THINK MY DAD WAS IN
        HIS 30'S…

Q:      YEAH.

A:      …CAUSE WE CAME 1995.

Q:      YEAH, DID HE GROW UP IN ANY PARTICULAR REGION OF IRAQ OR ANY
        PARTICULAR CITY?

A:      UH, NYJEF. (UNSURE OF NAME AND SPELLING)

Q:      NAJAF?

A:      M-HMM…

Q:      OKAY.

A:      …THAT'S WHAT HE CALLS THE BEST CITY IN THE WORLD.

Case 1:15-cr-00072-TWP-DML Document 5748-1 Filed 12/12/16 Page 89 of 349 PageID #
Case 1:15-cr-00072-TWP-DML Document 5748-1 Filed 01/22/16 Page 27 of 185 PageID #
3453

Q:     OH YEAH.  YEAH, HAS IT BEEN WRAPPED UP IN ANY OF THE FIGHTING
       WITH ISIS LATELY?

A:     ACTUALLY THAT'S BEEN THE CALMEST CITY.

Q:     IS IT IN THE SOUTH OR WHERE IS IT?

A:     IT'S…, UH, IT'S CLOSE TO BAGHDAD…

Q:     OKAY.

A:     …AND BAGHDAD'S PRETTY CALM RIGHT NOW.

Q:     YEAH, PRETTY SAFE AT THE MOMENT.

A:     AND UH, I THINK IT'S SOUTH OF BAGHDAD IF I'M CORRECT…

Q:     OH.

A:     …I'M NOT ONE HUNDRED PERCENT SURE.

Q:     YEAH, WELL THAT EXPLAINS IT IF IT'S STILL CALM, BECAUSE…

A:     EVERYTHING'S HAPPENING IN THE NORTH.

Q:     …I'VE SEEN THE…, YEAH, THE SYRIAN BORDER AND EVERYTHING UP
       NORTH IS WHERE THE PROBLEMS WERE LIVE. (UNSURE)

A:     REALLY (INAUDIBLE-UNSURE)

Q:     YEAH, HAS YOUR FAMILY NOT BEEN AFFECTED SO MUCH THEN IF
       THEY'RE DOWN IN NAJAF?

A:     UH, ONE OF THE AYATOLLAHS HAS DECLARED GUHAD…

Q:     M-HMM.

A:     …SO MEANING, UH, RELIGIOUSLY OBLIGED WE DO HAVE TO GO TO WAR
       WITH THE TERRORISTS, SO, UH, THEY ALL SIGNED UP FOR THE MILITARY,

THEY ONLY RECRUITED LIKE MAYBE A HUNDRED THOUSAND PEOPLE, SO I THINK MY FAMILY WASN'T ANY OF THEM…

Q:     HMM.

A:     …BUT…, UH, THEY WOULD DIE FOR THEIR COUNTRY AT ANY MINUTE, SO.

Q:     YEAH, OKAY.

A:     UH, ESPECIALLY FINDING THESE PEOPLE ARE MAKING US LOOK BAD BECAUSE…

Q:     HMM.

A:     …ISLAM IS NOT ABOUT WHAT PEOPLE MAKE IT SEEMS ABOUT…

Q:     HMM.

A:     …IT'S MORE ABOUT PEACE INSTEAD OF FIGHTING.

Q:     YEAH.

A:     THESE PEOPLE ARE JUST EXTREMISTS JUST LIKE THE WESTBORO BAPTIST CHURCH, I KNOW YOU'VE HEARD OF THAT.

Q:     THEY'RE EXTREMISTS, YEAH.

A:     THEY'RE EXTREME CHRISTIANS.

Q:     YEAH.

A:     THE REASON THEY'RE NOT SO WIDELY TALKED ABOUT IS CAUSE THEY'RE ONE SMALL GROUP AS OPPOSED TO HUGE GROUPS LIKE AL-QAEDA CLAIMING THEY'RE MUSLIMS AND THE ISIS WHO CLAIM THEY'RE MUSLIMS…

Q:     M-HMM.

A:     …IN REALITY THEY'RE NOT, BECAUSE IF YOU KILL SOMEONE YOU'RE NOT A MUSLIM…

Q:     YEAH.

A:     …YOU ARE DEFINITELY NOT.

Q:     I GOTCHA, OKAY.  WELL, UH, YEAH, I MEAN IT'S WEIRD BECAUSE THAT'S SUCH A…, IT'S NOT A PLACE THAT AMERICANS WOULD TYPICALLY KNOW A WHOLE LOT ABOUT, BUT…, BUT OBVIOUSLY WE'VE GOT A BIG STAKE IN THE COUNTRY AFTER BEING THERE FOR…

A:     M-HMM.

Q:     …OVER A DECADE, RIGHT?

A:     YEAH.

Q:     AND SO A LOT…, YOU'VE BEEN HEAR…, I'VE BEEN HEARING THE NAMES OF IRAQI CITIES ON THE NEWS AND IN LITERATURE AND STUFF FOR THE PAST 10 PLUS YEARS YOU KNOW.  SO IT'S LIKE I HEAR NAJAF AND I'M LIKE, YEAH, I'VE HEARD OF THAT…

A:     M-HMM.

Q:     …BUT I COULDN'T TELL YOU WHERE IT IS, SO.  ANYWAYS, UH OKAY, WELL HERE'S THE THING, MAN, UH, UH, JUST BRIEFLY AND I'M NOT ASKING IF YOU DID ANYTHING, I'M JUST SAYING DO…, DO YOU KNOW WHY YOU'RE HERE OR WHAT YOU'VE BEEN ACCUSED OF?

A:     I DO KNOW WHY.

Q:     IN JUST LIKE 2 WORDS OR 3 WORDS, HOW EVER AS BRIEFLY AS YOU CAN TELL ME WHAT YOU'VE BEEN ACCUSED OF DOING.

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 29 OF 185

Case 1:15-cr-00072-TWP-DML  Document 748-1  Filed 01/22/16  Page 30 of 185  PageID #: 3456

A:     I'VE BEEN ALLEGEDLY ACCUSED OF…, UH, TOUCHING A LITTLE GIRL.

Q:     OKAY, ALRIGHT AND THAT'S WHY I JUST WANTED TO MAKE SURE BEFORE I GET INTO…, THAT YOU KNOW WHY YOU'RE HERE.

A:     M-HMM.

Q:     I'M NOT GONNA BE LIKE YOU'RE SITTING HERE THINKING THAT YOU GOT CAUGHT UP IN SOME SPEEDING TICKETS AND THEN… (CHUCKLE)

A:     I…, NO.

Q:     …BY THE WAY…

A:     OKAY.

Q:     …NO, I WANTED YOU TO KNOW EXACTLY WHY YOU'RE HERE BEFORE WE GO ANY FURTHER.  UH, PART OF THE THING IS IN…, IN THE WORD YOU SAID THERE ACCUSED…

A:     M-HMM.

Q:     …UH, THAT'S KEY, BECAUSE…, UH, ANYTIME I WANT TO ASK SOMEONE QUESTIONS ABOUT ACCUSATIONS OR…, UH SOMETHING THEY'VE BEEN ACCUSED OF AND THEY'RE CONSIDERED IN CUSTODY, WHICH I MEAN THIS BUILDING IS…, UH, UM, I DON'T KNOW HOW EXACTLY HOW IT WENT DOWN WHEN…, WHEN THEY CAME OUT TO YOUR HOUSE.  I MEAN DID THEY ASK YOU IF YOU'D COME OR DID THEY SAY, HEY, YOU ARE COMING…

A:     THEY JUST…

Q:     …LET'S GO.

A:     …THEY SAID I HAVE TO…

Q:     YEAH.

A:     …GO WITH THEM AND THEY SAID IF I COOPERATE IT…, EVERYTHING WILL BE FINE.

Q:     OKAY.

A:     AND OF COURSE I WANT TO COOPERATE AND CLEAR ALL OF THIS…

Q:     (CLEARING THROAT) YEAH.

A:     …MESS.

Q:     YEAH.  NOW WHEN THEY SAID EVERYTHING WILL BE FINE, WHAT…, WHAT DID THAT MEAN TO YOU?

A:     UH, THAT MEANS PROBABLY I WOULDN'T GET HANDCUFFED OR…

Q:     OKAY.

A:     …ANY WORSE.

Q:     DID THEY HANDCUFF YOU?

A:     NO.

Q:     OKAY, ALRIGHT, UH, BUT YOU HAVE BEEN IN A LOCKED ROOM FOR NOW…

A:     M-HMM.

Q:     …UH, WELL I DON'T KNOW THIS ROOM WAS UNLOCKED WHEN I SHOWED UP, SO BUT TYPICALLY THIS ROOM'S SUPPOSED TO BE LOCKED WHEN NO ONE ELSE IS INSIDE HERE WITH YOU; IF IT'S JUST YOU WE TRY TO LOCK THE DOOR.

A:     M-HMM.

STATEMENT OF ALI AL-AWADI             DP14-0088487             PAGE 31 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 94 of 349 PageID #:
3458
Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 11/22/16   Page 32 of 185 PageID #:225

Q:     UH, BUT YEAH, I MEAN THE…, THE…, THE MORE COOPERATION WE

       RECEIVE IN…, IN SITUATIONS LIKE THIS THE MORE SORT OF…, I DON'T

       KNOW…, UH, HOW TO EX…, EXPLAIN IT, BUT JUST YEAH, UH, WE'RE NOT

       GONNA TIE SOMEONE UP AND SIT 'EM IN THE CORNER OR BOLT THEM TO

       THE WALL IF THEY'RE  BEING COOPERATIVE, RIGHT?

A:     M-HMM.

Q:     LIKE SO THAT'S TYPICALLY NOT THE WAY THINGS HAPPEN, SO I THINK

       THAT'S PROBABLY WHAT THEY WERE GETTING AT, THAT HEY, WE'RE NOT

       GONNA…, WE'RE NOT TRYING TO HURT YOU IF YOU'RE NOT TRYING TO

       HURT US, RIGHT…

A:     EXACTLY.

Q:     …BUT YOU DO HAVE TO COME WITH US, IS THAT PRETTY MUCH…?

A:     THAT'S WHAT THEY WANT TO GET THE STORY STRAIGHT AND…, AND MY

       SIDE…

Q:     YEAH, YEAH.

A:     …AND HOPEFULLY DO PROVE IT WAS ALL A MISUNDERSTANDING.

Q:     YEAH.  NOW…, NOW I'LL BE HONEST WITH YOU ON…, ON TERMS OF THE

       LONG TERM INVESTIGATION THEY HAVE NO WAY OF KNOWING WHAT

       THE FINAL OUTCOME'S GONNA BE AND HONESTLY I'M STILL IN THE

       MIDDLE OF IT AND I CAN'T TELL YOU AT THE…, AT THE END OF THE DAY

       WHAT THE FINAL OUTCOME'S GONNA BE.  SO IN THAT SENSE I DON'T

       WANT YOU TO THINK COOPERATION MEANS THAT THIS IS ALL JUST

       GONNA DISAPPEAR, BECAUSE YOU KNOW I DON'T KNOW…

STATEMENT OF ALI AL-AWADI              DP14-0088487         PAGE 32 OF 185

A:     OKAY.

Q:     …WE'RE IN THE MIDDLE OF IT, IT COULD BE THAT WE CAN'T MAKE IT

       DISAPPEAR, UH, IT…, IT MAY…, IT MAY GO AWAY, IT MAY NOT, I JUST…, I

       DON'T KNOW AND I'M NOT READY TO MAKE THAT PROCLAMATION AS TO

       EXACTLY WHAT HAS TO HAPPEN, WHAT'S GONNA HAPPEN, UH, IN THE

       LONG…, YOU KNOW THE LONG RUN AND…, AND THEY WEREN'T EITHER.

       SO I JUST DON'T WANT YOU TO THINK THAT BEING COOPERATIVE IN THAT

       SENSE OF COMING ALONG AND ALL THAT MEANS THAT NOTHING WILL

       EVER HAPPEN WITH THE CASE.

A:     COMPLETELY UNDERSTAND.

Q:     WE GOT TO FIGURE THE CASE OUT AND THAT'S SEPARATE FROM BEING

       JUST COOPERATIVE TO YOU KNOW NOT…, NOT BEING HANDCUFFED, SO.

A:     M-HMM.

Q:     DOES THAT MAKE SENSE?

A:     YEAH.

Q:     ALRIGHT, COOL.  UH, BUT HOPEFULLY ME GETTING INFORMATION FROM

       YOU AND TALKING TO YOU ABOUT ALL THIS WILL BE PART OF THAT SORT

       OF LONG TERM DECISION MAKING PROCESS THAT'S GONNA HAVE TO

       HAPPEN ABOUT THIS PARTICULAR CASE, OKAY…

A:     M-HMM.

Q:     …IN THE…, IN THE LONG RUN OF WHAT HAPPENS WITH IT.  UH, SO THAT'S

       WHY I'M INTERESTED IN TALKING WITH YOU, UH, BUT DID THEY TREAT

       YOU ALRIGHT THOUGH WHEN THEY PICKED YOU UP AND EVERYTHING?

A:      YEAH.

Q:      WEREN'T LIKE SPITTING AND CUSSING AT YOU OR ANYTHING?

A:      NO, NOT AT ALL.

Q:      ALRIGHT.  UH, SO ANYWAYS, UH, LET'S SEE HERE, OKAY.  I…, UH, I WANTED TO GO THROUGH SOMETHING BECAUSE LIKE I SAID ANYTIME I…, UH, I'M TALKING TO SOMEONE THAT'S BEING ACCUSED OF SOMETHING THEY'VE BEEN DETAINED.  THEY'VE BEEN YOU KNOW PLACED IN CUSTODY AND RIGHT NOW THAT'S WHAT HAPPENED YOU WERE DETAINED, WE THOUGHT MAN, WE REALLY NEED TO TALK TO THIS GUY, WE NEED TO REALLY FIGURE THIS OUT .  SO THAT'S WHY YOU KNOW I SENT YOU KNOW THE LIEUTENANT AND SOME OTHER GUYS OUT TO TALK WITH YOU, SO YOU'RE BEING DETAINED AND NOT…, THIS IS A POLICE FACILITY, NOT IT'S JUST COME IN OR GO. (UNSURE) SO ANYTIME WE WANT TO ASK SOME QUESTIONS WHILE YOU'RE BEING DETAINED WE HAVE TO GO THROUGH THE RIGHTS WITH THEM, OKAY?

A:      OKAY.

Q:      NOW YOU'VE HARD THESE BEFORE IF YOU GREW UP AND EVER WATCHED ANY TV HERE…

A:      RIGHT.

Q:      …IN OTHER WORDS MIRANDA RIGHTS, RIGHT.  THE BASIC IDEA THOUGH IS…, IS DIFFERENT THAN WHAT YOU SEE ON TV, ON TV MIRANDA RIGHTS…, THEY ONLY REALLY POP UP WHEN…, UH, THERE'S A FOOT CHASE AND SOME DUDE JUMPS OUT OF AN APARTMENT BACK WINDOW,

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 34 OF 185

Case 1:15-cr-00072-TWP-DML  Document 148-1  Filed 12/12/16  Page 97 of 349  PageID #:
3461
Case 1:15-cr-00072-TWP-DML  Document 148-1  Filed 01/22/16  Page 35 of 185  PageID #: 28

RUNS DOWN THE FIRE ESCAPE AND THE…, THE GRITTY YOU KNOW NEW YORK CITY OR CHICAGO COP CHASES THEM DOWN AND TACKLES THEM…

A:    M-HMM.

Q:    …AND PULLS A GUN OFF OF HIM AND SAYS, HEY, ASS HOLE, YOU'RE UNDER ARREST AND THEN THEY SLAP THEM IN CUFFS AND THEY HAVE A CAR COME…, I DON'T KNOW WHO THAT GUY WITH THE CAR IS THAT ALWAYS DRIVES UP, BUT SOME GUY WITH A POLICE CAR DRIVES UP AND THEY THROW 'EM IN THE POLICE CAR… (CHUCKLE)

A:    YEAH.

Q:    …AND AS THEY'RE LIKE PUTTING THEM IN THE POLICE CAR, DUCKING THEIR HEAD IN, THEY READ THEM THEIR RIGHTS AND THEY SAY, YOU HAVE THE RIGHT TO REMAIN SILENT; ANYTHING YOU SAY…, MAYBE THIS GUY IS LIKE STRUGGLING AGAINST THE POLICE CAR THEY'RE READING HIM THE RIGHTS, THEY JUST SAY THE RIGHTS.  BUT THEN THEY THROW HIM IN THIS MYSTERIOUS POLICE CAR THAT JUST SHOWS UP, THEY THROW 'EM IN THE CAR AND DISAPPEAR AND GO DOWNTOWN, THEY'RE UNDER ARREST, THEY NEVER ASK HIM A SINGLE QUESTION.

A:    M-HMM.

Q:    THAT'S RIDICULOUS…

A:    YEAH.

Q:    …THERE'S NO REASON TO READ SOMEONE THE RIGHTS UNLESS YOU'RE GONNA ASK THEM QUESTIONS…

A:    M-HMM.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 35 OF 185

Q:      …THAT'S THE WHOLE PURPOSE OF THIS.  SO I WANT YOU TO

UNDERSTAND THAT A: JUST BECAUSE SOMEONE'S READING YOU YOUR

RIGHTS DOESN'T MEAN YOU'RE GUILTY OF ANYTHING AND B: JUST

BECAUSE…, UH, YOU'RE BEING READ YOUR RIGHTS DOESN'T MEAN

YOU'RE UNDER ARREST, OKAY?

A:      OKAY.

Q:      UH, LET'S JUST THE WAY IT IS, UH, AND I LIKE TO EXPLAIN THAT CAUSE

TV ALWAYS GETS IT WRONG YOU KNOW.

A:      YEAH.

Q:      UH, TYPICALLY WHEN YOU HEAR YOUR RIGHTS READ TO YOU ON TV

THAT MEANS YOU'RE UNDER ARREST ALREADY…

A:      HMM.

Q:      …I JUST WANT YOU TO UNDERSTAND THE DIFFERENCE, IT DOESN'T

NECESSARILY MEAN SOMEONE'S UNDER ARREST OR THEY EVEN WILL BE,

JUST MEANS THAT YOU'RE IN CUSTODY AND WE'RE GONNA ASK YOU

QUESTIONS, OKAY?

A:      M-HMM.

Q:      DO YOU UNDERSTAND ALL THAT?

A:      YES I DO.

Q:      ALRIGHT MAN, UH, AND YOU'VE GRADUATED HIGH SCHOOL, HAVE YOU

STUDIED ANY COLLEGE COURSES YET?

A:      I HAVE.

Q:   HOW FAR HAVE YOU GONE IN THAT OR WHAT'D YOU…, WHAT HAVE YOU DONE?

A:   UH, I'M 2 YEARS INTO IT AND THEN THIS IS MY THIRD YEAR.

Q:   OKAY.  WHERE DO YOU…, WHERE DO YOU GO TO SCHOOL?

A:   IVY TECH.

Q:   OKAY, ALRIGHT.  WHAT KIND OF COURSES ARE YOU TAKING?

A:   COMPUTER AND SCIENCE CLASSES TO HOPEFULLY GET MY BACHELORS IN COMPUTER SCIENCE.

Q:   OKAY, ALRIGHT.  WELL, UH, SO ANYWAYS SO YOU READ, WRITE, UNDERSTAND ENGLISH JUST FINE I'M SURE…

A:   M-HMM.

Q:   …UH, I ALWAYS ASK EVERYONE THIS, YOU…, YOU'D BE SURPRISED, EVERY ONCE IN A WHILE PEOPLE EVEN MAKE IT OUT OF HIGH SCHOOL AND THEY'RE STILL ILLITERATE.  I MEAN I'M NOT SAYING I WOULD EX…, EXPECT THAT OUT OF YOU BUT I'M JUST SAYING THAT…, THAT HAPPENS SOMETIMES.  SO TO MAKE SURE I DON'T START READING THE FORM TO SOMEONE THAT THEY CAN'T UNDERSTAND…, I JUST HAVE TO WRITE THE TIME ON HERE.  UH, I WANT TO MAKE SURE YOU'RE…, YOU'RE GONNA BE ON BOARD WITH THIS, UH, ALRIGHT AND (INAUDIBLE-UNSURE) JUST GIVE ME THE PHONE HOURS TO SEE THE TIME. (UNSURE) ALRIGHT, SO I'M GONNA GO THROUGH THIS FORM WITH YOU, UH, I GOT TO READ IT ALL LINE BY LINE WITH YOU, SO I'M GONNA SCOOT OVER HERE SO WE CAN BOTH SEE IT AT THE SAME TIME.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 37 OF 185

A:     OKAY.

Q:     THAT WAY I'M NOT LETTING…, READING UPSIDE DOWN OR ANYTHING. BASICALLY IT'S IN 2 PARTS, 2 MAJOR SECTIONS AND I'LL DRAW…, I'LL DRAW A LINE RIGHT HERE…

A:     M-HMM.

Q:     …TO SORT OF VISUALLY DELINEATE THE 2 SECTIONS.  OKAY, SO THIS FIRST SECTION IS JUST YOUR RIGHTS; THESE ARE YOUR RIGHTS THAT YOU HAVE, UH, THEY DON'T CHANGE, I CAN'T TAKE THEM AWAY FROM YOU AND THEY'RE…, THEY'RE TOTALLY YOUR RIGHTS.  THE SECOND SECTION THOUGH IS IF YOU DECIDE THAT YOU DO WANT TO TALK TO ME TODAY AND MAKE A STATEMENT RIGHT HERE AND NOW ABOUT WHAT HAPPENED, UH, I'LL WANT YOU TO FILL THIS OUT OR UH, I WANT YOU TO READ THROUGH THIS, UNDERSTAND IT AND SIGN IT WITH ME, OKAY.  IF YOU DON'T WANT TO TALK TO ME TODAY, IF YOU DON'T WANT TO ANSWER ANY QUESTIONS DON'T SIGN THIS, OKAY.  SO, UH, AND…, AND IT'S TOTALLY YOUR CHOICE, OKAY, IT'S VOLUNTARY AND IT'S YOUR CHOICE.  YOU…, YOU WERE BROUGHT HERE YOU KNOW UNDER DETENTION OR WHATEVER, DETAINED, BUT…, UH, BUT…, BUT TALKING AND ALL THAT, THAT'S…, THAT'S UP TO YOU FROM HERE, OKAY?

A:     M-HMM.

Q:     SO IT SAYS: INDIANAPOLIS POLICE DEPARTMENT ADVICE OF RIGHTS. PLACE, 4134 NORTH KEYSTONE AVENUE; DATE, AUGUST 22ND, 2014 AND TIME IS 4:31 P.M., OKAY.  BEFORE WE ASK YOU ANY QUESTIONS YOU MUST

UNDERSTAND YOUR RIGHTS.  NUMBER 1: AND AFTER I EACH…, READ EACH OF THESE I'LL ASK YOU IF YOU UNDERSTAND IT.  IF YOU DO UNDERSTAND JUST TELL ME YES OUT LOUD AND I'LL PUT A CHECK MARK AND MOVE TO THE NEXT ONE.

A:     OKAY.

Q:     IF YOU DON'T, LET ME KNOW; ASK A QUESTION AND I'LL TRY TO FIGURE IT OUT WITH YOU, OKAY?

A:     (NO VERBAL RESPONSE)

Q:     SO NUMBER 1: YOU HAVE THE RIGHT TO REMAIN SILENT.  DO YOU UNDERSTAND THAT?

A:     YES.

Q:     OKAY.  NUMBER 2: ANYTHING YOU SAY CAN BE USED AS EVIDENCE AGAINST YOU IN COURT.  DO YOU UNDERSTAND THAT?

A:     YES.

Q:     SO IF YOU KILLED SOMEONE LAST NIGHT AND YOU TELL ME, WELL YEAH, I KILLED THAT GUY OVER ON…, UH, YOU KNOW OVER AT 71ST AND MICHIGAN AT THE YOU KNOW GAS STATION AND UH, AND I SEND A POLICE OFFICER THERE AND THERE'S A DEAD BODY BACK IN A DUMPSTER…, (CHUCKLE) I CAN PLAY THE RECORDING OF YOU BEING, YEAH, I KILLED THAT GUY LAST NIGHT…

A:     M-HMM.

Q:     …IN A COURT ROOM IN FRONT OF THE JUDGE OR JURY OR WHOEVER AND BE LIKE, SEE, HE KILLED HIM. (CHUCKLE)

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 39 OF 185

A:      YEAH.

Q:      SO ANYWAYS, NUMBER 3: YOU HAVE THE RIGHT TO TALK TO A LAWYER

        FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE HIM…,

        AND IT'S NOT ON HERE BUT I'LL SAY, OR HER, UH, WITH YOU DURING

        QUESTIONING.  DO YOU UNDERSTAND THAT?

A:      M-HMM.

Q:      OKAY, SO IF YOU…, IF YOU WANT TO TALK TO A LAWYER EITHER BEFORE

        OR DURING…, UH, TALKING TO ME YOU CAN DO THAT.  NUMBER 4 SAYS:

        IF YOU CANNOT AFFORD A LAWYER AND YOU WANT ONE, ONE WILL BE

        APPOINTED FOR YOU BY THE COURT BEFORE ANY QUESTIONING.  DO YOU

        UNDERSTAND THAT ONE?

A:      SO IT WOULD ONLY BE RIGHT BEFORE COURT OR LIKE…

Q:      SO WHAT WOULD HAPPEN IS IF…, UH, IF…, IF YOU CANNOT AFFORD AN

        ATTORNEY AND YOU WANT ONE, IT'S THE KIND OF THING WHERE I DON'T

        HAVE ONE YOU KNOW SI…, ON STAFF HERE AT MY OFFICE…

A:      M-HMM.

Q:      …UH, BUT WE WOULD HAVE TO SOMEHOW ARRANGE…, UH, FOR YOU TO

        TALK TO SOMEBODY, OKAY?

A:      M-HMM.

Q:      UH, BUT BASICALLY THOUGH IF YOU DID WANT TO TALK TO A LAWYER

        AND YOU…, AND YOU WANTED TO DO THAT AND YOU CAN'T AFFORD

        ONE YOU'RE ON YOUR OWN, BECAUSE I DON'T KNOW, IF YOU HAVE A

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 40 OF 185

LAWYER ON RETENTION OR NOT, IT DOESN'T SOUND LIKE YOU DO IF YOU'RE ASKING ABOUT NUMBER 4.

A:     YEAH.

Q:     SO IF YOU…, IF YOU DID WANT TO TALK TO A LAWYER…, UH, PRIOR TO GIVING ME A STATEMENT TODAY, I MEAN I…, THEY'RE NOT HERE RIGHT NOW.  SO BASICALLY THAT MEANS IN THE IMMEDIATE MOMENT WE WOULDN'T TAKE A STATEMENT OR TALK OR DO AN INTERVIEW TODAY. NOW THAT DOESN'T MEAN IF THE LAWYER DECIDED THEY WANTED YOU TO TALK OR GIVE A STATEMENT LATER ON THEY COULD YOU KNOW HAVE YOU DO THAT AT A LATER DATE, UH, BUT…, UH, BUT AS OF RIGHT NOW WE DON'T HAVE ANYONE HERE, SO WE'D HAVE TO PUT IT OFF OR DELAY IT UNTIL YOU DID GET A CHANCE TO TALK TO THAT ATTORNEY, OKAY?

A:     M-HMM.

Q:     AND SO WHAT I COULD DO IS IF YOU WERE TO LEAVE HERE TODAY AND…, AND NOT GIVE ME ANY KIND OF STATEMENT, BUT WANTED TO…, TO TALK TO…, UH, YOU KNOW AN ATTORNEY ABOUT IT, WE COULD…, UH, I COULD FIND THE PUBLIC DEFENDERS…, THE PUBLIC DEFENDER AGENCY, WHICH IS…, THERE'S…, IT'S A…, IT'S A GOVERNMENT FUNDED AGENCY YOU KNOW PART OF OUR…, UH, CITY GOVERNMENT THAT IS THE MARION COUNTY PUBLIC DEFENDERS AGENCY AND THEY HAVE A WHOLE LIST OF CRIMINAL DEFENSE ATTORNEYS AND YOU COULD CALL UP THERE AND TELL THEM, HEY, UH, THERE'S A PENDING INVESTIGATION

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 41 OF 185

YOU KNOW INTO ME OR INTO THE ALLEGATIONS ABOUT ME AND I'D LIKE

TO SEE…, AND I CAN'T AFFORD A LAWYER, BUT I WANT…, I'D LIKE TO

TALK TO SOMEONE BECAUSE THE POLICE WANT TO ASK ME QUESTIONS.

A:     M-HMM.

Q:     THEN SO I WOULD GIVE YOU THEIR NUMBER, YOU COULD…, UH, YOU

COULD MAKE THE CALL YOURSELF, I DON'T HAVE SOME CONNECTION

RIGHT THERE TO YOU KNOW SEND YOU, OH YEAH, CALL BOB AT 679-9923,

I CAN'T…, I DON'T…, I DON'T HAVE ANY OF THAT, BUT I CAN GIVE YOU

THE GENERAL NUMBER AND TELL YOU TO CALL.  AND I DON'T KNOW

WHAT THEIR OFFICE HOURS ARE OR WHATEVER, BUT…, BUT THAT'S…,

THAT'S THE WAY WE WOULD DO IT.

A:     NOW IF I'VE ALREADY GIVEN A STATEMENT AT WORK IT WOULD KIND OF

BE…, IT'S LESS NOT TO JUST GIVE A STATEMENT HERE?

Q:     WELL I DON'T KNOW, UH, YOU'RE GETTING INTO THE TERRITORY THAT

MAYBE A LAWYER WOULD HAVE TO GIVE YOU ADVICE ON.  UH, I CAN

SAY THAT…, UH, I MEAN I'LL BE HONEST WITH YOU I ALREADY HAVE THE

STATEMENT THAT YOU HAVE FROM WORK…

A:     M-HMM.

Q:     …AND UH, I'VE GOT QUESTIONS ABOUT THAT STATEMENT.

A:     OKAY.

Q:     SO THAT'S PART OF WHAT I WOULD WANT TO BE TALKING TO YOU ABOUT

TODAY.  UH, BUT WHETHER OR NOT IT'S BETTER TO…, TO…, TO…, MORE

FULLY EXPLAIN THAT INTERVIEW OR THAT STATEMENT TO ME OR NOT,

THEN I…, YOU KNOW THAT'S…, YOU…, YOU'D HAVE TO MAKE THAT

DECISION, UH, AND I CAN'T DO THAT FOR YOU, SO.

A:      I DO UNDERSTAND THOUGH.

Q:      OKAY, SO YOU UNDERSTAND NUMBER 4?

A:      M-HMM.

Q:      OKAY, ALRIGHT AND LIKE I SAID I DON'T HAVE ANYBODY RIGHT HERE,

SO IF YOU DECIDED YOU WANT ONE IT WOULD…, IT WOULD TAKE MORE

TIME AND WE JUST WOULDN'T DO THE INTERVIEW TODAY, BUT…, UH,

BUT ANYWAYS.  NUMBER 5 SAYS…, YEAH, IT'S IMPORTANT JUST BECAUSE

SOMETIMES THINK THAT OKAY, IF I'M SIGNING SOMETHING THAT MEANS

I'M JUST LIKE SIGNING MY RIGHTS AWAY FOREVER AND EVER, I'M IN.  UH,

THE REALITY IS IS THAT JUST BECAUSE YOU SIGN THIS DOESN'T MEAN

YOU NEVER…, THAT THOSE RIGHTS JUST ALL DISAPPEAR; IT

ESSENTIALLY MEANS YOU'RE TEMPORARILY WAIVING THOSE RIGHTS IN

ORDER TO GO AHEAD AND MAKE A STATEMENT AND SO NUMBER 5 WILL

EXPLAIN THAT MORE CLEARLY AND INSTEAD OF MY WORDS, OKAY?

A:      (NO VERBAL RESPONSE)

Q:      IT SAYS: IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A

LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP

ANSWERING AT ANYTIME.  YOU ALSO HAVE THE RIGHT TO STOP

ANSWERING AT ANY TIME UNTIL YOU TALK TO A LAWYER.  DO YOU

UNDERSTAND THAT?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 43 OF 185

Case 1:15-cr-00072-TWP-DML    Document 142-1    Filed 12/12/16    Page 106 of 349 PageID #:
3470
Case 1:15-cr-00072-TWP-DML    Document 57-1    Filed 01/22/16    Page 44 of 185    PageID 237

A:    M-HMM.  SO THAT MEANS I WOULDN'T BE ABLE TO LEAVE UNTIL I

        TALKED TO A LAWYER, LIKE IF I START ANSWERING HALF WAY THOUGH?

Q:    NO, YOU COULD…, YOU COULD…, YOU COULD START TALKING TO ME,

        HALF WAY THROUGH YOU COULD SAY, OH, I REALLY WANT TO TALK TO

        A LAWYER ABOUT THIS BEFORE I MAKE ANY MORE DECISIONS OR…

A:    OKAY.

Q:    …YOU KNOW AND THEN…, AND THEN I'D SAY, OKAY, WELL…, AND LIKE I

        SAID I DON'T HAVE ONE RIGHT HERE AND YOU DON'T HAVE ONE ON

        RETENTION TO CALL…

A:    M-HMM.

Q:    …SO YOU GOT…, UH, YOU'D HAVE TO TAKE SOME TIME TO ARRANGE

        THAT.  SO WE WOULD HAVE TO END THE INTERVIEW AT THAT POINT

        UNTIL AT YOU KNOW SOME LATER TIME OR DATE WHERE YOU…, UH,

        WERE ABLE TO TALK TO AN ATTORNEY…

A:    OKAY.

Q:    …AND GET THEIR ADVICE AND GO FROM THERE.  DOES THAT MAKE

        SENSE?

A:    YES.

Q:    OKAY.  SO, UH, SO I'LL PUT A CHECK MARK IN NUMBER 5, YOU DO

        UNDERSTAND THAT THEN?

A:    M-HMM.

Q:    OKAY AND I…, I…, I CHECKED BEFORE YOU SAID YOU DO UNDERSTAND,

        SO LET ME MAKE SURE, YOU…

STATEMENT OF ALI AL-AWADI       DP14-0088487       PAGE 44 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 107 of 349 PageID #:
3471
Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 45 of 185   PageID 238

A:    YES, I…

Q:    …YOU HAVE NO QUESTIONS ABOUT THAT ONE?

A:    …I UNDERSTAND.

Q:    OKAY.  UH, DO YOU KNOW WHAT YOU WANT TO DO TODAY OR NOT OR YOU…, CAUSE I CAN GO THROUGH THE FORM OF THE REASON WHY IT'S HERE BEFORE YOU MAKE YOUR FINAL DECISION, BUT BASICALLY…, UH, I DON'T KNOW, DO YOU HAVE ANY THOUGHTS, ARE YOU STILL DECIDING?

A:    UH, I'D RATHER JUST GET IT OFF MY CHEST AND TELL YOU GUYS…

Q:    OKAY.

A:    …AND MAKE SURE IT ALL GETS CLEARED UP.

Q:    OKAY, YEAH.

A:    CAUSE LIKE I SAID I DON'T WANT ANY OF THIS HOVERING OVER MY HEAD ANY LONGER.

Q:    YEAH.

A:    IT'S…, IT'S…, UH, TO BE HONEST WITH YOU I ALMOST HAD A PANIC ATTACK, IT WAS REALLY LIKE ONE OF THOSE SCARY MOMENTS…

Q:    YEAH.

A:    …WHERE…, MY MOM EVEN…, UH, ADVISED ME BEFORE TAKING THE JOB SHE SAID THIS IS WHAT YOU GOT TO BE CAREFUL OF, I WAS LIKE, IT'S NOT GONNA HAPPEN AND THEN IT'S…, IT'S A REAL…

Q:    HERE YOU SIT.

A:    …REAL SCARY THING WHEN IT HAPPENS.

Q:     YEAH, HERE WE SIT, SO.  WELL LET ME READ THIS SECOND SECTION TO

       YOU.  IT'S WRITTEN…, THE KEY THING ABOUT THIS IS IT'S WRITTEN FROM

       YOUR POINT OF VIEW, IT'S YOUR PERSPECTIVE, YOU'RE THE ONE THAT'S

       SAYING THESE THINGS, OKAY?

A:     M-HMM.

Q:     SO IF YOU DON'T AGREE WITH AND UNDERSTAND THESE STATEMENTS,

       DON'T SIGN HERE, OKAY.  BUT IF YOU DO AGREE AND UNDERSTAND AND

       WANT TO TALK TO ME WE'LL GO AHEAD AND HAVE YOU SIGN AND

       WE'LL…, WE'LL GO THROUGH IT, OKAY?

A:     OKAY.

Q:     SAYS: WAIVER OF RIGHTS.  THE ABOVE STATEMENT OF MY RIGHTS HAS

       BEEN READ TO ME AND I UNDERSTOOD WHAT MY RIGHTS ARE.  I AM 20

       YEARS OF AGE AND I AM SIGNING THIS OF MY OWN FREE WILL.  I DO NOT

       WANT A LAWYER AT THIS TIME.  I UNDERSTAND AND KNOW WHAT I AM

       DOING.  NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO

       PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.  I AM

       WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS.  DO YOU

       UNDERSTAND ALL THOSE?

A:     M-HMM.

Q:     DO YOU AGREE WITH ALL OF THOSE, ARE ALL THOSE THINGS TRUE?

A:     YEAH.

Q:     NO ONE'S PRESSURED YOU OR COERCED YOU OR THREATENED YOU, IS

       THAT RIGHT?

A:      YEAH.

Q:      OKAY.  ALRIGHT, WELL THEN GO AHEAD HERE WHERE IT SAYS SIGN AND THEN IF YOU WANT TO GO AHEAD AND SPEAK TO ME TODAY AND ALL THAT'S TRUE, THEN SIGN YOUR NAME.

A:      (NO VERBAL RESPONSE)

Q:      OKAY AND THEN I'M JUST GONNA FINISH THIS LAST LITTLE SECTION HERE.  IT SAYS: I HAVE READ THE FOREGOING ADVICE OF RIGHTS AND WAIVER OF RIGHTS TO ALI AL-AWADI…

A:      M-HMM.

Q:      …AND HE SIGNED THE WAIVER IN MY PRESENCE.  SO THEN 8-22-14 FOR THE DATE, MY ID NUMBER IS 20916 AND MY SIGNATURE, ELI MCALLISTER.  OKAY, ANY QUESTIONS ABOUT THIS FORM OR…, OR YOUR RIGHTS OR ANYTHING LIKE THAT?

A:      NO.

Q:      OKAY, ALRIGHT.  WELL, UH, SO BASICALLY I MEAN YOU KNOW MY JOB'S JUST TO TALK TO PEOPLE A LOT OF TIMES, I MEAN THERE'S OTHER PARTS TO IT AND OTHER THINGS HAPPEN, BUT A LOT OF WHAT MY JOB IS JUST TALK TO PEOPLE…

A:      M-HMM.

Q:      …AND UH, OH; AND UH, SEE WHAT'S GOING ON.  SO…

A:      OKAY.

Q:      …I MEAN THAT'S…, THAT'S KIND OF WHERE I'D LIKE TO START WITH YOU, IF YOU CAN TELL ME WHAT…, WHAT'S GOING ON, WHAT HAPPENED?

A:      UH, LIKE FROM HOW THE WHOLE THING STARTED OR…?

Q:      YEAH, JUST TELL ME FROM THE BEGINNING.  WELL LIKE FOR EXAMPLE
        JUST START WITH THIS, WHAT DO YOU DO FOR A LIVING, MAN?

A:      WELL I WORK AT…, UH, THE CHILDREN'S CHOICE LEARNING CENTER
        DAYCARE.

Q:      OKAY.

A:      BEEN THERE FOR ABOUT A YEAR AND A MONTH NOW…

Q:      M-HMM.

A:      …NO PROBLEMS AND UH…

Q:      WHERE'S THAT LOCATED?

A:      IT'S…, I THINK THE ADDRESS IS 1795 WEST 86TH STREET.

Q:      OKAY, ALRIGHT AND WHAT DO YOU DO THERE, WHAT'S YOUR JOB?

A:      UH, I WENT FROM BEING A FLOATER THERE, FROM HELPING OTHER
        TEACHERS OUT FROM CLASSROOM TO CLASSROOM TO BECOME THE
        ASSISTANT EDUCATOR IN THE EARLY PRESCHOOL ROOM, THE 2 YEAR OLD
        CLASS.

Q:      M-HMM.

A:      AND UH, PRETTY MUCH JUST HELP THE LEAD EDUCATOR OUT WITH
        TEACHING THE KIDS, SETTING UP ACTIVITIES, TO…, UH, SUCH ACTIV…,
        LIKE SUCH THINGS THAT A EDUCATOR WOULD DO.

Q:      OKAY, OKAY AND UH, YOU SAID A YEAR AND A HALF YOU'VE BEEN
        THERE?

A:      A YEAR AND A MONTH.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 48 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 111 of 349 PageID #:
3475
Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 49 of 185   PageID #:

Q:     OH, A YEAR AND A MONTH.

A:     LIKE JULY…, I STARTED LAST YEAR.

Q:     OKAY, ALRIGHT AND HOW LONG WAS IT BEFORE YOU WENT FROM A
       FLOATER TO A…, TO AN ASSISTANT EDUCATOR?

A:     UH, I WOULD SAY I BECAME THE…, UH, ASSISTANT EDUCATOR…, UH,
       MARCH OR APRIL.

Q:     OKAY, SO ABOUT 6, 7 MONTHS…, 5 MONTHS SOMEWHERE?

A:     ABOUT MAYBE 4 OR 5 MONTHS.

Q:     OKAY, UH, AND SO WHAT'S YOUR JOB AS A ASSISTANT EDUCATOR, YOU
       JUST KINDA…?

A:     JUST HELP OUT WITH THE…, UH, THE CLASSROOM, UH, BOUNCE IDEAS OFF
       THE LEAD EDUCATOR, WE TEACH THE KIDS, UH, HELP HER OUT WITH…,
       WE SPLIT UP THE KIDS INTO 2 DIFFERENT GROUPS AND THEY'RE MY
       PRIMARY CARE LIST AND SHE HAS HER PRIMARY CARE LIST…

Q:     M-HMM.

A:     …AND UH, REALLY WE JUST HELP OUT EVERYWHERE.  THERE'S NO
       REALLY THOSE ARE YOUR KIDS, THOSE ARE MY KIDS, WE'RE MORE LIKE
       A TEAM TOGETHER.

Q:     OKAY.

A:     AND WE…, UH, WE'VE BEEN DOING REALLY GREAT IN THERE.

Q:     OKAY.  WHO'S YOUR…, WHO'S YOUR LEAD EDUCATOR?

A:     UH, HER NAME IS CATHIE WILLIAMSON.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 49 OF 185

Q:      OKAY, ALRIGHT.  UH, SO WHEN IT…, UH, WELL BEFORE YOU WERE A FLOATER WOULD YOU JUST HELP ANYWHERE AND EVERYWHERE?

A:      UH, PRETTY MUCH ANY CLASSROOM THEY'D NEED HELP WITH, UH, BUT PRIMARILY I WAS BETWEEN THE PRE-K AND PRESCHOOL CLA…, CLASSROOMS, THE 3 AND 4 YEAR OLDS.

Q:      OKAY, ALRIGHT.

A:      AND THEY…, UH, THEY WERE A HECTIC GROUP CAUSE IT WAS A LOT OF KIDS AT ONE TIME.

Q:      YEAH.

A:      AND UH, THEY OFFERED ME THE ASSISTANT EDUCATOR POSITION AND SEEING THAT IT WAS A LOT LESS KIDS AT ONE TIME I THOUGHT IT'D REALLY BE EASIER TO HANDLE.

Q:      YEAH, HOW MANY KIDS ARE IN THE…, UH, THE CLASSROOM?

A:      UH, FOR PRE-K THERE'S UP TO 24…

Q:      M-HMM.

A:      …FOR 2 TEACHERS AND THEN…, UH, 12 TO 1 WITH PRESCHOOL IT'S 20 TO 2, BUT THEN THE 1 TO 10 RATIO AND THEN…, UH, THE EARLY PRESCHOOL I'M IN NOW IS…, UH, 10 TO 2, 5 TO 1.

Q:      SO…

A:      SO I CAN HAVE 5 CHILDREN…

Q:      …BY YOURSELF?

A:      …BY MYSELF.

Q:     AND BUT AS…, OKAY AND BUT YOU CAN HAVE 10 IN THERE WITH 2 PEOPLE?

A:     YEAH.

Q:     OKAY.

A:     ANYMORE THAN 5 I'D NEED ANOTHER TEACHER WITH ME.

Q:     OKAY, I GOTCHA AND THAT'S JUST TO TRY TO KEEP THE KIDS SAFE AND MAKE SURE…

A:     YEAH.

Q:     …YOU'RE NOT OVERWHELMED OR MISSING SOMETHING OR FORGET SOMETHING.

A:     SUPERVISION OF COURSE AND…

Q:     YEAH.

A:     …UH, KIDS SAFETY FOR SURE.

Q:     OKAY, I GOTCHA.  UH, (YAWNING) TELL ME THIS, UH, WHAT WAS…, WHAT WAS GOING ON YESTERDAY, WHAT WERE YOU DOING YESTERDAY?

A:     SO, UH, NOT…, ON A ROUTINE BASIS…, I WOULDN'T SAY ALL THE TIME, UH, I GO TO BREAK…, MS. EMILY, SHE'S THE…, UH, KINDERGARTEN TEACHER…

Q:     M-HMM.

A:     …LET HER GO ON BREAK WHILE I…, UH, SUPERVISE HER CLASS.

Q:     OKAY.

A:     AND UH, YESTERDAY WAS JUST NORMAL JUST DAY AND I KNOW ALL THE KIDS THERE…

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 114 of 349 PageID #:
3478
Case 1:15-cr-00072-TWP-DML   Document 57-4   Filed 01/22/16   Page 52 of 185   PageID #: 245

Q:      YEAH.

A:      …THEY'RE A FUN GROUP.

Q:      HOW MANY ARE THERE?

A:      UH, THERE'S 11 TOTAL IN THE CLASS, BUT…, UH, YESTERDAY I THINK
        THERE WAS MAYBE 10.

Q:      OKAY.

A:      AND UH, IT WAS AROUND NAPTIME, SHE WA…, MS. EMILY WASN'T THERE,
        MS. TYRIA WAS…, UH, THE TEACHER FILLING IN FOR HER.

Q:      OKAY.

A:      SO I LET HER GO ON BREAK AND THE KIDS WERE ALL STILL AWAKE FOR
        THE MOST PART, 2 WERE KINDA DOZING OFF AND I TOOK A SEAT
        BETWEEN 2 OF THE CHILDREN AND UH, THEY LIKE TO JOKE AROUND
        WITH ME, LITTLE GIRL NAMED        AND A LITTLE BOY NAMED ETHAN.

Q:      HMM, OKAY.

A:      AND UH, IT HASN'T BEEN THE FIRST TIME, I ALWAYS JUST LAY DOWN
        RIGHT ON THE CARPET AND THEN I'LL PRETEND LIKE I'M TAKING THEIR
        PILLOW AND FAKE SLEEPING AND THEY JUST START GIGGLING UNTIL
        THEY CAN'T BREATHE ANYMORE.

Q:      M-HMM.

A:      AND UH, A LOT OF THE OTHER KIDS WERE SITTING THERE WATCHING US
        AND LAUGHING AND THEN I SAID; OKAY, NOW IT'S TIME TO TAKE A NAP.

Q:      M-HMM.

A:      UH,      THEN GETS UP AND SITS IN MY LAP.

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 52 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 3 of 185   PageID 246
Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 12/12/16   Page 115 of 349 PageID #:
3479

Q:     M-HMM.

A:     AND I TOLD HER TO LAY BACK DOWN, IT'S TIME TO TAKE A NAP AND UH,

       SHE WASN'T REALLY LISTENING, BECAUSE 4 YEAR OLDS YOU KNOW

       HAVE A…, A HARD TIME GETTING OUT OF PLAY MOLD.

Q:     M-HMM.

A:     SO SHE…, UH, WOULDN'T GET UP SO I GO TO PICK HER UP TO PUT HER

       DOWN ON HER MAT, WHEN SHE LOCKS HER LEG AROUND MY ARM.

Q:     M-HMM.

A:     AND WHEN I GO TO WORK I HAVE A PRETTY BIG G-SHOCK WATCH ON.

Q:     YEAH.

A:     AND SHE WAS PRETTY MUCH AROUND THAT AS WELL.  SO I WAS…, I WAS

       KINDA A LITTLE PANICKING BECAUSE MY ARM WAS AROUND HER

       PRIVATE AREA AND I WAS…, I DIDN'T WANT ANY INTENTIONS OF THEM

       BEING THERE…

Q:     UH HUH.

A:     …SO I TOLD HER TO GET OFF AND GET OFF AND SHE WASN'T LISTENING

       AND THEN I HAD TO MANEUVER MY ARM OUT OF THERE.

Q:     M-HMM.

A:     UH, ALL THE KIDS THOUGHT IT WAS A JOKE AND PLAYING, SHE THOUGHT

       IT WAS THE SAME THING AND UH, SHE THEN KEPT TRYING TO GET IN MY

       LAP AND I KEPT HAVING TO TELL HER NO, SHE HAS TO LAY DOWN.  AND

       THEN SHE GRABBED MY ARM AND EVEN TRIED TO PUT IT BETWEEN

       AGAIN.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 53 OF 185

Q:     BETWEEN WHAT?

A:     HER…, HER LEGS.

Q:     OKAY.

A:     AND I DIDN'T…, I SAID NO, IT'S TIME TO TAKE A NAP.

Q:     M-HMM.

A:     SO I COVERED THEM UP, ALL THE OTHER KIDS…, OOPS, 'CUSE ME.
       (CLEARING THROAT) SOME OF THE KIDS STARTED ALREADY SLEEPING,
       UH, SHE USUALLY SLEEPS RIGHT AWAY AND THEN ETHAN FELL ASLEEP
       SHORTLY AFTER AND THEN I GET UP AND START DOING MY ROUNDS,
       MAKING SURE ALL THE KIDS ARE OKAY.  THERE'S…, UH, NO BREATHING
       ISSUES, CAUSE I KNOW A COUPLE OF THE KIDS IN THE CENTER HAVE…,
       UH, BREATHING TREATMENTS THEY NEED TO TAKE.

Q:     M-HMM.

A:     AND I ALWAYS WANT TO MAKE SURE ALL THE KIDS ARE SAFE FOR SURE.

Q:     YEAH.

A:     UH, AND THAT WAS PRETTY MUCH IT, I DIDN'T NOTICE ANYTHING ELSE
       OTHER THAN THEY WERE ALL FALLING ASLEEP…, THEY ALL FELL ASLEEP
       ACTUALLY.

Q:     OKAY.

A:     UH, THEN WHEN MS. TYRIA CAME BACK, UH, SHE SAW ME I THINK
       WALKING AROUND, I SAT DOWN WITH THE CLIPBOARD IN MY HAND JUST
       CAUSE I LIKE TO CARRY THAT EVERYWHERE I GO WITH ME AND AS SOON
       AS I SAW HER I SIGNED OUT AND I GAVE IT TO HER TO SIGN IN.  SO I GO ON

MY BREAK AND THEN I'D SAY 30 MINUTES AFTER I CLOCKED BACK IN, IT WASN'T 3:00 JUST YET…

Q:      M-HMM.

A:      …I GO TO MY ROOM, ONE OF THE KIDS…

Q:      WHEN'S YOUR BREAK FROM, WHAT TIME TO WHAT TIME?

A:      MY BREAK YESTERDAY WAS 1:30 I BELIEVE TO AROUND 2:30-ISH.

Q:      OKAY AND WHAT TIME WERE YOU IN THE KINDERGARTEN CLASS?

A:      UH, OH ACTUALLY MY BREAK WAS BETWEEN…, I…, I LET HER GO AT 12:30…

Q:      M-HMM.

A:      …SO I WAS IN THERE 12:30 TO 1:30…

Q:      OKAY.

A:      …AND THEN FROM THERE I TOOK MY BREAK.

Q:      IMMEDIATELY AFTER SHE GOT THERE? (UNSURE)

A:      UH, I THINK I WENT TO THE RESTROOM FIRST…

Q:      OKAY.

A:      …AND THEN I IMMEDIATELY WENT .  UH, DIDN'T REALLY DO MUCH ON MY BREAK, MS. TYRIA ASKED ME TO GO GET HER A POP FROM WHEREVER I WAS GOING, I SAID OKAY.  SO, UH, ON MY BREAK I GO AND GET HER A POP AND JUST PRETTY MUCH HANG OUT A LITTLE BIT.

Q:      M-HMM.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 55 OF 185

A:     AND UH, WHEN I CLOCKED BACK IN I GO TO MY ROOM, ONE OF THE

       LITTLE BOYS…, THE LITTLE PRE…, EARLY PRESCHOOL ROOM, THE 2 YEAR

       OLDS…

Q:     M-HMM.

A:     …UH, HAS…, HE HAS A PROBLEM WHERE HE LIKES TO PLAY AROUND

       WITH HIS DIAPER AND THEN END UP PEEING ALL OVER HIMSELF…

Q:     YEAH.

A:     …SO I HAVE TO GO GET HIM SOME CLOTHES.  UH, BEFORE I WAS EVEN

       HALF WAY THROUGH THE HALL, MS. CHIANA WHO SITS AT THE FRONT

       DESK TOLD ME SHE WANTS…, OR MS. TYRIA WANTS TO TALK TO ME.

Q:     M-HMM.

A:     SO I GO IN THE ROOM AND THEN SHE TELLS ME, LISTEN TO WHAT        HAS

       TO SAY AND THEN        TELLS ME THAT HER PRIVATE AREA IS HURTING

       FROM WHEN I TOUCHED HER.

Q:     M-HMM.

A:     AND I PRETTY MUCH ALMOST WENT INTO A PANIC ATTACK, BECAUSE I

       DIDN'T DO ANYTHING.

Q:     M-HMM.

A:     AND I…, I TOLD HER, ARE YOU SURE YOU'RE NOT DREAMING OR UH,

       BECAUSE I…, AND WE TAUGHT THE KIDS THAT WE DON'T APPRECIATE

       LIES AND SHE JUST KEPT SAYING NO, SHE WASN'T AND UH, I DON'T KNOW

       AND THEN I TOLD MS. TYRIA, I WAS LIKE…, I TOLD HER ABOUT THE

       WHOLE SITUATION WITH WHERE SHE WRAPPED HER LEGS AROUND MY

ARMS AND I DID INFORM HER ON THE WHOLE BREAK…, OR WHEN SHE WAS ON BREAK, THE WHOLE NAPTIME.

Q:     M-HMM.

A:     AND UH, SHE TOLD ME SHE WAS GONNA TELL THEM AND SHE'S GONNA SAY THAT I DID INFORM HER ON WHAT HAPPENED AND UH, CLEAR EVERYTHING UP.

Q:     TYRIA TOLD YOU THAT?

A:     M-HMM.

Q:     OKAY.

A:     AND UH, I…, AT THIS POINT WAS STILL PRETTY MUCH FREAKING OUT, BECAUSE SHE EVEN TOLD ME SHE WAS FREAKING OUT BECAUSE SHE KNOWS I'M NOT THAT KIND OF GUY, I WOULDN'T DO ANYTHING LIKE THAT.

Q:     M-HMM.

A:     SHE'S KNOWN ME FOR A YEAR AND A HALF…, WELL NOT A YEAR AND A HALF, BUT A YEAR AND A MONTH NOW…

Q:     M-HMM.

A:     …AND I'VE NEVER EVEN ONCE TRIED TO GRAB A CHILD OR ANYTHING LIKE THAT.

Q:     YEAH.

A:     BECAUSE FOR ONE TO BE HONEST…, UH, THROUGHOUT THE REST OF MY LIFE I HAD MEN…, I DON'T SEE WHY ANYONE WOULD DO THAT TO A CHILD, IT'S…

Q:     YEAH.

A:     …BECAUSE IF THAT WAS MY DAUGHTER HONESTLY I'D BE BEYOND

       UPSET, IT WAS…, IT'S A TERRIFYING…, EVEN FOR ME IT'S ABSOLUTELY

       TERRIFYING.  SO, UH, AFTER THAT, UH, JUST WENT TO MY ROOM, WENT

       ON ABOUT THE DAY, THEN AROUND 5:40-ISH…

Q:     M-HMM.

A:     …UH, I…, MY ASSISTANT DIRECTOR WANTS TO TALK TO ME AND THEN I

       GIVE HER MY FULL STATEMENT.

Q:     OKAY.

A:     AND UH…

Q:     WHAT'D SHE…, WHAT'D YOUR ASSISTANT DIRECTOR…, WHAT'S HER

       NAME?

A:     UH, HEIDI CONCES…

Q:     OKAY.

A:     …CONCES; SORRY, I DON'T KNOW HOW TO SAY HER LAST NAME.

Q:     YEAH.  WHAT DID…, WHAT DID SHE SAY WHEN SHE…, YOU SAID SHE

       CAME INTO THE CLASSROOM TO GET YOU?

A:     UH, I WAS IN THE HALL WITH…, UH, THE KIDS ON…, WHAT WE CALL THE

       JELLY BEAN, WHICH IS LIKE A WAY TO TEACH 'EM THAT WE WALK IN THE

       HALLS THEY NEED TO STAND IN A SINGLE FILE LINE.

Q:     M-HMM.

A:     UH, SHE…, UH, SHE HAD ANOTHER TEACHER COME IN FOR ME TO LET ME

       GO AND TALK TO THEM.  SHE…, UH, PUT ME ON ADMINISTRATIVE LEAVE,

       WHICH…

Q:     OKAY.

A:     …HONESTLY I REALLY APPRECIATE AT THIS POINT BECAUSE…, UH, A

       DETECTIVE JAM…, JIM MADISON…,  JAMES MADISON…

Q:     M-HMM.

A:     …HE TOLD ME THERE WAS MEDIA THERE AND IT WAS A BIG COMMOTION

       GOING ON.

Q:     AW, I DIDN'T SAY COMMOTION, THERE WAS A…, THERE WAS LIKE A NEWS

       CAMERA WHATEVER OUT THERE, YEAH.

A:     AND UH…

Q:     BUT I WOULDN'T SAY COMMOTION, BUT ANYWAYS GO AHEAD.

A:     …HE…, UH, HE TOLD ME JUST…, UH, IT WAS PROBABLY A GOOD THING

       THAT I WASN'T THERE AT THE TIME, CAUSE THEN HE…

Q:     THEY'D FILM YOU OR WHATEVER…

A:     YEAH.

Q:     …AND GET YOU ON THE NEWS OR WHATEVER.

A:     YEAH.

Q:     THAT HAPPENS. (CHUCKLE)

A:     SO I DO APPRECIATE THAT THEY PUT ME ON ADMINISTRATIVE LEAVE

       AND…

Q:     YEAH.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 59 OF 185

A:     …UH, SHE'S TOLD ME THAT EVEN FEMALE TEACHERS HAVE BEEN ACCUSED OF THESE ALLEGATIONS.

Q:     WHO TOLD YOU THAT?

A:     UH, HEIDI.

Q:     OKAY.

A:     SHE…, SHE DID.

Q:     NOW WHEN SHE FIRST GOT YOU OUT OF THE HALLWAY AND YOU GOT RELIEF TO YOU, WHO RELIEVED YOU?

A:     UH, HER NAME IS MS. FLO.

Q:     OKAY AND SO SHE…, MS. FLO RELIEVED YOU AND YOU WENT…

A:     M-HMM.

Q:     …WHERE DID YOU GO TO TALK TO MS. HEIDI?

A:     I WENT IN THE DIRECTOR'S OFFICE, MS. JENNIFER'S OFFICE…

Q:     OKAY.

A:     …UH…

Q:     YEAH.

A:     …MS. KIM WAS THERE TAKING NOTES AS I TALKED BECAUSE…, UH, IT IS…, I THINK A STATE REQUIREMENT THAT WHENEVER THEY TALK ABOUT ANYTHING LIKE THIS OR ANY DOMESTIC VIOLENCE OR WHATEVER IT IS THEY…, THERE'S A WITNESS IN THE ROOM.

Q:     M-HMM.

A:     SO, UH, WHICH I COMPLETELY UNDERSTAND AND I GAVE EVERYONE MY FULL COOPERATION BECAUSE LIKE I SAID I…, IT'S…, IT HIT ME, WAS A

SURPRISE BECAUSE I MEAN I CHANGE DIAPERS OF 2 YEAR OLD KIDS ALL DAY…

Q:     YEAH.

A:     …AND I'D NEVER EVEN EVER THINK ABOUT ANYTHING LIKE THAT.

Q:     SO WHEN YOU CAME IN THE ROOM WHAT DID MS. HEIDI SAY TO YOU? HOW DID SHE…, WHAT'D SHE TELL YOU?

A:     UH, SHE JUST…, UH, ASKED ME, SHE WAS LIKE, SO UH, ASKED ME ABOUT IF I DID BREAK MS. TYRIA TODAY…, OR NOT TODAY, YESTERDAY, BUT SHE SAID THIS TODAY…

Q:     M-HMM.

A:     …AND I DID YES…, I SAID YES, YES AND THEN I TOLD HER I KNOW…, I PROBABLY KNOW WHAT IT IS ABOUT BECAUSE ME AND TYRIA DID TALK AND SHE WAS LIKE, OKAY, THEN WE'D LIKE TO HEAR YOUR SIDE OF THE STORY.

Q:     M-HMM.

A:     SO THEN I GAVE HER MY SIDE AND THAT'S WHEN SHE TOLD ME TO MAKE SURE I WRITE EVERYTHING DOWN, SO IT DOESN'T COME BACK AND UH, BITE ME IN THE…, BITE ME IN THE BUTT.

Q:     YEAH.

A:     SO, UH, IT'S FRIGHTENING I MEAN AND…

Q:     M-HMM.

A:     …SHE…, UH, SHE JUST WANTED TO ASSURE ME THAT…, UH, IT'S HAPPENED BEFORE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 61 OF 185

Q:      M-HMM.

A:      THERE ARE ALLEGATIONS AND THERE ARE…, THERE'S GONNA BE AN

        INVESTIGATION GOING ON.

Q:      YEAH, WHAT ELSE DID SHE SAY? (CLEARING THROAT)

A:      UH, AFTER THAT SHE JUST ASKED ME IF I HAD ANY BELONGINGS I

        NEEDED TO GET OUT OF MY LOCKER AND THEN SHE…, UH, JUST…, UH,

        PRETTY MUCH ESCORTED ME OUT OF THE BUILDING.

Q:      OKAY, HMM.  UH, SO I WAS OUT THERE EARLIER TODAY…

A:      M-HMM.

Q:      …AND SHE GAVE ME THIS PAPER RIGHT HERE, IT'S JUST A BLANK…

A:      YES.

Q:      …PIECE OF PAPER THAT STARTED OFF JUST A WHITE PAPER AND THEN

        WITH PURPLE INK WRITING ON IT.

A:      M-HMM.

Q:      IS THAT YOUR HANDWRITING?

A:      YES.

Q:      DID YOU WRITE THAT?

A:      YES.

Q:      SO THIS IS THE STATEMENT THAT YOU WROTE FOR MS…., UH, MS. HEIDI?

A:      YES.

Q:      OKAY, ALRIGHT.  UH, IN THERE YOU TALK ABOUT YOU KNOW THEM

        TALKING TO YOU BEFORE ABOUT SOMETHING, WHAT'S THAT ALL ABOUT?

A:      UH, WHAT…, WHO TALKING TO ME BEFORE?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 62 OF 185

Q:     UH, WELL YOU WROTE…, OH WAIT, NO, YOU KNOW WHAT, I'M SORRY YOU DID NOT, I APOLOGIZE.

A:     YOU'RE FINE, THAT'S WHY I WAS JUST A LITTLE CONFUSED.

Q:     YEAH, YEAH, YEAH, NO, UH, WHAT THAT IS IS…, UH, MS. KIM WAS IN THERE TAKING NOTES, RIGHT?

A:     YES.

Q:     OKAY.  MS. KIM WROTE THAT YOU SAID YOU'VE BEEN TRYING TO BE MORE CAUTIOUS SINCE THEY TALKED TO YOU.

A:     YEAH, THEY…, UH, THEY APPROACHED ME, UH, EARLIER IN THE YEAR I'D SAY ABOUT PICKING UP THE CHILDREN, BECAUSE THEY'VE HAD AN INCIDENT WHERE…, UH, IT WAS SOME…, ONE OF THE CHILDREN HAS FALLEN AND THEY JUST DON'T WANT ME TO BE…, UH, IN…, LIKE BE THE CAUSE OF IT, BECAUSE ONE OF THE CHILDREN HAS I THINK BROKEN THEIR ARM ONCE BEFORE.

Q:     OKAY.

A:     AND THEY JUST WANTED ME NOT TO BE LIKE I SAID THE CAUSE OF THAT AND SHE ALSO STATED THAT SOME OF THE PARENTS MIGHT NOT APPRECIATE IT…, UH, TELLING ME THAT…, UH, FOR EXAMPLE GABBY'S DAD WOULD PROBABLY NOT APPRECIATE ME PICKING HER UP BECAUSE SHE'S A…, A GIRL AND I'M A GUY WHO ISN'T HER FATHER.

Q:     YEAH, HOW DID YOU…?

A:     AND SHE SAID THAT'S JUST THE TYPE OF GUY HE IS.

Q:     HOW DID YOU PICK UP…, UH, GABBY?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 63 OF 185

A:     WELL GABBY WAS A LITTLE…, UH, KINDERGARTENER…

Q:     UH HUH.

A:     …SHE…, I'VE KNOWN HER WHEN SHE WAS IN PRE-K WHEN I FIRST

        STARTED, SHE MOVED UP EARLIER ON, BUT SHE WAS JUST A…, THE

        LITTLE SWEETHEART OF THE ROOM WHERE SHE WOULD JUST COME UP TO

        ME EVERY TIME I'D WALK IN AND SHE'D GIVE ME A BIG HUG.

Q:     YEAH.

A:     SO I'D GENERALLY JUST GIVE HER A HUG BACK, BECAUSE…, UH, IT'S

        BETTER TO SHOW THE KIDS AFFECTION THAN NO AFFECTION AND THEN

        THEY START ACTING UP.

Q:     YEAH.

A:     SO, UH, IN NO WAY DID I PICK 'EM UP IN A SEXUAL MANNER OR

        ANYTHING LIKE THAT.

Q:     WHAT WAY DID YOU PICK HER UP, GABBY?

A:     WELL JUST NORMALLY HOW YOU'D EVER PICK UP A CHILD WHERE I'D

        MAKE SURE SHE'S RESTING, SO I WOULDN'T DROP HER AND THEN I'D PUT

        HER RIGHT BACK DOWN AFTER.

Q:     HOW DID YOU…, YOU SAID MAKE SURE SHE'S RESTING, WHAT WAS

        RESTING ON YOUR…?

A:     WELL LIKE…, UH, I WOULD SAY LIKE HER…, UH, LEGS…

Q:     M-HMM.

A:     …LIKE THE…, BETWEEN HER KNEES THAT'S WHERE I'D HOLD 'EM, SO I'D

        MAKE SURE I HAVE A…, A GOOD…, UH, GRIP SO I DON'T DROP THEM.

Q:   SO IF HER KNEES ARE RIGHT…, ON YOUR ARM, WHERE WOULD THE REST OF HER BODY BE?

A:   UH, IT'D BE LIKE IF MY…, HER LIKE KNEES WERE LIKE THIS IT'D BE JUST LIKE THAT, LIKE THE REST OF IT WOULD BE STA…, LIKE SITTING UP WOULD BE. (UNSURE)

Q:   WHAT DO YOU MEAN YOU'D HOLD HER BY THAT, I…, (CHUCKLE) WHAT DO YOU MEAN?

A:   NO, LIKE IF I WAS HOLDING HER LIKE THIS…

Q:   UH HUH.

A:   …SHE…, LIKE THE REST OF HER BODY WOULD BE…, UH…

Q:   OH, SO SHE WOULD…

A:   …I'D BE NO…, NO CONTACT IN…, IN…, OF ANY PART OF HER BODY OTHER THAN ME HAVING A SECURE…

Q:   OKAY.  SO I'M…, I'M ENVISIONING BECAUSE YOU'RE…, YOU'RE NOT SAYING THAT, YOU'RE SAYING YOU'RE JUST HOLDING BEHIND THE KNEES, BUT I MEAN SHE'D BE OFF BALANCE AND FALL BACKWARDS IF SHE…

A:   WELL IT WAS…

Q:   …WAS SHE SITTING ON YOUR ARM?

A:   (NO VERBAL RESPONSE)

Q:   I MEAN SHE WOULD HAVE HAD TO BEEN, I CAN'T REALLY…

A:   SHE WOULD ACTUALLY HOLD ON TO ME BECAUSE SHE WOULDN'T FALL OFF.

Q:     SO SHE PUT HER ARMS WHERE?

A:     LIKE MAYBE LIKE ONE ARM RIGHT HERE, NOTHING BIG AND…

Q:     JUST PUT HER ARM RIGHT THERE?

A:     LIKE HOLDING ON JUST SO SHE…

Q:     I MEAN I'VE GOT KIDS, I…, I'LL HOLD 'EM LIKE THIS, USUALLY THEY'LL

        WRAP THEIR LEGS AROUND YOU AND YOU KEEP YOUR HAND…, YOUR

        ARM WILL BE UNDER THEIR BUTT OR WHATEVER.

A:     M-HMM, WELL…

Q:      IS THAT LIKE WHAT YOU'RE DESCRIBING?

A:     …PRETTY MUCH, BUT WHENEVER SHE DOES TRY TO WRAP HER LEGS

        AROUND I GENERALLY MOVE IT JUST SO I…, LIKE I SAID I DON'T GET

        ACCUSED OF ANYTHING.

Q:     OKAY, ALRIGHT.  HAS SHE WRAPPED HER…, GABBY WRAP HER LEGS

        AROUND LIKE…, LIKE THAT WITH YOU BEFORE?

A:     SHE HAS AND UH, I…, I JUST PUT HER DOWN AS SOON AS POSSIBLE JUST

        SO IT DOESN'T HAPPEN.

Q:     YEAH.

A:     LIKE I SAID THE WHOLE SITUATION WITH ME AS WELL, UH, WHEN IT

        HAPPENED I…, I JUST DON'T FEEL COMFORTABLE WITH IT…

Q:     YEAH.

A:     …SO I DO PUT THEM DOWN.

Q:     NOW IS THIS THE FIRST TIME YOU'VE HAD TO WRITE A STATEMENT FOR

        YOUR…, FOR YOUR WORK?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 66 OF 185

Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 12/12/16   Page 129 of 349 PageID #:
3493
Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 01/22/16   Page 67 of 185   PageID #: 260

A:      YES, YES.

Q:      DID YOU WHEN…, DID…, WHO TALKED TO YOU ABOUT THE THING WITH

        GABBY AND HER DAD?

A:      UH, HEIDI DID AS WELL, BUT IT WAS…

Q:      WAS IT JUST HEIDI OR SOMEONE ELSE?

A:      …IT WASN'T…, UH, IT WASN'T JUST GABBY, SHE WAS JUST GIVING ME AN

        EXAMPLE…

Q:      OF…?

A:      …OF HOW HER DAD MIGHT REACT.  SHE WASN'T ACTUALLY SAYING HE

        DID COME UP TO HER AND TALK TO HER ABOUT IT, SHE JUST SAID BASED

        OFF HIS PERSONALITY HE MAY NOT…, UH, APPRECIATE THE ACTION…

Q:      M-HMM.

A:      …PRETTY MUCH.  SO I DID END UP BEING MORE CAUTIOUS, UH,

        ESPECIALLY WITH PICKING UP THE KIDS, SHE TOLD ME NOT TO HAVE THE

        KIDS REALLY ALL UP ON ME AND PLAYING, BECAUSE I'M…, I'D SAY I'M

        THE MORE FUN GUY…

Q:      YEAH.

A:      …AT THE…, AT THE CENTER KNOWING I'M THE GUY AND I ALSO HAVE

        MORE ENERGY THAN MOST OF THEM…

Q:      YEAH.

A:      …20 YEARS OLD, THE KIDS TEND TO JUST…, LIKE I'D ACT LIKE I FELL

        OVER THEY START POUNDING AT ME AND IT'S JUST…, UH, KID PLAY, IT'S

        NOTHING MORE THAN THAT.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 67 OF 185

Q:     YEAH, YEAH.

A:     SO I…, LIKE WHENEVER ANYTHING LIKE THAT HAPPENS IT REALLY

       MAKES ME UNCOMFORTABLE.

Q:     M-HMM.

A:     SO I DON'T…, I PUT THEM DOWN, I EVEN…, UH, TOLD GABBY TO NOT DO

       THAT ANYMORE, I…

Q:     DO WHAT?

A:     …LIKE WHEN SHE GETS UP ON ME LIKE WRAP HERSELF ON ME AND WHEN

       I'D…, I DID START EXPLAINING TO THEM THAT THAT'S NOT WHAT WE DO.

Q:     M-HMM.

A:     UH, THEN THERE ARE TIMES WHERE THEY WRAP THEIR WHOLE BODY

       AROUND MY LEGS, BECAUSE THEY DON'T WANT ME TO WALK AROUND,

       BUT THEN I ACT LIKE I'M PICKING THEM UP, SO IT'S NOT…

Q:     SO YOU'LL WALK WITH THEM LIKE CLINGING TO YOUR LEGS…

A:     …YEAH.

Q:     …LIKE WRAPPED AROUND…

A:     M-HMM.

Q:     …LIKE HANDS AND FEET?

A:     HANDS AND FEET PRETTY MUCH.

Q:     YEAH.

A:     AND IT'S LIKE…

Q:     LIKE SITTING ON YOUR FOOT?

A:     …IT…, YEAH…

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 68 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 131 of 349 PageID #:
3495
Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 01/22/16   Page 69 of 185   PageID #:
2262

Q:      OKAY.

A:      …IT'S ALL PLAYFUL, IT'S NOTHING LIKE I SAID MORE THAN THAT.

Q:      YEAH.

A:      SO IT'S…, LIKE WHEN THIS ALLEGATION HAPPENED I JUST COMPLETELY

        FREAKED OUT, BECAUSE I'VE…, I WAS TRYING TO BE MORE CAUTIOUS

        ANYWAY.

Q:      YEAH.

A:      AND IT STILL HAPPENED, SO.

Q:      SO BACK…, BACK TO IN THAT ROOM, UH, YESTERDAY.  YOU SAID YOU

        LAID DOWN NEXT TO…, WHO'D YOU LAY DOWN NEXT TO?

A:      IT WAS ON THE…, UH, THE CARPET…

Q:      UH HUH.

A:      …UH, BETWEEN…, OR ACTUALLY IT'S A RUG, BETWEEN ETHAN AND        .

Q:      OKAY.

A:      AND WE WERE JUST JOKING AROUND PLAYING LIKE…

Q:      WHAT WERE THEY LAYING ON…

A:      THEY HAVE MATS.

Q:      …OR WERE THEY SITTING UP, LAYING DOWN, WHAT WERE THEY DOING?

A:      UH, THEY WERE LAYING DOWN, THEN THEY SAT UP A COUPLE TIMES AND

        I KEPT TELLING THEM LAY DOWN…

Q:      (CLEARING THROAT)

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 69 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 132 of 349 PageID #:
3496
Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 01/22/16   Page 70 of 185   PageID #: 263

A:     …BECAUSE IT WAS NAPTIME AND I…, HONESTLY I WASN'T SUPPOSED TO
       BE PLAYING WITH THEM, I WAS SUPPOSED TO LET THEM REST BECAUSE
       THEY HAVE LONG DAYS.

Q:     YEAH, I GOTCHA.

A:     THERE WAS JUST A LOT OF PLAY, IT WASN'T ANYTHING MORE THAN THAT
       WHERE I WOULD JUST PRETEND I TOOK THEIR PILLOW AND THEN SLEPT
       ON IT…

Q:     YEAH.

A:     …AND THEN THEY'D BE LIKE, HEY, THAT'S MY PILLOW AND THEN HE
       WOULD TAKE IT BACK FROM ME AND THEN        WOULD DO THE SAME
       THING AND I TOOK HERS BECAUSE KIDS GET JEALOUS, EVEN THE KID
       ACROSS THE ROOM WAS LIKE, MR. ALI, COME TAKE MY PILLOW.

Q:     YEAH.

A:     BUT…

Q:     WHICH ONE SAID THAT?

A:     …UH, SOSHA, SHE WASN'T REALLY CROSS THE ROOM, SHE WAS JUST
       RIGHT ACROSS FROM THEM. (UNSURE OF NAME AND SPELLING)

Q:     OH.

A:     BUT IT WAS…, IT WAS JUST PLAY.

Q:     YEAH.

A:     LIKE IT WASN'T ANYTHING SERIOUS.

Q:     YEAH.

A:     AND THEN…, UH, I DID TELL THEM IT WAS TIME TO TAKE A NAP AND THEN THAT'S WHEN SHE STARTED SITTING ON MY LAP AND UH, ME AND HAVE A LITTLE JOKE GOING ON…

Q:     M-HMM.

A:     …THAT WHEN SHE LEAVES I CALL HER LITTLE BABY…

Q:     M-HMM.

A:     …BECAUSE SHE HAS A LITTLE SISTER, BABY EMILY.

Q:     YEAH.

A:     AND I SAY, YOU'RE THE LITTLE BABY, SHE GOES LIKE, NO, YOU'RE THE LITTLE BABY AND EVEN AS…, AS SHE LEFT THAT DAY SHE WAS LIKE, BYE MR. ALI BABY, LIKE CALLING ME THE LITTLE BABY AND I SAY, NO, YOU'RE THE LITTLE BABY.  SO…

Q:     YEAH, WHEN WAS THAT SHE LEFT?

A:     UH…

Q:     LIKE YOU MEAN LEAVING THE WHOLE CENTER FOR THE DAY?

A:     …WHEN HER DAD CAME TO PICK HER UP.

Q:     OKAY.  DID YOU SEE THEM WHEN THEY WERE LEAVING OR SOMETHING?

A:     UH, I SAW THEM ON THEIR WAY OUT.

Q:     OKAY.  WHERE…, WHERE WERE YOU WHEN YOU SAW 'EM?

A:     UH, I HAD THE KIDS WITH ME AND WE WERE…, UH, LEAVING THE ROOM TO GO TO THE LIBRARY.

Q:     OKAY, ALRIGHT AND UH, WHAT TIME WAS THAT?  WHAT TIME DID THEY COME THROUGH?

A:     UH, I WOULD SAY AROUND MAYBE 5:00-ISH, ONLY BECAUSE WE WERE IN THE LIBRARY AND UH, WE CAME OUT, PLAYED IN THE MULTI PURPOSE GYM AND I TOOK THE KIDS TO THE RESTROOM, CAUSE IT'S…, WE TAKE THEM OUT EVERY HOUR SINCE WE'RE POTTY TRAINING THEM WE DON'T WANT THEM TO…

Q:     YEAH.

A:     …PEE ALL OVER THEMSELVES AND AFTER THAT I…, WE STARTED WALKING OUT AND I SEE HER WITH…, LEAVING WITH HER DAD AND HER LITTLE SISTER.

Q:     OKAY.

A:     SO THAT'S WHEN SHE SAID IT, BUT…

Q:     OKAY.

A:     …SHE WAS JUST BEING PLAYFUL ABOUT IT.

Q:     OKAY.  TELL ME THIS, UH, THERE ARE A BUNCH OF QUESTIONS ABOUT SOME OF THE THINGS YOU TOLD ME, BUT…, UH…

A:     SURE.

Q:     …I'M JUST TRYING TO REMEMBER…, OH, SORRY, I'M JUST TRYING TO REMEMBER THEM AND GO ONE AT A TIME HERE.  UH, YOU SAID YOUR…, YOUR…, YOU THAT…, YOUR TEAM OR NOT TEAM, YOUR CLASSROOM…

A:     M-HMM.

Q:     …YOU SAID THAT YOU'RE THE ASSISTANT EDUCATOR AND…, AND UH, CATHIE IS THE LEAD.

A:     M-HMM.

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 135 of 349 PageID #:
3499
Case 1:15-cr-00072-TWP-DML   Document 74-1   Filed 01/22/16   Page 3 of 185 PageID #: 266

Q:     YOU SAID YOU…, YOU HAVE…,UH, GROUPS OF KIDS THAT ARE HER

       PRIMARY RESPONSIBILITY AND GROUPS THAT ARE YOUR PRIMARY

       RESPONSIBILITY, WHAT…, WHAT'S…

A:     UH…

Q:     …WHAT ARE THE NAMES OF YOUR KIDS?  I KNOW YOU SAID THAT

       EVERYBODY'S…, YOU'RE STILL RESPONSIBLE, BUT…?

A:     …UH, UH, TO BE HONEST WITH YOU I DON'T REMEMBER THE LIST

       EXACTLY, BECAUSE SHE MADE UP THE LIST AND UH, WHAT SHE WANTED

       TO DO WAS GIVE ME THE BOYS JUST SO SOME PARENTS WOULDN'T FEEL

       UNCOMFORTABLE, BUT I DID HAVE I THINK ANNA IN MY GROUP, UH, THE

       PAPER'S ON THE WALL AND I TOLD HER WE NEED TO UPDATE IT, BECAUSE

       WE GOT A COUPLE NEW KIDS…

Q:     UH HUH.

A:     …AND SOME OF THE KIDS WE HAD HAVE MOVED UP.  SO IT'S A REALLY

       OUTDATED LIST…

Q:     SO THIS…

A:     …IT'S…

Q:     …BUT IT'S ON THE WALL IN THE…

A:     …IT'S…, IT'S ON THE WALL IN THE CLASSROOM.

Q:     …OKAY.

A:     AND UH, WE'VE…, WE REALLY DON'T GO BY THE LIST, WE GO AS A

       CLASSROOM…

Q:     OKAY.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 73 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 136 of 349 PageID #7
3500
Case 1:15-cr-00072-TWP-DML   Document 57-1   Filed 01/22/16   Page 74 of 185 PageID 267

A:      …ME AND CATHIE WHERE SHE'LL SAY, OKAY, INSTEAD OF SPLITTING UP

THE TWO GROUPS AND WE DO OBSERVATIONS.

Q:      M-HMM.

A:      SHE'LL JUST DO OBSERVATIONS ON A CHILD AND THEN I'LL DO AN

OBSERVATION ON A CHILD.

Q:      WHAT'S AN OBSERVATION?

A:      AN OBSERVATION IS WHEN WE SEE THEM DOING SOMETHING…, UH, NEW,

LIKE THE…, OR SOMETHING WE OBSERVE ABOUT THEM THAT WE FIND…,

UH, INTERESTING FOR THEIR AGE.

Q:      YEAH.

A:      SO AS A 2 YEAR OLD IF THEY COME IN AND SAY, MY SHOES ARE PURPLE,

WE'D WRITE THAT AS AN OBSERVATION, BECAUSE THEY'RE STILL JUST

LEARNING THEIR COLORS.

Q:      M-HMM.

A:      AND WE'D DO THAT ALL THE TIME AND UH, I…, I BELIEVE OBSERVATIONS

ARE SUPPOSED TO BE SPLIT UP BETWEEN THE TWO, BUT I…, UH, ME AND

MS. CATHIE WE JUST DO OBSERVATIONS AS WE GO.  WHEN…, WHENEVER

WE HEAR THEM SAY SOMETHING WE HAVE OUR CLIPBOARD WITH THE

OBSERVATION SHEET AND WE JUST WRITE IT DOWN.

Q:      YEAH, I GOTCHA.

A:      SO, UH, THE…, LIKE I TOLD YOU THE PRIMARY CARE LIST IS…, UH, IT'S

THERE, BUT WE WORK AS A TEAM…

Q:      OKAY.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 74 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 137 of 349 PageID #:
3501
Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 01/22/16   Page 75 of 185   PageID 268

A:      …AS OPPOSED TO ALWAYS SPLITTING UP THE KIDS.

Q:      BUT THEY DID THE LIST YOU SAID GIRLS FOR CATHIE AND THE BOYS FOR

        YOU?

A:      THAT'S WHAT SHE SUGGESTED WITH THE DIAPER CHANGING…

Q:      OKAY.

A:      …JUST SO OF COURSE…

Q:      IS THAT THE PRIMARY LIST THOUGH TOO, IS THAT HOW YOU DO IT OR

        DIFFERENT?

A:      HMM, I DON'T THINK SHE DID THAT…

Q:      SO JUST FOR THE DIAPER CHANGING?

A:      …SHE WANTED TO DO THAT FOR THE DIAPERS, BUT THEN SHE SAID, UH, I

        HAVEN'T…, SHE WOULD NEVER ACCUSE ME OF ANYTHING LIKE THAT OF

        COURSE AND I'M…, I'M SO GREAT WITH THE KIDS THAT DOESN'T REALLY

        MATTER WHO'S DOING IT.

Q:      YEAH.

A:      AND LIKE I TOLD YOU IT MAKES ME FEEL UNCOMFORTABLE SOMETIMES,

        SO I JUST TRY TO HURRY UP AND…

Q:      DO IT QUICKLY.

A:      …DO IT QUICKLY AND GET IT OVER WITH.

Q:      YEAH.

A:      BECAUSE WHO LIKES CHANGING A POOPIE DIAPER OR…

Q:      YEAH, NO.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 75 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 138 of 349 PageID #:
3502
Case 1:15-cr-00072-TWP-DML   Document 373-1   Filed 01/22/16   Page 6 of 185   PageID 269

A:      …UH, ANYTHING LIKE THAT AND UH, THE GIRL ON MY LIST, ANNA
        DOESN'T EVEN WEAR…, WEAR PULL UPS ANYMORE, SHE…

Q:      YEAH, I GOTCHA.  SO SHE'S POTTY TRAINED TOO?

A:      …SHE'S POTTY TRAINED, YEAH.

Q:      THAT'S PRETTY GOOD.  UH, OKAY, SO…, UH, SO TELL ME…, GO BACK TO
        WHEN MS…., IS IT MS. TYRIA?

A:      YEAH.

Q:      CALLED YOU INTO THE ROOM OR SOMETHING OR WHA…, HOW'D THAT
        GO DOWN?

A:      SHE TOLD CHIANA SHE WANTED TO TALK TO ME.

Q:      OKAY.

A:      AND UH, I WENT IN THERE AND THAT'S WHEN SHE TOLD ME, LISTEN TO
        WHAT          SAYING AND…

Q:      THEN SHE TOLD YOU WHAT?

A:      LISTEN TO WHAT        WAS SAYING.

Q:      OKAY.

A:      AND IT…

Q:      AND WHAT DID        …, UH, WAS        THERE TOO?

A:      …YEAH.

Q:      WHERE…, WHERE WAS THIS CONVERSATION HAPPEN?

A:      RIGHT ON THE SPOT WHERE I WAS, SHE WAS SITTING RIGHT THERE TOO.

Q:      I MEAN LIKE WHAT ROOM WERE YOU GUYS IN?

A:      KINDERGARTEN.

Q:      SO YOU'RE IN THE KINDERGARTEN ROOM?

A:      YEAH.

Q:      IS THAT THE ONE WITH THE DOUBLE DOORS JUST OFF OF THE…, THE…

A:      RIGHT ACROSS…

Q:      …THE MAIN FRONT DESK?

A:      …YEAH.

Q:      OKAY.  SO THEY WERE ON THE FLOOR YOU SAID?

A:      YEAH, THEY WERE JUST LAYING DOWN ON THEIR MATS READY FOR NAP.

Q:      UH, WHEN YOU WENT IN TO TALK TO THEM?

A:      THEY WERE SITTING UP.

Q:      OKAY, WERE THEY ON THEIR MATS STILL OR…?

A:      THEY WERE ON THEIR MATS, UH, BUT MS. TYRIA WAS SITTING RIGHT

        BETWEEN ETHAN AND       .

Q:      OKAY AND YOU…, UH, YOU SAID YOU WENT INTO THE ROOM WITH THEM?

A:      I WENT INTO THE ROOM BECAUSE MS. TYRIA WANTED…

Q:      SURE, SHE CALLED YOU INTO THERE.

A:      …TO TALK TO ME AND THEN…

Q;      SO WHEN YOU WENT IN DID YOU STAND UP, SIT DOWN, LAY DOWN, HOW

        WERE YOU…, HOW WERE YOU POSITIONED?

A:      UH, I CAME DOWN AND THEN I LIKE BENT DOWN…

Q:      UH HUH.

A:      …SO I COULD…, UH, TALK TO MS. TYRIA…

Q:      OKAY.

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 77 OF 185

A:       …AND HEAR WHAT        WAS SAYING.

Q:       AND THEN WHAT DID        SAY AGAIN?

A:       SHE SAID HER PRIVATE AREA WAS HURTING BECAUSE I TOUCHED HER.

Q:       UH HUH.

A:       AND MS. TYRIA THEN TOLD ME, SHE WAS LIKE…, SHE WAS FREAKING OUT
         WHEN SHE SAID THAT.  SO I GEN…, OR OF COURSE TOLD HER I DIDN'T DO
         ANYTHING AND I…, I EXPLAINED WHAT MIGHT HAVE HAPPENED FROM
         THE…, HER WRAPPING AROUND MY WATCH…

Q:       YEAH.

A:       …WHERE SHE MIGHT'VE RUBBED UP ON IT AND HURT HERSELF.

Q:       M-HMM.

A:       AND THAT'S WHEN MS. TYRIA SAID SHE WAS GONNA…, UH, TELL THEM
         ABOUT IT AND THEN I SAID OKAY AND THAT I'LL TALK TO THEM
         WHENEVER…

Q:       YEAH.

A:       …THEY TALK TO ME.

Q:       UH, DID…, DID YOU SAY ANYTHING TO        ONCE SHE SAID THAT ABOUT
         YOU?

A:       I…, I TOLD HER…, I ASKED HER IF SHE WAS DREAMING…

Q:       UH HUH.

A:       …AND SHE SAID…

Q:       WHAT'D SHE SAY?

A:       …SHE SAID NO.

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 141 of 349   PageID #2
Case 1:15-cr-00072-TWP-DML   Document 373-1   Filed 01/22/16   Page 9 of 185   PageID #2
3505

Q:      OKAY.

A:      AND I TOLD HER, UH…, AND EVEN MS. TYRIA SAID, UH, SHE TALKED TO

        HER ABOUT LYING BECAUSE KIDS AT 4 YEAR OLD…, YEARS OLD TEND TO

        HAVE A HUGE IMAGINATION THE WAY THEY START SAYING A WHOLE

        BUNCH OF THINGS…

Q:      M-HMM.

A:      …AND SHE JUST TOLD SHE'S LIKE, YOU NEED TO TELL THE TRUTH AND

        NO LYING AND I JUST SAID, YEAH, MS. TYRIA'S RIGHT, WE CAN'T TELL

        LIES AND UH, AFTER THAT I JUST LEFT THE ROOM AND CLOSED…

Q:      WHAT DID SHE SAY IN RESPONSE TO ALL THAT; WHAT'D        SAY, DID

        SHE…, DID SHE…

A:      SHE…, SHE DIDN'T REALLY SAY ANYTHING…

Q:      …APOLOGIZE FOR LYING OR…?

A:      …SHE DIDN'T SAY ANYTHING, SHE JUST STAYED QUIET.

Q:      OKAY.  UH…

A:      LIKE SHE KIND OF PUT HER HEAD DOWN A LITTLE BIT.

Q:      …AFTER WHEN?

A:      AFTER WE TOLD HER THAT YOU SHOULDN'T LIE.

Q:      OKAY, SHE JUST PUT HER HEAD DOWN?

A:      M-HMM, SHE WAS JUST LIKE…, LIKE IN A…, KIND OF ODDLY UPSET.

        (UNSURE)

Q:      WHERE…, WHERE WAS SHE AT THAT POINT?

A:      UH, IN THE KINDERGARTEN ROOM ON HER MAT…

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 79 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 142 of 349 PageID #3
3506
Case 1:15-cr-00072-TWP-DML   Document 573-1   Filed 01/22/16   Page 80 of 185   PageID 273

Q:     OKAY.

A:     …STILL IN THE SAME SPOT.

Q:     DID SHE SIT ON YOUR LAP DURING THAT CONVERSATION AT ALL…

A:     NO.

Q:     …AT ANY POINT?

A:     NO.

Q:     SHE DIDN'T GET IN YOUR LAP?

A:     NO.

Q:     OKAY, UH…

A:     I THINK I DID TELL HER TO COME HERE…

Q:     M-HMM.

A:     …AND I TALKED TO HER, I ASKED HER IF SHE WAS DREAMING, I DID…, UH,
       JUST BRING HER CLOSER SO SHE WOULDN'T TRIP, THERE WAS A PLATE IN
       THE ROOM ON THE FLOOR…

Q:     M-HMM.

A:     …I DIDN'T WANT HER TO SPILL OVER WHAT WAS ON THE FLOOR.

Q:     OKAY, SO…

A:     AND THAT WAS PRETTY MUCH IT.

Q:     …SO HOW WAS SHE POSITIONED THEN ULTIMATELY?

A:     JUST STANDING UP.

Q:     OKAY.  HOW WERE YOU IN RELATION TO HER THEN?

A:     UH, JUST…

Q:     LIKE… (INAUDIBLE-BOTH SPEAKING)

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 80 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 143 of 349 PageID #4
3507
Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 81 of 185   PageID #4

A:     …FACE TO FACE KIND OF.

Q:     OKAY.  SO SHE WAS STANDING UP LIKE…, LIKE SO SHOW ME EXACTLY

       HOW YOU WERE ON THE RUG? (UNSURE)

A:     I WAS KINDA LIKE THIS…

Q:     OKAY.

A:     …RIGHT THERE AND THEN I CAME AND TALKED TO HER LIKE…

Q:     WHEN YOU SAID, COME HERE?

A:     …YEAH, I TOLD HER TO COME HERE.

Q:     AND THEN WHERE DID SHE…, WHERE DID SHE END UP STANDING?

A:     RIGHT…, RIGHT THERE.

Q:     OKAY.  SO SHE'S JUST RIGHT IN FRONT OF YOU THERE?

A:     YEAH.

Q:     OKAY, ALRIGHT.  UH, DO YOU REMEMBER YOUR EXACT WORDS TO HER

       WHEN SHE FIRST SAID THAT TO…, UH, TO YOU AND MS. TYRIA?

A:     UH…

Q:     JUST EXACTLY WHAT YOU SAID.

A:     …I…, I DO BELIEVE I ASKED HER IS SHE WAS DREAMING IF IT HAPPENED.

Q:     DID YOU SAY ANYTHING ELSE FIRST?

A:     I HONESTLY DO NOT RECALL, BECAUSE AS SOON AS IT HAPPENED I KINDA

       WENT INTO A PANIC ATTACK ALMOST WHERE I WAS FREAKING OUT.

Q:     YEAH.

A:     AND HONESTLY IT WAS…, IT MADE ME REALLY NAUSEOUS…

Q:     M-HMM.

A:     …AS SOON AS SHE…, UH, SAID IT, BECAUSE…, UH, IT…, LIKE I SAID IT'S ONE OF MY BIGGEST FEARS FOR SOMETHING LIKE THAT TO HAPPEN AND UH, I MEAN I…, I REALLY FELT LIKE I WAS GONNA BE SICK TO MY STOMACH AFTER THAT.

Q:     (SHUFFLING PAPERS) OKAY.  UH, LET'S GO BACK TO…, UH, THE MOMENT YOU WALKED INTO THE ROOM TO RELIEVE MS. TYRIA.

A:     M-HMM.

Q:     START FROM THE BEGINNING AND TELL ME THAT FROM BEGINNING TO END ONCE MORE, THAT'S…, THAT'S IMPORTANT FOR ME TO HEAR EXACTLY WHAT HAPPENED THERE AND I MIGHT ASK YOU TO DO THAT AGAIN.  I'M JUST TRYING TO UNDERSTAND EXACTLY.

A:     OKAY.  SO I WALKED IN…, UH, I…, I DON'T RECALL IF SHE WAS READING THE BOOK THAT DAY OR THE DAY BEFORE, UH…

Q:     WHEN YOU SAY SHE, WHO ARE YOU TALKING ABOUT?

A:     MS. TYRIA.

Q:     OKAY.

A:     UH, BECAUSE SHE WAS READING A BOOK TO THE CHILDREN AND I JUST CAN'T REMEMBER FO…, IF IT WAS YESTERDAY OR THE DAY BEFORE.

Q:     OKAY.

A:     AND I KINDA JUST STOOD THERE FOR A SECOND WHILE SHE WAS FINISHING READING AND SHE'S LIKE, UH, IF THIS WAS THE DAY BEFORE…, BECAUSE MS. EMILY WAS SICK FOR 2 DAYS.

Q:     SURE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 82 OF 185

A:      AND…

Q:      I'M MORE CONCERNED ABOUT YESTERDAY…

A:      …I'M TRYING TO…

Q:      …I MEAN THE DAY BEFORE KINDA MATTERS TO ME, BUT I'M THINKING
        SPECIFICALLY YESTERDAY, SO.

A:      …UH, BUT I DON'T THINK SHE WAS READING THE BOOK YESTERDAY.

Q:      WHAT WAS HAPPENING IN THE ROOM WHEN YOU WENT INSIDE?

A:      SHE WAS GETTING THEM READY TO TAKE A NAP.

Q:      OKAY.  WERE THEY…, WHERE WERE THE KIDS, WERE THEY UP AND
        ABOUT OR WHAT WERE THEY DOING?

A:      THEY WERE ON THEIR MATS.

Q:      OKAY.

A:      SHE TOLD ME…, UH, THAT THE LITTLE BOY GRANT WAS HAVING A LITTLE
        TROUBLE LISTENING THAT DAY.

Q:      OH.

A:      AND IT LOOKED LIKE HE WAS PRETTY MUCH FALLING ASLEEP, BE…, HE
        LOOKED TIRED.  SO I TELL HER SHE CAN GO ON BREAK, SHE GOES ON
        BREAK AND I GO AROUND MAKE SURE…, OR ACTUALLY I GO AROUND IN
        THE ROOM LOOKING FOR THE CLIP BOARD, I COULDN'T FIND IT FOR A
        WHILE.

Q:      M-HMM.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 83 OF 185

A:      AND THEN I FOUND IT, IT WAS RIGHT BY THE FISH TANK, SO I GRABBED IT,

SIGN IN, THEN I MAKE SURE ALL THE KIDS ARE THERE, NONE OF THEM

ARE IN THE RESTROOM OR ANYTHING LIKE THAT.

Q:      M-HMM.

A:      AND…, AND THEN I GO AND SIT DOWN BETWEEN…

Q:      (BURP) 'CUSE ME.

A:      …      AND ETHAN.

Q:      M-HMM.

A:      AND UH, THAT'S WHEN WE WERE JUST JOKING AROUND A LITTLE BIT AND

THEN ME LIKE TAKING THEIR PILLOW.

Q:      YEAH, WHOSE PILLOW DID YOU TAKE?

A:      I TOOK ETHAN'S…

Q:      YEAH.

A:      …AND THEN THAT'S WHEN      STARTED GETTING JEALOUS AND SHE

STARTED SCOOTING HER PILLOW CLOSER, SO THEN I PRETENDED I TOOK

HERS AND WAS SLEEPING ON IT.

Q:      DID YOU TAKE HER PILLOW THEN?

A:      M-HMM.

Q:      OKAY.

A:      AND…

Q:      AND YOU WERE LAYING DOWN IN BETWEEN THEM?

A:      …YEAH, I WAS PRETENDING…, BECAUSE I TOLD 'EM IT'S NAPTIME…

Q:      OKAY.

A:      …AND I WAS LIKE, IT'S TIME TO TAKE A NAP AND THEN…

Q:      YEAH.

A:      …I WOULD PRETEND TO SLEEP.

Q:      DID YOU LIKE SNORE OR SOMETHING OR (INAUDIBLE-UNSURE)?

A:      YEAH, I WAS FAKE SNORING.

Q:      OKAY.

A:      UH HUH AND…

Q:      HOW DID THEY RESPOND?

A:      …THEY WERE LIKE, WAKE UP, WAKE UP, UH, LIKE THEY DON'T WANT TO

        SEE THEIR TEACHER JUST FALL ASLEEP RIGHT THERE.

Q:      YEAH, YEAH, YEAH.

A:      SO, UH, ALL THAT ASIDE AFTER THAT SHE STARTED JUMPING IN MY LAP

        AND…

Q:      YEAH, AT WHAT POINT DID SHE START JUMPING IN YOUR LAP?

A:      …AFTER I STARTED GETTING SERIOUS OF THEM NEEDING TO TAKE A NAP,

        WHICH WAS AROUND 30 MINUTES, CAUSE I LET THEM PLAY AROUND A

        LITTLE BIT…

Q:      YEAH.

A:      …JUST SO THEY CAN GET TIRED, WORN OUT A LITTLE BIT.

Q:      YEAH, HOW LONG DID YOU PLAY WITH THEM THEN?

A:      OH, IT WAS JUST LIKE 30 MINUTES REALLY AFTER MS. TYRIA HAD LEFT

        AND THEN ME LOOKING FOR THE CLIP BOARD FOR ABOUT 5 MINUTES AND

        THEN I WOULD SAY MAYBE 25 MINUTES TOTAL OF JUST JOKING AROUND

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 85 OF 185

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 148 of 349 PageID #9
3512
Case 1:15-cr-00072-TWP-DML   Document 57-1   Filed 01/22/16   Page 86 of 185   PageID #

AND THEN…, UH, EVEN SOSHA WAS SITTING THERE JUST STARRING AT

THE WHOLE THING HAPPENED, SHE WAS LAUGHING ABOUT IT.  UH, AFTER

THAT I JUST SAID, YOU KNOW IT'S TIME TO TAKE A NAP FOR REAL, I

DON'T WANT MS. TYRIA COMING BACK AND GETTING MAD AT ME.  SO

THEY GO, OKAY, BUT THEN THAT'S WHEN        KEPT SITTING IN MY LAP

AND THEN I TOLD HER SIT ON HER COT AND…, NOT COT, MAT BECAUSE

THE OTHER CLASSROOMS HAVE COTS, KINDERGARTEN HAS MATS.

Q:    M-HMM.

A:    SO I TOLD HER SHE NEEDS TO GET ON HER MAT AND SHE WASN'T

LISTENING.  SO WHEN I GO TO PICK HER UP SHE JUST FLICKS HER LEG

OVER AND LIKE WRAPS AROUND.

Q:    HOW DID YOU PICK HER UP, WHAT…, HOW…, WHAT…, WHAT DID…?

A:    UH, AS IF SHE WAS LIKE A LITTLE BABY KIND OF…

Q:    UH HUH.

A:    …LIKE JUST KINDA CARRYING HER LIKE THAT AND THEN SHE FLICKED

HER LEG AROUND AND…, RIGHT AROUND…

Q:    OKAY.  SO LIKE HER KNEES WOULD'VE BEEN RIGHT HERE WITH HER FEET

COMING DOWN OR…, LIKE THAT?

A:    YEAH, PRETTY MUCH LIKE THAT AND THAT…

Q:    AND SO HER THIGHS WENT DOWN THIS WAY AND THEN LIKE HER BUTT

WOULD BE HERE AND HER BACK WAS UP HERE AND HER HEAD IN YOUR

ARMS? (UNSURE)

A:    YEAH, LIKE THAT…

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 87 of 185   PageID 280

Q:      OKAY.

A:      …AND THEN SHE JUST WRAPPED AROUND…

Q:      SHE CRADLED YOU. (UNSURE)

A:      … AND MY WATCH WASN'T ALL THE WAY ON MY WRIST…

Q:      SO WHICH…

A:      …IT HAD STARTED CLIMBING UP A LITTLE BIT.

Q:      …SO IF HER FEET WERE RIGHT HERE WHICH LEG DID SHE FLICK AROUND?

A:      HER RIGHT LEG.

Q:      OKAY.  SO SHE FLICKED HER RIGHT LEG AROUND YOUR WRIST?

A:      SO KIND OF LIKE THIS…

Q:      UH HUH.

A:      …TO GET AROUND AND GET A GOOD GRIP ON IT.

Q:      SO…, AND WHAT DID SHE DO WHEN SHE GOT A GOOD GRIP?

A:      UH, I TOLD HER SHE NEEDS TO GET OFF AND SHE THOUGHT IT WAS…, WE
        WERE STILL PLAYING.

Q:      M-HMM. (CLEARING THROAT)

A:      SO I STARTED TRYING TO MANEUVER MY HAND AROUND LIKE GET IT
        OUT, BECAUSE I TOLD HER SHE NEEDS TO GET OFF, SHE NEEDS TO GET
        OFF…

Q:      UH HUH.

A:      …BUT SHE WASN'T LISTENING.

Q:      OKAY.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 87 OF 185

A:     AND I KNEW IT WAS KIND OF…, IT WAS PROBABLY UNCOMFORTABLE

       CAUSE SHE WAS REALLY RIGHT ON MY WATCH AND I TOLD HER SHE

       NEEDS TO GET OFF, BUT IT SEEMS LIKE SHE WAS ENJOYING IT THINKING

       IT WAS A GAME, LAUGHING AND ETHAN WAS SITTING THERE LAUGHING

       TOO AND SOSHA AND…

Q:     YEAH.

A:     …I BELIEVE THERE WAS FALLING ASLEEP AROUND THIS TIME.

Q:     OKAY.

A:     SO I TOLD HER…, I…, AFTER I FINALLY MANAGED TO GET IT OUT…

Q:     YEAH, HOW DID YOU EN…, MANAGE TO GET IT OUT?

A:     I PUT HER HEAD DOWN AND THEN JUST MOVED HER LEG A LITTLE BIT

       AND MOVED IT OUT.

Q:     OKAY.

A:     BUT THERE WAS A LITTLE BIT OF STRUGGLING AT FIRST BECAUSE I

       WASN'T TRYING TO STAY THERE AS LONG AS I COULD OBVIOUSLY.

Q:     YEAH.

A:     UH, AND THEN PUT HER DOWN AND THEN SHE…, UH, SHE KEPT TRYING TO

       DO IT AGAIN…

Q:     M-HMM.

A:     …AND AGAIN ON MY LAP AND I SAID, NO, YOU GOT TO TAKE A NAP AND

       THEN SHE KEPT SAYING, WELL I WANT TO SIT ON YOUR LAP AND I SAID,

       WELL NOT RIGHT NOW, YOU NEED TO TAKE A NAP, HMM, WHICH REALLY

       FOR ME IS PRETTY MUCH SAYING NO, JUST TAKE A NAP.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 88 OF 185

Q:     M-HMM.

A:     WHEN I SAY NOT RIGHT NOW IS PRETTY MUCH TELLING THE KIDS, UH, NO IN A NICER WAY…

Q:     M-HMM.

A:     …CAUSE I DON'T LIKE TELLING THE KIDS NO, NO, NO, NO.

Q:     YEAH.

A:     I'LL SAY NOT RIGHT NOW OR IT JUST…, IT KEEPS THEM PREOCCUPIED.

Q:     M-HMM.

A:     SO, UH, AFTER THAT SHE AGAIN TRIED TO GRAB MY ARM AND PUT IT DOWN THERE AND I JUST MOVED IT REALLY QUICK.  SHE GRABBED MY RIGHT ARM THIS TIME…

Q:     M-HMM.

A:     …NOT MY LEFT AND I…, SHE WAS SMILING, SO I THINK SHE WAS STILL THINKING IT WAS A GAME WHERE SHE WAS JUST ENJOYING IT AND KIDS DO LIKE TO EXPERIMENT AT THAT AGE.  WE'VE HAD…, UH, A COUPLE INSTANCES WHERE KI…, YOU'D CATCH THE KIDS WITH THEIR HANDS IN THEIR PANTS.

Q:     M-HMM.

A:     AND WE TELL 'EM NO, ONLY BECAUSE IT'S NOT WHAT WE DO IN PUBLIC.

Q:     YEAH.

A:     AND I DON'T KNOW MAYBE I…

Q:     YOU THINK SHE WAS EXPERIMENTING WITH YOU?

A:     …IT…, IT MAY HAVE BEEN…

STATEMENT OF ALI AL-AWADI             DP14-0088487             PAGE 89 OF 185

Q:      YEAH.

A:      …BECAUSE MAYBE SHE JUST LIKED HOW IT FELT AND THEN AFTER THAT

IT…, I JUST STARTED WALKING AROUND MAKING SURE ALL THE KIDS

WERE OKAY.  SHE FELL ASLEEP, UH, I DIDN'T NOTICE ANYTHING

UNORDINARY, I MEAN IT LOOKED LIKE SHE SHIFTED AROUND A COUPLE

OF TIMES…

Q:      YEAH.

A:      …BUT I MEAN I JUST THOUGHT IT WAS NORMAL.

Q:      M-HMM.

A:      AND SHE DIDN'T EVEN SAY ANYTHING ABOUT ANYTHING HURTING OR

ANYTHING.

Q:      YEAH.

A:      SO THEN WHEN MS. TYRIA COMES IN IT LIKE…, LIKE I SAID IT FREAKED

ME OUT.

Q:      YEAH.  SO, UH, YOU SAID EARLIER SHE GRABBED YOUR ARM AND PUT IT

BETWEEN YOUR LEGS, IS THAT THE SECOND TIME YOU'RE TALKING

ABOUT WITH YOUR RIGHT ARM OR ARE YOU TALKING ABOUT…?

A:      WITH MY RIGHT ARM SHE THOUGHT IT WAS STILL I GUESS A GAME…

Q:      YEAH, SO SHE GRABBED YOUR…

A:      …SO SHE KEPT TRYING TO PUT IT BETWEEN HER LEGS.

Q:      WOULD SHE…, WHAT…, WHAT WOULD SHE DO WITH…, UH, YOUR ARM

WHEN SHE GOT IT BETWEEN YOUR…, HER LEGS?

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 153 of 349 PageID #:
3517
Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 01/22/16   Page 91 of 185   PageID #:
3517

A:    SHE WOULD GRAB IT AND THEN SHE WOULD TU…, LIKE OPEN UP HER LEGS…

Q:    UH HUH.

A:    …AND I SAID NO, IT'S TIME TO TAKE A NAP.

Q:    OKAY.

A:    AND THEN THAT'S WHEN I COVERED HER UP AND THEN I GOT UP AND LET HER TAKE A NAP AND THEN…

Q:    I THOUGHT YOU'D SAID SHE GOT…, ACTUALLY GOT IT IN BETWEEN HER LEGS AGAIN THAT SECOND TIME AND WRAPPED HER LEG…

A:    NO, SHE WAS TRYING TO, IT GOT REALLY CLOSE, BUT THEN I MOVED MY HAND OUT BEFORE.

Q:    OKAY.  SO…, SO THE FIRST TIME WHEN SHE HAD IT WRAPPED AROUND YOUR LEFT ARM…

A:    THE LEFT ARM.

Q:    …UH, IS THAT WHEN YOU THINK SHE WAS EXPERIMENTING KINDA SEXUALLY I GUESS?

A:    I…, I…, I THINK SO.

Q:    YEAH.

A:    BUT…

Q:    WHAT MADE YOU THINK MAYBE SHE WAS SEXUALLY…

A:    …BECAUSE…

Q:    …INTERESTED IN IT?

A:      …UH, ONLY BECAUSE SHE WANTED IT RIGHT THERE AGAIN WITH MY OTHER ARM.  SO…

Q:      M-HMM, OH, LIKE SO WHEN SHE TRIED TO PUT YOUR OTHER ARM THERE?

A:      …I DIDN'T THINK ANYTHING MUCH OF IT, OTHER THAN I THOUGHT SHE WAS JUST TRYING TO HOLD ON AT FIRST, BUT THEN MAYBE ONCE SHE GRABBED MY OTHER ARM AND…, OR TRIED TO PUT IT BETWEEN, THAT'S WHEN I THOUGHT MAYBE SHE WAS TRYING TO EXPERIMENT A LITTLE BIT.

Q:      OKAY, ALRIGHT.

A:      BUT LIKE I…

Q:      DID SHE SAY ANYTHING LIKE, PUT YOUR ARM BACK HERE OR LET ME…, LET ME FEEL AGAIN OR SOMETHING LIKE THAT?

A:      UH, SHE ACTUALLY DID, SHE SAID…

Q:      WHAT'D SHE SAY?

A:      …SHE SAID, GIVE ME YOUR ARM, GIVE ME YOUR ARM AND THEN…, UH, AT FIRST I THOUGHT SHE WAS NOT DOING ANYTHING MUCH WITH IT AND THEN SHE WAS LIKE…, THEN SHE GRABBED IT AND WENT CLOSER.

Q:      SO WHEN SHE ASKED FOR YOUR ARM YOU…

A:      I JUST STUCK IT OUT, BECAUSE I THOUGHT SHE WANTED TO SEE SOMETHING.

Q:      …YOU STUCK IT OUT TO HER?

A:      I JUST STUCK IT OUT…

Q:      OKAY.

Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 155 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML   Document 57-3   Filed 01/22/16   Page 93 of 185   PageID 236
3519

A:      …AND THEN SHE ACTUALLY GRABS IT AND TRIES TO PUT IT DOWN.

Q:      NOW WHEN YOU STUCK YOUR ARM OUT TO HER WERE YOU SITTING UP,

STANDING, LAYING DOWN?

A:      I WAS SITTING UP, I WASN'T LAYING DOWN ANYMORE BECAUSE…

Q:      SO…

A:      …LIKE I SAID WHEN…, WHEN I SAID…

Q:      …ON YOUR BUTT OR…?

A:      …IT WAS TIME FOR…, HUH?

Q:      SITTING ON YOUR BOTTOM OR…?

A:      YEAH, I WAS JUST SITTING A…, MY BACK AGAINST THE WALL.

Q:      OKAY.

A:      AND UH…

Q:      WAS SHE ON YOUR RIGHT OR LEFT SIDE OR WHERE WAS SHE?

A:      …SHE WAS ON MY RIGHT SIDE.

Q:      OKAY.

A:      AND THE…

Q:      WAS SHE LAYING BESIDE YOU LIKE THIS WAY OR WAS SHE LAYING LIKE

THAT WAY OR ANY WAY?

A:      SHE WAS LAYING VERTICAL TO ME…

Q:      OKAY.

A:      …SO.

Q:      WHERE WAS ETHAN?

A:      ETHAN WAS ON MY OTHER SIDE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 93 OF 185

Q:     OKAY.  HOW MUCH SPACE WAS BETWEEN THEIR 2 COTS?

A:     UH, MY BODY'S LENGTH PRETTY MUCH, TO THE POINT WHERE THEY

       WERE HOLDING HANDS BEHIND MY BACK.

Q:     AT ONE POINT?

A:     AT ONE POINT.

Q:     OKAY.

A:     SO IT WASN'T REALLY THAT MUCH OF A DISTANCE, CAUSE THEY…, LIKE I

       SAID THEY WERE STILL PLAYING THINKING IT WAS A JOKE.

Q:     HMM, OKAY.

A:     AND I…, UH, I DIDN'T THINK IT WOULD GET TO THIS POINT WHERE…

Q:     YEAH.

A:     …I'D GET ACCUSED OF ANYTHING LIKE THAT.

Q:     SURE.

A:     YEAH.

Q:     WHEN YOU PICKED HER UP, UH, HOW WERE YOU POSITIONED AT THAT

       POINT, WERE YOU STILL SITTING DOWN WITH YOUR BACK TO THE WALL?

A:     NO, I WAS ACTUALLY…, YEAH, SITTING BECAUSE THAT'S WHEN SHE

       CAME AND SAT ON MY LAP.

Q:     SO SHE SAT IN YOUR LAP.

A:     AND I WAS…

Q:     WHERE DID SHE SIT?

A:     …SITTING WITH MY LEGS FOLDED.

Q:     OKAY.  SO YOU'RE LIKE…, I GUESS WE'D CALL IT AGAINST…

STATEMENT OF ALI AL-AWADI             DP14-0088487             PAGE 94 OF 185

Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 01/22/16   Page 95 of 185   PageID #:
2583

A:      I…, I WAS…, I WAS SITTING…

Q:      …UH, ACROSS THE…

A:      …UH, WE WOULD CALL IT CRISS-CROSS APPLESAUCE.

Q:      …CRISS-CROSS APPLESAUCE, UH…

A:      SO I WAS JUST SITTING NORMAL LIKE THIS…

Q:      YEAH.

A:      …AND THAT'S WHEN SHE CAME AND JUST SAT DOWN.

Q:      OKAY AND WHERE'D SHE SIT?

A:      UH, PRETTY MUCH RIGHT HERE.

Q:      OKAY, WAS LIKE HER BUTT RIGHT THERE OR…

A:      YEAH, LIKE HER BUTT…

Q:      …HER BACK…

A:      …LIKE RIGHT HERE.

Q:      …WHERE WERE HER LEGS?

A:      HER LEGS WERE RIGHT OUT THERE…

Q:      OKAY.

A:      …CAUSE SHE WAS STILL FACING ETHAN.

Q:      DID SHE SQUIRM AROUND ON YOUR LAP OR ANYTHING LIKE THAT OR…?

A:      UH, A LITTLE BIT OF SQUIRMING ONLY BECAUSE I TOLD HER, GET ON HER

        MAT AND SHE WASN'T LISTENING.  SO THEN I GO AND PICK HER UP LIKE

        THIS…

Q:      OKAY.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 95 OF 185

A:      …AND THAT'S WHEN SHE FLICKED HER LEG AND GOT A REALLY GOOD GRIP AND…

Q:      OKAY AND THAT'S WHEN YOU WERE SITTING DOWN STILL?

A:      WHILE I WAS SITTING DOWN.

Q:      OKAY.

A:      SO THEN I GO TO PUT HER DOWN AND THEN I WAS TRYING TO MANEUVER MY ARM OUT…

Q:      YEAH.

A:      …SO I PUT HER DOWN AND THEN JUST MOVED HER LEG A LITTLE BIT AND…

Q:      NOW HOW LONG WAS…, WAS YOUR…, UH, YOUR RIGH…, YOUR LEFT WRIST IN…, IN BETWEEN HER LEGS?

A:      MAYBE 10 SECONDS, ONLY BECAUSE I DIDN'T WANT TO DO ANY FORCEFUL THINGS, I WANTED HER TO SEE THAT I'M NOT PLAYING, JUST MOVE IT OUT OF THERE REALLY QUICK.

Q:      ABOUT 10 SECONDS, OKAY.

A:      IT WASN'T THAT LONG.

Q:      DID SHE SAY ANYTHING WHILE…, UH, HER LEGS WERE CLAMPED AROUND YOUR WRIST?

A:      SH…, SHE WAS LAUGHING AND SO WAS ETHAN AND SOSHA…

Q:      M-HMM.

A:      …THEY THOUGHT IT WAS A GAME PRETTY MUCH.

Q:      OKAY, ALRIGHT.  UH, AND…, AND WHAT TIME IS NAPTIME FOR THEM OR REST TIME?

A:      UH, IT…, IT DIFFERS REALLY, UH, MS. TYRIA PUTS THEM DOWN EARLIER THAN MS…., UH, EMILY.

Q:      M-HMM.

A:      WELL MS. EMILY TOLD ME SHE'S BEEN TRYING TO GET THEM IN A ROUTINE FOR TAKING A NAP OR STARTING NAPTIME OR REST TIME BEFORE 1:00…

Q:      OKAY.

A:      …THAT'S WHAT SHE SAYS.  SO MS. TYRIA ACTUALLY HAD 'EM RIGHT AFTER LUNCH, CAUSE THAT'S WHAT PRE-K DOES IS RIGHT AFTER LUNCH THEY USE THE RESTROOM AND THEY GO LAY DOWN.

Q:      M-HMM.

A:      UH, PRE SCHOOL…, OUR LITTLE CLASSROOM DOES THE SAME THING.

Q:      OKAY.

A:      SO IT'S NOTHING UNUSUAL AND SOMETIMES THEY DON'T EVEN HAVE NAPTIME.

Q:      YEAH.

A:      BUT WITH THE NEWER KIDS I THINK SHE'S ALWAYS HAD A NAPTIME WITH THEM.

Q:      YEAH AND YOU SAID THAT…, UH, YOU SAID THAT…, UH, YOU REALLY…, EARLIER YOU SAID YOU REALLY WEREN'T SUPPOSED TO BE PLAYING WITH THEM BECAUSE THEY WERE SUPPOSED TO BE RESTING.

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 97 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 160 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML   Document 57-1   Filed 01/22/16   Page 98 of 185   PageID #:
3524

A:      THEY SUPPOSED TO TAKE A NAP…

Q:      YEAH.

A:      …BUT ME BEING THE MORE PLAYFUL KIND THEY REALLY OPEN UP AND

        LIKE TO PLAY.

Q:      YEAH.

A:      AND UH, THIS WAS THE SECOND DAY IN A ROW THAT I GOT TO…, UH, LET

        MS. TYRIA GO ON BREAK, SO I ACTUALLY…, UH, I ENJOY BEING WITH

        THEM BECAUSE THEY'RE…, THEY WERE MY OLD KIDS WHEN I WAS A

        FLOATER AND I USED TO SEE THEM EVERYDAY.

Q:      OH.

A:      NOW I DON'T SEE THEM AND THEN THEY ALWAYS LIKED TO PLAY

        AROUND.

Q:      YEAH.

A:      SO.

Q:      IS THAT WHEN YOU AND        STARTED YOUR GAME ABOUT BEING A

        BABY?

A:      THAT STARTED REALLY SOON WHEN I FOUND OUT SHE HAD A LITTLE

        SISTER.

Q:      M-HMM.

A:      I SAID, YOU'RE A LITTLE BABY JUST LIKE YOUR SISTER, SHE'S LIKE, NO,

        YOU'RE THE LITTLE BABY.

Q:      YEAH.

A:      SO IT WAS REALLY EARLY ON.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 98 OF 185

Case 1:15-cr-00072-TWP-DML   Document 143-1   Filed 01/22/16   Page 99 of 185   PageID #:
3525
Case 1:15-cr-00072-TWP-DML   Document 142-1   Filed 12/12/16   Page 161 of 349 PageID #2

Q:    DO YOU THINK YOU TWO KINDA HAD A SPECIAL CONNECTION COMPARED TO SOME OF THE OTHER KIDS?

A:    I WOULD NOT SAY SO.

Q:    I…, I MEAN I…, I JUST MEAN CAUSE…, I DON'T KNOW…

A:    BECAUSE…

Q:    …I…, I'VE…, I'VE GOT YOU KNOW 4 KIDS MYSELF AND UH, EVEN WITH MY OWN KIDS SOMETIMES YOU KINDA HAVE A CONNECTION WITH A CERTAIN KID OR…

A:    …UH, TO BE HONEST WITH YOU I TRY NOT TO PICK ANY FAVORITES…

Q:    WELL I KNOW.

A:    …WITH THE KIDS AND UH…

Q:    ME NEITHER, I'M A DAD, THEY'RE ALL 4 OF MY KIDS, I LOVE 'EM ALL, RIGHT, BUT YOU KNOW SOMETIMES…

A:    (COUGHING) (CHUCKLE) COMPLETELY UNDERSTANDABLE.

Q:    …SOMETIMES ONE OF THE KIDS SEEMS TO…, TO GET ALONG WITH YOU OR JUST CLICK A LITTLE BIT DIFFERENT…

A:    AND…

Q:    …AND I'M JUST…

A:    …    ACTUALLY…, UH, SHE'S A GOOD KID…

Q:    YEAH.

A:    …UH…

Q:    DESCRIBE HER TO ME THEN.

A:    …SHE'S REALLY PLAYFUL…

STATEMENT OF ALI AL-AWADI       DP14-0088487       PAGE 99 OF 185

Q:     YEAH.

A:     …UH, DOESN'T REALLY LIKE TO GET OUT OF PLAY MOOD…

Q:     YEAH.

A:     …WANTS TO STAY IN THAT, BUT SHE WILL LISTEN FOR THE MOST PART; SOMETIMES SHE'LL BE A LITTLE REBELLIOUS, BUT…, UH, LIKE I SAID I DO THAT WITH A LOT OF THE OTHER KIDS WHERE I PRETEND I'M CHASING THEM OUT THE ROOM BECAUSE I'M GONNA GET THEM…

Q:     YEAH.

A:     …BECAUSE SOMETIMES THEY DON'T WANT TO LEAVE AND THEIR PARENTS I KNOW ARE SAYING COME ON, WE GOT TO GO, WE GOT TO GO, SO ALL THE KIDS PRETTY MUCH MADE A GAME ABOUT THAT.

Q:     YEAH.

A:     IS WHERE, I'M GONNA GET YOU, I'M GONNA GET YOU.

Q:     HMM.

A:     SO THEY ALL WANT ME TO CHASE THEM OUT OF THE ROOM, SO YOU'LL HAVE A LITTLE GIRL, ISABELLA, UH, SHE MAY NOT BE THERE ANYMORE CAUSE SHE'S GOING TO KINDERGARTEN AT A NEW SCHOOL. (UNSURE OF NAME AND SPELLING)

Q:     YEAH.

A:     UH, SHE WOULD NOT LEAVE THE CENTER AT ALL UNLESS I CHASED HER DOWN AND WAS GONNA GET HER…

Q:     OKAY.

A:     …PER SAY.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 100 OF 185

Q:     I GOTCHA.

A:     AND IT…, I…, I JUST WANT…, I FEEL LIKE I MEAN I CONNECTED WITH ALL
       THE KIDS…

Q:     YEAH.

A:     …NOT JUST…

Q:     OH YEAH, SO LIKE…, SO LIKE…

A:     …I DON'T…, I DON'T…, YEAH.

Q:     …OH NO AND I'LL SAY THE SAME THING ABOUT MY KIDS, I JUST MEAN
       SOMETIMES A KID JUST…, YOU SEEM TO GET ALONG WITH 'EM BETTER
       THAT'S ALL.

A:     UH, THERE'S A LITTLE GIRL…

Q:     THAT JUST KINDA SOUNDS LIKE MAYBE WHAT…, WHAT IS…

A:     …I MEAN THERE'S A LITTLE GIRL WHO'S REALLY CLINGY, WHICH IS
       CHLOE… (UNSURE OF NAME AND SPELLING)

Q:     YEAH.

A:     …WHOSE MORE THAN        WHERE SHE'LL COME UP TO ME AND HOLD ON
       TO MY LEG AND…

Q:     JUST ALL THE TIME, MAN.

A:     …LIKE I SAID JUST SIT ON MY LEG AND NOT LET ME MOVE.

Q:     YEAH.

A:     SO THAT'S WHY I WAS SO SURPRISED WHEN        EVEN SAID ANYTHING
       LIKE THAT, BECAUSE IT'S…, IT'S NOTHING LIKE HER, IT'S…

Q:     YEAH, YEAH.

A:   …UH, AND I JUST WANTED TO BELIEVE SHE DREAMT IT MAYBE AND SHE WAS MAYBE THINKING SOMETHING WAS HAPPENING WHEN NOTHING WAS HAPPENING AT ALL.

Q:   BUT DID SHE…, WHEN YOU ASKED HER THAT SHE DIDN'T CHANGE HER STORY OR ANYTHING DID SHE?

A:   SHE DIDN'T, BUT THEN AGAIN 4 YEAR OLDS DON'T LIKE TO CHANGE THEIR STORY ALL THE TIME.

Q:   YEAH.

A:   AND…

Q:   HAS SHE EVER SAID ANYTHING LIKE THAT ABOUT ANYONE ELSE SINCE YOU'VE KNOWN    ?

A:   UH, I DON'T THINK SO.

Q:   OKAY.  HAVE YOU EVER BEEN ACCUSED OF ANYTHING WITH ANY OF THE OTHER KIDS AND STUFF LIKE THAT?

A:   NOT AT ALL, NEVER AND LIKE I SAID I…

Q:   HAVE YOU LIKE JOKED ABOUT IT…, WITH EVEN LIKE WITH YOUR FRIENDS AFTER, YOU KNOW NOT AT WORK…

A:   OH…

Q:   …BUT LIKE EVEN LIKE JOKED ABOUT IT OR JUST…?

A:   …UH, I MEAN THERE WAS THIS ONE TIME WE JOKED ABOUT ONE OF THE GIRLS WOULD JUST…, WENT TO THE RESTROOM AND CAME OUT FULLY UNCLOTHED AND WE JUST LAUGHED, BECAUSE IT WAS COMPLETELY LIKE RANDOM, WE DIDN'T EXPECT IT.

Q:     M-HMM.

A:     AND I MEAN SHE JUST WENT POTTY…, AND SHE WAS NEW, SO WE JUST

       THOUGHT MAYBE THAT'S WHAT SHE DID AT HOME.

Q:     YEAH.

A:     BUT OTHER THAN THAT NO, I DON'T…

Q:     WHO…, WHO'D YOU JOKE ABOUT IT WITH?

A:     I THINK IT WAS A TEACHER THAT NO LONGER IS THERE, I THINK HER…, IT

       WAS MS. JOYA. (UNSURE OF NAME AND SPELLING)

Q:     OKAY.

A:     BUT IT WAS…

Q:     I'M JUST THINKING THAT EVEN LIKE YOUR FRIENDS OR SOMETHING LIKE

       YOU KNOW…

A:     OH NO, I…

Q:     …AT YOUR AGE PEOPLE LIKE…, THEY'LL TEASE YOU ABOUT IT OR JOKE

       ABOUT IT WITH YOU.

A:     …THEY…, WELL MY COUSINS THINK, OH, IT'S AMAZING, I'M A TEACHER, I

       TEACH LITTLE KIDS, LITTLE DO THEY REALIZE IT'S A DAYCARE JOB, NOT

       REALLY…

Q:     YEAH.

A:     …SO MUCH AS A TEACHER.

Q:     YEAH.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 103 OF 185

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 166 of 349 PageID #:
3530
Case 1:15-cr-00072-TWP-DML Document 5748-1 Filed 01/22/16 Page 104 of 185 PageID 297

A:    BUT IT IS TEACHING, I DO THINK OF IT THAT WAY, BECAUSE IF WE DON'T
       SIT DOWN AND TELL THE KIDS THIS, THIS…, THAT YOUR COLORS, YOUR
       NUMBERS, YOUR ALPHABET, THEN WE'RE NOT BEING GOOD TEACHERS.

Q:    YEAH, I GOTCHA.

A:    AND HONESTLY I DON'T REALLY JOKE AROUND OR ANYTHING LIKE THAT
       ABOUT IT, UH, IT'S…, I MEAN I'LL TALK TO A CO-WORKER ABOUT MAYBE
       SOMETHING FUNNY THAT HAPPENED, BUT NOTHING SEXUAL AT ALL…

Q:    NOTHING ABOUT I MEAN LIKE ABOUT SEXUAL WITH THE KIDS, THAT'S
       WHAT I'M TALKING ABOUT?

A:    …AT ALL, NOTHING, NO.

Q:    OKAY.  HAVE YOU EV…, AND…, AND THIS…, AND JUST BE HONEST WITH
       ME, BECAUSE THIS IS NOT A CRIME…

A:    UH, M-HMM.

Q:    …A THOUGHT IS NOT A CRIME AND…, AND I UNDERSTAND WHY YOU MAY
       BE HESITANT TO TALK ABOUT IT, BUT AT THE SAME TIME I'M JUST
       TRYING TO BE OPEN AND HONEST AND IT'S IMPORTANT…

A:    I COMPLETELY UNDERSTAND.

Q:    …THAT I KNOW THAT YOU'RE HONEST WITH ME.  BUT HAVE YOU EVER…,
       HAVE YOU EVER EVEN JUST THOUGHT ABOUT IT, I MEAN NOT EVEN LIKE
       REALLY WANTING TO DO ANYTHING SEXUAL WITH THE KIDS, BUT HAVE
       YOU EVER EVEN JUST THOUGHT ABOUT IT OR ANYTHING?

Case 1:15-cr-00072-TWP-DML Document 574-1 Filed 12/12/16 Page 167 of 349 PageID #:
3531
Case 1:15-cr-00072-TWP-DML Document 574-1 Filed 01/22/16 Page 105 of 185 PageID #: 298

A:      I MEAN ME AND A TEACHER…, UH, IT WAS MS. CATHIE; WE TALKED

        ABOUT WHERE WE DON'T UNDERSTAND WHERE ANYONE WOULD GET

        ANY PLEASURE OUT OF IT.

Q:      M-HMM.

A:      AND I HAVEN'T THOUGHT ABOUT IT IN A SEXUAL WAY LIKE THAT, I JUST

        THOUGHT ABOUT HOW COULD ANYONE REALLY GET ANY PLEASURE OUT

        OF IT, BECAUSE THEY'RE JUST LITTLE KIDS, THEY DON'T UNDERSTAND

        ANYTHING.  IT'S NOT LIKE THEY'RE GROWN…, UH, ADULTS WHO KNOW

        WHAT SEXUAL FEELINGS FEEL LIKE.  THEY JUST…

Q:      SURE.

A:      …THINK OH, IT MIGHT FEEL GOOD OR WHATEVER, BUT ME…, EVEN ME

        AND MS. CATHIE WERE LIKE WE JUST DON'T GET WHY…

Q:      YEAH, GOTCHA.

A:      …ANYONE WOULD DO THAT.

Q:      OKAY.

A:      AND I MEAN MS. CATHIE, SHE…, IF SHE EVEN HEARD ABOUT THIS, RIGHT

        NOW SHE'D PROBABLY DENY IT COMPLETELY CAUSE SHE KNOWS HOW I

        AM WITH THE KIDS, SO.

Q:      WELL WE…, WE INTERVIEWED HER ALREADY TODAY.

A:      OKAY.

Q:      YEAH, ABSOLUTELY, ABSOLUTELY.  UH, OKAY, UH, TELL ME THIS, UH,

        THE…, UH, UH, BECAUSE HERE'S THE THING I…, I GUESS…, MS. TYRIA

        SAID THAT SHE WAS…, UH, DURING THE CONVERSATION WHEN SHE

CALLED YOU IN AND YOU AND          AND…, AND MS. TYRIA WERE ALL

TALKING, SHE SAID THAT…, UH,          WAS ACTUALLY IN YOUR LAP

DURING THAT CONVERSATION AT ONE POINT; NOT THE WHOLE TIME, BUT

JUST AT ONE POINT SHE WAS LIKE SITTING ON YOUR LAP, DO YOU

REMEMBER THAT?

A:     I MEAN LIKE I SAID I WAS HAVING LIKE A PANIC ATTACK, SO I DON'T

REMEMBER IT PRETTY MUCH, BUT I DID CALL FOR HER SHE MAY HAVE

ACTUALLY CAME AND I ACTUALLY DID TALK TO HER ABOUT IT, BUT I

DIDN'T…, LIKE I SAID DO ANYTHING LIKE ACTUALLY…

Q:     YEAH.  DID YOU TELL HER THAT IT DIDN'T HAPPEN OR DID YOU SAY

SOMETHING LIKE…

A:     I…, I…

Q:     …NO OR ANYTHING LIKE THAT?

A:     …I DID TELL HER I DIDN'T DO THAT AND WE SHOULDN'T LIE ABOUT IT.

Q:     YEAH.  DID SHE SAY…, DID YOU SAY ANYTHING ELSE TO HER?

A:     I DON'T…

Q:     MS. TYRIA SAID YOU SAID SOMETHING LIKE NO THANK YOU OR

SOMETHING LIKE THAT, DID YOU REALLY SAY THAT?

A:     OH, NO THANK YOU ABOUT LYING, BECAUSE WE…, INSTEAD OF SAYING

NO ALL THE TIME WE DO SAY NO THANK YOU.

Q:     OKAY AND DID YOU SAY NO THANK YOU TO HER?

A:     I…, I MAY HAVE.

Q:     OKAY.

STATEMENT OF ALI AL-AWADI              DP14-0088487         PAGE 106 OF 185

Case 1:15-cr-00072-TWP-DML  Document 148-1  Filed 12/12/16  Page 169 of 349 PageID #:
3533
Case 1:15-cr-00072-TWP-DML  Document 148-1  Filed 01/22/16  Page 107 of 185  PageID #: 300

A:     I…

Q:     AND…, AND WHAT DID YOU…, WHAT WOULD YOU…, UH, WHAT DID YOU

       SAY THAT TO HER FOR, DO YOU REMEMBER?

A:     PROBABLY FOR NOT LYING.

Q:     OKAY, ALRIGHT.

A:     BECAUSE I DO TELL ALL THE KIDS WHENEVER THEY LIE, NO THANK YOU.

Q:     OKAY.

A:     BECAUSE…, UH, WE…, WE SAY NO THANK YOU ABOUT EVERYTHING.  IF

       THEY PICK UP A TOY AND THEN THEY'RE NOT SUPPOSED TO PLAY WE'LL

       SAY, NO THANK YOU.  UH, FOR EXAMPLE LIKE NOAH OR…, I'M JUST

       CALLING OUT A RANDOM NAME, I'LL SAY NO THANK YOU, WE DON'T DO

       THAT, IT'S TIME TO READ A BOOK INSTEAD…

Q:     OKAY.

A:     …SOMETHING LIKE THAT.

Q:     YEAH.

A:     SO I MAY HAVE…, LIKE I TOLD YOU I WAS COMPLETELY FREAKING OUT

       AT THE TIME.

Q:     YEAH.

A:     AND UH, I'M TRYING TO GIVE YOU AS MUCH INFORMATION AS I

       REMEMBER.

Q:     I GOTCHA, I GOTCHA, UH, BUT EVEN AFTER YOU SAID NO THANK YOU SHE

       DIDN'T SAY, OH, I'M SORRY, I'M…, I'M SORRY FOR LYING OR ANYTHING

       LIKE THAT?

A:      I HONESTLY DO NOT RECALL, I REALLY DON'T.

Q:      BUT YOU DON'T REMEMBER HER SAYING ANYTHING LIKE THAT THEN DO YOU?

A:      I…, I DON'T.

Q:      OKAY, ALRIGHT.  UH, UM, (SHUFFLING PAPERS) SO, UH, IF WE COULD I'D JUST LIKE TO TALK REAL BRIEFLY HERE AND MAYBE A LITTLE BIT MORE THAN BRIEFLY, BUT I'D JUST LIKE TO TALK AGAIN ABOUT YOUR…, UH, ABOUT YOUR STATEMENT THAT YOU WROTE OUT, UH…

A:      SURE.

Q:      …JUST ASK A FEW QUESTIONS.  UH, SEE THE KIDS WERE LAUGHING A LITTLE BIT YOU SAID, IS THAT RIGHT?

A:      YEAH, THEY THOUGHT IT WAS PLAYFUL.

Q:      OH, EXCUSE ME.  WELL YOU DIDN'T MENTION IN HERE ABOUT THE SECOND TIME SHE TRIED TO PUT YOUR…, YOUR ARM IN BETWEEN HER LEGS.

A:      OH MY, I…

Q:      IS THERE ANY REASON YOU LEFT THAT OUT OR…?

A:      …I MAY HAVE FORGOT TO MENTION A LOT OF THINGS, LIKE I SAID IT'S…, I WAS PRETTY MUCH WRITING AS MUCH AS I COULD REMEMBER AT THE TIME.

Q:      OKAY.

A:      AND AS MUCH AS I REMEMBER RIGHT NOW I AM TRYING TO GIVE YOU MORE INFORMATION.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 108 OF 185

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 171 of 349 PageID #2
3535
Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 01/22/16 Page 109 of 185 PageID #2
3535

Q:      OKAY, ALRIGHT.

A:      UH, THAT STATEMENT…, SHE DID TELL ME TRY TO REMEMBER AS MUCH
        AS YOU CAN AND THAT WAS WHAT I COULD REMEMBER AT THE TIME
        BEING.

Q:      YEAH.  SO YOU SAID WHEN YOU LEFT THE…,THE ROOM, TELL ME WHAT
        YOU DID THE MOMENT YOU WALKED OUT OF THE KINDERGARTEN ROOM
        AFTER BREAKING…, AFTER LETTING…, UH, MS. TYRIA ON BREAK?

A:      AFT…, AFTER SHE DID?

Q:      YEAH, UH, WHEN SHE CAME BACK FROM HER LUNCH AND RELIEVED YOU
        AND YOU WERE ABLE TO LEAVE THE KINDERGARTEN ROOM…

A:      OH, SO…

Q:      …AND GO ON YOUR BREAK, TELL ME EXACTLY WHAT HAPPENED AND
        WHAT YOU DID.

A:      …I WENT TO THE RESTROOM.

Q:      M-HMM.

A:      AND AFTER THE RESTROOM I…, UH, CLOCKED OUT…

Q:      DID YOU USE THE RESTROOM?

A:      YES, I DID.

Q:      WHAT'D YOU DO?

A:      PEE'D.

Q:      OKAY, ALRIGHT.

A:      UH…, UH…, YEAH.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 109 OF 185

Q:      I'M JUST…, I MEAN EVERYTHING YOU DID LIKE; SO AFTER YOU PEE'D DID YOU…, WHAT'D YOU DO NEXT?

A:      I…, UH, WENT TO CLOCK OUT.

Q:      DID YOU…, UH, WHICH BATHROOM DID YOU USE BY THE WAY?

A:      THE ONE CLOSEST TO THE…, UH, THE…

Q:      SO WAS IT SNIFFLES ROOM? (UNSURE)

A:      …THE ONE ACROSS FROM THE PLAYGROUND I WOULD SAY, THE OTHER ONE, THERE'S 2 RESTROOMS.

Q:      OKAY, THE END CLOSEST TO YOUR CLASSROOM?

A:      NO, THERE'S…, UH, HERE'S THE SNIFFLES ROOM, THERE'S A RESTROOM RIGHT HERE AND THEN THERE'S ANOTHER RESTROOM OVER HERE.  UH…

Q:      OH, ON EITHER SIDE OF IT?

A:      …BECAUSE THE SNIFFLES/SNUGGLES ROOM HAS MS. KIM'S OFFICE AS WELL.

Q:      OH…

A:      UH, I JUST…

Q:      …SO YOU DON'T USE THAT ONE AS MUCH?

A:      …I DON'T LIKE TO AS MUCH, BECAUSE I FEEL LIKE I MIGHT BE BOTHERING HER OR WHATEVER…

Q:      YEAH.

A:      …SO I GO TO THE OTHER ONE.

Q:      OKAY.  WHAT'S MS. KIM'S JOB?

A:      UH, SHE'S THE EDUCATIONAL COORDINATOR.

STATEMENT OF ALI AL-AWADI              DP14-0088487          PAGE 110 OF 185

Q:      OH OKAY, ALRIGHT, YEAH.  SO, UH, SO AFTER YOU USED THE RESTROOM DID YOU WASH YOUR HANDS?

A:      OF COURSE.

Q:      OKAY, UH AND DRY THEM OFF WITH A PAPER TOWEL OR WHATEVER?

A:      M-HMM.

Q:      OKAY AND THEN AFTER THAT YOU WENT YOU SAID TO CLOCK OUT?

A:      YEAH.

Q:      WHERE DO YOU CLOCK IN AND OUT?

A:      UH, THE FRONT 2 COMPUTERS YOU'LL SEE.

Q:      USE THOSE?

A:      WE USE THE ONE ON THE RIGHT HAND SIDE.

Q:      OKAY, ALRIGHT, UH…

A:      BECAUSE THERE'S A…, AN OLD SYSTEM THE TEACHERS USED TO CLOCK IN AND THE PARENTS CLOCK IN ON…, THE KIDS ON THE NEW SYSTEM.

Q:      OKAY.  SO WHEN YOU LEFT WHERE'D YOU GO?

A:      UH, I WENT TO THE GAS STATION TO GET MS. TYRIA'S HER POP THAT SHE ASKED FOR.

Q:      OKAY.

A:      AND UH, I SPENT THE REST OF THE TIME IN THE CAR WATCHING YOUTUBE VIDEOS I BELIEVE AND I DON'T THINK I WENT ANYWHERE ELSE.  AND ACTUALLY I DIDN'T GO TO THE GAS STATION I WENT TO MARSH.

Q:      OKAY.

A:    I WENT TO THE GAS STATION THE DAY BEFORE AND GOT ME 2 DRINKS, BUT YESTERDAY I DID GO TO MARSH, UH, YOU CAN SEE IT ON MY DEBIT CARD TRANSACTIONS…

Q:    SURE.

A:    …UH, IF YOU WANT TO SEE IT.

Q:    YEAH, DID YOU GET ANYTHING TO EAT?

A:    UH, I USUALLY EAT WITH THE KIDS BECAUSE WE DO FAMILY STYLE DINING…

Q:    HMM.

A:    …UH, WE'RE ENCOURAGED TO SIT DOWN WITH THE KIDS AND ACTUALLY EAT WITH THEM, ASK THEM HOW THEIR FOOD IS, IF THEY LIKE IT, IF THEY DON'T; SEE WHAT THINGS THEY LIKE, WHAT THEY DON'T LIKE.

Q:    YEAH.

A:    HELP THEM SERVE THEMSELVES.

Q:    SO DID YOU EAT BEFORE YOU WENT IN WITH…, UH, WITH THE KINDERGARTEN CLASS?

A:    YEAH, WE HAD A…, A CAMPING DAY THAT DAY.

Q:    OKAY.

A:    AND WE…, UH, IT WAS SO MUCH FOOD AND UH, IT WAS JUST A LOT OF FUN, BUT I EVEN NOTICED          WASN'T REALLY LISTENING MUCH THAT DAY, BECAUSE SHE WAS WATCHING…, UH, THE KIDS, LIKE…, UH, IN THE BIG GYM, LIKE CAMPING AND PLAYING.

Q:    YEAH.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 112 OF 185

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 175 of 349 PageID #:
3539
Case 1:15-cr-00072-TWP-DML Document 57-3 Filed 01/22/16 Page 113 of 185 PageID 306

A:      AND HER CLASSROOM HAD ALREADY LEFT…

Q:      YEAH.

A:      …AND THEN I SEE HER RUN BACK AND THEN MS. TYRIA SEES HER, SHE'S

        LIKE, YOU SHOULD'VE BEEN FOLLOWING US PRETTY MUCH.

Q:      YEAH, I GOTCHA.

A:      SO, UH, OTHER THAN THAT…, UH, I DID GO AND GET A POP, UH, DIDN'T…, I

        DIDN'T GET A POP FOR ME I GOT IT FOR MS. TYRIA, OTHER THAN THAT I…,

        UH, JUST TURNED THE A/C ON IN MY CAR, IT WAS A REALLY HOT DAY

        YESTERDAY.

Q:      YEAH I KNOW.

A:      AND UH, PARKED BACK IN AND WHEN I GET BACK TO MY…, I GIVE HER

        THE POP, SHE SAYS THANK YOU, I SAY YOU'RE WELCOME AND THEN I GO

        TO MY…, MY ROOM AND ONE OF THE KIDS HAD…, LIKE I TOLD YOU PEE'D

        ALL OVER HIMSELF…, SOILED HIS CLOTHES.

Q:      YEAH.

A:      WENT DOWN…, WENT TO GO GET HIM SOME CLOTHES AND THAT'S WHEN

        SHE CALLED FOR ME TO TALK TO HER.

Q:      OKAY.  SO MS. TYRIA DIDN'T SAY ANYTHING TO YOU WHEN YOU GAVE

        HER THE POP EXCEPT FOR THANK YOU?

A:      NO, SHE DIDN'T SAY ANYTHING.

Q:      OKAY.  UH, (CLEARING THROAT) WHERE'D YOU PARK AND WATCH THE

        YOUTUBE VIDEOS?

A:      IN THE PARKING LOT.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 113 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 176 of 349 PageID #:
3540
Case 1:15-cr-00072-TWP-DML   Document 74-1   Filed 01/22/16   Page 114 of 185 PageID 307

Q:      OKAY, WHAT…

A:      IT'S…

Q:      …WHAT VIDEOS DID YOU WATCH?

A:      …UH, I DON'T REMEMBER EXACTLY, I WATCHED A LOT OF THE ALS ICE

        BUCKET CHALLENGE VIDEOS, I DON'T KNOW IF YOU'VE SEEN THOSE.

Q:      UH HUH.

A:      UH…

Q:      WHAT ELSE?

A:      …AND I…, IF I WASN'T ON YOUTUBE YESTERDAY I WAS JUST PLAYING A

        GAME ON MY PHONE, I PLAYED CLASH OF CLANS AND 20/48, UH, I

        PLAYED…

Q:      BUT YOU SAID YOU WERE WATCHING VIDEOS THOUGH, DID YOU WATCH

        ANYTHING BESIDES THE ICE BUCKET CHALLENGE VIDEO?

A:      UH, IF…, IF I WAS WATCHING THEM YESTERDAY AND NOT THE DAY

        BEFORE, BECAUSE I DON'T REALLY LIKE TO GO TOO MANY PLACES.

Q:      YEAH.

A:      UH, MS. TYRIA DID ASK ME WHERE I WAS GOING, I TOLD HER I THINK I'M

        GOING HOME AND GETTING A FEW THINGS; I DIDN'T END UP GOING HOME.

Q:      YEAH.

A:      SO I JUST WENT AND GOT HER HER POP INSTEAD OF…

Q:      WHAT OTHER VIDEOS DID YOU WATCH BESIDES THE ICE BUCKET

        CHALLENGE?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 114 OF 185

A:     UH, I DON'T THINK I REALLY WATCHED ANYTHING ELSE OTHER THAN
       THAT, I MEAN THE HISTORY'S ON MY PHONE.

Q:     IS IT?

A:     YEAH, YOU CAN SEE 'EM, UH, JUST…, THERE'S A…, I USE AN APP CALLED
       REDDIT. (UNSURE OF NAME AND SPELLING)

Q:     OKAY, WHAT'S REDDIT?

A:     REDDIT IS LIKE A…, IT'S A…, KINDA LIKE A SOCIAL MEDIA…

Q:     M-HMM.

A:     …WHERE PEOPLE POST CURRENT EVENTS, WHAT'S GOING ON, STUFF LIKE
       THAT.

Q:     YEAH.

A:     AND UH, THEY JUST POST FUNNY VIDEOS ALL THE TIME, TELLING YOU,
       HEY, CHECK THIS VIDEO OUT OR THEY'LL TELL YOU…, UH, SOMEONE
       LIKE…, SOMEONE FAMOUS LIKE BILL GATES DID THE ICE BUCKET
       CHALLENGE AND I CLICKED ON THAT AND I WATCHED IT.

Q:     M-HMM.

A:     THERE'S JUST SO MANY DIFFERENT THINGS ON THERE, SO MANY LINKS.
       UH, IT'S…, THAT…, I THINK THAT'S WHAT…, WHAT I MAY HAVE DONE A
       LITTLE BIT, BUT REALLY PLAY GAMES WAS THE MOST.

Q:     OKAY.  SO YOU PLAYED GAMES MOSTLY…

A:     YEAH.

Q:     …NOT…, NOT WATCHED VIDEOS?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 115 OF 185

A:     I DON'T THINK SO, I THINK I WATCHED MAYBE ONE VIDEO IF THAT, UH, BECAUSE I DO REMEMBER I WAS WATCHING 'EM THE DAY BEFORE…

Q:     M-HMM.

A:     …IN THE CAR, UH, I DO A LOT…, WATCH A LOT OF NETFLIX, BUT I DIDN'T BECAUSE LAST TIME I STARTED DOING IT ON MY BREAKS I WENT TOO MUCH IN MY DATA AND I DIDN'T WANT TO PAY TOO MUCH.

Q:     YEAH, YEAH, YEAH.

A:     SO, UH, OTHER THAN THAT I WAS JUST PLAYING THE CLASH OF CLANS GAME AND 20/48 AND I THINK I DIDN'T EVEN CLOCK IN ON MY NORMAL TIME, I THINK I CLOCKED IN A LITTLE EARLY.

Q:     LITTLE EARLY, OKAY.

A:     I THINK SO, I DON'T…, I DON'T REMEMBER BECAUSE…

Q:     RIGHT, IF I CHECKED YOUR VIDEO…

A:     YEAH, GO…

Q:     …UH, HISTORY THERE'S NOTHING EXCEPT FOR WHAT…

A:     IT'S…

Q:     …JUST A COUPLE VIDEOS ABOUT ALS AND THAT'S IT, NOTHING ELSE?

A:     …UH, THERE MAY HAVE BEEN OTHER VIDEOS, BUT NOTHING BAD, UH, IT MAY HAVE BEEN LIKE SILLY STUFF.

Q:     OKAY AND IT'S LIKE…, THIS IS NOT ILLEGAL, BUT DID YOU WATCH ANY PORN ON YOUR PHONE, IF THERE…, IF…, IF YOU DID IT'S IMPORTANT TO TELL ME?

A:    UH, UH, NOT…, I DON'T DO IT DURING WORK HOURS OF COURSE; I DO IT WHEN I'M AT HOME. (UNSURE)

Q:    WELL YOU WERE ON BREAK AT THAT TIME…

A:    YEAH, THAT'S…

Q:    …SO THAT'S…, UH, THAT'S WHAT I'M SAYING.

A:    …YEAH, I MEAN…

Q:    SO DURING YOUR BREAK DID YOU WATCH ANYTHING…

A:    NO.

Q:    …LIKE ANY VIDEOS OF PORN?

A:    NO, AT…, AT HOME I DO, BUT NOT…, NOT AT WORK.

Q:    BUT SO THERE'S NO VIDEOS ON YOUR HISTORY OR ON YOUR PHONE?

A:    THERE SHOULDN'T BE.

Q:    OKAY, UH, I MEAN THERE IS OR THERE ISN'T, IS THERE?

A:    UH, I…

Q:    HERE'S THE THING, I'M NOT MAD AT YOU, I'M A GUY TOO AND I…

A:    …ALRIGHT. (CHUCKLE)

Q:    …I'VE SEEN…, I'VE SEEN THINGS BEFORE AND YOU KNOW WHAT SOMETIMES IF YOU'RE DOING IT JUST ON YOUR OWN TIME, LOOK, CAUSE YOU…, YOU COULD'VE GONE HOME, YOU COULD'VE GONE…

A:    YEAH.

Q:    …TO MARSH, YOU COULD'VE GONE TO MCDONALD'S…

A:    YEAH.

Q:     …YOU KNOW YOU COULD'VE GONE TO A…, A GAY STRIP CLUB DOWNTOWN FOR ALL…, FOR ALL WORK CARES AND KNOWS…

A:     EXACTLY.

Q:     …THEY DON'T KNOW YOU, THEY'RE NOT PAYING YOU, YOU WERE CLOCKED OUT, SO.

A:     EXACTLY.

Q:     THERE'S NOTHING WRONG WITH IT AND SO HERE'S MY THING, IF THERE'S SOMETHING ON THERE LOOK, YOU'RE…, YOU'RE NOT GETTING JAMMED UP FOR WORK…

A:     THERE…, THERE SHOULDN'T BE.

Q:     …CAUSE YOU WEREN'T…

A:     YEAH.

Q:     …YOU WEREN'T ON THE CLOCK.  SO IF…, UH…

A:     THERE SHOULDN'T BE ANYTHING ON THERE.

Q:     …BUT THAT'S DIFFERENT THAN THERE ISN'T ANYTHING ON THERE, YOU SEE WHAT I'M SAYING?

A:     YEAH.

Q:     SO THAT'S WHY I'M CONCERNED, JUST WANT TO MAKE SURE IF IT'S ON THERE I'D RATHER YOU TELL ME…

A:     UH…

Q:     …THEN ME BE LIKE FINDING OUT, YOU KNOW WHAT I MEAN?

A:     M-HMM, WELL I MEAN ON THE REDDIT APP…

Q:     M-HMM.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 118 OF 185

Case 1:15-cr-00072-TWP-DML   Document 748-1   Filed 12/12/16   Page 181 of 349 PageID #:
3545
Case 1:15-cr-00072-TWP-DML   Document 574-1   Filed 01/22/16   Page 119 of 185   PageID #: 2

A:  …THERE'S A LOT OF DIFFERENT SIDE FORMS YOU CAN CHOOSE FROM.

Q:  YEAH.

A:  AND I MEAN THERE'S SOME CRAZY THINGS ON THERE FROM…, UH, LIKE
    GIRLS GOING NAKED TO GUYS BEING NAKED TO…

Q:  YEAH.

A:  …CRAZY THINGS, LIKE THERE'S EVEN SOMETHING CALLED WTF, WHICH
    STANDS FOR "WHAT THE FUCK" PRETTY MUCH.

Q:  YEAH, YEAH, YEAH.

A:  UH, AND UH, THERE'S STUFF LIKE…, UH, INCEST… (UNSURE)

Q:  DID YOU CLICK ON ANY OF THE (INAUDIBLE) ONES?

A:  I DIDN'T CLICK ON ANY OF THOSE.

Q:  YOU DIDN'T?

A:  NO.

Q:  OKAY.

A:  BUT…

Q:  YOU SAID THERE'S STUFF ON INCEST?

A:  …YEAH, THERE'S A WHOLE BUNCH OF THINGS ON THERE, LIKE IT'S JUST
    APPS ON THE SIDE THAT SOME PEOPLE MIGHT BE INTERESTED IN.
    (UNSURE)

Q:  OKAY, YEAH.

A:  AND I MEAN HONESTLY IT'S NOT REALLY SOMETHING I PROGRAMMED
    INTO IT, IT'S JUST AN APP.

Q:  NO, IT'S JUST PART OF THE APP, YEAH.

A:     SO, UH, I MEAN IF YOU LOOK THROUGH THAT YOU'LL…, YOU WILL
       DEFINITELY SEE SOME STUFF, BUT THAT'S THE APPLICATION.

Q:     NO, I JUST KNOW THAT'S TABS, YEAH, YEAH… (UNSURE)

A:     YEAH.

Q:     …I MEAN DID YOU VIEW ANYTHING OR…?

A:     ME PERSONALLY, NO.

Q:     OKAY.

A:     NOT…

Q:     ALRIGHT, THAT'S FINE, NOT A BIG DEAL.

A:     …NO.

Q:     BECAUSE I MEAN THE TRUTH IS YOU KNOW PEOPLE DO STUFF AND IT'S
       NOT ILLEGAL, THERE'S A LOT OF STUFF ON THE INTERNET AND I JUST…,
       THAT'S ONE OF THOSE THINGS WHERE…, UH, I JUST LIKE TO KNOW
       YOU'RE BEING HONEST WITH ME.

A:     UH, I…

Q:     UH, I LIKE TO KNOW THAT I CAN…, YOU KNOW WHAT I MEAN BELIEVE
       EVERYTHING YOU'RE SAYING, THAT'S ALL.

A:     …I'M GIVING YOU…

Q:     NO, THAT'S FINE.

A:     …ONE HUNDRED PERCENT TRUTH, IF YOU WANT TO PUT ME ON ONE OF
       THOSE LIE DETECTORS I'LL…

Q:     OKAY, NO, NO, YEAH, THAT'S FINE.

A:     …, I'LL DEFINITELY JUST SIGN OFF ON THAT, I DON'T CARE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 120 OF 185

**Q:**   NO, THAT'S FINE AND I APPRECIATE THAT.  UH, SO, UH, (SHUFFLING PAPERS) JUST GIVE ME ONE QUICK SECOND, OKAY, I'LL BE BACK IN JUST A MINUTE.  DO YOU NEED TO USE THE RESTROOM OR ANYTHING?

**A:**   UH, NOT REALLY, I JUST KINDA HOPE MY MOM ISN'T FREAKING OUT AT THIS POINT.

**Q:**   OKAY, YEAH.   WELL I MEAN I THINK SHE UNDERSTANDS IT'S A…, IT'S SOMETHING WE GOT TO GET TAKEN CARE OF AND…, AND SO SHE'S…, I'M SURE IF SHE'S CALLED OR ANYTHING THEY'VE…, THEY'VE LET HER KNOW YOU'RE OKAY AND YOU'RE FINE, OKAY?

**A:**   OKAY.

**Q:**   SO JUST HANG HERE, I'LL BE BACK IN A MINUTE.

**A:**   ALRIGHT. (DOOR OPENS AND CLOSES)

(PAUSE)

**Q:**   (DOOR OPENS) HEY MAN, SORRY ABOUT THAT. (DOOR CLOSES) I (INAUDIBLE-UNSURE)

**A:**   OKAY.

**Q:**   YEAH, SO WE HAD…, UH, WE HAD ETHAN IN HERE JUST NOW, THAT'S WHERE…, I WAS CHECKING ON THAT; HE WAS BEING INTERVIEWED WHILE YOU AND I WERE TALKING, SO.

**A:**   OKAY.

**Q:**   UH, WE DO WHAT WE CALL FORENSIC CHILD INTERVIEWS, DO YOU KNOW WHAT THOSE ARE?

**A:**   NO I DON'T.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 121 OF 185

Q:      YOU PROBABLY NEVER HEARD OF 'EM.  UH, FOR FORENSIC JUST MEANS

SOMETHING FOR EVIDENCE, RIGHT?

A:      YEAH.

Q:      SO IT'S NOT JUST YOU KNOW 2 PEOPLE TALKING, IT'S SOMETHING THAT

YOU…, UH, THAT YOU WANT TO AT THE HIGHEST STANDARD POSSIBLE…

A:      OF COURSE.

Q:      …ESSENTIALLY AND SO, UH, THEY DID…, SO WE HAVE WHAT WE CALL

CHILD FORENSIC INTERVIEWERS OR FORENSIC CHILD INTERVIEWERS,

THAT'S ALL THEY DO; YOU KNOW THEY JUST INTERVIEW KIDS, UH, HERE

AT THIS BUILDING.  UH, AND SO THIS MORNING…, UH, I DON'T KNOW, DID

YOU KNOW        WENT TO THE HOSPITAL LAST NIGHT?

A:      NO, I DIDN'T.

Q:      YOU MAY NOT HAVE KNOWN THAT.  YEAH, SHE WENT…, SHE WENT TO ST.

VINCENT, THEY HAVE WHAT THEY CALL THE CENTER OF HOPE AT ST.

VINCENT YESTERDAY, SHE WENT…, SHE WENT THERE.

A:      M-HMM.

Q:      UH, UH, ANYWAY SHE WENT THERE AND HAD A PHYSICAL EXAM AND THE

CENTER OF HOPE IS…, UH, IT'S JUST A WHATEVER, A TOUCHY FEELY

NAME FOR IT, BUT THEY'RE…, UH, FORENSIC NURSE EXAMINERS…

A:      M-HMM.

Q:      …UH, THEY ALSO CALL THEM SEXUAL ASSAULT NURSE EXAMINERS; BUT

EITHER WAY THEY SPECIALIZE IN…, IN…, IN DOING EXAMS…

A:      OKAY.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 185 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 74-1 Filed 01/22/16 Page 123 of 185 PageID #:
3549

Q:      …UH, AND…, AND NOT JUST FOR…, UH, LIKE THE SAKE OF HEALTH…

A:      M-HMM.

Q:      …WHICH IS ONE OF THE PRIMARY PURPOSES OF ANY MEDICAL PROVIDER
        IS TO TREAT THE PERSON'S HEALTH.

A:      OF COURSE.

Q:      BUT THEY ALSO DO THE EXAMS…, UH, FOR THE SAKE OF GATHERING ANY
        POTENTIAL EVIDENCE THAT COULD BE THERE, OKAY…

A:      M-HMM.

Q:      …ANY EVIDENCE AT ALL THEY…, THEY LOOK FOR IT.

A:      IS SHE OKAY?

Q:      UH, WELL LIKE I SAID SHE DIDN'T GO THERE NECESSARILY BECAUSE SHE
        WAS YOU KNOW SICK AND DYING…

A:      M-HMM.

Q:      …SHE WENT THERE BECAUSE OF YOU KNOW SHE WAS COMPLAINING
        OF…, OF SOME PAIN…

A:      M-HMM.

Q:      …OKAY, BUT ALSO…, UH, WHAT SHE WAS SAYING HAPPENED TO HER IS
        THE KIND OF THING THAT IF IT DID HAPPEN TO HER, UH, PHYSICAL
        EVIDENCE CAN AND OFTEN IS LEFT BEHIND.

A:      OKAY.

Q:      OKAY.  SO SHE WENT THERE NOT NECESSARILY SO THEY COULD LIKE
        SAVE HER LIFE WHEN YOU TYPICALLY…

A:      OKAY.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 123 OF 185

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 186 of 349 PageID #:
3550
Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 01/22/16 Page 124 of 185 PageID 317

Q:     …THINK SOMEONE GOING TO THE HOSPITAL, BUT…, UH, YOU KNOW AND
       THEY DO CHECK UP, CHECK HER BLOOD PRESSURE AND HEART YOU
       KNOW AND…, AND…, AND ALL THAT CRAP, YOU KNOW HEIGHT AND
       WEIGHT, TEMPERATURE…

A:     YEAH.

Q:     …THEY DO ALL THAT.  BUT REALLY THAT'S NOT SORT OF THE MAIN
       PURPOSE, CAUSE NO  ONE LOOKING AT HER WAS THINKING, OH, SHE'S
       ABOUT TO DIE, SHE'S GOT MALARIA OR SHE'S…, YOU KNOW HAS A HEART
       ATTACK, NO.

A:     M-HMM.

Q:     IT…, IT WAS MORE…, UH, TO DO THAT FORENSIC…, UH, EXAM.  SO I'VE
       ALREADY THROWN 2 FORENSIC THINGS AT YOU, BUT WHAT I'M SAYING IS
       TO DO THE EXAM LAST NIGHT, OKAY?

A:     M-HMM.

Q:     UH, AND THEY…, THEY DO A PHYSICAL EXAM, THEY TAKE…, UH, THEY
       TAKE SWABS FOR DNA, UH, THEY ALSO CHECK…, UH, THEY USE WHAT
       THEY CALL A SALINE DRIP, WHICH…, UH, SO THEY…, THEY DO THE SWAB
       FIRST IF I'M…, IF I'M CORRECT, I DON'T TYPICALLY GO WATCH THESE
       THINGS.

A:     M-HMM.

Q:     BUT FROM MY UNDERSTANDING THEY DO…, THEY DO A SWAB FIRST
       TO…, UH, CHECK FOR ANY…, UH, SORT OF DNA THAT'S JUST ON THE
       SURFACE OR WHATEVER THAT CAN COME OUT ON TO THE…, ON TO THE

SWAB, BUT THEN AFTER THAT THEY DO…, I THINK THEY DO WHAT THEY CALL A SALINE DRIP, WHICH IS THEY DRIP A SALINE STERILE SOLUTION, UH, OVER…

A:    M-HMM.

Q:    …YOU KNOW HER GENITALS ESSENTIALLY; UH, DRIP IT RIGHT OVER THERE AND THAT TENDS TO GET DNA CELLS THAT MAY NOT HAVE COME WITH THE SWAB, RIGHT?

A:    OKAY.

Q:    SO ANYTHING THAT MIGHT BE EVEN JUST A LITTLE BIT MORE RESISTANT OR WHATEVER TO…, UH, BEING PICKED UP BY THE SWAB, I THINK THAT'S THE PURPOSE OF THAT SALINE DRIP.

A:    M-HMM.

Q:    THEY…, THEY DRIP IT OVER THERE AND THEN THEY HAVE A SOLUTION, A SOLUTION THAT COULD CONTAIN ANYONE'S DNA IF THEY'RE YOU KNOW PART OF THE BODY TOUCHED OR INSIDE OF…, OF HER BODY, SO, UH, THERE…, THERE'S THAT.  UH, ANYWAYS, UH, SO SHE HAD THAT EXAM, THEY ALSO DO…, UH, JUST A VISUAL EXAM, SOMETIMES…

A:    OKAY.

Q:    …IF…, IF…, IF SOMETHING HAPPENS TO A KID, IF THERE'S SOME TYPE OF…, UH, SEXUAL CONTACT WITH A KID, UH…

A:    M-HMM.

Q:    …SOMETIMES THEY'LL BE PHYSICAL SORT OF…, UH, EVIDENCE OF THAT YOU KNOW, A INJURY ESSENTIALLY I GUESS IS WHAT I'M SAYING…

A:      M-HMM.

Q:      …I MEAN NOT NECESSARILY LIKE YOU KNOW HER ARM'S CUT OFF

        INJURY, BUT JUST INJURY, LIKE PHYSICAL AFFECTS FROM WHAT

        HAPPENED, UH, AND THEY DO A VERY THOROUGH JOB.  YOU OR I COULD

        LOOK AT THE…, THE BODY PART THAT THEY EXAMINE AND WE'D BE

        LIKE…

A:      M-HMM.

Q:      …IT'S PINK TO ME, (CHUCKLE) WHATEVER…

A:      YEAH.

Q:      …IT JUST LOOKS LIKE A BODY PART YOU KNOW, UH, IT WOULDN'T MAKE

        ANY DIFFERENCE TO YOU OR I JUST LOOKING AT IT…

A:      M-HMM.

Q:      …BUT THEY'RE SPECIALLY TRAINED AND THEY SEE A LOT OF DIFFERENT

        PEOPLE, IN PARTICULAR THE KIDS, UH, THAT PARTS OF THE BODY AND

        THEY'RE TRAINED WHAT TO LOOK FOR AND ALL THAT.  SO THEY ARE

        SPECIFICALLY TRAINED TO LOOK FOR THAT, UH, THEY ALSO HAVE…, UH,

        AND I DON'T KNOW, I'D HAVE TO LOOK IN THE MEDICAL RECORDS HERE

        TO…, TO BE A HUNDRED PERCENT ON THIS CASE, BUT…, UH, THEY ALSO

        HAVE WHAT THEY CALL LIKE A DYE.  THEY PUT A DYE ON THEIR BODIES,

        UH…

A:      M-HMM.

Q:      …ON THAT PARTICULAR PART OF THE BODY AND…, AND THAT DYE…,

        YOU KNOW AFTER THEY'VE DONE ALL THE OTHER EXAMS, THEY COULD

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 126 OF 185

DO IT BEFORE THE DNA CHECK, CAUSE THAT COULD CONTAMINATE THE..., THE SAMPLE, BUT AFTER THEY'VE DONE A DNA CHECK THEY COULD PUT A DYE ON THEIR BODIES TO CHECK FOR…, UH, ANY INJURIES. IF THEY…, YOU KNOW CAUSE YOU CAN…, YOU CAN LOOK AND SEE SOMETIMES…

A:   M-HMM.

Q:   …ACTUAL YOU KNOW REDNESS OR SWELLING OR ABRASIONS JUST SLIGHT, NOTHING CRAZY, I'M NOT TALKING ABOUT LIKE A…

A:   YEAH.

Q:   …LIKE A BLOODY GASH, JUST BE LIKE SLIGHT SCRAPE MARKS OR…, OR…, OR ABRASIONS…

A:   (CLEARING THROAT) M-HMM.

Q:   …THEY CHECK FOR THAT SORT OF PHYS… OR VISUALLY AND SOMETIMES THEY'LL USE MAYBE A MAGNIFYING YOU KNOW THING THAT THEY CAN LOOK AND SEE.  BUT THEN THEY ALSO USE WHAT THEY CALL A…, A DYE AND…, AND SOMETIMES WHAT HAPPENS IS ONCE YOU PUT THAT DYE ON THERE YOU CAN USE A PARTICULAR TYPE OF LIGHT AND A PARTICULAR TYPE OF CAMERA THAT WILL REACT WITH THAT, RIGHT.  SO IT'S LIKE…, I DON'T KNOW IF THEY USE SOME TYPE OF UV RAYS OR WHAT…

A:   M-HMM.

Q:   …OR THAT IF IT'S A BLACK LIGHT, I…, I DON'T…, I'M NOT…, I'M NOT A SCIENTIST, I'M A COP, RIGHT?

A:   YEAH.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 127 OF 185

Q:    BUT EITHER WAY THEY…, UH, THEY CAN…, THEY CAN PUT THAT ON

      THERE TO…, TO DOUBLE CHECK FOR ANY INJURIES, UH, THAT DIDN'T

      SHOW UP VISUALLY WHEN YOU JUST FIRST LOOK; IT'LL SHOW IF…, IF

      THERE'S SOME TYPE OF ABRASION, CAUSE WHAT HAPPENS IS IN…, UH, I

      MEAN BRUISE, SCRAPE, ANYTHING…

A:    YEAH.

Q:    …THE TISSUES ARE DAMAGED, UH, THE TINY LITTLE CAPILLARIES AND

      BLOOD VESSELS BURST AND…, AND YOU…, YOU GOT…, YOU GOT

      BLEEDING.  SO…

A:    YEAH.

Q:    …THERE'S DIFFERENT DYES THEY CAN USE, ONE WITH THE SPECIAL

      CAMERAS THAT CAN PICK UP THAT AND SHOW INJURY…

A:    OKAY.

Q:    …UH, NOT JUST ON THE OUTSIDE OF A…, OF A LITTLE GIRL'S BODY FOR

      EXAMPLE, BUT ALSO IN THE INSIDE, RIGHT?

A:    OKAY.

Q:    OF THE VAGINA AND ACTUALLY THE VAGINAL CAVITY OR CANAL,

      WHATEVER YOU CALL IT. (CHUCKLE)

A:    M-HMM.

Q:    I SAID CAVITY, MAYBE THAT'S IT, MAYBE IT'S NOT, EITHER WAY YOU GET

      IT…

A:    YEAH.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 128 OF 185

Q:    …JUST WHOLE INSIDE OF HER BODY, THEY CAN CHECK INSIDE THE HOLE, NOT JUST ON THE OUTSIDE.  UH, AND THAT'S…, AND THAT'S SOMETHING THEY DO AND I'M SURE THEY DID IT WITH HER.  UH, THEY ALSO TAKE PHOTOGRAPHS OF IT LIKE I SAID WITH THE SPECIAL CAMERA AND…, AND A REGULAR ONE…

A:    M-HMM.

Q:    …UH, THEY DOCUMENT ON DIAGRAMS, THINGS LIKE THAT AND…, AND CHECK FOR INJURIES, DO ALL THAT ASIDE FROM THE DNA CHECKS.  UH, OFTEN TIMES THEY'LL TAKE THE PANTIES, UH, YOU KNOW KEEP THOSE…

A:    HMM.

Q:    …AS POTENTIAL EVIDENCE, RIGHT, BECAUSE DNA COULD BE ON THOSE, THINGS LIKE THAT.  SO THERE'S ALL THAT, UH, IN ADDITION TO THAT…, SO THAT WAS DONE YESTERDAY EVENING, RIGHT, THE WHOLE THING DONE YESTERDAY EVENING.  UH, FIRST THING THIS MORNING SHE CAME IN HERE,    DID, UH, WE DID WHAT WAS CALLED A FORENSIC INTERVIEW, NOW THAT'S DIFFERENT.  NO ONE'S PULLING HER PANTS OFF AND OPENING HER LEGS. (CHUCKLE)

A:    RIGHT.

Q:    IT'S JUST TALKING…

A:    YEAH.

Q:    …JUST TALKING, BUT IT'S TALKING WITH SOMEONE WHO'S SPECIFICALLY TRAINED IN…, IN INTERVIEWING CHILDREN AND OPEN ENDED, NON-LEADING WAYS, RIGHT?

STATEMENT OF ALI AL-AWADI      DP14-0088487      PAGE 129 OF 185

Case 1:15-cr-00072-TWP-DML   Document 174-1   Filed 01/22/16   Page 130 of 185   PageID #: 323

A:      OF COURSE.

Q:      SO THEY ASK QUESTIONS THAT ARE JUST…, UH, NOT SAYING YOU KNOW…

A:      M-HMM.

Q:      …YOU'RE WEARING A WHITE SHIRT, AREN'T YOU?

A:      YEAH.

Q:      WHAT DO YOU SAY YES OR NO, YOU ONLY HAVE 2 CHOICES, YOU JUST SAY YES CAUSE YOU'RE WEARING A WHITE SHIRT, I GUESS YES…

A:      M-HMM.

Q:      …VERSUS ME SAYING WHAT KIND OF SHIRT ARE YOU WEARING.  WELL YOU COULD SAY, WELL IT'S COTTON OR IT'S SHORT SLEEVE OR IT…, YOU KNOW WHATEVER, IT'S HANES, YOU COULD SAY WHATEVER YOU WANT…

A:      M-HMM.

Q:      …WHEN I JUST ASK YOU WHAT KIND OF SHIRT DO YOU HAVE.  SO THEY'RE TRAINED IN DOING THAT, LONG STORY SHORT, SHE CAME IN, WE DID A FORENSIC CHILD INTERVIEW WITH HER AND UH, SHE TALKED ABOUT WHAT SHE SAYS HAPPENED YESTERDAY, OKAY?

A:      (NO VERBAL RESPONSE)

Q:      UH, IT'S…, OBVIOUSLY IT'S RECORDED, WE TAKE YOU KNOW VIDEO RECORDED AND EVERYTHING AND UH, AND JUST ASK HER QUESTIONS ABOUT IT, OKAY AND I'VE SEEN A TON OF THOSE.  I'VE BEEN DOING THIS FOR OVER 5 YEARS NOW AND I'VE WATCHED A WHOLE LOT OF THOSE

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 130 OF 185

Q:     INTERVIEWS.  SO, UH, THAT'S JUST ONE MORE TO ADD TO MY LIST I GUESS OF INTERVIEWS I'VE WATCHED.

A:     RIGHT. (UNSURE)

Q:     BUT…, UH, BUT ANYWAYS HERE'S THE…, THE THING, UH, AFTER THAT I…, I INTERVIEWED HER…, HER MOM…

A:     M-HMM.

Q:     …OKAY AND UH, TALKED TO HER MOM, TOOK A FULL STATEMENT FROM HER, YOU KNOW WHAT HAPPENED, WHAT DO YOU KNOW, HOW DID THIS COME OUT, WHAT…, HOW'D YOU FIND OUT ABOUT THIS, THAT TYPE OF THING.  TALKED TO HER DAD, TOOK A FULL STATEMENT FROM HIM, HE DIDN'T SPEAK A LOT OF ENGLISH SO WE GOT A TRANSLATOR.

A:     M-HMM.

Q:     I SPEAK SOME SPANISH ENOUGH TO UNDERSTAND MOST OF WHAT HE WAS SAYING, BUT I STILL LIKE TO HAVE A TRANSLATOR, CAUSE YOU KNOW YOU WANT TO DO IT RIGHT.

A:     OKAY.

Q:     BUT ANYWAYS WE HAD HIM COME IN, TALKED TO HIM, UH, UH, WHAT ELSE HAVE WE DONE.  UH, OBVIOUSLY I WENT OUT TO THE…, TO THE…, TO THE…

A:     CENTER.

Q:     …THE CENTER, YEAH, I DIDN'T KNOW WHAT TO CALL IT, I WAS GONNA SAY SCHOOL, BUT IT'S JUST A CENTER EITHER WAY, WENT OUT THERE, UH, GOT ALL KINDS OF…, UH, DOCUMENTS FROM THEM, OKAY.  I MEAN

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 131 OF 185

I'VE GOT YOUR APPLICATION THERE AND…, AND UH, YOU KNOW ALL KINDS OF STUFF, UH, IT'S…, I MEAN THEY…, THEY TOLD US YOUR FULL NAME YOU KNOW…

A:      YEAH.

Q:      …THAT'S HOW WE KNEW WHERE TO FIND YOU, BUT THEY DIDN'T HAVE MUCH OF A CHOICE.

A:      YEAH.

Q:      UH, DCS IS PART OF MY INVESTIGATION TOO, THEY'VE GOT WHAT THEY CALL A INSTITUTIONAL YOU KNOW WING, SO THEY CAME OUT WITH US, CAUSE THEY HAVE TO, RIGHT, IF SOMETHING'S SUPPOSED TO HAVE HAPPENED AT A…

A:      OF COURSE.

Q:      …INSTITUTION, THEY ARE CHARGED WITH CHECKING ON IT. (UNSURE) SO THEY WERE THERE WITH US AND LOOKING INTO EVERYTHING, BUT…, UH, TALKED TO…, UH, MS. TYRIA, I…, I ALREADY TOLD YOU THAT MORE OR LESS…

A:      M-HMM.

Q:      …CAUSE I SAID WHAT SHE SAID YOU…, YOU SAID, BUT ANYWAY TALKED TO HER AND UH, SHI…, SHI…, CHIANA…

A:      CHIANA.

Q:      …I JUST WANTED TO SAY SHI…, BUT IT'S CHIANA, I'M SORRY.

A:      M-HMM.

Q: UH, CHIANA, UH, MS. HEIDI, MS. KIM, UH, THERE'S MORE, I CAN'T REMEMBER, WE TALKED TO A BUNCH OF DIFFERENT PEOPLE AND THEN ALSO WE'VE BEEN INTERVIEWING CHILDREN, OKAY?

A: M-HMM.

Q: UH, ETHAN WAS THE ONE I WAS JUST NOW GOING ON, SO I YOU KNOW I NEED TO CHECK UP ON WHAT HE WAS SAYING ESSENTIALLY.

A: YEAH.

Q: I MEAN HE SAID SOME INTERESTING THINGS, QUITE HONESTLY, OKAY, WHICH ALL THAT BRINGS ME TO THE POINT WHERE I…, I…, I DON'T…, I…, I WANT TO BE HONEST WITH YOU, BUT I DON'T WANT TO…, I DON'T WANT TO SORT OF LEAD YOU ALONG AND…, AND…, AND NOT SORT OF LET YOU KNOW WHERE WE'RE AT WITH THIS THING, OKAY?

A: OKAY.

Q: AND THE TRUTH IS I…, I'M…, I'M JUST…, CAUSE I COME INTO THESE THINGS WITH A VERY OPEN MIND…

A: OKAY.

Q: …RIGHT, CAUSE YOU KNOW IT COULD BE ANYTHING GOING ON AND IT'S MY JOB TO BE LIKE, OKAY, LET'S SORT THROUGH THE B-S AND MAKE SURE SOMEBODY DIDN'T GET CAUGHT UP IN SOMETHING STUPID HERE, UH, JUST SOMEBODY BEING STUPID, BUT…, UH, I GOT TO BE HONEST WITH YOU WITH ALL THE INFORMATION AND ALL THE EVIDENCE I HAVE, ALL OF THE…, UH, I MEAN I JUST CAME FROM LOOKING AT THE PHOTOGRAPHS THAT WERE TAKEN…, UH, LAST NIGHT, OKAY?

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 196 of 349 PageID #:
3560
Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 01/22/16 Page 134 of 185 PageID #: 327

A:    M-HMM.

Q:    COMPARING THAT WITH THE DIAGRAMS THAT THEY MADE AND THE NOTES THAT THE DOCTORS AND NURSES MADE, UH, REALLY TRYING TO DO A GOOD JOB OF REVIEWING ALL THE POSSIBLE INFORMATION.  I MEAN I'VE READ…, YOU…, YOU WEREN'T THE ONLY ONE THAT TOOK A…, MADE A WRITTEN STATEMENT, UH, LIKE I SAID THERE'S…, THERE'S YOUR WRITTEN STATEMENT AND THEN THERE'S…, UH, MS…, UH, MS. CHIANA HARRIS, YOU KNOW SHE TOOK HERS, UH, TYRI…, TYRIA, IS IT TYRIA?

A:    TYRIA.

Q:    I ALWAYS PRONOUNCE TYRIA, BUT IT'S…, CAUSE IT'S GOT THAT I.

A:    M-HMM.

Q:    ANYWAYS MS. TYRIA MADE A STATEMENT, UH, THIS IS…, UH, MS…., UH, CONCES…, CONCES… (SHUFFLING PAPERS)

A:    M-HMM.

Q:    …AND THEN KIM WROTE SOME NOTES WHILE YOU WERE TALKING AND ALSO…, UH, I'VE GOT THAT AND I'VE GONE THROUGH THERE, I…, I'VE GOT SOME MORE QUESTIONS, NOT A TON BUT SOME OF THEM. OBVIOUSLY LIKE I SAID YOUR…, YOUR APPLICATION SHE GAVE ME THAT AND THEN…, AND THEN SHE SAID SHE PUT YOU ON ADMINISTRATIVE LEAVE YOU KNOW HERE IT IS.

A:    YEAH.

Q:    YOU KNOW THAT'S…, THAT'S A…, THAT DOESN'T MEAN ANYTHING, THAT'S JUST A…, A…

A:    PAPER.

Q:    …STOCK DOCUMENT, RIGHT, THERE'S NOTHING SPECIFIC TO YOU, EXCEPT

      FOR THE…, UH, SIGNED YOUR NAME RIGHT THERE; OTHERWISE IT

      DOESN'T EVEN HAVE YOUR NAME PRINTED, RIGHT?

A:    M-HMM.

Q:    ANYWAYS AND KIM…, KIM WAS THERE TOO.  LONG STORY SHORT…, AND

      THERE'S MORE DOCUMENTS THAT WE HAVE FROM THEM THAT WE'RE…,

      ANOTHER DETECTIVE HAS RIGHT NOW.  BUT…, UH, ANYWAYS I JUST

      WANT YOU TO KNOW THAT I'M NOT JUST BEING HALF COCKED HERE, I'M

      NOT JUST TRYING TO BE LIKE… YOU KNOW WHATEVER; I'M TRULY

      TRYING TO…

A:    YEAH, OF COURSE.

Q:    …THOROUGHLY INVESTIGATE THIS THING.

A:    OF COURSE.

Q:    ONE OF THE THINGS THAT I SAW IN THE NOTES, UH, FROM YOUR

      INTERVIEW WITH…, UH, INTERVIEW WHATEVER, YOUR STATEMENT…,

      YOUR…

A:    WITH KIM.

Q:    …YEAH, WITH…, WITH NOT JUST KIM, BUT ALSO…, UH, MS. HEIDI.  UH,

      WERE THEY BOTH IN THE ROOM, IS THAT RIGHT?

A:    YES.

Q:    OKAY.  UH, YOU SAID SOMETHING ABOUT WHEN IT HAPPENED WITH

      GABBY YOU BROUGHT HER TO THEM, TELL ME ABOUT THAT.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 135 OF 185

A:      OKAY, UH IT WAS…, I…, I THINK IT WAS THE BEGINNING OF THIS YEAR.

Q:      M-HMM.

A:      UH…

Q:      LIKE JANUARY OR LIKE THE BEGINNING OF THE SEMESTER…

A:      …I THINK…

Q:      …LIKE THIS FALL?

A:      …THE ACTUAL BEGINNING OF THIS YEAR.

Q:      OKAY, LIKE BACK IN JANUARY, FEBRUARY?

A:      UH HUH…

Q:      OKAY.

A:      …IF I REMEMBER CORRECTLY.

Q:      YEAH.

A:      UH, SHE WAS COMPLAINING ABOUT PAIN DOWN THERE.

Q:      M-HMM.

A:      AND IT WASN'T JUST HER, IT WAS ANOTHER CHILD NAMED KENNEDY AS

        WELL.

Q:      IS THAT A LITTLE GIRL OR BOY OR…?

A:      IT WAS A LITTLE GIRL.

Q:      OKAY.

A:      AND…

Q:      WHAT'S…, WHAT ARE THESE KIDS' LAST NAMES; GABBY WHAT?

A:      GABBY                AND KENNEDY…, UH,                    . (UNSURE OF NAME

        SPELLINGS)

STATEMENT OF ALI AL-AWADI              DP14-0088487          PAGE 136 OF 185

Q:      OKAY.

A:      UH, AND THE SAME THING HAPPENED IN THE SENSE THEY SAID THERE

        WAS PAIN AND I IMMEDIATELY TOOK 'EM TO THE NURSE, WHO WAS MS.

        TAWANA HURST. (UNSURE OF NAME AND SPELLING)

Q:      WHO WAS…, WELL WHO'D THEY SAY…, WHO'D THEY SAY THEY HAD

        PAIN…, DID THEY TELL YOU OR SOMEONE ELSE OR WHAT?

A:      WELL GABBY CAME UP TO ME AND TOLD ME.

Q:      OKAY.

A:      AND KENNEDY ALSO DID AS WELL, BUT WITH KENNEDY SHE WAS SITTING

        ON THE CARPET LIKE REALLY CLUTCHING HER PANTS LIKE THIS.

Q:      HMM.

A:      AND I IMMEDIATELY WENT AND TOLD THE NURSE, THE NURSE WHO

        IMMEDIATELY WENT AND TOLD MS. HEIDI.

Q:      M-HMM.

A:      BECAUSE I…, LIKE I TOLD YOU I NEVER WANT TO BE A PART OF THAT.

Q:      SURE, YEAH, YEAH, YEAH.

A:      AND UH, THAT WAS WHAT THAT WAS SAYING, IS AS SOON AS THAT

        HAPPENED I DID GO UP TO THEM AND TELL THEM IT DID…, THERE WAS

        PAIN.

Q:      OH OKAY, OKAY.

A:      BECAUSE I DIDN'T WANT TO BE THE ONE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 137 OF 185

Q:     DID…, WAS THERE ANY EVER ANY KIND OF THING THAT HAPPENED WITH ANY OF THOSE GIRLS EVEN JUST LIKE WITH…, WITH     , HOW IT WAS JUST A SORT OF ACCIDENTAL THING THAT YOU DIDN'T DO?

A:     NOT AT ALL.

Q:     THERE'S NOTHING…, NOTHING LIKE THAT WITH THEM?

A:     NO, NOT AT ALL AND…

Q:     OKAY.

A:     …EVEN THEN MS. HEIDI SAID, UH, IT MAY BE BECAUSE OF DEHYDRATION…

Q:     YEAH.

A:     …WHICH MAY HAVE CAUSED THEM TO PAIN…, HAVE PAIN, BUT REALLY AFTER THAT THEY NEVER COMPLAINED ABOUT ANYTHING.

Q:     OKAY.

A:     AND I EVEN DID GO UP TO CHIANA AND TELL THEM, HEY, UH, I TOLD CHIANA, KENN…, KENNEDY WAS PRETTY MUCH REALLY CLUTCHING IT…

Q:     M-HMM.

A:     …I KNOW SHE TOOK HER TO THE NURSE OR IF IT WASN'T CHIANA, IT WAS WHOEVER WAS UP FRONT AT THE TIME.

Q:     I GOTCHA.

A:     BUT I DO REMEMBER I DID TELL MS. TAWANA THAT HAD 2 GIRLS HAD BEEN SAYING THEY HURT…

Q:     M-HMM.

A:     …NOT JUST ONE.

Q:     I GOTCHA, OKAY.

A:     AND I WAS…

Q:     NOTHING CAME OF THAT THOUGH, THAT WAS NOT (INAUDIBLE-UNSURE)…

A:     …NOTHING AT ALL.

Q:     NO ONE ACCUSED YOU OF ANYTHING?

A:     UH, NOTHING, NO.

Q:     THERE WASN'T ANY ACCIDENTAL THING WHERE YOU ACCIDENTALLY…?

A:      NOT AT ALL, I HAVE…, UH, LIKE…

Q:     I KNOW GABBY WAS THE ONE GIRL THERE THOUGH THEY WAS TALKING ABOUT YOU KNOW PICKING HER UP, HAD YOU PICKED HER UP BEFORE THAT OR…?

A:     NO, BECAUSE THAT WAS…, UH, IT WAS LIKE AS SOON AS I WALKED INTO THE ROOM…

Q:     M-HMM.

A:     …SHE WOULD…, SHE JUST CAME AND TOLD ME…

Q:     OKAY.

A:     …AND AS IT HAPPENED THEN I JUS…, WENT AND TOOK HER TO THE NURSE.

Q:     WHAT EXACTLY DID SHE SAY?

A:     SHE SAID, IT HURTS DOWN THERE AND…

Q:     OKAY AND THEN THERE'S SOME REFERENCE TO LIKE A LITTLE BOY MAYBE LIKE TUESDAY OF THIS WEEK OR SOMETHING…

A:     IT WAS…, IT WAS…

Q:     …OR WHAT WAS THAT?

A:     …ACTUALLY…, UH, MS. CATHIE TOLD ME ABOUT IT.  A LITTLE BOY NAMED LUCAS IN OUR CLASSROOM HAS BEEN COMPLAINING THAT HIS PENIS HURTS.

Q:     OKAY.

A:     BUT REALLY THE ONLY TIME HE DOES THAT IS WHENEVER HE'S PULLING UP HIS UNDERWEAR.  SO MS. CATHIE SENT A MESSAGE OUT AND MS. CATHIE WAS THE ONE WHO NOTICED IT, IT WASN'T EVEN ME, I DIDN'T EVEN KNOW ABOUT IT.

Q:     OH OKAY, SO YOU DIDN'T HAVE ANYTHING TO DO WITH THAT.

A:     AND SHE TOLD ME ABOUT IT SHE WAS LIKE, HE'S BEEN COMPLAINING HIS PENIS HURTS.

Q:     OKAY.

A:     HE DOESN'T SAY IT AROUND ME; HE DIDN'T SAY IT AROUND ANYONE.  SO SHE TOLD…, SHE SENT A MESSAGE IN THE IPAD TO THE PARENTS SAYING MAYBE IT WAS…, HIS UNDERWEAR'S TOO TIGHT.

Q:     SO YOU GUYS USE MESSAGES BACK AND FORTH WITH THE PARENTS?

A:     UH, WHENEVER WE HAVE A SIGNAL WE'RE ABLE TO SEND THEM MESSAGES EASILY.

Q:     OH OKAY, OKAY.

A:     AND…

Q:     BUT THAT WASN'T ANYTHING TO DO WITH YOU, YOU…

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 140 OF 185

A:     NOT AT ALL, I…

Q:     …YOU DIDN'T HELP HIM USE THE BATHROOM RIGHT BEFORE THAT OR

        ANYTHING OR…?

A:     …NO, HE…, AND SHE TOLD ME SHE NOTICED IT LIKE 2 DAYS BEFORE

        THAT, SO…

Q:     OKAY.

A:     …SHE'S THE ONE WHO TOLD ME ABOUT THAT.

Q:     OKAY, THAT WASN'T IN YOUR WRITTEN STATEMENT, BUT THOSE 2 KIDS'

        NAMES IN PARTICULAR WAS BROUGHT UP, UH, YOU KNOW SO I JUST

        WANTED TO ASK ABOUT THOSE.

A:     YEAH.

Q:     NOT THAT I THINK THOSE ARE ANYTHING, I JUST WANTED…

A:     I TOL…, I TOLD MS. HEIDI ABOUT THAT BECAUSE I TOLD HER FACE TO

        FACE THAT WHENEVER THERE'S ANYTHING LIKE THAT I DON'T WANT TO

        BE THE ONE…

Q:     YOU'VE ALWAYS…

A:     …ON THE OTHER END OF IT.

Q:     …YEAH.

A:     I ALWAYS GO UP TO THEM AND TELL THEM…

Q:     YEAH, YEAH, YOU…

A:     …SO AND I MEAN EVEN IF THERE MAY BE DNA OR SOMETHING I'M

        AROUND THESE KIDS ALL DAY, I DON'T KNOW IF THAT IS…

STATEMENT OF ALI AL-AWADI            DP14-0088487        PAGE 141 OF 185

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 204 of 349 PageID #: 3568
Case 1:15-cr-00072-TWP-DML Document 5748-1 Filed 01/22/16 Page 142 of 185 PageID 335
3568

Q:   DO YOU THINK THERE'S ANY REASON THERE WOULD BE YOUR DNA…?

A:   NO, I MEAN OTHER THAN THE ONE TIME SHE WAS LIKE…, UH, I ASKED

HER…, SHE WAS LIKE, UH, SHE SAID SHE HAD NEW PANTIES.

Q:   M-HMM.

A:   AND I TOLD HER WHERE'S HER BELT, SHE'S LIKE MY DAD DIDN'T BRING…,

UH, FORGOT TO PUT IT ON.

Q:   M-HMM.

A:   SO THEN I…, UH, I TOLD HER HER PANTS ARE TOO LOOSE AND THAT

WOULD BE THE ONLY TIME MY FINGERS WERE EVEN ON HER PANTS, SO.

Q:   OH, WHEN WAS THAT?

A:   THE SAME TIME DURING THE NAPTIME, IT WAS LIKE BEFORE…, AS SOON

AS LIKE…, BUT…

Q:   OH, WHAT…, SO YOU'RE TALKING ABOUT YESTERDAY?

A:   …YES.

Q:   OKAY.  TELL ME MORE ABOUT THAT CAUSE…

A:   SHE…

Q:   …WHEN DID THAT HAPPEN?

A:   …UH, AS SOON AS I LAID DOWN, SHE…, SHE JUST RAN OVER AND SAID I

HAVE NEW PANTIES ON.

Q:   OKAY.

A:   AND I SAID…

Q:   DID SHE SHOW YOU HER PANTIES?

A:   …NO.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 142 OF 185

Q:     OKAY.

A:     AND…

Q:     WHAT COLOR WERE THEY?

A:     …WELL SHE WAS TRYING TO, BUT I TOLD HER, DON'T DO IT…

Q:     OKAY.

A:     …SO.

Q:     SO JUST START FROM THE BEGINNING AND TELL ME THAT.  SO YOU…, YOU COME IN THE ROOM, YOU RELIEVE HER, SHE LEAVES…

A:     UH, THAT WAS ANOTHER THING I JUST WAS KIND OF LIKE FOGGY ABOUT, BECAUSE IT…, I DIDN'T KNOW IF IT WAS REALLY RELEVANT OR NOT.

Q:     I MEAN IT'S…, KINDA AT THIS POINT IT'S…

A:     THAT IS, IT'S KINDA RELEVANT NOW THAT YOU'RE TELLING ME…

Q:     …YEAH, TELL ME…

A:     …ABOUT ALL THAT.

Q:     …TELL ME ALL ABOUT IT.

A:     SO SHE…, UH, SHE TOLD ME SHE HAD NEW PANTIES ON AND I WAS LIKE, OKAY, THAT'S NICE,        , BECAUSE I MEAN HONESTLY I DIDN'T FEEL VERY COMFORT ABOUT…, COMFORTABLE ABOUT THE…, THE TO…, THE TOPIC.  SO, UH, AND THEN I WAS LIKE, WHERE'S YOUR BELT, YOUR PANTS ARE TOO LOOSE AND THEN I LIKE JUST SHOOK HER PANTS LIKE THIS KINDA.

Q:     WHERE…, WHERE ON HER BODY?

A:     UH, IT WAS LIKE RIGHT AROUND HERE, I WAS LIKE…

STATEMENT OF ALI AL-AWADI             DP14-0088487          PAGE 143 OF 185

Q:     SO LIKE ON THE…, LIKE…

A:     YEAH.

Q:     …WHAT KIND OF PANTS WAS SHE WEARING?

A:     JEANS.

Q:     OKAY, WHAT COLOR WERE THEY?

A:     AND…, UH, BLUE, IT WASN'T ANYTHING OUT… (UNSURE)

Q:     LIKE REGULAR BLUE JEANS OR LIKE BRIGHT BLUE LIKE LITTLE…

       (INAUDIBLE-UNSURE)?

A:     LIKE A LITTLE DARKER THAN NORMAL BLUE JEANS, BUT THEN AGAIN

       THE LIGHTS WERE…

Q:     BUT JUST LIKE DENIM THOUGH, NOT LIKE…?

A:     …IT…, I DON'T THINK THEY WERE TOO DARK.

Q:     OKAY.

A:     BUT I MEAN…, BUT I DIDN'T REALLY SEE ANYTHING ABOUT THAT,

       BECAUSE SHE…

Q:     YEAH.

A:     …USUALLY JUST HAS A BELT ON…

Q:     BUT YOU…, YOU…, YOU GRABBED RIGHT HERE…

A:     YEAH.

Q:     AND JUST DID…, DID LIKE THIS?

A:     KINDA LIKE THIS, BECAUSE…

Q:     NOW WHERE WERE…, WHERE WERE YOU WHEN THAT HAPPENED?

A:     I WAS JUST SITTING LIKE…

STATEMENT OF ALI AL-AWADI            DP14-0088487          PAGE 144 OF 185

Q:      OKAY.

A:      …IT WAS BEFORE I SAT DOWN SHE SAID IT, SO AS I WAS SITTING DOWN

        THEN…

Q:      AND YOU SAID YOU LAID DOWN AT FIRST, IS THAT RIGHT?

A:      I MEAN YEAH, I LAID DOWN…

Q:      OKAY.

A:      …BUT THEN SHE STARTED TELLING ME.

Q:      WAS SHE SITTING UP OR LAYING DOWN OR WHATEVER WAY?

A:      SHE WAS SITTING DOWN…, LAYING DOWN.

Q:      SHE WAS LAYING DOWN…

A:      RIGHT.

Q:      …WHEN YOU…, YOU DID THAT WITH HER PANTS?

A:      UH, YEAH, BECAUSE IT WAS AROUND THAT TIME AND THEN I…

Q:      OKAY.

A:      …USUALLY  SHE HAS A BELT ON ALL THE TIME, SO I WANTED TO SEE IF I

        COULD TIGHTEN HER BELT, BECAUSE SHE ALWAYS COMES UP TO A

        TEACHER…, RE…, REGARDLESS WHO THE TEACHER IS…

Q:      YEAH.

A:      …SHE DOESN'T KNOW HOW TO BUCKLE HER BELT.

Q:      YEAH.

A:      SO SHE'LL HAVE HER PANTS ALL THE WAY AND THEN SHE'LL JUST GO UP

        TO A TEACHER LIKE THIS AND WANT…, WANTS THEM TO BUCKLE IT FOR

        HER.


STATEMENT OF ALI AL-AWADI              DP14-0088487          PAGE 145 OF 185

Q:     OKAY.

A:     AND I'VE DONE THAT MAYBE 2 TIMES, I HAVEN'T EVEN…, I USUALLY JUST

       TELL HER TO TRY.

Q:     OKAY.

A:     AND SOMETIMES SHE CAN GET IT, SOMETIMES SHE CAN'T.

Q:     OKAY.

A:     AND OTHER THAN THAT I MEAN THERE WAS NO CONTACT LIKE THAT AT

       ALL.

Q:     OKAY.

A:     AND THERE WASN'T EVEN LIKE…

Q:     TELL ME MORE ABOUT THAT, SO LIKE WHEN YOU…, SHE SAID I HAVE

       NEW PANTIES AS YOU WERE STANDING UP YOU WENT AHEAD AND LAID

       DOWN THERE…

A:     I…, I MEAN I…

Q:     …AND THEN WHAT DID SHE SAY?

A:     …LI…, I JUST SAID OKAY, THAT'S NICE AND THEN I LAID DOWN AND THEN

       SHE WAS LI…, LIKE TRYING TO SHOW ME, I WAS LIKE, NO, NO THANK

       YOU,      , I…, IT'S OKAY; LIKE PRETTY MUCH NOT TO GET HER UPSET.

Q:     HOW DID SHE TRY TO SHOW YOU, WHAT DID SHE DO TO TRY TO SHOW

       YOU?

A:     SHE WAS JUST LIKE…, TRYING TO LIFT UP HER SHIRT A LITTLE BIT.

Q:     OKAY.

A:     BUT IT WASN'T…, SHE WASN'T PULLING ANYTHING DOWN AT ALL.

STATEMENT OF ALI AL-AWADI              DP14-0088487          PAGE 146 OF 185

Q:      WHAT KIND OF SHIRT WAS SHE WEARING?

A:      I HAVE NO IDEA.

Q:      DID SHE LIFT UP YOUR SHIRT OR…

A:      NO, SHE WAS LIKE GOING…

Q:      …OR HER SHIRT I MEAN, I'M SORRY.

A:      …SHE WAS GOING TO GRAB IT AND I JUST FIGURED SHE WAS GOING TO
        DO IT, SO I SAID NO THANK YOU.

Q:      OKAY.  SO YOU JUST SAID NO THANK YOU?

A:      YEAH, I SAID NO THANK YOU, IT'S OKAY.

Q:      OKAY.

A:      SO, UH, AND THEN I…, I NOTICED HER PANTS WERE PRETTY LOOSE AND
        THEN THAT'S WHEN I ASKED HER WHERE WAS HER BELT AND THEN I
        TOLD HER IT WAS LOOSE.

Q:      OKAY.

A:      AND THAT WAS…, THAT WAS THAT, THAT WAS IT.

Q:      SO WHEN YOU KINDA SHOOK HER PANTS AND TOLD HER HER PANTS
        WERE LOOSE AND ASKED HER WHERE HER BELT WAS…

A:      YEAH.

Q:      …AND THEN WHAT DID SHE SAY?

A:      SHE SAID HER DAD FORGOT HER BELT IN THE MORNING.

Q:      OKAY.  DID YOU SAY ANYTHING BACK TO HER AFTER SHE SAID THAT?

A:      I SAID, WELL YOU SHOULD'VE REMEMBERED AND THEN SHE'S JUST LIKE,
        NO, THAT'S IT.

Q:   YEAH.  DID SHE TELL YOU ABOUT HER PANTIES OR SAY ANYTHING ABOUT THEM?

A:   NO, SHE JUST SAID I HAVE NEW PANTIES THAT WAS IT.

Q:   OKAY.  UH, OKAY.  WELL THAT…, BUT…, UH, SEE THERE'S NO WAY YOUR DNA WOULD GET ON…,

A:   AND IT…, IT…

Q:   …I MEAN IN…, INSIDE OF HER THAT WAY.  I JUST…, UH, YOU KNOW WHAT I'M SAYING, I CAN'T IMAGINE, THERE'S NO WAY IN THE WORLD YOUR DNA WOULD BE ON HER INSIDE OF HER LIKE THAT.  SO THAT'S…, THAT'S CERTAINLY NOT A WAY, THAT COULDN'T HAVE BEEN IT. (UNSURE)

A:   AND IT COULD BE FROM CONTACT TO CONTACT, LIKE IF SHE HOLDS MY HAND AND THEN TOUCHES ANY PART OF HER BODY?

Q:   NO, NOT THAT PART.

A:   OKAY.

Q:   NO, NO, NOTHING LIKE THAT, NOTHING LIKE THAT.  UH, ALRIGHT…

A:   AND I'M JUST TRYING TO COVER MY BASES.

Q:   NO, I THOUGHT THAT MIGHT COVER IT, UH, NEVER MIND THOUGH THAT'S…, THAT'S CERTAINLY NOT IT.  ANYWAYS, UH, WELL SO WHEN…, UH, WHEN WE CONDUCT OUR INVESTIGATION WE REALLY WANT TO BE THOROUGH LIKE I SAID…

A:   OF COURSE.

Q:   …AND DON'T LEAVE ANY STONES UNTURNED AND…, AND…, AND THAT'S GOOD FOR EVERYBODY, RIGHT?

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 148 OF 185

A:     YEAH, UH…

Q:     CAUSE IT GIVES YOU…

A:     …THAT'S WHY I'M TRYING TO TELL YOU EVERYTHING…

Q:     …A FULL CHANCE ABOUT…, YEAH.

A:     …AND WHAT I REMEMBERED ABOUT THAT I WANTED TO TELL YOU, I'M NOT…

Q:     YEAH.

A:     …HIDING ANYTHING FROM YOU GUYS.

Q:     YEAH AND THAT GIVES YOU FULL OPPORTUNITY TO…, TO…, TO GET THE BEST YOU KNOW FAIR SHAKE AT THIS AND…, AND YOU KNOW WHAT NOBODY WANTS…, WANTS ME TO JUST NOT DO MY JOB, BECAUSE THEN THAT LEAVES A CLOUD OF SUSPICION HANGING OVER YOU CAUSE PEOPLE LIKE, WELL HE DIDN'T DO A GOOD JOB.  SO MUCH BETTER FOR YOU, UH, ESPECIALLY YOU KNOW IF YOU DIDN'T DO ANYTHING FOR ME TO DO MY JOB WELL AND DO IT FAIRLY.

A:     OF COURSE.

Q:     SO THAT BENEFITS YOU, BUT ALSO FOR THEM, BECAUSE YOU KNOW YOU GOT TO FIGURE FROM THEIR PERSPECTIVE THERE'S 2 SIDES TO EVERY STORY.  YOU KNOW HER PARENTS AREN'T SURE THAT SOMETHING DIDN'T HAPPEN YOU KNOW WHAT I MEAN?

A:     YEAH, I MEAN…

Q:     AND SO THEY WANT TO KNOW THAT I'M DOING A THOROUGH JOB TO MAKE SURE…

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 149 OF 185

A:     …AND I…, I LOVE HER PARENTS, THEY'RE REALLY GREAT PARENTS, THEY'VE ALWAYS BEEN SUPPORTIVE OF OUR CLASSROOMS.

Q:     YEAH.

A:     AND THAT'S WHY I WAS SHOCKED.

Q:     HAV…, HAVE THEY EVER BEEN UPSET WITH YOU FOR ANY REASON OR…?

A:     NO, NOT THAT I KNOW OF, I MEAN…

Q:     NEVER GOT ANY FIGHTS OR ANYTHING LIKE THAT?

A:     …NO, NOT AT ALL AND…

Q:     NO ARGUMENTS?

A:     …THAT'S THE THING, I TRY TO CONNECT LIKE I SAID WITH THE CHILDREN AND THE PARENTS AS WELL, BECAUSE I MEAN SOME OF THE PARENTS ARE A LITTLE SKEPTICAL ABOUT HAVING A MALE TEACHER…

Q:     YEAH.

A:     …AND I JUST WANT TO EARN THEIR TRUST, SO.

Q:     YEAH, HAVE YOU BEEN ABLE TO DO THAT SUCCESSFULLY YOU FEEL LIKE?

A:     FOR…, FOR MOST PARENTS YES, THERE'S JUST THIS ONE LITTLE GIRL IN THE OTHER CLASSROOM, HER NAME IS DILLON; HER MOM JUST DIDN'T WANT HER AROUND A MALE TEACHER AND I…, I WAS IN THE CLASS MAYBE ONE TIME WITH HER.  AND SHE JUST WAS LIKE, OH…, AND THEN THAT'S WHEN HER MOM SAW ME AND SHE…, SHE JUST STARTED ASKING WHO'S HE AND THEY TOLD HER AND THEN SHE JUST PREFERRED I WASN'T IN THE CLASSROOM WITH… (UNSURE OF THE NAME AND SPELLING)

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 150 OF 185

Q:    WHAT'S DILLON'S LAST NAME?

A:        . (UNSURE OF NAME AND SPELLING)

Q:    OKAY AND SO DID THEY MOVE YOU AFTER THAT OR WHAT?

A:    THEY MOVED HER UP.

Q:    TO ANOTHER CLASS?

A:    …TO THE CLASSROOM ABOVE AND THEN I WENT TO THE OTHER CLASSROOM.

Q:    OKAY.

A:    ONLY BECAUSE THE MOTHER WASN'T TOO COMFORTABLE WITH HAV…, HER HAVING A MALE TEACHER, WHICH I THOUGHT WAS VERY REASONABLE BECAUSE IF I WERE TO HAVE A DAUGHTER THEN I MIGHT BE THE SAME WAY, BUT THEN AGAIN I WOULD WANT TO TRUST WHOEVER IT IS…

Q:    YEAH.

A:    …BECAUSE THEY WOULDN'T HIRE SOMEONE WHO…, AND I…

Q:    YEAH.

A:    …I'VE BEEN…

Q:    AND YOU…, AND YOU'VE NEVER BEEN ARRESTED FOR ANYTHING LIKE THAT BEFORE?

A:    NOT AT ALL.

Q:    HAVE YOU EVER BEEN ARRESTED AT ALL EVER?

A:    NO, NO.

Q:    NO, OKAY, SO THERE'S NEVER BEEN ANY (INAUDIBLE-BOTH SPEAKING)

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 151 OF 185

A:      NO AND THAT'S WHY I'M…

Q:      YEAH.

A:      …I'M COOPERATING WITH YOU AS WELL…

Q:      YEAH, ABSOLUTELY.

A:      …I'M NOT TRYING TO GIVE YOU GUYS ANYTHING…

Q:      ABSOLUTELY.

A:      …I'M NOT TRYING TO BEAT AROUND THE BUSH…

Q:      YEAH.

A:      …I'M TRYING TO GIVE YOU GUYS AS MUCH ACCURATE INFORMATION AS I CAN.

Q:      UH, SO I'M JUST TRYING TO THINK, CAUSE HERE'S…, IT'S REAL IMPORTANT THAT I GET THIS CLEAR IN MY HEAD.  IF THERE'S…, UH, CAUSE I CAN THINK OF ANY NUMBER OF WAYS WHERE MAYBE SOMETHING…

A:      OKAY.

Q:      …MIGHT EXPLAIN IT, BUT…, AND IT CERTAINLY WASN'T FROM JUST GRABBING THE OUTSIDE OR EVEN RIGHT HERE, THAT…, THAT…

A:      OKAY.

Q:      …COULDN'T TRANSFER DNA AND EVEN TOUCHING HANDS LIKE THAT. UH, IT…, IT'S MORE OF A DIRECT TRANSFER THING, NOT A…, NOT A SECONDARY THING.

A:      OF COURSE, SIR. (UNSURE)

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 215 of 349 PageID #:
3579
Case 1:15-cr-00072-TWP-DML   Document 57-3   Filed 01/22/16   Page 153 of 185   PageID #: 346

Q:     UH, ABSOLUTELY IT…, ABOUT ALMOST EXCLUSIVELY A…, A DIRECT
       TRANSFER…

A:     OKAY.

Q:     …BECAUSE THE…, THE CONCENTRATION LEVELS THEY FIND IT IN…, UH, I
       CAN'T GET INTO ALL OF IT, BUT…, BUT THE…, THERE'S WHAT THEY CALL
       EPITHELIA CELLS…

A:     M-HMM.

Q:     …AND THEY'RE FROM YOUR SKIN AND OTHER PARTS OF YOUR BODY;
       THEY CAN DIFFERENTIATE DIFFERENT TYPES OF EPITHELIA CELLS
       VERSUS OTHER TYPES OF CELLS IN YOUR BODY AND…

A:     HMM.

Q:     …ALL THE SCIENCES BEYOND ME CAUSE I'M NOT THE ONE, THE
       SCIENTISTS WILL DO IT, WE HAVE A WHOLE TEAM OF DOCTORS AND
       PHYSICIANS THAT…

A:     OF COURSE.

Q:     …UH, EXPERTS THAT…, I DON'T KNOW SCIENTISTS THAT DO THAT STUFF
       IN THE LAB I DON'T MESS WITH; THEY JUST EXPLAIN IT TO ME LATER ON,
       BUT FROM EVERYTHING THEY'VE EVER TOLD ME IT'S MORE OF A DIRECT
       TRANSFER ISSUE.

A:     OKAY.

Q:     CAUSE…, BECAUSE BY THE TIME YOU…, YOU TRANSFER THE EPITHELIA
       CELLS ONTO ANOTHER PERSON'S FINGERS AND ALL THAT, UH, THE

CONCENTRATION LEVELS GO DOWN TO A POINT WHERE IT'S JUST NOT GONNA…, IT'S NOT GONNA BE ADEQUATE TO EXPLAIN IT.  UH…

A:     OKAY.

Q:     …AND CERTAINLY ON THE OUTSIDE OF HER PANTS JUST ON EVEN THE…, UH, THAT'S NOT GONNA DO IT.  SO I GUESS I JUST WANT TO MAKE SURE, A HUNDRED PERCENT THAT THERE'S NO OTHER WAY…, I MEAN FOR ANY REASON…, AND EVEN INNOCENTLY, EVEN INNOCENTLY THERE'S NO REASON WHY SOME OF YOUR DNA WOULD'VE BEEN FOUND INSIDE…?

A:     I MEAN I DO OCCASIONALLY TICKLE THE KIDS LIKE AROUND THEIR BELLY AREA, CAUSE THAT'S WHERE THEY'RE USUALLY MOST TICKLISH.

Q:     YEAH AND…, AND I…, LET ME…, IT'S IMPORTANT MAYBE THAT I FINISH MY QUESTION AND THEN THAT'S…, THAT'S HELPFUL, WE'LL GO INTO THAT SOME MORE HERE IN A SECOND.

A:     OKAY.

Q:     BUT WHAT I'M ASKING IS IS THERE…, IS THERE ANYWAY EVEN…, EVEN INNOCENTLY IN THE COURSE OF JUST BEING A HELPFUL PERSON OR BEING A GOOD TEACHER ANY REASON AT ALL, EVEN INNOCENTLY, THAT WE WOULD FIND ANY OF YOUR DNA INSIDE OF HER VAGINA, DO YOU KNOW WHAT I'M SAYING?

A:     INSIDE, NO, THERE SHOULDN'T BE.

Q:     TELL ME MORE ABOUT THE TICKLING.

A:     I MEAN THE KIDS THEY JUST ALWAYS WANT TO PLAY LIKE I TOLD YOU.

Q:     M-HMM.

A:    UH, I DID TICKLE 'EM A LITTLE BIT, I…, ETHAN, YOU CAN ASK HIM, HE'S…, HE…, HE ENJOYS IT, HE ALWAYS FINDS IT HILARIOUS.

Q:    M-HMM.

A:    UH, ALL THE OTHER KIDS TOO, BUT I DID TICKLE THEM A LITTLE BIT DURING THE PLAY…

Q:    OH.

A:    …LIKE IT WAS JUST…

Q:    YOU SAID YOU LAID THERE FOR ABOUT WHAT HALF AN HOUR, 24…, 25 MINUTES?

A:    ABOUT 20 MINUTES…, HMM…

Q:    OKAY.

A:    …25 MINUTES MAYBE…

Q:    OKAY.

A:    …BUT IT WASN'T TOO MUCH AND…

Q:    OKAY, SO DURING THAT TIME WHEN YOU'RE TAKING ETHAN'S AND PILLOW…

A:    TAKING THE PILLOWS I'D LIKE…, I TOOK IT AND THEN HE'LL TRY TO TAKE IT BACK AND THEN I TICKLED HIM A LITTLE BIT AND…

Q:    YOU TICKLED ETHAN, OKAY…

A:    …ETHAN AND THEN I…

Q:    …WHERE DID YOU TICKLE HIM?

A:    ON THEIR TUMMIES.

Q:    OKAY.

STATEMENT OF ALI AL-AWADI        DP14-0088487        PAGE 155 OF 185

A:     AND UH,         SHIRT WAS UP A LITTLE BIT AND ETHAN'S TOO AND I

        TICKLED THEIR BELLIES.  SO I JUST THOUGHT IT WAS JUST INNOCENT

        PLAY, UH, THAT MIGHT ACCOUNT FOR ANY DNA ON THEIR BODIES, I

        MEAN…

Q:     YEAH, WELL I…, I'M BEING MORE SPECIFIC.

A:     YEAH I MEAN…, YEAH, I MEAN LIKE…

Q:     UH…

A:     …THE INSIDE OR ANYTHING LIKE THAT, NO, THERE SHOULDN'T BE.

Q:     OKAY, UH, I GUESS TO…, UH, YOU KNOW I…, I'M…, I…, I'M JUST THINKING

        HERE CAUSE IT COULD BE A NUMBER OF THINGS, BUT…, UH, IF…, IF YOU

        KNOW USING THE BATHROOM, WIPING FOR HER, SOMETHING LIKE THAT, I

        MEAN THAT MIGHT COULD EXPLAIN SOME OF IT TO ME, I…, I DON'T

        KNOW IF…, IF THAT EVEN HAPPENED OR SHE EVEN DID USE THE

        BATHROOM OR I…, I'M TRYING TO THINK IF SHE WERE YOU KNOW HURT

        OR LIKE YOU SAID, I KNOW KIDS SOMETIMES JUST TAKE THEIR CLOTHES

        OFF.  UH, I'VE GOT PICTURES OF…, I THINK IT'S OUR…, I'VE GOT 4 KIDS

        AND…, AND THEY'RE ALL ABOUT 2 YEARS APART…

A:     YEAH.

Q:     …AND UH, WHEN MY SECOND KID WAS BORN, I HAVE…, THE DAUGHTER

        WAS BORN FIRST AND THE SON WAS BORN SECOND AND THEY'RE 2

        YEARS APART.  SO WHEN…, ACTUALLY ABOUT 27 MONTHS, A LITTLE

        OVER 2 YEARS, SO PROBABLY ABOUT THE SAME AGE OF KIDS YOU'RE

        IN…, YOU KNOW IN THE CLASS WITH.  BUT WHEN…, WHEN MY SON WAS

BORN MY DAUGHTER WAS ABOUT 2 AND A HALF YEARS OLD SHE CAME

TO THE HOSPITAL TO SEE BABY BROTHER FOR THE FIRST TIME EVER AND

UH…

A:   M-HMM.

Q:   …AND WE HAD…, MY WIFE WAS REAL THOUGHTFUL ABOUT IT AND

BOUGHT A LITTLE CABBAGE PATCH KID LITTLE BOY TO BE LIKE, OH, THIS

IS BABY BROTHER AND WE GET…, TRYING TO TEACH HER HOW TO BE

YOU KNOW…, AND ALSO TO LIKE NOT MAKE HER JEALOUS OF THE NEW

BABY IF WE GAVE HER HER OWN LITTLE BABY, SO HER AND MOM COULD

TAKE CARE OF IT AT THE SAME TIME, YOU KNOW UH, IT WAS A GOOD

IDEA.  BUT SHE WAS A LITTLE BIT INTERESTED IN IT, IT WAS SWEET AND

HELD IT THE LITTLE THICK BABY NEXT TO THE REAL ONE AND…, AND

WAS INTERESTED IN IT FOR A FEW MINUTES, BUT BEFORE WE KNEW IT

SHE KINDA GOT OFF THE BED AND WAS WONDERING AROUND AND WE'RE

ALL LOOKING AT THE BABY, ME AND MY MOM AND UH, MY WIFE,

WHATEVER WE'RE LOOKING AT THE BABY.  BEFORE WE KNEW IT WE

HEAR MY DAUGHTER IN THE BATHROOM, SHE'S BUCK NAKED IN THE

SHOWER, (CHUCKLE) JUST STRIPPED ALL OF HER CLOTHES OFF.

A:   WOW.

Q:   ABSOLUTELY BUCK NAKED IN THE SHOWER AT THE HOSPITAL ROOM,

WE'RE LIKE, WHAT ARE YOU DOING, SO. (CHUCKLE) UH, I GET…, THAT'S

JUST AN EXAMPLE FOR IT, CAUSE LIKE…, LIKE YOU TOLD ME THE STORY

ABOUT EARLIER ABOUT THE GIRL AND STRIPPED NAKED.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 157 OF 185

A:    M-HMM.

Q:    UH, KIDS DO THAT STUFF SOMETIMES AND…, AND I CAN JUST IMAGINE THE SCENARIO IF SHE WAS…, IF SHE WAS TRYING TO SHOW…, AND I'M NOT SAYING THIS HAPPENED CAUSE YOU…, YOU DIDN'T TALK ABOUT IT, BUT THAT DOESN'T MEAN IT DIDN'T HAPPEN, IT JUST MEANS THAT WHATEVER.  BUT MY POINT IS I COULD SEE A SCENARIO WHERE SHE MIGHT'VE TAKEN SOME OF HER CLOTHES OFF OR IF SHE'S TRYING TO SHOW HER YOUR NEW PANTIES, CAUSE YOU KNOW WHAT SHE TALKED ABOUT NEW PANTIES IN THE FORENSIC INTERVIEW TOO.

A:    SHE DID.

Q:    SHE…, SHE SPECIFICALLY SAID, I GOT NEW PANTIES YESTERDAY, CAUSE WE ASK…, WELL WE ALWAYS ASK 'EM LIKE WHAT WERE YOU WEARING…

A:    M-HMM.

Q:    …YOU KNOW WHICH PANTS, UNDERWEAR, YOU KNOW SHIR…, WHATEVER AND SHE WAS SO EXCITED CAUSE SHE SAID, I GOT NEW…

A:    YEAH, THAT'S WHAT I WAS TELLING YOU…

Q:    …I GOT NEW PANTIES.

A:    …BUT I DIDN'T EVEN SIT DOWN AND SHE TOLD ME.

Q:    YEAH, YEAH.  SO ANYWAY SHE TOLD US WHEN WE ASKED HER ABOUT HER CLOTHES AND UH, AND UH, I CAN JUST…, LIKE I SAID YOU HAVEN'T TALKED ABOUT IT, BUT IT CAN BE FOR A NUMBER OF REASONS, MAYBE YOU FEEL UNCOMFORTABLE OR AFRAID IT MIGHT MAKE YOU LOOK BAD SOMETHING LIKE THAT, WHEN IN REALITY IF IT'S JUST WHAT KIDS DO,

IT'S WHAT KIDS DO.  BUT I CAN IMAGINE A SCENARIO WHERE MAYBE SOMETHING HAPPENED OR MAYBE SHE TOOK HER PANTIES…, OR TOOK HER PANTS DOWN TO SHOW YOU HER PANTIES AND YOU HAD TO HELP PUT IT BACK ON, I DON'T KNOW, I'M JUST…, I DON'T KNOW, I'M JUST THROWING IT OUT THERE BECAUSE IF THERE…, IT'S A PRETTY SPECIFIC PLACE AND WAY TO FIND…

A:     YEAH.

Q:     …DNA…

A:     YEAH.

Q:     …AND I'M JUST SAYING IF THERE WERE ANY DNA IN THERE AT ALL AND WE FOUND IT AND YOU DIDN'T TELL ME ABOUT IT BEFORE HAND AND IT WASN'T EXPLAINED…

A:     YEAH, I'M…

Q:     …UH, YEAH, WHAT AM I SUPPOSED TO DO WITH THAT…

A:     …YEAH, EXACTLY.

Q:     …MAN, THAT'S PRETTY TOUGH YOU KNOW.

A:     I MEAN…

Q:     SO THAT'S…, I GUESS THAT'S ALL I'M THINKING ABOUT, SO I DON'T KNOW I…

A:     IF ANYTHING IT WAS JUST A INNOCENT…, I WAS TELLING HER HER LITTLE…, UH, HER JEANS…

Q:     OH YEAH, NO, WE'RE GOOD…

A:     …THEY'RE…

STATEMENT OF ALI AL-AWADI              DP14-0088487          PAGE 159 OF 185

Q:     …THEY'RE…, WE'RE GOOD, IF THAT'S ALL THERE IS I WOULDN'T WORRY ABOUT IT, UH, THERE'S NO…, THERE'S NO WAY…

A:     …AND…

Q:     …YEAH.

A:     …THERE WAS…, AND UH…

Q:     OKAY, IF THAT'S…, IF THAT'S ALL THAT HAPPENED I WOULDN'T…, I WOULDN'T BE WORRIED ABOUT IT AT ALL.  I'LL BE RIGHT BACK, DO YOU NEED TO USE THE RESTROOM OR ANYTHING, MAN?

A:     UH, NO, I…, IF I COULD TALK TO MY MOM AND LET HER KNOW EVERYTHING'S ALRIGHT.

Q:     UH, I COULD CALL HER IF YOU GIVE ME HER NUMBER; YOU JUST WANT ME TO MAKE SURE?

A:     UH, SH…, SHE MIGHT BE A LITTLE FREAKED OUT IF YOU CALL HER.  I MEAN…

Q:     OKAY, WELL…

A:     …IT'S OKAY, I CAN WAIT A LITTLE BIT.

Q:     …OKAY. (DOOR OPENS) WELL JUST HANG TIGHT FOR A MINUTE, I'M JUST…, YOU KNOW…, UH, WELL WE'LL SEE, I…, I…, I DON'T KNOW, I…, I'LL BE BACK IN A MINUTE THOUGH, OKAY?

A:     OKAY. (DOOR CLOSES)

(PAUSE)

Q:     HEY, ONE OF THE THINGS I WANTED TO ASK YOU ABOUT WAS SOMETHING FROM…, UH, ETHAN'S INTERVIEW.

STATEMENT OF ALI AL-AWADI             DP14-0088487          PAGE 160 OF 185

A:     SURE.

Q:     NOT A BIG DEAL, I JUST WANT TO ASK YOU ABOUT IT.  UH, SAID THAT…,

       UH, THERE'S TIMES WHERE HE'S SUPPOSED TO TURN HIS BACK FROM YOU

       AND        , WHAT…, WHAT'S HE TALKING ABOUT WHEN HE SAID THAT?

A:     I MAKE 'EM LOOK THE OTHER WAY FROM EACH OTHER…

Q:     YEAH.

A:     …SO THEY DON'T PLAY, BECAUSE LIKE I TOLD YOU THEY STARTED

       HOLDING HANDS BEHIND MY BACK…

Q:     M-HMM.

A:     …SO I JUST TOLD THEM BOTH TO TURN THEIR HEADS AND THEN THAT'S

       WHEN I GOT UP AND ACTUALLY STARTED WALKING AROUND RIGHT

       AFTER I TOLD THEM THAT.

Q:     OKAY, ALRIGHT.

A:     OTHER THAN THAT I DON'T REALLY TELL THEM NOT TO.  BECAUSE IF

       THEY SIT THERE ON THE MATS LOOKING AT EACH OTHER THEY'RE NOT

       GONNA GO TO SLEEP…

Q:     YEAH.

A:     …THEY'LL JUST PLAY AROUND AND UH, THERE WAS TIMES…, IT WAS THE

       DAY BEFORE THEY ACTUALLY DID THAT SAME THING AND UNTIL I TOLD

       THEM TO TURN THEIR HEADS THE OTHER WAY THEN THEY FELL ASLEEP,

       BUT BEFORE THAT THEY DIDN'T.

Q:      OKAY.  WHEN…, UH, WHEN…, SO WHEN YOU TOLD HIM TO TURN HIS…, TO TURN HIS HEAD THAT WAS…, OR LOOK…, LOOK THE OTHER WAY THAT WAS RIGHT BEFORE YOU GOT UP?

A:      IT WAS AS I WAS GETTING UP PRETTY MUCH…

Q:      OKAY.

A:      …I TOLD HIM LOOK THAT WAY, YOU LOOK THAT WAY AND THEN TOLD 'EM, TAKE A NAP, SO THEY COULD GO TO SLEEP.

Q:      ALRIGHT, UH, OKAY.  SO, UH, ETH…, ETHAN SAID SOME OTHER THINGS TOO.

A:      OKAY.

Q:      UH, BUT I…, I DON'T KNOW…, DID ANYTHING ELSE HAPPEN WITH ETHAN THAT…, THAT DAY THAT MIGHT YOU KNOW ACCOUNT FOR SOME OF THE THINGS HE'S SAYING NOW?

A:      I HAVE NO IDEA TO BE HONEST WITH YOU.

Q:      YEAH.

A:      ETHAN'S JUST…, HE'S A…, LIKE THE WHOLE TIME…, UH, HE'S EVERYWHERE.

Q:      YEAH.

A:      AND LIKE WHEN YOU PLAY WITH HIM HE…, IF YOU SEE HIM IN THE BIG GYM PLAYING HE'S ALWAYS THE ONE WHO'S FALLING, GETTING HURT, PLAYING, STUFF LIKE THAT…, UH, ANY SEXUAL ACTIONS, NONE AT ALL EVER; SAME WITH        , NONE.

Q:      UH HUH.

A:     AND I MEAN OTHER THAN THE…, I SEE AS INNOCENT TICKLING NOTHING AT ALL.

Q:     YEAH.  HAD THEY…, WHEN THEY TALKED TO YOU ABOUT…, UH, PICKING KIDS UP…

A:     M-HMM.

Q:     …HOW LONG AGO WAS THAT CONVERSATION?

A:     UH, IT WAS EARLY ON THIS YEAR, UH, PROBABLY AROUND WHEN THE SNOW STARTED TO MELT A LITTLE BIT.

Q:     OKAY, SO BACK IN THE EARLY SPRING…

A:     YEAH, THE SPRING PROBABLY.

Q:     …APRIL OR SOMETHING OTHER, FEBRUARY, MARCH, WHATEVER?

A:     M-HMM AND I REMEMBER BECAUSE I WAS A LITTLE UPSET ABOUT IT…

Q:     M-HMM.

A:     …BECAUSE I FELT IT WAS A SEXIST THING, BECAUSE THE FEMALE TEACHERS COULD PICK UP THE KIDS AND I COULDN'T, BUT THEN I STARTED REALIZING THEY WERE JUST PRETTY MUCH LOOKING OUT FOR ME.

Q:     YEAH.

A:     AND…

Q:     TELL ME THIS, UH, WHEN…, UH, WELL I…, I GUESS THE THING IS I JUST WANT TO MAKE SURE THERE'S NOTHING THAT I'VE LEFT OUT OR FORGOT ABOUT.

A:     UH, FOR SURE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 163 OF 185

Q:     BECAUSE YOU KNOW YOUR STATEMENT TO ME IS PART OF MY INVESTIGATION AND…

A:     YEAH.

Q:     …THE THING IS THOUGH IT'S SUCH AN IMPORTANT PART BECAUSE…, UH, YOU GOT TO REMEMBER I GET INFORMATION FROM ALL KINDS OF SOURCES, RIGHT?

A:     M-HMM.

Q:     ALL KINDS OF DIFFERENT SOURCES AND SOME OF IT IS YOU KNOW PEOPLE AND THINGS THEY TELL ME AND SOME OF IT IS LIKE YOU KNOW PHYSICAL EVIDENCE IF YOU WILL…

A:     YEAH, YEAH.

Q:     …YOU KNOW AND…, AND SO WHEN YOU LOOK AT LIKE PEOPLE AND WHAT THEY SAY YOU GOT TO THINK WELL WHY WOULD THEY SAID THAT…

A:     YEAH, YEAH.

Q:     …WHY WOULD THEY…, WHY WOULD THEY BE TRUTHFUL OR UNTRUTHFUL ABOUT THIS PARTICULAR THING.

A:     OKAY.

Q:     YOU KNOW WHAT I MEAN?

A:     YEAH.

Q:     AND WHEN YOU LOOK AT EVIDENCE, THE EVIDENCE SAYS WHAT IT SAYS AND YOU DON'T HAVE TO WORRY ABOUT ANY BIAS.

A:     YEAH.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 164 OF 185

Q:    YOU CAN TRUST…, I THINK YOU WOULD AGREE WHAT SOMEONE SAYS IF YOU REALIZE THEY HAVE LESS REASON TO BE BIASED THAN NOT.

A:    YEAH.

Q:    YOU KNOW WHAT I'M SAYING, LIKE SO…, SO LIKE IF FOR EXAMPLE, UH, YOU'VE HEARD THE TERM LIKE GOLD DIGGER BEFORE? (CHUCKLE)

A:    YEAH.

Q:    RIGHT, LIKE SO IF LIKE A 22 YEAR OLD WOMAN MARRIES LIKE AN 85 YEAR OLD MAN…

A:    YEAH.

Q:    …WHO'S LIKE FILTHY RICH, TAKES A HUGE INSURANCE POLICY OUT ON HIM, GETS HIM TO SIGN HIS WILL OVER TO HER COMPLETELY…

A:    M-HMM.

Q:    …AND THEN LIKE 6 MONTHS LATER HE LIKE DIES MYSTERIOUSLY OR WHATEVER?

A:    YEAH, YEAH.

Q:    PEOPLE ARE LIKE, WHAT, OKAY, RIGHT?

A:    (NO VERBAL RESPONSE)

Q:    BECAUSE DO YOU THINK SHE HAS A BIAS, A REASON FOR HIM TO BE DEAD, RIGHT?

A:    YEAH.

Q:    LIKE YEAH, TOTALLY, CAUSE SHE KINDA GETS TO BECOME A MILLIONAIRE ONCE HE DIES.

A:    FOR SURE.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 165 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 228 of 349 PageID #: 359
Case 1:15-cr-00072-TWP-DML   Document 574-1   Filed 01/22/16   Page 166 of 185   PageID #:
3592

Q:     UH, AND SO IF SOMEONE LIKE THAT VERSUS YOU KNOW LET'S SAY IT'S

       AN OLD COUPLE AND THEY'RE BOTH 85 AND THEY'VE BEEN TOGETHER

       THEIR WHOLE LIVES AND THEY MARRIED WHEN THEY WERE BOTH 20 AND

       THEY'VE BEEN TOGETHER 65 YEARS AND THEN THE HUSBAND DIES, DO

       YOU THINK PEOPLE ARE GOING AROUND SUSPECTING HER…

A:     FOR SURE.

Q:     …DO YOU KNOW WHAT I MEAN…

A:     YEAH.

Q:     …LIKE CASHING IN ON HIS HEALTH IN…, OR LIFE INSURANCE, I MEAN NO,

       THERE'S NO BIAS THERE, THERE'S NO REASON.

A:     M-HMM.

Q:     THAT'S…, THAT'S SORT OF AN JUST AN EXAMPLE, BUT IT…, THE POINT IS,

       UH, WHEN PEOPLE DON'T HAVE A REASON TO MAKE SOMETHING UP WE

       TEND TO BELIEVE WHAT THEY SAY A LOT MORE, RIGHT?

A:     OF COURSE.

Q:     UH, AND…, AND…, AND HERE'S THE KICKER, MAN, I SEE NO REASON…, I

       SEE NO REASON AT ALL FOR          TO MAKE THIS UP.  I CAN'T FIGURE THAT

       OUT, I DON'T SEE…, LIKE SHE'S NOT…, BECAUSE HERE'S THE THING, UH,

       SHE'S…, SHE'S…, UH, VERY CLEARLY SAYING THAT…, THAT YOU DID DO

       SOMETHING TO HER AND SHE'S NOT…

A:     AND I COMPLETELY UNDERSTAND.

Q:     …AND SHE'S NOT CHANGING THAT, UH, WHAT YOU MAY NOT KNOW IS

       MS. TYRIA TALKED TO HER AND ASKED HER PROBABLY 10 TIMES.

STATEMENT OF ALI AL-AWADI            DP14-0088487          PAGE 166 OF 185

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 229 of 349 PageID #:
3593
Case 1:15-cr-00072-TWP-DML   Document 54-1   Filed 01/22/16   Page 167 of 185 PageID #: 360

A:      M-HMM.

Q:      MOST OF THOSE TIMES BEFORE YOU LEFT THE ROOM…, OR BEFORE YOU

        CAME INTO THE ROOM AND TALKED TO        YOURSELF.

A:      M-HMM.

Q:      AND UH, A LOT OF THOSE TIMES…, UH, AFTER, 2 OR 3 TIMES AGAIN AFTER

        YOU LEFT THE ROOM…

A:      M-HMM.

Q:      …SHE ASKED HER AGAIN AND CLARIFIED VERY SPECIFICALLY AND SHE

        WAS VERY, VERY SPECIFIC WITH TYRIA, BE…, BECAUSE SHE ASKED HER

        SO MANY TIMES SHE GOT VERY, VERY DETAILED INFORMATION FROM

A:      M-HMM.

Q:      …IN A WAY THAT NO ONE ELSE BESIDES THE FORENSIC INTERVIEWER

        DID.

A:      YEAH.

Q:      AND UH, AND SO WE HAVE MS…., MS. TYRIA THAT SHE TOLD AND SHE DID

        NOT…, I MEAN SHE SAID IT TO HER WITHIN PROBABLY 4 MINUTES OF YOU

        LEAVING THE ROOM SHE TOLD…

A:      M-HMM.

Q:      …IN ABOUT MAYBE 5…, I DON'T KNOW, RIGHT AFTER.  AND THEN…, UH,

        AND THEN YOU KNOW SHE TOLD HER AGAIN AND AGAIN AND AGAIN AND

        SHE WASN'T ASKING…, I MEAN CAUSE SHE'S THE ONE THAT JUST CAME

        OUT AND SAID IT.

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 167 OF 185

A:    M-HMM.

Q:    IT WASN'T THE KIND OF THING WHERE MS. TYRIA SAT DOWN AND STARTED DRILLING HER AND…

A:    YEAH.

Q:    …SAYING, WHO TOUCHED YOU, DID…, DID MR. ALI TOUCH YOU…

A:    YEAH.

Q:    …DID MS…, DID MS. HEIDI TOUCH YOU…, WHO TOUCHED YOU, WHO TOUCHED…, NO, SHE JUST CAME OUT AND TOLD HER OUT OF THE BLUE AND SO ANYWAY SHE TOLD HER A BUNCH OF TIMES AND SHE…, UH, SHE TOLD YOU.

A:    YEAH.

Q:    AND YOU SAID SHE WAS NEXT TO YOU OR YOU CALLED HER OVER…

A:    YEAH.

Q:    …AND THE THING IS, UH, MS. TYRIA, MAYBE SHE'S EXAGGERATING, MAYBE…, MAYBE YOU'RE MINIMIZING IT, BUT EITHER WAY SHE PUTS…, SHE PUTS…, UH,    IN YOUR LAP AT THAT POINT, NOT LIKE SHE PUT HER…

A:    YEAH.

Q:    …BUT SHE'S SAYING…

A:    SHE WAS PRETTY CLOSE I KNOW THAT. (UNSURE)

Q:    WAS IN YOUR LAP AT THAT POINT AND THAT EVEN IN YOUR LAP SHE SAID IT AGAIN TO YOU OR RIGHT IN FRONT OF YOU, RIGHT?

A:    YEAH, UH…

Q:   AND…, AND…, AND EVEN WHEN YOU TOLD HER NO THANK YOU OR TOLD HER NO OR I DIDN'T DO THAT SHE DIDN'T CHANGE AND SHE DIDN'T SAY, OH, I'M SORRY, I'M JUST PLAYING WHATEVER.  AND THEN AGAIN, UH, AFTER THAT, UH, MS…., FORGET HER NAME, MS. SH….

A:   SHERBY?

Q:   WHAT'S THAT?

A:   SHERBY.

Q:   NO, NO, NO, NO, THE…, UH, THE…, THE…, THE OFFICE MANAGER, WHAT'S HER FIRST…, WHAT'S HER NAME?

A:   HEIDI?

Q:   NO, NO, NO.

A:   KIM, CHIANA?

Q:   CHIANA… (CHUCKLE)

A:   OKAY.

Q:   …I WAS GONNA SAY SHEANA, I KEEP WANTING TO SAY SHEANA, THEN…, NO, MS. CHIANA, CHIANA, UH, WAS THE NEXT ONE AND CAUSE…, UH, TYRIA TOLD…, OR TYRIA TOLD CHIANA AND CHIANA WENT IN THERE AND SHE ASKED HER 2 TIMES.

A:   M-HMM.

Q:   ASKED HER 2 TIMES, ASKED HER ONCE SHE SAID EXACTLY WHAT SHE TOLD MS. TYRIA, SHE SAID WHAT, AND SHE SAID IT AGAIN A SECOND TIME AND I THINK SHE EVEN SAID, DO YOU KNOW THE DIFFERENCE BETWEEN TRUTH AND LIE, SHE'S LIKE YEAH…

STATEMENT OF ALI AL-AWADI            DP14-0088487          PAGE 169 OF 185

A:     YEAH.

Q:     …SHE'S LIKE, WE'RE TELLING THE TRUTH OR DID…, DID THIS HAPPEN, YEAH.  AND THEN AFTER THAT…, UH, CHIANA TOLD…, UH, HEIDI AND HEIDI WENT IN THERE AND SAID HEY, WHAT…, WHAT…, WHAT HAPPENED…

A:     M-HMM.

Q:     …AND SHE SAID TO HER, OH…, YEAH, ALI DID SUCH AND SUCH AND SAID THE EXACT SAME THING.  UH, AND THEN…, AND THEN AFTERWARDS YOU KNOW AND IT'S…, IT'S A SHAME THEY DIDN'T DO IT, BUT THEY…, THEY SHOULD HAVE, I DON'T KNOW, I DON'T UNDERSTAND WHY THEY DIDN'T, BUT THEY SHOULD…, THEY SHOULD'VE TOLD HER PARENTS.

A:     YEAH.

Q:     AND THEY…, THEY…, THEY CHOSE NOT TO FOR SOME REASON, I DON'T KNOW, THAT'S GOT NOTHING TO DO WITH YOU…

A:     M-HMM.

Q:     …UH, BUT THEY CHOSE NOT TO FOR SOME REASON.  SO THEY DIDN'T EVEN TELL HER PARENTS, SO THEY JUST SENT HER HOME WITHOUT SAYING ANYTHING TO HER PARENTS…

A:     M-HMM.

Q:     …AND UH, WOULDN'T YOU KNOW WITHIN…, UH, JUST A…, A SHORT TIME OF BEING WITH DAD SHE STARTED COMPLAINING THAT IT WAS HURTING DOWN THERE AND UH, DIDN'T REALLY TALK A WHOLE LOT ABOUT IT TO 'EM, BUT EVENTUALLY…, UH, WHEN THEY WENT HOME THE FIRST THING

WHEN SHE WAS WITH HER MOM, PROBABLY I DON'T KNOW WITHIN 5 MINUTES OR SO OF BEING WITH HER MOM HER MOM ASKED HER.  DO YOU KNOW…, UH, WHEN SHE WAS SITTING IN HER MOM'S LAP HER MOM ASKED HER THE FIRST TIME WHAT HAPPENED AND…, AND SHE WOULDN'T ANSWER, SHE ACTUALLY KINDA RAN AWAY, HER MOM WENT UPSTAIRS INTO HER BEDROOM WITH HER, SHE'S GOT LIKE A ROCKING CHAIR IN THE BEDROOM.  SHE SITS IN THE ROCKING CHAIR WITH       IN HER LAP AND ASKS HER WHAT HAPPENED…

A:    M-HMM.

Q:    …AND I GOT TO TELL YOU WHAT HAPPENS NEXT IS KINDA HEART BREAKING TO ME, BUT YOU KNOW…

A:    OF COURSE.

Q:    …THE TRUTH…, THE TRUTH IS THE TRUTH.  UH, SHE ASKED HER AGAIN, WHAT'S GOING ON, YOU'RE SAYING IT HURTS DOWN THERE, WHY DOES IT HURT AND YOU KNOW WHAT HAPPENED,       PEE'D HER PANTS RIGHT THEN AND THERE, WET HERSELF, RELIEVED HER BLADDER, JUST LET IT GO AND STARTED CRYING MORE AND MORE AND SAID EXACTLY WHAT HAPPENED; SAID THAT YOU HAD TOUCHED HER DOWN THERE. AND HERE'S THE THING WHEN I HEARD THAT STORY I'M LIKE, MAN, THAT'S PRETTY…, THAT'S MESSED UP AND SO AND…, AND SO WE BRING HER IN FOR THE FORENSIC INTERVIEW AND WE TALK TO HER ABOUT IT AND WE ASK HER…

A:    M-HMM.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 171 OF 185

Q:     …AND BEFORE WE COULD EVEN START ASKING HER PRELIMINARY QUESTIONS DO YOU KNOW WHAT SHE DID?

A:     (NO VERBAL RESPONSE)

Q:     WE DIDN'T EVEN GET A CHANCE TO ASK HER BEFORE SHE STARTED SAYING, MR. ALI TOUCHED ME DOWN THERE.  SO WE BRING OUT…, WE'VE GOT DIAGRAMS YOU KNOW, WE'VE GOT THESE DIAGRAMS, CAUSE YOU DON'T…, YOU DON'T WANT…, YOU DON'T WANT A MISTAKE, (SHUFFLING PAPERS) YOU DON'T WANT TO MAKE A MISTAKE AND…, AND…, AND POINT TO THE WRONG PART OF THE BODY.  SO WE…, WHEN WE SAY DOWN THERE YOU KNOW WHAT DO YOU CALL IT AND SHE USES HER KID WORD WHATEVER SHE USES…

A:     M-HMM.

Q:     …BUT THEN WE SAY, HERE'S A MARKER AND HERE'S A DRAWING, MAKE SURE…, WE DON'T WANT TO BE CONFUSED HERE, WE DON'T WANT YOU TO BE SAYING MY…, MY POO-POO AND THAT MEANS YOUR ARM PIT, (CHUCKLE) YOU KNOW WHAT I MEAN…

A:     YEAH.

Q:     …ALL OF A SUDDEN SOMEBODY'S GETTING JAMMED UP OVER A ARMPIT…

A:     M-HMM.

Q:     …WHEN…, WHEN WE THINK POO-POO MEANS…, UH, ARM…, YOU KNOW VAGINA…

A:     M-HMM.

Q:      …WHATEVER.  SO THIS IS THE DRAWING THAT WE USED WITH HER WHEN WE DID THE INTERVIEW AND THIS IS EXACTLY WHERE SHE SAYS THAT YOU TOUCHED HER, THAT'S PRETTY UNAMBIGUOUS AND HERE'S THE THING TOO…

A:      OF COURSE.

Q:      …SHE WAS VERY CLEAR ABOUT WHAT PART OF YOUR BODY THAT SHE SAID YOU DID IT WITH AND UH, I GOT TO TELL YOU SHE DIDN'T SAY YOUR WATCH.

A:      I MEAN I…

Q:      AND SHE DIDN'T SAY YOUR…, YOUR WRIST EITHER AND…, AND…, AND THE THING IS AT NO POINT DID SHE…, YOU KNOW ASKED SO MANY DIFFERENT TIMES BY SO MANY DIFFERENT PEOPLE AND SHE JUST…, SHE SAID IT THE SAME EVERY TIME.

A:      M-HMM.

Q:      AND…, AND HERE'S…, HERE'S THE THING I HAVEN'T TOLD YOU YET AND THIS MIGHT MAKE A DIFFERENCE BECAUSE HERE'S THE THING, WHATEVER HAPPENED IT'S IN THE PAST…

A:      M-HMM.

Q:      …AND THE REALITY IS…, IS WE CAN'T CHANGE THE PAST AND IF THERE'S DNA IN THERE, MAN YOU CAN'T CHANGE THAT.

A:      M-HMM.

Q:      AND…, AND YOU CAN'T CHANGE YOUR DNA…

A:      M-HMM.

STATEMENT OF ALI AL-AWADI              DP14-0088487              PAGE 173 OF 185

Q:      …AND YOU CAN'T CHANGE WHATEVER SAMPLES ARE IN THE VILE DOWN

AT THE LABORATORY RIGHT NOW EITHER.

A:      OKAY.

Q:      THE LIQUID SUSPENSION OR THE SWAB, CAUSE THEY DO IT TWICE TO BE

THOROUGH.

A:      OKAY.

Q:      WE CAN'T CHANGE THAT AND…, AND…, AND STUFF THAT'S IN THE PAST

YOU KNOW WHAT I'VE MADE A LOT OF MISTAKES IN MY LIFE AND I'VE

DONE A LOT OF THINGS WRONG AND THERE'S THINGS THAT I'M NOT

PROUD OF AND THAT IF I COULD HIDE AND BORROW IT UNDERNEATH A

THOUSAND BRICKS OR A MILLION BRICKS…

A:      M-HMM.

Q:      …OR BURY YOU KNOW 50 FEET UNDER THE GROUND AND NEVER LET

ANYONE SEE IT AGAIN…

A:      M-HMM.

Q:      …OR NEVER LET IT SEE THE LIGHT OF DAY AND I WOULD DO IT, OKAY…

A:      M-HMM.

Q:      …MISTAKES I'VE MADE IN MY PAST, BUT THE TRUTH IS WE…, WE CAN'T

CHANGE THE PAST, WE CAN'T MAKE IT DISAPPEAR…

A:      (INAUDIBLE-UNSURE)

Q:      …AND IF SOMETHING HAPPENS, AS MUCH AS MAYBE WE WANT IT TO, WE

CAN'T UNDO SOMETHING THAT'S ALREADY BEEN DONE.

A:      YEAH. (CLEARING THROAT)

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 174 OF 185

Q:     UH, AND…, AND THE THING IS MISTAKES ARE UNIVERSAL, THERE'S NO ONE IN THE WORLD THAT HASN'T MADE A MISTAKE; THERE'S NO ONE IN THE WORLD THAT HASN'T DONE SOMETHING WRONG OR…, OR DONE SOMETHING THAT THEY SHOULDN'T HAVE DONE.

A:     M-HMM.

Q:     I MEAN PEOPLE UNIVERSALLY UNDERSTAND, I DID SOMETHING WRONG AND…, AND THE TRUTH IS WHEN WE DO SOMETHING WRONG I THINK PEOPLE ALSO UNIVERSALLY UNDERSTAND THE RIGHT THING TO DO IS TO DEAL WITH IT, BECAUSE ONCE WE DO SOMETHING WRONG AND WE CAN'T CHANGE IT, EVEN IF YOU'RE NOT…, EVEN IF NO ONE CATCHES YOU; LET'S SAY I DO SOME HORRIBLE THING AND IT'S EMBARRASSING TO ME, I KNOW PEOPLE WOULD BE UPSET WITH ME IF THEY FOUND OUT ABOUT IT AND I WANT TO KEEP IT HIDDEN.  AND LET'S SAY EVEN I…, I SUCCEED AND I KEEP IT HIDDEN AND NO ONE EVEN EVER KNOWS ABOUT IT, THE REALITY IS IS WHEN WE DO SOMETHING WRONG, EVEN IF NO ONE EVER KNOWS, IT STILL EATS AT US, IT STILL…

A:     OF COURSE.

Q:     …PICKS AT US, IT STILL AFFECTS WHO WE ARE, IT AFFECTS HOW WE THINK, IT AFFECTS WHAT WE DO IN THE FUTURE, IT AFFECTS WHETHER OR NOT WE'RE SUCCESSFUL IN ANYTHING WE DO DOWN THE ROAD, IF WE CAN'T DEAL WITH THINGS WE'VE DONE…

A:     M-HMM.

Q:      …IF WE'VE DONE THINGS THAT WE'RE NOT PROUD OF OR THAT WE'RE

        ASHAMED OF OR THAT WERE MISTAKES, WE CAN'T…, WE CAN'T MOVE ON

        AND BE YOU KNOW COMPLETE, WHOLE AND SUCCESSFUL PEOPLE DOWN

        THE ROAD IF WE NEVER DEAL WITH THAT.

A:      M-HMM.

Q:      AND SO THE IMPORTANT THING TO UNDERSTAND IS WHEN YOU MAKE A

        MISTAKE YOU'VE GOT TO DEAL WITH IT.

A:      M-HMM.

Q:      (CLEARING THROAT) AN AIRPLANE PILOT CAN'T BE FLYING THROUGH

        THE SKY AND HAVE AN ENGINE GO OUT AND JUST KINDA GO, NO, NO, NO,

        NO, WE'RE FINE…

A:      YEAH.

Q:      …I KNOW WE'RE ONLY…, WE'RE ONLY…, UH, 250 MORE MILES FROM…,

        UH, DES MOINES, WE…, WE'LL…, WE'LL MAKE IT, JUST SH-H-H, NO, NO,

        NO, THE ENGINE'S FINE, THE ENGINE'S FINE, WHAT'S GONNA HAPPEN TO

        THAT PILOT…

A:      HMM.

Q:      …IF HE DOES THAT, YOU SEE WHAT I'M SAYING?

A:      YEAH.

Q:      WHAT'S GONNA HAPPEN, HE'S GONNA CRASH AND BURN.

A:      M-HMM.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 176 OF 185

Q:    AND…, AND HIM AND EVERYONE ON THE PLANE'S PROBABLY GONNA DIE, BECAUSE YOU KNOW WHAT HE'S NOT TAKING ANY PROACTIVE STEPS TO DEAL WITH THE PROBLEM…

A:    M-HMM.

Q:    …FIRST ACKNOWLEDGE THE PROBLEM; SECOND, DEAL WITH THE PROBLEM AND THEN THIRD, SOLVE THE PROBLEM.  HE'S NOT…, HE'S NOT GOING THROUGH THAT CHAIN OF…, OF…, OF EVENTS, BECAUSE WHAT HAPPENS IS IT…, A NEW PROBLEM HAS COME UP, MAN AND YOU'VE GOT TO CONSTANTLY BE IN THE MOLD OF ACKNOWLEDGING WHAT THE PROBLEM IS, ADDRESSING IT, SOLVING THE PROBLEM AND LOOKING A…, AHEAD AND SEEING WHAT'S NEXT.

A:    M-HMM.

Q:    AND…, AND…, AND THE THING IS WHEN WE MAKE MISTAKES AND WE KEEP THEM IN THE PAST AND WE BURY THEM THEY ALWAYS COME BACK TO BITE US AND YOU CAN ASK ANY THERAPIST OR SOCIAL YOU KNOW PSYCHOLOGIST OR WHATEVER, THEY KNOW THAT…, UH, THE CONCEPT OF CONFESSION IS GOOD FOR THE SOUL IS THE ALMOST UNIVERSALLY RECOGNIZED CONCEPT IN THE SENSE OF WE CARRY ROU…, AROUND WEIGHT ON OUR SHOULDERS WHEN WE'VE DONE THINGS THAT WE FEEL BAD FOR AND WE DON'T EVER DEAL WITH IT.

A:    M-HMM.

Q:    AND SO THAT'S WHY YOU KNOW IT'S SUCH AN IMPORTANT THING TO REALIZE IS PEOPLE ALL MAKE MISTAKES, BUT NOT EVERYONE HAS THE

STATEMENT OF ALI AL-AWADI            DP14-0088487            PAGE 177 OF 185

COURAGE TO DEAL WITH IT, THAT'S WHY YOU SEE A LOT OF ALCOHOLICS WALKING AROUND; THAT'S WHY YOU SEE A LOT OF DYSFUNCTIONAL FAMILIES THAT DON'T TALK TO EACH OTHER OR…, OR YOU KNOW RELATIONSHIPS THAT BREAK APART, OKAY, IT'S BECAUSE SOMETIMES PEOPLE ARE TOO PRIDEFUL OR TOO FILLED WITH…, UH, UH, SOMETIMES WE'RE STUBBORN, SOMETIMES WE'RE TOO PRIDEFUL, SOMETIMES PEOPLE ARE…, ARE…, ARE JUST THINKING THAT THINGS ARE GONNA BE ALRIGHT WHEN THEY'RE NOT.

A:     M-HMM.

Q:     AND…, AND SO THE PROBLEM IS WHEN WE DON'T DEAL WITH OUR ISSUES THEY COME BACK AND GET US AND THEY…, AND MANIFEST ITSELF IN ALL KINDS OF DIFFERENT WAYS.  AND SO ALL I'M SAYING IS IS IF AT THE END OF THE DAY MY THOROUGH INVESTIGATION THAT'S JUST BARELY STARTED AND IT'S CERTAINLY GONNA CONTINUE…

A:     M-HMM.

Q:     …AND IT'S CERTAINLY GONNA COME WITH MORE INFORMATION.  I DON'T KNOW THAT THERE'S GONNA BE A CHILD IN THOSE CLASSES THAT YOU'VE SAT IN THAT WE'RE NOT GONNA HAVE A DETAILED FORENSIC INTERVIEW.

A:     OF COURSE.

Q:     AND WE'VE ALREADY DONE SEVERAL, THERE'S GONNA BE SEVERAL MORE.

A:     M-HMM.

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 178 OF 185

Q:     AND…, AND…, AND ASIDE FROM THAT THERE'S PHYSICAL EVIDENCE AND

        THERE'S…, I DIDN'T TELL YOU THIS EARLIER, BECAUSE I DON'T WANT

        YOU TO BE UPSET AND I DON'T WANT YOU TO THINK I'M…, I'M JUST

        MESSING WITH YOU, BUT THERE'S PHYSICAL INJURY TO HER…

A:     OKAY.

Q:     …THAT IS INDICATIVE OF PENETRATION.

A:     OKAY.

Q:     AND HERE'S THE THING WHEN WE SEE THAT IT CAN'T BE CHANGED.

A:     M-HMM.

Q:     IT DOES NOT GO AWAY AND IT CANNOT BE TAKEN BACK AND…, AND…,

        AND AT THE END OF THE DAY THERE'S ONE PERSON AND ONE PERSON

        ALONE THAT SHE'S SAYING DID THAT TO HER AND…, AND

        UNFORTUNATELY IT'S YOU.  NOW LET ME ASK YOU THIS, YOU SAID YOU

        WERE WEARING YOUR WATCH AND HER…, HER LEGS WERE AROUND IT.

A:     YEAH.

Q:     DO YOU THINK THAT IT'S POSSIBLE THAT YOUR WATCH CAUSED INJURIES

        TO THE INSIDE OF HER BODY?

A:     I MEAN I'M HONESTLY NOT SURE, THAT'S WHY I'M TELLING YOU GUYS

        THE TRUTH, IT WAS KINDA TURNED A LITTLE BIT BECAUSE MY WATCH

        ISN'T ALWAYS SUPER TIGHT ON MY WRIST.

Q:     YEAH.

A:     SO WHEN IT'S TURNED…, IT'S A PRETTY BULKY WATCH, I CAN SHOW YOU

        WHAT IT LOOKS LIKE.

STATEMENT OF ALI AL-AWADI              DP14-0088487        PAGE 179 OF 185

Q:      NO. (UNSURE)

A:      UH, DO YOU KNOW WHAT G SHOCKS ARE?

Q:      YEAH.

A:      SO THEY'RE…

Q:      WHAT COLOR IS IT?

A:      IT'S A BLACK ONE, IT'S PRETTY BULKY.

Q:      YEAH.

A:      AND…

Q:      BUT SEE TO GO…

A:      …I DON'T KNOW IF IT CAUSED ANY…

Q:      …THE SPECIFIC INJURIES THAT SHE HAS ARE DEFINITELY PENETRATION
        AND IT'S TO THINK OF A WATCH GOING THAT DEEP…

A:      M-HMM.

Q:      …TO CAUSE SOME OF THOSE INJURIES, UH, I JUST…

A:      BUT I'M…, I'M TELLING YOU GUYS…

Q:      …DON'T THINK IT COULD, BUT HERE'S THE THING WHEN I LOOK AT MY
        INVESTIGATION AND WHEN I LOOK AT THE FULL DEPTH OF THE FACTS
        AND EVIDENCE THAT I HAVE IT CLEARLY SHOWS THAT YOU DID AND I'M
        NOT ANGRY AT YOU FOR IT, BUT THE THING IS…, UH, DNA DON'T LIE,
        MAN AND…

A:      I KNOW THAT, BUT…

Q:      …AND…, AND THE THING IS THERE'S NO REASON TUGGING ON HER BELT
        WOULD CAUSE DNA TO TRANSFER, IT'S JUST NO REASON FOR IT.

A:    EVEN IF SHE TOUCHED MY HANDS AND THEN SHE TOUCHED HERSELF?

Q:    IT'S NOT…, IT'S NOT INDIRECT TRANSFER…

A:    BECAUSE I'M…, I'M…

Q:    …IT'S DIRECT TRANSFER, MAN.

A:    …I'M TELLING YOU GUYS EVERYTHING.

Q:    I'LL BE BACK IN JUST A SECOND, OKAY, JUST HANG IN THERE ONE SECOND FOR ME, I'LL BE RIGHT BACK, OKAY?

A:    ALRIGHT. (DOOR OPENS AND CLOSES)

(PAUSE)

Q:    (DOOR OPENS) ALRIGHT ALI, ONE OF THE THINGS I LIKE TO DO (DOOR CLOSES) JUST…, JUST LIKE TALKING TO ME IT'S TOTALLY VOLUNTARY, BUT ONE OF THE THINGS I'D LIKE TO DO IS GO AHEAD AND OBTAIN A DNA SAMPLE FROM YOU TODAY.

A:    M-HMM.

Q:    IS THAT SOMETHING THAT YOU'D BE WILLING TO DO FOR ME?

A:    UH, I WAS THINKING MAYBE I SHOULD TALK TO A LAWYER.

Q:    YEAH.

A:    I MEAN I'M TELLING YOU GUYS THE TRUTH AND…

Q:    OKAY, I…, I…, I DON'T BELIEVE THAT, I REALLY DO THINK THAT YOU DID, UH, MOLEST    YESTERDAY AND SO, UH, YOU KNOW WHAT YOU…, UH, YOU CERTAINLY HAVE THE RIGHT TO TALK TO AN ATTORNEY.

A:    M-HMM.

Q:    SO WE DON'T DO ANYMORE QUESTIONING AT THIS TIME, OKAY?

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 244 of 349 PageID #:
3608
Case 1:15-cr-00072-TWP-DML   Document 54-1   Filed 01/22/16   Page 182 of 185   PageID #: 375

A:    OKAY.

Q:    UH, I DO NEED TO TELL YOU THOUGH THAT YOU ARE UNDER ARREST FOR

       CHILD MOLEST, OKAY?

A:    SO I'M GOING TO PRISON?

Q:    UH, NO, YOU'RE GOING TO…, TO THE APC, IT'S THE ARRESTEE

       PROCESSING CENTER.  IT'S…, UH, IT'S…, UH, IT'S NOT PRISON, UH, BUT

       IT'S A…, IT'S A SECURED DETENTION FACILITY, SO YOU'LL BE GOING

       THERE TODAY, OKAY?

A:    AND AM I STAYING THERE OVERNIGHT OR…

Q:    UH…

A:    …WILL I GET TO CALL SOMEONE?

Q:    …YEAH, I WOULD EXPECT THAT YOU'LL BE THERE AT A MINIMUM OVER

       THE WEEKEND ABSOLUTELY.  UH, YOU WON'T HAVE AN INITIAL HEARING

       UNTIL AT THE EARLIEST MONDAY, MAYBE AS LATE AS TUESDAY, OKAY?

A:    OKAY.

Q:    SO…

A:    I'M TELLING YOU GUYS THE TRUTH.

Q:    …OKAY, WELL I REALLY DON'T BELIEVE YOU, IF I DID BELIEVE YOU I

       WOULDN'T BE ARRESTING YOU RIGHT NOW, I WANT YOU TO KNOW THAT,

       OKAY.

A:    WELL…, OF COURSE.

Q:    UH, DO YOU HAVE ANYTHING IN YOUR POCKETS OR ANYTHING THAT'S

       DANGEROUS OR ANYTHING THAT CAN HURT ME?

A:    I HAVE MY WALLET AND MY KEYS…

Q:    OKAY, GO AHEAD AND GRAB THAT OUT FOR ME.

A:    …THAT'S WHAT I GOT. (UNSURE)

Q:    I'M SURE THEY SEARCHED YOU BEFORE THEY BROUGHT YOU IN HERE, RIGHT?

A:    (NO VERBAL RESPONSE)

Q:    OKAY, ALRIGHT. (SOUNDS OF COINS AND KEYS DROPPING ON A TABLE) (CLEARING THROAT) ALRIGHT.  GO AHEAD AND STAND UP FOR ME.  UH, FACE THE WALL, UH, CAN YOU PUT YOUR HANDS ON THE WALL FOR ME, OKAY, SPREAD YOUR FEET REAL WIDE.

A:    M-HMM.

Q:    ALRIGHT, GO AHEAD AND HAVE A…, WHOA, LET ME CHECK…, DOUBLE CHECK YOUR POCKETS HERE.  GO AHEAD AND HAVE A SEAT RIGHT HERE AND KICK YOUR SHOES OFF FOR ME. (SHUFFLING PAPERS) (INAUDIBLE), BUT WE'LL DO IT NOW.  UH, LET ME SEE YOUR FOOT, PLEASE, THAT ONE RIGHT THERE.

A:    THIS ONE?

Q:    YEAH, YEAH, JUST…, I'LL TAKE IT IN JUST A SECOND HERE. (INAUDIBLE-UNSURE) PEOPLE PUT STUFF ALL OVER, ALL KINDS OF PLACES, BUT WE GOT TO CHECK, OKAY.  ALRIGHT, SO THE NEXT STEP IS…, UH, THE PROSECUTORS OFFICE WILL REVIEW EVERYTHING THAT I HAVE AND DECIDE IF THEY WANT TO IN FACT FILE CRIMINAL CHARGES AGAINST YOU AND THEN AFTER THAT, UH, IT'LL BE IN THE HANDS OF THE COURT.

STATEMENT OF ALI AL-AWADI      DP14-0088487      PAGE 183 OF 185

Q:      UH, THERE'S ANY NUMBER OF RESOLUTIONS THAT COULD TAKE PLACE, YOU COULD EVENTUALLY COME TO AN AGREEMENT WITH THE PROSECUTORS OFFICE WHERE YOU PLEAD GUILTY FOR WHATEVER DETERMINED SENTENCE THAT THEY…, THEY WANT OR YOU COULD…, UH, TAKE IT TO A TRIAL EITHER IN FRONT OF A JUDGE OR IN FRONT OF A JURY IF CHARGES WERE FILED BY THE PROSECUTORS OFFICE, WHICH…

A:      OF COURSE.

Q:      …HASN'T HAPPENED YET, (CLEARING THROAT) UH, BUT…, UH, BUT THAT'S SORT OF THE COURSE OF THINGS, OKAY.  SO, UH, PRISON IS…, IS…, IS FOR PEOPLE WHO'VE BEEN CONVICTED…

A:      M-HMM.

Q:      …SO AT THIS POINT YOU'RE…, YOU'RE LOOKING AT GOING TO THE APC AND POTENTIALLY TO JAIL, BUT THOSE ARE MORE TEMPORARY OF A…, OF A FACILITY, NOT…, NOT SOMETHING THAT YOU'D SPEND 20 YEARS IN, YOU KNOW WHAT I'M SAYING?

A:      YEAH.

Q:      SO, ALRIGHT.  WELL…

A:      AND SO I…, I WILL GET A PHONE CALL WHENEVER I…?

Q:      NO, NOT HERE, BUT…, UH, BUT DOWN THERE YOU'LL HAVE TO REGISTER WITH THEM, DO A LITTLE PRE-ADMITTANCE INTERVIEW, GET SEARCHED, ALL WHATEVER THEY GOT TO DO AND THEN AFTER THAT THEY'LL GIVE YOU A SPECIAL WRISTBAND, IF THEY STILL DO IT THE SAME WAY THEY USED TO; THEY'LL GIVE YOU A SPECIAL WRISTBAND AND THAT

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 184 OF 185

WRISTBAND MEANS THAT YOU'VE CLEARED AND YOU CAN MAKE PHONE CALLS, THEN YOU CAN USE THE PHONES THERE TO…, TO MAKE A CALL, SO. GO AHEAD AND HAVE A SEAT AND UH, AND I'LL…, UH, I'LL BE WITH YOU AS SOON AS WE GET SOMEBODY HERE TO TAKE YOU DOWN THERE, OKAY?

A:     OKAY.

Q:     ALRIGHT. (DOOR OPENS AND CLOSES)

(PAUSE)

A:     (SNIFFING) (CLEARING THROAT)

Q:     (DOOR OPENS) ALRIGHT, GO AHEAD AND STAND UP FOR ME, MAN. HE'S GONNA SEARCH YOU, JUST DO WHAT THIS GENTLEMAN SAYS, OKAY.

OFFICER:     TURN AROUND BOSS.

Q:     (INAUDIBLE-UNSURE) (CUFFS CLICKING)

OFFICER:     SPREAD YOUR LEGS FOR ME, MAN. ALRIGHT, TURN AROUND. LIFT THAT LEG. (INAUDIBLE-UNSURE)

Q:     PASSED UP RECYCLE BOX AND EVERYTHING, RIGHT. (DOOR CLOSES)

END OF STATEMENT.

CYW
6-19-2015

STATEMENT OF ALI AL-AWADI          DP14-0088487          PAGE 185 OF 185

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,    )
                                )
            Plaintiff,     )
                                )
   v.                   ) Cause No. 1 1:15-cr-00072-TWP-DML
                                )
ALI AL-AWADI,              )
                                )
          Defendant.    )

### Government's Second Notice of Intent to Use Evidence under F.R.E. 404

The United States of America, by counsel, Josh J. Minkler, United States Attorney for the Southern District of Indiana, Bradley P. Shepard and Kristina Korobov, Assistant United States Attorneys, hereby files its, notice of intent to introduce evidence pursuant to Federal Rules of Evidence 404(b).

### Factual Background

The Defendant, at the time of the allegations, was an employee of the Children's Choice (Bright Horizons) Learning Center, which was a day care.  One of the Defendant's supervisors was Heidi Conces.  Approximately two (2) months prior to the allegations, Conces had counselled the Defendant regarding physical contact with children.

- Conces told police (during their investigation into the molesting allegations regarding Minor Victim One) that an employee had come to Conces to express concern that the Defendant "took preference" with the girls, letting the girls sit in his lap and taking the girls to the bathroom, even when a female employee offered to do it for him.

- Conces had seen the Defendant pick up a female child who was about 5 years old. Conces was concerned that the Defendant was holding the child with the girl's legs wrapped around the Defendant.

- Conces told the Defendant that the child was five (5) years old and that he did not need to pick her up and that it was not appropriate.

- Conces counselled the Defendant on two (2) occasions that he should not pick up the children who could walk on their own.

- Conces was also aware that another employee, Cathie Williamson, had talked with the Defendant, telling him that the girls should not sit in his lap and that Williamson would take the girls to the bathroom for him.

- Conces said that the Defendant was receptive to this counselling and said that it was okay.

Another co-worker, Cathie Williamson, told police (during their investigation into the molesting allegations regarding Minor Victim One) that she had also spoken with the Defendant regarding his physical contact with children.

- Williamson indicated that there were parents that had been uncomfortable with the Defendant.

- Williamson stated that she advised the Defendant not to pick up the girls and not to put them in his lap during "circle time."

- Williamson indicated that she also offered to change the girls so that the Defendant would not have to do it.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 250 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 83 Filed 04/22/16 Page 3 of 5 PageID #:
3614

Employees of the day care were prohibited from accessing cell phones in the classrooms and were also forbidden from taking any photos of the children with personal devices (Exhibit A: p. 23 and p. 28 of Bright Horizons Employee Handbook).

- At the time of the Defendant's arrest, his cell phone was seized and subsequently examined.  It was determined that

  - the defendant had three (3) photographs on his cell phone that showed him posing with Minor Victim One in photos that he had taken with his phone's camera, and

  - photos of Minor Victim One's genital area were found on the Defendant's cell phone and were determined to have been taken with his cell phone.


**<u>Proffered Evidence</u>**

The Government seeks to admit evidence that the Defendant had received instruction regarding the proper level of physical contact with female children at the day care.

- Testimony from Heidi Conces that she, as a supervisor, had directed the Defendant that he should not pick-up and / or carry children who could walk.

- Testimony from Cathie Williamson that she, as a co-worker, had suggested to the Defendant that the children not sit in his lap and that Williamson offered to take female children to the restroom so that the Defendant would not have to do so.

- Statements by the Defendant in his interview with Det. Eli McAlister that he had been cautioned about physically picking up the female children.

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 251 of 349 PageID #:
3615
Case 1:15-cr-00072-TWP-DML   Document 88   Filed 04/22/16   Page 4 of 9 PageID #: 2682

The Government also seeks to admit evidence that the day care prohibited employees
from taking photographs of the children with personal devices. The Government seeks to admit
evidence that, per day care policy, "[p]ersonal devices are not to be used or checked while you
are working and must be kept in a bag, locker, desk, or other location that is not accessed during
work time." (p. 28)

The Government is *not* seeking to admit any evidence that either Conces or Williamson
or any of the day care parents had concerns about the Defendant *unless* counsel for the
Defendant questions the motivation of these employees in speaking to the Defendant.

### Legal Basis

The evidence of these directives and advice provided to the Defendant is admissible
without resort to Fed. R. Crim. P. 404(b).  If, however, counsel would question the rationale for
Conces and Williamson talking to the Defendant, the Government would seek to admit evidence
from those employees as to their rationale in speaking to him (e.g. their specific concerns and /
or observations that gave rise to the concerns).  Offering evidence that policies existed and that
the Defendant had received direction and guidance regarding the physical handling of children
does not require a 404(b) analysis, as there is no "prior bad act" that the Government is seeking
to introduce; however, if this Court were to find that this evidence is subject to Fed. R. Crim. P.
404(b), there are non-propensity uses for the evidence. In *United States v. Gomez*, the Seventh
Circuit adopted "a more straightforward rules-based approach," which is summarized as follows:

> [T]o overcome an opponent's objection to the introduction of other-act evidence,
> the proponent of the evidence must first establish that the other act is relevant to a
> specific purpose other than the person's character or propensity to behave in a
> certain way. *See* Fed.R.Evid. 401, 402, 404(b). Other-act evidence need not be
> excluded whenever a propensity inference can be drawn. But its relevance to
> "another purpose" must be established through a chain of reasoning that does not

rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case. If the proponent can make this initial showing, the district court must in every case assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great. The court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.

*Gomez,* 763 F.3d 845*,* 853, 860 (7th Cir. 2014).

### *Absence of Accident / Mistake*

The evidence offered by the Government will be used to show the defendant's absence of mistake / lack of accident in creating the images of Minor Victim's One's vagina or in touching Minor Victim One in such a way as to create the images in question.

In the Defendant's statements to police and to day care personnel, he claimed that he had picked up Minor Victim One and that Minor Victim One had sat on his lap. In a probable cause affidavit, Det. Eli McAlister wrote the following, under oath, regarding his interview with the Defendant:

He then said it was time to take a nap and Mia got up and sat in his lap. He told her to sit back down and take a nap, but she wasn't listening. He eventually picked her up to put her down for nap and she "locked" her leg around his arm. Her legs were around his G-shock watch as well and he was panicking a little because his arm was against her "private area." He told her to get off, but she wasn't listening, so he had to maneuver his arm out of there. Her legs were wrapped around his arm for about ten seconds. All of the kids thought it was a joke and playing. Mia thought it was a joke as well and she kept trying to get in his lap.

After Ali got his left arm out from between Mia's legs, Mia kept trying to put his arm back in between her legs. Mia said, "Give me your arm. Give me your arm." In response, Ali stuck his right arm out to her. She then grabbed his arm, opened her legs, and tried to put his arm between her legs again. Kids do like to "experiment" at that age and Ali believes she just liked how it felt. Ali thinks Mia was experimenting sexually with his arm because she wanted it right there again. Ali thought it was normal and she didn't complain that it hurt or anything. After that, Ali finally got up and let her take a nap. During the rest of the time he was in the room, Ali saw her turn over a couple of times, but she seemed okay.

*Probable Cause Affidavit, August 26, 2014, p. 15*

When the Defendant was told that Minor Victim One's clothing was being tested for DNA evidence, the Defendant added the following information to his interview with Det. McAlister:

> Mia told him she had new panties as he was getting onto the ground in order to lie down next to her when he first went into the room on August 21, 2014. He said, "That's nice, Mia" and then went ahead and laid down next to Mia, even though he was uncomfortable talking about her underwear with her. She was trying to show him her panties by lifting up her shirt a little, but Ali told her not to and said, "No thank you, Mia." He then asked why her pants were so loose and asked where her belt was. As he asked about her loose pants, he grabbed her pants several inches down from the waistband between two fingers and shook them to show they were loose. He also put his fingers on the waistband of her pants, with one finger inside the top edge of her pants, in order to show how loose her pants were. Mia was lying down next to him when he grabbed her pants and shook them. Mia was wearing a pair of dark blue jean pants at the time. Ali asked her where her belt was and she told him her father forgot to put it on her that morning.
>
> He forgot to tell me earlier in the interview, but he sometimes tickles the kids in the belly area because that's where they are the most ticklish. Ali tickled Ethan and Mia during nap time on August 21, 2014. He tickled them on the stomach with his hand while they he was lying next to them on the ground playing for about half an hour. Mia's shirt was up a little bit and he just tickled their bellies. It was just innocent play, but that might account for any of Ali's DNA that might be in or on Mia's body.

*Probable Cause Affidavit, August 26, 2014, p. 15*

The Defendant's proffered explanations – attempts to offer innocent explanations for his behavior - give rise to the need to admit the evidence that Defendant had received instruction and suggestions regarding the proper care of the children at the day care. The Government also should be able to present evidence that policies of the day care prohibited any personal photography of the children at all, such that there would be no reason for the Defendant to be taking photos with his cell phone for any innocent purpose.

This evidence showing of absence of mistake or lack of accident is derived from a propensity-free chain of reasoning. There is no attempted use of the evidence to say that because the Defendant had been counseled on the proper physical care of the children that the Defendant is more likely to have created child pornography of Minor Victim One. As a result the chain from the proffered evidence to the proffered use has no propensity use in it and is therefore proper.

The final analysis is under Rule 403, is whether the probative value of the molest evidence substantially outweighed by the danger of unfair prejudice. "Unfair prejudice ... means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403, *cited approvingly in Old Chief v. United States*, 519 U.S. 172, 184−85 (1997).

In this matter, there is nothing unfairly prejudicial about the evidence that specific rules existed regarding the use of cell phones and taking photographs at the day care and that the Defendant had been notified that he should not have certain types of contact with the children at the day care. Given that the Seventh Circuit has repeatedly held that evidence of a *prior molest* is not more prejudicial than probative. {see *United States v. Russell,* 662 F.3d 831, 847−48 (7th Cir.2011) (prior instances of inappropriate touching, by establishing defendant's sexual interest in his minor daughter, were probative of his motive to induce his daughter to create sexually explicit photographs in violation of section 2251(a)); *United States v. Hawpetoss*, 478 F.3d 82, 824-827 (7th Cir. 2007)(admitting evidence under rule 403 of molestation of two uncharged minor victims); *United States v. Roux*, 715 F.3d 1019, 1024 (7th Cir. 2013)}, it cannot be argued that the evidence that the government seeks to admit rises to the level of unfairly prejudicial.

WHEREFORE the Government requests this Court issue a ruling that the evidence of the day care policies and the specific counseling provided to the defendant is admissible in the Government's case in chief.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

8

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 256 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 89 Filed 04/22/16 Page 9 of 9 PageID #:
3620

By:  <u> s/ Bradley P. Shepard         </u>
Bradley P. Shepard
Assistant United States Attorney


<u>s/ Kristina M. Korobov         </u>
Kristina M. Korobov
Assistant United States Attorney

When supervising children in your care, you are required to:

- Keep children within sight and sound supervision at all times.

- Maintain employee/child ratios set by Bright Horizons and licensing at all times. Never leave a child unattended.

- Be aware of the number of children in your care at all times, and implement transition tracking and roll-call procedures.

- Learn and implement Bright Horizons policies and procedures regarding feeding, diapering, and toileting children.

- Secure children's health and safety by learning, following, and implementing individualized feeding, nutrition, allergies, medication, and hygiene requirements and guidelines.

- Follow all Bright Horizons, location, and licensing health and safety requirements and guidelines.

## Telephone and Electronic Devices

Telephones and electronic devices are provided by Bright Horizons to support communication and business needs. The telephone land line is available for business use and in case of an emergency. If you receive a personal call while at work on the location telephone, a message will be taken or coverage will be provided in the case of an emergency. In order to assure quality and customer service, Bright Horizons may monitor and/or record calls made or received using Bright Horizons equipment or technology. By signing the handbook acknowledgment statement, you acknowledge and consent to this practice.

Personal phone calls or text messages are not allowed while you are caring for children or if they interfere with your job performance. Personal devices are not to be used or checked while you are working and must be kept in a bag, locker, desk, or other location that is not accessed during work time. While working, you are not permitted to use personal cellular telephones or devices to make or receive calls, send or receive text messages, or in lieu of a clock or watch. If working in a center or school, you are not permitted to send or receive text messages to/from families regarding children in your care.



## Training

Bright Horizons provides training programs to support your professional growth. In our centers and schools we also provide special training programs for safety and health procedures that meet state and national regulations. You are strongly encouraged to participate in continuing development opportunities and to provide documentation of this training for your training record.

For center and school employees, it is your responsibility to obtain the required training hours established by your state. In addition, in some states Bright Horizons requires training that exceeds the state requirements. If you are required by licensing regulations or your supervisor to attend or participate in a course, workshop, meeting, or training program, your time will be considered hours worked and will be paid. Your attendance or participation in voluntary programs is unpaid and will not be considered as time worked, unless the program occurs during your normal working hours. Please refer to the *About Your Pay: Training Pay* section for more information.



## Personnel Records

Each location maintains personnel records for employees to document employment information and to meet licensing and government requirements.

Personnel files are the property of Bright Horizons. Upon request, you may view the contents of your file with your supervisor. If you wish to obtain a copy of a document from your personnel file, please ask your supervisor. Original documents, unless otherwise required by state law, will remain the property of Bright Horizons.

## Photography

As part of our curriculum, employees in our centers and schools use photography of children in our care to document and display children engaged in learning. These photographs are the sole property of Bright Horizons and are considered confidential. Images of children in our care must not be reproduced, posted on the Internet, taken or sent via a personal mobile communications device, or distributed.

## Positive Guidance

Our guidelines for positive guidance promote basic respect for children and create a supportive atmosphere where young children can thrive. Positive guidance encompasses all the actions taken by teachers to develop self-fulfilling, productive, and socially acceptable behaviors in children. Development is viewed as a growth process, with each age and stage having its own characteristics, its own challenges, and needs. Caregivers are required to follow these standards:

- Set realistic expectations for young children's behavior
- Create a "yes" environment that encourages children's positive behavior
- Model appropriate behavior
- Encourage children's efforts to build feelings of self-worth
- Give children alternatives to make positive choices
- Use natural and logical consequences to motivate children to make positive decisions about their behavior
- Encourage behaviors such as cooperating, helping, negotiating, and problem-solving

It is inappropriate to discipline a child using punishment that is inconsistent with the principles of positive guidance. In particular, the following uses of punishment are absolutely prohibited and may result in progressive counseling up to and including immediate termination of employment:

- Corporal punishment, including spanking
- Shaking, jerking, squeezing, or physically indicating disapproval
- Shaming or using humiliation, harsh/inappropriate tone of voice, or verbal abuse
- Labeling ("bad" girl or boy) or otherwise implying that the child, rather than the behavior, is the problem
- Using bribes, false threats, or false choices
- Denial of food or special activities or events as a form of punishment; or force-feeding a child
- Retaliating or doing to the child what he or she did to someone else
- Punishment for soiling, wetting, or not using the toilet

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 12/12/16   Page 259 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML   Document 89   Filed 04/22/16   Page 1 of 3 PageID #:
3623

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1 1:15-cr-00072-TWP-DML |
| | ) |
| ALI AL-AWADI, | ) |
| | ) |
| Defendant. | ) |

### Government's Notice of Intent to
### Use Evidence under F.R.E. 801 and F.R.E. 803

The United States of America, by counsel, Josh J. Minkler, United States Attorney for the

Southern District of Indiana, Bradley P. Shepard and Kristina Korobov, Assistant United States

Attorneys, hereby files its Notice of Intent to Introduce Evidence pursuant to the **Federal Rules**

**of Evidence, Rules 801 and 803.**

### Proffered Evidence and Relevant Rules

On the day in question in this case, August 21, 2014, Minor Victim One was a student at

the Children's Choice Learning Center and was four (4) years old.  On this day, Minor Victim

One made statements to day care personnel and to her parents.  The Government seeks to admit

into evidence the following statements, pursuant to the enumerated Federal Rules of Evidence:

1) On August 21, 2014, the Defendant had been watching Minor Victim One's class during

the lunch hour for the regular teacher.  Minor Victim One made statements to Tyria

Graham.  Within the hour after the Defendant left Minor Victim One's classroom and

after going to the restroom, Minor Victim One told Graham that it hurt when she peed

because "Mr. Ali" touched it all the way and it hurts really bad.  When asked where it

hurt, Minor Victim One told Graham "it hurts" and pointed to her "private (Graham's term)."  **F.R.E. 803(1), 803(2), 803(3) and 803(4).**

2) After Minor Victim One told Graham what had happened, about one hour later, Graham brought the Defendant into the room with Minor Victim One.  The Defendant sat next to Minor Victim One on the floor.  Tyria told the child to tell the Defendant what had happened.  Minor Victim One said that "Mr. Ali" put his finger all the way in her down there and it hurt (words of Graham).  The Defendant responded saying loudly "(Child's name)! No thank you.  No thank you!"  Defendant picked the child up and placed her in his lap, saying "(her name)! I didn't do that."  When Graham asked Minor Victim One if she was telling the truth or a lie, the child simply said "Miss Tyria" and shook her head.  **F.R.E. 801** (statements not being offered for the truth of the matter, but to show the effect on the listener (the Defendant) and to put his responses into context, including his behavior in putting the child in his lap).

3) Minor Victim One's father picked her up from the day care on August 21, 2014.  She began saying that her "tito" (word used by child for vagina) hurt.  She cried while in a restaurant restroom at dinner time, and while going to the bathroom, said that it hurt her vagina.  **F.R.E. 803(1), 803(3), and 803(4).**

4) On the early evening on August 21, 2014, the mother of Minor Victim One asked Minor Victim One why it was hurting "down there."  Minor Victim One began crying and ran upstairs without answering.  The mother went upstairs and had the child sit in her lap.  She asked Minor Victim One what was going on and the child responded "No, no, no Mommy!"  The child then urinated all over herself and her mother while sitting in her mother's lap.  The mother again asked what was wrong and Minor Victim One told her

mother that "Mr. Ali put his fingers in my Tito (word used by child for vagina)."  Minor

Victim One told her mother that it happened during nap time and that she told Ms. Tyria

that it hurt.  After making these statements, the mother took the child to a hospital.

**F.R.E. 803(1), 803(2), 803(3), and 803(4).**


WHEREFORE the Government requests this Court issue a ruling that the

statements of Minor Victim One to Tyria Graham, to Minor Victim One's father, and to

Minor Victim One's mother - all made on August 21, 2014 - are admissible in the

Government's case in chief.


Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:  s/ Bradley P. Shepard
Bradley P. Shepard
Assistant United States Attorney

s/ Kristina M. Korobov
Kristina M. Korobov
Assistant United States Attorney

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 262 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 61 Filed 04/25/16 Page 1 of 1 PageID #:
3626

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:15-cr-00072-TWP-DML |
| | ) | |
| | ) | |
| ALI AL-AWADI, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>ORDER</u>**

This matter is before the Court on the United States' Motion to Withdraw,

Docket Number 54 and the Court being duly advised, now grants the motion.

It is hereby ORDERED that the Clerk of Court show this filing as WITHDRAWN.

IT IS SO ORDERED: 1/25/2016

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to all registered counsel via electronic notification.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 02/05/16 Page 1 of 8 PageID #:
Case 1:15-cr-00072-TWP-DML Document 174 Filed 02/05/16 Page 268 of 349 PageID #:
3627

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:15-cr-00072-TWP-DML |
| | ) | |
| ALI AL-AWADI, | ) | |
| | ) | |
| Defendant. | ) | |

**Government's Supplemental Brief in Support of its Motion to Admit
Evidence Pursuant Rule 414**

The United States of America, by Josh J. Minkler, United States Attorney, and Bradley P.

Shepard and Kristina M. Korobov, Assistant United States Attorneys, hereby file this

supplemental brief in support of the Government's notice of intent to admit evidence of the

alleged molest of Victim One by the defendant.

**Evidence sought for Admission**

The Government seeks to introduce in its case in chief evidence of (1) Victim One's

multiple statements that the defendant molested her and caused her pain in her vagina; (2) the

defendant's statements in response to accusations of the molest; (3) the medical examination and

findings of Victim One; and (4) the DNA evidence recovered from the inside crotch of Victim

One's underwear.

**Law**

Defendant is charged with four counts of production of child pornography and four

counts of attempted production of child pornography in violation of 18 U.S.C. § 2251(a)&(e).

Title 18 U.S.C. § 2251(a) has the following elements:

Case 1:15-cr-00072-TWP-DML Document 149-1 Filed 12/12/16 Page 264 of 349 PageID #:
3628
Case 1:15-cr-00072-TWP-DML Document 74 Filed 02/05/16 Page 2 of 8 PageID #:418

1.      At the time Victim One was under the age of eighteen years; and

2.      The defendant, for the purpose of producing a visual depiction of   such conduct employed, used, persuaded, and/or coerced Victim One to take part in sexually explicit conduct;

3.      The visual depiction was produced using materials that had been mailed, shipped, transported across state lines or in foreign commerce.

Seventh Cir. Pattern Instruction 18 U.S.C. § 2251(a).  Title 18 U.S.C. § 2251(a)&(e) has the

following elements:

1.      That the Defendant intended to employ, use, persuade, induce, entice or coerce Victim One to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct;

2.      That the Defendant engaged in a purposeful act, that under the circumstances as he believed them to be, amounted to a substantial step towards the commission of that crime and strongly corroborated his criminal intent;

3.      That the visual depiction would have been produced using  materials that had been mailed, shipped or transported in interstate and foreign commerce.

18 U.S.C. § 2251(a) &(e); Seventh Cir. Pattern Instruction 18 U.S.C. § 2251(a), 4.01, & 4.09.

For purposes of this motion, it is critically important to remember that the crime

prohibited in Section 2251(a) is not the production of the image but the use of a child. According

to the statute, the conduct (*actus reus*) that a defendant must engage in in order to commit the

substantive offense is the employment, use, persuasion, or coercion of a minor to take part in

sexually explicit conduct.  If the defendant engages in this conduct with the requisite mental state

(*mens rea*) (*i.e.*, for the purpose of producing a visual depiction of the conduct), he has

committed the substantive offense whether or not any visual depiction is actually produced.  This

concept is illustrated by *United States v. Buculei*, 262 F.3d 322, 325 (4th Cir. 2001), a case in

which the 38-year-old defendant, having traveled from New York to Maryland, brought the 14-

year-old Maryland girl whom he had met online to a motel room, placed a tape inside a camera,

positioned the camera facing the bed and turned it on, gave the girl an alcoholic drink, and then

engaged sexual acts with her. Ultimately, no child pornography video was made because Buculei failed to fully rewind the videotape. *Id*. at 325-326. Though no visual depiction was produced, the Fourth Circuit upheld Buculei's conviction for commission of the substantive offense. "That Buculei was unsuccessful in his attempt to actually produce a visual depiction of sexually explicit conduct, with [the minor] as its star, does not, therefore, require his acquittal on Count Two, that he violated § 2251(a). Assuming the jurisdictional commerce requirement was satisfied, *see infra*, the federal crime charged in Count Two was complete when Buculei induced [the minor] into sexually explicit conduct for the purpose of producing a visual depiction thereof." *Id*. at 328.

Based upon discussions with defense counsel, the main contested issue in this case is did the defendant use Victim One for the purpose of producing a depiction of sexually explicit conduct on the day in question.   That is what the Government must prove beyond a reasonable doubt.

### The Proffered Evidence is Direct Evidence of Elements of the Crime

Evidence is direct when it "tend[s] to prove the elements of the offense . . . actually charged."  *Id*; *see, e.g.*, *United States v. Miller*, 673 F.3d 688 (7th Cir. 2012) (holding that evidence of defendant's prior possession of a gun was admissible as direct evidence that the defendant possessed the same gun on the date charged); *United States v. McKibbins*, 656 F.3d 707 (7th Cir. 2011) (determining that it was not an abuse of discretion for the district court to admit child pornography and profile pictures as direct evidence of an obstruction charge).

All four of the proffered pieces of evidence are direct evidence of two critically important things the Government must prove.  First, that it was the defendant who committed the crime. Victim One's identifications of the defendant both orally to multiple Government witnesses and

Case 3:15-cr-00072-TWP-DML Document 142-1 Filed 12/12/16 Page 266 of 349 PageID #:
3630
Case 1:15-cr-00072-TWP-DML Document 74 Filed 02/05/16 Page 4 of 8 PageID #420

recorded in the Medical records and the DNA evidence are all evidence that is was the defendant
who committee the charged crime.  The medical records and the DNA evidence also corroborate
Victim One's account of the event.  Further the medical records, and DNA evidence also attack
the veracity of the defendant's version of events as relayed in his multiple statements;
specifically that Victim One was possibly hurt by his watch, or that Victim One's jeans or
underwear never were pulled down or aside.

Secondly, all four categories are evidence that Victim One was used *for the purpose of
producing a depiction of sexually explicit conduct*.  Here the instance of the molest, and the
corroborating evidence, are direct evidence of *why the image was produced*.  It proves a sexual
interest and attraction to Victim One, which resulted in the production of the visual depictions.
In other words, it not only proves the defendant's motive, *but an element of the crime*.  Therefore
the evidence is direct evidence of the central issues in this case.  Accordingly, subject to Rule
403 (see below), it is admissible without resort to Rule 414.

### The Evidence is also Admissible Pursuant to Rule 414

FRE 414(a) states "[i]n a criminal case in which the defendant is accused of child
molestation, the court may admit evidence that the defendant committed any other child
molestation.  The evidence may be considered on any matter to which it is relevant."  Child
molestation includes "any conduct prohibited by 18 U.S.C. chapter 110 … [and] contact between
any part of the defendant's body … and a child's genitals …"  FRE 414(d)(2)(B)&(C).

The charged offenses are crimes under 18 U.S.C. chapter 110 so are child molestation
offenses pursuant to FRE 414(d)(2)(B).  The proffered molest evidence concerns contact with the
defendant's body and Victim One's genitals so is a child molest offense pursuant to FRE
414(d)(2)(C).  Therefore FRE 414 applies.

FRE 414 constitutes an exception to the rule that evidence of prior bad acts is inadmissible to show a defendant's propensity to commit the offense charged. *See United States v. Rogers*, 587 F.3d 816, 822-23 (7th Cir. 2009) (discussing analogous Rule 413). FREs 413 and 414 effectively override the propensity bar in rule 404(a)(1) in sexual assault cases. *United States v. Stokes*, 726 F.3d 880,896 (7th Cir. 2013).

The Court must still employ FRE 403. Rule 403 requires the exclusion of relevant evidence when its "probative value is *substantially* outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403 (emphasis added). "Unfair prejudice ... means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403, *cited approvingly in Old Chief v. United States*, 519 U.S. 172, 184−85 (1997). FREs 413 & 414 hold that any possible propensity inference does not constitute unfair prejudice as contemplated by FRE 403. *Rogers*, 587 F.3d at 822 ("Because Rule 413 identifies this propensity inference as proper, the chance that the jury will rely on that inference can no longer be labeled as "unfair" for purposes of the Rule 403 analysis.")

In analyzing the proffered evidence, there is nothing about the evidence that would cause a decision on an improper basis. Indeed while at argument defense counsel repeatedly referred to the evidence as graphic, but when pressed by the Court as to what he was referring, counsel only responded concerns about redness in Victim One's hymen. This would not substantially outweigh the probative value of the evidence.

As discussed above, the main issue to be tried in the case is what was the purpose for producing the visual depictions. As the proffered evidence goes to that specific issue, the evidence's probative value is high. *See United States v. Brown*, 151 Fed.Appx. 286 , 288 (4th

Cir. 2005) (noting in a FRE 404(b) analysis that the probative value of evidence on a contested issue is high).

The Government has not found a case in the Seventh Circuit employing a 414/403 analysis where the two child molest incidents were contemporaneous as they are here. There have been multiple instances where evidence of a prior child molest offense was admitted after a 403 balancing as relevant and not overly prejudicial. *United States v. Hawpetoss*, 478 F.3d 82, 824-827 (7th Cir. 2007)(admitting evidence under rule 403 of molestation of two uncharged minor victims; *United States v. Foley*, 740 F.3d 1079 (7th Cir. 2014) (admitting evidence of a molest which occurred seven years prior to the charged instance); ); *United States v. Roux*, 715 F.3d 1019, 1024 (7th Cir. 2013)(admitting pursuant to the less generous 404(b) and 403 analysis evidence of molest of two uncharged victims as evidence of defendant's intent to produce child pornography of a charged victim). Based upon these cases, evidence of a contemporaneous molest does not substantially outweigh the probative value of the proffered evidence.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:   s/ Bradley P. Shepard
      Bradley P. Shepard
      Assistant United States Attorney

      s/ Kristina M. Korobov
      Kristina M. Korobov
      Assistant United States Attorney

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 269 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 74 Filed 02/05/16 Page 7 of 8 PageID 423
3633

## Certificate of Service

I hereby certify that on February 5, 2015, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF system for filing, which will send a notification of such filing to the following:

Ross Thomas

/s/ Bradley P. Shepard
Bradley P. Shepard

Case 1:15-cr-00072-TWP-DML Document 74 Filed 02/05/16 Page 8 of 8 PageID #: 424

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Cause No. 1:15-cr-00072-TWP-DML |
| ALI AL-AWADI, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S EXHIBIT LIST

The United States of America, by Josh J. Minkler, United States of America, and Bradley

P. Shepard and Kristina Korobov, Assistant United States Attorneys, hereby file this Exhibit

List.

| Exhibit | Description |
|---|---|
| 1 | Picture of Day Care (outside) |
| 2 | Picture of Classroom from door |
| 3 | Picture of Victim One and D. |
| 4 | Blanket |
| 5 | Underwear |
| 5A | Picture of Underwear |
| 6 | Jeans |
| 6A | Picture of Jeans |
| 7 | imgcache.0_embedded_329.jpg |

| 8 | imgcache.0_embedded_330.jpg |
|---|---|
| 9 | imgcache.0_embedded_330.jpg |
| 10 | imgcache.0_embedded_331.jpg |
| 11 | Center of Hope Records and Cert. |
| 12 | Center Of Hope Pg. 1 |
| 13 | Center of Hope Pg. 2 |
| 14 | Center of Hope pg. 4 |
| 15 | Center of Hope Pg. 7 |
| 16 | Center of Hope Pg. 8 |
| 17 | Examination Photo Bracelet |
| 18 | Packaged Victim One's underwear |
| 19 | Daycare Diagram |
| 20 | Graham Statement |
| 21 | Conces Statement |
| 22 | Day Care Business Records and Cert. |
| 23 | Defendant's Employment Application |
| 24 | Defendant's Written Statement provided to Day care |
| 25 | CD - Defendant's Statement |
| 26 | Reserved |
| 27 | Cell Phone recovered from Defendant |
| 28 | G-Shock Watch |
| 29 | Defendant Miranda Waiver |

| 30 | Defendant Buccal Swab |
|---|---|
| 31 | Justo Guevara Buccal Swab |
| 32 | Cellbrite Report |
| 33 | Cellbrite Supplemenal |
| 34 | Picture of phone (Made in China) |
| 35 | Email to Ali Al-Awadi |
| 36 | Email from Ali Al-Awadi |
| 37 | Image file name exhibit |
| 38 | Selfie Photo  Bathroom |
| 39 | Selfie Photo with kids |
| 40 | Selfie Photo with girl |
| 41 | Body Diagram |
| 42 | Victim One Statement 1 |
| 43 | Victim One Statement 2 |
| 44 | Definition of CP |
| 45 | Definition of Sex. Explicit Conduct |
| 46 | Definition of Lascivious Exhibition |
| 47 | Reserve |
| 48 | Hospital samples and clothing from Victim One |
| 49 | Buccal cell standard from Victim One |
| 50 | Hymen swabs |

| 51 | internal genitalia swabs |
|----|--------------------------|
| 52 | external genital swabs |
| 53 | oral swabs |
| 54 | anal swabs |
| 55 | cuttings from buccal cell swabs |
| 56 | coin envelope:  hymen swabs |
| 57 | coin envelope:  internal genitalia swabs |
| 58 | coin envelope:  external genital swabs |
| 59 | coin envelope:  oral swabs |
| 60 | coin envelope:  anal swabs |
| 61 | sample from inside crotch panel of underpants |
| 62 | exhibit female anatomy |
| 63 | |
| 64 | Property transfer sheet |
| 65 | Classroom mat to door |
| 66 | Classroom oposite window |
| 67 | Classroom Window and rug |
| 68 | Time Card record |
| 69 | SMS Conversation |

| 70 | DNA Testing Results |
| 71 | Incest Searches |
| 72 | |
| 73 | Shea Hays-Anderson Lab Report |
| 74 | Tonya Fishburn DNA Report 1 |
| 75 | Tonya Fishburn DNA Report 2 |
| 76 | Tonya Fishburn DNA Report 3 |
| 77 | Exam Photo Victim One |
| 78 | Picture of Disc of Center of Hope Photos |
| 79 | DNA Report from Tonya Fishburn |
| 80 | DNA Report from Shea Hayes Anderson |
| 81 | DNA Report from  Shea Hayes Anderson 2 |

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By: s://Bradley P.Shepard
Bradley P. Shepard
Assistant United States Attorney

 s/ Kristina M. Korobov
Kristina M. Korobov
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2016, a copy of the foregoing Government's Preliminary Witness and Exhibit list was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:    s:/ Bradley P. Shepard
       Bradley P. Shepard
       Kristina Korobov
       Assistant United States Attorney
       10 West Market Street, Suite 2100
       Indianapolis, IN 46204-3048
       Telephone: 317-226-6333
       Fax: 317-229-6125
       Email: bradley.shepard@usdoj.gov

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 277 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 80 Filed 02/23/16 Page 1 of 19 PageID #:
3641

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,    )
    )
       Plaintiff,    )
    )
       v.    )   Case No. 1:15-cr-00072-TWP-DML
    )
ALI AL-AWADI,    )
    )
       Defendant.    )

# PRELIMINARY JURY INSTRUCTIONS

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 278 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 02/23/16 Page 2 of 19 PageID #:
3642

## PRELIMINARY INSTRUCTION NO. 1

Ladies and gentlemen: You are now the jury in this case. I would like to take a few minutes to describe your duties as jurors and to give you instructions concerning the case.

As the judge in this case, one of my duties is to decide all questions of law and procedure. In these preliminary instructions, during the trial, and at the end of the trial, I will instruct you on the rules of law that you must follow in making your decision. The instructions that I give you at the end of the trial will be more detailed than the instructions I am giving you now. Each of you will have a copy of the instructions that I will give you at the end of the case.

You have two duties as jurors. Your first duty is to decide the facts from the evidence that you see and hear in court. Your second duty is to take the law as I give it to you, apply it to the facts, and decide if the Government has proved the defendant guilty beyond a reasonable doubt. You must perform these duties fairly and impartially. Do not let sympathy, prejudice, fear, or public opinion influence you.

You should not take anything I say or do during the trial as indicating what I think of the evidence or what I think your verdict should be.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 279 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 481 Filed 02/23/16 Page 3 of 19 PageID #:
3643

## PRELIMINARY INSTRUCTION NO. 2

This is a criminal case that has been brought by the United States of America against the Defendant, Ali Al-Awadi.  The charges against Mr. Al-Awadi are in a document called an Indictment.  You will have a copy of the Indictment during your deliberations.

The Indictment in this case charges that Mr. Al-Awadi committed the crimes of Counts 1 through 4, Production of Child Pornography, and Counts 5 through 8, Attempted Production of Child Pornography.  Mr. Al-Awadi has pleaded not guilty to the charges.

The Indictment reads as follows:

The Indictment is simply the formal way of telling the Defendant what crimes he is accused of committing.  It is not evidence that the Defendant is guilty.  It does not even raise a suspicion of guilt.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 280 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 80 Filed 02/23/16 Page 281 of 319 PageID #:
3644

## PRELIMINARY INSTRUCTION NO. 3

I may sometimes refer to the attorneys for the prosecution as the Government.  In this trial,

there is one Defendant:  Ali Al-Awadi.  I may sometimes refer to Mr. Al-Awadi as the Defendant.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 281 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 481 Filed 02/23/16 Page 281 of 349 PageID #:
3645

## PRELIMINARY INSTRUCTION NO. 4

Mr. Al-Awadi is presumed innocent of each and every one of the charges. This presumption continues throughout the case, including during your deliberations. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that Mr. Al-Awadi is guilty as charged.

The Government has the burden of proving Mr. Al-Awadi's guilt beyond a reasonable doubt. This burden of proof stays with the Government throughout the case.

Mr. Al-Awadi is never required to prove his innocence. He is not required to produce any evidence at all.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 282 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 80-1 Filed 02/23/16 Page 6 of 19 PageID #:
3646

## PRELIMINARY INSTRUCTION NO. 5

A defendant has an absolute right not to testify or present evidence.  You may not consider

in any way if Mr. Al-Awadi does not testify or present evidence.

## <u>PRELIMINARY INSTRUCTION NO. 6</u>

You may consider only the evidence that you see and hear in court. You may not consider anything you may see or hear outside of court, including anything from the newspaper, television, radio, the Internet, or any other source.

The evidence includes only what the witnesses say when they are testifying under oath, the exhibits that I allow into evidence, and any facts to which the parties stipulate. A stipulation is an agreement that certain facts are true or that a witness would have given certain testimony.

Nothing else is evidence. Any statements and arguments that the lawyers make are not evidence. If what a lawyer says is different from the evidence as you hear or see it, the evidence is what counts. The lawyers' questions and objections likewise are not evidence.

A lawyer has a duty to object if he thinks a question or evidence is improper. When an objection is made, I will be required to rule on the objection. If I sustain an objection to a question a lawyer asks, you must not speculate on what the answer might have been. If I strike testimony or an exhibit from the record, or tell you to disregard something, you must not consider it.

Pay close attention to the evidence as it is being presented. During your deliberations, you will have any exhibits that I allow into evidence, but you will not have a transcript of the testimony. You will have to make your decision based on what you recall of the evidence.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 284 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 80-1 Filed 02/23/16 Page 8 of 19 PageID #495
3648

## PRELIMINARY INSTRUCTION NO. 7

You may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves a fact.

For example, direct evidence that it was raining outside is testimony by a witness that it was raining. Circumstantial evidence that it was raining outside is the observation of someone entering a room carrying a wet umbrella.

You are to consider both direct and circumstantial evidence. The law does not say that one is better than the other. It is up to you to decide how much weight to give to any evidence, whether direct or circumstantial.

**PRELIMINARY INSTRUCTION NO. 8**

Give the evidence whatever weight you believe it deserves.  Use your common sense in weighing the evidence, and consider the evidence in light of your own everyday experience.

People sometimes look at one fact and conclude from it that another fact exists.  This is called an inference.  You are allowed to make reasonable inferences, so long as they are based on the evidence.

## PRELIMINARY INSTRUCTION NO. 9

Part of your job as jurors will be to decide how believable each witness was, and how much weight to give each witness's testimony.  I will give you additional instructions about this at the end of the trial.

**PRELIMINARY INSTRUCTION NO. 10**

Do not make any decisions by simply counting the number of witnesses who testified about a certain point.

What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Case 1:15-cr-00072-TWP-DML Document 180-1 Filed 02/23/16 Page 288 of 349 PageID #:
3652

## PRELIMINARY INSTRUCTION NO. 11

You will be permitted to take notes during the trial. If you take notes, you may use them during deliberations to help you remember what happened during the trial. You should use your notes only as aids to your memory. The notes are not evidence. All of you should rely on your independent recollection of the evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impressions of each juror.

## PRELIMINARY INSTRUCTION NO. 12

Before we begin the trial, I want to discuss several rules of conduct that you must follow as jurors.

First, you should keep an open mind throughout the trial.  Do not make up your mind about what your verdict should be until after the trial is over, you have received my final instructions on the law, and you and your fellow jurors have discussed the evidence.

Your verdict in this case must be based exclusively on the law as I give it to you and the evidence that is presented during the trial.  For this reason, and to ensure fairness to both sides in this case, you must obey the following rules.  These rules apply both when you are here in court and when you are not in court.  They apply until after you have returned your verdict in the case.

1.      You must not discuss the case, including anyone who is involved in the case, among yourselves until you go to the jury room to deliberate after the trial is completed.

2.      You must not communicate with anyone else about this case, including anyone who is involved in the case, until after you have returned your verdict.

3.      When you are not in the courtroom, you must not allow anyone to communicate with you about the case or give you any information about the case, or about anyone who is involved in the case.  If someone tries to communicate with you about the case or someone who is involved in the case, or if you overhear or learn any information about the case or someone involved in the case when you are not in the courtroom, you must report this to me promptly.

4.      You may tell your family and your employer that you are serving on a jury, so that you can explain that you have to be in court.  However, you must not communicate with them about the case or anyone who is involved in the case until after you have returned your verdict.

5.      All of the information that you will need to decide the case will be presented here in court.  You may not look up, obtain, or consider information from any outside source.

There are two reasons for these rules.  First, it would not be fair to the parties in the case for you to consider outside information or communicate information about the case to others.  Second, outside information may be incorrect or misleading.

When I say that you may not obtain or consider any information from outside sources, and may not communicate with anyone about the case, I am referring to any and all means by which people communicate or obtain information.  This includes, for example, face to face conversations; looking things up; doing research; reading, watching, or listening to reports in the news media; and any communication using any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Android, Blackberry or similar device, PDA, computer, the Internet, text messaging, emails, chat rooms, blogs, social networking websites like Facebook, YouTube, Twitter, GooglePlus, LinkedIn, SnapChat or any other form of communication at all.  If you hear, see, or receive any information about the case by these or any other means, you must report that to me immediately.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 291 of 349 PageID #:
3655
Case 1:15-cr-00072-TWP-DML Document 180-1 Filed 02/23/16 Page 291 of 349 PageID #:

## PRELIMINARY INSTRUCTION NO. 13

We are now ready to begin the trial.  The trial will proceed in the following manner:

First, each side's attorneys may make an opening statement.  An opening statement is not

evidence.  Rather, it is a summary of what each side's attorneys expect the evidence will show.

After the opening statements, you will hear the evidence.

After the evidence has been presented, the attorneys will make closing arguments, and I

will instruct you on the law that applies to the case.

After that, you will go to the jury room to deliberate on your verdict.


Thank you ladies and gentlemen.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cr-00072-TWP-DML |
| | ) | |
| ALI AL-AWADI, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>FINAL JURY INSTRUCTIONS</u>**

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 293 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 148-1 Filed 02/26/16 Page 293 of 349 PageID #:
3657

## JURY INSTRUCTION NO. 1

Members of the jury, I will now instruct you on the law that you must follow in deciding this case.  You must follow all of my instructions about the law, even if you disagree with them. This includes the instructions I gave you before the trial, any instructions I gave you during the trial, and the instructions I am giving you now.

As jurors, you have two duties.  Your first duty is to decide the facts from the evidence that you saw and heard here in court.  This is your job, not my job or anyone else's job.

Your second duty is to take the law as I give it to you, apply it to the facts, and decide if the government has proved the Defendant guilty beyond a reasonable.

You must perform these duties fairly and impartially.  Do not let sympathy, prejudice, fear, or public opinion influence you.  In addition, do not let any person's race, color, religion, national ancestry, or gender influence you.

You must not take anything I said or did during the trial as indicating that I have an opinion about the evidence or about what I think your verdict should be.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 294 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 87 Filed 02/26/16 Page 3 of 39 PageID #:
3658

## JURY INSTRUCTION NO. 2

The charges against the Defendant are in a document called an Indictment.

The Indictment in this case charges that the Defendant committed the crimes of sexual exploitation of a child and attempted sexual exploitation of a child.  The Defendant has pled not guilty to the charges.

The Indictment is simply the formal way of telling the Defendant what crimes he is accused of committing.  It is not evidence that the Defendant is guilty. It does not even raise a suspicion of guilt.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 295 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 87 Filed 02/26/16 Page 46 of 89 PageID #:
3659

## JURY INSTRUCTION NO. 3

The Defendant is presumed innocent of each and every one of the charges. This presumption continues throughout the case, including during your deliberations. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the Defendant is guilty as charged.

The Government has the burden of proving the Defendant's guilt beyond a reasonable doubt. This burden of proof stays with the Government throughout the case.

The Defendant is never required to prove his innocence. He is not required to produce any evidence at all.

## JURY INSTRUCTION NO. 4

You must make your decision based only on the evidence that you saw and heard here in court.  Do not consider anything you may have seen or heard outside of court, including anything from the newspaper, television, radio, the Internet, or any other source.

The evidence includes only what the witnesses said when they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to.  A stipulation is an agreement that certain facts are true or that a witness would have given certain testimony.

In addition, you may recall that I took judicial notice of certain facts that may be considered as matters of common knowledge.  You may accept those facts as proved, but you are not required to do so.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  If what a lawyer said is different from the evidence as you remember it, the evidence is what counts. The lawyers' questions and objections likewise are not evidence.

A lawyer has a duty to object if he thinks a question is improper.  If I sustained objections to questions the lawyers asked, you must not speculate on what the answers might have been.

If, during the trial, I struck testimony or exhibits from the record, or told you to disregard something, you must not consider it.

### JURY INSTRUCTION NO. 5

You may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves a fact.

You are to consider both direct and circumstantial evidence. The law does not say that one is better than the other. It is up to you to decide how much weight to give to any evidence, whether direct or circumstantial.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 298 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 87-1 Filed 02/26/16 Page 7 of 89 PageID 934:
3662

### JURY INSTRUCTION NO. 6

Do not make any decisions simply by counting the number of witnesses who testified about a certain point.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

What is important is how truthful and accurate the witnesses were and how much weight you think their testimony deserves.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 299 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 87 Filed 02/26/16 Page 3 of 39 PageID 535
3663

## JURY INSTRUCTION NO. 7

Part of your job as jurors is to decide how believable each witness was, and how much weight to give each witness' testimony, including that of the Defendant. You may accept all of what a witness says, or part of it, or none of it.

Some factors you may consider include:

- the intelligence of the witness;

- the witness' ability and opportunity to see, hear, or know the things the witness testified about;

- the witness' memory;

- the witness' demeanor;

- whether the witness had any bias, prejudice, or other reason to lie or slant the testimony;

- the truthfulness and accuracy of the witness' testimony in light of the other evidence presented; and

- inconsistent or consistent statements or conduct by the witness.

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 300 of 349 PageID #:
3664
Case 1:15-cv-00072-TWP-DML Document 87 Filed 02/26/16 Page 9 of 89 PageID 936

## JURY INSTRUCTION NO.  8

It is proper for an attorney to interview any witness in preparation for trial.

Case 1:15-cr-00072-TWP-DML  Document 149-1  Filed 12/12/16  Page 301 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML  Document 87  Filed 02/26/16  Page 10 of 35  PageID #:
3665

## <u>JURY INSTRUCTION NO.  9</u>

You have heard evidence that before the trial, witnesses made statements that may be inconsistent with their testimony here in court.  You may consider an inconsistent statement made before the trial to help you decide how believable a witness' testimony was here in court.

## JURY INSTRUCTION NO. 10

You have heard evidence that before the trial, the Defendant made statements that may be inconsistent with his testimony here in court. You may consider an inconsistent statement by the Defendant made before the trial to help you decide how believable the Defendant's testimony was here in court, and also as evidence of the truth of whatever the Defendant said in the earlier statement.

Case 1:15-cr-00072-TWP-DML Document 149-1 Filed 12/12/16 Page 303 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 87 Filed 02/26/16 Page 23 of 33 PageID 939:
3667

## JURY INSTRUCTION NO.  11

You have heard testimony that the Defendant made a statement to the Indianapolis Metropolitan Police Department.  You must decide whether the Defendant actually made these statements and, if so, how much weight to give the statement.  In making these decisions, you should consider all of the evidence, including the Defendant's personal characteristics and circumstances under which the statement may have been made.

### JURY INSTRUCTION NO. 12

You have heard testimony and evidence that the Defendant committed crimes, acts and/or wrongs other than the ones charged in the Indictment.  Before using this evidence, you must decide whether it is more likely than not that the Defendant did the crimes, acts, and/or wrongs that are not charged in the Indictment.  If you decide that he did, then you may consider this evidence to help you decide the Defendant's intent to produce or attempt to produce child pornography, absence of mistake in dealing with the alleged victim or opportunity.  You may not consider it for any other purpose.  Keep in mind that the Defendant is on trial here for sexual exploitation and attempted sexual exploitation of a child, not for the other crimes, acts, or wrongs.

## JURY INSTRUCTION NO. 13

You have heard testimony of an identification of a person. Identification testimony is an expression of the witness' belief or impression. In evaluating this testimony, you should consider the opportunity the witness had to observe the person at the time and to make a reliable identification later. You should also consider the circumstances under which the witness later made the identification.

The Government must prove beyond a reasonable doubt that the Defendant is the person who committed the crime that is charged.

### JURY INSTRUCTION NO. 14

You have heard witnesses who gave opinions and testimony based on their scientific, technical, or otherwise specialized knowledge.  You do not have to accept the witnesses' opinions or testimony.  You should judge the witnesses opinions and testimony the same way you judge the testimony of any other witness.  In deciding how much weight to give to these opinions and testimony, you should consider the witnesses qualifications, how the witness reached his or her opinions or conclusions, and the factors I have described for determining the believability of testimony.

Case 1:15-cr-00072-TWP-DML Document 87 Filed 02/26/16 Page 16 of 33 PageID #:

## JURY INSTRUCTION NO. 15

You have seen video recordings.  This is proper evidence that you should consider together with and in the same way you consider the other evidence.

There were also transcripts of the conversations on the video recordings to help you follow the recordings as you listened to them.  The recordings are the evidence of what was said and who said it.  The transcripts are not evidence.  If you noticed any differences between what you heard in a conversation and what you read in the transcripts, your understanding of the recording is what matters.  In other words, you must rely on what you heard, not what you read.  And if you could not hear or understand certain parts of a recording, you must ignore the transcripts as far as those parts are concerned.  You may consider a person's actions, facial expressions, and lip movements that you are able to observe on a video recording to help you determine what was said and who said it.

 If, during your deliberations, you wish to have another opportunity to view any transcript[s] as you listen to a recording, send a written message to the Bailiff, and I will provide you with the transcript[s].

Case 1:15-cr-00072-TWP-DML Document 148-1 Filed 12/12/16 Page 308 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 87-1 Filed 02/26/16 Page 1 of 38 PageID #:
3672

## JURY INSTRUCTION NO. 16

Certain summaries and charts were admitted in evidence. You may use those summaries and charts as evidence.

The accuracy of the summaries and charts has been challenged. The underlying documents and evidence have also been admitted so that you may determine whether the summaries are accurate.

It is up to you to decide how much weight to give to the summaries.

## JURY INSTRUCTION NO. 17

Certain summaries and charts were shown to you to help explain other evidence that was admitted. These summaries and charts are not themselves evidence or proof of any facts, so you will not have these particular summaries and charts during your deliberations. If they do not correctly reflect the facts shown by the evidence, you should disregard the summaries and charts and determine the facts from the underlying evidence.

Case 1:15-cr-00072-TWP-DML Document 149-1 Filed 12/12/16 Page 310 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 87 Filed 02/26/16 Page 19 of 33 PageID #:
3674

## JURY INSTRUCTION NO. 18

If you have taken notes during the trial, you may use them during deliberations to help you remember what happened during the trial.  You should use your notes only as aids to your memory.  The notes are not evidence.  All of you should rely on your independent recollection of the evidence, and you should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any more weight than the memory or impressions of each juror.

## JURY INSTRUCTION NO. 19

The Indictment charges the Defendant in Counts 1-4 with the crime of sexual exploitation of a minor. In order for you to find the Defendant guilty of this charge, the Government must prove each of the following elements beyond a reasonable doubt:

1.  At the time, Victim One was under the age of eighteen years; and

2.  The Defendant, for the purpose of producing a visual depiction of such conduct used Victim One to take part in sexually explicit conduct;

    and

3.  The visual depiction was produced using materials that had been mailed, shipped, transported across state lines or in foreign commerce.

If you find from your consideration of all the evidence that the Government has proved both of these elements beyond a reasonable doubt, then you should find the Defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that the Government has failed to prove any one of these elements beyond a reasonable doubt, then you should find the Defendant not guilty.

## JURY INSTRUCTION NO. 20

The Indictment charges the Defendant in Counts 5-8 with the crime of attempted sexual exploitation of a minor.  In order for you to find the Defendant guilty of this charge, the Government must prove both of the following elements beyond a reasonable doubt:

1.   That the Defendant intended to employ, use, persuade, induce, entice or coerce Victim One to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct;

2.   That the Defendant engaged in a purposeful act, that under the circumstances as he believed them to be, amounted to a substantial step towards the commission of that crime and strongly corroborated his criminal intent;

3.   That the visual depiction would have been produced using materials that had been mailed, shipped or transported in interstate and foreign commerce.

If you find from your consideration of all the evidence that the Government has proved each of these elements beyond a reasonable doubt, then you should find the Defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the Government has failed to prove any one of these elements beyond a reasonable doubt, then you must find the Defendant not guilty.

Case 1:15-cr-00072-TWP-DML   Document 149-1   Filed 12/12/16   Page 313 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML   Document 87   Filed 02/26/16   Page 22 of 33   PageID #:
3677

## JURY INSTRUCTION NO. 21

"Minor" means any person under the age of eighteen (18) years.

Case 1:15-cr-00072-TWP-DML   Document 149-1   Filed 12/12/16   Page 314 of 349 PageID #:
3678
Case 1:15-cr-00072-TWP-DML   Document 87   Filed 02/26/16   Page 23 of 33   PageID 950

## JURY INSTRUCTION NO. 22

"Sexually explicit conduct" includes the lascivious exhibition of the genitals or pubic area of any person.

## JURY INSTRUCTION NO. 23

The term "producing" includes producing, directing, manufacturing, issuing, publishing, or advertising.

## JURY INSTRUCTION NO. 24

"Computer" as used in this instruction means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device.

## JURY INSTRUCTION NO. 25

A lascivious display is one that draws attention to the genitals or pubic area of the subject in order to excite lustfulness or sexual stimulation in the viewer.

**JURY INSTRUCTION NO. 26**


More than nudity is required to make an image lascivious; the focus of the image must be on the genitals or the image must be otherwise sexually suggestive.

## JURY INSTRUCTION NO. 27

The term "visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

Computerized and digital visual depictions are produced when they are transferred and stored on computer media, including hard drives and flash drives, that have traveled in interstate commerce.

"Interstate commerce" means "commerce or travel between one state...of the United States and another state...of the United States."  "[F]oreign commerce...includes commerce with a foreign country."

Thus the phrase "shipped or transported in interstate commerce or foreign commerce" means that the items used to produce the visual depiction, at any time, traveled or moved between one state or foreign country and another.

## JURY INSTRUCTION NO. 28

The Defendant has been accused of more than one crime. The number of charges is not evidence of guilt and should not influence your decision.

You must consider each charge and the evidence concerning each charge separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any other charge.

## JURY INSTRUCTION NO. 29

Alternate jurors, you may not participate in deliberations unless you replace a member of the jury. Any replacement would be done in open court. You will be provided separate facilities during deliberations and will be brought into court once the jury has reached a verdict.

Ladies and gentlemen of the jury, once you are all in the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard. You may discuss the case only when all jurors are present.

Once you start deliberating, do not communicate about the case or your deliberations with anyone except other members of your jury. You may not communicate with others about the case or your deliberations by any means. This includes oral or written communication, as well as any electronic method of communication, such as telephone, cell phone, smart phone, iPhone, Blackberry, computer, text messaging, instant messaging, the Internet, chat rooms, blogs, websites, or services like Facebook, MySpace, LinkedIn, YouTube, Twitter, SnapChat, or any other method of communication.

If you need to communicate with me while you are deliberating, send a note through the Bailiff. The note should be signed by the foreperson, or by one or more members of the jury. To have a complete record of this trial, it is important that you do not communicate with me except by a written note. I may have to talk to the lawyers about your message, so it may take me some time to get back to you. You may continue your deliberations while you wait for my answer.

Please be advised that transcripts of trial testimony are not available to you. You must rely on your collective memory of the testimony.

If you send me a message, do not include the breakdown of any votes you may have conducted. In other words, do not tell me that you are split 6–6, or 8–4, or whatever your vote happens to be.

Case 1:15-cr-00072-TWP-DML Document 87 Filed 02/26/16 Page 31 of 33 PageID #: 998

## <u>JURY INSTRUCTION NO. 30</u>

Verdict forms have been prepared for you.  You will take these forms with you to the jury room.

When you have reached unanimous agreement, your foreperson will fill in, date, and sign the verdict forms.

Advise the Bailiff once you have reached a verdict.  When you come back to the courtroom, I will read the verdict aloud.

### JURY INSTRUCTION NO. 31

The verdict must represent the considered judgment of each juror. Your verdict, whether it is guilty or not guilty, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions. Discuss your differences with an open mind. Do not hesitate to re-examine your own view and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence just because of the opinions of your fellow jurors or just so that there can be a unanimous verdict.

The twelve of you should give fair and equal consideration to all the evidence. You should deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror.

You are impartial judges of the facts. Your sole interest is to determine whether the Government has proved its case beyond a reasonable doubt.

Case 1:15-cr-00022-TWP-DML Document 149-1 Filed 12/12/16 Page 324 of 349 PageID #:
Case 1:15-cr-00022-TWP-DML Document 87 Filed 02/26/16 Page 336 of 33 PageID #:
3688

## JURY INSTRUCTION NO. 32

    Ladies and gentlemen, you will have photographs of all of the physical evidence that has been admitted into evidence with you during your deliberations.  If you desire to listen to any recordings or view the physical evidence, please put that request in writing and you will be allowed to review that evidence in the courtroom.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   No. 1:15-cr-00072-TWP-DML |
| | ) |
| ALI  AL-AWADI (01), | ) |
| | ) |
| Defendant. | ) |

## EXHIBITS ADMITTED INTO EVIDENCE DURING TRIAL

The Court admitted the following exhibits into the record during the jury trial held in this

matter.

### GOVERNMENT'S

1 through 17
19 through 25
27 through 31
34, 36, 37
42 through 46
48 through 62
64 through 70
73 through 78

_____

BRADLEY PAUL SHEPARD
Assistant United States Attorney
KRISTINA M. KOROBOV
Assistant United States Attorney

_____

ROSS G. THOMAS
Counsel for Defendant

Distribution:

Ross G. Thomas
rossthomas@defenselawyerindiana.com

Bradley Paul Shepard
UNITED STATES ATTORNEY'S OFFICE
brad.shepard@usdoj.gov

Kristina M. Korobov
UNITED STATES ATTORNEY'S OFFICE
kristina.korobov@usdoj.gov

AO 245B    (Rev. 09/13) Judgment in a Criminal Case
           Sheet 1

# UNITED STATES DISTRICT COURT

<u>Southern</u>    District of    <u>Indiana</u>

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| | ) |
| ALI AL-AWADI | ) Case Number:   1:15CR00072-001 |
| | ) USM Number:   12616-028 |
| | ) |
| | ) Ross G. Thomas |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☒ was found guilty on count(s)   1, 2, 4, and 7 _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| <u>Title & Section</u> | <u>Nature of Offense</u> | <u>Offense Ended</u> | <u>Count</u> |
|---|---|---|---|
| 18 U.S.C. § 2251(a) | Sexual Exploitation of a Child | 8/21/2014 | 1 |
| 18 U.S.C. § 2251(a) | Sexual Exploitation of a Child | 8/21/2014 | 2 |
| 18 U.S.C. § 2251(a) | Sexual Exploitation of a Child | 8/21/2014 | 4 |
| 18 U.S.C. § 2251(a) | Attempted Sexual Exploitation of a Child | 8/21/2014 | 7 |

The defendant is sentenced as provided in pages 2 through   __5__   of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s)  3

☒ Count(s)  5,6, and 8 _____   ☐ is   ☒ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/2/2016
Date of Imposition of Judgment

*[signature]*

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

6/13/2016
Date

**A CERTIFIED TRUE COPY**
Laura A. Briggs, Clerk
U.S. District Court
Southern District of Indiana

By _____
      Deputy Clerk

AO 245B    (Rev. 09/13) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___5___

DEFENDANT:      ALI AL-AWADI
CASE NUMBER:       1:15CR00072-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:      324 months per count, concurrent.

☐  The court makes the following recommendations to the Bureau of Prisons:

☒  The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to  _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 09/13) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    3    of    5

DEFENDANT:      ALI AL-AWADI
CASE NUMBER:      1:15CR00072-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : 15 years per count, concurrent.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.   *(Check, if applicable.)*

☒    The defendant shall cooperate in the collection of DNA as directed by the probation officer.   *(Check, if applicable.)*

☒    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16913, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.   *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence.   *(Check, if applicable.)*

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the conditions listed below:

# CONDITIONS OF SUPERVISION

1.   You shall report to the probation office in the district to which you are released within 72 hours of release from the custody of the Bureau of Prisons.

2.   You shall report to the probation officer in a manner and frequency directed by the court or probation officer.

3.   You shall permit a probation officer to visit you at a reasonable time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

4.   You shall not knowingly leave the judicial district without the permission of the court or probation officer.

5.   You shall answer truthfully the inquiries by the probation officer, subject to your 5th Amendment privilege.

6.   You shall not meet, communicate, or otherwise interact with a person you know to be engaged, or planning to be engaged, in criminal activity. You shall report any contact with persons you know to be convicted felons to your probation officer within 72 hours of the contact.

7.   You shall reside at a location approved by the probation officer and shall notify the probation officer at least 72 hours prior to any planned change in place or circumstances of residence or employment (including, but not limited to, changes in residence occupants, job positions, job responsibilities).  When prior notification is not possible, you shall notify the probation officer within 72 hours of the change.

8.   You shall not own, possess, or have access to a firearm, ammunition, destructive device or dangerous weapon.

9.   You shall notify the probation officer within 72 hours of being arrested, charged, or questioned by a law enforcement officer.

10.   You shall maintain lawful full time employment, unless excused by the probation officer for schooling, vocational training, or other reasons that prevent lawful employment.

11.   As directed by the probation officer, you shall notify third parties who may be impacted by the nature of the conduct underlying your current or prior offense(s) of conviction and shall permit the probation officer to make such notifications and/or confirm your compliance with this requirement.

12.   You shall make a good faith effort to follow instructions of the probation officer necessary to ensure compliance with the conditions of supervision.

AO 245B    (Rev. 09/13) Judgment in a Criminal Case
           Sheet 3 — Supervised Release

| | | Judgment—Page | 3.01 | of | 5 |

DEFENDANT:        ALI AL-AWADI
CASE NUMBER:      1:15CR00072-001

13. You shall submit to the search by the probation officer of your person, vehicle, office/business, residence, and property, including any computer systems and hardware or software systems, electronic devices, telephones, and Internet-enabled devices, including the data contained in any such items, whenever the probation officer has a reasonable suspicion that a violation of a condition of supervision or other unlawful conduct may have occurred or be underway involving you and that the area(s) to be searched may contain evidence of such violation or conduct. Other law enforcement may assist as necessary. You shall submit to the seizure of contraband found by the probation officer. You shall warn other occupants these locations may be subject to searches.

14. You shall consent, at the direction of the probation officer, to having installed on your computer(s), telephones(s), electronic devices, and any hardware or software, systems to monitor your use of these items. Monitoring will occur on a random and/or regular basis. You will warn other occupants or uses of the existence of the monitoring hardware or software. To promote the effectiveness of this monitoring, you shall disclose in advance all cellular phones, electronic devices, computers, and any hardware or software to the probation officer and may not access or use any undisclosed equipment. You shall pay some or all of the costs associated with the monitoring, in accordance with your ability to pay.

15. You shall participate in a program of treatment for sexual disorders, including periodic polygraph examinations, as directed by the probation officer. The treatment provider should determine the type and timing of such polygraph examinations. The court authorizes the release of the presentence report and available psychological evaluations to the provider, as approved by the probation officer. You shall pay some or all of the costs of treatment, in accordance with your ability to pay.

16. You shall not possess any obscene material, child pornography, child erotica, or nude images of minors. Any such material found in your possession shall be considered contraband and will be confiscated by the probation officer.

17. You shall not have any unsupervised meetings, non-incidental communications, activities, or visits with any minor, unless they have been disclosed to the probation officer and approved by the court. In determining whether to recommend approval of such activities involving members of your family, the probation officer shall determine if you have notified the persons having custody of any such minors about the conviction in this case and the fact that you are under supervision. If this notification has been made, and if the person having custody consents to these activities, then this condition is not intended to prevent recommended approval of the activity.

18. You shall not engage in any meetings, communications, activities, or visits with any of the victim(s) involved in this case or members of the family of such victim(s) without prior approval from the court.

19. You shall not be employed in any position or participate as a volunteer in any activity that involves unsupervised meetings, non-incidental communications, activities, or visits with minors except as disclosed to the probation officer and approved by the court.

20. You shall not participate in unsupervised meetings, non-incidental communications, activities, or visits with person you know to be a registered sex offender or to have been convicted of a felony sex offense involving an adult or minor, including any child pornography offense, except as disclosed to the probation officer and approved by the court. This condition is not intended to prevent you from participating in mental health treatment or religious services with felons in such programs so long as the activity has been disclosed as described above.

21. You are prohibited from entering any place primarily frequented by children under the age of 18, including parks, schools, playgrounds, and childcare facilities.

22. You shall not remain at a place for the primary purpose of observing or contacting children under the age of 18.

AO 245B     (Rev. 09/13) Judgment in a Criminal Case
            Sheet 3 — Supervised Release

|  | Judgment—Page | 3.02 | of | 5 |

DEFENDANT:          ALI AL-AWADI
CASE NUMBER:        1:15CR00072-001


I understand that I and/or the probation officer may petition the Court to modify these conditions, and the final decision to modify these terms lies with the Court.   If I believe these conditions are being enforced unreasonably, I may petition the Court for relief or clarification; however, I must comply with the directions of my probation officer unless or until the Court directs otherwise.  Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the condition of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)

_____          _____
Defendant                                Date


_____          _____
U.S. Probation Officer/Designated Witness     Date

AO 245B    (Rev. 09/13) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page    4    of    5   

DEFENDANT:     ALI AL-AWADI
CASE NUMBER:     1:15CR00072-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 400.00 | $ | $ 9,000.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Child 1 | $9,000.00 | $9,000.00 | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement $   9,000.00

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☒ the interest requirement is waived for the   ☐ fine   ☒ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/13) Judgment in a Criminal Case
            Sheet 6 — Schedule of Payments

Judgment — Page ___5___ of ___5___

DEFENDANT:       ALI AL-AWADI
CASE NUMBER:     1:15CR00072-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance ☐ C ☐ D ☐ E, or ☐ G below; or

**B** ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ G below); or

**C** ☐ Payment in equal _____ (*e.g., weekly, monthly, quarterly*) installments of $ _____ over a period of
_____ (*e.g., months or years*), to commence _____ (*e.g., 30 or 60 days*) after the date of this judgment; or

**D** ☐ Payment in equal _____ (*e.g., weekly, monthly, quarterly*) installments of $ _____ over a period of
_____ (*e.g., months or years*), to commence _____ (*e.g., 30 or 60 days*) after release from imprisonment to a
term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (*e.g., 30 or 60 days*) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☒ If this case involves other defendants, each may be held jointly and severally liable for payment of all or part of the
restitution ordered herein and the Court may order such payment in the future. The victims' recovery is limited to the
amount of loss, and the defendant's liability for restitution ceases if and when the victims receive full restitution.

**G** ☒ Special instructions regarding the payment of criminal monetary penalties:

    Any unpaid restitution balance during the term of supervision shall be paid at a rate of not less than 10% of the defendant's
    gross monthly income.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is
due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount,
and corresponding payee, if appropriate.

| Defendant Name | Case Number | Joint & Several Amount |
|---|---|---|
| | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s): _____

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:
The cellular phone used in the offenses.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Case 1:15-cr-00072-TWP-DML Document 140-1 Filed 08/12/16 Page 334 of 349 PageID #:
Case 1:15-cr-00072-TWP-DML Document 140 Filed 06/13/16 Page 1 of 1 PageID #: 3052
3698

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA, )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )        1:15-cr-0000072-TWP-DML
                                    )
ALI AL-AWADI,                       )
                                    )
                    Defendant.      )

## NOTICE OF APPEAL

Notice is hereby given that Ali Al-Awadi, defendant in the above-captioned cause,

appeals to the United States Court of Appeals for the Seventh Circuit from the sentence imposed

thereon by the Hon. Judge Tonya Walton Pratt on June 2, 2016 and from the final Judgment of

Conviction entered on June 13, 2016.

Respectfully submitted,

*s/ Ross G. Thomas_____*

Ross G. Thomas, #18453-49
Attorney for the Defendant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served by
email, via the USDC Electronic Filing System, to the AUSA assigned to this case at the
time of filing.

*s/ Ross G. Thomas_____*

Ross G. Thomas
Attorney for the Defendant

Ross G. Thomas
Attorney #18453-49
3728 N. Delaware Street
Indianapolis, IN  46205-3434
Tel. (317) 920-2840

Case 1:15-cr-00072-TWP-DML   Document 148-1   Filed 08/12/16   Page 335 of 349 PageID #:
3699
Case 1:15-cr-00072-TWP-DML   Document 108   Filed 06/22/16   Page 1 of 2 PageID #:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,   )
                                        )
              Plaintiff,                )
                                        )
         vs.                            )        1:15-cr-0000072-TWP-DML
                                        )
ALI AL-AWADI,                           )
                                        )
              Defendant.                )
_____

## SEVENTH CIRCUIT RULE 3(C) DOCKETING STATEMENT

This is a direct appeal from a criminal conviction in the United States District Court for the

Southern District of Indiana, Indianapolis Division, obtained following a sentencing hearing

which concluded on June 2, 2016, 2016, with a judgment of conviction and sentencing order on

being entered on June 13, 2016. No motions for new trial have been filed. There are no related

cases.

The jurisdiction of the United States District Court was conferred pursuant to 18 U.S.C.3231.

The United States Court of Appeals for the Seventh Circuit has jurisdiction pursuant to 28U.S.C.

1291 and 1294(1). Mr. Ali Al-Awadi's Notice of Appeal was timely filed herein on June 22,

2016.

Respectfully submitted,

*s/ Ross G. Thomas*

Ross G. Thomas, #18453-49
Attorney for the Defendan

Case 1:15-cr-00072-TWP-DML Document 140-1 Filed 08/12/16 Page 336 of 349 PageID #:
Case 1:15-cv-00072-TWP-DML Document 108 Filed 06/22/16 Page 2 of 2 PageID #:
3700

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a copy of the foregoing has been served by email, via the USDC Electronic Filing System, to the AUSA assigned to this case at the time of filing.

*s/ Ross G. Thomas_____*

                                      Ross G. Thomas
                                      Attorney for the Defendant

Ross G. Thomas
Attorney #18453-49
3728 N. Delaware Street
Indianapolis, IN  46205-3434
Tel. (317) 920-2840
Fax (317) 920-2875

## SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET

PART I – Must be completed by party or party's attorney pursuant to Rule 10(b) of the Federal Rules of Appellate Procedure and Rule 11(a) of the Circuit Rules.  The appellant must file this form with the court reporter within 14 days of filing the notice of appeal, whether transcript is being ordered or not.  (FRAP 10(b)(1)) Satisfactory arrangements with the court reporter for payment of the costs of the transcripts must also be made at that time.  (FRAP 10(b)(4)) (Note: Appellees as well as appellants are expected to use this form when ordering transcripts.)

| Short Title <br> United States of America vs. Ali Al-Awadi | District <br> Southern Dist. of Indiana | D.C. Docket No. <br> 1:15-cr-72-TWP-DML |
| --- | --- | --- |
| | District Judge <br> Tonya Walton Pratt | Court Reporter <br> David Moxley |

| | |
| --- | --- |
| ☑ I am ordering transcript. <br><br> ☐ I am not ordering transcript because: <br><br> ☐ The transcript has been prepared. | Sign below and return original and one copy to court reporter. Distribute remaining copies to the Clerk of the District Court and opposing party, retaining one copy for yourself. |

Indicate proceedings for which transcript is required.  Dates must be provided:          Date(s)

☐ Pretrial proceedings.  Specify: _____   _____

☐ Voir Dire                                                                       _____

Trial or Hearing.  Specify: __Jury Trial_____   2/22/16-2/26/2016

☐ Opening statement                                                              _____

☐ Instruction conference                                                         _____

☑ Closing statements                                                             2/26/2016

☐ Court instructions                                                             _____

☐ Post-trial proceedings.  Specify: _____   _____

☑ Sentencing                                                                     10/02/2016

☐ Other proceedings.  Specify: _____   _____

| Method of Payment: | ☐ Cash | ☐ Check or Money Order | ☐ C.J.A. Voucher |
| --- | --- | --- | --- |
| Status of Payment: | ☐ Full Payment | ☐ Partial Payment | ☑ No Payment Yet |

Signature:   s/  Ross G. Thomas          Telephone No.  317-920-2840
Address:     3728 N. Delaware Street
             Indianapolis, IN  46205     Date:  July 8, 2016

PART II – Must be completed by Court Reporter pursuant to Rule 11(b) of the Federal Rules of Appellate Procedure.  By signing this Part II, the Court Reporter certifies that *satisfactory arrangements for payment have been made.*

| U.S.C.A. Docket No. | Date Order Received | Estimated Completion Date | Estimated Length |
| --- | --- | --- | --- |
| | | | |

Signature of Court Reporter:  s/ _____   Date: _____

NOTICE: The Judicial Conference of the United States, by its resolution of March 11, 1982, has provided that a penalty of 10 percent must apply, unless a waiver is granted by the Court of Appeals' Clerk, when a "transcript of a case on appeal is not delivered within 30 days of the date ordered and payment received therefor."  The penalty is 20 percent for transcript not delivered within 60 days.

Original to Court Reporter.  Copies to:  ● U.S.C.A. Clerk  ● Service Copy  ●District Court Clerk and to ● Party / Counsel Ordering Transcript.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| UNITED STATE OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee | ) | |
| | ) | |
| | ) | |
| vs. | ) | No. 1:15-cr-72-TWP-DML |
| | ) | |
| ALI AL-AWADI, | ) | |
| Defendant-Appellant | ) | |

## DESIGNATION OF RECORD

Comes now Charles C. Hayes, attorney for the defendant-appellant, Ali Al-Awadi, and submits his designation of the record herein. Attached hereto is a copy of the district court docket sheet with the document number, date of filing, and the title of the documents that the Defendant designates to be included in the appeal records, highlighted in green.

Respectfully Submitted,

s/ *Charles C. Hayes*

Charles C. Hayes # 24220-53
Attorney for Defendant-Appellant

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on September 26, 2016, a copy of the foregoing was electronically filed with the Clerk of the District Court. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document via first-class mail, postage prepaid, to the following non-CM-ECF participants:

> Mr. Ali-Awadi
> Grayson Detention Center
> 320 Shaw Station Road
> Leitchfield, KY 42754

.

Respectfully Submitted,

s/ *Charles C. Hayes*

Charles Hayes # 24220-53
Attorney for Defendant-Appellant

Charles C. Hayes, Attorney at Law
141 E. Washington Street Ste 225
Indianapolis, IN 46204
Tel: 317-491-1050
Fax:  317-491-1043

# U.S. District Court
## Southern District of Indiana (Indianapolis)
## CRIMINAL DOCKET FOR CASE #: 1:15-cr-00072-TWP-DML All Defendants

Case title: USA v. AL-AWADI
Magistrate judge case number: 1:15-mj-00073-TAB

Date Filed: 04/14/2015
Date Terminated: 06/13/2016

---

**Plaintiff**

**USA**

represented by **Bradley Paul Shepard**
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204
317-226-6333
Fax: (317) 226-6125
Email: brad.shepard@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Kristina M. Korobov**
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204
(317) 226-6333
Email: kristina.korobov@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2015 | 1 | COMPLAINT & AFFIDAVIT approved and signed by Judge Magistrate Judge Tim A. Baker, as to ALI AL-AWADI (1). Electronic Notice to USM. (CBU) [1:15-mj-00073-TAB] (Entered: 02/03/2015) |
| 02/02/2015 | 3 | NOTICE OF ATTORNEY APPEARANCE Steven D. DeBrota appearing for USA. (CBU) [1:15-mj-00073-TAB] (Entered: 02/03/2015) |
| 02/02/2015 | | NOTICE OF ATTORNEY APPEARANCE Charnette Darlene Garner appearing for USA. (CBU) [1:15-mj-00073-TAB] (Entered: 02/03/2015) |
| 02/03/2015 | 5 | WAIVER of Preliminary Hearing by ALI AL-AWADI (BAS) [1:15-mj-00073-TAB] (Entered: 02/03/2015) |
| 02/03/2015 | 6 | Arrest Warrant Returned by US Marshal. Service of Warrant EXECUTED on 2/3/2015 in case as to ALI AL-AWADI. (BAS) [1:15-mj-00073-TAB] (Entered: 02/03/2015) |
| 02/04/2015 | 7 | MINUTE ORDER for proceedings held before Magistrate Judge Tim A. Baker: Initial Appearance on Complaint held on 2/3/2015. Defendant ALI AL-AWADI appears in person and by FCD counsel Mike Donahoe. Appearance for the USA by AUSA Steve |

DeBrota. USPO represented by Mandy Burton. Charges, Rights and Penalties explained. Defendant waived his right to a detention hearing and probable cause was found. Government orally moved for pretrial detention and a hearing was granted. Detention Hearing set for 2/6/2015 01:30 PM in room #238, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Criminal Duty Magistrate Judge. Government orally moved to unseal the case file and the same granted. Defendant is remanded to custody of USM. Signed by Magistrate Judge Tim A. Baker. (BAS) [1:15-mj-00073-TAB] (Entered: 02/04/2015)

| | | |
|---|---|---|
| 02/05/2015 | 8 | NOTICE OF ATTORNEY APPEARANCE: Dylan A. Vigh appearing for ALI AL-AWADI (Retained). (Vigh, Dylan) [1:15-mj-00073-TAB] (Entered: 02/05/2015) |
| 02/05/2015 | 9 | WAIVER of Detention by ALI AL-AWADI. (Vigh, Dylan) [1:15-mj-00073-TAB] (Entered: 02/05/2015) |
| 02/06/2015 | 10 | ORDER accepting Waiver of Detention as to ALI AL-AWADI. Defendant ordered detained. Hearing set for 2/6/15 is vacated. (Marginal Notation). Signed by Magistrate Judge Tim A. Baker on 2/6/2015. (MAC) [1:15-mj-00073-TAB] (Entered: 02/06/2015) |
| 02/25/2015 | 11 | MOTION for Extension of Time to May 1, 2015 *to File an Indictment* by USA as to ALI AL-AWADI. (Attachments: # 1 Text of Proposed Order)(Garner, Charnette) [1:15-mj-00073-TAB] (Entered: 02/25/2015) |
| 02/26/2015 | 12 | ORDER granting 11 Motion for Extension of Time to File an Indictment or an Information as to ALI AL-AWADI (1) to and including May 1, 2015. Signed by Magistrate Judge Mark J. Dinsmore on 2/26/2015.(MGG) [1:15-mj-00073-TAB] (Entered: 02/27/2015) |
| 03/05/2015 | 13 | MOTION to Withdraw Attorney Appearance by Charnette D. Garner. by USA as to ALI AL-AWADI. (Attachments: # 1 Text of Proposed Order)(Garner, Charnette) [1:15-mj-00073-TAB] (Entered: 03/05/2015) |
| 03/06/2015 | 14 | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (Shepard, Bradley) [1:15-mj-00073-TAB] (Entered: 03/06/2015) |
| 03/09/2015 | 16 | ORDER granting 13 Motion to Withdraw Attorney Appearance. Charnette Darlene Garner withdrawn from case on behalf of the USA. Signed by Magistrate Judge Mark J. Dinsmore on 3/9/2015.(CBU) [1:15-mj-00073-TAB] (Entered: 03/11/2015) |
| 03/10/2015 | 15 | MOTION to Withdraw Attorney Appearance by Steven D. DeBrota. by USA as to ALI AL-AWADI. (Attachments: # 1 Text of Proposed Order)(DeBrota, Steven) [1:15-mj-00073-TAB] (Entered: 03/10/2015) |
| 03/11/2015 | 17 | ORDER granting 15 Motion to Withdraw Attorney Appearance. Steven D. DeBrota withdrawn from case as counsel for the USA. Signed by Magistrate Judge Denise K. LaRue on 3/11/2015.(CBU) [1:15-mj-00073-TAB] (Entered: 03/12/2015) |
| 04/08/2015 | 18 | NOTICE OF ATTORNEY APPEARANCE: Ross G. Thomas appearing for ALI AL-AWADI (Retained). (Thomas, Ross) [1:15-mj-00073-TAB] (Entered: 04/08/2015) |
| 04/14/2015 | 19 | INDICTMENT as to ALI AL-AWADI (1) count(s) 1. Electronic Notice to USM. (MGG) (Entered: 04/15/2015) |
| 04/14/2015 | 22 | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (MGG) (Entered: 04/15/2015) |
| 04/15/2015 | 26 | NOTIFICATION of Assigned Judge, Automatic Not Guilty Plea, Trial Date, Discovery Order and Other Matters as to ALI AL-AWADI. Jury Trial set for 6/15/2015 09:00 AM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before |

| 04/17/2015 | 27 | SCHEDULING ORDER as to ALI AL-AWADI Initial Appearance set for 4/23/2015 02:30 PM in room #243, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Criminal Duty Magistrate Judge. Signed by Magistrate Judge Debra McVicker Lynch on 4/17/2015. (BAS) (Entered: 04/20/2015) |
|---|---|---|
| 04/20/2015 | 28 | MOTION to Withdraw Attorney Appearance by Dylan Vigh. by ALI AL-AWADI. (Vigh, Dylan) (Entered: 04/20/2015) |
| 04/20/2015 | 29 | SCHEDULING ORDER as to ALI AL-AWADI (1) - The trial by jury in this matter remains set for June 15, 2015 at 9:00 a.m. Accordingly, this matter is set for final pretrial conference on May 27, 2015 at 11:00 a.m. in Room 344, BirchBayh Federal Building and United States Courthouse, Indianapolis, Indiana. Counsel shall be prepared to fully discuss the status of the action in accordance with the agenda for final pretrial conferences set out in this Court's Courtroom Practice and Trial Procedures. The Defendant is ordered to appear at the final pretrial conference. **SEE ORDER**. Signed by Judge Tanya Walton Pratt on 4/20/2015. (MGG) (Entered: 04/21/2015) |
| 04/22/2015 | 30 | Submission of Proposed Order , re 28 MOTION to Withdraw Attorney Appearance by Dylan Vigh. by ALI AL-AWADI. (Vigh, Dylan) (Entered: 04/22/2015) |
| 04/23/2015 | 31 | ORDER granting 28 Motion to Withdraw Attorney Appearance. Dylan A. Vigh withdrawn from case as to ALI AL-AWADI (1). Signed by Judge Tanya Walton Pratt on 4/23/2015.(AH) (Entered: 04/23/2015) |
| 04/23/2015 | 32 | Arrest Warrant Returned by US Marshal. Service of Warrant EXECUTED on 4/23/2015 in case as to ALI AL-AWADI. (BAS) (Entered: 04/24/2015) |
| 04/23/2015 | 33 | MINUTE ORDER for proceedings held before Magistrate Judge Denise K. LaRue: Initial Appearance on Indictment held on 4/23/2015. Defendant ALI AL-AWADI appears in person and by retained counsel Ross Thomas. Appearance for the USA by AUSA Cindy Cho for AUSA Brad Shepard. Charges, Rights and Penalties explained. Parties ordered to meet and confer regarding disclosure of evidence on or before 5/7/15. Defendant waived his right to a detention hearing on 2/5/15 and that waiver stands. Defendant waived formal arraignment. Defendant is remanded to custody of USM. Signed by Magistrate Judge Denise K. LaRue. (BAS) (Entered: 04/24/2015) |
| 05/15/2015 | 34 | MOTION to Continue by USA as to ALI AL-AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) Modified on 5/18/2015 (CKM). (Entered: 05/15/2015) |
| 05/18/2015 | 35 | ORDER - granting 34 Motion to Continue as to ALI AL-AWADI (1); The June 15, 2015 trial and the May 27, 2015 final pretrial conference are VACATED. Final Pretrial Conference is reset for 10/7/2015 02:30 PM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt. Jury Trial is reset for 10/26/2015 09:00 AM before Judge Tanya Walton Pratt. The Defendant shall appear at the final pretrial conference. The deadlines for pretrial filings are due in accordance with the order at Dkt. 29. Signed by Judge Tanya Walton Pratt on 5/18/2015.(CKM) (Entered: 05/18/2015) |
| 09/21/2015 | 36 | MOTION *TO CONTINUE PRE-TRIAL CONFERENCE, JURY TRIAL DATE AND ALL ASSOCIATED PRE-TRIAL FILING DEADLINES* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 09/21/2015) |
| 09/22/2015 | 37 | ORDER granting United States' 36 Motion as to ALI AL-AWADI (1). Scheduling: Jury Trial reset for 2/22/2016 at 09:00 AM in room #344, United States Courthouse, 46 E. |

| | | Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt., Pretrial Conference reset for 2/3/2016 at 03:00 PM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt., Status Conference set for 10/8/2015 10:00 AM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before Judge Tanya Walton Pratt. Signed by Judge Tanya Walton Pratt on 9/22/2015.(MAC) (Entered: 09/23/2015) |
|---|---|---|
| 10/08/2015 | 38 | MINUTE ENTRY for status conference held before Judge Tanya Walton Pratt on 10/8/2015: Defendant ALI AL-AWADI (1) appeared in person and by retained counsel Ross G. Thomas who apeared telephonically. Appearance for the USA by AUSA Brad Shepard. An accept or reject hearing was scheduled for January 14, 2016 at 10:30 a.m. in Courtroom 344. Case remains set for final pretrial conference on February 3, 2016 at 3:00 p.m. in Courtroom 344 and trial by jury on February 22, 2016 at 9:00 a.m. in Courtroom 344. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 10/08/2015) |
| 01/06/2016 | 39 | SCHEDULING ORDER - Due to a conflict of the Court's schedule, the accept or reject hearing set for Thursday, January 14, 2016 at 10:30 a.m. is RESCHEDULED to Thursday, January 14, 2016 at 2:00 p.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana. Please make note of this time change. SO ORDERED. Signed by Judge Tanya Walton Pratt on 1/6/2016. (JLS) (Entered: 01/06/2016) |
| 01/06/2016 | 41 | SUPERSEDING INDICTMENT as to ALI AL-AWADI (1) count(s) 1s-4s, 5s-8s. Electronic Notice to USM. (JLS) (Entered: 01/07/2016) |
| 01/06/2016 | 44 | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (JLS) (Entered: 01/07/2016) |
| 01/06/2016 | 48 | PENALTIES Form as to ALI AL-AWADI (1). (JLS) (Entered: 01/07/2016) |
| 01/07/2016 | 40 | NOTICE OF ATTORNEY APPEARANCE Kristina M. Korobov appearing for USA. (Korobov, Kristina) (Entered: 01/07/2016) |
| 01/13/2016 | 49 | MOTION for Extension of Time to File Response/Reply as to 29 Scheduling Order *Pre-Trial Filings* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 01/13/2016) |
| 01/14/2016 | 50 | ORDER FOR EXTENSION OF PRE-TRIAL FILINGS - This matter is before the Court upon Government's Motion to Extend the Pre-Trial Filings, presently set in this cause, and the Court, being duly advised, now finds the Motion well taken, and that the Motion should be GRANTED for the reasons set forth in Government's Motion. IT IS THEREFORE ORDERED that the Court continue ALI AL-AWADI's Pre-Trial filing deadlines until January 22, 2016. Signed by Judge Tanya Walton Pratt on 1/14/2016. (JLS) (Entered: 01/14/2016) |
| 01/14/2016 | 51 | Arrest Warrant Returned by US Marshal. Service of Warrant EXECUTED on 1/14/2016 in case as to ALI AL-AWADI (1). Electronic Notice to USM.(TRG) (Entered: 01/14/2016) |
| 01/14/2016 | 52 | PENALTIES Form executed as to ALI AL-AWADI (1). (TRG) (Entered: 01/14/2016) |
| 01/15/2016 | 53 | MINUTE ENTRY for initial hearing held before Judge Tanya Walton Pratt on 1/14/2016: Defendant ALI AL-AWADI (1) appeared in person and by retained counsel Ross G. Thomas. Appearance for the USA by AUSA Brad Shepard and Kristina Korobov. Initial Appearance on Indictment held on 1/14/2016. Charges, Rights and Penalties explained. Defendant waived formal arraignment. All plea offers rejected. Case remains set for jury trial on February 22, 2016. Defendant is remanded to custody of USM. Case remains set |

| | | |
|---|---|---|
| | | for trial on February 22, 2016. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 01/15/2016) |
| 01/22/2016 | 54 | *** WITHDRAWN Per Court's 61 order *** Submission *Governments Expert Disclosure* by USA as to ALI AL-AWADI (1). (Shepard, Bradley) Modified on 1/25/2016 (JLS). Modified on 1/25/2016 (JLS). (Entered: 01/22/2016) |
| 01/22/2016 | 55 | MOTION to Withdraw Document 54 Submission *Government's Expert Disclosure* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 56 | Submission *Governments Expert Disclosure* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Exhibit Bates CV, # 2 Exhibit Melton CV, # 3 Exhibit Woodall CV, # 4 Exhibit Hicks CV, # 5 Exhibit Fishburn CV, # 6 Exhibit Hayes-Anderson CV)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 57 | Submission *Governments Notice of Intent to Use Evidence* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Exhibit Exh A - Center of Hope Records, # 2 Exhibit Exh B - Marion County Forensics, # 3 Exhibit Exh C - Day Care employees Written statements, # 4 Exhibit Exh D - Defendants Interview transcript)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 58 | Submission *Governments Second Notice of Intent to* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Exhibit Exh A - Excerpt from Bright Horizons Handbook)(Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 59 | Submission *Gov't Notice of intent to Use Evidence under F.R.E. 801 and F.R.E. 803* by USA as to ALI AL-AWADI (1). (Shepard, Bradley) (Entered: 01/22/2016) |
| 01/22/2016 | 60 | EXHIBIT LIST and WITNESS LIST by USA as to ALI AL-AWADI (1) (Shepard, Bradley) Modified on 1/25/2016 (TRG). (Entered: 01/22/2016) |
| 01/25/2016 | 61 | ORDER - This matter is before the Court on the United States' Motion to Withdraw, Docket Number 54 and the Court being duly advised, now grants the motion. It is hereby ORDERED that the Clerk of Court show this filing as WITHDRAWN. Signed by Judge Tanya Walton Pratt on 1/25/2016.(JLS) (Entered: 01/25/2016) |
| 02/02/2016 | 62 | ORDER - No later than February 5, 2016, parties shall confer and file a joint set of proposed jury instructions and verdict forms. Signed by Judge Tanya Walton Pratt on 2/2/2016. (TRG) (Entered: 02/02/2016) |
| 02/03/2016 | 63 | SUPERSEDING INDICTMENT as to ALI AL-AWADI (1) count(s) 1ss-4ss, 5ss-8ss. Electronic Notice to USM. (JLS) (Entered: 02/03/2016) |
| 02/03/2016 | 66 | NOTICE OF ATTORNEY APPEARANCE Bradley Paul Shepard appearing for USA. (JLS) (Entered: 02/03/2016) |
| 02/03/2016 | 70 | PENALTIES Form as to ALI AL-AWADI (1). (JLS) (Entered: 02/03/2016) |
| 02/03/2016 | 71 | MINUTE ENTRY for final pretrial held before Judge Tanya Walton Pratt on 2/3/2016: Defendant ALI AL-AWADI (1) appeared in person and by retained counsel Ross G. Thomas. The Defendant executed a Waiver of Initial Appearance, Arraignment and Execution of Warrant on Superseding Indictment and a Charges and Penalties sheet in open court. Discussion held regarding pending motions, anticipated witnesses and exhibits. The Court will issue a separate Entry consistent with Federal Rule of Criminal Procedure 17.1. This matter remains set for trial by jury on 2/22/16 at 9:00 a.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/03/2016) |

| 02/03/2016 | 72 | PENALTIES Form executed in open court as to ALI AL-AWADI (1). (JLS) (Entered: 02/04/2016) |
|---|---|---|
| 02/04/2016 | 73 | WAIVER of Initial Appearance, Arraignment, and Execution of Warrant on Superseding Indictment by ALI AL-AWADI (1). (JLS) (Entered: 02/04/2016) |
| 02/05/2016 | 74 | NOTICE *Supplemental Brief in support* by USA as to ALI AL-AWADI (1) re 57 Submission (Shepard, Bradley) (Entered: 02/05/2016) |
| 02/05/2016 | 75 | Proposed Jury Instructions by USA as to ALI AL-AWADI (1) (Shepard, Bradley) (Entered: 02/05/2016) |
| 02/05/2016 | 76 | Submission *Verdict Forms* by USA as to ALI AL-AWADI (1). (Shepard, Bradley) (Entered: 02/05/2016) |
| 02/05/2016 | 77 | ENTRY FOLLOWING FINAL PRETRIAL CONFERENCE - The trial in this matter is scheduled for five days beginning Monday, February 22, 2016, at 9:00 a.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana. The doors to the Courtroom will be unlocked at 7:30 a.m. Attorneys and the Defendant are ordered to appear by 8:00 a.m. The jury is scheduled to arrive at 8:30 a.m., and panel selection will begin at 9:00 a.m. To accommodate counsel, trial will begin on subsequent days at 9:30 a.m. (See order for instructions and further information). Signed by Judge Tanya Walton Pratt on 2/5/2016. (JLS) (Entered: 02/05/2016) |
| 02/19/2016 | 78 | EXHIBIT LIST by USA as to ALI AL-AWADI (1) (Shepard, Bradley) (Entered: 02/19/2016) |
| 02/23/2016 | 79 | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/22/2016 (Day 1): Parties appeared by counsel. Jury seated and sworn. Opening statements presented. Government began presentation of case-in-chief. Evidence and testimony presented. Parties instructed to return at 9:00 a.m., Tuesday, February 23, 2016. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/23/2016) |
| 02/23/2016 | 80 | Preliminary Jury Instructions as to ALI AL-AWADI read into the record. (TRG) (Entered: 02/23/2016) |
| 02/23/2016 | 81 | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/23/2016 (Day 2): Parties appeared by counsel. Testimony presented and evidence entered. Jury instructed to return at 8:45 a.m., Wednesday, February 24, 2016. Parties instructed to return at 8:30 a.m., Wednesday, February 24, 2016. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/23/2016) |
| 02/25/2016 | 82 | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/24/2016 (Day 3): Parties appeared by counsel. Testimony presented and evidence entered. Government rested its case-in-chief. Defendant began presentation of his case-in-chief. Jury instructed to return at 10:00 a.m. on 2/25/16. Parties instructed to return at 9:00 a.m. on 2/25/16. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/25/2016) |
| 02/26/2016 | 83 | MINUTE ENTRY for jury trial held before Judge Tanya Walton Pratt on 2/25/2016 (Day 4): Parties appeared by counsel. Closing arguments presented. Final instructions read. Jury retired for deliberation. Jury reached a verdict. Jury found the Defendant GUILTY as charged in Counts 1, 2, 4, 5, 6, 7, and 8 and NOT GUILTY as to Count 3 of the Second Superseding Indictment. Counsel disagreed regarding entering judgment. Government shall file a written statement regarding their position on 2/26/2016. Defendant may file his response no later 2/29/2016. USPO directed to prepare PSR. Sentencing set 6/2/2016 at 10:30 a.m. in Courtroom 344. Defendant remanded to custody |

| | | of USM. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 02/26/2016) |
|---|---|---|
| 02/26/2016 | 84 | MOTION to Vacate *Counts 5, 6 and 8* by USA as to ALI AL-AWADI (1). (Shepard, Bradley) (Entered: 02/26/2016) |
| 02/26/2016 | 85 | JURY VERDICT as to ALI AL-AWADI (1) Guilty on Count 1ss-2ss,4ss,5ss-8ssALI AL-AWADI (1) Not Guilty on Count 3ss. **Verdict vacated as to Counts 5,6 and 8 pursuant to Order 92 ** (JLS) Modified on 3/2/2016 (JLS). (Entered: 02/26/2016) |
| 02/26/2016 | 87 | Final Jury Instructions as to ALI AL-AWADI (1) (JLS) (Entered: 02/26/2016) |
| 02/26/2016 | 88 | EXHIBITS ADMITTED INTO EVIDENCE DURING TRIAL.(JLS) (Entered: 02/26/2016) |
| 02/26/2016 | 89 | BAILIFF AND MEAL ENTRY THE HONORABLE TANYA WALTON PRATT, DISTRICT JUDGE - IT IS ORDERED that the jury in this cause be committed to the custody of the bailiffs, Tanesa Genier and Kelly Brewer. The Clerk is ORDERED to provide lunch for fourteen (14) jurors. Signed by Judge Tanya Walton Pratt on 2/26/2016. (JLS) (Entered: 02/26/2016) |
| 02/26/2016 | 90 | ENTRY ON TRIAL EXHIBITS - The Court now ORDERS the Government and its agents to keep and maintain custody and control over the trial exhibits that, due to their size or nature (containing biological or biohazardous material), cannot easily be maintained by the Clerk's Office. The Government shall substitute photographs of these exhibits to stand in place of the originals, which photographs shall then be maintained by the Clerk's Office. Signed by Judge Tanya Walton Pratt on 2/26/2016. (JLS) (Entered: 02/26/2016) |
| 03/01/2016 | 92 | ORDER - The Defendant was convicted after a trial by jury of Counts 1, 2, 4, 5, 6, 7, and 8. At the conclusion of the proceedings, the Court took under advisement whether it could impose convictions on Counts 5, 6, and 8 because they were lesser included offenses of Counts 1, 2, and 4. Based upon the Supreme Court's holdings in Rutledge v. United States, 517 U.S. 292 (1996) and Rey v. United States, 481 U.S. 736 (1987), the convictions must be vacated. WHEREFOR, the Court vacates the verdict for Counts 5, 6, and 8, and enters a judgment of conviction for Counts 1, 2, 4, and 7. Signed by Judge Tanya Walton Pratt on 3/1/2016.(JLS) (Entered: 03/01/2016) |
| 04/28/2016 | 94 | MOTION for Extension of Time to May 5, 2016 *to file objections to PSI* by ALI AL-AWADI (1). (Attachments: # 1 Text of Proposed Order)(Thomas, Ross) (Entered: 04/28/2016) |
| 04/29/2016 | 95 | ORDER ON DEFENDANT'S MOTION TO EXTEND DEADLINE FOR FILING OBJECTIONS TO PRESENTENCE REPORT - The Defendant, Ali Al-Awadi, by counsel, Ross G. Thomas, having moved to extend the deadline for noting objections to the Presentence Report, and the Court having considered the same and being duly advised, now GRANTS said Motion and extends the deadline to May 5, 2016. Copy to U.S. Probation per distribution list. Signed by Judge Tanya Walton Pratt on 04/29/2016. (JLS) (Entered: 05/02/2016) |
| 05/05/2016 | 97 | SCHEDULING ORDER - This matter is set for sentencing on June 2, 2016. The hearing will now be held at 8:30 a.m. in Courtroom 344, Birch Bayh Federal Building and United States Courthouse, Indianapolis, Indiana. Please make note of the time change. Signed by Judge Tanya Walton Pratt on 5/5/2016. Electronic Notice to USPO.(JLS) (Entered: 05/05/2016) |
| 05/24/2016 | 101 | ORDER directing the Clerk of the Court to docket the letter regarding sentencing as to ALI AL-AWADI (1). Signed by Judge Tanya Walton Pratt on 5/24/2016. (CBU) |

| 06/02/2016 | <u>104</u> | MINUTE ENTRY for sentencing held before Judge Tanya Walton Pratt on 6/2/2016: Defendant ALI AL-AWADI (1) appeared in person and by retained counsel Ross G. Thomas. Appearance for the USA by AUSA Brad Shepard and AUSA Kristina Korobov. USPO represented by Michelle Fitzgerald. Sentence imposed. Judgment forthcoming. Defendant is remanded to custody of USM. Signed by Judge Tanya Walton Pratt. (Court Reporter David Moxley) (TRG) (Entered: 06/02/2016) |
|---|---|---|
| 06/13/2016 | <u>105</u> | JUDGMENT as to ALI AL-AWADI (1). Count(s) 1, 1s-4s, 5s-8s, SUPERSEDED; Defendant was Found Guilty of Counts 1,2,4,7. IMPRISONMENT: 324 Months Per Count, concurrent. SUPERVISED RELEASE: 15 Years Per Count, Concurrent. S.A. Fee: $400.00. RESTITUTION: $9,000.; Count(s) 3ss, NOT GUILTY; Count(s) 5ss-6ss, 8ss, DISMISSED. Signed by Judge Tanya Walton Pratt on 6/13/2016. (JLS) (Entered: 06/13/2016) |
| 06/22/2016 | <u>107</u> | NOTICE OF APPEAL by ALI AL-AWADI (1) re <u>105</u> Judgment. (Filing fee $505, receipt number 0756-3939717) (Thomas, Ross) (Entered: 06/22/2016) |
| 06/22/2016 | <u>108</u> | DOCKETING STATEMENT as to ALI AL-AWADI (1) re <u>107</u> Notice of Appeal (Thomas, Ross) (Entered: 06/22/2016) |
| 06/23/2016 | <u>109</u> | PARTIAL TRANSCRIPT (Excerpt) of Jury Trial as to ALI AL-AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (420 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 7/14/2016. Release of Transcript Restriction set for 9/21/2016. (Moxley, David) Released on 9/21/2016 (SWM). (Entered: 06/23/2016) |
| 06/23/2016 | <u>110</u> | NOTICE of FILING of OFFICIAL TRANSCRIPT of Excerpts of Jury Trial held before Judge Tanya Walton Pratt on 02/22/2016 in case as to ALI AL-AWADI (1) (Moxley, David) (Entered: 06/23/2016) |
| 06/24/2016 | <u>111</u> | PARTIES' SHORT RECORD as to ALI AL-AWADI (1) re <u>107</u> Notice of Appeal - **Instructions for Attorneys and Designation of Record information attached.** (A paper copy of the Short Record was sent on 6/24/2016 to the defendant, via US Mail, at *Grayson County Detention Center.*) **Docket Sheet containing sealed entries emailed to counsel.** (LBT) (Entered: 06/24/2016) |
| 06/24/2016 | <u>112</u> | Transmission of Notice of Appeal and Docket Sheet as to ALI AL-AWADI (1) to US Court of Appeals re <u>107</u> Notice of Appeal. **- for Court of Appeals Use Only.** (LBT) (Entered: 06/24/2016) |
| 06/24/2016 | <u>113</u> | USCA Case Number 16-2643 as to ALI AL-AWADI (1) for <u>107</u> Notice of Appeal filed by ALI AL-AWADI. (MAG) (Entered: 06/24/2016) |
| 06/30/2016 | <u>114</u> | NOTICE *OF INTENT TO REDACT TRANSCRIPT AND REQUEST FOR EXTENSION OF TIME TO FILE* by USA as to ALI AL-AWADI (1) re <u>109</u> Transcript (Attachments: # <u>1</u> Text of Proposed Order)(Shepard, Bradley) Modified on 7/1/2016 (TRG). (Entered: 06/30/2016) |
| 07/01/2016 | <u>115</u> | ORDER - granting <u>114</u> Motion as to ALI AL-AWADI (1); The Government shall have up to and including August 15, 2016, to file a redaction statement. Signed by Judge Tanya Walton Pratt on 7/1/2016.(CKM) (Entered: 07/01/2016) |
| 07/08/2016 | <u>116</u> | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by ALI AL-AWADI (1) for proceedings held on 2/22/2016, 6/2/2016 before Judge Tonya Walton Pratt, re <u>107</u> Notice of Appeal Transcript due by 7/8/2016. (Thomas, Ross) Modified on 7/11/2016 to link to Notice of Appeal (MAG). (Entered: 07/08/2016) |

| | | |
|---|---|---|
| 07/22/2016 | <u>117</u> | PARTIAL TRANSCRIPT (Excerpt) of Testimony of Miosotis Georgiana Rodriguez as to ALI AL-AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (36 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 8/12/2016. Release of Transcript Restriction set for 10/20/2016. (Moxley, David) (Entered: 07/22/2016) |
| 07/22/2016 | <u>118</u> | NOTICE of FILING of OFFICIAL TRANSCRIPT of Excerpt - Testimony of Miosotis Georgiana Rodrigrez held before Judge Tanya Walton Pratt on 02/22/2016 in case as to ALI AL-AWADI (1) (Moxley, David) (Entered: 07/22/2016) |
| 08/01/2016 | <u>119</u> | TRANSCRIPT of Jury Trial - Vol. I as to ALI AL-AWADI (1) held on 02/22/2016 before Judge Tanya Walton Pratt. (141 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) (Entered: 08/01/2016) |
| 08/01/2016 | <u>120</u> | TRANSCRIPT of Jury Trial - Vol. II as to ALI AL-AWADI (1) held on 02/23/2016 before Judge Tanya Walton Pratt. (190 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) (Entered: 08/01/2016) |
| 08/01/2016 | <u>121</u> | TRANSCRIPT of Jury Trial - Vol. III as to ALI AL-AWADI (1) held on 02/24/2016 before Judge Tanya Walton Pratt. (345 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) (Entered: 08/01/2016) |
| 08/01/2016 | <u>122</u> | TRANSCRIPT of Jury Trial - Vol. IV as to ALI AL-AWADI (1) held on 02/25/2016 before Judge Tanya Walton Pratt. (100 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 8/22/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) (Entered: 08/01/2016) |
| 08/01/2016 | <u>123</u> | NOTICE of FILING of OFFICIAL TRANSCRIPT of Jury Trial held before Judge Tanya Walton Pratt on 02/22/2016 - 02/25/2016 in case as to ALI AL-AWADI (1) (Moxley, David) (Entered: 08/01/2016) |
| 08/02/2016 | <u>124</u> | TRANSCRIPT of Sentencing as to ALI AL-AWADI (1) held on 06/02/2016 before Judge Tanya Walton Pratt. (59 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review <u>Local Rule 80-2</u> for more information on redaction procedures. Redaction Statement due 8/23/2016. Release of Transcript Restriction set for 10/31/2016. (Moxley, David) (Entered: 08/02/2016) |
| 08/02/2016 | <u>125</u> | NOTICE of FILING of OFFICIAL TRANSCRIPT of Sentencing held before Judge Tanya Walton Pratt on 06/02/2016 in case as to ALI AL-AWADI (1) (Moxley, David) (Entered: 08/02/2016) |
| 08/16/2016 | <u>126</u> | MOTION for Extension of Time to File Redaction Statement to August 23, 2016 re <u>109</u> Transcript by USA as to ALI AL-AWADI (1). (Attachments: # <u>1</u> Text of Proposed Order) Motions referred to Debra McVicker Lynch.(Shepard, Bradley) (Entered: 08/16/2016) |
| 08/18/2016 | <u>127</u> | ORDER granting <u>126</u> Motion for Extension of Time re <u>121</u> Transcript as to ALI AL-AWADI (1) Redaction Statement due 8/23/2016. Signed by Judge Tanya Walton Pratt on 8/18/2016.(JLS) (Entered: 08/18/2016) |
| 08/23/2016 | <u>128</u> | MOTION for Extension of Time to October 7, 2016 *TO FILE REDACTION* |

| | | *STATEMENT* by USA as to ALI AL-AWADI (1). (Attachments: # 1 Text of Proposed Order)(Shepard, Bradley) (Entered: 08/23/2016) |
|---|---|---|
| 08/24/2016 | 129 | ORDER - This matter comes before the Court on the Government's motion for extension of time to and including October 7, 2016, to file a Redaction Statement. Upon consideration of the same, and for good cause shown, the Court grants the Government=s request. IT IS THEREFORE ORDERED that the Government shall have up to and including October 7, 2016, to file a redaction statement. Signed by Judge Tanya Walton Pratt on 8/24/2016.(JLS) (Entered: 08/25/2016) |
| 09/15/2016 | 130 | TRANSCRIPT of Initial Appearance and Final Pretrial Conference as to ALI AL-AWADI (1) held on 02/03/2016 before Judge Tanya Walton Pratt. (46 pages.) Court Reporter/Transcriber: David Moxley (Telephone: (317) 916-8209). Please review Local Rule 80-2 for more information on redaction procedures. Redaction Statement due 10/6/2016. Release of Transcript Restriction set for 12/14/2016. (Moxley, David) (Entered: 09/15/2016) |
| 09/15/2016 | 131 | NOTICE of FILING of OFFICIAL TRANSCRIPT of Initial Appearance and Final Pretrial Conference held before Judge Tanya Walton Pratt on 02/03/2016 in case as to ALI AL-AWADI (1) (Moxley, David) (Entered: 09/15/2016) |
| 09/16/2016 | 132 | **(Case Participants Document)** REDACTION STATEMENT in case as to ALI AL-AWADI (1) re 130 Transcript filed by attorney Bradley Paul Shepard (Shepard, Bradley) (Entered: 09/16/2016) |

## Case #: 1:15-cr-00072-TWP-DML-All

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/26/2016 13:38:33 | | | |
| **PACER Login:** | Jruemmele3809:4990325:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cr-00072-TWP-DML |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |