Case 1:15-cr-00073-TWP-DML Document 348-3 Filed 12/12/16 Page 1 of 420 PageID #: 29
Case 1:15-cr-00073-TWP-DML Document 348-3 Filed 12/12/16 Page 1 of 420 PageID #: 29
3714

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,           )
                                    ) Cause No.
          Plaintiff,                ) 1:15-cr-0072-TWP-DML
                                    ) Indianapolis, Indiana
   vs.                              ) **February 22 - 24, 2016**
                                    ) 9:11 a.m.
ALI AL-AWADI (01),                  )
                                    )    **EXCERPTS**
          Defendant.                )


**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
EXCERPTS OF JURY TRIAL

**R E D A C T E D**


**For Plaintiff:**          Bradley Paul Shepard, Esq.
                            Kristina M. Korobov, Esq.
                            Assistant U.S. Attorneys
                            United States Attorney's Office
                            Suite 2100
                            10 West Market Street
                            Indianapolis, IN  46204


**For Defendant:**          Ross G. Thomas, Esq.
                            Attorney at Law
                            3728 North Delaware Street
                            Indianapolis, IN  46205-3434


Court Reporter:             David W. Moxley, RMR, CRR, CMRS
                            United States District Court
                            46 East Ohio Street, Room 340
                            Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

# I N D E X

**GOVERNMENT'S WITNESSES:**                              **PAGE**

ANGELA BATES

Direct Examination by Ms. Korobov ...............4
Cross-examination by Mr. Thomas ................37
Redirect examination by Ms. Korobov ............43
Recross-examination by Mr. Thomas ..............46

TYRIA GRAHAM

Direct Examination by Mr. Shepard ..............48
Cross-examination by Mr. Thomas ................60
Redirect examination by Mr. Shepard ............74
Recross-examination by Mr. Thomas ..............77

HEIDI CONCES

Direct Examination by Mr. Shepard ..............79
Cross-examination by Mr. Thomas ...............100
Redirect examination by Mr. Shepard ...........113

ELI McALLISTER

Direct Examination by Mr. Shepard .............119
Cross-examination by Mr. Thomas ...............182
Redirect examination by Mr. Shepard ...........215
Recross-examination by Mr. Thomas .............225

M.R.

Direct Examination by Ms. Korobov .............235
Cross-examination by Mr. Thomas ...............239

ELI McALLISTER

Direct Examination by Ms. Korobov .............246
Cross-examination by Mr. Thomas ...............256
Redirect examination by Ms. Korobov ...........261

GRANT MELTON

Direct Examination by Mr. Shepard .............264
Cross-examination by Mr. Thomas ...............299

**DEFENDANT'S WITNESS:**                                    **PAGE**

ALI AL-AWADI

Direct Examination by Mr. Thomas ..............308
Cross-examination by Ms. Korobov ..............350
Redirect Examination by Mr. Thomas ...........409
Recross-examination by Ms. Korobov  ..........417

# I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBITS:**                                  **PAGE**

2  ...........................................51
3  ..........................................295
7  ..........................................282
8  ..........................................282
9  ..........................................282
10 ..........................................282
19 ...........................................82
24 ...........................................97
25 ..........................................154
27 ..........................................268
28 ..........................................171
29 ..........................................167
34 ..........................................271
36 ..........................................381
37 ..........................................277
42 ..........................................134
43 ..........................................134
65 ...........................................51
66 ...........................................51
67 ...........................................51
69 ..........................................287

*BATES – DIRECT/KOROBOV* 4

1          (In open court.)

2                  * * *

3               EXCERPT

4                  * * *

5          THE COURT:  Okay.  All right.  Thank you.  And now

6   you may call your next witness.

7          MS. KOROBOV:  Thank you.  The government calls

8   Angela Bates.

9          THE COURT:  Okay.  Ms. Bates, come right over here

10  to the witness stand.  And if you would remain standing and

11  raise your right hand and face me.

12          (The witness is sworn.)

13          THE COURT:  You may have a seat.

14          And, Ms. Korobov, you may examine your witness.

15          MS. KOROBOV:  Thank you, Your Honor.

16      **ANGELA BATES, PLAINTIFF'S WITNESS, SWORN**

17              <u>**DIRECT EXAMINATION**</u>

18  BY MS. KOROBOV:

19  Q.  Ms. Bates, would you tell the jury your name and spell

20  your first and your last name?

21  A.  Angela Bates, A-N-G-E-L-A; Bates, B-A-T-E-S.

22  Q.  Ms. Bates, how are you employed?

23  A.  I'm a forensic nurse at Riley Hospital for Children.

24  Q.  And are you a registered nurse?

25  A.  Yes, I'm a registered nurse.

 1  Q.  I'm sorry.  What kind of nurse?

 2  A.  Yes, I'm a registered nurse.

 3  Q.  A registered nurse?  And you're licensed by the State of

 4  Indiana to practice nursing?

 5  A.  Yes.

 6  Q.  When did you obtain your nursing license?

 7  A.  2005.

 8  Q.  And could you describe for the jury your educational

 9  background?

10  A.  I received a Bachelor's of Science, a nursing degree, in

11  2005 from Indiana University Northwest.  In 2010, I went

12  through adult and adolescent sexual assault training, finished

13  that class; and I also have training with pediatric sexual

14  assaults.  And that was in 2013.

15  Q.  Okay.  I'll back up to that in a moment.  You indicated to

16  the jury that you were a forensic nurse.  What does it mean to

17  be a forensic nurse?

18  A.  That means you have specialized training in evidence

19  collection, forensic photography, and documentation.

20  Q.  And you indicated that you underwent some specialized

21  training in order to get that designation; is that correct?

22  A.  Correct.

23  Q.  Okay.  You mentioned your first training that you went

24  through in order to become a forensic nurse.  How many -- can

25  you describe how that training works?  Is it like course --

1  classroom work?  Is it hands-on work?  How does it go?

2  A.  The adult and adolescent courses that I took in 2010, it

3  was about a, I'm going to say, six-week course.  It was filled

4  with -- you have to do like a certain number of sexual assault

5  exams.  There were some domestic violence cases and elder

6  abuse, some child -- pediatric sexual assault exams.  We met

7  with a prosecutor, social workers, law enforcement, even the

8  coroner, and crime lab.

9  Q.  Okay.  And you indicated that you also received

10  specialized training in pediatrics in order to examine

11  children.  Could you describe that training for the jury?

12  A.  The training for pediatric sexual assaults was done in

13  2000 -- actually it was 2012, and that was done in Virginia.

14  And that's pretty much the same thing, but that was a 40-hour

15  one-week full course.  Everything was centered on pediatric

16  sexual assaults and physical child abuse.  That was all

17  classwork.  And then after, I was trained by the physicians at

18  Riley Hospital for Children to continue on with those exams.

19  Q.  Could you describe your work history for the jury?

20  A.  Okay.  In 2005, I worked as a pediatric cardiac nurse at

21  Riley Hospital for Children, until about 2010.  2010, I went

22  to the Riley Hospital for Children Emergency Department, which

23  I was there until 2013.  And during that same period, I was

24  doing pediatric sexual assault exams.

25          In 2014, I started at St. Vincent Anderson to do

 1  their sexual assaults there for pediatrics only.  And I also

 2  started working at Peyton Manning at the same time, which was

 3  in 2014, doing sexual assault exams for their pediatric

 4  patients, adults, and did elder abuse, domestic violence, and

 5  those types of cases, as well.

 6  Q.  And you currently work at Riley Hospital for Children?

 7  A.  Yes.

 8  Q.  Okay.  And so all the patients that you saw during your

 9  time at Riley were children, as well; is that accurate?

10  A.  Correct.

11  Q.  Okay.  How long have you been performing sexual assault

12  examinations on children?

13  A.  Six years.

14  Q.  And about how many sexual assault exams on children have

15  you completed?

16  A.  Over 500.

17  Q.  All right.  And have you also testified in court and in

18  depositions about that work?

19  A.  Yes.

20  Q.  I want to talk to you specifically about the protocol

21  followed at St. Vincent Hospital, Peyton Manning Children's

22  Hospital.  What happens when a patient comes in and there's an

23  allegation that the patient has been sexually assaulted?

24  A.  They first stop at the registration desk.  The

25  registration desk, the registrar, they put down information

1   stating that parents may -- they request an exam, and they may

2   put down what the complaint is.  That also triggers a response

3   that says a Center of Hope nurse should respond to this

4   patient at some point in time in their treatment.

5           Then they get triaged by one of the regular ER

6   nurses after that.  And the triage just pretty much says vital

7   signs, height and weight.  And then after that, the Center of

8   Hope nurse or sexual assault nurse examiner -- I would come in

9   and talk to the parents and kind of figure out what their

10  allegations are.

11  Q.  Let me stop you there.  What's the point of kind of

12  talking to the parents at that point in time?

13  A.  The point of talking to the parents is to figure out

14  what's going on, because there are a lot of medical things

15  that could be going on that we need to test for and look into

16  and investigate.

17  Q.  Okay.  And so is the purpose of that conversation for

18  diagnosis and medical treatment?

19  A.  Yes.

20  Q.  And after you speak with the parents or whoever has

21  brought the child in -- is it always the parent?

22  A.  No.

23  Q.  Okay.  So after you speak to that person, what do you do

24  next?

25  A.  After we speak with the parents, we notify the hospital

1  social worker; we notify the emergency room doctor, as well;

2  and then we go into an exam room.

3  Q.  And who goes into the exam room with you?

4  A.  Normally a parent, the physician, myself, and the patient.

5  Q.  And what happens in an exam room?

6  A.  In the exam room, we do first just a regular physical

7  exam, head-to-toe assessment.  Myself, normally I go do my

8  head-to-toe assessment first.  If there's anything that seems

9  like different, any type of injuries, or anything like that,

10  then I will do some photo documentation of those on just the

11  arms, legs, those types of things that are just visible.

12        After that, the physician and I both will do a

13  genital exam, which that's when we'll do more of our forensic

14  evidence collection and our photography of the genital area.

15  And after that is done, we'll send off all of our labs and

16  package up the -- any evidence that we have retrieved.

17  Q.  Okay.  So you indicated that you do an exam of the child?

18  A.  Uh-huh.

19  Q.  You do a genital exam of the child?

20  A.  Yes.

21  Q.  You collect forensic evidence?

22  A.  Yes.

23  Q.  You take photography, as well?

24  A.  Correct.

25  Q.  Then you said you package up the evidence itself?

1   A.   Uh-huh.

2   Q.   Do you also document what it is that you found as you've

3   been doing this examination?

4   A.   Yes.

5   Q.   So you actually create a medical record, too?

6   A.   Correct.

7   Q.   All right.  And is the evidence then stored somewhere?

8   A.   Yes.

9   Q.   And can you describe for the jury where that's stored at

10  Peyton Manning Children's Hospital?

11  A.   We have a locked and secured evidence refrigerator that's

12  only accessible to the Center of Hope staff.

13  Q.   And how does someone who is not from the Center of Hope,

14  like the crime lab personnel, get access to that locker, or

15  that refrigerator?

16  A.   They don't.  They have to get access to a Center of Hope

17  nurse, and then the nurse actually opens it up.

18  Q.   Okay.  And provides the evidence to them?

19  A.   Correct.

20  Q.   I want to talk to you specifically about a patient named

21  M.R.           On August 21st of 2014, did you see that

22  patient?

23  A.   Yes.

24  Q.   And did you follow the protocol that you've described

25  above in assessing and treating M.R.?

*BATES – DIRECT/KOROBOV*                11

1    A.  Yes.

2            MS. KOROBOV:  Please display item 77.

3    BY MS. KOROBOV:

4    Q.  Is this the patient you saw, M.R.?

5    A.  Yes.

6    Q.  And when a patient comes into the hospital, do they

7    receive like a little identification bracelet?

8    A.  Yes.

9            MS. KOROBOV:  Display item 17, please.

10   BY MS. KOROBOV:

11   Q.  And is this the bracelet that M.R. received when she came

12   into the hospital?

13   A.  Yes.

14   Q.  Thank you.  What time did M.R. and her family present to

15   Peyton Manning Children's Hospital for treatment?

16   A.  Approximately 8:15 p.m.

17   Q.  And was preliminary information taken from M.R.'s family?

18   A.  Yes.

19           MS. KOROBOV:  Display item 12, please.

20   BY MS. KOROBOV:

21   Q.  Do you -- you indicated that someone else actually obtains

22   that information; is that correct?

23   A.  Yes.

24   Q.  Government's Exhibit Number 12, is that that initial

25   intake form that gets completed on M.R. when she first came

1   into the hospital?

2   A.  Yes.

3   Q.  And about what time was it that you began your care of

4   M.R.?

5   A.  Could I look at my chart here?

6          MS. KOROBOV:  May the witness refer to Government's

7   Exhibit Number 11?

8          THE COURT:  Do you have any objection, to refresh

9   her recollection?

10          MR. THOMAS:  After she stated she doesn't recall?

11          THE COURT:  Are you attempting to refresh her

12   recollection?

13          MS. KOROBOV:  I am.  It's an admitted exhibit, as

14   well.

15          MR. THOMAS:  No objection.

16          THE COURT:  You may.

17   BY MS. KOROBOV:

18   Q.  Ms. Bates, I'll direct you to the binder in front of you.

19   Government's Exhibit 11 contains a certified medical record.

20   And in there would be your records of the exam.

21   A.  Okay.

22          MS. KOROBOV:  May I approach the witness with the

23   page of this exhibit?

24          THE COURT:  You may.

25   BY MS. KOROBOV:

1  Q.  Ms. Bates, I'm showing you one of the pages from

2  Government's Exhibit Number 11, marked "ER Triage Note V2."

3  If the report indicates that, "Start R.N. talking with family

4  at 8:39 p.m.," would that be an accurate assessment of the

5  approximate time --

6  A.  Yes.

7  Q.  -- you began speaking with her?

8  A.  Yes.

9  Q.  Thank you.  And who was in the room when you began your

10 care of M.R.?

11 A.  Her mother -- initially it was her mother, her father, and

12 I believe a grandparent, and one of the emergency room

13 physicians.

14 Q.  Okay.  And did you do a head-to-toe examination of M.R.?

15 A.  Correct.

16 Q.  And did you find anything remarkable or out of the

17 ordinary with respect to M.R.'s exam?

18 A.  No.

19 Q.  Was she a child in good health?

20 A.  Yes.

21 Q.  Did she meet all the standards for her age?

22 A.  Yes.

23 Q.  Well nourished?

24 A.  Yes.

25 Q.  And could she communicate with you appropriately?

1  A.  Yes.

2  Q.  Okay.  I want to talk about her genital examination.  Did

3  you do this?

4  A.  Yes.

5  Q.  And how did you do the examination?

6  A.  Per the hospital protocol.  First we just do a visual

7  examination, just actually looking at the areas, and you take

8  pictures of what you actually see.  You do swabs of that area.

9  Then you move on to the next area and do the same thing,

10  visual examination, swabs for forensic evidence collection,

11  and then hospital swabs for lab.  And then you move on to the

12  next area.

13  Q.  Okay.  I want to kind of break this down for the jury

14  because they are not nurses, okay?  So you say a "visual

15  examination."  What's M.R. wearing at the time that she has

16  this examination?

17  A.  At the time, I have her in a gown for her examination,

18  have her in a gown.  You just look at her, look at her arms,

19  legs, to see if there's anything that's coming out.  The

20  genital -- once you get to the genital exam, you do the same

21  thing.  You look at her genital area and see if there's any

22  type of injuries on the outside, anything that needs to be --

23  that's not supposed to be there, or anything that's different.

24  Q.  Okay.  When you're examining M.R. and you're examining

25  specifically her genitals, in what position is she?

1  A.  Normally she's -- well, she was actually lying on her

2  back.

3  Q.  Okay.  And so you did kind of an external genital exam

4  first; is that fair to say?

5  A.  Correct.

6  Q.  Okay.  And did you take photographs of what it is that you

7  observed?

8  A.  Yes.

9  Q.  And do you make findings and kind of note those findings

10  before you start collecting evidence from the area?

11  A.  Yes.

12  Q.  Okay.  And after you examined her external genitals -- let

13  me ask this:  With respect to her external genitals, did you

14  see anything remarkable or out of the ordinary?

15  A.  No.

16  Q.  Okay.  So what did you do after you examined her external

17  genitals?

18  A.  After you examine the external genitals, which are mainly

19  the labia majora and the mons pubis, such as the outside, you

20  will open up and then you will see the labia minora and the

21  inside structures.  And then you just look at those structures

22  to see if there's anything that's overtly, obviously wrong or

23  anything that looks different --

24  Q.  Okay.  You --

25  A.  -- the normal -- different or normal variation or if

1   there's something that's -- that needs to be addressed.

2   Q.  You said the kind of -- you open up the area.  Are you

3   using some kind of equipment on M.R. to do this?

4   A.  No.

5   Q.  Can you tell the jury how you do this?

6   A.  There's a technique.  It's just called labial separation

7   and labial traction.  So separation is just pretty much you

8   use your hands like this and just slide them just open just a

9   little bit.  It doesn't take a lot of pressure or anything

10  like that.  Traction is something -- it's pretty much -- it's

11  pretty similar to separation, but you use your hands and you

12  kind of hold onto the sides and just slide them to the side.

13  It's just a different view.

14  Q.  Okay.  And does doing this cause any kind of injury or

15  redness when you're doing this to M.R.?

16  A.  No.

17  Q.  Okay.  So you indicated there was nothing externally of

18  note.  When you examined M.R.'s internal structures, did you

19  see anything that was noteworthy?

20  A.  Yes.

21  Q.  And can you tell the jury what it is you saw?

22  A.  She had several areas of redness, mainly around her

23  hymenal area, several areas.  If I could -- there's --

24  Q.  I'm going to show you a diagram in just a minute.  Did you

25  note all the areas that you found on M.R. during your exam?

1  A.  Yes.

2  Q.  Okay.  And then I want to ask this:  Did you also take

3  photographs of what it is that you observed?

4  A.  Yes, I did.

5  Q.  All right.  And with respect to evidence collection, what

6  did you collect in M.R.'s case?

7  A.  In M.R.'s case, buccal swabs, external genital swabs,

8  internal genital swabs, anal swabs, underwear.  And we also

9  sent labs off to our hospital laboratory, as well.

10  Q.  Okay.  And before you did any kind of putting swabs inside

11  of M.R. or on M.R.'s skin, you had taken your photographs; is

12  that correct?

13  A.  Correct.

14  Q.  And you had also made your observations?

15  A.  Yes.

16  Q.  All right.  You indicated that you charted your findings,

17  as well; is that correct?

18  A.  Correct.

19  Q.  Okay.

20          MS. KOROBOV:  Would you display item 13, please,

21  Exhibit 13?

22  BY MS. KOROBOV:

23  Q.  Would you take a look at Exhibit Number 13?  Does this --

24  is this part of your documentation in this particular case?

25  A.  Yes.

1       MS. KOROBOV:  Okay.  And I want to go specifically

2   to this portion of the note here.  My drawing is awful there.

3   If we can blow that up.

4           And it's going to be hard to read now, because my

5   writing is actually -- there we go.  All right.  My first time

6   using this equipment.

7   BY MS. KOROBOV:

8   Q.  So, with respect to this particular part of the

9   examination, where did these words come from that you've

10  written in your note?

11  A.  These words came from the child's mother.

12  Q.  Okay.  And so you're asking at this point, essentially,

13  what does the child call different parts of her body; is that

14  correct?

15  A.  Correct.

16  Q.  And the female sex organ in this case M.R. called what?

17  A.  Tito.

18  Q.  Okay.  And so you just write down whatever it is that they

19  give you; is that correct?

20  A.  Correct.

21      MS. KOROBOV:  Okay.  And we can back out of that,

22  please.  If we could go to Exhibit 14, display 14.

23  BY MS. KOROBOV:

24  Q.  And on Government's Exhibit Number 14, in this particular

25  case, did you, as well, document on here -- make documentation

1  with respect to M.R.'s genital and anal area; is that correct?

2  A.  Correct.

3  Q.  Okay.  With respect to this under genital and anus, it

4  says, "Pertinent Findings:  See Body Map."  Did you create a

5  specific body map in this case?

6  A.  Yes.

7  Q.  Okay.  And is that where you documented the different

8  findings that you made with respect to M.R.?

9  A.  Yes.

10  Q.  All right.  On here you indicated that you used "Direct

11  Visualization," "Labial Traction," and "Labial Separation."

12  Are those the methods that you've previously described in

13  order to see M.R.'s genitals?

14  A.  Yes.

15  Q.  Okay.  And you indicated on here that M.R. is a, "Breast

16  Tanner Stage 1."  What does that mean?

17  A.  That means that she has no signs of puberty occurring

18  anytime soon.

19  Q.  Okay.  And, "Genital Tanner Stage 1."  What does that

20  mean?

21  A.  Pretty much the same thing, no signs of pubertal

22  development at all.

23  Q.  Okay.

24  A.  Very basic stage of female development.

25  Q.  And with respect to -- it says, "Hymen," and it gives you

1  kind of four choices here.  You checked that her hymen is

2  "Annular."  What does that mean?

3  A.  It's more of a rounded circular shape.

4  Q.  Okay.  So this is just describing the shape of the hymen?

5  A.  Yes.

6  Q.  Okay.  You indicated you collected samples from M.R.; is

7  that correct?

8  A.  Correct.

9  Q.  Okay.  Right up there underneath that binder to your left

10  on the countertop is a kit.  It's Government's Exhibit

11  Number 48.  Do you recognize Government's 48?

12  A.  Yes.

13  Q.  Okay.  And how do you recognize Government's 48?

14  A.  This is the sexual assault kit that I actually collected

15  and performed.

16  Q.  And is this M.R.'s kit?

17  A.  Yes.

18  Q.  And do you recognize it based on your writing and your

19  initials on the kit?

20  A.  Yes.

21  Q.  Okay.  I'm going to ask you to open Government's 48.

22          Okay.  Inside of Government's Number 48, I'm going

23  to ask you to remove Government's 40 -- Exhibit Number 49.

24  Excuse me.  What is Exhibit Number 49?

25  A.  49 are the buccal swabs from M.R.

1   Q.  And can you tell the jury what a buccal swab is?

2   A.  It's a swab.  It's just one of our -- well, the state's

3   actual swab that we use.  And you rub it on the inside of her

4   actual cheek to get her DNA cells.

5   Q.  Is this for comparison purposes later on?

6   A.  Yes.

7   Q.  Okay.  And where do you get the swabs from that you use in

8   order to collect M.R.'s DNA on those?

9   A.  From the collection kit that comes from the State of

10  Indiana.

11  Q.  So is this a prepackaged kit with a bunch of envelopes in

12  it?

13  A.  Correct.

14  Q.  You then collect the evidence -- the items of evidence

15  from the patient and put it back in the kit; is that correct?

16  A.  Correct.

17  Q.  Okay.  Item number 49, I ask you to flip it over on the

18  back.  Does 49 have your patient identification label on it?

19  A.  Yes.

20  Q.  Okay.  And does it indicate that you took the swab from

21  M.R.?

22  A.  Yes.

23  Q.  And is your label still intact on that swab?

24  A.  Yes.

25  Q.  Okay.  I ask you to put that back down and I ask you to

1 retrieve Government's Exhibit Number 50-- or Exhibit

2 Number 50.  What do you recognize Number 50 to be?

3 A.  50 is a swab, saline dripped over a hymen swab.

4 Q.  Okay.  Can you explain to the jury how it is you collected

5 these swabs?

6 A.  For this sexual swab -- these swabs here, at the end of

7 the vaginal part of the exam, you just drip a couple

8 milliliters of just normal -- some saline over the hymen, just

9 a little bit of water.  It kind of rinses off any debris

10 that's on the actual hymen.  And then you just collect it with

11 a swab at the bottom.  And it sucks up anything that may have

12 been on the hymen.

13 Q.  So these were collected from M.R.'s body?

14 A.  Correct.

15 Q.  And flip over that item.  Do you see your label and your

16 identifiers on it?

17 A.  Yes.

18 Q.  And is that label still intact?

19 A.  Yes.

20 Q.  Okay.  I'll ask you to retrieve from that box Government's

21 Exhibit Number 51.  Do you recognize Government's 51?

22 A.  Yes.

23 Q.  And what do you recognize it to be?

24 A.  Internal genitalia.

25 Q.  Okay.  And what are the internal genitalia swabs or items?

1  A.  The swabs -- the areas that would be swabbed is the

2  clitoris, labia minora, outside of the hymen, posterior

3  fourchette, just pretty much anything inside of the labia

4  majora.

5  Q.  Okay.  And do you see your label on the back of that item?

6  A.  Yes.

7  Q.  And is your label still intact?

8  A.  Yes.

9  Q.  I ask you to retrieve Government's Number 52 from the kit.

10  And do you recognize Government's 52?

11  A.  Yes.

12  Q.  And what do you recognize Exhibit 52 to be?

13  A.  External genital swabs.

14  Q.  And can you tell the jury how you collect those?

15  A.  These swabs were done on the outside of the actual

16  genitals, so the labia majora and the mons pubis, the area all

17  around the actual -- her genital -- her genital area.  So

18  pretty much what's under the panties in the front, if that

19  paints a picture for you.

20  Q.  Okay.  When you say the "mons pubis," can you tell the

21  jury where that is?

22  A.  The area above the labia majora.  On a lady, it would be

23  pretty much the triangle area of her -- like where her panties

24  would be covering.

25  Q.  Okay.  And that's part of the area that you swabbed in

1  this case?

2  A.  Correct.

3  Q.  And do you see your patient identification label on there?

4  A.  Yes.

5  Q.  And is your seal still intact?

6  A.  Yes.

7  Q.  Okay.  I'm going to ask you to retrieve Government's -- or

8  excuse me, Exhibit 53.  And do you recognize 53?

9  A.  Yes.

10  Q.  And what do you recognize it to be?

11  A.  Oral swabs.

12  Q.  And where were the oral swabs obtained?

13  A.  These are obtained in the child's mouth.  You just go

14  around the gum line, back of the teeth, and go all the way

15  around the uppers and lowers with two different swabs.

16  Q.  And then those swabs are packaged in this packaging here?

17  A.  Yeah.

18  Q.  Okay.  And does that have your label on it?

19  A.  Yes.

20  Q.  Okay.  And is your label still intact?

21  A.  Yes, it is.

22  Q.  And I'll ask you to retrieve Exhibit Number 54 from the

23  box.  And do you recognize item 54?

24  A.  Yes.

25  Q.  And what do you recognize it to be?

1  A.  Anal swabs.

2  Q.  And how do you take an anal swab from a child?

3  A.  You go around the actual anal opening, just use some --

4  first you use a wet swab, and then you use a dry swab.  So

5  there's only two swabs in here.

6  Q.  Okay.  And were those swabs packaged in that item --

7  envelope?

8  A.  Yes.

9  Q.  And is your seal on that envelope?

10  A.  Yes.

11  Q.  Okay.  With respect to the box, as well as Exhibits 49,

12  50, 51, 52, 53, and 54, are there some other labels on there

13  that you did not place on there?

14  A.  Yes.

15  Q.  Okay.  Other than that, are your seals still intact on

16  those items?

17  A.  Yes.

18  Q.  And those items are in the same or substantially the same

19  condition as when you put them in that box?

20  A.  Yes.

21  Q.  Okay.  I'll ask you to retrieve from that box Exhibit

22  Number 5.  What is Exhibit Number 5?

23  A.  The victim's underpants.

24  Q.  Okay.  And how did you collect the underwear in this

25  particular case?

1  A.  The underwear was actually provided to me by a family

2  member.

3  Q.  And what did you do with the underwear once you were given

4  it?

5  A.  Put them in the bag and sealed it with the rest of my

6  evidence.

7  Q.  Okay.  And are your identification labels on that item?

8  A.  Yes.

9  Q.  Okay.  And are there other items -- there are other labels

10 on that item, as well, correct?

11 A.  Correct.

12 Q.  Other than those labels, is the item in the same or

13 substantially the same condition as when you last saw it?

14 A.  Yes.

15 Q.  Okay.  So after you collect all of these items, what do

16 you do with that kit?

17 A.  The kit is sealed, signed, and placed in a locked

18 refrigerator.  And then it isn't released until law

19 enforcement comes and gets it.

20 Q.  So is that what you did with item 48 and all of those

21 items, including the underwear?

22 A.  These are all locked and sealed in the refrigerator.

23 Q.  I'm going to ask you to refer in that binder to item 64.

24 And with respect to item number 64, do you recognize item 64?

25 A.  Yes.

1  Q.  What do you recognize item 64 to be?

2  A.  The sex crimes application.

3  Q.  Okay.  What does -- what purpose does that particular

4  sheet serve for you?

5  A.  It's a secondary waive of consent from the parents for us

6  to treat the child.  It also -- it's an application for

7  benefits for payment for a hospital for actually providing the

8  exam.  And it's also -- it also is a chain of evidence form

9  for law enforcement.

10  Q.  Okay.  So do you complete a portion of that form?

11  A.  Yes.

12  Q.  Okay.  Indicating what evidence was collected?

13  A.  Yes.

14  Q.  Okay.  And then does the crime lab come in and complete

15  another portion of that form?

16  A.  Yes.

17  Q.  However, the portions of the form that have your name and

18  your information on it is information that you actually

19  completed; is that correct?

20  A.  Correct.

21  Q.  Okay.  You indicated that you took photos of your findings

22  with respect to M.R.; is that correct?

23  A.  Yes.

24  Q.  I'm going to ask you to refer to item 78 in that binder.

25  And I would ask you to remove that disk and look at it.  Do

1  you recognize Exhibit 78?

2  A.  Yes.

3  Q.  And how do you recognize Exhibit 78?

4  A.  It's the CD of the photos from the sexual assault exam

5  performed on M.R.

6  Q.  And how do you recognize it in particular?

7  A.  Her name is on it, all her identifying factors, our time

8  stamp that pretty much says "Photos," and then my initials are

9  on this.

10  Q.  Okay.  Did you actually look at that disk to make sure

11  that contained the photos taken during your examination?

12  A.  Yes.

13  Q.  Okay.  And as best photos can, do they truly and

14  accurately show the way that M.R.'s body looked on August 21st

15  of 2014?

16  A.  Yes.

17          MS. KOROBOV:  At this time, the government would

18  move to admit Government's -- Exhibit 78.

19          THE COURT:  Any objection to 78?

20          MR. THOMAS:  I don't know that 78 has --

21          THE COURT:  78 is a -- well, in my book, it's a

22  picture of a Center of Hope photo.  So you have the actual CD

23  somewhere?

24          MS. KOROBOV:  It is right here.

25          THE COURT:  Okay.

1      MR. THOMAS:  I don't know if that's the --

2      MS. KOROBOV:  It's actually -- at this point, it's

3  actually already been admitted by certification, so I'll

4  withdraw the motion to admit --

5      THE COURT:  Okay.

6      MS. KOROBOV:  -- because it has been admitted.

7      THE COURT:  It's already in.

8      MR. THOMAS:  Yeah, I think it has.  I was going to

9  say, I don't know if it's the best evidence for the photos, if

10  they are going to admit those, but it's --

11      THE COURT:  The actual --

12      MR. THOMAS:  -- part -- it's part of the exam kit.

13      MS. KOROBOV:  We just have the disk.  It's already

14  in.

15      THE COURT:  Okay.  The actual disk is already in.

16  Okay.

17      MS. KOROBOV:  Thank you.

18  BY MS. KOROBOV:

19  Q.  With respect to M.R.'s examination, I want to draw your

20  attention, again, to Exhibit Number 14, which is displayed on

21  the screen.  Right under the words, "Genital/Anus," it says,

22  "omit AB."  What does that mean?

23  A.  That means that that was not supposed to be checked.  And

24  instead of getting a brand new chart or starting anything new,

25  you want to just keep it -- keep it what -- it is what it is,

1   so you -- I just wrote down "omit," so to take that out, and

2   my initials to say that I know that that was checked wrong,

3   but it's crossed out so it's not a part of the chart.

4   Q.   Okay.   So it is not correct that there was no injury

5   noted, and then you direct to see the body map --

6   A.   Correct.

7   Q.   -- is that accurate?   Okay.

8        MS. KOROBOV:   Call Government Exhibit 15, please.

9   BY MS. KOROBOV:

10   Q.   With respect to Government's 15, do you recognize 15?

11   A.   Yes.

12   Q.   And on Exhibit 15, is this the body map that you created

13   with respect to the findings that you made with respect to

14   M.R.?

15   A.   Yes.

16        MS. KOROBOV:   And I'm going to enlarge a portion of

17   this here.   We need to back out, please.   This is the portion

18   I would like enlarged, please.

19   BY MS. KOROBOV:

20   Q.   All right.   With respect to your specific findings on

21   here, you've got a number "1."   What does finding number 1

22   reflect?

23   A.   Swelling, redness, erythema to the hymen at 12:00,

24   which --

25   Q.   Okay.   What is erythema?

1    A.  It's redness and irritation.

2    Q.  Okay.  And when you say "swelling," can you describe for

3    the jury exactly what it is that you saw?

4    A.  A raised area that's edematous.

5    Q.  Okay.  Can you specifically touch on that diagram where it

6    is that you saw swelling on M.R.?  Just go ahead and put your

7    finger there.  It's going to create a little arrow.

8            Okay.  So the red dot there is where you observed

9    swelling on M.R.'s hymen; is that correct?

10   A.  Correct.

11   Q.  And with respect to finding number 2, could you tell the

12   jury what it is that you saw with finding number 2?

13   A.  Red coloration noted around the hymen on the left side, in

14   the vestibular area, which is inside of the labia minora,

15   going down into the hymen.

16   Q.  Okay.  And was that on both sides of her vaginal opening?

17   A.  Yes.

18   Q.  Okay.  Because number 2, it looks like there's a couple of

19   lines there.  Is that number 2 or number 3?

20   A.  That's -- number 2 and number 3 are pretty much the same.

21   Q.  Okay.  Can you just go ahead again and touch there on what

22   your findings were for number 2, the red coloration noted to

23   the peri-hymenal area on the left side?

24   A.  Okay.  Here.

25   Q.  Okay.  And then with finding number 3, could you describe

1  what that was to the jury?

2  A.  Number 3 is red coloration to the hymen between 6:00 and

3  11:00.  And that's actually on the hymen, not necessarily on

4  the outside of the hymen.

5  Q.  So on the hymen itself, you noted that it was red and

6  swollen?

7  A.  On the hymen, it's between 6:00 and 11:00.  It was, yeah,

8  red in color, red coloration, and also swollen.  Sorry.

9  Q.  Okay.  And when you say 6:00 and 12:00, or 6:00 and 11:00,

10 what are you referring to?

11 A.  We use the hymen -- hymenal opening, sort of, we use a

12 clock as a reference, like a regular hand clock.  So

13 12:00 would be towards, like, the patient's head.  6:00 would

14 be towards, like, the patient's feet.

15 Q.  Okay.  So that red dot that you previously made to reflect

16 finding number 1, would that essentially be the 12:00

17 position?

18 A.  Yes.

19 Q.  Okay.  Now, in here you've got some numbers.  What do

20 those numbers reference?

21 A.  The photo numbers?

22 Q.  Yes, ma'am.

23 A.  The numbers reference like the actual pictures where you

24 can see that particular area of concern, her injury.

25 Q.  When you take the findings of the patient, I want to talk

1  a little bit about that photography process.  You actually --

2  each photo has a number; is that correct?

3  A.  Correct.

4  Q.  Who is present when those photos are taken?

5  A.  The patient, parent, physician, and myself.

6  Q.  And contained in the medical record is a specific question

7  you ask of the parent, permission to take those photos?

8  A.  Yes.

9  Q.  And when you take the photos themselves, is that noted in

10 the medical record specifically that you've taken photos?

11 A.  Yes.

12 Q.  Okay.

13         MS. KOROBOV:  All right.  And we can remove that

14 exhibit, please.

15 BY MS. KOROBOV:

16 Q.  Did you find any medical cause as to the condition of

17 M.R.'s hymen or peri-hymenal area, the swelling and the

18 redness that you saw?

19 A.  No.

20 Q.  And are there things that can medically cause a child's

21 body to become red in that area?

22 A.  Yes.

23 Q.  Okay.  And can you give us an example of one of those

24 conditions?

25 A.  Lichen sclerosis.

*BATES - DIRECT/KOROBOV*          34

1   Q.  Okay.  Can you tell the jury what lichen sclerosis is?

2   A.  Lichen sclerosis is a -- like an autoimmune-type

3   condition.  It's -- layman terms, it's like eczema of the

4   genital area.

5   Q.  Okay.  Is that what M.R. had?

6   A.  No.

7   Q.  Okay.  Did you find any medical explanation for what it is

8   that you observed with respect to M.R.'s hymen?

9   A.  No.

10  Q.  Were the findings consistent with the account that was

11  provided to you by M.R.'s mother?

12  A.  Yes.

13  Q.  And in the final report, did you specifically document

14  what information had been provided to you when you examined

15  M.R.?

16  A.  Yes.

17         MS. KOROBOV:  I would ask you to display Exhibit 16,

18  please.

19  BY MS. KOROBOV:

20  Q.  I'm going to enlarge this area and ask that you read that,

21  please.

22         MR. THOMAS:  Your Honor, I object.  I mean, it's

23  been admitted into evidence.  The document speaks for itself.

24         MS. KOROBOV:  Judge, I just -- she should be able to

25  read it so the jury doesn't have to strain to read what it is

1  that's been documented.

2          MR. THOMAS:  Well, Judge, I mean, the document is

3  the best evidence, and it's already in and speaks for itself.

4          THE COURT:  What are you asking her to read?  The

5  entire document?

6          MS. KOROBOV:  I'm asking her to read the two

7  paragraphs that are there, the two paragraphs and two

8  sentences.

9          THE COURT:  Well, I don't think it will hurt

10 anything.  The jury is going to have it when they deliberate.

11         MR. THOMAS:  Well, Judge, it's also emphasizing a

12 certain point in the evidence and, as I said, we have the

13 document.  The jury can decide that.

14         THE COURT:  I'll overrule it.  I'll let her read it

15 into the record.

16 BY MS. KOROBOV:

17 Q.  You can read Exhibit 16, please.

18 A.  "August 21, 2014.

19         "M.R. arrived at St. Vincent Hospital via private

20 vehicle, accompanied by her mother (Miosotis Rodriguez)," her,

21 "father (Justo Guevara) and extended family members.

22 Miosotis Rodriguez and Justo Guevara report M.R. stated,

23 'Someone touched her down there,' and request her to be

24 evaluated.

25         "This Sexual Assault Nurse Examiner offered Miosotis

1   Rodriguez and Justo Guevara a Spanish interpreter.  Miosotis

2   Rodriguez and Justo Guevara declined Spanish language services

3   at this time.  This Sexual Assault Nurse Examiner informed

4   Miosotis Rodriguez and Justo Guevara of the role and services

5   provided by a Sexual Assault," Nurse, "Examiner, including

6   photography.  Miosotis Rodriguez and" --

7           THE REPORTER:  I'm sorry.  You need to slow down.

8           THE DEFENDANT:  Oh, sorry.

9           "Miosotis Rodriguez and Justo Guevara verbalized an

10  understanding and consents were obtained via protocol and

11  signed per Miosotis Rodriguez.

12          "Miosotis Rodriguez reports M.R. was picked up from

13  Bright Horizons daycare at approximately 1730.  Miosotis

14  Rodriguez states M.R. told Justo Guevara that, 'she hurt down

15  there.'  Miosotis states Justo gave M.R. some diaper rash

16  cream and told her to put it down there.  Miosotis states

17  Justo told her M.R. complained of pain in her 'Tito.'

18  Miosotis states," that -- "states she asked M.R., 'why does it

19  hurt down there?'  Miosotis states, 'M.R. started crying and

20  ran to her room saying no, no, no.'.

21          "Miosotis reports she went and picked up M.R. and

22  asked, 'why does it hurt down there?'  Again, Miosotis states

23  this time, 'M.R. just peed all over me.  She told me Mr. Ali

24  touched me with his finger down there and it hurts.'  Miosotis

25  states she asked M.R., 'Why didn't you tell me right away?'

1    Miosotis states M.R. told her, 'he said not to tell anybody.'

2            "Miosotis states she called Bright Horizons and was

3    informed, 'yes, we know of the situation, Mr. Ali is suspended

4    and we will investigate this.'

5            "Forensic Examination complete, DCS has been

6    notified," and, "IMPD is involved."

7            MS. KOROBOV:  Pass the witness for

8    cross-examination.

9            THE COURT:  You may cross-examine.

10           MR. THOMAS:  Thank you, Your Honor.

11                       **CROSS EXAMINATION**

12   BY MR. THOMAS:

13   Q.  Ms. Bates, essentially -- I mean, your job is more as an

14   evidence collector than a healthcare provider at this point in

15   your job, is that -- do you agree with that?

16   A.  No.  We do both, forensics and medical care.

17   Q.  I understand.  It's a hospital.

18   A.  Yes.

19   Q.  And I'm not suggesting you don't do medical care, but your

20   job -- they call you to do a forensic exam because they want

21   to make sure that it's somebody who knows how to collect

22   evidence, right?

23   A.  Yes.

24   Q.  If there's not a request for a forensics examiner, you

25   don't examine everybody, do you?

BATES - CROSS/THOMAS                    38

1   A.  I don't examine everyone.

2   Q.  So you are there specifically, obviously, to observe for

3   future medical treatment, but also to make sure that evidence

4   is collected?

5   A.  Yes.

6   Q.  And you know how to do that?

7   A.  Yes.

8   Q.  And you're there to specifically focus to see if you can

9   find an injury that's consistent with abuse, correct?

10  A.  Yes.

11  Q.  You said on direct that when you observed externally that

12  there was nothing of note -- was that what you said?

13  A.  Correct.

14  Q.  So someone observing MR. without doing a pelvic exam would

15  not have seen, as you say, anything noteworthy; is that right?

16  A.  If anyone did a pelvic exam on her, they would have seen

17  the same thing.

18  Q.  A pelvic exam?

19  A.  A pelvic exam.

20  Q.  But as you said, externally, you didn't notice anything of

21  note?

22  A.  No.

23  Q.  What you saw was internal?

24  A.  Yes.

25  Q.  And you don't know specifically when those injuries took

BATES - CROSS/THOMAS                39

1  place, do you?

2  A.  No.

3  Q.  And those don't last forever, right, the injuries like

4  that?

5  A.  No.

6  Q.  But they could last several days, right?

7  A.  Sometimes.

8  Q.  You have no way of telling from that exam when those

9  injuries took place?

10  A.  No.

11  Q.  And no way of knowing specifically how the injuries took

12  place?

13  A.  No.

14  Q.  There's nothing about the exam that says, well, a man's

15  finger caused that injury, right?

16  A.  I can't confirm or deny.

17  Q.  You couldn't rule it out, but there's nothing about it

18  that you could say, "Well, I can tell from this exam that a

19  man's finger caused this injury"?

20  A.  No.

21  Q.  If a man's finger or a woman's finger, you wouldn't --

22  would potentially cause the same injury, right?

23  A.  Correct.

24  Q.  It's possible that the child's hand could cause that

25  injury, too, right?

1  A.  Possible.

2  Q.  And did you note that she had been given diaper rash

3  cream?

4  A.  Yes.

5  Q.  And do you know how that was applied?

6  A.  No.

7  Q.  Do you know who applied it?

8  A.  In my notes, M.R. -- I think Father gave M.R. the diaper

9  rash cream and had her apply it.

10 Q.  That's what Dad told you, right?  Or I guess Mom told you

11 that Dad told her, right?

12 A.  Uh-huh.

13 Q.  You didn't see it applied?

14 A.  No.

15 Q.  Did you ever ask M.R. how she applied it?

16 A.  No.

17 Q.  Would that -- could that have been important?

18 A.  No.

19 Q.  No?  Well, if M.R. had applied it inside her vagina, would

20 that have been important?

21 A.  Yes, but she had pain before she applied it.

22 Q.  Well, that's what was reported, right?

23 A.  (Nods head up and down.)

24          THE COURT:  You have to answer out loud.

25          THE WITNESS:  Yes.

1        THE COURT:  Thank you.

2   BY MR. THOMAS:

3   Q.  By her parents?

4   A.  Yes.

5   Q.  Now, all the information that you have comes from M.R.'s

6   parents, right?  You don't have any other information at all,

7   right?

8   A.  Correct.

9   Q.  Did you inquire as to whether M.R. had bathed or showered

10  when that -- when she might have bathed or showered?

11  A.  Yes.

12  Q.  And what were you told about that?

13  A.  I believe they changed her, that they changed her

14  clothing.

15  Q.  But she had not bathed or showered before coming for the

16  exam, right?

17  A.  Not that I recall.

18  Q.  Well, that's not -- your records show that, right?  That's

19  what you were told?

20  A.  Yes, I believe so, or I can read if you tell me which --

21  Q.  Well, if you remember or don't remember.  Do you remember

22  or not?

23  A.  I remember her -- them saying that she changed -- that

24  they changed her bottoms, like her clothes, but I don't recall

25  if they told me if she had a shower -- took a shower or not.

1  Q.  Is that something you would normally ask?

2  A.  Usually I do.

3  Q.  And you have no information that she did, right?

4  A.  I probably wrote it down somewhere in the chart.  If I

5  could flip back to it?

6  Q.  Go ahead.

7  A.  Which exhibit is it?

8  Q.  They're not my exhibits, ma'am.

9           THE COURT:  Ms. Korobov, what number is the exhibit

10  in the binder?

11           MS. KOROBOV:  Your Honor, it's Exhibit Number 11.

12           THE WITNESS:  Thank you.

13  BY MR. THOMAS:

14  Q.  These are your notes, ma'am, so if you want to refer to

15  them, please do.

16           MS. KOROBOV:  It's on page 3 --

17           THE REPORTER:  I cannot hear you.

18           MS. KOROBOV:  On page 3 of the document --

19           THE REPORTER:  I'm sorry.  I still cannot hear you.

20           MS. KOROBOV:  Page 3 of the document stamp.

21           THE COURT:  Say it again.

22           MS. KOROBOV:  Page 3 of the document.

23           THE WITNESS:  I have it.

24  A.  She -- they changed her clothes, but they did not indicate

25  that she was given a bath or a shower.

 1  BY MR. THOMAS:

 2  Q.  Very good.  Nothing about the injuries that you saw that

 3  would specifically say that they were caused by a hand at all,

 4  right?

 5  A.  Correct.

 6          MR. THOMAS:  That's all.  Thank you.

 7          THE COURT:  Do you have any redirect?

 8          MS. KOROBOV:  May I have a moment, Your Honor?

 9          THE COURT:  You may.

10          (Off the record.)

11                  **REDIRECT EXAMINATION**

12  BY MS. KOROBOV:

13  Q.  Ms. Bates, when you do an examination of a child under

14  these circumstances, does your exam have multiple parts to it,

15  as you previously described?

16  A.  Yeah.

17  Q.  And is taking a patient history an important part of that?

18  A.  Crucial.

19  Q.  Okay.  And at the end, you're trying to give some

20  diagnosis and some treatment options for those particular

21  patients that you see; is that correct?

22  A.  Correct.

23  Q.  All right.  Now, counsel suggested that you're looking for

24  some kind of injury consistent with abuse.  When you begin

25  your exam of a patient and do your exam of a patient, is it

1  your goal to try to find some evidence that a child has been

2  abused?

3  A.  No.

4  Q.  Okay.  What's your goal?

5  A.  My goal is to figure out an answer to their concern, a

6  medical reason, primarily, to rule out anything.

7  Q.  Okay.  And do you document everything that you find?

8  A.  Yes.

9  Q.  Do you document it whether you find any kind of medical

10  finding or not?

11  A.  Yes.

12  Q.  And do you take pictures of what you find under any

13  circumstance?

14  A.  Yes.

15  Q.  When it comes to the conversation that you have about a

16  patient history, is it typical to not -- for you, to not

17  question the patient themselves?

18  A.  Yes.

19  Q.  Okay.  Who do you typically get the history from?

20  A.  I get the patient's information from their parents.

21  Q.  Or whoever brings them in?

22  A.  Law enforcement, DCS, yeah.

23  Q.  Okay.  You indicated in this case that M.R. had some

24  swelling in addition to redness to her hymen.  Did that tell

25  you anything about the recency of the findings that you made?

1   A.  With the tissue down there being pretty similar to, like,

2   the inside of your mouth.  I mean, you bite yourself on the

3   inside of your mouth today; four days from that, you're not

4   going to even know where you actually bit the inside of your

5   mouth.  So I would say within a few days.

6   Q.  Okay.  But it's not something that you can put a date on

7   with respect to these findings; is that correct?

8   A.  Correct.

9           MR. THOMAS:  This is a leading question at this

10  point.

11          THE COURT:  Don't --

12          MS. KOROBOV:  I can rephrase it.

13          THE COURT:  Go ahead and rephrase it.

14  BY MS. KOROBOV:

15  Q.  Are you able to put any kind of date stamp on when an

16  injury happened?

17  A.  No.

18  Q.  Were the findings that you made consistent with digital

19  penetration of M.R.'s vaginal area?

20  A.  Yes.

21          MS. KOROBOV:  Nothing further.

22          MR. THOMAS:  Just one thing, Judge.

23          THE COURT:  You may.

24

25

1                    **RECROSS EXAMINATION**

2  BY MR. THOMAS:

3  Q.  Just so I'm clear, "consistent with," means that it could

4  have been that, right?

5  A.  Correct.

6  Q.  It doesn't mean it couldn't have been something else,

7  right?

8  A.  Correct.

9              MR. THOMAS:  Thank you.

10             THE COURT:  Okay.  Any questions on that?

11             MS. KOROBOV:  No, Your Honor.

12             THE COURT:  May this witness be released from

13  subpoena?

14             MS. KOROBOV:  I ask that she be released to go home

15  today, but I may need to recall her under circumstances, so I

16  would ask that she remain under subpoena.

17             THE COURT:  Okay.  You may leave, but you're still

18  under subpoena.  If they need you, they will contact you

19  again.

20             THE WITNESS:  Okay.

21             THE COURT:  Thank you.

22             (Witness excused.)

23

24

25

1          **TUESDAY, FEBRUARY 23, 2016**

2                          * * *

3                        EXCERPT

4                          * * *

5          THE COURT:  Okay.  I believe we're all here and the

6  jurors have all arrived.  We're back on the record.  This is

7  the United States of America versus Ali Al-Awadi.  And is the

8  government ready for the jury?

9          MR. SHEPARD:  Yes, Your Honor.

10         THE COURT:  Defense ready?

11         MR. THOMAS:  Yes, Your Honor.

12         THE COURT:  And, Tanesa, you may bring in the panel.

13         Do you want to bring your witness in?

14         (Jury in at 9:13 a.m.)

15         THE COURT:  Good morning, ladies and gentlemen of

16 the jury.  I hope that you are well rested.  Did everyone

17 follow their admonishment last night and not talk to your

18 family and friends about the trial?  Everyone not?  Okay.

19 Very good.

20         We are back on the record, the United States of

21 America versus Ali Al-Awadi.  And, Mr. Shepard, you may call

22 your first witness of the day.

23         MR. SHEPARD:  The government calls Tyria Graham,

24 Your Honor.

25         THE COURT:  Okay.  And I believe she's coming in.

```
 1   Witness, if you would come right over here, come right up this

 2   way and go around that way.  Right over here, Ms. Graham.  All

 3   right.  Come on up that step and I need you to remain standing

 4   and face me and raise your right hand.

 5             (The witness is sworn.)

 6             THE COURT:  You may have a seat.

 7             Mr. Shepard, you may examine your witness.

 8         TYRIA GRAHAM, PLAINTIFF'S WITNESS, SWORN

 9                   DIRECT EXAMINATION

10   BY MR. SHEPARD:

11   Q.  Could you please state your name and spell it for the

12   record?

13   A.  Tyria Graham, T-Y-R-I-A.  Last name is Graham,

14   G-R-A-H-A-M.

15   Q.  Okay.  Where do you live?

16   A.  Here in Indianapolis.

17   Q.  How long have you lived here in Indianapolis?

18   A.  For a long time.

19             THE COURT:  Ms. Graham, can you pull the mic a

20   little closer to you?  And sit a little closer so that we can

21   hear you very well.

22             THE WITNESS:  Okay.

23             THE COURT:  Thank you.

24   BY MR. SHEPARD:

25   Q.  What do you do for a living?
```

1  A.  I'm self-employed right now.

2  Q.  Are you about to start a new job?

3  A.  Uh-huh.

4  Q.  What are you going to be doing?

5  A.  Educator.

6  Q.  Have you ever been an educator before?

7  A.  Yes, I have.

8  Q.  Where at?

9  A.  St. Vincent Children's Choice, Bright Horizons.

10  Q.  How long were you there?

11  A.  A little over three years.

12  Q.  What did you do?

13  A.  Teach kids, educate them.

14        MR. SHEPARD:  Okay.  Please call up Exhibit 1.

15  BY MR. SHEPARD:

16  Q.  What's that?

17  A.  The building where I worked at.

18        THE COURT:  Is your screen working?  Tanesa, go look

19  at that real quick.

20        Okay.  Very good.  You may continue.

21  BY MR. SHEPARD:

22  Q.  Did you have a specific class that you taught while you

23  were there or did you float between?  How did it work?

24  A.  I had a specific class, but I was in all classes when they

25  needed me.

1    Q.  Okay.  I would ask you to -- the binder in front of you,

2    there's some pictures behind some tabs.  I'm going to ask if

3    you recognize the pictures.  Can you look behind tab number 2?

4    Do you recognize what that's a picture of?

5    A.  Yes, I do.

6    Q.  Okay.  Look behind tab number 65.  If you were my teacher,

7    you would have taught me to count better, right?  Do you

8    recognize what's behind tab 65?

9    A.  Yes, I do.

10   Q.  Look behind tab 66.

11   A.  Yes.

12   Q.  Do you recognize what's behind 66?

13   A.  Yes, I do.

14   Q.  And behind tab 67.  Do you recognize what's behind tab 67?

15   A.  Yes.

16   Q.  Okay.  What are all these -- what's depicted in these

17   pictures?

18   A.  Pictures of the kindergarten classroom.

19   Q.  Is that one of the rooms that you taught in?

20   A.  Yes.

21   Q.  And was that a room at the daycare which is up on the

22   screen in Exhibit 1?

23   A.  Yes.

24   Q.  And are they accurate representations of the kindergarten

25   room?

 1  A.  Yes.

 2          MR. SHEPARD:  I move to admit Exhibits 2, 65, 66,

 3  and 67.

 4          THE COURT:  Any objection, Mr. Thomas?

 5          MR. THOMAS:  No objection, Your Honor.

 6          THE COURT:  Government's Exhibits 2, 65, 66, and 67

 7  are admitted into evidence without objection.

 8                  *(Government's Exhibits 2, 65 – 67 were*

 9                      *received in evidence.)*

10          MR. SHEPARD:  Can you please display Exhibit 2.

11  BY MR. SHEPARD:

12  Q.  Can you please just tell the jury what we're seeing?

13  A.  Another picture of the kindergarten classroom.

14  Q.  So that's the kindergarten classroom?

15  A.  Yes.

16          MR. SHEPARD:  Please display 65.

17  BY MR. SHEPARD:

18  Q.  What are we seeing here?

19  A.  Pictures of the kindergarten classroom.

20  Q.  Just from a different angle?

21  A.  Uh-huh.  Yes.

22  Q.  66?

23  A.  Picture of the kindergarten classroom.

24  Q.  And 67?

25  A.  The same, as well, a picture of the kindergarten

1  classroom.

2  Q.  Did you have a coworker named Ali Al-Awadi at any time

3  when you worked there?

4  A.  Yes.

5  Q.  Was there a student at the daycare when you worked there

6  named M.R.?

7  A.  Yes.

8          MR. SHEPARD:  Please display Exhibit 77.  It will

9  pop up on your monitor.

10  BY MR. SHEPARD:

11  Q.  Do you recognize the girl in that photo?  Who is that?

12  A.  That's M.R.

13  Q.  Do you remember a day at the daycare where something

14  happened involving Mr. Al-Awadi and M.R.?

15  A.  Yes.

16  Q.  What were you doing that day, if you can remember?

17          It's okay.  Take a deep breath.

18  A.  I was...

19  Q.  Let's back up.  Let's start from the morning.

20  A.  I was told to take over the kindergarten classroom.

21  Q.  And do you remember about what time you started teaching

22  in the kindergarten classroom that morning?

23          MR. THOMAS:  Judge, is there a -- oh, it's tissues.

24  I'm sorry.  I was hearing a rattling.  I apologize.

25          THE COURT:  Oh, the rattling.  That's the witness

1  with the package of tissue.

2          MR. THOMAS:  I'm sorry.

3  BY MR. SHEPARD:

4  Q.  Is it safe to say that you started in the morning

5  sometime?

6  A.  Yes, I did.  Yes, I started in the morning.

7  Q.  Now, what's the general age range of the kids in the

8  kindergarten classroom?

9  A.  Sometimes four and up.

10  Q.  Is it fair to say they've got to go to the bathroom often?

11  A.  All the time.

12  Q.  Did you have any -- did you give them any bathroom breaks

13  in the morning?

14  A.  Whenever they needed to go to the restroom.

15  Q.  Did M.R. have a bathroom break in the morning?

16  A.  I'm not sure.

17  Q.  Do you ever remember M.R. complaining about it hurting to

18  go to the bathroom anytime before lunch?

19  A.  No.

20          MR. SHEPARD:  Judge, if I could approach the

21  witness.

22          THE COURT:  Why?  Come on up.  What do you want to

23  do with the witness?  Do you want to show her an exhibit or --

24          MR. SHEPARD:  Yes, Your Honor.

25          THE COURT:  Oh, yes.  You may approach if you want

*GRAHAM - DIRECT/SHEPARD*      54

 1   to show the witness an exhibit.

 2         MR. SHEPARD: I need help. We're both going to

 3   approach, if that's okay.

 4         THE COURT: Okay. You may.

 5         MR. THOMAS: Can he identify what he's showing her?

 6         THE COURT: Show Mr. Thomas.

 7   BY MR. SHEPARD:

 8   Q. Let me back up. Ms. Graham, do you remember being

 9   interviewed at the Marten House after the event?

10   A. Yes.

11   Q. Okay. And was that interview by personnel from IMPD?

12   A. Yes.

13   Q. And do you remember a transcription of that interview

14   being done?

15   A. Yeah.

16         MR. THOMAS: Judge, I'm not sure what these

17   questions are at this point. I mean, she's already denied --

18   she was asked specifically if she had a bathroom break in the

19   morning, and she said, "No." I don't know if he's trying to

20   impeach his own witness or --

21         MR. SHEPARD: Actually, I believe the answer was she

22   didn't remember. I'm trying to refresh her recollection, Your

23   Honor.

24         MR. THOMAS: I think it was, "No," Your Honor.

25         THE COURT: Well, I'll take a look and let you know

1   what it was.

2            Her answer was, "I am not sure."

3            "Did M.R. have a bathroom break in the morning?"

4            And she said, "I am not sure."

5            MR. THOMAS:  Your Honor, if I may, right after that,

6   I wrote down the word, "No."  What did she say right after

7   that?

8            THE COURT:  "Do you remember M.R. complaining about

9   it hurting to go to the bathroom before lunch?"

10           The answer was, "No."

11           MR. THOMAS:  Okay.  That's a different question,

12  Your Honor.

13           THE COURT:  All right.  So you may refresh your

14  witness' recollection, Counsel.

15           MR. THOMAS:  Can he give me a page?

16           MR. SHEPARD:  Page 17.

17           MR. THOMAS:  Thank you.

18           THE COURT:  Now, ask your question.

19  BY MR. SHEPARD:

20  Q.  After reading this, does it help you to remember what

21  happened that day?

22           THE COURT:  You have to answer out loud.

23  A.  Yes.

24           MR. THOMAS:  Judge, she did not testify that she

25  doesn't remember what happened that day.  I'm not sure about

1  these line -- this line of questioning.

2        THE COURT:  She said she couldn't recall.

3        MR. THOMAS:  She couldn't recall if she had a

4  bathroom break.

5        MR. SHEPARD:  Your Honor, can we approach?

6        THE COURT:  Yes.

7        (Bench conference on the record.)

8        MR. SHEPARD:  He's trying to split hairs, Your

9  Honor.  She clearly said she didn't recall.  I was allowed to

10  refresh her recollection.  I would even be allowed to impeach

11  my witness if I needed to.  I'm just -- I refreshed her

12  recollection.  She said her -- excuse me.  I showed her the

13  transcript.  She said it helped to remember, and I'm going to

14  go down the line of questioning after her recollection has

15  been refreshed.

16        MR. THOMAS:  As to the specific question as to

17  whether she had a bathroom break in the morning, yes, but not

18  to, "Do you remember the events of the day?"  I mean, he's

19  opening that up rather broadly at that point.

20        THE COURT:  Okay.  Go ahead and ask specific

21  questions.

22                    (Open court.)

23  BY MR. SHEPARD:

24  Q.  Ms. Graham, do you remember, after having had a chance to

25  review your statement, if M.R. had a bathroom break that

Case 1:15-cr-00073-TWP-DML Document 348-2 Filed 12/12/16 Page 57 of 420 PageID #85
3770

1  morning?

2  A.  Yes.

3  Q.  Did she?

4  A.  Yes.

5  Q.  Did she say anything after the bathroom break?

6  A.  When she came back to the room, she did.

7  Q.  What did she say?

8  A.  She says that, "It hurts down there."

9  Q.  Did she say anything else at that time?  Now, this is

10  before lunch.

11  A.  I don't remember.

12  Q.  Okay.  What happened at lunchtime?

13  A.  It was a regular day.  The kids, they just had lunch and

14  read their stories and got ready for a nap.  They used the

15  bathroom, I guess, before nap, like they always do.

16  Q.  Did you get relieved to go take your own lunch?

17  A.  Yes.

18  Q.  Who relieved you?

19  A.  Mr. Ali.

20  Q.  Did you tell him anything at that time about any of the

21  kids?

22  A.  No, I didn't.

23  Q.  What happened when you came back from lunch?

24  A.  When I came back from lunch, I signed in and he signed

25  out.

1  Q.  Did he tell you anything about anything that happened

2  during the lunch hour that was --

3  A.  No, he didn't say anything.

4  Q.  Okay.  Did something happen with M.R. after lunch?

5  A.  M.R.-- I sat on the floor, in the middle of two kids, M.R.

6  and another kid.  And she told me that it hurt, "down there."

7  Q.  When she said, "down there," do you know what she was

8  referring to?

9  A.  She -- she took her finger and she pointed.

10 Q.  Where at?

11 A.  She pointed to her private part and said that, "It hurts

12 down there."

13 Q.  Did she say why?

14 A.  I asked her why.

15 Q.  What did she say?

16 A.  She said that, "It hurts" -- she said that, "It hurts down

17 there because Mr. Ali touched it."

18         THE COURT:  Next question.

19         MR. SHEPARD:  Okay.

20 BY MR. SHEPARD:

21 Q.  Did you ask her what she meant or ask her anything about

22 it?

23 A.  I asked her, I said, "M.R., what are you talking about?"

24 She said Mr. Ali touched her, "all the way down there and it

25 really hurts.  And Mommy said that I can't take a bubble bath

1   no more because it's going to hurt worse."

2   Q.  What did you do after she told you that?

3   A.  I asked her again.  I said, "M.R., what are you talking

4   about?"  She just pointed, and she said it again.

5   Q.  Did you tell any of the other teachers?

6   A.  I told the secretary.

7   Q.  Who is that?

8   A.  Ms. Chiana.

9   Q.  Eventually did you ask Mr. Al-Awadi about it?

10  A.  I told her to go and get him for me.

11  Q.  And did she?

12  A.  Yes.

13  Q.  What happened when Mr. Al-Awadi came?

14  A.  He came in and he sat down on the floor.

15  Q.  Did you tell him what M.R. had said?

16  A.  I said, "M.R., tell him what you just told me."  And she

17  said it again.

18  Q.  What was Mr. Al-Awadi's reaction?

19  A.  He was calm.

20  Q.  Did he say anything or do anything?

21  A.  He picked her up and sat her on his lap and said, "M.R.,

22  no, thank you."

23  Q.  What was M.R.'s reaction?

24  A.  She just looked at me and she got back on the floor.

25  Q.  Did he leave the room shortly thereafter?

1  A.  Then he got up and left the room.

2  Q.  Did you ask M.R., after he left the room, anything?

3  A.  I couldn't -- I couldn't talk.

4  Q.  Eventually, do you remember giving a statement?

5  A.  Ms. Heidi came in and told me to write a statement of what

6  was said.

7       MR. SHEPARD:  Your Honor, we pass the witness for

8  cross-examination.

9       THE COURT:  Okay.  You may cross-examine the

10  witness, Mr. Thomas.

11       MR. THOMAS:  Thank you.

12                    **CROSS EXAMINATION**

13  BY MR. THOMAS:

14  Q.  Ms. Graham, you were asked specifically on direct

15  examination if M.R. had complained about pain before lunch,

16  right?  And your immediate response was, "No," right?  "No,

17  she hasn't complained before."  That's what you told us today

18  in court, right?

19  A.  Sure.

20  Q.  That's not correct, is it?

21  A.  I don't remember.

22  Q.  Okay.  Well, do you remember giving a -- this statement

23  that you've looked at of the day after this incident, when you

24  spoke to Detective McAllister?  Do you remember that?

25  A.  Yes.

1  Q.  Okay.  Do you think you remembered what happened the day

2  before when you talked to Detective McAllister?

3  A.  I remember some of it, but then I can't remember.  I try

4  hard to block it out so I won't remember.

5  Q.  I understand.  But the day after, you remembered what

6  happened, right?

7  A.  Yes.

8  Q.  And, in fact, there were three separate times that you

9  told Detective McAllister that she had complained about that

10  it hurt to pee in the morning, specifically around 11:30,

11  right?

12  A.  Yes.

13  Q.  And you don't -- you told him that three times.  Do you

14  remember that now?

15  A.  Yes.

16  Q.  Now, do you remember what you told Detective McAllister

17  about the incident in the morning?

18  A.  No.

19         MR. THOMAS:  May I approach the witness, Your Honor?

20  May I approach the witness, Your Honor?

21         THE COURT:  What do you want to do?

22         MR. THOMAS:  I have her statement.  I would like to

23  give her a chance to refresh her memory.

24         THE COURT:  You may.

25  BY MR. THOMAS:

GRAHAM - CROSS/THOMAS                62

1   Q.  If you could, on page 8, starting here where it says,

2   "Before that," if you could read that, from there down to

3   there for me.  See if that refreshes your memory of the first

4   time you mentioned that.

5   A.  Read it right here?

6   Q.  Yeah.  Just "Before" -- it starts with, "Before that."

7   A.  "Before that" --

8   Q.  You don't have to read it out loud.

9           THE COURT:  Just read it to yourself.

10          MR. THOMAS:  Just read it to yourself.

11          THE WITNESS:  Okay.

12  BY MR. THOMAS:

13  Q.  Does that refresh your memory as to what you told

14  Detective McAllister?

15  A.  Yes.

16          THE COURT:  Now, you need to return to the lecturn.

17          Thank you.

18          MR. THOMAS:  Excuse me.  I need to take this with

19  me.

20  BY MR. THOMAS:

21  Q.  And the first time you mentioned the morning bathroom

22  break, what did you tell Detective McAllister?

23  A.  You said before the morning bathroom break?

24  Q.  About the morning bathroom break, would you just refresh

25  there?

1  A.  She went to the bathroom and she was taking too long.

2  Q.  She was actually in the bathroom, and you went into the

3  bathroom and said, "You're taking too long"?

4  A.  Yes.

5  Q.  And she said, "It hurts to pee"?

6  A.  Yes.

7  Q.  Now, Mr. Al-Awadi came in at 12:30, thereabouts, right?

8  A.  Right.

9  Q.  This was at 11:30, right?

10  A.  Right.

11  Q.  And now that you've refreshed your memory, do you remember

12  that --

13  A.  Yes.

14  Q.  -- happening?

15  A.  Yes.

16  Q.  To your knowledge, did Mr. Al-Awadi have any contact with

17  her prior to 12:30 that day?

18  A.  Not to my recollection, no.

19  Q.  You were in the class, right?

20  A.  Yes.

21  Q.  And you didn't say anything to Mr. Al-Awadi about, "Oh, by

22  the way, M.R. is complaining about pain," when he came in to

23  relieve you?  You didn't mention that to him, did you?

24  A.  No, I didn't.

25  Q.  In fact, you didn't mention that to anybody, right?

GRAHAM - CROSS/THOMAS                    64

1  A.  No, I didn't.

2  Q.  At that point, did you think it was a big deal?

3  A.  Telling them, a male, that about a little girl, no.

4  Q.  No.  Did you -- did you think the fact that she --

5          MR. SHEPARD:  She can answer the question.

6          THE COURT:  Yeah, she can answer the question.

7          MR. THOMAS:  Well, she -- I think she did, but --

8          THE COURT:  Did you finish your answer?

9          THE WITNESS:  I guess so.  I tried to.

10         THE COURT:  Okay.  All right.

11 BY MR. THOMAS:

12 Q.  Okay.  It was a poorly worded question, ma'am.  Did you --

13 not about telling Mr. Al-Awadi.  You've already told us you

14 didn't do that.

15 A.  Right.

16 Q.  Did you think it was a big deal that she had reported that

17 it hurts when she pees at 11:30?  Did you think that was

18 important?

19 A.  It's important -- yes, it was important, yes.

20 Q.  You didn't report that to anybody, though?

21 A.  No.

22 Q.  And that was a different instance than the one you've

23 talked about where she came back in the room and sat down and

24 said, "It hurts to pee"?  That was the second time she told

25 you that, right?

1          THE COURT:  Can you answer out loud?

2   A.  Yes.  Sorry.

3          THE COURT:  Thank you.

4          MR. THOMAS:  Excuse me, Your Honor.  I left my notes

5   over here.  Sorry.

6          THE COURT:  Sure.

7   BY MR. THOMAS:

8   Q.  When you came back in the room, you sat down on the floor,

9   right?

10  A.  Yes.

11  Q.  That's not unusual, is it?

12  A.  It's usual.

13  Q.  Yeah.  That's nothing that you wouldn't do to interact

14  with the children, sit down, story time, whatever?

15  A.  Yes.

16  Q.  To your knowledge, had M.R.'s mother been at school that

17  day, on the 21st?

18  A.  No.

19  Q.  And you mentioned that in addition to saying, "It hurts

20  down there.  Mr. Ali put his fingers down all the way,"

21  immediately after that, in the same sentence, she said, "Mommy

22  said I can't have bubbles in a tub because it's going to get

23  worse," right?

24  A.  Yes.

25  Q.  She said that immediately?

 1  A.  Yes.

 2  Q.  To your knowledge, she had not talked to her mother that

 3  day at school, right?

 4  A.  Correct.

 5  Q.  Do you know what she was talking about when she said,

 6  "Mommy says it's going to get worse"?

 7  A.  Say that --

 8  Q.  Do you know what she was talking about?

 9  A.  She said it's going to get worse if she takes a bubble

10  bath.

11  Q.  And that's -- she told you that's what her mother had told

12  her before?  She didn't say when or where?

13          THE COURT:  Answer out loud.

14  A.  No.

15  BY MR. THOMAS:

16  Q.  But it wasn't that day at school, was it?

17  A.  No.

18  Q.  And do you recall, in your interview with Detective

19  McAllister, telling him about the incident in the morning with

20  pain three separate times?

21  A.  I don't remember.

22  Q.  Okay.

23  A.  I don't remember.

24          MR. THOMAS:  Your Honor, if I may approach the

25  witness for the purpose of recollection?

1          THE COURT:  You may.

2          MR. SHEPARD:  Your Honor, may we approach?

3          THE COURT:  Yes.

4          (Bench conference on the record.)

5          MR. SHEPARD:  I believe this question was asked and

6   answered earlier when he said, "Do you remember saying three

7   times about the pain?"  And she said, "Yes."

8          THE COURT:  Well, this is cross-examination, so I'm

9   going to let him ask the question.

10          MR. SHEPARD:  Okay.

11          THE COURT:  Okay.

12          MR. SHEPARD:  I believe he's already asked and had

13  it answered on cross, Your Honor.  The first time he refreshed

14  her, he went down through it and he asked about it being three

15  times, and she said, "Yes," at that point.

16          THE COURT:  He only -- I remember him just

17  refreshing on one.  Are you attempting to refresh on two other

18  statements?

19          MR. THOMAS:  It's a different question, Your Honor.

20  I'm asking her specifically if she remembers telling the

21  detective three separate times.  The purpose, obviously, is --

22          THE COURT:  And she says, no, she doesn't recall.

23          MR. THOMAS:  She says, "I don't remember three

24  different times."  I'm just going to have to point out the

25  other two times to refresh her memory of how many times she

1  told him that.

2          THE COURT:  I'll allow that.

3                  (Open court.)

4          THE COURT:  You may continue.  You may --

5          MR. THOMAS:  Thank you, Your Honor.

6          THE COURT:  -- refresh the witness' recollection.

7  BY MR. THOMAS:

8  Q.  Now, start on page 16 and into page 17, if you could.

9  Starting here and down to, say, here, if you could.

10         Are you finished?

11 A.  Yes.

12 Q.  After looking at that, does that refresh your memory about

13 the second time that you told Detective McAllister about the

14 incident in the morning with pain?

15 A.  Yes.

16 Q.  Okay.

17 A.  Yes.

18 Q.  And now, if you would, look to page 18.  And starting

19 about here, on down to here, if you could read that for me.

20         And did you have a chance to read that?

21 A.  Yes.

22 Q.  Did it refresh your memory?

23 A.  Yes.

24 Q.  So -- so, ma'am, now that you've had a chance to refresh

25 your memory, would you agree that you told Detective

1  McAllister three different times about an incident -- the

2  incident where she said it hurt to pee around 11:30?

3  A.  Yes.

4  Q.  You came back at around 1:30, right?

5  A.  Yes.

6  Q.  And at that point, Mr. Ali -- or Mr. Al-Awadi left the

7  room?

8  A.  Yes.

9  Q.  Now, you talked about Mr. Al-Awadi saying, "No, thank

10  you," to M.R..  Is that -- that's something that you all are

11  told to do or trained to do with the kids, right?  When they

12  say, "No," that you correct them and say, "No, thank you,"

13  right?

14  A.  Yes.

15  Q.  All right.  And so that's kind of common at the school,

16  when a child says, "No," you correct the child by saying, "No,

17  thank you"?  That's pretty common, isn't it?

18  A.  It's pretty common.

19  Q.  Okay.

20  A.  But that's not the only thing that we say.

21        MR. THOMAS:  That's nonresponsive, Your Honor.

22        THE COURT:  She can answer the question.

23  BY MR. THOMAS:

24  Q.  I'm sorry?

25  A.  I said, we say it more than just, "No, thank you," but

1  that's common that we do say that.  But we say other things,

2  as well.

3  Q.  I'm sure you do.

4          THE COURT:  Now, you -- that's stricken from the

5  record.  That was not a question.

6          MR. THOMAS:  You're right, Your Honor.

7          THE COURT:  All right.  Next question.

8  BY MR. THOMAS:

9  Q.  Now, when -- when you -- your recollection is that you

10  told Chiana, the receptionist, to find Mr. Ali.  Do you know

11  how she found him?

12  A.  No, I don't.

13  Q.  Do you know what she said to him to have him come back to

14  your room?

15  A.  No, I don't.

16  Q.  But he showed up there?

17  A.  Yes.

18  Q.  And the accusation was made, again, in front of him,

19  right?

20  A.  Yes.

21  Q.  And he denied it, right?

22  A.  Yes.

23  Q.  He didn't just say, "No, thank you"; he said he didn't do

24  it, right?

25  A.  He said, "No, thank you."

1   Q.  Right.  And he denied it?

2   A.  If that's him denying it.

3   Q.  Okay.  Again, going back, do you recall your statement to

4   Detective McAllister, ma'am?

5   A.  Yes.

6   Q.  And do you remember what your answer was to the question,

7   "What did he say when he put her on his lap?"

8   A.  He told -- he told her, "No, thank you."

9   Q.  Do you remember what your answer was to Detective

10  McAllister?

11  A.  No.

12          MR. THOMAS:  Your Honor, may I approach the witness?

13          THE COURT:  You may.

14          MR. THOMAS:  12.

15  BY MR. THOMAS:

16  Q.  I'm going to ask you to look at page 12, after the

17  question, "What did he say when he put her on his lap?"  And I

18  ask you to read down to right there.

19  A.  Yes, I see it.

20  Q.  Okay.  Does that refresh your memory of what you told

21  Detective McAllister?

22  A.  Yes.

23  Q.  Because you told Detective McAllister that day that, in

24  addition to saying, "M.R., no, thank you," he said, "M.R., I

25  didn't do that," right?

1  A.  Right.

2  Q.  You remember that now?

3  A.  Yes.

4  Q.  You mentioned that you got back at 1:30ish and you talked

5  to Chiana at about 2:30.  Would that be right?

6  A.  Afterwards.

7  Q.  So an hour passed before you were able to tell Chiana

8  about it, right?

9  A.  Yes.

10 Q.  And in that time, did M.R. go to sleep?

11 A.  No.

12 Q.  Did E.C. ever go to sleep?

13 A.  No.

14 Q.  Does he ever go to sleep?

15 A.  No.

16 Q.  He was right there -- his mat was right beside M.R.'s,

17 right?

18 A.  Right beside me.

19 Q.  Right.  And his mat, I guess, was right beside M.R.'s when

20 they took a nap?  They were in the same area, right?

21 A.  Correct.

22 Q.  And when you came in and sat down, E.C. was the other

23 child that you sat down with?

24 A.  Yes.

25 Q.  So, presumably, he was there, awake, the entire time that

1   Mr. Al-Awadi was there, right?

2   A.   Correct.

3          MR. SHEPARD:  Objection, calls for speculation.  She

4   wasn't in the room.

5          THE COURT:  All right.

6          MR. THOMAS:  I think it does.  I'll withdraw the

7   question.

8          THE COURT:  Why don't you withdraw the question.

9   BY MR. THOMAS:

10  Q.   He was awake when you left and he was awake when you got

11  back?

12  A.   Yes.

13  Q.   And your experience with him is that he didn't sleep at

14  nap time?

15  A.   Right.

16  Q.   And prior to that, you hadn't seen Mr. Al-Awadi do

17  anything improper with any of the kids, right?

18  A.   No.

19  Q.   Did you see Mr. Al-Awadi any more that day after he became

20  aware of this accusation?

21  A.   Yes.

22  Q.   He stayed at school, right?

23  A.   Yes.

24         MR. THOMAS:  No other questions.  Thank you.

25         THE COURT:  Do you have any redirect for the

1   witness?

2           MR. SHEPARD:  Yes, Your Honor.

3           THE COURT:  You may.

4           MR. SHEPARD:  Sorry, Your Honor.

5                   **REDIRECT EXAMINATION**

6   BY MR. SHEPARD:

7   Q.  Ms. Graham, Mr. Thomas asked if you remembered telling

8   Detective McAllister multiple times, I think three times, if

9   M.R. had complained of pain.  Do you remember him asking you

10  that?

11  A.  Yes.

12  Q.  Okay.  Did you also tell Detective McAllister that you had

13  asked M.R. about what she said about Mr. Al-Awadi multiple

14  times?

15  A.  Yes.

16  Q.  And do you remember he said that her statement was

17  consistent?

18  A.  Yes.

19  Q.  Was it consistent?

20  A.  Yes.

21  Q.  Multiple times?

22  A.  Yes.

23  Q.  And did you tell that to Detective McAllister, also?

24  A.  Yes.

25  Q.  Counsel asked if you had ever seen Mr. Al-Awadi do

1 anything inappropriate with any of the kids.  Do you remember

2 that?

3 A.  Yes.

4 Q.  Had you heard about him doing --

5          MR. THOMAS:  Objection.

6 BY MR. SHEPARD:

7 Q.  -- anything inappropriate?

8          MR. THOMAS:  Objection, Your Honor.

9          THE COURT:  Let's approach.

10          (Bench conference on the record.)

11          MR. THOMAS:  Your Honor, he knows this calls for

12 hearsay.  And asking the question is making an improper

13 implication that there is something.

14          MR. SHEPARD:  It's an invited response to his

15 question on direct, Your Honor -- or on cross.

16          THE COURT:  Well, it would call for hearsay.  Don't

17 you agree?  The response would call for hearsay --

18          MR. SHEPARD:  I think it's --

19          THE COURT:  -- unless you have an exception?

20          MR. SHEPARD:  I don't think it's necessarily offered

21 for its truth.  It's offered for, has she heard?  What is it?

22          THE COURT:  I'll sustain the objection.

23                    (Open court.)

24          THE COURT:  The objection is sustained.  Next

25 question.

1   BY MR. SHEPARD:

2   Q. You talked a little bit about, "No," and, "No, thank you."

3   Do you remember talking about that with Mr. Thomas?

4   A. Yes.

5   Q. All right. You said, "'No, thank you,' that's not usually

6   all we say." What else -- what other types of things do you

7   say?

8   A. "That's not right," "Don't do that," or, "Let's do

9   something else."

10   Q. He asked if you were taught to say, "No, thank you." Do

11   you remember him asking you that?

12   A. Yes.

13   Q. Are you taught to say, "No, thank you," if you've just

14   been accused of molestation?

15       MR. THOMAS: Objection, Your Honor. That calls for

16   speculation.

17       MR. SHEPARD: Your Honor, I don't know how it calls

18   for speculation. I'm asking her specifically if she --

19       THE COURT: I'll overrule. She can answer it.

20   BY MR. SHEPARD:

21   Q. Are you taught to say, "No, thank you," if a child accuses

22   you of molestation?

23   A. No.

24       MR. SHEPARD: Can I have just a moment, Your Honor?

25       (Off the record.)

1          MR. SHEPARD:  No further questions, Your Honor.

2          THE COURT:  Any follow-up?

3          MR. THOMAS:  Briefly, Your Honor.

4                    **RECROSS-EXAMINATION**

5    BY MR. THOMAS:

6    Q.  Ma'am, were you taught what to say at all when someone

7    accuses you of molestation?  Was that part of your training?

8    A.  No.  You're taught a lot of things.  There's a lot of

9    things that you go by the handbook --

10   Q.  And --

11   A.  -- but saying, "No, thank you," I don't think that you're

12   taught to say, "No, thank you."  You're taught to say whatever

13   is right.

14   Q.  Okay.  So are you telling me that in your handbook,

15   there's a section that says, here's the appropriate response

16   if you're accused of molestation?

17   A.  I don't remember the handbook, reading the handbook.

18   Q.  In fact, nobody ever told you what the appropriate

19   response would be -- was for being accused of molestation,

20   correct?

21   A.  Correct.

22   Q.  In fact, when you heard about the accusation, you said

23   your response was to freak out, right?

24   A.  I did freak out.

25   Q.  And you were asked on redirect about M.R. referring to

 1  pain at 11:30.  I mean, it was that, "It hurts to pee," right?

 2  That was her specific complaint?

 3  A.  Yes.

 4          MR. THOMAS:  That's all.  Thank you.

 5          THE COURT:  Okay.  Anything further for this

 6  witness?

 7          MR. SHEPARD:  No, Your Honor.

 8          THE COURT:  All right.  Is she released from

 9  subpoena?

10          MR. SHEPARD:  Yes, Your Honor.

11          THE COURT:  All right.  You may be excused.  Thank

12  you.

13          THE WITNESS:  Thank you.

14          (Witness excused.)

15          THE COURT:  And you may call your next witness.

16          MR. SHEPARD:  The government would call Heidi

17  Conces, Your Honor.

18          THE COURT:  Ma'am, if you would come right around

19  this way and right over here to the witness stand.  And if you

20  would remain standing and raise your right hand.

21          (The witness is sworn.)

22          THE COURT:  You may have a seat.

23          You may examine your witness, Counsel.

24          MR. SHEPARD:  Thank you, Your Honor.

25

1          **HEIDI CONCES, PLAINTIFF'S WITNESS, SWORN**

2              **DIRECT EXAMINATION**

3  BY MR. SHEPARD:

4  Q.  Would you please state your name and spell it for the

5  record?

6  A.  Spell it, as well?

7  Q.  Yes, please.

8  A.  Heidi Conces, C-O-N-C-E-S.

9  Q.  And where do you live?

10 A.  Greenfield, Indiana.

11 Q.  How long have you lived there?

12 A.  Almost my whole life.

13 Q.  What do you do for a living?

14 A.  I'm an academic advisor at a college.

15 Q.  How long have you been there?

16 A.  A year.

17 Q.  What did you do before that?

18 A.  I was the assistant director.

19 Q.  Where at?

20 A.  Children's Choice Learning Center, or Bright Horizons.

21          MR. SHEPARD:  Please display Exhibit 1.

22          THE WITNESS:  Is this the one that's open?

23 BY MR. SHEPARD:

24 Q.  It's on your monitor.

25 A.  Oh, okay.

1   Q.  Do you recognize that?

2   A.  I do.

3   Q.  What is that?

4   A.  That's the daycare.

5   Q.  Is that the one you were just talking about?

6   A.  Yes.

7   Q.  How long were you the assistant director?

8   A.  A year.

9   Q.  What -- did you have any positions before that?

10  A.  I was the kindergarten teacher for two years.

11          MR. SHEPARD:  Please display Exhibit 2.

12  BY MR. SHEPARD:

13  Q.  Do you recognize that?

14  A.  Yes.

15  Q.  What is that?

16  A.  That's the kindergarten classroom.

17  Q.  How are we seeing the kindergarten classroom right now?

18  A.  From the front doors as if you were walking into the

19  classroom.

20          MR. SHEPARD:  And please display 65.

21  BY MR. SHEPARD:

22  Q.  What are see seeing here?

23  A.  That's the side.  So as we walk in, that's the side that's

24  to the -- if you're walking directly in, it's what's to the

25  left of you when you walk into the classroom.

1  Q.  Here, is that the front door you were talking about

2  earlier?

3  A.  Yes, sir.

4  Q.  And this little thing right here, remember that, okay?

5  A.  Sure.

6       MR. SHEPARD:  Go back to Exhibit 2, please.

7  BY MR. SHEPARD:

8  Q.  Is that the same?

9  A.  Yes.

10 Q.  Okay.

11      MR. SHEPARD:  66, please.

12 BY MR. SHEPARD:

13 Q.  Is that that same little bookcase we've been talking

14 about?

15 A.  It is.  And then that table is what you see to the right

16 when you walk into the classroom.  And that's the window to

17 the outside.

18 Q.  And 67?

19 A.  That's the back of the classroom.

20      MR. SHEPARD:  Okay.  Can we come back out?  I would

21 ask you -- can you just close the image?

22 BY MR. SHEPARD:

23 Q.  Take a look behind tab number 19.

24 A.  Going this way?  It's like on tab 60-something.  There we

25 go.  Okay.

1  Q.  Do you recognize what's in 19?

2  A.  It's the setup of the classroom.

3  Q.  Is it an accurate description or drawing of the classroom

4  as you remember it?

5  A.  Absolutely.

6        MR. SHEPARD:  All right.  Your Honor, I would ask

7  that 19 be admitted.

8        THE COURT:  Any objection to 19?

9        MR. THOMAS:  Judge, I'm sorry.  My 19 in my booklet

10 appears to be blank.  If I could see hers for just a second.

11       No objection to 19.

12       THE COURT:  Government's Exhibit 19 is admitted into

13 evidence without objection.

14                    *(Government's Exhibit 19 was*

15                     *received in evidence.)*

16       MR. SHEPARD:  And could you display 19.

17 BY MR. SHEPARD:

18 Q.  Is that the -- when you were talking about the front door,

19 is that what's right there?

20 A.  Yes.

21 Q.  And then kind of the -- that bookshelf we were using as a

22 point of reference?

23 A.  Yes.

24       MR. SHEPARD:  Put 19 down.

25 BY MR. SHEPARD:

1   Q.  Did you have a student at the daycare named M.R.?

2   A.  Yes, we did.

3          MR. SHEPARD:  Please display Exhibit 77.

4   BY MR. SHEPARD:

5   Q.  Do you recognize that girl?

6   A.  Yes.

7   Q.  Who is that?

8   A.  That's M.R.

9   Q.  Do you remember an employee named Ali Al-Awadi?

10  A.  I do.

11  Q.  Do you see him here anywhere in the courtroom today?

12  A.  I do.

13  Q.  Please identify him.

14  A.  He's right there.

15  Q.  There's two gentlemen here.  The one closest or furthest?

16  A.  The one with the green shirt.

17  Q.  Okay.  Thank you.

18         MR. SHEPARD:  Please let the record reflect she

19  identified the defendant.

20         THE COURT:  The record will so reflect.

21  BY MR. SHEPARD:

22  Q.  Were you the kindergarten teacher or the assistant

23  director in 2014?

24  A.  Assistant director.

25  Q.  Were you familiar with the staff and the employees in 2014

1  in your position?

2  A.  Absolutely.

3  Q.  Was Mr. Al-Awadi the only male teacher?

4  A.  Yes.

5        MR. SHEPARD:  If you can close the image.

6  BY MR. SHEPARD:

7  Q.  I want to talk about some general policies of the daycare

8  for a little bit.  Were the teachers allowed to have personal

9  cell phones in the classroom?

10  A.  No.

11  Q.  Were they allowed to take pictures with personal phones or

12  cameras in the -- back in the classrooms, of the students?

13  A.  Not their personal, no.

14  Q.  And would there have been any sorts of forms or things

15  that would have notified them of this policy?

16  A.  Yeah.  They sign it when they first are employed and they

17  do their employee packet.  They sign a paper of that.

18        MR. SHEPARD:  Can you please display Exhibit 22,

19  page number 13.  And if you could magnify right there.

20        THE WITNESS:  You just circled the, "No purses."

21        MR. SHEPARD:  Hold on.

22  BY MR. SHEPARD:

23  Q.  What does that say?

24  A.  "No purses, bags, cell phones allowed in the classrooms."

25        MR. SHEPARD:  Can you back out?  And -- you know

1   what I'm getting at.  Down.

2   BY MR. SHEPARD:

3   Q.  What's this part of the form?

4   A.  It's the -- it explains to them the three offenses that

5   they get for having their cell phones in the classroom.

6   Q.  Are they fired on the first offense?

7   A.  They are not.

8   Q.  Second offense?

9   A.  They are not.

10  Q.  Third offense?

11  A.  They are.

12  Q.  Is it the third or the fourth?  I ask you to take a look

13  at the --

14  A.  It depends on the offense of what they're using the phone

15  for.  Typically it's the fourth, but it just depends on what

16  we've found with the cell phone.  We don't have the right to

17  actually go through their cell phone, but it just really

18  depends on the discretion of the director.

19  Q.  Okay.  So are you telling us that there's things that are

20  worse that you could be doing with a cell phone than others?

21  A.  There is.  There is if you got caught with it.  So we

22  actually would -- if we were catching you taking pictures of

23  the kids, that obviously is a worse offense than if you were

24  just using your cell phone to call in the classroom.  So it

25  really depends on the severity of the offense; but also to --

1  I guess, when we call the first offense, that would be your

2  counsel, not a write-up.  So that's kind of where we're

3  getting the three offenses and you're fired.

4  Q.  The first time you're just told to knock it off?

5  A.  Yeah.  Basically, it's just a conversation.  There's no

6  paper written, there's no -- it's just a conversation between

7  directors.  Once it gets to the second offense, we begin to

8  write them up.  And there's a form for each step.

9  Q.  Okay.  You mentioned --

10       MR. SHEPARD:  Oh, please back out of this.  And

11 right down there.

12 Q.  Do you recognize the signature?

13 A.  I do.

14 Q.  Whose signature?

15 A.  Ali Al-Awadi.

16       MR. SHEPARD:  Thank you very much.  You can clear

17 this exhibit.

18 BY MR. SHEPARD:

19 Q.  What did Ali Al-Awadi do at the daycare?

20 A.  He started off as a floater, if you will, or a part-time

21 person in our pre-K room.  He was in there for quite a while.

22 He did cover breaks in our kindergarten room, and with the

23 older kids.  Especially as the kids moved up from the pre-K to

24 the kindergarten room, they already knew him, so if we had a

25 lunch break or a teacher was out for the day, we would use him

1   as a sub in there.

2           About after he had been there about a year, we had a

3   couple employees that left the EPS, or the two-year-old room,

4   and he asked if he could go to the two-year-old room to work

5   in there.  So in 2014, he was actually the assistant teacher

6   in the EPS, or two-year-old room.

7   Q.  At any time during the course of his employment, if you

8   can remember, was Mr. Al-Awadi cautioned about use of a cell

9   phone?

10  A.  No.  I never had to call him to the office for it.

11  Q.  Was he cautioned about picking up students who could walk?

12  A.  Yes.

13  Q.  Was he told not to do it?

14  A.  Yes.

15          MR. THOMAS:  Objection.  These are all leading, Your

16  Honor.

17          THE COURT:  Rephrase.

18          MR. SHEPARD:  Okay.

19  BY MR. SHEPARD:

20  Q.  Did you ever have to caution Mr. Al-Awadi about anything?

21          MR. THOMAS:  Objection.  It's still a leading

22  question.

23          THE COURT:  Overruled.  She may answer.

24  BY MR. SHEPARD:

25  Q.  What were those?

1  A.  What were the cautions I had to give him?

2  Q.  Yeah, uh-huh.

3  A.  Basically just picking up especially the older kids.

4  There was a specific incident with one of our girls in the

5  kindergarten classroom where her parents were there.  They

6  didn't make a complaint, but I saw him pick up one of the

7  five-year-olds in the classroom.  And when he picked her up,

8  she wrapped her legs around him, and they kind of swung around

9  together.

10        The parents didn't say anything, but I took it upon

11  myself, once the parents left with the child, to talk to him

12  and explain to him that our policy in the daycare is, if a

13  child is walking, we only pick them up if they're injured or

14  if something has happened to them, and especially in the sense

15  of a five-year-old child that is able to communicate and walk,

16  clearly, on their own.

17  Q.  Was he ever cautioned about anything else?

18  A.  I do know that we had one of our employees in the EPS

19  classroom had a concern about him taking a female child to the

20  bathroom himself and sitting the females in his lap.  That was

21  never something that I don't -- that went to our director, but

22  the teacher that was in the classroom did speak to him about

23  it, came to me and let me know she spoke to him about it,

24  feeling uncomfortable.

25  Q.  Okay.  Do you remember an event that led to Mr. Al-Awadi's

1  termination?

2  A.  Yes.

3  Q.  Do you remember when that was?

4  A.  It was August of 2014.  I believe it was the 21st.

5  Q.  Okay.  Do you have a good memory of that day?

6  A.  Absolutely.

7  Q.  How did the day begin?

8  A.  It was hectic.  We were shorthanded.  Our director was

9  out.  We had a couple people that called in sick, so we were

10  pretty shorthanded with the staff, but we handled it.  We had

11  the daycare going and everything was pretty, you know, smooth

12  once we got the day going, but it was a little hectic to start

13  off with.

14  Q.  Okay.  I know I heard you say something about the director

15  was gone.  Was anyone else gone that day?

16  A.  We had a couple of educators out.  The kindergarten

17  teacher was not there, which would be why Tyria Graham was the

18  teacher in the room for the day.  She typically worked in

19  pre-K, but we -- again, if you worked in pre-K, we would use

20  you to sub in the kindergarten classroom just because the kids

21  were already familiar with them.

22  Q.  So is it fair to say daycares are pretty regulated by the

23  State?

24  A.  Absolutely.

25  Q.  Is there something called ratios?

1  A.  Yes.

2  Q.  What's a -- what is -- just generally, what's a ratio?

3  A.  It's the amount of kids that you can have compared to the

4  teacher.

5  Q.  All right.  On that day, was it difficult to keep ratio

6  with everyone being out?

7  A.  It depended.  In the morning, not so much.  In the

8  afternoon, it does, because you have -- we -- it was a daycare

9  center that was open until 8:00 p.m.  So when we had the

10  hiccup between 3:00 and 4:30 when our second set of employees

11  came in, that would be where it was really hectic, because we

12  had employees out for the day, so we did kind of have to shift

13  everybody around.

14  Q.  Typically, do you try and have two educators in a room at

15  a time?

16  A.  In every room we did, except for the kindergarten room.

17  Q.  Were you able to -- why not in the kindergarten room?

18  A.  Because the kindergarten room only had 11 kids to one

19  teacher, and that was the ratio.  And we could never go over

20  that, because the room couldn't hold more than 11 kids.  So we

21  didn't have to have two teachers in the classroom.

22  Q.  What was Al-Awadi doing that day?

23  A.  He was in the twos room most of the day.  And then, when

24  it was time for lunch breaks, Chiana at the front desk does

25  the lunch break schedule, and she had asked him to do the

1  kindergarten's lunch break.

2  Q.  Who was teaching the kindergarten class that day?

3  A.  Tyria Graham.

4  Q.  Do you remember what time Mr. Al-Awadi gave Tyria a lunch

5  break -- or that's a badly worded question.  Strike that.

6          Do you know from when to when Mr. Al-Awadi was in

7  the kindergarten room?

8  A.  It was either 12:00 to 1:00 or 1:00 to 2:00.  That was the

9  two times that we did lunch in the kindergarten room.  It just

10  depended if Ali did his lunch break first or she did hers

11  first.

12  Q.  When did you -- or did something happen that day?

13  A.  Yes.

14  Q.  Okay.  When did you first become aware that something had

15  happened?

16  A.  Around 3:30 p.m.

17  Q.  How did you become aware something had happened?

18  A.  Chiana, our front secretary, came to me.

19  Q.  And what did she tell you?

20  A.  Well, originally, she had said to me that she had

21  something to talk to me about.  And I pulled her to the side

22  and she had let me know that Ms. Tyria had come to her and had

23  said that M.R. had complained that it hurt to pee --

24          MR. THOMAS:  Your Honor, I'm going to object to the

25  hearsay nature of the answer.

1          MR. SHEPARD:  I'm not offering it for its truth,

2   Your Honor.

3          THE COURT:  I'll overrule.  You may continue your

4   answer.

5          MR. SHEPARD:  Go ahead.

6   A.  Okay.  Chiana had come to me and said that Tyria had said

7   M.R. had said it had hurt to pee, and that when she asked M.R.

8   about it, M.R. had said that Ali had touched her on her

9   private areas.

10  BY MR. SHEPARD:

11  Q.  And as a result of that, did you do anything?

12  A.  I did.  I spoke with M.R. first and then I spoke with

13  Tyria.

14  Q.  When you spoke with M.R., did she say something similar?

15  A.  She did.  I first asked her -- well, first I just asked

16  her how her day was going.  I tried to make her feel like she

17  wasn't in trouble.  And I just asked her, because she was

18  crying, I said, "M.R., what's wrong?"  And I said, "What's

19  going on?"

20          And she said, "Well, when I went to the bathroom, it

21  hurt to pee."

22          And I said, "It did?"  I said, "Well, why is it

23  hurting to pee?"

24          And she said to me, she said, "Mommy said that I

25  can't have bubble bath anymore because it makes it hurt to

1  pee."

2           And I said -- I said, "Oh, is that what Mommy said?"

3           And she said, "Yes.  I told that to Mr. Ali."

4           And I said, "M.R., what did Mr. Ali say to you?

5           And she said, "He told me not to tell anybody, that

6  I should -- that I need to tell the truth."

7           And I asked her, I said, "M.R., what do you need to

8  tell the truth about?"

9           And she said, "Mr. Ali put his fingers down there."

10 Q.  And what did she mean by "there"?

11 A.  Her vagina.

12 Q.  What did you do as a result of hearing this from M.R.?

13 A.  I immediately called our director.

14 Q.  Why did you call your director?

15 A.  That's the chain of command.  One, I had never handled

16 that type of situation, and our policy is to go through the

17 chain of command when it's a severe incident like that.

18 Q.  Okay.  Were you seeking direction?

19 A.  Absolutely.

20 Q.  Did you receive any?

21 A.  Yes.

22 Q.  What were you told to do?

23 A.  I was told to take statements from each of the people

24 involved.  And then I was told to, as soon as I could get Ali

25 out of ratio, to take him out of ratio, take his statement,

1  and have him leave the building.

2  Q.  Did you take a statement from Ms. Graham?

3  A.  I did.

4  Q.  Were you asked to provide your own statement?

5  A.  I was.

6  Q.  How long did it take you to, if you remember, get Mr. Ali

7  out of ratio?

8  A.  It was probably 45 minutes, half an hour to 45 minutes,

9  before anybody could go in there.

10  Q.  So if you first found out about it, I believe you told us

11  3:30, approximately what time were you talking to Mr. Ali?

12  A.  About 4:45, after I took the statements of everybody else.

13  He was the last statement that I took.

14  Q.  Prior to you calling -- had he ever come up and said

15  anything about it?

16  A.  No.

17  Q.  Did you tell him what M.R. had said?

18  A.  I didn't tell him exactly what she said, because I didn't

19  want to lead him into the statement.

20  Q.  What did you tell him?

21  A.  I told him that she had come to me and said that he had

22  inappropriately touched her.

23  Q.  Did he say anything?

24  A.  He was nervous.  He said that he -- he first off said to

25  me he knew what it was about.  He said he knew I was going to

1  come to him about it.  And I then asked him, I said, "Well, I

2  need you to tell me what happened."

3         He said that they were playing in the classroom.

4  She kept getting off the cot, jumping in his lap.  He would

5  put her back on the cot, she would jump back up.  And when he

6  had told her that she needed to lay down, he picked her up.

7  And when he picked her up, he said that she wrapped her legs

8  around his arm.  And when he pushed her off, she pinched her

9  vagina on his watch.

10 Q.  Were those his words?

11 A.  Those were his words.

12 Q.  He said, "pinched her vagina," on his watch?

13 A.  Yeah, those were his words.

14 Q.  You said he was nervous.  Was he flailing his arms or --

15 A.  No.

16 Q.  -- intonation changing?

17 A.  No.  You could just tell his demeanor, just -- you know,

18 not sitting still.  I could just tell his demeanor.  He had

19 been thinking about it for a while.

20 Q.  How quick were his answers to your questions?

21 A.  They were quick.

22 Q.  Did you ask him to draft a statement?

23 A.  I did.

24 Q.  Before he drafted it, did you tell him how important it

25 was to think about it and put everything in there?

1   A.  I did.

2   Q.  I ask you to look in the binder behind tab 24.  Do you

3   recognize 24?

4   A.  Yes.

5   Q.  What is that?

6   A.  His statement.

7   Q.  Did you watch him fill it out?

8   A.  I did.

9   Q.  Does that look like substantially the same condition as it

10  was when he did it and gave it to you?

11  A.  Yes, sir.

12          MR. SHEPARD:  Move for the admission of 24.

13          THE COURT:  Any objection to 24?

14          MR. THOMAS:  Has 24 already been admitted as part of

15  another --

16          MR. SHEPARD:  I don't believe so.

17          MR. THOMAS:  -- another --

18          THE COURT:  No.

19          MR. THOMAS:  -- exhibit?  One of the first exhibits?

20          THE COURT:  No.  Let's see.

21          MR. THOMAS:  Not as number 24, but this letter.

22          THE COURT:  No.  20, 21, 22 are in.  24 is not in.

23          MR. THOMAS:  I understand.  My question is, the

24  letter itself, was it contained in one of the earlier

25  exhibits?

1       MR. SHEPARD:  I don't believe it was in the business

2   records, if that's what you're asking.

3       MR. THOMAS:  Yeah.  My recollection is that it's

4   already been admitted as part of the business records, but --

5       THE COURT:  Do you object to 24?

6       MR. THOMAS:  But I don't object to 24.

7       THE COURT:  24 is admitted into evidence without

8   objection.

9               *(Government's Exhibit 24 was*

10                  *received in evidence.)*

11      MR. SHEPARD:  Please display 24.

12  BY MR. SHEPARD:

13  Q.  Ms. Conces, could you take a minute and just read that?

14  It may be easier to read the -- tell me when you're done.

15  A.  I don't have to read it too much.  I've read it quite a

16  few times.

17  Q.  Is there anywhere in that statement that he mentions using

18  his cell phone to take pictures?

19  A.  He did not.

20  Q.  Anywhere in that statement where he mentions M.R.

21  complaining of an injury that he thought he had to document?

22  A.  Nope.

23  Q.  Would it be appropriate for a -- or, excuse me.  Let me

24  back up.

25          Would one of your -- would it be all right or

1  allowed under your policies for any one of your employees to

2  use their personal phones to document an injury?

3  A.  No.

4  Q.  That's something he would have been told?

5  A.  Absolutely.

6  Q.  What did you do next?  After he wrote the statement, what

7  did you do next?

8  A.  I placed him on administrative leave.

9  Q.  And then was he escorted out of the building?

10  A.  He was.

11  Q.  Do you recall about what time that would have been?

12  A.  Around 5:20.

13  Q.  Were the parents ever notified prior to him -- or, excuse

14  me, prior to M.R. being picked up that night --

15  A.  They were not.

16  Q.  -- about the incident?  They were not?

17  A.  Uh-uh.

18  Q.  Why not?

19  A.  Because we had Mr. Ali still in the building, and our

20  director had told me that she was getting with the regional

21  director to make sure we followed the steps through.  I took

22  it upon myself not to tell the parents yet, because when they

23  picked up, Ali was still in the building.  And I felt it was

24  my job to protect my kids and my parents from the situation,

25  and I was not sure how the dad would react had he found out at

1  that exact moment.

2  Q.  Did -- were the parents ever notified by anyone at the

3  daycare before they called?

4  A.  No.

5  Q.  Now, what do I mean when I say, "before they called"?

6  A.  The parents called the daycare.  I had already left.  It

7  was probably 6:45, 7:00ish when they called the daycare and

8  spoke with Kim Jones.

9  Q.  And at that time, did they -- had they found out what had

10  happened?

11  A.  Yes.

12  Q.  And who's Kim Jones?

13  A.  She would be our educational coordinator.

14  Q.  Okay.  Did she call you after that?

15  A.  She did.

16  Q.  Did she -- is it fair to -- how did she describe the mood

17  of the parents?

18  A.  They were upset.  I mean, they were extremely upset.

19  Q.  Do you recall around what time this would have been?

20  A.  It was 6:30, 6:45.  I was driving home.  I live an hour

21  from the daycare, and I was not quite home yet.  I was on

22  Mount Comfort, so it had to be 6:45ish.

23  Q.  What did you do after that?

24  A.  I pulled over on the side of the road.  There's a little

25  church right there.  And I called Jennifer, our director, and

*CONCES – CROSS/THOMAS* 100

1  I demanded that she call the parents and that she handle the

2  situation, because I did not want the parents to feel like we

3  neglected to take it seriously.

4  Q.  Did you stay with the daycare very long afterwards?

5  A.  Just about a month.

6  Q.  Okay.  How did your employment end?

7  A.  I resigned.

8       MR. SHEPARD:  If I could just have a moment, Your

9  Honor?

10       THE COURT:  You may.

11       (Off the record.)

12  BY MR. SHEPARD:

13  Q.  One last question, or maybe one last question.  Were you

14  aware, at any time in that time period, of any nicknames or

15  special names that Mr. Al-Awadi referred to M.R. as?

16  A.  No, sir.

17       MR. SHEPARD:  No further questions, Your Honor.

18       THE COURT:  Okay.  Mr. Thomas, you may cross-examine

19  the witness.

20       MR. THOMAS:  Thank you, Your Honor.

21                    **CROSS EXAMINATION**

22  BY MR. THOMAS:

23  Q.  Ma'am, I want to start with that first conversation that

24  you had with M.R..  The first thing you asked her was how her

25  day was going and she said okay?

1  A.  Uh-huh.

2  Q.  And when you asked her the question -- after she said, "It

3  hurts," you asked some follow-up questions, right, to try to

4  find out something about --

5  A.  Yeah.  I asked her why she was saying it hurt.

6  Q.  Right.  And you asked her if it hurt last night or when

7  she went home, right?

8  A.  Yeah.

9  Q.  And when you asked her about it hurting, she said, "Mommy

10 told me that I can't have any bubbles in the tub because

11 that's what's making it hurt to pee," right?

12 A.  Exactly.

13 Q.  That was her answer to that question?

14 A.  Yes.

15 Q.  Now, to your knowledge, had her mother been at the school

16 that day?

17 A.  I'm not sure who dropped off.  I came in after drop-off.

18 Q.  Well, after the children were dropped off, did you have

19 any information that her mother would have been at the school,

20 that she would have talked to her mother?

21 A.  No.

22 Q.  Would she have had a bubble bath at school?

23 A.  No.

24 Q.  And in addition to that, that's not all she said.  When

25 she said, "I can't have any bubbles in the bath because that's

1  what makes it hurt to pee," she then said, "But I told Mr. Ali

2  that"?

3  A.  Correct.

4  Q.  About it hurting to pee and about the bubble bath?

5  A.  Correct.

6  Q.  That's what she told you at that point?

7  A.  Uh-huh.

8  Q.  Okay.  Any discussion that she had with her mother about

9  that, you wouldn't know about?

10 A.  Nope.  They didn't say anything to us, no.

11 Q.  As far as you know, it didn't happen at school that day,

12 right?

13 A.  Correct.

14 Q.  Were you in the building, say around 11:30?

15 A.  I was.

16 Q.  Did Tyria come to you around 11:30 and tell you that M.R.

17 said it hurt to pee?

18 A.  She did not.

19 Q.  Would it have been policy that if a child in the classroom

20 had told the teacher, "It hurts to pee," is that something

21 that should be reported?

22 A.  It is.  Typically they do an accident report, and then

23 they would let us have the accident report.  Sometimes we do

24 the accident reports at the end of the day, so it doesn't

25 necessarily mean that she would right away.  Most of the

1  classrooms have a phone in them.  The kindergarten room

2  didn't.  So it would have to be when, you know, we all saw

3  each other.

4  Q.  Okay.  She never reported that to you?

5  A.  She did not.

6  Q.  In fact, every time a child complains of pain of any kind,

7  would you say that's reported every time that happens in the

8  classroom?

9  A.  No.  It depends on the severity of the pain.  If they're

10  just saying their belly hurts, we don't do an accident report.

11  Q.  It's clear the policy at the daycare was that no one would

12  have their cell phone, but that wasn't strictly enforced, was

13  it?

14  A.  No.  It was strictly enforced.

15  Q.  Do your --

16  A.  Do I think people had them?  Yes, but it was strictly

17  enforced.

18  Q.  Fair enough.  When you found out about it, there was a

19  procedure, right?

20  A.  Absolutely.

21  Q.  And it was pretty common that people got counseled for

22  having their cell phone, right?

23  A.  I wouldn't say it's common.

24  Q.  Well, it wouldn't be your testimony that Mr. Al-Awadi was

25  the only person that was ever -- ever had his personal cell

1   phone in the school, right?

2   A.   Sure.

3   Q.   And people didn't always follow that policy?

4   A.   Sure.

5   Q.   To your knowledge, did anyone ever get fired over having

6   their cell phone?

7   A.   Nope.

8   Q.   But they could have, right?

9   A.   They could have, yes.

10  Q.   And Mr. Al-Awadi was aware that telling you that he had

11  taken pictures for any reason with his cell phone would have

12  probably gotten him fired, right?

13  A.   Absolutely.

14  Q.   Now, M.R. told you that it hurt to pee, she told you that

15  Mr. Al-Awadi had touched her?

16  A.   Uh-huh.

17  Q.   And you didn't look at her injuries, did you?

18  A.   Absolutely not.

19  Q.   Because that's against the rules, right?

20  A.   Yes, it is.

21  Q.   And do you remember giving a statement to Detective

22  McAllister the day after this happened?

23  A.   I do.

24  Q.   Do you remember him being a little surprised about that?

25  A.   I do.

1  Q.  What do you remember about that?

2  A.  He was surprised because he felt like if she had an

3  injury, then it's something we should have made sure she

4  wasn't bleeding or that she was okay.  I explained to him that

5  Indiana State licensing policy, we don't check when it's

6  something like that.

7          We did have nurses that were there before.  They had

8  cut budget and taken the nurses.  They could have looked.

9  But, otherwise, it has to be done either with a parent present

10 or it has to be done with -- if we would take them over to the

11 hospital.  But it is never our policy that I would look at any

12 of the child's private parts, ever.

13 Q.  Well, he was pretty surprised about that and said, "What

14 do you mean?  The child is hurting."  The natural response

15 from a person would be, "I want to see if you're okay"?

16 A.  Absolutely.

17 Q.  But the rules were you can't do that, right?

18 A.  Absolutely.

19 Q.  Even if that might be your initial response, correct?

20 A.  Exactly.

21 Q.  So as a well-trained professional, even if your response

22 would be, "Let me see if you're okay," you know that you can't

23 do that?

24 A.  Exactly.

25 Q.  And if you did that, you would get fired, wouldn't you?

1  A.  Absolutely.

2  Q.  But if Mr. Al-Awadi had told you, "Yeah, when she told me

3  that it hurt, I looked at it to see if she was okay," that

4  would have gotten him fired on the spot?

5  A.  Yes, it would have.

6          MR. THOMAS:  Could I have a moment, Your Honor?  I

7  have a note that I left.

8          THE COURT:  Okay.

9          MR. THOMAS:  Thank you.

10  BY MR. THOMAS:

11  Q.  Is it safe to say that some of the parents were

12  uncomfortable with a man working at the daycare, would you

13  say?

14  A.  Yes.

15  Q.  And they expressed that at times?

16  A.  Yes.

17  Q.  But Mr. Al-Awadi was perfectly capable of working there,

18  right, under your policies?

19  A.  Absolutely.

20  Q.  And you made it clear in your prior statement that your

21  company didn't discriminate based on gender?

22  A.  Yep, we did not.

23  Q.  And that was kind of an important policy, wouldn't you

24  say?

25  A.  Absolutely, yes.

1  Q.  And Mr. Al-Awadi, prior to these accusations, he hadn't

2  done anything inappropriate with a child to cause you those

3  kinds of concerns, had he?

4  A.  Not me, personally, have those concerns; but, no, he had

5  not.

6  Q.  Well, who -- who had those concerns?  Nobody had those

7  concerns.

8  A.  Some of the parents had those concerns, yes.

9  Q.  Parents had concerns just in general that he's a man,

10 right?

11 A.  Yes.

12 Q.  Parents didn't have specific accusations about

13 inappropriate behavior?

14 A.  No.  A couple employees did not appreciate that he chose

15 to just take the females to the bathroom, especially in the

16 twos room.

17 Q.  Okay.  Who were the couple of employees?

18 A.  That would be Cathie.

19 Q.  Yeah.

20 A.  And I don't remember her last name.  I apologize.

21 Q.  Cathie Williamson?

22 A.  There you go.

23 Q.  Or Williams, I believe?

24 A.  She had concerns because she felt like he let the girls

25 sit in his lap, and she had concerns because she felt like he

1  preferenced taking the females to the bathroom.

2  Q.  Well, you talked to Detective McAllister about that the

3  day after this happened, right?

4  A.  Yes.

5  Q.  And you told him that her concern was for his own

6  protection, right?

7  A.  Absolutely.

8  Q.  Not that he had done anything inappropriate?

9  A.  Nope.  She did not feel like he had done anything

10 inappropriate.  She just felt like it did not look good for

11 Mr. Ali.

12 Q.  Right.  So the parents had concerns just in general?

13 A.  Yes.

14 Q.  And for his own protection, "Hey, maybe you should protect

15 yourself," right?

16 A.  Absolutely.

17 Q.  "Because you might be accused of something"?

18 A.  Absolutely.

19 Q.  And, in fact, you made it clear to him at that point that

20 he hadn't done anything wrong, right?

21 A.  At what point?  With Cathie or when he came into my office

22 for M.R.?

23 Q.  With Cathie.

24 A.  Yeah.  Well, yeah.  I never spoke to Ali about that

25 situation.  I only spoke to Cathie.

1  Q.  You spoke -- and there was no reason at all at that point

2  to make -- to write him up or to talk to him or punish him,

3  because he hadn't done anything wrong?

4  A.  Well, no.  I took Cathie's statement.  I gave it to our

5  director.  I was out of the center on Tuesday and Wednesday.

6  My son was moving into college.  It was my understanding that

7  she was to speak with Mr. Ali, which would be the first

8  counsel about that situation, just counseling him about the

9  feelings that, you know, Cathie had had in the classroom.  I

10  was not there, so I cannot tell you if the discussion or the

11  counsel ever took place.

12  Q.  And there was the prior incident with picking up G.F.,

13  right?

14  A.  Yes.

15  Q.  And, again, you made pretty clear previously that there

16  was nothing individually inappropriate about what he did?

17  A.  It was inappropriate.

18  Q.  And it's inappropriate -- it would have been inappropriate

19  for you to pick up a child?

20  A.  Yeah.  If they're walking, our policy is to not pick up a

21  child unless they're hurting.  So we're not going to pick them

22  up, swing them around, play with them that way.  So it would

23  have been inappropriate regardless of who picked the child up.

24  Q.  Not inappropriate in, like, a sexual way or anything like

25  that, right?

1  A.  I wouldn't say that, no.

2  Q.  Nobody accused him of that at the time?

3  A.  No.

4  Q.  In fact, you said at the time, "I know your intentions are

5  good"?

6  A.  Yeah.  I knew he was playing with her.

7  Q.  Right.  Again, you were more concerned seeing him pick up

8  the child as to how it looked?

9  A.  Exactly.

10  Q.  Do you keep records of how many people got write-ups for

11  cell phones?

12  A.  Yeah.  They would be in their files.

13  Q.  Can you give me an approximation as to how many people had

14  gotten write-ups for cell phones?

15  A.  I had only been doing it for a year.  I only personally

16  did three.

17          MR. THOMAS:  Just a moment, Your Honor.

18  BY MR. THOMAS:

19  Q.  Now, the conversation that you had with Mr. Al-Awadi was

20  about what time in the day?

21  A.  Around 4:30, 4:45.

22  Q.  And, to your knowledge, he had been at the school that

23  afternoon?

24  A.  Yes, other than his lunch break.  He left for his lunch

25  break.

1  Q.  The doors aren't locked there, right?

2  A.  They are.

3  Q.  From the outside or the inside?

4  A.  They are locked from the outside, not the inside.

5  Q.  So he could have left at any time in the afternoon?

6  A.  He could have.

7  Q.  And he also -- when you spoke to Mr. Al-Awadi about this,

8  he told you he didn't do it, right?

9  A.  He did.

10  Q.  And he seemed nervous and scared, right?

11  A.  He did.

12  Q.  The handbook, do you remember that?  Did you review that

13  during your employment there?

14  A.  I did.  At the time, Bright Horizons had just taken over

15  Children's Choice, so at the time our handbook was on-line.

16  We didn't have, like, a hand copy, but we did.  Each employee

17  had to go through the one on-line and sign that they had read

18  through it.

19  Q.  And there's a portion in the handbook -- we talked about

20  the personal cell phone, but there's also a section in there

21  about photographs and encouraging photographs of the children?

22  A.  Agreed.

23  Q.  And what -- how were those taken?

24  A.  We had what we called Baby Connect, which were iPads,

25  but they were only in the infant room, the ones and twos room.

1  In the preschool, pre-K, and kindergarten, they did not have

2  iPads.  They could take pictures of those to send them to the

3  parents throughout the day.

4           And we had classroom cameras that they checked out

5  of my office or Jennifer's office.  They could take pictures,

6  but they had to be returned by the end of the day.  It was

7  always understood and told that the cameras did not leave the

8  building for any reason.

9  Q.  And the purpose for taking those pictures -- what would

10 have been those purposes?

11 A.  We -- well, the Baby Connect is the mom, the infants.

12 They like to see in case they miss that first step or whatever

13 they were doing at the daycare.  Some of the pictures that we

14 took, we had boards outside of the classrooms.  That was all

15 about their day.  So they could take the pictures and put the

16 pictures up to show the work that they had done, along with

17 the documentation.

18 Q.  Right.  How long have you been in -- well, at the time

19 of -- in 2014, how long had you been in childhood education?

20 A.  15 years.

21 Q.  And if you remember, at around that time, how long had

22 Mr. Al-Awadi been in childhood education?

23 A.  A year.  Just about a year.

24 Q.  How long was his training period?

25 A.  They have two weeks in the -- when they first start in the

1 classroom, where they work with an educator.  They're never

2 left alone in the room.  That may be different in the evening

3 just if they -- you know, they were down in numbers and had

4 four or five and we felt they could handle it.  But during the

5 day when the class is full, for two weeks you're with an

6 educator.

7          And we do -- we did weekly -- let me take that back.

8 We did biweekly staff meetings.  And, typically, I wouldn't

9 call it necessarily like individual training, but we did

10 trainings as a group and spoke about the different policies of

11 the center.

12 Q.  So two weeks.  It's your clear recollection today that

13 when Cathie came to you with her concerns, that she told you,

14 clearly, she did not think Mr. Ali had done anything wrong?

15 A.  Yes.

16          MR. THOMAS:  No other questions.  Thank you.

17          THE COURT:  Do you have any redirect?

18          MR. SHEPARD:  Yes, Your Honor.  Can I have just a

19 moment?

20          THE COURT:  You may.

21          (Off the record.)

22                    **REDIRECT EXAMINATION**

23 BY MR. SHEPARD:

24 Q.  Ms. Conces.

25 A.  Yes.

1   Q.  What was your demeanor like when you were interviewing

2   Mr. --

3           MR. THOMAS:  Objection to relevance, Your Honor.

4           THE COURT:  Well, let's hear the question.

5           MR. SHEPARD:  Thank you, Your Honor.

6           THE COURT:  I'm not sure what the question is.

7   BY MR. SHEPARD:

8   Q.  How were you acting when you were interviewing

9   Mr. Al-Awadi?

10          MR. THOMAS:  I object to the relevance of her

11  demeanor.

12          MR. SHEPARD:  He's brought up a lot of times trying

13  to insinuate he had fear of losing her job -- or losing his

14  job.  I'm trying to get how the witness was acting.  Was she

15  threatening his job?  Was she doing anything like that?

16          THE COURT:  All right.  I'll overrule --

17          MR. THOMAS:  He can't testify, Your Honor.

18          THE COURT:  He cannot testify, but I will overrule

19  the objection.  She may answer the question.

20          THE WITNESS:  Can you repeat your question, please?

21  BY MR. SHEPARD:

22  Q.  Certainly.  What was your demeanor during the talk that

23  you had with Mr. Al-Awadi?

24  A.  I was professional, just as I'm talking to you right now.

25  Q.  Did you ever threaten his job?

1  A.  I did not.

2  Q.  In fact, did you tell him how important it was to say

3  everything --

4          MR. THOMAS:  Object to the leading question, Your

5  Honor.

6  BY MR. SHEPARD:

7  Q.  Did you tell him anything about saying everything?

8  A.  I did tell him it was important that -- I told him it was

9  important that we put everything in the statement, especially

10  because he had not come and told me earlier in the day.  And I

11  explained to him anytime anything like that happens going

12  forward, the importance of him coming forward and letting us

13  know the situation happened.  And I explained to him that I

14  needed fully what happened in his statement.

15  Q.  Did he say anything at all about his cell phone?

16  A.  He did not.

17  Q.  Anything at all about pictures?

18  A.  He did not.

19  Q.  Were you talking about something serious at that time?

20  A.  Absolutely.

21  Q.  Talking about his job or a potential crime?

22  A.  Both.

23  Q.  And you mentioned that Ms. Graham didn't come up and

24  report it?

25  A.  No.

1  Q.  Was Ms. Graham ever accused of touching her

2  inappropriately?

3  A.  She was not.

4  Q.  Who was the only one?

5  A.  Mr. Ali.

6  Q.  You mentioned about the incident with      G.F.     And

7  then the incident with Cathie Williamson.  Do you remember

8  that?

9  A.  Correct.

10 Q.  Do you remember saying that you didn't feel that it was

11 sexual; inappropriate, but not sexual?

12 A.  Yes.

13 Q.  Did those happen before or after the incidents with M.R.?

14 A.  Before.

15 Q.  Would you possibly have looked at it differently --

16         MR. THOMAS:  Objection.  Calls for speculation at

17 this point.

18         THE COURT:  Let's hear the --

19         MR. SHEPARD:  I'll withdraw the --

20         THE COURT:  Okay.  I didn't --

21         MR. SHEPARD:  I'll withdraw the question, Your

22 Honor.

23         THE COURT:  All right.

24         MR. SHEPARD:  No further questions.

25         THE COURT:  Anything on those questions, Mr. Thomas?

 1          MR. THOMAS:  No, Your Honor.

 2          THE COURT:  May this witness be released from

 3  subpoena, Government?  Do you need her?

 4          MR. SHEPARD:  Your Honor, we would like to hold her

 5  under subpoena.

 6          THE COURT:  All right.  Do you want to keep her here

 7  in the building?

 8          MR. SHEPARD:  No, Your Honor.

 9          THE COURT:  All right.  Ma'am, you are excused for

10  today, but you're still under subpoena.  So if they need you

11  back, they will call you, okay?

12          THE WITNESS:  Okay.  Thank you very much.

13          THE COURT:  All right.  Thank you.

14          (Witness excused.)

15          THE COURT:  And we're going to go ahead and take our

16  morning break.  Ladies and gentlemen, we'll give you about 15

17  minutes.  No deliberation, no discussion, and we'll come back

18  in 15 minutes.

19          THE COURTROOM DEPUTY:  All rise.

20          (Jury out at 10:53.)

21          THE COURT:  Okay.  We are in recess.

22          (Recess at 10:54, until 11:16.)

23          THE COURT:  We are back on the record.  Are you

24  ready with your next witness?

25          MR. SHEPARD:  We are.  I do have just a question so

1  we can ease the Court in the next break.  It's going to be

2  Detective McAllister, and he's going to be up there for quite

3  a while.  Is there any particular timeframe the Court would

4  like me to shoot for for an actual break?

5          THE COURT:  If you want to go until -- it's 11:16.

6  Go to maybe 12:30?  That will be good.  We'll have lunch from

7  12:30 to 1:30.

8          MR. SHEPARD:  I will try my best to find a break

9  right around there, or if there's a break coming close, I'll

10  let the Court know.

11          THE COURT:  Sounds good.  Are you ready for the

12  panel?

13          MR. SHEPARD:  Yes, Your Honor.

14          THE COURT:  Defense ready?

15          MR. THOMAS:  Ready, Judge.

16          THE COURT:  You may bring in the jury.

17          (Jury in at 11:17.)

18          THE COURT:  You may be seated.

19          And, Witness, if you would remain standing and raise

20  your right hand.

21          (The witness is sworn.)

22          THE COURT:  You may have a seat.

23          And as soon as he's comfortable, Counsel, you may

24  examine your witness.

25          MR. SHEPARD:  Thank you, Your Honor.

1    **ELI McALLISTER, PLAINTIFF'S WITNESS, SWORN**

2    <u>**DIRECT EXAMINATION**</u>

3    BY MR. SHEPARD:

4    Q.  Could you please state your name and spell your last name

5    for the record?

6    A.  Eli McAllister, M-C-A-L-L-I-S-T-E-R.

7    Q.  And how are you employed?

8    A.  I am with the Indianapolis Metropolitan Police Department.

9    Q.  What's your position?

10   A.  I'm a sergeant.

11   Q.  And is that a recent --

12   A.  Since January of this year.  Yes, sir.

13   Q.  What are you a sergeant in?

14   A.  I'm a patrol sergeant on the southwest side of

15   Indianapolis.

16   Q.  What were you before you were a patrol sergeant?

17   A.  I was a detective within the child abuse unit.

18   Q.  And did you switch to patrol when you were promoted to

19   sergeant?

20   A.  Yes, sir.

21   Q.  How long were you a detective in the child abuse unit?

22   A.  Six and a half years.

23   Q.  How many child molest cases do you think you investigated

24   over that time?

25   A.  Well, total cases per year ended up being anywhere from 50

1  to 70 cases.  And we investigate child molest or sexual abuse

2  of children as well as neglect and physical abuse of children,

3  so I'm going to guess maybe 30 to 40 cases a year of child

4  molest over six years, six and a half years.

5  Q.  Did you have any training in that area?

6  A.  Yes.

7  Q.  And did that include training into how to interview

8  children witnesses?

9  A.  Yes.

10  Q.  Things to look for?

11  A.  Yes.

12  Q.  Are there things called verbals and nonverbals?

13  A.  Sure.  There's verbal communication and nonverbal

14  communication.

15  Q.  And are those important in cases involving victims, or

16  alleged victims, as young as four years old?

17  A.  Yes.  It can be important in any aspect of human

18  communication, yes, sir.

19  Q.  Were you the investigating officer in this case?

20  A.  Yes.  I was the detective assigned the case.

21  Q.  Okay.  Now, I want to just talk about something real fast

22  before we get into the full narrative.  You've been in here

23  the entire time; is that correct?

24  A.  Yes, sir.

25  Q.  And you just saw the examination and cross-examination of

1  Heidi Conces; is that a fair statement?

2  A.  Yes.

3  Q.  Your reactions to some of the things that Heidi said was

4  characterized --

5           MR. THOMAS:  Object.  I'm sorry.  I'll let him

6  finish the question.

7           THE COURT:  You may finish your question.

8  BY MR. SHEPARD:

9  Q.  -- as being shocked.  Do you remember hearing that?

10          MR. THOMAS:  Objection to the relevance of his

11  reaction to the testimony, Your Honor.

12          MR. SHEPARD:  Do you want to approach?

13          THE COURT:  Sure.

14          (Bench conference on the record.)

15          MR. SHEPARD:  Your Honor, he's setting up for close

16  to use the fact that, as he characterized, Detective

17  McAllister was shocked they didn't have anyone document her

18  injury or take her anywhere.  Detective McAllister has a

19  completely different account of how that happened, why those

20  questions were asked, and why it's relevant as to other

21  places.

22          It also goes to multiple things that Mr. Thomas said

23  in opening, as well as the cross-examination, about various

24  avenues of investigation that were not done by IMPD.  He's

25  going to talk about -- where I'm going with this is, he's

1  going to talk about why those questions were asked, why it's

2  important, and he's going to refute that he was shocked that

3  they hadn't taken her or looked at her injury themselves.

4          THE COURT:  Okay.

5          MR. THOMAS:  I guess I understood the question about

6  asking him about what -- about her reactions.  I mean, if he

7  wants to ask him about his investigation, fine, but my

8  understanding from the question was that he was asking about

9  whether she -- his reaction to her being shocked.

10          THE COURT:  No.  It was --

11          MR. SHEPARD:  I said it was his characterization of

12  him being shocked.

13          THE COURT:  Right.  It's whether or not the

14  detective was shocked, was the question.

15          MR. THOMAS:  Well, I think he can ask the detective

16  all he wants about his investigation, but --

17          THE COURT:  Well --

18          MR. THOMAS:  -- I object on the form of the question

19  as to relating to what she said.

20          THE COURT:  Okay.  Yeah.  You kind of opened the

21  door and you brought in evidence that he was shocked.  So he

22  can clarify that.

23          MR. THOMAS:  I understand that.  I --

24          THE COURT:  I don't think he's talking about -- and

25  he can testify as to her demeanor, also, but I think your

1   question was, was the detective actually shocked?

2          MR. THOMAS:  Well, if that -- I don't think it was

3   asked that way, but if that's the question, I have no

4   objection.

5          THE COURT:  Okay.

6                       (Open court.)

7          THE COURT:  All right.  The objection is withdrawn,

8   and you may answer the question.  Do you remember the

9   question?

10         MR. SHEPARD:  I'm going to ask it again.

11         THE WITNESS:  Sure.  Please.

12  BY MR. SHEPARD:

13  Q.  Do you remember having your reaction being characterized

14  as shocked by what you heard from Ms. Conces?

15  A.  I remember at one point specifically my reaction to the

16  fact that no one on the daycare staff physically examined M.R.

17  being that I was surprised.  He may have said shocked, I don't

18  remember that, but just that I was surprised that no one had

19  examined her when she disclosed what she said.

20  Q.  Can you tell us about your remembrance of that

21  conversation and how you reacted and why you did what you did,

22  why you asked what you asked?

23         MR. THOMAS:  That's a compound question at this

24  point, Judge.

25  BY MR. SHEPARD:

1  Q.  Why don't you just tell us how you recall that

2  conversation going.

3  A.  So I actually began by asking what the policy or procedure

4  of the daycare was when a child was hurt or injured at the

5  daycare, and asking Ms. Conces to fill me in on that.  I think

6  I asked her at least twice what the procedure was when a child

7  notified anyone on daycare staff that they had been hurt, and

8  asking what that procedure was.

9          And she told me what the policy was that was in

10  place and what they were supposed to do when someone, a child,

11  was hurt.  I then went on to ask her about the -- if there was

12  any -- since we were located within a hospital campus, if

13  there was any medical personnel on staff or inside the

14  building working at that time.  She told me there wasn't.

15          I also asked them what their policies and procedures

16  were as far as obtaining medical assistance or notifying

17  parents when a child was hurt or injured in any way or when a

18  child told the daycare staff that they were hurt or said they

19  had pain or were hurting somewhere.

20          My next question had to do with --

21          MR. THOMAS:  Your Honor, I'm going to object at this

22  point to --

23          THE COURT:  Narrative form?  Next question.

24  BY MR. SHEPARD:

25  Q.  What was the next thing you asked her about?

1 A.  About their procedures and policies as far as notifying

2 parents and notifying DCS and notifying law enforcement.

3 Q.  Did you ever express surprise at their policies?

4 A.  I think any surprise that was expressed on my part during

5 that conversation was at the lack of notification to DCS or

6 notification of the parents, or the failure of any medical

7 assistance being offered or provided to the child that had

8 disclosed she was in pain and hurting.

9 Q.  Did you ever suggest that they should have taken off her

10 pants and looked?

11 A.  No.  I did ask if anyone had checked or looked at M.R.,

12 but I didn't suggest that anyone should have done that.

13 Q.  Now, why is that an important question for you to ask?

14 A.  For a number of reasons.  One of the things to keep in

15 mind is that my investigation wasn't solely into what Mr. Ali

16 Al-Awadi may or may not have done at the daycare that day, but

17 also part of my investigative responsibility is into how the

18 daycare responded and if there was any neglect on the part of

19 the daycare staff.  So I needed to know how they responded.

20 And the limited information I had had up to that point caused

21 me some concern, so I was exploring that topic with them.

22 Q.  Would it also be important for you to know who else may

23 have touched or looked at the child for exclusion purposes,

24 where you needed to interview next?

25 A.  Yes, absolutely.  It's important for me to know who may

1   have performed any exam or may have looked at the child.  And

2   so that was one of the questions I asked her after that.

3   Q.  How did you become involved with this case?

4   A.  Within the child abuse unit, we -- we don't have enough

5   detectives to cover 24 hours, seven days a week, 365 days a

6   year.  We work typically Monday through Friday, 8:00 to 4:00,

7   and so we have an on-call rotation.  On-call for us is 8:00

8   a.m. to 8:00 p.m. the following -- or, I'm sorry, 8:00 a.m. to

9   8:00 a.m. the following day, so a 24-hour period.  I was the

10  on-call detective on October -- or, I'm sorry, on August the

11  21st, 2014.  I got a page at, I think it was 1:51 a.m.  I got

12  a page to contact a police officer who was at St. Vincent

13  Hospital with M.R. and her parents.

14  Q.  Did you contact that officer?

15  A.  I called him on the phone with the number provided in the

16  page.

17  Q.  And I'm sorry.  What time was that again?

18  A.  1:51 a.m.  It was actually on the 22nd of August, but it

19  was still within my on-call period.

20  Q.  Will you just generalize the sum and substance of that

21  conversation?

22  A.  Well, once I woke up, I called him.  And he informed me

23  that he was there at the hospital with a four-year-old child

24  in the emergency department, along with the child's parents,

25  and that the child had disclosed that an individual at the

1  daycare had put their finger inside her vagina the day

2  previous, but that the parents had no information beyond

3  Mr. Ali as the identity of the individual who did that.

4  Q.  And what did you do as a result of that conversation?

5  A.  Well, I ensured that everything was -- that needed to be

6  done at the hospital was taking place, so I verified that the

7  child was having a forensic exam done by a forensic nurse

8  examiner.

9         I explored with the officer on-scene if we could

10  develop any further lead as to the identity of the individual

11  who had done it, and learned that the daycare was closed.

12  There was no one we could speak to at that time to pursue any

13  lead further in that regard.

14         And so I asked the officer who was there at the

15  hospital to instruct the parents to meet me at my office the

16  following morning at 9:00 a.m. so that I could have the child

17  interviewed and interview the parents and proceed with the

18  investigation from there.

19  Q.  Where was your office located in August of 2014?

20  A.  The IMPD child abuse office is located within the Marion

21  County Child Advocacy Center.  It's a multidisciplinary team

22  located at 4134 North Keystone Avenue.  It's just between --

23  on Keystone, North Keystone, between East 38th Street and Fall

24  Creek Parkway.  It's right near the state fairgrounds here in

25  Indianapolis.

1  Q.  Can you kind of describe a little bit more for the jury

2  what you mean by "multidisciplinary team" and what happens at

3  the Child Advocacy Center?

4  A.  So, as I mentioned before, the City doesn't have a ton of

5  child abuse detectives.  There's about eight to nine with

6  several supervisors.  So our offices are located in that

7  building, but there's also the adult sex crimes investigators

8  within IMPD.  And there may be about 15 of them and some

9  supervisors.

10         But then, aside from IMPD, we also have multiple

11  other agencies located within the same physical building,

12  primarily Department of Child Services, the state agency

13  responsible for investigating allegations of abuse and neglect

14  of children.  They have several hundred, if not more, staff

15  members within the building, including what they call the FCM,

16  or a family case manager.  They investigate the allegations of

17  abuse for DCS.  They also have their legal team.  They also

18  have their ongoing case managers that fulfill kind of a social

19  work function.

20         But then, in addition to that, we also have the

21  Marion County Prosecutor's office.  They have a presence in

22  the building.  They have three attorneys.  And, in addition to

23  that, we also have several child interviewers that also work

24  in the building.  And the concept behind it is so that --

25  because anytime you have --

1      MR. THOMAS:  Your Honor, this is an awfully long

2  answer.

3      THE COURT:  Go ahead and ask the next question.

4  BY MR. SHEPARD:

5  Q.  What's the concept behind this?

6  A.  That anytime you have an investigation into allegations of

7  child abuse and neglect, all these different agencies are

8  going to be interested and involved in the investigation.  And

9  so the best way to proceed with the investigation is to make

10  sure that all the parties are communicating with one another

11  and able to act in unison, so that you're not having one

12  person interview for DCS and someone else interview for, you

13  know, the police department, and duplicating efforts.  It's to

14  sort of unify and combine efforts and make sure we don't

15  interfere and get in each other's way, I suppose.

16  BY MR. SHEPARD:

17  Q.  Is it fair to say bring multiple expertises together to

18  collaborate, as well?

19  A.  That's true, yes.  Each of us has sort of a different

20  focus and emphasis that we bring to the table.  And it's an

21  attempt to make sure that everyone is able to achieve their

22  own, you know, professional goal or their role within the

23  situation.

24  Q.  Can you physically describe the building?  Is it -- does

25  it look like a police station or --

1  A.  No, not at all.  It's -- I think it's an old department

2  store, but it's a rather large building with kind of like a

3  cubicle land, tons and tons of gray cubicles all throughout.

4  There's a large waiting room up front.  And, also, we have a

5  smaller waiting room where children that are going to be

6  interviewed forensically can wait with their parents, as well.

7  Q.  Is there a playroom or anything like that on the premises?

8  A.  There are some toys in the front main lobby.  And there's

9  a great higher number of toys in that smaller space: video

10  games, books, puzzles, coloring books, all kinds of toys,

11  things like that in that waiting room where children are

12  waiting to be interviewed.

13  Q.  What's the purpose of having all that?

14  A.  Oftentimes the kids that come in there to be interviewed

15  have been through traumatic situations or have just left a

16  traumatic situation, and we try to give them something to

17  occupy their mind and keep them calm.  Plus, kids get, I don't

18  want to say destructive, but they can get into problems if

19  they're bored.  So if they're just sitting there on chairs by

20  themselves, it wouldn't be the most conducive environment to

21  having children wait.

22  Q.  And is that where the interviews with the family were to

23  take place?

24  A.  Yes.  Within that building, we have multiple different

25  areas that are designated for interviewing.

1  Q.  Did the family come that morning?

2  A.  Yes.  I called them at 8:30 to make sure they were on

3  their way, and she showed up sometime shortly after 9:00.

4  Q.  What happened when they got there?  Did you learn the

5  identity of the four-year-old child?

6  A.  Yes.  I met the family and just briefly explained to them

7  the process that we were getting ready to undergo, which was

8  to start with an interview of M.R.

9  Q.  All right.  And so --

10         MR. SHEPARD:  Please display Exhibit 77.

11  BY MR. SHEPARD:

12  Q.  Who is that?

13  A.  That's M.R.

14  Q.  And then who else came with her?

15  A.  Her mother and her father.  Her mother is Miosotis

16  Rodriguez and her father is Justo Guevara.

17  Q.  The same two that testified yesterday?

18  A.  Yes, the exact same people.

19  Q.  You said the first process was M.R. was interviewed?

20  A.  Yes.

21  Q.  How does that interview take place?

22  A.  So I'm trained in interviewing children but, if and when

23  possible, I defer to have a full-time professional child

24  interviewer do the interview instead.  And there was one

25  available to do the interview for me that morning.  And so

1  when that happens, there's -- it's a child interview room, and

2  there are live monitoring cameras that both relay it to a

3  monitor in an observation room nearby, but also record the

4  interview.  And so I was able to sit in the observation room

5  and watch the interview live as it was happening.

6  Q.  Do you remember about when the interview started?

7  A.  I feel like it was maybe around 9:30.  I remember 9:30,

8  9:00 a.m. stands out, but sometime around 9:30.

9  Q.  Was there a break taken at some point?

10  A.  The interview was concluded after a period of time, and I

11  moved on to interview M.R.'s parents.  And the

12  multidisciplinary team, together, decided that there were just

13  two things that we wanted to follow up with and ask M.R.

14  further about, and so about two hours after we initially

15  concluded the interview, the same child interviewer in the

16  exact same room spoke to M.R. again.

17  Q.  Do you remember how long about that -- how long the

18  interview continued?

19  A.  I don't remember.  I think it was in between 15 to 20

20  minutes.  I think the initial interview was around 20 minutes.

21  I'm just --

22  Q.  And did you live watch this continuation?

23  A.  Yes.  I watched both parts of the interview.

24  Q.  Okay.  I would ask you to look at Exhibits 42 and 43.  If

25  you would display those to the defense counsel, as well.

1          What are 42 and 43?

2  A.  They're compact disks that contain the video file of the

3  recording of each of those parts of the two interviews that I

4  just talked about.

5  Q.  And did you personally view what was on those two CDs?

6  A.  Yes, to make sure that was exactly what was on there.

7  Q.  And it was a true and accurate copy of the interview that

8  you witnessed?

9  A.  Yes.

10  Q.  Did you do anything after you watched the CDs to make

11  certain it was the same one?

12  A.  Oh, yes.  I signed my name and put the date on there, on

13  the actual disk itself.

14  Q.  Is the content of those two interviews important to you in

15  formulating how to go about your investigation?

16  A.  Yes.  We often refer to the child interview as sort of the

17  foundation of the investigation.  That is assuming that the

18  child is old enough to speak, which sometimes they're not.

19  But if and when you have a child old enough to talk, yes, it's

20  very important.

21  Q.  And was it the foundation of the investigation in this

22  case?

23  A.  Yeah.  Sure.

24          MR. SHEPARD:  Okay.  Your Honor, I would move for

25  the admission of Exhibits 42 and 43.

1        MR. THOMAS:  No objection to 42 or 43.

2        THE COURT:  Government's Exhibits 42 and 43 are

3   admitted into evidence without objection.

4                    *(Government's Exhibits 42 and 43 were*

5                    *received in evidence.)*

6        MR. SHEPARD:  Please bring up 42.

7   BY MR. SHEPARD:

8   Q.  What are we seeing here, Detective McAllister?

9   A.  That is the child interview room where M.R. was

10  interviewed the morning of August the 22nd.

11  Q.  And what happens for approximately the first ten minutes

12  of this video file?

13  A.  Nothing.  We like to have the camera running the entire

14  time that the child is in the room, so that we're not missing

15  anything or that we couldn't be accused of hiding anything of

16  what's said or done in the room.  So we turn the camera on

17  before the child enters the room.  And sometimes that's a

18  little too early.

19        So in this case, it was about ten minutes before the

20  the child entered the room with the interviewer.  At the very

21  beginning, the interviewer comes in and says a few things just

22  to introduce the recording as far as the name of the

23  interviewer, the name of the child, the case number, the

24  detective involved, things like that.

25  Q.  Are there any questions asked of the interviewee at that

1  time?

2  A.  No.  She wasn't in the room until roughly ten minutes

3  after the --

4         MR. SHEPARD:  Can you skip ahead to when they both

5  come into the room and play from there?

6         (Video playing in open court.)

7         MR. SHEPARD:  Can you pause it?

8  BY MR. SHEPARD:

9  Q.  Who is this?

10  A.  That is M.R.

11        MR. SHEPARD:  And just play ahead a little bit.  We

12  lost the other person.  Now, please pause it.

13  BY MR. SHEPARD:

14  Q.  And who is this?

15  A.  That's the forensic child interviewer that assisted that

16  morning.  Her name is Jessica Woodall.

17  Q.  What's the purpose of a forensic interview?

18  A.  It's simply to obtain a statement from the child, find

19  out what the child says in any given situation.  Sometimes we

20  do it for victims of sexual abuse, sometimes we do it for

21  victims of physical abuse.  We've had instances where children

22  here in Indianapolis have been witnesses to the murders of

23  their parents or family members, for example.  We'll do it

24  when they're a witness, as well.

25  Q.  Is it important to try and get an interview in every case?

1  A.  If the child can speak and can tell you what happened,

2  absolutely.

3          MR. SHEPARD:  Please go ahead and play the file.

4          (Video playing in open court.)

5          THE COURT:  Can you turn up your volume?

6          MR. SHEPARD:  I think it has to be done from up

7  there, Your Honor.

8          THE COURT:  Tanesa, do you control the volume?

9          Can you hear, ladies and gentlemen?  They can't

10  hear.  They can't hear.

11         MR. SHEPARD:  Can you pause it?

12         THE COURT:  Tanesa, do you control volume?  Tanesa

13  has got it up as high as it goes over here, so you guys need

14  to turn it up on your computer.

15         MR. SHEPARD:  I think that's as high as it goes,

16  Your Honor.

17         THE COURT:  That's as high as it goes?  Okay.

18         MR. SHEPARD:  Everyone just try real hard.  Lean

19  into the -- if I can stand on crutches, you all can lean into

20  the screen.

21         THE COURT:  I don't think the sound comes out of the

22  screen.  Okay.  Go ahead.

23         MR. SHEPARD:  Please go ahead and play.

24         (Video playing in open court.)

25         THE COURT:  Some mics are too close together?  Okay.

1  Let's try it again.

2          (Video playing in open court.)

3  BY MR. SHEPARD:

4  Q.  Was that the end of the first portion of the interview?

5  A.  Yes.

6  Q.  What happened after that?

7  A.  Jessica escorted her back to the waiting room, the smaller

8  one with all the toys and games that I described earlier.  I

9  left the observation room and went up to that lobby and got

10  M.R.'s mother, Miosotis, and took her back to an interview

11  room, an adult interview room, and completed a recorded

12  statement, took a statement from her.

13  Q.  All right.  Was that similar to the testimony that the

14  jury already heard?

15  A.  Yes.

16  Q.  Was her father there?

17  A.  Not in the interview room with -- interview room with her

18  mother and I.  He was in the waiting room.

19  Q.  I'm sorry.  But he was there at the center?

20  A.  Yes, he was at the Child Advocacy Center, yes.

21  Q.  Was he interviewed, as well?

22  A.  Yes.  I interviewed him after I completed the interview of

23  Miosotis.

24  Q.  How did that interview take place?  He doesn't speak very

25  good English.

1  A.  Yeah.  I believe we had an interpreter there.  I can't

2  remember who it was at the moment, but --

3  Q.  Now, do you recall, during their cross-examination, lots

4  of questions about if you had ever -- if they had ever viewed

5  those videos, if you had ever showed them the videos?  Did you

6  ever show them the videos of M.R.'s interview?

7  A.  No.  They've never seen the interview, the video recorded

8  interview of M.R.

9  Q.  And is that something that you would ever do in your

10 investigations?

11 A.  In the six and a half years I've done this, I never showed

12 the parent a video of the child interview.

13 Q.  After the parents were interviewed, was there a decision

14 made to continue the interview of M.R.?

15 A.  Yes.  The multidisciplinary team -- including myself, DCS,

16 and the prosecutor and the child interviewer -- wanted to do a

17 follow-up on the original interview, because after Jessica

18 Woodall left the interview, she realized that she had left

19 some key components out that she typically tries to cover in

20 the interview.

21 Q.  And what were those?

22 A.  Two things in particular.  The diagram that she placed on

23 the easel where M.R. circled the little -- the circle where

24 she said Mr. Ali touched her.  Typically, they go through and

25 identify multiple body parts on that diagram and complete what

1  they call a body safety interview, basically have the child

2  identify each different body part and then ask if anyone ever

3  touched them on any other part of their body, things like

4  that.

5  Q.  And what was the other point?

6  A.  The other thing that they often try to do is, if a child

7  does disclose that someone has touched them somewhere on their

8  body, they try to follow up also by asking if anyone else has

9  ever touched them on any of those parts of the body.

10         Typically they go through and identify a large

11  number of body parts and ask them if there's any part of the

12  body they don't want someone to touch.  And then they will

13  either circle or make some note of which body parts they don't

14  want someone to touch.  And then they will go through and ask

15  if anyone touched them there.  If the child discloses that

16  they did, like I said earlier, they will follow up by saying,

17  "Has anyone else touched you on one of these parts of your

18  body?"

19  Q.  And why would those questions be important?

20  A.  Just to make sure that we're not missing something or that

21  there wasn't someone else that might have been involved or

22  caused -- or done whatever it is that caused us to be there.

23  Q.  Was it discussed why that wasn't done in the first

24  interview?

25  A.  Yes.

1   Q.  And why was it not done?

2   A.  Because, as the video shows, the child almost immediately

3   went into describing what Mr. Ali specifically did to her.

4   And she didn't have a chance to kind of go through the typical

5   protocol she would normally follow.

6   Q.  And in the continuation, did they go through that

7   protocol?

8   A.  Yes.  That was the point of her doing the follow-up, so

9   she could go through those two.  And she did.

10          MR. SHEPARD:  Can you please display Exhibit 43.

11  BY MR. SHEPARD:

12  Q.  What are we seeing here?

13  A.  I am not seeing anything.  When the sound went out before,

14  my video feed died.

15  Q.  Oh.  Does everyone have video feed?

16  A.  It looked like everyone else was watching the screen, but

17  I --

18          THE COURT:  Are your video screens working, ladies

19  and gentlemen?  Is it working, Tanesa?

20          THE WITNESS:  It just did that for a little bit and

21  then went blank.

22          MR. SHEPARD:  Your Honor, maybe we ought to break.

23          THE COURT:  Do you want to go to lunch break?

24          MR. SHEPARD:  Well, if we're having technical

25  problems, those could be fixed.

 1            THE COURT:  All right.  We'll go ahead and take our

 2    lunch break, ladies and gentlemen.

 3            You call the tech people.

 4            All right.  We're going to adjourn for your lunch

 5    recess.  The Court is going to admonish you, ladies and

 6    gentlemen, you are not to have any discussion about the case

 7    among yourselves or with anyone else.  Remember not to read or

 8    listen to any news accounts regarding this matter.  No

 9    research or anything on social media.

10            If anyone should attempt to talk to you about the

11    matter, please refuse and report that attempt to your bailiff

12    at your earliest opportunity.  Under this admonishment, we'll

13    be in recess until 1:00 p.m.  Enjoy your lunch.

14            THE COURTROOM DEPUTY:  All rise.

15            (Jury out at 12:08.)

16            THE COURT:  Okay.  We'll get someone here from IT

17    and see if they can get the screen working.

18            MR. SHEPARD:  We'll stay until we can make certain

19    it's up and running.

20            THE COURT:  Well, why don't you come back early,

21    because -- be back in -- can you come back in about half an

22    hour?  We'll have somebody here by then.

23            MR. SHEPARD:  Yes, Your Honor.  Thank you.

24            THE COURT:  All right.  We're in recess.

25            (Recess at 12:09, until 1:11.)

1          THE COURT:  Government, are you ready for the jury?

2          MR. SHEPARD:  Yes, Your Honor.

3          THE COURT:  All right.  Witness, you can come on

4  back to the stand.

5          And, Mr. Thomas, are you ready for the jury?

6          MR. THOMAS:  I am ready.

7          THE COURT:  All right.  Tanesa, you may bring the

8  panel in.

9          (Jury in at 1:12.)

10          THE COURT:  We are back on the record.  The United

11  States of America versus Ali Al-Awadi.  Ladies and gentlemen,

12  good afternoon.  I hope that you had a pleasant lunch.  We

13  have all of the equipment working and we are back on the

14  record.

15          And, Witness, you are still under oath.

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  You may continue with your direct

18  examination of the witness, Mr. Shepard.

19          MR. SHEPARD:  Please display Exhibit 43.

20          THE COURT:  Is it working?

21          THE WITNESS:  It's just facing a little bit outward

22  now.  Can I turn it without -- okay.

23  BY MR. SHEPARD:

24  Q.  What are we seeing here, Detective McAllister?

25  A.  It appears to be the beginning of the second part of the

1  interview with M.R.

2  Q.  Is that the same room?

3  A.  The same room.

4  Q.  What's up here?

5  A.  That is a date and time stamp.

6  Q.  Is that in military time or is that a.m./p.m.?

7  A.  I -- I mean, you can't tell at 11:00.  At 1:00 I could

8  tell you.  I don't remember off the top of my head.

9  Q.  Do you remember about what time the continuation of the

10 interview began?

11 A.  I think it was after 11:30.  I think the time stamp is off

12 just a little bit.

13 Q.  In the morning?

14 A.  Yes, sir, if not a little bit later.  I can't remember

15 exactly.

16 Q.  And for approximately the first two minutes of the

17 video, what happens?

18 A.  Jessica Woodall comes back into the room and states the

19 date and time and her name and the case number and my name and

20 who she will be interviewing.  And then there's silence while

21 she goes to get M.R.

22 Q.  Any discussions with MR. during those first two minutes?

23 A.  No.  She wasn't in the room.

24         MR. SHEPARD:  Please advance it to about

25 approximately two minutes in, and then play the clip.

1           (Video playing in open court.)

2           MR. SHEPARD:  Go ahead and clear the screen.

3    BY MR. SHEPARD:

4    Q.  So, Detective, you watched both of those interviews as

5    they happened; is that correct?

6    A.  Yes.

7    Q.  Okay.  Is one of the things that you have to do is, as a

8    detective, is evaluate what you've heard and what you've seen

9    in the videos and figure out what to do next?

10   A.  Yes.

11   Q.  How do you go about -- or in this case, how did you go

12   about evaluating the two videos and deciding what next to do,

13   especially here where you've got what's a seemingly

14   inconsistent statement within the second interview?

15   A.  Well, I look at the broader context within which the two

16   interviews were set.

17   Q.  Okay.  And what was the context of the first interview?

18   A.  The first thing when they arrived, it was earlier in the

19   morning, soon after she had woke up.  And she directed much of

20   the interview herself as far as deciding when and where to

21   begin talking about what happened.

22   Q.  Anything about her relative attentiveness in the two

23   videos that was important?

24   A.  Yeah.  I certainly watched and evaluated her body language

25   throughout the two interviews and compared them as I

1  considered what she said during the interviews.

2  Q.  What did you notice in the second interview versus the

3  first interview as it relates to body language?

4  A.  She was -- well, at one point she laid down on the chair,

5  dropped her head so she was kind of looking upside down with

6  her feet in the air, a very sort of playful demeanor and

7  attitude.

8  Q.  Is that different than what was seen in the first video?

9  A.  The first video, she was sitting on the edge of the chair

10  and much more serious and attentive to the conversation.

11  Q.  And you said you had received training in interviewing

12  children; is that correct?

13  A.  Yes.

14  Q.  Did some of that training include interpreting body

15  language?

16  A.  It's not a heavy emphasis that we look at, but certainly

17  when you're dealing with a child, you have to take every piece

18  of their communication into account, including their mood and

19  their demeanor at the time of the interview.

20  Q.  What was the context of the second interview?

21  A.  It was later in the day, after she had been there.  She

22  had been interviewed once.  And then she had been in the front

23  lobby of the Child Advocacy Center with all the toys, games,

24  movies, and books, and she had been up for several hours after

25  probably about five or six hours of sleep.

1  Q.  And what had happened to her the day before?

2  A.  The day before was August 21st, the day that the incident

3  took place.  And my investigation showed that she went to the

4  hospital sometime around 8:00, 8:30 p.m. and stayed there

5  until at least when I spoke to the officer at 1:51.  It was

6  well after 2:00 before they would have had the chance to be

7  discharged and leave.  And then they were back up and at my

8  office by just a little bit after 9:00.

9  Q.  And is there anything about the differences in the two

10 videos that helped you decide what to do next in the

11 investigation?

12 A.  About the difference between the two videos?

13 Q.  Or the -- what you saw in the two videos.

14 A.  I'm sorry.  I was coughing.  I apologize.

15 Q.  What is it about the videos that helped you decide what to

16 do next -- or the interviews, rather?

17 A.  Just the descriptions of what she said happened,

18 particularly in the first interview, and then how she began

19 the first -- the second recording, and then how she ended

20 that.  She was still talking about things that were consistent

21 with what she had said in the first interview, as well as what

22 information I began with.

23 Q.  And so I guess, and maybe I just inartfully asked it, why

24 did you decide to focus on what was said in the first

25 interview versus the second?

1          MR. THOMAS:  Objection.  The prosecutor is

2    testifying in the way he's characterizing the questions.  It's

3    leading in that way.

4          THE COURT:  Why don't you rephrase it.

5    BY MR. SHEPARD:

6    Q.  Did you decide to focus on --

7          MR. THOMAS:  Again, the form of the question is

8    leading if he's going to tell him what he focused on.  He can

9    ask him what he focused on.

10          THE COURT:  Well, let's hear his question.

11    BY MR. SHEPARD:

12    Q.  Did you decide to focus on anything based upon seeing the

13    two interviews?

14    A.  Yes.

15    Q.  Okay.  What and why?

16    A.  I focused on Ali Al-Awadi as the suspect of my

17    investigation because I believed everything up to that point

18    in my interview pointed to him having molested her the day

19    before.

20    Q.  And anything about Ms. Anna or the monster with the key

21    lock give you pause?

22    A.  Sure.  I took note of it, absolutely.  I paid attention to

23    the entire interview, and that was part of it.  However, she

24    also stated that she was tricking the interviewer at that

25    point, and that Ms. Anna had not, in fact, touched her.

1          And the part about a monster was more about would a

2    monster come in, and then she said she had a dream about that,

3    and that would be scary if that happened.  I didn't know if

4    maybe she had dreamed about it the night before.

5    Q.  And so as a result of seeing that, how did the interview

6    focus -- or the investigation focus?

7    A.  I proceeded to investigate into the circumstances

8    surrounding the one hour in which Mr. Al-Awadi was alone with

9    her class the day before.

10   Q.  And how did you go about continuing the investigation?

11   A.  I went to the Children's Choice Learning Center at the

12   campus of St. Vincent Hospital.

13   Q.  What is the first thing you did when you got to the

14   daycare?

15   A.  Parked, went inside and introduced myself to the person at

16   the front desk.  She got Ms. Heidi Conces and took us to

17   Heidi's office.  I introduced myself and Sergeant Bruce Smith,

18   who was also in the unit with me, as well as the DCS worker

19   who accompanied us, to Ms. Conces and told her why we were

20   there.  And I told her that I would need to speak to her and

21   continue my investigation there at the site of the daycare.

22   Q.  Who did you speak with, yourself, if you remember?

23   A.  I believe Chiana Harris was the person that I met at the

24   front desk.  And she took me back to Heidi's office, which was

25   just to the right of the main entrance.  And then Heidi Conces

1  spoke to her, and I took a formal recorded statement from

2  Tyria Graham, Chiana Harris, and Heidi -- no.  Tyria Graham

3  and Chiana Harris.

4  Q.  And without getting into the details, were they consistent

5  with what you had heard from the family and from the hospital

6  records about what had happened the day before?

7  A.  Yes.

8  Q.  All right.  Were you able to determine the identity of

9  Mr. Ali?

10 A.  Yes.  Ms. Conces provided me several documents, one of

11 which was his application for employment to the Learning

12 Center, that he had filled out, I believe in 2013.

13 Q.  And who was Mr. Ali?

14 A.  Ali Al-Awadi.  And he's seated to my right, wearing a suit

15 with a green shirt.

16         MR. SHEPARD:  Please let the record reflect he's

17 identified the defendant.

18         THE COURT:  The record will so reflect.

19 BY MR. SHEPARD:

20 Q.  Were you able to determine where you believe the incident

21 to occur?

22 A.  Yes.

23 Q.  And where was that?

24 A.  What they called the kindergarten classroom.

25         MR. SHEPARD:  Could you please display Exhibit 2.

1  BY MR. SHEPARD:

2  Q.  Can you kind of describe what we're seeing here?

3  A.  That is the kindergarten classroom as viewed once you open

4  the doors and step inside.  There's double doors that go into

5  the room.  They are wooden doors with glass panels in them.

6  Q.  And so a pretty big room.  Do you have a theory as to

7  where in the room the incident occurred?

8  A.  If you will look to the left of the photograph, you can

9  see a large white square, rectangle-shaped rug --

10  Q.  Right there?

11  A.  -- with multicolored buttons on it.  Yes, sir.

12  Q.  Why do you believe it occurred there?

13  A.  Throughout the course of my investigation, that's where --

14  the location that kept coming up, I suppose.  Particularly

15  when I spoke to Mr. Al-Awadi later, he discussed being on the

16  rug.

17          MR. SHEPARD:  Can you display 67?

18  BY MR. SHEPARD:

19  Q.  What is this a view from?

20  A.  So if you were standing just inside the door of the

21  classroom and took the first picture, it's just basically a

22  45-degree turn to the left, showing a little bit more of the

23  left side of the room, including the kitchen and play area, as

24  well as more of that rug and the window that it sat

25  underneath.

1  Q.  All right.  Is this the same rug we were just talking

2  about?

3  A.  Yes.  It's the only rug in the room.

4  Q.  Is the full rug viewable from the door?

5  A.  No.  As you can see, there is a kitchen play set, a sink

6  and a range, as well as a bookshelf that obstructs the view

7  from -- or at least part of the view of that rug from anyone

8  that would be walking by or standing in the door.

9  Q.  What's behind the door?  Do you recall?

10  A.  Do you mean immediately to your left if you stepped into

11  the room?

12  Q.  No.  If you exited the room from the door.

13  A.  Oh, okay.  It's just across from the main reception desk.

14  So when you walk into the front door of the daycare, the first

15  thing you see is the reception desk with two different

16  computers to -- for the employees and the parents to sign

17  their children in.  And if you were to walk up to that desk,

18  turn left, walk around it, and then kind of snake your way

19  back, you would come to the door.  So it's just across from

20  that desk, basically, to the left if you were to first walk

21  into the building.

22  Q.  Could you see the rug from the reception desk?

23  A.  You might could see part of it; not the entire thing.

24  Q.  Similar because of something like that?

25  A.  Yes.  In fact, you would see less of the rug out in the

1  hallway or at the representation desk than you do from this

2  photograph, because this is a much closer view.  You would be

3  back out of the room and away from the door, or you just

4  wouldn't have as good of an angle as this camera shows right

5  now.

6  Q.  Eventually, did you interview the defendant?

7  A.  Yes.

8  Q.  How did that interview come to happen?

9  A.  Once I obtained Mr. Al-Awadi's application for employment,

10 which included his home address, I -- Sergeant Bruce Smith, at

11 my direction, contacted the lieutenant of our unit and asked

12 him to go to the home address of Mr. Al-Awadi and see if he

13 could make contact with him in order to detain him and bring

14 him back to my office for an interview.  Lieutenant Madison

15 did so on our behalf.

16 Q.  Did you hear anything at all with anyone you spoke with at

17 the daycare about someone touching M.R.?

18 A.  Yes.  Mr. Al-Awadi.

19 Q.  Anybody else?

20 A.  No, not at all.

21 Q.  Where did the interview of Mr. Al-Awadi take place?

22 A.  4134 North Keystone Avenue, my office within the Child

23 Advocacy Center.

24 Q.  I would ask you to look at Exhibit 25.

25 A.  Okay.

1  Q.  Do you recognize 25?

2  A.  I do.

3  Q.  What is it?

4  A.  It is a DVD disk that contains two files on it.  One of

5  them is a -- I believe it's a Word document.  That's a

6  transcript of my interview of Mr. Al-Awadi.  The second one

7  is a WMV file, or a video file, of the video recording of my

8  interview with Mr. Al-Awadi.

9  Q.  And did you watch the video file with the transcript?

10  A.  Yes.

11  Q.  And is it an accurate transcript of what was said?

12  A.  For the most part, it's pretty good.  I did notice a few

13  times that the words were not quite wrong (sic) or they

14  transposed something.  For example, at one point Mr. Al-Awadi

15  was talking about M.R. being in play mode, and the transcript

16  states "play mold," M-O-L-D.

17  Q.  A few misspellings?

18  A.  Yeah.  So, I mean, it's not perfect, I guess, is my point,

19  but it's very close.

20  Q.  And would it -- would the transcript help you -- or would

21  it help the jury to follow along with the interview?

22  A.  Oh, yes, probably.

23          MR. SHEPARD:  Your Honor, I would move for the

24  admission of -- or, excuse me.

25  BY MR. SHEPARD:

1  Q.  And how do you know that that's the same CD that contains

2  those two files?

3  A.  I watched it, looked at it, and then signed my name and

4  dated it.

5  Q.  And do you see those there today?

6  A.  Yes.

7  Q.  Your signature?

8  A.  My signature and the date.

9        MR. SHEPARD:  Your Honor, I would move for the

10  admission of Exhibit 25.

11        THE COURT:  Any objection?

12        MR. THOMAS:  25 is the disk?

13        THE WITNESS:  Yes, sir.

14        MR. THOMAS:  No objection to 25.

15        THE COURT:  25 is admitted into evidence without

16  objection.

17                    *(Government's Exhibit 25 was*

18                    *received in evidence.)*

19  BY MR. SHEPARD:

20  Q.  How long did your interview last with the defendant?

21        MR. THOMAS:  Objection.  Can we approach, Your

22  Honor?

23        THE COURT:  You may.

24        (Bench conference on the record.)

25        THE COURT:  How long did the interview last?

1        MR. THOMAS:  Your Honor, my concern is that the

2   video that's being shown to the jury is redacted, so it will

3   be shorter than the actual interview.  And that would -- so I

4   think that's an inappropriate question at this point.  It

5   would tend to raise questions and confuse the jury.

6        MR. SHEPARD:  I'll rephrase it, Your Honor.  I

7   didn't think of that.

8        THE COURT:  Okay.

9                    (Open court.)

10       THE COURT:  Do you want to rephrase your question,

11  Counsel?

12       MR. SHEPARD:  Yes.

13       THE COURT:  You may.

14  BY MR. SHEPARD:

15  Q.  Well, let's just go right into it.  At some point during

16  the interview, did you happen to realize the defendant had his

17  phone with him?

18  A.  Yes.

19  Q.  Did you take the phone?

20  A.  I did.

21       MR. SHEPARD:  Can you please play clip, "Takes the

22  Phone"?  And these are all portions of Exhibit 25 for purposes

23  of the record.

24            (Playing video in open court.)

25            MR. SHEPARD:  Pause it.

1  BY MR. SHEPARD:

2  Q.  Okay.  Describe just what we're seeing here.

3  A.  The shot of the back of my bald head, as well as --

4          MR. THOMAS:  Your Honor, if I may, seeing as how

5  this is being presented, I would request an instruction to the

6  jury that the video is what they should follow.  And if they

7  see an inaccuracy --

8          THE COURT:  Right.  Ladies and gentlemen, the

9  transcript at the bottom of the screen is being displayed to

10  assist you as you listen to the audio.  The audio is the best

11  evidence.  So if there's a discrepancy in what you hear and

12  what you read in the transcript, what you hear is the best

13  evidence.

14  BY MR. SHEPARD:

15  Q.  Again, what are we seeing here?

16  A.  That's me in the foreground with my back to the camera.

17  That's Mr. Al-Awadi.

18  Q.  Right there?

19  A.  Yes, that's me.

20  Q.  Who is this?

21  A.  That's Mr. Al-Awadi.

22          MR. SHEPARD:  All right.  Go ahead and play.

23          (Video playing in open court.)

24  Q.  What did you do with the phone after that?

25  A.  I placed it in or on my desk.

1   Q.  Did you retrieve it after the interview was over?

2   A.  Yes.

3   Q.  What did you do with it after that?

4   A.  It was later that night or just after midnight on the 23rd

5   that I placed it in the IMPD property room downtown where we

6   place anything that we want to have stored as evidence.

7   Q.  When you came back to get it, was it in the same place you

8   had put it?

9   A.  You mean in my desk?

10  Q.  Yes.

11  A.  Yes.

12  Q.  I ask you to look in the box behind you at Exhibit -- or,

13  excuse me, what's marked as Exhibit 27.

14          Does the outside of that package tell you what's in

15  there?

16  A.  Yes.  There's a label from our digital forensic unit.

17  Q.  And is it still sealed?

18  A.  Yes.  The tape is broke on the pleat here on the side of

19  the envelope.  But, otherwise, it's still -- the seal is

20  intact.

21  Q.  And go ahead and open it up and take a look at what's

22  inside.

23          MR. THOMAS:  Your Honor, can I inspect the object

24  before he does that?

25          THE COURT:  You may.

1      MR. THOMAS:  That's fine.  Thank you.

2  BY MR. SHEPARD:

3  Q.  Do you recognize it?

4  A.  Yes.

5  Q.  What is it?

6  A.  It's Mr. Al-Awadi's cell phone, or at least the four

7  parts -- or the three parts of the phone, as well as a cover,

8  the case that he had.

9  Q.  Is that the same one that we saw you take in the video?

10  A.  Yes.

11  Q.  How do you know?

12  A.  I remember it.  It also -- the envelope it was in holds

13  the case number from the case and the type of investigation it

14  was, my name, the type of phone it was.  I remember taking it

15  from him.

16  Q.  All right.  And is it -- other than being taken apart, is

17  it in substantially the same condition?

18  A.  Yes.  If I were to resemble it, it would be closer to what

19  I took from him, but yes.

20  Q.  And you said you checked it into the property room?

21  A.  Yes.

22  Q.  Is that a secure facility?

23  A.  Yeah.  It's in the basement of the City-County Building

24  downtown, 50 North Alabama.  It's a secured facility that's

25  staffed 24 hours a day by IMPD personnel.

1  Q.  Did you ever take it out of the property room?

2  A.  Yes.

3  Q.  When did that happen, and what did you do with it?

4  A.  I took it out of the property room just a little after

5  8:00 a.m. on the 27th of August, 2014.  And I drove to the

6  area of 16th and Sherman where I met up with Detective Grant

7  Melton with the digital forensic unit of IMPD.

8  Q.  And did he perform an exam on it?

9  A.  Not that day, but eventually, yes, sir.

10  Q.  And then was it returned to the property room?

11  A.  By Detective Melton, yes.

12  Q.  And presumably it was sealed until he brought it here

13  today?

14  A.  This red evidence tape around the opening of the envelope

15  contains the five-digit ID number of Detective Melton along

16  with the date of 1/2/2015, and it was still sealed when I

17  opened it up just now.

18        MR. SHEPARD:  Your Honor, I move for the admission

19  of Exhibit 27.

20        THE COURT:  Any objection to 27?

21        MR. THOMAS:  Preliminary question if I may.

22        THE COURT:  You may.

23  BY MR. THOMAS:

24  Q.  Officer, you sealed it in the bag originally?

25  A.  No, I don't believe this is the same envelope.  He had to

1  open it up, obviously, to do his work with it.  So it's a

2  different envelope, I think.

3  Q.  So you don't know how it got into that envelope?  Were you

4  there when it got placed in this envelope?

5  A.  Well, my belief is that Detective Melton did since his ID

6  is on it, and since he's the person I gave it to, and since it

7  has the digital forensic unit label, which they are the only

8  ones that create those --

9  Q.  I understand --

10  A.  -- plus my familiarity with how it works.  But, no, I

11  didn't actually see him do that, no, not at all.

12  Q.  Are you aware of the items' whereabouts while it was out

13  of the packaging you put it in?

14  A.  Yes.  After I met with him, he took it to the digital

15  forensic unit office, which is located at 201 North Shadeland

16  Avenue, I believe.

17  Q.  Did you go with him?

18  A.  No, no.  I handed the cellular telephone to him and he

19  kept it from there.

20          MR. THOMAS:  Your Honor, I think at this point we

21  don't have a chain of custody.  It's not in the original

22  packaging.  It left him.  He does not -- can't tell us what

23  happened to it, only that it at some point got placed in this

24  packaging and was brought back to him.

25          MR. SHEPARD:  Do you want us to approach, Your

 1  Honor?

 2          THE COURT:  You may.

 3          (Bench conference on the record.)

 4          THE COURT:  What rule are you proceeding under?

 5          MR. SHEPARD:  I'm just presenting the fact that

 6  he --

 7          THE COURT:  "He" as in?

 8          MR. SHEPARD:  Detective McAllister identified the

 9  phone, says he remembered it as the phone that he took from

10  the defendant.  I'll ask a final question, if it appears -- I

11  think I asked him, actually, if it appeared in substantially

12  the same condition.  He said, other than being in three parts,

13  it was, and he remembered the phone, and that he put it in the

14  property room.  I think once we get it to the property room,

15  that's all we have to do.  Everything else goes to weight,

16  Your Honor.

17          MR. THOMAS:  It's not simply being offered as the

18  phone.  They're going to -- there's going to be testimony

19  about how it was taken apart, how it was tested, and what was

20  done with it.  If there's -- if there were to be no more

21  testimony about it other than this is the phone he had, it

22  wouldn't be an issue, but it certainly is, and -- because he

23  does not know where it was throughout that testing period

24  specifically, and we don't have a chain of custody for the

25  reason it's being offered.

1        THE COURT:  Yeah, I think you're going to have to

2   get that, unless you -- if you all haven't stipulated to any

3   chain of custody.

4        MR. THOMAS:  No.

5        THE COURT:  Okay.  Who was the -- you will have to

6   get that other person in here, unless you're going to give me

7   a trial rule.

8        MR. SHEPARD:  It's Detective Melton.

9        THE COURT:  Melton.  Is he here?

10       MR. SHEPARD:  Yes, he is.

11       THE COURT:  Okay.  I think you're going to have to

12  let Melton say what he did with it, because that's his

13  initials on the exhibit, right?  May I see the exhibit?

14       MR. THOMAS:  This is not the original packaging, so

15  it's not as if, well, this is mine and these are my initials

16  and --

17       THE COURT:  Uh-huh.

18       MR. THOMAS:  -- this is back from him and his.  This

19  is -- he says this is a new package with someone else's

20  initials.

21       THE COURT:  Yeah.  I think you're going to need to

22  get Melton since he's not going to agree or stipulate.

23       MR. SHEPARD:  For purposes of admission at all or

24  just to go into testing?  I think I've laid enough foundation

25  to admit the phone as the one that he took.

1          THE COURT:  Are the things still on the phone, the

2   pictures and --

3          MR. SHEPARD:  Whether or not Detective Melton can

4   testify about if it was in the same condition when he examined

5   it, I think I would agree that that would go to the

6   admissibility of the findings of Detective Melton, not whether

7   or not the phone, the physical phone itself, comes in.

8          THE COURT:  Okay.  I'm going to sustain the

9   objection.  You're going to have to get the phone in through

10  Melton, okay?

11                    (Open court.)

12         THE COURT:  Did you offer the exhibit?

13         MR. SHEPARD:  Yes, Your Honor.

14         THE COURT:  Okay.  The Court is going to sustain the

15  objection.

16         MR. THOMAS:  Thank you, Your Honor.

17  BY MR. SHEPARD:

18  Q.  Do you know what's commonly referred to as an advice of

19  rights?

20  A.  Yes.

21  Q.  What's the layman's term for the advice of rights?

22  A.  It's the written form that -- well, more broadly, it's

23  just Miranda rights, is what most people know them as.

24  Q.  Right to remain silent, the stuff you see on TV?

25  A.  Right, to -- yes, the right to an attorney, absolutely.

1  Q.  Were those rights given to the defendant?

2  A.  Yes.  I read a form to him.

3          MR. SHEPARD:  Please play clip, "Miranda."  This is,

4  again, a portion of Exhibit 25.

5          MR. THOMAS:  Your Honor, may we approach?  I have an

6  objection.

7          THE COURT:  You may.

8          (Bench conference on the record.)

9          MR. THOMAS:  Your Honor, I will object to relevance

10  at this point.  We haven't raised any issues about lack of

11  advisement.  I think just playing that in front of the jury,

12  particularly as he says, what you see on TV, you know, it has

13  no real bearing.  We're not suggesting he wasn't properly

14  advised.

15          MR. SHEPARD:  Your Honor, again, throughout opening,

16  throughout cross of all the witnesses, there have been

17  implications and statements about the ways in which the

18  investigation was conducted, rush to judgment

19  characterizations, and statements.  This --

20          THE COURT:  I think it's relevant that the witness

21  was Mirandized properly.

22          MR. THOMAS:  Just to finish the record, Your Honor,

23  we've raised a lot of issues, but certainly none about whether

24  he's Mirandized or not.  And I do think that it's prejudicial

25  and not relevant.

 1              THE COURT:  Well, I think it's a part of their

 2    burden.  If they want to get it in and play the statement,

 3    they are going to have to show that it was -- they could

 4    either ask him was he properly Mirandized or they can show the

 5    video.  I mean, it's normal.  There's nothing prejudicial

 6    about it.

 7              MR. SHEPARD:  It's *Old Chief*.  We get to present our

 8    case.  And --

 9              THE COURT:  Yeah.  And it's relevant.  They can --

10    it's relevant.

11              MR. THOMAS:  I would say it's more prejudicial than

12    relevant, but I understand.

13              THE COURT:  I don't know anything prejudicial about

14    a Miranda warning.  I mean, it's a part of life.  It's a duty

15    and responsibility that they --

16              MR. THOMAS:  But --

17              THE COURT:  We can't talk at the same time.

18              MR. THOMAS:  I'm sorry, Judge.

19              THE COURT:  It's a responsibility that the

20    government and the prosecution has to fulfill in order to get

21    this statement into evidence.  And if he wants to do it

22    through the -- I mean, normally they will ask the witness,

23    "Did you admonish them, give them their advisements, and what

24    did you tell them?"  If they want to do it in the form of a

25    video, that's fine.  I don't think --

1          MR. THOMAS:  I would understand if we were raising

2     an issue, but we have not raised an issue.

3          THE COURT:  You don't have to raise an issue.  If he

4     wants a statement in, he's got to get it in.

5          MR. THOMAS:  That's fine.

6          THE COURT:  Okay.

7          MR. SHEPARD:  Thank you, Your Honor.

8                         (Open court.)

9          MR. THOMAS:  I withdraw my objection, Your Honor.

10          THE COURT:  You're going to withdraw your objection?

11          MR. THOMAS:  Sure.

12          THE COURT:  Okay.

13          MR. SHEPARD:  Please go ahead and play the clip.

14          (Video playing in open court.)

15          MR. SHEPARD:  Stop that.

16     BY MR. SHEPARD:

17     Q.  I'm going to ask you to look in the binder behind tab 29.

18     Do you recognize 29?

19     A.  Yes.

20     Q.  What is it?

21     A.  It's a copy of the form that I was just showing on the

22     video, reading, explaining, and filling out with Mr. Al-Awadi.

23     Q.  Is that the same form that we just saw you going over in

24     the video?

25     A.  That's the one.

1  Q.  All right.  Is his signature on it?

2  A.  It is.

3  Q.  And did you witness him sign it?

4  A.  Yes.

5  Q.  It's your signature on it?

6  A.  It is.

7        MR. SHEPARD:  Your Honor, I would move for the

8  admission of Exhibit 29.

9        MR. THOMAS:  Your Honor, I would object to it at

10  this point.  I mean, it's cumulative.  We've just spent a long

11  time showing the jury that he was Mirandized.  It's not at

12  issue.  And at this point it's cumulative evidence.

13        THE COURT:  I'll overrule.  29 is admitted into

14  evidence over objection.

15                    (Government's Exhibit 29 was

16                    received in evidence.)

17        MR. SHEPARD:  Please display 29.

18  BY MR. SHEPARD:

19  Q.  Is that the part we heard you reading, right there at the

20  very end?

21  A.  Yes, just before he signed it.

22  Q.  Is that his signature?

23  A.  Yes.

24  Q.  And is that yours?

25  A.  Yes, sir.

1  Q.  Did you ask him if he knew why he was there?

2  A.  I believe so, yes.

3  Q.  Did he know why he was there?

4  A.  He told me he did.

5  Q.  What did he say?  Why did he say he was there?

6  A.  He told me about an incident that happened the day before

7  at the daycare.

8          MR. SHEPARD:  You can clear the image.

9  BY MR. SHEPARD:

10  Q.  And did he have a version of the events?

11  A.  Yes.

12  Q.  And did you talk about that with him?

13  A.  Yes.

14          MR. SHEPARD:  Please play "First Account."

15          (Video playing in open court.)

16  BY MR. SHEPARD:

17  Q.  Did he ever say anything about his cell phone during that

18  first account?

19  A.  No.

20  Q.  Did you ask him if he gave a statement to his employer?

21  A.  Yes.

22          MR. SHEPARD:  Please play clip, "Heidi Talk."

23          (Video playing in open court.)

24          MR. SHEPARD:  Please display Exhibit 24.

25  BY MR. SHEPARD:

1  Q.  Is that the piece of paper you were just talking about?

2  A.  Yes.

3  Q.  Have you had a chance to read that before today?

4  A.  Yes.

5  Q.  Does it mention anything about him using his cell phone to

6  take pictures of M.R.?

7  A.  No.

8  Q.  Did you ask him to go over what happened again?

9  A.  Yes.

10          MR. SHEPARD:  Please play clip "Second Account."

11          (Video playing in open court.)

12  BY MR. SHEPARD:

13  Q.  Did he mention anything about a cell phone?

14  A.  No, not at all during that account.

15  Q.  Did you specifically start talking to him about an injury

16  to M.R.?

17  A.  I believe so.

18  Q.  And did he have -- did he offer an explanation?

19  A.  He offered up something that he said happened, that he

20  thought might be related to it.

21          MR. SHEPARD:  Can you please play clip, "Watch

22  Account."

23          (Video playing in open court.)

24  BY MR. SHEPARD:

25  Q.  At some point in the investigation, did you go get that

1  watch?

2  A.  Yes.

3  Q.  How did that happen?

4  A.  I obtained a search warrant from Marion County Superior

5  Court.

6  Q.  I'll ask you to look at Exhibit 28.  It's 28.

7  A.  Yes.

8  Q.  What is it?

9  A.  Oh, it's a box that contains the Casio watch in question.

10  Q.  And how do you know?

11  A.  It's got a label on it from our IMPD property room.

12  Q.  How did it get to the property room?

13  A.  I took it there after I recovered it during the search

14  warrant.

15  Q.  Can you open it up -- or is it still sealed?

16  A.  Yes, it is.

17  Q.  Okay.  Is there any initials or anything on the sealing?

18  A.  No.  It's just got a heavy-duty piece of tape.  And then

19  over top of that, there is a red evidence seal closing it.

20  Q.  Is that typically what's done to evidence at the crime

21  room -- or the property room?

22  A.  Yeah.  That's how we sealed it when I took it in.

23  Q.  Okay.  Go ahead and open it up.

24  A.  I can try.  I don't know if the Court has scissors.

25  Q.  What's inside?

1  A.  An envelope.

2  Q.  And what's on the envelope?

3  A.  There's another label, the same label that's on the

4  outside.  And it has the case number, as well as the tape that

5  wraps all the way around the seal, with my signature and the

6  date of August 27, 2014, on it.

7  Q.  And what did you put in there?

8  A.  I put the watch in there.

9  Q.  Go ahead and open that up, please.

10          Do you recognize it?

11  A.  Yes.

12  Q.  What is it?

13  A.  That is the watch that I recovered from Mr. Al-Awadi's

14  bedroom.

15  Q.  Is it in substantially the same condition as it was when

16  you recovered it?

17  A.  It hasn't been opened since I sealed it.

18          MR. SHEPARD:  Your Honor, I would move for the

19  admission of Government's 28.

20          THE COURT:  Any objection?

21          MR. THOMAS:  No objection to 28, Your Honor.

22          THE COURT:  Government's Exhibit 28 is admitted into

23  evidence without objection.

24                    *(Government's Exhibit 28 was*

25                    *received in evidence.)*

1  BY MR. SHEPARD:

2  Q.  And was that the watch that he was talking about in that

3  last interview clip?

4  A.  He described it as a black Casio G-Shock watch and said it

5  was his.  I think later in the interview, after that clip, he

6  told me that it was in his bedroom at his home.  And that's

7  where I recovered it from, so I believe it to be the same

8  watch he described.

9          MR. SHEPARD:  Can we publish the watch to the jury,

10  Your Honor?

11          THE COURT:  You may.

12  BY MR. SHEPARD:

13  Q.  About this time, do you remember how many times you would

14  have gone through his version of events with him?

15  A.  Do you mean up to the point that we last watched the

16  video?

17  Q.  That we've just seen.

18  A.  I believe it was at least three times.

19  Q.  And did he say anything about M.R. complaining of pain

20  before he was confronted by Tyria to him?

21  A.  No.

22  Q.  Did he say anything about his cell phone?

23  A.  No, nothing.

24  Q.  Did he say anything about pictures on his cell phone of

25  M.R.?

1  A.  Nothing.

2  Q.  Did you talk about it again?

3  A.  Yes.

4           MR. SHEPARD:  Please play clip, "Fourth Account."

5           (Video playing in open court.)

6  BY MR. SHEPARD:

7  Q.  Now, is there some point that you started asking him about

8  his cell phone and what may be on it?

9  A.  Yes.

10  Q.  And in what context was that?

11  A.  In describing the events to me, he said that immediately

12  after being relieved from break, he went to the restroom.  And

13  after he went to the restroom, he went out to his car.  He

14  said he went to the Marsh to buy a pop for Ms. Tyria, but then

15  he spent the remainder of the time on his one-hour lunch break

16  in his car parked in the parking lot of the daycare, with the

17  air conditioning on because it was hot, and he watched videos

18  on his cell phone.

19  Q.  And did you talk about that with him?

20  A.  Yes.

21           MR. SHEPARD:  Please play clip, "Cell Phone Video."

22           (Video playing in open court.)

23  BY MR. SHEPARD:

24  Q.  After that, did he tell you about four pictures of M.R.

25  that might be found on his cell phone?

1  A.  No.

2  Q.  Now, when this interview was being conducted, were you

3  aware of the physical examination of M.R. Guevara by the

4  Center of Hope?

5  A.  Yes.  I had received the results of that physical exam

6  earlier in the morning prior to, I think, even M.R.'s

7  interview beginning.

8  Q.  Did you confront the defendant with the possibility of DNA

9  being found?

10  A.  I did.

11  Q.  How did you go about confronting him?

12  A.  At one point I explained to him the process of the

13  forensic exam that's performed by the nurse and told him that

14  M.R. had been examined and asked him if there was any reason

15  his DNA would be found inside of her vagina, or anything like

16  that.

17          MR. SHEPARD:  Can you play clip, "First Underwear"?

18          (Playing video in open court.)

19  BY MR. SHEPARD:

20  Q.  Did he say anything about pictures?

21  A.  He didn't say anything about photographs, no.

22  Q.  Ever even say he saw the underwear?

23  A.  No.

24  Q.  Did he deny it multiple times?

25  A.  That's correct.

1  Q.  Did you ask him about it again?

2  A.  Yes.

3          MR. SHEPARD:  Please play clip, "Tickle Their

4  Bellies."

5          (Playing video in open court.)

6  BY MR. SHEPARD:

7  Q.  Ever say anything about her pants or anything being pulled

8  away?

9  A.  No, just that her shirt was up a little bit, but never --

10  Q.  Any photographs taken while her shirt was up?

11  A.  He didn't mention anything about taking any photographs of

12  her.

13  Q.  Did you talk about it again?

14  A.  Yes.

15          MR. SHEPARD:  Please play clip, "I Can Envision a

16  Scenario."

17          (Playing video in open court.)

18          THE COURT:  Mr. Shepard, is this a good time for our

19  afternoon break?

20          MR. SHEPARD:  Yes, Your Honor.

21          THE COURT:  Okay.  Let's take our afternoon break.

22  Ladies and gentlemen, no deliberation, no discussion, we'll

23  have you back in the courtroom in about 15 minutes.

24          THE COURTROOM DEPUTY:  All rise.

25          (Jury out at 2:56.)

1          THE COURT:  Okay.  We'll take 15 minutes.

2          MR. SHEPARD:  Thank you, Your Honor.

3          (Recess at 2:56, until 3:15.)

4          THE COURT:  Are you ready for the jury, Mr. Shepard?

5          MR. SHEPARD:  Yes, Your Honor.

6          THE COURT:  Ready, Mr. Thomas?

7          MR. THOMAS:  Ready, Your Honor.

8          THE COURT:  Tanesa, you may bring in the panel.

9          (Jury in at 3:15.)

10          THE COURT:  Counsel, you may continue with the

11 examination of your witness.

12          MR. SHEPARD:  Thank you, Your Honor.

13 BY MR. SHEPARD:

14 Q.  Detective McAllister, during your interview with the

15 defendant, did you ever discuss two other girls who had

16 complained of pain in their private areas and what the

17 defendant did?

18 A.  He told me about two other girls besides M.R. that he said

19 complained to him about vaginal pain while he worked at the

20 daycare.  So, yes, we did.

21          MR. SHEPARD:  Would you please play clip, "Two Other

22 Girls" -- or "Other Two Girls."  Excuse me.

23          (Playing video in open court.)

24 BY MR. SHEPARD:

25 Q.  Did he say anything at all about reporting pain of M.R. to

1  Chiana or to Heidi or to a nurse?

2  A.  No.

3  Q.  Other than -- when you say he was confronted by

4  Ms. Graham, anything at all about M.R. telling him anything

5  about pain?

6          MR. THOMAS:  Objection to the form of the question.

7  Is he asking this witness about what the defendant said to

8  Ms. Graham?

9          THE COURT:  You need to rephrase your question.

10  "Did he say anything at all about reporting pain of M.R. to

11  Chiana or to Heidi or to a nurse?"

12          MR. SHEPARD:  I'll rephrase, Your Honor.

13          THE COURT:  Okay.

14  BY MR. SHEPARD:

15  Q.  Other than when you were talking about -- with the

16  defendant of when he came back after break and Tyria and --

17  and what M.R. had said then in Tyria's presence, and the

18  defendant, did the defendant say M.R. ever told him about any

19  other pain throughout your interview?

20  A.  No.  The only time that he, during my conversation with

21  him, talked about M.R. complaining of pain was in the context

22  of her telling Ms. Tyria and him that it hurt when he went

23  into the room with the two of them after he got back from

24  break.

25  Q.  Did he say anything about her telling him she was in pain

1  during the time they were alone?

2  A.  No.

3  Q.  Did he tell you anything about pictures of M.R. that might

4  be on his cell phone?

5  A.  He didn't say anything about that at all.

6  Q.  Did you eventually take a swab of the defendant's DNA?

7  A.  I did.

8  Q.  Please look at Exhibit 30 behind you.

9          Do you recognize that?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's the envelope that I placed what we call the buccal

13  swab from Ali Al-Awadi into after I obtained it from him.

14  Q.  And what did you do after you placed it into that

15  envelope?

16  A.  I transported it to the Indianapolis Metropolitan Police

17  Department property room located in the basement of the

18  City-County Council -- or City-County Building and turned it

19  in there as evidence after I put this red seal, the evidence

20  tape, around it and signed my name with the date and time and

21  the date (sic) of 3:54 p.m.  And, in fact -- I'm sorry.  I

22  misremembered.  Ali Al-Awadi also signed the seal, so we

23  sealed it together immediately after I took the swab from him.

24  Q.  And then you turned it over to the property room?

25  A.  Yes.  So --

1  Q.  Did you have anything to do with it after that?

2  A.  No.  I -- aside from recovering it from the property room

3  prior to trial, no, I have not seen or done anything with this

4  after I placed it into the property room sealed with his and

5  I's signatures.

6  Q.  And is the property room a secure facility?

7  A.  It is.

8  Q.  Why did you take that sample?

9  A.  I obtained his buccal swab, the swab from the inside of

10  the mouth, in order to have cells from him so that the Marion

11  County -- or Indianapolis-Marion County Forensic Services

12  Agency, our crime lab, would have a DNA standard of

13  Mr. Al-Awadi to compare any possible evidence recovered in

14  this case, so that they could compare it to his DNA.

15  Q.  Did you take a swab of Justo Guevara?

16  A.  I did.

17  Q.  Would you please look at Exhibit 31.

18          What's 31?

19  A.  This is the envelope containing Justo Guevara's buccal

20  swab.

21  Q.  And how do you know that?

22  A.  Because it has his name on it.  Well, it's written on the

23  front what it is.  It's got the IMPD case number, the date I

24  took it, my initials, his name.  I wrote on it "Buccal Swab,"

25  the time that I took it, and it has the property room label

1 that also contains the case number and his name.

2 Q.  And, again, did you turn it over to the property room?

3 A.  Yes.  I sealed it with the red evidence tape here with my

4 name signed across the top, as well as the date.

5 Q.  And what was the purpose of obtaining that swab?

6 A.  It's what we call an exclusionary standard, so just to be

7 able to say that the DNA -- or any DNA recovered or found

8 within any of the samples or evidence did not belong to Justo

9 Guevara.

10 Q.  For purposes of comparison?

11 A.  Yes.  It's a -- just like with Mr. Al-Awadi, it's a

12 standard against which they can compare any other potential

13 samples of DNA against to see if the DNA present in any of the

14 evidence belongs to Mr. Guevara.

15          MR. SHEPARD:  If I could have just a moment, Your

16 Honor?

17          THE COURT:  You may.

18          (Off the record.)

19 BY MR. SHEPARD:

20 Q.  Detective, can you please look at what's marked as

21 Exhibit 5 behind you?  I believe it's inside of the rape kit.

22 A.  Is it within 48?

23 Q.  Yes, sir.

24 A.  Okay.  I'm looking for a nonexistent 5.

25 Q.  What's Exhibit 5?

1  A.  It's a paper envelope containing the panties of M.R.

2  Guevara that were recovered by Angela Bates and placed within

3  the sexual assault examination kit that she prepared on the

4  date of her exam with M.R.

5  Q.  Did you handle that at any time?

6  A.  I did.

7  Q.  When?

8  A.  It was on January the 8th of 2015.

9  Q.  Why did you handle it?

10  A.  To compare the underwear recovered the day of the exam

11  with underwear discovered in photographs found within the cell

12  phone of Mr. Al-Awadi.

13  Q.  How did you go about handling Exhibit 5?

14  A.  I went to the property room and requested the entire kit,

15  which was still sealed at the time.  Prior to opening the kit,

16  I obtained a blank sheet of white paper from an unopened ream

17  of paper and set it down on a workspace there.  And I placed

18  on a set of latex gloves, blue latex gloves, and then I cut

19  open the seal of this white box here, Exhibit 48.

20        And using the gloves on the entire time, I opened up

21  the kit, found the ones -- this particular envelope, and then

22  opened this envelope.  And, using the gloves, I pulled out the

23  underwear to look at them and see if they were the same ones

24  that were in the photographs on Mr. Al-Awadi's phone.

25  Q.  Did they appear to you to be the same?

*McALLISTER - CROSS/THOMAS* 182

1 A. Yes. They appeared identical.

2 Q. What did you do after that?

3 A. Well, after I opened the envelope, I placed them on that

4 clean sheet of white paper. I photographed the underwear,

5 took several photographs of the underwear, and replaced them

6 or put them back into this white paper envelope that they were

7 in originally. I resealed it with evidence tape and I signed

8 and dated the -- over the seal.

9 Q. Then what did you do with that envelope?

10 A. I placed it back within this -- this white box here,

11 closed the box back up and placed new seals on the envelope in

12 several places, right here and right here, to show that it was

13 sealed once again. I signed and dated the edges of both

14 seals.

15 Q. And then what did you do with the box?

16 A. I turned it back into the property room.

17 Q. And is the property room a secure facility?

18 A. Yes.

19          MR. SHEPARD: Your Honor, I pass the witness for

20 cross.

21          THE COURT: Okay. You may.

22          MR. THOMAS: Thank you, Your Honor.

23                    **CROSS EXAMINATION**

24 BY MR. THOMAS:

25 Q. Detective, I want to start with something that kind of

1  came at the end.  There was talk about two other students,

2  G.F. and K.E.?

3  A.  Yes, sir.

4  Q.  Do you recall that?

5  A.  Yes.

6  Q.  And you were able to find out who they were, right?

7  A.  Absolutely.  Yes, sir.

8  Q.  And then they were -- there were forensic interviews of

9  those children similar to the one we saw with M.R., right?

10  A.  Yes.

11  Q.  That was part of this investigation, right?

12  A.  Yes, sir.

13  Q.  And neither of those girls said Mr. Al-Awadi did anything

14  wrong to them, right?

15         MR. SHEPARD:  Objection, hearsay.

16         MR. THOMAS:  It's not offered for the truth.  It's

17  about his investigation and whether he followed up on it.

18         THE COURT:  I'll sustain the objection.

19  BY MR. THOMAS:

20  Q.  Did you, after interviewing -- after G.F. and K.E. were

21  interviewed, was there any follow-up investigation involving

22  them?

23  A.  I believe I spoke to their parents.  But, beyond that, I

24  don't think there was much more.

25  Q.  When you are watching these forensic interviews, we saw in

1  this one perhaps, but there's a walkie-talkie-like device,

2  right?

3  A.  Yes, sir.

4  Q.  And the purpose of that is so you, being the detective,

5  can communicate with the interviewer about questions you might

6  want to be asked?

7  A.  Yes.  It's not simultaneous communication the entire

8  interview.  The way they do it at the Marion County Child

9  Advocacy Center is that they will perform the interview.  When

10  they've exhausted any material they think they have to cover,

11  at that point they will take the walkie-talkie, turn it on,

12  and put the earpiece in their ear as a signal to anyone who

13  may be watching to ask any follow-up questions of them or

14  instruct them to do any follow-up work that needs to be done.

15  Q.  You're watching the whole thing, right?

16  A.  Yes, sir.

17  Q.  And if there are follow-up questions that you want to be

18  asked, you have the ability to say, "Hey, ask something else"?

19  A.  Yes, that's true.

20  Q.  And there are numerous times where things are sort of left

21  hanging; wouldn't you agree?

22  A.  I don't know that I would -- for instance?

23  Q.  I'll give you an example.

24  A.  Thank you.

25  Q.  I'm glad you asked.  In    M.R.'s    statement, she

1 | was -- she was asked about Mr. Al-Awadi's hand, or how his

2 | hand moved, and she said, "Like a bird."  Do you remember

3 | that?

4 | A.  I do.

5 | Q.  And do you remember the response of the interviewer?

6 | A.  I think I remember.  I think she said that she was

7 | confused and asked her to tell her again what she meant.

8 | Q.  Right.

9 | A.  I think.  I can't remember for sure without seeing it

10 | again, but --

11 | Q.  Okay.  When she asked her again, she gave the same

12 | response, right, "Like a bird"?

13 | A.  "Like a bird," yes, sir.

14 | Q.  And didn't ask her anything else about that?

15 | A.  I didn't ask?

16 | Q.  She didn't ask her anything else about that?

17 | A.  I don't think so.

18 | Q.  Did you know what that meant when a four-year-old child

19 | said that his hand was, "like a bird"?

20 | A.  Imagery of his finger moving up and down or sort of

21 | fluttering came to my mind.

22 | Q.  In your mind?

23 | A.  Yes, sir.

24 | Q.  But the child never said that, right?

25 | A.  Well, she used the words, "like a bird."

1  Q.  And --

2  A.  It was a metaphor.  It wasn't -- she didn't say it was a

3  bird in her, just, "like a bird."

4  Q.  Right.  You know what you would mean if you said, "like a

5  bird," right?  But you don't have any idea at this point what

6  M.R. meant by, "like a bird," because nobody asked her what

7  does that mean, right?

8  A.  Well, as an adult, I wouldn't describe it that way.  I

9  would probably use more explicit language.  However, she did

10  try to follow up and ask her what she meant by that, and she

11  didn't elaborate beyond just saying it was like a bird, which

12  was consistent with her developmental level, of a

13  four-year-old child.

14  Q.  Right.  The follow-up was, "What do you mean, 'just like a

15  bird'?  I'm confused."  Right?  That's --

16  A.  That sounds -- that sounds about as I remember it, yes,

17  sir.

18  Q.  Not, "Can you show me what you mean, can you show me with

19  your hand," so you would have had an opportunity to follow up

20  on that, right?

21  A.  If I saw fit to, I could have, yes, sir.

22  Q.  If you had followed up and she would have said, "What do

23  you mean like a bird," and she would have gone like this,

24  flapped her arms, would that have seemed -- would that have

25  made sense to you?

1  A.  That didn't happen, so I have no idea how I would have

2  reacted.

3  Q.  Right.  Nothing happened because nobody followed up and

4  nobody really asked her, "What do you mean when you say

5  something like that?"

6        MR. SHEPARD:  Objection.  Asked and answered,

7  multiple times, I believe.

8        THE COURT:  It is cross and I've given you leeway,

9  but you have asked it multiple times.  So would you move on,

10  Counsel?

11  BY MR. THOMAS:

12  Q.  That was one example.  You also interviewed, on the same

13  day, M.R.'s mother, correct?

14  A.  Miosotis, yes.  Yes, sir.

15  Q.  And do you remember in the interview she said she had two

16  children?

17  A.  Yes.

18  Q.  Do you remember their names?

19  A.  M.R. and E.R.

20  Q.  Was there a mention of a G.F.?

21  A.  I've had multiple different conversations with Miosotis.

22  I believe in one of the subsequent conversations, that she's

23  mentioned a cousin named G.F.  I don't know that she

24  mentioned cousins during that first interview on the 22nd of

25  August.

1   Q.  In the -- your interview with her, she also mentioned that

2   she had another daughter, that died.  Do you recall that?

3   A.  I don't remember.  I'm sorry.

4   Q.  Well, I guess the reason I'm asking is that there were a

5   couple of references in M.R.'s statement to G.F., "my sister

6   G.F.," right?  Do you remember that?

7   A.  At least one that I remember, yes, sir.

8   Q.  What do you remember about that?

9   A.  That there was a reference to G.F.

10  Q.  So you don't remember the specific --

11  A.  Not without being refreshed.  I know I watched it earlier,

12  but I can't remember.  I'm sorry.

13          MR. THOMAS:  Approach the witness, Your Honor?

14          THE COURT:  You may.

15  BY MR. THOMAS:

16  Q.  I'll show you the transcript of what's already been

17  admitted as 43.  Here's the first one.  If you could just

18  take a look at that.

19  A.  It doesn't say anything about G.F. -- oh, I'm sorry.

20  There it is.

21  Q.  Yeah, it kind of does.

22  A.  I'm sorry.

23  Q.  Go ahead and read it for me, please.

24          MR. SHEPARD:  Your Honor, could we have the page

25  number?

1    MR. THOMAS:  Oh, I'm sorry.  Page 13.

2    THE WITNESS:  I've read it.

3  BY MR. THOMAS:

4  Q.  Okay.  And having read it, does it refresh your memory as

5  to what she was talking about?

6  A.  Yes.

7  Q.  And what was she talking about?

8  A.  She said -- it was in the context of her talking about

9  being tricked and tricking.  And she said, "My sister

10  G.F....tricked me."

11  Q.  "My sister G.F....tricked me about something and I don't

12  like it," right?

13  A.  Yes, sir.

14  Q.  And I'll show you on page 14, right up here.  If you could

15  take a look at that and see if it refreshes your memory.

16  A.  Yes, I remember.

17  Q.  Okay.  And after seeing that, what was her second

18  reference to her sister, G.F.?

19  A.  That her sister, G.F., had tricked her that morning.

20  Q.  She doesn't have a sister G.F., as far as you know,

21  right?

22  A.  No.

23  Q.  Did you ever follow up and try to find out who G.F. was?

24  A.  My belief was that it was her cousin.

25  Q.  Was it your belief at that time?

1  A.  I don't remember.

2  Q.  Was she -- was -- do you know if she was ever around

3  anyone named G.F.?

4  A.  I know she was around her cousins.

5  Q.  You don't know when, do you?

6  A.  No.  I know there was family members that I believe

7  accompanied them to the hospital, but I'm not --

8  Q.  She doesn't say her cousin, G.F., does she?  She says her

9  sister, G.F., right?

10  A.  Oh, that's true, yes, sir.

11  Q.  And she's talking about that in the context of her

12  statement about Ms. Anna, right?

13  A.  About tricking Jessica is the context both those comments

14  came in.

15  Q.  Right.  You had told us that you thought that she was --

16  M.R. in her first interview at 9:30 was more attentive than in

17  the second one, right?

18  A.  She appeared to be, or more focused, I guess I would say.

19  She was more direct about addressing the immediate issues at

20  hand, whereas the second interview, she went a little bit more

21  far afield and was definitely in a different mood and demeanor

22  during the interview.

23  Q.  Was it your experience in conducting these and seeing

24  these conducted that children tend to get more familiar, more

25  comfortable as the interview goes on in some cases?

1  A.  Sometimes, but my specific observation in this one was

2  more that she was trying to change the subject after being

3  asked multiple times about -- about being touched.

4  Q.  Okay.  Now, she did say that she was touched at school by

5  Ms. Anna, didn't she?

6  A.  Yes.

7  Q.  And on a different day than this happens, is what she

8  said, right?

9  A.  Yes.

10 Q.  And she was pretty specific in her description, right, I

11 mean about what happened?

12 A.  Yes.  As far as what happened, not necessarily the context

13 surrounding it, but, yes.

14 Q.  Well, I mean, she -- "How did Ms. Anna hurt you?"

15          "Cause she did...she just put it," in, "right

16 there."

17          "What do you mean?"

18          "Stick it in and stick it out."

19          "Stick what in and...what out?"

20          "Uh...finger."

21          "Ms. Anna?"

22          "Yes."

23          I mean, so she was pretty specific at that part when

24 she was describing it, yes?

25 A.  I just meant, when I said not specifically about the

1  context surrounding it, she didn't say exactly when or where

2  or what place they were, besides at the daycare.

3  Q.  At the daycare.  And then she did go on to say something

4  about, "I may trick you," "I trick you," right?

5  A.  That's what she said to Ms. Woodall, yes.

6  Q.  And she talked about being tricked by a sister she doesn't

7  have?

8  A.  About G.F., yes.

9  Q.  That was enough at that point, that she -- because she

10 then later said, no, she didn't do anything, it was a trick.

11 That was the end of that, right?

12 A.  I don't know.  What do you mean?

13 Q.  Well, you never asked anybody at the school about Anna or

14 anyone by that name or close to that name or anyone she had

15 contact with; you didn't follow up on that at all, right?

16 A.  Based on her demeanor when discussing that and based upon

17 her telling outright to Ms. Woodall that she was just tricking

18 and, you know, laying upside down and then later correcting

19 herself and saying, "No, I was tricking you.  Ms. Anna didn't

20 do nothing, nothing happened," and then reaffirming that it

21 was only Mr. Ali that put his finger inside of her vagina.

22 Yes, based on that, I didn't follow up on the other

23 information.  Plus, there was no one else in the room when

24 that happened --

25 Q.  Well, she didn't say Ms. Anna did it on the same day,

1  right?  She said it was on a different day?  She was

2  specifically asked and she said a different day, right?

3  A.  No.  I guess I mean, I also -- when she was talking about

4  Mr. Ali doing it, she said other teachers were in the room,

5  Ms. Tyria.  And, in fact, she wasn't -- it was when Ms. Tyria

6  was gone.

7  Q.  Right.  So that was a detail that she gave in her

8  statement about Mr. Ali that was wrong, right?

9  A.  A minor detail, yes, sir.

10 Q.  We don't really know about the other accusation because

11 you took her word for it when she said, "No, I tricked you, it

12 didn't happen," right?

13 A.   It wasn't just her word at that moment, but all of the

14 prior statements that she had made.  At no point had she ever

15 referenced an Anna.  And what she did say later to correct her

16 statement and say, "No, I was tricking, Ms. Anna didn't do

17 anything at all," it was consistent with everything I had

18 heard and learned and knew up to that point.

19 Q.  You didn't take her word for it when she said Ms. Graham

20 was in the room, right, because you knew that was false?

21 A.  As my investigation proceeded, I learned that that was

22 false, yes, sir.

23 Q.  So the things that help your case, that she says, are

24 believable; the things that don't help your case --

25        MR. SHEPARD:  Objection, argumentative.

1          THE COURT:  I'll overrule.  You may answer the

2     question.

3     BY MR. THOMAS:

4     Q.  The things that help your case, that M.R. says, you

5     believe wholeheartedly; the things that don't help your case,

6     you don't, or you discount?

7     A.  No, that's not a fair characterization, no, sir.

8     Q.  Okay.  Now, you talked a little bit about this statement

9     near the end of the interview when she's again asked if

10    anybody had touched her.  You said in your direct that you

11    thought it was something into the future about this monster,

12    that you thought she was saying about something that might

13    happen, right?

14    A.  I think it was actually the condition of verb tense.  I

15    think she said "would."

16    Q.  Well, what she said is, "When I go to -- when I go to

17    sleep at home when somebody knock on the door and has already

18    had a key...and it looks like a monster," right?  That's not

19    future tense, right?

20    A.  There was something more after that.

21    Q.  Do you remember her making that statement?

22    A.  I remember her saying those words and more, yes, sir.

23    Q.  And that, what I just read to you, you would agree that's

24    not in the future tense, right?

25    A.  She mixed her verb tenses all up in there, yes, sir.

1  Q.  Okay.  So, again, when it's -- when it's not helpful to

2  your case, you can ignore her verb tense and say, well, she

3  meant future tense because she mixed it up, right?

4  A.  She was also discussing a monster.

5  Q.  Yeah.

6  A.  And a dream.

7  Q.  And that would touch her down there, right?

8  A.  Would touch her, like -- yes, sir, absolutely.

9  Q.  Which you discounted that completely, right, because she

10  said it was a dream?

11  A.  And because it was a monster or looked like a monster.

12  And she said she had that dream.

13  Q.  Now, at this --

14  A.  She had slept since the incident had occurred.  Like I

15  said earlier, I didn't know if maybe she had had nightmares

16  about what happened to her the day before, which is entirely

17  likely.

18  Q.  Nobody ever asked her, did they?

19  A.  She -- asked her what, sir?

20  Q.  Well, you're speculating about, "Well, I don't know when

21  she had that dream.  I don't know if she had it before.  Maybe

22  she had it that night."  Well, we'll never know, because

23  nobody asked her, right?

24  A.  She said she had the dream.  As far as when exactly, I

25  don't know.  You're right.

1   Q.  That goes back to, we talked about follow-up questions.

2   You could have asked follow-up questions about this, right?

3   A.  If I thought that follow-up questions were appropriate or

4   necessary or helpful at that point, yes.

5   Q.  And a child, a four-year-old child relaying, even as a

6   dream, a monster with a key, "who comes into my room at night

7   and touches me," that wasn't anything to follow up on?

8   A.  She said that it would be bad if someone -- or if that did

9   happen, and then said she had dreamed that.

10  Q.  Right.  So that was --

11  A.  It didn't indicate to me that there was any particular

12  piece of follow-up investigative work that needed to be done

13  based on those statements, no.

14  Q.  But that was future tense, but she didn't mix up her tense

15  at that point, did she?

16  A.  What future tense?  I'm sorry.

17  Q.  Well, you're talking about, "Well, she said it would," so

18  that's future tense, right?

19  A.  No, I never said that.  I said conditional.

20  Q.  Okay.  You read into when she said, "When I go to sleep at

21  home when somebody knock on the door and has already had a

22  key...and it looks like a monster...and it would touch me down

23  there," you -- that's conditional?

24  A.  If then, yes, sir, it would.

25  Q.  Okay.  At that point, you had evidence of a possible

1  injury, possible molestation, right, from the hospital?

2  A.  Her forensic exam showed findings that were consistent

3  with penetration, a sexual penetration injury to her hymen, on

4  the interior structures of her genital area, yes, sir.

5  Q.  And you had a suspect?

6  A.  Yes.  From the beginning, she's consistently said it was

7  Mr. Ali.

8  Q.  Now, if you had -- you said you've done hundreds of these

9  cases, right?

10  A.  I'm sure.

11  Q.  Something like that?

12  A.  Yes.

13  Q.  In a case like this, if you had evidence of abuse, you

14  didn't have a suspect, but you had evidence of abuse --

15  A.  Yes, sir.

16  Q.  -- you interviewed the child, and the only thing the child

17  says is, "There's a monster with a key that knocks on the

18  door, comes in my room, and would touch me down there," would

19  you be done with that?

20  A.  I don't know.  That's not what happened in this case.

21  Q.  I know.  I'm asking you about, in your experience in what

22  you do, if the only evidence that you had was the child saying

23  about a monster --

24        MR. SHEPARD:  Your Honor, I object --

25  BY MR. THOMAS:

1  Q.  -- that comes in the room.

2              THE COURT:  Would you approach?

3              (Bench conference on the record.)

4              THE COURT:  Okay.  Your objection is relevance?

5              MR. SHEPARD:  I object to the relevance.  The

6  witness clearly answered that's not what happened in this

7  case.

8              MR. THOMAS:  Well, Judge --

9              THE COURT:  How is it relevant?

10             MR. THOMAS:  It is relevant because he has

11  discounted and said, "Well, it doesn't mean anything.  It's

12  meaningless in this case."  I'm trying to point out that it

13  perhaps wouldn't be meaningless in another case, that, in and

14  of itself, it isn't meaningless, and it's something that he

15  might very well have followed up on and could have followed up

16  on.

17             MR. SHEPARD:  Your Honor, what happens in another

18  case is completely irrelevant.  The defendant has testified

19  why it wasn't relevant here and it didn't happen in this case,

20  and he's already said why he did what he did.  It's just

21  not --

22             THE COURT:  I think you've gotten it in.  Can you

23  save it for your argument?

24             MR. THOMAS:  That's fine.

25             THE COURT:  Okay.

1      (Open court.)

2           THE COURT:  All right.  We're going to sustain the

3  objection and we're going to move on.

4  BY MR. THOMAS:

5  Q.  The -- you said you had had multiple meetings or

6  conversations with M.R.'s mother, right?

7  A.  Yes.

8  Q.  And you mentioned, I think on direct, that you never

9  talked to the parents about their child's interview?

10  A.  No.  I said I never show them the interview.

11  Q.  Oh, okay.  So not, "Sit down and let's watch this video,"

12  that's what you meant?

13  A.  I've never, ever shown a parent the video of the forensic

14  interview of their child, no.

15  Q.  It makes more sense, though?  You obviously do talk to

16  them about the contents of the interview, right?

17  A.  It depends on the case and each specific circumstance.

18  Q.  And what would those circumstances be?

19  A.  Well, unfortunately, sometimes, depending on the facts of

20  the case, the suspect that the child discloses abused him

21  might be the parents, and that's a circumstance I wouldn't go

22  tell them everything the child said right off the front.

23  Q.  And is that the only circumstance where you wouldn't tell

24  the parents about the contents of the interview?

25  A.  No.  Sometimes the things that children say are quite

1   disturbing, and if there's no real advantage for me to tell

2   them the facts in full, I don't sit there and just tell them

3   and describe everything that happened.

4          I don't hide from a parent the fact that they've --

5   their child has disclosed they've been abused.  I'll tell them

6   in general terms, if their child discloses, you know, that the

7   child did describe something happening.  But rarely, if ever,

8   will I go into detail about what the child said or the exact

9   circumstances.

10         Also, sometimes if I were to tell them all the

11  details, they might have some type of communication with the

12  individual accused.  And if they knew all the details, that

13  would take away some of my sort of advantage in interviewing

14  them.  If they already knew the facts of the case completely,

15  it wouldn't be a blank slate that I would be interviewing, so

16  to speak.

17  Q.  In this case, M.R.'s mother was not a suspect, was she?

18  A.  No, not at all.

19  Q.  And she wasn't having any contact with Mr. Al-Awadi, was

20  she?

21  A.  Not that I knew, but you never can tell what may happen.

22  Q.  She testified that she had never heard the contents of the

23  forensic interview?

24  A.  You asked her if she had watched it, and she said no.

25  Q.  And I think I asked her if she had ever talked to you

1  about it, and she said no?

2  A.  Yeah.  She said that, yes, sir.

3  Q.  Is that your recollection, as well?

4  A.  Yeah.  I didn't get into the details and describe to them

5  exactly what was said or what happened.  At most, I may have

6  confirmed to her that her daughter was continuing to disclose

7  that Mr. Al-Awadi touched her, but none of the details.

8  Q.  And no questions to her mother about prior dreams or

9  whether she frequently had nightmares or if they had started

10  at a particular time, or anything like that?

11  A.  I typically ask parents about the child's behavior or

12  demeanor.  I don't think I asked her specifically about dreams

13  of M.R. or beginning or ending dates of periods of dreams or

14  anything like that.

15  Q.  If you know, based on your investigation, about what time

16  did Mr. Al-Awadi leave the school on the 21st?

17  A.  He left twice.  Which time are you referring to?

18  Q.  Well -- for good.

19  A.  Oh, okay.  There is a time card printout that I have

20  obtained, or that I've seen, that shows that specific piece of

21  information.  I don't remember what it is.  I want to say it

22  was after 5:00, close to 5:40 p.m., if I'm not mistaken.  I

23  can't say for sure, but I think it's around that time.  Before

24  6:00, after 5:00.

25  Q.  And that -- so, roughly, we'll say 5:00, 6:00, somewhere

1  in there.  And when did the officers come to his house?  Do

2  you remember?

3  A.  Oh, it was the following day.

4  Q.  Do you remember about what time that was?

5  A.  It's in my notes.  If you want me to refresh my memory, I

6  can take a look.

7  Q.  If you can give me a general estimate.

8  A.  I think around 12:00, 11:30, 12:00, 1:00, somewhere in

9  there.

10  Q.  And you don't know where Mr. Al-Awadi was during that

11  period of time, right?

12  A.  I mean, he's at my office.  Prior to that?

13  Q.  Prior to that.

14  A.  No, no idea.  I would assume he was at home for most of

15  that time, but that's an assumption.  I don't know.

16  Q.  He wasn't on house arrest at his home, right?

17  A.  Not at that time, no.

18  Q.  And when he came with the police, is it your understanding

19  that he brought his phone with him?

20  A.  Yes, that's my understanding.  Yes, sir.  He told me as

21  much -- or I implied as much from him having it in his pocket

22  and pulling it out.

23  Q.  Do you have any reason to think that he didn't have access

24  to his phone from the time the accusations were made until the

25  time you took it from him in the interview room?

1  A.  I would assume he had plenty of opportunity and access to

2  that cell phone in the hours between leaving the daycare that

3  afternoon on the 21st and being taken into custody the

4  following day on the 22nd.

5  Q.  Mr. Al-Awadi was 20 years old when you interviewed him in

6  the interview we saw today; is that right?

7  A.  Yes, sir.

8  Q.  He lived at home with his parents?

9  A.  Yes.

10  Q.  And they didn't come with him to the interview, right?

11  A.  No.

12  Q.  Is it safe to say that he said a lot of things to you that

13  you don't think are true, right?

14  A.  Yeah.  He said a lot of things that I don't think are

15  true, absolutely, or at a minimum -- yes.  That and left

16  things out that did happen, and he denied happening.

17  Q.  Going back to MR.'s statement, she was specifically asked,

18  "How did his finger get inside your hurting thing?"  And she

19  said, "Because I'm sleeping."  Right?  Do you remember that?

20  A.  At one point she said that, yes.  I think she was asked

21  more than once --

22  Q.  Yes.

23  A.  -- bout how sort of it happened.

24  Q.  She was.  But at one point she said she was sleeping?

25  A.  At least twice she said she was sleeping when he put his

1   finger in her.

2   Q.  She didn't -- well, strike that.

3          MR. THOMAS:  Can I have just a moment, Your Honor?

4   BY MR. THOMAS:

5   Q.  You did the interview of Tyria Graham, as well?

6   A.  Yes.  And earlier on direct examination, I was -- I wasn't

7   sure, but I'm pretty sure I interviewed Tyria, Chiana, and

8   Heidi at the school before leaving to go interview

9   Mr. Al-Awadi.

10  Q.  You were here when she testified, and after memories were

11  refreshed, she told you three times that M.R. had complained

12  of hurting to pee, pain, at 11:30 in the morning, right?

13  A.  Yes.  I was here for that, yes, sir.

14  Q.  You were there when she said it the first time, right?

15  A.  I expect so, yes, sir.

16  Q.  You made case notes and filled out a couple of affidavits

17  related to this case as it went forward, right?

18  A.  I think my case file is over 300-plus pages.

19  Q.  I'll bet it is.

20  A.  All kinds of documents, yes, sir.

21  Q.  And nothing that you wrote about or kept track of or

22  passed on to anyone about your interview with Tyria Graham

23  mentions that she said the little girl complained of pain at

24  11:30 in the morning, do they?

25  A.  No, that's not true.

1   Q.  Where is that?  Where did you document that?

2   A.  It's in the transcript and it's in the video recording

3   that I -- or the audio recording that I made of my interview

4   with Ms. Graham.

5   Q.  Well, I understand.  She said it, right?  It's going to be

6   in the video?  She said it?

7   A.  Well, it's an audio recording that I made, yes --

8   Q.  You're right, you're right.

9   A.  -- it's in the audio.

10  Q.  It is in the audio?

11  A.  Yes.

12  Q.  So if she said it and you were recording it, it's in the

13  audio, right?

14  A.  There.  It's there, it's in the transcript.  And that was

15  turned over to the government, which I believe was, in turn,

16  turned over to you, yes, sir.

17  Q.  You made case notes, right?

18  A.  Yes, sir.

19  Q.  It's not mentioned in your case notes at all?

20  A.  I would have to look through them all to be sure.  If

21  you're saying it's not, it's quite plausible that it's not.

22  Q.  It didn't mean anything to you, really, did it?

23  A.  No.  I took note of it.

24  Q.  Can you explain it?

25  A.  There's any number of possible explanations, one of which

 1  is that Mr. --

 2          MR. SHEPARD:  (Inaudible.)

 3          THE REPORTER:  I cannot hear you.

 4          THE COURT:  I can't either.  Do you have an

 5  objection?

 6          MR. SHEPARD:  He can't be asked to explain what a

 7  witness meant, Your Honor.  He can't --

 8          THE REPORTER:  I'm sorry.

 9          THE COURT:  You're saying the question is not

10  appropriate?

11          MR. THOMAS:  I'll withdraw it, Judge.

12          THE COURT:  All right.

13  BY MR. THOMAS:

14  Q.  We talked about G.F. and K.E. being interviewed.  E.C.,

15  the boy who was awake right next to M.R., he was interviewed,

16  as well?

17  A.  Well, Mr. Al-Awadi said he was asleep at one point.  I

18  don't think he was awake the entire time.

19  Q.  Okay.

20  A.  He at least twice described him as being asleep.  But,

21  yes, he was in the room at the time it occurred, from

22  everything I can tell.

23  Q.  And he was interviewed, as well?

24  A.  Yes.  He was interviewed on the 21st of August.

25  Q.  Do you remember how many of the children in the room were

1  interviewed?

2  A.  I don't remember the exact number.

3  Q.  Well, there were only 11.

4  A.  No, I know how many kids were in the room.  And, actually,

5  I think that day there were 10 in the room, not 11.  What I'm

6  saying is, I can't remember exactly how many of those ten were

7  interviewed.  I know, obviously, E.C. and M.R. were.  I can't

8  remember which other kids.  I know there was a total of just

9  over 20 different people that I took statements from in

10  entirety, but how many of the children I don't recall.

11  Q.  One of the reasons you don't remember is because nothing

12  significant came from any of those interviews, right?

13  A.  It was during nap time when it happened, so -- I don't

14  know if I would say there was nothing significant, but nothing

15  that --

16  Q.  Nothing you remember here today, right?  You already told

17  that.

18  A.  Yeah.  Obviously, I have some memory of those interviews.

19  I'm just -- I'm saying I can't remember exactly which children

20  were interviewed and not interviewed.  All the children

21  interviewed from the daycare, though, there were no other

22  charges or crimes that we have alleged.

23  Q.  Well, in fact, none of them corroborate M.R.'s story,

24  right?

25          MR. SHEPARD:  Objection.  Calls for a legal

1  conclusion.

2          THE COURT:  Do you have a response?

3          MR. THOMAS:  I'm not -- I don't know that

4  corroboration is a legal conclusion, Your Honor.

5          THE COURT:  I'll -- well, all the charges are crimes

6  that you have alleged, so I'll sustain.  Why don't you

7  rephrase.

8          MR. THOMAS:  Well, I --

9          THE COURT:  Rephrase your question.

10          MR. THOMAS:  I will.  Thank you, Your Honor.

11  BY MR. THOMAS:

12  Q.  You don't have -- after interviewing those children, you

13  don't have any other eyewitnesses to the crime, correct?

14  A.  No.

15  Q.  You were asked about -- you had conversation with

16  Mr. Al-Awadi about did he watch porn, right?

17  A.  Yes, sir.  I asked him if he had watched porn that day.

18  Q.  And you never asked him if he had taken pictures of M.R.?

19  A.  I wouldn't have imagined, under any circumstance, he would

20  have.  So, no, I didn't.

21  Q.  And he admitted having watched porn, right?

22  A.  He said at home he had watched some, or he did watch it.

23  Q.  The search warrant that you did, you included other

24  electronics other than just his phone, right?

25  A.  We've discussed a search warrant at his house for his

1  watch and then a search warrant for -- to have his phone

2  examined.

3  Q.  You also took other electronics from his house for review,

4  right?

5  A.  Not at the time I recovered the watch.

6  Q.  No -- yeah, you're right.  I apologize.  Not the same

7  search warrant, but ultimately you gathered evidence, your

8  department gathered evidence, in the form of computers,

9  electronics, from his house, right?

10  A.  Months after the incident occurred, when the results of

11  the forensic examination of his cellular telephone came back

12  and he had four images of what I believed to be M.R.'s genital

13  area and mons pubis.  Yes, at that time I wrote a search

14  warrant to search his house to see if those images in their

15  original form, or if any other child pornography images, were

16  at his home.  But that's months afterwards, yes, sir.

17  Q.  Right.  And, ultimately, you didn't actually use this

18  search warrant to search the phone, did you?

19  A.  I don't know how I would describe it.  I mean, I obtained

20  a search warrant and had the phone given to the digital

21  forensic unit detective and asked him to examine the cell

22  phone underneath the authority of that search warrant.  And he

23  attempted to and the phone was locked.

24  Q.  And Mr. Al-Awadi gave you the information to unlock it,

25  right?

1  A.  No.

2  Q.  I'm sorry?

3  A.  No.

4  Q.  Did you -- did Samsung give you that information?

5  A.  No.

6  Q.  How did you obtain that?

7  A.  One of the members of the Marion County Prosecutor's

8  office sent me an e-mail with an attachment that included, I

9  think, two different possible passwords that Mr. Al-Awadi had

10  apparently provided to his then attorney, who provided it to

11  the Marion County Prosecutor's office, who provided it to me.

12  Q.  Okay.  Fair enough.  He didn't hand it to you?

13  A.  No.

14  Q.  But that information that you used came from Mr. Al-Awadi,

15  did it not?

16  A.  I forwarded the information to the digital forensic unit

17  detective.  And my understanding was that the piece of

18  information had originated from Mr. Al-Awadi.  It was his cell

19  phone.  He would be the person who knew the password.

20  Q.  You mentioned that part of your investigation was to see

21  whether the other people at the daycare broke any laws, or I

22  think the term you used was "committed neglect."  Do you

23  remember saying that?

24  A.  Yes.  At face value, it was disturbing that no one had

25  contacted the police immediately once this small four-year-old

1  child disclosed that she had just been molested in her daycare

2  during naptime.  And so I wanted to make sure that I kept an

3  eye on not just what did Mr. Al-Awadi do or what happened

4  between he and M.R., but also how did they respond.

5          As part of my investigation, as I mentioned earlier,

6  the Department of Child Services was part of that.  They have

7  what's called an institutional unit, and so that DCS family

8  case manager was present with me during much of my

9  investigation.  That was the main focus of his, but the way I

10 said we would do it, as far as being a team approach so we

11 don't have redundant interviews, not only for any potential

12 criminal purposes, but for some of his purposes, too, I would

13 ask a lot of questions regarding not just what happened

14 between M.R. and Mr. Al-Awadi, but also how the daycare

15 responded.  Their license was eventually revoked as a result

16 of my and DCS's investigation.

17 Q.  Is it safe to say that their procedures and training

18 methods were unsound?

19 A.  I don't know about that --

20        MR. SHEPARD:  Objection, Your Honor.  He's got no

21 basis for that.  The witness has no basis to answer that

22 question.

23        THE COURT:  Do you know?  Can you answer that

24 question?

25        THE WITNESS:  Actually, I can.  I think so, yes,

 1  ma'am.

 2          THE COURT:  Overruled.  You may answer.

 3  A.  The policies and procedures, as I know them, appear to be

 4  quite good.  The execution of said policies and procedures

 5  would be questionable at best, particularly on August the

 6  21st, 2014.

 7  BY MR. THOMAS:

 8  Q.  When you got the password, you unlocked the phone, right?

 9  A.  No, I didn't -- I didn't touch the phone again after I

10  gave it to Detective Melton.

11  Q.  Did you -- was it even in your control when they got the

12  password?

13  A.  In a manner of speaking.  I was the lead investigating

14  detective on the criminal investigation, and the phone was

15  attached to my case number within our evidence tracking

16  system.  So, in that sense, I'm always in control.  But I had

17  given the phone, after removing it from the property room and

18  signing it out in my name, to Detective Melton, because that's

19  his area of expertise and specialty, that's what he does, as

20  far as examining items like that, and not mine.  So it was in

21  his sort of physical control, so to speak, while I still

22  maintained sort of investigative control over the phone.

23  Q.  You heard the testimony, and there was some discussion

24  about whether you were shocked or surprised by revelations by

25  Heidi Conces about their policies and looking at injuries,

1  right?

2  A.  I remember both your cross-examination of Ms. Conces

3  regarding that subject and when the subject came up during my

4  direct examination, yes, sir.

5  Q.  And you understand that's the policy, right?

6  A.  I'm sorry.  What --

7  Q.  You understand, after she explained it to you, that that's

8  their policy, not to look at injuries to the private area?

9  A.  Okay.  So, yeah, I asked her several questions about what

10 their policies and procedures were.  And then later I asked

11 just to find out if anyone had done that, and she did, I

12 believe at that time, tell me that it was against their policy

13 to do physical examinations of children.  I can't remember the

14 exact words, but, yes, I think she did say that, absolutely.

15 Q.  Did you get follow-up information from the physician that

16 ultimately examined M.R. after the -- after the first

17 evaluation?

18 A.  Okay.  So -- excuse me.

19 Q.  Yes or no?

20 A.  Well, there were -- there was more than one physician who

21 was involved in her examination.

22 Q.  Okay.  Which ones did you talk to?

23 A.  I talked to Dr. Ralph Hicks, who is at IU Health at Riley

24 Hospital.  He's with the child protection team.

25 Q.  When did you talk to him?

1  A.  I believe it's in my notes.  I think it was within a month

2  of the initial -- initial incident, but I can't remember.  It

3  may have been less than a month.  I'm not sure.  I know that

4  M.R. eventually went and he performed another evaluation later

5  on.

6  Q.  You haven't talked to him since?

7  A.  No.  I've spoken to him about several different cases

8  between now and then, and I know I've talked to him at least

9  once, maybe twice.  Oftentimes when we screen the case, I'll

10 consult with him on the phone.  I don't remember how often I

11 spoke to him on this one.  At least, at a minimum, once after

12 I received his report, we communicated on the phone.

13 Q.  Would that have been back in 2014 still?

14 A.  I believe so, yes.  Yeah.  Like I said, I think it was

15 within one month.  The date is in my notes.  I can't remember.

16 Q.  You reviewed the report from Nurse Bryant, I think it is?

17 A.  Angela Bates?

18 Q.  Bates.  Good man.  You reviewed her report, correct?

19 A.  Yes, the morning of the 21st of August 2014, before we

20 interviewed.

21 Q.  They were --

22 A.  Well, no.  Actually, you know, I think -- I can't

23 remember, but, yeah, that morning, sometime that morning.

24 Q.  And we have in evidence that there were photos of her

25 injuries taken at the time of her examination, right?

 1 | A.  That's true.

 2 | Q.  Did you see those?

 3 | A.  I believe I looked briefly at them, yes, sir.

 4 | Q.  Do you know if Dr. Hicks looked at those?

 5 | A.  Yes, he did look at them.

 6 |      MR. THOMAS:  Okay.  I think that's all I have.

 7 | Thank you.

 8 |      THE COURT:  Very good.  Do you have redirect?

 9 |      MR. SHEPARD:  Yes, Your Honor.  Can I just take a

10 | moment?

11 |      (Off the record.)

12 |      MR. SHEPARD:  Thank you, Your Honor.

13 | **REDIRECT EXAMINATION**

14 | BY MR. SHEPARD:

15 | Q.  Detective McAllister, you talked at length on cross about

16 | some of the statements that   M.R.   made during her

17 | interview?

18 | A.  Yes, sir.

19 | Q.  Do you remember talking about the phrase, or Mr. Thomas

20 | saying, "It was a trick and that was that"?

21 | A.  I can't remember all the details of that conversation.  I

22 | remember we talked about her saying it was a trick, something

23 | to that.

24 | Q.  Did he try to imply that after she said it was a trick,

25 | you heard all you needed to hear?

1  A.  Oh, yeah.  No.  I remember what you're asking now.  Yes,

2  that essentially I dropped it and didn't do anything further

3  to follow up.  Yeah, I remember that.

4  Q.  If you can remember, what actually did   M.R.   say,

5  both when she was talking about a trick and after she talked

6  about what a trick was?  What did she go over with Jessica

7  Woodall?

8  A.  That it was -- it's not easy to summarize that entire

9  section of the video, but basically saying that she was

10  tricking her.  And sort of later, as that conversation

11  continued, it was revealed by M.R. that the person -- or this

12  other person that she said had touched her, Anna, or Ms. Anna,

13  hadn't touched her, that Ms. Anna didn't do anything to her.

14  And then she went on to affirm that it was, in fact, Mr. Ali

15  who did that, and he was the only one.

16  Q.  Did she agree that it wasn't nice to trick people, or

17  something to that effect?

18  A.  Yes.  She had said that she didn't like it when people

19  tricked her.  And Jessica's response was, "Well, I don't like

20  it when people trick me."  And it was at that point that M.R.

21  then began to explain that Ms. Anna hadn't done anything to

22  her.

23  Q.  And there were a lot of talk with Mr. Thomas about the

24  monster?

25  A.  Yes.

1  Q.  Did Jessica Woodall speak with M.R. about if that really

2  happened?

3  A.  I don't remember her specifically following up about the

4  monster scenario.  I do remember that whatever Ms. Woodall

5  said, that M.R.'s response was that she dreamed that that

6  happened.

7  Q.  Right.  And after that, did she say anything about talking

8  only about things that really happened in the room?  Do you

9  remember that?

10 A.  Yes.  In response to M.R. saying that she had that dream,

11 that's when Jessica said, "In this room, let's only talk about

12 things that really happened."

13 Q.  And --

14 A.  And Jessica said, "Deal?" and M.R. said, "Deal."

15 Q.  And after that, what then did M.R. go on and say?

16 A.  She went on to say that Ms. Anna hadn't touched her, but

17 that Mr. Ali had, and that Mr. Ali was the only one who had

18 done that.

19 Q.  When you got to the daycare, I think you indicated you

20 spoke with multiple employees as witnesses; is that correct?

21 A.  Yes.

22 Q.  And read even more interview reports of employees there?

23 A.  I obtained written statements from -- written statements

24 from four employees, including Mr. Al-Awadi, and then written

25 notes from another employee that observed the interview or the

1   conversation between Ms. Conces and Mr. Al-Awadi.  So five

2   different people's written version of events, so to speak.

3   Q.  Did anyone that you interviewed or read, any of them say

4   anything about M.R. accusing Ms. Anna of touching her?

5   A.  No.

6   Q.  Who did they say M.R. accused of touching her?

7   A.  Mr. Al-Awadi, or Mr. Ali.

8   Q.  Prior to this investigation, did you know Ali Al-Awadi?

9   A.  No.  I had never met him before until I walked into the

10  interview room at the Child Advocacy Center and he was sitting

11  there in the T-shirt and shorts.

12  Q.  Is there anything -- were you out to get him in any way?

13  A.  No.  I certainly would characterize my investigation as

14  one that held him responsible for his actions, but it wasn't

15  anything vindictive or spite filled or --

16  Q.  Did you even know him from Adam?

17  A.  No, I didn't know him at all until I met him that day.

18  Q.  Mr. Thomas talked to you about how the pass code was

19  obtained for the phone.  Do you recall that?

20  A.  Yes.

21  Q.  Do you recall a rough approximation of when Tyria Graham

22  confronted Mr. Al-Awadi about M.R.'s accusation for the first

23  time?

24  A.  From my interview with Ms. Graham, my conclusion was it

25  was no more than 10 to 15 minutes after he left the room on

1  August the 21st, 2014 --

2  Q.  Did you --

3  A.  -- Mr. Al-Awadi left the room.  So no later than maybe, I

4  don't know, about a quarter till 2:00, 2:00 at the latest.

5  Q.  In the afternoon?

6  A.  Yes.

7  Q.  On what day?

8  A.  The 21st of August 2014.

9  Q.  Do you recall that you were asked what time Mr. Al-Awadi

10  was picked up the next day to be brought down to the Child

11  Advocacy Center?

12  A.  I remember Mr. Thomas asking me that, yes.

13  Q.  And could you remember the exact time or were you

14  speculating?

15  A.  I had a rough ballpark, somewhere between 11:30, 2:00,

16  somewhere in there.

17  Q.  When someone is interviewed, is the start time of that

18  documented?

19  A.  Yes.

20  Q.  Okay.  And will that start time be close to the time that

21  they arrived at the center?

22  A.  It depends on the case.  I've known some people who had to

23  wait a matter of hours before the detective had the

24  opportunity to conduct their interview.  Other times I have

25  walked people into the interview room and sat down; walked

1  right in with them, sat down, and began the interview.  So it

2  really varies.

3  Q.  What about in this case?  Would that start time have been

4  pretty close to around when he arrived?

5  A.  No.  It was about an hour, because if you recall, I was at

6  the daycare campus at St. Vincent Hospital, and I had sent

7  someone else to go pick up Mr. Al-Awadi at his home and take

8  him there.  So I had to wrap up the interviews I was

9  conducting at the daycare and then drive back to my office,

10  catch up on a few things that I had to do, and then go into

11  the interview room and talk to him.  So I think he waited

12  about an hour, maybe a little bit over that.

13  Q.  About an hour?

14  A.  Yes, sir.

15  Q.  Would it -- do you remember the start time of the

16  interview?

17  A.  I think it was about 2:37 or 2:47 p.m.

18  Q.  Would it help you if you were able to look at the

19  transcript to remember?

20  A.  Yes.  I --

21          MR. SHEPARD:  Your Honor, if I can approach?

22          THE COURT:  You may.

23          MS. KOROBOV:  May I approach?

24          THE COURT:  You may, Counsel.

25          MR. THOMAS:  Judge, we'll stipulate that it was

1   3:46 p.m.

2          THE COURT:  Is that good?

3          MR. SHEPARD:  That's good enough for me, Your Honor.

4          THE COURT:  So stipulated, 3:46 p.m.

5   BY MR. SHEPARD:

6   Q.  So he would have arrived about an hour before that?  So --

7   A.  Yeah.  So I was remembering the time he came in, but I

8   actually began the interview an hour later.  That sounds about

9   right.

10  Q.  So about 2:46?

11  A.  Is when he arrived, roughly.

12  Q.  Do you know about how far away from the center Mr. Ali

13  lived?

14  A.  I want to say anywhere between five to eight miles,

15  probably closer to eight miles away.  I'm just kind of

16  estimating based on the number of blocks over, but...

17  Q.  About 15, 20 minutes, if you had to ballpark it?

18  A.  Oh, I would say closer to 25, 30 minutes.

19  Q.  Okay.  So --

20  A.  Michigan Road is the best way to get up and down, and it's

21  a lot of stoplights and school zones.

22  Q.  So would that have put the time he was picked up closer to

23  2:00, if you do all the math?

24  A.  Probably close to that time.

25  Q.  And --

1  A.  I think --

2  Q.  -- was that 2:00 on what day?

3  A.  The 22nd of August 2014.

4  Q.  So between about a quarter till 2:00 on August 20 -- on

5  the 21st to between about 2:00 on August 22nd, close to 24

6  hours?

7  A.  Yes.

8  Q.  All right.  In your experience, is that enough time to

9  delete four images off your cell phone?

10  A.  It would take a fraction of 24 hours, just a few seconds.

11  But then, again, I use an iPhone, not a Samsung, so I'm not

12  sure how easy it is on a Samsung.

13  Q.  How old was    M.R.    at the time she was being

14  interviewed?

15  A.  Four years old.

16  Q.  How long had she been at the Child Advocacy Center by the

17  time the continuation interview was begun?

18  A.  If you recall, I couldn't remember the exact start time of

19  that second video.  And I don't think the date stamp was

20  correct.  I think it was around 9:00 -- or, I'm sorry, around

21  11:30, if I'm not mistaken, but I can't remember for sure.

22  Q.  Do you remember how long she had been there?

23  A.  I think she had been there for at least two, two and a

24  half hours.

25  Q.  Okay.  Do you remember what time you had asked them to be

1  there?

2  A.  I had asked them to be there at 9:00 a.m.  I think they

3  arrived shortly after that.

4  Q.  Okay.  And what's the latest you knew that they were still

5  at the hospital?

6          MR. THOMAS:  Your Honor, I think this is beyond the

7  scope.  And I think that this was all testified to on direct.

8          THE COURT:  Do you have a response?  This is beyond

9  the scope of cross-examination.

10          MR. SHEPARD:  I do, Your Honor.

11          THE COURT:  All right.  Come on up.

12          (Bench conference on the record.)

13          MR. SHEPARD:  Your Honor, on cross-examination he

14  went through multiple times asking of things he ignored or why

15  he believed what he believed in the first and discounted some

16  of the things that were in the second.  I'm just trying to lay

17  the foundation of how long she had been up, what she had been

18  going through, and if that went into his --

19          THE COURT:  How long the child had been up?

20          MR. SHEPARD:  Correct, Your Honor.  And if that was

21  one of the reasons he had --

22          THE COURT:  Okay.  All right.  Briefly.  Okay.

23                    (Open court.)

24          THE COURT:  The Court will overrule the objection.

25  You may continue.

1  BY MR. SHEPARD:

2  Q.  What's the latest you knew that they were still in the

3  hospital the previous day?

4  A.  Well, as I testified previously, I received the page at

5  1:51 a.m. on the 22nd of August.  It took me some time to wake

6  up, read the page, call the officer, talk to him.  And at the

7  time I spoke to him, they were still at the hospital with M.R.

8          And the earliest, if they -- if they left

9  immediately upon the conclusion of my conversation with the

10  officer, it would have been as early as 2:00 a.m., but my

11  experience with hospitals is that they're not always that

12  prompt when it comes to discharge, so I don't know.  Sometime

13  after 2:00 a.m., I can say with confidence.

14  Q.  In your experience as a -- in six and a half years as a

15  child molest detective, does it -- at some point, do

16  four-year-olds just get tired and does it become hard for them

17  to focus?

18  A.  Yes.  One of the things we try to do is make sure the

19  child is well rested and had ample opportunity to get a good

20  night's sleep.  Unfortunately, this didn't happen in this

21  instance, but I knew I had an incident that had just occurred

22  the day before.  And in weighing the pros and cons of going

23  forward with the interview, I felt like it was necessary to

24  have the interview done as soon as possible.

25          When I scheduled for them to come in at 9:00 a.m., I

1  didn't know any of the actions taken at the daycare the day

2  before.  As far as I knew, Mr. Ali, whoever he was, could be

3  caring for children and potentially even molesting them that

4  following day.  So I didn't want to leave it hanging out

5  there.

6          And so even though she wasn't as well rested as our

7  protocol would typically require, I went ahead and had the

8  family bring her in so that we could address this public

9  safety issue that existed.

10          MR. SHEPARD:  Thank you, Your Honor.  No further

11  redirect.

12          THE COURT:  Any questions on those questions?

13          MR. THOMAS:  Yes, Your Honor, if I could, just

14  briefly.

15          THE COURT:  Briefly.

16                     **RECROSS-EXAMINATION**

17  BY MR. THOMAS:

18  Q.  You can stop an interview anytime, can't you?

19  A.  No, I wouldn't say that.

20  Q.  Well, who decides when it's over?

21  A.  Well, if you recall earlier from my testimony, the way we

22  do it at Marion County, and the protocol we follow, is that

23  the child interviewer goes into the interview room with the

24  child one on one with the door closed and they conduct the

25  interview.  They follow the typical protocol, they explore the

1  subject at hand.

2         And once they feel like they have come to the

3  conclusion of the questions they need and want to ask, that's

4  when they will turn on their walkie-talkie, put it in their

5  ear, and allow it to -- you know, allow me an opportunity to

6  communicate with them.  So in the sense that I have an

7  opportunity to communicate in a discreet way with the child

8  interviewer, no, I can't just stop it at any point.

9  Q.  Well, if the child interviewer -- if the child falls

10 asleep, is the child interviewer going to continue on or are

11 they going to end the interview?

12 A.  I've never seen that happen.  I don't know.

13 Q.  I guess the point is, if she thought that this second

14 interview was worthless because the child was too tired -- as

15 you said, she was up all night -- she could have -- she could

16 have stopped that interview and said, "this is not" -- "this

17 is worthless"?

18 A.  Not exactly.  If you remember, I said that it was the

19 multidisciplinary team that decided that a second follow-up to

20 the original interview needed to be conducted, and it wasn't

21 necessarily the child interviewer's call alone as to whether

22 or not to conduct the interview.

23 Q.  You didn't -- the child's parents didn't tell you that you

24 couldn't ever speak to her again, right?

25 A.  No.  In fact, I have spoken with her many times since

1  then.  They've been more than cooperative and welcoming to

2  allow us to have interaction with her, yes, sir.

3  Q.  So -- well, tell me about those interactions.  Were they

4  recorded?

5  A.  No.

6  Q.  Did you take notes of those?

7  A.  No.

8  Q.  Well, what -- this is the first I'm hearing about this,

9  Officer.  Tell me a little bit more about these meetings that

10  you had with the witness, that I know nothing about.

11  A.  Okay.  I don't think it's anything extraordinary.  It's

12  actually fairly routine.  She met with myself and the

13  government in order to discuss the case and find out what she

14  would be able to testify to, ask her what happened and see

15  what she would say.

16  Q.  And you --

17  A.  It's been almost two years, or not quite, but two and a

18  half years, and she was four years old at the time and six

19  years old now.  Without speaking to her again in 2016, we

20  wouldn't know if or what she might be able to testify to or

21  what she remembered.  So that was the process of us finding

22  out if she even remembered what happened to her when she was

23  four years old at a daycare that she no longer attends.

24  Q.  I understand that.

25  A.  Okay.

*McALLISTER - RECROSS/THOMAS* 228

1  Q.  You were preparing for trial.  That's normal.

2  A.  Sure.  That's all I'm referring to.  I'm not referring to

3  any other additional meetings with her.

4  Q.  Okay.  And I guess that's what I'm trying to ask you, is

5  that after -- on the 22nd, there was nothing to keep you from

6  going to her parents and saying, "Hey, you know, that last

7  interview, I thought she was really too tired.  You know,

8  maybe I would like to ask those questions again because --

9  when she's more attentive."  You could have done that and you

10 didn't, right?

11 A.  Well, she had answered the questions.  I didn't see the

12 point in doing it again at that time.

13 Q.  Well, she had answered the questions and you could

14 discount the answers because you thought she was too tired and

15 not paying attention, right?

16 A.  No.  I thought she, if you recall, even yawned real big

17 during the first interview, and then later her demeanor and

18 her physical behavior during the interview showed that she was

19 clearly not in the most focused or attentive or serious mood

20 and demeanor.

21        And then when she herself specifically addressed

22 what she had said about tricking Ms. Woodall and saying that

23 Ms. Anna touched her when she hadn't, I felt like it had been

24 resolved within that entire interview.  It wasn't something

25 that needed a second or third or further times to clarify.  I

1  thought she had clarified it sufficiently at the time we

2  talked to her on the 22nd.  There were no lingering questions

3  in my mind about what happened or didn't happen according to

4  M.R.

5  Q.  Well, there were no lingering questions, as you say, and

6  there was no follow-up on anything other than the

7  investigation of Mr. Al-Awadi, right?

8  A.  The person she had consistently and repeatedly accused of

9  molesting her, absolutely.

10  Q.  You had time, certainly, to ask M.R.'s mother about dream

11  patterns; it wasn't that you didn't have time, right?

12  A.  No, yeah.  I could have followed up with a more specific

13  interview or follow-up questions with Ms. Rodriguez concerning

14  M.R.'s dreams.

15  Q.  Or inquiring about E.R.'s teacher and whether there was an

16  Anna or someone close to that name or just to -- you had time

17  to do that, didn't you?

18  A.  Well, at some point I have obtained the full register of

19  all employees of the daycare.  I think that was information

20  that you have, in fact.

21  Q.  But just to be clear, that was because you discounted all

22  that, not because you didn't have time to do it, right?

23  A.  I don't know that I discounted it.

24          MR. SHEPARD:  (Unintelligible.)

25          THE REPORTER:  I cannot hear you.

1          THE COURT:  Put your mic on.

2          MR. THOMAS:  That's okay.  Your Honor --

3          MR. SHEPARD:  Explain the question --

4          THE COURT:  All right.  He said -- are you going to

5    withdraw that question?

6          MR. THOMAS:  I'll withdraw that question and I'll be

7    finished with this witness, Judge.  Thank you.

8          THE COURT:  All right.  Very good.

9          Do you have anything further for the detective this

10   evening?

11         MR. SHEPARD:  No, Your Honor.

12         THE COURT:  Very good.  Detective, you may return to

13   your seat.

14         THE WITNESS:  Thank you, ma'am.

15         (Witness excused.)

16         THE COURT:  And, lawyers, would you approach?

17         (Bench conference on the record.)

18         THE COURT:  It's 4:45.  Do you have a quick witness?

19         MR. SHEPARD:  Unfortunately, Your Honor, the next

20   witness is --

21         THE COURT:  Who is the next witness?

22         MR. SHEPARD:  Grant Melton, the --

23         THE COURT:  Oh, the forensic --

24         MR. SHEPARD:  -- the forensic examiner, Detective

25   Grant Melton.

```
 1            THE COURT:  Okay.  All right.

 2            MR. SHEPARD:  It's not going to be short.

 3            THE COURT:  All right.  Well, how are you timewise?

 4  Are you going to be able to finish tomorrow?

 5            MR. SHEPARD:  We'll still finish tomorrow, Your

 6  Honor.

 7            THE COURT:  Okay.  And if you want to present any

 8  evidence tomorrow, if in fact you do intend to call your

 9  client, we'll do that tomorrow, also, and try to finish all

10  the evidence tomorrow.  And then we'll come back and

11  deliberate Thursday morning.

12            MS. KOROBOV:  And the plan will be to close on

13  Thursday, then, is that --

14            THE COURT:  Yes.  That sounds good.  We don't want

15  to keep them late.  So do you have enough evidence to go

16  through the day tomorrow?

17            MS. KOROBOV:  It's a good portion of the day, yeah.

18            THE COURT:  Okay.  All right, unless we finish at

19  noon.  If we finish in the afternoon, after lunch, we'll come

20  back in the morning.

21            MR. SHEPARD:  We won't be finished by noon.

22            MR. THOMAS:  Just so I'm clear, we should not be

23  prepared to do closing tomorrow?

24            THE COURT:  Unless they finish by noon.

25            MR. THOMAS:  Fair enough.
```

232

1        THE COURT:  Okay.  All right.  So unless they --

2    unless you all stipulate to some things, to the forensics

3    and -- which isn't going to happen, right?

4        MR. THOMAS:  It's not going to happen.

5        THE COURT:  Okay.  All right.  Okay.  All right.

6                    (Open court.)

7        THE COURT:  All right.  Ladies and gentlemen, they

8    don't have a quick witness, so we're going to go home.  The

9    Court -- we're going to go ahead and adjourn.  And I'll need

10   you back in your jury room at 9:00 a.m.  And please leave in

11   plenty of time because you just never know when there's an

12   accident on the interstate, so try to make sure -- we want to

13   start promptly at 9:00 a.m. so that we can finish -- our goal

14   is to finish all the evidence tomorrow and then bring you back

15   bright and early on Thursday morning so that you can

16   deliberate and get your final instructions.  And then you can

17   get back to your life and we can let the juror in the back go

18   and make his doctor's appointment so he can make sure his legs

19   are okay.

20       Ladies and gentlemen, the Court is going to admonish

21   you, during this period of time that you're allowed to

22   separate for overnight, remember you are not to have any

23   discussion about the case among yourselves or with anyone

24   else.  You can't tell your families what happened in court

25   today, or your friends.

233

 1          If anyone should attempt to talk to you about the

 2  matter, you should refuse and report that attempt to me at

 3  your earliest opportunity.

 4          You are not to do any research on the Internet, no

 5  Googling, no Facebook, no Twitter, nothing about any of the

 6  attorneys, parties, witnesses.  And if you know any

 7  spectators, don't Google them either.

 8          Under this admonishment, you will be allowed to

 9  separate for overnight.  Be in there at 8:45, eat a snack,

10  drink some coffee, and we'll get you in the courtroom promptly

11  at 9:00 a.m.  Have a good evening.

12          THE COURTROOM DEPUTY:  All rise.

13          (Jury out at 4:47.)

14          THE COURT:  Anything further this evening?

15          MR. SHEPARD:  Nothing from the government, Your

16  Honor.

17          THE COURT:  Okay.  All right.  Come here,

18  Mr. Shepard.  And you can come, also.  And we can -- I just

19  need to tell you one thing, and then we'll adjourn.

20          We're off the record.

21          (Bench conference off the record.)

22                        (Open court.)

23          THE COURT:  Okay.  We're in recess.

24          THE COURTROOM DEPUTY:  All rise.

25          (Proceedings adjourned at 4:49 p.m.)

234

1              **WEDNESDAY, FEBRUARY 24, 2016**

2              THE COURT:  Okay.  We are on the record.  This is

3    the United States of America versus Ali Al-Awadi.  Good

4    morning, Counsel.  Is the -- the jury have all made it in

5    despite the weather and accidents.  It was just rain today.

6    Is the government ready for the jury?

7              MS. KOROBOV:  Yes, Your Honor.

8              THE COURT:  Defense ready?

9              MR. THOMAS:  We're ready, Your Honor.

10             THE COURT:  Tanesa, you may bring in the panel.

11             MS. KOROBOV:  Your Honor, just -- my first witness

12   is the child.  And if it's okay with the Court, I would like

13   to kind of pick her up at the door and walk her in --

14             THE COURT:  Sure.

15             MS. KOROBOV:  -- if that's okay, and then to walk

16   her out at the end, just for closure for her sake.  I think --

17             THE COURT:  Very good.

18             MS. KOROBOV:  Thank you.

19             (Jury in at 9:19.)

20             THE COURT:  Good morning, ladies and gentlemen.  I'm

21   glad that you all made it in safely.  We are on the record.

22   This is the United States of America versus Ali Al-Awadi.

23   And, Ms. Korobov, you may call your first witness of the day.

24             MS. KOROBOV:  Thank you.  The government calls

25   M.R.

235

```
1           THE COURT:  I need you to come right over here.
2    Okay.  M.R., I need you to remain standing.  M.R., I need you
3    to keep standing.  I'm going to stand up also so I can see
4    you.  I want you to raise your right hand and face me.
5               (The witness is sworn.)
6           THE COURT:  You may have a seat.
7           And, Ms. Korobov, you may examine your witness.
8           MS. KOROBOV:  Thank you.
9               M.R., PLAINTIFF'S WITNESS, SWORN
10                  DIRECT EXAMINATION
11   BY MS. KOROBOV:
12   Q.  Good morning, M.R.
13   A.  Good morning.
14   Q.  How are you doing?
15   A.  Good.
16   Q.  Good.  Can you please tell the jury what your name is?
17   A.  My name is M.R.
18   Q.  And, M.R., what's your last name?
19   A.  M.R.
20   Q.  And, M.R., how old are you?
21   A.  Six.
22   Q.  When is your birthday?
23   A.  ████████████.
24   Q.  M.R., do you go to school?
25   A.  Yes.
```

1  Q.  Where do you go to school?

2  A.  Spring Mill.

3  Q.  And what grade are you in?

4  A.  Kindergarten.

5  Q.  Kindergarten.  Who is your teacher there?

6  A.  Ms. Moore and Ms. Klaus.

7  Q.  You have two of them?

8  A.  Yes.

9  Q.  Yeah.  And who is your favorite of the two?

10  A.  Ms. Moore.

11  Q.  Ms. Moore?  Okay.  What's your favorite thing to do at

12  school?

13  A.  Recess.

14  Q.  Recess.  Okay.  M.R., do you live with your parents?

15  A.  Yes.

16  Q.  And what's your mom's name?

17  A.  Georgie.

18  Q.  Georgie?  Okay.  And who else lives in your home with you

19  and your mom and your dad?

20  A.  G.F., Teetsy, H.LNU.

21  Q.  So who is G.F.?

22  A.  My cousin.

23  Q.  And who is Teetsy?

24  A.  My aunt.

25  Q.  And who is H.LNU?

1  A.  My cousin.

2  Q.  And do you have a little sister?

3  A.  Yes.

4  Q.  What's her name?

5  A.  E.R.

6  Q.  How old is E.R.?

7  A.  Two.

8  Q.  Two?  Okay.  So are you the big sister, then?

9  A.  Yes.

10  Q.  How old is G.F.?

11  A.  She's 11.

12  Q.  Okay.  All right.  M.R., do you have any pets that live in

13  your home, too?

14  A.  Yes.

15  Q.  Okay.  What kind of pets do you have?

16  A.  A dog.

17  Q.  A dog.  All right.

18        MS. KOROBOV:  I'm going to ask to display

19  Government's 77, please.

20  BY MS. KOROBOV:

21  Q.  M.R., will you look at the TV screen that's right there?

22  Who is that in that picture?

23  A.  Me.

24  Q.  That's you?  Okay.  And do you remember where you are in

25  that picture?

1  A.  Yes.

2  Q.  Where are you?

3  A.  In the hospital.

4  Q.  In the hospital?  Okay.

5          MS. KOROBOV:  Could we display Government's 70 -- or

6  17 alongside it, please.

7  BY MS. KOROBOV:

8  Q.  And what's that?

9  A.  My bracelet.

10  Q.  Your bracelet?  Where did you wear that bracelet?

11  A.  At the hospital.

12  Q.  In the hospital, okay.  Do you remember why it is you went

13  to the hospital?

14  A.  Because Mr. Ali touched me in the privacy.

15  Q.  Okay.  And do you remember who brought you to the

16  hospital, M.R.?

17  A.  My mom.

18  Q.  Okay.  And do you remember, M.R., where you were when

19  Mr. Ali touched you in the privacy?

20  A.  Yes.

21  Q.  Where were you?

22  A.  I was in the big kids' room.

23  Q.  Okay.  And what were you doing when Mr. Ali touched you in

24  the privacy?

25  A.  I wasn't really feeling good, but I was sleeping.

1  Q.  Okay.

2  A.  And then, when my other teacher came, she said, "Why are

3  you awake?"  And I said, "Because Mr. Ali touched me in the

4  privacy."

5  Q.  Okay.  M.R., what do you use your privacy for?

6  A.  To go to the restroom.

7          MS. KOROBOV:  Okay.  I don't have any other

8  questions, M.R.  I'm going to let Mr. Thomas ask you some

9  questions.  Is that okay?

10          THE WITNESS:  Yes.

11          MS. KOROBOV:  Okay.  Thank you, M.R.

12                    **CROSS EXAMINATION**

13  BY MR. THOMAS:

14  Q.  Good morning, M.R.

15  A.  Good morning.

16  Q.  M.R., how long have you lived on -- where you live now?

17  A.  I don't know.

18  Q.  And you said that your mom and dad live there with you?

19  A.  Yes.

20  Q.  Your little sister?

21  A.  Yes.

22  Q.  And your aunt?

23  A.  Yes.

24  Q.  And your cousin?

25  A.  Yes.

1   Q.  Have they always lived with you?

2   A.  Yeah.

3   Q.  Yeah?  When you were going to school at -- where Mr. Ali

4   was, did they live with you then?

5   A.  No.  No.

6   Q.  No?  Have you ever had a sister named G.F.?

7   A.  No.

8   Q.  No?  Your cousin, G.F., lives with you now?

9   A.  Yes.

10  Q.  But she didn't live with you back then?

11  A.  No.

12  Q.  Okay.  M.R., do you remember who else was in the classroom

13  with you when you were touched?

14  A.  No.

15  Q.  Do you remember Mr. Ali taking your picture?

16  A.  No.

17  Q.  Did he ever ask you to pose for a picture?

18  A.  No.

19  Q.  Did he ever ask you to sit in a certain way or let him

20  take pictures of you?

21  A.  No.

22  Q.  Did you ever see that happen?

23  A.  No.

24  Q.  Did you see Mr. Ali touch you?

25  A.  No.

1  Q.  How do you know that he did?

2  A.  I just -- actually, I did feel him, but -- and I didn't

3  know what to say.  And I just woke up, and then my other

4  teacher came in.  Then I just saw him walk out.

5  Q.  Okay.

6  A.  And then he came back and then we was hugging about what

7  happened.

8  Q.  Okay.  When you woke up, was he touching your underwear?

9  A.  Yes.

10  Q.  Had you been -- had you been hurting that day?

11  A.  Yes.

12  Q.  Had you been hurting for a while that way before?

13  A.  Uh-huh.  Yes.

14  Q.  Did you ever talk to your mommy before about it hurting

15  that way?

16  A.  Yes.

17  Q.  Did she ever give you medicine for that?

18  A.  No.

19  Q.  No?  What about your dad?  Did he ever give you medicine?

20  A.  No.

21  Q.  Do you know why it was hurting?

22  A.  Because he put his whole finger in it.

23  Q.  Okay.  But was it hurting before that?

24  A.  No.

25  Q.  You don't remember telling Ms. Graham that morning that it

*M.R. - CROSS/THOMAS*                242

1  hurt?

2  A.  Yes.

3  Q.  Do you remember that?

4  A.  Yeah.

5  Q.  Do you remember talking to your mommy about the bubble

6  bath making it hurt?

7  A.  Yes.

8  Q.  When did you -- when did you and Mommy talk about that?

9  A.  When I first came to the hospital.

10  Q.  Do you remember talking to your teachers about that, too?

11  A.  Yes.

12  Q.  Did you talk to your mommy about the bubble bath before

13  you talked to your teachers?

14  A.  Yes.

15  Q.  It was before that day, wasn't it?

16  A.  Yes.

17  Q.  Do you remember talking to a lady the day after this

18  happened?  You went in a little room and sat in a chair with

19  toys and she asked you questions.  Do you remember that?

20  A.  Yeah.

21  Q.  Do you remember telling her about a dream that you had

22  had?

23  A.  Yes.

24  Q.  What was that dream?

25  A.  I forgot, but I know that I told her.

*M.R. - CROSS/THOMAS*                    243

1    Q.  Okay.  How do you know that you told her?

2    A.  Because I was telling her.  And she asked me why.  And

3    I -- and I said it was like a bad dream.

4    Q.  Okay.  Have you talked to some people about what you were

5    going to say here today and how you were going to testify?

6    A.  Yes.

7    Q.  And did they talk to you about what you had said to the

8    lady in the room?

9    A.  Yes.

10   Q.  Remind you what you had said?

11   A.  Yes.

12   Q.  Do you remember having that bad dream?

13   A.  No.

14   Q.  Do you remember telling the lady that Ms. Anna had touched

15   you?

16   A.  No.

17   Q.  You don't remember that?

18   A.  No.

19   Q.  Do you know Ms. Anna?

20   A.  Not anymore.

21   Q.  No?  But you did know Ms. Anna?

22   A.  Yeah.

23   Q.  Did you like her?

24   A.  Yeah.

25   Q.  If you remember, M.R., how long had you been sleeping when

1  you woke up with Mr. Ali?

2  A.  Like only one time.

3  Q.  Okay.  And you don't remember who else was there?

4          MS. KOROBOV:  Objection, asked and answered.

5          THE COURT:  Sustained.  Next question.

6  BY MR. THOMAS:

7  Q.  Do you remember how you were sleeping, how you were

8  laying?

9  A.  I was laying like this, but I thought he couldn't touch

10  me.  So I was still staying like this, but he still touched

11  me.

12  Q.  And, I'm sorry.  What do you mean when you say, "laying

13  like this"?

14  A.  I was laying my feet -- I was laying with my feet up.

15  Q.  Okay.  And why were -- is that how you would normally lay

16  for your nap?

17  A.  Yes.

18  Q.  Okay.  So if it's me -- if I may, Your Honor.  If it's me

19  and I'm laying down, I put my knees like that, that's how you

20  remember laying?

21  A.  Yes.

22  Q.  Okay.  Do you remember telling Mr. Ali that you were

23  hurting?

24  A.  Yes.

25  Q.  Was that before you remember him touching you?

1  A.  Yes.

2  Q.  What's the first thing you remember when you woke up?

3  A.  That I feeled his finger.

4  Q.  Okay.  Did you remember Mr. Ali saying anything to you?

5  A.  No.

6          MR. THOMAS:  That's all the questions I have for

7  you.  Thanks very much.

8          THE WITNESS:  You're welcome.

9          THE COURT:  Do you have any redirect?

10         MS. KOROBOV:  No, Your Honor.  We're finished with

11 this witness.

12         THE COURT:  All right.

13         MS. KOROBOV:  May I walk her out, please?

14         THE COURT:  You may.  Thank you, M.R.  You may be

15 excused.

16         MS. KOROBOV:  Do you want to come with me, M.R.?

17         (Witness excused.)

18         MS. KOROBOV:  The government is going to call

19 Detective Eli McAllister.

20         THE COURT:  Okay.  All right.  Detective, as soon as

21 they get the chair switched, you may come up to the witness

22 stand.

23         Raise your right hand.

24         (The witness is sworn.)

25         THE COURT:  You may have a seat.

1          (Off the record.)

2          THE COURT:  All right.  The witness has been sworn

3   and you may examine the witness.

4          **ELI McALLISTER, PLAINTIFF'S WITNESS, SWORN**

5                    **DIRECT EXAMINATION**

6   BY MS. KOROBOV:

7   Q.  Are you the same Detective Sergeant Eli McAllister who has

8   previously testified in this matter?

9   A.  Yes, ma'am.

10  Q.  And I want to talk to you a little bit about preparing

11  M.R. for trial.

12  A.  Yes.

13  Q.  Were you present during all times that we prepared her to

14  walk into this courtroom and give testimony?

15  A.  I was.

16  Q.  Okay.  And can you tell the jury a little bit about

17  approximately how long ago the first time was that I met with

18  M.R. and you met with M.R.?

19  A.  I believe it was before Christmas.  I don't remember the

20  exact date.

21  Q.  And do you remember where we met?

22  A.  The first time we met was at the office of -- at your

23  office, at the U.S. Attorney's office, just a couple of blocks

24  away.

25  Q.  Did we talk at all about the facts of the case?

1  A.  No, not at all.

2  Q.  What did we do?

3  A.  Well, we just sat with her to build rapport, to let her

4  get to know us.  I sat on the ground and drew on the coffee

5  table next to her, I drew an airplane, I think.  We just

6  talked to her.

7  Q.  For the record, I am not as skilled a drawer as you; is

8  that correct?

9  A.  No.  I'm a better drawer --

10 Q.  And you --

11 A.  -- artist, I don't know.  Whatever it is.

12 Q.  And do you also recall the next meeting that we had with

13 M.R.?

14 A.  I do.

15 Q.  And can you tell the jury where that meeting occurred?

16 A.  At her family's home.

17 Q.  Okay.  And who went to that meeting, if you remember?

18 A.  You were there, I was there, Mr. Shepard was there.  And

19 Ms. Lloyd, the victim advocate for the U.S. Attorney's office,

20 was also present, along with M.R.  And her little sister was

21 there and her parents.

22 Q.  Just a little bit about M.R.'s living arrangement.  Does

23 she have family that lives, like, physically close to where it

24 is that M.R. currently lives?

25 A.  Yeah.  My understanding is that they have two condos that

1  are adjacent to one other, or two townhouses next to one

2  another.  And part of the family lives in one, part of the

3  family lives in the other.

4  Q.  When we went to the house that day, did we discuss the

5  facts of the case on that evening?

6  A.  Our intention was to bring up the facts of the case and

7  see if she would talk about them.

8  Q.  Okay.

9  A.  But, ultimately --

10  Q.  And how did she respond?

11  A.  So we weren't entirely sure the best way to broach the

12  subject.  It had been quite some time, and it was not a fun

13  thing for her to talk about.  So we thought one of the easiest

14  ways might be to show her a photograph of Mr. Ali Al-Awadi and

15  see if she could talk about him from there.

16  Q.  What did she do?

17  A.  She said that she didn't know who he was.

18  Q.  And did she have a physical response to being shown that

19  photo?

20  A.  Yes.  She was clearly uncomfortable.  She looked away.

21  And then, when we tried to ask her if she knew him or who he

22  was, she would -- tucked her chin a little bit and would look

23  at me and then back to you, and then look at me again and then

24  say, no, she didn't know who he was.

25  Q.  Was M.R. holding anything at the time that we spoke to her

1  that evening?

2  A.  I think she had an American Girl doll, if I'm not

3  mistaken.

4  Q.  And do you recall whether she was holding a blanket?

5          MR. THOMAS:  I'm sorry.  About the relevance of

6  whether she was holding a blanket, Your Honor.

7          THE COURT:  I'll let her tie it up.  Do you -- even

8  if he recalls.  Do you recall whether or not she was holding a

9  blanket?

10  A.  Okay.  Yes, I remember.  So when we were asking her about

11  it, she was sitting on the couch.  And I apologize, I didn't

12  remember at first the exact circumstances, but she was sitting

13  on the couch.  She had a blanket kind of wrapped around behind

14  her.  When we showed her the photograph, she placed her hands

15  in between her -- in between her legs and covered her genital

16  area.

17          And as we continued to try to ask her if she knew

18  who he was and if she recognized him, she grabbed the blanket

19  that was behind her and grabbed it and stuffed it between her

20  legs and held it in front of her as we talked, and covered her

21  genital area.  I remember seeing that happen and then

22  mentioning it to you as we were leaving, just the physical

23  response and the body language that she displayed when we

24  brought the topic up.

25  BY MS. KOROBOV:

1  Q.  So, other than asking her if she remembered Mr. Ali or

2  remembered going to the daycare, did we discuss the facts at

3  all with her?

4  A.  No.  That was the way we were hoping to introduce the

5  subject, and she -- it was a complete dead end with her.  She

6  did not appear to want to talk about the topic.

7  Q.  When is the next time that we met with M.R.?

8  A.  I don't remember the dates.  It was probably within a

9  week.  I think it was maybe the following week we met with her

10  at the U.S. Attorney's office.

11  Q.  And who was there that time?

12  A.  Originally it was just you and I in the room with M.R.

13  Ms. Lloyd was in another room with M.R.'s parents, I believe.

14  And Mr. Shepard was running late, so he wasn't there with us.

15  Q.  Okay.  And what did we do with M.R. this time?

16  A.  We did some more rapport building, just talking to her,

17  asking how her day was, talking about the doll she had with

18  her.  I think we did some more coloring that day, as well.  A

19  dinosaur is what I drew that time.  And then --

20  Q.  Did you show anything to M.R. that time?

21  A.  Did we show her?  Yes, ma'am, we did.

22  Q.  And what did we show M.R.?

23  A.  You had a laptop with the video recording of the interview

24  that she did with Ms. Woodall on it.  And you played the video

25  recording of her interview with Ms. Woodall.

1  Q.  Okay.  Did we get through the whole video?

2  A.  No.

3  Q.  What happened?

4  A.  She began to spontaneously -- not spontaneously, but just

5  as she was watching the video, she started to say things about

6  what was being said and done on the interview -- or during the

7  video.  So when she watched herself start to talk about it,

8  she pointed to, I believe it was the hospital bracelet she was

9  wearing, and said she remembered wearing that, at which point

10  you paused the video.

11  Q.  Okay.  And did we ask her, then, questions about what it

12  is that she did remember happening?

13  A.  Yes.

14  Q.  Okay.  The next time we met with M.R., where did we meet

15  with her?

16  A.  We met at the U.S. Attorney's office again.

17  Q.  Okay.  And what do you recall happening at that meeting?

18  A.  We talked with her briefly there just to say hi.  And then

19  we walked the block and a half or two blocks here to the U.S.

20  Courthouse.

21  Q.  Okay.  And did M.R. get a tour of the courtroom?

22  A.  Yes.  We wanted to familiarize herself with -- or

23  familiarize her with the room that we were going to expect her

24  to sit in the chair and talk to strangers about this incident.

25  So we had her sit in that same gray chair, whatever color it

1  is, and you stood back there and asked her questions like how

2  old she was and what her favorite color was and what games she

3  liked to play, things like that.

4  Q.  Did we ask her anything about the facts of the case?

5  A.  No, you didn't ask her anything about what happened.

6  Q.  Okay.  And did I let M.R. ask me questions, too?

7  A.  Yes.  I believe you sat up here and she asked you

8  questions -- or she sat up here and asked you questions.

9  Q.  Okay.

10  A.  I think she wanted to question her mother, as well, so she

11  did that.

12  Q.  Okay.  And did we do a final meeting with M.R.?

13  A.  Yes.

14  Q.  And where did that last meeting occur?

15  A.  I believe it was at your office, as well.

16  Q.  Okay.  And about in relation to the start of the trial on

17  Monday, do you recall when that meeting was?

18  A.  I've had a bit of a crazy schedule of late.  I've been

19  working some late shift hours and day shift combined, back to

20  back, so I feel like it was one of those mornings where I had

21  worked the whole night and then came in at 8:00 the next

22  morning and met with them.  I feel like it was maybe the week

23  before trial.  I'm sorry.  I really don't remember.

24  Q.  That's okay.

25  A.  Within a week of the trial.

1   Q.  Okay.  At that meeting, did we discuss the facts of the

2   case?

3   A.  Yes.

4   Q.  Okay.  And where did that discussion occur?

5   A.  Right across from Ms. Lloyd's office, there's an empty --

6   or at the time -- or that day, there was an empty intern's

7   office.  So you, M.R., and I all sat in the intern's office.

8   Q.  And was anything shown to M.R.?

9   A.  No.

10  Q.  No videos?

11  A.  No, ma'am.

12  Q.  Okay.  And we just asked her questions at that point in

13  time?

14  A.  Yes.

15  Q.  Okay.  To your knowledge or in your presence, has M.R.

16  ever been showed the complete first part of that interview?

17  A.  No.  We didn't make it through the entire interview.  When

18  she started talking and pointing to the screen and commenting

19  on what she was seeing, we paused the video.  And we never

20  revisited that or showed her the rest of the video or the

21  second recording.  And we didn't do that ever again.  We never

22  played the video again once she started talking about it.  We

23  were just trying to open the door to refresh her memory that

24  way.

25  Q.  Okay.  And did -- you said -- did we ever show her that

1  second portion --

2  A.   No.  We never got --

3  Q.   -- of the video?

4  A.   No, we never even got through the first one.  We

5  certainly didn't start the second recording, no.

6  Q.   Okay.  And just one thing.  In the one video -- or excuse

7  me, one photo, Government's Exhibit 17, the bracelet of M.R.,

8  it appears that there's a mark on her arm.  Have you seen that

9  mark on M.R.?

10 A.   Yes.  I believe it's --

11          MR. THOMAS:  Objection to relevance, Your Honor.

12          MS. KOROBOV:  I just wanted to be sure it wasn't

13 mistaken for some kind of injury.

14          MR. THOMAS:  May way approach, Your Honor?

15          THE COURT:  You may.

16          (Bench conference on the record.)

17          MR. THOMAS:  Your Honor, this is highly improper,

18 this suggestion here that there's some injury on her arm.

19          THE COURT:  I think she's trying to do --

20          MS. KOROBOV:  I want to make sure --

21          THE COURT:  -- the opposite.

22          MS. KOROBOV:  I want to make sure that no one thinks

23 that she was, like, physically assaulted.  It's a birthmark.

24 That's all I want to bring out.

25          MR. THOMAS:  Okay.

 1          THE COURT:  Yeah, because I saw it.  I noticed it,

 2   also.

 3          MR. THOMAS:  Well, just the nature of the

 4   question -- okay.  If that's what you're doing, I have no

 5   objection.

 6          THE COURT:  Okay.  All right.

 7                    (Open court.)

 8          THE COURT:  All right.  The objection is withdrawn?

 9          MR. THOMAS:  Yes, Your Honor.

10          THE COURT:  All right.  You may.

11   BY MS. KOROBOV:

12   Q.  Did M.R. have a birthmark on her arm?

13   A.  Yes.  I believe it's on the right wrist, or right -- just

14   on the outside of her arm there.

15   Q.  Okay.  And that was visible in the photo with her hospital

16   band?

17   A.  Yes.  You could see it just around or above the band.

18   Q.  Okay.  And how many years have you -- you said six and a

19   half years in childhood abuse?

20   A.  Yes.

21   Q.  Okay.  And is the preparation that we gave M.R. for the

22   courtroom -- is that something that is typically done in

23   preparing children for court?

24   A.  Yes, it's common.  I've shown children videos of their

25   interviews before, because particularly if you have a young

1  child.  It's been a long time, and they were quite young when

2  it happened, so it's not uncommon for them to forget or put it

3  out of their memory.

4         MS. KOROBOV:  Okay.  Thank you very much.  I pass

5  the witness.

6         THE COURT:  You may cross.

7         MR. THOMAS:  Thank you, Your Honor.

8                         **CROSS EXAMINATION**

9  BY MR. THOMAS:

10  Q.  So you met with M.R. five times to prepare?

11  A.  Probably.  I think that's it.  I wasn't counting as we

12  went through them.

13  Q.  And you didn't show her the video about the dream?

14  A.  No.

15  Q.  Did you talk to her about it?

16  A.  No, I don't believe we talked to her about it when --

17  Q.  Well, she seemed to remember that you did.

18         MS. KOROBOV:  Objection --

19         THE REPORTER:  I cannot hear you.

20         MS. KOROBOV:  Objection, Your Honor --

21         THE COURT:  I don't think you're on.

22         MS. KOROBOV:  I'm sorry.  Objection.  The question

23  has been asked and answered.  At this point, it's simply

24  argumentative.

25         THE COURT:  I'll overrule.

1   BY MR. THOMAS:

2   Q.  You were sitting here when she testified?

3   A.  Yes.

4   Q.  And you remember I asked her about the dream?

5   A.  Yes.

6   Q.  She said she didn't remember, but she knew about it?

7   A.  Yes.

8   Q.  And I said, "Was that from talking about what you said --

9   what you had said?"  And she said, "Yes."  Do you remember

10  that?

11  A.  Yes, I think so.

12  Q.  And I asked her about whether she had been -- remembered

13  what she said in the interview, and she said she didn't,

14  right?

15  A.  Yes.

16  Q.  That she had gone over it and now knew about it, right?

17  A.  She didn't say she had gone over it.

18  Q.  Well, you made her familiar with what she had said by

19  showing her the video and then talking to her about what she

20  had said, right?

21  A.  Yes, sir, when she started pointing to the screen and

22  discussing her memory of the wrist band.

23  Q.  In that -- it was the second meeting when you showed her

24  the picture of Mr. Al-Awadi, or the first meeting?

25  A.  It was the second, the one in her home.

1  Q.  Okay.  And she told you that she didn't recognize him, or

2  said she didn't know who it was?

3  A.  Yeah.  It was a photograph --

4  Q.  It's a yes or no.

5  A.  Yeah, she said that she didn't know who he was.

6  Q.  Okay.  And did you ever -- who was present for that

7  meeting?

8  A.  I was there, Mr. Shepard was there, Ms. Korobov was there,

9  and Ms. Lloyd was there.  M.R.'s parents were upstairs with

10  her -- her little sister.

11          MR. THOMAS:  May we approach, Your Honor?

12          THE COURT:  You may.

13          (Bench conference on the record.)

14          MR. THOMAS:  Your Honor, I think this is *Brady*

15  material, and I don't think it was ever revealed that they had

16  the meeting, and that at the meeting she could not identify my

17  client.  That should have been turned over to me prior to

18  trial as *Brady*, and it was not.

19          MS. KOROBOV:  Judge, I don't consider it to be *Brady*

20  material.  It's a photo actually of the two of them together.

21  We can elicit some more testimony, but that's simply what she

22  said.

23          THE COURT:  Is it the photograph that's in the

24  exhibit binder?

25          MS. KOROBOV:  Yes.

1          THE COURT:  Had you seen that before?

2          MR. THOMAS:  I've seen the photo.  I was not told

3    that the victim did not recognize my client.  And I don't

4    think it's up to her to decide what *Brady* material is, Your

5    Honor, but, clearly, if they've interviewed their witness

6    again and the witness says, "I don't recognize that person,"

7    that's information that needs to be disclosed prior to trial.

8          THE COURT:  Okay.

9          MS. KOROBOV:  This isn't a case where it's a

10   stranger identification.  Who Mr. Ali is and who his presence

11   is in the classroom has never been in question.  There's never

12   been -- this isn't an issue like it's a bank robbery where a

13   witness identified him for a brief second.  This is who this

14   person is in her classroom.

15          So we just didn't think that it had anything --

16   didn't see it as -- it didn't make it more or less likely that

17   the defendant produced an image of M.R. and used her to

18   produce an image of her engaging in sexually explicit conduct.

19          THE COURT:  All right.  So what are you asking for?

20   Are you saying that it's a mistrial because of a *Brady*

21   violation?

22          MR. THOMAS:  Your Honor, we're not talking about

23   identity.  We're talking about the memory of their witness.

24   And today the witness comes in and identifies him, and that's

25   fine --

1      MS. KOROBOV:  The witness didn't identify him.  I

2 never asked her to identify him.

3      THE COURT:  Yeah, she didn't identify him today.

4      MR. THOMAS:  Well, fair enough.  The witness --

5      THE COURT:  She just said, "Mr. Ali."

6      MR. THOMAS:  Right.  The witness testified,

7 presumably from her memory, about Mr. Ali, and at a point in

8 the middle couldn't identify him in a picture.  I think that

9 is evidence that we need to know, about the memory of the

10 witness, in order to properly cross-examine her about what she

11 remembered then, what she's been told now, particularly

12 meeting with the government five times to prepare for her

13 testimony to tell us that, well, at one point when we talked

14 to her we couldn't even -- she couldn't even identify him.

15      THE COURT:  Well, Counsel, you've got the

16 information.  You've cross-examined -- I mean, you're

17 cross-examining the detective on it.  The child is six years

18 old, so you can't really get much cross out of her.  I don't

19 think it rises to the level of a mistrial if, in fact, it were

20 a *Brady* violation.  But I'll take your motion for mistrial

21 under advisement.  Go ahead and finish examination of the

22 witness, and we'll talk about it during the recess.

23      MR. THOMAS:  Thank you, Your Honor.

24      THE COURT:  Okay.

25                    (Open court.)

1            THE COURT:  All right.  You may continue.

2    BY MR. THOMAS:

3    Q.  After that fifth meeting with M.R., did you have any other

4    contact with her, as far as preparation?

5    A.  No, no preparation.

6    Q.  Any other contact with her?

7    A.  Yes.

8    Q.  What was that?

9    A.  This morning.  I walked into the witness room and said hi

10   to her.

11   Q.  Do you know if -- were you present for -- you were present

12   for five meetings to prepare her for trial.  Are you aware of

13   any other meetings that were had when you weren't there?

14   A.  No.  It was always a very clear point that I had to be

15   present for all of those meetings.

16   Q.  You don't know why she remembers talking to you about the

17   dream, because you didn't talk to her, right?

18   A.  No.  We never discussed the dream.

19            MR. THOMAS:  All righty.  That's all I have.

20            THE COURT:  Any redirect?

21                    **REDIRECT EXAMINATION**

22   BY MS. KOROBOV:

23   Q.  Detective Sergeant, I ask you to look in the binder at

24   Government's Exhibit 3, please.

25   A.  Yes, ma'am.

1  Q.  Do you recognize Government's Exhibit 3?

2  A.  Absolutely.

3  Q.  How do you recognize it?

4  A.  It's one of the photographs that we recovered from the

5  cell phone of Mr. Al-Awadi during Detective Melton's forensic

6  exam of the phone.

7  Q.  Okay.  And is Government's Exhibit 3 the photo -- the

8  photo that we showed to M.R. to see if she recognized anyone

9  in it?

10  A.  Yes.

11  Q.  Okay.  Is -- who else is in that photo?

12  A.  M.R.

13  Q.  Okay.  Did M.R. recognize herself in the photo?

14  A.  Yes.

15          MS. KOROBOV:  Nothing further.

16          THE COURT:  Okay.  Any questions on those?

17          MR. THOMAS:  No questions, Your Honor.

18          THE COURT:  All right.  Thank you.  You may return

19  to your seat.

20          THE WITNESS:  Thank you.

21          (Witness excused.)

22                          * * *

23                        EXCERPT

24                          * * *

25          THE COURT:  Is this your next witness?

1          MR. SHEPARD:  It is, Your Honor.

2          THE COURT:  All right.  Are you ready for the jury?

3          MR. SHEPARD:  We have one fast question beforehand.

4 Do you want us to have another witness available before the

5 lunch break?  We can call her here if you do.  I just didn't

6 know how long you wanted to -- wanted us to go.

7          THE COURT:  It's up to you.  You know, we took an

8 hour for lunch, and it's not raining now, so maybe we could --

9          MS. KOROBOV:  The witness, Your Honor, is Shea

10 Hayes-Anderson from the crime lab, so she would be probably a

11 lengthy witness, too.  So, I mean, I can have her here if the

12 Court would like, but --

13          THE COURT:  No.  That's fine.  It's 11:30.  We'll do

14 this witness and then we'll go to lunch.

15          MS. KOROBOV:  Thank you.

16          MR. SHEPARD:  Thank you, Your Honor.

17          THE COURT:  We'll just have a long afternoon.  Okay.

18          MR. SHEPARD:  And we are ready for the -- the

19 government is ready for the jury, Your Honor.

20          THE COURT:  Mr. Thomas, are you ready for the jury?

21          MR. THOMAS:  I am ready, Your Honor.

22          THE COURT:  You may bring in the panel, Tanesa.

23          (Jury in at 11:33.)

24          THE COURT:  Witness, if you would remain standing

25 and raise your right hand.

1     (The witness is sworn.)

2     THE COURT:  You may have a seat.

3     And as soon as he's comfortable, you may examine

4  your witness.

5     MR. SHEPARD:  Thank you, Your Honor.

6     **GRANT MELTON, PLAINTIFF'S WITNESS, SWORN**

7     <u>**DIRECT EXAMINATION**</u>

8  BY MR. SHEPARD:

9  Q.  Detective, could you please state your full name and spell

10  your last name for the record?

11  A.  Grant Melton, M-E-L-T-O-N.

12  Q.  And what do you do for a living?

13  A.  I'm a digital forensic examiner for the Indianapolis

14  Metropolitan Police Department.

15  Q.  How long have you held that position?

16  A.  I've been a police officer for 14 years.  I've been a

17  digital forensic examiner since May of 2013, for almost three

18  years now.

19  Q.  What does it mean to be a digital forensic examiner?

20  A.  I examine digital devices or electronic storage devices,

21  such as computers, cell phones, tablets, any kind of digital

22  storage device, pretty much, for investigators.  I do

23  case-specific requests, searches for digital evidence.

24  Q.  And have you had any training in this area?

25  A.  Yes.

1   Q.  Approximately how many hours of training?

2   A.  I've had about 500 hours of formal classroom training.

3   Q.  All right.  And then have you had kind of on-the-job

4   training and experience?

5   A.  On-the-job training, yes.

6   Q.  All right.  Did those training classes include classes in

7   cell phones and smartphones specifically?

8   A.  Yes.

9   Q.  Including a basic cell phone investigation course in

10  September of 2014?

11  A.  Yes.

12  Q.  A cell phone interrogation course in October of 2014?

13  A.  Yes.

14  Q.  And advanced smartphone forensics in November of 2014?

15  A.  Yes.

16  Q.  As well as a number of other courses just about general

17  computer forensics; is that a fair statement?

18  A.  Yes, sir.

19  Q.  Have you ever examined any cell phones or smart phones?

20  A.  Yes.

21  Q.  About how many?

22  A.  Over 500.

23  Q.  I ask you to turn around to the box and find something

24  with a sticker on it, Exhibit 27.

25  A.  Okay.

1  Q.  Do you recognize Exhibit 27?

2  A.  Yes.

3  Q.  What is it?

4  A.  This is a cell phone that I examined in 2014.

5  Q.  How do you know that that's the same cell phone?

6  A.  At the time -- at the time of my examination, I documented

7  the serial number, which matches the serial number on this

8  device, as well as the packaging.  It contains evidence tape

9  that I placed on the package.  And I wrote my police

10 department identification number and the date that I sealed

11 it.

12 Q.  And when you received it, you noted the serial number.

13 What then did you do with the cell phone?

14 A.  I first received this in August of 2014.  I -- I reviewed

15 the documentation that the detective provided with the legal

16 authority to do an examination, and I documented with

17 photographs.  At that time, I learned that the device was

18 locked with a pass code that I couldn't, at that time, get

19 past.  I then examined it again in December of 2014.

20 Q.  And was it in your custody and control while you were

21 waiting for the ability to open the phone?

22 A.  Yes.

23 Q.  All right.  And what's an image in your line of work?

24 A.  An image is -- we refer to -- I'm not sure --

25 Q.  When you receive -- what is the first thing you did after

1  you unlocked the phone?

2  A.  We don't -- in digital forensics, we try to make -- and I

3  believe what we're referring to here is the image.  I imaged

4  the phone, so I make a copy of the information on the phone,

5  and that's then a working copy.  So the examination I'm doing

6  is on the evidence that's -- or the data that's copied from

7  the device, or we call that a physical image of the device.

8  Q.  Then, after you obtained the physical image, what did you

9  do with the unit, with the hardware unit?

10 A.  After I did that, I sealed it back in its envelope.

11 Q.  Okay.  And then did it eventually make its way back to the

12 property room?

13 A.  Yes.

14 Q.  In all of your examinations, did that come off -- did you

15 pull that back out and do your examinations or did you work

16 off your physical image?

17 A.  I worked off the physical image.

18 Q.  Okay.  And is that standard operating procedure in the

19 field of digital forensics?

20 A.  Yes, it is.

21         MR. SHEPARD:  Your Honor, I move for the admission

22 of Government's Exhibit 27 at this time.

23         MR. THOMAS:  Preliminary question if I could, Your

24 Honor.

25         THE COURT:  You may.

*MELTON - DIRECT/SHEPARD*                268

1  BY MR. THOMAS:

2  Q.  The item was in your control from the time you received --

3  well, let me ask you this first.  Who did you receive it from?

4  A.  Detective McAllister.

5  Q.  And in what manner?  Hand to hand or --

6  A.  I believe it was hand to hand, yes.

7  Q.  And it remained in your custody while you did your

8  examination?

9  A.  It was secured in my office, yes.

10  Q.  And what did you do with it when you were finished?

11  A.  After the conclusion of my examination?

12  Q.  Yeah.

13  A.  I returned it to Detective McAllister.

14       MR. THOMAS:  I would have no objection at this point

15  to Government's 27.

16       THE COURT:  Government's Exhibit 27 is admitted into

17  evidence without objection.

18                    *(Government's Exhibit 27 was*

19                    *received in evidence.)*

20  BY MR. SHEPARD:

21  Q.  Can you talk just generally about -- well, did you examine

22  Government's 27?

23  A.  Yes.

24  Q.  Did you find anything on it that was of evidentiary value

25  for the case?

1  A.  Yes.

2  Q.  What did you find?

3  A.  I found some images that were of interest, as well as some

4  artifacts related to some file names, some file paths, as well

5  some items indicating who the user of the phone was.

6  Q.  Okay.  Let's just talk about, before we get to the

7  specific things that you found, computers and cell phones in

8  general.  How are they similar?

9  A.  They're similar in that today's smart phones -- like your

10  Androids, your Apple iPhones, Windows, and BlackBerry

11  phones -- those are very much just small computers.  They have

12  all -- or almost all the functionality that any home computer

13  would have.

14  Q.  All right.  And so they retain data?

15  A.  Yes.

16  Q.  Are there any differences between the two?

17  A.  Yes.

18  Q.  What would those be?

19  A.  Cell phones generally have very small storage capacity

20  relative to what our computers have now.  Also, the way they

21  store memory in their flash memory, the way the memory itself

22  works, is different than what we find on most of our

23  traditional mechanical hard drives.

24  Q.  Now, go ahead and can you just kind of hold up Exhibit 27

25  so that the jury can see it?  The phone itself.

1  A.  (Witness complied.)

2  Q.  And then what's on the back of it?

3  A.  On the back is a label that identifies the model and

4  serial number of the device.

5  Q.  Does it also have where the device was made?

6  A.  Yes.

7  Q.  Did you take a picture of that?

8  A.  Yes.

9  Q.  Please look in the binder behind tab 34.

10  A.  Did you say 34?

11  Q.  Yes.

12  A.  Okay.

13  Q.  Do you recognize that?

14  A.  Yes.

15  Q.  What is that?

16  A.  That's an image I took of that label.

17  Q.  Okay.  And does it correctly and accurately represent the

18  label on Exhibit 27 up there?

19  A.  Yes.

20        MR. SHEPARD:  Your Honor, I move for the admission

21  of Exhibit 34.

22        THE COURT:  Any objection?

23        MR. THOMAS:  I have no objection to 34, Your Honor.

24        THE COURT:  Government's 34 is admitted into

25  evidence without objection.

MELTON - DIRECT/SHEPARD          271

1          (Government's Exhibit 34 was

2          received in evidence.)

3          MR. SHEPARD:  Please call up 34.

4  BY MR. SHEPARD:

5  Q.  Where was the phone made?

6  A.  China.

7  Q.  Are you familiar with a concept called "attribution"?

8  A.  Yes.

9  Q.  What is attribution?

10 A.  Basically being able to attribute a specific piece of

11 property to a person.

12 Q.  Trying to find out whose phone it was?

13 A.  Yes.

14 Q.  Okay.  Did you find any evidence that allows you to

15 conclude whose phone that is?

16 A.  Yes.

17 Q.  Okay.  Were you able to determine the number on the

18 telephone?

19 A.  Yes.

20          MR. SHEPARD:  Can you please pull up Exhibit 23.

21 BY MR. SHEPARD:

22 Q.  What was the phone number on -- that you were able to

23 determine returned to that device?

24 A.  It was area code ███████████ .

25 Q.  All right.  I would ask you to look at Exhibit 23, which

1  has been previously admitted as the defendant's application

2  for employment.  Do you see in "General Information" a name

3  listed by -- or excuse me, a phone number listed by "Ali

4  Al-Awadi"?

5  A.  Yes.

6  Q.  Is that the same phone number as you found returned to the

7  device?

8  A.  Yes.

9  Q.  Were you able to find any e-mail addresses that were

10 loaded into that phone?

11 A.  Yes.

12 Q.  How many?

13 A.  There were three.

14 Q.  Okay.  And what were the three?

15 A.  There was -- there was one e-mail address,

16 ██████@hotmail.com.  That was associated with a Snapchat

17 account, as well as a Netflix account.  There was an e-mail

18 account, ██████@5linx.net.  And there was also

19 ██████@gmail.com.  That was for the Google accounts on

20 the phone.

21 Q.  I would also ask you to again look at Exhibit 23.  Do you

22 see an e-mail address listed by Mr. Al-Awadi on his

23 application for employment?

24 A.  Yes.

25 Q.  Is that one of the three you just mentioned?

1  A.  Yes, it is.

2  Q.  All right.  Were you able to recover any e-mails --

3  A.  Yes.

4  Q.  -- on the phone?  I would ask you to look in the binder

5  under -- behind tabs 35 and 36.

6  A.  Okay.

7  Q.  Do you recognize 35 and 36?

8  A.  Yes.

9  Q.  What are they?

10  A.  These are e-mails I recovered from the phone.

11  Q.  And are they -- are the printouts that are there

12  substantially accurate copies of the files you were able to

13  retrieve off the phone?

14  A.  Yes.

15         MR. SHEPARD:  Your Honor, I would move for the

16  admission of Exhibits 35 and 36.

17         THE COURT:  Any objection to 35 and 36?

18         MR. THOMAS:  Your Honor, I guess I would object to

19  35 and 36 on relevance grounds.  At this point, I don't think

20  there's an issue as to -- we haven't raised an issue about

21  ownership of the phone.  I think it's been established by

22  prior evidence that the phone number matches his and that the

23  e-mail address matches his, so I would object at this point on

24  the grounds of -- that it is -- for identification purposes,

25  it's cumulative.  As far as what's listed there or what's

 1   being discussed there, it's probably not relevant.

 2            MR. SHEPARD:  Your Honor, if he will stipulate that

 3   the phone was his client's, we'll move right on through this.

 4   Otherwise, I think we get to prove whose phone it is.

 5            THE COURT:  Did you make that stipulation?

 6            MR. THOMAS:  I was --

 7            THE COURT:  Why don't we approach.

 8            (Bench conference on the record.)

 9            MR. THOMAS:  Judge, I was actually prepared to do

10   this, just that, as he started asking those questions.  I

11   don't think that the ownership of the phone is in question, so

12   we're happy to stipulate that it was his phone.

13            MR. SHEPARD:  We accept the stipulation.

14            THE COURT:  Okay.  All right.

15                          (Open court.)

16            THE COURT:  The attorneys are going to stipulate

17   that the cell phone, which is Exhibit 37 --

18            MR. SHEPARD:  27, Your Honor.

19            THE COURT:  -- 27 did, in fact, belong to the

20   defendant Ali Al-Awadi.  Is that correct, Government?

21            MR. SHEPARD:  Yes, Your Honor.

22            THE COURT:  And is that correct, Mr. Thomas?

23            MR. THOMAS:  That is correct, Your Honor.

24            THE COURT:  All right.  You may.

25   BY MR. SHEPARD:

1  Q.  When you do examinations to help out investigations, is it

2  important for you to become aware of general facts of the

3  investigation?

4  A.  Yes.

5  Q.  Why is that?

6  A.  There is so much data.  Even though a cell phones contains

7  a lot less than a computer, there's still a considerable

8  amount of data that can be there.  So what we have to do is do

9  a -- basically, we're trying to answer case-specific

10  questions.  I need to learn information about the case to know

11  what type of information I might need to look for on a

12  specific device.

13          THE COURT:  Mr. Shepard, for the record, are you

14  going to withdraw Government's Exhibits 35 and 36 in lieu of

15  the stipulation?

16          MR. SHEPARD:  Yes, Your Honor.

17          THE COURT:  All right.  Those two are withdrawn.

18          MR. SHEPARD:  Thank you, Your Honor.

19  BY MR. SHEPARD:

20  Q.  And did you as to some of the general facts of this

21  investigation?

22  A.  Yes.

23  Q.  Were one of those facts the investigator's belief of when

24  the incident occurred?

25  A.  Yes.

1  Q.  And what was that?

2  A.  That was August 21st of 2014, roughly between 12:30 and

3  1:30 p.m.

4  Q.  And did you begin to search for evidence in this case?

5  A.  Yes.

6  Q.  How did you go about doing that?

7  A.  Well, I reviewed -- once I have that image, I use analysis

8  software that decodes the information for me.  And essentially

9  I'll look at different types of information:  The text

10  messages, browsing history, photographs, that kind of

11  information, to see if there's anything that was related to

12  the investigation.

13  Q.  I would ask you to look at -- behind tab number 37.

14  A.  Okay.

15  Q.  What is 37?

16  A.  37 is a report that I created containing information about

17  files that had at one time resided on the device.

18  Q.  And is that an accurate summary of the data that was

19  produced from your equipment and what you analyzed?

20  A.  Yes, it is.

21  Q.  And will the chart that you created help explain your

22  testimony to the jury?

23  A.  Yes.

24          MR. SHEPARD:  Your Honor, I would move for the

25  admission of Exhibit 37.

1        THE COURT:  Any objection to 37?

2        MR. THOMAS:  I have no objection to 37.

3        THE COURT:  Government's Exhibit 37 is admitted into

4   evidence without objection.

5                        *(Government's Exhibit 37 was*

6                        *received in evidence.)*

7        MR. SHEPARD:  Please display Exhibit 37.  If you

8   could magnify.

9   BY MR. SHEPARD:

10  Q.  Detective, what are we seeing here?

11  A.  On the -- this is, again, the report that I generated as

12  part of my examination.  The column that says "File Info" at

13  the top, in the gray header, that column -- each one of those

14  rows contains information about files that had at one time

15  resided on the phone.

16       The "Name" field is consistent with what we call a

17  naming convention.  It's consistent with the way photographs

18  on this phone are named.  You have the 20140821.  That's the

19  four digit year, two digit month, and two digit date.  And

20  then the underscore is the hours, minutes, and seconds.  So

21  132313 equates to 1:23:13 p.m.  And then the .jpg indicates

22  that it was an image.

23       Below that, you have "Path," the, "Root/media/0."

24  That identifies the item that I was examining.  The "DCIM" and

25  "Camera," those are directories that would be the default

1  location for images that were taken with this device.  And

2  then, again, you have that file name.

3  Q.  Okay.  And you meant camera as the default for images

4  taken by the device.  Does that tell you that the file

5  20140821_132313.jpg was created by that device?

6  A.  That's where I would expect to find -- the DCIM directory

7  and then the camera sub directory is where I would expect to

8  find images that were taken.  It would be the default location

9  for images taken by that device.

10 Q.  And it would have a file path just like what you talked

11 about?

12 A.  Yes.

13 Q.  There's a column over here, "Delete."  What's that mean?

14 A.  That means the image itself, that it was referring to, was

15 deleted.

16 Q.  So the image associated with that JPEG file had been

17 deleted by the time you received the phone?

18 A.  Yes.

19 Q.  What about number two?

20 A.  Two?  Again, it's located in the same location.  This one

21 has a file name that indicates it was an image that was taken

22 on August 21st, 2014, at 1:23:19 p.m.

23 Q.  And was it also deleted?

24 A.  Yes.

25 Q.  Number three?

1  A.  Again, in the same location.  It's a file that was taken

2  August 21st, 2014, at 1:25:55 p.m.

3  Q.  And was it deleted?

4  A.  Yes.

5  Q.  And number four?

6  A.  That was also in the same location.  That's a file taken

7  on August 21st, 2014, at 1:26:01 in the afternoon.

8  Q.  And was it deleted?

9  A.  Yes.

10 Q.  Throughout the course of your examination, did you find

11 any other image files, either deleted or nondeleted, that were

12 created between that 12:30 p.m. and 1:30 p.m. time frame?

13 A.  No.

14 Q.  Is there any way to tell, based upon the information that

15 you recovered, when these four files were deleted?

16 A.  No.

17 Q.  Is that common?  Uncommon?

18 A.  Yes.  Once an image is deleted, or once any file is

19 deleted, it's difficult to tell when exactly it was deleted.

20 Q.  I'm going to ask you to look at Exhibits 7, 8, 9, and

21 10 -- or proposed Exhibits 7, 8, 9, and 10 in the binder.

22 A.  Okay.

23 Q.  Do you recognize those?

24 A.  Yes.

25 Q.  What are they?

1  A.  Those are images that I recovered from the device.

2  Q.  Are the print-offs accurate copies of the files which were

3  found by your software?

4  A.  Yes, they were.

5          MR. SHEPARD:  And I would move for the admission of

6  7, 8, 9, and 10, Your Honor.

7          MR. THOMAS:  Preliminary question, if I could.

8          THE COURT:  You may.

9          MR. THOMAS:  Well, first, Your Honor, can I look at

10 the exhibits?

11         THE COURT:  At the exhibits?  You may.

12         MR. THOMAS:  And if I could ask a preliminary

13 question, Your Honor.

14         THE COURT:  You may.

15 BY MR. THOMAS:

16 Q.  Did you enhance those photographs or enlarge or do

17 anything to them in that -- along those lines?

18 A.  The original images were small.  I did increase the size

19 and then take a screen shot of the image.

20 Q.  Okay.  Explain that to me.  So these are essentially a

21 photograph of a photograph?

22 A.  Yes.

23 Q.  What kind of device did you take the photographs with?

24 A.  Using a computer.  So the original images that I was able

25 to recover are small representations of an original image.  So

1  the original image, as it would appear in digital format,

2  would be very small.  The analysis software that I used in

3  examining the phone allows an opportunity to zoom in.

4          I zoomed it in and then I used a screen shot

5  software that's included in Microsoft Windows to take a screen

6  shot of the image for better presentation of my report, so for

7  the recipient of my report to be able to view the image better

8  than a very small thumbnail image.

9  Q.  What dictates the size of the original image?

10 A.  What --

11 Q.  Well, I mean, are they all the same size or were these

12 particularly smaller or --

13 A.  They were different sizes.  So the way this -- I think

14 we -- you have an original image, and then these images that I

15 was able to recover are thumbnails of the original image.  I

16 wasn't able to recover the original image, so these are

17 smaller representations of another image already, kind of like

18 if you're looking at --

19          MR. SHEPARD:  Your Honor, does he have an objection

20 or is he doing his cross?

21          MR. THOMAS:  I'm waiting to hear the answer, Your

22 Honor.

23          MR. SHEPARD:  The witness has testified that it's an

24 accurate copy of the data he recovered.

25          THE COURT:  Of the thumbnail.  Do you have an

1  objection?

2  BY MR. THOMAS:

3  Q.  Well, is it a reproduction or a photograph of a

4  photograph?

5  A.  Well, this is a print-off --

6          MR. SHEPARD:  The evidence -- the Rules of Evidence

7  make no difference, Your Honor.

8          THE COURT:  Let him ask his question.

9  A.  This is a print-off.  So the original image that was

10  recovered from the device was zoomed in.  An image was

11  captured of that.  And I believe this is a print-off of that

12  image.

13          MR. THOMAS:  No objection.

14          MR. SHEPARD:  Thank you, Your Honor.

15          THE COURT:  Government's Exhibits 7, 8, 9, and 10

16  are admitted into evidence without objection.

17                          (Government's Exhibits 7 - 10 were

18                           received in evidence.)

19  BY MR. SHEPARD:

20  Q.  Do you recall the file names of 7, 8, 9, and 10?

21  A.  Yes.

22  Q.  What were they?

23  A.  Where they resided, the file name was actually "imgcache,"

24  that's I-M-G-C-A-C-H-E, ".0."  And then my analysis software,

25  the way it processes the image cache, appends an underscore,

1  embedded underscore, 329, 330, 331, and 332 for these photos.

2  Q.  Okay.  And so is -- and is it .jpg at the end of all of

3  them?

4  A.  Yes.

5  Q.  Was 7 329?

6  A.  Yes.

7  Q.  8, 330; so just in sequential order, 9, 331; and 10, 332?

8  A.  Yes.

9         MR. THOMAS:  I'm sorry.  What is -- are you just

10  referring back to the photographs at this point?  You're not

11  looking at a --

12         THE WITNESS:  I'm looking at my report.

13         MR. THOMAS:  Okay.  Your Honor, I would ask the

14  witness to testify from his memory; and if he's going to refer

15  to his report, to please advise us.

16         THE COURT:  I agree.

17         THE WITNESS:  I'm sorry.

18         THE COURT:  Next question.

19  BY MR. SHEPARD:

20  Q.  Where were these files found?

21  A.  These files were found associated with the gallery

22  application.  I'm sorry.  Do you want me to explain that?

23  Q.  Yes, please.

24  A.  Basically, this phone was an Android phone, and there's an

25  application on there called Gallery.  The Gallery facilitates

1  being able to look at pictures that are on your device.  When

2  an image is stored on the device and it's able to be viewed in

3  the Gallery, what a lot of people don't realize, or what most

4  users don't realize, is your phone actually creates copies of

5  your image to be able to display in the Gallery.

6       That's why when we look at the Gallery and it shows

7  all of your albums, it will show an image from that album in

8  a -- as a small representation.  And then you select that

9  album and it will show several images from that album, again,

10 a little bit bigger.  And then, once you pick which one you

11 want, it will show you a bigger representation of that.

12      So the way this works is the Gallery application

13 creates three files.  They are called image cache, image cache

14 micro, and image cache mini.  Each one of these is basically a

15 container to hold all of these smaller images.  And what we're

16 showing here are from the image cache, which is the larger of

17 these three files.  The micro and mini would be even smaller.

18 So think of the image cache file like a container.  And as

19 images come into the Gallery, a smaller representation of that

20 original image gets added to that file, and they just keep

21 getting added to that file.

22      And then the analysis software we use goes through

23 that file and looks for what we call a JPEG image header,

24 which signifies the beginning of a new image.  And it will

25 take that image and separate it out and, like I stated

1  earlier, it will append this embedded with a sequential number

2  to identify it as a distinct image that was within that file.

3  Q.  All right.  I ask you to look --

4          MR. SHEPARD:  Please display Exhibit 37 again.

5  BY MR. SHEPARD:

6  Q.  So if we have a JPEG image like the ones here, 1, 2, 3,

7  and 4 on the report, the phone will automatically create

8  copies and image cache; is that accurate?

9  A.  That's correct.

10  Q.  What happens to those image cache if the original file is

11  deleted, like what happened with these four?

12  A.  Sometimes they are still retained inside that image cache

13  file.

14  Q.  All right.  And is that why you look in the image cache

15  file as an examiner to try and find deleted information?

16  A.  Yes.

17  Q.  Was there an SMS application on the phone?

18  A.  Yes, there was.

19  Q.  What do I mean when I say "SMS"?

20  A.  "SMS" stands for short message service.  That's what,

21  generally, we refer to as text messages.

22  Q.  Were you able to recover some text messages --

23  A.  Yes.

24  Q.  -- on the phone?  I ask you to turn to the tab -- to

25  Exhibit 69.

1    A.  Okay.

2    Q.  What is 69?

3    A.  69 is a print-off of some of the text messages, or SMS

4    messages, that were recovered from these -- from this phone.

5    Q.  And is it an accurate summary of the data that you pulled

6    off the phone?

7    A.  Yes, it is.

8              MR. SHEPARD:  Okay.  Your Honor, I would move for

9    the admission of Exhibit 69.

10             MR. THOMAS:  Preliminary question, if I may, Your

11   Honor.

12             THE COURT:  You may.

13   BY MR. THOMAS:

14   Q.  You said this was, "some of the text messages."  Were

15   these specific selections that you made or is it from a

16   particular time period?

17   A.  There were -- this is -- appears to be one page of the

18   report.  I reported out 260 messages.  I believe those -- I

19   don't recall if those 260 were every message or if that was

20   just every message from the date of the alleged incident on --

21   Q.  I mean, I guess my question, I apologize, the 16 that are

22   here, is that a sequential list?  In other words, are these

23   all of the text messages that you found from that time period,

24   or did you pull out certain ones based on content and make a

25   list?

1  A.  I don't recall if there were others in here during this

2  time frame.

3         MR. THOMAS:  Well, Your Honor, at this point I would

4  object to Government's 69 if it's not a -- if it's not a

5  complete list and it's simply random e-mails that he noted.  I

6  don't think it's a complete record.

7         MR. SHEPARD:  Your Honor, it's just specific files.

8  He said that they're on the computer, that they're accurate

9  copies of specific files.

10        THE COURT:  Okay.  I'll overrule the objection.  He

11  doesn't have to put every single text message.  These are just

12  specific ones that are being offered by the government.  Next

13  question.

14        MR. SHEPARD:  Thank you, Your Honor.

15        Please display Exhibit 69.

16        THE COURT:  69 is admitted into evidence over the

17  defendant's objection.

18                     (Government's Exhibit 69 was

19                      received in evidence.)

20        MR. SHEPARD:  Thank you, Your Honor.

21        Please display 69.  If you could just -- kind of

22  this little gray header bar here.  Back out of that, please.

23  Give me the first one with it, so it makes sense.

24  BY MR. SHEPARD:

25  Q.  Detective Melton, can you kind of go across the columns

1  and tell the jury what they're seeing in the exhibits?

2  A.  Sure.  The first column, the pound sign, is the number.

3  It just identifies which row we're on.

4         "Folder" indicates which SMS folder the message is

5  from.

6         "Party" is the other party of the conversation, in

7  the conversation with this user.

8         "Time" is the timestamp for the messages.

9         The "All timestamps," that's showing timestamps from

10 the network itself.

11        The "SMSC" is what's called a short message service

12 center.  That's a service center where messages are being

13 routed through.

14        "Status" is the status of the message, whether it

15 was read, sent, or unread.

16        "Message" is the body of the message.

17        And the "Del?" is a column that would show an

18 indicator of whether the message was previously deleted.

19        MR. SHEPARD:  You can clear -- or go back out to the

20 main exhibit.  And if you could blow up from message 6 down to

21 message 16.

22 BY MR. SHEPARD:

23 Q.  Are these in reverse order?

24 A.  Yes.

25 Q.  And so let's look at row 16.  First is "Inbox."  What does

1  that mean?

2  A.  That means the messages were recovered from the in box,

3  the received message.

4  Q.  Received by the phone, Exhibit 27?

5  A.  Yes.

6  Q.  From?

7  A.  From phone number ███████████.  And that phone number,

8  the red, where it shows "Habibti," with the -- it looks like a

9  heart, that is cross-referenced to the phone's contacts.  So

10 that means that this phone number was stored in the phone's

11 contacts associated with that name.

12 Q.  And is that the other end of the communication?

13 A.  Yes.

14 Q.  And is that when the message was received?

15 A.  Yes.

16 Q.  Okay.  And that indicates that the message had been

17 opened?

18 A.  Yes.

19 Q.  And that's the text?

20 A.  Yes.

21 Q.  And let me find -- okay.  So 14 is a little different.

22 We've got "Sent" up here in the second column.  What does that

23 mean?

24 A.  That means the message was sent from this phone to that

25 phone number.

1  Q.  All right.  Otherwise, is the information generally the

2  same?

3  A.  Yes.

4  Q.  Okay.  And what is the time frame from 16 to 6?

5  A.  They were all on August 22nd of 2014 from 1:35 p.m. to

6  2:00 p.m.

7  Q.  Okay.  What time zone, if you remember, was the phone set

8  to?

9  A.  Eastern.  At that time, Eastern Daylight Time.

10 Q.  And so would these correspond to -- so it was set to

11 display Eastern Time?

12 A.  Yes.

13 Q.  And in what time zone is Indianapolis?

14 A.  Eastern Time.

15 Q.  And is that what this would be displaying over here?

16 A.  Yes.

17 Q.  Okay.  In this column, it all says either "Read" or

18 "Sent."  What does that mean?

19 A.  That indicates whether the message had been read by the

20 user of this phone or sent by the user of this phone.

21 Q.  Okay.  For ease of kind of going through these, let's you

22 and I go from 16 to 10, and I'll read anything with a "Sent."

23 And why don't you read anything with an "Inbox."

24 A.  Okay.

25 Q.  So let's start with 16.

1  A.  "Babe, tell me why the police and news people are here

2  about an ongoing conflict that Heidi can't tell us about,

3  LOL."

4        "I'm scared to go outside."

5  Q.  "Wtf really?"  And then kind of an attempt at an emoji, a

6  colon, backslash, or a frowny face.

7        MR. THOMAS:  Your Honor, I'm going to object at this

8  point.  I mean, Government's 69 is in evidence.  The jurors

9  can read.  The item kind of speaks for itself.  I don't know

10 that him reading it adds anything to the exhibit.

11       MR. SHEPARD:  Your Honor, reading it into the

12 record, I think it is an easier way for the jury to understand

13 the conversation.

14       THE COURT:  I'll let you do it.  I'll overrule the

15 objection.

16 BY MR. SHEPARD:

17 Q.  So I'll pick it up again.  "Wtf" -- in your training and

18 experience, do you see that "wtf" a lot?

19 A.  Yes.

20 Q.  Do you know what that stands for?

21 A.  "What the fuck."

22 Q.  Okay.  Pick it up on 13, please.

23 A.  "Yeah, idk what it is she scared me."  And "idk" is

24 commonly used to represent, "I don't know."

25 Q.  Okay.

1  A.  "Cause she got down and was like I have an issue with a

2  parent.  The police is in my office."

3          "And I was like what?  And she said conflict going

4  on with something else."

5  Q.  "That's really scary."

6  A.  "The news is up here what the hell happened after I left

7  yesterday do you know" --

8  Q.  Hold on.  We were stopping after 10.

9  A.  Oh, I'm sorry.

10 Q.  We're going to pick up -- beginning at number 9, is it a

11 different phone number that's in the conversation?

12 A.  Yes, it is.

13 Q.  Okay.  So do 9 through 6 appear to be a different

14 conversation than 10 through 16?

15 A.  That's correct.

16 Q.  Now, the same thing.  You go ahead and we'll do -- you do

17 the "Inbox," I'll do the "Sent" box.

18 A.  "The news is up here what the hell happened after I left

19 yesterday do you know?"

20 Q.  "Wtf idk," or, "What the fuck, I don't know."

21 A.  "Yes," I, "don't say nothing just wait and let them tell

22 you but it's something going on the police is here in Jennifer

23 office with some parents I don't know."

24          "What's going on...didn't see the parents they were

25 here when I came back from lunch with the news outside."

1  Q.  And if you can recall, was number 6 the last read message

2  that you were able to recover from the phone?

3  A.  Yes, it was.

4  Q.  And what was the time of that last read message?

5  A.  2:00 in the afternoon on August 22nd, 2014.

6  Q.  I want you to look in the binder behind tab number 3.  Do

7  you recognize 3?

8  A.  Yes.

9  Q.  What's 3?

10 A.  3 is another image I recovered from the phone.

11 Q.  And is that an accurate copy of the image file you

12 recovered from the phone?

13 A.  Yes, it is.

14      MR. SHEPARD:  Your Honor, I would move to admit

15 Exhibit 3.

16      MR. THOMAS:  Preliminary question, if I could, Your

17 Honor?

18      THE COURT:  You may.

19 BY MR. THOMAS:

20 Q.  Do you know when Government's 3 was taken?

21      THE WITNESS:  Can I refer to my reports?

22      THE COURT:  You may.

23 A.  No, I don't.

24      THE COURT:  Any objection?

25      MR. THOMAS:  I do, Judge.  At this point I would

1   object on relevance grounds.  It -- if -- we don't know when

2   it was taken, we don't know where it was taken.  The fact that

3   it was on his phone is -- is -- we've already established his

4   identity is not at issue.  That the phone is his is not at

5   issue.  Specifically since we don't know when this was taken,

6   I don't -- I would object to it.

7            MR. SHEPARD:  Can I ask one more question?

8   BY MR. SHEPARD:

9   Q.  Was that still on the phone or was that deleted, as well?

10  A.  This phone (sic) was stored in the same location as the

11  other images we talked about in the image cache.  The original

12  image was no longer on the phone.

13           MR. SHEPARD:  Do you want me to approach?

14           THE COURT:  Sure.

15           (Bench conference on the record.)

16           THE COURT:  Tell me why it's relevant.  I think I

17  know why, but you tell me why you --

18           MR. SHEPARD:  I think he was trying to destroy any

19  evidence on that phone about any contact he had with M.R.  And

20  the fact that it was found on the phone and found in the

21  deleted space, the image cache, the original being deleted, we

22  think that's why it's relevant.

23           MR. THOMAS:  Why can't he establish when it was

24  taken in relation to the others?

25           MR. SHEPARD:  You can ask him that on cross.  It

*MELTON - DIRECT/SHEPARD*                    295

1   doesn't go to admissibility.

2          MR. THOMAS:  I think it does.  If the -- at this

3   point, its only purpose is that it's on the phone and that

4   it's him.  But, unless we know when it was taken, then it's

5   not relevant to the case.

6          THE COURT:  I'll overrule.  Government's Exhibit --

7   and I'll admit it into evidence over your objection.  I do

8   believe it's relevant.

9          MR. SHEPARD:  Thank you, Your Honor.

10                       (Open court.)

11         THE COURT:  The objection is overruled and

12  Government's Exhibit 3 is admitted into evidence over the

13  defendant's objection.

14                   *(Government's Exhibit 3 was*

15                   *received in evidence.)*

16         MR. SHEPARD:  Can you call back up Exhibit 69?  And

17  if you could highlight block 6 again.

18  BY MR. SHEPARD:

19  Q.  That was the time that the message was received, correct?

20  A.  Yes.

21  Q.  And that's 2:00:57 p.m.?

22  A.  Yes.

23  Q.  All right.  And you stated, I think earlier, you were

24  aware of the believed time frame of the incident?

25         MR. THOMAS:  I'm going to object to the continuing

1  leading of his own witness, Your Honor.

2  BY MR. SHEPARD:

3  Q.  Do you know --

4         THE COURT:  Would you ask direct questions?

5  BY MR. SHEPARD:

6  Q.  What was the time frame of the alleged incident?

7  A.  August 21st, 2014, between 12:30 and 1:30 p.m.

8  Q.  How much time had elapsed between that and this last read

9  message?

10  A.  24 hours and 30 minutes.

11  Q.  In your training and experience as a forensic detective,

12  do you know about how long it takes to delete a file off a

13  phone?

14  A.  A person could delete an image very quickly.

15  Q.  Would 24 hours be enough time?

16  A.  Yes.

17         MR. SHEPARD:  If I could have just a moment, Your

18  Honor?

19         THE COURT:  You may.

20         (Off the record.)

21  BY MR. SHEPARD:

22  Q.  Please look behind tab 40.  Do you recognize tab 40?

23  A.  Yes.

24  Q.  What is tab 40 -- or what is marked as Exhibit 40?

25  A.  That's an image that I recovered from the phone.

1  Q.  And is that a substantially accurate copy of the image?

2  A.  Yes.

3  Q.  All right.  Was that deleted or was that one still on the

4  phone?

5  A.  Again, I need to refer to my notes.

6  Q.  Go ahead.

7  A.  That image was still present on the phone.  It had not

8  been deleted.

9          MR. SHEPARD:  Your Honor, I would -- the government

10  would move for the admission of Exhibit 40.

11          MR. THOMAS:  Your Honor, I think if the purpose of

12  40 is from his testimony that it wasn't deleted, that there

13  were images that weren't deleted, that evidence is in.  As far

14  as the -- what the image shows and what it is -- may we

15  approach, Your Honor?

16          THE COURT:  You may.

17          (Bench conference on the record.)

18          MR. THOMAS:  Your Honor, I don't feel the photograph

19  is the best evidence here.  If the government's relevance is

20  to say that he had pictures on his phone he didn't delete --

21          THE COURT:  Let's find out.  Why is this relevant?

22          MR. SHEPARD:  Really, it's going to be relevant for

23  cross-examination, Your Honor.  It appears that the photo of

24  him and his -- that we believe was taken at the daycare with

25  M.R., the victim, was deleted.  We believe that this one was

1  also taken at the daycare, due to some of the other

2  information contained within the images, with a different kid,

3  it wasn't deleted.  If he can explain it --

4            THE COURT:  Who can explain it?

5            MR. SHEPARD:  The defendant on cross.

6            THE COURT:  Well, the defendant doesn't have to

7  testify.

8            MR. SHEPARD:  If he -- you're correct, Your Honor.

9  If he were to testify --

10            THE REPORTER:  I cannot hear you.

11            THE COURT:  Talk in there.  I think you're going

12  to -- if the defendant --

13            THE REPORTER:  I did not hear what Mr. Shepard said.

14            THE COURT:  Oh, he didn't hear what you said.

15            MR. SHEPARD:  Your Honor, we believe that it's

16  relevant.  We're anticipating that should he testify, we would

17  need that for cross-examination.

18            THE COURT:  Then, Counsel, you're going to have to

19  wait until he is being cross-examined to offer it.  I'll

20  sustain the objection.

21            MR. SHEPARD:  Thank you, Your Honor.

22            THE COURT:  Okay.

23                        (Open court.)

24            THE COURT:  The objection is sustained.

25            MR. SHEPARD:  We pass the witness for cross, Your

1  Honor.

2              THE COURT:  Okay.

3              MR. THOMAS:  Thank you, Your Honor.

4              THE COURT:  Mr. Thomas, you may cross-examine the

5  witness.

6                      **CROSS EXAMINATION**

7  BY MR. THOMAS:

8  Q.  You do not know when -- you do not know when the fourth

9  image was taken, the --

10             THE COURT:  You need to give an exhibit number.

11             MR. THOMAS:  Yeah.  Let me find that.

12 BY MR. THOMAS:

13 Q.  Government's 3.  You don't know when that was taken?

14 A.  You said 3?

15 Q.  Yeah.

16 A.  That's correct.

17 Q.  How is it that you don't know when that was taken?

18 A.  The original -- as I said, the original image was deleted.

19 These files that are recovered from the image cache file, or

20 the individual images that are embedded, the metadata, or what

21 we call metadata, well, that's data about data.  That

22 doesn't -- that gets updated for the image cache file to just

23 say that the file was modified at a certain time.

24             So the only time that I would find associated with

25 that image cache file is when the last file went in there.

1   I'm not able to determine the individual -- the other

2   individual files within their -- what time they got entered

3   into that image cache file.

4   Q.  The other four, which I think are 7, 8, 9, and 10, you

5   were able to make a determination for each one of those as to

6   when they were taken?

7   A.  7, 8, 9, and 10, no.  That's the same.  Those are the

8   image cache files.  So those files that were recovered from

9   there I'm not able to say, with certainty, when they were

10  taken.

11  Q.  What is that when you explained to us the 132319, what is

12  that -- what did that mean to you for number 7, for example?

13  A.  132319, where are you getting that from?  What was that?

14  Q.  Let's go back to -- what is it, 67?  No.  37 maybe.  I'm

15  sorry.  I don't have these together like I wanted to.  37,

16  which was admitted.  You pointed out that these JPGs for 1, 2,

17  3, and 4, those corresponded with 7, 8, 9, and 10, right,

18  Exhibits 7, 8, 9, and 10?

19  A.  I did not say that, no.

20  Q.  Okay.  What do they correspond to?

21  A.  These are -- these file names and the paths of the file

22  names indicate to me that there were previously images on the

23  phone, that had been taken on August 21st, 2014, at 1:23:13,

24  at 1:23:19, at 1:25:55, and 1:26:01.  That's all that that

25  means to me, is that there were images on this phone

1  previously that had been taken at those times.

2  Q.  You have no idea that -- whether these four, the four

3  images that were taken on that day, are those four images?

4  A.  From a digital forensics standpoint, no.

5  Q.  And you don't know when Government's 3 was taken at all?

6  A.  That's correct.

7  Q.  You can't tell at all when these photos were erased?  I

8  think that was your testimony?

9  A.  That's correct.  The four images that were -- that had the

10  file names of taken August 21st 2014, with those times, I

11  don't know when those images were deleted.  The images that

12  we're talking about, 7, 8, 9, and 10, those actual images are

13  still on there, but the original images that those were

14  derived from were no longer on there, and I can't tell when

15  they were deleted.

16  Q.  Right.  When you say they're still on there, would -- if

17  that's my phone and I delete them without -- and I don't have

18  any of your equipment, would I be able to access those

19  thumbnail pictures you're talking about?

20  A.  Typically not without some kind of special equipment.

21  Q.  Once they're -- once they're gone, they're gone, for the

22  layman?

23  A.  Yes.

24  Q.  You have no way of telling whether those were -- were

25  deleted -- they could have been deleted between pictures,

1  right?  He could have taken one, deleted it; taken the second

2  one, deleted it; taken the third one, deleted it; taken

3  the fourth one, deleted it?  There's nothing in your

4  information to say that couldn't have happened, right?

5  A.  That's correct.

6  Q.  And even though Mr. Al-Awadi had his phone for 24 hours,

7  you have no idea, during that period of time, when they were

8  deleted, correct?

9  A.  That's correct.

10  Q.  Or even if they were deleted during that 24 hours, right?

11  A.  That's correct.

12  Q.  Did you examine other electronics for this case?

13  A.  I don't believe I examined any others.

14  Q.  Were folks in your office involved with that, or why would

15  you not?

16  A.  I do know there were other items that were examined as

17  part of this case, examined by other examiners in my office,

18  yes.

19  Q.  Okay.  Would you presume that they do the same kind of

20  analysis you would do?

21  A.  Yes.

22  Q.  Would you presume that any evidence that they found in the

23  case, they would have turned over in the way you did?  Would

24  that be normal in your office?

25  A.  Yes.

1   Q.  Do you know at this point how many other electronic

2   devices, computers, phones, and things from Mr. Al-Awadi's

3   house were examined by your office?

4   A.  I don't know.

5   Q.  But you are aware that there were items that were

6   examined?

7   A.  Yes.

8   Q.  Were you able to make a determination as to how many photo

9   files had been deleted on that phone over its lifetime?

10  A.  No.

11  Q.  Did you try to determine that?

12  A.  There would be no way to determine that.

13  Q.  Well, did you find other -- these data image files, say in

14  Government's 37, did you find other data image files on the

15  phone?

16  A.  When I found these, I had specifically searched for

17  photographs that could have been taken on the date of the

18  incident we're referring to here.  I didn't specifically look

19  for any other records of those file paths.

20  Q.  You have no way of knowing that the image in

21  Government's 3 was deleted at the same time or the same day or

22  anything as to any of these other images, correct?

23  A.  Correct.

24  Q.  And you have no way -- you made no record of how many

25  other items may have been deleted from the phone at any

1  particular time?

2  A.  That's correct.

3  Q.  The text messages that you and Mr. Shepard read to us,

4  there's a -- you made a notation that some of them say "Read"

5  and some of them say "Unread."  To your knowledge, with the

6  way that phone works, what's required -- what's required to

7  make a message go from "Unread" to "Read"?

8  A.  Selecting the message and -- messages come into the phone.

9  They show a flag that they are unread.  Once a user selects on

10 that message, it would change the flag to read.

11 Q.  So after 2:00, there were some additional messages, at

12 least on that page, that hadn't been read?

13 A.  That's correct.

14 Q.  Were there any other unread messages on the phone, that

15 you recall?

16 A.  No.

17 Q.  And those are the -- I'm not quite clear, and, of course,

18 I was asking a question before for a different purpose, but

19 these particular messages, how did they end up in your

20 extraction report, these text messages?

21 A.  I don't recall exactly how many messages total there were.

22 I reported out 260 messages that I believe, if I remember

23 right, they were messages from the date of the alleged

24 incident or the date and time to the present.  I don't -- I

25 don't believe -- or I don't recall whether there were

1  additional messages.

2  Q.  Okay.  And I -- and just so I'm understanding, were you --

3  did you take it upon yourself or were you asked to find

4  messages with a particular content or simply a date range?

5  A.  Again, I don't remember.  I know that these -- at the time

6  of the examination, those conversations stood out, because it

7  was clear that the messages seemed to be referring to the

8  investigation of this incident.

9  Q.  Did you make any other report that would have contained

10  all of the messages from that time frame?

11  A.  Again, I don't remember if the report that I did contains

12  all of the messages or not.

13  Q.  Okay.

14  A.  So I can't really say.

15         MR. THOMAS:  That's all the questions I have.

16  Thanks.

17         THE COURT:  Any redirect for the witness?

18         MR. SHEPARD:  No, Your Honor.

19         THE COURT:  Very good.  And may this witness be

20  excused?

21         MR. SHEPARD:  No, Your Honor.  We would like to keep

22  him subject to recall.

23         THE COURT:  Okay.  All right.  You're going to hang

24  around.

25         THE WITNESS:  Thank you, Your Honor.

1          (Witness excused.)

2                          * * *

3                        EXCERPT

4                          * * *

5          (Jury out at 4:24.)

6          THE COURT:  The government has rested.  And,

7    Mr. Thomas, will you be presenting any evidence?

8          MR. THOMAS:  I will, Your Honor.  I intend to call

9    the defendant, Ali Al-Awadi.

10         THE COURT:  All right.  Mr. Ali Al-Awadi, have you

11   had an opportunity to discuss with your attorney whether

12   you're going to testify or not in your trial?

13         Can you give him the microphone, please?

14         MR. THOMAS:  Yes, Your Honor.

15         THE DEFENDANT:  Yes, I have.

16         THE COURT:  And I want to make certain that you

17   understand your rights.  You do have a right to testify in

18   your defense if you wish to testify, and no one can prevent

19   you from doing so.  If you testify, the Assistant United

20   States Attorneys will be allowed to cross-examine you.  Do you

21   understand that?

22         THE DEFENDANT:  Yes, I do.

23         THE COURT:  You also have a right to decline to

24   testify.  You're presumed innocent, you don't have any burden

25   of proof.  The government alone has the burden of proving your

1  guilt beyond a reasonable doubt.  If you do not testify, this

2  fact cannot be used against you, and the jury would be so

3  instructed, because a defendant has an absolute right not to

4  testify or present evidence.  And they may not -- the jury may

5  not consider in any way if you do not testify or present

6  evidence.  Do you understand that, also?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  And have you been advised of these

9  rights?  Do you still wish to testify?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Okay.  All right, let's bring the jury

12  in and get started.  Oh, we need to put him on the stand.

13          MR. THOMAS:  Oh, yes.  Your Honor.

14          (Off the record.)

15          THE COURT:  All right.  Go ahead and have a seat.

16  Go ahead and have a seat.  And when we say, "Stand," you stand

17  with everyone else, okay?

18          All right.  Government, are you ready for the panel?

19          MS. KOROBOV:  Yes, Your Honor.

20          THE COURT:  Mr. Thomas, ready?

21          MR. THOMAS:  I'm ready, Judge.

22          THE COURT:  All right.  You may bring in the panel.

23          (Jury in at 4:28.)

24          THE COURT:  And, Witness, if you would remain

25  standing and raise your right hand.

1    (The witness is sworn.)

2         THE COURT:  You may have a seat.

3         Ladies and gentlemen, when we -- before we took our

4   brief adjournment, the government rested.  And the defendant

5   does not have a burden of proof.  He does not have to testify.

6   However, if he wishes to do so, he may.

7         And, Mr. Thomas, since your client has been sworn,

8   he does intend to testify, correct?

9         MR. THOMAS:  He does, Your Honor.

10        THE COURT:  All right.  You may examine your

11  witness.

12        MR. THOMAS:  Thank you.

13      **ALI AL-AWADI, DEFENDANT'S WITNESS, SWORN**

14                **DIRECT EXAMINATION**

15  BY MR. THOMAS:

16  Q.  Can you tell us your name again?

17  A.  Ali Al-Awadi.

18  Q.  Where were you born, Mr. Al-Awadi?

19  A.  I was born in Saudi Arabia.

20  Q.  And is your family from Saudi Arabia?

21  A.  No.

22  Q.  Where are they from?

23  A.  They are from Iraq.

24  Q.  How is it you ended up in Saudi Arabia?

25  A.  My parents left Iraq because of the time of Saddam

1  Hussein, as refugees.

2  Q.  Do you remember about when that was?

3  A.  I wasn't born at the time, so I have no idea.

4  Q.  And then how long were you in Saudi Arabia, if you

5  remember?

6  A.  I would say around two years.

7  Q.  And where did you go from there?

8  A.  From there, got on a plane and came to America.

9  Q.  So you have been in the United States since you were two?

10  A.  Yes.

11  Q.  And where have you lived in the United States?

12  A.  In Indiana.

13  Q.  You came -- that's where your family settled?

14  A.  Yes.

15  Q.  Okay.  And who's in your family?

16  A.  I have my father, my mother, my brother, and my sister.

17  Q.  You're how old now, Mr. Al-Awadi?

18  A.  22.

19  Q.  Do you know how your family ended up settling in

20  Indianapolis?

21  A.  No.

22  Q.  Do you have other family, other than your mom and dad,

23  that are in this area?

24  A.  Yes.

25  Q.  Were they here before or did they come after?

1  A.  They were here before.

2  Q.  How far did you go in school?

3  A.  I made it about two years in college.

4  Q.  What year did you graduate from high school?

5  A.  2012.

6  Q.  What high school did you graduate from?

7  A.  Pike High School.

8  Q.  Where -- did you go immediately to college?

9  A.  Yes.

10  Q.  And where did you go?

11  A.  Ivy Tech.

12  Q.  What were you studying?

13  A.  Computer science.

14  Q.  And how far along were you with that?

15  A.  I was still taking what they call prerequisite classes,

16  which are pretty much before you get anything into your major.

17  You take basic classes:  Some math, some English, some, you

18  know, speech.

19  Q.  Did you have a job when you were in high school?

20  A.  Yes.

21  Q.  What was that?

22  A.  I worked at a company, a small company, called Midwest

23  Telephone Company.

24  Q.  And what kind of job was that?

25  A.  My position?

1   Q.  Yeah.  What did you do?

2   A.  I was the telephone refurbisher, office telephone

3   refurbisher.

4   Q.  What kind of telephones did you refurbish?

5   A.  Office phones, the ones you would see in businesses, and

6   secretaries.

7   Q.  How long did you have that job?

8   A.  I would say I almost had that job for about two years.

9   Q.  Do you remember how old you were when you started that

10  job?

11  A.  I believe I was 17.

12  Q.  Did you work at all before that, before the telephone job?

13  A.  Yes.

14  Q.  And what did you do?

15  A.  My father opened a restaurant, and I would help him out in

16  the restaurant.

17  Q.  Were you going to college at the same time you were

18  working at the telephone repair company?

19  A.  Yes.

20  Q.  Were you a full-time student or a part-time student?

21  A.  Full-time student.

22  Q.  Did you at some point end up leaving that job?

23  A.  Yes.

24  Q.  Why?

25  A.  The owner of the company informed me that business was

1  kind of slow, and they cut my hours.

2  Q.  Did you then find a new job?

3  A.  Yes.

4  Q.  And where did you end up getting a job?

5  A.  Children's Choice Learning Center.

6  Q.  And how was it you went from television -- or telephone

7  repair to Children's Choice Learning Center?  How did you find

8  that job?

9  A.  I was looking for a job on a Web site called snagajob, and

10 I was looking at many different openings.  And there wasn't

11 really much besides fast-food or something you needed a degree

12 for.  When I stumbled upon the Children's Choice, it said,

13 "Looking for a floater," someone who doesn't need to have

14 necessarily an education other than high school.  And I looked

15 at it as kind of like, you know, as almost like baby-sitting.

16 Q.  Was it a full-time job?

17 A.  Yes.

18 Q.  And if you remember, did you -- did you apply over that

19 Web site, or how did you end up applying for the job?

20 A.  I did apply on the Web site.

21 Q.  How long did it take for them to hire you?

22 A.  I would say within two weeks after me turning in my resumé

23 and application, I was called in to observe.

24 Q.  Now, when you -- when you went there to observe, were you

25 hired?  I mean, were you on the job or was that just part of

1  the application process?

2  A.  You were hired.

3  Q.  When you first met with -- do you remember who you met

4  with at the learning center when you applied, when you went to

5  interview?

6  A.  Her name was Jennifer, and she was the director.

7  Q.  You mentioned that you didn't have any real experience.

8  Did you tell them you didn't have any experience?

9  A.  Yes.

10  Q.  Was that okay?

11  A.  Yes.

12  Q.  Had you -- you said something about baby-sitting.  Why

13  did -- why did that make a connection to you?

14  A.  Because I would sometimes baby-sit for my uncles, my

15  aunts.  Whenever they would go shopping or whatever, they

16  would leave me at home and say, "Hey, can you watch my son,"

17  or whatever.  And I would stay with them for a couple of

18  hours.  We would watch TV, play, and just, you know, what you

19  would normally do when you baby-sit.

20  Q.  Is that as close to experience as you had for this job?

21  A.  It wasn't 100 percent, but there was a lot of the same

22  things, yes.

23  Q.  And did they know, when you started, that that's -- you

24  had had no experience other than that you had baby-sat for

25  your family sometimes?

1   A.  Yes.

2   Q.  Were there any other men that worked there?

3   A.  No.

4   Q.  Did -- was that subject brought up when you applied for

5   the job?

6   A.  Yes.

7   Q.  Did that seem to be a negative or a positive?

8   A.  It was actually a positive.  I recall Jennifer telling me

9   that the male children don't really have a role model to look

10  up to, other than their parents.  And their parents are

11  usually at work almost all day.  So even the time they get to

12  spend with their family, they go home and they're tired and

13  ready to sleep, so they don't really get to spend too much

14  time with their family.  So she told me that having a male in

15  the building is a good -- is a good look for the children,

16  because it's more of a role model for them.

17  Q.  Did -- was there -- was there anything ever mentioned to

18  you about diversity at the place?

19  A.  At first, it was not.  But then I was -- I was given the

20  title diversity -- I can't remember the exact title.  I think

21  it was called diversity champion, or something, where the

22  company would actually give you the title, and you would

23  attend seminars and you would actually get to speak at the

24  employee meetings on that, because you have a small title as

25  the diversity.

1  Q.  And you did that?

2  A.  I was not able to because I had recently been given that.

3  Q.  I gotcha.  What kind of training did you get when you

4  started?

5  A.  When I first started, we were instructed to watch, I

6  believe, two or three videos and to answer a questionnaire.

7  Q.  How long were the videos?

8  A.  About an hour.

9  Q.  Was there an instructor there to explain the video or

10  answer questions?

11  A.  No.

12  Q.  Anybody else in the room with you?

13  A.  No.

14  Q.  What kind of subjects were in the videos?

15  A.  Pretty much what you would be looking forward to in the

16  particular age group of the room you were in.  One was labeled

17  "Pre-K Preschool," one was labeled "Toddler," one was labeled

18  "Infant."  You would watch all those videos, and they will

19  tell you what would be going on in the room, how to handle

20  things, like maybe how to positively, you know, teach things

21  instead of, you know, just being hard.

22       You know, you're supposed to be more of an educator

23  instead of, you know, someone who is -- like, you're not

24  supposed to be a mean person, you know.  In other words, they

25  just wanted to make sure you knew how to interact.

1  Q.  Other than the videos, mostly on-the-job training; would

2  that be fair?

3  A.  After the videos, you were to complete a couple of hours

4  of observing classrooms before you actually got in.  And then,

5  once you actually did get the position, they would do employee

6  meetings.

7  Q.  And how often would those take place?

8  A.  At first, it was just once a month, if that.

9  Q.  When you say, "At first," did something change along the

10  way?

11  A.  Along the way, the company, Children's Choice Learning

12  Center, was bought by another company, Bright Horizons.  And

13  they were told to adopt the new policies and new teachings of

14  the new company.

15  Q.  Did the other employees -- were they -- did they

16  acknowledge that you were the only male there?

17  A.  Yes.

18  Q.  Was that an issue for anybody?

19  A.  No.

20  Q.  Did your -- did your fellow employees just treat you like

21  everybody else?

22  A.  To an extent.

23  Q.  You were told the company policies, were you?

24  A.  Yes.

25  Q.  What did you understand in terms of what you could do or

1  couldn't do as a male employee as opposed to a female

2  employee?

3  A.  There was no difference.

4  Q.  Is that something that was emphasized to you by the

5  management?

6  A.  No.

7  Q.  Was that something that was discouraged by the management?

8  A.  No.

9  Q.  Did anyone that you worked with ever suggest to you that

10 being a male there, despite policy, might become an issue at

11 some point?

12 A.  Become an issue, no, but they said it would be difficult.

13 Q.  Do you remember who told you things like that?

14 A.  I remember Tyria did.  I remember there was a teacher

15 there before, but she had gotten -- I think she either quit or

16 was fired, I cannot recall.  But she told me, as well.  And,

17 basically, they would just tell me, you know, that being a

18 male, of course, you're going to be looked at differently.

19 You're going to be looked at harder than you would if you were

20 a female teacher.

21 Q.  Were you aware of that as you went through -- as you

22 continued to work there?

23 A.  Yes.

24 Q.  What about the parents?  Do you think all the parents

25 accepted you being there as an employee?

1   A.  No.

2   Q.  Did you ever have any specific complaints made by parents

3   about anything that you did prior to the accusations that were

4   made in this case?

5   A.  No.

6   Q.  We've heard about the policy about cell phones.  Were you

7   made aware of that policy when you worked there?

8   A.  Yes.

9   Q.  Was that a policy that they tried to enforce?

10  A.  Enforce, yes.  Like, they didn't want you to have your

11  phone on you, but they would -- they wouldn't make you turn it

12  in somewhere in the beginning, or anything like that.  They

13  pretty much just took your word for it.

14  Q.  Were you the only one that would have your cell phone at

15  work?

16  A.  No.

17  Q.  Did you ever see Tyria Graham with her cell phone?

18  A.  On many occasions.

19  Q.  Was it pretty common that teachers would have their phones

20  with them during the day?

21  A.  Yes.

22  Q.  But was it something that you would still want to hide or

23  could you just be blatant about it and say, "I don't care, I

24  got my cell phone"?

25  A.  You would hide it in front of the management, because if

1  they saw you, you would, of course, get in trouble for it.

2  Q.  Between the nonmanagement employees?

3  A.  It was pretty much normal, if you ever had your phone out,

4  between employees.

5  Q.  What was your understanding of the procedure for what

6  would happen, what you should do if a child is injured?

7  A.  You would fill out something called an accident report.

8  Q.  Did you ever fill those out?

9  A.  Yes.

10  Q.  And just so I remember, how long did you work there?

11  A.  I worked there for a year and maybe a month.

12  Q.  We heard mention of a counsel, as they referred to it,

13  that you had after working there for a while about picking up

14  children.  Do you remember that?

15  A.  Yes.

16  Q.  How did that -- how did that issue come about?

17  A.  It was a surprise to me, because Heidi said, "Well, I

18  would like to talk to you in my office."  And I said, "Okay."

19  So I went in there, and she closed the door.  And then, of

20  course, there was another educator in there at the time.  And

21  the educator, I think, was Kim, who was like the educational

22  coordinator.

23          And she didn't really tell me like she seen me do

24  anything wrong.  She just said, "Well, I saw, you know, you

25  picking up the children.  And I just want to let you know that

1  we've had incidents before where on the playground a child had

2  been dropped and broke their arm."  And she said, "And I want

3  to tell you, if they're old enough to walk, that they are old

4  enough for you not to pick them up."

5  Q.  Were you okay with that?

6  A.  At first I was not.

7  Q.  Why not?

8  A.  Because I felt like there was a deeper reason than that,

9  and I thought it was because I was being discriminated

10  against.

11  Q.  What do you mean by that?

12  A.  Well, all the other teachers would pick up the children

13  all day long, even the ones that were walking, even the older

14  ones in the kindergarten room, including Heidi, who was the

15  director -- assistant director.  Excuse me.  And I would see

16  this happening all day long, and no one would ever get

17  notified about it or get counseled about it, but then I get

18  counseled about it because I was a man, is what I felt.

19  Q.  And was part of the talk -- she said you had done nothing

20  wrong, but was part of it the perception that she was worried

21  about that the parents, because you were a man, might not like

22  to see you holding a kid?

23  A.  She did say that.

24  Q.  Was that something that, throughout your job, you were

25  aware of, that there were perceptions about you, and maybe you

1  had to act more carefully than the women?

2  A.  Yes.

3  Q.  Did you try to do that?

4  A.  Yes, but I also was myself.  I was -- you know, I wasn't

5  going to stop being playful with the children.  I wasn't going

6  to stop being, you know, energetic just because I wanted to be

7  cautious.

8  Q.  Did you interact well with the children, do you think?

9  A.  Yes.

10  Q.  Did all the children like you?

11         MS. KOROBOV:  Objection, Your Honor.  It calls for

12  speculation on the part of the witness.

13         THE COURT:  Sustained.

14  BY MR. THOMAS:

15  Q.  Did any of the children ever complain about you or -- to

16  your knowledge?

17  A.  No.

18  Q.  There is another issue that was discussed by Heidi

19  regarding Cathie.  Who was Cathie?

20  A.  Cathie was my head educator at the time.

21  Q.  And when you started, did you start out working with

22  Cathie?

23  A.  No.

24  Q.  What did you start out doing?

25  A.  I was what they called a floater.

1  Q.  What's that?

2  A.  A floater is the position you get, in other words, to --

3  you bounce around classrooms, you make sure ratio is kept.

4  You give people bathroom breaks, lunch breaks.  In other

5  words, you are pretty much just the helping hand around the

6  building.

7  Q.  How long were you a floater after you started?

8  A.  Until a couple months before the termination -- my

9  termination.

10  Q.  And how is it that that changed?

11  A.  There was an opening in another room.  Another teacher had

12  turned her two-week notice in and moved on from her position.

13  Q.  And what room was that in?

14  A.  The early preschool-1 room.

15  Q.  Did you specifically ask to be in the early preschool

16  class or is that where the opening was?

17  A.  That was where the opening was.

18  Q.  Was that a promotion?

19  A.  Yes.

20  Q.  I don't think I asked, but how many hours a week were you

21  working, normally?

22  A.  40 hours a week.

23  Q.  And who was the main educator in the early preschool

24  class?

25  A.  Cathie Williamson.

1  Q.  Now, so going back to her, there was mention of another

2  issue or conversation that she had had with Heidi regarding

3  you.  Did Heidi make you aware of that?

4  A.  No.

5  Q.  Did Cathie make you aware of it?

6  A.  Yes.

7  Q.  And how did she do that?

8  A.  Well, we would talk in the room all the time, and she just

9  told me, she was like, "Well, it's -- what I'm about to tell

10 you is pretty much for your protection.  I don't want you to

11 get upset about it."  And she told me that it's a bad look to

12 be around the female children all day instead of the whole

13 group of children, which I didn't understand at the time,

14 because I was really around all of them all day, pretty much.

15 Q.  Did you get in any trouble for that?

16 A.  No.

17 Q.  Did anybody ever talk to you about that?

18 A.  No.

19 Q.  Just kind of between you and her?

20 A.  Yes.

21 Q.  What was the policy regarding, as you understood it,

22 regarding injuries to the genitals or pain in the private

23 area, however we want to put it?  Were you specifically told

24 how to deal with a situation like that in your job?

25 A.  No.

1  Q.  What did you understand the policy to be?

2  A.  Just inform the nurse.

3  Q.  Did -- was it made clear to you that you weren't supposed

4  to examine an injury like that?

5  A.  Yes.

6  Q.  Were there ever situations where you were told to provide

7  first aid?

8  A.  Yes.

9  Q.  What were those?

10  A.  Well, if a child was running around and they fell and

11  scraped their elbow, and it was just a little scrape or

12  something like that, you would clean the area off first and

13  then you would put a Band-Aid on.  And then you would fill out

14  what they call an accident report.

15  Q.  Were you told to fill out an accident report for every

16  complaint of every child?

17  A.  No.

18  Q.  What kind of things did they tell you not to report?

19  A.  You know, if the child complains about a stomach pain,

20  just, you know, maybe a little bit after eating, or if they,

21  you know, "My head hurts," or, you know, sometimes they just

22  say, "My finger hurts."  You know, it's -- and, really,

23  sometimes it's nothing, other than they just, you know,

24  want -- just want to say something hurts.

25  Q.  And specifically about a -- were there specific rules

1  about complaints about injuries to the genitals?

2  A.  Not that I was aware of.

3  Q.  Were there rules about taking pictures?

4  A.  Yes.

5  Q.  And what did you understand those rules to be?

6  A.  On a personal device or on the devices they --

7  Q.  Well, both.

8  A.  Well, they provided some -- some cameras.  And what they

9  had were iPads at the center, as well.  And you were able to

10  take pictures and send them to the family via what they called

11  Baby Connect.  And the Baby Connect would allow you to even

12  receive instant messages, and you could post photos.  They

13  could -- you could write what they ate, what they -- when the

14  last time they went to the restroom.  And that was really in

15  the smaller classrooms.  But you could still use the iPads

16  for pictures, and they would take pictures on those.

17              And there were also cameras, digital cameras, that

18  you could get from the office.  And they would use those for

19  making -- at least with the new Bright Horizons, they made you

20  make bulletin boards outside.  And you would take pictures and

21  then put a label under it, like, "This is so-and-so doing

22  this."

23  Q.  I'll ask you about August 21st of 2014.  Did you go to

24  work that day?

25  A.  Yes.

1  Q.  Anything unusual about that day going in?

2  A.  Nothing at all.

3  Q.  What class were you working in?

4  A.  The early preschool-1 room.

5  Q.  That's your regular class?

6  A.  Yes.

7  Q.  Even when you were assigned to one class, did you still

8  move around and help people at times?

9  A.  Yes.

10  Q.  Is that something that you did or is that kind of

11  something everybody did?

12  A.  It was a little bit of both.  They would really rely on me

13  a lot because I was already a floater before, so I was kind of

14  already used to being in all the classrooms.

15  Q.  And how would they -- how would you help those folks?

16  A.  Well, if they needed to go to the restroom or if they were

17  out of ratio, or even if they just needed a hand with

18  something in the room, I would go in there, and any way I

19  could provide assistance, I would.

20  Q.  On that August 21st, did you help anybody out that way?

21  A.  I relieved Ms. Tyria for her lunch break.

22  Q.  Tell me about that.  Is that something that was scheduled

23  ahead of time or did she just come and ask you, or was that

24  your regular -- were you regularly assigned to do that?  How

25  does that come about?

1  A.  I usually give Ms. Emily her lunch break, but Ms. Emily

2  had not been in that day, or the previous day.

3  Q.  So would it -- when Ms. Emily was there, how long had you

4  been giving her her break?

5  A.  I don't recall the exact number of --

6  Q.  Was it a couple days or a month or --

7  A.  It was going on for a couple of weeks.

8  Q.  Is that something that was worked out between you guys or

9  is that something that was told to you by management?

10  A.  That was told to me by management.

11  Q.  On this day when you went to work, were you expecting to

12  help Tyria?

13  A.  Yes.

14  Q.  And that's something you had done many times before?

15  A.  Yes.

16  Q.  In that -- what class was she in that day?

17  A.  She was in the kindergarten room.

18  Q.  And that was regularly whose class?

19  A.  Ms. Emily's.

20  Q.  Were you familiar with the kids in the class?

21  A.  Yes.

22  Q.  Do you remember about what time you went to her class?

23  A.  I believe I went around -- it was lunchtime, for sure.  I

24  think it was 12:30.

25  Q.  What happens in your classroom when you leave to go give

1   someone a break?  Who's in your classroom?

2   A.  It was Cathie.  But the daycare had this rule that if the

3   children were asleep, as long as the ones that were awake

4   didn't put you out of ratio, you were okay.  So if you had a

5   roomful of ten children and your ratio was one to five, and

6   five was asleep, they said you were okay to be in there alone.

7   Q.  You didn't have anything to do with that policy, right?

8   A.  No.

9   Q.  If you remember on that particular day, what do you

10  remember about going to Ms. Emily's class that day?

11  A.  It was just another normal day.

12  Q.  And tell me what you did when you got there.

13  A.  Well, when I first got in the room, I noticed they were

14  still awake, and --

15  Q.  Who is "they"?

16  A.  The children.  And I believe one of the -- or one of them

17  said, "Mr. Ali," and then all of them started, you know,

18  repeating pretty much like, you know, acknowledging I came

19  into the room.  And I go and I look for the clipboard so I

20  could sign in and so Ms. Tyria could sign out and go on her

21  lunch break.

22  Q.  Was that normal, that they would be awake when you got

23  there, or is it -- is that nap time?  Were you expecting that?

24  A.  It was nap time, but kindergarten does not always take

25  naps.

1  Q.  Did Tyria leave immediately or did she hang around?

2  A.  She left pretty quick.

3  Q.  Okay.  How long were you expecting to stay in that room?

4  A.  For as long as she was on her lunch break.

5  Q.  How long was that, usually?

6  A.  One hour.

7  Q.  And what do you remember doing after you got the

8  clipboard?

9  A.  Well, I signed in; saw who was in the room, of course;

10  made sure, you know, everything was okay; and then I go and

11  take a seat.

12  Q.  Where did you sit, if you remember?

13  A.  On the carpet.

14  Q.  Why did you sit on the carpet?

15  A.  Pretty much because that was what most of the educators

16  usually did.  They would interact with the children.  Plus,

17  that was where Ms. Tyria just was.

18  Q.  And which children were in the area around the carpet, if

19  you remember?

20  A.  E.C. and M.R..

21  Q.  Were they still awake?

22  A.  Yes.

23  Q.  What did you do after you sat down?

24  A.  Well, I sat down and I started joking around with them.  I

25  would pretend to steal their pillows and act like I was going

1   to sleep on them.  And they would go, "Hey, that's my pillow."

2   And, you know, once you did it with one of them, the other one

3   wanted you to do it.  And when I first did it, I did it with

4   E.C., and then M.R said, "Well, don't take mine, Mr. Ali."

5   And then I would do it.  And then S.LNU would be across and

6   she would be like, "Don't take mine."  And I would -- you

7   know, I would just interact with the children and --

8   Q.  How long did that go on?

9   A.  Five minutes, ten minutes.

10  Q.  You mentioned E.C. and M.R. and S.LNU?

11  A.  Yes.

12  Q.  What were the other seven children doing?

13  A.  They were watching and giggling and laughing.  I believe

14  maybe one of them might have been asleep, if I recall.

15  Q.  What do you remember happening next?

16  A.  I remember when -- right after S.LNU said, "Well, don't

17  take mine, Mr. Ali," that's when M.R. gets up and sits in my

18  lap, like she didn't want me to get up over there.

19          MS. KOROBOV:  I'm sorry.  What was the last part of

20  that answer?  I didn't hear it.

21          THE COURT:  Can you repeat your answer?

22          THE WITNESS:  After S.LNU told me not to -- or not

23  to take hers, in other words, M.R. got up and sat on my lap,

24  almost like not wanting me to get up.

25  BY MR. THOMAS:

1  Q.  Were there any kind of rules about the kids sitting on

2  your lap?

3  A.  Not that I was aware of.

4  Q.  Is that something that commonly happened with boys and

5  girls?

6  A.  Yes.

7  Q.  Did anybody ever counsel you or write you up or say, "Kids

8  can't sit on your lap"?

9  A.  No.

10 Q.  Did you commonly, as you've described, interact with the

11 kids on the floor with them?

12 A.  Every day.

13 Q.  Did you ever have any issues about that --

14 A.  No.

15 Q.  -- before that day?

16 A.  No.

17 Q.  Okay.  What happened next?

18 A.  Well, then I started telling M.R., "M.R., you need to get

19 on your mat.  It's nap time, it's time to go to sleep."

20 Q.  And how did she respond to that?

21 A.  She kind of just looked at me and, like disapproval,

22 didn't want to get up; kind of like, you know, defiant, as

23 well, like, "I'm not getting up."

24 Q.  And what do you remember happening after that?

25 A.  That's when I went to pick her up like she was a baby,

1  like cradle her.  And that's when she -- that's when she

2  wrapped her legs around my arm.

3  Q.  Okay.  And show me with your arms, if you could, show the

4  jury with your arms, how your arms were positioned.

5  A.  Well, she was in my lap, and then I went like this to

6  almost scoop her up.  So her head would be over here and then

7  her legs would be on that side.

8  Q.  And was your hand -- was your arm under her legs at that

9  point?

10  A.  Yes -- or, yes.

11  Q.  And then what happened?

12  A.  That's when she -- she threw her leg around my arm.  So,

13  in other words, I couldn't place her down.

14  Q.  What did you think at that point in terms of what was

15  going on?

16  A.  It was obviously something different.  She's never done

17  that.  And I -- it was surprising at the time.

18  Q.  Did you feel that she was being playful?

19  A.  Yes.

20  Q.  And how did you -- how did you respond to that?

21  A.  Well, I told her, you know, "You need to let go," and,

22  "No, thank you."  But she kept laughing and giggling about the

23  situation.

24  Q.  You said, "No, thank you"?

25  A.  Yes.

1  Q.  What's that about?

2  A.  "No, thank you," was a term we generally used with the

3  children.  We didn't tell them, "No, don't."  You know, like

4  we would tell them, "No.  No, thank you."  Because when you

5  enforce the, "Thank you," it also teaches them to be

6  respectful, to also -- we teach them a lot of etiquette.  And

7  we would tell them, "Please," and "Thank you."  And if you

8  don't want something, you would say, "No, thank you."  There

9  was a lot of positive reinforcement.  You didn't use a lot of

10 negative reinforcement.

11 Q.  Were you told, as part of your job, that when you say,

12 "No," to a child, you should say, "No, thank you"?

13 A.  Yes.

14 Q.  Is that something you were used to saying?

15 A.  Before I started working there, no.

16 Q.  How about after you started working there?

17 A.  Yes.  You get in a routine of it.

18 Q.  So she's -- was she moving around at that point when you

19 said she had wrapped her leg over?

20 A.  She was.  She was squirming around a lot.

21 Q.  Okay.  What happened then?

22 A.  Then I go to pull my arm out.  And it was -- I put her

23 down at first, and then I would go to pull my arm out.  And

24 she says, "Ouch."

25 Q.  Okay.  What happened then?

1  A.  I said, "Are you okay?"  And she said, "You hurt me."

2  Q.  Did she say where?

3  A.  I asked, "How did I hurt you?"  She said, "You hurt me

4  down there."

5  Q.  What's your reaction when she said, "Ouch"?

6  A.  When she said, "Ouch"?

7  Q.  Yeah.

8  A.  At first I thought, you know, maybe she just got pinched

9  or something.  But when she said I hurt her, my reaction

10  almost was like, you know, I didn't really mean to.  And I

11  even told her, "I'm sorry.  I didn't mean to."

12  Q.  Where was she in relation to your arm when she said,

13  "Ouch"?

14  A.  She was on her mat, on my right side.

15  Q.  Okay.  And how were you touching her when she said,

16  "Ouch"?  What kind of contact were you having with her when

17  she said, "Ouch"?

18  A.  I had just removed my arm from her grip.

19  Q.  Was she wearing clothing at that time?

20  A.  Yes.

21  Q.  What kind of clothes were you wearing?

22  A.  The dress code.  I think it was a weekday, so I was pretty

23  sure I was wearing the blue collar button-up shirt.

24  Q.  Long sleeve or short sleeve?

25  A.  Short sleeve.

1   Q.  And the G-Shock watch that is in evidence, were you

2   wearing that?

3   A.  Yes.

4   Q.  Once she said, "You hurt me," what were you thinking then?

5   A.  I was thinking, you know, how did I hurt her?  You know,

6   what did I actually do?  I mean, what kind of injury happened?

7   Q.  And what happened then?

8   A.  After she said that, I asked her if she was okay.  She

9   said, "I'm okay."  And then she said, "It hurts when I pee."

10  Q.  All right.  Is that the first time you had heard her say

11  that?

12  A.  Yes.

13  Q.  And how did you react to that?

14  A.  I reacted like -- honestly, I didn't really react to her

15  saying it hurts to pee, because I was still worried about if

16  she was injured or not.

17  Q.  What happened then?

18  A.  Then I tell them to lay down, all of them, all the

19  children.  I tell them it's time for a nap.

20  Q.  Is -- if you remember, was E.C. still right there beside

21  you?

22  A.  Yes.

23  Q.  Was he awake during that time?

24  A.  When everything was happening --

25  Q.  Everything that you described up to this point, was he

1  awake?

2  A.  Yes.

3  Q.  Were other children awake?

4  A.  Yes.

5  Q.  Did -- well, tell me what happened.  What happened next?

6  A.  Well, I waited a couple of minutes.  I told -- I had to

7  tell some of the children to, you know, face different

8  directions, because they were still playing around, pretty

9  much, like S.LNU and G.D. and E.C. and M.R..  Like, whoever

10  was close to each other, they would just keep playing around.

11          So I would tell them, you know -- and that's

12  something all the educators would do, is tell them, you know,

13  "You face that way so you don't, you know, have to interact

14  with them so you can go to sleep."

15  Q.  Did everyone eventually lay down?

16  A.  They were already on their mats, and they all did

17  eventually lay down.

18  Q.  Did you have any more interaction with M.R.?

19  A.  Yes.

20  Q.  What happened next?

21  A.  After I -- I walked around, checked on all the kids.  I

22  sat down again between E.C. and M.R. and I checked to see if

23  she was hurt.

24  Q.  Had she told you again when you sat down, had she said

25  anything else about that you hurt her?

1  A.  Not immediately.

2  Q.  When did she say that again?

3  A.  After she squirmed around, and it was like halfway, I

4  guess, asleep, groggy, I don't know what you want to call it.

5  Q.  Tell me -- actually, let's go back.  You said you checked

6  her.  Tell me what you were doing.

7  A.  Well, I had lifted up the jeans to see if there was any

8  marks maybe that -- from what I did.

9  Q.  Why in the world did you do that?

10  A.  At the time, I wasn't thinking.  I was just acting on

11  impulse, really.  I didn't even think about it.

12  Q.  Were you scared?

13  A.  Yes.

14  Q.  Why?

15  A.  Because I thought I hurt the child.

16  Q.  And did you have your phone with you?

17  A.  Yes.

18  Q.  Why?

19  A.  I carried my phone with me all day.

20  Q.  Why did you have your phone?

21  A.  In that situation?

22  Q.  Just carrying your phone all day, what were you doing with

23  it?

24  A.  I just always kept my phone next to me in case an

25  emergency, someone called me, texted me.  Really, I just -- I

1  never really left my phone anywhere.  It was always on me.

2  Q.  As long as it stayed hidden, is that okay?

3  A.  Yes.

4  Q.  How was M.R. laying -- well, let me make sure I'm clear.

5  Was she asleep when you went back and sat down?

6  A.  I believed she was.

7  Q.  What did you do with your phone?

8  A.  I couldn't really see at the time the -- if there were any

9  injuries.

10  Q.  Was it light or dark in the room?

11  A.  It was dark because it was nap time.  We dimmed the

12  lights.  So I took my phone out and turned the camera's flash

13  on.  You could keep it on.

14  Q.  And what did you do then?

15  A.  And then I took some pictures to see if I could see any

16  injuries.

17  Q.  Did you see any injuries?

18  A.  No.

19  Q.  How many pictures did you take, if you remember?

20  A.  Four pictures.

21  Q.  Did you take them all one right after the other or --

22  A.  No.

23  Q.  How did that happen?

24  A.  Two were back to back, almost.  And then she squirmed

25  around and she said that she was -- her eyes were still

1  closed, and she said, "You hurt me, Mr. Ali."  And it shocked

2  me for a second, and I couldn't -- I looked at the pictures

3  and couldn't really notice anything.  So I wanted to make sure

4  again, and I took some more.

5  Q.  How soon -- well, after that happened, what did M.R. do?

6  A.  She fell asleep.

7  Q.  What did you do?

8  A.  It was about ten minutes before it was time for Ms. Tyria

9  to get back, so I got up, started making my rounds around the

10  room, you know, because some of the children did have

11  breathing issues.  So you want to make sure all the children

12  were okay at all times.

13  Q.  Were you still thinking about what had happened with M.R.?

14  A.  Yes.

15  Q.  What were you thinking?

16  A.  I was thinking, you know, I might have hurt her for real.

17  And then I started thinking -- you know, I said -- I did want

18  to report it, but then I realized, you know -- or I didn't

19  realize.  I felt like I would have been blamed for it and

20  gotten in trouble for it.  And that's when I pulled my phone

21  out, deleted the pictures, and I didn't mention it.

22  Q.  Were you supposed to look at her injuries?  Is that part

23  of your job?

24  A.  No.

25  Q.  Were you scared when you did that?

1  A.  I was beyond scared.

2  Q.  Why were you beyond scared?

3  A.  I mean, it was never my intention to hurt the child.  It

4  was never -- I'd never do that.  You know, of being there the

5  whole time, I never had a complaint of one similar to hers.

6  Q.  What was your intention when you took those photographs?

7  A.  First it was just to turn the light on to see if I could

8  see, but I thought maybe if I took the pictures and turned the

9  brightness on my phone up all the way, I could see a little

10  better, you know.  But even then I didn't see anything.

11  Q.  Were you trying to take pictures in a sexual way with MR.?

12  A.  No.

13  Q.  Do you realize at some point that you had done something

14  stupid?

15          MS. KOROBOV:  I'm going to object.  The question is

16  leading.

17          THE COURT:  Sustained.

18  BY MR. THOMAS:

19  Q.  Did you start thinking about what had happened after it

20  happened?

21  A.  Yes.

22  Q.  How were you feeling then?

23  A.  I felt bad about the entire situation from start to

24  finish, from her saying she got hurt, from me looking, from me

25  taking pictures, from me not even saying anything about it.

1  Q.  What's the next thing that you remember happening?

2  A.  Well, I remember Ms. Tyria came back in the room.  I

3  signed out and I proceeded out of the room.

4  Q.  When you went to take the pictures, how was M.R. laying?

5  A.  On her back.

6  Q.  Did she move at all when you went over to her?

7  A.  Yes.

8  Q.  Do you know if she was aware of what you were doing?

9  A.  To my knowledge, no.  I thought she was asleep.

10  Q.  Did you remove her clothing in any way?

11  A.  No.

12  Q.  Could you have done that?

13          MS. KOROBOV:  Your Honor, I'm going to object.  I'm

14  not exactly sure what he means by that.  I would ask him to

15  clarify what "Could" means.

16          THE COURT:  Would you rephrase the question?

17  BY MR. THOMAS:

18  Q.  Were you in a -- were you in a position to do that if you

19  had wanted to?

20  A.  Yes.

21  Q.  Did you want to do anything like that?

22  A.  No.

23  Q.  How soon after that did Tyria arrive?

24  A.  I would say anywhere -- it was maybe 10, 15 minutes.

25  Q.  What did you do after you left?

1   A.  I went to the restroom.  And then I believe I clocked out

2   for my lunch break.

3   Q.  What's going through your mind at that point?

4   A.  I was really trying to wrap my head around the whole

5   situation at first.  And then I decided, you know, maybe it

6   was nothing, you know.  Maybe she just -- it was just a little

7   injury.

8   Q.  Did you ever put your hand inside of her vagina?

9   A.  No.

10  Q.  Did you ever touch her underwear in any way, other than

11  the way you lifted them up when you tried to take pictures?

12  A.  I only touched the underwear lifting up the pictures -- or

13  lifting them up for the pictures.

14  Q.  Once the pictures were erased, you were still in the room?

15  A.  Yes.

16  Q.  Did you have access to them anymore?

17  A.  They were gone.

18  Q.  Did you try to save them in some way?

19  A.  No.

20  Q.  Did you try to send them to anyone?

21  A.  No.

22  Q.  Did you tell anyone you had them?

23  A.  No.

24  Q.  After you got back from lunch -- you did come back from

25  lunch, right?

AL-AWADI - DIRECT/THOMAS                    343

1    A.   Yes.

2    Q.   This is after all this had happened?

3    A.   Yes.

4    Q.   What do you remember then?

5    A.   I remember clocking back in and giving Ms. Tyria the pop

6    she asked me to get her.  And then I went to my room -- or my

7    room being the EPS1 room.

8    Q.   Did Tyria say anything to you when you gave her the pop?

9    A.   She just said, "Thank you."

10   Q.   And what do you remember happening after that?

11   A.   I went to my room.  And I -- as soon as I got in there, I

12   believe Ms. Cathie told me L.LNU had wet himself.

13   Q.   That was one of the children in your class?

14   A.   Yes.

15   Q.   And so what did you do then?

16   A.   I left the room to go get an extra pair of clothing,

17   because all his clothing was either dirty or he didn't have

18   any more.

19   Q.   What happened then?

20   A.   Then that's when I walked past the front desk and

21   Ms. Chiana said, "Ms. Tyria wants to talk to you."

22   Q.   And did you know why?

23   A.   No.

24   Q.   Did you go talk to her?

25   A.   Yes.

1  Q.  What happened then?

2  A.  I went in the room and she told me, "Listen to what M.R.

3  has to say."

4  Q.  And what did M.R. say?

5  A.  She said that I put a finger in her.

6  Q.  What was your reaction to that?

7  A.  Even more terrified than the beginning.

8  Q.  Do you remember how you reacted?

9  A.  I was -- I was in shock.  I believe at the time, I almost

10  felt like -- I felt like I was going to have a panic attack.

11  It was scary, it was surreal. And I told M.R., you know, "Come

12  over here."  I was crouching down.  And I told her, you know,

13  "Come over here."  And I told her, you know, "You shouldn't

14  lie.  No, thank you."  And I did say, "No, thank you."

15          And she was almost in my lap.  She was still

16  standing, but I wasn't sitting.  I was crouching.  So she --

17  then Ms. Tyria asked her again to say what really happened,

18  and she asked her if it was just a dream.  And she said, "No."

19  And she puts her head down and she -- she was pretty upset.

20  Q.  Did you tell Tyria what had happened?

21  A.  I told her, "I believe it might have been from my watch."

22  Q.  Did you tell her about the rest of it?

23  A.  No.

24  Q.  Why not?

25  A.  I was scared to get in trouble about it.

1  Q.  What did you think would happen if you told them that you

2  had looked at M.R. and taken her picture?

3  A.  Obviously, I would have been instantly fired.  But at that

4  point, that was the least of my worries.

5  Q.  Because you had just been accused of child molesting,

6  right?

7  A.  Yes.

8  Q.  Once you were -- once that happened, did you leave the

9  room?

10  A.  Yes.

11  Q.  And where did you go then?

12  A.  I went back to the EPS1 room.

13  Q.  How long did you stay there?

14  A.  A few more hours.

15  Q.  What do you remember happening then?

16  A.  I remember -- I remember walking the children to the -- to

17  the -- to the library.  And they were using something called

18  the jelly bean, where they hold it and it kind of helps guide

19  them in a straight line.  And the front receptionist, Ms. Flo,

20  told me that she was going to switch with me so I could have a

21  conversation with Heidi.

22  Q.  Did you end up talking to Heidi about what had happened?

23  A.  Yes.

24  Q.  Did you tell Heidi about everything that happened?

25  A.  Not everything.  I didn't mention her saying she was ever

1  in pain, me looking, taking the pictures, but everything else

2  I did tell her about.

3  Q.  Were you free to go at that point and you could leave?

4  A.  At that point I was put on administrative leave, and Heidi

5  did escort me out of the building.

6  Q.  Now, at that point were you under arrest or anything like

7  that?

8  A.  No.

9  Q.  Could you have gone anywhere you wanted?

10  A.  Yes.

11  Q.  Did you still have your phone?

12  A.  Yes.

13  Q.  And where did you go?

14  A.  I went home.

15  Q.  We saw that, from the exhibits, that the next day you got

16  a text message -- text messages from work, right?

17  A.  Yes.

18  Q.  Who were they from?

19  A.  My coworkers.

20  Q.  Do you remember what their names were?

21  A.  Cathie and Karen.

22  Q.  And at that point had you had any contact with the police?

23  A.  No.

24  Q.  They told you in the messages the police were there,

25  right?

1  A.  Yes, they did.

2  Q.  What were you thinking then?

3  A.  Well, I thought back to what Heidi had told me.  She told

4  me not to say anything about the situation.  So when they said

5  there's police over there, I acted completely dumb to the

6  fact, because earlier on in the day they were texting me while

7  they were working, telling me, "Where are you," you know, "Why

8  aren't you at work?"  You know.  And I just told them -- I

9  believe I said I wasn't feeling well.  And I was doing as I

10  was told, not to say anything about what had happened that

11  night.

12  Q.  Eventually that afternoon of the next day, you're still at

13  home, the police showed up?

14  A.  Yes.

15  Q.  And where did you -- what did you do?

16  A.  Well, I answered the door.  I remember my mom asking who

17  was at the door.  I said, "I don't know."  I opened the door

18  and I see an officer at the door.  And I remember my mom

19  almost freaking out instantly.  And my mom, she tells me, she

20  said -- she said, "What happened?  What happened?"

21      I remember I didn't even tell my parents about

22  anything that happened.  I told her, "There was an incident

23  and they just want to ask me some questions."  And my mom

24  said, "Were you the one who caused the incident?  Is that what

25  happened?"  And I told my mom, "No."

1  Q.  We saw that you ended up coming to a police station,

2  right?

3  A.  Yes.

4  Q.  And Detective McAllister interviewed you?

5  A.  Yes.

6  Q.  You didn't tell him about what had happened, did you?

7  A.  No.  I did tell him about what happened, but I didn't tell

8  him the full truth about everything that had happened.  I told

9  him mainly what happened.

10  Q.  You left out some pretty important parts?

11  A.  Yes.

12  Q.  You lied to him?

13  A.  Yes.

14  Q.  Why did you do that?

15  A.  I was -- I was scared.  And I thought if I would have told

16  them, that I would have, you know, been arrested.  And I

17  remember I was so naive at that point, that I thought I would

18  be going straight to prison, not even jail.

19  Q.  At that point, you still had your phone?

20  A.  Yes.

21  Q.  Did you try to throw it away or destroy it or anything

22  like that?

23  A.  No.

24  Q.  Were you even thinking about the pictures at that point?

25  A.  No.

1  Q.  Why not?

2  A.  From my experience with pictures, if you deleted them,

3  they're gone.

4  Q.  Did you ever, ever have any intention of keeping those

5  pictures?

6  A.  No.

7  Q.  Did you ever think those pictures were porn?

8  A.  No.

9  Q.  Did you think it was a smart thing to do or a stupid thing

10  to do after the fact?

11  A.  It was the dumbest thing I could have probably ever done.

12  I remember the whole time I was in jail, I just kept thinking

13  about it, like what even made me do it, you know?  And it was

14  just acting on impulse.  I was -- she said I hurt her, and I

15  was scared.

16  Q.  When you spoke to Detective McAllister, did you think you

17  would be able to explain what happened in a way that he would

18  understand?

19  A.  No, except the way I stated in that statement.  If -- I

20  felt like if I would have told him the truth, that I couldn't

21  justify looking or I couldn't justify the pictures.  But even

22  then, the pictures were already gone, so I couldn't even tell

23  him, "Well, I took pictures, too."  So I felt like I couldn't

24  justify anything.

25  Q.  Did you ever want to hurt M.R.?

1   A.  Never.

2   Q.  Any child?

3   A.  Never.

4           MR. THOMAS:  That's all the questions I have.  Thank

5   you.

6           THE COURT:  Okay.  Let's take five minutes.

7   Unfortunately, they turned off the air or whatever at 5:00, so

8   it's very warm in here.  So get some water and we'll take a

9   five-minute break and then we'll resume.

10          THE COURTROOM DEPUTY:  All rise.

11          (Jury out at 5:40.)

12          THE COURT:  Okay, five minutes.

13          (Recess at 5:41, until 5:51.)

14          THE COURT:  Are you ready for the jury, Ms. Korobov?

15          MS. KOROBOV:  Yes, Your Honor.

16          THE COURT:  Are you ready, Mr. Thomas?

17          MR. THOMAS:  Yes, Your Honor.

18          THE COURT:  You may bring in the panel.

19          (Jury in at 5:51.)

20          THE COURT:  We are back on the record.  And,

21   Ms. Korobov, you may cross-examine the witness.

22          MS. KOROBOV:  Thank you.

23                      **CROSS-EXAMINATION**

24   BY MS. KOROBOV:

25   Q.  Mr. Al-Awadi, your last statement to the jury was that you

1  didn't want to hurt M.R. or any child; is that correct?

2  A.  That is correct.

3  Q.  Because you had a very good relationship with M.R. as of

4  October (sic) 21st of 2014; isn't that correct?

5  A.  I had a good relationship with many of the children.

6  Q.  Sir, my question to you was:  You had a good relationship

7  with M.R. as of August 21st, 2014, correct?

8  A.  Yes.

9  Q.  And you had been working with her for about a year, the

10 entire time you were there, right?

11 A.  No.

12 Q.  You hadn't been with her for a year?

13 A.  She was in the preschool room, and I started in the pre-K

14 room.

15 Q.  Okay.  But you floated between rooms, correct?

16 A.  Correct.

17 Q.  So there were times you had interaction with her over that

18 full year, correct?

19 A.  When I first floated.  I did not fully start in the

20 preschool room.  I ended up floating around in there after.

21 They mainly kept me in the pre-K room.

22 Q.  Sir, for the entire time you knew M.R., you had a good

23 relationship with her, didn't you?

24 A.  Yes.

25 Q.  And you shared inside jokes with her, right?

1  A.  Yes.

2  Q.  You called each other "Baby," didn't you?

3  A.  "Little Baby."

4  Q.  "Little Baby," is what you called each other?

5  A.  Yes.

6  Q.  Okay.  And when you walked into the classroom on that day,

7  on August 21st of 2014, you chose to go sit by her and E.C.,

8  correct?

9  A.  Correct.

10  Q.  You liked her family, right?

11  A.  Yes.

12  Q.  In fact, when her dad came to pick her up on the night of

13  August 21st, you waved to him, right?

14  A.  Yes.

15  Q.  Okay.  She had never accused you of anything before

16  August 21st of 2014, correct?

17  A.  Correct.

18  Q.  I also want to talk about your relationship with your

19  coworkers.  You didn't have any reason to fear them, did you?

20  A.  No.

21  Q.  Okay.  They on various occasions told you that they were

22  looking out for you, right?

23  A.  Yes.

24  Q.  Okay.  Sometimes even pulled you aside and said, "Hey I

25  just want to give you some inside information on something,"

1  right?

2  A.  Uh-huh.

3  Q.  Is that yes?

4  A.  Yes.

5  Q.  Okay.  And, in fact, when you had picked up G.F. and there

6  was the conversation about not picking up the kids, you were

7  specifically told, "Hey, I know you didn't mean anything by

8  that," right?

9  A.  Yes.

10  Q.  And Cathie Williamson specifically offered to take the

11  girls to the bathroom so that you wouldn't be put in a bad

12  position, correct?

13  A.  Yes.

14  Q.  And when Heidi was having you fill out your statement, she

15  specifically said, "Make sure you put everything in it,"

16  correct?

17  A.  Yes.

18  Q.  "Because we don't want anything to come back and bite you

19  in the butt," right?

20  A.  Yes.

21  Q.  On the day in question, the day that the police came to

22  the daycare, on the 22nd, your coworkers were telling you

23  what's going on at the daycare, right?

24  A.  Yes.

25  Q.  And you were the diversity champion, correct?

1   A.  Yes.

2   Q.  You said that the employees really relied on you a lot,

3   right?

4   A.  Yes.

5   Q.  And it's your -- previously, when you spoke to Detective

6   McAllister, you told him that after Tyria had let M.R. tell

7   you what it is that you had done to her, that Tyria said,

8   "Hey, I'm going to go and I'm going to clear everything up,"

9   correct?

10  A.  Yes.

11  Q.  So as of that moment, you believed that Tyria is going to

12  go and at least she's willing to speak on your behalf,

13  correct?

14  A.  Correct.

15  Q.  So on that day, August 21st, 2014, you believe you have a

16  lot of friends at that daycare, right?

17  A.  Yes.

18  Q.  Speaking of friends, the two people who called you from

19  the daycare, you described them to the jury as coworkers; is

20  that correct?

21  A.  Yes.

22  Q.  Cathie is a coworker, correct?

23  A.  Yes.

24  Q.  Who is Karen to you?

25  A.  She was -- an ex-girlfriend of mine now.

1  Q.  Now, correct?

2  A.  Yes.

3  Q.  So when you told the jury that Karen was your coworker,

4  she was actually your girlfriend at the time, wasn't she?

5  A.  She was also my coworker.

6  Q.  Okay.  You didn't tell the jury that, did you?

7  A.  No, I did not.

8  Q.  And, in fact, she's listed in your phone under a pet name,

9  isn't she?

10  A.  Yes.

11  Q.  "Habibti" means my love, doesn't it?

12  A.  Yes.

13  Q.  I want to talk about August 21st, that day in particular.

14  You knew that that was a hectic day at the daycare because of

15  short staffing, right?

16  A.  Yes.

17  Q.  And the director was gone on that day, right?

18  A.  Yes.

19  Q.  Two teachers had called off?

20  A.  Yes.

21  Q.  But you knew that you were going to be in the lunch -- or

22  you were going to be covering lunch in the kindergarten room,

23  right?

24  A.  Yes.

25  Q.  In fact, for two weeks, you had been covering that lunch

1  period, correct?

2  A.  Yes.

3  Q.  And you knew that you would be the only teacher in there

4  during the lunch time, right?

5  A.  Yes.

6  Q.  And when you're the teacher in that room over lunch time,

7  you're kind of in control of that room, right?  You have to be

8  with ten kids, right?

9  A.  Yes.

10  Q.  Okay.  So you decide whether the lights are up or the

11  lights are down, correct?

12  A.  You would follow the instructions of the educator before

13  you.

14  Q.  Okay.  You make that decision about whether the lights are

15  going to be on or the lights are going to be off, right?

16  A.  Yes.

17  Q.  Okay.  Because when you walked into the room, the lights

18  were on, correct?

19  A.  No.

20  Q.  The lights were off when you walked into the room?

21  A.  I believe they were off.  To my recollection, they were.

22  Q.  Didn't you tell the jury that you dimmed the lights in the

23  room?

24  A.  We dim the lights when it's nap time.

25  Q.  So you didn't tell the jury today that you dimmed the

1  lights on August 21st of 2014?

2  A.  I may have been the one who dimmed them, but I don't think

3  I did that day.  But what I was trying to say is, when we get

4  to the nap time period, that's when the lights are dimmed or

5  turned off.

6  Q.  Okay.  So you know that the room is going to be dark when

7  you go into that room, or able to be darkened, correct?

8  A.  Yes.

9  Q.  And you decide kind of, to some degree, when the kids go

10 to sleep, right?

11 A.  To an extent.

12 Q.  Because if you clown around and you're playing with them,

13 they're not going to go to sleep at that time, right?

14 A.  Unless they're very tired.

15 Q.  Okay.  But if you're making noise and laughing and joking

16 with the kids, they're going to stay up, right?

17 A.  Yes.

18 Q.  So when you say it's time to go to sleep and you shut off

19 the playtime, it's time to go to sleep; is that correct?

20 A.  That is correct.

21 Q.  And you, as a teacher in that room, you provide direction

22 to the kids as to even which direction they should look,

23 correct?

24 A.  That was something the educators would do, yes.

25 Q.  Okay.  And you did that in particular, correct?

1   A.  Yes.

2   Q.  And in particular, you did that on August 21st of 2014,

3   right?

4   A.  Yes.

5   Q.  You told E.C. to look away from M.R., correct?

6   A.  Yes, because they were playing around, holding hands, and

7   they wouldn't stop scooting their mats together.  So I told

8   them to stop interacting with each other.

9   Q.  Okay.  So let's talk about that.  You're telling me that

10  this occurs now after there's been this injury and M.R. said

11  you had hurt her, right?

12  A.  Yes.

13  Q.  So after that, where you're so terrified that she's hurt,

14  been hurt by you, she's laughing and playing with E.C., isn't

15  she?

16  A.  Yes.

17  Q.  And they're holding hands, right?

18  A.  Yes.

19  Q.  And there's no complaint of pain, correct?

20  A.  There was an initial complaint of pain.

21  Q.  Not at the time she's holding hands with E.C., is there?

22  A.  No.

23  Q.  Okay.  So at that point, then, you decide that they're

24  going to face away from each other, correct?

25  A.  Yes.

1    MS. KOROBOV:  Can I call up Exhibit 24, please?

2    BY MS. KOROBOV:

3    Q.  Let me ask this:  Before the kids went to sleep is when

4    you say that M.R. wrapped her legs around your arm, correct?

5    A.  Could you repeat that question?

6    Q.  Sure.  Before the kids went to sleep is when you say that

7    M.R. had wrapped her legs around your arm, correct?

8    A.  In my statement, yes.

9    Q.  Well, is that true?

10   A.  Yes.

11   Q.  Okay.  So when that happened, nine out of the ten kids

12   were wide awake during this time, correct?

13   A.  Correct.

14   Q.  And they are all focused on you and what you're doing with

15   M.R. and E.C. and S.LNU, right?

16   A.  Yes.

17   Q.  Every eye, except for the two eyes of the one child who is

18   sleeping, are focused on you and what's going on, correct?

19   A.  Yes.

20   Q.  So they all witnessed, then, this leg around the arm,

21   correct?

22   A.  Yes, but they were laughing at her doing it, thinking it

23   was just a joke.

24   Q.  Okay.  So they're thinking it's a joke, they're laughing.

25   There's no problem at that point, right?

1   A.  No.

2   Q.  And so -- and you say immediately, though, M.R. says, "You

3   hurt me," right?

4   A.  Yes.

5   Q.  And at the time she says that, every one of those kids is

6   awake, correct?

7   A.  Yes, but she doesn't like blurt it out like she's yelling

8   it, but she did tell me I hurt her.

9   Q.  Right.  And at that time, nine out of the ten kids are

10  awake, correct?

11         MR. THOMAS:  I think that's been asked and answered

12  a couple three times.

13         THE COURT:  Overruled.  It's cross-examination.  She

14  may.

15  BY MS. KOROBOV:

16  Q.  Nine out of the ten kids are awake, right?

17  A.  Yes.

18  Q.  So you have nine witnesses that you didn't just assault

19  this child in some way, correct?

20  A.  Yes.

21  Q.  Okay.  In Exhibit Number 24, at the time that you wrote

22  this statement, this is the statement that you wrote out for

23  the daycare, correct?

24  A.  Yes.

25  Q.  It wasn't a statement to law enforcement, right?

1  A.  Yes.

2  Q.  And you didn't like get Mirandized or anything like that

3  before you wrote it, correct?

4  A.  Correct.

5  Q.  And you could write as much as you wanted, right?

6  A.  Yes.

7  Q.  Give as many details about what it is that had happened

8  there?

9  A.  Yes.

10  Q.  Okay.  So could you point out for the jury where it is

11  that you said that M.R. said, "Ouch," when the thing happened

12  with the watch?  Could you just -- you know how this works.

13  Just circle on there where the word "Ouch" is.

14  A.  I did not tell them.  I did not write it down.

15  Q.  You didn't write that in that statement?

16  A.  No, I did not.

17  Q.  Okay.  So you left that out of there.  And did you write

18  anything in there about wanting to physically look at her for

19  injuries?

20  A.  No.

21  Q.  Okay.  And you certainly didn't write anything in there

22  about snapping off the photos of her, did you?

23  A.  No.

24          THE REPORTER:  I'm sorry.  I didn't get that.

25  BY MS. KOROBOV:

1  Q.  You certainly didn't write anything in there about

2  snapping off the photos of her injuries, did you?

3  A.  No.

4  Q.  Now -- and at the time you made the statement, you're

5  making it for people who like you, right?

6  A.  Yes.

7  Q.  People who trust you with children every single day,

8  correct?

9  A.  Yes.

10 Q.  And you told the detective that you gave your full

11 cooperation to the daycare at the time that you went in there,

12 correct?

13 A.  I did.

14 Q.  At the time that you were giving this statement, you were

15 not on any kind of suspension with the daycare, right?

16 A.  No.

17 Q.  Not like you were on strike three and ready to get the old

18 heave-ho, right?

19 A.  No.

20 Q.  Okay.  In fact, you had just been promoted at the daycare,

21 correct?

22 A.  A couple of months, yes.

23 Q.  Okay.  So a new job, they've given you more

24 responsibility, right?

25 A.  Yes.

1   Q.  And you said you've just been named this diversity

2   champion, correct?

3   A.  Yes.

4   Q.  And even though there are some rules of the daycare that

5   you decide not to follow, you're still moving up at the

6   daycare, correct?

7   A.  Correct.

8   Q.  Now, at this point in time there's no police

9   investigation, is there?

10  A.  No.

11  Q.  No one is -- not a -- not Detective McAllister standing

12  outside waiting for Heidi to give up your statement, correct?

13  A.  Correct.

14  Q.  And, in fact, Heidi tells you, "Hey, we're just going

15  to -- we're going to take care of this, we're going to figure

16  out what happened.  We'll put you on leave."  Right?

17  A.  Yes.

18  Q.  Okay.  So at this point, the only thing that you risk

19  having lost is potentially your job by telling them the truth,

20  correct?

21  A.  Correct.

22  Q.  Okay.  And let's talk about the job.

23          MS. KOROBOV:  Could I call up Exhibit Number 23.

24  BY MS. KOROBOV:

25  Q.  This is the application that you submitted when you

1  started at Bright Horizons, right?

2  A.  Yes.

3  Q.  Okay.  And for your education, I'll go down to the bottom

4  there.

5          MS. KOROBOV:  If you could just enlarge that.

6  BY MS. KOROBOV:

7  Q.  With respect to this, you told the people at Bright

8  Horizons Daycare that you had studied computers at Pike High

9  School, correct?

10  A.  Yes.

11  Q.  And then you were at Ivy Tech studying computers, as well,

12  correct?

13  A.  Correct.

14          MS. KOROBOV:  Can we back out, please.

15  BY MS. KOROBOV:

16  Q.  And your previous job experience, you had worked at a

17  phone company, right?

18  A.  Yes.

19  Q.  And you had also worked at a family restaurant, correct?

20  A.  Correct.

21  Q.  Okay.  So prior to this, it's not like you had had a long

22  history of working at daycares, right?

23  A.  No.

24  Q.  This wasn't your life mission, to become an educator, was

25  it?

Case 1:15-cr-00072-TWP-DML Document 139 Filed 11/17/16 Page 365 of 420 PageID #: 2493



A. No, it was not.

Q. Okay. So at worst, you might lose your job if you say to them, "Hey, look, I did something really stupid. The kid said she was injured, I took some photos. Really, though, nothing happened." That's what you risked losing at that point in time, correct?

A. I risked losing that, and I was also scared of being blamed for hurting her.

Q. For actually causing an injury to her?

A. Correct.

Q. Okay. But, again, no one is accusing you of causing an injury with your watch at that point, are they?

A. No.

Q. All right. And so if you perhaps lose your job at that point, that's -- that at this point is all you've lost, right?

A. Yes.

Q. August 22nd, 2014, so we're at a new day here, right? You go home, you go to sleep, don't tell anyone at home about it, do you?

A. No, I do not.

Q. You don't call any friends and say, "Hey, look, I may have done something dumb, give me a little bit of advice"?

A. I didn't tell anybody about it.

Q. Okay. And there's kind of an emergency number that you can call into the daycare if, say, you're going to be sick or

1  out or something like that, right?

2  A.  There's just the -- you call the front office, the front

3  desk --

4  Q.  Okay.

5  A.  -- which is the general number.

6  Q.  All right.  And, actually, the daycare is open until

7  8:00 at night, right?

8  A.  Yes.

9  Q.  Okay.  So there are employees there that late, correct?

10  A.  Correct.

11  Q.  So during that period up at least until 8:00, you could

12  have picked up the phone and said, "You know what, that thing

13  I wrote out, that Exhibit 24, I need to fill in some more

14  information on that," right?

15  A.  I could have, yes.

16  Q.  You didn't do that?

17  A.  I did not.

18  Q.  The daycare opens what time on August 22nd?

19  A.  6:30 is the usual time they open up.

20  Q.  Okay.  You didn't place any calls to anyone at the daycare

21  about your role in what happened to M.R., did you?

22  A.  I did not.

23  Q.  Okay.  And at 1:30, you start getting text messages

24  saying, "Hey, the cops are here," right?

25  A.  I did.

1  Q.  From your girlfriend and from Cathie, correct?

2  A.  Correct.

3  Q.  Okay.  And at that time, again, you don't pick up the

4  phone and call Heidi and say, I've got more information for

5  you, I'm -- please, send the police my way.  I've got some

6  things to tell them."  You don't do that, do you?

7  A.  No, I do not.

8  Q.  Lieutenant Madison comes to your door to take you down to

9  the police station, right?

10 A.  Yes.

11 Q.  And you don't tell him, "Hey, look, I've got to tell you

12 something that happened.  I've got this phone, I took some

13 pictures on it."  You don't have that conversation with him,

14 do you?

15 A.  I do not.

16 Q.  At the Child Advocacy Center, your time down there -- it

17 looks like a giant warehouse when you pull up to it, right?

18 A.  Pretty much.

19 Q.  Okay.  You can see where you're going when you go there,

20 right?

21 A.  I didn't know where I was going exactly.

22 Q.  Okay.  You're not brought underground, though, and brought

23 into a building like here, right?

24 A.  No.

25 Q.  Okay.  So you know what it is, you know what the

1  environment is, when you're brought in, correct?

2  A.  Correct.

3  Q.  Okay.  And they treated you well, right?

4  A.  Yes.

5  Q.  You weren't even handcuffed on the way down, were you?

6  A.  I was not.

7  Q.  Okay.  You weren't shackled to anything, correct?

8  A.  No.

9  Q.  They didn't do some kind of full body cavity search on

10  you, right?

11  A.  No.

12  Q.  They even let you keep your phone, didn't they?

13  A.  Yes.

14  Q.  And, in fact, the very first thing that happens, really,

15  your first interaction with Detective McAllister, is when you

16  ask him, "Hey, can I use my phone," right?

17  A.  Yes.

18  Q.  And he says, "Hold on, hold on.  I don't want to get in

19  trouble.  I need to take that phone from you."  Right?

20  A.  Yes.

21  Q.  So your very first interaction with Detective McAllister

22  deals with what?

23  A.  We were talking about sports and something at first.  It

24  wasn't directly that.  His phone kept vibrating, and he

25  kept -- he said, "I need to take this."  And I had told him,

1   "Well, is it okay if I check my phone?"

2   Q.  You had a long conversation with Detective McAllister,

3   before you ever got to anything here, about things like

4   soccer, right?

5   A.  Correct.

6   Q.  About your upbringing and how it is you came to be in the

7   country?

8   A.  Correct.

9   Q.  He treated you with the utmost respect, didn't he?

10  A.  Yes.

11  Q.  He told you a number of times, "Mr. Al-Awadi, if this is a

12  mistake, please help me clear it up," correct?

13  A.  I believe so.

14  Q.  All right.  Let's talk about what it is that you told

15  Detective McAllister.  It's a little bit different than what

16  you've told here today, isn't it?

17  A.  Yes.

18  Q.  In fact, your attorney said that you lied to him because

19  you didn't tell him certain things, correct?

20  A.  Correct.

21  Q.  But there's other details that you added in, that never

22  happened, correct?

23  A.  Well, correct.

24  Q.  Okay.  Because you decided that as he started talking to

25  you about physical evidence, that you had to give him an

1  innocent explanation for the physical evidence, right?

2  A.  I was explaining what had happened when -- in the

3  statement, when I even told him about the watch, I was not

4  lying about that.  I had told him about the incident, but I

5  did not tell him she had said that she was hurt.

6  Q.  Okay.  Well, let's talk about this, sir.  You told

7  Detective McAllister on that day that you may have -- that you

8  did, not, "may have," that you did tickle M.R. on her bare

9  skin, correct?

10  A.  Yes.

11  Q.  And that's a lie?  That didn't happen, did it?

12  A.  That did happen.

13  Q.  When did that happen, sir?

14  A.  That happened along with the taking of the pillows.  It

15  was like they would take their pillows back and hold onto it

16  tight.  And then I would be like, "You give it to me."  And

17  they wouldn't give it to me, so then I would tickle them until

18  they let go, and then I would take it.

19  Q.  You didn't tell the jury that today, did you?

20  A.  I didn't go into very much detail, no.

21  Q.  Well, sir, it was your attorney asking you questions,

22  right?

23  A.  Yes.

24  Q.  And you had a chance to give as much information as you

25  wanted as he asked you questions, correct?

1  A.  Yes.

2  Q.  You never told the jury that you tickled her, correct?

3  A.  I did not.

4  Q.  And you never told the jury that she said, "Look, Mr. Ali,

5  I've got new panties," did you?

6  A.  I did not.

7  Q.  And you said that she, in fact -- what you told Detective

8  McAllister is that she lifted up her shirt to try to show you

9  her panties, correct?

10  A.  She did.

11  Q.  You're saying now that she did that?

12  A.  She did.  That was just -- when my attorney was asking me

13  questions, he did not specifically ask me about it.  And I may

14  have neglected to inform the jury about that, yes.

15  Q.  Well, why don't you tell the jury now when that happened

16  in this scheme of events.

17  A.  When she told me about her panties?

18  Q.  Uh-huh.

19  A.  It was upon the first inspection, right before I did the

20  first inspection.  You know, I sat down, and she was -- she

21  was almost asleep the first time.  So she tells me, "Well, I

22  got new panties."  It was -- it was -- she was telling me, "I

23  got new panties."  And then I let her go to sleep, and then I

24  did the inspection.

25  Q.  Okay.  Well, according to the version you gave Detective

1  McAllister, though, that would be leaving out some details

2  from what you told him, right?

3  A.  Definitely.

4  Q.  Because what you told Detective McAllister was that when

5  she said, "I got new panties," you said, "M.R., no, thank

6  you," correct?

7  A.  Yes.

8  Q.  And you told Detective McAllister that then she pulled up

9  her shirt to try to show you, correct?

10 A.  Correct.

11 Q.  And that after that, you were telling her, "No, thank you,

12 no, thank you," and you told Detective McAllister that that

13 made you very uncomfortable, didn't it?

14 A.  Yes.

15 Q.  It made you so uncomfortable, in fact, that you then

16 decided to put a finger at the top of her jeans to show her

17 that her pants didn't fit her, right?

18 A.  I did say that, yes.

19 Q.  Okay.  You didn't tell the jury that today, did you?

20 A.  No, I did not.

21 Q.  Okay.  And the -- so did that happen or didn't that

22 happen?

23 A.  It did happen.

24 Q.  Okay.  That's also another fact that you've added today,

25 correct?

1   A.  It was just something I was not asked about specifically.

2   I was answering the questions I was asked about.

3   Q.  So at that point, when you are putting your fingers in her

4   pants after she has said, "Ouch, you hurt me," you knew that

5   her pants were loose, didn't you?

6   A.  After she said it, yes.

7   Q.  Well, after you put your fingers in her pants to pull on

8   them, right?

9   A.  Well, she -- the reason I did that was because she wanted

10  to show me.  And I noticed she wasn't wearing her belt.  And

11  that's when I said, "Well, where is your belt?"  And she

12  said -- well, I told her, "They're loose.  Where is your

13  belt?"  And she said, "My daddy forgot to give me my belt this

14  morning."

15  Q.  Okay.  So are you now saying that the reason you put your

16  fingers in her pants is because she wanted to show you her

17  underwear?

18  A.  That wasn't the reason they were in there.

19  Q.  You did tell the detective, at least three times, that you

20  never saw her underpants, correct?

21  A.  I did.

22  Q.  And that was a lie, wasn't it?

23  A.  Yes.

24  Q.  And you talked about -- when you talked to the detective

25  about tickling her, again, you reiterated you never saw the

1  underpants, correct?

2  A.  I did.

3  Q.  In fact, at one point when you were speaking to the

4  detective, you suggested to the detective that by wrapping her

5  legs around your arm and your watch, that M.R. was sexually

6  experimenting, didn't you?

7  A.  I said that could have been a possibility.

8  Q.  Okay.  You said that you thought she was enjoying it,

9  correct?

10  A.  She was moving back and forth, rubbing pretty much.

11  Q.  Okay.  So it's your testimony today that -- your watch is

12  just like mine, right, a similar watch?

13  A.  It's noticeably bigger in size, but --

14  Q.  Your watch is noticeably bigger?

15  A.  Yes.

16          MS. KOROBOV:  Okay.  May I approach the witness?

17          THE COURT:  You may.

18          MS. KOROBOV:  I'm just going to get it.

19  BY MS. KOROBOV:

20  Q.  For the record, I have retrieved Exhibit 28, the G-Shock

21  watch.  Your watch is noticeably bigger than mine?

22  A.  From right here, it does look bigger.

23  Q.  Okay.  Bigger, all right.  So you're saying she wraps her

24  legs around this watch, right?

25  A.  Correct.

1  Q.  And that she's wiggling up and down on it, isn't she?

2  A.  She was squirming around, yes.

3  Q.  And you believed that she was sexually pleasuring herself

4  at that time, didn't you?

5  A.  I said it could have been a possibility.

6  Q.  You said, "Kids do like to experiment," right?

7  A.  I did say that.

8  Q.  You said, "Maybe she liked how it felt," correct?  You

9  told the detective, "She was just enjoying it," right?

10  A.  Yes.

11  Q.  And then you told the detective, "And then she fell

12  asleep," right?

13  A.  Yes.

14  Q.  At the time that she's got her legs wrapped around your

15  watch, sexually pleasuring herself, to your estimate, she is

16  fully clothed, correct?

17  A.  Yes.

18          MS. KOROBOV:  May I approach again, Your Honor?

19          THE COURT:  You may.

20  BY MS. KOROBOV:

21  Q.  Referring to Government's Exhibit Number 6, M.R. is

22  wearing these jeans, right, at the time that she's got her

23  legs wrapped around you, correct?

24  A.  Yes.

25  Q.  Now, in looking at the jeans, there are no tears in the

1  crotch, correct?

2  A.  Correct.

3  Q.  No damage to them anywhere, right?

4  A.  No.

5  Q.  And I can look at that -- and can you notice that here --

6  excuse me.  I'll step back to the podium.

7          Even from as far away as here, sir, you can see that

8  there's nothing torn or nothing damaged about the jeans,

9  correct?

10 A.  It's a little far, but I don't think you can.

11         MS. KOROBOV:  May I approach the witness again, Your

12 Honor?

13         THE COURT:  You may.

14 BY MS. KOROBOV:

15 Q.  When you put your hands down M.R.'s pants to take the

16 photos, could you show the jury how close you were to her

17 jeans?

18 A.  Where I was sitting?

19 Q.  How close you were to the jeans when you put your hands in

20 her pants.

21 A.  Well, when I put my hands, my hands were here.

22 Q.  Okay.  So how far were you, then, physically from her

23 jeans?  Is that how far you kept her when you took the

24 pictures?

25 A.  She would have been -- her body was laying down right

1    here.  I would have been about right here, yes.

2    Q.  Okay.  You could have used your cell phone to look on the

3    outside of the jeans, right?

4    A.  Yes.

5    Q.  And see whether there was any damage, correct?

6    A.  Correct.

7    Q.  Okay.  You can fully inspect the outside of the jeans and

8    see if there's any blood or anything coming out of the jeans,

9    right?

10   A.  Yes.

11   Q.  You didn't do that, though, did you?

12   A.  I did not.

13   Q.  And just a size comparison for M.R.  When the jurors saw

14   her today, she's bigger than she was back in August of 2014,

15   right?

16   A.  I honestly cannot recall.

17   Q.  You don't remember how big she was back then?

18   A.  I mean, I wasn't really paying attention to how tall she

19   has gotten now.

20   Q.  Okay.  Out of curiosity, before I continue with more on

21   that day, you said you have a brother, right?

22   A.  Correct.

23   Q.  How old is your brother?

24   A.  He is 20 now.

25   Q.  20 now, okay.  Did he work at the daycare on August 21st

1   of 2014?

2   A.  No.

3   Q.  Okay.  Did you have any other male relatives that ever

4   worked at the daycare on August 24th of 2014?

5   A.  No.

6   Q.  They never visited the daycare either, did they?

7   A.  My brother has visited the daycare.

8   Q.  Did he ever have contact with M.R.?

9   A.  He may have.  He was in the class interacting with the

10  children; reading them books, too.

11  Q.  When was that?

12  A.  Once before.

13  Q.  Not August 21st of 2014, right?

14  A.  I -- no.

15  Q.  Okay.  And you never saw him put his hands down M.R.'s

16  pants, correct?

17  A.  Correct.

18  Q.  You spent two years on a job working refurbishing phones,

19  you said, correct?

20  A.  Correct.

21  Q.  And during that time, you never took pictures of anyone's

22  genital area on that job, correct?

23  A.  No.

24  Q.  Okay.  And you felt that you were well trained to do that

25  job, correct?

1   A.   Yes.

2   Q.   Okay.  And then you also worked at a restaurant, right?

3   A.   Yes.

4   Q.   And this is a family restaurant, correct?

5   A.   Correct.

6   Q.   You worked as a cashier and a cook, right?

7   A.   Yes.

8   Q.   You had contact with members of the public?

9   A.   Yes.

10  Q.   Okay.  You never took pictures of anyone's genitals on

11  that job, right?

12  A.   No.

13  Q.   Okay.  You said that you baby-sat kids within your family,

14  right?

15  A.   Yes.

16  Q.   Okay.  And you also took care of a child who wasn't in

17  your family, named B.N., correct?

18  A.   No.

19  Q.   You never took care of B.N.?

20  A.   No.  He was at the daycare.

21  Q.   He was a child at the daycare?

22  A.   Yes.

23  Q.   Right?  And it's your -- you're saying that you never took

24  care of him?

25  A.   Outside?

1  Q.  Correct.

2  A.  No.

3  Q.  Do you remember sending an e-mail to a woman about a job

4  at the Goddard School?

5  A.  Yes.

6  Q.  And do you remember telling her that you took care of a

7  little boy named B.N.?

8  A.  That was her son.

9  Q.  That was the son of the woman you were e-mailing about the

10  job at the daycare?

11  A.  Yes.

12  Q.  Okay.  So you've taken care of kids, obviously, both in

13  and out of your family, right?

14  A.  No.  He was at the daycare, and I was employed at the

15  daycare.  And she had told me she actually worked at the

16  Goddard School and had an opening.  I inquired about that

17  after they had left the daycare.  And I have never taken care

18  of him outside of school, no.

19         MS. KOROBOV:  May I approach the witness, please?

20         THE COURT:  You may.

21  BY MS. KOROBOV:

22  Q.  I'll show you what I've marked as Government's Exhibit 36.

23  I'll ask you to read that to yourself.

24         Do you recognize Government's 36?

25  A.  Yes.

1  Q.  And what is Government's 36?

2  A.  Me writing an e-mail to the HR person that worked at the

3  Goddard School.

4  Q.  Okay.  And is that a true and accurate copy of the e-mail

5  that you sent on April 1st of 2014?

6  A.  Yes.

7          MS. KOROBOV:  At this time, the government moves to

8  admit Government's Exhibit 36.

9          THE COURT:  Any objection to 36?

10         MR. THOMAS:  No, not at all.

11         THE COURT:  36 is admitted into evidence without

12  objection.

13                    (Government's Exhibit 36 was

14                     received in evidence.)

15  BY MS. KOROBOV:

16  Q.  "Hello, Rachel" --

17         MS. KOROBOV:  Permission to publish, Your Honor, by

18  reading?

19         THE COURT:  You may.

20  BY MS. KOROBOV:

21  Q.  "Hello, Rachael, My name is Ali Al-Awadi.  I am an

22  educator at Bright Horizons.  I used to care for B.N. in the

23  evenings and Mrs. Newkirk informed me of an opportunity to

24  work at the Goddard School.  I have given her a call and she

25  told me to e-mail you," with, "my resumé.  Thank you for your

1  time."  You wrote that e-mail?

2  A.  Yes, I did.

3  Q.  Okay.  And this was when you were trying to apply for work

4  at the Goddard School, correct?

5  A.  Correct.

6  Q.  When you cared for children in your family, could you tell

7  the jurors which children you cared for?

8  A.  My uncle's -- on my dad's side, my dad's brother's

9  children; my mom's brother's children; anyone who was pretty

10  much related to me.

11  Q.  Okay.  About how many children?

12  A.  I would say more than five, but never more than two at a

13  time.

14  Q.  Okay.  More than five kids total, not at one setting, but

15  five different children?

16  A.  Yes.

17  Q.  Okay.  Can you give an estimate about how many different

18  children?  Is it just five or more than just five?

19  A.  It's more than five.

20  Q.  Can you give us an estimate?

21  A.  I would say maybe around -- between eight to ten.

22  Q.  Eight to ten children in your family you cared for, right?

23  A.  Different ones, yes.

24  Q.  Okay.  And other children -- you didn't receive any formal

25  training on how to take care of them, right?

1   A.  No.

2   Q.  Okay.  It was stuff you learned by interacting with your

3   family, correct?

4   A.  Correct.

5   Q.  And by interacting with those kids, right?

6   A.  Yes.

7   Q.  Can you tell the jury how many times you took pictures of

8   their genitals in order to document something?

9   A.  Never.

10  Q.  Let's talk a little bit about the cell phone policy.  The

11  cell phone policy wasn't something that you were worried

12  about, right?

13  A.  I was, but I wasn't very -- it wasn't a rule I followed

14  too much.

15  Q.  Okay.

16  A.  It still did concern me.

17  Q.  It's a rule that concerned you, but not enough to follow

18  the rule, right?

19  A.  Only because everyone else would still have their phone on

20  them.

21  Q.  Okay.  So everyone else is breaking the rule, so it wasn't

22  a policy that really worried you, right?

23  A.  It worried me in the sense if I were to keep getting

24  caught, I would eventually get disciplined for it.

25  Q.  Okay.  Well, how many times had you been caught?

AL-AWADI - CROSS/KOROBOV                    384

1  A.  I've been caught with it, I would say, maybe twice.

2  Q.  Okay.  Ever written up for it?

3  A.  No.

4  Q.  Okay.  So even -- you heard Ms. Heidi testify earlier,

5  right?

6  A.  Yes.

7  Q.  Sorry to call her "Ms. Heidi," but you heard her testify,

8  and she said, "Look, you get kind of like one free" --

9         THE REPORTER:  I'm sorry.  I lost you.

10        MS. KOROBOV:  I'm sorry.

11 BY MS. KOROBOV:

12 Q.  You said you heard Ms. Heidi testify about the policy that

13 you get one freebie, right?

14 A.  Uh-huh.

15 Q.  And after that, you're supposed to start getting written

16 up, correct?

17 A.  That was the new policy, yes.

18 Q.  Okay.  You had never even been written up for this, had

19 you?

20 A.  No.

21 Q.  Okay.  How many accident reports do you think you had

22 filled out during your time at Bright Horizons Daycare?

23 A.  Plenty.  I mean, it's hard to even give you a number.

24 Q.  Because it's a lot, isn't it?

25 A.  Yes.

1  Q.  Okay.  Kids say they get hurt or they're injured or

2  they're in pain on a routine basis, right?

3  A.  Well, yes.

4  Q.  They're kids, right?

5  A.  Yes.

6  Q.  Okay.  And some of these kids, when they come to you and

7  say, "I'm hurt," or, "I'm in pain, I've hurt myself," they're

8  in your care at the time that that happens, correct?

9  A.  Correct.

10  Q.  But despite the fact that they were in your care at the

11  time you got -- they got hurt, that didn't stop you from going

12  and filling out an accident report, did it?

13  A.  No.

14  Q.  Okay.  And on how many of those accident reports, could

15  you tell the jury, that you took photos to document what it is

16  that had happened to the child?

17  A.  None.

18  Q.  And so you mentioned some of the daycare's policies.  You

19  tried to make sure that anytime that there was interaction

20  between -- of a disciplinary nature, even between adults, that

21  there was a witness to it, right?

22  A.  Yes.

23  Q.  Okay.  So when you were counseled, I think by Heidi, there

24  was another educator, Kim, in the room, correct?

25  A.  Correct.

1  Q.  And that was something that was emphasized as kind of

2  following policies on certain things, correct?

3  A.  Correct.

4  Q.  Not on other things, though, right?

5  A.  Correct.

6  Q.  And, in fact, the policy regarding injuries, you knew that

7  you needed to inform the nurse, correct?

8  A.  Yes.

9  Q.  Okay.  Now, there wasn't a nurse working, though, in

10  August of 2014, correct?

11  A.  No, there was not.

12  Q.  But in that kindergarten room, you're the only teacher,

13  right?

14  A.  Yes.

15  Q.  Right outside of the kindergarten room is the reception

16  desk, correct?

17  A.  Correct.

18  Q.  Who is sitting at the reception desk on August 21st, 2014?

19  A.  Chiana.

20  Q.  Okay.  And you'd previously made reports to Chiana about a

21  child having genital pain, correct?

22  A.  Correct.

23  Q.  Okay.  And the child made the comment about having genital

24  pain while in your care, correct?

25  A.  It was as soon as I got in the room, though.

1  Q.  Okay.  But when the child is really holding herself and

2  rocking back, she had made that complaint to you, correct?

3  A.  Yes.

4  Q.  And you went and you notified who?

5  A.  Chiana.

6  Q.  And Chiana went and told the nurse, right?

7  A.  Yes.

8  Q.  Did you get in any trouble over that?

9  A.  No.

10  Q.  Did anyone say, "Hey, Mr. Ali, I really wish you would

11  have taken some photos so that we would know that you're not

12  the source of this child's genital pain"?

13  A.  No.

14  Q.  So there was nothing that prevented you on August 21st of

15  2014 from opening that door and saying, "Chiana, get in here,"

16  right?

17  A.  No.

18  Q.  And at the time you would have asked her to come in there,

19  nine of the ten children were awake, correct?

20  A.  Correct.

21  Q.  You could have said, "Hey, Chiana, please talk to these

22  kids.  She's saying she's hurt.  I didn't do anything wrong.

23  Get someone in here."  Correct?

24  A.  Correct.

25  Q.  You didn't do that, did you?

1   A.  I was panicking at the time.

2   Q.  You indicated that there are devices, though, in the room

3   for taking photos, correct?

4   A.  In the younger classrooms, yes.

5   Q.  Right, some cameras or iPads, right?

6   A.  Yes.

7   Q.  And those, you're supposed to take photos that, like, can

8   be put up on bulletin boards, right?

9   A.  Yes.

10  Q.  You didn't take these photos to put them up on a bulletin

11  board, did you?

12  A.  No.

13  Q.  When you came into the room, you indicated that M.R. was

14  happy, correct?

15  A.  Yes.

16  Q.  She was laughing, right?

17  A.  Yes.

18  Q.  And she was playful, correct?

19  A.  Yes.

20  Q.  M.R. wasn't complaining of any kind of genital pain when

21  you walked into the room, was she?

22  A.  No.

23  Q.  And, in fact, you said that M.R. sat on your lap like she

24  didn't want to get up, right?

25  A.  Correct.

1  Q.  You indicated that you kept your phone on you in case of

2  an emergency, correct?

3  A.  Yes.

4  Q.  And that phone had the numbers of other employees of the

5  daycare, correct?

6  A.  Yes.

7  Q.  And your phone was with you at the time that M.R. said,

8  "Ouch," right?

9  A.  Yes.

10 Q.  Your phone was with you at the time that she said, "You

11 hurt me," correct?

12 A.  Yes.

13 Q.  You did not pick up that phone to call anyone to come in

14 there to provide assistance, did you?

15 A.  No.

16 Q.  Instead, you turned down the lights and took photos of her

17 genitals, correct?

18 A.  The lights were already off.

19 Q.  What kind of mark were you expecting to see on MR.'s body?

20 A.  I thought she might have got pinched or something.

21 Q.  Why did you think that?

22 A.  Because it was -- as soon as I removed my arm from her

23 grip is when she said, "Ouch, you hurt me."

24 Q.  Okay.  She didn't say, "Ouch, you hurt my tito," though,

25 did she?

 1  A.  No.

 2  Q.  She didn't say, "You hurt my privacy," or anything like

 3  that, did she?

 4  A.  No.

 5  Q.  She just said, "You hurt me," correct?

 6  A.  "Down there."

 7  Q.  Oh, so now you're saying she (sic) hurt you down there?

 8  A.  And I believe I did say that when I was asked.

 9  Q.  I want to talk a little bit about the confrontation.  You

10  were called into the room by Chiana, correct?

11  A.  Correct.

12  Q.  And she told you to go into the room after -- where M.R.

13  was located, right?

14  A.  Because Ms. Tyria was located there, as well, yes.

15  Q.  Right.  So you knew that you were going into a room with

16  M.R. and Tyria in that room, right?

17  A.  Yes.

18  Q.  And E.C. was in the room, too, correct?

19  A.  Correct.

20  Q.  And when you walked in there, M.R. is in there and E.C. is

21  in there and Tyria is in there, and they are all sitting down,

22  right?

23  A.  Yes.

24  Q.  On the mats, correct?

25  A.  Correct.

1  Q.  And you went into the room, right?

2  A.  Yes.

3  Q.  And that's when Tyria told M.R., "Tell him what happened,"

4  correct?

5  A.  Yes.

6  Q.  Okay.  And M.R. said that you had touched her down there

7  and it hurt, right?

8  A.  Yes.

9  Q.  Okay.  And at that time, M.R. is on her mat, correct?

10 A.  I believe she was -- I do not recall.

11 Q.  Okay.  Well, you describe that you walk into the room;

12 Tyria is there, M.R. is there, E.C. is there; they're sitting

13 on either side of her, right?  Correct?

14 A.  Yes.

15 Q.  Okay.  And Tyria just says, "Tell him what happened,"

16 right?

17 A.  Yes.

18 Q.  M.R. doesn't stand up to give a book report, does she?

19 A.  No.

20 Q.  M.R. remains sitting down, didn't she?

21 A.  What I'm saying is, I can't remember if she was standing

22 already or if she was sitting.

23 Q.  Okay.  So you don't remember what position she was in?

24 A.  No.

25 Q.  Do you remember telling Detective McAllister, though, that

1  the reason you pulled her to you is because you didn't want

2  her to fall on a plate?

3  A.  I believe so.

4  Q.  The truth is, Mr. Ali, that you put her in your lap,

5  didn't you?

6  A.  She was right next to my lap, but she was -- I was

7  crouching.  I couldn't actually pick her up and sit her down

8  in my lap.  She was in the general area, yes.

9  Q.  So if your coworker, Tyria, came into court and said that

10  man put her on his lap, it's your recollection that that is

11  simply not accurate?

12  A.  My recollection is, if she did see her on my lap, then it

13  was because she was maybe even standing so close she was

14  almost on my lap instead of actually sitting-sitting on my

15  lap.

16  Q.  Regardless, is it your testimony that at the point that

17  the child is accusing you of sexually molestive touching, you

18  physically pulled her closer to you?

19  A.  Yes.  Yes.

20  Q.  And at that point, you accused her of lying to you, didn't

21  you?

22  A.  I asked her if she was dreaming.

23  Q.  Okay.  Because you knew that when you touched her, she was

24  sleeping, wasn't she?

25  A.  When I examined -- when I took the pictures, she was

1  asleep, yes.

2  Q.  When you touched her, she was sleeping, right?

3  A.  I --

4          MR. THOMAS:  Objection, asked and answered.

5          THE COURT:  He didn't answer that question.  The

6  question was, "When you touched her, she was sleeping?"  You

7  need to answer that.

8  A.  Could you clarify by "touching" if I was -- if you mean

9  what she was accusing me of doing?

10  BY MS. KOROBOV:

11  Q.  When you touched her -- did you touch her on August 21st,

12  2014?

13  A.  I did not molest her.  I did not fondle her.  But I did,

14  of course, touch her, but not in a sexual manner.

15  Q.  Okay.  And when that happened, she was sleeping, right?

16  A.  Correct.

17  Q.  You knew, from the very beginning, that what you were

18  asking her about is something that happened when she was

19  sleeping?

20  A.  Correct.

21  Q.  And in front of all those people, you accused her of lying

22  to you, didn't you?

23  A.  I asked if she was dreaming.  And I said, "We're not

24  supposed to lie."

25  Q.  "We're not supposed to lie."  Interesting words, Mr. Ali,

1  because from there, what did you proceed to do in front of

2  that classroom full of people?

3  A.  I do not recall.

4  Q.  You lied, didn't you?

5  A.  You mean --

6  Q.  Did you tell any of those people, "I just snapped off some

7  pictures of this child's vagina"?

8  A.  No.

9  Q.  Okay.  Did you tell any of those people, "Hey, she said,

10  'Ouch, you hurt me down there'"?  Did you tell any of them

11  that?

12  A.  No.

13  Q.  Okay.  And then, when -- and for then the next what,

14  couple of hours, when you're talking to Heidi, when you're

15  talking to Chiana, when you're talking to Tyria, you never

16  told any of them that, did you?

17  A.  No, I didn't, but I didn't lie to them.  I didn't -- I

18  just did not tell them.

19  Q.  You didn't tell them the whole truth; is that your

20  testimony?

21  A.  What I'm saying is I did not lie to them.

22  Q.  So it's not a lie, in your opinion, to fail to disclose

23  information that would better give a full picture of what

24  happened?

25  A.  I'm not saying it's not a lie.  I'm just saying I didn't

1  tell them because I was scared at the time.

2  Q.  Okay.  Counsel asked if you could have removed M.R.'s

3  clothes, correct?

4  A.  Correct.

5  Q.  All right.  So let's talk a little bit about that scenario

6  in the room.  In the room, there are ten sleeping children at

7  this point, including M.R., right?

8  A.  Yes.

9  Q.  Okay.  And you know that you are approaching the end of

10  the lunch hour, right?

11  A.  Yes.

12  Q.  Okay.  And so if you take off M.R.'s pants and someone

13  walks in, what's going to happen?

14  A.  Someone is going to see.

15  Q.  Someone is going to see it, aren't they?

16  A.  Of course.

17  Q.  Okay.  But what you weren't worried about was opening up

18  her pants and snapping off some photos, right?

19  A.  I was worried about that, but I -- I was also more worried

20  about if she was okay, if I actually did hurt her.

21  Q.  Not worried enough to tell anyone about whether you did

22  hurt her, right?

23  A.  No, because she was accusing me.

24  Q.  Accusing you of what?

25  A.  Hurting her.

1  Q.  She just said, "You hurt me down there," right?

2  A.  Yes.

3  Q.  At that point, she didn't say, "You put your fingers in

4  me," did she?

5  A.  No.

6  Q.  And, actually, by your definition, it was true, you had

7  hurt her down there, right?

8  A.  Yes.

9  Q.  So M.R. wasn't falsely accusing you of anything, right?

10  A.  No.

11  Q.  So your testimony at that point, "Yeah, I've got an

12  innocent explanation.  It's just -- it's my watch.  Take this

13  thing away from me.  It's a crotch killer"?

14  A.  I just felt like, telling them I would inspect and when --

15  and if I took pictures or not, I could not justify it to them,

16  regardless if they were my closest friends, my mother, my

17  father, my family.  I felt like I couldn't justify telling

18  anyone that.

19  Q.  Because it's shameful to do what you did, isn't it?

20  A.  Not as much shameful as it would look bad.  It would make

21  me look like I, of course, did something wrong, that I wasn't

22  supposed to do it, even if I had pure intentions.

23  Q.  When the police came to the door, you told your parents,

24  or your mom, that there was an incident and the police wanted

25  to talk to you about it, right?

1   A.  Yes.

2   Q.  And your mom says to you, "You didn't cause the incident?"

3    Correct?

4   A.  Correct.

5   Q.  A little bit about the phone.  You believed you deleted

6   the images from the phone, right?

7   A.  I knew I did.

8   Q.  Okay.  And it's your testimony that you didn't believe at

9   that point that they could be recovered, right?

10  A.  Correct.

11  Q.  So when counsel asked, "You didn't throw away your phone,

12  did you," you don't believe you had to throw away your phone,

13  right?

14  A.  Correct.

15  Q.  Because you believed they were gone, correct?

16  A.  Correct.

17  Q.  After you took the images of M.R., you went to the

18  bathroom, correct?

19  A.  Yes.

20  Q.  And you brought your phone with you into that bathroom,

21  right?

22  A.  It was on me at the time, yes.

23  Q.  You brought your phone with you into the bathroom,

24  correct?

25  A.  My phone was always on me, so, yes, it was in the

1  bathroom.

2  Q.  Okay.  And then you went to your car with that phone,

3  correct?

4  A.  I went on break and I went to, I believe it was the gas

5  station or the Marsh.  I don't recall.  I got her her pop.

6  And then I stayed in the car the rest of the day -- or the

7  rest of the break.

8  Q.  Okay.  So you sat out in that car with your phone, right?

9  A.  Yes.

10 Q.  The phone you had used to take those images of M.R.,

11 correct?

12 A.  Yes.

13 Q.  So you were alone in that car with your phone for at least

14 a half-hour?

15 A.  You could say that, yes.

16 Q.  Okay.  It's your testimony that you -- or you previously

17 told the detective you were actually using the phone at that

18 time, right?

19 A.  Yes.

20 Q.  This thing that you just used to create these awful images

21 and make this terrible mistake, you sit in the phone -- car

22 and just kind of keep thumbing through your phone, right?

23 A.  Yes.

24 Q.  The one that you used to take pictures of M.R.'s genitals,

25 right?

1  A.  Yes.

2  Q.  You heard M.R.'s testimony in here in court, right?

3  A.  Yes.

4  Q.  And you heard her say that you put your hand in her

5  underwear, right?

6  A.  Yes.

7  Q.  Okay.  And so when M.R. says that, that's accurate, isn't

8  it?

9  A.  I did lift up the underwear.  I put my hand on the inside

10 to lift it up, yes.

11 Q.  Okay.  Do you recall your counsel asking the detective if

12 there were any eyewitnesses to what had happened in the

13 daycare?  Do you remember him asking that?

14 A.  Yes.

15 Q.  And on that day, you had the opportunity to essentially

16 create eyewitnesses by calling Chiana into the room, right?

17 A.  I had the opportunity, yes.

18 Q.  But you didn't do that, did you?

19 A.  No.

20 Q.  It is true that you opened up her pants, right?

21 A.  Yes.

22 Q.  It is true that you pulled back her underwear, correct?

23 A.  Pulled up, upwards; not back.

24 Q.  Up?

25 A.  Yes.

1  Q.  Okay.  You pulled her underwear away from her skin,

2  correct?

3  A.  Yes.

4  Q.  Pulled it away enough that you could put your camera down

5  there, right?

6  A.  The camera wouldn't be down anywhere in there.

7  Q.  Right.  You pulled it enough so that the camera could get

8  an angle of her genitals, correct?

9  A.  To look for the injury, yes.

10  Q.  Okay.  And you're telling us that you snapped off a couple

11  of those shots, right?

12  A.  Yes.

13  Q.  And you didn't see anything there, right?

14  A.  No.

15  Q.  Okay.  So at that point, "Whew, I'm done, no injuries.

16  She doesn't have any blood on her jeans," right?  You're out,

17  correct?

18  A.  Correct.

19  Q.  That's not what you did, was it?

20  A.  No.

21  Q.  You decided to take two more photos of her genitals,

22  correct?

23  A.  After she complained about more pain.

24  Q.  Did you see any evidence on that camera, or when you were

25  looking at her skin, of any injuries?

1  A.  No.

2  Q.  Okay.  And so at this point, the area that you've now

3  looked at, what, up here, the mons pubis, across the thighs,

4  through here, no injury on it, right?

5  A.  No.

6  Q.  Okay.  So you didn't at this point wiggle her pants down

7  to try to get a better angle of what might be between her

8  legs, did you?

9  A.  No.

10 Q.  You didn't call someone in to say, "Hey, look, check out

11 this kid," right?

12 A.  No.

13 Q.  There are some other things that you weren't honest with

14 the detective about that day, correct?

15 A.  I don't know what you're talking about exactly.

16 Q.  Okay.  Well, the detective asked you about your Internet

17 history, correct?

18       MR. THOMAS:  Objection.  May we approach, Your

19 Honor?

20       THE COURT:  Do you want to approach?

21       (Bench conference on the record.)

22       MR. THOMAS:  Your Honor, this is an attempt by the

23 government to bring in his Internet browser history, which

24 showed that he looked at legal pornography at various times,

25 which is -- which he did not lie about.  He told the officer

1   that he looked at pornography.  And --

2        THE COURT:  Yeah, I think that's in evidence, that

3   he said he did --

4        MS. KOROBOV:  May I show the Court what it is that

5   we're talking about?

6        THE COURT:  Yes.

7        MS. KOROBOV:  Because the defendant has now

8   testified that he -- that he lied to the detective, yes, but,

9   "I wouldn't hurt M.R. or any child."  The sites referenced in

10  here are incest pornography, which I would contend is perhaps

11  not at all legal.  But, regardless, if his testimony is, "I

12  wouldn't hurt any child" -- and, additionally, he's admitted

13  at this point to every element of production except intent.

14  So at this point his intent becomes relevant.

15       MR. THOMAS:  Your Honor, this is not illegal

16  pornography.  These are not things that have been charged.

17  The dates on these have nothing to do with this case.  This is

18  an attempt to taint the jury.  There's been no evidence

19  regarding this at all.  And there's no evidence that looking

20  at legal pornography indicates you're going to hurt a child.

21  It's prejudicial.

22       MS. KOROBOV:  The question is whether it's unfairly

23  prejudicial.  The defendant said, "I would never hurt any

24  child."  And given the images here -- and, additionally he

25  told the detective that he -- that he would look at Reddit and

1  he used Reddit to look at porn, and that sometimes there would

2  be incest sites on there, "but I didn't go to any of them."

3  Well, that's a lie, so it goes to his credibility.  It goes to

4  show, as well, what his intent was at the time he took those

5  pictures.

6           MR. THOMAS:  I didn't ask him any questions about

7  his history on direct, first of all.  The fact that --

8           THE COURT:  You did ask him had he ever hurt any

9  other child, which wasn't a good question to ask.

10          MR. THOMAS:  I'm sorry, but the government's

11 contention that looking at legal pornography is hurting a

12 child is not true.

13          THE COURT:  Well, it says incest.  Is that legal?

14 Incest is a crime.

15          MR. THOMAS:  That is all legal.  No one is having

16 incest in that pornography.  It's all -- it's all fake.  I've

17 dealt with those cases before, Your Honor.  That's not --

18          THE COURT:  You've seen these videos?

19          MR. THOMAS:  I've certainly not seen those

20 particular videos, but if the government is alleging new

21 crimes here, that he committed a crime in looking at these

22 videos, they know for a fact, as an officer of the court, she

23 knows that's not illegal, Your Honor.  She's being

24 disingenuous with The Court.  She knows that that's not

25 illegal.

```
 1          THE COURT:  Did you look at -- do you know what

 2   these are?

 3          MS. KOROBOV:  Do I know --

 4          THE COURT:  Did you all see what they are?

 5          MS. KOROBOV:  No.  We haven't gone to those sites.

 6          THE COURT:  Okay.

 7          MS. KOROBOV:  The issue isn't, quite frankly,

 8   whether he -- whether the porn is legal or illegal.  That's

 9   not my issue.  If it's legal, I don't care one way or the

10   other.  The issue is, "I would never hurt any child."  This is

11   his area of interest.  If he's saying that, "When I pulled

12   down her pants, it was just to take photos to document

13   injuries as opposed to I was sexually interested in that

14   child," there it is.

15          MR. THOMAS:  There's no evidence that that

16   involves --

17          THE REPORTER:  I'm sorry.  I cannot hear you.

18          MR. THOMAS:  There's no evidence that anything that

19   he looked at involved children at all.

20          THE COURT:  Oh, you're saying it might be adult

21   incest?

22          MR. THOMAS:  Yeah.  There's no --

23          MS. KOROBOV:  That's not what --

24          MR. THOMAS:  If it was --

25          MS. KOROBOV:  This is --
```

1              MR. THOMAS:  If it was children -- if it's child

2      pornography, he would be charged.  None of it is child

3      pornography, Your Honor.

4              THE COURT:  "The First Time with My Daddy."

5              MS. KOROBOV:  "The First time with My Daddy," who --

6              MR. THOMAS:  Well, listen --

7              THE COURT:  Okay.  Listen, this is what I will let

8      you do.  Don't -- don't get that in, but you can read the

9      titles of those three, and the date --

10             MR. THOMAS:  What?

11             THE COURT:  -- to show --

12             MR. THOMAS:  What -- and just so I'm clear for the

13     record, Your Honor, what is the government relying on to

14     show --

15             THE COURT:  You're offering those to show what?

16             MS. KOROBOV:  I'm using it to show, first of all,

17     his intent when he took the pictures of M.R.  And I'm also

18     using it to contradict his statement to counsel that, "I would

19     never hurt M.R. or any child."  And, finally, it goes to show

20     that when he talked to the detective and he said, "Oh, yes, I

21     go to Reddit, but not to these sites," that that was a lie.

22     It's another thing he lied about.  His credibility is the sole

23     issue here today.

24             MR. THOMAS:  Well, Your Honor, if I may respond,

25     first of all, I will again object that looking at legal

1  pornography, it's not evidence that you have hurt a child.  So

2  the idea that he opened the door to his looking at legal

3  pornography -- and if she wants to say --

4          THE COURT:  It's just the title, the title, "My

5  First Time with Daddy."  That's why --

6          MS. KOROBOV:  We asked --

7          MR. THOMAS:  Looking --

8          THE REPORTER:  I cannot hear you.

9          THE COURT:  What's it say?

10         MS. KOROBOV:  "B.S. Used to Play Truth or Dare as

11 Young Kids."

12         MR. THOMAS:  He didn't have anything to do with

13 creation of this pornography.  He looked at it legally on the

14 Internet.  He didn't hurt a child by doing that.

15         THE COURT:  Agree, but she's -- well, she's trying

16 to show that his intent in this case was for sexual --

17         MR. THOMAS:  Well, there's no --

18         THE COURT:  -- lascivious purposes.

19         MR. THOMAS:  There's no evidence that any of that is

20 child pornography.  In fact, the evidence is the opposite, and

21 the government knows it.  None of this is child pornography.

22 The implication from those titles, which he had nothing to do

23 with creating, is that it is child pornography.  The fact is,

24 it is not.  None of it is, and the government knows it.

25         THE COURT:  Where is the one that says, Young

1  Child?"

2          MS. KOROBOV:  The one that says, "Young Child" --

3          THE REPORTER:  I cannot hear you.

4          MR. THOMAS:  I don't care what the titles say, Your

5  Honor.  This is legal pornography.

6          THE COURT:  We're just going by the titles.  That's

7  fine.  Let me see what the --

8          MS. KOROBOV:  The red highlighted ones are the

9  ones --

10          THE REPORTER:  I did hear you.

11          MS. KOROBOV:  The red highlighted pages on there are

12  the ones he was looking at.

13          THE COURT:  Okay.  I didn't see that one.

14          MR. THOMAS:  Your Honor, this is legal pornography.

15  The government --

16          THE COURT:  Okay.  I'll let you ask him about one,

17  "I'm Attracted to My Little Sis."

18          MR. THOMAS:  And is this -- and how is this related

19  to direct?

20          MS. KOROBOV:  On direct, you were asking your client

21  questions, and the very last thing that your client said to

22  the jury is, "I would never hurt M.R. or any child."

23  Additionally, he repeatedly put his intent at issue.  "It

24  wasn't for sexual attraction, it was because I was documenting

25  an injury."

```
 1              THE COURT:  So, for intent, the Court is going to
 2   allow it.
 3              MR. THOMAS:  Okay.  And --
 4              THE COURT:  And your objection is noted for the
 5   record.  Let's get on.
 6                        (Open court.)
 7              THE COURT:  The objection --
 8              MR. SHEPARD:  If I can confer very briefly, Your
 9   Honor.
10         (Off the record.)
11              THE COURT:  The objection is overruled --
12              MR. THOMAS:  In full, Your Honor?
13              THE COURT:  -- with a limited -- with a limited
14   allowance.
15   BY MS. KOROBOV:
16   Q.  Detective McAllister asked you some questions regarding
17   the use of the Web site Reddit, correct?
18   A.  Correct.
19   Q.  And you responded to his questions about your use of the
20   Web site Reddit, correct?
21   A.  Correct.
22   Q.  Specifically he asked you questions about certain types of
23   Web sites on Reddit, or certain links to Reddit, correct?
24   A.  Yes.
25   Q.  And you told him that you didn't visit any particular
```

1  sites on Reddit that were anything beyond, like, legit porn,

2  correct?

3  A.  I did say that, yes.

4  Q.  But on August 14th of 2014, you visited a specific portion

5  of Reddit with the title "reddit.com/R/incest/comments/2DV --

6  2DEVPQ/SS_ I'm_attracted_to_my_little_sis_2," correct?

7          THE REPORTER:  I'm sorry.  You've got to slow down.

8  BY MS. KOROBOV:

9  Q.  The Web site, to be repeated, is

10  www.reddit.com/R/incest/comments/2DEVPQ/SS_

11  I'm_attracted_to_my_little_sis_2.  Is that correct?

12  A.  I guess.

13          MS. KOROBOV:  I pass the witness.

14          THE COURT:  And, ladies and gentlemen of the jury,

15  that evidence is offered for the limited purpose of showing

16  intent.

17          MR. THOMAS:  She passed the witness, Your Honor?

18          THE COURT:  She passed the witness.  You may

19  cross -- I'm sorry.  You may redirect.

20                    **REDIRECT EXAMINATION**

21  BY MR. THOMAS:

22  Q.  How old were you at the time of this incident?

23  A.  20 years old.

24  Q.  Did you look at porn when you were 20?

25  A.  Yes.

1  Q.  Was any of it child porn?

2  A.  No.

3  Q.  Were any of the Web sites that you ever visited child

4  porn?

5  A.  No.

6  Q.  Would the government be able to produce any evidence

7  whatsoever that any of the porn you ever looked at on your

8  phone, on Web sites, was child porn?

9          MS. KOROBOV:  Objection, Your Honor --

10          THE REPORTER:  I cannot hear you.

11          MS. KOROBOV:  I don't believe he can testify --

12          THE REPORTER:  I cannot hear you.  You need to use

13  your microphone.

14          MS. KOROBOV:  I don't believe counsel --

15          THE COURT:  It's not on yet.

16          MS. KOROBOV:  Because I'm out of batteries.

17          THE COURT:  Tanesa, will you give her some

18  batteries?

19          MS. KOROBOV:  Actually, let me just trade with

20  Mr. Shepard.

21          I don't believe that counsel --

22          MR. THOMAS:  I'll withdraw the question, Judge.

23  Let's move on.

24          THE COURT:  Okay.  The question is withdrawn.

25  BY MR. THOMAS:

1  Q.  Do you think if you had viewed child pornography on your

2  phone that has been examined by the government to the -- down

3  to the smallest portion, do you think if you had viewed child

4  pornography on your phone, that you would not have been

5  charged with that?

6         MS. KOROBOV:  Objection, calls for speculation.

7         THE COURT:  I'll let him answer it.

8         THE WITNESS:  Could you ask again?

9  BY MR. THOMAS:

10 Q.  Do you think if you had viewed child pornography on the

11 same telephone that Detective Melton examined down to its

12 core, that you would not have been charged with that?

13 A.  No.

14 Q.  And, in fact, you were not, were you?

15 A.  No.

16 Q.  Because you had never looked at child pornography, did

17 you?

18 A.  No.

19 Q.  How many shifts at the daycare?

20 A.  It just depended on some people who worked part time and

21 some people worked full time, but, really, it was two shifts.

22 Q.  When you first started -- well, what time did the first

23 shift go and what time did the second shift go?

24 A.  The first shift would be around the morning time, anywhere

25 between 6:30 to, I would say, 8:00.  Some people would come in

1  early, because not all the children would be there, and all

2  the kids would be in, like, the gym until the teachers got

3  there, or any -- so anywhere between, I would say, 6:30 to

4  8:00 was anytime the first shift would start.  And it would

5  end around 3:00, 4:00ish, maybe 5:00.

6  Q.  What about the second shift?

7  A.  A lot of the people on the second shift would either start

8  anytime after noon and go until 8:00.

9  Q.  What shift did you work when you started there?

10  A.  The 12:00 to 8:00.

11  Q.  Did you ever refer to that as the evening, evenings?

12  A.  Yes.

13  Q.  I'm going to show what you I think was entered as

14  Government's Exhibit 36, again.  You told us that -- you told

15  us that B.N. was a student at Bright Horizons, right?

16  A.  Yes.  He was in the kindergarten room.

17  Q.  And you sent this e-mail April 1st of 2014, correct?

18  A.  Correct.

19  Q.  Was that before or after you got the full-time position in

20  Cathie's class?

21  A.  Before.

22  Q.  And were you working the evening shift then?

23  A.  Yes.

24  Q.  And when you had cared for B.N., would that have been

25  during the evening shift?

1  A.  Yes.  Sometimes he would be one of the last ones picked

2  up.

3  Q.  So when you said in 36, "I am an educator at Bright

4  Horizons.  I used to care for B.N. in the evenings," were you

5  lying to Rachel?

6  A.  No.

7  Q.  You did care for him in the evenings at the school, right?

8  A.  Correct.

9  Q.  You worked till 8:00 at night?

10  A.  Yes.

11  Q.  Did you send this e-mail to try to lie or trick anybody?

12  A.  Not at all.

13  Q.  She just didn't know what she was talking about, right?

14          MS. KOROBOV:  Objection, leading.

15          THE COURT:  And that is an argumentative question

16  that the government didn't know what they were talking about.

17  So --

18          MR. THOMAS:  Fair enough.

19          THE COURT:  -- we'll strike that question.  Do you

20  have any other questions --

21          MR. THOMAS:  I do.

22          THE COURT:  -- on redirect?

23          MR. THOMAS:  I do.

24  BY MR. THOMAS:

25  Q.  You were asked on cross that -- about these were all

1  people that like you?

2  A.  Yes.

3  Q.  Would they still like you if you told them that you had

4  looked at M.R.?

5         MS. KOROBOV:  Objection, Your Honor.  It calls for

6  speculation.

7         THE COURT:  Sustained.

8  BY MR. THOMAS:

9  Q.  What do you think would have happened if you had told your

10  bosses what had really happened?

11  A.  Well, I believed they would have looked into the situation

12  and probably even fired me first, because it was going against

13  policy and procedure.

14  Q.  It wouldn't have mattered -- would it have mattered what

15  your intentions were?

16  A.  No.

17  Q.  Did you think anybody was going to believe you after you

18  had been accused of child molesting?

19  A.  No.

20  Q.  All those other accident reports that you filled out, did

21  any of those children say you hurt them?

22  A.  No.

23  Q.  In fact, was M.R. the only one who said that, "You hurt

24  me"?

25  A.  She was the first one.  And then I was terminated after,

1  so that made her the only one.

2  Q.  When you described her on your arm --

3  A.  Yes.

4  Q.  -- did you -- she told you that she had been hurt?  She

5  said, "Ow"?

6          MS. KOROBOV:  Your Honor, I'm going to object.

7  Counsel is leading.

8          MR. THOMAS:  I am.

9          THE COURT:  You are.

10  BY MR. THOMAS:

11  Q.  When she was on your arm, how did you know that she might

12  be hurt?

13  A.  It wasn't until after I put her down and pulled my arm

14  free when she said, "Ow."

15  Q.  At any -- she was showing you the jeans and how -- whether

16  they were ripped.  I mean, did you ever think that you had

17  done anything that would rip her jeans?

18  A.  No.

19  Q.  Anything close to that?

20  A.  No.  I thought at the time she might have gotten pinched

21  or something.

22  Q.  Did you really know?

23  A.  I did not know.

24  Q.  I think you were asked on cross whether you opened her

25  pants.  Did you ever open her pants?

1  A.  I did not open her pants if you mean by like unbuttoning

2  and -- no.  If -- by lifting, yes.

3  Q.  You had a girlfriend who worked with you?

4  A.  Yes.

5  Q.  Is there a particular reason that you described her as

6  your coworker and not your girlfriend when I asked you the

7  question before?

8  A.  It was off and on.

9  Q.  But you had a girlfriend.  How old was she?

10 A.  Either 19 or -- no.  She was 17, but we were together

11 before I even turned 18.

12 Q.  And you were 19 when you started, right?

13 A.  Yes.  And --

14       THE COURT:  There's no question before you.  Wait

15 for the question.

16       THE WITNESS:  Okay.

17 BY MR. THOMAS:

18 Q.  Did you ever consider after what happened, as was

19 suggested, going and telling Tyria or going and telling Heidi

20 what happened?

21 A.  Did you ask if I ever considered it?

22 Q.  Yeah.  Did you consider it?

23 A.  I did consider it, but I thought about how they would have

24 looked at the situation.  And I -- like I said, I felt like I

25 couldn't justify what I did.

1  Q.  You were asked on cross, you could have immediately gone

2  and said, "This is what happened," right?

3  A.  Yes.

4  Q.  Do you wish you had done that?

5  A.  Definitely.

6          MR. THOMAS:  That's all.  Thank you.

7          THE COURT:  Okay.  You have some questions?

8          MS. KOROBOV:  Very briefly, Judge.

9          THE COURT:  Okay.  Very briefly.

10                    **RECROSS-EXAMINATION**

11  BY MS. KOROBOV:

12  Q.  Counsel asked you, "What did you think would happen if you

13  told Heidi and the people at the daycare what you had done,"

14  correct?

15  A.  Yes.

16  Q.  And your answer to him was, "I was afraid I would be

17  fired," right?

18  A.  At the moment, yes.

19  Q.  Okay.  At the time of this, you lived with your family,

20  right?

21  A.  Yes.

22  Q.  So if you got fired, you weren't going to be homeless,

23  correct?

24  A.  No.

25  Q.  Your family wasn't going to kick you out because you got

1  fired, right?

2  A.  No.

3  Q.  Not going to stop giving you food or shelter or anything

4  like that, right?

5  A.  I was helping pay bills, though.

6  Q.  Right, but you weren't going to be homeless or anything

7  along those lines, correct?

8  A.  What I was trying to say is, I was helping pay bills so my

9  father -- he had -- he was laid off a little before, and I

10  was -- me and him were pitching in on bills.  And so, as far

11  as saying I can't go homeless, I mean, I can't say no to that.

12  Q.  Okay.  So your concern at that point is, you were more

13  worried about this whole situation than a child who's saying,

14  "He put his fingers inside me"?

15  A.  No.  I was -- I was pretty worried about both situations.

16  Q.  In fact, you just said that you were worried about how

17  Tyria and Heidi would look at you if you did decide to come

18  clean with them, correct?

19  A.  Yes.

20  Q.  And Tyria and Heidi weren't people that you hung out with

21  outside of work, correct?

22  A.  No.

23  Q.  Not in a social circle with you, right?

24  A.  No.

25  Q.  And not people who hang out with you even now, right?

1    A.  No.

2    Q.  You only knew them from the daycare, correct?

3    A.  Correct.

4    Q.  And yet you were so worried about how they would look at

5    you, that you say you decided not to tell them, right?

6    A.  Yes, because if they were to ever say -- if I was ever

7    accused of it, I didn't know if they would actually have my

8    back or not, because out of work, I was never really close

9    with them.  Yes, we were friends at work, but that's why I was

10   afraid of what they were thinking.  Maybe they would go and

11   tell them, you know, "He did this," and they would say, "Yeah,

12   he was known to do this, that, or that."  I don't know what

13   they would say.

14   Q.  So they had never falsely accused you of anything, had

15   they?

16   A.  No, but what I'm saying is, I didn't know if they would or

17   wouldn't.

18   Q.  You said, actually, that you were afraid that if you told

19   them, that you wouldn't like what they would think of you

20   because you couldn't justify what it is you had done, right?

21   A.  Correct.

22   Q.  Because there is no justification for what it is you did

23   on that day, is there?

24   A.  There was no justifying me examining and taking pictures.

25            MS. KOROBOV:  Thank you.  Pass the witness.

1          THE COURT:  Nothing further?

2          MR. THOMAS:  Nothing further, Judge.

3                         * * *

4                         EXCERPT

5                         * * *

6

7            CERTIFICATE OF COURT REPORTER

8

9      I, David W. Moxley, hereby certify that the

10  foregoing is a true and correct transcript from

11  reported proceedings in the above-entitled matter.

12

13

14

15  /S/ David W. Moxley_____    March 23, 2016
    DAVID W. MOXLEY, RMR/CRR/CMRS
16  Official Court Reporter
    Southern District of Indiana
17  Indianapolis Division

18

19

20

21

22

23

24

25