UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,         )
                                     ) Cause No.
        Plaintiff,          ) 1:15-cr-0072-TWP-DML
                                     ) Indianapolis, Indiana
  vs.                        ) **February 22, 2016**
                                     ) 9:11 a.m.
ALI AL-AWADI (01),         )
                                     )   **EXCERPT**
        Defendant.         )



**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
EXCERPT (MIOSOTIS GEORGINA RODRIGUEZ) OF JURY TRIAL

**R E D A C T E D**


**For Plaintiff:**                   Bradley Paul Shepard, Esq.
                                  Kristina M. Korobov, Esq.
                                  Assistant U.S. Attorneys
                                  United States Attorney's Office
                                  Suite 2100
                                  10 West Market Street
                                  Indianapolis, IN 46204


**For Defendant:**                 Ross G. Thomas, Esq.
                                  Attorney at Law
                                  3728 North Delaware Street
                                  Indianapolis, IN  46205-3434


Court Reporter:                 David W. Moxley, RMR, CRR, CMRS
                                  United States District Court
                                  46 East Ohio Street, Room 340
                                  Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1                        **I N D E X**

2  <u>**GOVERNMENT'S WITNESS:**</u>                           **PAGE**

3  MIOSOTIS GEORGINA RODRIGUEZ

4  Direct Examination by Mr. Shepard ...............3
   Cross-examination by Mr. Thomas ................27

5

6          **I N D E X   O F   E X H I B I T S**

7  <u>**GOVERNMENT'S EXHIBITS:**</u>                         **PAGE**

8  1 ................................................6
   4 ...............................................25
9  5-A ..............................................19
   6 ...............................................22
10 6-A ..............................................24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     (In open court.)

2                      * * *

3                      EXCERPT

4                      * * *

5      THE COURT:  And you may examine your -- call your

6 first witness.

7      MR. SHEPARD:  The government would call Miosotis

8 Rodriguez, Your Honor.

9      THE COURT:  Ma'am, if you would come right up here

10 to the witness stand.  Bring her that way.  Right over here.

11 And if you would remain standing and raise your right hand.

12      (The witness is sworn.)

13      THE COURT:  You may have a seat.

14      THE WITNESS:  Thank you.

15      THE COURT:  All right.  Mr. Shepard, you may examine

16 your witness.

17      MR. SHEPARD:  Thank you, Your Honor.

18   **MIOSOTIS GEORGINA RODRIGUEZ, PLAINTIFF'S WITNESS, SWORN**

19                 **DIRECT EXAMINATION**

20 BY MR. SHEPARD:

21 Q.  Would you please state your full name and spell your last

22 name for the record -- or you may need to spell your first

23 name.  I don't know if David is familiar with it.

24 A.  Okay.  My name is Miosotis Georgina Rodriguez.  My first

25 name is spelled M-I-O-S-O-T-I-S.

1  Q.  And are you a U.S. citizen?

2  A.  Yes, I am.

3  Q.  Where do you live?

4  A.  I live in Indianapolis, Indiana. ██████████████,

5  46260.

6  Q.  How long have you lived here?

7  A.  In Indianapolis?

8  Q.  Uh-huh.

9  A.  I have lived here for over 12 years.

10  Q.  Who lives with you?

11  A.  My husband, Justo; M.R., E.R., my two daughters; and right

12  now my sister.

13  Q.  All right.  Do you have other family that's living close

14  by?

15  A.  My mother.

16  Q.  Where does she live?

17  A.  She lives in -- it's a two-condo, so she lives in one of

18  the -- the other side of the condo.

19  Q.  All right.  You mentioned M.R.  Who is M.R.?

20  A.  M.R. is my daughter.

21  Q.  How old is she?

22  A.  M.R. is six years old.

23  Q.  You've got a binder -- actually, it was admitted.

24       MR. SHEPARD:  Could you please display Exhibit 77,

25  which has been admitted pursuant to certification.

1  A.  Open it?

2  BY MR. SHEPARD:

3  Q.  It will come up on your screen.  Do you recognize who's in

4  that photo?

5  A.  Yes.  That's my daughter, M.R.

6  Q.  Would you describe M.R. a little bit for us?

7  A.  Oh.  M.R., she is the most loving little girl, caring,

8  very active, and just cheerful, just -- yeah, just a

9  beautiful, spiritual little girl.

10  Q.  Is she energetic?

11  A.  Yes, she is.  She's very active.

12  Q.  Was she the same way two years ago?

13  A.  Two years ago?  It changed from one point.

14  Q.  Do you remember what it was that caused the change?

15  A.  Yes, I do.

16  Q.  Okay.  Did she go to daycare?

17  A.  Right now?

18  Q.  Did she go to daycare in 2014?

19  A.  Yes, she did.

20  Q.  Okay.  I ask you to look at, in the binder, what's marked

21  as Exhibit 1.  And I'll ask if you recognize that.

22  A.  Yes.  This is the daycare that she used to attend.

23  Q.  Is that --

24  A.  Children's Choice Learning Center.

25  Q.  Is that an accurate portrayal of the daycare as you

1  remember it?

2  A.  Yes.

3          MR. SHEPARD:  Your Honor, I would move for the

4  admission of Government's Exhibit -- or, excuse me, as

5  Exhibit 1.

6          MR. THOMAS:  I have no objection to 1.

7          THE COURT:  1 is admitted into evidence without

8  objection.

9                  *(Government's Exhibit 1 was*

10                 *received in evidence.)*

11         MR. SHEPARD:  Please display Exhibit 1.

12 BY MR. SHEPARD:

13 Q.  How long did M.R. attend this daycare?

14 A.  M.R. was there -- she started at -- well, a year and a

15 half -- when she was a year and a half.  And at that point she

16 was four.  That was four and a half, because her birthday is

17 in October.

18 Q.  Where was the daycare located?

19 A.  It was located on St. Vincent property, 86th.

20 Q.  Is that here in Indianapolis?

21 A.  Yes, it was.

22         MR. SHEPARD:  Your Honor, I would ask the Court to

23 take judicial notice that Indianapolis is within the Southern

24 District of Indiana.

25         THE COURT:  The Court will take judicial notice.

1    MR. SHEPARD:  Thank you, Your Honor.

2    BY MR. SHEPARD:

3    Q.  So how would the typical weekday, when you had to use the

4    daycare, work?  Who would generally take M.R. and her sister

5    to daycare?

6    A.  I would be the one mainly taking them to daycare, except

7    when my husband probably -- when he didn't work, then he will

8    take the girls in a little late so that they can sleep in a

9    little bit, because I would be at work at 8:00, so I had to

10   get them up earlier, to get -- you know, just to let them rest

11   a little bit.

12   Q.  Who typically would pick them up?

13   A.  Either my husband or I, only the two main persons.

14   Q.  Just whoever was free that day?

15   A.  Yes.  Yes.  Or if I worked late, like I first started my

16   job, that was in July, so I had two late nights.  So my

17   husband was the one picking them up on those two late nights.

18   Q.  Now, you mentioned that there was a day where things about

19   M.R. changed.  Do you remember what day that was?

20   A.  Yes.  That was on August the 21st.

21   Q.  Of what year?

22   A.  Of 2014.

23   Q.  I want you to think back to that day.  How did that day

24   begin?

25   A.  It just began like a typical day.  My husband, he actually

1   didn't work that day, so he was the one that took the girls to

2   daycare that morning.  He usually -- the daycare had a rule of

3   taking the kids before 10:00, so he took them in close to

4   10:00, 9:45 or close to 10:00 in the morning.  And I just went

5   to work and he just took them to daycare and he went back

6   home.

7   Q.  How were the girls in the morning?

8   A.  The girls were fine.  Yeah, they were fine in the morning.

9   They're happy when they get to sleep in a little bit and wake

10  up.  They're daddy girls, so they were happy to see their dad.

11  Q.  Talking, playing?

12  A.  Yeah, they were, just -- you know, just M.R. being her,

13  yeah.

14  Q.  When was the first time you heard that something might be

15  wrong that day?

16  A.  When I got off work that afternoon, my husband -- I called

17  him just to check to see where they were going.  And he

18  tell -- told me that M.R. --

19          MR. THOMAS:  Objection.  Hearsay, Your Honor.

20          THE COURT:  Do you have an exception?

21          MR. SHEPARD:  From here or from there, Your Honor?

22          THE COURT:  Well, come on up.

23          (Bench conference on the record.)

24          THE COURT:  Okay, the question was, "When was the

25  first time you heard something might be wrong that day?"

*MIOSOTIS RODRIGUEZ – DIRECT/SHEPARD*      9

1      MR. SHEPARD:  The government is not offering it for
2  its truth.  The government is offering it to show why, as I'm
3  getting ready to go to the next question or two, that she
4  examined the child when she got home.  It's just knowledge,
5  state of mind of the witness.
6      MR. THOMAS:  Judge, I believe the evidence is being
7  offered for the truth.
8      THE COURT:  What is she going to say?
9      MR. SHEPARD:  Just complaining of pain.
10      THE COURT:  Okay.  I'll allow that.  Objection is
11  overruled.
12      MR. THOMAS:  Thank you, Your Honor.
13              (Open court.)
14      THE COURT:  You may ask the question.  The objection
15  is overruled.
16  BY MR. SHEPARD:
17  Q.  Did he indicate that M.R. was complaining of pain?
18  A.  Well, when my husband called, he said that M.R. was acting
19  a little bit different and that she was complaining of her
20  tito hurting, which is just like a sweet, like, name that we
21  just call vagina, was hurting.
22  Q.  Did you meet them at home?
23  A.  He told me he was going to Chick fil A to take the girls
24  to have dinner there, and I was just heading to work.  Being a
25  long work, I was tired.  I'm like, "Just go ahead and I'll

Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 10 of 36 PageID #: 4143
Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 10 of 36 PageID #: 59

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD      10

1  meet you at home."

2  Q.  What happened when they got home?

3  A.  When they got home, I asked my husband, okay, what was

4  going on with M.R..  And he said that she was complaining of

5  her tito hurting, and that she was not interested in eating.

6  She wasn't -- like she didn't want to play.  And that's her

7  favorite spot to go, and so it was odd for her not to

8  socialize with other kids.  It wasn't herself.

9  Q.  Was she awake or asleep when she got home, do you

10 remember?

11 A.  When she got home, she was still -- she fell asleep in the

12 car, so she was sleeping.

13 Q.  Okay.  After your husband told you this, what did you do?

14 A.  Well, when he told me, I just went upstairs to the room.

15 He laid her in the bed, and I just went to check on her and

16 check her vaginal.

17 Q.  What do you do for a living?

18 A.  I work as a medical -- I am a medical assistant.  I have a

19 medical assistant degree.  And at that time, I was working for

20 Eskenazi Health Family Planning.

21 Q.  In the same capacity, as medical assistant?

22 A.  Yes.

23 Q.  When you went up to check on her, how did you go about

24 checking on her?

25 A.  I pulled her pants down, and I just wanted to just

1  visualize of her complaining, why her tito was hurting.  So I

2  just --

3  Q.  Did you examine it?

4  A.  Yes.  I examined --

5  Q.  How did you go about examining, if you can remember?

6  A.  I just opened her vaginal lips and saw the redness.

7  Q.  Okay.  And is that the same type of thing you would do if

8  a patient came in and complained of that type of pain or

9  uncomfortableness?

10  A.  I won't be the one examining it, but I would ask the

11  questions of why.

12  Q.  Did -- when you did that, did it look normal?

13  A.  No.

14  Q.  What did it look like, if you remember?

15  A.  It looked red.  Her vaginal looked like irritated, like

16  red.

17  Q.  Had you ever seen --

18  A.  No.

19  Q.  -- anything like that on your daughter before?

20  A.  No.

21  Q.  Had she ever had anything like a urinary tract infection

22  before?

23  A.  Never.

24  Q.  At some point did she wake up?

25  A.  Yes, she woke up.  I came downstairs and, like, five

1  minutes later she woke up.  And --

2  Q.  Did you talk to her about what you had found?

3  A.  Yes.  When she woke up, she -- we were -- my husband and

4  I -- we were sitting at our dining table, and she went to my

5  husband and sat in his lap.  And I questioned her and I asked

6  her why her tito was hurting.

7  Q.  And were these the same types of questions you would ask

8  any patient who came in and --

9  A.  Yes.

10  Q.  What were you wearing at the time?

11  A.  I was wearing my scrubs, my work scrubs, the blue -- blue

12  scrubs.

13  Q.  Does M.R. know what you do for a living?

14  A.  Yes.

15  Q.  Would it be important in your profession to hear from the

16  patient why they were hurting?

17  A.  Yes.

18        MR. THOMAS:  Your Honor, preliminary question for

19  the purpose of objection?

20        THE COURT:  You may.

21  BY MR. THOMAS:

22  Q.  Ma'am, what is your -- what is your role at your job?

23  What are your job requirements?

24  A.  What I do is, basically, when the patient go in, I take

25  their information.  If they're having any complaints,

Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 13 of 36 PageID #: 4146

*MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD*    13

1  vaginally, I will ask them what's going on and just get some

2  information on what type of symptoms are you -- are they

3  having.

4  Q.  Do you make any kind of diagnosis?  Is that part of your

5  job?

6  A.  No, no diagnosis.

7          MR. THOMAS:  Your Honor, I would object to her

8  testimony about the conditions of other people and how it

9  might relate to her daughter.  She's not qualified to say

10  that.

11          THE COURT:  Okay.  Do you have a response to that?

12          MR. SHEPARD:  Let me ask one question and then I'll

13  respond.  Is that okay?

14          THE COURT:  Go ahead.

15  BY MR. SHEPARD:

16  Q.  After you take this information at your job place, who,

17  then, is it given to?

18  A.  It is given to the nurse practitioner.  And I have to

19  explain to her even in -- exactly what it is that the patient

20  told me.

21  Q.  And that goes into the formulation of the diagnosis and

22  treatment?

23  A.  Yes.

24  Q.  All right.

25          MR. SHEPARD:  Now, Your Honor, can we approach and

 1  I'll --

 2          THE COURT:  You may.

 3          (Bench conference on the record.)

 4          MR. SHEPARD:  Your Honor, the case law is clear that

 5  any statements made for medical purposes do not have to be

 6  made even to a medical professional, which the witness clearly

 7  is.  They just have to be made -- it would be admitted if --

 8          THE COURT:  Is it a gynecologist's office?

 9          MR. SHEPARD:  It's family planning.  So, in a way,

10  yes, Your Honor.

11          THE COURT:  Okay.

12          MR. SHEPARD:  So, as the Court knows, it's even in

13  her field.  Statements made to parents by children have

14  regularly been admitted as statements for the purposes of

15  medical diagnosis.  The point is, what was the purpose of the

16  statement?  Is it to try and get help for what is happening to

17  you or is -- and to find out, or is it for some other purpose,

18  to preserve evidence for later litigation?

19          I think here, as the foundation has been laid by the

20  witness, it's clearly to determine what is wrong with the

21  child so that they can figure out what was happening.

22          MR. THOMAS:  My objection is to the question

23  regarding her employment and her other patient, or he referred

24  to them as her patients.  It would appear that she takes down

25  information and passes it on to other folks.  So my objection

1   is, when he's asking her how does this compare to other

2   patients, he's asking her for a medical opinion that she's not

3   qualified to give.

4           THE COURT:  Okay.  Why don't you rephrase the

5   question so that you're not asking her about other patients.

6   I think what you were trying to do was to establish your

7   medical exception by asking her is this what she does in the

8   regular course of examination of patients.  So why don't you

9   rephrase and just ask her about her child and what her child

10  told her and what she observed with respect to her child,

11  okay?

12                          (Open court.)

13  BY MR. SHEPARD:

14  Q.  Did you ask M.R. what happened or --

15  A.  Yes.

16  Q.  And what did she say?

17  A.  I asked M.R. why was her tito hurting, and she didn't

18  answer.  She just started crying and running upstairs to her

19  room.  And then once I -- of course, I immediately followed

20  her after I saw her reaction to my question, and I questioned

21  her upstairs.  And she was still crying.  She didn't want to

22  say nothing.  And I'm, like -- I just sat her in my lap.  I

23  had -- I grabbed a chair and just sat her there and tried to

24  kind of calm her down.  And it got me very concerned, because

25  I had never seen her like that.  And --

1          MR. THOMAS:  Judge, I'm going to object to the

2  narrative at this point.

3          THE COURT:  I'll overrule.  She can say what she

4  observed and felt.  You may.

5  BY MR. SHEPARD:

6  Q.  Please continue.

7  A.  Okay.  So I sat her in my lap and I started questioning

8  her and telling her, "Mommy -- you can..."

9  Q.  It's okay.

10  A.  I'm sorry.  I told her, "Mommy -- you know Mommy loves

11  you, so you have to trust me.  You have to tell me what's

12  wrong, because Mommy is very concerned."

13          And she told me that she couldn't say nothing.  I'm

14  like, "No, you can say something.  You have to tell me what's

15  wrong."  And before she even said something to me, she, like,

16  peed all over my pants.  And I'm, like, "What's going on,

17  M.R.?  Tell me."  And then she told me that Mr. Ali put her

18  finger inside her tito.

19  Q.  Put her finger or his finger?

20  A.  His finger inside her tito.

21  Q.  And, again, what was "tito"?

22  A.  Her tito is her vaginal -- inside her vaginal.  And

23  then --

24  Q.  Did you take her to the hospital?

25  A.  I took her -- I immediately took her to the hospital, and

Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 17 of 36 PageID #: 4150
Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 17 of 36 PageID #: 466

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD     17

1  I called --

2  Q.  Do you remember which hospital?

3  A.  I took her to St. Vincent ER Emergency, Children's

4  Hospital.

5  Q.  Did you eventually get routed to the Center of Hope?

6  A.  We went to the Center of Hope.  They had a Center of Hope

7  inside the St. Vincent area, the nurses.  There were -- one of

8  the nurses, she was going to switch shift, so she was the one

9  that saw us, the second nurse.

10 Q.  Did you go back with M.R. during the exam?

11 A.  Yes.

12 Q.  Who all went back?

13 A.  My husband and myself.

14 Q.  And did you tell essentially the same thing to the nurse?

15 A.  Yes.  Before then, they asked M.R. what was going on.  And

16 M.R. talked and said the same thing she told me.  And then

17 they asked her again in the room, and they asked me, as well.

18 Q.  I ask you to look in the binder in front of you and look

19 at what's marked as Exhibit 5-A.

20 A.  Go ahead.

21 Q.  Do you recognize that?

22 A.  Yes.  Those are M.R. underwear.

23 Q.  Is that the underwear she was wearing that day?

24 A.  Yes.

25 Q.  Is that an accurate depiction of the underwear as you

1  remember it?

2  A.  Yes.

3          MR. SHEPARD:  Move to admit Exhibit 5-A.

4          THE COURT:  Any objection to 5-A?

5          MR. THOMAS:  Preliminary question if I could, Your

6  Honor.

7          THE COURT:  You may.

8  BY MR. THOMAS:

9  Q.  How is it, ma'am, that you specifically recognize

10 Government's 5-A?

11 A.  Because this underwear was in my aunt.  She just came back

12 from a trip from New York, and she brought, like, a package of

13 underwear.  And I told M.R., "Hey, the next day, you can wear

14 this underwear for tomorrow."  I actually took it out from the

15 package, from the new package.

16 Q.  I guess my question would be:  What specifically about

17 this photograph is it that you recognize?

18 A.  Because she has similar underwears like this.

19 Q.  Similar or -- I mean, what is it about this photo that you

20 can tell us that that is --

21         MR. SHEPARD:  Your Honor, I think he's arguing as to

22 weight.  The witness has stated she recognized it.  It

23 accurately depicts it.  I think what -- Mr. Thomas is arguing

24 weight.

25         THE COURT:  Do you have an objection?

```
 1              MR. THOMAS:  Well --

 2              THE COURT:  She says she recognizes it as the

 3   underwear.

 4              MR. THOMAS:  My question was:  What specifically

 5   does she recognize?

 6              MR. SHEPARD:  Didn't she answer that?

 7              THE COURT:  She did answer that.  She said it was a

 8   new package --

 9              MR. THOMAS:  I understand.

10              THE COURT:  -- from New York.

11   BY MR. THOMAS:

12   Q.  There's no package in the picture, correct?

13   A.  No, no package, because I took it out from the package.

14              MR. THOMAS:  Okay.  I have no objection, Judge.

15              THE COURT:  No objection?  All right.

16              MR. SHEPARD:  Thank you, Your Honor.

17              THE COURT:  5-A is admitted into evidence without --

18   you haven't even offered it, have you?

19              MR. SHEPARD:  I am now.  The government would move

20   for the admission of 5-A, Your Honor.

21              THE COURT:  5-A is admitted into evidence without

22   objection.

23                    (Government's Exhibit 5-A was

24                     received in evidence.)

25              MR. SHEPARD:  Please display 5-A.
```

1   BY MR. SHEPARD:

2   Q.  Now, behind you, in a box, should be a bag labeled "6."

3   A.  This one?

4   Q.  Do you see it?

5   A.  Government's Exhibit 6.

6   Q.  Why don't you go ahead and open that up.  I guess, before

7   we do, is it pretty sealed up?

8   A.  (Nods head up and down.)

9   Q.  Just take a minute and look at 6.

10          Do you recognize 6?

11  A.  Yeah.  These are M.R.'s pants.

12  Q.  Okay.  Are they the pants she was wearing that day?

13  A.  Yes.

14  Q.  How do you remember?

15  A.  Because of the -- I don't know what you call this, like

16  handmade sewing, flowers.

17          MR. SHEPARD:  Move for the admission of Government's

18  6, Your Honor.

19          THE COURT:  Any objection to Government's Exhibit 6?

20  6 is the actual pants, not the photo.

21          MR. THOMAS:  Preliminary question, if I could, Your

22  Honor?

23          THE COURT:  You may.

24  BY MR. THOMAS:

25  Q.  Did -- when was the last time you saw those pants?

Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 31 of 36 PageID #: 470
Case 1:15-cr-00073-WYD-DML Document 148-3 Filed 12/12/16 Page 31 of 36 PageID #:
4154

*MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD*     21

1   A.   These pants?

2   Q.   Yeah.

3   A.   The last time I saw them -- well, she wore this at the

4   daycare, and then when they asked me to provide this as

5   evidence.

6   Q.   Who is "they," ma'am?

7   A.   Detective McAlister.

8   Q.   And you -- where were the pants?

9   A.   It was in her closet.  I washed them.

10  Q.   Do you remember -- do you remember how much time elapsed

11  between when she last wore them and when you gave them to

12  Detective McAlister?

13          MR. SHEPARD:  Your Honor, again, I think he's

14  arguing weight.

15          THE COURT:  Why don't you approach.

16          (Bench conference on the record.)

17          THE COURT:  What's your concern?

18          MR. THOMAS:  Well, she's not -- he did not ask her

19  if they were in substantially the same condition.

20          THE COURT:  Well, she just said she washed them, so

21  they are not.

22          MR. THOMAS:  Well, I guess at this point, the

23  purpose is to show that they were the pants she was wearing

24  that day.  She's testified to that.  But as to the chain of

25  custody for any later photographs and other --

1          THE COURT:  Well, for forensics, he's not -- you

2    know, she just said she washed them before she gave them to

3    the detective.  So you're not using it for forensics, are you?

4          MR. THOMAS:  Well --

5          THE COURT:  You're just trying to show what she was

6    wearing that day?

7          MR. SHEPARD:  Correct, Your Honor.

8          MR. THOMAS:  Okay.  If that's his purpose, then I

9    have no further objection.

10          THE COURT:  Okay.  And he hasn't offered it yet.

11                    (Open court.)

12          THE COURT:  All right.  At this point, there's no

13    objection.  Next question.

14          MR. SHEPARD:  Your Honor, the government would move

15    for the admission of Exhibit 6.

16          THE COURT:  Do you have any objection to Exhibit 6?

17          MR. THOMAS:  No objection to Exhibit --

18          THE COURT:  The actual pants are 6.

19          MR. THOMAS:  Yes.  No objection to 6.

20          THE COURT:  6 is admitted into evidence without

21    objection.

22                    *(Government's Exhibit 6 was*

23                    *received in evidence.)*

24    BY MR. SHEPARD:

25    Q.  Ma'am, if you would look at what's tabbed as 6-A in the

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD     23

1  binder.  What's 6-A?

2  A.  6-A?  That's her -- inside of her pants.

3  Q.  A picture of the same pants?  Is that what it appears to

4  be?

5  A.  Oh, am I looking at the wrong --

6  Q.  It's two pages.  6-A, there's two pages to it.

7  A.  Okay.  Yes.  The inside of her pants.

8  Q.  Is that the first page or the second page?

9  A.  The second page.

10  Q.  All right.  And what's the first page?

11  A.  The actual pants.

12  Q.  A picture?

13  A.  A picture of the actual pants.

14  Q.  Does this appear to be a picture of the same pants as

15  Exhibit 6 right there?

16  A.  Yes.

17  Q.  And then this ought to be easy since they are right next

18  to each other.  Is it an accurate depiction of Government's

19  Exhibit 6 -- or of Exhibit 6?

20  A.  Yes.

21        MR. SHEPARD:  Your Honor, I would move for the

22  admission of 6-A as the photographs of Government's Exhibit 6.

23        THE COURT:  6-A is in two parts.

24        MR. SHEPARD:  6-A, 1 and 2.  I move for the

25  admission of both pages.

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD     24

1          MR. THOMAS:  Your Honor, I guess I would object to

2     both pages of 6-A as being cumulative.  The jury has the

3     actual pants, so I'm not sure what the photographs of the

4     pants would add.

5          THE COURT:  It's just a little easier to --

6          MR. SHEPARD:  It's a little easier, Your Honor, for

7     presentation purposes.

8          THE COURT:  All right.  I'll overrule.  I'll let

9     6-A, and this really should be 6-B, the second page, but 6-A

10    and the first and second page --

11         MR. SHEPARD:  Thank you, Your Honor.

12         THE COURT:  -- in evidence over Defendant's

13    objection.

14                   (Government's Exhibit 6-A was

15                   received in evidence.)

16    BY MR. SHEPARD:

17    Q.  There should be, again, in the box behind you, something

18    marked as Exhibit 4.

19         Take a second and unroll that.

20         Do you recognize Exhibit 4?

21    A.  Yes.  This is M.R.'s -- her sleeping bag that she -- we

22    left at daycare for her to sleep in.

23    Q.  Is it in substantially the same condition as it was the

24    last time you saw it?

25    A.  Yes.

Case 1:15-cr-00023-TWP-DML Document 148-3 Filed 12/12/16 Page 25 of 36 PageID #: 74

*MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD*     25

1          MR. SHEPARD:  Move for the admission of

2    Government's -- or, excuse me, as Exhibit 4.

3          MR. THOMAS:  No objection to 4.

4          THE COURT:  Exhibit 4 is admitted into evidence

5    without objection.

6                    *(Government's Exhibit 4 was*

7                    *received in evidence.)*

8    BY MR. SHEPARD:

9    Q.  You can go ahead and put all those back in the box.

10         I ask you to look at Exhibits 7, 8, 9, and 10.  Do

11   you recognize what's in those photos?

12   A.  Yes.  That's --

13   Q.  Who's in --

14   A.  That's my --

15   Q.  Just hold on.  Listen to my question.  Who is in the

16   photos?

17   A.  M.R.

18         MR. SHEPARD:  If I could have just a minute to speak

19   with my co-counsel.

20         (Off the record.)

21   BY MR. SHEPARD:

22   Q.  I want to go back and talk a little bit about when you

23   examined M.R.  Did she wake up during your examination?

24   A.  No.

25   Q.  Did you put your fingers inside her in any way?

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD     26

1  A.  No.

2  Q.  When you were speaking with her, did she give you any

3  indication that she was experiencing pain?

4          MR. THOMAS:  Objection.  There's no time frame here.

5          MR. SHEPARD:  We're speaking about --

6          THE COURT:  Clarify the time frame.

7          MR. SHEPARD:  Thank you.

8  BY MR. SHEPARD:

9  Q.  After she woke up after your examination of her, did she

10 give you any indication that she was experiencing pain?

11 A.  After she woke up, no.

12 Q.  She just started crying?  Was it mostly when you were

13 talking with her?

14         MR. THOMAS:  Objection to the leading form of these

15 questions, Judge.

16         THE COURT:  I'll sustain.  Rephrase your question.

17 BY MR. SHEPARD:

18 Q.  What was happening during the discussion with your

19 daughter after the examination?

20 A.  After the examination?  Like I said, she walked over to my

21 husband, and I started questioning her.  And then she started

22 bursting into tears, and I followed her up.

23         MR. THOMAS:  This has been asked and answered, I

24 think, already, Judge.

25         THE COURT:  Yeah, it has been.  Don't ask it again.

Case 1:15-cr-00073-TWP-DML Document 148-3 Filed 12/12/16 Page 27 of 36 PageID #: 476

*MIOSOTIS RODRIGUEZ - CROSS/THOMAS*       27

 1   Next question.

 2          MR. SHEPARD:  Understood, Your Honor.

 3          Can you go ahead and display what's been admitted as

 4   6-A, page 1.

 5          And 6-A, page 2.

 6   BY MR. SHEPARD:

 7   Q.  What did you say that 6-A, page 2, was?

 8   A.  6-A, page 2, was the inside of her pants.

 9   Q.  Is that the front or the back?

10   A.  That is the side, because of the strap, like, to adjust

11   the waist.

12          MR. SHEPARD:  Okay.  No further questions of the

13   witness, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          Mr. Thomas, you may cross-examine the witness.

16          MR. THOMAS:  Thank you, Your Honor.

17                    **CROSS EXAMINATION**

18   BY MR. THOMAS:

19   Q.  Ma'am, when you examined M.R. while she was sleeping, did

20   you observe any ointment on her?

21   A.  She had a little bit of the ointment --

22   Q.  Okay.

23   A.  -- A&D ointment.

24   Q.  Okay.  You don't know how that got there, do you?

25   A.  Yes.

MIOSOTIS RODRIGUEZ - CROSS/THOMAS     28

1  Q.  You didn't see it put on there, did you?

2  A.  No, because --

3  Q.  You may have been told, but you didn't see it put on

4  there?

5  A.  No.

6  Q.  Okay.  How long did M.R. sleep before she came down to her

7  father?

8  A.  To the home?

9  Q.  Well, when you examined her, she was sleeping.  How long

10 did she sleep before she came downstairs?

11 A.  She slept for another five or ten minutes.

12 Q.  Okay.  You testified that you immediately took her to the

13 hospital.  That's not quite right.  You let her sleep after

14 you first observed those injuries, or what you thought were

15 injuries, right?

16 A.  Yes.

17 Q.  At that point, it wasn't enough of a concern to

18 immediately go to the hospital; would that be right?

19 A.  Well, I wanted to ask her first.

20 Q.  You wanted to ask her if she was red and injured, because

21 she was red and injured, right?

22 A.  Yes, I wanted to ask her first why.

23 Q.  Your testimony is that she never complained of hurting in

24 that area before, right?

25 A.  Yes.

1   Q.  And you were not at the daycare that day?

2   A.  No.

3   Q.  You didn't see anybody touch your daughter, did you?

4   A.  No.

5   Q.  How long after this case began did lawyers start

6   contacting you?

7   A.  Lawyers from -- like, reporters immediately.

8   Q.  Not reporters.  Lawyers --

9   A.  Lawyers?

10  Q.  -- asking to take your case.

11  A.  Oh.  Like, one or two weeks, almost.

12  Q.  Do you remember how many contacted you?

13  A.  Only one.

14  Q.  And did you end up hiring that lawyer?

15  A.  No.

16  Q.  How did you end up deciding on a lawyer?

17  A.  It took awhile for me to decide, because my biggest

18  concern was to get -- M.R. was my daughter.

19  Q.  But you did file a lawsuit, right?

20  A.  Yes, I did.

21  Q.  Against Mr. Ali?

22  A.  Against the daycare.

23  Q.  And Mr. Ali, right?

24  A.  Yes.

25  Q.  And the daycare and all the companies involved, right?

1  A.  Yes.

2  Q.  That's still going on, isn't it?

3  A.  Yes.

4  Q.  You don't know how that's going to end up, do you?

5  A.  No.

6  Q.  Did you watch the interview that your daughter gave with

7  child services when she gave it?

8  A.  No.  The video?

9  Q.  Yeah.

10 A.  No.

11 Q.  Were you there?

12 A.  No.

13 Q.  Her father brought her there?

14 A.  No.

15 Q.  How did she get there?

16 A.  To the hospital?

17 Q.  To the interview room with the child services officer that

18 sat her down.  You've seen the video, I'm sure, at this point,

19 right, where she sat and talked to child services?

20 A.  No.

21 Q.  You've never seen that?

22 A.  No.

23 Q.  Anybody ever talk to you about it?

24 A.  M.R.

25 Q.  M.R. gave an interview --

*MIOSOTIS RODRIGUEZ - CROSS/THOMAS    31*

1   A.  Yes.

2   Q.  -- to a --

3   A.  Yes.

4   Q.  -- DCS worker, a child services worker, right?

5   A.  I've never seen the video.

6   Q.  You never saw that?

7   A.  No.

8   Q.  Did anybody ever talk to you about what was said there?

9   A.  No.

10  Q.  Nobody ever?

11  A.  No.

12  Q.  Okay.  So nobody ever told you that --

13          THE COURT:  Counsel --

14          MR. SHEPARD:  Asked and answered.

15          THE COURT:  -- you've asked it five times.  She said

16  no.  Next question.

17          MR. THOMAS:  I --

18          THE COURT:  Next question.

19  BY MR. THOMAS:

20  Q.  Were you aware -- okay.  That's good enough.

21          You did -- did you ever meet with Detective

22  McAlister?

23  A.  Yes, I did.

24  Q.  And he never told you about any other accusations that

25  M.R. might have made?

1          MR. SHEPARD:  Objection, hearsay.

2          THE COURT:  Do you have a hearsay exception to

3    what --

4          MR. THOMAS:  It's not being offered for the truth.

5    I'm asking her -- she stated that she was never told about the

6    forensic interview.  I'm asking her if he ever told her about

7    anything else as to the examination -- or as to the

8    investigation.  It's not whether it's true or not.

9          THE COURT:  Well, that wasn't your question.  Your

10   question was, "And he never told you about any other

11   accusations that M.R. might have made" --

12         MR. THOMAS:  That's what --

13         THE COURT:  -- and the objection is, that response

14   would call for hearsay.

15         MR. THOMAS:  It's not being offered for the truth of

16   what Officer McAlister said.  It's in response to her saying

17   that she had no knowledge of the investigation.

18         THE COURT:  Would you approach?

19         (Bench conference on the record.)

20         THE COURT:  Okay.  She never said she didn't have

21   any knowledge about the investigation.  She said she did

22   not -- had never -- was never told about her forensic

23   interview on the videotape --

24         MR. THOMAS:  That's accurate, Judge.  I --

25         THE COURT:  -- so why don't -- what do you want to

MIOSOTIS RODRIGUEZ - CROSS/THOMAS      33

1  ask her?  You want to ask her --

2          MR. THOMAS:  I want --

3          THE COURT:  -- did the detective ever tell her

4  about --

5          MR. THOMAS:  Did the detective ever tell her about

6  any other accusations that M.R. may have made?

7          THE COURT:  Okay.

8          MR. SHEPARD:  I think that's hearsay, Your Honor.  I

9  don't see --

10         THE COURT:  Well, she can answer yes or no, okay?

11 But she can't say what he told her, because he can testify to

12 that.

13         MR. THOMAS:  Yes.

14         THE COURT:  Okay.

15                   (Open court.)

16         THE COURT:  All right.  Counsel, would you rephrase

17 your question?

18 BY MR. THOMAS:

19 Q.  Again, I'm not asking you anything other than a yes or no

20 question here.

21 A.  Okay.

22 Q.  Did he ever tell you, "he" being Detective McAlister, ever

23 tell you about any other accusations or statements about these

24 events that M.R. made?  Yes or no?

25 A.  Can you -- I'm sorry.  I'm not understanding like

1   exactly --

2   Q.  Well, you met with Detective McAlister?

3   A.  Yes.

4   Q.  And talked about the investigation?

5   A.  Yes.

6   Q.  He asked you a lot of questions --

7   A.  Yes.

8   Q.  -- about what happened?

9   A.  Yes.

10  Q.  Did he ever tell you about any other statements that M.R.

11  may have made about these events?

12  A.  No.

13  Q.  Okay.  And M.R. was not wearing those -- the underwear

14  that have been admitted, or the photo of the underwear that

15  have been admitted, when she arrived at the hospital; is that

16  right?

17  A.  Yes.

18  Q.  And they were back at the house?

19  A.  Yes.

20  Q.  She was wearing those when she wet herself?

21  A.  Yes.

22  Q.  Do you remember, were they still wet when they were

23  brought to the hospital?

24  A.  Yes.

25  Q.  And you didn't leave with those, right?

1  A.  No.

2  Q.  When you -- do you remember who brought those to the

3  hospital?

4  A.  Yes.  My mother.

5  Q.  Did she have them in a bag or was she carrying them or how

6  did she bring them?

7  A.  In a Ziploc bag.

8  Q.  And do you remember who she gave that bag to?

9  A.  She gave it to -- I believe it was the nurse from the

10  hospital.

11  Q.  You don't know what happened to it after that?

12  A.  I knew that it was going to be under investigation.

13  Q.  Did your lawyer ever talk to you about anything --

14  something called a preexisting condition?

15  A.  Yes, he did mention that.

16  Q.  That would affect your ability to collect in a lawsuit

17  potentially, couldn't it?  If M.R. had a preexisting

18  condition, that could affect your ability to collect in the

19  lawsuit, right?

20  A.  I believe so.

21          MR. THOMAS:  Okay.  That's all.  Thank you.

22          THE COURT:  Do you have any redirect?

23          MR. SHEPARD:  None, Your Honor.

24          THE COURT:  All right.  Thank you very much, ma'am.

25  You may step down.

1    (Witness excused.)

2    * * *

3    EXCERPT

4    * * *

5

6

7    <u>CERTIFICATE OF COURT REPORTER</u>

8

9    I, David W. Moxley, hereby certify that the

10   foregoing is a true and correct transcript from

11   reported proceedings in the above-entitled matter.

12

13

14

15   /S/ David W. Moxley_____    July 22, 2016
     DAVID W. MOXLEY, RMR/CRR/CMRS
16   Official Court Reporter
     Southern District of Indiana
17   Indianapolis Division

18

19

20

21

22

23

24

25