UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Cause No. |
| Plaintiff, | ) | 1:15-cr-0072-TWP-DML |
| | ) | Indianapolis, Indiana |
| vs. | ) | **February 22, 2016** |
| | ) | 9:08 a.m. |
| ALI AL-AWADI (01), | ) | |
| | ) | **VOLUME I** |
| Defendant. | ) | |

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL

**For Plaintiff:**                     Bradley Paul Shepard, Esq.
                                        Kristina M. Korobov, Esq.
                                        Assistant U.S. Attorneys
                                        United States Attorney's Office
                                        Suite 2100
                                        10 West Market Street
                                        Indianapolis, IN  46204

**For Defendant:**                      Ross G. Thomas, Esq.
                                        Attorney at Law
                                        3728 North Delaware Street
                                        Indianapolis, IN  46205-3434

Court Reporter:                         David W. Moxley, RMR, CRR, CMRS
                                        United States District Court
                                        46 East Ohio Street, Room 340
                                        Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

# I N D E X

|  | PAGE |
|---|---|
| Opening Statement by Mr. Shepard | 30 |
| Opening Statement by Mr. Thomas | 35 |

**GOVERNMENT'S WITNESSES:**                    **PAGE**

MIOSOTIS GEORGINA RODRIGUEZ

Direct Examination by Mr. Shepard ..............39
Cross-examination by Mr. Thomas ................63

JUSTO GUEVARA RODRIGUEZ

Direct Examination by Mr. Shepard ..............73
Cross-examination by Mr. Thomas ................80

ANGELA BATES

Direct Examination by Ms. Korobov ..............89
Cross-examination by Mr. Thomas ...............122
Redirect examination by Ms. Korobov ..........128
Recross-examination by Mr. Thomas .............130

KENT HEDBERG

Direct Examination by Ms. Korobov ............132
Cross-examination by Mr. Thomas  .............137

# I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBITS:**                                    **PAGE**

1 ................................................42
4 ................................................61
5-A ..............................................56
6 ................................................59
6-A ..............................................60
11 ...............................................39
12 ...............................................39
13 ...............................................39
14 ...............................................39
15 ...............................................39
16 ...............................................39
17 ...............................................39
20 ...............................................39
21 ...............................................39
22 ...............................................39
23 ...............................................39
68 ...............................................39
77 ...............................................39
78 ...............................................39

Case 1:15-cr-00073-TWP-DML Document 148-4 Filed 12/12/16 Page 4 of 141 PageID #:

Vol. 1-4

1                    (In open court.)

2          THE COURT:  Good morning, ladies and gentlemen.  Oh,

3    what a wonderful group of people, ready to get to work.  My

4    name is Tanya Walton Pratt, and I am the judge who will be

5    presiding over a jury trial, which will begin today here in

6    the United States District Court for the Southern District of

7    Indiana.

8          I want to begin by thanking all of you for

9    responding to your summons and appearing for jury selection.

10   I'm certain this is a sacrifice for you all to be here today,

11   either of your time, and some of you it's a financial

12   sacrifice, because you get paid for jury duty, but it's not

13   very much.

14         It is a very important civic duty to serve on a jury

15   when called upon.  It goes along the lines of your right to

16   vote and your duty to serve in the military.  So you all are

17   very good citizens for responding to your summons, and we do

18   thank you.

19         In just a moment, all of you will be asked to stand

20   and take an oath or affirmation that your answers this morning

21   will be truthful.  Thereafter, I will ask a number of

22   questions addressed to all of you as a group.  After I have

23   questioned you, the attorneys will have a brief opportunity to

24   ask some supplemental follow-up questions.

25         These questions are not intended, in any way, to be

Vol. 1-5

1  personal, prying, or offensive, but rather they are necessary

2  to ensure that a panel of fair and impartial persons can be

3  selected for this particular matter.

4       You should not be offended if you are excused for no

5  apparent reason.  If any of you have personal knowledge of

6  this case or knew any of the parties or had a bias towards the

7  issues of the case or one of the parties in the case, you

8  would understand that you may not be the appropriate person to

9  serve on this particular jury.

10      So at this time, I need all of you in the box and in

11 the audience to please stand and raise your right hands to

12 take either an oath or affirmation.  And if you are unable to

13 stand, that's fine.  You can just raise your right hand.

14          (The prospective jury is sworn.)

15          THE COURT:  You may be seated.

16          Ladies and gentlemen, the matter to be tried this

17 morning, beginning this morning, is a criminal case as opposed

18 to a civil matter.  And the case is entitled the United States

19 of America, plaintiff, versus Ali Al-Awadi, the defendant.

20 Ladies and gentlemen, throughout the proceedings, I will

21 likely refer to the United States of America as the

22 "government," and I will -- or the "prosecution," and I will

23 likely refer to Mr. Ali Al-Awadi as the "defendant."

24          The charges against Mr. Al-Awadi are in a document

25 that's called an indictment.  And this is the formal way of

1  telling a person who's accused of a crime the nature of the

2  crime that he's accused of committing.  The indictment against

3  Mr. Al-Awadi charges him with having committed the crimes of

4  production of child pornography and attempted production of

5  child pornography.

6         Mr. Al-Awadi has entered a plea of not guilty to

7  these charges, and he is presumed to be innocent.  As a

8  criminal defendant in our country, you have no burden of

9  proof.  You are presumed to be innocent and the government

10 alone has the burden of proof, and that burden is proof beyond

11 a reasonable doubt.  And to these charges, Mr. Al-Awadi,

12 again, has entered a plea of not guilty, and that is why we

13 are here today.

14        The lawyers in this matter represent not only the

15 particular parties in this case, but the lawyers are also

16 officers of the court.  They've spent many, many months

17 preparing this matter for trial so that they can present the

18 evidence from which a jury of 12 persons will reach a verdict.

19        And at this time, I'm going to introduce the

20 attorneys that are involved in this case.  Representing the

21 government, the lead counsel is Assistant United States

22 Attorney Bradley Shepard.  And that's Mr. Shepard.  And his

23 co-counsel is Assistant United States Attorney Kristina

24 Korobov.  And, Mr. Shepard, would you please introduce the

25 person that's seated with you at the government's table?

Vol. 1-7

1      MR. SHEPARD:  Certainly, Your Honor.  Seated here to

2  my left is Detective Eli McAlister of the Indianapolis

3  Metropolitan Police Department.

4      THE COURT:  Okay.  And, Detective, stand up and turn

5  around so they can all get a good look at you.  All right.

6  And, Mr. Shepard, you turn around, and Ms. Korobov, so they

7  can see you in the back, also.  Okay.  These are the lawyers

8  representing the government, and their assisting witness.

9      Does any member of the panel, either in the box or

10  in the audience, have any professional or personal

11  relationship or dealings with either of these persons?  That

12  would be Assistant United States Attorney Bradley Shepard;

13  Assistant United States Attorney Kristina Korobov; and our

14  officer, Eli McAlister.

15      Okay.  Would you stand, ma'am?  And, Janell, you

16  need to take the mic so we can talk to her.

17      You all may be seated.  Go ahead and have a seat.

18      Ma'am, okay, what is your name?

19  PROSPECTIVE JUROR:  ███████████.

20  THE COURT:  What number is she, Tanesa?  Number 61.

21  And who are you familiar with, Ms. ████?

22  PROSPECTIVE JUROR:  Ms. Korobov.

23  THE COURT:  And how do you know Ms. Korobov?

24  PROSPECTIVE JUROR:  She's a customer of mine.

25  THE COURT:  Okay.  Can we find out what kind of

Vol. 1-8

1  customer?

2        PROSPECTIVE JUROR:  I take care of her clothing.

3        THE COURT:  Oh, wow.  Okay.  So what is your

4  profession?

5        PROSPECTIVE JUROR:  Leon Tailoring Company.

6        THE COURT:  Oh, you're a tailor, okay.  All right.

7  Ma'am, would the fact that Ms. Korobov is one of your

8  customers -- do you think that would affect your ability to be

9  a fair and impartial juror if you were selected for this jury?

10        PROSPECTIVE JUROR:  Not at all, ma'am.

11        THE COURT:  Thank you very much.

12        All right.  Does anyone else know any of the

13  parties?

14        Okay.  At our defendant's table, the defense

15  attorney is Attorney Ross G. Thomas.  And, Mr. Thomas, would

16  you please stand and introduce your client?

17        MR. THOMAS:  Good morning.  This is my client, Ali

18  Al-Awadi.

19        THE COURT:  Okay.  And did everyone get a good look?

20        All right.  You may be seated.

21        Does any member of the panel, either in the box or

22  in the audience, have any professional or personal

23  relationship or knowledge of either the attorney, Ross Thomas,

24  or the defendant, Ali Al-Awadi?  Any familiarity?  Okay, very

25  good.

Vol. 1-9

1      Ladies and gentlemen, I'm going to introduce to you

2  the people that will be assisting me in this -- during the

3  course of the trial.  Seated to my left is my judicial law

4  clerk, Kelly Brewer.  And my law clerk assists me with any

5  legal research.  We have very good technology in the federal

6  court system, so if he needs to communicate with me, he can

7  through instant messaging and other means.

8      And to my right is my courtroom deputy clerk.  And

9  you probably, if not -- have they met you, Tanesa?  You've

10  probably met Tanesa Genier.  And she serves as the official

11  bailiff.  She brought you in this morning, and she will be

12  assisting throughout the trial proceedings with the actual

13  jury.  She will escort you in and out.

14      She will also act as the liaison between you and me.

15  So if you develop some sort of personal problems or issues,

16  you just contact -- catch her eye and she will contact me, and

17  the Court will address any concerns or problems that a juror

18  may have.

19      And also assisting is Janell Smiley.  Stand up,

20  Janell.  Janell is my courtroom -- what's her title -- case

21  administrator.  And she's going to be assisting with the

22  microphone this morning and throughout the trial.

23      The official court reporter in this matter is David

24  Moxley.  And he can't stand up because -- or wave at you

25  because he's doing realtime transcription.  He's a

 1  stenographer, so what he's doing, he's transcribing every word

 2  that's spoken in this court so I can have it on this screen,

 3  but the jury will not have access to a transcript of this

 4  matter.  The jury will have to pay attention to the evidence

 5  and testimony and use their memory and recollection of what

 6  they see and hear in the courtroom, because, although he's

 7  very good, it's not perfect.  And so the jury is not allowed

 8  to have copies of any transcript or use that during their

 9  deliberation.

10         But this is a court of record, which means that

11  every word that is spoken in the courtroom is taken down by

12  the court reporter.  So what I say and the attorneys say and

13  what you say is all going to be a part of the record of these

14  proceedings.

15         The burden of proof in a criminal case, as I stated

16  earlier, rests solely with the government.  And the government

17  alone has the burden of proving Mr. Ali Al-Awadi guilty of the

18  charges that have been filed against him.  And, again, that

19  burden of proof is proof beyond a reasonable doubt.

20         The burden of proof in a criminal case is much

21  higher than the low burden of a preponderance of the evidence,

22  which is the burden in a civil matter.  And because this

23  defendant has no burden, Mr. Thomas does not have to present

24  any evidence, he does not have to call any witnesses on his

25  client's behalf.  However, if he chooses to call witnesses and

Vol. 1-11

1  present evidence, he may do so.

2          And I'm going to read to you the names of the

3  possible witnesses who may be called to testify in this

4  matter.  And if you recognize any of these names, just raise

5  your hand and then we'll talk about it.  And this question is

6  addressed to those in the box and in the audience.

7          You've met Eli McAlister, who is an officer with the

8  Indianapolis Metropolitan Police Department; Grant Melton;

9  Bruce Smith; James Madison; Jessica Woodall; Laura Fuhrman;

10 Christopher Powell; Angela Bates; Dr. Ralph Hicks; Miosostis

11 Pinnot Rodriguez -- is that correct?  Is that the -- or are

12 those two people?

13         MS. KOROBOV:  They are two separate people, Your

14 Honor.

15         THE COURT:  Okay.  Miosostis Rodriguez; Justo

16 Guevara;    M.R.,   and that's the child; Miosostis Pinnot;

17 Tyria Graham; China Harris; and Heidi Conces.  Does anyone

18 recognize any of those names or any of those persons?  Okay,

19 very good.

20         And the defendant may or may not be called to

21 testify.  Remember, the defendant is presumed innocent.  He

22 has no burden of proof.  The government alone has the burden

23 of proving the defendant guilty beyond a reasonable doubt.

24 Therefore, the defendant has a right to testify or not,

25 whatever he and his counsel decide.

Vol. 1-12

1    The next phase of this trial is called the voir

2  dire --

3    MR. SHEPARD:  There's more witnesses.

4    THE COURT:  Oh, there are more witnesses?  Oh.

5  Cathie Williamson -- I'm sorry -- Kent Hedberg, Shea

6  Hayes-Anderson, Tonya Fishburn, and Mike Johnson.  And those

7  people, they are all with the Marion County forensics --

8    MS. KOROBOV:  Three of them are, Your Honor.

9  Michael Johnson is a special agent with Homeland Security.

10    THE COURT:  Okay.  Anyone recognize any of those

11  names or those persons?  Thank you.

12    Thank you for that, Government.  All right, Tanesa.

13    So the next phase is the voir dire examination, and

14  this is where I will ask specific questions.  And these

15  questions will be directed to those of you in the box.  The

16  term "voir dire" is both a Latin and a French phrase, which

17  means to speak the truth.  And, again, it's a very important

18  civic duty to serve on a jury.

19    Now that we have you here in this courtroom -- we've

20  got a big panel, 60 persons.  And now that we have you here,

21  there are two ways that you can be excused.  One is through a

22  challenge for cause and the other are through peremptory

23  challenges.  A challenge for cause is if there's some legal or

24  statutory reason why you cannot serve, such as your age.  You

25  have to be at least 18.  You have to be able to understand the

Vol. 1-13

1  English language, and you have to be a resident of the
2  Southern District of Indiana.
3          The peremptory challenges are the other types of
4  challenges that can get you excused from jury duty.  And these
5  peremptory challenges are challenges that can be used at the
6  discretion of the attorneys to assist them in arriving at a
7  panel of persons who they believe can be fair and impartial in
8  this case.  The peremptory challenges enable counsel to
9  exercise their individual judgments to arrive at a panel that
10  they believe can be fair and impartial in this particular
11  matter.
12          Because the United States of America is bringing
13  this criminal matter rather than the State of Indiana, the
14  federal court has jurisdiction to hear this trial.  There are
15  94 federal judicial districts in the United States.  There are
16  two in Indiana, the Northern District of Indiana and the
17  Southern District of Indiana, where we are today.
18          We have four courthouses, four federal courthouses,
19  in the Southern District: the Indianapolis Division; we have a
20  federal courthouse in New Albany, Indiana; Evansville,
21  Indiana; and Terre Haute, Indiana.  And the Southern District
22  of Indiana is composed of the 60 most southern counties in the
23  State of Indiana, and that is why we have some jurors who are
24  right here in Indianapolis and some from very far away.  So
25  that's -- because you're all within the Southern District of

1  Indiana.

2         As the judge in this case, it's my duty to ensure

3  that a fair and impartial jury is selected.  I will also

4  assess the evidence that's presented during the trial, and I

5  will rule on objections.  And I will control how the trial

6  will unfold here in this courtroom.

7         You, ladies and gentlemen, are all here today

8  because you're either a registered voter or on the Indiana

9  state resident taxpayer rolls, or you're registered with the

10  Indiana Bureau of Motor Vehicles.  And the reason we have

11  jurors from all three of these sources is so that we can

12  arrive at a very diverse panel, so that everyone who is in a

13  federal courtroom can be ensured that they're going to have a

14  jury of their peers and a jury that can arrive at fair and

15  impartial rulings.

16         If you're chosen as a juror, it will be your job to

17  judge the facts of the case.  You will do this by judging the

18  credibility of each witness as they testify and by using your

19  common sense and life experiences.  And the very good news is

20  that, from our panel of 60 people, we will only be selecting

21  14 persons, 12 of you to serve as jurors and two persons to

22  serve as alternate jurors.

23         The role of the alternate juror is very similar to

24  that of the regular members of the panel.  The alternate is

25  with the jury at all times except during deliberations.  So

Vol. 1-15

1  every day during the course of trial, the alternates sit with

2  the jury, and you're in the jury room with them at all times.

3  The alternate may not render a vote on the verdict or

4  participate in deliberations unless a regular member of the

5  panel is excused.

6          The alternate jurors, however, must listen as

7  attentively to the testimony and the evidence that's presented

8  as any other regular member of the panel, so that if called

9  upon to replace a member of the panel, they will be ready to

10  do that.

11          The jury of 12 will be asked to render a unanimous

12  verdict on each of the eight counts in the indictment.  And

13  the verdict will be either guilty or not guilty.

14          This case is expected to take no more than four

15  days, and we'll take about an hour for lunch each day.  You

16  will get a short break in the morning and the afternoon, and

17  we'll try to give you about an hour each day for lunch.

18          This is not a sequestered jury, so you go home each

19  night, and you will be able to communicate with your family

20  and your employers during the course of the trial.  The only

21  time that you're not allowed to communicate with the outside

22  world is during deliberations.  When you deliberate, we'll

23  take your cell phones and you will just be in the room with

24  your 12 fellow jurors.

25          Now, having heard these things -- and it's a

 1  wonderful experience to serve on a jury.  I've done lots of

 2  jury trials, and I've never had a juror tell me, "Oh, Judge

 3  Pratt, I hated it.  It was a bad experience."  So, regardless

 4  of the nature of the proceedings, it's really important to

 5  have an opportunity to see how this process works, because

 6  we're all citizens of this great country and this is a very

 7  integral part of our rights as citizens.  And so it is a good

 8  experience.

 9          Is there anyone in the panel, both in the audience

10  and in the box, who cannot be available for up to four days

11  for any reason, other than inconvenience or you just don't

12  want to fool with us?  Anyone with a legitimate reason why you

13  can't be here for four days?  Anyone in the box?

14          (The jury selection was recorded but not transcribed

15          for purposes of this transcript.)

16      THE COURT:  Okay.  Ladies and gentlemen of the jury,

17  Tanesa is going to take you in the back and get you lined up

18  with your fellow jurors, and then we're going to bring you in

19  court and I'm going to swear the jury in, and then we're going

20  to send you to lunch.

21          And when you get back from lunch, we'll begin.  You

22  will be hearing the opening statements of counsel, get the

23  preliminary instructions of the Court, and we will begin to

24  hear evidence.  So we'll have you back in the courtroom as

25  soon as she can get everyone lined up.

 1          THE COURTROOM DEPUTY:  All rise.

 2          (Jury out at 12:17.)

 3          THE COURT:  We'll get them lined up and get the jury

 4   sworn, and then we'll send them to lunch.

 5          (Jury in at 12:20.)

 6          THE COURT:  Everyone may be seated except the jury,

 7   and the alternate jurors.  If you would remain standing and

 8   raise your right hands.  I'm going to swear you in.

 9          (The jury is sworn.)

10          THE COURT:  You may be seated.

11          All right.  Ladies and gentlemen, we're going to go

12   ahead and take our lunch break in just a moment.  And when you

13   return from lunch, you will hear the opening statements of

14   counsel, the Court's preliminary instructions, and you will

15   begin to hear testimony and evidence.

16          You can use your lunch hour to notify your family

17   and friends, "Guess what," and your employers, "I'm on jury

18   duty for at least four days."  And, hopefully, we'll go very

19   quickly.  These are very good lawyers, and they will be very

20   efficient with your time.

21          The Court is going to admonish you, during this

22   period of time that you are allowed to separate for lunch,

23   that you're not to have any discussion about the case among

24   yourselves or with anyone else.  If anyone should attempt to

25   talk to you about this matter, you should refuse and report

1  that attempt to me or your bailiff at your earliest

2  opportunity.

3      During the lunch break, if you should see one of the

4  attorneys and they don't speak to you, that's because --

5  they're not being unfriendly.  That's because they are under

6  the exact same admonishment.  They are not allowed to talk to

7  you.

8      If there is anything about this matter in a

9  newspaper, on radio or television, you are not to read or

10  listen to those accounts.  And remember, you are not allowed

11  to do any research on your cell phones or your laptops if you

12  brought them with you, nothing of that nature.

13      And under this admonishment, you will be allowed to

14  separate for your lunch hour.  It is 12:22, so we'll have you

15  back in the courtroom at 1:20.  So what that means, ladies and

16  gentlemen, come back a little earlier so that you can get in

17  your jury room and be in your jury room at 1:20, and we can

18  get you through promptly into the courtroom.

19      Security sometimes takes a few minutes, so if you

20  want to go get your lunch and bring it back and eat in your

21  jury room, you are free to do that, also.  I think it's a nice

22  day.  If you want to walk around downtown during your lunch

23  break, you are free to do that, also.  And we'll see you back

24  in the courtroom at 1:20 p.m.  Have a good lunch.

25      THE COURTROOM DEPUTY:  All rise.

Vol. 1-19

1     (Jury out at 12:23.)

2          THE COURT:  Lawyers, did I give you 20 minutes?

3          MR. SHEPARD:  I believe so, Your Honor.

4          THE COURT:  20 long minutes for your opening

5     statements.  And the Court will give the preliminary

6     instructions.  And who will be your first witness this

7     afternoon, Counsel?

8          MR. SHEPARD:  Miosotis Rodriguez.

9          THE COURT:  That's the child's --

10         MR. SHEPARD:  The mother.

11         THE COURT:  The mother.  Okay.  All right.  We are

12    in recess, and so be back and ready to start at 1:20 p.m.  We

13    are in recess for lunch.

14         MR. SHEPARD:  Thank you, Your Honor.

15         (Recess at 12:24, until 3:31.)

16

17

18

19

20

21

22

23

24

25

1                    **AFTERNOON SESSION**

2              THE COURT:  We are back on the record.  Is the

3    government ready for the jury?

4              MR. SHEPARD:  Yes, Your Honor.

5              THE COURT:  Defense ready?

6              MR. THOMAS:  We are ready, Your Honor.

7              THE COURT:  All right.  You may bring in the panel.

8    And I will read the preliminary instructions.  And then,

9    Counsel, you may -- we'll do the opening statements.

10             MR. THOMAS:  I'm sorry, Your Honor.  Do you want us

11   at the lectern for opening statements?

12             THE COURT:  Yes.

13             MR. THOMAS:  Thank you.

14             THE COURT:  Or you can walk around if you like, as

15   long as you have your mic on.

16             MR. THOMAS:  Thank you.

17             (Jury in at 1:32.)

18             THE COURT:  Good afternoon, ladies and gentlemen of

19   the jury.  We are on the record, the United States of America,

20   the plaintiff, versus the defendant, Ali Al-Awadi.  And,

21   ladies and gentlemen, sit back and relax.  At this time I'm

22   going to give you your preliminary instructions.  You may

23   follow along on the screens if you would like, or you can just

24   sit back and listen.

25             Ladies and gentlemen, you are now the jury in this

1  case.  I would like to take a few minutes to describe your

2  duties as jurors and to give you instructions concerning the

3  case.

4          As the judge in this case, one of my duties is to

5  decide all questions of law and procedure.  In these

6  preliminary instructions, during the trial, and at the end of

7  the trial, I will instruct you on the rules of law that you

8  must follow in making your decision.  The instructions that I

9  give you at the end of the trial will be more detailed than

10  the instructions I am giving you now.  Each of you will have a

11  copy of the instructions that I will give you at the end of

12  the case.

13          You have two duties as jurors.  Your first duty is

14  to decide the facts from the evidence that you see and hear in

15  court.  Your second duty is to take the law as I give it to

16  you, apply it to the facts, and decide if the government has

17  proved the defendant guilty beyond a reasonable doubt.  You

18  must perform these duties fairly and impartially.  Do not let

19  sympathy, prejudice, fear, or public opinion influence you.

20          You should not take anything I say or do during the

21  trial as indicating what I think of the evidence or what I

22  think your verdict should be.

23          This is a criminal case that has been brought by the

24  United States of America against the defendant, Ali Al-Awadi.

25  The charges against Mr. Al-Awadi are in a document called an

Vol. 1-22

1   indictment.  You will have a copy of the indictment during

2   your deliberations.

3           The indictment in this case charges that

4   Mr. Al-Awadi committed the crimes of Counts 1 through 4,

5   production of child pornography; and Counts 5 through 8,

6   attempted production of child pornography.  Mr. Al-Awadi has

7   pleaded not guilty to the charges.

8           The indictment is simply the formal way of telling

9   the defendant what crimes he is accused of committing.  It is

10  not evidence that the defendant is guilty.  It does not even

11  raise a suspicion of guilt.

12          And, Mr. Shepard, if you're able to stand at the

13  lectern, I'm going to have you read the indictment to the

14  jury.

15          MR. SHEPARD:  It's faster that way.

16          THE COURT:  Okay.

17          MR. SHEPARD:  Certainly, Your Honor.  Counts 1

18  through 4.  "On or about August 21, 2014, in Marion County...

19  within the Southern District of Indiana, Ali Al-Awadi,

20  defendant herein, did knowingly employ and use Victim One, a

21  minor, to engage in sexually explicit conduct, namely the

22  lascivious exhibition of the genitals or pubic area, for the

23  purpose of producing visual depictions of such conduct, each

24  visual depiction being a separate count, as further set below.

25          "Further, the defendant knew, or had reason to know,

 1   said visual depictions would be transported or transmitted

 2   using any means or facility of interstate or foreign commerce,

 3   or were produced using materials that had been mailed,

 4   shipped, or transported in interstate or foreign commerce,

 5   including a computer.

 6          "Count 1, file name imagcache.0_embedded_330.jpg;

 7   Count 2, imagcache.0_embedded_329.jpg; Count 3,

 8   imagcache.0_embedded_332.jpg; Count 4,

 9   imagcache.0_embedded_331.jpg, all in violation of Title 18

10   United States Code, Section 2251(a)."

11          Counts 5 through 8.

12          "On or about August 21, 2014, in Marion County,

13   Indiana, within the Southern District of Indiana, Ali

14   Al-Awadi, defendant herein, did knowingly attempt to employ

15   and use Victim One, a minor, to engage in sexually explicit

16   conduct, namely the lascivious exhibition of the genitals or

17   pubic area for the purposes of producing a visual depiction of

18   such conduct, each visual depiction being a separate count, as

19   further set forth below.

20          "Further, the defendant knew, or had reason to know,

21   said visual depictions would be transported or transmitted

22   using any means or facility of interstate or foreign commerce,

23   or were produced using materials that had been mailed,

24   shipped, or transported in interstate or foreign commerce,

25   including a computer.

Vol. 1-24

1          "And in furtherance of these counts, did perpetrate

2     the following substantial steps:  Utilization of a cellular

3     telephone to create the following images.

4          "Count 5, imagcache.0_embedded_330.jpg; Count 6,

5     imagcache.0_embedded_329.jpg; Count 7,

6     imagcache.0_embedded_332.jpg; and Count 8,

7     imagcache.0_embedded_331.jpg, all in violation of Title 18

8     United States Code, Section 2251(e)," as in echo.

9          THE COURT:  Thank you, Mr. Shepard.

10         Ladies and gentlemen, I may sometimes refer to the

11    attorneys for the prosecution as the "government."  In this

12    trial, there is one defendant, Ali Al-Awadi.  I may sometimes

13    refer to Mr. Al-Awadi as the "defendant."

14         Mr. Al-Awadi is presumed innocent of each and every

15    one of the charges.  This presumption continues throughout the

16    case, including during your deliberations.  It is not overcome

17    unless, from all of the evidence in the case, you are

18    convinced, beyond a reasonable doubt, that Mr. Al-Awadi is

19    guilty as charged.

20         The government has the burden of proving

21    Mr. Al-Awadi's guilt beyond a reasonable doubt.  This burden

22    of proof stays with the government throughout the case.

23    Mr. Al-Awadi is never required to prove his innocence.  He is

24    not required to produce any evidence at all.

25         A defendant has an absolute right not to testify or

1  present evidence.  You may not consider in any way if

2  Mr. Al-Awadi does not testify or present evidence.

3          You may consider only the evidence that you see and

4  hear in court.  You may not consider anything you may see or

5  hear outside of court, including anything from the newspaper,

6  television, radio, the Internet, or any other source.

7          The evidence includes only what the witnesses say

8  when they are testifying under oath, the exhibits that I allow

9  into evidence, and any facts to which the parties stipulate.

10  A stipulation is an agreement that certain facts are true or

11  that a witness would have given certain testimony.

12          Nothing else is evidence.  Any statements and

13  arguments that the lawyers make are not evidence.  If what a

14  lawyer says is different from the evidence as you see or hear

15  it, the evidence is what counts.  The lawyers' questions and

16  objections, likewise, are not evidence.

17          A lawyer has a duty to object if he thinks a

18  question or evidence is improper.  When an objection is made,

19  I will be required to rule on the objection.  If I sustain an

20  objection to a question a lawyer asks, you must not speculate

21  on what the answer might have been.  If I strike testimony or

22  an exhibit from the record, or tell you to disregard

23  something, you must not consider it.

24          Pay close attention to the evidence as it is being

25  presented.  During your deliberations, you will have any

1    exhibits that I allow into evidence, but you will not have a

2    transcript of the testimony.  You will have to make your

3    decision based on what you recall of the evidence.

4           You may have heard the terms "direct evidence" and

5    "circumstantial evidence."  Direct evidence is evidence that

6    directly proves a fact.  Circumstantial evidence is evidence

7    that indirectly proves a fact.

8           For example, direct evidence that it was raining

9    outside is testimony by a witness that it was raining.

10   Circumstantial evidence that it was raining outside is the

11   observation of someone entering a room carrying a wet

12   umbrella.

13          You are to consider both direct and circumstantial

14   evidence.  The law does not say that one is better than the

15   other.  It is up to you to decide how much weight to give to

16   any evidence, whether direct or circumstantial.

17          Give the evidence whatever weight you believe it

18   deserves.  Use your common sense in weighing the evidence, and

19   consider the evidence in light of your own everyday

20   experience.  People sometimes look at one fact and conclude

21   from it that another fact exists.  This is called an

22   inference.  You are allowed to make reasonable inferences so

23   long as they are based on the evidence.

24          Part of your job as jurors will be to decide how

25   believable each witness was and how much weight to give each

Vol. 1-27

1  witness' testimony.  I will give you additional instructions

2  about this at the end of the trial.

3          Do not make any decisions by simply counting the

4  number of witnesses who testified about a certain point.  What

5  is important is how believable the witnesses were and how much

6  weight you think their testimony deserves.

7          You will be permitted to take notes during the

8  trial.  If you take notes, you may use them during

9  deliberations to help you remember what happened during the

10 trial.  You should not use -- you should use your notes only

11 as an aid to your memory.  The notes are not evidence.  All of

12 you should rely on your independent recollection of the

13 evidence, and you should not be unduly influenced by the notes

14 of other jurors.  Notes are not entitled to any more weight

15 than the memory or impressions of each juror.

16         Before we begin the trial, I want to discuss several

17 rules of conduct that you must follow as jurors.  First, you

18 must keep an open mind throughout the trial.  Do not make up

19 your mind about what your verdict should be until after the

20 trial is over, you have received my final instructions on the

21 law, and you are with your fellow jurors and having discussed

22 the evidence.

23         Your verdict in this case must be based exclusively

24 on the law as I give it to you and the evidence that is

25 presented during the trial.  For this reason, and to ensure

Vol. 1-28

1  fairness to both sides in this case, you must obey the

2  following rules.  These rules apply both when you are here in

3  court and when you are not in court.  They apply until after

4  you have returned your verdict in the case.

5          You must not discuss the case, including anyone who

6  is involved in the case, among yourselves until you go to the

7  jury room to deliberate after the trial is completed.

8          You must not communicate with anyone else about this

9  case, including anyone who is involved in the case, until

10  after you have returned your verdict.

11          When you are not in the courtroom, you must not

12  allow anyone to communicate with you about the case or give

13  you any information about the case or about anyone who is

14  involved in the case.  If someone tries to communicate with

15  you about the case or someone who is involved in the case, or

16  if you overhear or learn any information about the case or

17  someone involved in the case when you are not in the

18  courtroom, you must report this to me promptly.

19          You may tell your family and your employer that you

20  are serving on a jury, so that you can explain that you have

21  to be in court.  However, you must not communicate with them

22  about the case or anyone who is involved in the case until

23  after you have returned your verdict.

24          All of the information that you will need to decide

25  the case will be presented here in court.  You may not look

Case 1:15-cr-00023-TWP-DML Document 148-1 Filed 12/12/16 Page 29 of 141 PageID #: 15
Case 1:15-cr-00023-TWP-DML Document 148-1 Filed 12/12/16 Page 29 of 141 PageID #: 4198

Vol. 1-29

1   up, obtain, or consider information from any outside source.

2           There are two reasons for these rules.  First, it

3   would not be fair to the parties in the case for you to

4   consider outside information or communicate information about

5   the case to others.  Second, outside information may be

6   incorrect or misleading.

7           When I say that you may not obtain or consider any

8   information from outside sources and may not communicate with

9   anyone about the case, I am referring to any and all means by

10  which people communicate or obtain information.  This

11  includes, for example, face-to-face conversations, looking

12  things up, doing research, reading, watching or listening to

13  reports in the news media, and any communication using any

14  electronic device or media, such as a telephone, cell phone,

15  smartphone, iPhone, Android, BlackBerry or similar device,

16  PDA, computer, the Internet, text messaging, e-mails, chat

17  rooms, blogs, social networking Web sites like Facebook,

18  YouTube, Twitter, Google+, LinkedIn, Snapchat, or any other

19  form of communication at all.  If you hear, see, or receive

20  any information about the case by these or any other means,

21  you must report that to me immediately.

22          We are now ready for trial.  The trial will proceed

23  in the following manner:  First, each side's attorneys may

24  make an opening statement.  An opening statement is not

25  evidence.  Rather, it is a summary of what each side's

1  attorneys expect the evidence will show.

2         After the opening statements, you will hear the

3  evidence.

4         After the evidence has been presented, the attorneys

5  will make closing arguments and I will instruct you on the law

6  that applies to the case.

7         After that, you will go to the jury room to

8  deliberate on your verdict.

9         Thank you, ladies and gentlemen.  And now we're

10  going to hear the opening statements of counsel.  And because

11  the government has the burden of proof, they go first at all

12  stages of the proceedings.  So, Mr. Shepard, are you making

13  the opening?

14         MR. SHEPARD:  Yes, Your Honor.

15         THE COURT:  All right.  You may.

16                   **OPENING STATEMENT BY**:

17         MR. SHEPARD:  Thank you, Your Honor.  May it please

18  the Court.  Good afternoon, ladies and gentlemen.  Over these

19  next four days, you're going to hear from a lot of people,

20  you're going to hear a lot of evidence, and that evidence is

21  going to tell a story.  And, unfortunately, the story is going

22  to be one of the worst nightmares that can ever befall a

23  parent, the robbing of part of the innocence of their child.

24         You're going to hear from Justo Guevara and Miosotis

25  Rodriguez, or Georgina.  And they're going to tell you about

 1  their daughter M.R., who at the time of the incident was four

 2  years old.  You're going to hear that they took both M.R. and

 3  her sister to a daycare run by Bright Horizons, which is --

 4  was attached to St. Vincent's Hospital up on the north side of

 5  Indianapolis.  And you're going to hear how M.R. normally

 6  acted.

 7         And then you're going to hear how August the 21st of

 8  2014 began like any other day, how Justo dropped the sisters

 9  off early in the morning before he went to work and while

10  Georgina was at work.  And then you're going to hear, when

11  Justo came to pick them up, how there was a markedly different

12  behavior being exhibited by M.R., really, than he had ever

13  seen in his daughter.  You're going to hear about how she

14  wouldn't play on the playground or even eat her favorite food

15  at Chick fil A.  You're going to hear how she started

16  complaining of pain when she went to the bathroom.

17         You're going to hear about when they got home, how

18  when Georgina, who was also a medical assistant, went up to

19  try and figure out what was wrong.  And while M.R. was

20  sleeping, she examined her, and that she examined -- or excuse

21  me, that she saw a redness in her vaginal area; and that after

22  M.R. woke up, she was still trying to find out what happened.

23  Why was she not feeling good?  Why was this pain happening?

24  And how M.R. started crying, how M.R. ultimately urinated on

25  herself and her mother.  And then you're going to hear what

1   shattered their world, that Mr. Ali had touched her in her

2   "tito," her word for vagina, at naptime that day at the

3   daycare.

4          You're next going to hear from Angela Bates, who was

5   the examining registered nurse at the Center of Hope, which is

6   part of St. Vincent's Hospital.  You're going to hear about

7   the medical examination that she performed on M.R. and how she

8   found swelling and redness on her hymen, how the hymen is an

9   area of the female genitals that is protected by both layers

10  of the labium.  You're going to hear how she took multiple

11  swabs for biological material over M.R., and how she took the

12  underwear that she was wearing that day to preserve it as

13  evidence.

14         You're going to hear from other staff members of the

15  daycare.  You're going to hear that M.R. told them that

16  Mr. Ali had touched her during naptime, and that she was

17  continually questioned by multiple members of the daycare, and

18  that every time, that's exactly what she stated.

19         You're also going to hear how they confronted Ali

20  Al-Awadi about the accusations made by M.R.  You're going to

21  hear those reactions weren't quite what the staff expected.

22  You're going to hear that after being told how important it

23  was that you remember every detail and you write it down, he

24  wrote a written statement, and you're going to see that

25  nowhere in that written statement does he mention anything

1   being found on his cell phone.

2           You're going to hear from Detective McAlister, who

3   interviewed the defendant; and you're going to hear from the

4   defendant himself by way of a video recording of that

5   interview.  You're going to hear his version of events, how he

6   states how he was playing with M.R. and another child and how

7   he picked M.R. up.  And then, when he did this, M.R. wrapped

8   his (sic) legs around her (sic) and that he had a big watch,

9   and it must have been that watch that caused those physical

10  findings of Angela Bates, despite that it would have had to

11  have happened through two layers of clothing.

12          You're going to hear that when confronted about the

13  possibility of DNA evidence, some new details that no one had

14  ever heard before were offered by the defendant, that M.R.

15  came in and said, "I have new underwear," and started to lift

16  up her shirt.  He's also going to tell you that he tickled

17  M.R. and the other child.  But you will hear the defendant was

18  adamant, he never saw the underwear, and that he stopped her

19  before she could show him anything.

20          And at no point, despite having a lengthy discussion

21  about what may be on his cellular telephone, there were no

22  mention of four pictures of M.R. taken like this.

23          You're going to hear from Grant Melton, the forensic

24  examiner who examined the defendant's phone.  He's going to

25  tell you how he recovered text messages showing that the

1  defendant was warned that the police were at the daycare

2  searching it before they ever came in contact with him.  He's

3  going to tell you about recovered file paths, and that these

4  recovered file paths were created by -- they were deleted

5  files, that they were created by the camera function on the

6  defendant's phone, and that they were created in a one-hour

7  window when the defendant was alone with M.R.'s classroom,

8  naptime.

9          And he's going to tell you that a phone

10  automatically makes copies of every picture it takes.  And

11  even if the original picture is deleted, you can sometimes

12  find that copy.  And he's going to tell you about four images

13  that he found, which display the pubic area and genital area

14  of M.R.

15          You're going to hear from scientists at the Marion

16  County Crime Lab, how they recovered male DNA from the inside

17  crotch of the underwear that M.R. was wearing that day. You're

18  going to hear that DNA does not match her father, and you're

19  going to hear that that DNA is consistent with the defendant.

20          Finally, you're going to hear from Mike Johnson, who

21  is a special agent with Homeland Security, and he's going to

22  talk to you about what child pornography is and what child

23  pornography isn't, so you can decide for yourselves.  We don't

24  want you to take our word for it.  I want you to decide for

25  yourselves if the four images were, in fact, child

1   pornography.

2        And at the end of the day, after hearing all of this

3   evidence, we're confident that you will find that the

4   defendant used   M.R.   to create, or an attempt in creating,

5   the four images of child pornography, because that's what we

6   have to prove, and that you will return a verdict of guilty.

7   Thank you.

8        THE COURT:  Thank you, Counsel.

9        Mr. Thomas?

10        MR. THOMAS:  Thank you, Your Honor.

11                    **OPENING STATEMENT BY**:

12        MR. THOMAS:  Ladies and gentlemen of the jury, if it

13   please the Court.  Well, you all heard at the beginning, when

14   you sat down, "child pornography," and everyone had a certain

15   reaction.  It's normal.  Accusations like these elicit a

16   certain reaction.

17        Ladies and gentlemen, what I ask you is to follow

18   those instructions and remember what we talked about in jury

19   selection.  And that is that this is the government's case to

20   prove, not Mr. Ali Al-Awadi's case to disprove.  And that's

21   very important when you evaluate the evidence.

22        The one thing that I would tell you is, look at the

23   evidence very carefully and understand that you may not be the

24   only ones who have an instant reaction.  And I think the

25   evidence is going to show that law enforcement, DCS, people

1   who investigated this case, had an instant reaction.  And the
2   evidence is going to show that they missed, overlooked,
3   ignored certain aspects of the case, which will seriously draw
4   into question whether things took place the way that the
5   government alleges.

6          Remember that you're going to hear evidence about
7   fondling, about child molestation.  This is not a child
8   molestation trial.  This is a child pornography trial.  We are
9   here in this federal courthouse because Mr. Al-Awadi's cell
10  phone was made in China.  That's what makes this a federal
11  case.

12         You will see that there are four images being
13  charged, but eight counts.  The government has charged four
14  counts of production and then four more counts of attempted
15  production.  You're going to be asked to decide whether or not
16  these images are pornographic.  And the evidence is going to
17  show that there was another valid reason to take these
18  pictures, a stupid reason, but a valid reason, nonetheless,
19  that was not to create a lascivious display, which is what
20  would make it pornography.

21         And I think the evidence is going to show that not
22  every photograph that involves nudity is pornographic.  And
23  you will find that there is another reason why these
24  photographs were taken, and that there are significant issues
25  about the timeline about the story that the government will

Case 1:15-cr-00073-TWP-DML Document 148-1 Filed 12/12/16 Page 37 of 141 PageID #:
4206
Case 9:15-cr-00073-TWP-DML Document 148-1 Filed 12/12/16 Page 37 of 141 PageID #:23

1  submit.

2       Yes, the evidence will show that M.R. did say that

3  Mr. Al-Awadi touched her, but the evidence will also show that

4  she, when being interviewed, said that another person named

5  Ms. Anna had touched her.  She changed her mind about that.

6  And she also said that a monster came into her room at night

7  with a key and touched her.  She said that was a dream.

8       The government is going to present evidence that,

9  after being with Mr. Al-Awadi, M.R. complained of pain, but

10 from their own witness, you're going to hear that she had

11 complained of pain earlier in the day before she ever saw

12 Mr. Al-Awadi.  And the evidence is going to show that she

13 talked about hurting with her mother before she ever saw

14 Mr. Al-Awadi.

15      Now, those things may be glossed over, but you can't

16 gloss them over.  You want to look very carefully.  Don't fall

17 into a trap of overreacting, of thinking horrible accusation,

18 horrible crime, it must be true.  That's not your job.  What I

19 ask you to do is look at the evidence in the case and realize

20 that there is another explanation and that there are questions

21 about the case.

22      At the end of the day, what I ask you to do is hold

23 the government to their burden, don't overreact.  Look at

24 every aspect.  And when you see that there is another

25 possibility, and it's a reasonable possibility, that these are

 1  not child pornography and these were not taken to be child

 2  pornography, when you come to the conclusion that that is a

 3  very real possibility, you will have to vote not guilty.

 4  That's what I will ask you to do at the appropriate time.

 5          Keep an open mind, listen to all of the evidence,

 6  and I know you will do your best.  Thank you.

 7          THE COURT:  Thank you, Mr. Thomas.

 8          And, Mr. Shepard, you may call your first witness.

 9          MR. SHEPARD:  Your Honor, prior to calling

10  witnesses, the government would move to admit Exhibits 11 and

11  its individually numbered sub exhibits, or sub pages, 12, 13,

12  14, 15, 16, 17, 77, and 78, pursuant to the certification,

13  which is attached to Exhibit 11, as business records and

14  self-authenticating nonhearsay of the Center of Hope.  We

15  would also move to admit Exhibit 22 and its individually

16  numbered subparts, 20, 21, 23, and 68, pursuant to its

17  certification of self-authenticating nonhearsay, business

18  records of Bright Horizons Daycare.

19          THE COURT:  Any objection?

20          MR. THOMAS:  I'm sorry.  What was the second number,

21  Your Honor, the second exhibit number?

22          THE COURT:  The second set?

23          MR. SHEPARD:  22.

24          THE COURT:  22 and its subparts.

25          MR. THOMAS:  We have no objection.

1          THE COURT:  Government's Exhibits 11, 12, 13, 14,

2   15, 16, 17, 77, and 78, as well as 22 -- 21?

3          MR. SHEPARD:  22, 20, 21, 23, and 68.

4          THE COURT:  Those exhibits are admitted without

5   objection.

6                          *(Government's Exhibits 11 - 17, 20 - 23,*

7                          *68, 77, 78 were received in evidence.)*

8          THE COURT:  And you may examine your -- call your

9   first witness.

10          MR. SHEPARD:  The government would call Miosotis

11   Rodriguez, Your Honor.

12          THE COURT:  Ma'am, if you would come right up here

13   to the witness stand.  Bring her that way.  Right over here.

14   And if you would remain standing and raise your right hand.

15          (The witness is sworn.)

16          THE COURT:  You may have a seat.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  Mr. Shepard, you may examine

19   your witness.

20          MR. SHEPARD:  Thank you, Your Honor.

21      **MIOSOTIS GEORGINA RODRIGUEZ, PLAINTIFF'S WITNESS, SWORN**

22                      **DIRECT EXAMINATION**

23   BY MR. SHEPARD:

24   Q.  Would you please state your full name and spell your last

25   name for the record -- or you may need to spell your first

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD     Vol. 1-40

 1  name.  I don't know if David is familiar with it.

 2  A.  Okay.  My name is Miosotis Georgina Rodriguez.  My first

 3  name is spelled M-I-O-S-O-T-I-S.

 4  Q.  And are you a U.S. citizen?

 5  A.  Yes, I am.

 6  Q.  Where do you live?

 7  A.  I live in Indianapolis, Indiana.  1301 Tishman Lane,

 8  46260.

 9  Q.  How long have you lived here?

10  A.  In Indianapolis?

11  Q.  Uh-huh.

12  A.  I have lived here for over 12 years.

13  Q.  Who lives with you?

14  A.  My husband, Justo; M.R., E.R., my two daughters; and right

15  now my sister.

16  Q.  All right.  Do you have other family that's living close

17  by?

18  A.  My mother.

19  Q.  Where does she live?

20  A.  She lives in -- it's a two-condo, so she lives in one of

21  the -- the other side of the condo.

22  Q.  All right.  You mentioned M.R.  Who is M.R.?

23  A.  M.R. is my daughter.

24  Q.  How old is she?

25  A.  M.R. is six years old.

1   Q.  You've got a binder -- actually, it was admitted.

2           MR. SHEPARD:  Could you please display Exhibit 77,

3   which has been admitted pursuant to certification.

4   A.  Open it?

5   BY MR. SHEPARD:

6   Q.  It will come up on your screen.  Do you recognize who's in

7   that photo?

8   A.  Yes.  That's my daughter, M.R.

9   Q.  Would you describe M.R. a little bit for us?

10  A.  Oh.  M.R., she is the most loving little girl, caring,

11  very active, and just cheerful, just -- yeah, just a

12  beautiful, spiritual little girl.

13  Q.  Is she energetic?

14  A.  Yes, she is.  She's very active.

15  Q.  Was she the same way two years ago?

16  A.  Two years ago?  It changed from one point.

17  Q.  Do you remember what it was that caused the change?

18  A.  Yes, I do.

19  Q.  Okay.  Did she go to daycare?

20  A.  Right now?

21  Q.  Did she go to daycare in 2014?

22  A.  Yes, she did.

23  Q.  Okay.  I ask you to look at, in the binder, what's marked

24  as Exhibit 1.  And I'll ask if you recognize that.

25  A.  Yes.  This is the daycare that she used to attend.

MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD    Vol. 1-42

1   Q.  Is that --

2   A.  Children's Choice Learning Center.

3   Q.  Is that an accurate portrayal of the daycare as you

4   remember it?

5   A.  Yes.

6           MR. SHEPARD:  Your Honor, I would move for the

7   admission of Government's Exhibit -- or, excuse me, as

8   Exhibit 1.

9           MR. THOMAS:  I have no objection to 1.

10          THE COURT:  1 is admitted into evidence without

11  objection.

12                  (Government's Exhibit 1 was

13                   received in evidence.)

14          MR. SHEPARD:  Please display Exhibit 1.

15  BY MR. SHEPARD:

16  Q.  How long did M.R. attend this daycare?

17  A.  M.R. was there -- she started at -- well, a year and a

18  half -- when she was a year and a half.  And at that point she

19  was four.  That was four and a half, because her birthday is

20  in October.

21  Q.  Where was the daycare located?

22  A.  It was located on St. Vincent property, 86th.

23  Q.  Is that here in Indianapolis?

24  A.  Yes, it was.

25          MR. SHEPARD:  Your Honor, I would ask the Court to

1  take judicial notice that Indianapolis is within the Southern

2  District of Indiana.

3            THE COURT:  The Court will take judicial notice.

4            MR. SHEPARD:  Thank you, Your Honor.

5  BY MR. SHEPARD:

6  Q.  So how would the typical weekday, when you had to use the

7  daycare, work?  Who would generally take M.R. and her sister

8  to daycare?

9  A.  I would be the one mainly taking them to daycare, except

10 when my husband probably -- when he didn't work, then he will

11 take the girls in a little late so that they can sleep in a

12 little bit, because I would be at work at 8:00, so I had to

13 get them up earlier, to get -- you know, just to let them rest

14 a little bit.

15 Q.  Who typically would pick them up?

16 A.  Either my husband or I, only the two main persons.

17 Q.  Just whoever was free that day?

18 A.  Yes.  Yes.  Or if I worked late, like I first started my

19 job, that was in July, so I had two late nights.  So my

20 husband was the one picking them up on those two late nights.

21 Q.  Now, you mentioned that there was a day where things about

22 M.R. changed.  Do you remember what day that was?

23 A.  Yes.  That was on August the 21st.

24 Q.  Of what year?

25 A.  Of 2014.

1  Q.  I want you to think back to that day.  How did that day

2  begin?

3  A.  It just began like a typical day.  My husband, he actually

4  didn't work that day, so he was the one that took the girls to

5  daycare that morning.  He usually -- the daycare had a rule of

6  taking the kids before 10:00, so he took them in close to

7  10:00, 9:45 or close to 10:00 in the morning.  And I just went

8  to work and he just took them to daycare and he went back

9  home.

10  Q.  How were the girls in the morning?

11  A.  The girls were fine.  Yeah, they were fine in the morning.

12  They're happy when they get to sleep in a little bit and wake

13  up.  They're daddy girls, so they were happy to see their dad.

14  Q.  Talking, playing?

15  A.  Yeah, they were, just -- you know, just M.R. being her,

16  yeah.

17  Q.  When was the first time you heard that something might be

18  wrong that day?

19  A.  When I got off work that afternoon, my husband -- I called

20  him just to check to see where they were going.  And he

21  tell -- told me that M.R. --

22              MR. THOMAS:  Objection.  Hearsay, Your Honor.

23              THE COURT:  Do you have an exception?

24              MR. SHEPARD:  From here or from there, Your Honor?

25              THE COURT:  Well, come on up.

1    (Bench conference on the record.)

2    THE COURT:  Okay, the question was, "When was the

3 first time you heard something might be wrong that day?"

4    MR. SHEPARD:  The government is not offering it for

5 its truth.  The government is offering it to show why, as I'm

6 getting ready to go to in the next question or two, that she

7 examined the child when she got home.  It's just knowledge,

8 state of mind of the witness.

9    MR. THOMAS:  Judge, I believe the evidence is being

10 offered for the truth.

11    THE COURT:  What is she going to say?

12    MR. SHEPARD:  Just complaining of pain.

13    THE COURT:  Okay.  I'll allow that.  Objection is

14 overruled.

15    MR. THOMAS:  Thank you, Your Honor.

16                (Open court.)

17    THE COURT:  You may ask the question.  The objection

18 is overruled.

19 BY MR. SHEPARD:

20 Q.  Did he indicate that M.R. was complaining of pain?

21 A.  Well, when my husband called, he said that M.R. was acting

22 a little bit different and that she was complaining of her

23 tito hurting, which is just like a sweet, like, name that we

24 just call vagina, was hurting.

25 Q.  Did you meet them at home?

1  A.  He told me he was going to Chick fil A to take the girls

2  to have dinner there, and I was just heading to work.  Being a

3  long work, I was tired.  I'm like, "Just go ahead and I'll

4  meet you at home."

5  Q.  What happened when they got home?

6  A.  When they got home, I asked my husband, okay, what was

7  going on with M.R.  And he said that she was complaining of

8  her tito hurting, and that she was not interested in eating.

9  She wasn't -- like she didn't want to play.  And that's her

10  favorite spot to go, and so it was odd for her not to

11  socialize with other kids.  It wasn't herself.

12  Q.  Was she awake or asleep when she got home, do you

13  remember?

14  A.  When she got home, she was still -- she fell asleep in the

15  car, so she was sleeping.

16  Q.  Okay.  After your husband told you this, what did you do?

17  A.  Well, when he told me, I just went upstairs to the room.

18  He laid her in the bed, and I just went to check on her and

19  check her vaginal.

20  Q.  What do you do for a living?

21  A.  I work as a medical -- I am a medical assistant.  I have a

22  medical assistant degree.  And at that time, I was working for

23  Eskenazi Health Family Planning.

24  Q.  In the same capacity, as medical assistant?

25  A.  Yes.

1  Q.  When you went up to check on her, how did you go about

2  checking on her?

3  A.  I pulled her pants down, and I just wanted to just

4  visualize of her complaining, why her tito was hurting.  So I

5  just --

6  Q.  Did you examine it?

7  A.  Yes.  I examined --

8  Q.  How did you go about examining, if you can remember?

9  A.  I just opened her vaginal lips and saw the redness.

10 Q.  Okay.  And is that the same type of thing you would do if

11 a patient came in and complained of that type of pain or

12 uncomfortableness?

13 A.  I won't be the one examining it, but I would ask the

14 questions of why.

15 Q.  Did -- when you did that, did it look normal?

16 A.  No.

17 Q.  What did it look like, if you remember?

18 A.  It looked red.  Her vaginal looked like irritated, like

19 red.

20 Q.  Had you ever seen --

21 A.  No.

22 Q.  -- anything like that on your daughter before?

23 A.  No.

24 Q.  Had she ever had anything like a urinary tract infection

25 before?

 1  A.  Never.

 2  Q.  At some point did she wake up?

 3  A.  Yes, she woke up.  I came downstairs and, like, five

 4  minutes later she woke up.  And --

 5  Q.  Did you talk to her about what you had found?

 6  A.  Yes.  When she woke up, she -- we were -- my husband and

 7  I -- we were sitting at our dining table, and she went to my

 8  husband and sat in his lap.  And I questioned her and I asked

 9  her why her tito was hurting.

10  Q.  And were these the same types of questions you would ask

11  any patient who came in and --

12  A.  Yes.

13  Q.  What were you wearing at the time?

14  A.  I was wearing my scrubs, my work scrubs, the blue -- blue

15  scrubs.

16  Q.  Does M.R. know what you do for a living?

17  A.  Yes.

18  Q.  Would it be important in your profession to hear from the

19  patient why they were hurting?

20  A.  Yes.

21        MR. THOMAS:  Your Honor, preliminary question for

22  the purpose of objection?

23        THE COURT:  You may.

24  BY MR. THOMAS:

25  Q.  Ma'am, what is your -- what is your role at your job?

1  What are your job requirements?

2  A.  What I do is, basically, when the patient go in, I take

3  their information.  If they're having any complaints,

4  vaginally, I will ask them what's going on and just get some

5  information on what type of symptoms are you -- are they

6  having.

7  Q.  Do you make any kind of diagnosis?  Is that part of your

8  job?

9  A.  No, no diagnosis.

10         MR. THOMAS:  Your Honor, I would object to her

11  testimony about the conditions of other people and how it

12  might relate to her daughter.  She's not qualified to say

13  that.

14         THE COURT:  Okay.  Do you have a response to that?

15         MR. SHEPARD:  Let me ask one question and then I'll

16  respond.  Is that okay?

17         THE COURT:  Go ahead.

18  BY MR. SHEPARD:

19  Q.  After you take this information at your job place, who,

20  then, is it given to?

21  A.  It is given to the nurse practitioner.  And I have to

22  explain to her even in -- exactly what it is that the patient

23  told me.

24  Q.  And that goes into the formulation of the diagnosis and

25  treatment?

1  A.  Yes.

2  Q.  All right.

3         MR. SHEPARD:  Now, Your Honor, can we approach and

4  I'll --

5         THE COURT:  You may.

6         (Bench conference on the record.)

7         MR. SHEPARD:  Your Honor, the case law is clear that

8  any statements made for medical purposes do not have to be

9  made even to a medical professional, which the witness clearly

10  is.  They just have to be made -- it would be admitted if --

11         THE COURT:  Is it a gynecologist's office?

12         MR. SHEPARD:  It's family planning.  So, in a way,

13  yes, Your Honor.

14         THE COURT:  Okay.

15         MR. SHEPARD:  So, as the Court knows, it's even in

16  her field.  Statements made to parents by children have

17  regularly been admitted as statements for the purposes of

18  medical diagnosis.  The point is, what was the purpose of the

19  statement?  Is it to try and get help for what is happening to

20  you or is -- and to find out, or is it for some other purpose,

21  to preserve evidence for later litigation?

22         I think here, as the foundation has been laid by the

23  witness, it's clearly to determine what is wrong with the

24  child so that they can figure out what was happening.

25         MR. THOMAS:  My objection is to the question

1  regarding her employment and her other patient, or he referred

2  to him as her patients.  It would appear that she takes down

3  information and passes it on to other folks.  So my objection

4  is, when he's asking her how does this compare to other

5  patients, he's asking her for a medical opinion that she's not

6  qualified to give.

7          THE COURT:  Okay.  Why don't you rephrase the

8  question so that you're not asking her about other patients.

9  I think what you were trying to do was to establish your

10  medical exception by asking her is this what she does in the

11  regular course of examination of patients.  So why don't you

12  rephrase and just ask her about her child and what her child

13  told here and what she observed with respect to her child,

14  okay?

15                  (Open court.)

16  BY MR. SHEPARD:

17  Q.  Did you ask M.R. what happened or --

18  A.  Yes.

19  Q.  And what did she say?

20  A.  I asked M.R. why was her tito hurting, and she didn't

21  answer.  She just started crying and running upstairs to her

22  room.  And then once I -- of course, I immediately followed

23  her after I saw her reaction to my question, and I questioned

24  her upstairs.  And she was still crying.  She didn't want to

25  say nothing.  And I'm, like -- I just sat her in my lap.  I

1  had -- I grabbed a chair and just sat her there and tried to

2  kind of calm her down.  And it got me very concerned, because

3  I had never seen her like that.  And --

4        MR. THOMAS:  Judge, I'm going to object to the

5  narrative at this point.

6        THE COURT:  I'll overrule.  She can say what she

7  observed and felt.  You may.

8  BY MR. SHEPARD:

9  Q.  Please continue.

10 A.  Okay.  So I sat her in my lap and I started questioning

11 her and telling her, "Mommy -- you can..."

12 Q.  It's okay.

13 A.  I'm sorry.  I told her, "Mommy -- you know Mommy loves

14 you, so you have to trust me.  You have to tell me what's

15 wrong, because Mommy is very concerned."

16        And she told me that she couldn't say nothing.  I'm

17 like, "No, you can say something.  You have to tell me what's

18 wrong."  And before she even said something to me, she, like,

19 peed all over my pants.  And I'm, like, "What's going on,

20 M.R.?  Tell me."  And then she told me that Mr. Ali put her

21 finger inside her tito.

22 Q.  Put her finger or his finger?

23 A.  His finger inside her tito.

24 Q.  And, again, what was "tito"?

25 A.  Her tito is her vaginal -- inside her vaginal.  And

1  then --

2  Q.  Did you take her to the hospital?

3  A.  I took her -- I immediately took her to the hospital, and

4  I called --

5  Q.  Do you remember which hospital?

6  A.  I took her to St. Vincent ER Emergency, Children's

7  Hospital.

8  Q.  Did you eventually get routed to the Center of Hope?

9  A.  We went to the Center of Hope.  They had a Center of Hope

10  inside the St. Vincent area, the nurses.  There were -- one of

11  the nurses, she was going to switch shift, so she was the one

12  that saw us, the second nurse.

13  Q.  Did you go back with M.R. during the exam?

14  A.  Yes.

15  Q.  Who all went back?

16  A.  My husband and myself.

17  Q.  And did you tell essentially the same thing to the nurse?

18  A.  Yes.  Before then, they asked M.R. what was going on.  And

19  M.R. talked and said the same thing she told me.  And then

20  they asked her again in the room, and they asked me, as well.

21  Q.  I ask you to look in the binder in front of you and look

22  at what's marked as Exhibit 5-A.

23  A.  Go ahead.

24  Q.  Do you recognize that?

25  A.  Yes.  Those are M.R. underwear.

1  Q.  Is that the underwear she was wearing that day?

2  A.  Yes.

3  Q.  Is that an accurate depiction of the underwear as you

4  remember it?

5  A.  Yes.

6         MR. SHEPARD:  Move to admit Exhibit 5-A.

7         THE COURT:  Any objection to 5-A?

8         MR. THOMAS:  Preliminary question if I could, Your

9  Honor.

10        THE COURT:  You may.

11 BY MR. THOMAS:

12 Q.  How is it, ma'am, that you specifically recognize

13 Government's 5-A?

14 A.  Because this underwear was in my aunt.  She just came back

15 from a trip from New York, and she brought, like, a package of

16 underwear.  And I told M.R., "Hey, the next day, you can wear

17 this underwear for tomorrow."  I actually took it out from the

18 package, from the new package.

19 Q.  I guess my question would be:  What specifically about

20 this photograph is it that you recognize?

21 A.  Because she has similar underwears like this.

22 Q.  Similar or -- I mean, what is it about this photo that you

23 can tell us that that is --

24        MR. SHEPARD:  Your Honor, I think he's arguing as to

25 weight.  The witness has stated she recognized it.  It

 1  accurately depicts it.  I think what Mr. Thomas is arguing

 2  weight.

 3          THE COURT:  Do you have an objection?

 4          MR. THOMAS:  Well --

 5          THE COURT:  She says she recognizes it as the

 6  underwear.

 7          MR. THOMAS:  My question was:  What specifically

 8  does she recognize?

 9          MR. SHEPARD:  Didn't she answer that?

10          THE COURT:  She did answer that.  She said it was a

11  new package --

12          MR. THOMAS:  I understand.

13          THE COURT:  -- from New York.

14  BY MR. THOMAS:

15  Q.  There's no package in the picture, correct?

16  A.  No, no package, because I took it out from the package.

17          MR. THOMAS:  Okay.  I have no objection, Judge.

18          THE COURT:  No objection?  All right.

19          MR. SHEPARD:  Thank you, Your Honor.

20          THE COURT:  5-A is admitted into evidence without --

21  you haven't even offered it, have you?

22          MR. SHEPARD:  I am now.  The government would move

23  for the admission of 5-A, Your Honor.

24          THE COURT:  5-A is admitted into evidence without

25  objection.

1      *(Government's Exhibit 5-A was*

2          *received in evidence.)*

3          MR. SHEPARD:  Please display 5-A.

4  BY MR. SHEPARD:

5  Q.  Now, behind you, in a box, should be a bag labeled "6."

6  A.  This one?

7  Q.  Do you see it?

8  A.  Government's Exhibit 6.

9  Q.  Why don't you go ahead and open that up.  I guess, before

10  we do, is it pretty sealed up?

11  A.  (Nods head up and down.)

12  Q.  Just take a minute and look at 6.

13          Do you recognize 6?

14  A.  Yeah.  These are M.R.'s pants.

15  Q.  Okay.  Are they the pants she was wearing that day?

16  A.  Yes.

17  Q.  How do you remember?

18  A.  Because of the -- I don't know what you call this, like

19  handmade sewing, flowers.

20          MR. SHEPARD:  Move for the admission of Government's

21  6, Your Honor.

22          THE COURT:  Any objection to Government's Exhibit 6?

23  6 is the actual pants, not the photo.

24          MR. THOMAS:  Preliminary question, if I could, Your

25  Honor?

 1          THE COURT:  You may.

 2   BY MR. THOMAS:

 3   Q.  Did -- when was the last time you saw those pants?

 4   A.  These pants?

 5   Q.  Yeah.

 6   A.  The last time I saw them -- well, she wore this at the

 7   daycare, and then when they asked me to provide this as

 8   evidence.

 9   Q.  Who is "they," ma'am?

10   A.  Detective McAlister.

11   Q.  And you -- where were the pants?

12   A.  It was in her closet.  I washed them.

13   Q.  Do you remember -- do you remember how much time elapsed

14   between when she last wore them and when you gave them to

15   Detective McAlister?

16          MR. SHEPARD:  Your Honor, again, I think he's

17   arguing weight.

18          THE COURT:  Why don't you approach.

19          (Bench conference on the record.)

20          THE COURT:  What's your concern?

21          MR. THOMAS:  Well, she's not -- he did not ask her

22   if they were in substantially the same condition.

23          THE COURT:  Well, she just said she washed them, so

24   they are not.

25          MR. THOMAS:  Well, I guess at this point, the

 1  purpose is to show that they were the pants she was wearing

 2  that day.  She's testified to that.  But as to the chain of

 3  custody for any later photographs and other --

 4          THE COURT:  Well, for forensics, he's not -- you

 5  know, she just said she washed them before she gave them to

 6  the detective.  So you're not using it for forensics, are you?

 7          MR. THOMAS:  Well --

 8          THE COURT:  You're just trying to show what she was

 9  wearing that day?

10          MR. SHEPARD:  Correct, Your Honor.

11          MR. THOMAS:  Okay.  If that's his purpose, then I

12  have no further objection.

13          THE COURT:  Okay.  And he hasn't offered it yet.

14                  (Open court.)

15          THE COURT:  All right.  At this point, there's no

16  objection.  Next question.

17          MR. SHEPARD:  Your Honor, the government would move

18  for the admission of Exhibit 6.

19          THE COURT:  Do you have any objection to Exhibit 6?

20          MR. THOMAS:  No objection to Exhibit --

21          THE COURT:  The actual pants are 6.

22          MR. THOMAS:  Yes.  No objection to 6.

23          THE COURT:  6 is admitted into evidence without

24  objection.

25

1            *(Government's Exhibit 6 was*

2            *received in evidence.)*

3   BY MR. SHEPARD:

4   Q.  Ma'am, if you would look at what's tabbed as 6-A in the

5   binder.  What's 6-A?

6   A.  6-A?  That's her -- inside of her pants.

7   Q.  A picture of the same pants?  Is that what it appears to

8   be?

9   A.  Oh, am I looking at the wrong --

10  Q.  It's two pages.  6-A, there's two pages to it.

11  A.  Okay.  Yes.  The inside of her pants.

12  Q.  Is that the first page or the second page?

13  A.  The second page.

14  Q.  All right.  And what's the first page?

15  A.  The actual pants.

16  Q.  A picture?

17  A.  A picture of the actual pants.

18  Q.  Does this appear to be a picture of the same pants as

19  Exhibit 6 right there?

20  A.  Yes.

21  Q.  And then this ought to be easy since they are right next

22  to each other.  Is it an accurate depiction of Government's

23  Exhibit 6 -- or of Exhibit 6?

24  A.  Yes.

25            MR. SHEPARD:  Your Honor, I would move for the

*MIOSOTIS RODRIGUEZ - DIRECT/SHEPARD    Vol. 1-60*

1   admission of 6-A as the photographs of Government's Exhibit 6.

2           THE COURT:  6-A is in two parts.

3           MR. SHEPARD:  6-A, 1 and 2.  I move for the

4   admission of both pages.

5           MR. THOMAS:  Your Honor, I guess I would object to

6   both pages of 6-A as being cumulative.  The jury has the

7   actual pants, so I'm not sure what the photographs of the

8   pants would add.

9           THE COURT:  It's just a little easier to --

10          MR. SHEPARD:  It's a little easier, Your Honor, for

11  presentation purposes.

12          THE COURT:  All right.  I'll overrule.  I'll let

13  6-A, and this really should be 6-B, the second page, but 6-A

14  and the first and second page --

15          MR. SHEPARD:  Thank you, Your Honor.

16          THE COURT:  -- in evidence over Defendant's

17  objection.

18                  *(Government's Exhibit 6-A was*

19                  *received in evidence.)*

20  BY MR. SHEPARD:

21  Q.  There should be, again, in the box behind you, something

22  marked as Exhibit 4.

23          Take a second and unroll that.

24          Do you recognize Exhibit 4?

25  A.  Yes.  This is M.R.'s -- her sleeping bag that she -- we

 1  left at daycare for her to sleep in.

 2  Q.  Is it in substantially the same condition as it was the

 3  last time you saw it?

 4  A.  Yes.

 5          MR. SHEPARD:  Move for the admission of

 6  Government's -- or, excuse me, as Exhibit 4.

 7          MR. THOMAS:  No objection to 4.

 8          THE COURT:  Exhibit 4 is admitted into evidence

 9  without objection.

10                          *(Government's Exhibit 4 was*

11                          *received in evidence.)*

12  BY MR. SHEPARD:

13  Q.  You can go ahead and put all those back in the box.

14          I ask you to look at Exhibits 7, 8, 9, and 10.  Do

15  you recognize what's in those photos?

16  A.  Yes.  That's --

17  Q.  Who's in --

18  A.  That's my --

19  Q.  Just hold on.  Listen to my question.  Who is in the

20  photos?

21  A.  M.R.

22          MR. SHEPARD:  If I could have just a minute to speak

23  with my co-counsel.

24          (Off the record.)

25  BY MR. SHEPARD:

1  Q.  I want to go back and talk a little bit about when you

2  examined M.R.  Did she wake up during your examination?

3  A.  No.

4  Q.  Did you put your fingers inside her in any way?

5  A.  No.

6  Q.  When you were speaking with her, did she give you any

7  indication that she was experiencing pain?

8          MR. THOMAS:  Objection.  There's no time frame here.

9          MR. SHEPARD:  We're speaking about --

10         THE COURT:  Clarify the time frame.

11         MR. SHEPARD:  Thank you.

12  BY MR. SHEPARD:

13  Q.  After she woke up after your examination of her, did she

14  give you any indication that she was experiencing pain?

15  A.  After she woke up, no.

16  Q.  She just started crying?  Was it mostly when you were

17  talking with her?

18         MR. THOMAS:  Objection to the leading form of these

19  questions, Judge.

20         THE COURT:  I'll sustain.  Rephrase your question.

21  BY MR. SHEPARD:

22  Q.  What was happening during the discussion with your

23  daughter after the examination?

24  A.  After the examination?  Like I said, she walked over to my

25  husband, and I started questioning her.  And then she started

1  bursting into tears, and I followed her up.

2         MR. THOMAS:  This has been asked and answered, I

3  think, already, Judge.

4         THE COURT:  Yeah, it has been.  Don't ask it again.

5  Next question.

6         MR. SHEPARD:  Understood, Your Honor.

7         Can you go ahead and display what's been admitted as

8  6-A, page 1.

9         And 6-A, page 2.

10  BY MR. SHEPARD:

11  Q.  What did you say that 6-A, page 2, was?

12  A.  6-A, page 2, was the inside of her pants.

13  Q.  Is that the front or the back?

14  A.  That is the side, because of the strap, like, to adjust

15  the waist.

16         MR. SHEPARD:  Okay.  No further questions of the

17  witness, Your Honor.

18         THE COURT:  Okay.  Thank you.

19         Mr. Thomas, you may cross-examine the witness.

20         MR. THOMAS:  Thank you, Your Honor.

21                      **CROSS EXAMINATION**

22  BY MR. THOMAS:

23  Q.  Ma'am, when you examined M.R. while she was sleeping, did

24  you observe any ointment on her?

25  A.  She had a little bit of the ointment --

1   Q.  Okay.

2   A.  -- A&D ointment.

3   Q.  Okay.  You don't know how that got there, do you?

4   A.  Yes.

5   Q.  You didn't see it put on there, did you?

6   A.  No, because --

7   Q.  You may have been told, but you didn't see it put on

8   there?

9   A.  No.

10  Q.  Okay.  How long did M.R. sleep before she came down to her

11  father?

12  A.  To the home?

13  Q.  Well, when you examined her, she was sleeping.  How long

14  did she sleep before she came downstairs?

15  A.  She slept for another five or ten minutes.

16  Q.  Okay.  You testified that you immediately took her to the

17  hospital.  That's not quite right.  You let her sleep after

18  you first observed those injuries, or what you thought were

19  injuries, right?

20  A.  Yes.

21  Q.  At that point, it wasn't enough of a concern to

22  immediately go to the hospital; would that be right?

23  A.  Well, I wanted to ask her first.

24  Q.  You wanted to ask her if she was red and injured, because

25  she was red and injured, right?

1  A.  Yes, I wanted to ask her first why.

2  Q.  Your testimony is that she never complained of hurting in

3  that area before, right?

4  A.  Yes.

5  Q.  And you were not at the daycare that day?

6  A.  No.

7  Q.  You didn't see anybody touch your daughter, did you?

8  A.  No.

9  Q.  How long after this case began did lawyers start

10 contacting you?

11 A.  Lawyers from -- like, reporters immediately.

12 Q.  Not reporters.  Lawyers --

13 A.  Lawyers?

14 Q.  -- asking to take your case.

15 A.  Oh.  Like, one or two weeks, almost.

16 Q.  Do you remember how many contacted you?

17 A.  Only one.

18 Q.  And did you end up hiring that lawyer?

19 A.  No.

20 Q.  How did you end up deciding on a lawyer?

21 A.  It took awhile for me to decide, because my biggest

22 concern was to get -- M.R. was my daughter.

23 Q.  But you did file a lawsuit, right?

24 A.  Yes, I did.

25 Q.  Against Mr. Ali?

*MIOSOTIS RODRIGUEZ - CROSS/THOMAS*     Vol. 1-66

1   A.  Against the daycare.

2   Q.  And Mr. Ali, right?

3   A.  Yes.

4   Q.  And the daycare and all the companies involved, right?

5   A.  Yes.

6   Q.  That's still going on, isn't it?

7   A.  Yes.

8   Q.  You don't know how that's going to end up, do you?

9   A.  No.

10  Q.  Did you watch the interview that your daughter gave with

11  child services when she gave it?

12  A.  No.  The video?

13  Q.  Yeah.

14  A.  No.

15  Q.  Were you there?

16  A.  No.

17  Q.  Her father brought her there?

18  A.  No.

19  Q.  How did she get there?

20  A.  To the hospital?

21  Q.  To the interview room with the child services officer that

22  sat her down.  You've seen the video, I'm sure, at this point,

23  right, where she sat and talked to child services?

24  A.  No.

25  Q.  You've never seen that?

 1  A.  No.

 2  Q.  Anybody ever talk to you about it?

 3  A.  M.R.

 4  Q.  M.R. gave an interview --

 5  A.  Yes.

 6  Q.  -- to a --

 7  A.  Yes.

 8  Q.  -- DCS worker, a child services worker, right?

 9  A.  I've never seen the video.

10  Q.  You never saw that?

11  A.  No.

12  Q.  Did anybody ever talk to you about what was said there?

13  A.  No.

14  Q.  Nobody ever?

15  A.  No.

16  Q.  Okay.  So no nobody ever told you that --

17         THE COURT:  Counsel --

18         MR. SHEPARD:  Asked and answered.

19         THE COURT:  -- you've asked it five times.  She said

20  no.  Next question.

21         MR. THOMAS:  I --

22         THE COURT:  Next question.

23  BY MR. THOMAS:

24  Q.  Were you aware -- okay.  That's good enough.

25         You did -- did you ever meet with Detective

1  McAlister?

2  A.  Yes, I did.

3  Q.  And he never told you about any other accusations that

4  M.R. might have made?

5          MR. SHEPARD:  Objection, hearsay.

6          THE COURT:  Do you have an hearsay exception to

7  what --

8          MR. THOMAS:  It's not being offered for the truth.

9  I'm asking her -- she stated that she was never told about the

10  forensic interview.  I'm asking her if he ever told her about

11  anything else as to the examination -- or as to the

12  investigation.  It's not whether it's true or not.

13          THE COURT:  Well, that wasn't your question.  Your

14  question was, "And he never told you about any other

15  accusations that M.R. might have made" --

16          MR. THOMAS:  That's what --

17          THE COURT:  -- and the objection is, that response

18  would call for hearsay.

19          MR. THOMAS:  It's not being offered for the truth of

20  what Officer McAlister said.  It's in response to her saying

21  that she had no knowledge of the investigation.

22          THE COURT:  Would you approach?

23          (Bench conference on the record.)

24          THE COURT:  Okay.  She never said she didn't have

25  any knowledge about the investigation.  She said she did

*MIOSOTIS RODRIGUEZ - CROSS/THOMAS*      Vol. 1-69

1  not -- had never -- was never told about her forensic

2  interview on the videotape --

3          MR. THOMAS:  That's accurate, Judge.  I --

4          THE COURT:  -- so why don't -- what do you want to

5  ask her?  You want to ask her --

6          MR. THOMAS:  I want --

7          THE COURT:  -- did the detective ever tell her

8  about --

9          MR. THOMAS:  Did the detective ever tell her about

10 any other accusations that M.R. may have made?

11         THE COURT:  Okay.

12         MR. SHEPARD:  I think that's hearsay, Your Honor.  I

13 don't see --

14         THE COURT:  Well, she can answer yes or no, okay?

15 But she can't say what he told her, because he can testify to

16 that.

17         MR. THOMAS:  Yes.

18         THE COURT:  Okay.

19                    (Open court.)

20         THE COURT:  All right.  Counsel, would you rephrase

21 your question?

22 BY MR. THOMAS:

23 Q.  Again, I'm not asking you anything other than a yes or no

24 question here.

25 A.  Okay.

*MIOSOTIS RODRIGUEZ - CROSS/THOMAS*       Vol. 1-70

1  Q.  Did he ever tell you, "he" being Detective McAlister, ever

2  tell you about any other accusations or statements about these

3  events that M.R. made?  Yes or no?

4  A.  Can you -- I'm sorry.  I'm not understanding like

5  exactly --

6  Q.  Well, you met with Detective McAlister?

7  A.  Yes.

8  Q.  And talked about the investigation?

9  A.  Yes.

10  Q.  He asked you a lot of questions --

11  A.  Yes.

12  Q.  -- about what happened?

13  A.  Yes.

14  Q.  Did he ever tell you about any other statements that M.R.

15  may have made about these events?

16  A.  No.

17  Q.  Okay.  And M.R. was not wearing those -- the underwear

18  that have been admitted, or the photo of the underwear that

19  have been admitted, when she arrived at the hospital; is that

20  right?

21  A.  Yes.

22  Q.  And they were back at the house?

23  A.  Yes.

24  Q.  She was wearing those when she wet herself?

25  A.  Yes.

1  Q.  Do you remember, were they still wet when they were

2  brought to the hospital?

3  A.  Yes.

4  Q.  And you didn't leave with those, right?

5  A.  No.

6  Q.  When you -- do you remember who brought those to the

7  hospital?

8  A.  Yes.  My mother.

9  Q.  Did she have them in a bag or was she carrying them or how

10  did she bring them?

11  A.  In a Ziploc bag.

12  Q.  And do you remember who she gave that bag to?

13  A.  She gave it to -- I believe it was the nurse from the

14  hospital.

15  Q.  You don't know what happened to it after that?

16  A.  I knew that it was going to be under investigation.

17  Q.  Did your lawyer ever talk to you about anything --

18  something called a preexisting condition?

19  A.  Yes, he did mention that.

20  Q.  That would affect your ability to collect in a lawsuit

21  potentially, couldn't it?  If M.R. had a preexisting

22  condition, that could affect your ability to collect in the

23  lawsuit, right?

24  A.  I believe so.

25          MR. THOMAS:  Okay.  That's all.  Thank you.

*MIOSOTIS RODRIGUEZ - CROSS/THOMAS*     Vol. 1-72

1          THE COURT:  Do you have any redirect?

2          MR. SHEPARD:  None, Your Honor.

3          THE COURT:  All right.  Thank you very much, ma'am.

4    You may step down.

5          (Witness excused.)

6          THE COURT:  Do you want to break?  Is that what

7    you're saying?

8          MR. SHEPARD:  I'm asking if we should call our

9    second witness or are you going to break?

10         THE COURT:  Go ahead and call your second witness.

11         MR. SHEPARD:  Okay.  The government will call Justo

12   Guevara, Your Honor.

13         THE COURT:  I see we have the madam interpreter

14   here.  Does the witness not speak English; is that correct?

15         THE INTERPRETER:  Yes, Your Honor.

16         THE COURT:  Would you raise your hand, madam

17   interpreter?

18         (The interpreter is sworn.)

19         THE COURT:  And, sir, would you raise your right

20   hand?

21         (The witness is sworn.)

22         THE COURT:  You may have a seat.

23         And, Counsel, you may examine your witness.

24         MR. SHEPARD:  Thank you, Your Honor.

25

1    **JUSTO GUEVARA RODRIGUEZ, PLAINTIFF'S WITNESS, SWORN**

2                         **DIRECT EXAMINATION**

3    BY MR. SHEPARD:

4    Q.  Would you please state your name and spell it for the

5    record?

6    A.  Justo Guevara Rodriguez, spelled J-U-S-T-O, G-U-E-V-A-R-A.

7    Q.  Where do you live?

8    A.  Indianapolis.

9    Q.  How long have you lived here in Indianapolis?

10   A.  Ten years.

11   Q.  Who lives with you?

12   A.  My sister-in-law and my wife.

13   Q.  Who is your wife?

14   A.  Georgina.

15   Q.  Any children?

16   A.  Two.

17   Q.  Who are they?

18   A.  M.R., E.R.

19         MR. SHEPARD:  Please display Exhibit 77.

20   BY MR. SHEPARD:

21   Q.  Who is that?

22   A.  M.R.

23   Q.  How old is she?

24   A.  Six.

25   Q.  Can you describe M.R. for us, how she normally acts?

*JUSTO RODRIGUEZ - DIRECT/SHEPARD*     Vol. 1-74

1   A.  Happy.

2   Q.  Is she energetic?

3   A.  Yes.

4   Q.  Did she go to daycare in 2014?

5   A.  Yes.

6           MR. SHEPARD:  Please display Exhibit 1.

7   BY MR. SHEPARD:

8   Q.  Do you recognize Exhibit 1?

9   A.  Yes.

10  Q.  What is it?

11  A.  Daycare.

12  Q.  The same one that M.R. went to?

13  A.  Yes.

14  Q.  Who would typically drop off M.R. at the daycare?

15  A.  I did.

16  Q.  Do you remember a day where something happened to M.R. at

17  daycare?

18  A.  Yes.

19  Q.  Do you remember what day that was?

20  A.  The 21st of February?  I forget.  I don't recall very

21  well.  I think.

22  Q.  If you would look at -- do you recall, did you take M.R.

23  to the hospital that day?

24  A.  Yes.

25          MR. SHEPARD:  Can you display Exhibit 12.

1          MR. THOMAS:  Judge, we'll stipulate it was

2   August 21st.  I don't think that's at issue.

3          THE COURT:  Of what year?

4          MR. THOMAS:  2014.

5          MR. SHEPARD:  Of 2014.

6          THE COURT:  The parties will stipulate that the date

7   was August 20 --

8          MR. SHEPARD:  August 21st, 2014.

9          THE COURT:  August 21st, 2014.  Next question.

10  BY MR. SHEPARD:

11  Q.  Do you remember how she was that morning?

12  A.  Happy.

13  Q.  Typical?

14  A.  Normal.

15  Q.  And you dropped her off?

16  A.  Yes.

17  Q.  Do you remember -- do you have any idea around what time?

18  A.  About 9:00 in the morning.

19  Q.  Did she say anything to you about pain or anything in the

20  morning before you dropped her off?

21  A.  No.

22  Q.  Did you pick her up that day?

23  A.  Yes.

24  Q.  Do you remember about what time you picked her up?

25  A.  About 5:00 or 5:30.

 1   Q.  Did anybody at the daycare tell you, when you picked her

 2   up, that something might have happened to her that day?

 3   A.  No.

 4   Q.  None of the staff?

 5   A.  No.

 6   Q.  How was M.R. acting when you picked her up?

 7   A.  Different.

 8   Q.  How so?

 9   A.  She didn't want to talk.  She didn't want to play.  She

10   didn't want to do anything.

11   Q.  Did you take her to dinner afterwards?

12   A.  Yes.

13   Q.  Where did you go?

14   A.  Chick fil A.

15   Q.  Does M.R. like Chick fil A?

16   A.  Yes.

17   Q.  What about Chick fil A is it that she likes?

18   A.  She likes to play there.

19   Q.  Does it have one of those indoor playgrounds?

20   A.  Yes.

21   Q.  Did she play when you took her that night?

22   A.  No.

23   Q.  Was that out of the ordinary?

24   A.  Yes.

25   Q.  At any point, did she start complaining of hurting

 1  anywhere?

 2  A.  Well, when I took her to the bathroom, she said she wanted

 3  to go to the bathroom, but that she could not urinate.

 4  Q.  Did she say why?

 5  A.  Because she said that she was hurting in her -- in her

 6  vagina.

 7  Q.  Did you give her anything to try and help?

 8  A.  I gave her a cream, because she asked me to give her some

 9  of the cream.  I didn't touch her.  I held it out and she took

10  it off my finger and used it.

11  Q.  After she took it off your finger, did you see her use it

12  or --

13  A.  No, I didn't.  I was changing the diaper off my other

14  daughter.

15  Q.  Okay.  So you just know you gave her some ointment or

16  diaper cream?

17  A.  Yes.

18  Q.  After you guys ate, where did you go?

19  A.  Home.

20  Q.  What happened when you got home?

21  A.  Well, when we reached the house, she went up to her

22  bedroom to sleep.

23  Q.  Did you tell your wife that M.R. was complaining about

24  hurting?

25  A.  Yes.  I told her that she seemed strange to me and that

*JUSTO RODRIGUEZ - DIRECT/SHEPARD*      Vol. 1-78

1  she, my wife, should check her out.

2  Q.  Did your wife go upstairs?

3  A.  Yes.

4  Q.  What happened when she came back downstairs?

5  A.  Well, I stayed downstairs and she went upstairs to check

6  on my daughter.  And she started crying.

7  Q.  Who started crying?

8  A.  My wife.

9  Q.  Do you remember what she was crying about?

10 A.  She said it was because --

11         MR. THOMAS:  Objection, hearsay.

12         MR. SHEPARD:  Excited utterance, Your Honor.

13         THE COURT:  I'll overrule.  You may answer the

14 question.

15 A.  She said it was because she said that Ali had touched her.

16 BY MR. SHEPARD:

17 Q.  What did you do after that?

18 A.  I didn't do anything.  I started to cry, too.

19 Q.  Did you eventually take her to the hospital?

20 A.  Yes.

21 Q.  Did you speak to any lawyers before you went to the

22 hospital?

23 A.  No.

24 Q.  Did you go back in the examination room?

25 A.  Yes.

*JUSTO RODRIGUEZ - DIRECT/SHEPARD*      Vol. 1-79

1  Q.  Were they speaking English or Spanish?

2  A.  English.

3        MR. SHEPARD:  Please display Exhibit 5-A.

4  BY MR. SHEPARD:

5  Q.  Do you recognize 5-A?

6  A.  Yes.

7  Q.  What are those?

8  A.  My daughter's panties.

9  Q.  Take a look at Exhibit 6 behind you.

10       MR. SHEPARD:  It's in a box behind you, Christina.

11       MR. THOMAS:  Your Honor, those have been admitted.

12  There's no dispute as to whose they are, so I think his

13  identification of them at this point would be cumulative.

14       MR. SHEPARD:  Your Honor, it just goes to the weight

15  of the evidence.  He made many objections or questions about

16  authenticity, if those were the pants that had been worn that

17  day.

18       THE COURT:  All right.  I'll let him answer the

19  question.  I'll overrule the objection.

20  BY MR. SHEPARD:

21  Q.  Go ahead and take it out of the bag.

22       Do you recognize 6?

23  A.  Yes.

24  Q.  What are they?

25  A.  My daughter's pants.

*JUSTO RODRIGUEZ – CROSS/THOMAS*          Vol. 1-80

1  Q.  Can you look in the binder at Exhibits 7, 8, 9, and 10.

2  A.  Is this 7?

3          MR. SHEPARD:  If I could approach, Your Honor.

4          THE COURT:  You may.

5  BY MR. SHEPARD:

6  Q.  Exhibit 7?  Go ahead and take a look at it.

7          Please look at Exhibit 8.

8          Please look at Exhibit 9.

9          And please look at Exhibit 10.

10          Do you recognize the underwear?

11  A.  Yes.

12  Q.  Do you recognize the pants?

13  A.  Yes.

14  Q.  Do you recognize who's in the images?

15  A.  My daughter.

16          MR. SHEPARD:  No further questions, Your Honor.

17          THE COURT:  Okay.  Mr. Thomas, you may cross-examine

18  the witness.

19          MR. THOMAS:  Thank you, Your Honor.

20                  **CROSS EXAMINATION**

21  BY MR. THOMAS:

22  Q.  Mr. Guevara, your testimony is that M.R. had never

23  complained about pain in her vagina or in that area prior to

24  the night after you picked her up from school, right?

25  A.  Yes.

JUSTO RODRIGUEZ - CROSS/THOMAS        Vol. 1-81

1  Q.  And the first time she complained to you was at the
2  Chick fil A?
3  A.  Yes.
4  Q.  And that's the first time you had ever heard her say that
5  it hurt to pee?
6  A.  Yes.
7  Q.  And your response was, while you were changing diapers, to
8  give her some ointment from -- diaper rash ointment; is that
9  right?
10  A.  Yes.
11  Q.  And you didn't apply it?
12  A.  No.
13  Q.  You didn't touch her at all, did you?
14  A.  No, I didn't.
15  Q.  You didn't see her apply it?
16  A.  No.
17  Q.  You just gave it to a four-year-old child and said what?
18  A.  To put it on.  And I thought -- she thought it was going
19  to end the pain, but it didn't.
20  Q.  Did you tell her how to put it on or where to put it on?
21  A.  No.
22  Q.  She knew where to put it on, right?
23  A.  Yes.
24  Q.  Because she used that diaper rash ointment before, right?
25  A.  No.

1  Q.  But she figured it out that day by herself?

2  A.  She did it herself, yes.

3  Q.  And you didn't --

4  A.  I don't think it's right for me to touch her.

5  Q.  You're her father, right?

6  A.  Yes.

7  Q.  And you think you would be doing something bad if you

8  applied medicine to your daughter?

9  A.  I don't know.  I don't think so.

10  Q.  You didn't observe how she put on the ointment or even

11  where she put the ointment, did you?

12  A.  She put it on her private parts, because she told me that

13  it hurt her there.

14  Q.  Well, you testified before that you didn't even watch

15  because you were changing the diaper?

16  A.  She told me.

17  Q.  What did she tell you specifically?

18  A.  That her private parts hurt.

19  Q.  Well, I understand that.  And you gave her ointment and

20  you sent her off to put it on.  We got that part.  How do you

21  know she put it on, and how do you know where and how she put

22  it on?

23  A.  Because they found it when they did the medical exam on

24  her.

25  Q.  At the time, you didn't know?

1  A.  No.  She told me that she had put it on, and she never

2  lies to me.

3  Q.  Okay.  You had been to the daycare numerous times before,

4  yes?

5  A.  I was the one who dropped her off most of the time.

6  Q.  And you had seen Mr. Al-Awadi at the daycare before,

7  right?

8  A.  Yes.

9  Q.  You weren't too pleased, in general, with a man, a

10 20-year-old man, working at the daycare, were you?

11 A.  No.  I asked my wife, what was a man doing working at a

12 daycare.

13 Q.  That was something you had questions about from the

14 beginning, right?

15 A.  Yes, but I talked it over with my wife.

16 Q.  You saw Mr. Al-Awadi as you and your daughter were leaving

17 that day, correct?

18 A.  Yes.

19 Q.  And he saw you and said, "Hi," as you were coming in,

20 didn't he?

21 A.  Yes.

22 Q.  And he said, "Bye," to you and your daughter, you guys

23 said, "Bye," back, she said, "Bye, Mr. Ali, baby," and you all

24 left, right?

25          MR. SHEPARD:  Objection.  I think there are about

1  three or four questions in there.

2           THE COURT:  That was a compound question.  Why don't

3  you break it up into three questions.

4           MR. THOMAS:  Okay.

5  BY MR. THOMAS:

6  Q.  You saw Mr. Al-Awadi as you and your daughter were

7  leaving, right?

8  A.  When I came in to pick up my girls, I first went to where

9  E.R., the younger one, was to pick her up; and then I went to

10 where M.R. was to pick her up.  When I came in, I saw the guy,

11 Ali, over in the room where the books are.  And from a

12 distance, I waved hi to him, but I didn't speak to him.

13 Q.  And as you were leaving, did he say "Bye" to you?

14 A.  No.  I didn't see him either.

15 Q.  Who was E.R.'s teacher?

16 A.  I don't recall her name.

17 Q.  Do you recall a teacher named Ms. Anna?

18 A.  I really don't remember well.

19 Q.  Were you aware that your daughter gave an interview with

20 the child services worker soon after these events?

21 A.  No.

22 Q.  Did you ever see a recording of that interview, or set of

23 interviews?

24 A.  No.  When I went, I really don't remember.

25 Q.  Did Detective McAlister ever talk to you about what was

Case 1:15-cr-00073-TWP-DML Document 148-4 Filed 12/12/16 Page 85 of 141 PageID #71
4254
*JUSTO RODRIGUEZ - CROSS/THOMAS*      Vol. 1-85

1   said in that interview?

2   A.   It was my wife who spoke with him.   I did not speak with

3   him.

4   Q.   He interviewed you on August 22nd, right?

5   A.   Yes.

6   Q.   Other than that interview, did --

7   A.   But first it was my wife and then with me.

8   Q.   Right.   He interviewed you, he asked you some questions,

9   right?

10   A.   Yes.

11   Q.   But didn't tell you anything else about the investigation?

12   A.   Yes.   And I told him everything, what happened.

13   Q.   Other than picking up or dropping off your daughters and

14   picking up your daughters, you weren't at the daycare that

15   day?

16   A.   No.   I just pick her up and go home.

17         MR. THOMAS:   That's all I have.

18         THE COURT:   Mr. Shepard, do you have any redirect

19   for the witness?

20         MR. SHEPARD:   No further questions, Your Honor.

21         THE COURT:   Okay.   Thank you.   Now, do you want to

22   release these -- the two witnesses from subpoena?

23         MR. SHEPARD:   No, Your Honor.

24         THE COURT:   You want to keep them under subpoena in

25   case you have to recall them?

1        MR. SHEPARD:  Yes, Your Honor.

2        THE COURT:  Okay.  All right.  Well, let's go ahead

3   and take our afternoon break.  Ladies and gentlemen, we're

4   going to take about 15 minutes.  During this period of time

5   that you're on your break, you are not to have any discussion

6   about the case among yourselves or with anyone else, and we'll

7   have you back in the jury room in about 15 minutes.

8        THE COURTROOM DEPUTY:  All rise.

9        (Jury out at 3:23.)

10        THE COURT:  All right.  Let's let the witness pass

11   through, and then we'll go on our recess.

12        (Witness excused.)

13        THE COURT:  Okay.  15-minute recess.

14        (Recess at 3:24, until 3:42.)

15        THE COURT:  We're back on the record.  Is the

16   government ready for the witness?

17        MS. KOROBOV:  Your Honor, we actually have a

18   stipulation to the next witness.  In speaking with defense

19   counsel, he's going to stipulate that Government's Exhibit

20   Number 5, the underwear of M.R., were brought to the hospital

21   from the child's bedroom by the child's grandmother, Miosotis

22   Pinnot, on August 24th of 2014.  So that will eliminate that

23   next witness and then we would then --

24        MR. THOMAS:  21st.

25        MS. KOROBOV:  2st.  I'm sorry.  And that --

1          THE COURT:  August 21st?

2          MS. KOROBOV:  21st, 2014.

3          THE COURT:  So that's going to eliminate the

4    grandmother as a witness?

5          MS. KOROBOV:  Yes.  And then our -- then we have the

6    nurse to testify, and we have the change-of-custody person who

7    brought the sexual assault kit from the hospital to the crime

8    lab, and that's -- those are our witnesses for the day.

9          THE COURT:  Okay.  And, Mr. Shepard, you've made

10   some arrangements so you can be here at 9:00?

11         MR. SHEPARD:  Yes, ma'am.

12         THE COURT:  For the rest of the week?

13         MR. SHEPARD:  Yes, ma'am.

14         THE COURT:  So we don't have to work until 6:00 or

15   7:00?

16         MR. SHEPARD:  Yes, ma'am.

17         THE COURT:  Okay.  Sounds good.

18         MR. SHEPARD:  If my knee (unintelligible) --

19         THE REPORTER:  I'm sorry.  I cannot hear you.

20         MR. SHEPARD:  Unimportant.

21         THE COURT:  Your knee is better?

22         MR. SHEPARD:  I said I don't know if my knee would

23   go until 6:00 tonight, Your Honor.

24         THE COURT:  All right.  Okay.  Are you -- you're

25   going to put the stipulation on the record in front of the

1  jury.  Are you ready for the jury, Mr. Thomas?

2           MR. THOMAS:  Ready, Your Honor.

3           THE COURT:  You may bring in the panel.

4           We weren't really going to go that late.

5           (Jury in at 3:44.)

6           THE COURT:  Ms. Korobov, you may call the next

7  witness on behalf of the government.

8           MS. KOROBOV:  Thank you, Your Honor.  At this point

9  the government and the defense have reached a stipulation as

10 to Government's Exhibit Number 5.  We have agreed that Exhibit

11 Number 5, the underwear of M.R., were brought to the hospital

12 from the child's bedroom by her grandmother, Miosotis Pinnot,

13 on August 24th of 2014.

14          THE COURT:  Okay.  Thank you for --

15          MS. KOROBOV:  August 24th -- 21st of 2014.

16          THE COURT:  Say it again.  Which date?

17          MS. KOROBOV:  August 21st, 2014.

18          THE COURT:  All right.  Do you agree to that

19 stipulation, Mr. Thomas?

20          MR. THOMAS:  Thank you, Your Honor.  We would so

21 stipulate.

22          THE COURT:  Okay.  All right.  Thank you.  And now

23 you may call your next witness.

24          MS. KOROBOV:  Thank you.  The government calls

25 Angela Bates.

 1          THE COURT:  Okay.  Ms. Bates, come right over here

 2    to the witness stand.  And if you would remain standing and

 3    raise your right hand and face me.

 4          (The witness is sworn.)

 5          THE COURT:  You may have a seat.

 6          And, Ms. Korobov, you may examine your witness.

 7          MS. KOROBOV:  Thank you, Your Honor.

 8          **ANGELA BATES, PLAINTIFF'S WITNESS, SWORN**

 9                  **<u>DIRECT EXAMINATION</u>**

10    BY MS. KOROBOV:

11    Q.  Ms. Bates, would you tell the jury your name and spell

12    your first and your last name?

13    A.  Angela Bates, A-N-G-E-L-A; Bates, B-A-T-E-S.

14    Q.  Ms. Bates, how are you employed?

15    A.  I'm a forensic nurse at Riley Hospital for Children.

16    Q.  And are you a registered nurse?

17    A.  Yes, I'm a registered nurse.

18    Q.  I'm sorry.  What kind of nurse?

19    A.  Yes, I'm a registered nurse.

20    Q.  A registered nurse?  And you're licensed by the State of

21    Indiana to practice nursing?

22    A.  Yes.

23    Q.  When did you obtain your nursing license?

24    A.  2005.

25    Q.  And could you describe for the jury your educational

1  background?

2  A.  I received a Bachelor's of Science, a nursing degree, in

3  2005 from Indiana University Northwest.  In 2010, I went

4  through adult and adolescent sexual assault training, finished

5  that class; and I also have training with pediatric sexual

6  assaults.  And that was in 2013.

7  Q.  Okay.  I'll back up to that in a moment.  You indicated to

8  the jury that you were a forensic nurse.  What does it mean to

9  be a forensic nurse?

10  A.  That means you have specialized training in evidence

11  collection, forensic photography, and documentation.

12  Q.  And you indicated that you underwent some specialized

13  training in order to get that designation; is that correct?

14  A.  Correct.

15  Q.  Okay.  You mentioned your first training that you went

16  through in order to become a forensic nurse.  How many -- can

17  you describe how that training works?  Is it like course --

18  classroom work?  Is it hands-on work?  How does it go?

19  A.  The adult and adolescent courses that I took in 2010, it

20  was about a, I'm going to say, six-week course.  It was filled

21  with -- you have to do like a certain number of sexual assault

22  exams.  There were some domestic violence cases and elder

23  abuse, some child -- pediatric sexual assault exams.  We met

24  with a prosecutor, social workers, law enforcement, even the

25  coroner, and crime lab.

1  Q.  Okay.  And you indicated that you also received

2  specialized training in pediatrics in order to examine

3  children.  Could you describe that training for the jury?

4  A.  The training for pediatric sexual assaults was done in

5  2000 -- actually it was 2012, and that was done in Virginia.

6  And that's pretty much the same thing, but that was a 40-hour

7  one-week full course.  Everything was centered on pediatric

8  sexual assaults and physical child abuse.  That was all

9  classwork.  And then after, I was trained by the physicians at

10  Riley Hospital for Children to continue on with those exams.

11  Q.  Could you describe your work history for the jury?

12  A.  Okay.  In 2005, I worked as a pediatric cardiac nurse at

13  Riley Hospital for Children, until about 2010.  2010, I went

14  to the Riley Hospital for Children Emergency Department, which

15  I was there until 2013.  And during that same period, I was

16  doing pediatric sexual assault exams.

17          In 2014, I started at St. Vincent Anderson to do

18  their sexual assaults there for pediatrics only.  And I also

19  started working at Peyton Manning at the same time, which was

20  in 2014, doing sexual assault exams for their pediatric

21  patients, adults, and did elder abuse, domestic violence, and

22  those types of cases, as well.

23  Q.  And you currently work at Riley Hospital for Children?

24  A.  Yes.

25  Q.  Okay.  And so all the patients that you saw during your

1  time at Riley were children, as well; is that accurate?

2  A.  Correct.

3  Q.  Okay.  How long have you been performing sexual assault

4  examinations on children?

5  A.  Six years.

6  Q.  And about how many sexual assault exams on children have

7  you completed?

8  A.  Over 500.

9  Q.  All right.  And have you also testified in court and in

10  depositions about that work?

11  A.  Yes.

12  Q.  I want to talk to you specifically about the protocol

13  followed at St. Vincent Hospital, Peyton Manning Children's

14  Hospital.  What happens when a patient comes in and there's an

15  allegation that the patient has been sexually assaulted?

16  A.  They first stop at the registration desk.  The

17  registration desk, the registrar, they put down information

18  stating that parents may -- they request an exam, and they may

19  put down what the complaint is.  That also triggers a response

20  that says a Center of Hope nurse should respond to this

21  patient at some point in time in their treatment.

22        Then they get triaged by one of the regular ER

23  nurses after that.  And the triage just pretty much says vital

24  signs, height and weight.  And then after that, the Center of

25  Hope nurse or sexual assault nurse examiner -- I would come in

1  and talk to the parents and kind of figure out what their

2  allegations are.

3  Q.  Let me stop you there.  What's the point of kind of

4  talking to the parents at that point in time?

5  A.  The point of talking to the parents is to figure out

6  what's going on, because there are a lot of medical things

7  that could be going on that we need to test for and look into

8  and investigate.

9  Q.  Okay.  And so is the purpose of that conversation for

10  diagnosis and medical treatment?

11  A.  Yes.

12  Q.  And after you speak with the parents or whoever has

13  brought the child in -- is it always the parent?

14  A.  No.

15  Q.  Okay.  So after you speak to that person, what do you do

16  next?

17  A.  After we speak with the parents, we notify the hospital

18  social worker; we notify the emergency room doctor, as well;

19  and then we go into an exam room.

20  Q.  And who goes into the exam room with you?

21  A.  Normally a parent, the physician, myself, and the patient.

22  Q.  And what happens in an exam room?

23  A.  In the exam room, we do first just a regular physical

24  exam, head-to-toe assessment.  Myself, normally I go do my

25  head-to-toe assessment first.  If there's anything that seems

 1  like different, any type of injuries, or anything like that,

 2  then I will do some photo documentation of those on just the

 3  arms, legs, those types of things that are just visible.

 4           After that, the physician and I both will do a

 5  genital exam, which that's when we'll do more of our forensic

 6  evidence collection and our photography of the genital area.

 7  And after that is done, we'll send off all of our labs and

 8  package up the -- any evidence that we have retrieved.

 9  Q.  Okay.  So you indicated that you do an exam of the child?

10  A.  Uh-huh.

11  Q.  You do a genital exam of the child?

12  A.  Yes.

13  Q.  You collect forensic evidence?

14  A.  Yes.

15  Q.  You take photography, as well?

16  A.  Correct.

17  Q.  Then you said you package up the evidence itself?

18  A.  Uh-huh.

19  Q.  Do you also document what it is that you found as you've

20  been doing this examination?

21  A.  Yes.

22  Q.  So you actually create a medical record, too?

23  A.  Correct.

24  Q.  All right.  And is the evidence then stored somewhere?

25  A.  Yes.

1  Q.  And can you describe for the jury where that's stored at

2  Peyton Manning Children's Hospital?

3  A.  We have a locked and secured evidence refrigerator that's

4  only accessible to the Center of Hope staff.

5  Q.  And how does someone who is not from the Center of Hope,

6  like the crime lab personnel, get access to that locker, or

7  that refrigerator?

8  A.  They don't.  They have to get access to a Center of Hope

9  nurse, and then the nurse actually opens it up.

10 Q.  Okay.  And provides the evidence to them?

11 A.  Correct.

12 Q.  I want to talk to you specifically about a patient named

13 M.R.            On August 21st of 2014, did you see that

14 patient?

15 A.  Yes.

16 Q.  And did you follow the protocol that you've described

17 above in assessing and treating M.R.?

18 A.  Yes.

19         MS. KOROBOV:  Please display item 77.

20 BY MS. KOROBOV:

21 Q.  Is this the patient you saw, M.R.?

22 A.  Yes.

23 Q.  And when a patient comes into the hospital, do they

24 receive like a little identification bracelet?

25 A.  Yes.

 1        MS. KOROBOV:  Display item 17, please.

 2   BY MS. KOROBOV:

 3   Q.  And is this the bracelet that M.R. received when she came

 4   into the hospital?

 5   A.  Yes.

 6   Q.  Thank you.  What time did M.R. and her family present to

 7   Peyton Manning Children's Hospital for treatment?

 8   A.  Approximately 8:15 p.m.

 9   Q.  And was preliminary information taken from M.R.'s family?

10   A.  Yes.

11        MS. KOROBOV:  Display item 12, please.

12   BY MS. KOROBOV:

13   Q.  Do you -- you indicated that someone else actually obtains

14   that information; is that correct?

15   A.  Yes.

16   Q.  Government's Exhibit Number 12, is that that initial

17   intake form that gets completed on M.R. when she first came

18   into the hospital?

19   A.  Yes.

20   Q.  And about what time was it that you began your care of

21   M.R.?

22   A.  Could I look at my chart here?

23        MS. KOROBOV:  May the witness refer to Government's

24   Exhibit Number 11?

25        THE COURT:  Do you have any objection, to refresh

1  her recollection?

2          MR. THOMAS:  After she stated she doesn't recall?

3          THE COURT:  Are you attempting to refresh her

4  recollection?

5          MS. KOROBOV:  I am.  It's an admitted exhibit, as

6  well.

7          MR. THOMAS:  No objection.

8          THE COURT:  You may.

9  BY MS. KOROBOV:

10  Q.  Ms. Bates, I'll direct you to the binder in front of you.

11  Government's Exhibit 11 contains a certified medical record.

12  And in there would be your records of the exam.

13  A.  Okay.

14          MS. KOROBOV:  May I approach the witness with the

15  page of this exhibit?

16          THE COURT:  You may.

17  BY MS. KOROBOV:

18  Q.  Ms. Bates, I'm showing you one of the pages from

19  Government's Exhibit Number 11, marked "ER Triage Note V2."

20  If the report indicates that, "Start R.N. talking with family

21  at 8:39 p.m.," would that be an accurate assessment of the

22  approximate time --

23  A.  Yes.

24  Q.  -- you began speaking with her?

25  A.  Yes.

*BATES - DIRECT/KOROBOV*                    Vol. 1-98

1   Q.  Thank you.  And who was in the room when you began your

2   care of M.R.?

3   A.  Her mother -- initially it was her mother, her father, and

4   I believe a grandparent, and one of the emergency room

5   physicians.

6   Q.  Okay.  And did you do a head-to-toe examination of M.R.?

7   A.  Correct.

8   Q.  And did you find anything remarkable or out of the

9   ordinary with respect to M.R.'s exam?

10  A.  No.

11  Q.  Was she a child in good health?

12  A.  Yes.

13  Q.  Did she meet all the standards for her age?

14  A.  Yes.

15  Q.  Well nourished?

16  A.  Yes.

17  Q.  And could she communicate with you appropriately?

18  A.  Yes.

19  Q.  Okay.  I want to talk about her genital examination.  Did

20  you do this?

21  A.  Yes.

22  Q.  And how did you do the examination?

23  A.  Per the hospital protocol.  First we just do a visual

24  examination, just actually looking at the areas, and you take

25  pictures of what you actually see.  You do swabs of that area.

1  Then you move on to the next area and do the same thing,

2  visual examination, swabs for forensic evidence collection,

3  and then hospital swabs for lab.  And then you move on to the

4  next area.

5  Q.  Okay.  I want to kind of break this down for the jury

6  because they are not nurses, okay?  So you say a "visual

7  examination."  What's M.R. wearing at the time that she has

8  this examination?

9  A.  At the time, I have her in a gown for her examination,

10 have her in a gown.  You just look at her, look at her arms,

11 legs, to see if there's anything that's coming out.  The

12 genital -- once you get to the genital exam, you do the same

13 thing.  You look at her genital area and see if there's any

14 type of injuries on the outside, anything that needs to be --

15 that's not supposed to be there, or anything that's different.

16 Q.  Okay.  When you're examining M.R. and you're examining

17 specifically her genitals, in what position is she?

18 A.  Normally she's -- well, she was actually lying on her

19 back.

20 Q.  Okay.  And so you did kind of an external genital exam

21 first; is that fair to say?

22 A.  Correct.

23 Q.  Okay.  And did you take photographs of what it is that you

24 observed?

25 A.  Yes.

 1  Q.  And do you make findings and kind of note those findings

 2  before you start collecting evidence from the area?

 3  A.  Yes.

 4  Q.  Okay.  And after you examined her external genitals -- let

 5  me ask this:  With respect to her external genitals, did you

 6  see anything remarkable or out of the ordinary?

 7  A.  No.

 8  Q.  Okay.  So what did you do after you examined her external

 9  genitals?

10  A.  After you examine the external genitals, which are mainly

11  the labia majora and the mons pubis, such as the outside, you

12  will open up and then you will see the labia minora and the

13  inside structures.  And then you just look at those structures

14  to see if there's anything that's overtly, obviously wrong or

15  anything that looks different --

16  Q.  Okay.  You --

17  A.  -- the normal -- different or normal variation or if

18  there's something that's -- that needs to be addressed.

19  Q.  You said the kind of -- you open up the area.  Are you

20  using some kind of equipment on M.R. to do this?

21  A.  No.

22  Q.  Can you tell the jury how you do this?

23  A.  There's a technique.  It's just called labial separation

24  and labial traction.  So separation is just pretty much you

25  use your hands like this and just slide them just open just a

1  little bit.  It doesn't take a lot of pressure or anything

2  like that.  Traction is something -- it's pretty much -- it's

3  pretty similar to separation, but you use your hands and you

4  kind of hold onto the sides and just slide them to the side.

5  It's just a different view.

6  Q.  Okay.  And does doing this cause any kind of injury or

7  redness when you're doing this to M.R.?

8  A.  No.

9  Q.  Okay.  So you indicated there was nothing externally of

10 note.  When you examined M.R.'s internal structures, did you

11 see anything that was noteworthy?

12 A.  Yes.

13 Q.  And can you tell the jury what it is you saw?

14 A.  She had several areas of redness, mainly around her

15 hymenal area, several areas.  If I could -- there's --

16 Q.  I'm going to show you a diagram in just a minute.  Did you

17 note all the areas that you found on M.R. during your exam?

18 A.  Yes.

19 Q.  Okay.  And then I want to ask this:  Did you also take

20 photographs of what it is that you observed?

21 A.  Yes, I did.

22 Q.  All right.  And with respect to evidence collection, what

23 did you collect in M.R.'s case?

24 A.  In M.R.'s case, buccal swabs, external genital swabs,

25 internal genital swabs, anal swabs, underwear.  And we also

1  sent labs off to our hospital laboratory, as well.

2  Q.  Okay.  And before you did any kind of putting swabs inside

3  of M.R. or on M.R.'s skin, you had taken your photographs; is

4  that correct?

5  A.  Correct.

6  Q.  And you had also made your observations?

7  A.  Yes.

8  Q.  All right.  You indicated that you charted your findings,

9  as well; is that correct?

10  A.  Correct.

11  Q.  Okay.

12        MS. KOROBOV:  Would you display item 13, please,

13  Exhibit 13?

14  BY MS. KOROBOV:

15  Q.  Would you take a look at Exhibit Number 13?  Does this --

16  is this part of your documentation in this particular case?

17  A.  Yes.

18        MS. KOROBOV:  Okay.  And I want to go specifically

19  to this portion of the note here.  My drawing is awful there.

20  If we can blow that up.

21        And it's going to be hard to read now, because my

22  writing is actually -- there we go.  All right.  My first time

23  using this equipment.

24  BY MS. KOROBOV:

25  Q.  So, with respect to this particular part of the

1  examination, where did these words come from that you've

2  written in your note?

3  A.  These words came from the child's mother.

4  Q.  Okay.  And so you're asking at this point, essentially,

5  what does the child call different parts of her body; is that

6  correct?

7  A.  Correct.

8  Q.  And the female sex organ in this case M.R. called what?

9  A.  Tito.

10 Q.  Okay.  And so you just write down whatever it is that they

11 give you; is that correct?

12 A.  Correct.

13         MS. KOROBOV:  Okay.  And we can back out of that,

14 please.  If we could go to Exhibit 14, display 14.

15 BY MS. KOROBOV:

16 Q.  And on Government's Exhibit Number 14, in this particular

17 case, did you, as well, document on here -- make documentation

18 with respect to M.R.'s genital and anal area; is that correct?

19 A.  Correct.

20 Q.  Okay.  With respect to this under genital and anus, it

21 says, "Pertinent Findings:  See Body Map."  Did you create a

22 specific body map in this case?

23 A.  Yes.

24 Q.  Okay.  And is that where you documented the different

25 findings that you made with respect to M.R.?

1  A.  Yes.

2  Q.  All right.  On here you indicated that you used "Direct

3  Visualization," "Labial Traction," and "Labial Separation."

4  Are those the methods that you've previously described in

5  order to see M.R.'s genitals?

6  A.  Yes.

7  Q.  Okay.  And you indicated on here that M.R. is a, "Breast

8  Tanner Stage 1."  What does that mean?

9  A.  That means that she has no signs of puberty occurring

10 anytime soon.

11 Q.  Okay.  And, "Genital Tanner Stage 1."  What does that

12 mean?

13 A.  Pretty much the same thing, no signs of pubertal

14 development at all.

15 Q.  Okay.

16 A.  Very basic stage of female development.

17 Q.  And with respect to -- it says, "Hymen," and it gives you

18 kind of four choices here.  You checked that her hymen is

19 "Annular."  What does that mean?

20 A.  It's more of a rounded circular shape.

21 Q.  Okay.  So this is just describing the shape of the hymen?

22 A.  Yes.

23 Q.  Okay.  You indicated you collected samples from M.R.; is

24 that correct?

25 A.  Correct.

1   Q.  Okay.  Right up there underneath that binder to your left

2   on the countertop is a kit.  It's Government's Exhibit

3   Number 48.  Do you recognize Government's 48?

4   A.  Yes.

5   Q.  Okay.  And how do you recognize Government's 48?

6   A.  This is the sexual assault kit that I actually collected

7   and performed.

8   Q.  And is this M.R.'s kit?

9   A.  Yes.

10  Q.  And do you recognize it based on your writing and your

11  initials on the kit?

12  A.  Yes.

13  Q.  Okay.  I'm going to ask you to open Government's 48.

14         Okay.  Inside of Government's Number 48, I'm going

15  to ask you to remove Government's 40 -- Exhibit Number 49.

16  Excuse me.  What is Exhibit Number 49?

17  A.  49 are the buccal swabs from M.R.

18  Q.  And can you tell the jury what a buccal swab is?

19  A.  It's a swab.  It's just one of our -- well, the state's

20  actual swab that we use.  And you rub it on the inside of her

21  actual cheek to get her DNA cells.

22  Q.  Is this for comparison purposes later on?

23  A.  Yes.

24  Q.  Okay.  And where do you get the swabs from that you use in

25  order to collect M.R.'s DNA on those?

1  A.  From the collection kit that comes from the State of

2  Indiana.

3  Q.  So is this a prepackaged kit with a bunch of envelopes in

4  it?

5  A.  Correct.

6  Q.  You then collect the evidence -- the items of evidence

7  from the patient and put it back in the kit; is that correct?

8  A.  Correct.

9  Q.  Okay.  Item number 49, I ask you to flip it over on the

10 back.  Does 49 have your patient identification label on it?

11 A.  Yes.

12 Q.  Okay.  And does it indicate that you took the swab from

13 M.R.?

14 A.  Yes.

15 Q.  And is your label still intact on that swab?

16 A.  Yes.

17 Q.  Okay.  I ask you to put that back down and I ask you to

18 retrieve Government's Exhibit Number 50-- or Exhibit

19 Number 50.  What do you recognize Number 50 to be?

20 A.  50 is a swab, saline dripped over a hymen swab.

21 Q.  Okay.  Can you explain to the jury how it is you collected

22 these swabs?

23 A.  For this sexual swab -- these swabs here, at the end of

24 the vaginal part of the exam, you just drip a couple

25 milliliters of just normal -- some saline over the hymen, just

1  a little bit of water.  It kind of rinses off any debris

2  that's on the actual hymen.  And then you just collect it with

3  a swab at the bottom.  And it sucks up anything that may have

4  been on the hymen.

5  Q.  So these were collected from M.R.'s body?

6  A.  Correct.

7  Q.  And flip over that item.  Do you see your label and your

8  identifiers on it?

9  A.  Yes.

10  Q.  And is that label still intact?

11  A.  Yes.

12  Q.  Okay.  I'll ask you to retrieve from that box Government's

13  Exhibit Number 51.  Do you recognize Government's 51?

14  A.  Yes.

15  Q.  And what do you recognize it to be?

16  A.  Internal genitalia.

17  Q.  Okay.  And what are the internal genitalia swabs or items?

18  A.  The swabs -- the areas that would be swabbed is the

19  clitoris, labia minora, outside of the hymen, posterior

20  fourchette, just pretty much anything inside of the labia

21  majora.

22  Q.  Okay.  And do you see your label on the back of that item?

23  A.  Yes.

24  Q.  And is your label still intact?

25  A.  Yes.

1  Q.  I ask you to retrieve Government's Number 52 from the kit.

2  And do you recognize Government's 52?

3  A.  Yes.

4  Q.  And what do you recognize Exhibit 52 to be?

5  A.  External genital swabs.

6  Q.  And can you tell the jury how you collect those?

7  A.  These swabs were done on the outside of the actual

8  genitals, so the labia majora and the mons pubis, the area all

9  around the actual -- her genital -- her genital area.  So

10  pretty much what's under the panties in the front, if that

11  paints a picture for you.

12  Q.  Okay.  When you say the "mons pubis," can you tell the

13  jury where that is?

14  A.  The area above the labia majora.  On a lady, it would be

15  pretty much the triangle area of her -- like where her panties

16  would be covering.

17  Q.  Okay.  And that's part of the area that you swabbed in

18  this case?

19  A.  Correct.

20  Q.  And do you see your patient identification label on there?

21  A.  Yes.

22  Q.  And is your seal still intact?

23  A.  Yes.

24  Q.  Okay.  I'm going to ask you to retrieve Government's -- or

25  excuse me, Exhibit 53.  And do you recognize 53?

Case 1:15-cr-00072-TWP-DML   Document 148-4   Filed 12/12/16   Page 109 of 141 PageID #: 4298

BATES - DIRECT/KOROBOV                    Vol. 1-109

1   A.   Yes.

2   Q.   And what do you recognize it to be?

3   A.   Oral swabs.

4   Q.   And where were the oral swabs obtained?

5   A.   These are obtained in the child's mouth.  You just go

6   around the gum line, back of the teeth, and go all the way

7   around the uppers and lowers with two different swabs.

8   Q.   And then those swabs are packaged in this packaging here?

9   A.   Yeah.

10  Q.   Okay.  And does that have your label on it?

11  A.   Yes.

12  Q.   Okay.  And is your label still intact?

13  A.   Yes, it is.

14  Q.   And I'll ask you to retrieve Exhibit Number 54 from the

15  box.  And do you recognize item 54?

16  A.   Yes.

17  Q.   And what do you recognize it to be?

18  A.   Anal swabs.

19  Q.   And how do you take an anal swab from a child?

20  A.   You go around the actual anal opening, just use some --

21  first you use a wet swab, and then you use a dry swab.  So

22  there's only two swabs in here.

23  Q.   Okay.  And were those swabs packaged in that item --

24  envelope?

25  A.   Yes.

1  Q.  And is your seal on that envelope?

2  A.  Yes.

3  Q.  Okay.  With respect to the box, as well as Exhibits 49,

4  50, 51, 52, 53, and 54, are there some other labels on there

5  that you did not place on there?

6  A.  Yes.

7  Q.  Okay.  Other than that, are your seals still intact on

8  those items?

9  A.  Yes.

10  Q.  And those items are in the same or substantially the same

11  condition as when you put them in that box?

12  A.  Yes.

13  Q.  Okay.  I'll ask you to retrieve from that box Exhibit

14  Number 5.  What is Exhibit Number 5?

15  A.  The victim's underpants.

16  Q.  Okay.  And how did you collect the underwear in this

17  particular case?

18  A.  The underwear was actually provided to me by a family

19  member.

20  Q.  And what did you do with the underwear once you were given

21  it?

22  A.  Put them in the bag and sealed it with the rest of my

23  evidence.

24  Q.  Okay.  And are your identification labels on that item?

25  A.  Yes.

1   Q.  Okay.  And are there other items -- there are other labels

2   on that item, as well, correct?

3   A.  Correct.

4   Q.  Other than those labels, is the item in the same or

5   substantially the same condition as when you last saw it?

6   A.  Yes.

7   Q.  Okay.  So after you collect all of these items, what do

8   you do with that kit?

9   A.  The kit is sealed, signed, and placed in a locked

10  refrigerator.  And then it isn't released until law

11  enforcement comes and gets it.

12  Q.  So is that what you did with item 48 and all of those

13  items, including the underwear?

14  A.  These are all locked and sealed in the refrigerator.

15  Q.  I'm going to ask you to refer in that binder to item 64.

16  And with respect to item number 64, do you recognize item 64?

17  A.  Yes.

18  Q.  What do you recognize item 64 to be?

19  A.  The sex crimes application.

20  Q.  Okay.  What does -- what purpose does that particular

21  sheet serve for you?

22  A.  It's a secondary waive of consent from the parents for us

23  to treat the child.  It also -- it's an application for

24  benefits for payment for a hospital for actually providing the

25  exam.  And it's also -- it also is a chain of evidence form

1  for law enforcement.

2  Q.  Okay.  So do you complete a portion of that form?

3  A.  Yes.

4  Q.  Okay.  Indicating what evidence was collected?

5  A.  Yes.

6  Q.  Okay.  And then does the crime lab come in and complete

7  another portion of that form?

8  A.  Yes.

9  Q.  However, the portions of the form that have your name and

10  your information on it is information that you actually

11  completed; is that correct?

12  A.  Correct.

13  Q.  Okay.  You indicated that you took photos of your findings

14  with respect to M.R.; is that correct?

15  A.  Yes.

16  Q.  I'm going to ask you to refer to item 78 in that binder.

17  And I would ask you to remove that disk and look at it.  Do

18  you recognize Exhibit 78?

19  A.  Yes.

20  Q.  And how do you recognize Exhibit 78?

21  A.  It's the CD of the photos from the sexual assault exam

22  performed on M.R.

23  Q.  And how do you recognize it in particular?

24  A.  Her name is on it, all her identifying factors, our time

25  stamp that pretty much says "Photos," and then my initials are

1  on this.

2  Q.  Okay.  Did you actually look at that disk to make sure

3  that contained the photos taken during your examination?

4  A.  Yes.

5  Q.  Okay.  And as best photos can, do they truly and

6  accurately show the way that M.R.'s body looked on August 21st

7  of 2014?

8  A.  Yes.

9         MS. KOROBOV:  At this time, the government would

10  move to admit Government's -- Exhibit 78.

11         THE COURT:  Any objection to 78?

12         MR. THOMAS:  I don't know that 78 has --

13         THE COURT:  78 is a -- well, in my book, it's a

14  picture of a Center of Hope photo.  So you have the actual CD

15  somewhere?

16         MS. KOROBOV:  It is right here.

17         THE COURT:  Okay.

18         MR. THOMAS:  I don't know if that's the --

19         MS. KOROBOV:  It's actually -- at this point, it's

20  actually already been admitted by certification, so I'll

21  withdraw the motion to admit --

22         THE COURT:  Okay.

23         MS. KOROBOV:  -- because it has been admitted.

24         THE COURT:  It's already in.

25         MR. THOMAS:  Yeah, I think it has.  I was going to

1   say, I don't know if it's the best evidence for the photos, if

2   they are going to admit those, but it's --

3           THE COURT:  The actual --

4           MR. THOMAS:  -- part -- it's part of the exam kit.

5           MS. KOROBOV:  We just have the disk.  It's already

6   in.

7           THE COURT:  Okay.  The actual disk is already in.

8   Okay.

9           MS. KOROBOV:  Thank you.

10  BY MS. KOROBOV:

11  Q.  With respect to M.R.'s examination, I want to draw your

12  attention, again, to Exhibit Number 14, which is displayed on

13  the screen.  Right under the words, "Genital/Anus," it says,

14  "omit AB."  What does that mean?

15  A.  That means that that was not supposed to be checked.  And

16  instead of getting a brand new chart or starting anything new,

17  you want to just keep it -- keep it what -- it is what it is,

18  so you -- I just wrote down "omit," so to take that out, and

19  my initials to say that I know that that was checked wrong,

20  but it's crossed out so it's not a part of the chart.

21  Q.  Okay.  So it is not correct that there was no injury

22  noted, and then you direct to see the body map --

23  A.  Correct.

24  Q.  -- is that accurate?  Okay.

25          MS. KOROBOV:  Call Government Exhibit 15, please.

1  BY MS. KOROBOV:

2  Q.  With respect to Government's 15, do you recognize 15?

3  A.  Yes.

4  Q.  And on Exhibit 15, is this the body map that you created

5  with respect to the findings that you made with respect to

6  M.R.?

7  A.  Yes.

8          MS. KOROBOV:  And I'm going to enlarge a portion of

9  this here.  We need to back out, please.  This is the portion

10  I would like enlarged, please.

11  BY MS. KOROBOV:

12  Q.  All right.  With respect to your specific findings on

13  here, you've got a number "1."  What does finding number 1

14  reflect?

15  A.  Swelling, redness, erythema to the hymen at 12:00,

16  which --

17  Q.  Okay.  What is erythema?

18  A.  It's redness and irritation.

19  Q.  Okay.  And when you say "swelling," can you describe for

20  the jury exactly what it is that you saw?

21  A.  A raised area that's edematous.

22  Q.  Okay.  Can you specifically touch on that diagram where it

23  is that you saw swelling on M.R.?  Just go ahead and put your

24  finger there.  It's going to create a little arrow.

25          Okay.  So the red dot there is where you observed

1  swelling on M.R.'s hymen; is that correct?

2  A.  Correct.

3  Q.  And with respect to finding number 2, could you tell the

4  jury what it is that you saw with finding number 2?

5  A.  Red coloration noted around the hymen on the left side, in

6  the vestibular area, which is inside of the labia minora,

7  going down into the hymen.

8  Q.  Okay.  And was that on both sides of her vaginal opening?

9  A.  Yes.

10  Q.  Okay.  Because number 2, it looks like there's a couple of

11  lines there.  Is that number 2 or number 3?

12  A.  That's -- number 2 and number 3 are pretty much the same.

13  Q.  Okay.  Can you just go ahead again and touch there on what

14  your findings were for number 2, the red coloration noted to

15  the peri-hymenal area on the left side?

16  A.  Okay.  Here.

17  Q.  Okay.  And then with finding number 3, could you describe

18  what that was to the jury?

19  A.  Number 3 is red coloration to the hymen between 6:00 and

20  11:00.  And that's actually on the hymen, not necessarily on

21  the outside of the hymen.

22  Q.  So on the hymen itself, you noted that it was red and

23  swollen?

24  A.  On the hymen, it's between 6:00 and 11:00.  It was, yeah,

25  red in color, red coloration, and also swollen.  Sorry.

1  Q.  Okay.  And when you say 6:00 and 12:00, or 6:00 and 11:00,

2  what are you referring to?

3  A.  We use the hymen -- hymenal opening, sort of, we use a

4  clock as a reference, like a regular hand clock.  So

5  12:00 would be towards, like, the patient's head.  6:00 would

6  be towards, like, the patient's feet.

7  Q.  Okay.  So that red dot that you previously made to reflect

8  finding number 1, would that essentially be the 12:00

9  position?

10  A.  Yes.

11  Q.  Okay.  Now, in here you've got some numbers.  What do

12  those numbers reference?

13  A.  The photo numbers?

14  Q.  Yes, ma'am.

15  A.  The numbers reference like the actual pictures where you

16  can see that particular area of concern, her injury.

17  Q.  When you take the findings of the patient, I want to talk

18  a little bit about that photography process.  You actually --

19  each photo has a number; is that correct?

20  A.  Correct.

21  Q.  Who is present when those photos are taken?

22  A.  The patient, parent, physician, and myself.

23  Q.  And contained in the medical record is a specific question

24  you ask of the parent, permission to take those photos?

25  A.  Yes.

1  Q.  And when you take the photos themselves, is that noted in

2  the medical record specifically that you've taken photos?

3  A.  Yes.

4  Q.  Okay.

5          MS. KOROBOV:  All right.  And we can remove that

6  exhibit, please.

7  BY MS. KOROBOV:

8  Q.  Did you find any medical cause as to the condition of

9  M.R.'s hymen or peri-hymenal area, the swelling and the

10 redness that you saw?

11 A.  No.

12 Q.  And are there things that can medically cause a child's

13 body to become red in that area?

14 A.  Yes.

15 Q.  Okay.  And can you give us an example of one of those

16 conditions?

17 A.  Lichen sclerosis.

18 Q.  Okay.  Can you tell the jury what lichen sclerosis is?

19 A.  Lichen sclerosis is a -- like an autoimmune-type

20 condition.  It's -- layman terms, it's like eczema of the

21 genital area.

22 Q.  Okay.  Is that what M.R. had?

23 A.  No.

24 Q.  Okay.  Did you find any medical explanation for what it is

25 that you observed with respect to M.R.'s hymen?

1  A.  No.

2  Q.  Were the findings consistent with the account that was

3  provided to you by M.R.'s mother?

4  A.  Yes.

5  Q.  And in the final report, did you specifically document

6  what information had been provided to you when you examined

7  M.R.?

8  A.  Yes.

9       MS. KOROBOV:  I would ask you to display Exhibit 16,

10  please.

11  BY MS. KOROBOV:

12  Q.  I'm going to enlarge this area and ask that you read that,

13  please.

14       MR. THOMAS:  Your Honor, I object.  I mean, it's

15  been admitted into evidence.  The document speaks for itself.

16       MS. KOROBOV:  Judge, I just -- she should be able to

17  read it so the jury doesn't have to strain to read what it is

18  that's been documented.

19       MR. THOMAS:  Well, Judge, I mean, the document is

20  the best evidence, and it's already in and speaks for itself.

21       THE COURT:  What are you asking her to read?  The

22  entire document?

23       MS. KOROBOV:  I'm asking her to read the two

24  paragraphs that are there, the two paragraphs and two

25  sentences.

1          THE COURT:  Well, I don't think it will hurt

2    anything.  The jury is going to have it when they deliberate.

3          MR. THOMAS:  Well, Judge, it's also emphasizing a

4    certain point in the evidence and, as I said, we have the

5    document.  The jury can decide that.

6          THE COURT:  I'll overrule it.  I'll let her read it

7    into the record.

8    BY MS. KOROBOV:

9    Q.  You can read Exhibit 16, please.

10   A.  "August 21, 2014.

11         "M.R.    arrived at St. Vincent Hospital via

12   private vehicle, accompanied by her mother (Miosotis

13   Rodriguez)," her, "father (Justo Guevara) and extended family

14   members.  Miosotis Rodriguez and Justo Guevara report M.R.

15   stated, 'Someone touched her down there,' and request her to

16   be evaluated.

17         "This Sexual Assault Nurse Examiner offered Miosotis

18   Rodriguez and Justo Guevara a Spanish interpreter.  Miosotis

19   Rodriguez and Justo Guevara declined Spanish language services

20   at this time.  This Sexual Assault Nurse Examiner informed

21   Miosotis Rodriguez and Justo Guevara of the role and services

22   provided by a Sexual Assault," Nurse, "Examiner, including

23   photography.  Miosotis Rodriguez and" --

24         THE REPORTER:  I'm sorry.  You need to slow down.

25         THE DEFENDANT:  Oh, sorry.

1          "Miosotis Rodriguez and Justo Guevara verbalized an
2   understanding and consents were obtained via protocol and
3   signed per Miosotis Rodriguez.
4          "Miosotis Rodriguez reports          M.R.      was
5   picked up from Bright Horizons daycare at approximately 1730.
6   Miosotis Rodriguez states          M.R.         told Justo
7   Guevara that, 'she hurt down there.'  Miosotis states Justo
8   gave M.R. some diaper rash cream and told her to put it down
9   there.  Miosotis states Justo told her M.R. complained of pain
10  in her 'Tito.'  Miosotis states," that -- "states she asked
11  M.R., 'why does it hurt down there?'  Miosotis states, 'M.R.
12  started crying and ran to her room saying no, no, no.'.
13         "Miosotis reports she went and picked up M.R. and
14  asked, 'why does it hurt down there?'  Again, Miosotis states
15  this time, 'M.R. just peed all over me.  She told me Mr. Ali
16  touched me with his finger down there and it hurts.'  Miosotis
17  states she asked M.R., 'Why didn't you tell me right away?'
18  Miosotis states M.R. told her, 'he said not to tell anybody.'
19         "Miosotis states she called Bright Horizons and was
20  informed, 'yes, we know of the situation, Mr. Ali is suspended
21  and we will investigate this.'
22         "Forensic Examination complete, DCS has been
23  notified," and, "IMPD is involved."
24         MS. KOROBOV:  Pass the witness for
25  cross-examination.

1      THE COURT:  You may cross-examine.

2      MR. THOMAS:  Thank you, Your Honor.

3                  **CROSS EXAMINATION**

4   BY MR. THOMAS:

5   Q.  Ms. Bates, essentially -- I mean, your job is more as an

6   evidence collector than a healthcare provider at this point in

7   your job, is that -- do you agree with that?

8   A.  No.  We do both, forensics and medical care.

9   Q.  I understand.  It's a hospital.

10  A.  Yes.

11  Q.  And I'm not suggesting you don't do medical care, but your

12  job -- they call you to do a forensic exam because they want

13  to make sure that it's somebody who knows how to collect

14  evidence, right?

15  A.  Yes.

16  Q.  If there's not a request for a forensics examiner, you

17  don't examine everybody, do you?

18  A.  I don't examine everyone.

19  Q.  So you are there specifically, obviously, to observe for

20  future medical treatment, but also to make sure that evidence

21  is collected?

22  A.  Yes.

23  Q.  And you know how to do that?

24  A.  Yes.

25  Q.  And you're there to specifically focus to see if you can

 1  find an injury that's consistent with abuse, correct?

 2  A.  Yes.

 3  Q.  You said on direct that when you observed externally that

 4  there was nothing of note -- was that what you said?

 5  A.  Correct.

 6  Q.  So someone observing M.R without doing a pelvic exam would

 7  not have seen, as you say, anything noteworthy; is that right?

 8  A.  If anyone did a pelvic exam on her, they would have seen

 9  the same thing.

10  Q.  A pelvic exam?

11  A.  A pelvic exam.

12  Q.  But as you said, externally, you didn't notice anything of

13  note?

14  A.  No.

15  Q.  What you saw was internal?

16  A.  Yes.

17  Q.  And you don't know specifically when those injuries took

18  place, do you?

19  A.  No.

20  Q.  And those don't last forever, right, the injuries like

21  that?

22  A.  No.

23  Q.  But they could last several days, right?

24  A.  Sometimes.

25  Q.  You have no way of telling from that exam when those

 1  injuries took place?

 2  A.  No.

 3  Q.  And no way of knowing specifically how the injuries took

 4  place?

 5  A.  No.

 6  Q.  There's nothing about the exam that says, well, a man's

 7  finger caused that injury, right?

 8  A.  I can't confirm or deny.

 9  Q.  You couldn't rule it out, but there's nothing about it

10  that you could say, "Well, I can tell from this exam that a

11  man's finger caused this injury"?

12  A.  No.

13  Q.  If a man's finger or a woman's finger, you wouldn't --

14  would potentially cause the same injury, right?

15  A.  Correct.

16  Q.  It's possible that the child's hand could cause that

17  injury, too, right?

18  A.  Possible.

19  Q.  And did you note that she had been given diaper rash

20  cream?

21  A.  Yes.

22  Q.  And do you know how that was applied?

23  A.  No.

24  Q.  Do you know who applied it?

25  A.  In my notes, M.R. -- I think Father gave M.R. the diaper

1   rash cream and had her apply it.

2   Q.  That's what Dad told you, right?  Or I guess Mom told you

3   that Dad told her, right?

4   A.  Uh-huh.

5   Q.  You didn't see it applied?

6   A.  No.

7   Q.  Did you ever ask M.R. how she applied it?

8   A.  No.

9   Q.  Would that -- could that have been important?

10  A.  No.

11  Q.  No?  Well, if M.R. had applied it inside her vagina, would

12  that have been important?

13  A.  Yes, but she had pain before she applied it.

14  Q.  Well, that's what was reported, right?

15  A.  (Nods head up and down.)

16          THE COURT:  You have to answer out loud.

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you.

19  BY MR. THOMAS:

20  Q.  By her parents?

21  A.  Yes.

22  Q.  Now, all the information that you have comes from M.R.'s

23  parents, right?  You don't have any other information at all,

24  right?

25  A.  Correct.

1  Q.  Did you inquire as to whether M.R. had bathed or showered

2  when that -- when she might have bathed or showered?

3  A.  Yes.

4  Q.  And what were you told about that?

5  A.  I believe they changed her, that they changed her

6  clothing.

7  Q.  But she had not bathed or showered before coming for the

8  exam, right?

9  A.  Not that I recall.

10 Q.  Well, that's not -- your records show that, right?  That's

11 what you were told?

12 A.  Yes, I believe so, or I can read if you tell me which --

13 Q.  Well, if you remember or don't remember.  Do you remember

14 or not?

15 A.  I remember her -- them saying that she changed -- that

16 they changed her bottoms, like her clothes, but I don't recall

17 if they told me if she had a shower -- took a shower or not.

18 Q.  Is that something you would normally ask?

19 A.  Usually I do.

20 Q.  And you have no information that she did, right?

21 A.  I probably wrote it down somewhere in the chart.  If I

22 could flip back to it?

23 Q.  Go ahead.

24 A.  Which exhibit is it?

25 Q.  They're not my exhibits, ma'am.

1      THE COURT:  Ms. Korobov, what number is the exhibit

2  in the binder?

3      MS. KOROBOV:  Your Honor, it's Exhibit Number 11.

4      THE WITNESS:  Thank you.

5  BY MR. THOMAS:

6  Q.  These are your notes, ma'am, so if you want to refer to

7  them, please do.

8      MS. KOROBOV:  It's on page 3 --

9      THE REPORTER:  I cannot hear you.

10      MS. KOROBOV:  On page 3 of the document --

11      THE REPORTER:  I'm sorry.  I still cannot hear you.

12      MS. KOROBOV:  Page 3 of the document stamp.

13      THE COURT:  Say it again.

14      MS. KOROBOV:  Page 3 of the document.

15      THE WITNESS:  I have it.

16  A.  She -- they changed her clothes, but they did not indicate

17  that she was given a bath or a shower.

18  BY MR. THOMAS:

19  Q.  Very good.  Nothing about the injuries that you saw that

20  would specifically say that they were caused by a hand at all,

21  right?

22  A.  Correct.

23      MR. THOMAS:  That's all.  Thank you.

24      THE COURT:  Do you have any redirect?

25      MS. KOROBOV:  May I have a moment, Your Honor?

1          THE COURT:  You may.

2          (Off the record.)

3                    **REDIRECT EXAMINATION**

4   BY MS. KOROBOV:

5   Q.  Ms. Bates, when you do an examination of a child under

6   these circumstances, does your exam have multiple parts to it,

7   as you previously described?

8   A.  Yeah.

9   Q.  And is taking a patient history an important part of that?

10  A.  Crucial.

11  Q.  Okay.  And at the end, you're trying to give some

12  diagnosis and some treatment options for those particular

13  patients that you see; is that correct?

14  A.  Correct.

15  Q.  All right.  Now, counsel suggested that you're looking for

16  some kind of injury consistent with abuse.  When you begin

17  your exam of a patient and do your exam of a patient, is it

18  your goal to try to find some evidence that a child has been

19  abused?

20  A.  No.

21  Q.  Okay.  What's your goal?

22  A.  My goal is to figure out an answer to their concern, a

23  medical reason, primarily, to rule out anything.

24  Q.  Okay.  And do you document everything that you find?

25  A.  Yes.

 1  Q.  Do you document it whether you find any kind of medical

 2  finding or not?

 3  A.  Yes.

 4  Q.  And do you take pictures of what you find under any

 5  circumstance?

 6  A.  Yes.

 7  Q.  When it comes to the conversation that you have about a

 8  patient history, is it typical to not -- for you, to not

 9  question the patient themselves?

10  A.  Yes.

11  Q.  Okay.  Who do you typically get the history from?

12  A.  I get the patient's information from their parents.

13  Q.  Or whoever brings them in?

14  A.  Law enforcement, DCS, yeah.

15  Q.  Okay.  You indicated in this case that M.R. had some

16  swelling in addition to redness to her hymen.  Did that tell

17  you anything about the recency of the findings that you made?

18  A.  With the tissue down there being pretty similar to, like,

19  the inside of your mouth.  I mean, you bite yourself on the

20  inside of your mouth today; four days from that, you're not

21  going to even know where you actually bit the inside of your

22  mouth.  So I would say within a few days.

23  Q.  Okay.  But it's not something that you can put a date on

24  with respect to these findings; is that correct?

25  A.  Correct.

1          MR. THOMAS:  This is a leading question at this

2   point.

3          THE COURT:  Don't --

4          MS. KOROBOV:  I can rephrase it.

5          THE COURT:  Go ahead and rephrase it.

6   BY MS. KOROBOV:

7   Q.  Are you able to put any kind of date stamp on when an

8   injury happened?

9   A.  No.

10  Q.  Were the findings that you made consistent with digital

11  penetration of M.R.'s vaginal area?

12  A.  Yes.

13          MS. KOROBOV:  Nothing further.

14          MR. THOMAS:  Just one thing, Judge.

15          THE COURT:  You may.

16                    **RECROSS EXAMINATION**

17  BY MR. THOMAS:

18  Q.  Just so I'm clear, "consistent with," means that it could

19  have been that, right?

20  A.  Correct.

21  Q.  It doesn't mean it couldn't have been something else,

22  right?

23  A.  Correct.

24          MR. THOMAS:  Thank you.

25          THE COURT:  Okay.  Any questions on that?

 1          MS. KOROBOV:  No, Your Honor.

 2          THE COURT:  May this witness be released from

 3   subpoena?

 4          MS. KOROBOV:  I ask that she be released to go home

 5   today, but I may need to recall her under circumstances, so I

 6   would ask that she remain under subpoena.

 7          THE COURT:  Okay.  You may leave, but you're still

 8   under subpoena.  If they need you, they will contact you

 9   again.

10          THE WITNESS:  Okay.

11          THE COURT:  Thank you.

12          (Witness excused.)

13          THE COURT:  And you've got another witness for

14   today?

15          MS. KOROBOV:  I do, a very brief one, your Honor,

16   Kent Hedberg.

17          THE COURT:  Okay.  You may.  If you would go that

18   way.  I know it's a maze.  Sorry about that.

19          Sir, if you would come right up here, right over

20   there.  And, sir, if you would remain standing and raise your

21   right hand, please.

22          (The witness is sworn.)

23          THE COURT:  You may have a seat.

24          And, Counsel, you may examine the witness.

25          MS. KOROBOV:  Thank you, Your Honor.

1     **KENT HEDBERG, PLAINTIFF'S WITNESS, SWORN**

2              **<u>DIRECT EXAMINATION</u>**

3   BY MS. KOROBOV:

4   Q.  Would you state your name and spell your first and last

5   name, please?

6   A.  Kent Hedberg, K-E-N-T, H-E-D-B-E-R-G.

7   Q.  Mr. Hedberg, how are you employed?

8   A.  I'm currently employed by the Indianapolis-Marion County

9   Forensic Services Agency, more commonly known as the crime

10  lab.

11  Q.  And can you tell the jury what it is you do at the crime

12  lab?

13  A.  Currently I'm a forensic scientist trainee.

14  Q.  And as part of your duties as a forensic scientist in

15  training, can you tell the jury a little bit about what you

16  do?

17  A.  I currently am in training to be a latent print examiner,

18  so right now I learn the basis of latent print examination and

19  how it -- how it applies to forensic science.  And later on, I

20  will learn how to compare fingerprints.

21  Q.  Okay.  How long have you actually been employed by the

22  crime lab?

23  A.  Approximately two years.

24  Q.  All right.  I'm going to go back to August 21st, or August

25  of 2014.  You were working for the crime lab then; is that

1  correct?

2  A.  Yes.

3  Q.  And can you tell the jury what you did in August of 2014

4  for the lab?

5  A.  I was a forensic evidence technician.

6  Q.  Can you tell the jury what you did as a forensic evidence

7  technician?

8  A.  As a forensic evidence technician, part of my duties are

9  to go to area hospitals once per week and pick up rape kits.

10  Q.  Can you tell the jury what you do when you go to a

11  hospital to pick up a kit?

12  A.  Once I go to a hospital, I'll meet with the forensic

13  nurse.  We'll -- she'll open the secure refrigerator and

14  hand -- and then we will transfer the rape kits into my

15  custody.  I take those rape kits back to the lab and process

16  them.  In some cases, they will have a blood tube.  I'll take

17  that blood tube and make a stain card.  In this case, it did

18  not have a stain card -- or, I'm sorry, it did not have a

19  blood tube.

20  Q.  I want to direct your attention specifically to this

21  case -- actually, let me go back to this.

22        Do you fill out paperwork when you complete any kind

23  of transfer of evidence from a hospital back to the crime lab?

24  A.  Yes.  There is a form that -- it's a State of Indiana

25  benefits form.  On that is kind of a chain of custody going

1 from the hospital to myself.

2 Q.  And once you transfer that kit, where are you taking the

3 kit to when you bring it from the hospital?

4 A.  Once I bring it from the hospital, we -- we have an office

5 over at the Marion County coroner's office.  Once I'm finished

6 processing, it will go into a freezer.

7 Q.  And the area that you bring it from the hospital to the

8 area at the coroner's office, is that a secured area?

9 A.  Yes.  It's very -- it's a limited access area.

10 Q.  Okay.  Who has access to it?

11 A.  Other FETs, forensic evidence technicians, and a DNA

12 analyst.

13 Q.  I'm going to ask you to look in the binder at Exhibit

14 Number 64, please.  With respect to item 64, do you recognize

15 Exhibit 64?

16 A.  Yes.

17 Q.  And how do you recognize Exhibit 64?

18 A.  I recognize Exhibit 64 as the Indiana benefits form.  I

19 know it as the Indiana benefits form by my initials and date

20 on the bottom section of the paper.

21 Q.  Okay.  Does this reflect a transfer of evidence in case

22 lab 14-08-47DP14088487?

23 A.  Yes.

24 Q.  And is the date of transfer of evidence August 22nd, 2014?

25 A.  No.

1  Q.  What was the date of evidence transfer in this case?

2  A.  August 26, 2014.

3  Q.  26, I apologize.  Okay.  And so what happened on

4  August 26, 2014, according to that record?

5  A.  I picked it up from St. Vincent's Hospital.

6  Q.  And what did you do with the kit?

7  A.  Once I got back to the coroner's office, I opened the kit.

8  Once I saw there was no blood tube for me to make a stain card

9  with, I marked into our log book what came with the kit, or

10  what was in the kit, and then sealed it up and transferred it

11  to the freezer.

12  Q.  Other than opening that box -- I'll ask you to refer to

13  item 48 sitting on the table right next to you.

14          Other than opening up the box, do you do anything

15  with any of the envelopes inside?

16  A.  No.

17  Q.  And did you touch any of the evidence inside?

18  A.  No.

19  Q.  And you indicated that after you brought it into the lab,

20  you did what with it?

21  A.  After I got it to the laboratory, I just opened it,

22  ensured there was no blood tube inside, and then sealed it.

23  Q.  What's the purpose of ensuring that there's no blood tube

24  inside?

25  A.  Ensuring there's no blood tube inside?  The blood tube is

1  used to make a stain card.  That stain card, in turn, is used

2  as a DNA standard for the victim.

3  Q.  So some kits actually have blood or some other kind of

4  liquid inside; is that correct?

5  A.  Yes.

6  Q.  Okay.  And if it's got a liquid inside of the kit, what do

7  you do with the liquid, then?

8  A.  If it has a liquid -- if it has blood in there, I make a

9  stain card from the liquid blood.  And then I'll -- that stain

10  card will be dried and then sealed, and then that will be used

11  later on.

12  Q.  Okay.  This kit, though, did not have any blood in it; is

13  that correct?

14  A.  No, it did not.

15  Q.  So was the kit stored in the lab?

16  A.  It was stored at the lab for approximately three months,

17  and then it was transferred to the IMPD property room.

18  Q.  Is that also a secure facility?

19  A.  Yes, it is.

20  Q.  Okay.  Is that kind of standard chain of custody protocol

21  with respect to items that have been in the lab for a few

22  months?

23  A.  Correct.

24  Q.  And after you processed that kit, have you had any more

25  contact with it?

1  A.  No, I did not.

2          MS. KOROBOV:  I pass the witness for cross.

3          THE COURT:  Okay.  You may cross-examine the

4  witness.

5          MR. THOMAS:  Very briefly, Judge.

6                    **CROSS EXAMINATION**

7  BY MR. THOMAS:

8  Q.  And just so I'm clear, when you say "processed it," that's

9  basically opening it up, looking inside, and closing it back

10 up, right?

11 A.  Yes.

12 Q.  And you didn't have anything to do with how it was

13 packaged, and you don't know what happened to it after you

14 sent it to the freezer, right?

15 A.  Correct.

16          MR. THOMAS:  Nothing else.

17          THE COURT:  Any redirect?

18          MS. KOROBOV:  No, Your Honor.

19          THE COURT:  All right.  May this witness be

20 excused --

21          MS. KOROBOV:  He may, Your Honor.

22          THE COURT:  -- and released from subpoena?

23          MS. KOROBOV:  He may.

24          THE COURT:  All right.  Thank you, sir.  You are

25 excused.

1          THE WITNESS:  Thank you.

2          (Witness excused.)

3          MS. KOROBOV:  May we approach, Your Honor?

4          THE COURT:  You may.

5          (Bench conference on the record.)

6          MS. KOROBOV:  That's the last witness for the day,

7   the last one that we brought here.

8          THE COURT:  Okay.  That's fine.  And we can start at

9   9:00?

10          MR. SHEPARD:  Yes.

11          THE COURT:  Okay.  If we start at 9:00, Tanesa will

12   have the doors open by 8:00, so just make sure you're here by

13   a quarter till 9:00 at the latest, as long as she's here.  You

14   get here at 9:00, also, okay?

15          MR. SHEPARD:  Thank you, Your Honor.

16          THE COURT:  All right.  Okay.

17                    (Open court.)

18          THE COURT:  Ladies and gentlemen, we're going to go

19   ahead and adjourn for the day and send you home this evening,

20   and I'll -- and we're going to resume in the morning at

21   9:00 a.m.  That means please try to get here around 8:30 and

22   get through security, and be in your jury room at 9:00 a.m.,

23   and we'll get you into the courtroom promptly at 9:00 a.m.

24   You're going to have to get parked and get through security,

25   so leave yourself plenty of time so that you can actually be

1   in your jury room at 9:00 a.m.

2          During this period of time that you are allowed to

3   separate for overnight, you are not to have any discussion

4   about this case among yourselves or with anyone else.  What

5   that means, ladies and gentlemen, when you get home tonight,

6   your family is going to know -- you're going to tell them that

7   you're on jury duty.  You may not tell them what your trial is

8   about; the reason being that if you begin to discuss it with

9   your family or friends, you will begin to form and express

10  opinions.  And you're not allowed to do that until you've

11  heard all of the testimony, received all of the evidence,

12  closing argument of counsel, final instructions from the

13  Court, and you are deliberating, the 12 jurors.

14         So no discussion about it with your family.  It's

15  human nature to want to talk about it, but you may not.  When

16  the trial is over, you may talk about it as much as you like,

17  but for now no discussion.  Can everyone follow this portion

18  of the admonishment?

19         Remember, you are not to do any research on the

20  Internet, no Facebook, Googling, Facetime, all those things we

21  read to you in the instructions, just about every type of

22  social media communication, don't do any of that.  Do not look

23  at anything in the newspaper, radio, or television about this

24  matter.  If something should appear, you should ignore that.

25  Can everyone follow this portion of the admonishment?

Vol. 1-140

1          If anyone should attempt to talk to you about the

2   matter, you should refuse and report that attempt to me or

3   your bailiff at your earliest opportunity.  And, again, no

4   talking to attorneys, parties, spectators or witnesses.

5          Under this admonishment, you are allowed to separate

6   for overnight, and we'll see you in the courtroom at 8:00 --

7   I'm sorry, at 9:00 a.m.  Be in your jury room around 8:45.

8   Have a good evening.

9          THE COURTROOM DEPUTY:  All rise.

10          (Jury out at 4:48.)

11          THE COURT:  Mr. Shepard, what is your order of proof

12   for tomorrow?  Who will we hear from in the morning?

13          MR. SHEPARD:  Your Honor, we'll hear from Tyria

14   Graham, we'll hear from Heidi Conces, we will hear from

15   Detective McAlister, we'll hear from Detective Melton.  And

16   then, if we get that far, we'll begin our -- probably with the

17   DNA witness, most likely Shea Hayes-Anderson.

18          THE COURT:  Okay.  Very good.  All right.  Lawyers,

19   we are adjourned for the evening.  We will lock the courtroom

20   if you want to leave anything.  You can also use that room in

21   the back.  You might want to take your things home, but we can

22   lock the room in the back, not the witness room, but the other

23   room.

24          Government, you have a room in the building, so if

25   the defense attorney wants to use that room, we'll let him

Vol. 1-141

1   have it.  And we'll see you bright and early in the morning.

2              MR. SHEPARD:  Thank you, Your Honor.

3              MR. THOMAS:  Thank you.

4              THE COURT:  Have a good evening.

5              (Proceedings adjourned at 4:50 p.m.)

6

7                    CERTIFICATE OF COURT REPORTER

8

9        I, David W. Moxley, hereby certify that the

10  foregoing is a true and correct transcript from

11  reported proceedings in the above-entitled matter.

12

13

14

15  /S/ David W. Moxley_____    August 1, 2016
    DAVID W. MOXLEY, RMR/CRR/CMRS
16  Official Court Reporter
    Southern District of Indiana
17  Indianapolis Division

18

19

20

21

22

23

24

25