Vol. 2-142

 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF INDIANA
 2                        INDIANAPOLIS DIVISION

 3

 4   UNITED STATES OF AMERICA,           )
                                         ) Cause No.
 5          Plaintiff,                   ) 1:15-cr-0072-TWP-DML
                                         ) Indianapolis, Indiana
 6      vs.                              ) **February 23, 2016**
                                         ) 9:11 a.m.
 7   ALI AL-AWADI (01),                  )
                                         )   **VOLUME II**
 8          Defendant.                   )

 9

10                      **Before the Honorable**
                        **TANYA WALTON PRATT**
11
                   OFFICIAL REPORTER'S TRANSCRIPT OF
12                          JURY TRIAL

13

14   **For Plaintiff:**                  Bradley Paul Shepard, Esq.
                                        Kristina M. Korobov, Esq.
15                                      Assistant U.S. Attorneys
                                        United States Attorney's Office
16                                      Suite 2100
                                        10 West Market Street
17                                      Indianapolis, IN  46204

18   **For Defendant:**                  Ross G. Thomas, Esq.
                                        Attorney at Law
19                                      3728 North Delaware Street
                                        Indianapolis, IN  46205-3434
20

21

22   Court Reporter:                    David W. Moxley, RMR, CRR, CMRS
                                        United States District Court
23                                      46 East Ohio Street, Room 340
                                        Indianapolis, Indiana  46204
24
              PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25       TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1

**I N D E X**

2

**GOVERNMENT'S WITNESSES:**                                    **PAGE**

3

TYRIA GRAHAM

4
Direct Examination by Mr. Shepard .............145
Cross-examination by Mr. Thomas ..............157

5
Redirect examination by Mr. Shepard ..........171
Recross-examination by Mr. Thomas ............174

6

HEIDI CONCES

7
Direct Examination by Mr. Shepard .............176

8
Cross-examination by Mr. Thomas ..............197
Redirect examination by Mr. Shepard ..........210

9

ELI McALLISTER

10
Direct Examination by Mr. Shepard .............216

11
Cross-examination by Mr. Thomas ..............279
Redirect examination by Mr. Shepard ..........312

12
Recross-examination by Mr. Thomas ............322

13

14

**I N D E X   O F   E X H I B I T S**

15

**GOVERNMENT'S EXHIBITS:**                                    **PAGE**

16
2 .................................................148
19 ................................................179

17
24 ................................................194
25 ................................................251

18
28 ................................................268
29 ................................................264

19
42 ................................................231
43 ................................................231

20
65 ................................................148
66 ................................................148

21
67 ................................................148

22

23

24

25

Vol. 2-144

1                    (In open court.)

2           THE COURT:  I'm advised that the defendant is on his

3  way.  He's coming down the hall?  So we'll get started as soon

4  as he gets in here.  So we can go off the record.

5           (Off the record.)

6           THE COURT:  Okay.  I believe we're all here and the

7  jurors have all arrived.  We're back on the record.  This is

8  the United States of America versus Ali Al-Awadi.  And is the

9  government ready for the jury?

10          MR. SHEPARD:  Yes, Your Honor.

11          THE COURT:  Defense ready?

12          MR. THOMAS:  Yes, Your Honor.

13          THE COURT:  And, Tanesa, you may bring in the panel.

14          Do you want to bring your witness in?

15          (Jury in at 9:13 a.m.)

16          THE COURT:  Good morning, ladies and gentlemen of

17 the jury.  I hope that you are well rested.  Did everyone

18 follow their admonishment last night and not talk to your

19 family and friends about the trial?  Everyone not?  Okay.

20 Very good.

21          We are back on the record, the United States of

22 America versus Ali Al-Awadi.  And, Mr. Shepard, you may call

23 your first witness of the day.

24          MR. SHEPARD:  The government calls Tyria Graham,

25 Your Honor.

1    THE COURT:  Okay.  And I believe she's coming in.

2    Witness, if you would come right over here, come right up this

3    way and go around that way.  Right over here, Ms. Graham.  All

4    right.  Come on up that step and I need you to remain standing

5    and face me and raise your right hand.

6         (The witness is sworn.)

7         THE COURT:  You may have a seat.

8         Mr. Shepard, you may examine your witness.

9         **TYRIA GRAHAM, PLAINTIFF'S WITNESS, SWORN**

10                  **DIRECT EXAMINATION**

11   BY MR. SHEPARD:

12   Q.  Could you please state your name and spell it for the

13   record?

14   A.  Tyria Graham, T-Y-R-I-A.  Last name is Graham,

15   G-R-A-H-A-M.

16   Q.  Okay.  Where do you live?

17   A.  Here in Indianapolis.

18   Q.  How long have you lived here in Indianapolis?

19   A.  For a long time.

20        THE COURT:  Ms. Graham, can you pull the mic a

21   little closer to you?  And sit a little closer so that we can

22   hear you very well.

23        THE WITNESS:  Okay.

24        THE COURT:  Thank you.

25   BY MR. SHEPARD:

1  Q.  What do you do for a living?

2  A.  I'm self-employed right now.

3  Q.  Are you about to start a new job?

4  A.  Uh-huh.

5  Q.  What are you going to be doing?

6  A.  Educator.

7  Q.  Have you ever been an educator before?

8  A.  Yes, I have.

9  Q.  Where at?

10 A.  St. Vincent Children's Choice, Bright Horizons.

11 Q.  How long were you there?

12 A.  A little over three years.

13 Q.  What did you do?

14 A.  Teach kids, educate them.

15      MR. SHEPARD:  Okay.  Please call up Exhibit 1.

16 BY MR. SHEPARD:

17 Q.  What's that?

18 A.  The building where I worked at.

19      THE COURT:  Is your screen working?  Tanesa, go look

20 at that real quick.

21      Okay.  Very good.  You may continue.

22 BY MR. SHEPARD:

23 Q.  Did you have a specific class that you taught while you

24 were there or did you float between?  How did it work?

25 A.  I had a specific class, but I was in all classes when they

1  needed me.

2  Q.  Okay.  I would ask you to -- the binder in front of you,

3  there's some pictures behind some tabs.  I'm going to ask if

4  you recognize the pictures.  Can you look behind tab number 2?

5  Do you recognize what that's a picture of?

6  A.  Yes, I do.

7  Q.  Okay.  Look behind tab number 65.  If you were my teacher,

8  you would have taught me to count better, right?  Do you

9  recognize what's behind tab 65?

10  A.  Yes, I do.

11  Q.  Look behind tab 66.

12  A.  Yes.

13  Q.  Do you recognize what's behind 66?

14  A.  Yes, I do.

15  Q.  And behind tab 67.  Do you recognize what's behind tab 67?

16  A.  Yes.

17  Q.  Okay.  What are all these -- what's depicted in these

18  pictures?

19  A.  Pictures of the kindergarten classroom.

20  Q.  Is that one of the rooms that you taught in?

21  A.  Yes.

22  Q.  And was that a room at the daycare which is up on the

23  screen in Exhibit 1?

24  A.  Yes.

25  Q.  And are they accurate representations of the kindergarten

1  room?

2  A.  Yes.

3          MR. SHEPARD:  I move to admit Exhibits 2, 65, 66,

4  and 67.

5          THE COURT:  Any objection, Mr. Thomas?

6          MR. THOMAS:  No objection, Your Honor.

7          THE COURT:  Government's Exhibits 2, 65, 66, and 67

8  are admitted into evidence without objection.

9                  *(Government's Exhibits 2, 65 - 67 were*

10                 *received in evidence.)*

11         MR. SHEPARD:  Can you please display Exhibit 2.

12  BY MR. SHEPARD:

13  Q.  Can you please just tell the jury what we're seeing?

14  A.  Another picture of the kindergarten classroom.

15  Q.  So that's the kindergarten classroom?

16  A.  Yes.

17         MR. SHEPARD:  Please display 65.

18  BY MR. SHEPARD:

19  Q.  What are we seeing here?

20  A.  Pictures of the kindergarten classroom.

21  Q.  Just from a different angle?

22  A.  Uh-huh.  Yes.

23  Q.  66?

24  A.  Picture of the kindergarten classroom.

25  Q.  And 67?

1  A.  The same, as well, a picture of the kindergarten

2  classroom.

3  Q.  Did you have a coworker named Ali Al-Awadi at any time

4  when you worked there?

5  A.  Yes.

6  Q.  Was there a student at the daycare when you worked there

7  named M.R.?

8  A.  Yes.

9         MR. SHEPARD:  Please display Exhibit 77.  It will

10  pop up on your monitor.

11  BY MR. SHEPARD:

12  Q.  Do you recognize the girl in that photo?  Who is that?

13  A.  That's M.R.

14  Q.  Do you remember a day at the daycare where something

15  happened involving Mr. Al-Awadi and M.R.?

16  A.  Yes.

17  Q.  What were you doing that day, if you can remember?

18         It's okay.  Take a deep breath.

19  A.  I was...

20  Q.  Let's back up.  Let's start from the morning.

21  A.  I was told to take over the kindergarten classroom.

22  Q.  And do you remember about what time you started teaching

23  in the kindergarten classroom that morning?

24         MR. THOMAS:  Judge, is there a -- oh, it's tissues.

25  I'm sorry.  I was hearing a rattling.  I apologize.

1          THE COURT:  Oh, the rattling.  That's the witness

2   with the package of tissue.

3          MR. THOMAS:  I'm sorry.

4   BY MR. SHEPARD:

5   Q.  Is it safe to say that you started in the morning

6   sometime?

7   A.  Yes, I did.  Yes, I started in the morning.

8   Q.  Now, what's the general age range of the kids in the

9   kindergarten classroom?

10  A.  Sometimes four and up.

11  Q.  Is it fair to say they've got to go to the bathroom often?

12  A.  All the time.

13  Q.  Did you have any -- did you give them any bathroom breaks

14  in the morning?

15  A.  Whenever they needed to go to the restroom.

16  Q.  Did M.R. have a bathroom break in the morning?

17  A.  I'm not sure.

18  Q.  Do you ever remember M.R. complaining about it hurting to

19  go to the bathroom anytime before lunch?

20  A.  No.

21          MR. SHEPARD:  Judge, if I could approach the

22  witness.

23          THE COURT:  Why?  Come on up.  What do you want to

24  do with the witness?  Do you want to show her an exhibit or --

25          MR. SHEPARD:  Yes, Your Honor.

1          THE COURT:  Oh, yes.  You may approach if you want

2    to show the witness an exhibit.

3          MR. SHEPARD:  I need help.  We're both going to

4    approach, if that's okay.

5          THE COURT:  Okay.  You may.

6          MR. THOMAS:  Can he identify what he's showing her?

7          THE COURT:  Show Mr. Thomas.

8    BY MR. SHEPARD:

9    Q.  Let me back up.  Ms. Graham, do you remember being

10   interviewed at the Marten House after the event?

11   A.  Yes.

12   Q.  Okay.  And was that interview by personnel from IMPD?

13   A.  Yes.

14   Q.  And do you remember a transcription of that interview

15   being done?

16   A.  Yeah.

17          MR. THOMAS:  Judge, I'm not sure what these

18   questions are at this point.  I mean, she's already denied --

19   she was asked specifically if she had a bathroom break in the

20   morning, and she said, "No."  I don't know if he's trying to

21   impeach his own witness or --

22          MR. SHEPARD:  Actually, I believe the answer was she

23   didn't remember.  I'm trying to refresh her recollection, Your

24   Honor.

25          MR. THOMAS:  I think it was, "No," Your Honor.

 1              THE COURT:  Well, I'll take a look and let you know

 2      what it was.

 3              Her answer was, "I am not sure."

 4              "Did M.R. have a bathroom break in the morning?"

 5              And she said, "I am not sure."

 6              MR. THOMAS:  Your Honor, if I may, right after that,

 7      I wrote down the word, "No."  What did she say right after

 8      that?

 9              THE COURT:  "Do you remember M.R. complaining about

10      it hurting to go to the bathroom before lunch?"

11              The answer was, "No."

12              MR. THOMAS:  Okay.  That's a different question,

13      Your Honor.

14              THE COURT:  All right.  So you may refresh your

15      witness' recollection, Counsel.

16              MR. THOMAS:  Can he give me a page?

17              MR. SHEPARD:  Page 17.

18              MR. THOMAS:  Thank you.

19              THE COURT:  Now, ask your question.

20      BY MR. SHEPARD:

21      Q.  After reading this, does it help you to remember what

22      happened that day?

23              THE COURT:  You have to answer out loud.

24      A.  Yes.

25              MR. THOMAS:  Judge, she did not testify that she

1  doesn't remember what happened that day.  I'm not sure about

2  these line -- this line of questioning.

3          THE COURT:  She said she couldn't recall.

4          MR. THOMAS:  She couldn't recall if she had a

5  bathroom break.

6          MR. SHEPARD:  Your Honor, can we approach?

7          THE COURT:  Yes.

8          (Bench conference on the record.)

9          MR. SHEPARD:  He's trying to split hairs, Your

10 Honor.  She clearly said she didn't recall.  I was allowed to

11 refresh her recollection.  I would even be allowed to impeach

12 my witness if I needed to.  I'm just -- I refreshed her

13 recollection.  She said her -- excuse me.  I showed her the

14 transcript.  She said it helped to remember, and I'm going to

15 go down the line of questioning after her recollection has

16 been refreshed.

17         MR. THOMAS:  As to the specific question as to

18 whether she had a bathroom break in the morning, yes, but not

19 to, "Do you remember the events of the day?"  I mean, he's

20 opening that up rather broadly at that point.

21         THE COURT:  Okay.  Go ahead and ask specific

22 questions.

23                  (Open court.)

24 BY MR. SHEPARD:

25 Q.  Ms. Graham, do you remember, after having had a chance to

Case 1:15-cr-00023-TWP-DML Document 448 Filed 12/12/16 Page 13 of 190 PageID #40

1  review your statement, if M.R. had a bathroom break that

2  morning?

3  A.  Yes.

4  Q.  Did she?

5  A.  Yes.

6  Q.  Did she say anything after the bathroom break?

7  A.  When she came back to the room, she did.

8  Q.  What did she say?

9  A.  She says that, "It hurts down there."

10 Q.  Did she say anything else at that time?  Now, this is

11 before lunch.

12 A.  I don't remember.

13 Q.  Okay.  What happened at lunchtime?

14 A.  It was a regular day.  The kids, they just had lunch and

15 read their stories and got ready for a nap.  They used the

16 bathroom, I guess, before nap, like they always do.

17 Q.  Did you get relieved to go take your own lunch?

18 A.  Yes.

19 Q.  Who relieved you?

20 A.  Mr. Ali.

21 Q.  Did you tell him anything at that time about any of the

22 kids?

23 A.  No, I didn't.

24 Q.  What happened when you came back from lunch?

25 A.  When I came back from lunch, I signed in and he signed

 1  out.

 2  Q.  Did he tell you anything about anything that happened

 3  during the lunch hour that was --

 4  A.  No, he didn't say anything.

 5  Q.  Okay.  Did something happen with M.R. after lunch?

 6  A.  M.R. -- I sat on the floor, in the middle of two kids, M.R

 7  and another kid.  And she told me that it hurt, "down there."

 8  Q.  When she said, "down there," do you know what she was

 9  referring to?

10  A.  She -- she took her finger and she pointed.

11  Q.  Where at?

12  A.  She pointed to her private part and said that, "It hurts

13  down there."

14  Q.  Did she say why?

15  A.  I asked her why.

16  Q.  What did she say?

17  A.  She said that, "It hurts" -- she said that, "It hurts down

18  there because Mr. Ali touched it."

19          THE COURT:  Next question.

20          MR. SHEPARD:  Okay.

21  BY MR. SHEPARD:

22  Q.  Did you ask her what she meant or ask her anything about

23  it?

24  A.  I asked her, I said, "M.R., what are you talking about?"

25  She said Mr. Ali touched her, "all the way down there and it

Case 1:15-cr-00073-TWP-DML Document 448 Filed 12/12/16 Page 15 of 190 PageID #42

1  really hurts.  And Mommy said that I can't take a bubble bath

2  no more because it's going to hurt worse."

3  Q.  What did you do after she told you that?

4  A.  I asked her again.  I said, "M.R., what are you talking

5  about?"  She just pointed, and she said it again.

6  Q.  Did you tell any of the other teachers?

7  A.  I told the secretary.

8  Q.  Who is that?

9  A.  Ms. Chiana.

10 Q.  Eventually did you ask Mr. Al-Awadi about it?

11 A.  I told her to go and get him for me.

12 Q.  And did she?

13 A.  Yes.

14 Q.  What happened when Mr. Al-Awadi came?

15 A.  He came in and he sat down on the floor.

16 Q.  Did you tell him what M.R. had said?

17 A.  I said, "M.R., tell him what you just told me."  And she

18 said it again.

19 Q.  What was Mr. Al-Awadi's reaction?

20 A.  He was calm.

21 Q.  Did he say anything or do anything?

22 A.  He picked her up and sat her on his lap and said, "M.R.,

23 no, thank you."

24 Q.  What was M.R.'s reaction?

25 A.  She just looked at me and she got back on the floor.

GRAHAM - CROSS/THOMAS                    Vol. 2-157

1  Q.  Did he leave the room shortly thereafter?

2  A.  Then he got up and left the room.

3  Q.  Did you ask M.R., after he left the room, anything?

4  A.  I couldn't -- I couldn't talk.

5  Q.  Eventually, do you remember giving a statement?

6  A.  Ms. Heidi came in and told me to write a statement of what

7  was said.

8        MR. SHEPARD:  Your Honor, we pass the witness for

9  cross-examination.

10        THE COURT:  Okay.  You may cross-examine the

11  witness, Mr. Thomas.

12        MR. THOMAS:  Thank you.

13                   **CROSS EXAMINATION**

14  BY MR. THOMAS:

15  Q.  Ms. Graham, you were asked specifically on direct

16  examination if M.R. had complained about pain before lunch,

17  right?  And your immediate response was, "No," right?  "No,

18  she hasn't complained before."  That's what you told us today

19  in court, right?

20  A.  Sure.

21  Q.  That's not correct, is it?

22  A.  I don't remember.

23  Q.  Okay.  Well, do you remember giving a -- this statement

24  that you've looked at of the day after this incident, when you

25  spoke to Detective McAllister?  Do you remember that?

1  A.  Yes.

2  Q.  Okay.  Do you think you remembered what happened the day

3  before when you talked to Detective McAllister?

4  A.  I remember some of it, but then I can't remember.  I try

5  hard to block it out so I won't remember.

6  Q.  I understand.  But the day after, you remembered what

7  happened, right?

8  A.  Yes.

9  Q.  And, in fact, there were three separate times that you

10  told Detective McAllister that she had complained about that

11  it hurt to pee in the morning, specifically around 11:30,

12  right?

13  A.  Yes.

14  Q.  And you don't -- you told him that three times.  Do you

15  remember that now?

16  A.  Yes.

17  Q.  Now, do you remember what you told Detective McAllister

18  about the incident in the morning?

19  A.  No.

20          MR. THOMAS:  May I approach the witness, Your Honor?

21  May I approach the witness, Your Honor?

22          THE COURT:  What do you want to do?

23          MR. THOMAS:  I have her statement.  I would like to

24  give her a chance to refresh her memory.

25          THE COURT:  You may.

 1  BY MR. THOMAS:

 2  Q.  If you could, on page 8, starting here where it says,

 3  "Before that," if you could read that, from there down to

 4  there for me.  See if that refreshes your memory of the first

 5  time you mentioned that.

 6  A.  Read it right here?

 7  Q.  Yeah.  Just "Before" -- it starts with, "Before that."

 8  A.  "Before that" --

 9  Q.  You don't have to read it out loud.

10          THE COURT:  Just read it to yourself.

11          MR. THOMAS:  Just read it to yourself.

12          THE WITNESS:  Okay.

13  BY MR. THOMAS:

14  Q.  Does that refresh your memory as to what you told

15  Detective McAllister?

16  A.  Yes.

17          THE COURT:  Now, you need to return to the lectern.

18          Thank you.

19          MR. THOMAS:  Excuse me.  I need to take this with

20  me.

21  BY MR. THOMAS:

22  Q.  And the first time you mentioned the morning bathroom

23  break, what did you tell Detective McAllister?

24  A.  You said before the morning bathroom break?

25  Q.  About the morning bathroom break, would you just refresh

GRAHAM - CROSS/THOMAS                    Vol. 2-160

1   there?

2   A.   She went to the bathroom and she was taking too long.

3   Q.   She was actually in the bathroom, and you went into the

4   bathroom and said, "You're taking too long"?

5   A.   Yes.

6   Q.   And she said, "It hurts to pee"?

7   A.   Yes.

8   Q.   Now, Mr. Al-Awadi came in at 12:30, thereabouts, right?

9   A.   Right.

10  Q.   This was at 11:30, right?

11  A.   Right.

12  Q.   And now that you've refreshed your memory, do you remember

13  that --

14  A.   Yes.

15  Q.   -- happening?

16  A.   Yes.

17  Q.   To your knowledge, did Mr. Al-Awadi have any contact with

18  her prior to 12:30 that day?

19  A.   Not to my recollection, no.

20  Q.   You were in the class, right?

21  A.   Yes.

22  Q.   And you didn't say anything to Mr. Al-Awadi about, "Oh, by

23  the way, M.R. is complaining about pain," when he came in to

24  relieve you?  You didn't mention that to him, did you?

25  A.   No, I didn't.

1    Q.  In fact, you didn't mention that to anybody, right?

2    A.  No, I didn't.

3    Q.  At that point, did you think it was a big deal?

4    A.  Telling them, a male, that about a little girl, no.

5    Q.  No.  Did you -- did you think the fact that she --

6            MR. SHEPARD:  She can answer the question.

7            THE COURT:  Yeah, she can answer the question.

8            MR. THOMAS:  Well, she -- I think she did, but --

9            THE COURT:  Did you finish your answer?

10           THE WITNESS:  I guess so.  I tried to.

11           THE COURT:  Okay.  All right.

12   BY MR. THOMAS:

13   Q.  Okay.  It was a poorly worded question, ma'am.  Did you --

14   not about telling Mr. Al-Awadi.  You've already told us you

15   didn't do that.

16   A.  Right.

17   Q.  Did you think it was a big deal that she had reported that

18   it hurts when she pees at 11:30?  Did you think that was

19   important?

20   A.  It's important -- yes, it was important, yes.

21   Q.  You didn't report that to anybody, though?

22   A.  No.

23   Q.  And that was a different instance than the one you've

24   talked about where she came back in the room and sat down and

25   said, "It hurts to pee"?  That was the second time she told

1   you that, right?

2           THE COURT:  Can you answer out loud?

3   A.  Yes.  Sorry.

4           THE COURT:  Thank you.

5           MR. THOMAS:  Excuse me, Your Honor.  I left my notes

6   over here.  Sorry.

7           THE COURT:  Sure.

8   BY MR. THOMAS:

9   Q.  When you came back in the room, you sat down on the floor,

10  right?

11  A.  Yes.

12  Q.  That's not unusual, is it?

13  A.  It's usual.

14  Q.  Yeah.  That's nothing that you wouldn't do to interact

15  with the children, sit down, story time, whatever?

16  A.  Yes.

17  Q.  To your knowledge, had M.R.'s mother been at school that

18  day, on the 21st?

19  A.  No.

20  Q.  And you mentioned that in addition to saying, "It hurts

21  down there.  Mr. Ali put his fingers down all the way,"

22  immediately after that, in the same sentence, she said, "Mommy

23  said I can't have bubbles in a tub because it's going to get

24  worse," right?

25  A.  Yes.

GRAHAM - CROSS/THOMAS                    Vol. 2-163

1   Q.  She said that immediately?

2   A.  Yes.

3   Q.  To your knowledge, she had not talked to her mother that

4   day at school, right?

5   A.  Correct.

6   Q.  Do you know what she was talking about when she said,

7   "Mommy says it's going to get worse"?

8   A.  Say that --

9   Q.  Do you know what she was talking about?

10  A.  She said it's going to get worse if she takes a bubble

11  bath.

12  Q.  And that's -- she told you that's what her mother had told

13  her before?  She didn't say when or where?

14          THE COURT:  Answer out loud.

15  A.  No.

16  BY MR. THOMAS:

17  Q.  But it wasn't that day at school, was it?

18  A.  No.

19  Q.  And do you recall, in your interview with Detective

20  McAllister, telling him about the incident in the morning with

21  pain three separate times?

22  A.  I don't remember.

23  Q.  Okay.

24  A.  I don't remember.

25          MR. THOMAS:  Your Honor, if I may approach the

1  witness for the purpose of recollection?

2          THE COURT:  You may.

3          MR. SHEPARD:  Your Honor, may we approach?

4          THE COURT:  Yes.

5          (Bench conference on the record.)

6          MR. SHEPARD:  I believe this question was asked and

7  answered earlier when he said, "Do you remember saying three

8  times about the pain?"  And she said, "Yes."

9          THE COURT:  Well, this is cross-examination, so I'm

10  going to let him ask the question.

11          MR. SHEPARD:  Okay.

12          THE COURT:  Okay.

13          MR. SHEPARD:  I believe he's already asked and had

14  it answered on cross, Your Honor.  The first time he refreshed

15  her, he went down through it and he asked about it being three

16  times, and she said, "Yes," at that point.

17          THE COURT:  He only -- I remember him just

18  refreshing on one.  Are you attempting to refresh on two other

19  statements?

20          MR. THOMAS:  It's a different question, Your Honor.

21  I'm asking her specifically if she remembers telling the

22  detective three separate times.  The purpose, obviously, is --

23          THE COURT:  And she says, no, she doesn't recall.

24          MR. THOMAS:  She says, "I don't remember three

25  different times."  I'm just going to have to point out the

GRAHAM - CROSS/THOMAS          Vol. 2-165

1  other two times to refresh her memory of how many times she

2  told him that.

3          THE COURT:  I'll allow that.

4                  (Open court.)

5          THE COURT:  You may continue.  You may --

6          MR. THOMAS:  Thank you, Your Honor.

7          THE COURT:  -- refresh the witness' recollection.

8  BY MR. THOMAS:

9  Q.  Now, start on page 16 and into page 17, if you could.

10 Starting here and down to, say, here, if you could.

11         Are you finished?

12 A.  Yes.

13 Q.  After looking at that, does that refresh your memory about

14 the second time that you told Detective McAllister about the

15 incident in the morning with pain?

16 A.  Yes.

17 Q.  Okay.

18 A.  Yes.

19 Q.  And now, if you would, look to page 18.  And starting

20 about here, on down to here, if you could read that for me.

21         And did you have a chance to read that?

22 A.  Yes.

23 Q.  Did it refresh your memory?

24 A.  Yes.

25 Q.  So -- so, ma'am, now that you've had a chance to refresh

1  your memory, would you agree that you told Detective

2  McAllister three different times about an incident -- the

3  incident where she said it hurt to pee around 11:30?

4  A.  Yes.

5  Q.  You came back at around 1:30, right?

6  A.  Yes.

7  Q.  And at that point, Mr. Ali -- or Mr. Al-Awadi left the

8  room?

9  A.  Yes.

10 Q.  Now, you talked about Mr. Al-Awadi saying, "No, thank

11 you," to M.R.  Is that -- that's something that you all are

12 told to do or trained to do with the kids, right?  When they

13 say, "No," that you correct them and say, "No, thank you,"

14 right?

15 A.  Yes.

16 Q.  All right.  And so that's kind of common at the school,

17 when a child says, "No," you correct the child by saying, "No,

18 thank you"?  That's pretty common, isn't it?

19 A.  It's pretty common.

20 Q.  Okay.

21 A.  But that's not the only thing that we say.

22         MR. THOMAS:  That's nonresponsive, Your Honor.

23         THE COURT:  She can answer the question.

24 BY MR. THOMAS:

25 Q.  I'm sorry?

1  A.  I said, we say it more than just, "No, thank you," but

2  that's common that we do say that.  But we say other things,

3  as well.

4  Q.  I'm sure you do.

5          THE COURT:  Now, you -- that's stricken from the

6  record.  That was not a question.

7          MR. THOMAS:  You're right, Your Honor.

8          THE COURT:  All right.  Next question.

9  BY MR. THOMAS:

10  Q.  Now, when -- when you -- your recollection is that you

11  told Chiana, the receptionist, to find Mr. Ali.  Do you know

12  how she found him?

13  A.  No, I don't.

14  Q.  Do you know what she said to him to have him come back to

15  your room?

16  A.  No, I don't.

17  Q.  But he showed up there?

18  A.  Yes.

19  Q.  And the accusation was made, again, in front of him,

20  right?

21  A.  Yes.

22  Q.  And he denied it, right?

23  A.  Yes.

24  Q.  He didn't just say, "No, thank you"; he said he didn't do

25  it, right?

GRAHAM - CROSS/THOMAS                    Vol. 2-168

1  A.  He said, "No, thank you."

2  Q.  Right.  And he denied it?

3  A.  If that's him denying it.

4  Q.  Okay.  Again, going back, do you recall your statement to

5  Detective McAllister, ma'am?

6  A.  Yes.

7  Q.  And do you remember what your answer was to the question,

8  "What did he say when he put her on his lap?"

9  A.  He told -- he told her, "No, thank you."

10  Q.  Do you remember what your answer was to Detective

11  McAllister?

12  A.  No.

13         MR. THOMAS:  Your Honor, may I approach the witness?

14         THE COURT:  You may.

15         MR. THOMAS:  12.

16  BY MR. THOMAS:

17  Q.  I'm going to ask you to look at page 12, after the

18  question, "What did he say when he put her on his lap?"  And I

19  ask you to read down to right there.

20  A.  Yes, I see it.

21  Q.  Okay.  Does that refresh your memory of what you told

22  Detective McAllister?

23  A.  Yes.

24  Q.  Because you told Detective McAllister that day that, in

25  addition to saying, "M.R., no, thank you," he said, "M.R., I

Case 1:15-cr-00023-TWP-DML Document 448-5 Filed 12/12/16 Page 28 of 190 PageID #: 55

GRAHAM - CROSS/THOMAS                    Vol. 2-169

1  didn't do that," right?

2  A.  Right.

3  Q.  You remember that now?

4  A.  Yes.

5  Q.  You mentioned that you got back at 1:30ish and you talked

6  to Chiana at about 2:30.  Would that be right?

7  A.  Afterwards.

8  Q.  So an hour passed before you were able to tell Chiana

9  about it, right?

10  A.  Yes.

11  Q.  And in that time, did M.R. go to sleep?

12  A.  No.

13  Q.  Did E.C. ever go to sleep?

14  A.  No.

15  Q.  Does he ever go to sleep?

16  A.  No.

17  Q.  He was right there -- his mat was right beside M.R.'s,

18  right?

19  A.  Right beside me.

20  Q.  Right.  And his mat, I guess, was right beside M.R.'s when

21  they took a nap?  They were in the same area, right?

22  A.  Correct.

23  Q.  And when you came in and sat down, E.C. was the other

24  child that you sat down with?

25  A.  Yes.

GRAHAM - CROSS/THOMAS                    Vol. 2-170

 1  Q.  So, presumably, he was there, awake, the entire time that

 2  Mr. Al-Awadi was there, right?

 3  A.  Correct.

 4          MR. SHEPARD:  Objection, calls for speculation.  She

 5  wasn't in the room.

 6          THE COURT:  All right.

 7          MR. THOMAS:  I think it does.  I'll withdraw the

 8  question.

 9          THE COURT:  Why don't you withdraw the question.

10  BY MR. THOMAS:

11  Q.  He was awake when you left and he was awake when you got

12  back?

13  A.  Yes.

14  Q.  And your experience with him is that he didn't sleep at

15  nap time?

16  A.  Right.

17  Q.  And prior to that, you hadn't seen Mr. Al-Awadi do

18  anything improper with any of the kids, right?

19  A.  No.

20  Q.  Did you see Mr. Al-Awadi any more that day after he became

21  aware of this accusation?

22  A.  Yes.

23  Q.  He stayed at school, right?

24  A.  Yes.

25          MR. THOMAS:  No other questions.  Thank you.

1      THE COURT:  Do you have any redirect for the

2  witness?

3      MR. SHEPARD:  Yes, Your Honor.

4      THE COURT:  You may.

5      MR. SHEPARD:  Sorry, Your Honor.

6                    **REDIRECT EXAMINATION**

7  BY MR. SHEPARD:

8  Q.  Ms. Graham, Mr. Thomas asked if you remembered telling

9  Detective McAllister multiple times, I think three times, if

10 M.R. had complained of pain.  Do you remember him asking you

11 that?

12 A.  Yes.

13 Q.  Okay.  Did you also tell Detective McAllister that you had

14 asked M.R. about what she said about Mr. Al-Awadi multiple

15 times?

16 A.  Yes.

17 Q.  And do you remember he said that her statement was

18 consistent?

19 A.  Yes.

20 Q.  Was it consistent?

21 A.  Yes.

22 Q.  Multiple times?

23 A.  Yes.

24 Q.  And did you tell that to Detective McAllister, also?

25 A.  Yes.

GRAHAM - REDIRECT/SHEPARD          Vol. 2-172

1   Q.  Counsel asked if you had ever seen Mr. Al-Awadi do

2   anything inappropriate with any of the kids.  Do you remember

3   that?

4   A.  Yes.

5   Q.  Had you heard about him doing --

6            MR. THOMAS:  Objection.

7   BY MR. SHEPARD:

8   Q.  -- anything inappropriate?

9            MR. THOMAS:  Objection, Your Honor.

10           THE COURT:  Let's approach.

11           (Bench conference on the record.)

12           MR. THOMAS:  Your Honor, he knows this calls for

13  hearsay.  And asking the question is making an improper

14  implication that there is something.

15           MR. SHEPARD:  It's an invited response to his

16  question on direct, Your Honor -- or on cross.

17           THE COURT:  Well, it would call for hearsay.  Don't

18  you agree?  The response would call for hearsay --

19           MR. SHEPARD:  I think it's --

20           THE COURT:  -- unless you have an exception?

21           MR. SHEPARD:  I don't think it's necessarily offered

22  for its truth.  It's offered for, has she heard?  What is it?

23           THE COURT:  I'll sustain the objection.

24                      (Open court.)

25           THE COURT:  The objection is sustained.  Next

1   question.

2   BY MR. SHEPARD:

3   Q.  You talked a little bit about, "No," and, "No, thank you."

4   Do you remember talking about that with Mr. Thomas?

5   A.  Yes.

6   Q.  All right.  You said, "'No, thank you,' that's not usually

7   all we say."  What else -- what other types of things do you

8   say?

9   A.  "That's not right," "Don't do that," or, "Let's do

10  something else."

11  Q.  He asked if you were taught to say, "No, thank you."  Do

12  you remember him asking you that?

13  A.  Yes.

14  Q.  Are you taught to say, "No, thank you," if you've just

15  been accused of molestation?

16          MR. THOMAS:  Objection, Your Honor.  That calls for

17  speculation.

18          MR. SHEPARD:  Your Honor, I don't know how it calls

19  for speculation.  I'm asking her specifically if she --

20          THE COURT:  I'll overrule.  She can answer it.

21  BY MR. SHEPARD:

22  Q.  Are you taught to say, "No, thank you," if a child accuses

23  you of molestation?

24  A.  No.

25          MR. SHEPARD:  Can I have just a moment, Your Honor?

1    (Off the record.)

2        MR. SHEPARD:  No further questions, Your Honor.

3        THE COURT:  Any follow-up?

4        MR. THOMAS:  Briefly, Your Honor.

5                    **RECROSS-EXAMINATION**

6    BY MR. THOMAS:

7    Q.  Ma'am, were you taught what to say at all when someone

8    accuses you of molestation?  Was that part of your training?

9    A.  No.  You're taught a lot of things.  There's a lot of

10   things that you go by by the handbook --

11   Q.  And --

12   A.  -- but saying, "No, thank you," I don't think that you're

13   taught to say, "No, thank you."  You're taught to say whatever

14   is right.

15   Q.  Okay.  So are you telling me that in your handbook,

16   there's a section that says, here's the appropriate response

17   if you're accused of molestation?

18   A.  I don't remember the handbook, reading the handbook.

19   Q.  In fact, nobody ever told you what the appropriate

20   response would be -- was for being accused of molestation,

21   correct?

22   A.  Correct.

23   Q.  In fact, when you heard about the accusation, you said

24   your response was to freak out, right?

25   A.  I did freak out.

GRAHAM - RECROSS/THOMAS              Vol. 2-175

 1   Q.  And you were asked on redirect about M.R. referring to

 2   pain at 11:30.  I mean, it was that, "It hurts to pee," right?

 3   That was her specific complaint?

 4   A.  Yes.

 5          MR. THOMAS:  That's all.  Thank you.

 6          THE COURT:  Okay.  Anything further for this

 7   witness?

 8          MR. SHEPARD:  No, Your Honor.

 9          THE COURT:  All right.  Is she released from

10   subpoena?

11          MR. SHEPARD:  Yes, Your Honor.

12          THE COURT:  All right.  You may be excused.  Thank

13   you.

14          THE WITNESS:  Thank you.

15          (Witness excused.)

16          THE COURT:  And you may call your next witness.

17          MR. SHEPARD:  The government would call Heidi

18   Conces, Your Honor.

19          THE COURT:  Ma'am, if you would come right around

20   this way and right over here to the witness stand.  And if you

21   would remain standing and raise your right hand.

22          (The witness is sworn.)

23          THE COURT:  You may have a seat.

24          You may examine your witness, Counsel.

25          MR. SHEPARD:  Thank you, Your Honor.

1    **HEIDI CONCES, PLAINTIFF'S WITNESS, SWORN**

2    <u>**DIRECT EXAMINATION**</u>

3    BY MR. SHEPARD:

4    Q.  Would you please state your name and spell it for the

5    record?

6    A.  Spell it, as well?

7    Q.  Yes, please.

8    A.  Heidi Conces, C-O-N-C-E-S.

9    Q.  And where do you live?

10   A.  Greenfield, Indiana.

11   Q.  How long have you lived there?

12   A.  Almost my whole life.

13   Q.  What do you do for a living?

14   A.  I'm an academic advisor at a college.

15   Q.  How long have you been there?

16   A.  A year.

17   Q.  What did you do before that?

18   A.  I was the assistant director.

19   Q.  Where at?

20   A.  Children's Choice Learning Center, or Bright Horizons.

21          MR. SHEPARD:  Please display Exhibit 1.

22          THE WITNESS:  Is this the one that's open?

23   BY MR. SHEPARD:

24   Q.  It's on your monitor.

25   A.  Oh, okay.

1   Q.  Do you recognize that?

2   A.  I do.

3   Q.  What is that?

4   A.  That's the daycare.

5   Q.  Is that the one you were just talking about?

6   A.  Yes.

7   Q.  How long were you the assistant director?

8   A.  A year.

9   Q.  What -- did you have any positions before that?

10  A.  I was the kindergarten teacher for two years.

11          MR. SHEPARD:  Please display Exhibit 2.

12  BY MR. SHEPARD:

13  Q.  Do you recognize that?

14  A.  Yes.

15  Q.  What is that?

16  A.  That's the kindergarten classroom.

17  Q.  How are we seeing the kindergarten classroom right now?

18  A.  From the front doors as if you were walking into the

19  classroom.

20          MR. SHEPARD:  And please display 65.

21  BY MR. SHEPARD:

22  Q.  What are see seeing here?

23  A.  That's the side.  So as we walk in, that's the side that's

24  to the -- if you're walking directly in, it's what's to the

25  left of you when you walk into the classroom.

CONCES - DIRECT/SHEPARD                    Vol. 2-178

1  Q.  Here, is that the front door you were talking about

2  earlier?

3  A.  Yes, sir.

4  Q.  And this little thing right here, remember that, okay?

5  A.  Sure.

6        MR. SHEPARD:  Go back to Exhibit 2, please.

7  BY MR. SHEPARD:

8  Q.  Is that the same?

9  A.  Yes.

10 Q.  Okay.

11       MR. SHEPARD:  66, please.

12 BY MR. SHEPARD:

13 Q.  Is that that same little bookcase we've been talking

14 about?

15 A.  It is.  And then that table is what you see to the right

16 when you walk into the classroom.  And that's the window to

17 the outside.

18 Q.  And 67?

19 A.  That's the back of the classroom.

20       MR. SHEPARD:  Okay.  Can we come back out?  I would

21 ask you -- can you just close the image?

22 BY MR. SHEPARD:

23 Q.  Take a look behind tab number 19.

24 A.  Going this way?  It's like on tab 60-something.  There we

25 go.  Okay.

CONCES - DIRECT/SHEPARD                    Vol. 2-179

1  Q.  Do you recognize what's in 19?

2  A.  It's the setup of the classroom.

3  Q.  Is it an accurate description or drawing of the classroom

4  as you remember it?

5  A.  Absolutely.

6        MR. SHEPARD:  All right.  Your Honor, I would ask

7  that 19 be admitted.

8        THE COURT:  Any objection to 19?

9        MR. THOMAS:  Judge, I'm sorry.  My 19 in my booklet

10 appears to be blank.  If I could see hers for just a second.

11       No objection to 19.

12       THE COURT:  Government's Exhibit 19 is admitted into

13 evidence without objection.

14                    (Government's Exhibit 19 was

15                     received in evidence.)

16       MR. SHEPARD:  And could you display 19.

17 BY MR. SHEPARD:

18 Q.  Is that the -- when you were talking about the front door,

19 is that what's right there?

20 A.  Yes.

21 Q.  And then kind of the -- that bookshelf we were using as a

22 point of reference?

23 A.  Yes.

24       MR. SHEPARD:  Put 19 down.

25 BY MR. SHEPARD:

*CONCES - DIRECT/SHEPARD*                    Vol. 2-180

1  Q.  Did you have a student at the daycare named M.R.?

2  A.  Yes, we did.

3          MR. SHEPARD:  Please display Exhibit 77.

4  BY MR. SHEPARD:

5  Q.  Do you recognize that girl?

6  A.  Yes.

7  Q.  Who is that?

8  A.  That's M.R.

9  Q.  Do you remember an employee named Ali Al-Awadi?

10  A.  I do.

11  Q.  Do you see him here anywhere in the courtroom today?

12  A.  I do.

13  Q.  Please identify him.

14  A.  He's right there.

15  Q.  There's two gentlemen here.  The one closest or furthest?

16  A.  The one with the green shirt.

17  Q.  Okay.  Thank you.

18          MR. SHEPARD:  Please let the record reflect she

19  identified the defendant.

20          THE COURT:  The record will so reflect.

21  BY MR. SHEPARD:

22  Q.  Were you the kindergarten teacher or the assistant

23  director in 2014?

24  A.  Assistant director.

25  Q.  Were you familiar with the staff and the employees in 2014

1  in your position?

2  A.  Absolutely.

3  Q.  Was Mr. Al-Awadi the only male teacher?

4  A.  Yes.

5       MR. SHEPARD:  If you can close the image.

6  BY MR. SHEPARD:

7  Q.  I want to talk about some general policies of the daycare

8  for a little bit.  Were the teachers allowed to have personal

9  cell phones in the classroom?

10 A.  No.

11 Q.  Were they allowed to take pictures with personal phones or

12 cameras in the -- back in the classrooms, of the students?

13 A.  Not their personal, no.

14 Q.  And would there have been any sorts of forms or things

15 that would have notified them of this policy?

16 A.  Yeah.  They sign it when they first are employed and they

17 do their employee packet.  They sign a paper of that.

18       MR. SHEPARD:  Can you please display Exhibit 22,

19 page number 13.  And if you could magnify right there.

20       THE WITNESS:  You just circled the, "No purses."

21       MR. SHEPARD:  Hold on.

22 BY MR. SHEPARD:

23 Q.  What does that say?

24 A.  "No purses, bags, cell phones allowed in the classrooms."

25       MR. SHEPARD:  Can you back out?  And -- you know

CONCES - DIRECT/SHEPARD               Vol. 2-182

1  what I'm getting at.  Down.

2  BY MR. SHEPARD:

3  Q.  What's this part of the form?

4  A.  It's the -- it explains to them the three offenses that

5  they get for having their cell phones in the classroom.

6  Q.  Are they fired on the first offense?

7  A.  They are not.

8  Q.  Second offense?

9  A.  They are not.

10  Q.  Third offense?

11  A.  They are.

12  Q.  Is it the third or the fourth?  I ask you to take a look

13  at the --

14  A.  It depends on the offense of what they're using the phone

15  for.  Typically it's the fourth, but it just depends on what

16  we've found with the cell phone.  We don't have the right to

17  actually go through their cell phone, but it just really

18  depends on the discretion of the director.

19  Q.  Okay.  So are you telling us that there's things that are

20  worse that you could be doing with a cell phone than others?

21  A.  There is.  There is if you got caught with it.  So we

22  actually would -- if we were catching you taking pictures of

23  the kids, that obviously is a worse offense than if you were

24  just using your cell phone to call in the classroom.  So it

25  really depends on the severity of the offense; but also to --

1  I guess, when we call the first offense, that would be your

2  counsel, not a write-up.  So that's kind of where we're

3  getting the three offenses and you're fired.

4  Q.  The first time you're just told to knock it off?

5  A.  Yeah.  Basically, it's just a conversation.  There's no

6  paper written, there's no -- it's just a conversation between

7  directors.  Once it gets to the second offense, we begin to

8  write them up.  And there's a form for each step.

9  Q.  Okay.  You mentioned --

10        MR. SHEPARD:  Oh, please back out of this.  And

11  right down there.

12  Q.  Do you recognize the signature?

13  A.  I do.

14  Q.  Whose signature?

15  A.  Ali Al-Awadi.

16        MR. SHEPARD:  Thank you very much.  You can clear

17  this exhibit.

18  BY MR. SHEPARD:

19  Q.  What did Ali Al-Awadi do at the daycare?

20  A.  He started off as a floater, if you will, or a part-time

21  person in our pre-K room.  He was in there for quite a while.

22  He did cover breaks in our kindergarten room, and with the

23  older kids.  Especially as the kids moved up from the pre-K to

24  the kindergarten room, they already knew him, so if we had a

25  lunch break or a teacher was out for the day, we would use him

1  as a sub in there.

2          About after he had been there about a year, we had a

3  couple employees that left the EPS, or the two-year-old room,

4  and he asked if he could go to the two-year-old room to work

5  in there.  So in 2014, he was actually the assistant teacher

6  in the EPS, or two-year-old room.

7  Q.  At any time during the course of his employment, if you

8  can remember, was Mr. Al-Awadi cautioned about use of a cell

9  phone?

10 A.  No.  I never had to call him to the office for it.

11 Q.  Was he cautioned about picking up students who could walk?

12 A.  Yes.

13 Q.  Was he told not to do it?

14 A.  Yes.

15         MR. THOMAS:  Objection.  These are all leading, Your

16 Honor.

17         THE COURT:  Rephrase.

18         MR. SHEPARD:  Okay.

19 BY MR. SHEPARD:

20 Q.  Did you ever have to caution Mr. Al-Awadi about anything?

21         MR. THOMAS:  Objection.  It's still a leading

22 question.

23         THE COURT:  Overruled.  She may answer.

24 BY MR. SHEPARD:

25 Q.  What were those?

1   A.   What were the cautions I had to give him?

2   Q.   Yeah, uh-huh.

3   A.   Basically just picking up especially the older kids.

4   There was a specific incident with one of our girls in the

5   kindergarten classroom where her parents were there.  They

6   didn't make a complaint, but I saw him pick up one of the

7   five-year-olds in the classroom.  And when he picked her up,

8   she wrapped her legs around him, and they kind of swung around

9   together.

10          The parents didn't say anything, but I took it upon

11  myself, once the parents left with the child, to talk to him

12  and explain to him that our policy in the daycare is, if a

13  child is walking, we only pick them up if they're injured or

14  if something has happened to them, and especially in the sense

15  of a five-year-old child that is able to communicate and walk,

16  clearly, on their own.

17  Q.   Was he ever cautioned about anything else?

18  A.   I do know that we had one of our employees in the EPS

19  classroom had a concern about him taking a female child to the

20  bathroom himself and sitting the females in his lap.  That was

21  never something that I don't -- that went to our director, but

22  the teacher that was in the classroom did speak to him about

23  it, came to me and let me know she spoke to him about it,

24  feeling uncomfortable.

25  Q.   Okay.  Do you remember an event that led to Mr. Al-Awadi's

1  termination?

2  A.  Yes.

3  Q.  Do you remember when that was?

4  A.  It was August of 2014.  I believe it was the 21st.

5  Q.  Okay.  Do you have a good memory of that day?

6  A.  Absolutely.

7  Q.  How did the day begin?

8  A.  It was hectic.  We were shorthanded.  Our director was

9  out.  We had a couple people that called in sick, so we were

10  pretty shorthanded with the staff, but we handled it.  We had

11  the daycare going and everything was pretty, you know, smooth

12  once we got the day going, but it was a little hectic to start

13  off with.

14  Q.  Okay.  I know I heard you say something about the director

15  was gone.  Was anyone else gone that day?

16  A.  We had a couple of educators out.  The kindergarten

17  teacher was not there, which would be why Tyria Graham was the

18  teacher in the room for the day.  She typically worked in

19  pre-K, but we -- again, if you worked in pre-K, we would use

20  you to sub in the kindergarten classroom just because the kids

21  were already familiar with them.

22  Q.  So is it fair to say daycares are pretty regulated by the

23  State?

24  A.  Absolutely.

25  Q.  Is there something called ratios?

1  A.  Yes.

2  Q.  What's a -- what is -- just generally, what's a ratio?

3  A.  It's the amount of kids that you can have compared to the

4  teacher.

5  Q.  All right.  On that day, was it difficult to keep ratio

6  with everyone being out?

7  A.  It depended.  In the morning, not so much.  In the

8  afternoon, it does, because you have -- we -- it was a daycare

9  center that was open until 8:00 p.m.  So when we had the

10  hiccup between 3:00 and 4:30 when our second set of employees

11  came in, that would be where it was really hectic, because we

12  had employees out for the day, so we did kind of have to shift

13  everybody around.

14  Q.  Typically, do you try and have two educators in a room at

15  a time?

16  A.  In every room we did, except for the kindergarten room.

17  Q.  Were you able to -- why not in the kindergarten room?

18  A.  Because the kindergarten room only had 11 kids to one

19  teacher, and that was the ratio.  And we could never go over

20  that, because the room couldn't hold more than 11 kids.  So we

21  didn't have to have two teachers in the classroom.

22  Q.  What was Al-Awadi doing that day?

23  A.  He was in the twos room most of the day.  And then, when

24  it was time for lunch breaks, Chiana at the front desk does

25  the lunch break schedule, and she had asked him to do the

1   kindergarten's lunch break.

2   Q.  Who was teaching the kindergarten class that day?

3   A.  Tyria Graham.

4   Q.  Do you remember what time Mr. Al-Awadi gave Tyria a lunch

5   break -- or that's a badly worded question.  Strike that.

6           Do you know from when to when Mr. Al-Awadi was in

7   the kindergarten room?

8   A.  It was either 12:00 to 1:00 or 1:00 to 2:00.  That was the

9   two times that we did lunch in the kindergarten room.  It just

10  depended if Ali did his lunch break first or she did hers

11  first.

12  Q.  When did you -- or did something happen that day?

13  A.  Yes.

14  Q.  Okay.  When did you first become aware that something had

15  happened?

16  A.  Around 3:30 p.m.

17  Q.  How did you become aware something had happened?

18  A.  Chiana, our front secretary, came to me.

19  Q.  And what did she tell you?

20  A.  Well, originally, she had said to me that she had

21  something to talk to me about.  And I pulled her to the side

22  and she had let me know that Ms. Tyria had come to her and had

23  said that M.R. had complained that it hurt to pee --

24          MR. THOMAS:  Your Honor, I'm going to object to the

25  hearsay nature of the answer.

1      MR. SHEPARD:  I'm not offering it for its truth,

2  Your Honor.

3      THE COURT:  I'll overrule.  You may continue your

4  answer.

5      MR. SHEPARD:  Go ahead.

6  A.  Okay.  Chiana had come to me and said that Tyria had said

7  M.R. had said it had hurt to pee, and that when she asked M.R.

8  about it, M.R. had said that Ali had touched her on her

9  private areas.

10 BY MR. SHEPARD:

11 Q.  And as a result of that, did you do anything?

12 A.  I did.  I spoke with M.R. first and then I spoke with

13 Tyria.

14 Q.  When you spoke with M.R., did she say something similar?

15 A.  She did.  I first asked her -- well, first I just asked

16 her how her day was going.  I tried to make her feel like she

17 wasn't in trouble.  And I just asked her, because she was

18 crying, I said, "M.R., what's wrong?"  And I said, "What's

19 going on?"

20      And she said, "Well, when I went to the bathroom, it

21 hurt to pee."

22      And I said, "It did?"  I said, "Well, why is it

23 hurting to pee?"

24      And she said to me, she said, "Mommy said that I

25 can't have bubble bath anymore because it makes it hurt to

1  pee."

2          And I said -- I said, "Oh, is that what Mommy said?"

3          And she said, "Yes.  I told that to Mr. Ali."

4          And I said, "M.R., what did Mr. Ali say to you?

5          And she said, "He told me not to tell anybody, that

6  I should -- that I need to tell the truth."

7          And I asked her, I said, "M.R., what do you need to

8  tell the truth about?"

9          And she said, "Mr. Ali put his fingers down there."

10 Q.  And what did she mean by "there"?

11 A.  Her vagina.

12 Q.  What did you do as a result of hearing this from M.R.?

13 A.  I immediately called our director.

14 Q.  Why did you call your director?

15 A.  That's the chain of command.  One, I had never handled

16 that type of situation, and our policy is to go through the

17 chain of command when it's a severe incident like that.

18 Q.  Okay.  Were you seeking direction?

19 A.  Absolutely.

20 Q.  Did you receive any?

21 A.  Yes.

22 Q.  What were you told to do?

23 A.  I was told to take statements from each of the people

24 involved.  And then I was told to, as soon as I could get Ali

25 out of ratio, to take him out of ratio, take his statement,

Case 1:15-cr-00073-TWP-DML Document 148-5 Filed 12/12/16 Page 50 of 190 PageID #:77

1  and have him leave the building.

2  Q.  Did you take a statement from Ms. Graham?

3  A.  I did.

4  Q.  Were you asked to provide your own statement?

5  A.  I was.

6  Q.  How long did it take you to, if you remember, get Mr. Ali

7  out of ratio?

8  A.  It was probably 45 minutes, half an hour to 45 minutes,

9  before anybody could go in there.

10  Q.  So if you first found out about it, I believe you told us

11  3:30, approximately what time were you talking to Mr. Ali?

12  A.  About 4:45, after I took the statements of everybody else.

13  He was the last statement that I took.

14  Q.  Prior to you calling -- had he ever come up and said

15  anything about it?

16  A.  No.

17  Q.  Did you tell him what M.R. had said?

18  A.  I didn't tell him exactly what she said, because I didn't

19  want to lead him into the statement.

20  Q.  What did you tell him?

21  A.  I told him that she had come to me and said that he had

22  inappropriately touched her.

23  Q.  Did he say anything?

24  A.  He was nervous.  He said that he -- he first off said to

25  me he knew what it was about.  He said he knew I was going to

1   come to him about it.  And I then asked him, I said, "Well, I

2   need you to tell me what happened."

3              He said that they were playing in the classroom.

4   She kept getting off the cot, jumping in his lap.  He would

5   put her back on the cot, she would jump back up.  And when he

6   had told her that she needed to lay down, he picked her up.

7   And when he picked her up, he said that she wrapped her legs

8   around his arm.  And when he pushed her off, she pinched her

9   vagina on his watch.

10  Q.  Were those his words?

11  A.  Those were his words.

12  Q.  He said, "pinched her vagina," on his watch?

13  A.  Yeah, those were his words.

14  Q.  You said he was nervous.  Was he flailing his arms or --

15  A.  No.

16  Q.  -- intonation changing?

17  A.  No.  You could just tell his demeanor, just -- you know,

18  not sitting still.  I could just tell his demeanor.  He had

19  been thinking about it for a while.

20  Q.  How quick were his answers to your questions?

21  A.  They were quick.

22  Q.  Did you ask him to draft a statement?

23  A.  I did.

24  Q.  Before he drafted it, did you tell him how important it

25  was to think about it and put everything in there?

CONCES - DIRECT/SHEPARD                Vol. 2-193

1  A.  I did.

2  Q.  I ask you to look in the binder behind tab 24.  Do you

3  recognize 24?

4  A.  Yes.

5  Q.  What is that?

6  A.  His statement.

7  Q.  Did you watch him fill it out?

8  A.  I did.

9  Q.  Does that look like substantially the same condition as it

10 was when he did it and gave it to you?

11 A.  Yes, sir.

12         MR. SHEPARD:  Move for the admission of 24.

13         THE COURT:  Any objection to 24?

14         MR. THOMAS:  Has 24 already been admitted as part of

15 another --

16         MR. SHEPARD:  I don't believe so.

17         MR. THOMAS:  -- another --

18         THE COURT:  No.

19         MR. THOMAS:  -- exhibit?  One of the first exhibits?

20         THE COURT:  No.  Let's see.

21         MR. THOMAS:  Not as number 24, but this letter.

22         THE COURT:  No.  20, 21, 22 are in.  24 is not in.

23         MR. THOMAS:  I understand.  My question is, the

24 letter itself, was it contained in one of the earlier

25 exhibits?

 1          MR. SHEPARD:  I don't believe it was in the business

 2   records, if that's what you're asking.

 3          MR. THOMAS:  Yeah.  My recollection is that it's

 4   already been admitted as part of the business records, but --

 5          THE COURT:  Do you object to 24?

 6          MR. THOMAS:  But I don't object to 24.

 7          THE COURT:  24 is admitted into evidence without

 8   objection.

 9                    *(Government's Exhibit 24 was*

10                    *received in evidence.)*

11          MR. SHEPARD:  Please display 24.

12   BY MR. SHEPARD:

13   Q.  Ms. Conces, could you take a minute and just read that?

14   It may be easier to read the -- tell me when you're done.

15   A.  I don't have to read it too much.  I've read it quite a

16   few times.

17   Q.  Is there anywhere in that statement that he mentions using

18   his cell phone to take pictures?

19   A.  He did not.

20   Q.  Anywhere in that statement where he mentions M.R.

21   complaining of an injury that he thought he had to document?

22   A.  Nope.

23   Q.  Would it be appropriate for a -- or, excuse me.  Let me

24   back up.

25          Would one of your -- would it be all right or

CONCES - DIRECT/SHEPARD                    Vol. 2-195

1  allowed under your policies for any one of your employees to

2  use their personal phones to document an injury?

3  A.  No.

4  Q.  That's something he would have been told?

5  A.  Absolutely.

6  Q.  What did you do next?  After he wrote the statement, what

7  did you do next?

8  A.  I placed him on administrative leave.

9  Q.  And then was he escorted out of the building?

10 A.  He was.

11 Q.  Do you recall about what time that would have been?

12 A.  Around 5:20.

13 Q.  Were the parents ever notified prior to him -- or, excuse

14 me, prior to M.R. being picked up that night --

15 A.  They were not.

16 Q.  -- about the incident?  They were not?

17 A.  Uh-uh.

18 Q.  Why not?

19 A.  Because we had Mr. Ali still in the building, and our

20 director had told me that she was getting with the regional

21 director to make sure we followed the steps through.  I took

22 it upon myself not to tell the parents yet, because when they

23 picked up, Ali was still in the building.  And I felt it was

24 my job to protect my kids and my parents from the situation,

25 and I was not sure how the dad would react had he found out at

CONCES - DIRECT/SHEPARD                    Vol. 2-196

1   that exact moment.

2   Q.  Did -- were the parents ever notified by anyone at the

3   daycare before they called?

4   A.  No.

5   Q.  Now, what do I mean when I say, "before they called"?

6   A.  The parents called the daycare.  I had already left.  It

7   was probably 6:45, 7:00ish when they called the daycare and

8   spoke with Kim Jones.

9   Q.  And at that time, did they -- had they found out what had

10  happened?

11  A.  Yes.

12  Q.  And who's Kim Jones?

13  A.  She would be our educational coordinator.

14  Q.  Okay.  Did she call you after that?

15  A.  She did.

16  Q.  Did she -- is it fair to -- how did she describe the mood

17  of the parents?

18  A.  They were upset.  I mean, they were extremely upset.

19  Q.  Do you recall around what time this would have been?

20  A.  It was 6:30, 6:45.  I was driving home.  I live an hour

21  from the daycare, and I was not quite home yet.  I was on

22  Mount Comfort, so it had to be 6:45ish.

23  Q.  What did you do after that?

24  A.  I pulled over on the side of the road.  There's a little

25  church right there.  And I called Jennifer, our director, and

1  I demanded that she call the parents and that she handle the

2  situation, because I did not want the parents to feel like we

3  neglected to take it seriously.

4  Q.  Did you stay with the daycare very long afterwards?

5  A.  Just about a month.

6  Q.  Okay.  How did your employment end?

7  A.  I resigned.

8       MR. SHEPARD:  If I could just have a moment, Your

9  Honor?

10       THE COURT:  You may.

11       (Off the record.)

12 BY MR. SHEPARD:

13 Q.  One last question, or maybe one last question.  Were you

14 aware, at any time in that time period, of any nicknames or

15 special names that Mr. Al-Awadi referred to M.R. as?

16 A.  No, sir.

17       MR. SHEPARD:  No further questions, Your Honor.

18       THE COURT:  Okay.  Mr. Thomas, you may cross-examine

19 the witness.

20       MR. THOMAS:  Thank you, Your Honor.

21                    **CROSS EXAMINATION**

22 BY MR. THOMAS:

23 Q.  Ma'am, I want to start with that first conversation that

24 you had with M.R.  The first thing you asked her was how her

25 day was going and she said okay?

CONCES - CROSS/THOMAS          Vol. 2-198

1  A.  Uh-huh.

2  Q.  And when you asked her the question -- after she said, "It

3  hurts," you asked some follow-up questions, right, to try to

4  find out something about --

5  A.  Yeah.  I asked her why she was saying it hurt.

6  Q.  Right.  And you asked her if it hurt last night or when

7  she went home, right?

8  A.  Yeah.

9  Q.  And when you asked her about it hurting, she said, "Mommy

10 told me that I can't have any bubbles in the tub because

11 that's what's making it hurt to pee," right?

12 A.  Exactly.

13 Q.  That was her answer to that question?

14 A.  Yes.

15 Q.  Now, to your knowledge, had her mother been at the school

16 that day?

17 A.  I'm not sure who dropped off.  I came in after drop-off.

18 Q.  Well, after the children were dropped off, did you have

19 any information that her mother would have been at the school,

20 that she would have talked to her mother?

21 A.  No.

22 Q.  Would she have had a bubble bath at school?

23 A.  No.

24 Q.  And in addition to that, that's not all she said.  When

25 she said, "I can't have any bubbles in the bath because that's

1  what makes it hurt to pee," she then said, "But I told Mr. Ali

2  that"?

3  A.  Correct.

4  Q.  About it hurting to pee and about the bubble bath?

5  A.  Correct.

6  Q.  That's what she told you at that point?

7  A.  Uh-huh.

8  Q.  Okay.  Any discussion that she had with her mother about

9  that, you wouldn't know about?

10  A.  Nope.  They didn't say anything to us, no.

11  Q.  As far as you know, it didn't happen at school that day,

12  right?

13  A.  Correct.

14  Q.  Were you in the building, say around 11:30?

15  A.  I was.

16  Q.  Did Tyria come to you around 11:30 and tell you that M.R.

17  said it hurt to pee?

18  A.  She did not.

19  Q.  Would it have been policy that if a child in the classroom

20  had told the teacher, "It hurts to pee," is that something

21  that should be reported?

22  A.  It is.  Typically they do an accident report, and then

23  they would let us have the accident report.  Sometimes we do

24  the accident reports at the end of the day, so it doesn't

25  necessarily mean that she would right away.  Most of the

1  classrooms have a phone in them.  The kindergarten room

2  didn't.  So it would have to be when, you know, we all saw

3  each other.

4  Q.  Okay.  She never reported that to you?

5  A.  She did not.

6  Q.  In fact, every time a child complains of pain of any kind,

7  would you say that's reported every time that happens in the

8  classroom?

9  A.  No.  It depends on the severity of the pain.  If they're

10 just saying their belly hurts, we don't do an accident report.

11 Q.  It's clear the policy at the daycare was that no one would

12 have their cell phone, but that wasn't strictly enforced, was

13 it?

14 A.  No.  It was strictly enforced.

15 Q.  Do your --

16 A.  Do I think people had them?  Yes, but it was strictly

17 enforced.

18 Q.  Fair enough.  When you found out about it, there was a

19 procedure, right?

20 A.  Absolutely.

21 Q.  And it was pretty common that people got counseled for

22 having their cell phone, right?

23 A.  I wouldn't say it's common.

24 Q.  Well, it wouldn't be your testimony that Mr. Al-Awadi was

25 the only person that was ever -- ever had his personal cell

1  phone in the school, right?

2  A.  Sure.

3  Q.  And people didn't always follow that policy?

4  A.  Sure.

5  Q.  To your knowledge, did anyone ever get fired over having

6  their cell phone?

7  A.  Nope.

8  Q.  But they could have, right?

9  A.  They could have, yes.

10  Q.  And Mr. Al-Awadi was aware that telling you that he had

11  taken pictures for any reason with his cell phone would have

12  probably gotten him fired, right?

13  A.  Absolutely.

14  Q.  Now, M.R. told you that it hurt to pee, she told you that

15  Mr. Al-Awadi had touched her?

16  A.  Uh-huh.

17  Q.  And you didn't look at her injuries, did you?

18  A.  Absolutely not.

19  Q.  Because that's against the rules, right?

20  A.  Yes, it is.

21  Q.  And do you remember giving a statement to Detective

22  McAllister the day after this happened?

23  A.  I do.

24  Q.  Do you remember him being a little surprised about that?

25  A.  I do.

1  Q.  What do you remember about that?

2  A.  He was surprised because he felt like if she had an

3  injury, then it's something we should have made sure she

4  wasn't bleeding or that she was okay.  I explained to him that

5  Indiana State licensing policy, we don't check when it's

6  something like that.

7          We did have nurses that were there before.  They had

8  cut budget and taken the nurses.  They could have looked.

9  But, otherwise, it has to be done either with a parent present

10 or it has to be done with -- if we would take them over to the

11 hospital.  But it is never our policy that I would look at any

12 of the child's private parts, ever.

13 Q.  Well, he was pretty surprised about that and said, "What

14 do you mean?  The child is hurting."  The natural response

15 from a person would be, "I want to see if you're okay"?

16 A.  Absolutely.

17 Q.  But the rules were you can't do that, right?

18 A.  Absolutely.

19 Q.  Even if that might be your initial response, correct?

20 A.  Exactly.

21 Q.  So as a well-trained professional, even if your response

22 would be, "Let me see if you're okay," you know that you can't

23 do that?

24 A.  Exactly.

25 Q.  And if you did that, you would get fired, wouldn't you?

1  A.  Absolutely.

2  Q.  But if Mr. Al-Awadi had told you, "Yeah, when she told me

3  that it hurt, I looked at it to see if she was okay," that

4  would have gotten him fired on the spot?

5  A.  Yes, it would have.

6       MR. THOMAS:  Could I have a moment, Your Honor?  I

7  have a note that I left.

8       THE COURT:  Okay.

9       MR. THOMAS:  Thank you.

10  BY MR. THOMAS:

11  Q.  Is it safe to say that some of the parents were

12  uncomfortable with a man working at the daycare, would you

13  say?

14  A.  Yes.

15  Q.  And they expressed that at times?

16  A.  Yes.

17  Q.  But Mr. Al-Awadi was perfectly capable of working there,

18  right, under your policies?

19  A.  Absolutely.

20  Q.  And you made it clear in your prior statement that your

21  company didn't discriminate based on gender?

22  A.  Yep, we did not.

23  Q.  And that was kind of an important policy, wouldn't you

24  say?

25  A.  Absolutely, yes.

1  Q.  And Mr. Al-Awadi, prior to these accusations, he hadn't

2  done anything inappropriate with a child to cause you those

3  kinds of concerns, had he?

4  A.  Not me, personally, have those concerns; but, no, he had

5  not.

6  Q.  Well, who -- who had those concerns?  Nobody had those

7  concerns.

8  A.  Some of the parents had those concerns, yes.

9  Q.  Parents had concerns just in general that he's a man,

10 right?

11 A.  Yes.

12 Q.  Parents didn't have specific accusations about

13 inappropriate behavior?

14 A.  No.  A couple employees did not appreciate that he chose

15 to just take the females to the bathroom, especially in the

16 twos room.

17 Q.  Okay.  Who were the couple of employees?

18 A.  That would be Cathie.

19 Q.  Yeah.

20 A.  And I don't remember her last name.  I apologize.

21 Q.  Cathie Williamson?

22 A.  There you go.

23 Q.  Or Williams, I believe?

24 A.  She had concerns because she felt like he let the girls

25 sit in his lap, and she had concerns because she felt like he

1  preferenced taking the females to the bathroom.

2  Q.  Well, you talked to Detective McAllister about that the

3  day after this happened, right?

4  A.  Yes.

5  Q.  And you told him that her concern was for his own

6  protection, right?

7  A.  Absolutely.

8  Q.  Not that he had done anything inappropriate?

9  A.  Nope.  She did not feel like he had done anything

10  inappropriate.  She just felt like it did not look good for

11  Mr. Ali.

12  Q.  Right.  So the parents had concerns just in general?

13  A.  Yes.

14  Q.  And for his own protection, "Hey, maybe you should protect

15  yourself," right?

16  A.  Absolutely.

17  Q.  "Because you might be accused of something"?

18  A.  Absolutely.

19  Q.  And, in fact, you made it clear to him at that point that

20  he hadn't done anything wrong, right?

21  A.  At what point?  With Cathie or when he came into my office

22  for M.R.?

23  Q.  With Cathie.

24  A.  Yeah.  Well, yeah.  I never spoke to Ali about that

25  situation.  I only spoke to Cathie.

1   Q.  You spoke -- and there was no reason at all at that point

2   to make -- to write him up or to talk to him or punish him,

3   because he hadn't done anything wrong?

4   A.  Well, no.  I took Cathie's statement.  I gave it to our

5   director.  I was out of the center on Tuesday and Wednesday.

6   My son was moving into college.  It was my understanding that

7   she was to speak with Mr. Ali, which would be the first

8   counsel about that situation, just counseling him about the

9   feelings that, you know, Cathie had had in the classroom.  I

10  was not there, so I cannot tell you if the discussion or the

11  counsel ever took place.

12  Q.  And there was the prior incident with picking up G.F.,

13  right?

14  A.  Yes.

15  Q.  And, again, you made pretty clear previously that there

16  was nothing individually inappropriate about what he did?

17  A.  It was inappropriate.

18  Q.  And it's inappropriate -- it would have been inappropriate

19  for you to pick up a child?

20  A.  Yeah.  If they're walking, our policy is to not pick up a

21  child unless they're hurting.  So we're not going to pick them

22  up, swing them around, play with them that way.  So it would

23  have been inappropriate regardless of who picked the child up.

24  Q.  Not inappropriate in, like, a sexual way or anything like

25  that, right?

CONCES - CROSS/THOMAS                    Vol. 2-207

1  A.  I wouldn't say that, no.

2  Q.  Nobody accused him of that at the time?

3  A.  No.

4  Q.  In fact, you said at the time, "I know your intentions are

5  good"?

6  A.  Yeah.  I knew he was playing with her.

7  Q.  Right.  Again, you were more concerned seeing him pick up

8  the child as to how it looked?

9  A.  Exactly.

10 Q.  Do you keep records of how many people got write-ups for

11 cell phones?

12 A.  Yeah.  They would be in their files.

13 Q.  Can you give me an approximation as to how many people had

14 gotten write-ups for cell phones?

15 A.  I had only been doing it for a year.  I only personally

16 did three.

17         MR. THOMAS:  Just a moment, Your Honor.

18 BY MR. THOMAS:

19 Q.  Now, the conversation that you had with Mr. Al-Awadi was

20 about what time in the day?

21 A.  Around 4:30, 4:45.

22 Q.  And, to your knowledge, he had been at the school that

23 afternoon?

24 A.  Yes, other than his lunch break.  He left for his lunch

25 break.

1  Q.  The doors aren't locked there, right?

2  A.  They are.

3  Q.  From the outside or the inside?

4  A.  They are locked from the outside, not the inside.

5  Q.  So he could have left at any time in the afternoon?

6  A.  He could have.

7  Q.  And he also -- when you spoke to Mr. Al-Awadi about this,

8  he told you he didn't do it, right?

9  A.  He did.

10  Q.  And he seemed nervous and scared, right?

11  A.  He did.

12  Q.  The handbook, do you remember that?  Did you review that

13  during your employment there?

14  A.  I did.  At the time, Bright Horizons had just taken over

15  Children's Choice, so at the time our handbook was on-line.

16  We didn't have, like, a hand copy, but we did.  Each employee

17  had to go through the one on-line and sign that they had read

18  through it.

19  Q.  And there's a portion in the handbook -- we talked about

20  the personal cell phone, but there's also a section in there

21  about photographs and encouraging photographs of the children?

22  A.  Agreed.

23  Q.  And what -- how were those taken?

24  A.  We had what we called Baby Connect, which were iPads,

25  but they were only in the infant room, the ones and twos room.

1  In the preschool, pre-K, and kindergarten, they did not have

2  iPads.  They could take pictures of those to send them to the

3  parents throughout the day.

4          And we had classroom cameras that they checked out

5  of my office or Jennifer's office.  They could take pictures,

6  but they had to be returned by the end of the day.  It was

7  always understood and told that the cameras did not leave the

8  building for any reason.

9  Q.  And the purpose for taking those pictures -- what would

10 have been those purposes?

11 A.  We -- well, the Baby Connect is the mom, the infants.

12 They like to see in case they miss that first step or whatever

13 they were doing at the daycare.  Some of the pictures that we

14 took, we had boards outside of the classrooms.  That was all

15 about their day.  So they could take the pictures and put the

16 pictures up to show the work that they had done, along with

17 the documentation.

18 Q.  Right.  How long have you been in -- well, at the time

19 of -- in 2014, how long had you been in childhood education?

20 A.  15 years.

21 Q.  And if you remember, at around that time, how long had

22 Mr. Al-Awadi been in childhood education?

23 A.  A year.  Just about a year.

24 Q.  How long was his training period?

25 A.  They have two weeks in the -- when they first start in the

1   classroom, where they work with an educator.  They're never

2   left alone in the room.  That may be different in the evening

3   just if they -- you know, they were down in numbers and had

4   four or five and we felt they could handle it.  But during the

5   day when the class is full, for two weeks you're with an

6   educator.

7            And we do -- we did weekly -- let me take that back.

8   We did biweekly staff meetings.  And, typically, I wouldn't

9   call it necessarily like individual training, but we did

10  trainings as a group and spoke about the different policies of

11  the center.

12  Q.  So two weeks.  It's your clear recollection today that

13  when Cathie came to you with her concerns, that she told you,

14  clearly, she did not think Mr. Ali had done anything wrong?

15  A.  Yes.

16           MR. THOMAS:  No other questions.  Thank you.

17           THE COURT:  Do you have any redirect?

18           MR. SHEPARD:  Yes, Your Honor.  Can I have just a

19  moment?

20           THE COURT:  You may.

21           (Off the record.)

22                     **REDIRECT EXAMINATION**

23  BY MR. SHEPARD:

24  Q.  Ms. Conces.

25  A.  Yes.

```
 1   Q.  What was your demeanor like when you were interviewing
 2   Mr. --
 3             MR. THOMAS:  Objection to relevance, Your Honor.
 4             THE COURT:  Well, let's hear the question.
 5             MR. SHEPARD:  Thank you, Your Honor.
 6             THE COURT:  I'm not sure what the question is.
 7   BY MR. SHEPARD:
 8   Q.  How were you acting when you were interviewing
 9   Mr. Al-Awadi?
10             MR. THOMAS:  I object to the relevance of her
11   demeanor.
12             MR. SHEPARD:  He's brought up a lot of times trying
13   to insinuate he had fear of losing her job -- or losing his
14   job.  I'm trying to get how the witness was acting.  Was she
15   threatening his job?  Was she doing anything like that?
16             THE COURT:  All right.  I'll overrule --
17             MR. THOMAS:  He can't testify, Your Honor.
18             THE COURT:  He cannot testify, but I will overrule
19   the objection.  She may answer the question.
20             THE WITNESS:  Can you repeat your question, please?
21   BY MR. SHEPARD:
22   Q.  Certainly.  What was your demeanor during the talk that
23   you had with Mr. Al-Awadi?
24   A.  I was professional, just as I'm talking to you right now.
25   Q.  Did you ever threaten his job?
```

1  A.  I did not.

2  Q.  In fact, did you tell him how important it was to say

3  everything --

4          MR. THOMAS:  Object to the leading question, Your

5  Honor.

6  BY MR. SHEPARD:

7  Q.  Did you tell him anything about saying everything?

8  A.  I did tell him it was important that -- I told him it was

9  important that we put everything in the statement, especially

10 because he had not come and told me earlier in the day.  And I

11 explained to him anytime anything like that happens going

12 forward, the importance of him coming forward and letting us

13 know the situation happened.  And I explained to him that I

14 needed fully what happened in his statement.

15 Q.  Did he say anything at all about his cell phone?

16 A.  He did not.

17 Q.  Anything at all about pictures?

18 A.  He did not.

19 Q.  Were you talking about something serious at that time?

20 A.  Absolutely.

21 Q.  Talking about his job or a potential crime?

22 A.  Both.

23 Q.  And you mentioned that Ms. Graham didn't come up and

24 report it?

25 A.  No.

1  Q.  Was Ms. Graham ever accused of touching her

2  inappropriately?

3  A.  She was not.

4  Q.  Who was the only one?

5  A.  Mr. Ali.

6  Q.  You mentioned about the incident with        G.F.      and

7  then the incident with Cathie Williamson.  Do you remember

8  that?

9  A.  Correct.

10  Q.  Do you remember saying that you didn't feel that it was

11  sexual; inappropriate, but not sexual?

12  A.  Yes.

13  Q.  Did those happen before or after the incidents with M.R.?

14  A.  Before.

15  Q.  Would you possibly have looked at it differently --

16          MR. THOMAS:  Objection.  Calls for speculation at

17  this point.

18          THE COURT:  Let's hear the --

19          MR. SHEPARD:  I'll withdraw the --

20          THE COURT:  Okay.  I didn't --

21          MR. SHEPARD:  I'll withdraw the question, Your

22  Honor.

23          THE COURT:  All right.

24          MR. SHEPARD:  No further questions.

25          THE COURT:  Anything on those questions, Mr. Thomas?

 1              MR. THOMAS:  No, Your Honor.

 2              THE COURT:  May this witness be released from

 3   subpoena, Government?  Do you need her?

 4              MR. SHEPARD:  Your Honor, we would like to hold her

 5   under subpoena.

 6              THE COURT:  All right.  Do you want to keep her here

 7   in the building?

 8              MR. SHEPARD:  No, Your Honor.

 9              THE COURT:  All right.  Ma'am, you are excused for

10   today, but you're still under subpoena.  So if they need you

11   back, they will call you, okay?

12              THE WITNESS:  Okay.  Thank you very much.

13              THE COURT:  All right.  Thank you.

14              (Witness excused.)

15              THE COURT:  And we're going to go ahead and take our

16   morning break.  Ladies and gentlemen, we'll give you about 15

17   minutes.  No deliberation, no discussion, and we'll come back

18   in 15 minutes.

19              THE COURTROOM DEPUTY:  All rise.

20              (Jury out at 10:53.)

21              THE COURT:  Okay.  We are in recess.

22              (Recess at 10:54, until 11:16.)

23              THE COURT:  We are back on the record.  Are you

24   ready with your next witness?

25              MR. SHEPARD:  We are.  I do have just a question so

*CONCES - REDIRECT/SHEPARD*          Vol. 2-215

1   we can ease the Court in the next break.  It's going to be

2   Detective McAllister, and he's going to be up there for quite

3   a while.  Is there any particular timeframe the Court would

4   like me to shoot for for an actual break?

5              THE COURT:  If you want to go until -- it's 11:16.

6   Go to maybe 12:30?  That will be good.  We'll have lunch from

7   12:30 to 1:30.

8              MR. SHEPARD:  I will try my best to find a break

9   right around there, or if there's a break coming close, I'll

10  let the Court know.

11             THE COURT:  Sounds good.  Are you ready for the

12  panel?

13             MR. SHEPARD:  Yes, Your Honor.

14             THE COURT:  Defense ready?

15             MR. THOMAS:  Ready, Judge.

16             THE COURT:  You may bring in the jury.

17             (Jury in at 11:17.)

18             THE COURT:  You may be seated.

19             And, Witness, if you would remain standing and raise

20  your right hand.

21             (The witness is sworn.)

22             THE COURT:  You may have a seat.

23             And as soon as he's comfortable, Counsel, you may

24  examine your witness.

25             MR. SHEPARD:  Thank you, Your Honor.

Case 1:15-cr-00073-TWP-DML Document 448-5 Filed 12/12/16 Page 75 of 190 PageID #: 4385

1    **ELI McALLISTER, PLAINTIFF'S WITNESS, SWORN**

2    <u>**DIRECT EXAMINATION**</u>

3    BY MR. SHEPARD:

4    Q.  Could you please state your name and spell your last name

5    for the record?

6    A.  Eli McAllister, M-C-A-L-L-I-S-T-E-R.

7    Q.  And how are you employed?

8    A.  I am with the Indianapolis Metropolitan Police Department.

9    Q.  What's your position?

10   A.  I'm a sergeant.

11   Q.  And is that a recent --

12   A.  Since January of this year.  Yes, sir.

13   Q.  What are you a sergeant in?

14   A.  I'm a patrol sergeant on the southwest side of

15   Indianapolis.

16   Q.  What were you before you were a patrol sergeant?

17   A.  I was a detective within the child abuse unit.

18   Q.  And did you switch to patrol when you were promoted to

19   sergeant?

20   A.  Yes, sir.

21   Q.  How long were you a detective in the child abuse unit?

22   A.  Six and a half years.

23   Q.  How many child molest cases do you think you investigated

24   over that time?

25   A.  Well, total cases per year ended up being anywhere from 50

Case 1:15-cr-00073-TWP-DML Document 448 Filed 12/12/16 Page 76 of 190 PageID #: 4386

1  to 70 cases.  And we investigate child molest or sexual abuse

2  of children as well as neglect and physical abuse of children,

3  so I'm going to guess maybe 30 to 40 cases a year of child

4  molest over six years, six and a half years.

5  Q.  Did you have any training in that area?

6  A.  Yes.

7  Q.  And did that include training into how to interview

8  children witnesses?

9  A.  Yes.

10  Q.  Things to look for?

11  A.  Yes.

12  Q.  Are there things called verbals and nonverbals?

13  A.  Sure.  There's verbal communication and nonverbal

14  communication.

15  Q.  And are those important in cases involving victims, or

16  alleged victims, as young as four years old?

17  A.  Yes.  It can be important in any aspect of human

18  communication, yes, sir.

19  Q.  Were you the investigating officer in this case?

20  A.  Yes.  I was the detective assigned the case.

21  Q.  Okay.  Now, I want to just talk about something real fast

22  before we get into the full narrative.  You've been in here

23  the entire time; is that correct?

24  A.  Yes, sir.

25  Q.  And you just saw the examination and cross-examination of

1   Heidi Conces; is that a fair statement?

2   A.  Yes.

3   Q.  Your reactions to some of the things that Heidi said was

4   characterized --

5              MR. THOMAS:  Object.  I'm sorry.  I'll let him

6   finish the question.

7              THE COURT:  You may finish your question.

8   BY MR. SHEPARD:

9   Q.  -- as being shocked.  Do you remember hearing that?

10              MR. THOMAS:  Objection to the relevance of his

11   reaction to the testimony, Your Honor.

12              MR. SHEPARD:  Do you want to approach?

13              THE COURT:  Sure.

14              (Bench conference on the record.)

15              MR. SHEPARD:  Your Honor, he's setting up for close

16   to use the fact that, as he characterized, Detective

17   McAllister was shocked they didn't have anyone document her

18   injury or take her anywhere.  Detective McAllister has a

19   completely different account of how that happened, why those

20   questions were asked, and why it's relevant as to other

21   places.

22              It also goes to multiple things that Mr. Thomas said

23   in opening, as well as the cross-examination, about various

24   avenues of investigation that were not done by IMPD.  He's

25   going to talk about -- where I'm going with this is, he's

1  going to talk about why those questions were asked, why it's

2  important, and he's going to refute that he was shocked that

3  they hadn't taken her or looked at her injury themselves.

4          THE COURT:  Okay.

5          MR. THOMAS:  I guess I understood the question about

6  asking him about what -- about her reactions.  I mean, if he

7  wants to ask him about his investigation, fine, but my

8  understanding from the question was that he was asking about

9  whether she -- his reaction to her being shocked.

10         THE COURT:  No.  It was --

11         MR. SHEPARD:  I said it was his characterization of

12 him being shocked.

13         THE COURT:  Right.  It's whether or not the

14 detective was shocked, was the question.

15         MR. THOMAS:  Well, I think he can ask the detective

16 all he wants about his investigation, but --

17         THE COURT:  Well --

18         MR. THOMAS:  -- I object on the form of the question

19 as to relating to what she said.

20         THE COURT:  Okay.  Yeah.  You kind of opened the

21 door and you brought in evidence that he was shocked.  So he

22 can clarify that.

23         MR. THOMAS:  I understand that.  I --

24         THE COURT:  I don't think he's talking about -- and

25 he can testify as to her demeanor, also, but I think your

1 question was, was the detective actually shocked?

2          MR. THOMAS:  Well, if that -- I don't think it was

3 asked that way, but if that's the question, I have no

4 objection.

5          THE COURT:  Okay.

6                    (Open court.)

7          THE COURT:  All right.  The objection is withdrawn,

8 and you may answer the question.  Do you remember the

9 question?

10          MR. SHEPARD:  I'm going to ask it again.

11          THE WITNESS:  Sure.  Please.

12 BY MR. SHEPARD:

13 Q.  Do you remember having your reaction being characterized

14 as shocked by what you heard from Ms. Conces?

15 A.  I remember at one point specifically my reaction to the

16 fact that no one on the daycare staff physically examined M.R.

17 being that I was surprised.  He may have said shocked, I don't

18 remember that, but just that I was surprised that no one had

19 examined her when she disclosed what she said.

20 Q.  Can you tell us about your remembrance of that

21 conversation and how you reacted and why you did what you did,

22 why you asked what you asked?

23          MR. THOMAS:  That's a compound question at this

24 point, Judge.

25 BY MR. SHEPARD:

Case 1:15-cr-00023-TWP-DML Document 448 Filed 12/12/16 Page 80 of 190 PageID #07
4390

1  Q.  Why don't you just tell us how you recall that

2  conversation going.

3  A.  So I actually began by asking what the policy or procedure

4  of the daycare was when a child was hurt or injured at the

5  daycare, and asking Ms. Conces to fill me in on that.  I think

6  I asked her at least twice what the procedure was when a child

7  notified anyone on daycare staff that they had been hurt, and

8  asking what that procedure was.

9          And she told me what the policy was that was in

10  place and what they were supposed to do when someone, a child,

11  was hurt.  I then went on to ask her about the -- if there was

12  any -- since we were located within a hospital campus, if

13  there was any medical personnel on staff or inside the

14  building working at that time.  She told me there wasn't.

15          I also asked them what their policies and procedures

16  were as far as obtaining medical assistance or notifying

17  parents when a child was hurt or injured in any way or when a

18  child told the daycare staff that they were hurt or said they

19  had pain or were hurting somewhere.

20          My next question had to do with --

21          MR. THOMAS:  Your Honor, I'm going to object at this

22  point to --

23          THE COURT:  Narrative form?  Next question.

24  BY MR. SHEPARD:

25  Q.  What was the next thing you asked her about?

1  A.  About their procedures and policies as far as notifying

2  parents and notifying DCS and notifying law enforcement.

3  Q.  Did you ever express surprise at their policies?

4  A.  I think any surprise that was expressed on my part during

5  that conversation was at the lack of notification to DCS or

6  notification of the parents, or the failure of any medical

7  assistance being offered or provided to the child that had

8  disclosed she was in pain and hurting.

9  Q.  Did you ever suggest that they should have taken off her

10  pants and looked?

11  A.  No.  I did ask if anyone had checked or looked at M.R.,

12  but I didn't suggest that anyone should have done that.

13  Q.  Now, why is that an important question for you to ask?

14  A.  For a number of reasons.  One of the things to keep in

15  mind is that my investigation wasn't solely into what Mr. Ali

16  Al-Awadi may or may not have done at the daycare that day, but

17  also part of my investigative responsibility is into how the

18  daycare responded and if there was any neglect on the part of

19  the daycare staff.  So I needed to know how they responded.

20  And the limited information I had had up to that point caused

21  me some concern, so I was exploring that topic with them.

22  Q.  Would it also be important for you to know who else may

23  have touched or looked at the child for exclusion purposes,

24  where you needed to interview next?

25  A.  Yes, absolutely.  It's important for me to know who may

1  have performed any exam or may have looked at the child.  And

2  so that was one of the questions I asked her after that.

3  Q.  How did you become involved with this case?

4  A.  Within the child abuse unit, we -- we don't have enough

5  detectives to cover 24 hours, seven days a week, 365 days a

6  year.  We work typically Monday through Friday, 8:00 to 4:00,

7  and so we have an on-call rotation.  On-call for us is 8:00

8  a.m. to 8:00 p.m. the following -- or, I'm sorry, 8:00 a.m. to

9  8:00 a.m. the following day, so a 24-hour period.  I was the

10 on-call detective on October -- or, I'm sorry, on August the

11 21st, 2014.  I got a page at, I think it was 1:51 a.m.  I got

12 a page to contact a police officer who was at St. Vincent

13 Hospital with M.R. and her parents.

14 Q.  Did you contact that officer?

15 A.  I called him on the phone with the number provided in the

16 page.

17 Q.  And I'm sorry.  What time was that again?

18 A.  1:51 a.m.  It was actually on the 22nd of August, but it

19 was still within my on-call period.

20 Q.  Will you just generalize the sum and substance of that

21 conversation?

22 A.  Well, once I woke up, I called him.  And he informed me

23 that he was there at the hospital with a four-year-old child

24 in the emergency department, along with the child's parents,

25 and that the child had disclosed that an individual at the

1  daycare had put their finger inside her vagina the day

2  previous, but that the parents had no information beyond

3  Mr. Ali as the identity of the individual who did that.

4  Q.  And what did you do as a result of that conversation?

5  A.  Well, I ensured that everything was -- that needed to be

6  done at the hospital was taking place, so I verified that the

7  child was having a forensic exam done by a forensic nurse

8  examiner.

9       I explored with the officer on-scene if we could

10  develop any further lead as to the identity of the individual

11  who had done it, and learned that the daycare was closed.

12  There was no one we could speak to at that time to pursue any

13  lead further in that regard.

14       And so I asked the officer who was there at the

15  hospital to instruct the parents to meet me at my office the

16  following morning at 9:00 a.m. so that I could have the child

17  interviewed and interview the parents and proceed with the

18  investigation from there.

19  Q.  Where was your office located in August of 2014?

20  A.  The IMPD child abuse office is located within the Marion

21  County Child Advocacy Center.  It's a multidisciplinary team

22  located at 4134 North Keystone Avenue.  It's just between --

23  on Keystone, North Keystone, between East 38th Street and Fall

24  Creek Parkway.  It's right near the state fairgrounds here in

25  Indianapolis.

1  Q.  Can you kind of describe a little bit more for the jury

2  what you mean by "multidisciplinary team" and what happens at

3  the Child Advocacy Center?

4  A.  So, as I mentioned before, the City doesn't have a ton of

5  child abuse detectives.  There's about eight to nine with

6  several supervisors.  So our offices are located in that

7  building, but there's also the adult sex crimes investigators

8  within IMPD.  And there may be about 15 of them and some

9  supervisors.

10         But then, aside from IMPD, we also have multiple

11 other agencies located within the same physical building,

12 primarily Department of Child Services, the state agency

13 responsible for investigating allegations of abuse and neglect

14 of children.  They have several hundred, if not more, staff

15 members within the building, including what they call the FCM,

16 or a family case manager.  They investigate the allegations of

17 abuse for DCS.  They also have their legal team.  They also

18 have their ongoing case managers that fulfill kind of a social

19 work function.

20         But then, in addition to that, we also have the

21 Marion County Prosecutor's office.  They have a presence in

22 the building.  They have three attorneys.  And, in addition to

23 that, we also have several child interviewers that also work

24 in the building.  And the concept behind it is so that --

25 because anytime you have --

1          MR. THOMAS:  Your Honor, this is an awfully long

2    answer.

3          THE COURT:  Go ahead and ask the next question.

4    BY MR. SHEPARD:

5    Q.  What's the concept behind this?

6    A.  That anytime you have an investigation into allegations of

7    child abuse and neglect, all these different agencies are

8    going to be interested and involved in the investigation.  And

9    so the best way to proceed with the investigation is to make

10   sure that all the parties are communicating with one another

11   and able to act in unison, so that you're not having one

12   person interview for DCS and someone else interview for, you

13   know, the police department, and duplicating efforts.  It's to

14   sort of unify and combine efforts and make sure we don't

15   interfere and get in each other's way, I suppose.

16   BY MR. SHEPARD:

17   Q.  Is it fair to say bring multiple expertises together to

18   collaborate, as well?

19   A.  That's true, yes.  Each of us has sort of a different

20   focus and emphasis that we bring to the table.  And it's an

21   attempt to make sure that everyone is able to achieve their

22   own, you know, professional goal or their role within the

23   situation.

24   Q.  Can you physically describe the building?  Is it -- does

25   it look like a police station or --

Case 1:15-cr-00023-TWP-DML Document 148 Filed 12/12/16 Page 86 of 190 PageID #: 4396

1   A.  No, not at all.  It's -- I think it's an old department

2   store, but it's a rather large building with kind of like a

3   cubicle land, tons and tons of gray cubicles all throughout.

4   There's a large waiting room up front.  And, also, we have a

5   smaller waiting room where children that are going to be

6   interviewed forensically can wait with their parents, as well.

7   Q.  Is there a playroom or anything like that on the premises?

8   A.  There are some toys in the front main lobby.  And there's

9   a great higher number of toys in that smaller space: video

10  games, books, puzzles, coloring books, all kinds of toys,

11  things like that in that waiting room where children are

12  waiting to be interviewed.

13  Q.  What's the purpose of having all that?

14  A.  Oftentimes the kids that come in there to be interviewed

15  have been through traumatic situations or have just left a

16  traumatic situation, and we try to give them something to

17  occupy their mind and keep them calm.  Plus, kids get, I don't

18  want to say destructive, but they can get into problems if

19  they're bored.  So if they're just sitting there on chairs by

20  themselves, it wouldn't be the most conducive environment to

21  having children wait.

22  Q.  And is that where the interviews with the family were to

23  take place?

24  A.  Yes.  Within that building, we have multiple different

25  areas that are designated for interviewing.

McALLISTER - DIRECT/SHEPARD          Vol. 2-228

1   Q.  Did the family come that morning?

2   A.  Yes.  I called them at 8:30 to make sure they were on

3   their way, and she showed up sometime shortly after 9:00.

4   Q.  What happened when they got there?  Did you learn the

5   identity of the four-year-old child?

6   A.  Yes.  I met the family and just briefly explained to them

7   the process that we were getting ready to undergo, which was

8   to start with an interview of M.R.

9   Q.  All right.  And so --

10          MR. SHEPARD:  Please display Exhibit 77.

11  BY MR. SHEPARD:

12  Q.  Who is that?

13  A.  That's M.R.

14  Q.  And then who else came with her?

15  A.  Her mother and her father.  Her mother is Miosotis

16  Rodriguez and her father is Justo Guevara.

17  Q.  The same two that testified yesterday?

18  A.  Yes, the exact same people.

19  Q.  You said the first process was M.R. was interviewed?

20  A.  Yes.

21  Q.  How does that interview take place?

22  A.  So I'm trained in interviewing children but, if and when

23  possible, I defer to have a full-time professional child

24  interviewer do the interview instead.  And there was one

25  available to do the interview for me that morning.  And so

1  when that happens, there's -- it's a child interview room, and

2  there are live monitoring cameras that both relay it to a

3  monitor in an observation room nearby, but also record the

4  interview.  And so I was able to sit in the observation room

5  and watch the interview live as it was happening.

6  Q.  Do you remember about when the interview started?

7  A.  I feel like it was maybe around 9:30.  I remember 9:30,

8  9:00 a.m. stands out, but sometime around 9:30.

9  Q.  Was there a break taken at some point?

10 A.  The interview was concluded after a period of time, and I

11 moved on to interview M.R.'s parents.  And the

12 multidisciplinary team, together, decided that there were just

13 two things that we wanted to follow up with and ask M.R.

14 further about, and so about two hours after we initially

15 concluded the interview, the same child interviewer in the

16 exact same room spoke to M.R. again.

17 Q.  Do you remember how long about that -- how long the

18 interview continued?

19 A.  I don't remember.  I think it was in between 15 to 20

20 minutes.  I think the initial interview was around 20 minutes.

21 I'm just --

22 Q.  And did you live watch this continuation?

23 A.  Yes.  I watched both parts of the interview.

24 Q.  Okay.  I would ask you to look at Exhibits 42 and 43.  If

25 you would display those to the defense counsel, as well.

Case 1:15-cr-00073-TWP-DML Document 148 Filed 12/12/16 Page 89 of 190 PageID #16

1          What are 42 and 43?

2   A.  They're compact disks that contain the video file of the

3   recording of each of those parts of the two interviews that I

4   just talked about.

5   Q.  And did you personally view what was on those two CDs?

6   A.  Yes, to make sure that was exactly what was on there.

7   Q.  And it was a true and accurate copy of the interview that

8   you witnessed?

9   A.  Yes.

10  Q.  Did you do anything after you watched the CDs to make

11  certain it was the same one?

12  A.  Oh, yes.  I signed my name and put the date on there, on

13  the actual disk itself.

14  Q.  Is the content of those two interviews important to you in

15  formulating how to go about your investigation?

16  A.  Yes.  We often refer to the child interview as sort of the

17  foundation of the investigation.  That is assuming that the

18  child is old enough to speak, which sometimes they're not.

19  But if and when you have a child old enough to talk, yes, it's

20  very important.

21  Q.  And was it the foundation of the investigation in this

22  case?

23  A.  Yeah.  Sure.

24          MR. SHEPARD:  Okay.  Your Honor, I would move for

25  the admission of Exhibits 42 and 43.

1     MR. THOMAS:  No objection to 42 or 43.

2     THE COURT:  Government's Exhibits 42 and 43 are

3   admitted into evidence without objection.

4                    *(Government's Exhibits 42 and 43 were*

5                    *received in evidence.)*

6     MR. SHEPARD:  Please bring up 42.

7   BY MR. SHEPARD:

8   Q.  What are we seeing here, Detective McAllister?

9   A.  That is the child interview room where M.R. was

10  interviewed the morning of August the 22nd.

11  Q.  And what happens for approximately the first ten minutes

12  of this video file?

13  A.  Nothing.  We like to have the camera running the entire

14  time that the child is in the room, so that we're not missing

15  anything or that we couldn't be accused of hiding anything of

16  what's said or done in the room.  So we turn the camera on

17  before the child enters the room.  And sometimes that's a

18  little too early.

19         So in this case, it was about ten minutes before the

20  the child entered the room with the interviewer.  At the very

21  beginning, the interviewer comes in and says a few things just

22  to introduce the recording as far as the name of the

23  interviewer, the name of the child, the case number, the

24  detective involved, things like that.

25  Q.  Are there any questions asked of the interviewee at that

1  time?

2  A.  No.  She wasn't in the room until roughly ten minutes

3  after the --

4          MR. SHEPARD:  Can you skip ahead to when they both

5  come into the room and play from there?

6          (Video playing in open court.)

7          MR. SHEPARD:  Can you pause it?

8  BY MR. SHEPARD:

9  Q.  Who is this?

10  A.  That is M.R.

11          MR. SHEPARD:  And just play ahead a little bit.  We

12  lost the other person.  Now, please pause it.

13  BY MR. SHEPARD:

14  Q.  And who is this?

15  A.  That's the forensic child interviewer that assisted that

16  morning.  Her name is Jessica Woodall.

17  Q.  What's the purpose of a forensic interview?

18  A.  It's simply to obtain a statement from the child, find

19  out what the child says in any given situation.  Sometimes we

20  do it for victims of sexual abuse, sometimes we do it for

21  victims of physical abuse.  We've had instances where children

22  here in Indianapolis have been witnesses to the murders of

23  their parents or family members, for example.  We'll do it

24  when they're a witness, as well.

25  Q.  Is it important to try and get an interview in every case?

1  A.  If the child can speak and can tell you what happened,

2  absolutely.

3          MR. SHEPARD:  Please go ahead and play the file.

4          (Video playing in open court.)

5          THE COURT:  Can you turn up your volume?

6          MR. SHEPARD:  I think it has to be done from up

7  there, Your Honor.

8          THE COURT:  Tanesa, do you control the volume?

9          Can you hear, ladies and gentlemen?  They can't

10  hear.  They can't hear.

11          MR. SHEPARD:  Can you pause it?

12          THE COURT:  Tanesa, do you control volume?  Tanesa

13  has got it up as high as it goes over here, so you guys need

14  to turn it up on your computer.

15          MR. SHEPARD:  I think that's as high as it goes,

16  Your Honor.

17          THE COURT:  That's as high as it goes?  Okay.

18          MR. SHEPARD:  Everyone just try real hard.  Lean

19  into the -- if I can stand on crutches, you all can lean into

20  the screen.

21          THE COURT:  I don't think the sound comes out of the

22  screen.  Okay.  Go ahead.

23          MR. SHEPARD:  Please go ahead and play.

24          (Video playing in open court.)

25          THE COURT:  Some mics are too close together?  Okay.

 1  Let's try it again.

 2            (Video playing in open court.)

 3  BY MR. SHEPARD:

 4  Q.  Was that the end of the first portion of the interview?

 5  A.  Yes.

 6  Q.  What happened after that?

 7  A.  Jessica escorted her back to the waiting room, the smaller

 8  one with all the toys and games that I described earlier.  I

 9  left the observation room and went up to that lobby and got

10  M.R.'s mother, Miosotis, and took her back to an interview

11  room, an adult interview room, and completed a recorded

12  statement, took a statement from her.

13  Q.  All right.  Was that similar to the testimony that the

14  jury already heard?

15  A.  Yes.

16  Q.  Was her father there?

17  A.  Not in the interview room with -- interview room with her

18  mother and I.  He was in the waiting room.

19  Q.  I'm sorry.  But he was there at the center?

20  A.  Yes, he was at the Child Advocacy Center, yes.

21  Q.  Was he interviewed, as well?

22  A.  Yes.  I interviewed him after I completed the interview of

23  Miosotis.

24  Q.  How did that interview take place?  He doesn't speak very

25  good English.

1  A.  Yeah.  I believe we had an interpreter there.  I can't

2  remember who it was at the moment, but --

3  Q.  Now, do you recall, during their cross-examination, lots

4  of questions about if you had ever -- if they had ever viewed

5  those videos, if you had ever showed them the videos?  Did you

6  ever show them the videos of M.R.'s interview?

7  A.  No.  They've never seen the interview, the video recorded

8  interview of M.R.

9  Q.  And is that something that you would ever do in your

10 investigations?

11 A.  In the six and a half years I've done this, I never showed

12 the parent a video of the child interview.

13 Q.  After the parents were interviewed, was there a decision

14 made to continue the interview of M.R.?

15 A.  Yes.  The multidisciplinary team -- including myself, DCS,

16 and the prosecutor and the child interviewer -- wanted to do a

17 follow-up on the original interview, because after Jessica

18 Woodall left the interview, she realized that she had left

19 some key components out that she typically tries to cover in

20 the interview.

21 Q.  And what were those?

22 A.  Two things in particular.  The diagram that she placed on

23 the easel where M.R. circled the little -- the circle where

24 she said Mr. Ali touched her.  Typically, they go through and

25 identify multiple body parts on that diagram and complete what

1  they call a body safety interview, basically have the child

2  identify each different body part and then ask if anyone ever

3  touched them on any other part of their body, things like

4  that.

5  Q.  And what was the other point?

6  A.  The other thing that they often try to do is, if a child

7  does disclose that someone has touched them somewhere on their

8  body, they try to follow up also by asking if anyone else has

9  ever touched them on any of those parts of the body.

10        Typically they go through and identify a large

11  number of body parts and ask them if there's any part of the

12  body they don't want someone to touch.  And then they will

13  either circle or make some note of which body parts they don't

14  want someone to touch.  And then they will go through and ask

15  if anyone touched them there.  If the child discloses that

16  they did, like I said earlier, they will follow up by saying,

17  "Has anyone else touched you on one of these parts of your

18  body?"

19  Q.  And why would those questions be important?

20  A.  Just to make sure that we're not missing something or that

21  there wasn't someone else that might have been involved or

22  caused -- or done whatever it is that caused us to be there.

23  Q.  Was it discussed why that wasn't done in the first

24  interview?

25  A.  Yes.

1  Q.  And why was it not done?

2  A.  Because, as the video shows, the child almost immediately

3  went into describing what Mr. Ali specifically did to her.

4  And she didn't have a chance to kind of go through the typical

5  protocol she would normally follow.

6  Q.  And in the continuation, did they go through that

7  protocol?

8  A.  Yes.  That was the point of her doing the follow-up, so

9  she could go through those two.  And she did.

10          MR. SHEPARD:  Can you please display Exhibit 43.

11  BY MR. SHEPARD:

12  Q.  What are we seeing here?

13  A.  I am not seeing anything.  When the sound went out before,

14  my video feed died.

15  Q.  Oh.  Does everyone have video feed?

16  A.  It looked like everyone else was watching the screen, but

17  I --

18          THE COURT:  Are your video screens working, ladies

19  and gentlemen?  Is it working, Tanesa?

20          THE WITNESS:  It just did that for a little bit and

21  then went blank.

22          MR. SHEPARD:  Your Honor, maybe we ought to break.

23          THE COURT:  Do you want to go to lunch break?

24          MR. SHEPARD:  Well, if we're having technical

25  problems, those could be fixed.

1            THE COURT:  All right.  We'll go ahead and take our

2   lunch break, ladies and gentlemen.

3            You call the tech people.

4            All right.  We're going to adjourn for your lunch

5   recess.  The Court is going to admonish you, ladies and

6   gentlemen, you are not to have any discussion about the case

7   among yourselves or with anyone else.  Remember not to read or

8   listen to any news accounts regarding this matter.  No

9   research or anything on social media.

10           If anyone should attempt to talk to you about the

11  matter, please refuse and report that attempt to your bailiff

12  at your earliest opportunity.  Under this admonishment, we'll

13  be in recess until 1:00 p.m.  Enjoy your lunch.

14           THE COURTROOM DEPUTY:  All rise.

15           (Jury out at 12:08.)

16           THE COURT:  Okay.  We'll get someone here from IT

17  and see if they can get the screen working.

18           MR. SHEPARD:  We'll stay until we can make certain

19  it's up and running.

20           THE COURT:  Well, why don't you come back early,

21  because -- be back in -- can you come back in about half an

22  hour?  We'll have somebody here by then.

23           MR. SHEPARD:  Yes, Your Honor.  Thank you.

24           THE COURT:  All right.  We're in recess.

25           (Recess at 12:09, until 1:11.)

1          THE COURT:  Government, are you ready for the jury?

2          MR. SHEPARD:  Yes, Your Honor.

3          THE COURT:  All right.  Witness, you can come on

4   back to the stand.

5          And, Mr. Thomas, are you ready for the jury?

6          MR. THOMAS:  I am ready.

7          THE COURT:  All right.  Tanesa, you may bring the

8   panel in.

9          (Jury in at 1:12.)

10         THE COURT:  We are back on the record.  The United

11  States of America versus Ali Al-Awadi.  Ladies and gentlemen,

12  good afternoon.  I hope that you had a pleasant lunch.  We

13  have all of the equipment working and we are back on the

14  record.

15         And, Witness, you are still under oath.

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  You may continue with your direct

18  examination of the witness, Mr. Shepard.

19         MR. SHEPARD:  Please display Exhibit 43.

20         THE COURT:  Is it working?

21         THE WITNESS:  It's just facing a little bit outward

22  now.  Can I turn it without -- okay.

23  BY MR. SHEPARD:

24  Q.  What are we seeing here, Detective McAllister?

25  A.  It appears to be the beginning of the second part of the

Case 1:15-cr-00023-TWP-DML Document 148-5 Filed 12/12/16 Page 99 of 190 PageID #: 4409

1  interview with M.R.

2  Q.  Is that the same room?

3  A.  The same room.

4  Q.  What's up here?

5  A.  That is a date and time stamp.

6  Q.  Is that in military time or is that a.m./p.m.?

7  A.  I -- I mean, you can't tell at 11:00.  At 1:00 I could

8  tell you.  I don't remember off the top of my head.

9  Q.  Do you remember about what time the continuation of the

10 interview began?

11 A.  I think it was after 11:30.  I think the time stamp is off

12 just a little bit.

13 Q.  In the morning?

14 A.  Yes, sir, if not a little bit later.  I can't remember

15 exactly.

16 Q.  And for approximately the first two minutes of the

17 video, what happens?

18 A.  Jessica Woodall comes back into the room and states the

19 date and time and her name and the case number and my name and

20 who she will be interviewing.  And then there's silence while

21 she goes to get M.R.

22 Q.  Any discussions with M.R during those first two minutes?

23 A.  No.  She wasn't in the room.

24        MR. SHEPARD:  Please advance it to about

25 approximately two minutes in, and then play the clip.

 1              (Video playing in open court.)

 2              MR. SHEPARD:  Go ahead and clear the screen.

 3  BY MR. SHEPARD:

 4  Q.  So, Detective, you watched both of those interviews as

 5  they happened; is that correct?

 6  A.  Yes.

 7  Q.  Okay.  Is one of the things that you have to do is, as a

 8  detective, is evaluate what you've heard and what you've seen

 9  in the videos and figure out what to do next?

10  A.  Yes.

11  Q.  How do you go about -- or in this case, how did you go

12  about evaluating the two videos and deciding what next to do,

13  especially here where you've got what's a seemingly

14  inconsistent statement within the second interview?

15  A.  Well, I look at the broader context within which the two

16  interviews were set.

17  Q.  Okay.  And what was the context of the first interview?

18  A.  The first thing when they arrived, it was earlier in the

19  morning, soon after she had woke up.  And she directed much of

20  the interview herself as far as deciding when and where to

21  begin talking about what happened.

22  Q.  Anything about her relative attentiveness in the two

23  videos that was important?

24  A.  Yeah.  I certainly watched and evaluated her body language

25  throughout the two interviews and compared them as I

1  considered what she said during the interviews.

2  Q.  What did you notice in the second interview versus the

3  first interview as it relates to body language?

4  A.  She was -- well, at one point she laid down on the chair,

5  dropped her head so she was kind of looking upside down with

6  her feet in the air, a very sort of playful demeanor and

7  attitude.

8  Q.  Is that different than what was seen in the first video?

9  A.  The first video, she was sitting on the edge of the chair

10 and much more serious and attentive to the conversation.

11 Q.  And you said you had received training in interviewing

12 children; is that correct?

13 A.  Yes.

14 Q.  Did some of that training include interpreting body

15 language?

16 A.  It's not a heavy emphasis that we look at, but certainly

17 when you're dealing with a child, you have to take every piece

18 of their communication into account, including their mood and

19 their demeanor at the time of the interview.

20 Q.  What was the context of the second interview?

21 A.  It was later in the day, after she had been there.  She

22 had been interviewed once.  And then she had been in the front

23 lobby of the Child Advocacy Center with all the toys, games,

24 movies, and books, and she had been up for several hours after

25 probably about five or six hours of sleep.

1  Q.  And what had happened to her the day before?

2  A.  The day before was August 21st, the day that the incident

3  took place.  And my investigation showed that she went to the

4  hospital sometime around 8:00, 8:30 p.m. and stayed there

5  until at least when I spoke to the officer at 1:51.  It was

6  well after 2:00 before they would have had the chance to be

7  discharged and leave.  And then they were back up and at my

8  office by just a little bit after 9:00.

9  Q.  And is there anything about the differences in the two

10  videos that helped you decide what to do next in the

11  investigation?

12  A.  About the difference between the two videos?

13  Q.  Or the -- what you saw in the two videos.

14  A.  I'm sorry.  I was coughing.  I apologize.

15  Q.  What is it about the videos that helped you decide what to

16  do next -- or the interviews, rather?

17  A.  Just the descriptions of what she said happened,

18  particularly in the first interview, and then how she began

19  the first -- the second recording, and then how she ended

20  that.  She was still talking about things that were consistent

21  with what she had said in the first interview, as well as what

22  information I began with.

23  Q.  And so I guess, and maybe I just inartfully asked it, why

24  did you decide to focus on what was said in the first

25  interview versus the second?

1          MR. THOMAS:  Objection.  The prosecutor is

2   testifying in the way he's characterizing the questions.  It's

3   leading in that way.

4          THE COURT:  Why don't you rephrase it.

5   BY MR. SHEPARD:

6   Q.  Did you decide to focus on --

7          MR. THOMAS:  Again, the form of the question is

8   leading if he's going to tell him what he focused on.  He can

9   ask him what he focused on.

10          THE COURT:  Well, let's hear his question.

11   BY MR. SHEPARD:

12   Q.  Did you decide to focus on anything based upon seeing the

13   two interviews?

14   A.  Yes.

15   Q.  Okay.  What and why?

16   A.  I focused on Ali Al-Awadi as the suspect of my

17   investigation because I believed everything up to that point

18   in my interview pointed to him having molested her the day

19   before.

20   Q.  And anything about Ms. Anna or the monster with the key

21   lock give you pause?

22   A.  Sure.  I took note of it, absolutely.  I paid attention to

23   the entire interview, and that was part of it.  However, she

24   also stated that she was tricking the interviewer at that

25   point, and that Ms. Anna had not, in fact, touched her.

1          And the part about a monster was more about would a

2     monster come in, and then she said she had a dream about that,

3     and that would be scary if that happened.  I didn't know if

4     maybe she had dreamed about it the night before.

5     Q.  And so as a result of seeing that, how did the interview

6     focus -- or the investigation focus?

7     A.  I proceeded to investigate into the circumstances

8     surrounding the one hour in which Mr. Al-Awadi was alone with

9     her class the day before.

10    Q.  And how did you go about continuing the investigation?

11    A.  I went to the Children's Choice Learning Center at the

12    campus of St. Vincent Hospital.

13    Q.  What is the first thing you did when you got to the

14    daycare?

15    A.  Parked, went inside and introduced myself to the person at

16    the front desk.  She got Ms. Heidi Conces and took us to

17    Heidi's office.  I introduced myself and Sergeant Bruce Smith,

18    who was also in the unit with me, as well as the DCS worker

19    who accompanied us, to Ms. Conces and told her why we were

20    there.  And I told her that I would need to speak to her and

21    continue my investigation there at the site of the daycare.

22    Q.  Who did you speak with, yourself, if you remember?

23    A.  I believe Chiana Harris was the person that I met at the

24    front desk.  And she took me back to Heidi's office, which was

25    just to the right of the main entrance.  And then Heidi Conces

1  spoke to her, and I took a formal recorded statement from

2  Tyria Graham, Chiana Harris, and Heidi -- no.  Tyria Graham

3  and Chiana Harris.

4  Q.  And without getting into the details, were they consistent

5  with what you had heard from the family and from the hospital

6  records about what had happened the day before?

7  A.  Yes.

8  Q.  All right.  Were you able to determine the identity of

9  Mr. Ali?

10  A.  Yes.  Ms. Conces provided me several documents, one of

11  which was his application for employment to the Learning

12  Center, that he had filled out, I believe in 2013.

13  Q.  And who was Mr. Ali?

14  A.  Ali Al-Awadi.  And he's seated to my right, wearing a suit

15  with a green shirt.

16          MR. SHEPARD:  Please let the record reflect he's

17  identified the defendant.

18          THE COURT:  The record will so reflect.

19  BY MR. SHEPARD:

20  Q.  Were you able to determine where you believe the incident

21  to occur?

22  A.  Yes.

23  Q.  And where was that?

24  A.  What they called the kindergarten classroom.

25          MR. SHEPARD:  Could you please display Exhibit 2.

1   BY MR. SHEPARD:

2   Q.  Can you kind of describe what we're seeing here?

3   A.  That is the kindergarten classroom as viewed once you open

4   the doors and step inside.  There's double doors that go into

5   the room.  They are wooden doors with glass panels in them.

6   Q.  And so a pretty big room.  Do you have a theory as to

7   where in the room the incident occurred?

8   A.  If you will look to the left of the photograph, you can

9   see a large white square, rectangle-shaped rug --

10  Q.  Right there?

11  A.  -- with multicolored buttons on it.  Yes, sir.

12  Q.  Why do you believe it occurred there?

13  A.  Throughout the course of my investigation, that's where --

14  the location that kept coming up, I suppose.  Particularly

15  when I spoke to Mr. Al-Awadi later, he discussed being on the

16  rug.

17          MR. SHEPARD:  Can you display 67?

18  BY MR. SHEPARD:

19  Q.  What is this a view from?

20  A.  So if you were standing just inside the door of the

21  classroom and took the first picture, it's just basically a

22  45-degree turn to the left, showing a little bit more of the

23  left side of the room, including the kitchen and play area, as

24  well as more of that rug and the window that it sat

25  underneath.

1  Q.  All right.  Is this the same rug we were just talking

2  about?

3  A.  Yes.  It's the only rug in the room.

4  Q.  Is the full rug viewable from the door?

5  A.  No.  As you can see, there is a kitchen play set, a sink

6  and a range, as well as a bookshelf that obstructs the view

7  from -- or at least part of the view of that rug from anyone

8  that would be walking by or standing in the door.

9  Q.  What's behind the door?  Do you recall?

10  A.  Do you mean immediately to your left if you stepped into

11  the room?

12  Q.  No.  If you exited the room from the door.

13  A.  Oh, okay.  It's just across from the main reception desk.

14  So when you walk into the front door of the daycare, the first

15  thing you see is the reception desk with two different

16  computers to -- for the employees and the parents to sign

17  their children in.  And if you were to walk up to that desk,

18  turn left, walk around it, and then kind of snake your way

19  back, you would come to the door.  So it's just across from

20  that desk, basically, to the left if you were to first walk

21  into the building.

22  Q.  Could you see the rug from the reception desk?

23  A.  You might could see part of it; not the entire thing.

24  Q.  Similar because of something like that?

25  A.  Yes.  In fact, you would see less of the rug out in the

1  hallway or at the representation desk than you do from this

2  photograph, because this is a much closer view.  You would be

3  back out of the room and away from the door, or you just

4  wouldn't have as good of an angle as this camera shows right

5  now.

6  Q.  Eventually, did you interview the defendant?

7  A.  Yes.

8  Q.  How did that interview come to happen?

9  A.  Once I obtained Mr. Al-Awadi's application for employment,

10 which included his home address, I -- Sergeant Bruce Smith, at

11 my direction, contacted the lieutenant of our unit and asked

12 him to go to the home address of Mr. Al-Awadi and see if he

13 could make contact with him in order to detain him and bring

14 him back to my office for an interview.  Lieutenant Madison

15 did so on our behalf.

16 Q.  Did you hear anything at all with anyone you spoke with at

17 the daycare about someone touching M.R.?

18 A.  Yes.  Mr. Al-Awadi.

19 Q.  Anybody else?

20 A.  No, not at all.

21 Q.  Where did the interview of Mr. Al-Awadi take place?

22 A.  4134 North Keystone Avenue, my office within the Child

23 Advocacy Center.

24 Q.  I would ask you to look at Exhibit 25.

25 A.  Okay.

1  Q.  Do you recognize 25?

2  A.  I do.

3  Q.  What is it?

4  A.  It is a DVD disk that contains two files on it.  One of

5  them is a -- I believe it's a Word document.  That's a

6  transcript of my interview of Mr. Al-Awadi.  The second one

7  is a WMV file, or a video file, of the video recording of my

8  interview with Mr. Al-Awadi.

9  Q.  And did you watch the video file with the transcript?

10 A.  Yes.

11 Q.  And is it an accurate transcript of what was said?

12 A.  For the most part, it's pretty good.  I did notice a few

13 times that the words were not quite wrong (sic) or they

14 transposed something.  For example, at one point Mr. Al-Awadi

15 was talking about M.R. being in play mode, and the transcript

16 states "play mold," M-O-L-D.

17 Q.  A few misspellings?

18 A.  Yeah.  So, I mean, it's not perfect, I guess, is my point,

19 but it's very close.

20 Q.  And would it -- would the transcript help you -- or would

21 it help the jury to follow along with the interview?

22 A.  Oh, yes, probably.

23         MR. SHEPARD:  Your Honor, I would move for the

24 admission of -- or, excuse me.

25 BY MR. SHEPARD:

1  Q.  And how do you know that that's the same CD that contains

2  those two files?

3  A.  I watched it, looked at it, and then signed my name and

4  dated it.

5  Q.  And do you see those there today?

6  A.  Yes.

7  Q.  Your signature?

8  A.  My signature and the date.

9          MR. SHEPARD:  Your Honor, I would move for the

10  admission of Exhibit 25.

11          THE COURT:  Any objection?

12          MR. THOMAS:  25 is the disk?

13          THE WITNESS:  Yes, sir.

14          MR. THOMAS:  No objection to 25.

15          THE COURT:  25 is admitted into evidence without

16  objection.

17                  (Government's Exhibit 25 was

18                  received in evidence.)

19  BY MR. SHEPARD:

20  Q.  How long did your interview last with the defendant?

21          MR. THOMAS:  Objection.  Can we approach, Your

22  Honor?

23          THE COURT:  You may.

24          (Bench conference on the record.)

25          THE COURT:  How long did the interview last?

1          MR. THOMAS:  Your Honor, my concern is that the

2     video that's being shown to the jury is redacted, so it will

3     be shorter than the actual interview.  And that would -- so I

4     think that's an inappropriate question at this point.  It

5     would tend to raise questions and confuse the jury.

6          MR. SHEPARD:  I'll rephrase it, Your Honor.  I

7     didn't think of that.

8          THE COURT:  Okay.

9                    (Open court.)

10         THE COURT:  Do you want to rephrase your question,

11    Counsel?

12         MR. SHEPARD:  Yes.

13         THE COURT:  You may.

14    BY MR. SHEPARD:

15    Q.  Well, let's just go right into it.  At some point during

16    the interview, did you happen to realize the defendant had his

17    phone with him?

18    A.  Yes.

19    Q.  Did you take the phone?

20    A.  I did.

21         MR. SHEPARD:  Can you please play clip, "Takes the

22    Phone"?  And these are all portions of Exhibit 25 for purposes

23    of the record.

24              (Playing video in open court.)

25              MR. SHEPARD:  Pause it.

1  BY MR. SHEPARD:

2  Q.  Okay.  Describe just what we're seeing here.

3  A.  The shot of the back of my bald head, as well as --

4          MR. THOMAS:  Your Honor, if I may, seeing as how

5  this is being presented, I would request an instruction to the

6  jury that the video is what they should follow.  And if they

7  see an inaccuracy --

8          THE COURT:  Right.  Ladies and gentlemen, the

9  transcript at the bottom of the screen is being displayed to

10 assist you as you listen to the audio.  The audio is the best

11 evidence.  So if there's a discrepancy in what you hear and

12 what you read in the transcript, what you hear is the best

13 evidence.

14 BY MR. SHEPARD:

15 Q.  Again, what are we seeing here?

16 A.  That's me in the foreground with my back to the camera.

17 That's Mr. Al-Awadi.

18 Q.  Right there?

19 A.  Yes, that's me.

20 Q.  Who is this?

21 A.  That's Mr. Al-Awadi.

22          MR. SHEPARD:  All right.  Go ahead and play.

23          (Video playing in open court.)

24 Q.  What did you do with the phone after that?

25 A.  I placed it in or on my desk.

1  Q.  Did you retrieve it after the interview was over?

2  A.  Yes.

3  Q.  What did you do with it after that?

4  A.  It was later that night or just after midnight on the 23rd

5  that I placed it in the IMPD property room downtown where we

6  place anything that we want to have stored as evidence.

7  Q.  When you came back to get it, was it in the same place you

8  had put it?

9  A.  You mean in my desk?

10  Q.  Yes.

11  A.  Yes.

12  Q.  I ask you to look in the box behind you at Exhibit -- or,

13  excuse me, what's marked as Exhibit 27.

14        Does the outside of that package tell you what's in

15  there?

16  A.  Yes.  There's a label from our digital forensic unit.

17  Q.  And is it still sealed?

18  A.  Yes.  The tape is broke on the pleat here on the side of

19  the envelope.  But, otherwise, it's still -- the seal is

20  intact.

21  Q.  And go ahead and open it up and take a look at what's

22  inside.

23        MR. THOMAS:  Your Honor, can I inspect the object

24  before he does that?

25        THE COURT:  You may.

1              MR. THOMAS:  That's fine.  Thank you.

2  BY MR. SHEPARD:

3  Q.  Do you recognize it?

4  A.  Yes.

5  Q.  What is it?

6  A.  It's Mr. Al-Awadi's cell phone, or at least the four

7  parts -- or the three parts of the phone, as well as a cover,

8  the case that he had.

9  Q.  Is that the same one that we saw you take in the video?

10 A.  Yes.

11 Q.  How do you know?

12 A.  I remember it.  It also -- the envelope it was in holds

13 the case number from the case and the type of investigation it

14 was, my name, the type of phone it was.  I remember taking it

15 from him.

16 Q.  All right.  And is it -- other than being taken apart, is

17 it in substantially the same condition?

18 A.  Yes.  If I were to resemble it, it would be closer to what

19 I took from him, but yes.

20 Q.  And you said you checked it into the property room?

21 A.  Yes.

22 Q.  Is that a secure facility?

23 A.  Yeah.  It's in the basement of the City-County Building

24 downtown, 50 North Alabama.  It's a secured facility that's

25 staffed 24 hours a day by IMPD personnel.

1   Q.  Did you ever take it out of the property room?

2   A.  Yes.

3   Q.  When did that happen, and what did you do with it?

4   A.  I took it out of the property room just a little after

5   8:00 a.m. on the 27th of August, 2014.  And I drove to the

6   area of 16th and Sherman where I met up with Detective Grant

7   Melton with the digital forensic unit of IMPD.

8   Q.  And did he perform an exam on it?

9   A.  Not that day, but eventually, yes, sir.

10  Q.  And then was it returned to the property room?

11  A.  By Detective Melton, yes.

12  Q.  And presumably it was sealed until he brought it here

13  today?

14  A.  This red evidence tape around the opening of the envelope

15  contains the five-digit ID number of Detective Melton along

16  with the date of 1/2/2015, and it was still sealed when I

17  opened it up just now.

18          MR. SHEPARD:  Your Honor, I move for the admission

19  of Exhibit 27.

20          THE COURT:  Any objection to 27?

21          MR. THOMAS:  Preliminary question if I may.

22          THE COURT:  You may.

23  BY MR. THOMAS:

24  Q.  Officer, you sealed it in the bag originally?

25  A.  No, I don't believe this is the same envelope.  He had to

1   open it up, obviously, to do his work with it.  So it's a

2   different envelope, I think.

3   Q.  So you don't know how it got into that envelope?  Were you

4   there when it got placed in this envelope?

5   A.  Well, my belief is that Detective Melton did since his ID

6   is on it, and since he's the person I gave it to, and since it

7   has the digital forensic unit label, which they are the only

8   ones that create those --

9   Q.  I understand --

10  A.  -- plus my familiarity with how it works.  But, no, I

11  didn't actually see him do that, no, not at all.

12  Q.  Are you aware of the items' whereabouts while it was out

13  of the packaging you put it in?

14  A.  Yes.  After I met with him, he took it to the digital

15  forensic unit office, which is located at 201 North Shadeland

16  Avenue, I believe.

17  Q.  Did you go with him?

18  A.  No, no.  I handed the cellular telephone to him and he

19  kept it from there.

20          MR. THOMAS:  Your Honor, I think at this point we

21  don't have a chain of custody.  It's not in the original

22  packaging.  It left him.  He does not -- can't tell us what

23  happened to it, only that it at some point got placed in this

24  packaging and was brought back to him.

25          MR. SHEPARD:  Do you want us to approach, Your

1  Honor?

2        THE COURT:  You may.

3        (Bench conference on the record.)

4        THE COURT:  What rule are you proceeding under?

5        MR. SHEPARD:  I'm just presenting the fact that

6  he --

7        THE COURT:  "He" as in?

8        MR. SHEPARD:  Detective McAllister identified the

9  phone, says he remembered it as the phone that he took from

10  the defendant.  I'll ask a final question, if it appears -- I

11  think I asked him, actually, if it appeared in substantially

12  the same condition.  He said, other than being in three parts,

13  it was, and he remembered the phone, and that he put it in the

14  property room.  I think once we get it to the property room,

15  that's all we have to do.  Everything else goes to weight,

16  Your Honor.

17        MR. THOMAS:  It's not simply being offered as the

18  phone.  They're going to -- there's going to be testimony

19  about how it was taken apart, how it was tested, and what was

20  done with it.  If there's -- if there were to be no more

21  testimony about it other than this is the phone he had, it

22  wouldn't be an issue, but it certainly is, and -- because he

23  does not know where it was throughout that testing period

24  specifically, and we don't have a chain of custody for the

25  reason it's being offered.

1          THE COURT:  Yeah, I think you're going to have to

2    get that, unless you -- if you all haven't stipulated to any

3    chain of custody.

4          MR. THOMAS:  No.

5          THE COURT:  Okay.  Who was the -- you will have to

6    get that other person in here, unless you're going to give me

7    a trial rule.

8          MR. SHEPARD:  It's Detective Melton.

9          THE COURT:  Melton.  Is he here?

10         MR. SHEPARD:  Yes, he is.

11         THE COURT:  Okay.  I think you're going to have to

12   let Melton say what he did with it, because that's his

13   initials on the exhibit, right?  May I see the exhibit?

14         MR. THOMAS:  This is not the original packaging, so

15   it's not as if, well, this is mine and these are my initials

16   and --

17         THE COURT:  Uh-huh.

18         MR. THOMAS:  -- this is back from him and his.  This

19   is -- he says this is a new package with someone else's

20   initials.

21         THE COURT:  Yeah.  I think you're going to need to

22   get Melton since he's not going to agree or stipulate.

23         MR. SHEPARD:  For purposes of admission at all or

24   just to go into testing?  I think I've laid enough foundation

25   to admit the phone as the one that he took.

 1          THE COURT:  Are the things still on the phone, the

 2   pictures and --

 3          MR. SHEPARD:  Whether or not Detective Melton can

 4   testify about if it was in the same condition when he examined

 5   it, I think I would agree that that would go to the

 6   admissibility of the findings of Detective Melton, not whether

 7   or not the phone, the physical phone itself, comes in.

 8          THE COURT:  Okay.  I'm going to sustain the

 9   objection.  You're going to have to get the phone in through

10   Melton, okay?

11                     (Open court.)

12          THE COURT:  Did you offer the exhibit?

13          MR. SHEPARD:  Yes, Your Honor.

14          THE COURT:  Okay.  The Court is going to sustain the

15   objection.

16          MR. THOMAS:  Thank you, Your Honor.

17   BY MR. SHEPARD:

18   Q.  Do you know what's commonly referred to as an advice of

19   rights?

20   A.  Yes.

21   Q.  What's the layman's term for the advice of rights?

22   A.  It's the written form that -- well, more broadly, it's

23   just Miranda rights, is what most people know them as.

24   Q.  Right to remain silent, the stuff you see on TV?

25   A.  Right, to -- yes, the right to an attorney, absolutely.

1  Q.  Were those rights given to the defendant?

2  A.  Yes.  I read a form to him.

3        MR. SHEPARD:  Please play clip, "Miranda."  This is,

4  again, a portion of Exhibit 25.

5        MR. THOMAS:  Your Honor, may we approach?  I have an

6  objection.

7        THE COURT:  You may.

8        (Bench conference on the record.)

9        MR. THOMAS:  Your Honor, I will object to relevance

10 at this point.  We haven't raised any issues about lack of

11 advisement.  I think just playing that in front of the jury,

12 particularly as he says, what you see on TV, you know, it has

13 no real bearing.  We're not suggesting he wasn't properly

14 advised.

15       MR. SHEPARD:  Your Honor, again, throughout opening,

16 throughout cross of all the witnesses, there have been

17 implications and statements about the ways in which the

18 investigation was conducted, rush to judgment

19 characterizations, and statements.  This --

20       THE COURT:  I think it's relevant that the witness

21 was Mirandized properly.

22       MR. THOMAS:  Just to finish the record, Your Honor,

23 we've raised a lot of issues, but certainly none about whether

24 he's Mirandized or not.  And I do think that it's prejudicial

25 and not relevant.

```
 1              THE COURT:  Well, I think it's a part of their
 2   burden.  If they want to get it in and play the statement,
 3   they are going to have to show that it was -- they could
 4   either ask him was he properly Mirandized or they can show the
 5   video.  I mean, it's normal.  There's nothing prejudicial
 6   about it.
 7              MR. SHEPARD:  It's Old Chief.  We get to present our
 8   case.  And --
 9              THE COURT:  Yeah.  And it's relevant.  They can --
10   it's relevant.
11              MR. THOMAS:  I would say it's more prejudicial than
12   relevant, but I understand.
13              THE COURT:  I don't know anything prejudicial about
14   a Miranda warning.  I mean, it's a part of life.  It's a duty
15   and responsibility that they --
16              MR. THOMAS:  But --
17              THE COURT:  We can't talk at the same time.
18              MR. THOMAS:  I'm sorry, Judge.
19              THE COURT:  It's a responsibility that the
20   government and the prosecution has to fulfill in order to get
21   this statement into evidence.  And if he wants to do it
22   through the -- I mean, normally they will ask the witness,
23   "Did you admonish them, give them their advisements, and what
24   did you tell them?"  If they want to do it in the form of a
25   video, that's fine.  I don't think --
```

1      MR. THOMAS:  I would understand if we were raising

2  an issue, but we have not raised an issue.

3      THE COURT:  You don't have to raise an issue.  If he

4  wants a statement in, he's got to get it in.

5      MR. THOMAS:  That's fine.

6      THE COURT:  Okay.

7      MR. SHEPARD:  Thank you, Your Honor.

8              (Open court.)

9      MR. THOMAS:  I withdraw my objection, Your Honor.

10     THE COURT:  You're going to withdraw your objection?

11     MR. THOMAS:  Sure.

12     THE COURT:  Okay.

13     MR. SHEPARD:  Please go ahead and play the clip.

14     (Video playing in open court.)

15     MR. SHEPARD:  Stop that.

16  BY MR. SHEPARD:

17  Q.  I'm going to ask you to look in the binder behind tab 29.

18  Do you recognize 29?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's a copy of the form that I was just showing on the

22  video, reading, explaining, and filling out with Mr. Al-Awadi.

23  Q.  Is that the same form that we just saw you going over in

24  the video?

25  A.  That's the one.

1   Q.  All right.  Is his signature on it?

2   A.  It is.

3   Q.  And did you witness him sign it?

4   A.  Yes.

5   Q.  It's your signature on it?

6   A.  It is.

7          MR. SHEPARD:  Your Honor, I would move for the

8   admission of Exhibit 29.

9          MR. THOMAS:  Your Honor, I would object to it at

10  this point.  I mean, it's cumulative.  We've just spent a long

11  time showing the jury that he was Mirandized.  It's not at

12  issue.  And at this point it's cumulative evidence.

13         THE COURT:  I'll overrule.  29 is admitted into

14  evidence over objection.

15                    (Government's Exhibit 29 was

16                     received in evidence.)

17         MR. SHEPARD:  Please display 29.

18  BY MR. SHEPARD:

19  Q.  Is that the part we heard you reading, right there at the

20  very end?

21  A.  Yes, just before he signed it.

22  Q.  Is that his signature?

23  A.  Yes.

24  Q.  And is that yours?

25  A.  Yes, sir.

1   Q.  Did you ask him if he knew why he was there?

2   A.  I believe so, yes.

3   Q.  Did he know why he was there?

4   A.  He told me he did.

5   Q.  What did he say?  Why did he say he was there?

6   A.  He told me about an incident that happened the day before

7   at the daycare.

8          MR. SHEPARD:  You can clear the image.

9   BY MR. SHEPARD:

10  Q.  And did he have a version of the events?

11  A.  Yes.

12  Q.  And did you talk about that with him?

13  A.  Yes.

14         MR. SHEPARD:  Please play "First Account."

15         (Video playing in open court.)

16  BY MR. SHEPARD:

17  Q.  Did he ever say anything about his cell phone during that

18  first account?

19  A.  No.

20  Q.  Did you ask him if he gave a statement to his employer?

21  A.  Yes.

22         MR. SHEPARD:  Please play clip, "Heidi Talk."

23         (Video playing in open court.)

24         MR. SHEPARD:  Please display Exhibit 24.

25  BY MR. SHEPARD:

1  Q.  Is that the piece of paper you were just talking about?

2  A.  Yes.

3  Q.  Have you had a chance to read that before today?

4  A.  Yes.

5  Q.  Does it mention anything about him using his cell phone to

6  take pictures of M.R. Guevara?

7  A.  No.

8  Q.  Did you ask him to go over what happened again?

9  A.  Yes.

10          MR. SHEPARD:  Please play clip "Second Account."

11          (Video playing in open court.)

12  BY MR. SHEPARD:

13  Q.  Did he mention anything about a cell phone?

14  A.  No, not at all during that account.

15  Q.  Did you specifically start talking to him about an injury

16  to M.R.?

17  A.  I believe so.

18  Q.  And did he have -- did he offer an explanation?

19  A.  He offered up something that he said happened, that he

20  thought might be related to it.

21          MR. SHEPARD:  Can you please play clip, "Watch

22  Account."

23          (Video playing in open court.)

24  BY MR. SHEPARD:

25  Q.  At some point in the investigation, did you go get that

1  watch?

2  A.  Yes.

3  Q.  How did that happen?

4  A.  I obtained a search warrant from Marion County Superior

5  Court.

6  Q.  I'll ask you to look at Exhibit 28.  It's 28.

7  A.  Yes.

8  Q.  What is it?

9  A.  Oh, it's a box that contains the Casio watch in question.

10 Q.  And how do you know?

11 A.  It's got a label on it from our IMPD property room.

12 Q.  How did it get to the property room?

13 A.  I took it there after I recovered it during the search

14 warrant.

15 Q.  Can you open it up -- or is it still sealed?

16 A.  Yes, it is.

17 Q.  Okay.  Is there any initials or anything on the sealing?

18 A.  No.  It's just got a heavy-duty piece of tape.  And then

19 over top of that, there is a red evidence seal closing it.

20 Q.  Is that typically what's done to evidence at the crime

21 room -- or the property room?

22 A.  Yeah.  That's how we sealed it when I took it in.

23 Q.  Okay.  Go ahead and open it up.

24 A.  I can try.  I don't know if the Court has scissors.

25 Q.  What's inside?

1   A.  An envelope.

2   Q.  And what's on the envelope?

3   A.  There's another label, the same label that's on the

4   outside.  And it has the case number, as well as the tape that

5   wraps all the way around the seal, with my signature and the

6   date of August 27, 2014, on it.

7   Q.  And what did you put in there?

8   A.  I put the watch in there.

9   Q.  Go ahead and open that up, please.

10          Do you recognize it?

11  A.  Yes.

12  Q.  What is it?

13  A.  That is the watch that I recovered from Mr. Al-Awadi's

14  bedroom.

15  Q.  Is it in substantially the same condition as it was when

16  you recovered it?

17  A.  It hasn't been opened since I sealed it.

18          MR. SHEPARD:  Your Honor, I would move for the

19  admission of Government's 28.

20          THE COURT:  Any objection?

21          MR. THOMAS:  No objection to 28, Your Honor.

22          THE COURT:  Government's Exhibit 28 is admitted into

23  evidence without objection.

24                  (Government's Exhibit 28 was

25                   received in evidence.)

1  BY MR. SHEPARD:

2  Q.  And was that the watch that he was talking about in that

3  last interview clip?

4  A.  He described it as a black Casio G-Shock watch and said it

5  was his.  I think later in the interview, after that clip, he

6  told me that it was in his bedroom at his home.  And that's

7  where I recovered it from, so I believe it to be the same

8  watch he described.

9          MR. SHEPARD:  Can we publish the watch to the jury,

10 Your Honor?

11         THE COURT:  You may.

12 BY MR. SHEPARD:

13 Q.  About this time, do you remember how many times you would

14 have gone through his version of events with him?

15 A.  Do you mean up to the point that we last watched the

16 video?

17 Q.  That we've just seen.

18 A.  I believe it was at least three times.

19 Q.  And did he say anything about M.R. complaining of pain

20 before he was confronted by Tyria to him?

21 A.  No.

22 Q.  Did he say anything about his cell phone?

23 A.  No, nothing.

24 Q.  Did he say anything about pictures on his cell phone of

25 M.R.?

1  A.  Nothing.

2  Q.  Did you talk about it again?

3  A.  Yes.

4        MR. SHEPARD:  Please play clip, "Fourth Account."

5        (Video playing in open court.)

6  BY MR. SHEPARD:

7  Q.  Now, is there some point that you started asking him about

8  his cell phone and what may be on it?

9  A.  Yes.

10  Q.  And in what context was that?

11  A.  In describing the events to me, he said that immediately

12  after being relieved from break, he went to the restroom.  And

13  after he went to the restroom, he went out to his car.  He

14  said he went to the Marsh to buy a pop for Ms. Tyria, but then

15  he spent the remainder of the time on his one-hour lunch break

16  in his car parked in the parking lot of the daycare, with the

17  air conditioning on because it was hot, and he watched videos

18  on his cell phone.

19  Q.  And did you talk about that with him?

20  A.  Yes.

21        MR. SHEPARD:  Please play clip, "Cell Phone Video."

22        (Video playing in open court.)

23  BY MR. SHEPARD:

24  Q.  After that, did he tell you about four pictures of M.R.

25  that might be found on his cell phone?

1  A.  No.

2  Q.  Now, when this interview was being conducted, were you

3  aware of the physical examination of M.R. by the Center of

4  Hope?

5  A.  Yes.  I had received the results of that physical exam

6  earlier in the morning prior to, I think, even M.R.'s

7  interview beginning.

8  Q.  Did you confront the defendant with the possibility of DNA

9  being found?

10  A.  I did.

11  Q.  How did you go about confronting him?

12  A.  At one point I explained to him the process of the

13  forensic exam that's performed by the nurse and told him that

14  M.R. had been examined and asked him if there was any reason

15  his DNA would be found inside of her vagina, or anything like

16  that.

17          MR. SHEPARD:  Can you play clip, "First Underwear"?

18          (Playing video in open court.)

19  BY MR. SHEPARD:

20  Q.  Did he say anything about pictures?

21  A.  He didn't say anything about photographs, no.

22  Q.  Ever even say he saw the underwear?

23  A.  No.

24  Q.  Did he deny it multiple times?

25  A.  That's correct.

 1  Q.  Did you ask him about it again?

 2  A.  Yes.

 3          MR. SHEPARD:  Please play clip, "Tickle Their

 4  Bellies."

 5          (Playing video in open court.)

 6  BY MR. SHEPARD:

 7  Q.  Ever say anything about her pants or anything being pulled

 8  away?

 9  A.  No, just that her shirt was up a little bit, but never --

10  Q.  Any photographs taken while her shirt was up?

11  A.  He didn't mention anything about taking any photographs of

12  her.

13  Q.  Did you talk about it again?

14  A.  Yes.

15          MR. SHEPARD:  Please play clip, "I Can Envision a

16  Scenario."

17          (Playing video in open court.)

18          THE COURT:  Mr. Shepard, is this a good time for our

19  afternoon break?

20          MR. SHEPARD:  Yes, Your Honor.

21          THE COURT:  Okay.  Let's take our afternoon break.

22  Ladies and gentlemen, no deliberation, no discussion, we'll

23  have you back in the courtroom in about 15 minutes.

24          THE COURTROOM DEPUTY:  All rise.

25          (Jury out at 2:56.)

 1          THE COURT:  Okay.  We'll take 15 minutes.

 2          MR. SHEPARD:  Thank you, Your Honor.

 3          (Recess at 2:56, until 3:15.)

 4          THE COURT:  Are you ready for the jury, Mr. Shepard?

 5          MR. SHEPARD:  Yes, Your Honor.

 6          THE COURT:  Ready, Mr. Thomas?

 7          MR. THOMAS:  Ready, Your Honor.

 8          THE COURT:  Tanesa, you may bring in the panel.

 9          (Jury in at 3:15.)

10          THE COURT:  Counsel, you may continue with the

11   examination of your witness.

12          MR. SHEPARD:  Thank you, Your Honor.

13   BY MR. SHEPARD:

14   Q.  Detective McAllister, during your interview with the

15   defendant, did you ever discuss two other girls who had

16   complained of pain in their private areas and what the

17   defendant did?

18   A.  He told me about two other girls besides M.R. that he said

19   complained to him about vaginal pain while he worked at the

20   daycare.  So, yes, we did.

21          MR. SHEPARD:  Would you please play clip, "Two Other

22   Girls" -- or "Other Two Girls."  Excuse me.

23          (Playing video in open court.)

24   BY MR. SHEPARD:

25   Q.  Did he say anything at all about reporting pain of M.R. to

1  Chiana or to Heidi or to a nurse?

2  A.  No.

3  Q.  Other than -- when you say he was confronted by

4  Ms. Graham, anything at all about M.R. telling him anything

5  about pain?

6          MR. THOMAS:  Objection to the form of the question.

7  Is he asking this witness about what the defendant said to

8  Ms. Graham?

9          THE COURT:  You need to rephrase your question.

10  "Did he say anything at all about reporting pain of M.R. to

11  Chiana or to Heidi or to a nurse?"

12          MR. SHEPARD:  I'll rephrase, Your Honor.

13          THE COURT:  Okay.

14  BY MR. SHEPARD:

15  Q.  Other than when you were talking about -- with the

16  defendant of when he came back after break and Tyria and --

17  and what M.R. had said then in Tyria's presence, and the

18  defendant, did the defendant say M.R. ever told him about any

19  other pain throughout your interview?

20  A.  No.  The only time that he, during my conversation with

21  him, talked about M.R. complaining of pain was in the context

22  of her telling Ms. Tyria and him that it hurt when he went

23  into the room with the two of them after he got back from

24  break.

25  Q.  Did he say anything about her telling him she was in pain

1  during the time they were alone?

2  A.  No.

3  Q.  Did he tell you anything about pictures of M.R. that might

4  be on his cell phone?

5  A.  He didn't say anything about that at all.

6  Q.  Did you eventually take a swab of the defendant's DNA?

7  A.  I did.

8  Q.  Please look at Exhibit 30 behind you.

9       Do you recognize that?

10 A.  Yes.

11 Q.  What is it?

12 A.  It's the envelope that I placed what we call the buccal

13 swab from Ali Al-Awadi into after I obtained it from him.

14 Q.  And what did you do after you placed it into that

15 envelope?

16 A.  I transported it to the Indianapolis Metropolitan Police

17 Department property room located in the basement of the

18 City-County Council -- or City-County Building and turned it

19 in there as evidence after I put this red seal, the evidence

20 tape, around it and signed my name with the date and time and

21 the date (sic) of 3:54 p.m.  And, in fact -- I'm sorry.  I

22 misremembered.  Ali Al-Awadi also signed the seal, so we

23 sealed it together immediately after I took the swab from him.

24 Q.  And then you turned it over to the property room?

25 A.  Yes.  So --

1  Q.  Did you have anything to do with it after that?

2  A.  No.  I -- aside from recovering it from the property room

3  prior to trial, no, I have not seen or done anything with this

4  after I placed it into the property room sealed with his and

5  I's signatures.

6  Q.  And is the property room a secure facility?

7  A.  It is.

8  Q.  Why did you take that sample?

9  A.  I obtained his buccal swab, the swab from the inside of

10 the mouth, in order to have cells from him so that the Marion

11 County -- or Indianapolis-Marion County Forensic Services

12 Agency, our crime lab, would have a DNA standard of

13 Mr. Al-Awadi to compare any possible evidence recovered in

14 this case, so that they could compare it to his DNA.

15 Q.  Did you take a swab of Justo Guevara?

16 A.  I did.

17 Q.  Would you please look at Exhibit 31.

18         What's 31?

19 A.  This is the envelope containing Justo Guevara's buccal

20 swab.

21 Q.  And how do you know that?

22 A.  Because it has his name on it.  Well, it's written on the

23 front what it is.  It's got the IMPD case number, the date I

24 took it, my initials, his name.  I wrote on it "Buccal Swab,"

25 the time that I took it, and it has the property room label

1  that also contains the case number and his name.

2  Q.  And, again, did you turn it over to the property room?

3  A.  Yes.  I sealed it with the red evidence tape here with my

4  name signed across the top, as well as the date.

5  Q.  And what was the purpose of obtaining that swab?

6  A.  It's what we call an exclusionary standard, so just to be

7  able to say that the DNA -- or any DNA recovered or found

8  within any of the samples or evidence did not belong to Justo

9  Guevara.

10 Q.  For purposes of comparison?

11 A.  Yes.  It's a -- just like with Mr. Al-Awadi, it's a

12 standard against which they can compare any other potential

13 samples of DNA against to see if the DNA present in any of the

14 evidence belongs to Mr. Guevara.

15         MR. SHEPARD:  If I could have just a moment, Your

16 Honor?

17         THE COURT:  You may.

18         (Off the record.)

19 BY MR. SHEPARD:

20 Q.  Detective, can you please look at what's marked as

21 Exhibit 5 behind you?  I believe it's inside of the rape kit.

22 A.  Is it within 48?

23 Q.  Yes, sir.

24 A.  Okay.  I'm looking for a nonexistent 5.

25 Q.  What's Exhibit 5?

1  A.  It's a paper envelope containing the panties of M.R. that
2  were recovered by Angela Bates and placed within the sexual
3  assault examination kit that she prepared on the date of her
4  exam with M.R.
5  Q.  Did you handle that at any time?
6  A.  I did.
7  Q.  When?
8  A.  It was on January the 8th of 2015.
9  Q.  Why did you handle it?
10  A.  To compare the underwear recovered the day of the exam
11  with underwear discovered in photographs found within the cell
12  phone of Mr. Al-Awadi.
13  Q.  How did you go about handling Exhibit 5?
14  A.  I went to the property room and requested the entire kit,
15  which was still sealed at the time.  Prior to opening the kit,
16  I obtained a blank sheet of white paper from an unopened ream
17  of paper and set it down on a workspace there.  And I placed
18  on a set of latex gloves, blue latex gloves, and then I cut
19  open the seal of this white box here, Exhibit 48.
20          And using the gloves on the entire time, I opened up
21  the kit, found the ones -- this particular envelope, and then
22  opened this envelope.  And, using the gloves, I pulled out the
23  underwear to look at them and see if they were the same ones
24  that were in the photographs on Mr. Al-Awadi's phone.
25  Q.  Did they appear to you to be the same?

1  A.  Yes.  They appeared identical.

2  Q.  What did you do after that?

3  A.  Well, after I opened the envelope, I placed them on that

4  clean sheet of white paper.  I photographed the underwear,

5  took several photographs of the underwear, and replaced them

6  or put them back into this white paper envelope that they were

7  in originally.  I resealed it with evidence tape and I signed

8  and dated the -- over the seal.

9  Q.  Then what did you do with that envelope?

10  A.  I placed it back within this -- this white box here,

11  closed the box back up and placed new seals on the envelope in

12  several places, right here and right here, to show that it was

13  sealed once again.  I signed and dated the edges of both

14  seals.

15  Q.  And then what did you do with the box?

16  A.  I turned it back into the property room.

17  Q.  And is the property room a secure facility?

18  A.  Yes.

19         MR. SHEPARD:  Your Honor, I pass the witness for

20  cross.

21         THE COURT:  Okay.  You may.

22         MR. THOMAS:  Thank you, Your Honor.

23                   **CROSS EXAMINATION**

24  BY MR. THOMAS:

25  Q.  Detective, I want to start with something that kind of

1  came at the end.  There was talk about two other students,

2  G.F. and K.E.?

3  A.  Yes, sir.

4  Q.  Do you recall that?

5  A.  Yes.

6  Q.  And you were able to find out who they were, right?

7  A.  Absolutely.  Yes, sir.

8  Q.  And then they were -- there were forensic interviews of

9  those children similar to the one we saw with M.R., right?

10 A.  Yes.

11 Q.  That was part of this investigation, right?

12 A.  Yes, sir.

13 Q.  And neither of those girls said Mr. Al-Awadi did anything

14 wrong to them, right?

15       MR. SHEPARD:  Objection, hearsay.

16       MR. THOMAS:  It's not offered for the truth.  It's

17 about his investigation and whether he followed up on it.

18       THE COURT:  I'll sustain the objection.

19 BY MR. THOMAS:

20 Q.  Did you, after interviewing -- after G.F. and K.E. were

21 interviewed, was there any follow-up investigation involving

22 them?

23 A.  I believe I spoke to their parents.  But, beyond that, I

24 don't think there was much more.

25 Q.  When you are watching these forensic interviews, we saw in

1  this one perhaps, but there's a walkie-talkie-like device,

2  right?

3  A.  Yes, sir.

4  Q.  And the purpose of that is so you, being the detective,

5  can communicate with the interviewer about questions you might

6  want to be asked?

7  A.  Yes.  It's not simultaneous communication the entire

8  interview.  The way they do it at the Marion County Child

9  Advocacy Center is that they will perform the interview.  When

10  they've exhausted any material they think they have to cover,

11  at that point they will take the walkie-talkie, turn it on,

12  and put the earpiece in their ear as a signal to anyone who

13  may be watching to ask any follow-up questions of them or

14  instruct them to do any follow-up work that needs to be done.

15  Q.  You're watching the whole thing, right?

16  A.  Yes, sir.

17  Q.  And if there are follow-up questions that you want to be

18  asked, you have the ability to say, "Hey, ask something else"?

19  A.  Yes, that's true.

20  Q.  And there are numerous times where things are sort of left

21  hanging; wouldn't you agree?

22  A.  I don't know that I would -- for instance?

23  Q.  I'll give you an example.

24  A.  Thank you.

25  Q.  I'm glad you asked.  In     M.R.'s      statement, she

1   was -- she was asked about Mr. Al-Awadi's hand, or how his

2   hand moved, and she said, "Like a bird."  Do you remember

3   that?

4   A.  I do.

5   Q.  And do you remember the response of the interviewer?

6   A.  I think I remember.  I think she said that she was

7   confused and asked her to tell her again what she meant.

8   Q.  Right.

9   A.  I think.  I can't remember for sure without seeing it

10  again, but --

11  Q.  Okay.  When she asked her again, she gave the same

12  response, right, "Like a bird"?

13  A.  "Like a bird," yes, sir.

14  Q.  And didn't ask her anything else about that?

15  A.  I didn't ask?

16  Q.  She didn't ask her anything else about that?

17  A.  I don't think so.

18  Q.  Did you know what that meant when a four-year-old child

19  said that his hand was, "like a bird"?

20  A.  Imagery of his finger moving up and down or sort of

21  fluttering came to my mind.

22  Q.  In your mind?

23  A.  Yes, sir.

24  Q.  But the child never said that, right?

25  A.  Well, she used the words, "like a bird."

McALLISTER - CROSS/THOMAS          Vol. 2-283

1   Q.  And --

2   A.  It was a metaphor.  It wasn't -- she didn't say it was a

3   bird in her, just, "like a bird."

4   Q.  Right.  You know what you would mean if you said, "like a

5   bird," right?  But you don't have any idea at this point what

6   M.R. meant by, "like a bird," because nobody asked her what

7   does that mean, right?

8   A.  Well, as an adult, I wouldn't describe it that way.  I

9   would probably use more explicit language.  However, she did

10  try to follow up and ask her what she meant by that, and she

11  didn't elaborate beyond just saying it was like a bird, which

12  was consistent with her developmental level, of a

13  four-year-old child.

14  Q.  Right.  The follow-up was, "What do you mean, 'just like a

15  bird'?  I'm confused."  Right?  That's --

16  A.  That sounds -- that sounds about as I remember it, yes,

17  sir.

18  Q.  Not, "Can you show me what you mean, can you show me with

19  your hand," so you would have had an opportunity to follow up

20  on that, right?

21  A.  If I saw fit to, I could have, yes, sir.

22  Q.  If you had followed up and she would have said, "What do

23  you mean like a bird," and she would have gone like this,

24  flapped her arms, would that have seemed -- would that have

25  made sense to you?

1  A.  That didn't happen, so I have no idea how I would have

2  reacted.

3  Q.  Right.  Nothing happened because nobody followed up and

4  nobody really asked her, "What do you mean when you say

5  something like that?"

6          MR. SHEPARD:  Objection.  Asked and answered,

7  multiple times, I believe.

8          THE COURT:  It is cross and I've given you leeway,

9  but you have asked it multiple times.  So would you move on,

10  Counsel?

11  BY MR. THOMAS:

12  Q.  That was one example.  You also interviewed, on the same

13  day, M.R.'s mother, correct?

14  A.  Miosotis, yes.  Yes, sir.

15  Q.  And do you remember in the interview she said she had two

16  children?

17  A.  Yes.

18  Q.  Do you remember their names?

19  A.  M.R. and E.R.

20  Q.  Was there a mention of a G.F.?

21  A.  I've had multiple different conversations with Miosotis.

22  I believe in one of the subsequent conversations, that she's

23  mentioned a cousin named  G.F.  I don't know that she

24  mentioned cousins during that first interview on the 22nd of

25  August.

1  Q.  In the -- your interview with her, she also mentioned that

2  she had another daughter, that died.  Do you recall that?

3  A.  I don't remember.  I'm sorry.

4  Q.  Well, I guess the reason I'm asking is that there were a

5  couple of references in M.R.'s statement to G.F., "my sister

6  G.F.," right?  Do you remember that?

7  A.  At least one that I remember, yes, sir.

8  Q.  What do you remember about that?

9  A.  That there was a reference to G.F.

10 Q.  So you don't remember the specific --

11 A.  Not without being refreshed.  I know I watched it earlier,

12 but I can't remember.  I'm sorry.

13         MR. THOMAS:  Approach the witness, Your Honor?

14         THE COURT:  You may.

15 BY MR. THOMAS:

16 Q.  I'll show you the transcript of what's already been

17 admitted as 43.  Here's the first one.  If you could just

18 take a look at that.

19 A.  It doesn't say anything about G.F. -- oh, I'm sorry.

20 There it is.

21 Q.  Yeah, it kind of does.

22 A.  I'm sorry.

23 Q.  Go ahead and read it for me, please.

24         MR. SHEPARD:  Your Honor, could we have the page

25 number?

1      MR. THOMAS:  Oh, I'm sorry.  Page 13.

2      THE WITNESS:  I've read it.

3  BY MR. THOMAS:

4  Q.  Okay.  And having read it, does it refresh your memory as

5  to what she was talking about?

6  A.  Yes.

7  Q.  And what was she talking about?

8  A.  She said -- it was in the context of her talking about

9  being tricked and tricking.  And she said, "My sister

10  G.F...tricked me."

11  Q.  "My sister G.F...tricked me about something and I don't

12  like it," right?

13  A.  Yes, sir.

14  Q.  And I'll show you on page 14, right up here.  If you could

15  take a look at that and see if it refreshes your memory.

16  A.  Yes, I remember.

17  Q.  Okay.  And after seeing that, what was her second

18  reference to her sister, G.F.?

19  A.  That her sister, G.F., had tricked her that morning.

20  Q.  She doesn't have a sister G.F., as far as you know,

21  right?

22  A.  No.

23  Q.  Did you ever follow up and try to find out who G.F. was?

24  A.  My belief was that it was her cousin.

25  Q.  Was it your belief at that time?

1  A.  I don't remember.

2  Q.  Was she -- was -- do you know if she was ever around

3  anyone named G.F.?

4  A.  I know she was around her cousins.

5  Q.  You don't know when, do you?

6  A.  No.  I know there was family members that I believe

7  accompanied them to the hospital, but I'm not --

8  Q.  She doesn't say her cousin, G.F., does she?  She says her

9  sister, G.F., right?

10  A.  Oh, that's true, yes, sir.

11  Q.  And she's talking about that in the context of her

12  statement about Ms. Anna, right?

13  A.  About tricking Jessica is the context both those comments

14  came in.

15  Q.  Right.  You had told us that you thought that she was --

16  M.R. in her first interview at 9:30 was more attentive than in

17  the second one, right?

18  A.  She appeared to be, or more focused, I guess I would say.

19  She was more direct about addressing the immediate issues at

20  hand, whereas the second interview, she went a little bit more

21  far afield and was definitely in a different mood and demeanor

22  during the interview.

23  Q.  Was it your experience in conducting these and seeing

24  these conducted that children tend to get more familiar, more

25  comfortable as the interview goes on in some cases?

1  A.  Sometimes, but my specific observation in this one was

2  more that she was trying to change the subject after being

3  asked multiple times about -- about being touched.

4  Q.  Okay.  Now, she did say that she was touched at school by

5  Ms. Anna, didn't she?

6  A.  Yes.

7  Q.  And on a different day than this happens, is what she

8  said, right?

9  A.  Yes.

10  Q.  And she was pretty specific in her description, right, I

11  mean about what happened?

12  A.  Yes.  As far as what happened, not necessarily the context

13  surrounding it, but, yes.

14  Q.  Well, I mean, she -- "How did Ms. Anna hurt you?"

15       "Cause she did...she just put it," in, "right

16  there."

17       "What do you mean?"

18       "Stick it in and stick it out."

19       "Stick what in and...what out?"

20       "Uh...finger."

21       "Ms. Anna?"

22       "Yes."

23       I mean, so she was pretty specific at that part when

24  she was describing it, yes?

25  A.  I just meant, when I said not specifically about the

1  context surrounding it, she didn't say exactly when or where

2  or what place they were, besides at the daycare.

3  Q.  At the daycare.  And then she did go on to say something

4  about, "I may trick you," "I trick you," right?

5  A.  That's what she said to Ms. Woodall, yes.

6  Q.  And she talked about being tricked by a sister she doesn't

7  have?

8  A.  About G.F., yes.

9  Q.  That was enough at that point, that she -- because she

10 then later said, no, she didn't do anything, it was a trick.

11 That was the end of that, right?

12 A.  I don't know.  What do you mean?

13 Q.  Well, you never asked anybody at the school about Anna or

14 anyone by that name or close to that name or anyone she had

15 contact with; you didn't follow up on that at all, right?

16 A.  Based on her demeanor when discussing that and based upon

17 her telling outright to Ms. Woodall that she was just tricking

18 and, you know, laying upside down and then later correcting

19 herself and saying, "No, I was tricking you.  Ms. Anna didn't

20 do nothing, nothing happened," and then reaffirming that it

21 was only Mr. Ali that put his finger inside of her vagina.

22 Yes, based on that, I didn't follow up on the other

23 information.  Plus, there was no one else in the room when

24 that happened --

25 Q.  Well, she didn't say Ms. Anna did it on the same day,

McALLISTER - CROSS/THOMAS          Vol. 2-290

1  right?  She said it was on a different day?  She was

2  specifically asked and she said a different day, right?

3  A.  No.  I guess I mean, I also -- when she was talking about

4  Mr. Ali doing it, she said other teachers were in the room,

5  Ms. Tyria.  And, in fact, she wasn't -- it was when Ms. Tyria

6  was gone.

7  Q.  Right.  So that was a detail that she gave in her

8  statement about Mr. Ali that was wrong, right?

9  A.  A minor detail, yes, sir.

10  Q.  We don't really know about the other accusation because

11  you took her word for it when she said, "No, I tricked you, it

12  didn't happen," right?

13  A.   It wasn't just her word at that moment, but all of the

14  prior statements that she had made.  At no point had she ever

15  referenced an Anna.  And what she did say later to correct her

16  statement and say, "No, I was tricking, Ms. Anna didn't do

17  anything at all," it was consistent with everything I had

18  heard and learned and knew up to that point.

19  Q.  You didn't take her word for it when she said Ms. Graham

20  was in the room, right, because you knew that was false?

21  A.  As my investigation proceeded, I learned that that was

22  false, yes, sir.

23  Q.  So the things that help your case, that she says, are

24  believable; the things that don't help your case --

25          MR. SHEPARD:  Objection, argumentative.

1          THE COURT:  I'll overrule.  You may answer the

2    question.

3    BY MR. THOMAS:

4    Q.  The things that help your case, that M.R. says, you

5    believe wholeheartedly; the things that don't help your case,

6    you don't, or you discount?

7    A.  No, that's not a fair characterization, no, sir.

8    Q.  Okay.  Now, you talked a little bit about this statement

9    near the end of the interview when she's again asked if

10   anybody had touched her.  You said in your direct that you

11   thought it was something into the future about this monster,

12   that you thought she was saying about something that might

13   happen, right?

14   A.  I think it was actually the condition of verb tense.  I

15   think she said "would."

16   Q.  Well, what she said is, "When I go to -- when I go to

17   sleep at home when somebody knock on the door and has already

18   had a key...and it looks like a monster," right?  That's not

19   future tense, right?

20   A.  There was something more after that.

21   Q.  Do you remember her making that statement?

22   A.  I remember her saying those words and more, yes, sir.

23   Q.  And that, what I just read to you, you would agree that's

24   not in the future tense, right?

25   A.  She mixed her verb tenses all up in there, yes, sir.

1  Q.  Okay.  So, again, when it's -- when it's not helpful to

2  your case, you can ignore her verb tense and say, well, she

3  meant future tense because she mixed it up, right?

4  A.  She was also discussing a monster.

5  Q.  Yeah.

6  A.  And a dream.

7  Q.  And that would touch her down there, right?

8  A.  Would touch her, like -- yes, sir, absolutely.

9  Q.  Which you discounted that completely, right, because she

10 said it was a dream?

11 A.  And because it was a monster or looked like a monster.

12 And she said she had that dream.

13 Q.  Now, at this --

14 A.  She had slept since the incident had occurred.  Like I

15 said earlier, I didn't know if maybe she had had nightmares

16 about what happened to her the day before, which is entirely

17 likely.

18 Q.  Nobody ever asked her, did they?

19 A.  She -- asked her what, sir?

20 Q.  Well, you're speculating about, "Well, I don't know when

21 she had that dream.  I don't know if she had it before.  Maybe

22 she had it that night."  Well, we'll never know, because

23 nobody asked her, right?

24 A.  She said she had the dream.  As far as when exactly, I

25 don't know.  You're right.

1  Q.  That goes back to, we talked about follow-up questions.

2  You could have asked follow-up questions about this, right?

3  A.  If I thought that follow-up questions were appropriate or

4  necessary or helpful at that point, yes.

5  Q.  And a child, a four-year-old child relaying, even as a

6  dream, a monster with a key, "who comes into my room at night

7  and touches me," that wasn't anything to follow up on?

8  A.  She said that it would be bad if someone -- or if that did

9  happen, and then said she had dreamed that.

10  Q.  Right.  So that was --

11  A.  It didn't indicate to me that there was any particular

12  piece of follow-up investigative work that needed to be done

13  based on those statements, no.

14  Q.  But that was future tense, but she didn't mix up her tense

15  at that point, did she?

16  A.  What future tense?  I'm sorry.

17  Q.  Well, you're talking about, "Well, she said it would," so

18  that's future tense, right?

19  A.  No, I never said that.  I said conditional.

20  Q.  Okay.  You read into when she said, "When I go to sleep at

21  home when somebody knock on the door and has already had a

22  key...and it looks like a monster...and it would touch me down

23  there," you -- that's conditional?

24  A.  If then, yes, sir, it would.

25  Q.  Okay.  At that point, you had evidence of a possible

1  injury, possible molestation, right, from the hospital?

2  A.  Her forensic exam showed findings that were consistent

3  with penetration, a sexual penetration injury to her hymen, on

4  the interior structures of her genital area, yes, sir.

5  Q.  And you had a suspect?

6  A.  Yes.  From the beginning, she's consistently said it was

7  Mr. Ali.

8  Q.  Now, if you had -- you said you've done hundreds of these

9  cases, right?

10  A.  I'm sure.

11  Q.  Something like that?

12  A.  Yes.

13  Q.  In a case like this, if you had evidence of abuse, you

14  didn't have a suspect, but you had evidence of abuse --

15  A.  Yes, sir.

16  Q.  -- you interviewed the child, and the only thing the child

17  says is, "There's a monster with a key that knocks on the

18  door, comes in my room, and would touch me down there," would

19  you be done with that?

20  A.  I don't know.  That's not what happened in this case.

21  Q.  I know.  I'm asking you about, in your experience in what

22  you do, if the only evidence that you had was the child saying

23  about a monster --

24         MR. SHEPARD:  Your Honor, I object --

25  BY MR. THOMAS:

1  Q.  -- that comes in the room.

2          THE COURT:  Would you approach?

3          (Bench conference on the record.)

4          THE COURT:  Okay.  Your objection is relevance?

5          MR. SHEPARD:  I object to the relevance.  The

6  witness clearly answered that's not what happened in this

7  case.

8          MR. THOMAS:  Well, Judge --

9          THE COURT:  How is it relevant?

10          MR. THOMAS:  It is relevant because he has

11  discounted and said, "Well, it doesn't mean anything.  It's

12  meaningless in this case."  I'm trying to point out that it

13  perhaps wouldn't be meaningless in another case, that, in and

14  of itself, it isn't meaningless, and it's something that he

15  might very well have followed up on and could have followed up

16  on.

17          MR. SHEPARD:  Your Honor, what happens in another

18  case is completely irrelevant.  The defendant has testified

19  why it wasn't relevant here and it didn't happen in this case,

20  and he's already said why he did what he did.  It's just

21  not --

22          THE COURT:  I think you've gotten it in.  Can you

23  save it for your argument?

24          MR. THOMAS:  That's fine.

25          THE COURT:  Okay.

```
 1              (Open court.)
 2         THE COURT:  All right.  We're going to sustain the
 3  objection and we're going to move on.
 4  BY MR. THOMAS:
 5  Q.  The -- you said you had had multiple meetings or
 6  conversations with M.R.'s mother, right?
 7  A.  Yes.
 8  Q.  And you mentioned, I think on direct, that you never
 9  talked to the parents about their child's interview?
10  A.  No.  I said I never show them the interview.
11  Q.  Oh, okay.  So not, "Sit down and let's watch this video,"
12  that's what you meant?
13  A.  I've never, ever shown a parent the video of the forensic
14  interview of their child, no.
15  Q.  It makes more sense, though?  You obviously do talk to
16  them about the contents of the interview, right?
17  A.  It depends on the case and each specific circumstance.
18  Q.  And what would those circumstances be?
19  A.  Well, unfortunately, sometimes, depending on the facts of
20  the case, the suspect that the child discloses abused him
21  might be the parents, and that's a circumstance I wouldn't go
22  tell them everything the child said right off the front.
23  Q.  And is that the only circumstance where you wouldn't tell
24  the parents about the contents of the interview?
25  A.  No.  Sometimes the things that children say are quite
```

1  disturbing, and if there's no real advantage for me to tell

2  them the facts in full, I don't sit there and just tell them

3  and describe everything that happened.

4          I don't hide from a parent the fact that they've --

5  their child has disclosed they've been abused.  I'll tell them

6  in general terms, if their child discloses, you know, that the

7  child did describe something happening.  But rarely, if ever,

8  will I go into detail about what the child said or the exact

9  circumstances.

10          Also, sometimes if I were to tell them all the

11  details, they might have some type of communication with the

12  individual accused.  And if they knew all the details, that

13  would take away some of my sort of advantage in interviewing

14  them.  If they already knew the facts of the case completely,

15  it wouldn't be a blank slate that I would be interviewing, so

16  to speak.

17  Q.  In this case, M.R.'s mother was not a suspect, was she?

18  A.  No, not at all.

19  Q.  And she wasn't having any contact with Mr. Al-Awadi, was

20  she?

21  A.  Not that I knew, but you never can tell what may happen.

22  Q.  She testified that she had never heard the contents of the

23  forensic interview?

24  A.  You asked her if she had watched it, and she said no.

25  Q.  And I think I asked her if she had ever talked to you

1  about it, and she said no?

2  A.  Yeah.  She said that, yes, sir.

3  Q.  Is that your recollection, as well?

4  A.  Yeah.  I didn't get into the details and describe to them

5  exactly what was said or what happened.  At most, I may have

6  confirmed to her that her daughter was continuing to disclose

7  that Mr. Al-Awadi touched her, but none of the details.

8  Q.  And no questions to her mother about prior dreams or

9  whether she frequently had nightmares or if they had started

10  at a particular time, or anything like that?

11  A.  I typically ask parents about the child's behavior or

12  demeanor.  I don't think I asked her specifically about dreams

13  of M.R. or beginning or ending dates of periods of dreams or

14  anything like that.

15  Q.  If you know, based on your investigation, about what time

16  did Mr. Al-Awadi leave the school on the 21st?

17  A.  He left twice.  Which time are you referring to?

18  Q.  Well -- for good.

19  A.  Oh, okay.  There is a time card printout that I have

20  obtained, or that I've seen, that shows that specific piece of

21  information.  I don't remember what it is.  I want to say it

22  was after 5:00, close to 5:40 p.m., if I'm not mistaken.  I

23  can't say for sure, but I think it's around that time.  Before

24  6:00, after 5:00.

25  Q.  And that -- so, roughly, we'll say 5:00, 6:00, somewhere

1  in there.  And when did the officers come to his house?  Do

2  you remember?

3  A.  Oh, it was the following day.

4  Q.  Do you remember about what time that was?

5  A.  It's in my notes.  If you want me to refresh my memory, I

6  can take a look.

7  Q.  If you can give me a general estimate.

8  A.  I think around 12:00, 11:30, 12:00, 1:00, somewhere in

9  there.

10 Q.  And you don't know where Mr. Al-Awadi was during that

11 period of time, right?

12 A.  I mean, he's at my office.  Prior to that?

13 Q.  Prior to that.

14 A.  No, no idea.  I would assume he was at home for most of

15 that time, but that's an assumption.  I don't know.

16 Q.  He wasn't on house arrest at his home, right?

17 A.  Not at that time, no.

18 Q.  And when he came with the police, is it your understanding

19 that he brought his phone with him?

20 A.  Yes, that's my understanding.  Yes, sir.  He told me as

21 much -- or I implied as much from him having it in his pocket

22 and pulling it out.

23 Q.  Do you have any reason to think that he didn't have access

24 to his phone from the time the accusations were made until the

25 time you took it from him in the interview room?

1  A.  I would assume he had plenty of opportunity and access to

2  that cell phone in the hours between leaving the daycare that

3  afternoon on the 21st and being taken into custody the

4  following day on the 22nd.

5  Q.  Mr. Al-Awadi was 20 years old when you interviewed him in

6  the interview we saw today; is that right?

7  A.  Yes, sir.

8  Q.  He lived at home with his parents?

9  A.  Yes.

10  Q.  And they didn't come with him to the interview, right?

11  A.  No.

12  Q.  Is it safe to say that he said a lot of things to you that

13  you don't think are true, right?

14  A.  Yeah.  He said a lot of things that I don't think are

15  true, absolutely, or at a minimum -- yes.  That and left

16  things out that did happen, and he denied happening.

17  Q.  Going back to M.R's statement, she was specifically asked,

18  "How did his finger get inside your hurting thing?"  And she

19  said, "Because I'm sleeping."  Right?  Do you remember that?

20  A.  At one point she said that, yes.  I think she was asked

21  more than once --

22  Q.  Yes.

23  A.  -- bout how sort of it happened.

24  Q.  She was.  But at one point she said she was sleeping?

25  A.  At least twice she said she was sleeping when he put his

 1  finger in her.

 2  Q.  She didn't -- well, strike that.

 3       MR. THOMAS:  Can I have just a moment, Your Honor?

 4  BY MR. THOMAS:

 5  Q.  You did the interview of Tyria Graham, as well?

 6  A.  Yes.  And earlier on direct examination, I was -- I wasn't

 7  sure, but I'm pretty sure I interviewed Tyria, Chiana, and

 8  Heidi at the school before leaving to go interview

 9  Mr. Al-Awadi.

10  Q.  You were here when she testified, and after memories were

11  refreshed, she told you three times that M.R. had complained

12  of hurting to pee, pain, at 11:30 in the morning, right?

13  A.  Yes.  I was here for that, yes, sir.

14  Q.  You were there when she said it the first time, right?

15  A.  I expect so, yes, sir.

16  Q.  You made case notes and filled out a couple of affidavits

17  related to this case as it went forward, right?

18  A.  I think my case file is over 300-plus pages.

19  Q.  I'll bet it is.

20  A.  All kinds of documents, yes, sir.

21  Q.  And nothing that you wrote about or kept track of or

22  passed on to anyone about your interview with Tyria Graham

23  mentions that she said the little girl complained of pain at

24  11:30 in the morning, do they?

25  A.  No, that's not true.

1  Q.  Where is that?  Where did you document that?

2  A.  It's in the transcript and it's in the video recording

3  that I -- or the audio recording that I made of my interview

4  with Ms. Graham.

5  Q.  Well, I understand.  She said it, right?  It's going to be

6  in the video?  She said it?

7  A.  Well, it's an audio recording that I made, yes --

8  Q.  You're right, you're right.

9  A.  -- it's in the audio.

10  Q.  It is in the audio?

11  A.  Yes.

12  Q.  So if she said it and you were recording it, it's in the

13  audio, right?

14  A.  There.  It's there, it's in the transcript.  And that was

15  turned over to the government, which I believe was, in turn,

16  turned over to you, yes, sir.

17  Q.  You made case notes, right?

18  A.  Yes, sir.

19  Q.  It's not mentioned in your case notes at all?

20  A.  I would have to look through them all to be sure.  If

21  you're saying it's not, it's quite plausible that it's not.

22  Q.  It didn't mean anything to you, really, did it?

23  A.  No.  I took note of it.

24  Q.  Can you explain it?

25  A.  There's any number of possible explanations, one of which

1  is that Mr. --

2          MR. SHEPARD:  (Inaudible.)

3          THE REPORTER:  I cannot hear you.

4          THE COURT:  I can't either.  Do you have an

5  objection?

6          MR. SHEPARD:  He can't be asked to explain what a

7  witness meant, Your Honor.  He can't --

8          THE REPORTER:  I'm sorry.

9          THE COURT:  You're saying the question is not

10 appropriate?

11         MR. THOMAS:  I'll withdraw it, Judge.

12         THE COURT:  All right.

13 BY MR. THOMAS:

14 Q.  We talked about G.F. and K.E. being interviewed.  E.C.,

15 the boy who was awake right next to M.R., he was interviewed,

16 as well?

17 A.  Well, Mr. Al-Awadi said he was asleep at one point.  I

18 don't think he was awake the entire time.

19 Q.  Okay.

20 A.  He at least twice described him as being asleep.  But,

21 yes, he was in the room at the time it occurred, from

22 everything I can tell.

23 Q.  And he was interviewed, as well?

24 A.  Yes.  He was interviewed on the 21st of August.

25 Q.  Do you remember how many of the children in the room were

1  interviewed?

2  A.  I don't remember the exact number.

3  Q.  Well, there were only 11.

4  A.  No, I know how many kids were in the room.  And, actually,

5  I think that day there were 10 in the room, not 11.  What I'm

6  saying is, I can't remember exactly how many of those ten were

7  interviewed.  I know, obviously, E.C. and M.R. were.  I can't

8  remember which other kids.  I know there was a total of just

9  over 20 different people that I took statements from in

10 entirety, but how many of the children I don't recall.

11 Q.  One of the reasons you don't remember is because nothing

12 significant came from any of those interviews, right?

13 A.  It was during nap time when it happened, so -- I don't

14 know if I would say there was nothing significant, but nothing

15 that --

16 Q.  Nothing you remember here today, right?  You already told

17 that.

18 A.  Yeah.  Obviously, I have some memory of those interviews.

19 I'm just -- I'm saying I can't remember exactly which children

20 were interviewed and not interviewed.  All the children

21 interviewed from the daycare, though, there were no other

22 charges or crimes that we have alleged.

23 Q.  Well, in fact, none of them corroborate M.R.'s story,

24 right?

25          MR. SHEPARD:  Objection.  Calls for a legal

1  conclusion.

2          THE COURT:  Do you have a response?

3          MR. THOMAS:  I'm not -- I don't know that

4  corroboration is a legal conclusion, Your Honor.

5          THE COURT:  I'll -- well, all the charges are crimes

6  that you have alleged, so I'll sustain.  Why don't you

7  rephrase.

8          MR. THOMAS:  Well, I --

9          THE COURT:  Rephrase your question.

10          MR. THOMAS:  I will.  Thank you, Your Honor.

11  BY MR. THOMAS:

12  Q.  You don't have -- after interviewing those children, you

13  don't have any other eyewitnesses to the crime, correct?

14  A.  No.

15  Q.  You were asked about -- you had conversation with

16  Mr. Al-Awadi about did he watch porn, right?

17  A.  Yes, sir.  I asked him if he had watched porn that day.

18  Q.  And you never asked him if he had taken pictures of M.R.?

19  A.  I wouldn't have imagined, under any circumstance, he would

20  have.  So, no, I didn't.

21  Q.  And he admitted having watched porn, right?

22  A.  He said at home he had watched some, or he did watch it.

23  Q.  The search warrant that you did, you included other

24  electronics other than just his phone, right?

25  A.  We've discussed a search warrant at his house for his

1  watch and then a search warrant for -- to have his phone

2  examined.

3  Q.  You also took other electronics from his house for review,

4  right?

5  A.  Not at the time I recovered the watch.

6  Q.  No -- yeah, you're right.  I apologize.  Not the same

7  search warrant, but ultimately you gathered evidence, your

8  department gathered evidence, in the form of computers,

9  electronics, from his house, right?

10  A.  Months after the incident occurred, when the results of

11  the forensic examination of his cellular telephone came back

12  and he had four images of what I believed to be M.R.'s genital

13  area and mons pubis.  Yes, at that time I wrote a search

14  warrant to search his house to see if those images in their

15  original form, or if any other child pornography images, were

16  at his home.  But that's months afterwards, yes, sir.

17  Q.  Right.  And, ultimately, you didn't actually use this

18  search warrant to search the phone, did you?

19  A.  I don't know how I would describe it.  I mean, I obtained

20  a search warrant and had the phone given to the digital

21  forensic unit detective and asked him to examine the cell

22  phone underneath the authority of that search warrant.  And he

23  attempted to and the phone was locked.

24  Q.  And Mr. Al-Awadi gave you the information to unlock it,

25  right?

1   A.  No.

2   Q.  I'm sorry?

3   A.  No.

4   Q.  Did you -- did Samsung give you that information?

5   A.  No.

6   Q.  How did you obtain that?

7   A.  One of the members of the Marion County Prosecutor's

8   office sent me an e-mail with an attachment that included, I

9   think, two different possible passwords that Mr. Al-Awadi had

10  apparently provided to his then attorney, who provided it to

11  the Marion County Prosecutor's office, who provided it to me.

12  Q.  Okay.  Fair enough.  He didn't hand it to you?

13  A.  No.

14  Q.  But that information that you used came from Mr. Al-Awadi,

15  did it not?

16  A.  I forwarded the information to the digital forensic unit

17  detective.  And my understanding was that the piece of

18  information had originated from Mr. Al-Awadi.  It was his cell

19  phone.  He would be the person who knew the password.

20  Q.  You mentioned that part of your investigation was to see

21  whether the other people at the daycare broke any laws, or I

22  think the term you used was "committed neglect."  Do you

23  remember saying that?

24  A.  Yes.  At face value, it was disturbing that no one had

25  contacted the police immediately once this small four-year-old

1  child disclosed that she had just been molested in her daycare

2  during naptime.  And so I wanted to make sure that I kept an

3  eye on not just what did Mr. Al-Awadi do or what happened

4  between he and M.R., but also how did they respond.

5          As part of my investigation, as I mentioned earlier,

6  the Department of Child Services was part of that.  They have

7  what's called an institutional unit, and so that DCS family

8  case manager was present with me during much of my

9  investigation.  That was the main focus of his, but the way I

10  said we would do it, as far as being a team approach so we

11  don't have redundant interviews, not only for any potential

12  criminal purposes, but for some of his purposes, too, I would

13  ask a lot of questions regarding not just what happened

14  between M.R. and Mr. Al-Awadi, but also how the daycare

15  responded.  Their license was eventually revoked as a result

16  of my and DCS's investigation.

17  Q.  Is it safe to say that their procedures and training

18  methods were unsound?

19  A.  I don't know about that --

20          MR. SHEPARD:  Objection, Your Honor.  He's got no

21  basis for that.  The witness has no basis to answer that

22  question.

23          THE COURT:  Do you know?  Can you answer that

24  question?

25          THE WITNESS:  Actually, I can.  I think so, yes,

 1  ma'am.

 2           THE COURT:  Overruled.  You may answer.

 3  A.  The policies and procedures, as I know them, appear to be

 4  quite good.  The execution of said policies and procedures

 5  would be questionable at best, particularly on August the

 6  21st, 2014.

 7  BY MR. THOMAS:

 8  Q.  When you got the password, you unlocked the phone, right?

 9  A.  No, I didn't -- I didn't touch the phone again after I

10  gave it to Detective Melton.

11  Q.  Did you -- was it even in your control when they got the

12  password?

13  A.  In a manner of speaking.  I was the lead investigating

14  detective on the criminal investigation, and the phone was

15  attached to my case number within our evidence tracking

16  system.  So, in that sense, I'm always in control.  But I had

17  given the phone, after removing it from the property room and

18  signing it out in my name, to Detective Melton, because that's

19  his area of expertise and specialty, that's what he does, as

20  far as examining items like that, and not mine.  So it was in

21  his sort of physical control, so to speak, while I still

22  maintained sort of investigative control over the phone.

23  Q.  You heard the testimony, and there was some discussion

24  about whether you were shocked or surprised by revelations by

25  Heidi Conces about their policies and looking at injuries,

1  right?

2  A.  I remember both your cross-examination of Ms. Conces

3  regarding that subject and when the subject came up during my

4  direct examination, yes, sir.

5  Q.  And you understand that's the policy, right?

6  A.  I'm sorry.  What --

7  Q.  You understand, after she explained it to you, that that's

8  their policy, not to look at injuries to the private area?

9  A.  Okay.  So, yeah, I asked her several questions about what

10  their policies and procedures were.  And then later I asked

11  just to find out if anyone had done that, and she did, I

12  believe at that time, tell me that it was against their policy

13  to do physical examinations of children.  I can't remember the

14  exact words, but, yes, I think she did say that, absolutely.

15  Q.  Did you get follow-up information from the physician that

16  ultimately examined M.R. after the -- after the first

17  evaluation?

18  A.  Okay.  So -- excuse me.

19  Q.  Yes or no?

20  A.  Well, there were -- there was more than one physician who

21  was involved in her examination.

22  Q.  Okay.  Which ones did you talk to?

23  A.  I talked to Dr. Ralph Hicks, who is at IU Health at Riley

24  Hospital.  He's with the child protection team.

25  Q.  When did you talk to him?

1  A.  I believe it's in my notes.  I think it was within a month

2  of the initial -- initial incident, but I can't remember.  It

3  may have been less than a month.  I'm not sure.  I know that

4  M.R. eventually went and he performed another evaluation later

5  on.

6  Q.  You haven't talked to him since?

7  A.  No.  I've spoken to him about several different cases

8  between now and then, and I know I've talked to him at least

9  once, maybe twice.  Oftentimes when we screen the case, I'll

10 consult with him on the phone.  I don't remember how often I

11 spoke to him on this one.  At least, at a minimum, once after

12 I received his report, we communicated on the phone.

13 Q.  Would that have been back in 2014 still?

14 A.  I believe so, yes.  Yeah.  Like I said, I think it was

15 within one month.  The date is in my notes.  I can't remember.

16 Q.  You reviewed the report from Nurse Bryant, I think it is?

17 A.  Angela Bates?

18 Q.  Bates.  Good man.  You reviewed her report, correct?

19 A.  Yes, the morning of the 21st of August 2014, before we

20 interviewed.

21 Q.  They were --

22 A.  Well, no.  Actually, you know, I think -- I can't

23 remember, but, yeah, that morning, sometime that morning.

24 Q.  And we have in evidence that there were photos of her

25 injuries taken at the time of her examination, right?

1  A.  That's true.

2  Q.  Did you see those?

3  A.  I believe I looked briefly at them, yes, sir.

4  Q.  Do you know if Dr. Hicks looked at those?

5  A.  Yes, he did look at them.

6          MR. THOMAS:  Okay.  I think that's all I have.

7  Thank you.

8          THE COURT:  Very good.  Do you have redirect?

9          MR. SHEPARD:  Yes, Your Honor.  Can I just take a

10  moment?

11          (Off the record.)

12          MR. SHEPARD:  Thank you, Your Honor.

13                    **REDIRECT EXAMINATION**

14  BY MR. SHEPARD:

15  Q.  Detective McAllister, you talked at length on cross about

16  some of the statements that   M.R.   made during her

17  interview?

18  A.  Yes, sir.

19  Q.  Do you remember talking about the phrase, or Mr. Thomas

20  saying, "It was a trick and that was that"?

21  A.  I can't remember all the details of that conversation.  I

22  remember we talked about her saying it was a trick, something

23  to that.

24  Q.  Did he try to imply that after she said it was a trick,

25  you heard all you needed to hear?

1  A.  Oh, yeah.  No.  I remember what you're asking now.  Yes,

2  that essentially I dropped it and didn't do anything further

3  to follow up.  Yeah, I remember that.

4  Q.  If you can remember, what actually did     M.R.    say,

5  both when she was talking about a trick and after she talked

6  about what a trick was?  What did she go over with Jessica

7  Woodall?

8  A.  That it was -- it's not easy to summarize that entire

9  section of the video, but basically saying that she was

10 tricking her.  And sort of later, as that conversation

11 continued, it was revealed by M.R. that the person -- or this

12 other person that she said had touched her, Anna, or Ms. Anna,

13 hadn't touched her, that Ms. Anna didn't do anything to her.

14 And then she went on to affirm that it was, in fact, Mr. Ali

15 who did that, and he was the only one.

16 Q.  Did she agree that it wasn't nice to trick people, or

17 something to that effect?

18 A.  Yes.  She had said that she didn't like it when people

19 tricked her.  And Jessica's response was, "Well, I don't like

20 it when people trick me."  And it was at that point that M.R.

21 then began to explain that Ms. Anna hadn't done anything to

22 her.

23 Q.  And there were a lot of talk with Mr. Thomas about the

24 monster?

25 A.  Yes.

1  Q.  Did Jessica Woodall speak with M.R. about if that really

2  happened?

3  A.  I don't remember her specifically following up about the

4  monster scenario.  I do remember that whatever Ms. Woodall

5  said, that M.R.'s response was that she dreamed that that

6  happened.

7  Q.  Right.  And after that, did she say anything about talking

8  only about things that really happened in the room?  Do you

9  remember that?

10 A.  Yes.  In response to M.R. saying that she had that dream,

11 that's when Jessica said, "In this room, let's only talk about

12 things that really happened."

13 Q.  And --

14 A.  And Jessica said, "Deal?" and M.R. said, "Deal."

15 Q.  And after that, what then did M.R. go on and say?

16 A.  She went on to say that Ms. Anna hadn't touched her, but

17 that Mr. Ali had, and that Mr. Ali was the only one who had

18 done that.

19 Q.  When you got to the daycare, I think you indicated you

20 spoke with multiple employees as witnesses; is that correct?

21 A.  Yes.

22 Q.  And read even more interview reports of employees there?

23 A.  I obtained written statements from -- written statements

24 from four employees, including Mr. Al-Awadi, and then written

25 notes from another employee that observed the interview or the

1  conversation between Ms. Conces and Mr. Al-Awadi.  So five

2  different people's written version of events, so to speak.

3  Q.  Did anyone that you interviewed or read, any of them say

4  anything about M.R. accusing Ms. Anna of touching her?

5  A.  No.

6  Q.  Who did they say M.R. accused of touching her?

7  A.  Mr. Al-Awadi, or Mr. Ali.

8  Q.  Prior to this investigation, did you know Ali Al-Awadi?

9  A.  No.  I had never met him before until I walked into the

10 interview room at the Child Advocacy Center and he was sitting

11 there in the T-shirt and shorts.

12 Q.  Is there anything -- were you out to get him in any way?

13 A.  No.  I certainly would characterize my investigation as

14 one that held him responsible for his actions, but it wasn't

15 anything vindictive or spite filled or --

16 Q.  Did you even know him from Adam?

17 A.  No, I didn't know him at all until I met him that day.

18 Q.  Mr. Thomas talked to you about how the pass code was

19 obtained for the phone.  Do you recall that?

20 A.  Yes.

21 Q.  Do you recall a rough approximation of when Tyria Graham

22 confronted Mr. Al-Awadi about M.R.'s accusation for the first

23 time?

24 A.  From my interview with Ms. Graham, my conclusion was it

25 was no more than 10 to 15 minutes after he left the room on

1  August the 21st, 2014 --

2  Q.  Did you --

3  A.  -- Mr. Al-Awadi left the room.  So no later than maybe, I

4  don't know, about a quarter till 2:00, 2:00 at the latest.

5  Q.  In the afternoon?

6  A.  Yes.

7  Q.  On what day?

8  A.  The 21st of August 2014.

9  Q.  Do you recall that you were asked what time Mr. Al-Awadi

10  was picked up the next day to be brought down to the Child

11  Advocacy Center?

12  A.  I remember Mr. Thomas asking me that, yes.

13  Q.  And could you remember the exact time or were you

14  speculating?

15  A.  I had a rough ballpark, somewhere between 11:30, 2:00,

16  somewhere in there.

17  Q.  When someone is interviewed, is the start time of that

18  documented?

19  A.  Yes.

20  Q.  Okay.  And will that start time be close to the time that

21  they arrived at the center?

22  A.  It depends on the case.  I've known some people who had to

23  wait a matter of hours before the detective had the

24  opportunity to conduct their interview.  Other times I have

25  walked people into the interview room and sat down; walked

1  right in with them, sat down, and began the interview.  So it

2  really varies.

3  Q.  What about in this case?  Would that start time have been

4  pretty close to around when he arrived?

5  A.  No.  It was about an hour, because if you recall, I was at

6  the daycare campus at St. Vincent Hospital, and I had sent

7  someone else to go pick up Mr. Al-Awadi at his home and take

8  him there.  So I had to wrap up the interviews I was

9  conducting at the daycare and then drive back to my office,

10 catch up on a few things that I had to do, and then go into

11 the interview room and talk to him.  So I think he waited

12 about an hour, maybe a little bit over that.

13 Q.  About an hour?

14 A.  Yes, sir.

15 Q.  Would it -- do you remember the start time of the

16 interview?

17 A.  I think it was about 2:37 or 2:47 p.m.

18 Q.  Would it help you if you were able to look at the

19 transcript to remember?

20 A.  Yes.  I --

21         MR. SHEPARD:  Your Honor, if I can approach?

22         THE COURT:  You may.

23         MS. KOROBOV:  May I approach?

24         THE COURT:  You may, Counsel.

25         MR. THOMAS:  Judge, we'll stipulate that it was

1   3:46 p.m.

2              THE COURT:  Is that good?

3              MR. SHEPARD:  That's good enough for me, Your Honor.

4              THE COURT:  So stipulated, 3:46 p.m.

5   BY MR. SHEPARD:

6   Q.  So he would have arrived about an hour before that?  So --

7   A.  Yeah.  So I was remembering the time he came in, but I

8   actually began the interview an hour later.  That sounds about

9   right.

10  Q.  So about 2:46?

11  A.  Is when he arrived, roughly.

12  Q.  Do you know about how far away from the center Mr. Ali

13  lived?

14  A.  I want to say anywhere between five to eight miles,

15  probably closer to eight miles away.  I'm just kind of

16  estimating based on the number of blocks over, but...

17  Q.  About 15, 20 minutes, if you had to ballpark it?

18  A.  Oh, I would say closer to 25, 30 minutes.

19  Q.  Okay.  So --

20  A.  Michigan Road is the best way to get up and down, and it's

21  a lot of stoplights and school zones.

22  Q.  So would that have put the time he was picked up closer to

23  2:00, if you do all the math?

24  A.  Probably close to that time.

25  Q.  And --

1  A.  I think --

2  Q.  -- was that 2:00 on what day?

3  A.  The 22nd of August 2014.

4  Q.  So between about a quarter till 2:00 on August 20 -- on

5  the 21st to between about 2:00 on August 22nd, close to 24

6  hours?

7  A.  Yes.

8  Q.  All right.  In your experience, is that enough time to

9  delete four images off your cell phone?

10 A.  It would take a fraction of 24 hours, just a few seconds.

11 But then, again, I use an iPhone, not a Samsung, so I'm not

12 sure how easy it is on a Samsung.

13 Q.  How old was    M.R.    at the time she was being

14 interviewed?

15 A.  Four years old.

16 Q.  How long had she been at the Child Advocacy Center by the

17 time the continuation interview was begun?

18 A.  If you recall, I couldn't remember the exact start time of

19 that second video.  And I don't think the date stamp was

20 correct.  I think it was around 9:00 -- or, I'm sorry, around

21 11:30, if I'm not mistaken, but I can't remember for sure.

22 Q.  Do you remember how long she had been there?

23 A.  I think she had been there for at least two, two and a

24 half hours.

25 Q.  Okay.  Do you remember what time you had asked them to be

1  there?

2  A.  I had asked them to be there at 9:00 a.m.  I think they

3  arrived shortly after that.

4  Q.  Okay.  And what's the latest you knew that they were still

5  at the hospital?

6          MR. THOMAS:  Your Honor, I think this is beyond the

7  scope.  And I think that this was all testified to on direct.

8          THE COURT:  Do you have a response?  This is beyond

9  the scope of cross-examination.

10          MR. SHEPARD:  I do, Your Honor.

11          THE COURT:  All right.  Come on up.

12          (Bench conference on the record.)

13          MR. SHEPARD:  Your Honor, on cross-examination he

14  went through multiple times asking of things he ignored or why

15  he believed what he believed in the first and discounted some

16  of the things that were in the second.  I'm just trying to lay

17  the foundation of how long she had been up, what she had been

18  going through, and if that went into his --

19          THE COURT:  How long the child had been up?

20          MR. SHEPARD:  Correct, Your Honor.  And if that was

21  one of the reasons he had --

22          THE COURT:  Okay.  All right.  Briefly.  Okay.

23                  (Open court.)

24          THE COURT:  The Court will overrule the objection.

25  You may continue.

1  BY MR. SHEPARD:

2  Q.  What's the latest you knew that they were still in the

3  hospital the previous day?

4  A.  Well, as I testified previously, I received the page at

5  1:51 a.m. on the 22nd of August.  It took me some time to wake

6  up, read the page, call the officer, talk to him.  And at the

7  time I spoke to him, they were still at the hospital with M.R.

8           And the earliest, if they -- if they left

9  immediately upon the conclusion of my conversation with the

10 officer, it would have been as early as 2:00 a.m., but my

11 experience with hospitals is that they're not always that

12 prompt when it comes to discharge, so I don't know.  Sometime

13 after 2:00 a.m., I can say with confidence.

14 Q.  In your experience as a -- in six and a half years as a

15 child molest detective, does it -- at some point, do

16 four-year-olds just get tired and does it become hard for them

17 to focus?

18 A.  Yes.  One of the things we try to do is make sure the

19 child is well rested and had ample opportunity to get a good

20 night's sleep.  Unfortunately, this didn't happen in this

21 instance, but I knew I had an incident that had just occurred

22 the day before.  And in weighing the pros and cons of going

23 forward with the interview, I felt like it was necessary to

24 have the interview done as soon as possible.

25           When I scheduled for them to come in at 9:00 a.m., I

1  didn't know any of the actions taken at the daycare the day

2  before.  As far as I knew, Mr. Ali, whoever he was, could be

3  caring for children and potentially even molesting them that

4  following day.  So I didn't want to leave it hanging out

5  there.

6          And so even though she wasn't as well rested as our

7  protocol would typically require, I went ahead and had the

8  family bring her in so that we could address this public

9  safety issue that existed.

10         MR. SHEPARD:  Thank you, Your Honor.  No further

11  redirect.

12         THE COURT:  Any questions on those questions?

13         MR. THOMAS:  Yes, Your Honor, if I could, just

14  briefly.

15         THE COURT:  Briefly.

16                   **RECROSS-EXAMINATION**

17  BY MR. THOMAS:

18  Q.  You can stop an interview anytime, can't you?

19  A.  No, I wouldn't say that.

20  Q.  Well, who decides when it's over?

21  A.  Well, if you recall earlier from my testimony, the way we

22  do it at Marion County, and the protocol we follow, is that

23  the child interviewer goes into the interview room with the

24  child one on one with the door closed and they conduct the

25  interview.  They follow the typical protocol, they explore the

1  subject at hand.

2          And once they feel like they have come to the

3  conclusion of the questions they need and want to ask, that's

4  when they will turn on their walkie-talkie, put it in their

5  ear, and allow it to -- you know, allow me an opportunity to

6  communicate with them.  So in the sense that I have an

7  opportunity to communicate in a discreet way with the child

8  interviewer, no, I can't just stop it at any point.

9  Q.  Well, if the child interviewer -- if the child falls

10  asleep, is the child interviewer going to continue on or are

11  they going to end the interview?

12  A.  I've never seen that happen.  I don't know.

13  Q.  I guess the point is, if she thought that this second

14  interview was worthless because the child was too tired -- as

15  you said, she was up all night -- she could have -- she could

16  have stopped that interview and said, "this is not" -- "this

17  is worthless"?

18  A.  Not exactly.  If you remember, I said that it was the

19  multidisciplinary team that decided that a second follow-up to

20  the original interview needed to be conducted, and it wasn't

21  necessarily the child interviewer's call alone as to whether

22  or not to conduct the interview.

23  Q.  You didn't -- the child's parents didn't tell you that you

24  couldn't ever speak to her again, right?

25  A.  No.  In fact, I have spoken with her many times since

1  then.  They've been more than cooperative and welcoming to

2  allow us to have interaction with her, yes, sir.

3  Q.  So -- well, tell me about those interactions.  Were they

4  recorded?

5  A.  No.

6  Q.  Did you take notes of those?

7  A.  No.

8  Q.  Well, what -- this is the first I'm hearing about this,

9  Officer.  Tell me a little bit more about these meetings that

10  you had with the witness, that I know nothing about.

11  A.  Okay.  I don't think it's anything extraordinary.  It's

12  actually fairly routine.  She met with myself and the

13  government in order to discuss the case and find out what she

14  would be able to testify to, ask her what happened and see

15  what she would say.

16  Q.  And you --

17  A.  It's been almost two years, or not quite, but two and a

18  half years, and she was four years old at the time and six

19  years old now.  Without speaking to her again in 2016, we

20  wouldn't know if or what she might be able to testify to or

21  what she remembered.  So that was the process of us finding

22  out if she even remembered what happened to her when she was

23  four years old at a daycare that she no longer attends.

24  Q.  I understand that.

25  A.  Okay.

1  Q.  You were preparing for trial.  That's normal.
2  A.  Sure.  That's all I'm referring to.  I'm not referring to
3  any other additional meetings with her.
4  Q.  Okay.  And I guess that's what I'm trying to ask you, is
5  that after -- on the 22nd, there was nothing to keep you from
6  going to her parents and saying, "Hey, you know, that last
7  interview, I thought she was really too tired.  You know,
8  maybe I would like to ask those questions again because --
9  when she's more attentive."  You could have done that and you
10  didn't, right?
11  A.  Well, she had answered the questions.  I didn't see the
12  point in doing it again at that time.
13  Q.  Well, she had answered the questions and you could
14  discount the answers because you thought she was too tired and
15  not paying attention, right?
16  A.  No.  I thought she, if you recall, even yawned real big
17  during the first interview, and then later her demeanor and
18  her physical behavior during the interview showed that she was
19  clearly not in the most focused or attentive or serious mood
20  and demeanor.
21       And then when she herself specifically addressed
22  what she had said about tricking Ms. Woodall and saying that
23  Ms. Anna touched her when she hadn't, I felt like it had been
24  resolved within that entire interview.  It wasn't something
25  that needed a second or third or further times to clarify.  I

1  thought she had clarified it sufficiently at the time we

2  talked to her on the 22nd.  There were no lingering questions

3  in my mind about what happened or didn't happen according to

4  M.R.

5  Q.  Well, there were no lingering questions, as you say, and

6  there was no follow-up on anything other than the

7  investigation of Mr. Al-Awadi, right?

8  A.  The person she had consistently and repeatedly accused of

9  molesting her, absolutely.

10  Q.  You had time, certainly, to ask M.R.'s mother about dream

11  patterns; it wasn't that you didn't have time, right?

12  A.  No, yeah.  I could have followed up with a more specific

13  interview or follow-up questions with Ms. Rodriguez concerning

14  M.R.'s dreams.

15  Q.  Or inquiring about E.R.'s teacher and whether there was an

16  Anna or someone close to that name or just to -- you had time

17  to do that, didn't you?

18  A.  Well, at some point I have obtained the full register of

19  all employees of the daycare.  I think that was information

20  that you have, in fact.

21  Q.  But just to be clear, that was because you discounted all

22  that, not because you didn't have time to do it, right?

23  A.  I don't know that I discounted it.

24          MR. SHEPARD:  (Unintelligible.)

25          THE REPORTER:  I cannot hear you.

  1          THE COURT:  Put your mic on.

  2          MR. THOMAS:  That's okay.  Your Honor --

  3          MR. SHEPARD:  Explain the question --

  4          THE COURT:  All right.  He said -- are you going to

  5  withdraw that question?

  6          MR. THOMAS:  I'll withdraw that question and I'll be

  7  finished with this witness, Judge.  Thank you.

  8          THE COURT:  All right.  Very good.

  9          Do you have anything further for the detective this

 10  evening?

 11          MR. SHEPARD:  No, Your Honor.

 12          THE COURT:  Very good.  Detective, you may return to

 13  your seat.

 14          THE WITNESS:  Thank you, ma'am.

 15          (Witness excused.)

 16          THE COURT:  And, lawyers, would you approach?

 17          (Bench conference on the record.)

 18          THE COURT:  It's 4:45.  Do you have a quick witness?

 19          MR. SHEPARD:  Unfortunately, Your Honor, the next

 20  witness is --

 21          THE COURT:  Who is the next witness?

 22          MR. SHEPARD:  Grant Melton, the --

 23          THE COURT:  Oh, the forensic --

 24          MR. SHEPARD:  -- the forensic examiner, Detective

 25  Grant Melton.

Vol. 2-328

1          THE COURT:  Okay.  All right.

2          MR. SHEPARD:  It's not going to be short.

3          THE COURT:  All right.  Well, how are you timewise?

4  Are you going to be able to finish tomorrow?

5          MR. SHEPARD:  We'll still finish tomorrow, Your

6  Honor.

7          THE COURT:  Okay.  And if you want to present any

8  evidence tomorrow, if in fact you do intend to call your

9  client, we'll do that tomorrow, also, and try to finish all

10  the evidence tomorrow.  And then we'll come back and

11  deliberate Thursday morning.

12          MS. KOROBOV:  And the plan will be to close on

13  Thursday, then, is that --

14          THE COURT:  Yes.  That sounds good.  We don't want

15  to keep them late.  So do you have enough evidence to go

16  through the day tomorrow?

17          MS. KOROBOV:  It's a good portion of the day, yeah.

18          THE COURT:  Okay.  All right, unless we finish at

19  noon.  If we finish in the afternoon, after lunch, we'll come

20  back in the morning.

21          MR. SHEPARD:  We won't be finished by noon.

22          MR. THOMAS:  Just so I'm clear, we should not be

23  prepared to do closing tomorrow?

24          THE COURT:  Unless they finish by noon.

25          MR. THOMAS:  Fair enough.

1       THE COURT:  Okay.  All right.  So unless they --

2  unless you all stipulate to some things, to the forensics

3  and -- which isn't going to happen, right?

4       MR. THOMAS:  It's not going to happen.

5       THE COURT:  Okay.  All right.  Okay.  All right.

6            (Open court.)

7       THE COURT:  All right.  Ladies and gentlemen, they

8  don't have a quick witness, so we're going to go home.  The

9  Court -- we're going to go ahead and adjourn.  And I'll need

10 you back in your jury room at 9:00 a.m.  And please leave in

11 plenty of time because you just never know when there's an

12 accident on the interstate, so try to make sure -- we want to

13 start promptly at 9:00 a.m. so that we can finish -- our goal

14 is to finish all the evidence tomorrow and then bring you back

15 bright and early on Thursday morning so that you can

16 deliberate and get your final instructions.  And then you can

17 get back to your life and we can let the juror in the back go

18 and make his doctor's appointment so he can make sure his legs

19 are okay.

20      Ladies and gentlemen, the Court is going to admonish

21 you, during this period of time that you're allowed to

22 separate for overnight, remember you are not to have any

23 discussion about the case among yourselves or with anyone

24 else.  You can't tell your families what happened in court

25 today, or your friends.

Vol. 2-330

1          If anyone should attempt to talk to you about the
2    matter, you should refuse and report that attempt to me at
3    your earliest opportunity.
4          You are not to do any research on the Internet, no
5    Googling, no Facebook, no Twitter, nothing about any of the
6    attorneys, parties, witnesses.  And if you know any
7    spectators, don't Google them either.
8          Under this admonishment, you will be allowed to
9    separate for overnight.  Be in there at 8:45, eat a snack,
10   drink some coffee, and we'll get you in the courtroom promptly
11   at 9:00 a.m.  Have a good evening.
12          THE COURTROOM DEPUTY:  All rise.
13          (Jury out at 4:47.)
14          THE COURT:  Anything further this evening?
15          MR. SHEPARD:  Nothing from the government, Your
16   Honor.
17          THE COURT:  Okay.  All right.  Come here,
18   Mr. Shepard.  And you can come, also.  And we can -- I just
19   need to tell you one thing, and then we'll adjourn.
20          We're off the record.
21          (Bench conference off the record.)
22                    (Open court.)
23          THE COURT:  Okay.  We're in recess.
24          THE COURTROOM DEPUTY:  All rise.
25          (Proceedings adjourned at 4:49 p.m.)

Vol. 2-331

1

2                    CERTIFICATE OF COURT REPORTER

3

4        I, David W. Moxley, hereby certify that the

5   foregoing is a true and correct transcript from

6   reported proceedings in the above-entitled matter.

7

8

9

10  /S/ David W. Moxley_____       August 1, 2016
    DAVID W. MOXLEY, RMR/CRR/CMRS
11  Official Court Reporter
    Southern District of Indiana
12  Indianapolis Division

13

14

15

16

17

18

19

20

21

22

23

24

25