Case 1:15-cr-00073-TWP-DML Document 148-6 Filed 12/12/16 Page 1 of 345 PageID #:
4501
Case 1:15-cr-00072-TWP-DML Document 148-6 Filed 12/12/16 Page 1 of 345 PageID #:18

Vol. 3-332

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF INDIANA
3                  INDIANAPOLIS DIVISION

4   UNITED STATES OF AMERICA,          )
                                       ) Cause No.
5          Plaintiff,                  ) 1:15-cr-0072-TWP-DML
                                       ) Indianapolis, Indiana
6     vs.                              ) **February 24, 2016**
                                       ) 9:18 a.m.
7   ALI AL-AWADI (01),                 )
                                       )  **VOLUME III**
8          Defendant.                  )

9

10              **Before the Honorable**
                **TANYA WALTON PRATT**

11          OFFICIAL REPORTER'S TRANSCRIPT OF
12                  JURY TRIAL

13

14  **For Plaintiff:**              Bradley Paul Shepard, Esq.
                                    Kristina M. Korobov, Esq.
15                                  Assistant U.S. Attorneys
                                    United States Attorney's Office
16                                  Suite 2100
                                    10 West Market Street
17                                  Indianapolis, IN  46204

18  **For Defendant:**             Ross G. Thomas, Esq.
                                    Attorney at Law
19                                  3728 North Delaware Street
                                    Indianapolis, IN  46205-3434
20

21

22  Court Reporter:                 David W. Moxley, RMR, CRR, CMRS
                                    United States District Court
23                                  46 East Ohio Street, Room 340
                                    Indianapolis, Indiana  46204
24
            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25      TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

Vol. 3-333

1                     **I N D E X**

2   **GOVERNMENT'S WITNESSES:**                         **PAGE**

3   M.R.

4   Direct Examination by Ms. Korobov .............337
    Cross-examination by Mr. Thomas ...............341
5
    ELI McALLISTER
6
    Direct Examination by Ms. Korobov .............348
7   Cross-examination by Mr. Thomas ...............358
    Redirect examination by Ms. Korobov ...........363
8
    RALPH ANDREW HICKS, M.D.
9
    Direct Examination by Ms. Korobov .............365
10  Cross-examination by Mr. Thomas ...............389
    Redirect examination by Ms. Korobov ...........398
11
    GRANT MELTON
12
    Direct Examination by Mr. Shepard .............414
13  Cross-examination by Mr. Thomas ...............449

14  SHEA ANDERSON

15  Direct Examination by Ms. Korobov .............458
    Cross-examination by Mr. Thomas ...............482
16  Redirect examination by Ms. Korobov ...........486
    Recross-examination by Mr. Thomas .............487
17
    TONYA FISHBURN
18
    Direct Examination by Ms. Korobov .............490
19  Cross-examination by Mr. Thomas ...............517
    Redirect examination by Ms. Korobov ...........523
20  Recross-examination by Mr. Thomas .............524

21  MICHAEL JOHNSON

22  Direct Examination by Mr. Shepard .............526
    Cross-examination by Mr. Thomas ...............549
23

24

25

Vol. 3-334

| 1 | **DEFENDANT'S WITNESS:** | **PAGE** |

ALI AL-AWADI

Direct Examination by Mr. Thomas ..............561
Cross-examination by Ms. Korobov ..............603
Redirect Examination by Mr. Thomas ...........662
Recross-examination by Ms. Korobov ..........670

# I N D E X   O F   E X H I B I T S

**GOVERNMENT'S EXHIBITS:** **PAGE**

3 .............................................445
5 .............................................472
7 .............................................432
8 .............................................432
9 .............................................432
10 ............................................432
27 ............................................418
30 ............................................500
30-A ..........................................500
31 ............................................500
31-A ..........................................500
34 ............................................421
36 ............................................634
37 ............................................427
44 ............................................530
45 ............................................530
46 ............................................530
48 ............................................472
49 ............................................472
50 ............................................472
51 ............................................472
52 ............................................472
53 ............................................498
54 ............................................498
55 ............................................498
56 ............................................498
57 ............................................498
58 ............................................498
59 ............................................498
60 ............................................498
61 ............................................498
62 ............................................369

1 | GOVERNMENT'S EXHIBITS (CONT'D):                    PAGE

2 | 64 ..........................................466
   | 69 ..........................................437
3 | 70 ..........................................509
   | 73 ..........................................473
4 | 74 ..........................................501
   | 75 ..........................................505
5 | 76 ..........................................508

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3-336

1                    (In open court.)

2            THE COURT:  Okay.  We are on the record.  This is

3    the United States of America versus Ali Al-Awadi.  Good

4    morning, Counsel.  Is the -- the jury have all made it in

5    despite the weather and accidents.  It was just rain today.

6    Is the government ready for the jury?

7            MS. KOROBOV:  Yes, Your Honor.

8            THE COURT:  Defense ready?

9            MR. THOMAS:  We're ready, Your Honor.

10            THE COURT:  Tanesa, you may bring in the panel.

11            MS. KOROBOV:  Your Honor, just -- my first witness

12    is the child.  And if it's okay with the Court, I would like

13    to kind of pick her up at the door and walk her in --

14            THE COURT:  Sure.

15            MS. KOROBOV:  -- if that's okay, and then to walk

16    her out at the end, just for closure for her sake.  I think --

17            THE COURT:  Very good.

18            MS. KOROBOV:  Thank you.

19            (Jury in at 9:19.)

20            THE COURT:  Good morning, ladies and gentlemen.  I'm

21    glad that you all made it in safely.  We are on the record.

22    This is the United States of America versus Ali Al-Awadi.

23    And, Ms. Korobov, you may call your first witness of the day.

24            MS. KOROBOV:  Thank you.  The government calls

25    M.R.

 1          THE COURT:  I need you to come right over here.

 2   Okay.  M.R., I need you to remain standing.  M.R., I need you

 3   to keep standing.  I'm going to stand up also so I can see

 4   you.  I want you to raise your right hand and face me.

 5          (The witness is sworn.)

 6          THE COURT:  You may have a seat.

 7          And, Ms. Korobov, you may examine your witness.

 8          MS. KOROBOV:  Thank you.

 9              **M.R., PLAINTIFF'S WITNESS, SWORN**

10                  <u>**DIRECT EXAMINATION**</u>

11   BY MS. KOROBOV:

12   Q.  Good morning, M.R.

13   A.  Good morning.

14   Q.  How are you doing?

15   A.  Good.

16   Q.  Good.  Can you please tell the jury what your name is?

17   A.  My name is M.R.

18   Q.  And, M.R., what's your last name?

19   A.  M.R.

20   Q.  And, M.R., how old are you?

21   A.  Six.

22   Q.  When is your birthday?

23   A.  ████████████.

24   Q.  M.R., do you go to school?

25   A.  Yes.

1  Q.  Where do you go to school?

2  A.  Spring Mill.

3  Q.  And what grade are you in?

4  A.  Kindergarten.

5  Q.  Kindergarten.  Who is your teacher there?

6  A.  Ms. Moore and Ms. Klaus.

7  Q.  You have two of them?

8  A.  Yes.

9  Q.  Yeah.  And who is your favorite of the two?

10 A.  Ms. Moore.

11 Q.  Ms. Moore?  Okay.  What's your favorite thing to do at

12 school?

13 A.  Recess.

14 Q.  Recess.  Okay.  M.R., do you live with your parents?

15 A.  Yes.

16 Q.  And what's your mom's name?

17 A.  Georgie.

18 Q.  Georgie?  Okay.  And who else lives in your home with you

19 and your mom and your dad?

20 A.  G.F., Teetsy, H.LNU.

21 Q.  So who is G.F.?

22 A.  My cousin.

23 Q.  And who is Teetsy?

24 A.  My aunt.

25 Q.  And who is H.LNU?

1   A.  My cousin.

2   Q.  And do you have a little sister?

3   A.  Yes.

4   Q.  What's her name?

5   A.  E.R..

6   Q.  How old is E.R.?

7   A.  Two.

8   Q.  Two?  Okay.  So are you the big sister, then?

9   A.  Yes.

10  Q.  How old is G.F.?

11  A.  She's 11.

12  Q.  Okay.  All right.  M.R., do you have any pets that live in

13  your home, too?

14  A.  Yes.

15  Q.  Okay.  What kind of pets do you have?

16  A.  A dog.

17  Q.  A dog.  All right.

18          MS. KOROBOV:  I'm going to ask to display

19  Government's 77, please.

20  BY MS. KOROBOV:

21  Q.  M.R., will you look at the TV screen that's right there?

22  Who is that in that picture?

23  A.  Me.

24  Q.  That's you?  Okay.  And do you remember where you are in

25  that picture?

1  A.  Yes.

2  Q.  Where are you?

3  A.  In the hospital.

4  Q.  In the hospital?  Okay.

5         MS. KOROBOV:  Could we display Government's 70 -- or

6  17 alongside it, please.

7  BY MS. KOROBOV:

8  Q.  And what's that?

9  A.  My bracelet.

10  Q.  Your bracelet?  Where did you wear that bracelet?

11  A.  At the hospital.

12  Q.  In the hospital, okay.  Do you remember why it is you went

13  to the hospital?

14  A.  Because Mr. Ali touched me in the privacy.

15  Q.  Okay.  And do you remember who brought you to the

16  hospital, M.R.?

17  A.  My mom.

18  Q.  Okay.  And do you remember, M.R., where you were when

19  Mr. Ali touched you in the privacy?

20  A.  Yes.

21  Q.  Where were you?

22  A.  I was in the big kids' room.

23  Q.  Okay.  And what were you doing when Mr. Ali touched you in

24  the privacy?

25  A.  I wasn't really feeling good, but I was sleeping.

*M.R. – CROSS/THOMAS*                    Vol. 3-341

1    Q.  Okay.

2    A.  And then, when my other teacher came, she said, "Why are

3    you awake?"  And I said, "Because Mr. Ali touched me in the

4    privacy."

5    Q.  Okay.  M.R., what do you use your privacy for?

6    A.  To go to the restroom.

7             MS. KOROBOV:  Okay.  I don't have any other

8    questions, M.R.  I'm going to let Mr. Thomas ask you some

9    questions.  Is that okay?

10            THE WITNESS:  Yes.

11            MS. KOROBOV:  Okay.  Thank you, M.R.

12                    **CROSS EXAMINATION**

13   BY MR. THOMAS:

14   Q.  Good morning, M.R.

15   A.  Good morning.

16   Q.  M.R., how long have you lived on -- where you live now?

17   A.  I don't know.

18   Q.  And you said that your mom and dad live there with you?

19   A.  Yes.

20   Q.  Your little sister?

21   A.  Yes.

22   Q.  And your aunt?

23   A.  Yes.

24   Q.  And your cousin?

25   A.  Yes.

*M.R. - CROSS/THOMAS*                        Vol. 3-342

1   Q.  Have they always lived with you?

2   A.  Yeah.

3   Q.  Yeah?  When you were going to school at -- where Mr. Ali

4   was, did they live with you then?

5   A.  No.  No.

6   Q.  No?  Have you ever had a sister named G.F.?

7   A.  No.

8   Q.  No?  Your cousin, G.F., lives with you now?

9   A.  Yes.

10  Q.  But she didn't live with you back then?

11  A.  No.

12  Q.  Okay.  M.R., do you remember who else was in the classroom

13  with you when you were touched?

14  A.  No.

15  Q.  Do you remember Mr. Ali taking your picture?

16  A.  No.

17  Q.  Did he ever ask you to pose for a picture?

18  A.  No.

19  Q.  Did he ever ask you to sit in a certain way or let him

20  take pictures of you?

21  A.  No.

22  Q.  Did you ever see that happen?

23  A.  No.

24  Q.  Did you see Mr. Ali touch you?

25  A.  No.

1  Q.  How do you know that he did?

2  A.  I just -- actually, I did feel him, but -- and I didn't

3  know what to say.  And I just woke up, and then my other

4  teacher came in.  Then I just saw him walk out.

5  Q.  Okay.

6  A.  And then he came back and then we was hugging about what

7  happened.

8  Q.  Okay.  When you woke up, was he touching your underwear?

9  A.  Yes.

10  Q.  Had you been -- had you been hurting that day?

11  A.  Yes.

12  Q.  Had you been hurting for a while that way before?

13  A.  Uh-huh.  Yes.

14  Q.  Did you ever talk to your mommy before about it hurting

15  that way?

16  A.  Yes.

17  Q.  Did she ever give you medicine for that?

18  A.  No.

19  Q.  No?  What about your dad?  Did he ever give you medicine?

20  A.  No.

21  Q.  Do you know why it was hurting?

22  A.  Because he put his whole finger in it.

23  Q.  Okay.  But was it hurting before that?

24  A.  No.

25  Q.  You don't remember telling Ms. Graham that morning that it

*M.R. - CROSS/THOMAS*                    Vol. 3-344

1   hurt?

2   A.  Yes.

3   Q.  Do you remember that?

4   A.  Yeah.

5   Q.  Do you remember talking to your mommy about the bubble

6   bath making it hurt?

7   A.  Yes.

8   Q.  When did you -- when did you and Mommy talk about that?

9   A.  When I first came to the hospital.

10  Q.  Do you remember talking to your teachers about that, too?

11  A.  Yes.

12  Q.  Did you talk to your mommy about the bubble bath before

13  you talked to your teachers?

14  A.  Yes.

15  Q.  It was before that day, wasn't it?

16  A.  Yes.

17  Q.  Do you remember talking to a lady the day after this

18  happened?  You went in a little room and sat in a chair with

19  toys and she asked you questions.  Do you remember that?

20  A.  Yeah.

21  Q.  Do you remember telling her about a dream that you had

22  had?

23  A.  Yes.

24  Q.  What was that dream?

25  A.  I forgot, but I know that I told her.

1  Q.  Okay.  How do you know that you told her?

2  A.  Because I was telling her.  And she asked me why.  And

3  I -- and I said it was like a bad dream.

4  Q.  Okay.  Have you talked to some people about what you were

5  going to say here today and how you were going to testify?

6  A.  Yes.

7  Q.  And did they talk to you about what you had said to the

8  lady in the room?

9  A.  Yes.

10  Q.  Remind you what you had said?

11  A.  Yes.

12  Q.  Do you remember having that bad dream?

13  A.  No.

14  Q.  Do you remember telling the lady that Ms. Anna had touched

15  you?

16  A.  No.

17  Q.  You don't remember that?

18  A.  No.

19  Q.  Do you know Ms. Anna?

20  A.  Not anymore.

21  Q.  No?  But you did know Ms. Anna?

22  A.  Yeah.

23  Q.  Did you like her?

24  A.  Yeah.

25  Q.  If you remember, M.R., how long had you been sleeping when

1  you woke up with Mr. Ali?

2  A.  Like only one time.

3  Q.  Okay.  And you don't remember who else was there?

4          MS. KOROBOV:  Objection, asked and answered.

5          THE COURT:  Sustained.  Next question.

6  BY MR. THOMAS:

7  Q.  Do you remember how you were sleeping, how you were

8  laying?

9  A.  I was laying like this, but I thought he couldn't touch

10 me.  So I was still staying like this, but he still touched

11 me.

12 Q.  And, I'm sorry.  What do you mean when you say, "laying

13 like this"?

14 A.  I was laying my feet -- I was laying with my feet up.

15 Q.  Okay.  And why were -- is that how you would normally lay

16 for your nap?

17 A.  Yes.

18 Q.  Okay.  So if it's me -- if I may, Your Honor.  If it's me

19 and I'm laying down, I put my knees like that, that's how you

20 remember laying?

21 A.  Yes.

22 Q.  Okay.  Do you remember telling Mr. Ali that you were

23 hurting?

24 A.  Yes.

25 Q.  Was that before you remember him touching you?

1  A.  Yes.

2  Q.  What's the first thing you remember when you woke up?

3  A.  That I feeled his finger.

4  Q.  Okay.  Did you remember Mr. Ali saying anything to you?

5  A.  No.

6         MR. THOMAS:  That's all the questions I have for

7  you.  Thanks very much.

8         THE WITNESS:  You're welcome.

9         THE COURT:  Do you have any redirect?

10        MS. KOROBOV:  No, Your Honor.  We're finished with

11  this witness.

12        THE COURT:  All right.

13        MS. KOROBOV:  May I walk her out, please?

14        THE COURT:  You may.  Thank you, M.R.  You may be

15  excused.

16        MS. KOROBOV:  Do you want to come with me, M.R.?

17        (Witness excused.)

18        MS. KOROBOV:  The government is going to call

19  Detective Eli McAllister.

20        THE COURT:  Okay.  All right.  Detective, as soon as

21  they get the chair switched, you may come up to the witness

22  stand.

23        Raise your right hand.

24        (The witness is sworn.)

25        THE COURT:  You may have a seat.

1          (Off the record.)

2          THE COURT:  All right.  The witness has been sworn

3   and you may examine the witness.

4          **ELI McALLISTER, PLAINTIFF'S WITNESS, SWORN**

5                    **DIRECT EXAMINATION**

6   BY MS. KOROBOV:

7   Q.  Are you the same Detective Sergeant Eli McAllister who has

8   previously testified in this matter?

9   A.  Yes, ma'am.

10  Q.  And I want to talk to you a little bit about preparing

11  M.R. for trial.

12  A.  Yes.

13  Q.  Were you present during all times that we prepared her to

14  walk into this courtroom and give testimony?

15  A.  I was.

16  Q.  Okay.  And can you tell the jury a little bit about

17  approximately how long ago the first time was that I met with

18  M.R. and you met with M.R.?

19  A.  I believe it was before Christmas.  I don't remember the

20  exact date.

21  Q.  And do you remember where we met?

22  A.  The first time we met was at the office of -- at your

23  office, at the U.S. Attorney's office, just a couple of blocks

24  away.

25  Q.  Did we talk at all about the facts of the case?

1  A.  No, not at all.

2  Q.  What did we do?

3  A.  Well, we just sat with her to build rapport, to let her

4  get to know us.  I sat on the ground and drew on the coffee

5  table next to her, I drew an airplane, I think.  We just

6  talked to her.

7  Q.  For the record, I am not as skilled a drawer as you; is

8  that correct?

9  A.  No.  I'm a better drawer --

10  Q.  And you --

11  A.  -- artist, I don't know.  Whatever it is.

12  Q.  And do you also recall the next meeting that we had with

13  M.R.?

14  A.  I do.

15  Q.  And can you tell the jury where that meeting occurred?

16  A.  At her family's home.

17  Q.  Okay.  And who went to that meeting, if you remember?

18  A.  You were there, I was there, Mr. Shepard was there.  And

19  Ms. Lloyd, the victim advocate for the U.S. Attorney's office,

20  was also present, along with M.R.  And her little sister was

21  there and her parents.

22  Q.  Just a little bit about M.R.'s living arrangement.  Does

23  she have family that lives, like, physically close to where it

24  is that M.R. currently lives?

25  A.  Yeah.  My understanding is that they have two condos that

Case 1:15-cr-00073-TWP-DML Document 448-6 Filed 12/12/16 Page 19 of 345 PageID #26

1  are adjacent to one other, or two townhouses next to one

2  another.  And part of the family lives in one, part of the

3  family lives in the other.

4  Q.  When we went to the house that day, did we discuss the

5  facts of the case on that evening?

6  A.  Our intention was to bring up the facts of the case and

7  see if she would talk about them.

8  Q.  Okay.

9  A.  But, ultimately --

10  Q.  And how did she respond?

11  A.  So we weren't entirely sure the best way to broach the

12  subject.  It had been quite some time, and it was not a fun

13  thing for her to talk about.  So we thought one of the easiest

14  ways might be to show her a photograph of Mr. Ali Al-Awadi and

15  see if she could talk about him from there.

16  Q.  What did she do?

17  A.  She said that she didn't know who he was.

18  Q.  And did she have a physical response to being shown that

19  photo?

20  A.  Yes.  She was clearly uncomfortable.  She looked away.

21  And then, when we tried to ask her if she knew him or who he

22  was, she would -- tucked her chin a little bit and would look

23  at me and then back to you, and then look at me again and then

24  say, no, she didn't know who he was.

25  Q.  Was M.R. holding anything at the time that we spoke to her

1   that evening?

2   A.  I think she had an American Girl doll, if I'm not

3   mistaken.

4   Q.  And do you recall whether she was holding a blanket?

5          MR. THOMAS:  I'm sorry.  About the relevance of

6   whether she was holding a blanket, Your Honor.

7          THE COURT:  I'll let her tie it up.  Do you -- even

8   if he recalls.  Do you recall whether or not she was holding a

9   blanket?

10  A.  Okay.  Yes, I remember.  So when we were asking her about

11  it, she was sitting on the couch.  And I apologize, I didn't

12  remember at first the exact circumstances, but she was sitting

13  on the couch.  She had a blanket kind of wrapped around behind

14  her.  When we showed her the photograph, she placed her hands

15  in between her -- in between her legs and covered her genital

16  area.

17         And as we continued to try to ask her if she knew

18  who he was and if she recognized him, she grabbed the blanket

19  that was behind her and grabbed it and stuffed it between her

20  legs and held it in front of her as we talked, and covered her

21  genital area.  I remember seeing that happen and then

22  mentioning it to you as we were leaving, just the physical

23  response and the body language that she displayed when we

24  brought the topic up.

25  BY MS. KOROBOV:

1  Q.  So, other than asking her if she remembered Mr. Ali or

2  remembered going to the daycare, did we discuss the facts at

3  all with her?

4  A.  No.  That was the way we were hoping to introduce the

5  subject, and she -- it was a complete dead end with her.  She

6  did not appear to want to talk about the topic.

7  Q.  When is the next time that we met with M.R.?

8  A.  I don't remember the dates.  It was probably within a

9  week.  I think it was maybe the following week we met with her

10 at the U.S. Attorney's office.

11 Q.  And who was there that time?

12 A.  Originally it was just you and I in the room with M.R.

13 Ms. Lloyd was in another room with M.R.'s parents, I believe.

14 And Mr. Shepard was running late, so he wasn't there with us.

15 Q.  Okay.  And what did we do with M.R. this time?

16 A.  We did some more rapport building, just talking to her,

17 asking how her day was, talking about the doll she had with

18 her.  I think we did some more coloring that day, as well.  A

19 dinosaur is what I drew that time.  And then --

20 Q.  Did you show anything to M.R. that time?

21 A.  Did we show her?  Yes, ma'am, we did.

22 Q.  And what did we show M.R.?

23 A.  You had a laptop with the video recording of the interview

24 that she did with Ms. Woodall on it.  And you played the video

25 recording of her interview with Ms. Woodall.

1  Q.  Okay.  Did we get through the whole video?

2  A.  No.

3  Q.  What happened?

4  A.  She began to spontaneously -- not spontaneously, but just

5  as she was watching the video, she started to say things about

6  what was being said and done on the interview -- or during the

7  video.  So when she watched herself start to talk about it,

8  she pointed to, I believe it was the hospital bracelet she was

9  wearing, and said she remembered wearing that, at which point

10 you paused the video.

11 Q.  Okay.  And did we ask her, then, questions about what it

12 is that she did remember happening?

13 A.  Yes.

14 Q.  Okay.  The next time we met with M.R., where did we meet

15 with her?

16 A.  We met at the U.S. Attorney's office again.

17 Q.  Okay.  And what do you recall happening at that meeting?

18 A.  We talked with her briefly there just to say hi.  And then

19 we walked the block and a half or two blocks here to the U.S.

20 Courthouse.

21 Q.  Okay.  And did M.R. get a tour of the courtroom?

22 A.  Yes.  We wanted to familiarize herself with -- or

23 familiarize her with the room that we were going to expect her

24 to sit in the chair and talk to strangers about this incident.

25 So we had her sit in that same gray chair, whatever color it

Case 1:15-cr-00073-TWP-DML Document 148-6 Filed 12/12/16 Page 23 of 345 PageID #: 4523

1  is, and you stood back there and asked her questions like how

2  old she was and what her favorite color was and what games she

3  liked to play, things like that.

4  Q.  Did we ask her anything about the facts of the case?

5  A.  No, you didn't ask her anything about what happened.

6  Q.  Okay.  And did I let M.R. ask me questions, too?

7  A.  Yes.  I believe you sat up here and she asked you

8  questions -- or she sat up here and asked you questions.

9  Q.  Okay.

10  A.  I think she wanted to question her mother, as well, so she

11  did that.

12  Q.  Okay.  And did we do a final meeting with M.R.?

13  A.  Yes.

14  Q.  And where did that last meeting occur?

15  A.  I believe it was at your office, as well.

16  Q.  Okay.  And about in relation to the start of the trial on

17  Monday, do you recall when that meeting was?

18  A.  I've had a bit of a crazy schedule of late.  I've been

19  working some late shift hours and day shift combined, back to

20  back, so I feel like it was one of those mornings where I had

21  worked the whole night and then came in at 8:00 the next

22  morning and met with them.  I feel like it was maybe the week

23  before trial.  I'm sorry.  I really don't remember.

24  Q.  That's okay.

25  A.  Within a week of the trial.

1  Q.  Okay.  At that meeting, did we discuss the facts of the

2  case?

3  A.  Yes.

4  Q.  Okay.  And where did that discussion occur?

5  A.  Right across from Ms. Lloyd's office, there's an empty --

6  or at the time -- or that day, there was an empty intern's

7  office.  So you, M.R., and I all sat in the intern's office.

8  Q.  And was anything shown to M.R.?

9  A.  No.

10 Q.  No videos?

11 A.  No, ma'am.

12 Q.  Okay.  And we just asked her questions at that point in

13 time?

14 A.  Yes.

15 Q.  Okay.  To your knowledge or in your presence, has M.R.

16 ever been showed the complete first part of that interview?

17 A.  No.  We didn't make it through the entire interview.  When

18 she started talking and pointing to the screen and commenting

19 on what she was seeing, we paused the video.  And we never

20 revisited that or showed her the rest of the video or the

21 second recording.  And we didn't do that ever again.  We never

22 played the video again once she started talking about it.  We

23 were just trying to open the door to refresh her memory that

24 way.

25 Q.  Okay.  And did -- you said -- did we ever show her that

Case 1:15-cr-00023-TWP-DML Document 148 Filed 12/12/16 Page 25 of 345 PageID #42

McALLISTER - DIRECT/KOROBOV          Vol. 3-356

 1  second portion --

 2  A.  No.  We never got --

 3  Q.  -- of the video?

 4  A.  No, we never even got through the first one.  We

 5  certainly didn't start the second recording, no.

 6  Q.  Okay.  And just one thing.  In the one video -- or excuse

 7  me, one photo, Government's Exhibit 17, the bracelet of M.R.,

 8  it appears that there's a mark on her arm.  Have you seen that

 9  mark on M.R.?

10  A.  Yes.  I believe it's --

11          MR. THOMAS:  Objection to relevance, Your Honor.

12          MS. KOROBOV:  I just wanted to be sure it wasn't

13  mistaken for some kind of injury.

14          MR. THOMAS:  May way approach, Your Honor?

15          THE COURT:  You may.

16          (Bench conference on the record.)

17          MR. THOMAS:  Your Honor, this is highly improper,

18  this suggestion here that there's some injury on her arm.

19          THE COURT:  I think she's trying to do --

20          MS. KOROBOV:  I want to make sure --

21          THE COURT:  -- the opposite.

22          MS. KOROBOV:  I want to make sure that no one thinks

23  that she was, like, physically assaulted.  It's a birthmark.

24  That's all I want to bring out.

25          MR. THOMAS:  Okay.

1       THE COURT:  Yeah, because I saw it.  I noticed it,

2  also.

3       MR. THOMAS:  Well, just the nature of the

4  question -- okay.  If that's what you're doing, I have no

5  objection.

6       THE COURT:  Okay.  All right.

7                  (Open court.)

8       THE COURT:  All right.  The objection is withdrawn?

9       MR. THOMAS:  Yes, Your Honor.

10      THE COURT:  All right.  You may.

11  BY MS. KOROBOV:

12  Q.  Did M.R. have a birthmark on her arm?

13  A.  Yes.  I believe it's on the right wrist, or right -- just

14  on the outside of her arm there.

15  Q.  Okay.  And that was visible in the photo with her hospital

16  band?

17  A.  Yes.  You could see it just around or above the band.

18  Q.  Okay.  And how many years have you -- you said six and a

19  half years in childhood abuse?

20  A.  Yes.

21  Q.  Okay.  And is the preparation that we gave M.R. for the

22  courtroom -- is that something that is typically done in

23  preparing children for court?

24  A.  Yes, it's common.  I've shown children videos of their

25  interviews before, because particularly if you have a young

McALLISTER – CROSS/THOMAS          Vol. 3-358

1   child.  It's been a long time, and they were quite young when

2   it happened, so it's not uncommon for them to forget or put it

3   out of their memory.

4           MS. KOROBOV:  Okay.  Thank you very much.  I pass

5   the witness.

6           THE COURT:  You may cross.

7           MR. THOMAS:  Thank you, Your Honor.

8                      **CROSS EXAMINATION**

9   BY MR. THOMAS:

10  Q.  So you met with M.R. five times to prepare?

11  A.  Probably.  I think that's it.  I wasn't counting as we

12  went through them.

13  Q.  And you didn't show her the video about the dream?

14  A.  No.

15  Q.  Did you talk to her about it?

16  A.  No, I don't believe we talked to her about it when --

17  Q.  Well, she seemed to remember that you did.

18          MS. KOROBOV:  Objection --

19          THE REPORTER:  I cannot hear you.

20          MS. KOROBOV:  Objection, Your Honor --

21          THE COURT:  I don't think you're on.

22          MS. KOROBOV:  I'm sorry.  Objection.  The question

23  has been asked and answered.  At this point, it's simply

24  argumentative.

25          THE COURT:  I'll overrule.

1  BY MR. THOMAS:

2  Q.  You were sitting here when she testified?

3  A.  Yes.

4  Q.  And you remember I asked her about the dream?

5  A.  Yes.

6  Q.  She said she didn't remember, but she knew about it?

7  A.  Yes.

8  Q.  And I said, "Was that from talking about what you said --

9  what you had said?"  And she said, "Yes."  Do you remember

10 that?

11 A.  Yes, I think so.

12 Q.  And I asked her about whether she had been -- remembered

13 what she said in the interview, and she said she didn't,

14 right?

15 A.  Yes.

16 Q.  That she had gone over it and now knew about it, right?

17 A.  She didn't say she had gone over it.

18 Q.  Well, you made her familiar with what she had said by

19 showing her the video and then talking to her about what she

20 had said, right?

21 A.  Yes, sir, when she started pointing to the screen and

22 discussing her memory of the wrist band.

23 Q.  In that -- it was the second meeting when you showed her

24 the picture of Mr. Al-Awadi, or the first meeting?

25 A.  It was the second, the one in her home.

McALLISTER - CROSS/THOMAS          Vol. 3-360

1  Q.  Okay.  And she told you that she didn't recognize him, or

2  said she didn't know who it was?

3  A.  Yeah.  It was a photograph --

4  Q.  It's a yes or no.

5  A.  Yeah, she said that she didn't know who he was.

6  Q.  Okay.  And did you ever -- who was present for that

7  meeting?

8  A.  I was there, Mr. Shepard was there, Ms. Korobov was there,

9  and Ms. Lloyd was there.  M.R.'s parents were upstairs with

10 her -- her little sister.

11           MR. THOMAS:  May we approach, Your Honor?

12           THE COURT:  You may.

13           (Bench conference on the record.)

14           MR. THOMAS:  Your Honor, I think this is *Brady*

15 material, and I don't think it was ever revealed that they had

16 the meeting, and that at the meeting she could not identify my

17 client.  That should have been turned over to me prior to

18 trial as *Brady*, and it was not.

19           MS. KOROBOV:  Judge, I don't consider it to be *Brady*

20 material.  It's a photo actually of the two of them together.

21 We can elicit some more testimony, but that's simply what she

22 said.

23           THE COURT:  Is it the photograph that's in the

24 exhibit binder?

25           MS. KOROBOV:  Yes.

1          THE COURT:  Had you seen that before?

2          MR. THOMAS:  I've seen the photo.  I was not told

3   that the victim did not recognize my client.  And I don't

4   think it's up to her to decide what *Brady* material is, Your

5   Honor, but, clearly, if they've interviewed their witness

6   again and the witness says, "I don't recognize that person,"

7   that's information that needs to be disclosed prior to trial.

8          THE COURT:  Okay.

9          MS. KOROBOV:  This isn't a case where it's a

10  stranger identification.  Who Mr. Ali is and who his presence

11  is in the classroom has never been in question.  There's never

12  been -- this isn't an issue like it's a bank robbery where a

13  witness identified him for a brief second.  This is who this

14  person is in her classroom.

15         So we just didn't think that it had anything --

16  didn't see it as -- it didn't make it more or less likely that

17  the defendant produced an image of M.R. and used her to

18  produce an image of her engaging in sexually explicit conduct.

19         THE COURT:  All right.  So what are you asking for?

20  Are you saying that it's a mistrial because of a *Brady*

21  violation?

22         MR. THOMAS:  Your Honor, we're not talking about

23  identity.  We're talking about the memory of their witness.

24  And today the witness comes in and identifies him, and that's

25  fine --

 1          MS. KOROBOV:  The witness didn't identify him.  I

 2   never asked her to identify him.

 3          THE COURT:  Yeah, she didn't identify him today.

 4          MR. THOMAS:  Well, fair enough.  The witness --

 5          THE COURT:  She just said, "Mr. Ali."

 6          MR. THOMAS:  Right.  The witness testified,

 7   presumably from her memory, about Mr. Ali, and at a point in

 8   the middle couldn't identify him in a picture.  I think that

 9   is evidence that we need to know, about the memory of the

10   witness, in order to properly cross-examine her about what she

11   remembered then, what she's been told now, particularly

12   meeting with the government five times to prepare for her

13   testimony to tell us that, well, at one point when we talked

14   to her we couldn't even -- she couldn't even identify him.

15          THE COURT:  Well, Counsel, you've got the

16   information.  You've cross-examined -- I mean, you're

17   cross-examining the detective on it.  The child is six years

18   old, so you can't really get much cross out of her.  I don't

19   think it rises to the level of a mistrial if, in fact, it were

20   a *Brady* violation.  But I'll take your motion for mistrial

21   under advisement.  Go ahead and finish examination of the

22   witness, and we'll talk about it during the recess.

23          MR. THOMAS:  Thank you, Your Honor.

24          THE COURT:  Okay.

25                    (Open court.)

1          THE COURT:  All right.  You may continue.

2   BY MR. THOMAS:

3   Q.  After that fifth meeting with M.R., did you have any other

4   contact with her, as far as preparation?

5   A.  No, no preparation.

6   Q.  Any other contact with her?

7   A.  Yes.

8   Q.  What was that?

9   A.  This morning.  I walked into the witness room and said hi

10  to her.

11  Q.  Do you know if -- were you present for -- you were present

12  for five meetings to prepare her for trial.  Are you aware of

13  any other meetings that were had when you weren't there?

14  A.  No.  It was always a very clear point that I had to be

15  present for all of those meetings.

16  Q.  You don't know why she remembers talking to you about the

17  dream, because you didn't talk to her, right?

18  A.  No.  We never discussed the dream.

19          MR. THOMAS:  All righty.  That's all I have.

20          THE COURT:  Any redirect?

21                **REDIRECT EXAMINATION**

22  BY MS. KOROBOV:

23  Q.  Detective Sergeant, I ask you to look in the binder at

24  Government's Exhibit 3, please.

25  A.  Yes, ma'am.

McALLISTER – REDIRECT/KOROBOV          Vol. 3-364

1  Q.  Do you recognize Government's Exhibit 3?

2  A.  Absolutely.

3  Q.  How do you recognize it?

4  A.  It's one of the photographs that we recovered from the

5  cell phone of Mr. Al-Awadi during Detective Melton's forensic

6  exam of the phone.

7  Q.  Okay.  And is Government's Exhibit 3 the photo -- the

8  photo that we showed to M.R. to see if she recognized anyone

9  in it?

10  A.  Yes.

11  Q.  Okay.  Is -- who else is in that photo?

12  A.  M.R.

13  Q.  Okay.  Did M.R. recognize herself in the photo?

14  A.  Yes.

15          MS. KOROBOV:  Nothing further.

16          THE COURT:  Okay.  Any questions on those?

17          MR. THOMAS:  No questions, Your Honor.

18          THE COURT:  All right.  Thank you.  You may return

19  to your seat.

20          THE WITNESS:  Thank you.

21          (Witness excused.)

22          THE COURT:  And you may call your next witness.

23          MS. KOROBOV:  The government calls Dr. Hicks.

24          THE COURT:  Okay.  Doctor, if you would remain

25  standing and raise your right hand.

```
 1              (The witness is sworn.)

 2              THE COURT:  You may have a seat.

 3              You may examine your witness, Counsel.

 4              MS. KOROBOV:  Thank you.

 5      RALPH ANDREW HICKS, M.D., PLAINTIFF'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7  BY MS. KOROBOV:

 8  Q.  Would you tell the jury your name, and spell your

 9  first and last name, please?

10  A.  My name is Ralph Andrew Hicks.  The first name is spelled

11  R-A-L-P-H, last name H-I-C-K-S.

12  Q.  And, Dr. Hicks, how are you employed?

13  A.  I'm a pediatrician and I'm employed by Indiana University

14  with -- the School of Medicine with an appointment in the

15  Department of Pediatrics, which is based at Riley Hospital for

16  Children in Indianapolis.

17  Q.  Would you describe your educational background for the

18  jury, please?

19  A.  I completed my -- from 1973 to 1978, I completed my

20  undergraduate college work at the University of Louisville in

21  Louisville, Kentucky.  From 1978 to 1982, I completed medical

22  school at the University of Louisville School of Medicine in

23  Louisville, Kentucky.  From 1982 to 1985, I completed a

24  three-year residency in pediatrics at the Children's Mercy

25  Hospital, which is in Kansas City, Missouri.  From 1985 to
```

1  1987, I completed a two-year fellowship in pediatric

2  infectious diseases, also at the Children's Mercy Hospital in

3  Kansas City, Missouri.  And then, beyond that, I've had

4  continuing medical education and board certification.

5  Q.  And what board certification specifically do you hold?

6  A.  Since 1987, I've been certified by the American Board of

7  Pediatrics in general pediatrics.  And since November of 2009,

8  which was the first offering for the child abuse pediatrics

9  subspecialty board examination, I've been certified by the

10  American Board of Pediatrics in the subspecialty called child

11  abuse pediatrics.

12  Q.  Could you tell the jury what child abuse pediatrics is?

13  A.  Well, it's -- as you can tell, since the first board

14  offering was in 2009, it's a relatively new subspecialty in

15  pediatrics.  And it involves the practice of an evaluation of

16  infants, children, adolescents, where there may be concerns

17  for child -- any types of child abuse or neglect.

18  Q.  And are you published and do you teach in the area of

19  child abuse pediatrics?

20  A.  Yes.  I have some publications, both in the peer reviewed

21  medical literature, as well as other sources.  And as part of

22  my role as a faculty member, I certainly am involved in

23  teaching.  And I'm also the program director for our

24  fellowship at Indiana University in child abuse pediatrics.

25  Q.  On a daily basis, are you part of a clinical team at Riley

1  Hospital for Children?

2  A.  Yes I am.

3  Q.  And could you describe for the jury what it is that your

4  team does?

5  A.  My -- within the Department of Pediatrics, I'm part of a

6  section that is called the Indiana University Child Protection

7  Programs.  So we're a section within the Department of

8  Pediatrics at IU and Riley, just like the cardiology section

9  or newborn medicine section or other specialties.

10          Our team includes four staff, or faculty

11  pediatricians, three others besides myself; one nurse

12  practitioner, two nurses, two social workers, and other staff

13  that work with us, both in clinical care and in the office and

14  teaching responsibilities.

15          We provide a consultation service for referrals of

16  children where there may be concerns for injuries or other

17  findings or concerns that may represent child abuse or

18  neglect.  We provide consultation both to medical

19  practitioners in the inpatient and outpatient areas at Riley

20  Hospital, as well as other consultations, and by telephone

21  calls from around the state and from all types of providers,

22  and are available to do other types of consultation, as well.

23  Q.  And, essentially, do you also do exams and follow-up exams

24  of children where there's allegations of physical or sexual

25  abuse or neglect?

1  A.  We do, yes.

2  Q.  Okay.  And, Doctor, is the hospital, or Indiana

3  University, paid for your time whenever you're testifying in

4  court?

5  A.  Well, we do -- our practice is, among the physicians, is

6  to submit a bill for our time if we are testifying as an

7  expert witness.  And that's done through our practice plan,

8  which is the company that provides billing services for our

9  practices.

10 Q.  Okay.  So is your -- are you -- someone will receive money

11 for your time testifying here today; is that correct?

12 A.  It goes into our practice plan to provide support for our

13 programs, yes.

14 Q.  Okay.  Thank you.  Doctor, before we discuss M.R. at all,

15 I would like to discuss, in general terms, female pubic and

16 genital anatomy.  I'm going to ask you to look in that book at

17 Exhibit Number 62 and ask if you recognize it.

18 A.  Yes, I do.

19 Q.  Okay.  And what do you recognize it to be?

20 A.  This is a printed version of a PowerPoint that I provided

21 to you as a way to illustrate and explain some questions that

22 you had about female genital anatomy.

23 Q.  Okay.  And would this be helpful to the jury in

24 understanding the female genital and pubic anatomy of a child

25 of M.R.'s age?

1  A.  I think it could be, yes.

2        MS. KOROBOV:  Okay.  At this time, we move to admit

3  Exhibit Number 62 for demonstrative purposes.

4        THE COURT:  Any objection to 62?

5        MR. THOMAS:  Judge, I have two pages under my --

6        MS. KOROBOV:  And the first page is the cover page

7  that has the sticker on it.

8        MR. THOMAS:  So are you moving to admit all three

9  pages?

10        MS. KOROBOV:  Yes.

11        MR. THOMAS:  What's the purpose of page 1?

12        MS. KOROBOV:  Page 1 is the cover page of the

13  exhibit on which I put the sticker, so that it wouldn't

14  interfere with the rest of the exhibit.

15        MR. THOMAS:  Okay.  No objection.

16        THE COURT:  Government's Exhibit 62, in 3 parts, is

17  admitted into evidence without objection.

18                  *(Government's Exhibit 62 was*

19                  *received in evidence.)*

20        MS. KOROBOV:  Thank you, Your Honor.

21        I would ask to display Government's 62, page 2,

22  please.

23  BY MS. KOROBOV:

24  Q.  What are we looking at here, Dr. Hicks?

25  A.  This is a schematic diagram of the external aspects of the

1  female genitalia.

2  Q.  Okay.  And does it have labeled the different parts of the

3  female genitalia and pubic area?

4  A.  It does, yes.

5  Q.  The area up here, where I've just kind of put this red

6  line, I'd ask you to look at it.  What would you call that

7  area?

8  A.  The skin below --

9  Q.  Yes, the skin underneath that red line.

10  A.  Yeah.  That is referred to or called the mons pubis.  And

11  that's the soft tissues that cover the pubic bone in the

12  midline.

13  Q.  And the labium majora, or I think it says on here "majus,"

14  can you kind of touch the screen to show where it is the labia

15  majora are, both of them?

16  A.  The labia majora are the skin folds, external folds of

17  skin, on the left and the right that come together in the

18  midline --

19  Q.  Okay.

20  A.  -- to cover the vaginal opening.

21  Q.  All right.  And are you able to touch those on the screen

22  so we can get some highlight?  There, just run your finger

23  along it.

24  A.  Right there and there.

25  Q.  Okay.  Okay.  Actually, it's coming up as an arrow there.

Case 1:15-cr-00073-TWP-DML Document 448-6 Filed 12/12/16 Page 40 of 345 PageID #457

1  All right.  I'm going to ask you to just kind of run your

2  finger fully along the screen to show us where the labia

3  majora are.  I'm not sure if it's --

4  A.  There.

5  Q.  Okay.

6  A.  That's -- that would be the patient's right --

7  Q.  Okay.

8  A.  -- and this would be the patient's left labia majora --

9  Q.  Okay.

10  A.  -- and it extends from the front to the back.

11  Q.  All right.  And then that next set of skin folds, what is

12  that?

13  A.  Just to the -- towards the middle of the slide on the

14  midline, this -- I don't know if I can show right there and

15  right there.  That's called the labia minora, also called the

16  labia minus.  And those are skin folds inside, or to the

17  medial aspect, or what we call medial towards the midline of

18  the labia majora.  And they also come together at the midline

19  to cover the vaginal opening in females.

20  Q.  Okay.  So then in the center there, marked, we have the

21  vaginal opening; is that correct?

22  A.  Yes.  "Orifice" is another word for opening, and that

23  arrow or the line, the white line, points into the vaginal

24  opening or orifice, yes.

25  Q.  Okay.  And where is the hymen, then, in relation to

1  vaginal orifice?

2  A.  The hymen in this schematic diagram is the pink tissue

3  that surrounds the vaginal opening.  So this is all hymen

4  tissue.  I don't know if you can tell where I'm touching,

5  but --

6          MS. KOROBOV:  Your Honor, it appears that he is

7  touching the screen, but we are not getting anything on it.

8  So I'm not sure if the screen is having trouble again.

9          THE COURT:  Tanesa will take a look at it.  You just

10  have to touch it really hard.

11          MS. KOROBOV:  Okay.

12          THE COURT:  Do you want to erase Tanesa's marks?

13  BY MS. KOROBOV:

14  Q.  Okay.  If you could kind of circle where the hymen is?

15  A.  The hymen is --

16          THE COURT:  Push it really --

17          MS. KOROBOV:  There we go.

18          THE COURT:  -- hard.  There you --

19  A.  Well, that arrow points to part of the hymen tissue, and

20  it completely encircles the vaginal opening.

21  BY MS. KOROBOV:

22  Q.  Okay.

23  A.  And there normally is an opening in the hymen.  It doesn't

24  completely cover the vaginal opening, but it -- and there are

25  various normal -- there are a number of normal variants to the

 1  appearance of the hymen.  It may completely surround the

 2  opening.  Sometimes there's not tissue present in the front,

 3  but it partially covers the vaginal opening.

 4          MS. KOROBOV:  Okay.  Can we see page 3 of

 5  Exhibit 62, please.

 6  BY MS. KOROBOV:

 7  Q.  Okay.  With respect to page 3 of Exhibit 62, the area that

 8  I'm going to touch with my finger here, what is this area

 9  called?

10  A.  Well, this is a side view, a schematic diagram again, and

11  so we are looking -- and this is what's called, in medical

12  terms, a sagittal cutaway view.  So if you imagine the body is

13  cut in the midline, separated in the midline, and we're

14  looking from the side, we're looking at the -- a side view of

15  the external and internal genitalia.  The area that's in red,

16  just below that red line, is, again, the suprapubic area, or

17  the soft tissues that cover the pubic bone, also called the

18  mons pubis, there in the midline.

19  Q.  Okay.  So the area where the red line is, that's the mons

20  pubis?

21  A.  Yes.

22  Q.  Okay.  And can you put your finger there, then, on where

23  the hymen is?

24  A.  It's -- it's difficult to see completely, but the hymen is

25  the area right there, or the side view of the tissue right

Case 1:15-cr-00073-TWP-DML Document 148-6 Filed 12/12/16 Page 43 of 345 PageID #460

1  there, that encircles or partially covers the vaginal opening.

2  Q.  Does something cover the hymen?

3  A.  Well, normally the hymen and the vaginal opening are

4  covered, because the labia majora and labia minora come

5  together in the midline in females, and so there's -- it's

6  normally not exposed, but covered by the labia.

7  Q.  Question:  Does the hymen cover the vaginal opening like a

8  piece of Saran Wrap?

9  A.  Well, no.  I mentioned earlier that there is normally an

10  opening in the hymen.  In fact, it's abnormal, it's an

11  abnormal condition not to have an opening, even for the

12  newborn, even in newborns.  And the tissue itself is more --

13  very similar -- it's called mucosal tissue.  It's very similar

14  to the inside of the mouth.  It's that type of tissue, but

15  there -- it doesn't completely cover the vaginal opening, no.

16  Q.  So can something pass through a hymen without tearing it,

17  even the hymen of a child?

18  A.  Yes.

19  Q.  I'm sorry?

20  A.  Yes.

21  Q.  Thank you.  Can you describe the hymen of a child the age

22  of M.R.?

23  A.  I'm sorry?

24  Q.  Can you describe a hymen in a child the age of

25  M.R.?

1  A.  You're asking whether -- to describe what it would

2  typically appear --

3  Q.  Yes, sir.

4  A.  -- like, in that age child?

5  Q.  Yes, sir.

6  A.  Normally, in this --

7       MR. THOMAS:  Your Honor, preliminary question for

8  purpose of objection?

9       THE COURT:  You may.

10 BY MR. THOMAS:

11 Q.  Was there anything abnormal about Ms. Guevara's hymen in

12 your examination?

13 A.  Not on my examination on September 9th of 2014, no, sir.

14      MR. THOMAS:  Your Honor, I don't see the relevance

15 of this --

16      THE COURT:  Why don't we approach.

17      (Bench conference on the record.)

18      THE COURT:  All right.  He objects to the relevance.

19      MS. KOROBOV:  I'm going to have the doctor explain

20 that the hymen of a child is different than the hymen of an

21 adult, which would be typically the juror's experience in that

22 the hymen in a child hasn't been estrogenized yet, so touching

23 it results in pain.

24      THE COURT:  Oh, okay.  That's fair enough.

25      MR. THOMAS:  Okay.

1          THE COURT:  All right.

2                    (Open court.)

3          THE COURT:  The objection is overruled.

4  BY MS. KOROBOV:

5  Q.  Can you describe a hymen in a child the age of four, five

6  years old?

7  A.  Well, typically that would be normally a child who is

8  below or before the age of puberty, and during which time

9  there are physical changes that occur in the hymen.  And the

10  hymen typically will appear, as I mentioned, as mucosal type

11  tissue, but it's generally relatively thin in relation or

12  comparison to an adolescent or adult.

13          As I said, it may come together, it may fold in on

14  itself, so that initially we may not see a measurable opening.

15  But with separation of the labia during a medical examination,

16  most of the time we will be able to visualize an opening to

17  the hymen.  But it partially or completely encircles the

18  vaginal opening.

19  Q.  And based on the nature of the tissue of the hymen and the

20  fact that the child has not gone through puberty at that

21  point, does it cause physical pain to come into contact with

22  the hymen of a child of that age?

23  A.  Most -- almost all girls of that age, if the hymen is

24  touched, for example -- and we know this from our experience

25  with exams if we need to obtain cultures, for example, for

1  vaginal, because of a vaginal discharge -- if the hymen is

2  touched, most of the time girls will report discomfort or

3  pain, almost always, in that -- at that age.

4  Q.  And if a child, four or five years old, somehow touched

5  her own hymen, how would you expect that child to respond,

6  based on your training and your experience?

7  A.  I would expect that she would experience discomfort or

8  pain.

9          MS. KOROBOV:  All right.  You can take down the

10  exhibit, please.

11  BY MS. KOROBOV:

12  Q.  I'm going to talk specifically about          M.R.

13  Did you have the opportunity to do an examination of

14  her?

15  A.  I did, yes.

16          MS. KOROBOV:  Can you close that up.

17  BY MS. KOROBOV:

18  Q.  On what date did you examine M.R.?

19  A.  I examined M.R. on September 9th of 2014.

20  Q.  Where did you do the exam?

21  A.  This was at Riley Hospital for Children in our clinic,

22  outpatient clinic area.

23  Q.  Who was with her?

24  A.  She was accompanied by her mother and great aunt.

25  Q.  And what was the purpose of your examination at that point

1  in time?

2  A.  She had been referred to us by the Center of Hope program

3  and emergency department at St. Vincent Hospital following an

4  examination there on August 21st of 2014.

5  Q.  So you're seeing her approximately two and a half weeks

6  afterwards?

7  A.  That's correct, yes.

8  Q.  And what did you review prior to your examination of M.R.?

9  A.  Prior to my examination, we -- I reviewed the medical

10  record report from her examination on August 21st of 2014.  In

11  addition, one of our social workers, who routinely is in

12  clinic with us, obtained some history on my behalf from the

13  mother related to the reason for the visit, and other social

14  and behavioral history.  And then I also, while meeting with

15  the child and mother and aunt prior to the exam, obtained some

16  additional medical history.  So all that was reviewed and

17  available prior to the actual physical examination.

18  Q.  Okay.  As part of your examination, you indicated that

19  you're asking some questions about behaviors of the child; is

20  that correct?

21  A.  Yes.

22  Q.  And what's the purpose of doing that?

23  A.  Well, in -- in children who -- well, behavioral concerns,

24  in general, among parents of children are relatively common

25  concerns that are reported as part of medical visits, and so

1  that's one reason we ask.  Among children who have experienced

2  abuse or neglect or maltreatment of any kind, behavioral and

3  developmental problems are fairly common.  And so we screen

4  for those sort of things during our clinic visit for those

5  reasons.

6  Q.  Okay.  And in this case, were any behavioral changes

7  reported by M.R.'s family with respect to her?

8  A.  There were a few, yes.

9  Q.  Okay.  Can you describe those for the jury, please?

10           MR. THOMAS:  Objection -- or preliminary question

11 for purpose of objection?

12           THE COURT:  You may.

13 BY MR. THOMAS:

14 Q.  Doctor, are you a psychiatrist?

15 A.  No.

16 Q.  Psychologist?

17 A.  No.

18 Q.  Was your examination of her medical condition based on her

19 behavior?

20 A.  Well, as a pediatrician, pediatrics involves the physical,

21 emotional, and mental health of newborns, infants, children,

22 and adolescents.  Yes, it is.

23 Q.  So --

24           THE COURT:  Do you have an objection?

25           MR. THOMAS:  I have another question, if I may.

Case 1:15-cr-00023-TWP-DML Document 148-6 Filed 12/12/16 Page 49 of 345 PageID #466
Case 1:15-cr-00023-TWP-DML Document 148-6 Filed 12/12/16 Page 49 of 345 PageID #466
4549

1  BY MR. THOMAS:

2  Q.  Your -- your examination of her injuries was related to

3  her behavior?

4  A.  The -- my examination was related to the reason for her

5  being referred to us for a follow-up examination, which was,

6  in part, related to behaviors, yes.

7          MR. THOMAS:  I'll accept that, Your Honor.  No

8  objection.

9          THE COURT:  All right.  You may continue.

10 BY MS. KOROBOV:

11 Q.  Would you describe for the jury, please, what, if any,

12 behavioral changes had been noted in M.R.?

13 A.  She had been -- or M.R. was described as, on August 21st,

14 after returning home, was described as sad and crying.  She

15 had one episode of what's called enuresis, or wetting herself,

16 that day.  And since August 21st, Mother reported that she had

17 been sleeping with her parents rather than in her own bed.  So

18 those were the pertinent things that were reported to us, yes.

19 Q.  Did you do a physical exam of M.R.?

20 A.  Yes.

21 Q.  And can you describe, in particular, the genital portion

22 of her exam?

23 A.  Yes.  That's part of the exam.  We do a head-to-toe

24 general exam followed by a detailed examination of the anal

25 and genital areas.  With respect to your question and the anal

1  and genital examinations, it was unremarkable, or normal, on

2  that date.

3  Q.  Was M.R. at that point experiencing any more vaginal pain?

4  A.  She was not.

5  Q.  Was she a healthy child?

6  A.  She appeared healthy that day, yes.

7  Q.  Developmentally on target?

8  A.  Yes.

9  Q.  And was this what you expected with respect -- to find

10 with respect to her genital exam?

11 A.  Yes.  At that time, yes.

12 Q.  Okay.  Why is that?

13 A.  Well, there had -- from her examination on August 21st,

14 there had been some findings consistent with injury.  And the

15 findings that were described on that prior examination, I

16 would not have expected them to have persisted or lasted for

17 longer than a few days to maybe a week or so.  So it wasn't

18 surprising to me that her examination was normal two and a

19 half weeks later.

20 Q.  Okay.  As part of your work in child abuse pediatrics, do

21 you sometimes take children -- photos of children's bodies?

22 A.  We sometimes do, yes.

23 Q.  And both -- that's physical abuse of children, as well as

24 sexual abuse?

25 A.  Yes.

1 Q.  Okay.  And what protocols do you follow when you take

2 photographs of children?

3 A.  Well, it differs a little bit depending on the setting.

4 For the patients that we see with injuries, physical injuries,

5 on nongenital parts of the body, we normally -- and in the

6 hospital setting or the emergency department, we normally will

7 call the medical photographers at IU Health, and one of them

8 will come and take the photos.

9      Oftentimes we are there to point out, or a nurse is

10 there to point out, the areas that we want photographed.  And

11 that's done with the use of identifying a ruler, usually, in

12 the field of view with patient identification on it.

13      With respect to sexual abuse exams, if there are --

14 if there's a reason to do photographs, those are done with the

15 consent of the parent or guardian and with the assent of the

16 child.  And typically -- and along with the photographs, we

17 will normally take a photograph of the patient's

18 identification information, which is in the form of a sticker

19 that is put on the chart.  And we include that before and --

20 at the beginning and the end of the series of photographs.

21 And those are -- those are stored in a -- on a secure server

22 at IU and IU Health, that's separate from the medical record.

23 Q.  And you document when you take photos?

24 A.  We do, yes.

25 Q.  And you document if you don't take photos; is that

1   correct?

2   A.  Usually I do, yes.

3   Q.  In M.R.'s case, did you take any photographs of her body?

4   A.  I did not.

5   Q.  And is that, in fact, documented in your report?

6   A.  I believe it is, yes.

7   Q.  On occasions where you do take photos, do the photos

8   always turn out the way that you intended?

9   A.  Not always, no.

10  Q.  How does a child's cooperation affect the quality of the

11  photos?

12          You can answer.  He hasn't stood up yet.

13  A.  How does a child's cooperation affect the photos?

14  Q.  Yeah.

15  A.  Well, certainly, if a child is moving, it tends to cause

16  blurring of a photograph, and obviously difficulty --

17          MR. THOMAS:  I'm sorry.  Preliminary question for

18  purpose of objection, Your Honor?

19          THE COURT:  You may.

20  BY MR. THOMAS:

21  Q.  When photographs are taken in your office, do you take

22  photographs, Doctor?

23  A.  If -- well, as I mentioned, normally in the inpatient or

24  emergency department setting, where the exam is done primarily

25  for concerns about physical abuse, we usually have the medical

1  photographer take those in our clinic or emergency department;

2  or if we're doing an exam for sexual abuse concerns, we will

3  normally -- the examiner or myself included, would normally

4  take those photographs.

5  Q.  How many times have you taken photographs of injuries?

6  A.  Well, I've taken photographs, I would say, hundreds of

7  times or more.

8          THE COURT:  Do you have an objection, Counsel?

9          MR. THOMAS:  Not based on that answer.

10         THE COURT:  All right.  You may continue.

11 BY MS. KOROBOV:

12 Q.  You're indicating how a child's cooperation can affect the

13 quality of the photos?

14 A.  Yes.

15 Q.  And during your examination, are there things that

16 sometimes cause children pain?

17 A.  During the sexual abuse examination?

18 Q.  Yes.

19 A.  Normally the children don't experience pain or physical

20 discomfort unless there is an injury or skin condition that

21 might cause discomfort or pain when it is manipulated or

22 touched.

23         The other possible cause for discomfort or pain, as

24 I've already mentioned, is in prepubertal, the younger girls,

25 if we need to obtain a vaginal specimen using a swab.  And if

1  that's not able to be done without touching the hymen, that

2  can cause discomfort, as well.

3  Q.  So I would like to pose a hypothetical to you, if I could.

4  During the course of an examination, one of your medical staff

5  or you have a swab that comes into the -- into contact with

6  the hymen of a prepubertal child, and as a result, that child

7  experiences pain.  How cooperative would you expect that child

8  to be, then, with photography?

9  A.  Well, that -- it certainly could be variable depending

10  upon the individual situation, but it -- once a child, during

11  an exam -- at least my experience has been, once a child has

12  experienced something that is uncomfortable or painful,

13  particularly in younger children, they're going to have more

14  difficulty with the remainder of the exam.  And that's, for

15  example, why in general pediatrics or when we are examining

16  infants and young children, that's why we usually save the

17  throat and the ear part of the physical exam until the end.

18  Q.  You indicated that you had the opportunity to review

19  M.R.'s records from her visit to Peyton Manning's Children's

20  Hospital prior to your examination; is that correct?

21  A.  I did.

22  Q.  At some point, did you have the opportunity to review the

23  examination photos that were taken by Angela Bates?

24  A.  Yes.

25  Q.  And do you recall when it is you first saw the examination

1  photos that was taken by Angela Bates on August 21st, 2014?

2  A.  It was last week when you met with me to review my report

3  and opinion and review those photographs.

4  Q.  And you had a chance to look through those photos on the

5  computer?

6  A.  Yes, I did.

7  Q.  Okay.  And what did you observe when you saw those

8  photographs?  Specifically the genital photographs.

9  A.  There was a little -- there was a mild degree of redness

10  around the edge of the hymenal area.  The -- and the hymen.

11  The labia were not separated widely enough that I could really

12  appreciate -- as in the schematic diagram, I wasn't able to

13  really completely appreciate the full area around the hymen

14  and the inner aspects of the labia.

15  Q.  So were you able to see any swelling in those photographs?

16  A.  I couldn't -- beyond the redness, I really couldn't

17  appreciate that as a distinct finding.

18  Q.  Okay.  So, given that you've reviewed her medical records,

19  you're aware of the findings that she made on August 21st of

20  2014; is that correct?

21  A.  Yes.

22  Q.  So did that somehow contradict with what it is that you

23  reviewed in the records versus what it is you saw in the

24  photos?

25  A.  Not -- not particularly.  I generally -- having used

1  photos before, taken photos before and reviewed them, and as I

2  mentioned about these, it can be difficult to always depict

3  the actual findings from an exam.  And so I generally would

4  defer to the examiner that was present at the, you know, the

5  actual exam in terms of the actual description of the

6  findings.

7  Q.  Would the findings that Angela Bates documented on M.R.'s

8  hymen and peri-hymenal area, the swelling and the redness, be

9  caused by M.R. while fully clothed, wrapping her legs around

10 the arm of someone who was wearing a large watch?

11 A.  No, I would not expect that, no.

12 Q.  Why wouldn't you expect that?

13 A.  Well, first of all, if clothing were being worn, that

14 would protect the genital area.  Second of all, the labia, as

15 I mentioned before, come together at the midline.  And if

16 there was injury due to something as you suggest, I would

17 expect there would be injury to the external -- the skin of

18 the labia, the external-most structure or area.  So I would --

19 I would not expect injury to the actual hymen.

20 Q.  And in any of the notation, did you find any evidence of

21 injury to the external genitals?

22 A.  No.

23 Q.  Would M.R.'s vaginal findings with respect to her hymen be

24 caused by tickling the stomach?

25 A.  No.

Case 1:15-cr-00023-TWP-DML Document 148-6 Filed 12/12/16 Page 57 of 345 PageID #74
Case 1:15-cr-00023-TWP-DML Document 148-6 Filed 12/12/16 Page 57 of 345 PageID #74
4557

*HICKS - DIRECT/KOROBOV*                     Vol. 3-388

1  Q.  What about by pants that are too tight?

2  A.  No.

3  Q.  Did you obtain a -- or pants that are too loose?

4  A.  No.

5  Q.  Did you obtain a medical history from M.R.?

6  A.  Yes.

7  Q.  And did you note any medical cause for any of the findings

8  with which M.R. presented when she saw Angela Bates?

9  A.  No.

10 Q.  Were there any preexisting conditions that would account

11 for Ms. Bates' findings?

12 A.  No.

13 Q.  And were M.R.'s findings that you made consistent with her

14 medical exam on August 21st of 2014?

15 A.  I'm sorry.  Can you repeat that?

16 Q.  Sure.  The findings that you made when you examined M.R.

17 on September 9th of 2014 -- were those consistent with her

18 prior examination?

19 A.  Yes, in the sense that they -- the findings described on

20 that exam would -- I would expect would have resolved, and so,

21 yes.

22 Q.  And what conclusions did you draw, based on your review of

23 her medical record and exam, as to the causation of M.R.'s

24 hymenal findings on August 21st of 2014?

25 A.  Well, as I mentioned in my impression portion of the

1  report, there was a history of sexual abuse.  The -- there

2  were -- the examination, on the day that I performed the

3  examination, was normal.  And the findings that were described

4  on the exam on August 21st were consistent with -- while not

5  specific, were consistent with the history of the -- that was

6  offered that day, and had healed or resolved as I would have

7  expected.  And then, in addition, there were some of the

8  behavioral changes that I had previously mentioned.

9  Q.  And did you note that her findings were consistent with

10  acute trauma?

11  A.  Yes.

12         MS. KOROBOV:  I pass the witness.

13         THE COURT:  You may cross-examine.

14         MR. THOMAS:  Thank you, Your Honor.

15                   **CROSS EXAMINATION**

16  BY MR. THOMAS:

17  Q.  Doctor, just so I'm clear, the terminology that you're

18  using, you didn't observe any injuries to M.R. when you

19  examined her on September 9th of 2014, right?

20  A.  That's correct.

21  Q.  And your opinion here, that the injuries were consistent

22  with sexual abuse, would be based solely on the -- what Nurse

23  Bates told you, because you didn't see any injuries, right?

24  A.  In part, yes.

25  Q.  Well, if a patient comes to you without any injuries, and

1   all you have to look at is that patient, and they don't have

2   any injuries, you wouldn't be able to draw any other

3   conclusions, would you?

4   A.  Well, just like any other area of medicine, the history is

5   the most important information in terms of making a diagnosis

6   or determining management for a patient, and so that's part of

7   the information that went into my decision.

8   Q.  And the history in this case, in particular, came from

9   Nurse Bates?

10   A.  In part, yes.

11   Q.  Well, you also mentioned that you reviewed the medical

12   history of Ms. Guevara.  What did that consist of?

13   A.  Well, that consisted of asking questions about her newborn

14   history, whether she had had any prior hospitalizations,

15   surgeries, any ongoing medical problems, medications,

16   allergies, developmental history, family medical history --

17   Q.  You didn't actually --

18   A.  -- review of symptoms --

19   Q.  I'm sorry.  I thought you were finished.

20   A.  -- review of systems.

21   BY MR. THOMAS:

22   Q.  You didn't actually review any records, did you, Doctor?

23   You just talked to her mother?  Other than Nurse Bates, you

24   didn't --

25   A.  As I --

1  Q.  -- review her medical history?

2  A.  As I already stated, I reviewed the records from the exam

3  on August 21st --

4  Q.  Okay.

5  A.  -- talked with the mother to obtain history, and also got

6  some from the child, as well, yes.

7  Q.  Right.  So, just so we're clear, when we're talking about,

8  "I reviewed her medical history," you didn't -- you didn't get

9  a medical chart brought to you of her birth records and her

10  medical history and her vaccinations and things like that; you

11  got Nurse Bates' record, and you talked to the child and her

12  mother, right?

13  A.  Yes.  As is the case in most patients, yes.

14  Q.  Sure.  And so you didn't -- you weren't able to confirm or

15  deny the medical history given to you by the mother, right?

16  A.  That's correct.

17  Q.  You just take her word for it?

18  A.  Yes.

19  Q.  So, accurately, when you say, well, there's nothing in her

20  medical history to point this out, there's nothing that her

21  mother told me that would explain this otherwise, that's

22  another way to put it, wouldn't it be?

23  A.  That's correct, yes.

24  Q.  You talked about, based on Nurse Bates' report, that this

25  was consistent, but not specific, as far as an injury caused

1  by sexual abuse, correct?

2  A.  Yes.

3  Q.  And what that means is that it could have been caused by

4  sexual abuse and it could have been caused by something else,

5  right?

6  A.  Well, every -- as every finding has the potential for a

7  variety of causes, that's -- this is no different, yes.

8  Q.  So you're not going to sit here and say that you can tell,

9  from that record, that that child was penetrated by a finger,

10 right?

11 A.  One cannot infer something that specific from those exam

12 findings, no.

13 Q.  And consistent -- you can't tell from that, from Nurse

14 Bates' report, that it was abuse at all, only that there was

15 what she says, redness and swelling, right?

16 A.  Well, what I can -- what I said was that the findings were

17 consistent with an acute injury and with the history that was

18 available that we had, and had healed as I would have

19 expected.

20 Q.  You don't know what caused that injury?

21 A.  Well, I certainly wasn't there when it occurred, so...

22 Q.  Well, nothing in the physical examination itself, just the

23 injuries themselves, tells you what specifically caused them,

24 right?

25 A.  As -- any medical finding has to be considered in the

1  context of the history that's available, and so --

2  Q.  I understand what you're trying to say, sir, but my

3  question is:  The injuries themselves that were observed by

4  Nurse Bates, that you no longer observed, but based on her

5  finding, the injuries themselves can't tell you what caused

6  them, can they?

7  A.  Not specifically, no.

8  Q.  Thank you.  I'm going to ask you about -- how many times

9  have you worked with Nurse Bates before this incident?

10  A.  I don't know a precise number, but she has worked in our

11  program through the emergency department at Riley, so I would

12  say I've worked with her dozens of times.

13  Q.  Would you say it's their normal protocol to take

14  photographs of injuries like these, where she's at?

15  A.  Well, not being a part of that program, I don't know that

16  I could comment on what their normal protocol is.  I think you

17  would have to ask her.

18  Q.  Well, when you get -- when you get the records from them,

19  do you inquire as to whether or not there are photographs?

20  A.  I think I knew there were photographs that had been taken.

21  Q.  And how did you know that?

22  A.  I think it was mentioned in the report.

23  Q.  But they weren't sent to you, correct?

24  A.  Correct.

25  Q.  And now that you've seen them over a year later, they

1  don't completely -- you can't observe in the photographs --

2  and you've explained that.  You can't observe everything that

3  she lists in the report, you can't observe those in the

4  photographs; is that accurate?

5  A.  That's -- as I've testified to, yes.

6  Q.  All you saw in the photographs was redness?

7  A.  Yes.

8  Q.  And redness can be caused by a lot of things, right?

9  A.  Correct.

10 Q.  Do you have any concerns as a doctor, as a pediatrician,

11 about having photographs of a child's genitals for medical

12 purposes?  Does that give you any concern as a doctor or as

13 a -- to have those or to have those sent to you as part of an

14 exam?  Does that give you any concern?

15 A.  Well, I -- it's certainly concerning in the sense that I

16 would not want them to be publicly available.  And that's why

17 we keep them in a separate place from the medical record, as

18 do many centers, and take care and -- when we do take them and

19 save them.

20 Q.  When you take a picture of a child who has injuries to

21 their -- to their genitals, there's nothing sexual about that,

22 is there, Doctor?

23 A.  No.

24 Q.  And you don't consider yourself a pornographer when you

25 take a picture for medical purposes of a child's genitals,

1  right?

2  A.  No.

3  Q.  And if a policeman came into your office and went through

4  your files, and there were pictures like that, that wouldn't

5  be pornography, would it?

6  A.  Well, they're not in my files.

7  Q.  You don't put them in your files because you don't want to

8  take that chance, right?

9  A.  That's correct.

10 Q.  That's the truth, that you don't want to take the chance

11 of somebody freaking out over you having a picture -- even as

12 a medical doctor for medical purposes, you don't want to take

13 the chance of somebody freaking out over you having that

14 picture, right?

15 A.  I guess I'm more concerned about making sure that the

16 photographs of the children are not -- don't get into hands

17 that would be unauthorized to have them.

18 Q.  Right.  But you don't keep them in your files, just in

19 case?

20 A.  That's correct.

21 Q.  And in this case, you weren't even shown them?  They had

22 nothing to do with your treatment or diagnosis, did they?

23 A.  That's correct.

24 Q.  You got those from the government; you didn't get those

25 from the hospital?  You saw those -- you saw those from the

1  government; you didn't see those from a medical file, right?

2  A.  That's correct.

3          MR. THOMAS:  Can I have just a moment, Judge?

4  BY MR. THOMAS:

5  Q.  Oh, you mentioned that in your office, you got some

6  background information from Ms. Guevara's mother, you already

7  talked about the medical history.  Your report also shows that

8  she was asked or gave information about who she lived with at

9  the time.  Do you remember that?

10 A.  Yes.

11 Q.  And do you remember who she said she lived with at the

12 time?

13 A.  I would have to look at my report to refresh my memory.

14          MR. THOMAS:  May I approach the witness, Your Honor?

15 May I approach the witness, Your Honor?

16          THE COURT:  You may.

17 BY MR. THOMAS:

18 Q.  I'll show you page 2 there.  It might help you.

19 A.  Oh.  Well, this is from the social work note rather than

20 mine, but it would contain similar information.  Yes.

21 Q.  And after reading that, do you recall what she reported to

22 you?

23 A.  Yes.

24 Q.  What was that?

25 A.  That M.R. lived with her mother, her father, and

1  13-month-old sibling.

2  Q.  You didn't observe any acute trauma on September 9th,

3  correct?

4  A.  That's correct.

5  Q.  And you did not observe any acute trauma in the

6  photographs that you observed -- that you were given by the

7  government to look at before trial, right?

8  A.  Well, I was able to visualize some of the redness that was

9  mentioned, which is consistent with that.

10  Q.  So even redness like that, you would -- you would qualify

11  as acute trauma?

12  A.  Well, as I said previously, while it's a nonspecific

13  finding, it's consistent with the history from that time.

14  Q.  Well, that's from the whole report.  I'm asking about the

15  pictures.  From the pictures that you saw, you didn't see any

16  acute trauma in those pictures; would that be accurate?

17  A.  Well, what I think my answer was -- or what I meant to say

18  was that I could visualize some of the redness that was

19  mentioned, and that can be consistent with acute trauma, yes.

20  Q.  Just redness like that is -- when you say "acute trauma,"

21  it could just be the redness that you saw in the pictures?

22  A.  That is a finding that, while not specific, can be

23  consistent with acute trauma, yes.

24  Q.  Okay.  Nothing in your report or your observations, or

25  Nurse Bates' report, showed any external injuries; is that

1  right?

2  A.  Well, the findings that were described and noted on the

3  examination on August 21st would be considered findings in the

4  genital area external to the vaginal opening, but I did not

5  see any findings of injury on my examination.

6          MR. THOMAS:  Nothing further.

7          THE COURT:  Any redirect?

8          MS. KOROBOV:  Briefly, Judge.

9                    **REDIRECT EXAMINATION**

10 BY MS. KOROBOV:

11 Q.  Doctor, I would like to talk to you a little bit about

12 patient privacy.  Before testifying here today, do you have an

13 authorization-to-testify form signed?

14 A.  I do.

15 Q.  And who do you want to have sign that form?

16 A.  Well, what we request is an authorization, a signed

17 authorization, to release protected health information from

18 the child's -- one of the child's legal guardians.

19 Q.  Okay.  So before you even talk about M.R.'s genitals and

20 what you did, you have a signed authorization by a parent or

21 guardian of hers; is that correct?

22 A.  Well, not just the genital findings, but her health

23 information in general, yes.

24 Q.  Any health information with respect to M.R.; is that

25 correct?

1  A.  Yes.

2  Q.  Okay.  And that's done in part because of what we call

3  HIPAA; is that correct?

4  A.  Correct.

5  Q.  Okay.  And your hospital's legal department; is that

6  accurate?

7  A.  That's correct.

8          MR. THOMAS:  They're all leading at this point, Your

9  Honor.  If we could move along.

10          THE COURT:  Why don't you rephrase.

11          MS. KOROBOV:  Sure.

12  BY MS. KOROBOV:

13  Q.  Why is it that we're completing all that paperwork to get

14  you to come here to give testimony to a jury?

15  A.  Well, it is -- it is something that's addressed in the

16  HIPAA federal law with respect to protected health information

17  of patients.  And something --

18          MR. THOMAS:  Your Honor, I'm going to object for

19  relevance at this point.  We did not raise any questions about

20  him improperly releasing information.  I'm not -- and it's

21  beyond the scope of cross.

22          MS. KOROBOV:  It's not, Your Honor.  It has to do

23  with counsel's questions regarding release of photos and why

24  it is that would be important.

25          THE COURT:  I'll overrule.

*HICKS - REDIRECT/KOROBOV*          Vol. 3-400

1        MS. KOROBOV:  Thank you.

2        THE COURT:  You may answer.

3        THE WITNESS:  I can't remember the question.  I'm

4  sorry.

5  BY MS. KOROBOV:

6  Q.  I was asking why is it that we have all these releases

7  signed.

8  A.  Oh.  Well, I think I answered that it's, in large part,

9  due to -- well, it's related to patient privacy, and

10  specifically it's something that's addressed by federal law

11  known as HIPAA, the Health Information Portability and

12  Accountability Act.  And it's something that our practice has

13  been directed to address prior to any pretrial meetings or

14  testimony by our hospital attorneys.

15  Q.  Okay.  Doctor, in addition to taking photos of children's

16  genitals, are there other areas of children's bodies that you

17  photograph, perhaps during the course of a physical abuse or

18  even a physical abuse resulting in death investigation?

19  A.  Yes.

20  Q.  And are those photos that you want available to other

21  people --

22  A.  No.

23  Q.  -- members of the public?

24  A.  No.

25  Q.  Okay.  Is there anything in some of those photos that has

*HICKS - REDIRECT/KOROBOV*                    Vol. 3-401

1  anything to do with genitals?

2  A.  Yes.

3  Q.  Okay.  And with respect to those photos, are they also

4  stored securely?

5  A.  Yes.

6  Q.  Having seen the photographs that were taken by Angela

7  Bates on August 21st of 2014, does that change anything about

8  the nature of the findings that you made back in September of

9  2014?

10 A.  No.

11         MS. KOROBOV:  Thank you.  I pass the witness.

12         MR. THOMAS:  No other questions for the witness,

13 Your Honor.

14         THE COURT:  All right.  Thank you very much, Doctor.

15 You may be excused.

16         (Witness excused.)

17         THE COURT:  And we're going to go ahead and take our

18 morning break after the witness is excused.

19         All right, ladies and gentlemen, we're going to take

20 our morning break.  The Court is going to admonish you not to

21 begin any -- have any discussion about the case and no

22 deliberation, and we'll have you back in the courtroom in

23 about 15 minutes, maybe 20, 15 to 20 minutes.

24         THE COURTROOM DEPUTY:  All rise.

25         (Jury out at 10:57.)

1      THE COURT:  Please be seated.  And we'll go ahead
2  and hear your motion for a mistrial.
3      MR. THOMAS:  Thank you, Your Honor.  Your Honor, I
4  was not advised, but it was revealed during testimony by
5  Detective McAllister that he had interviewed M.R. prior to
6  trial, which is certainly his right to do.  However, he
7  revealed during his testimony that when he spoke to her, he
8  had asked her to -- started the conversation by asking to
9  identify Mr. Al-Awadi, and that she could not identify him in
10  the photo, even a photo that she was in herself.  And she
11  could identify herself.  That was not revealed to me at all,
12  that she had -- that her memory was in question before trial.
13      And whether or not she can identify his photo or the
14  fact that her memory of the events was questionable prior to
15  trial -- and with knowledge of the government, as the
16  government was there for the interview -- is something that
17  should have been revealed.
18      It is *Brady* material that the witness -- that the
19  memory of the witness has been affected since the discovery
20  that was provided and prior to trial.  And it puts us in a
21  position of great peril to not be able to cross-examine the
22  witness.
23      THE COURT:  Which witness?  The child?
24      MR. THOMAS:  The child, regarding her memory of
25  events, and particularly her memory of the meeting with the

1   detective without knowing that previously.  And we believe

2   that that's information that easily should have been and could

3   easily have been reported to the defense, and was not, Your

4   Honor.

5           THE COURT:  All right.  You may respond.

6           MS. KOROBOV:  Thank you, Your Honor.  With respect

7   to being able to first, I guess, cross-examine the child, the

8   child was here, she was available for cross-examination.

9   Defense counsel asked her any number of questions.  He never

10  asked her whether she recognized his own client.  So the issue

11  of identification has never been an issue here today.

12          Additionally, this is a child who has never been

13  asked to identify the defendant.  There is no history, for

14  instance, where the child previously looked at, say, a

15  six-pack or a photo of the defendant and said, "That's the

16  person who touched me," and her memory has now changed.  That

17  didn't happen in this case.  So it's not as though there's

18  been any kind of change in circumstances.

19          THE COURT:  Is the photograph Government's

20  Exhibit 39?

21          MS. KOROBOV:  It's 3, Your Honor, that she was

22  shown.

23          THE COURT:  Okay.  All right.

24          MS. KOROBOV:  Additionally, if he wants to have the

25  witness come back, we can reproduce M.R. if he wants to

1  question her, but he did question her about her pretrial prep.

2        Additionally, defense counsel questioned Detective

3  McAllister yesterday regarding meetings with witnesses,

4  including meetings with the family, and I believe specifically

5  meetings with M.R.  And he mentioned it at that time, that

6  there had been a meeting.  So there just is nothing

7  exculpatory about this information, because there is -- or

8  potentially exculpatory for that matter.

9        There's never been a prior identification that has

10 now subsequently changed such that there's any evidence that

11 her memory was somehow compromised.  Remembering someone from

12 a photo that was taken, it's not -- it simply doesn't prove or

13 disprove or go to affect, in any way, the nature of the

14 allegation in this case, which is specifically that the

15 defendant did use M.R. to produce images of a child that are

16 lascivious in nature.

17        THE COURT:  Okay.  All right.  Mr. Thomas, how is

18 this evidence either material to either the guilt or -- to the

19 guilt of your client?  How is it material?

20        MR. THOMAS:  Well, Your Honor, I should not have

21 to --

22        THE COURT:  But you do under the *Brady* --

23        MR. THOMAS:  No, I understand --

24        THE COURT:  -- elements.

25        MR. THOMAS:  I guess --

 1          THE COURT:  You have to show how it was material.

 2          MR. THOMAS:  Prior to answering the Court's

 3  question, can I respond?

 4          THE COURT:  Sure.

 5          MR. THOMAS:  I should not have to discover *Brady*

 6  material during my examination of the state's -- or the

 7  government's witnesses.  That's not the way it works.  I

 8  should not -- the fact that I was given an opportunity to

 9  cross-examine M.R. does not relieve the government of its

10  *Brady* burden, first of all.

11          Now, to answer the Court's question --

12          THE COURT:  Right, because for it to be a *Brady*

13  violation, it's got to be certain types of material.

14          MR. THOMAS:  Absolutely.

15          THE COURT:  It's got to be material --

16          MR. THOMAS:  Absolutely.

17          THE COURT:  So tell me that.

18          MR. THOMAS:  Well, the child gives a statement.

19  That statement is turned over to me.  Her memory of the events

20  is sort of put in place at that point.  And then the

21  government meets with the witness again and says, "Do you know

22  who this is?"

23          And she says, "No."

24          That is material to whether or not -- at that point,

25  I can -- if I have that material ahead of time, I can

1  cross-examine the witness, because I would have followed up.

2  They apparently didn't.  She said, "I don't know who that is."

3  Good enough for us, and they didn't follow up.  I wasn't given

4  the opportunity to follow up --

5          THE COURT:  Well, you still have that opportunity.

6          MR. THOMAS:  Well --

7          THE COURT:  She's still here.

8          MS. KOROBOV:  We can bring her back, Judge.

9          THE COURT:  They can bring her back.

10          MS. KOROBOV:  She's left.  If you want her back --

11          THE COURT:  All right.  Let me -- let the Court --

12          MS. KOROBOV:  She's on her way, Your Honor.

13          THE COURT:  Let the Court talk.

14          First of all, every *Brady* inquiry is fact specific,

15  so we look at the specific facts of our case.  And suppression

16  of evidence favorable to an accused violates due process where

17  the evidence is material either to guilt or to punishment

18  irrespective to the good faith or bad faith of the

19  prosecution.  Evidence is material for *Brady* purposes only if

20  reasonable probability exists.  Had the evidence been

21  disclosed to the defense, the result of the proceedings would

22  have been different.

23          And in the Seventh Circuit, the Seventh Circuit

24  cases, the courts have held that the prosecutor's revelation

25  of exculpatory material just prior to the end of the trial did

1   not violate the defendant's right to due process under the

2   Fifth Amendment to the federal constitution since the

3   constitutional standard of materiality was not met, as the

4   defendant did not show that an earlier disclosure of the

5   exculpatory material by the federal prosecutor would have

6   created any greater doubt about the defendant's guilt or

7   affected the results of the trial.

8           The *Giglio* rights extend the prosecution's

9   obligation to include disclosure of information affecting the

10  credibility of a government witness.  And so I assume that's

11  what you're arguing, that it would go to the credibility of

12  this child who was -- who is now six and was four when the

13  incident occurred.

14          To establish a *Brady* violation -- this is your

15  burden -- the defendant must demonstrate three elements:

16  first, that the information must be favorable to the defendant

17  because it is either exculpatory or impeaching; second, that

18  the government failed to disclose the material, either

19  willfully or inadvertently.  I don't believe you're arguing --

20  are you saying that it was willful?

21          MR. THOMAS:  Judge, I don't --

22          THE COURT:  I think it was inadvertent --

23          MR. THOMAS:  I don't know.  I just know --

24          THE COURT:  -- because she didn't consider it *Brady*.

25          MR. THOMAS:  -- it wasn't revealed.

 1          THE COURT:  Okay.  It doesn't -- regardless, if it

 2   was intentional or not, that's one of the elements.  And then

 3   the most important element is that the information must be

 4   material to guilt such that prejudice ensued from the

 5   suppression.  In other words, the suppressed evidence was

 6   material to the guilt of your client.  Specifically you, the

 7   defendant, must show that there is a reasonable probability

 8   that if the allegedly suppressed evidence had been disclosed

 9   earlier, the results of the proceeding would have been

10   different.

11          Even if the Court were to find that the evidence is

12   material such that it would deprive Mr. Al-Awadi of a fair

13   trial, the remedy would not be a mistrial, not necessarily.

14   That's the most extreme remedy.  The district court has a wide

15   discretion to determine an appropriate remedy, whether

16   exclusion of the witness, which isn't possible here;

17   limitations of the scope of permitted testimony; instructions

18   to the jury; or mistrial; or allowing the witness to be called

19   again.

20          So in this case, the disclosure occurred during

21   trial.  In some circumstances, disclosure during trial has

22   been found to be sufficient disclosure and not a *Brady*

23   violation.  The remedy for a *Brady* violation that surfaces

24   mid-trial is, one, we could do a continuance to allow an

25   opportunity to analyze the new information and recall the

1   witness for impeachment purposes.

2          The Seventh Circuit has held in this case right

3   here, *Bielanski v. County of Kane*, 550 F.3d 632, that a

4   mid-trial disclosure suffices if time remains for the

5   defendant to make effective use of the exculpatory material.

6   "Even late disclosure does not constitute a *Brady* violation

7   unless the defendant is unable to make effective use of the

8   evidence."

9          In this case, the defendant alleges that the

10  government failed to disclose that the six-year-old child was

11  unable to identify the defendant's photograph, and it's

12  Government's Exhibit 3, in their second meeting with the

13  government attorney and the detective when this child was

14  shown the photograph of the defendant.  The government argues

15  there's no *Brady* violation because the information is not

16  material.  The identity was not -- is not an issue in this

17  case.  The government did not ask the child to identify the

18  defendant in open court.  And, therefore, the evidence is not

19  what we call *Brady* material.

20         And if this were a child molest trial, the Court

21  would agree that that is -- something should have been

22  revealed and the evidence would likely be considered *Brady*

23  material.  However, we have to remember that the charges in

24  this case are not -- we've talked a lot about child molest,

25  but the charges are not child molest.  It's production of

1  child pornography and attempted production of child

2  pornography.

3        So even if -- the Court is not certain that it's

4  *Brady* material, but even if it is *Brady* material, you still

5  have sufficient time to cure any alleged violations.  If you

6  want to recall the child, tell the government now, and they

7  will get her back here --

8        MR. THOMAS:  Judge --

9        THE COURT:  -- because we're going to finish

10 evidence today, so they need to get her here now.

11       MR. THOMAS:  Absolutely.  Before I answer that, I

12 would ask -- I mean, if the government's position has been

13 that information like that is not information that ought to be

14 revealed, I mean, I would like to inquire of the government

15 now, in these five meetings, are there any other instances

16 where the child either contradicted herself or could not

17 remember, that you noted during your meetings?

18       MS. KOROBOV:  Never.  We have never asked the child

19 about identity, first of all; but, otherwise, every open-ended

20 question she's asked, it's simply a, "Tell us what happened,"

21 and we leave it at that.

22       THE COURT:  Right.

23       MS. KOROBOV:  The detective's description of

24 everything that happened is a complete and accurate

25 description of those meetings.  He was present during every

*HICKS – REDIRECT/KOROBOV*                Vol. 3-411

1   single encounter with that child.

2             THE COURT:  Okay.

3             MR. THOMAS:  I understand.  I guess if -- I'm not

4   limiting that to identity in a photograph, but anything that

5   affected where her memory was questioned or a story changed.

6   If there's anything like that, I would ask that it be

7   revealed.

8             MS. KOROBOV:  There is nothing like that.

9             MR. THOMAS:  I'll --

10            THE COURT:  All right.

11            MR. THOMAS:  I'll accept that.  At this point, I do

12  not believe that recalling the witness at this point would

13  cure -- would cure the damage, and would --

14            THE COURT:  Well, what do you want me to do,

15  Counsel?  Do you want to continue so you can investigate that

16  information?

17            MR. THOMAS:  No.  I'm going to stand on my motion,

18  Your Honor, but I would not ask to recall the witness.

19            THE COURT:  Okay.  All right.  All right.  So the

20  Court's ruling, first of all, I don't believe there's a *Brady*

21  violation.  And even if there were a *Brady* violation, the

22  Court has offered you several remedies: a continuance to allow

23  you to further investigate or whatever you would like to do

24  with the information to analyze it, and an opportunity to

25  recall the witness has been offered.  And you've declined

1  both; is that correct?

2           MR. THOMAS:  Yes, Your Honor.  I don't believe those

3  would be adequate remedies, and I'll stand on my motion.

4           THE COURT:  Okay.  All right.  Let's take our -- the

5  Court has made its ruling, and we'll go ahead and take our

6  break.

7           MS. KOROBOV:  May the witness then be excused from

8  her subpoena, the child?

9           THE COURT:  Counsel?  Mr. Thomas?

10          MR. THOMAS:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MR. THOMAS:  That's fine.

13          THE COURT:  And one more thing for the record.  And

14  I believe this is one of the reasons why you don't want to

15  recall the witness, is because she's six years old, she was

16  four years old when it occurred, and I don't know how much

17  impeachment you can keep from a six-year-old child and their

18  recollection of events that occurred two years previously.

19  I'll just make sure that's noted for the record.  All right.

20  And we're on break.

21          MR. SHEPARD:  Thank you, Your Honor.

22          THE COURTROOM DEPUTY:  All rise.

23          (Recess at 11:12, until 11:32.)

24          THE COURT:  Is this your next witness?

25          MR. SHEPARD:  It is, Your Honor.

```
 1              THE COURT:  All right.  Are you ready for the jury?
 2              MR. SHEPARD:  We have one fast question beforehand.
 3   Do you want us to have another witness available before the
 4   lunch break?  We can call her here if you do.  I just didn't
 5   know how long you wanted to -- wanted us to go.
 6              THE COURT:  It's up to you.  You know, we took an
 7   hour for lunch, and it's not raining now, so maybe we could --
 8              MS. KOROBOV:  The witness, Your Honor, is Shea
 9   Hayes-Anderson from the crime lab, so she would be probably a
10   lengthy witness, too.  So, I mean, I can have her here if the
11   Court would like, but --
12              THE COURT:  No.  That's fine.  It's 11:30.  We'll do
13   this witness and then we'll go to lunch.
14              MS. KOROBOV:  Thank you.
15              MR. SHEPARD:  Thank you, Your Honor.
16              THE COURT:  We'll just have a long afternoon.  Okay.
17              MR. SHEPARD:  And we are ready for the -- the
18   government is ready for the jury, Your Honor.
19              THE COURT:  Mr. Thomas, are you ready for the jury?
20              MR. THOMAS:  I am ready, Your Honor.
21              THE COURT:  You may bring in the panel, Tanesa.
22              (Jury in at 11:33.)
23              THE COURT:  Witness, if you would remain standing
24   and raise your right hand.
25              (The witness is sworn.)
```

 1          THE COURT:  You may have a seat.

 2          And as soon as he's comfortable, you may examine

 3  your witness.

 4          MR. SHEPARD:  Thank you, Your Honor.

 5          **GRANT MELTON, PLAINTIFF'S WITNESS, SWORN**

 6                **DIRECT EXAMINATION**

 7  BY MR. SHEPARD:

 8  Q.  Detective, could you please state your full name and spell

 9  your last name for the record?

10  A.  Grant Melton, M-E-L-T-O-N.

11  Q.  And what do you do for a living?

12  A.  I'm a digital forensic examiner for the Indianapolis

13  Metropolitan Police Department.

14  Q.  How long have you held that position?

15  A.  I've been a police officer for 14 years.  I've been a

16  digital forensic examiner since May of 2013, for almost three

17  years now.

18  Q.  What does it mean to be a digital forensic examiner?

19  A.  I examine digital devices or electronic storage devices,

20  such as computers, cell phones, tablets, any kind of digital

21  storage device, pretty much, for investigators.  I do

22  case-specific requests, searches for digital evidence.

23  Q.  And have you had any training in this area?

24  A.  Yes.

25  Q.  Approximately how many hours of training?

MELTON - DIRECT/SHEPARD          Vol. 3-415

 1  A.  I've had about 500 hours of formal classroom training.

 2  Q.  All right.  And then have you had kind of on-the-job

 3  training and experience?

 4  A.  On-the-job training, yes.

 5  Q.  All right.  Did those training classes include classes in

 6  cell phones and smartphones specifically?

 7  A.  Yes.

 8  Q.  Including a basic cell phone investigation course in

 9  September of 2014?

10  A.  Yes.

11  Q.  A cell phone interrogation course in October of 2014?

12  A.  Yes.

13  Q.  And advanced smartphone forensics in November of 2014?

14  A.  Yes.

15  Q.  As well as a number of other courses just about general

16  computer forensics; is that a fair statement?

17  A.  Yes, sir.

18  Q.  Have you ever examined any cell phones or smart phones?

19  A.  Yes.

20  Q.  About how many?

21  A.  Over 500.

22  Q.  I ask you to turn around to the box and find something

23  with a sticker on it, Exhibit 27.

24  A.  Okay.

25  Q.  Do you recognize Exhibit 27?

1  A.  Yes.

2  Q.  What is it?

3  A.  This is a cell phone that I examined in 2014.

4  Q.  How do you know that that's the same cell phone?

5  A.  At the time -- at the time of my examination, I documented

6  the serial number, which matches the serial number on this

7  device, as well as the packaging.  It contains evidence tape

8  that I placed on the package.  And I wrote my police

9  department identification number and the date that I sealed

10 it.

11 Q.  And when you received it, you noted the serial number.

12 What then did you do with the cell phone?

13 A.  I first received this in August of 2014.  I -- I reviewed

14 the documentation that the detective provided with the legal

15 authority to do an examination, and I documented with

16 photographs.  At that time, I learned that the device was

17 locked with a pass code that I couldn't, at that time, get

18 past.  I then examined it again in December of 2014.

19 Q.  And was it in your custody and control while you were

20 waiting for the ability to open the phone?

21 A.  Yes.

22 Q.  All right.  And what's an image in your line of work?

23 A.  An image is -- we refer to -- I'm not sure --

24 Q.  When you receive -- what is the first thing you did after

25 you unlocked the phone?

1   A.  We don't -- in digital forensics, we try to make -- and I

2   believe what we're referring to here is the image.  I imaged

3   the phone, so I make a copy of the information on the phone,

4   and that's then a working copy.  So the examination I'm doing

5   is on the evidence that's -- or the data that's copied from

6   the device, or we call that a physical image of the device.

7   Q.  Then, after you obtained the physical image, what did you

8   do with the unit, with the hardware unit?

9   A.  After I did that, I sealed it back in its envelope.

10  Q.  Okay.  And then did it eventually make its way back to the

11  property room?

12  A.  Yes.

13  Q.  In all of your examinations, did that come off -- did you

14  pull that back out and do your examinations or did you work

15  off your physical image?

16  A.  I worked off the physical image.

17  Q.  Okay.  And is that standard operating procedure in the

18  field of digital forensics?

19  A.  Yes, it is.

20          MR. SHEPARD:  Your Honor, I move for the admission

21  of Government's Exhibit 27 at this time.

22          MR. THOMAS:  Preliminary question if I could, Your

23  Honor.

24          THE COURT:  You may.

25  BY MR. THOMAS:

1  Q.  The item was in your control from the time you received --

2  well, let me ask you this first.  Who did you receive it from?

3  A.  Detective McAllister.

4  Q.  And in what manner?  Hand to hand or --

5  A.  I believe it was hand to hand, yes.

6  Q.  And it remained in your custody while you did your

7  examination?

8  A.  It was secured in my office, yes.

9  Q.  And what did you do with it when you were finished?

10 A.  After the conclusion of my examination?

11 Q.  Yeah.

12 A.  I returned it to Detective McAllister.

13        MR. THOMAS:  I would have no objection at this point

14 to Government's 27.

15        THE COURT:  Government's Exhibit 27 is admitted into

16 evidence without objection.

17                     *(Government's Exhibit 27 was*

18                     *received in evidence.)*

19 BY MR. SHEPARD:

20 Q.  Can you talk just generally about -- well, did you examine

21 Government's 27?

22 A.  Yes.

23 Q.  Did you find anything on it that was of evidentiary value

24 for the case?

25 A.  Yes.

1  Q.  What did you find?

2  A.  I found some images that were of interest, as well as some

3  artifacts related to some file names, some file paths, as well

4  some items indicating who the user of the phone was.

5  Q.  Okay.  Let's just talk about, before we get to the

6  specific things that you found, computers and cell phones in

7  general.  How are they similar?

8  A.  They're similar in that today's smart phones -- like your

9  Androids, your Apple iPhones, Windows, and BlackBerry

10 phones -- those are very much just small computers.  They have

11 all -- or almost all the functionality that any home computer

12 would have.

13 Q.  All right.  And so they retain data?

14 A.  Yes.

15 Q.  Are there any differences between the two?

16 A.  Yes.

17 Q.  What would those be?

18 A.  Cell phones generally have very small storage capacity

19 relative to what our computers have now.  Also, the way they

20 store memory in their flash memory, the way the memory itself

21 works, is different than what we find on most of our

22 traditional mechanical hard drives.

23 Q.  Now, go ahead and can you just kind of hold up Exhibit 27

24 so that the jury can see it?  The phone itself.

25 A.  (Witness complied.)

1   Q.  And then what's on the back of it?

2   A.  On the back is a label that identifies the model and

3   serial number of the device.

4   Q.  Does it also have where the device was made?

5   A.  Yes.

6   Q.  Did you take a picture of that?

7   A.  Yes.

8   Q.  Please look in the binder behind tab 34.

9   A.  Did you say 34?

10  Q.  Yes.

11  A.  Okay.

12  Q.  Do you recognize that?

13  A.  Yes.

14  Q.  What is that?

15  A.  That's an image I took of that label.

16  Q.  Okay.  And does it correctly and accurately represent the

17  label on Exhibit 27 up there?

18  A.  Yes.

19       MR. SHEPARD:  Your Honor, I move for the admission

20  of Exhibit 34.

21       THE COURT:  Any objection?

22       MR. THOMAS:  I have no objection to 34, Your Honor.

23       THE COURT:  Government's 34 is admitted into

24  evidence without objection.

25

1          (Government's Exhibit 34 was

2            received in evidence.)

3          MR. SHEPARD:  Please call up 34.

4   BY MR. SHEPARD:

5   Q.  Where was the phone made?

6   A.  China.

7   Q.  Are you familiar with a concept called "attribution"?

8   A.  Yes.

9   Q.  What is attribution?

10  A.  Basically being able to attribute a specific piece of

11  property to a person.

12  Q.  Trying to find out whose phone it was?

13  A.  Yes.

14  Q.  Okay.  Did you find any evidence that allows you to

15  conclude whose phone that is?

16  A.  Yes.

17  Q.  Okay.  Were you able to determine the number on the

18  telephone?

19  A.  Yes.

20          MR. SHEPARD:  Can you please pull up Exhibit 23.

21  BY MR. SHEPARD:

22  Q.  What was the phone number on -- that you were able to

23  determine returned to that device?

24  A.  It was area code ██████████████ .

25  Q.  All right.  I would ask you to look at Exhibit 23, which

1  has been previously admitted as the defendant's application

2  for employment.  Do you see in "General Information" a name

3  listed by -- or excuse me, a phone number listed by "Ali

4  Al-Awadi"?

5  A.  Yes.

6  Q.  Is that the same phone number as you found returned to the

7  device?

8  A.  Yes.

9  Q.  Were you able to find any e-mail addresses that were

10 loaded into that phone?

11 A.  Yes.

12 Q.  How many?

13 A.  There were three.

14 Q.  Okay.  And what were the three?

15 A.  There was -- there was one e-mail address,

16 ████████@hotmail.com.  That was associated with a Snapchat

17 account, as well as a Netflix account.  There was an e-mail

18 account, ████████@5linx.net.  And there was also

19 ████████@gmail.com.  That was for the Google accounts on

20 the phone.

21 Q.  I would also ask you to again look at Exhibit 23.  Do you

22 see an e-mail address listed by Mr. Al-Awadi on his

23 application for employment?

24 A.  Yes.

25 Q.  Is that one of the three you just mentioned?

1  A.  Yes, it is.

2  Q.  All right.  Were you able to recover any e-mails --

3  A.  Yes.

4  Q.  -- on the phone?  I would ask you to look in the binder

5  under -- behind tabs 35 and 36.

6  A.  Okay.

7  Q.  Do you recognize 35 and 36?

8  A.  Yes.

9  Q.  What are they?

10  A.  These are e-mails I recovered from the phone.

11  Q.  And are they -- are the printouts that are there

12  substantially accurate copies of the files you were able to

13  retrieve off the phone?

14  A.  Yes.

15          MR. SHEPARD:  Your Honor, I would move for the

16  admission of Exhibits 35 and 36.

17          THE COURT:  Any objection to 35 and 36?

18          MR. THOMAS:  Your Honor, I guess I would object to

19  35 and 36 on relevance grounds.  At this point, I don't think

20  there's an issue as to -- we haven't raised an issue about

21  ownership of the phone.  I think it's been established by

22  prior evidence that the phone number matches his and that the

23  e-mail address matches his, so I would object at this point on

24  the grounds of -- that it is -- for identification purposes,

25  it's cumulative.  As far as what's listed there or what's

 1  being discussed there, it's probably not relevant.

 2          MR. SHEPARD:  Your Honor, if he will stipulate that

 3  the phone was his client's, we'll move right on through this.

 4  Otherwise, I think we get to prove whose phone it is.

 5          THE COURT:  Did you make that stipulation?

 6          MR. THOMAS:  I was --

 7          THE COURT:  Why don't we approach.

 8          (Bench conference on the record.)

 9          MR. THOMAS:  Judge, I was actually prepared to do

10  this, just that, as he started asking those questions.  I

11  don't think that the ownership of the phone is in question, so

12  we're happy to stipulate that it was his phone.

13          MR. SHEPARD:  We accept the stipulation.

14          THE COURT:  Okay.  All right.

15                      (Open court.)

16          THE COURT:  The attorneys are going to stipulate

17  that the cell phone, which is Exhibit 37 --

18          MR. SHEPARD:  27, Your Honor.

19          THE COURT:  -- 27 did, in fact, belong to the

20  defendant Ali Al-Awadi.  Is that correct, Government?

21          MR. SHEPARD:  Yes, Your Honor.

22          THE COURT:  And is that correct, Mr. Thomas?

23          MR. THOMAS:  That is correct, Your Honor.

24          THE COURT:  All right.  You may.

25  BY MR. SHEPARD:

1  Q.  When you do examinations to help out investigations, is it

2  important for you to become aware of general facts of the

3  investigation?

4  A.  Yes.

5  Q.  Why is that?

6  A.  There is so much data.  Even though a cell phones contains

7  a lot less than a computer, there's still a considerable

8  amount of data that can be there.  So what we have to do is do

9  a -- basically, we're trying to answer case-specific

10  questions.  I need to learn information about the case to know

11  what type of information I might need to look for on a

12  specific device.

13          THE COURT:  Mr. Shepard, for the record, are you

14  going to withdraw Government's Exhibits 35 and 36 in lieu of

15  the stipulation?

16          MR. SHEPARD:  Yes, Your Honor.

17          THE COURT:  All right.  Those two are withdrawn.

18          MR. SHEPARD:  Thank you, Your Honor.

19  BY MR. SHEPARD:

20  Q.  And did you as to some of the general facts of this

21  investigation?

22  A.  Yes.

23  Q.  Were one of those facts the investigator's belief of when

24  the incident occurred?

25  A.  Yes.

1   Q.  And what was that?

2   A.  That was August 21st of 2014, roughly between 12:30 and

3   1:30 p.m.

4   Q.  And did you begin to search for evidence in this case?

5   A.  Yes.

6   Q.  How did you go about doing that?

7   A.  Well, I reviewed -- once I have that image, I use analysis

8   software that decodes the information for me.  And essentially

9   I'll look at different types of information:  The text

10  messages, browsing history, photographs, that kind of

11  information, to see if there's anything that was related to

12  the investigation.

13  Q.  I would ask you to look at -- behind tab number 37.

14  A.  Okay.

15  Q.  What is 37?

16  A.  37 is a report that I created containing information about

17  files that had at one time resided on the device.

18  Q.  And is that an accurate summary of the data that was

19  produced from your equipment and what you analyzed?

20  A.  Yes, it is.

21  Q.  And will the chart that you created help explain your

22  testimony to the jury?

23  A.  Yes.

24          MR. SHEPARD:  Your Honor, I would move for the

25  admission of Exhibit 37.

1        THE COURT:  Any objection to 37?

2        MR. THOMAS:  I have no objection to 37.

3        THE COURT:  Government's Exhibit 37 is admitted into

4 evidence without objection.

5                 *(Government's Exhibit 37 was*

6                 *received in evidence.)*

7        MR. SHEPARD:  Please display Exhibit 37.  If you

8 could magnify.

9 BY MR. SHEPARD:

10 Q.  Detective, what are we seeing here?

11 A.  On the -- this is, again, the report that I generated as

12 part of my examination.  The column that says "File Info" at

13 the top, in the gray header, that column -- each one of those

14 rows contains information about files that had at one time

15 resided on the phone.

16        The "Name" field is consistent with what we call a

17 naming convention.  It's consistent with the way photographs

18 on this phone are named.  You have the 20140821.  That's the

19 four digit year, two digit month, and two digit date.  And

20 then the underscore is the hours, minutes, and seconds.  So

21 132313 equates to 1:23:13 p.m.  And then the .jpg indicates

22 that it was an image.

23        Below that, you have "Path," the, "Root/media/0."

24 That identifies the item that I was examining.  The "DCIM" and

25 "Camera," those are directories that would be the default

1  location for images that were taken with this device.  And

2  then, again, you have that file name.

3  Q.  Okay.  And you meant camera as the default for images

4  taken by the device.  Does that tell you that the file

5  20140821_132313.jpg was created by that device?

6  A.  That's where I would expect to find -- the DCIM directory

7  and then the camera sub directory is where I would expect to

8  find images that were taken.  It would be the default location

9  for images taken by that device.

10 Q.  And it would have a file path just like what you talked

11 about?

12 A.  Yes.

13 Q.  There's a column over here, "Delete."  What's that mean?

14 A.  That means the image itself, that it was referring to, was

15 deleted.

16 Q.  So the image associated with that JPEG file had been

17 deleted by the time you received the phone?

18 A.  Yes.

19 Q.  What about number two?

20 A.  Two?  Again, it's located in the same location.  This one

21 has a file name that indicates it was an image that was taken

22 on August 21st, 2014, at 1:23:19 p.m.

23 Q.  And was it also deleted?

24 A.  Yes.

25 Q.  Number three?

Case 1:15-cr-00073-TWP-DML Document 148-6 Filed 12/12/16 Page 98 of 345 PageID #:15
4598

 1  A.  Again, in the same location.  It's a file that was taken

 2  August 21st, 2014, at 1:25:55 p.m.

 3  Q.  And was it deleted?

 4  A.  Yes.

 5  Q.  And number four?

 6  A.  That was also in the same location.  That's a file taken

 7  on August 21st, 2014, at 1:26:01 in the afternoon.

 8  Q.  And was it deleted?

 9  A.  Yes.

10  Q.  Throughout the course of your examination, did you find

11  any other image files, either deleted or nondeleted, that were

12  created between that 12:30 p.m. and 1:30 p.m. time frame?

13  A.  No.

14  Q.  Is there any way to tell, based upon the information that

15  you recovered, when these four files were deleted?

16  A.  No.

17  Q.  Is that common?  Uncommon?

18  A.  Yes.  Once an image is deleted, or once any file is

19  deleted, it's difficult to tell when exactly it was deleted.

20  Q.  I'm going to ask you to look at Exhibits 7, 8, 9, and

21  10 -- or proposed Exhibits 7, 8, 9, and 10 in the binder.

22  A.  Okay.

23  Q.  Do you recognize those?

24  A.  Yes.

25  Q.  What are they?

*MELTON - DIRECT/SHEPARD*                    Vol. 3-430

1  A.  Those are images that I recovered from the device.

2  Q.  Are the print-offs accurate copies of the files which were

3  found by your software?

4  A.  Yes, they were.

5        MR. SHEPARD:  And I would move for the admission of

6  7, 8, 9, and 10, Your Honor.

7        MR. THOMAS:  Preliminary question, if I could.

8        THE COURT:  You may.

9        MR. THOMAS:  Well, first, Your Honor, can I look at

10  the exhibits?

11        THE COURT:  At the exhibits?  You may.

12        MR. THOMAS:  And if I could ask a preliminary

13  question, Your Honor.

14        THE COURT:  You may.

15  BY MR. THOMAS:

16  Q.  Did you enhance those photographs or enlarge or do

17  anything to them in that -- along those lines?

18  A.  The original images were small.  I did increase the size

19  and then take a screen shot of the image.

20  Q.  Okay.  Explain that to me.  So these are essentially a

21  photograph of a photograph?

22  A.  Yes.

23  Q.  What kind of device did you take the photographs with?

24  A.  Using a computer.  So the original images that I was able

25  to recover are small representations of an original image.  So

1  the original image, as it would appear in digital format,

2  would be very small.  The analysis software that I used in

3  examining the phone allows an opportunity to zoom in.

4        I zoomed it in and then I used a screen shot

5  software that's included in Microsoft Windows to take a screen

6  shot of the image for better presentation of my report, so for

7  the recipient of my report to be able to view the image better

8  than a very small thumbnail image.

9  Q.  What dictates the size of the original image?

10 A.  What --

11 Q.  Well, I mean, are they all the same size or were these

12 particularly smaller or --

13 A.  They were different sizes.  So the way this -- I think

14 we -- you have an original image, and then these images that I

15 was able to recover are thumbnails of the original image.  I

16 wasn't able to recover the original image, so these are

17 smaller representations of another image already, kind of like

18 if you're looking at --

19        MR. SHEPARD:  Your Honor, does he have an objection

20 or is he doing his cross?

21        MR. THOMAS:  I'm waiting to hear the answer, Your

22 Honor.

23        MR. SHEPARD:  The witness has testified that it's an

24 accurate copy of the data he recovered.

25        THE COURT:  Of the thumbnail.  Do you have an

1  objection?

2  BY MR. THOMAS:

3  Q.  Well, is it a reproduction or a photograph of a

4  photograph?

5  A.  Well, this is a print-off --

6         MR. SHEPARD:  The evidence -- the Rules of Evidence

7  make no difference, Your Honor.

8         THE COURT:  Let him ask his question.

9  A.  This is a print-off.  So the original image that was

10  recovered from the device was zoomed in.  An image was

11  captured of that.  And I believe this is a print-off of that

12  image.

13         MR. THOMAS:  No objection.

14         MR. SHEPARD:  Thank you, Your Honor.

15         THE COURT:  Government's Exhibits 7, 8, 9, and 10

16  are admitted into evidence without objection.

17                  *(Government's Exhibits 7 - 10 were*

18                  *received in evidence.)*

19  BY MR. SHEPARD:

20  Q.  Do you recall the file names of 7, 8, 9, and 10?

21  A.  Yes.

22  Q.  What were they?

23  A.  Where they resided, the file name was actually "imgcache,"

24  that's I-M-G-C-A-C-H-E, ".0."  And then my analysis software,

25  the way it processes the image cache, appends an underscore,

1  embedded underscore, 329, 330, 331, and 332 for these photos.

2  Q.  Okay.  And so is -- and is it .jpg at the end of all of

3  them?

4  A.  Yes.

5  Q.  Was 7 329?

6  A.  Yes.

7  Q.  8, 330; so just in sequential order, 9, 331; and 10, 332?

8  A.  Yes.

9        MR. THOMAS:  I'm sorry.  What is -- are you just

10  referring back to the photographs at this point?  You're not

11  looking at a --

12        THE WITNESS:  I'm looking at my report.

13        MR. THOMAS:  Okay.  Your Honor, I would ask the

14  witness to testify from his memory; and if he's going to refer

15  to his report, to please advise us.

16        THE COURT:  I agree.

17        THE WITNESS:  I'm sorry.

18        THE COURT:  Next question.

19  BY MR. SHEPARD:

20  Q.  Where were these files found?

21  A.  These files were found associated with the gallery

22  application.  I'm sorry.  Do you want me to explain that?

23  Q.  Yes, please.

24  A.  Basically, this phone was an Android phone, and there's an

25  application on there called Gallery.  The Gallery facilitates

1  being able to look at pictures that are on your device.  When

2  an image is stored on the device and it's able to be viewed in

3  the Gallery, what a lot of people don't realize, or what most

4  users don't realize, is your phone actually creates copies of

5  your image to be able to display in the Gallery.

6          That's why when we look at the Gallery and it shows

7  all of your albums, it will show an image from that album in

8  a -- as a small representation.  And then you select that

9  album and it will show several images from that album, again,

10  a little bit bigger.  And then, once you pick which one you

11  want, it will show you a bigger representation of that.

12          So the way this works is the Gallery application

13  creates three files.  They are called image cache, image cache

14  micro, and image cache mini.  Each one of these is basically a

15  container to hold all of these smaller images.  And what we're

16  showing here are from the image cache, which is the larger of

17  these three files.  The micro and mini would be even smaller.

18  So think of the image cache file like a container.  And as

19  images come into the Gallery, a smaller representation of that

20  original image gets added to that file, and they just keep

21  getting added to that file.

22          And then the analysis software we use goes through

23  that file and looks for what we call a JPEG image header,

24  which signifies the beginning of a new image.  And it will

25  take that image and separate it out and, like I stated

1  earlier, it will append this embedded with a sequential number

2  to identify it as a distinct image that was within that file.

3  Q.  All right.  I ask you to look --

4          MR. SHEPARD:  Please display Exhibit 37 again.

5  BY MR. SHEPARD:

6  Q.  So if we have a JPEG image like the ones here, 1, 2, 3,

7  and 4 on the report, the phone will automatically create

8  copies and image cache; is that accurate?

9  A.  That's correct.

10 Q.  What happens to those image cache if the original file is

11 deleted, like what happened with these four?

12 A.  Sometimes they are still retained inside that image cache

13 file.

14 Q.  All right.  And is that why you look in the image cache

15 file as an examiner to try and find deleted information?

16 A.  Yes.

17 Q.  Was there an SMS application on the phone?

18 A.  Yes, there was.

19 Q.  What do I mean when I say "SMS"?

20 A.  "SMS" stands for short message service.  That's what,

21 generally, we refer to as text messages.

22 Q.  Were you able to recover some text messages --

23 A.  Yes.

24 Q.  -- on the phone?  I ask you to turn to the tab -- to

25 Exhibit 69.

1   A.  Okay.

2   Q.  What is 69?

3   A.  69 is a print-off of some of the text messages, or SMS

4   messages, that were recovered from these -- from this phone.

5   Q.  And is it an accurate summary of the data that you pulled

6   off the phone?

7   A.  Yes, it is.

8          MR. SHEPARD:  Okay.  Your Honor, I would move for

9   the admission of Exhibit 69.

10         MR. THOMAS:  Preliminary question, if I may, Your

11  Honor.

12         THE COURT:  You may.

13  BY MR. THOMAS:

14  Q.  You said this was, "some of the text messages."  Were

15  these specific selections that you made or is it from a

16  particular time period?

17  A.  There were -- this is -- appears to be one page of the

18  report.  I reported out 260 messages.  I believe those -- I

19  don't recall if those 260 were every message or if that was

20  just every message from the date of the alleged incident on --

21  Q.  I mean, I guess my question, I apologize, the 16 that are

22  here, is that a sequential list?  In other words, are these

23  all of the text messages that you found from that time period,

24  or did you pull out certain ones based on content and make a

25  list?

1  A.  I don't recall if there were others in here during this

2  time frame.

3          MR. THOMAS:  Well, Your Honor, at this point I would

4  object to Government's 69 if it's not a -- if it's not a

5  complete list and it's simply random e-mails that he noted.  I

6  don't think it's a complete record.

7          MR. SHEPARD:  Your Honor, it's just specific files.

8  He said that they're on the computer, that they're accurate

9  copies of specific files.

10          THE COURT:  Okay.  I'll overrule the objection.  He

11  doesn't have to put every single text message.  These are just

12  specific ones that are being offered by the government.  Next

13  question.

14          MR. SHEPARD:  Thank you, Your Honor.

15          Please display Exhibit 69.

16          THE COURT:  69 is admitted into evidence over the

17  defendant's objection.

18                    *(Government's Exhibit 69 was*

19                    *received in evidence.)*

20          MR. SHEPARD:  Thank you, Your Honor.

21          Please display 69.  If you could just -- kind of

22  this little gray header bar here.  Back out of that, please.

23  Give me the first one with it, so it makes sense.

24  BY MR. SHEPARD:

25  Q.  Detective Melton, can you kind of go across the columns

1  and tell the jury what they're seeing in the exhibits?

2  A.  Sure.  The first column, the pound sign, is the number.

3  It just identifies which row we're on.

4          "Folder" indicates which SMS folder the message is

5  from.

6          "Party" is the other party of the conversation, in

7  the conversation with this user.

8          "Time" is the timestamp for the messages.

9          The "All timestamps," that's showing timestamps from

10 the network itself.

11         The "SMSC" is what's called a short message service

12 center.  That's a service center where messages are being

13 routed through.

14         "Status" is the status of the message, whether it

15 was read, sent, or unread.

16         "Message" is the body of the message.

17         And the "Del?" is a column that would show an

18 indicator of whether the message was previously deleted.

19         MR. SHEPARD:  You can clear -- or go back out to the

20 main exhibit.  And if you could blow up from message 6 down to

21 message 16.

22 BY MR. SHEPARD:

23 Q.  Are these in reverse order?

24 A.  Yes.

25 Q.  And so let's look at row 16.  First is "Inbox."  What does

1  that mean?

2  A.  That means the messages were recovered from the in box,

3  the received message.

4  Q.  Received by the phone, Exhibit 27?

5  A.  Yes.

6  Q.  From?

7  A.  From phone number ▮▮▮▮▮▮▮▮.  And that phone number,

8  the red, where it shows "Habibti," with the -- it looks like a

9  heart, that is cross-referenced to the phone's contacts.  So

10 that means that this phone number was stored in the phone's

11 contacts associated with that name.

12 Q.  And is that the other end of the communication?

13 A.  Yes.

14 Q.  And is that when the message was received?

15 A.  Yes.

16 Q.  Okay.  And that indicates that the message had been

17 opened?

18 A.  Yes.

19 Q.  And that's the text?

20 A.  Yes.

21 Q.  And let me find -- okay.  So 14 is a little different.

22 We've got "Sent" up here in the second column.  What does that

23 mean?

24 A.  That means the message was sent from this phone to that

25 phone number.

1  Q.  All right.  Otherwise, is the information generally the

2  same?

3  A.  Yes.

4  Q.  Okay.  And what is the time frame from 16 to 6?

5  A.  They were all on August 22nd of 2014 from 1:35 p.m. to

6  2:00 p.m.

7  Q.  Okay.  What time zone, if you remember, was the phone set

8  to?

9  A.  Eastern.  At that time, Eastern Daylight Time.

10  Q.  And so would these correspond to -- so it was set to

11  display Eastern Time?

12  A.  Yes.

13  Q.  And in what time zone is Indianapolis?

14  A.  Eastern Time.

15  Q.  And is that what this would be displaying over here?

16  A.  Yes.

17  Q.  Okay.  In this column, it all says either "Read" or

18  "Sent."  What does that mean?

19  A.  That indicates whether the message had been read by the

20  user of this phone or sent by the user of this phone.

21  Q.  Okay.  For ease of kind of going through these, let's you

22  and I go from 16 to 10, and I'll read anything with a "Sent."

23  And why don't you read anything with an "Inbox."

24  A.  Okay.

25  Q.  So let's start with 16.

1  A.  "Babe, tell me why the police and news people are here

2  about an ongoing conflict that Heidi can't tell us about,

3  LOL."

4           "I'm scared to go outside."

5  Q.  "Wtf really?"  And then kind of an attempt at an emoji, a

6  colon, backslash, or a frowny face.

7           MR. THOMAS:  Your Honor, I'm going to object at this

8  point.  I mean, Government's 69 is in evidence.  The jurors

9  can read.  The item kind of speaks for itself.  I don't know

10  that him reading it adds anything to the exhibit.

11           MR. SHEPARD:  Your Honor, reading it into the

12  record, I think it is an easier way for the jury to understand

13  the conversation.

14           THE COURT:  I'll let you do it.  I'll overrule the

15  objection.

16  BY MR. SHEPARD:

17  Q.  So I'll pick it up again.  "Wtf" -- in your training and

18  experience, do you see that "wtf" a lot?

19  A.  Yes.

20  Q.  Do you know what that stands for?

21  A.  "What the fuck."

22  Q.  Okay.  Pick it up on 13, please.

23  A.  "Yeah, idk what it is she scared me."  And "idk" is

24  commonly used to represent, "I don't know."

25  Q.  Okay.

1  A.  "Cause she got down and was like I have an issue with a

2  parent.  The police is in my office."

3          "And I was like what?  And she said conflict going

4  on with something else."

5  Q.  "That's really scary."

6  A.  "The news is up here what the hell happened after I left

7  yesterday do you know" --

8  Q.  Hold on.  We were stopping after 10.

9  A.  Oh, I'm sorry.

10 Q.  We're going to pick up -- beginning at number 9, is it a

11 different phone number that's in the conversation?

12 A.  Yes, it is.

13 Q.  Okay.  So do 9 through 6 appear to be a different

14 conversation than 10 through 16?

15 A.  That's correct.

16 Q.  Now, the same thing.  You go ahead and we'll do -- you do

17 the "Inbox," I'll do the "Sent" box.

18 A.  "The news is up here what the hell happened after I left

19 yesterday do you know?"

20 Q.  "Wtf idk," or, "What the fuck, I don't know."

21 A.  "Yes," I, "don't say nothing just wait and let them tell

22 you but it's something going on the police is here in Jennifer

23 office with some parents I don't know."

24          "What's going on...didn't see the parents they were

25 here when I came back from lunch with the news outside."

1  Q.  And if you can recall, was number 6 the last read message

2  that you were able to recover from the phone?

3  A.  Yes, it was.

4  Q.  And what was the time of that last read message?

5  A.  2:00 in the afternoon on August 22nd, 2014.

6  Q.  I want you to look in the binder behind tab number 3.  Do

7  you recognize 3?

8  A.  Yes.

9  Q.  What's 3?

10 A.  3 is another image I recovered from the phone.

11 Q.  And is that an accurate copy of the image file you

12 recovered from the phone?

13 A.  Yes, it is.

14        MR. SHEPARD:  Your Honor, I would move to admit

15 Exhibit 3.

16        MR. THOMAS:  Preliminary question, if I could, Your

17 Honor?

18        THE COURT:  You may.

19 BY MR. THOMAS:

20 Q.  Do you know when Government's 3 was taken?

21        THE WITNESS:  Can I refer to my reports?

22        THE COURT:  You may.

23 A.  No, I don't.

24        THE COURT:  Any objection?

25        MR. THOMAS:  I do, Judge.  At this point I would

1  object on relevance grounds.  It -- if -- we don't know when

2  it was taken, we don't know where it was taken.  The fact that

3  it was on his phone is -- is -- we've already established his

4  identity is not at issue.  That the phone is his is not at

5  issue.  Specifically since we don't know when this was taken,

6  I don't -- I would object to it.

7          MR. SHEPARD:  Can I ask one more question?

8  BY MR. SHEPARD:

9  Q.  Was that still on the phone or was that deleted, as well?

10 A.  This phone (sic) was stored in the same location as the

11 other images we talked about in the image cache.  The original

12 image was no longer on the phone.

13         MR. SHEPARD:  Do you want me to approach?

14         THE COURT:  Sure.

15         (Bench conference on the record.)

16         THE COURT:  Tell me why it's relevant.  I think I

17 know why, but you tell me why you --

18         MR. SHEPARD:  I think he was trying to destroy any

19 evidence on that phone about any contact he had with M.R.  And

20 the fact that it was found on the phone and found in the

21 deleted space, the image cache, the original being deleted, we

22 think that's why it's relevant.

23         MR. THOMAS:  Why can't he establish when it was

24 taken in relation to the others?

25         MR. SHEPARD:  You can ask him that on cross.  It

1  doesn't go to admissibility.

2          MR. THOMAS:  I think it does.  If the -- at this

3  point, its only purpose is that it's on the phone and that

4  it's him.  But, unless we know when it was taken, then it's

5  not relevant to the case.

6          THE COURT:  I'll overrule.  Government's Exhibit --

7  and I'll admit it into evidence over your objection.  I do

8  believe it's relevant.

9          MR. SHEPARD:  Thank you, Your Honor.

10                      (Open court.)

11          THE COURT:  The objection is overruled and

12  Government's Exhibit 3 is admitted into evidence over the

13  defendant's objection.

14                      *(Government's Exhibit 3 was*

15                      *received in evidence.)*

16          MR. SHEPARD:  Can you call back up Exhibit 69?  And

17  if you could highlight block 6 again.

18  BY MR. SHEPARD:

19  Q.  That was the time that the message was received, correct?

20  A.  Yes.

21  Q.  And that's 2:00:57 p.m.?

22  A.  Yes.

23  Q.  All right.  And you stated, I think earlier, you were

24  aware of the believed time frame of the incident?

25          MR. THOMAS:  I'm going to object to the continuing

1  leading of his own witness, Your Honor.

2  BY MR. SHEPARD:

3  Q.  Do you know --

4          THE COURT:  Would you ask direct questions?

5  BY MR. SHEPARD:

6  Q.  What was the time frame of the alleged incident?

7  A.  August 21st, 2014, between 12:30 and 1:30 p.m.

8  Q.  How much time had elapsed between that and this last read

9  message?

10  A.  24 hours and 30 minutes.

11  Q.  In your training and experience as a forensic detective,

12  do you know about how long it takes to delete a file off a

13  phone?

14  A.  A person could delete an image very quickly.

15  Q.  Would 24 hours be enough time?

16  A.  Yes.

17          MR. SHEPARD:  If I could have just a moment, Your

18  Honor?

19          THE COURT:  You may.

20          (Off the record.)

21  BY MR. SHEPARD:

22  Q.  Please look behind tab 40.  Do you recognize tab 40?

23  A.  Yes.

24  Q.  What is tab 40 -- or what is marked as Exhibit 40?

25  A.  That's an image that I recovered from the phone.

1  Q.  And is that a substantially accurate copy of the image?

2  A.  Yes.

3  Q.  All right.  Was that deleted or was that one still on the

4  phone?

5  A.  Again, I need to refer to my notes.

6  Q.  Go ahead.

7  A.  That image was still present on the phone.  It had not

8  been deleted.

9          MR. SHEPARD:  Your Honor, I would -- the government

10  would move for the admission of Exhibit 40.

11          MR. THOMAS:  Your Honor, I think if the purpose of

12  40 is from his testimony that it wasn't deleted, that there

13  were images that weren't deleted, that evidence is in.  As far

14  as the -- what the image shows and what it is -- may we

15  approach, Your Honor?

16          THE COURT:  You may.

17          (Bench conference on the record.)

18          MR. THOMAS:  Your Honor, I don't feel the photograph

19  is the best evidence here.  If the government's relevance is

20  to say that he had pictures on his phone he didn't delete --

21          THE COURT:  Let's find out.  Why is this relevant?

22          MR. SHEPARD:  Really, it's going to be relevant for

23  cross-examination, Your Honor.  It appears that the photo of

24  him and his -- that we believe was taken at the daycare with

25  M.R., the victim, was deleted.  We believe that this one was

 1 | also taken at the daycare, due to some of the other

 2 | information contained within the images, with a different kid,

 3 | it wasn't deleted.  If he can explain it --

 4 |         THE COURT:  Who can explain it?

 5 |         MR. SHEPARD:  The defendant on cross.

 6 |         THE COURT:  Well, the defendant doesn't have to

 7 | testify.

 8 |         MR. SHEPARD:  If he -- you're correct, Your Honor.

 9 | If he were to testify --

10 |         THE REPORTER:  I cannot hear you.

11 |         THE COURT:  Talk in there.  I think you're going

12 | to -- if the defendant --

13 |         THE REPORTER:  I did not hear what Mr. Shepard said.

14 |         THE COURT:  Oh, he didn't hear what you said.

15 |         MR. SHEPARD:  Your Honor, we believe that it's

16 | relevant.  We're anticipating that should he testify, we would

17 | need that for cross-examination.

18 |         THE COURT:  Then, Counsel, you're going to have to

19 | wait until he is being cross-examined to offer it.  I'll

20 | sustain the objection.

21 |         MR. SHEPARD:  Thank you, Your Honor.

22 |         THE COURT:  Okay.

23 |                   (Open court.)

24 |         THE COURT:  The objection is sustained.

25 |         MR. SHEPARD:  We pass the witness for cross, Your

1  Honor.

2             THE COURT:  Okay.

3             MR. THOMAS:  Thank you, Your Honor.

4             THE COURT:  Mr. Thomas, you may cross-examine the

5  witness.

6                    **CROSS EXAMINATION**

7  BY MR. THOMAS:

8  Q.  You do not know when -- you do not know when the fourth

9  image was taken, the --

10            THE COURT:  You need to give an exhibit number.

11            MR. THOMAS:  Yeah.  Let me find that.

12  BY MR. THOMAS:

13  Q.  Government's 3.  You don't know when that was taken?

14  A.  You said 3?

15  Q.  Yeah.

16  A.  That's correct.

17  Q.  How is it that you don't know when that was taken?

18  A.  The original -- as I said, the original image was deleted.

19  These files that are recovered from the image cache file, or

20  the individual images that are embedded, the metadata, or what

21  we call metadata, well, that's data about data.  That

22  doesn't -- that gets updated for the image cache file to just

23  say that the file was modified at a certain time.

24            So the only time that I would find associated with

25  that image cache file is when the last file went in there.

1   I'm not able to determine the individual -- the other

2   individual files within their -- what time they got entered

3   into that image cache file.

4   Q.  The other four, which I think are 7, 8, 9, and 10, you

5   were able to make a determination for each one of those as to

6   when they were taken?

7   A.  7, 8, 9, and 10, no.  That's the same.  Those are the

8   image cache files.  So those files that were recovered from

9   there I'm not able to say, with certainty, when they were

10  taken.

11  Q.  What is that when you explained to us the 132319, what is

12  that -- what did that mean to you for number 7, for example?

13  A.  132319, where are you getting that from?  What was that?

14  Q.  Let's go back to -- what is it, 67?  No.  37 maybe.  I'm

15  sorry.  I don't have these together like I wanted to.  37,

16  which was admitted.  You pointed out that these JPGs for 1, 2,

17  3, and 4, those corresponded with 7, 8, 9, and 10, right,

18  Exhibits 7, 8, 9, and 10?

19  A.  I did not say that, no.

20  Q.  Okay.  What do they correspond to?

21  A.  These are -- these file names and the paths of the file

22  names indicate to me that there were previously images on the

23  phone, that had been taken on August 21st, 2014, at 1:23:13,

24  at 1:23:19, at 1:25:55, and 1:26:01.  That's all that that

25  means to me, is that there were images on this phone

1  previously that had been taken at those times.

2  Q.  You have no idea that -- whether these four, the four

3  images that were taken on that day, are those four images?

4  A.  From a digital forensics standpoint, no.

5  Q.  And you don't know when Government's 3 was taken at all?

6  A.  That's correct.

7  Q.  You can't tell at all when these photos were erased?  I

8  think that was your testimony?

9  A.  That's correct.  The four images that were -- that had the

10 file names of taken August 21st 2014, with those times, I

11 don't know when those images were deleted.  The images that

12 we're talking about, 7, 8, 9, and 10, those actual images are

13 still on there, but the original images that those were

14 derived from were no longer on there, and I can't tell when

15 they were deleted.

16 Q.  Right.  When you say they're still on there, would -- if

17 that's my phone and I delete them without -- and I don't have

18 any of your equipment, would I be able to access those

19 thumbnail pictures you're talking about?

20 A.  Typically not without some kind of special equipment.

21 Q.  Once they're -- once they're gone, they're gone, for the

22 layman?

23 A.  Yes.

24 Q.  You have no way of telling whether those were -- were

25 deleted -- they could have been deleted between pictures,

1  right?  He could have taken one, deleted it; taken the second

2  one, deleted it; taken the third one, deleted it; taken

3  the fourth one, deleted it?  There's nothing in your

4  information to say that couldn't have happened, right?

5  A.  That's correct.

6  Q.  And even though Mr. Al-Awadi had his phone for 24 hours,

7  you have no idea, during that period of time, when they were

8  deleted, correct?

9  A.  That's correct.

10 Q.  Or even if they were deleted during that 24 hours, right?

11 A.  That's correct.

12 Q.  Did you examine other electronics for this case?

13 A.  I don't believe I examined any others.

14 Q.  Were folks in your office involved with that, or why would

15 you not?

16 A.  I do know there were other items that were examined as

17 part of this case, examined by other examiners in my office,

18 yes.

19 Q.  Okay.  Would you presume that they do the same kind of

20 analysis you would do?

21 A.  Yes.

22 Q.  Would you presume that any evidence that they found in the

23 case, they would have turned over in the way you did?  Would

24 that be normal in your office?

25 A.  Yes.

1  Q.  Do you know at this point how many other electronic

2  devices, computers, phones, and things from Mr. Al-Awadi's

3  house were examined by your office?

4  A.  I don't know.

5  Q.  But you are aware that there were items that were

6  examined?

7  A.  Yes.

8  Q.  Were you able to make a determination as to how many photo

9  files had been deleted on that phone over its lifetime?

10  A.  No.

11  Q.  Did you try to determine that?

12  A.  There would be no way to determine that.

13  Q.  Well, did you find other -- these data image files, say in

14  Government's 37, did you find other data image files on the

15  phone?

16  A.  When I found these, I had specifically searched for

17  photographs that could have been taken on the date of the

18  incident we're referring to here.  I didn't specifically look

19  for any other records of those file paths.

20  Q.  You have no way of knowing that the image in

21  Government's 3 was deleted at the same time or the same day or

22  anything as to any of these other images, correct?

23  A.  Correct.

24  Q.  And you have no way -- you made no record of how many

25  other items may have been deleted from the phone at any

1  particular time?

2  A.  That's correct.

3  Q.  The text messages that you and Mr. Shepard read to us,

4  there's a -- you made a notation that some of them say "Read"

5  and some of them say "Unread."  To your knowledge, with the

6  way that phone works, what's required -- what's required to

7  make a message go from "Unread" to "Read"?

8  A.  Selecting the message and -- messages come into the phone.

9  They show a flag that they are unread.  Once a user selects on

10  that message, it would change the flag to read.

11  Q.  So after 2:00, there were some additional messages, at

12  least on that page, that hadn't been read?

13  A.  That's correct.

14  Q.  Were there any other unread messages on the phone, that

15  you recall?

16  A.  No.

17  Q.  And those are the -- I'm not quite clear, and, of course,

18  I was asking a question before for a different purpose, but

19  these particular messages, how did they end up in your

20  extraction report, these text messages?

21  A.  I don't recall exactly how many messages total there were.

22  I reported out 260 messages that I believe, if I remember

23  right, they were messages from the date of the alleged

24  incident or the date and time to the present.  I don't -- I

25  don't believe -- or I don't recall whether there were

1  additional messages.

2  Q.  Okay.  And I -- and just so I'm understanding, were you --

3  did you take it upon yourself or were you asked to find

4  messages with a particular content or simply a date range?

5  A.  Again, I don't remember.  I know that these -- at the time

6  of the examination, those conversations stood out, because it

7  was clear that the messages seemed to be referring to the

8  investigation of this incident.

9  Q.  Did you make any other report that would have contained

10  all of the messages from that time frame?

11  A.  Again, I don't remember if the report that I did contains

12  all of the messages or not.

13  Q.  Okay.

14  A.  So I can't really say.

15          MR. THOMAS:  That's all the questions I have.

16  Thanks.

17          THE COURT:  Any redirect for the witness?

18          MR. SHEPARD:  No, Your Honor.

19          THE COURT:  Very good.  And may this witness be

20  excused?

21          MR. SHEPARD:  No, Your Honor.  We would like to keep

22  him subject to recall.

23          THE COURT:  Okay.  All right.  You're going to hang

24  around.

25          THE WITNESS:  Thank you, Your Honor.

1          (Witness excused.)

2          THE COURT:  Okay.  We're going to go ahead and take

3   our lunch break.  Ladies and gentlemen, the Court is going to

4   admonish you that you are not to begin any deliberation and no

5   discussion.  And remember, if you see any of the attorneys,

6   parties, spectators, or a witness during your lunch break, you

7   are not to talk to those folks.  And if anyone should attempt

8   to talk to you about this matter, refuse and report that

9   attempt to your bailiff at your earliest opportunity.

10          No Googling or using your social media with respect

11  to this matter.  Under this admonishment, you are allowed to

12  separate, and we'll need you back in your jury room -- it's

13  12:35 -- at 1:30.  See you at 1:30.

14          THE COURTROOM DEPUTY:  All rise.

15          (Jury out at 12:35.)

16          THE COURT:  Witness, you may step down.

17          And you may be seated.  Who do we have this

18  afternoon?  Shea Anderson?

19          THE WITNESS:  Should I just leave those here?

20          THE COURT:  Yeah, you can leave those there.  Thank

21  you.

22          MS. KOROBOV:  Shea Anderson, Tonya Fishburn, and

23  Mike Johnson from Homeland Security.

24          THE COURT:  Okay.  I remember Tonya -- Shea Anderson

25  and Tonya Fishburn from Marion County, okay.  All right.  So

 1  those three witnesses, and then are you finished?

 2            MS. KOROBOV:  (Nods head up and down.)

 3            THE COURT:  All right.  So if you do intend to

 4  present any evidence, it will be this afternoon, Counsel.  I

 5  think we should be able to get those three.  Agree?

 6            MS. KOROBOV:  I -- we'll finish with our -- how long

 7  their cross is, I don't -- but, yes, we'll finish today.

 8            THE COURT:  We're going to stay and finish.

 9            MS. KOROBOV:  Wonderful.  Thank you.

10            THE COURT:  Quick or not, okay?  All right.  Go

11  ahead and take your lunch break, and we will resume at

12  1:30 p.m.

13            THE COURTROOM DEPUTY:  All rise.

14            (Recess at 12:37, until 1:39.)

15            THE COURT:  We're back on the record.  Are you ready

16  with your next witness, Government?

17            MS. KOROBOV:  Yes, Your Honor.

18            THE COURT:  Is the defense ready?

19            MR. THOMAS:  We're ready, Judge.

20            THE COURT:  Tanesa, you may bring in the panel.

21            MS. KOROBOV:  Would you like the witness to go ahead

22  and stand by the witness box?

23            THE COURT:  Sure.

24            I haven't seen you in a long time.

25            THE WITNESS:  Likewise.

 1          (Off the record.)

 2          (Jury in at 1:39.)

 3          THE COURT:  Witness, if you would come up to the

 4   stand and raise your right hand.

 5          (The witness is sworn.)

 6          THE COURT:  You may be seated.

 7          And good afternoon, ladies and gentlemen.  We are

 8   back on the record, and we're going to resume with the next

 9   witness.

10          And, Ms. Korobov, you may examine your witness.

11          MS. KOROBOV:  Thank you, Your Honor.

12          **SHEA ANDERSON, PLAINTIFF'S WITNESS, SWORN**

13                  **<u>DIRECT EXAMINATION</u>**

14   BY MS. KOROBOV:

15   Q.  Would you state your name and spell your first and last

16   names for the jury, please?

17   A.  Shea Anderson, S-H-E-A, A-N-D-E-R-S-O-N.

18   Q.  Ms. Anderson, where are you employed?

19   A.  I'm employed by the Indianapolis-Marion County Forensic

20   Services Agency, also known as the crime laboratory.

21   Q.  And what do you do at the crime lab?

22   A.  I'm a forensic scientist in the biology unit of the crime

23   laboratory.

24   Q.  Can you tell us what it means to be a forensic scientist?

25   A.  Basically, a forensic scientist deals with evidence or

1  materials associated in criminal cases.  My job title, as a

2  biologist, is also a forensic sociologist.  My job deals with

3  the study, identification, and analysis of blood and other

4  biological fluids.  That includes semen and saliva.

5  Q.  Ms. Anderson, could you describe your educational

6  background for the jury?

7  A.  I have a Bachelor's of Science degree in biology; six

8  graduate credit hours, three in basic forensic serology, an

9  additional three in DNA typing techniques.  I've been employed

10  as a forensic sociologist for approximately 32 years at the

11  laboratory, so throughout my career as a scientist, I've

12  attended various workshops and seminars in the field of

13  forensic serology.

14  Q.  So 32 years at the crime lab; is that correct?

15  A.  That's correct.

16  Q.  And working as a forensic scientist that entire time?

17  A.  Yes, that's correct.

18  Q.  Is the Marion County Crime Lab accredited?

19  A.  Yes, it is.

20  Q.  And who does that accreditation?

21  A.  Our lab is accredited by the ASCLD/LAB, which stands for

22  the American Society of Laboratory Directors Laboratory

23  Accreditation Board.  So it's a group of crime laboratory

24  directors that are with the ASCLD/LAB.

25  Q.  What does it mean that your lab is accredited?

1  A.  Basically, to be accredited means that our lab is meeting

2  guidelines or standards that have been approved through this

3  board so that we follow certain procedures in our laboratory

4  to ensure that we're doing proper testing in the laboratory.

5  Q.  And do you have to maintain that accreditation on a yearly

6  or a biannual basis?

7  A.  Yes, we do.

8  Q.  As individual scientists, are you also periodically tested

9  to ensure that you're proficient at your job?

10  A.  Yes, we do.

11  Q.  Okay.  And how are you tested?

12  A.  Basically, we have external proficiency testing that we do

13  on a yearly basis, where we get blind samples that we do

14  testing on.  And then it's sent out to determine if you got

15  the right answer as far as the testing that you did.

16  Q.  Now that you've talked to the jury a little bit about,

17  generally, what it is that you do, could you tell them

18  specifically what kind of evidence items you examine in your

19  role as a forensic scientist?

20  A.  Basically, any evidence that could have a potential body

21  fluid on it, or skin cells, can be received into our section

22  for me to examine.  I identify -- there are certain body

23  fluids that I can identify or say, for a fact, that that is

24  that body fluid, which would be blood and semen.  And, also, I

25  can get an indication if saliva is present, present on a

1  sample, as well as now the collection of possible skin cells

2  that could be deposited on items.

3  Q.  Do you ever examine evidence that has been collected into

4  a sexual assault examination kit?

5  A.  Yes, I do.

6  Q.  Okay.  And are those kits typically provided by the State

7  Police for Indiana?

8  A.  Yes.

9  Q.  Is it a standard kit that comes with certain items in it?

10 A.  Yes, that's correct.

11 Q.  Is there a protocol or practice that you follow when you

12 get a sexual assault evidence collection kit into your lab?

13 A.  Yes, there is.

14 Q.  Could you describe that for the jury, please?

15 A.  Basically, when we receive sexual assault evidence in, the

16 first step is to do an inventory of what was received in that

17 kit, identifiers as to who it belongs to.  So I inventory

18 what's in there, and -- after I do my inventory, I then would

19 go to determine what type of testing or what type of body

20 fluid I may be looking for in the evidence that was submitted.

21 Q.  So what's the goal of the testing that you're doing?

22 A.  Yes.

23 Q.  To see if there's any body fluid on any of these items or

24 something that could be passed for further testing?

25 A.  That's correct.

1  Q.  What testing specifically -- well, let me ask this.  You

2  indicated that you can test for blood, for -- and for semen,

3  for certain; is that correct?

4  A.  That's correct.

5  Q.  And could you describe those two types of testing for the

6  jury?

7  A.  Basically, the testing for each body fluid is different,

8  but the procedure is basically the same.  We start off doing a

9  visual examination.  Obviously, in cases looking for blood,

10  you're going to look for something that looks like blood

11  staining, or red/brown in color.

12         So we start off with a visual examination, and then

13  we go on to what we call presumptive testing, where it's

14  basically a chemical test.  And the tests are different

15  depending on what type of body fluids you're looking for, but

16  you're looking for a positive chemical test that tells you

17  that, yes, it could be that body fluid.  There is an indicator

18  to tell you to go on further to confirm it.

19         So once you do the presumptive test on either one of

20  those body fluids, you go on and do a confirmatory test where

21  you then, in fact, confirm that you do have blood staining or

22  you do have semen staining in that sample.

23  Q.  You also indicated that you are testing for what you call

24  indications of saliva.  What does that mean?

25  A.  Basically, saliva does not have anything unique in it

1  that's unique only -- that you can only find in saliva, so

2  there is no confirmatory test to say, yes, you do, in fact,

3  have saliva.  But there is an enzyme that's found in saliva

4  that you can find in high levels in saliva.  So we have a test

5  that gives you an indication that it could be saliva, but you

6  can't confirm it because amylase is not unique only to saliva.

7  Q.  What other bodily fluids is amylase present in?

8  A.  It could be present in basically all body fluids, but it

9  can be present in lower amounts.  So that's why we have a test

10  that you detect an elevated level of amylase that gives you

11  the indication.

12  Q.  Ms. Anderson, after you've determined that an item

13  contains biological materials through the testing process that

14  you've described, what do you do next?

15  A.  Basically, once I've identified a body fluid, I'm going to

16  remove that staining in whatever sample that I have and

17  collect it to repackage it.  And then, at that point, it's

18  going to be sent on for a later date, if there's going to be

19  DNA analysis, to determine who that body fluid could have come

20  from.

21  Q.  So you're looking to determine essentially what body fluid

22  you have, if any, and it gets passed on to determine who that

23  fluid might belong to; is that correct?

24  A.  That's correct.

25  Q.  Okay.  In the instance, though, where you're looking for

1  something perhaps, like skin cells, is the process any

2  different?

3  A.  Yes, it is.

4  Q.  And can you explain what you do for the jury?

5  A.  Yes.  Basically, in looking for possible skin cells on an

6  item, there is no confirmatory testing that you can do to say,

7  yes, in fact, you have skin cells.  Basically, you can't

8  really see skin cells, so I couldn't see a body fluid when I

9  first do that visual examination.

10         So, basically, all we're doing in collection of

11  possible skin cells is going into a particular area on an item

12  where someone may have handled or worn an item where skin

13  cells could have been deposited, and we're just swabbing and

14  making a collection of that area in hopes that we collect

15  enough skin cells to determine if there is DNA in that sample.

16  Q.  Ms. Hayes-Anderson, in your work at the crime lab, did you

17  receive a request to test evidence under item number IP -- or

18  IP Case No. DP14088487, lab number 14-05043?

19  A.  Yes, I did.

20  Q.  And what evidence did you receive for testing?

21  A.  May I refer to my notes?

22  Q.  I don't have an objection to that.  Counsel --

23         THE COURT:  You may.

24         THE WITNESS:  Thank you.

25  A.  I received into the laboratory a sexual assault kit

1  containing hospital samples and clothing that were labeled as

2  from M.R.  And that kit included a buccal cell standard, a

3  swab -- swabs that were described as saline dripped over the

4  hymen, swabs described as internal genitalia, swabs described

5  as external genitalia, oral swabs, anal swabs, and a pair of

6  underwear.

7  BY MS. KOROBOV:

8  Q.  I'm going to ask you to look in that book in front of you,

9  to the right, at Exhibit Number 64, if you could turn to that,

10 please.

11         Do you recognize item 64?

12 A.  Yes, I do.

13 Q.  And what do you recognize item 64 to be?

14 A.  I recognize State's Exhibit Number 64 as a copy of the

15 applications for benefit sheet that was received in the kit

16 that I received from the hospital.

17 Q.  Okay.  And what do you use this particular form to

18 document?

19 A.  Basically, this is kind of used as a chain-of-custody

20 form.  This came with the kit.  It has the signatures of our

21 climb lab personnel, our forensic evidence technician that

22 picked up the kit from the hospital.  He signed it when he

23 picked it up and brought it into the laboratory.  Once I open

24 the kit, I also sign when I take possession of the kit.  It

25 also has identifying information on this paperwork that

1  relates it back to the kit.

2  Q.  And are you essentially, then, the last link in the chain

3  of custody on that sheet?

4  A.  Yes, I am.

5          MS. KOROBOV:  At this time, we move to admit 64 into

6  evidence.

7          THE COURT:  Any objection to 64?

8          MR. THOMAS:  No objection to 64.

9          THE COURT:  Government's Exhibit 64 is admitted into

10  evidence without objection.

11                  *(Government's Exhibit 64 was*

12                  *received in evidence.)*

13          MS. KOROBOV:  Thank you.

14  BY MS. KOROBOV:

15  Q.  Ms. Anderson, in front of you is a box marked Exhibit 48.

16  Could you look at that box, please?  I think the exhibit

17  sticker is on the bottom of it, maybe.

18  A.  Okay.

19  Q.  Do you recognize Exhibit 48?

20  A.  Yes, I do.

21  Q.  And what do you recognize it to be?

22  A.  I recognize this as the box containing the sexual assault

23  evidence that was received on M.R..  I can recognize it

24  through what our laboratory describes as a CIDI label, which

25  was placed on there by me.  This label is on the front of the

1  box.  It has the agency number, the item number, the case

2  number, and then it has the date that I received the evidence

3  and took possession of it, as well as the -- my initials on

4  the label.

5  Q.  And was that item sealed when you received it?

6  A.  I need to refer to my notes on that one.

7          Yes.  It was -- the state's sexual assault kit was

8  sealed.

9  Q.  Okay.  I would ask you to open up Exhibit 48, please.  And

10  does item 48 contain a number of hospital samples?

11  A.  Yes, it does.

12  Q.  I ask you to look at item 49.  And do you recognize number

13  49?

14  A.  Yes, I do.

15  Q.  What do you recognize 49 to be?

16  A.  I recognize 49 as my item 4.1.  This is the envelope that

17  contained buccal swabs elicited from M.R.  Once again, I can

18  identify it through the CIDI label that I placed on it with

19  the case number, the item number.  It has the date and

20  initials that I received it.  It also has evidence tape.  Once

21  I completed my analysis on it, I resealed the evidence -- the

22  envelope back up with evidence tape.  It has my initials and

23  the date that I sealed it.

24  Q.  Okay.  When you received that item, was that also sealed

25  when you received it?

1  A.  Yes, it was.

2  Q.  Okay.  And when you open those items, do you leave the

3  original seal from the hospital intact?

4  A.  If possible, yes.

5  Q.  Okay.  And so then you kind of cut an opening for

6  yourself, and then that opening gets resealed by you when you

7  finish with the item?

8  A.  That's correct.

9  Q.  Okay.  And is item 49 in the same or substantially the

10  same condition as when you sealed it?

11  A.  Yes, it is.

12  Q.  I'll ask you to retrieve Government's 50, please.  Do you

13  recognize Government's 50?

14  A.  Yes, I do.

15  Q.  And what do you recognize it to be?

16  A.  This is the envelope that contained the swabs

17  containing -- swabs that were labeled as saline dripped over

18  the hymen swabs.  Once again, I can identify it the same way

19  as the other item.  It has the CIDI label that I placed on it

20  myself, it has the initials that I -- my initials and the date

21  that I received the evidence in.  It's also sealed with

22  evidence tape that has my initials and the date that I sealed

23  it.

24  Q.  And was that item also sealed when you received it?

25  A.  Yes, it was.

1  Q.  Okay.  I'll have you retrieve item 51 -- excuse me.  Was

2  50 in the same or substantially the same condition as when you

3  sealed it?

4  A.  Yes, it is.

5  Q.  Okay.  Item 51, please.  What do you recognize item 51 to

6  be?

7  A.  I can recognize item 51 as the envelope that I received

8  containing internal genitalia swabs labeled as from M.R.  Once

9  again, it has the CIDI label that I placed on it, with the

10 date that I took possession of the evidence, and my initials.

11 Once I finished my analysis, I sealed it at the opposite end

12 with evidence tape that has my initials and the date that I

13 sealed it.

14 Q.  Okay.  And is item 51 in the same or substantially the

15 same condition as when you saw it?

16 A.  Yes, it is.

17 Q.  And was it sealed when you received it?

18 A.  Yes.

19 Q.  I'll ask you to retrieve item 52, please.  Do you

20 recognize item 52?

21 A.  Yes, I do.

22 Q.  And what do you recognize item 52 to be?

23 A.  As the envelope that contained external genital swabs.

24 Once again, I received this in from the hospital samples, from

25 the kit.  It has the CIDI label that I placed on it myself.

1  It has the date that I received it or took possession of it

2  with my initials.  Also, once I finished my analysis, I sealed

3  it across one end with evidence tape that has my initials and

4  the date that I sealed it.

5  Q.  And was it sealed when you received it?

6  A.  Yes, it was.

7  Q.  And is item 52 in the same or substantially the same

8  condition as when you saw it?

9  A.  Yes, it is.

10  Q.  Thank you.  And I'll ask you to retrieve item 53, please.

11  Do you recognize Exhibit 53?

12  A.  Yes, I do.

13  Q.  And how do you recognize it?

14  A.  As the envelope that contained oral swabs.  Once again, it

15  has a CIDI label that I placed on it myself with the

16  identifiers, as well as the date I took possession of it, and

17  my initials.  When I completed my analysis, I sealed the end

18  with evidence tape that has the date that I sealed it and my

19  initials.

20  Q.  Was the item sealed when you received it?

21  A.  Yes, it was.

22  Q.  And is it in the same or substantially the same condition

23  as when you sealed it for storage?

24  A.  Yes, it is.

25  Q.  Okay.  I would ask you to retrieve Exhibit 54.  And do you

1  recognize 54?

2  A.  Yes, I do.

3  Q.  And what do you recognize 54 to be?

4  A.  As the envelope that contained anal swabs that were

5  received from the hospital.  Once again, it has a CIDI label

6  that I placed on it myself with the date that I took

7  possession of it, and my initials.  Once I finished my

8  analysis, I sealed it at one end with evidence tape that has

9  my initials and the date that I sealed it.

10 Q.  And was that item sealed when you received it?

11 A.  Yes, it was.

12 Q.  And is it in the same or substantially the same condition

13 as when you packaged it?

14 A.  Yes, it is.

15 Q.  And, finally, I would ask you to retrieve Exhibit

16 Number 5.  Do you recognize item 5?

17 A.  Yes, I do.

18 Q.  And what do you recognize it to be?

19 A.  As a paper bag that contained a pair of underpants that I

20 received from the hospital.  Once again, it has a CIDI label

21 that I placed on it that has the date that I took possession

22 of this item, with my initials.  Once I completed my analysis,

23 I sealed the opposite end with evidence tape that has my

24 initials and the date that I sealed it.

25 Q.  Okay.  Was that item sealed when you received it?

 1  A.  Yes, it was.

 2  Q.  And is it in the same or substantially the same condition

 3  as when you saw it?

 4  A.  Yes, it is.

 5          MS. KOROBOV:  You Honor, at this time, the

 6  government moves to admit Exhibits 48, 49, 50, 51, 52, 53, 54,

 7  and 5.

 8          MR. THOMAS:  No objection.

 9          THE COURT:  No objection?  Government's Exhibits 48,

10  49, 50, 51, 52, and 5 are admitted into evidence without

11  objection.

12                          *(Government's Exhibits 5, 48 – 52 were*

13                          *received in evidence.)*

14          MS. KOROBOV:  Thank you.

15  BY MS. KOROBOV:

16  Q.  Ms. Anderson, did you perform testing on these items?

17  A.  Yes, I did.

18  Q.  And did you perform the same type of testing searching for

19  blood, semen, and indications of saliva that you previously

20  described to the jury?

21  A.  Yes, I did.

22  Q.  And did you obtain test results for those items?

23  A.  Yes.

24  Q.  I'm going to ask you to look in that binder at item 63 --

25  or 73, please.  Do you recognize Exhibit 73?

1  A.  Yes, I do.

2  Q.  And how -- what do you recognize it to be?

3  A.  I can recognize State's' Exhibit 73 -- I'm sorry,

4  Government's Exhibit 73 as a copy of a report that I issued on

5  the case once I completed my analysis.

6  Q.  Does this report contain all of your findings in the

7  matter?

8  A.  Yes, it does.

9          MS. KOROBOV:  At this time, the government moves to

10  admit Exhibit 73.

11          MR. THOMAS:  No objection to 73, Your Honor.

12          THE COURT:   73 is admitted into evidence without

13  objection.

14                          (Government's Exhibit 73 was

15                          received in evidence.)

16  BY MS. KOROBOV:

17  Q.  Ms. Anderson, on any of the items that you tested, did you

18  find blood?

19  A.  No, I did not.

20  Q.  In any of the items that you tested, did you find semen or

21  indications of seminal fluid?

22  A.  No, I did not.

23  Q.  On any of these items, did you find levels of amylase that

24  are consistent with saliva?

25  A.  No, I did not.

1  Q.  So then what did you do with the items?

2  A.  Basically, after I did the testing for those body fluids,

3  I then packaged particular samples to be sent on to DNA for

4  possible skin cell samples.

5  Q.  Okay.  And which items did you package from?

6  A.  I sent on the buccal cell standard to be used as a

7  standard for M.R.  I also packaged the swabs labeled as saline

8  dripped over hymen, the swabs labeled as interim genitalia

9  swabs, the external genital swabs, the oral swabs, the anal

10 swabs, and also a sample collected from the inside crotch

11 panel of the underwear.

12 Q.  I would like to talk to you about that incident crotch

13 panel of the underwear.  Did you examine item -- Exhibit

14 Number 5?

15 A.  Yes, I did.

16 Q.  Okay.  And what observations did you make about the crotch

17 panel on the front of -- the front crotch panel inside of

18 Exhibit Number 5?

19 A.  From my notes, my observations were that there was white

20 staining on the inside crotch panel, as well as some white

21 staining on the outside crotch panel.

22 Q.  Okay.  And you indicated that that white substance,

23 though, didn't test positive for semen or seminal fluid; is

24 that correct?

25 A.  That's correct.

1  Q.  Okay.  Did that stain -- could it be consistent with some

2  kind of diaper cream?

3  A.  It's possible, yes.

4  Q.  And so you sent a portion of those panties on for testing;

5  is that correct?

6  A.  That's correct.

7  Q.  And, specifically, what portion of those underwear did you

8  send on for testing?

9  A.  The portion that I sent on was staining that was located

10  on the inside crotch panel that encompassed the white staining

11  that I saw on the underwear.

12  Q.  Okay.  And why did you send that particular portion?

13  A.  Basically, after doing my testing for possible semen and

14  possible saliva, that was the only staining that I visualized

15  on the underwear, so I sent that on with hopes that there

16  could be possible skin cells in that sample.

17  Q.  Specifically with the evidence collection kit from M.R.,

18  you indicated that you packaged on further items for testing;

19  is that correct?

20  A.  Yes.

21  Q.  And did you bring those items with you today?

22  A.  Yes, I did.

23  Q.  I'll ask you to retrieve those, please.  Do you have in

24  front of you Government's 54?

25          Let me ask this:  What's the first item you've got

1   there?  We'll just tick through them that way.

2   A.  Okay.  The first item I have is Government's Exhibit 55.

3   Q.  Okay.  So item 55, could you tell the jury what that is?

4   A.  Yes.  This is a coin envelope that I personally prepared

5   that contained the two buccal cell standards from M.R.  Once

6   again, I can identify this.  I brought it into court, but I'm

7   the one that prepared the coin envelope.

8           I took two of the swabs that were submitted from the

9   hospital, placed them into this coin envelope, sealed it up,

10  put writing on it.  As you can see, it has a CIDI label that I

11  placed on it myself with the item number, the date that I

12  received it, and my initials.  It's sealed across the back

13  with my initials and the date that I sealed it.  And this is

14  what was submitted on to DNA for analysis.

15  Q.  Okay.  Let's pull out Government's 56, please.

16  A.  Government's 56, once again, is a coin envelope that I

17  personally prepared that contained the two swabs that were

18  labeled as saline dripped over the hymen.  Once again, I

19  prepared it, it has my handwriting, the CIDI label placed on

20  it, with my date and my initials.  It's sealed across the back

21  with the date that I sealed it and my initials.  And this was

22  transferred on to DNA for analysis.

23  Q.  Okay.  Government's 57, please.  What is that item?

24  A.  Government's 57 is a coin envelope that I prepared

25  containing two internal genitalia swabs.  Once again, once I

1   completed my analysis, I took the swabs from their original

2   container, placed them into this coin envelope, did my

3   labeling with the CIDI label, put my initials and date on the

4   coin envelope, and then this was transferred on to DNA for

5   analysis.

6   Q.  Exhibit 58, please?

7   A.  Exhibit Number 58 I can identify as the coin envelope I

8   prepared containing two external genital swabs.  Once again, I

9   removed the original swabs from their original envelope,

10  placed them into this coin envelope, put my identifiers on it

11  and labeling on it, sealed it with my date and my initials,

12  and then this was transferred on to DNA for analysis.

13  Q.  Exhibit 59, please?

14  A.  Exhibit Number 59 I can identify as a coin envelope I

15  prepared containing two oral swabs.  Once again, those swabs

16  were removed from their original container.  I placed them

17  into this coin envelope, put my identifiers on it, sealed it

18  up with my date -- with the date and the initials that I

19  sealed it, and then this was transferred on to DNA for

20  analysis.

21  Q.  Thank you.  And Exhibit 60, please?

22  A.  Exhibit Number 60 I can identify as the coin envelope that

23  I prepared containing two anal swabs.  Once again, this was

24  prepared by me.  It has the identifiers on it, the CIDI label,

25  it has my date and the initials, it's sealed across the back

1  with my initials and the date I sealed it, and then this was

2  transferred on to DNA for analysis.

3  Q.  Thank you.  And Exhibit 61?

4  A.  Exhibit Number 61 I can identify as the coin envelope that

5  I prepared containing the sample collected from the inside

6  crotch panel of the underpants.  Once again, I prepared it,

7  put my identifiers on it, the CIDI label on it.  It has my

8  initials and the date that I received it, and it's also sealed

9  across the back with my initials and the date that I sealed

10  it.  And this was also transferred on to DNA for analysis.

11  Q.  Are all of those items in the same or substantially the

12  same condition as when you last saw them?

13  A.  They are, except for the fact that they went on to a DNA

14  analyst who then processed the evidence, and so it now has

15  additional tape on the back with that analyst's initials and

16  the date that they received it or sealed it.

17  Q.  Okay.  With respect to item 61, I want to clarify

18  something about where exactly that sample was taken from the

19  underwear.  You're saying the inside crotch panel of the

20  underwear.  Can you explain to the jury what exactly you mean

21  by that?

22  A.  Yes.  When I describe something as the inside, it's -- it

23  is my description as to how you would have had it on.  So if

24  there's a manufacturer's tag or a label on it that would be on

25  the inside of the underwear, then that crotch panel would be

1   the inside where the label is on the inside of the underwear.

2         So when I say, "inside crotch panel," it's the

3   inside as if you were wearing it the way -- you would assume

4   to wear it with the tag on the inside.  And the crotch panel

5   is obviously the bottom part that would be closest to the

6   genital area.  You have what we describe as a front panel and

7   a back panel, and then a crotch panel that ties the two

8   together.  So the inside crotch panel would be on the crotch,

9   on the inside, if you were wearing it that way.

10  Q.  Thank you.  With respect to items 55, 56, 57, 58, 59, 60,

11  and 61, what did you do with those items after you made the

12  cuttings and sealed the envelopes?

13  A.  Basically, in our laboratory, the sociologists and the DNA

14  analysts, we work together in the same laboratory, but when

15  I'm ready for it to be transferred on to DNA, we have an

16  evidence room where we have a freezer where, once we get our

17  samples together, we just move it into the freezer, into the

18  DNA section.  And then, when it's assigned to a DNA analyst,

19  they go to that freezer and take that evidence out so that

20  they can process it.

21  Q.  Okay.  And could you describe the security associated with

22  the items in that freezer?

23  A.  Basically, everything is in the secured facility of the

24  laboratory.  Our evidence room that contains a freezer is also

25  within the locked facility, but then the evidence room is also

1   locked, as well.  All the evidence, the samples that are then

2   placed into the freezer, once I seal it and put my tape across

3   the back of it, if something were to happen to it, the DNA

4   analysis could determine that the coin envelope had been

5   opened.  So it's in the locked facility, then in the locked

6   evidence room, and then inside the freezer that's in the

7   evidence room.

8   Q.  Thank you.  After you did all that work, everything was

9   put in the freezer; is that correct?

10  A.  That's correct.

11  Q.  And you did that?

12  A.  Yes.

13  Q.  All right.  Was your work reviewed in the case?

14  A.  Yes.

15  Q.  And who reviewed your work?

16  A.  I'm going to refer to my notes.  Every report that I issue

17  in our laboratory, based on the lab protocol or policy, is

18  that it has to be technically reviewed by an analyst of my

19  peer or another sociologist, and it also has to be

20  administratively reviewed.

21          So in this particular case, it was technically

22  reviewed by --

23          MR. THOMAS:  Excuse me.  What are you referring to,

24  ma'am, when you're referring to your notes?  Can you tell me

25  what you're referring to?

1          THE WITNESS:  My cover page that tells me who

2    reviewed my file.

3          MR. THOMAS:  Can I see that for just a second?

4          Excuse me, Your Honor.

5          Okay.  Thank you.

6          THE COURT:  All right.  You may continue.

7    BY MS. KOROBOV:

8    Q.  Who reviewed that packet, please?

9    A.  Yes.  It was technically reviewed by analyst Sarah

10   Closson, and it was administratively reviewed by analyst

11   Shelley Crispin.

12   Q.  Okay.  After you complete your testing, you put the

13   evidence there, are there samples available for further

14   testing if desired?

15   A.  It would be the remaining samples that be would in this

16   coin envelope, as well as any original evidence that was put

17   back into the box and submitted back to the property room.

18   Q.  Okay.  So the items that still remain in there -- what do

19   you do with those items that are in the kit?

20   A.  Once I collect my samples and put them in the coin

21   envelope, I reseal back the original envelopes, and then this

22   is returned to the IMPD property room.

23          MS. KOROBOV:  I pass the witness for

24   cross-examination.  Thank you, Ms. Anderson.

25          THE COURT:  You may cross-examine.

1                **CROSS EXAMINATION**

2 BY MR. THOMAS:

3 Q.  Ms. Anderson, you said that skin cells are invisible; is

4 that right?

5 A.  For the most part, they are, yes.

6 Q.  To the naked eye?

7 A.  Yes.

8 Q.  When you observed these underwear, is it safe to say you

9 did not observe any skin cells?

10 A.  That's correct.

11 Q.  But you also didn't observe any blood, any semen, or any

12 saliva, right?

13 A.  That's correct.

14 Q.  The substance that you viewed, because -- well, let me say

15 this.  Your job was to see if there was blood, semen, or

16 saliva; that's your job, right?

17 A.  Correct.  That's part of it.

18 Q.  Well, in this case, because there was no blood, semen, or

19 saliva, your next job is to -- is to just send it on to the

20 next step; would that be accurate?

21 A.  Yes.

22 Q.  And at the next step, there's a possibility that someone

23 might find DNA that wasn't associated with blood and semen and

24 saliva, right?

25 A.  That's correct.

1  Q.  To be clear, you chose the -- what you described as the

2  crotch area of the underwear because of the white staining; is

3  that accurate?

4  A.  That's part of the reason, yes.

5  Q.  You didn't know what that white staining was?

6  A.  That's correct.  I did not.

7  Q.  Skin cells that are invisible to the naked eye, do they

8  move around?

9  A.  It's possible that they can, yes.

10  Q.  No testing was done on any other part of the underwear; is

11  that right?  Only the sample you sent was tested?

12  A.  No, that's not correct.

13  Q.  Okay.  What other -- what portions of the underwear were

14  tested?

15  A.  I tested -- I tested the entire underwear looking for the

16  presence of semen.  But then, once that was a negative result

17  for semen, I also tested select areas within that white

18  staining for the indication of saliva, which was also

19  negative.  Then, after I did that testing, I determined what

20  sample I wanted to send on for possible skin cells.

21  Q.  That was just a bad question, ma'am.  Obviously, you had

22  the entire underwear there.  You tested it to your

23  satisfaction, right?

24  A.  That's correct.

25  Q.  But you could have sent the entire pair of underwear ahead

1  for DNA analysis to find skin cells, right?

2  A.  Not really, no.

3  Q.  Why not?

4  A.  We don't normally send an entire garment on to DNA.  We

5  narrow down a particular area or sample where we think that

6  the best potential would be for a sample for a DNA profile.

7  So we don't send a whole garment on.  I narrow it down and

8  send on what I think would be the best sample.

9  Q.  And that's because with skin cells, it's either on there

10  or not on there, right?

11  A.  Yes, that's true.

12  Q.  So if it can start out on the waistband, once the item is

13  wadded up and put in a box, it could move around the item, so

14  you're just going to test a sample piece to see if you can

15  find one, right?

16        MS. KOROBOV:  Your Honor, I would object that that

17  calls for speculation on the part of the witness regarding

18  movement of items, skin cells.

19        MR. THOMAS:  She's already testified about this.

20        THE COURT:  Can you answer that question?

21        THE WITNESS:  I think I can.  Can you repeat the

22  question?

23  BY MR. THOMAS:

24  Q.  Well --

25        THE COURT:  The objection is overruled.  She can

 1  answer.

 2  BY MR. THOMAS:

 3  Q.  If there are skin cells on the item, they are mobile, they

 4  can move, right?

 5  A.  Possibly, yes.

 6  Q.  So when you are testing for a sample, you don't know where

 7  it started out on the item?  Your -- it could have started in

 8  one spot and ended up on another by the time it's being

 9  tested, right?

10  A.  That potential exists, yes.

11  Q.  Clearly, it's not as if you said, "Well, I see skin cells

12  here so I want those tested for DNA," it wasn't anything like

13  that?

14  A.  That's correct, it was not.

15  Q.  When you received the -- I think what your documentation

16  refers to as item 4007, that's the underwear, correct?

17  A.  Yes.  4.7, yes.

18  Q.  Okay.  And when you received it, do you recall how it was

19  packaged?

20  A.  Yes.  I can refer to my notes and --

21  Q.  Please do.

22  A.  I received the underwear in -- they were sealed in a white

23  paper bag.  The underwear was submitted, as I received them,

24  inside out.  I did my description.  They were black with a

25  pink lace trim.  I didn't see any physical damage, I didn't

1  see any suspected blood staining, but I did observe the white

2  staining on the inside and outside of the crotch.

3  Q.  On the outside, also?

4  A.  Yes.

5  Q.  And were they -- when you opened the package, for lack of

6  a better term, were they wadded up or were they flat?

7  A.  That -- I didn't make a note of that in my notes.  They

8  were just received inside out.  So if they had been wadded, I

9  would have made a note that they were wadded, but I don't have

10 that in my notes.

11 Q.  How big was the package in relation to the underwear?

12 A.  The size of the paper bag.  This is the size of the paper

13 bag, and the underwear were contained in this bag.

14 Q.  Inside.  Okay.  Now, you obviously don't know what

15 condition they were in when they were initially recovered,

16 correct?

17 A.  That's correct.  I don't.

18         MR. THOMAS:  I have no other questions.  Thank you.

19         THE COURT:  Any redirect?

20         MS. KOROBOV:  Can we have a moment, Your Honor?

21         (Off the record.)

22                    **REDIRECT EXAMINATION**

23 BY MS. KOROBOV:

24 Q.  You had indicated that part of the reason that you

25 selected the inside crotch panel of the underwear was that

1  there was some white staining; is that correct?

2  A.  Yes.

3  Q.  And what was the other reason that you chose to use that

4  location?

5  A.  Basically, based on the scenario that I received with the

6  information on the particular case, my -- the scenario that I

7  received was that someone possibly touched the vaginal area of

8  the little girl with their finger.  If she had her underwear

9  on, and it was worn with the tag on the inside, the most

10  likely area where I would expect to find possible skin cells

11  would be on the crotch panel on the inside of the underwear.

12  So that was my focus area as to where the most likely area

13  would be to have possible skin cells.

14          MS. KOROBOV:  Thank you.  Pass the witness.

15          THE COURT:  Any questions on that question?

16          MR. THOMAS:  Yes.

17                  **RECROSS-EXAMINATION**

18  BY MR. THOMAS:

19  Q.  You did tell me that at that stage, finding skin cells

20  there doesn't mean that they started out there, right?

21  A.  That is a possibility.

22  Q.  A skin cell is not like a bloodstain; would you agree?

23          MS. KOROBOV:  Your Honor, I'm going to object.  This

24  goes beyond the scope of my redirect.

25          THE COURT:  I'll allow.

1  BY MR. THOMAS:

2  Q.  A skin cell is not like a bloodstain, right?

3  A.  Well, a bloodstain is a body fluid, and a skin cell is a

4  cell, or a skin cell.

5  Q.  Unless it's cleaned off, when a bloodstain lands on

6  clothing, it's going to stay there?  It may spread and be

7  white, but it's going to stay there, right?

8  A.  That's correct, usually.

9  Q.  A skin cell may stay there, it may move, right?

10 A.  In the same regard, it can be like a blood sample,

11 depending on how it's placed there.  Skin cells can travel,

12 but if they traveled that often, I would never be able to

13 pinpoint or find a skin cell, because it would always be

14 moving as I'm doing my examination if it was that -- if skin

15 cells were that movable, anytime I lift up the garment or do

16 any of my testing, I could be moving or getting rid of the

17 skin cell.

18          So, potentially, depending on how much skin cells or

19 how someone held something, the amount of oils that may be in

20 with that skin cell, if you touch something, it's going to

21 stay there and not necessarily move, depending on the amount

22 of contact when you touch it.

23 Q.  Ma'am, you didn't find any skin cells at all in this case?

24 A.  I did not test for skin cells, so that is correct.

25 Q.  So you have no idea where the skin cells were or where

 1 │ they started or where they ended up, do you?

 2 │ A.   That is correct.  I just used my logic as to determine

 3 │ where possibly skin cells would be.

 4 │           MR. THOMAS:  Thank you.

 5 │           THE COURT:  Any questions on those?

 6 │           MS. KOROBOV:  No, Your Honor.

 7 │           THE COURT:  All right.  Now, do you need to keep

 8 │ this witness?

 9 │           MS. KOROBOV:  I don't believe so, Your Honor.  She

10 │ can be excused.

11 │           THE COURT:  You may be excused.  Thank you.

12 │           (Witness excused.)

13 │           MS. KOROBOV:  The government calls Tonya Fishburn.

14 │           Your Honor, may I retrieve a couple of items from

15 │ the box back there?  Thank you.

16 │           THE COURT:  Okay.  The witness has stepped out for a

17 │ moment to the ladies' room, so we'll -- if you want to stand

18 │ up and stretch, you feel free to do so.  I think I will, also.

19 │           (Off the record.)

20 │           MS. KOROBOV:  Your Honor, the government calls Tonya

21 │ Fishburn.

22 │           THE COURT:  If you would come right over here to the

23 │ witness stand.  And if you would remain standing and raise

24 │ your right hand.

25 │           (The witness is sworn.)

1      THE COURT:  You may have a seat.

2      **TONYA FISHBURN, PLAINTIFF'S WITNESS, SWORN**

3                **DIRECT EXAMINATION**

4   BY MS. KOROBOV:

5   Q.  Would you state your name and spell your first and last

6   name for the record, please?

7   A.  My name is Tonya Fishburn, T-O-N-Y-A, F-I-S-H-B-U-R-N.

8   Q.  And where are you employed?

9   A.  The Indianapolis-Marion County Forensic Services Agency,

10  commonly known as the crime lab.

11  Q.  What do you do at the crime lab?

12  A.  I am a forensic scientist in the biology section, and I

13  perform DNA analysis on casework.

14  Q.  Now, we've heard Ms. Anderson testify about what a

15  forensic scientist is.  Are your duties the same as

16  Ms. Anderson's?

17  A.  Ms. Anderson performs serology testing and I perform

18  mostly DNA testing.

19  Q.  And could you describe your educational background for the

20  jury?

21  A.  Sure.  I have a Bachelor's of Science degree in genetic

22  biology from Purdue University, and I have a Master's of

23  Science degree specializing in forensic serology and DNA from

24  the University of Florida.

25  Q.  Could you briefly describe the training you've received in

1  order to become a forensic scientist?

2  A.  I underwent in-house training that covered all the

3  processes involved in DNA analysis and completed a competency

4  test at the end of that training.  I also receive annual DNA

5  training, and I undergo semiannual proficiency testing.

6  Q.  We've heard Ms. Anderson, as well, describe that the crime

7  lab is accredited.  Do you undergo the same type of

8  proficiency testing that Ms. Anderson undergoes?

9  A.  Yes, I do.

10  Q.  Specifically what do you do when evidence comes to you for

11  biological testing?

12  A.  I will attempt to develop a DNA profile from that evidence

13  item and, from that DNA profile, try to determine who that DNA

14  came from.

15  Q.  Okay.  And could you describe for the jury the process you

16  receive when evidence physically comes to you?

17  A.  So when evidence comes to me, I will take a portion of

18  that evidence and I will go through the process, develop a DNA

19  profile.  The first process is extraction, so I will try to

20  extract out any DNA that may be in that sample.  And I do this

21  by treating the sample with chemicals that will break open the

22  cells that may be on the item and release the DNA.  And then I

23  will collect that DNA into a concentrated sample.

24          If there's potential for sperm cells in that sample,

25  then I'll do what's called a differential extraction, where I

1  will first treat the sample with a mild chemical that will

2  break open any non-sperm cells, and I will collect those, and

3  that becomes the epithelial fraction of that sample.

4          And then anything that's remaining, I will then

5  treat it with stronger chemicals that will break open any

6  sperm cells.  And then that will be the sperm fraction of that

7  sample.  Once I do that, then I will do a quantitation, which

8  is I'm trying to determine how much DNA is in the sample, if

9  any.

10 Q.  And what does that quantitation -- oh, you said -- lets

11 you know how much DNA is -- is there a certain amount that you

12 need in order to conduct testing?

13 A.  We target one nanogram of DNA during our testing; but if

14 there's less than that, we'll still attempt to develop a DNA

15 profile.

16 Q.  But, so -- I mean, you're able to develop, essentially, a

17 number at that point as to how much DNA you've got on a

18 particular item?

19 A.  Yes, I am.  I'm also able to determine how much male DNA

20 is in that sample.

21 Q.  Okay.  And after you determine that, the initial process,

22 and then you determine the quantity of DNA, step by step, can

23 you take the jury through the DNA testing process?

24 A.  Yes.  So once I know how much DNA is actually in that

25 sample, then I perform what's called amplification.  So,

1  during forensic testing, what we look at are STR regions, or

2  short tandem repeat regions.  And they are regions where the

3  DNA gets repeated over and over again.  So at one of your STR

4  regions, you may have 12 repeats.  I may have 13 repeats at

5  that region.

6        So I look at 15 of these STR regions, and I

7  determine the number of repeats at each of these 15 regions.

8  We have two copies of DNA, one from each of our parents, so

9  we'll have two numbers at each of these regions, the number of

10  repeats on the copy you receive from your mother and the

11  number of repeats on the copy you receive from your father.

12  So, in total, there will be 30 numbers for these 15 regions.

13        So, in order to determine the number of repeats at

14  these regions, what we do is -- the amplification process will

15  target those 15 regions and make millions of copies of those

16  regions of the DNA.  And this allows us to detect a DNA

17  profile from a very small amount of DNA.

18        So once I amplify the sample, then it will run on an

19  instrument that will actually tell me the number of repeats at

20  each of those regions.  And then that is what a DNA profile

21  is.  It's the number of repeats at each of these 15 regions.

22  So then I can compare the DNA profile from the evidence item

23  to a DNA profile from the standard and see if those number of

24  repeats match or not, which will tell me whether that DNA

25  could have come from that individual or not.

1  Q.  So, essentially you go to 15 different places on the DNA

2  ladder; is that correct?

3  A.  That is correct.

4  Q.  And you're looking at what numbers are associated with

5  those locations on the ladder?

6  A.  Yes, that is correct.

7  Q.  And then you're comparing your unknowns, so you're testing

8  items that have come in to known samples that you've got; is

9  that correct?

10  A.  Yes.

11  Q.  To try to determine if any of those numbers match up?

12  A.  Yes, that's correct.

13  Q.  Or if there is no match?

14  A.  Yes.

15  Q.  Okay.  This type of analysis, what is it called?

16  A.  It's called short tandem repeat testing, or STR testing.

17  Q.  And is your lab certified to perform that type of DNA

18  testing?

19  A.  Yes, we are.

20  Q.  And how long have you personally been preforming PCR-STR

21  testing?

22  A.  I've been performing it in forensics since I first started

23  at the crime lab, which was October of 2004.

24  Q.  And is there a protocol or practice that you follow when

25  you examine the evidence and when you do this type of testing?

1  A.  Yes.

2  Q.  If you have to deviate from the protocol for some reason,

3  what do you do?

4  A.  If there's a deviation, it would be documented in my file.

5  And I would also discuss it with the technical leader in the

6  laboratory to see how to proceed.

7  Q.  Okay.  And do you use controls during your testing?

8  A.  Yes, I do.

9  Q.  Could you explain to the jury what a control is?

10  A.  A control -- there's two types of controls.  There's

11  reagent blank controls.  These are samples that there's no DNA

12  in the sample.  It gets treated alongside all of the evidence

13  samples, and it gets treated with the same reagents on the

14  same instruments.  And at the end of the testing, there should

15  be no DNA profile developed from this sample.  It's just to

16  show there's no contamination coming into the system during

17  the testing.

18          There's also a positive control.  And this is a

19  profile I know what the DNA profile should be at the end of my

20  testing, and so it's also run alongside the samples.  And it's

21  just showing that the testing is working appropriately and

22  that the appropriate profile is developed from that positive

23  control.

24  Q.  And, again, if something goes wrong with these controls

25  during the testing, what happens?

1  A.  So then it would -- if -- then I would discuss it with my

2  technical leader and determine whether the results could be

3  reported or not.

4  Q.  After you perform DNA testing, get these profiles, what do

5  you do?

6  A.  So once I develop the DNA profiles, then I will do my

7  comparisons of the profiles from the evidence item to the

8  profiles from the known standards, and I will make a

9  determination whether that person is included or excluded from

10  that sample.  And I will generate a report.  And then that

11  report will go through a review process before it's released.

12  Q.  Okay.  And you indicated that the written report itself,

13  as well as your work, undergo a review process?

14  A.  Yes, that is correct.

15  Q.  Okay.  A question about DNA testing in general.  You

16  mentioned there's 15 different locations that you're looking

17  at, right?

18  A.  Yes.

19  Q.  And possibly two numbers for each profile; is that

20  correct?

21  A.  That is correct.

22  Q.  If any of those numbers from an unknown do not match a

23  number from the known, what kind of finding do you make with

24  respect to whether that is a match?

25  A.  So that person would be eliminated from that sample.

1  Q.  They're excluded as a potential contributor; is that

2  correct?

3  A.  Yes, that is correct.

4  Q.  All right.  In your work at the crime lab, did you receive

5  a request to test evidence under IP Case No. DP14088487, lab

6  number 140-5043?

7  A.  Yes, I did.

8  Q.  And what items did you receive for testing?

9  A.  I received various hospital samples from -- excuse me --

10  M.R.  And then I also received a buccal cell standard from

11  M.R. and Ali Al-Awadi.

12  Q.  And I'm going to direct your attention specifically to

13  some envelopes in front of you, items 55 through 61, and ask

14  you to take a look at those items.  Do you recognize

15  Government's Exhibits 55, 56, 57, 58, 59, 60, and 61?

16  A.  Yes, I do.

17  Q.  And how do you recognize them?

18  A.  They have the case number, the item number, and then my

19  initials and date that I did my testing of those items.

20  Q.  How did you come to be in possession of those items?

21  A.  So those items were created by the serologist, Shea

22  Anderson, and so she would place those in the biology evidence

23  room upon completion of her testing.  And then, when I was

24  assigned the case, I obtained those samples from that biology

25  evidence room.

1  Q.  Okay.  And are those the samples, 55, 56, 57, 58, 59, 60,

2  and 61, on which you did testing?

3  A.  Yes, they are.

4  Q.  Would they be considered, then, your unknown samples?

5  A.  Yes.

6          MS. KOROBOV:  Okay.  At this time, the government

7  moves to admit 55, 56, 57, 58, 59, 60, and 61.

8          MR. THOMAS:  No objection.

9          THE COURT:  Government's Exhibits -- would you

10 repeat --

11         MS. KOROBOV:  55, 56, 57, 58, 59, 60, and 61.

12                     (Government's Exhibits 55 - 61 were

13                      received in evidence.)

14         THE COURT:  And the Court needs to clarify for the

15 record that Government's Exhibits 53 and 54 were also admitted

16 without objection.

17                     (Government's Exhibits 53 - 54 were

18                      received in evidence.)

19         MS. KOROBOV:  Thank you.

20 BY MS. KOROBOV:

21 Q.  Ms. Fishburn, I'm going to ask you to look under the

22 table, and there are two packages, Exhibits 30 and 31.  Could

23 you look at those, please?

24 A.  Yes.

25 Q.  And could you tell me what is Exhibit 30?

1  A.  Exhibit 30 is a buccal cell standard that was taken from

2  Ali Al-Awadi.

3  Q.  Okay.  And does that item have your seals on it?

4  A.  Yes, it does.

5  Q.  Okay.  What did you do with respect to Exhibit 30?

6  A.  So Exhibit 30 I then -- I subitemized that item into a

7  coin envelope, just for easier storage in our laboratory, and

8  I developed a DNA profile from them.

9  Q.  Okay.  And with respect to Exhibit 31, could you tell me

10 what that is, please?

11 A.  That is a buccal cell standard from -- I'm sorry if I

12 butcher the name -- Justo Guevara Rodriguez.

13 Q.  And what did you do with respect to Exhibit 31?

14 A.  I also created a coin envelope from that item and

15 developed a DNA profile from that.

16 Q.  And did you bring those coin envelopes with you today?

17 A.  Yes, I did.

18 Q.  I'm going to ask you to retrieve those, please.  Referring

19 to Exhibit 30-A, could you tell the jury what that is?

20 A.  That is the coin envelope that I created from the buccal

21 standard from Ali Al-Awadi.

22 Q.  Okay.  And what is Exhibit 31?

23 A.  31 is the buccal cell standard -- the coin envelope I

24 developed from the standard of Justo Guevara Rodriguez.

25 Q.  And are items 30-A and 31-A the items on which you did DNA

1  testing comparison, some of your known samples?

2  A.  Yes, they are.

3  Q.  And in the items I previously described, I believe

4  Exhibit -- item 55, your coin envelope, was that a buccal cell

5  standard for M.R.?

6  A.  Yes, it is.

7  Q.  Okay.  So 55, 30-A, and 31-A were your knowns in this

8  case; is that correct?

9  A.  Yes, that is correct.

10 Q.  And the remaining items are the items which you were

11 looking to develop a DNA profile to compare against those

12 three known samples; is that correct?

13 A.  Yes, that is correct.

14         MS. KOROBOV:  At this time, the government would

15 move to admit items 30, 31, 30-A, and 31-A.

16         MR. THOMAS:  I have no objection.

17         THE COURT:  Government's Exhibits 30, 31, 30-A, and

18 31-A are admitted into evidence without objection.

19                         (Government's Exhibits 30, 30-A, 31, 31-A

20                          were received in evidence.)

21 BY MS. KOROBOV:

22 Q.  Did you perform testing on these particular items?

23 A.  Yes, I did.

24 Q.  And did you prepare a report describing these results?

25 A.  Yes, I did.

1  Q.  So the first type of testing that you did is called

2  PCR-STR testing; is that correct?

3  A.  Yes, that is correct.

4  Q.  I'm going to ask you to look in that book at Exhibit 74

5  and ask if you recognize it.

6  A.  Yes, I do.

7  Q.  And what do you recognize Exhibit 74 to be?

8  A.  This is the report I generated with my results and

9  conclusions for the STR testing that I performed in this case.

10         MS. KOROBOV:  At this time, the government moves to

11  admit Exhibit 74.

12         MR. THOMAS:  No objection to 74.

13         THE COURT:  74 is admitted into evidence without

14  objection.

15                    (Government's Exhibit 74 was

16                    received in evidence.)

17  BY MS. KOROBOV:

18  Q.  Ms. Fishburn, could you describe the results that you see

19  from this round of DNA testing?

20  A.  Yes.  The DNA profiles obtained from the epithelial

21  fractions of item 4.002.01, which was two saline drips over

22  hymen swabs; item 4.003.01, which was two internal genital

23  swabs; item 4.004.01, which was two external genital swabs;

24  item 4.005.01, which was --

25         THE REPORTER:  I'm sorry.  Can you slow down a

 1  little bit?

 2          THE WITNESS:  Sure.  Sorry.

 3  A.  Item 4.005.01, which are two oral swabs; item 4.006.01,

 4  which are two anal swabs; and item 4.007.01, which was the

 5  sample from the inside crotch panel of the underpants.  The

 6  epithelial fractions from all of those samples came back to be

 7  consistent with M.R.

 8  BY MS. KOROBOV:

 9  Q.  And did you make any other determinations about those

10  items?

11  A.  Yes.  The DNA profile obtained from the sperm fraction of

12  item 4.007.01, which was the sample collected from the inside

13  crotch panel of the underpants, is a mixture with major and

14  minor contributors.  The major contributor is consistent with

15  the DNA profile of M.R., and the partial DNA profile of the

16  minor contributor is inconclusive.

17  Q.  Okay.  So at this point, you could determine that part of

18  that underwear sample -- part of that profile shows that it's

19  consistent with M.R.  The other part you couldn't determine

20  who that profile belonged to?

21  A.  That's correct.

22  Q.  Did you make a determination about whether that sample

23  from the underwear contained male DNA?

24  A.  Yes.  The profile from the underwear did have male DNA in

25  it.

1  Q.  So did you make a determination, then, about what to do

2  with that evidence?

3  A.  Yes.  I decided to do additional testing that would help

4  me try to determine who that male DNA is from.

5  Q.  Okay.  And what type of testing did you decide to do?

6  A.  I performed a Y-STR DNA testing.

7  Q.  And could you tell the jury how Y-STR testing is different

8  than PCR-STR DNA testing?

9  A.  Y-STR testing is looking at those STR regions, or those

10  repeat regions, that are found only on the Y chromosome.  The

11  Y chromosome is only found in a male individual.  So this

12  testing is used whenever there's an overwhelming amount of

13  female DNA in the sample that's kind of -- it's overwhelming

14  the male DNA, so there's so much female DNA in these samples,

15  I can't tell any information from the male profile using the

16  traditional STR testing.  So in Y-STR testing, I can kind of

17  remove the female from the picture and I'm only looking at

18  that Y chromosome and developing a DNA profile from the Y

19  chromosome.

20  Q.  Is Y-marker testing considered scientifically reliable?

21  A.  Yes, it is.

22  Q.  And is your lab accredited to perform it?

23  A.  Yes, we are.

24  Q.  And the methods that you use, are they accepted within the

25  scientific community?

1  A.  Yes.

2  Q.  And about how long has Y-marker DNA testing been around?

3  A.  It has been around for over a decade.

4  Q.  And did you conduct Y-marker testing in this case?

5  A.  Yes, I did.

6  Q.  And on what items did you perform the Y-marker analysis?

7  A.  I performed Y-STR testing on the epithelial and the sperm

8  fractions of item 4.007.01, which was the inside crotch panel

9  of the underpants.

10  Q.  Did you obtain results?

11  A.  Yes, I did.

12  Q.  And did you prepare a report explaining those results?

13  A.  Yes, I did.

14  Q.  Could you look at Exhibit Number 65 -- or 75, excuse me,

15  in the binder?  Do you recognize Exhibit 75?

16  A.  Yes, I do.

17  Q.  And what do you recognize Exhibit 75 to be?

18  A.  This is the report with my results and conclusions for the

19  Y-STR testing I performed.

20          MS. KOROBOV:  And at this time, the government would

21  move to admit Government's 75.

22          THE COURT:  Any objection to 75?

23          MR. THOMAS:  I have no objection to 75.

24          THE COURT:  Government's 75 is admitted without

25  objection.

1              *(Government's Exhibit 75 was*

2              *received in evidence.)*

3   BY MS. KOROBOV:

4   Q.  Could you describe your results that you obtained in this

5   case?

6   A.  The Y-STR DNA profile that was obtained from the

7   epithelial fraction of item 4.007.01 is consistent with the

8   Y-STR DNA profile of Ali Al-Awadi.  Therefore, Ali Al-Awadi

9   and all his male patrilineal relatives cannot be excluded as

10  potential Y-STR contributors to the sample.

11              The Y-STR profile was searched in the U.S. Y-STR

12  database, and it was not observed in 25,644 individuals that

13  were in that database.  The upper 95 percent confidence limit

14  on this estimate is -- equals to one in 8,621 individuals.

15              MS. KOROBOV:  I'm going to ask to display item 76,

16  or kind of take those findings one by one, if we could.  It

17  would be page 1 I -- and I'm going to ask you to zero in --

18  excuse me.  I'm going to go to 75, please.  Okay.  Try to

19  create a box there.  Okay, a little bit off there.

20  BY MS. KOROBOV:

21  Q.  All right.  With respect to your conclusions in this case,

22  first of all, one of the conclusions you obtained is that the

23  profile was consistent with the Y-STR DNA profile for Ali

24  Al-Awadi.  What does that mean?

25  A.  That means that the profile that was obtained from that

1  evidence item, those repeat units match, or are the same as

2  the repeat units on the DNA profile of Ali Al-Awadi.

3  Q.  Okay.  Now, the next sentence says that, "Therefore, Ali

4  Al-Awadi and...his...paternal relatives cannot be excluded as

5  potential Y-STR contributors to the sample."  You didn't have

6  any other samples from the defendant's family, correct?

7  A.  Correct.

8  Q.  So why do you make that statement?  Can you explain that?

9  A.  Of course.  In Y-STR testing, the Y chromosome is passed

10  from father to son to down the line, and so the Y-STR profile

11  from a male individual would be the same for him and his

12  father and his grandfather and his son.  So anyone on his

13  patrilineal line would also have that same Y-STR profile.  So

14  it is not unique to him; it would also be in any of his

15  patrilineal related relatives.

16  Q.  Then you indicated that the profile obtained from the

17  epithelial fraction was searched in the U.S. Y-STR database.

18  What are your -- what are you doing there?

19  A.  So there is a database that has Y-STR profiles in that

20  database, and it's from all over the United States.  And so

21  that profile that I developed off the underpants is searched

22  in that database to see if it is found in that database at

23  all.  And so in this case, it was not found in that database.

24  Q.  And there were 25,644 individuals in that database; is

25  that correct?

1  A.  That is correct.

2  Q.  Then you write, "The upper 95 percent confidence limit on

3  this estimate is .000116, or one in 8,621 individuals."  What

4  does that mean?

5  A.  So that means because I am only -- I am looking in a

6  database, and I'm limited by the size of the database and

7  duplications that may occur in that database, we apply a

8  95 percent confidence integral on the statistics.  So what I'm

9  saying is, one in every 8,621 individuals, I would expect to

10  see that profile.

11       MS. KOROBOV:  Okay.  Remove that, please.

12  BY MS. KOROBOV:

13  Q.  Did you also do another standard comparison against the

14  results that you received?

15  A.  Yes, I did.

16  Q.  And was that using the profile of Justo Guevara?

17  A.  Yes.

18  Q.  Okay.  And it was, I believe, 31-A that you used to do

19  that testing?

20  A.  Yes, that's correct.

21  Q.  And did you receive results in that case?

22  A.  Yes, I did.

23  Q.  And are those results reflected in -- I'll have you turn

24  to Government's Exhibit 76.

25  A.  Yes, they are.

FISHBURN - DIRECT/KOROBOV          Vol. 3-508

1  Q.  And does item 76 reflect the results that you received for

2  comparison of Justo Guevara's sample?

3  A.  Yes.

4        MS. KOROBOV:  At this time, the government moves to

5  admit Exhibit 76.

6        THE COURT:  Any objection to 76?

7        MR. THOMAS:  Sorry, Your Honor.  No, I have no

8  objection to 76.

9        THE COURT:  Government's Exhibit 76 is admitted into

10  evidence.

11                    (Government's Exhibit 76 was

12                    received in evidence.)

13  BY MS. KOROBOV:

14  Q.  And what did those results tell you?

15  A.  This Y-STR DNA profile obtained from the epithelial

16  fraction of item 4.007.01 is not consistent with the Y-STR DNA

17  profile of Justo Guevara.

18  Q.  And so does that mean he is excluded as a possible

19  contributor of what was found in that underwear?

20  A.  That is correct, yes.

21  Q.  I'm going to ask you to look at Exhibit 70 within that

22  binder.  And it's in, I believe, three pages.  Have you

23  reviewed Exhibit 70?

24  A.  Yes, I have.

25  Q.  And does this exhibit show the Y-DNA -- Y-marker DNA

FISHBURN - DIRECT/KOROBOV          Vol. 3-509

1   testing results that you've described previously?

2   A.  Yes.

3   Q.  And does this chart essentially show the comparison

4   between the unknown sample, the sample from Ali Al-Awadi, and

5   the sample from Justo Guevara?

6   A.  Yes, it does.

7   Q.  And you think it would be helpful for the jury to see how

8   it is that you achieved your results?

9   A.  Yes.

10          MS. KOROBOV:  At this time, the government moves to

11   admit Government's Exhibit 70 for demonstrative purposes.

12          MR. THOMAS:  No objection to 70 for demonstrative

13   purposes.

14          THE COURT:  Government's Exhibit 70 is admitted into

15   evidence for demonstrative purposes only.

16                    *(Government's Exhibit 70 was*

17                     *received in evidence.)*

18          MS. KOROBOV:  Can we display 70, please?  And let's

19   display -- okay.  All right.  Let's display page 2.  Let's do

20   our best here.  All right.

21          We're having a little technical difficulty with this

22   showing up.  Do we want to use the -- can we use this one?

23          Is it acceptable to the Court to use this --

24          THE COURT:  It is, yes.

25          MS. KOROBOV:  -- to display it?  Thank you.

1          THE COURT:  On the screen, yes.

2          MS. KOROBOV:  There we go.  Okay.  Let's start a

3    little bit over here.

4    BY MS. KOROBOV:

5    Q.  Okay.  I want to focus -- so the data up at the top, on

6    this sample, the first line here that says, "Positive," what

7    are the numbers reflected in that line over there?

8    A.  So this sample is my positive control.  And this is the

9    Y-STR DNA profile that I obtained from that control.  So in

10   each of the boxes is one of those STR regions, and then the

11   number in that box is the repeat units at that STR region.

12   Q.  So, actually, let's just go down that first, kind of,

13   aisle here marked "Sample," the first column.  So your top row

14   then contains your positive control results; is that correct?

15   A.  Yes, that is correct.

16   Q.  Your second row contains your negative control results; is

17   that correct?

18   A.  Yes, that's correct.

19   Q.  Then what is 4.71E and 4.7.1SP?

20   A.  So 4.71E is the epithelial fraction of item 4.71.  And

21   then 4.71 sperm is the sperm fraction of that item.

22   Q.  Okay.  And then these columns that run down here -- so,

23   for instance, DYS456 that run along, kind of, the top of that

24   page -- what do each of those columns reflect?

25   A.  So each of those are an STR region that I'm looking at.

1  So DYS456 is the name of one of those STR regions.

2  Q.  So, specifically, that's a location within that Y

3  chromosome that you're going to get an identifying number; is

4  that correct?

5  A.  That is correct.

6  Q.  Okay.  Then we've got here 5.1, sample from defendant Ali

7  Al-Awadi.  Do those reflect his test results, then, beginning

8  with the number 15?

9  A.  Yes, they do.

10  Q.  And sample from Child Victim One's father, that being

11  Justo Guevara, is -- was he 6.1?

12  A.  Yes, he is.

13  Q.  Okay.  I specifically want to talk about the results here.

14  You mentioned the positive control here up at the top.  When

15  you get that positive control, what are you comparing those

16  numbers to to make sure that your sample -- your testing was

17  run correctly?

18  A.  So within our protocol, we have what that positive profile

19  should be, so I am comparing my numbers to that number and

20  ensuring that they are the same.

21  Q.  So you've got, essentially, a key somewhere of numbers,

22  and they need to match up to all these numbers?

23  A.  Yes, that is correct.

24  Q.  Okay.  Your negative control, I have a bunch of NRs there.

25  What does that mean?

1  A.  That means no results.

2  Q.  And the fact that there are no results, what does that

3  tell you?

4  A.  That tells me that there's no contamination during the

5  testing.

6  Q.  Okay.  Now we've got 4.7.1 -- let me start with SP.  NR,

7  what does that mean?

8  A.  That means that there was no profile obtained, no Y-STR

9  profile obtained from the sperm fraction of that item.

10  Q.  Okay.  So then let's go to 4.7.1E.  Are each of these

11  numbers here the data that you received from that specific

12  point from the underwear sample?

13  A.  Yes.

14  Q.  Okay.  So let's talk first about the sample from defendant

15  Ali Al-Awadi.  At the first loci, or the first point here --

16  is that what we -- we refer to them as "loci"?

17  A.  Yes, they are called "loci."

18  Q.  Okay.  The location on the DNA ladder.  The unknown sample

19  is a 15; is that correct?

20  A.  That is correct.

21  Q.  And Ali Al-Awadi also has a 15; is that correct?

22  A.  Yes, that is correct.

23  Q.  The next loci, the unknown profile, is a 13?

24  A.  Yes.

25  Q.  And Ali Al-Awadi is also a 13?

1  A.  Yes, that's correct.

2  Q.  At the next location, the profile is a 20 -- the unknown

3  profile from the underwear is 23; is that correct?

4  A.  Yes.

5  Q.  And the defendant is a 23; is that correct?

6  A.  That is correct.

7  Q.  So kind of for every one of these numbers, then, going

8  across, does every single one of the numbers from 4.7.1E match

9  identically the numbers from the sample from the defendant Ali

10  Al-Awadi?

11  A.  Yes, they do.

12  Q.  If any one of those numbers had been different, what would

13  your result be?

14  A.  Then he would be excluded from that item.

15  Q.  And so let's talk, then, about an exclusion.  On the

16  sample from the Child Victim One's father, Justo Guevara, 6.1,

17  his first number is a 17 while the sample 4.7.1E is a 15; is

18  that correct?

19  A.  Yes, that is correct.

20  Q.  What does that number tell you right there?

21  A.  That tells me that he is eliminated as being the

22  contributor of that DNA.

23  Q.  Okay.  Now, at a couple places, though, for instance, at

24  the second loci, he has a 13 and that sample up top has a 13.

25  So what does that mean?

1  A.  So at that location, he is the same.  However, there's

2  many other locations where he's not the same.

3  Q.  Okay.  And if even, again, one of those locations is off,

4  he is excluded?

5  A.  That's correct.

6  Q.  I want to talk a little bit about how DNA gets to certain

7  places.  In this particular case, you indicated that you did a

8  quantification of the DNA on these samples; is that accurate?

9  A.  Yes, that is correct.

10  Q.  And did you do that in particular with respect to the

11  front crotch panel of the underwear, 4.7.1?

12  A.  Yes, I did.

13  Q.  And what can you tell the jury about the quantity of the

14  DNA there?

15  A.  So there was -- male DNA was detected on that item.

16  Q.  Okay.  And with respect to that particular item, did

17  anything about the presence of the DNA tell you how it is that

18  it got there?

19  A.  No.  It was a low amount of DNA that was on that item, but

20  there's no -- nothing during DNA testing that tells me where

21  the source of that item is.

22  Q.  Okay.  And with respect to that item, is it possible that

23  the DNA was deposited on that item off of the body onto the

24  item?

25  A.  Yes, it is possible.

1  Q.  Okay.  And so, for instance, if a child had DNA on her

2  body, the child wearing 4.7.1E -- because her profile was

3  found on that item, correct?

4  A.  That is correct.

5  Q.  So if she had urinated and she had previously been touched

6  by the defendant, and -- is it possible that urine then took

7  those skin cells and put them on that underwear?

8  A.  Yes, that is possible.

9  Q.  Okay.  If she had urinated while wearing the underwear?

10  A.  Yes.

11  Q.  And with respect to that -- okay.  I think that's the

12  question there.

13         Was your work reviewed in this case?

14  A.  Yes, it was.

15  Q.  And who reviewed your work?

16  A.  My work was reviewed by another analyst.  May I look at my

17  notes to tell you?

18  Q.  Yes.

19  A.  Okay.  My work was reviewed by Sarah Closson, who is

20  another qualified DNA analyst within the laboratory.

21  Q.  Okay.  And the reports that you prepared, were they also

22  reviewed?

23  A.  Yes, they were.

24  Q.  Okay.  And who reviewed those?

25  A.  Those were also reviewed by Sarah Closson.

1   Q.  One more question about the DNA results themselves.  In

2   this case, you indicated that the item on the underwear was a

3   mixture of the male profile that was ultimately identified to

4   the defendant, as consistent with his profile, and the female

5   profile identified to M.R.  Can you describe for the jury what

6   a mixture is, what that means?

7   A.  Yes.  A mixture means that there's more than one

8   individual's DNA on that sample.  Sometimes it's one

9   individual has more of their DNA than another individual.

10  Then they would be considered a major contributor in that

11  mixture.  And then the individual with less DNA would be

12  considered the minor contributor in that sample.

13  Q.  And do you have to use a chemical process, essentially, to

14  separate out those profiles from each other?

15  A.  The chemical process is used to separate if there's any

16  sperm that could potentially be in that sample.

17  Q.  Okay.  After your testing is completed, what's done with

18  the evidence?

19  A.  The evidence is then repackaged and then placed back into

20  the biology evidence room, into a secured box that has all of

21  my samples that I keep.

22  Q.  And are those items suitable for further comparison if

23  someone requests that of you?

24  A.  Yes, they are.

25           MS. KOROBOV:  I pass the witness.

 1          THE COURT:  You may cross-examine.

 2          MR. THOMAS:  Thank you, Your Honor.

 3                    **CROSS EXAMINATION**

 4   BY MR. THOMAS:

 5   Q.  Just so I'm clear, you tested -- rather than going through

 6   all the zero zeros, I'm just going to call them 1, 2, 3, 4, 5,

 7   6, and 7.  Will you know what I'm talking about if I do that?

 8   A.  Yes, I will.

 9   Q.  Okay.  I've got too many zeros in there.  Item 2 was the

10   saline drip over hymen swabs, correct?

11   A.  Yes, that's correct.

12   Q.  So that would have been the nurse, or whoever collected

13   the sample, would have taken a sample from the hymen and

14   sealed it up, ultimately sent that to you for testing?

15   A.  Yes.  It would have gone through Shea Anderson first --

16   Q.  Right.

17   A.  -- but then to me.

18   Q.  She already told us about.

19   A.  Yes.

20   Q.  And on to you.  And you found no male DNA at all in the

21   hymen swab; is that right?

22   A.  That is correct.

23   Q.  And then there's the number 3, which is the internal

24   genitalia.  So that's inside, taking a sample inside the

25   genitalia, inside taking a sample.  It ultimately gets to you.

1  You found no male DNA at all, right?

2  A.  That is correct.

3  Q.  And then outside, the external genital swabs from the

4  outside of the genitalia, those were taken, sent to you, you

5  found no male DNA at all, right?

6  A.  That's correct.

7  Q.  And then oral swabs from the mouth, no male DNA at all?

8  A.  Right.

9  Q.  And the anal swabs, no male DNA at all?

10  A.  That's correct.

11  Q.  Now, the item that you received, that is number 7, the

12  underwear, did you collect -- would it have been your job to

13  collect a sample to try to locate skin cells, or how do you --

14  how did you come about finding those from the sample that you

15  received the piece of cloth?

16  A.  So I received a cutting from the crotch area of the

17  underpants from Shea Anderson.  And so there's no test for

18  skin cells that to -- that could identify skin cells.  So I am

19  just taking a cutting from her cutting in order to do my

20  testing.

21  Q.  Can you make a determination that if you find DNA, or a

22  partial sample, if it's not blood, if it's not saliva, if it's

23  not semen, that it is from skin or sweat or something like

24  that?

25  A.  Yes.  It's most likely from that if it's not from any

1   other body fluid.

2   Q.  Do you have a name for that?

3   A.  It's sometimes called touch DNA.

4   Q.  And in this case, you found touch DNA on the item that was

5   sent to you?

6   A.  That's correct.

7   Q.  So it's not as if you could locate a particular and say,

8   "Oh, there's a -- there's a" -- looking through a microscope,

9   say, "There's a bunch of skin cells there.  I'm not going to

10  take those off and test them"?  It doesn't work like that,

11  does it?

12  A.  No, it does not.

13  Q.  You mentioned that you have no way of knowing how the skin

14  cells or the touch DNA got there?

15  A.  No.

16  Q.  And you don't know for sure that it is skin cells, right?

17  A.  That's correct.

18  Q.  This kind of touch DNA is mobile, is it not?

19  A.  It can be.  It would have to be -- it can come -- it would

20  have to come into contact with another item to transfer it to

21  the item.

22  Q.  Fair enough.  It's not -- it doesn't fly around?

23  A.  That's correct.

24  Q.  But if I touch my jacket here, I might very well leave

25  touch DNA on it, possibly?

1   A.  Yes, yes.

2   Q.  And then, if my arms touch here, I might transfer that

3   over to my other arm?

4   A.  It's possible.

5   Q.  So I could have my DNA on this side of my jacket when I

6   actually touched this side of my jacket; would that be fair?

7   A.  Yes, if they rubbed into each other, yes.

8   Q.  And on a -- on something like those underwear, for

9   example, if I add my DNA on the waistband of the underwear and

10  they were then folded up or put together, that could move

11  around the item, show up in a different place, right?

12  A.  There would have to be friction that would be rubbing

13  those two areas against each other to have that transfer to

14  occur.

15  Q.  If somebody picked it up -- well, let me ask another

16  question.  Strike that.

17         You mentioned the urination that was suggested by

18  the government, that there was male DNA in the genitalia, that

19  got washed out.  You don't have any -- you don't have any

20  evidence of that, do you?

21  A.  No, I did not do anything to test for urine.

22  Q.  But a liquid can move cells around, right?

23  A.  Yes, it can.

24  Q.  And those cells actually move better in something that's

25  wet than they do in something that's dry; is that right?

1  A.  Yes.

2  Q.  So a wet -- if someone had testified that that pair of

3  underwear were wet and put into a Ziploc bag, that would

4  facilitate the moving of the cells, would it not?

5  A.  Yes, it could.

6  Q.  The bottom line is, you have no real way of knowing how

7  those skin cells or that trace DNA ended up where it ended up,

8  right?

9  A.  That's correct.

10 Q.  Just so I'm real clear, too, you said a couple of times

11 that this was a very small amount of DNA, correct?

12 A.  Yes, that is correct.

13 Q.  Not enough that you could do sort of the first step PCR

14 DNA testing; is that correct?

15 A.  I wasn't able to detect it in my initial STR testing.

16 Q.  And so not enough to get a profile, an STR profile; is

17 that right?

18 A.  Yes.  The main reason at the beginning was because there

19 was a lot of female DNA in there, so the comparison of the

20 female to the male DNA, because there was so much female, was

21 what hindered the development of the Y-STR -- or the male DNA

22 profile.

23 Q.  And the male amount, as you said, is very small?

24 A.  Yes, it is.

25 Q.  The -- when you can get an S -- is that what you refer to

1  as an STR match, when you can get that?  Am I using the right

2  term for you?

3  A.  Yes.  That's --

4  Q.  Okay.  When you can get an STR match, how reliable is

5  that?

6  A.  I don't really understand what your question is.

7  Q.  Well, I'll put it into context.  You said that you made an

8  ultimate conclusion that, from the Y-STR, the sort of partial

9  that you were able to do, you could say one in 8,621.  If you

10  got an STR match, what would that typically be?

11  A.  The numbers are a lot larger for the regular STR testing

12  because it is unique to an individual, where in this case it

13  is passed through patrilineal relatives.  And so the type of

14  statistics that are performed are different than in normal STR

15  testing.

16  Q.  Well, so, typically, what -- if this is one in 8,621,

17  typically what would an STR match be?

18  A.  It would depend on the profile, but it could be millions

19  or billions.

20  Q.  One in a million, one in 2 billion, it's going to be

21  someone up there?

22  A.  Yes.

23  Q.  The friction that you talked about, the transfer from

24  the -- I think the example the government asked you, could it

25  have transferred from the body to the underwear.  Do you

1  remember being asked that?

2  A.  Yes.

3  Q.  Presumably, if there's touch there, friction as you said,

4  it could also -- would also go back the other way, right?

5  Could it, from the clothing to the body?

6  A.  Yes, it could.

7  Q.  And even back and forth, right?

8  A.  Yes.

9  Q.  In this case, there was DNA on the underwear; there was

10  not DNA from any of the samples taken from the body?

11  A.  That's correct.

12          MR. THOMAS:  Thank you.

13          THE COURT:  If you have any redirect, you may.

14          MS. KOROBOV:  Just briefly, Your Honor.

15                 **REDIRECT EXAMINATION**

16  BY MS. KOROBOV:

17  Q.  Counsel just referred to a partial Y-ST profile -- Y-STR

18  profile.  Did you obtain a partial Y-STR profile in this case

19  or a complete Y-STR profile on 4.7.1?

20  A.  It was a complete profile.

21  Q.  Okay.  And is Y-STR testing any more or any less reliable

22  than PCR-STR testing?

23  A.  It's just as reliable.  It's -- the discrimination factor

24  is less than regular testing.

25  Q.  Because you're only looking at one place on the DNA ladder

1 and then multiple places on that ladder with Y-STR testing; is

2 that correct?

3 A.  With regular testing, yes, that is correct.

4          MS. KOROBOV:  Thank you.  I pass the witness.

5          MR. THOMAS:  Just very briefly, Your Honor.

6                    **RECROSS-EXAMINATION**

7 BY MR. THOMAS:

8 Q.  And I apologize.  You're way smarter than me, but I guess

9 when I said "partial," the reason that you move on to Y-STR is

10 because you can't test the entire chain; is that right?

11 A.  I don't understand your question.  I'm sorry.

12 Q.  Well, you talked about -- you're testing the Y portion in

13 the STR, correct?

14 A.  Yes, that is correct.

15 Q.  When I say "partial," you're testing the portion that is

16 the Y, right?

17 A.  Yes.  I'm only testing the Y chromosome and not the other

18 chromosomes.

19 Q.  And that's because you don't have a large enough sample to

20 test the whole thing; is that right?

21 A.  That's because there's so much of the victim's DNA, that

22 I'm not able to do the traditional testing.

23 Q.  Right.  And had you had a larger amount of male DNA, you

24 would have been able to do that, presumably?

25 A.  Possibly.  If the ratio of female to male was less, then I

 1  may have been able to detect the male profile in that sample.

 2          MR. THOMAS:  Okay.  Thank you.

 3          THE COURT:  Anything further?

 4          MS. KOROBOV:  No, Your Honor.

 5          THE COURT:  And may this witness be excused?

 6          MS. KOROBOV:  Yes, Your Honor.

 7          THE COURT:  Thank you.  You are excused.

 8          (Witness excused.)

 9          THE COURT:  The court reporter is ready for a

10  recess, so we'll take our afternoon break.

11          And, ladies and gentlemen, no deliberation or

12  discussion and we'll be back in the courtroom in about 15

13  minutes.

14          THE COURTROOM DEPUTY:  All rise.

15          (Jury out at 3:08.)

16          THE COURT:  Okay.  We'll take 15 minutes.

17          (Recess at 3:09, until 3:30.)

18          THE COURT:  We are back on the record.  Are you

19  ready for the jury, Mr. Shepard?

20          MR. SHEPARD:  Yes, Your Honor.

21          THE COURT:  Ready, Mr. Thomas?

22          MR. THOMAS:  Ready, Your Honor.

23          THE COURT:  You may bring in the panel.

24          (Jury in at 3:30.)

25          THE COURT:  Witness, if you would remain standing

 1  and raise your right hand.

 2          (The witness is sworn.)

 3          THE COURT:  You may have a seat.

 4          THE WITNESS:  Thank you.

 5          THE COURT:  And, Mr. Shepard, you may examine your

 6  witness.

 7          MR. SHEPARD:  Thank you, Your Honor.

 8       **MICHAEL JOHNSON, PLAINTIFF'S WITNESS, SWORN**

 9              <u>**DIRECT EXAMINATION**</u>

10  BY MR. SHEPARD:

11  Q.  Could you please state your name and spell your last name

12  for the record?

13  A.  Michael Johnson, J-O-H-N-S-O-N.

14  Q.  And what do you do?

15  A.  I'm a special agent with the United States Department of

16  Homeland Security.

17  Q.  How long have you been a special agent with -- I'll refer

18  to as just Homeland Security?

19  A.  Since February of 2006.

20  Q.  What are your duties?

21  A.  I'm assigned to investigate cybercrimes, specifically

22  child exploitation crimes, and assigned to examine digital

23  evidence.

24  Q.  How long have you been investigating cyber child

25  exploitation cases?

1   A.  Since 2006.

2   Q.  What training have you received in the areas of this?

3   A.  I've received training from the United States Department

4   of Homeland Security, the United States Department of Justice.

5   I've received training through conferences like the Dallas

6   Crimes Against Children Conference, the Internet Crimes

7   Against Children Conference.

8           With regard to digital evidence and digital

9   forensics, I've received training from the U.S. Department of

10  Homeland Security, the Department of Justice, as well as

11  vendor-based training, actual computer platform-specific

12  training through Guidance Software, AccessData, Internet

13  Evidence Finder or Magnet Forensics, as well as others.

14  Q.  Approximately how many investigations do you think you've

15  been involved in involving a computer-based exploitation of a

16  child case?

17  A.  Approximately 500 or more.

18  Q.  And what types of things do you do in those cases?

19  A.  I investigate the possession, distribution, production of

20  child exploitation material, child pornography; and examine

21  the digital evidence that's parts of those cases.

22  Q.  Throughout the course of your investigative career, how

23  many times do you think you've had to look at images and try

24  and determine if they are child pornography?

25  A.  I've -- I've done that thousands of times with millions of

1  files.

2  Q.  Do those include both stills and video files?

3  A.  Yes, sir.

4  Q.  In addition to your career as investigator, has there been

5  any other capacities in which you've served where you've had

6  to analyze images for child pornography?

7  A.  Yes.  On multiple indications I've been temporarily

8  assigned to our headquarters component, where I've been

9  involved in the cataloging and categorizing, classification of

10  images into either child pornography; exploitative, but not

11  pornography; and otherwise nonpertinent-type images.

12  Q.  And what types of things would you do -- how would you get

13  the images when you were working this headquarters component?

14  A.  These would have been images that would have been

15  submitted to our headquarters component from either a field

16  office or also through the National Center for Missing and

17  Exploited Children, which is -- they receive material from

18  agencies across the board -- state, local, federal agencies --

19  as a clearinghouse for the victim information that's attached

20  to those files.

21       So those files would come from -- would originate in

22  some investigative form, either a state, local, federal, or

23  our own agency, and then would have ended up in this bulk data

24  set of files that we were looking at.

25  Q.  And in that capacity, how many more images would you have

 1  had to look at and attempt to classify?

 2  A.  There were millions of files in that dataset.

 3  Q.  Are you familiar with the federal definitions of child

 4  pornography?

 5  A.  I am.

 6  Q.  Please -- did you use those federal definitions in all

 7  that work and experience you just talked about?

 8  A.  Yes.  They were one of the factors we used, for sure.

 9  Q.  I ask you to look behind tab 44, 45, and 46.

10  A.  Yes, sir.

11  Q.  Do you recognize 44, 45, and 46?

12  A.  I do.

13  Q.  What are they?

14  A.  Tab 44, or Exhibit 44, is the definition of child

15  pornography as it is in federal law.

16  Q.  What about 45?

17  A.  45 is the definition of sexually explicit conduct as it is

18  defined in federal law.

19  Q.  What about 46?

20  A.  46 is the definition of lascivious exhibition as I know it

21  to be defined in federal law.

22  Q.  And would these slides help you explain the concepts to

23  the jury?

24  A.  It would.

25          MR. SHEPARD:  Your Honor, the government would move

1  for the admissions of 44, 45, and 46 as demonstratives.

2         THE COURT:  Any objection?

3         MR. THOMAS:  Your Honor, I would request an

4  instruction to the jury as to the purpose of demonstrative

5  evidence in this situation.

6         THE COURT:  Ladies and gentlemen, demonstrative

7  evidence is used to assist you and educate you, and is a

8  summary of evidence, and is not -- it will not go back with

9  you when you deliberate, because it is demonstrative only.

10         MR. THOMAS:  No objection, Your Honor.

11         THE COURT:  Exhibits 40 -- where do they start,

12  Mr. --

13         MR. SHEPARD:  44, 45, and 46, Your Honor.

14         THE COURT:  44, 45, and 46 are admitted into

15  evidence without objection.

16                  *(Government's Exhibits 44 - 46 were*

17                  *received in evidence.)*

18         MR. SHEPARD:  Would you please display Exhibit 44?

19         THE DEFENDANT:  Yes, sir.

20         MR. SHEPARD:  If you could magnify.

21  BY MR. SHEPARD:

22  Q.  Let's just start at the beginning.  What's a visual

23  depiction?

24  A.  A visual depiction would be anything that you could -- you

25  could see, anything that you would be able to define the

1  content by being able to look at it.

2  Q.  Does this include a picture?

3  A.  Yes.

4  Q.  What does it mean to be a computer-generated image or

5  picture?

6  A.  Computer-generated images, you would also hear that a lot

7  called CGI.  It would be a graphic that's actually created,

8  defined by a computer itself, and not some type of outside

9  source or outside input, like the environment that you would

10  be taking a picture or a video of.

11  Q.  Would that include a smartphone?

12  A.  Yes.

13  Q.  That says, "whether made or produced."  What's it talking

14  about there?

15  A.  Those are literally what they mean.  It is either the --

16  the picture is either made or produced, created by

17  interpreting the environment and making it into a visual

18  depiction that you can then look at.

19  Q.  And then the visual depiction.  What's a minor?

20  A.  A minor is a person under the age of 18.

21  Q.  Sexually explicit conduct.  Does that have its own

22  definition?

23  A.  It does.

24         MR. SHEPARD:  Please display Exhibit 45.

25  BY MR. SHEPARD:

1  Q.  Does the full definition -- or sexually explicit conduct

2  means -- what do we have here?

3  A.  The lascivious exhibition of the genitals or pubic area of

4  any person.

5  Q.  And lascivious exhibition, does that also have its own

6  definition?

7  A.  It does, sir.

8          MR. SHEPARD:  Please display Exhibit 46.

9  BY MR. SHEPARD:

10 Q.  And is that the definition of lascivious exhibition as you

11 know it to be?

12 A.  It is, sir.

13 Q.  We're talking here about this last clause.  What do you

14 understand to be the focus of the image?

15 A.  The focus of the image would be circumstances or

16 characteristics of the image or the file, if it's a

17 computer-generated graphic, but an image that would draw your

18 eyes to it.  So a focal point, or the focus of the image,

19 doesn't necessarily mean that the image is in focus, like we

20 commonly speak of the word "focus" when we're talking about a

21 picture.  It's more where your eyes are drawn to in the

22 picture.

23 Q.  Is every image of a nude minor going to be lascivious?

24 A.  No.

25 Q.  What are some examples that would not be lascivious?

1  A.  Really, any image that has some type of artistic,

2  scientific, or documentative value.  So, certainly an art --

3  you know, an art photo or something that you often see in

4  museums, things like that, cherubs.  Pictures like that not

5  be -- would not be lascivious.

6  Q.  What about the picture we've all seen at the mall of the

7  kind of the naked baby lying on the arm of someone?

8  A.  Sure.  That would not be lascivious at all, because it

9  would have the documentative value of the parent and the

10 child.  And sometimes in those pictures, the genitals aren't

11 exposed at all, or the pubic area is not exposed at all.

12 Q.  Now, let me stop you right there.  Do the genitals or the

13 pubic area have to be exposed?

14 A.  No.

15 Q.  Is it possible to have a lascivious exhibition where

16 there's no nudity at all?

17 A.  It is possible, yes.

18 Q.  The photo that mom and dad takes of their child in the

19 bathtub?

20 A.  Yeah, that would not be lascivious.

21 Q.  Is it possible that it could be lascivious?

22 A.  It could be.  It could be.

23 Q.  And in what circumstances would it end up being

24 lascivious?

25 A.  I've been involved in cases where those photos, or those

1  types of photos, have been presented in a manner of almost

2  advertisement, saying, you know, that additional, you know,

3  pictures are available or additional access to the child is

4  available, and that picture is out there for that manner and

5  being presented in that context.  And that picture -- the

6  meaning of that picture changes.

7  Q.  So is the context in which a visual depiction is

8  produced -- is that important?

9  A.  Yes.  If that can be known, that's very important.

10 Q.  Why?

11 A.  For just what I just said.  You're able to take into

12 context, then, all of the circumstances of the environment and

13 the time and place that that picture is taken.

14 Q.  And does that go to --

15 A.  Yes.

16 Q.  -- this part of the definition?

17 A.  It would.

18 Q.  So for you, in your career, it would be important to know

19 what else was going on when the picture was taken?

20 A.  Yes.

21 Q.  I believe up there with you is an exhibit --

22        MR. SHEPARD:  You can clear that exhibit.  It should

23 be Exhibit 4 and Exhibit 6.

24        THE WITNESS:  Yes, sir.

25        MR. SHEPARD:  And then can you put Exhibit 5-A on

1  half the screen?  Or, actually, clear 5, 5-A.  Please display

2  Exhibit 7.

3  BY MR. SHEPARD:

4  Q.  What do you see in this image, Special Agent Johnson?

5  A.  In this image, I see what appears to be the pubic area of

6  a prepubescent child.  The child appears to be clothed, yet

7  the clothing is being pulled back to expose the child's mons

8  pubis area.  And the focal point, as I was describing earlier,

9  the circumstances of this picture with the clothing being

10  pulled back, and that causes the focal point of that image to

11  be the pubic area of the child.

12  Q.  And where are you saying is the pubic area of the child?

13  A.  Yes, sir.

14  Q.  You can draw on the --

15  A.  (Indicating).

16  Q.  Now, you said something about prepubescent child.  Why do

17  you believe that to be?

18  A.  Because there's no pubic development in the mons pubis

19  area of the child.  And I'm also familiar with the clothing

20  that the child was wearing, and the clothing in this picture

21  is for a toddler or slightly older age child.

22  Q.  Does that appear to be the same, at least Exhibit 6 you've

23  got right there?

24          MR. SHEPARD:  Clear Exhibit 7.  Display Exhibit 8.

25  BY MR. SHEPARD:

1  Q.  What are we seeing here?

2  A.  We're seeing what appears to be a photograph of the same

3  prepubescent child.  Again, the clothing is being pulled back,

4  exposing the pubic area of the child.  In this picture, you

5  can see a finger, or at least part of a hand, that appears to

6  be assisting in the pulling back of the clothing to expose the

7  pubic area of the child.  In relation to what we can see

8  anatomically of the child, that finger appears to be from a

9  much larger person than what would be the finger of that

10 child.

11 Q.  So is this the finger you're talking about?

12 A.  Yes, sir.  Yes, sir.

13 Q.  So do you believe that finger to be that of the child?

14 A.  No, sir.

15 Q.  What's the focal point of the image, and why do you

16 believe that to be the focal point?

17 A.  Much like the image that we saw before, with the clothing

18 being pulled back and with mons pubis being in the center of

19 the image itself, that would lend the viewer's eyes to be

20 drawn to the pubic area of that child.

21 Q.  Now, do you see what we're seeing right here?

22 A.  Yes, sir.

23 Q.  Do you know what that is?  If you open -- look at

24 Exhibit 6.

25 A.  Yes, sir.

1  Q.  Do you see any part of that?

2  A.  Yes, sir.  It appears to be a tab for the button on the

3  inside of the beltline of the child.

4  Q.  On the inside of the front or back?

5  A.  Inside of the front.

6  Q.  And would that be consistent with this being the side that

7  is the mons pubis -- or, excuse me, the mons pubis?

8  A.  Yes, sir.

9          MR. SHEPARD:  Mons pubis.  That was my Oklahoma

10  accent.  My apologies.

11          Please clear Exhibit 8.  Display Exhibit 9.

12  BY MR. SHEPARD:

13  Q.  Do you see what we're seeing here in Exhibit 9?

14  A.  Yes, sir.  This, again, appears to be the same child and

15  the same clothing from the images that we've seen before.  In

16  this image, we can see what appears to be the lower part of

17  the child's abdomen.  And within relation to how the pants

18  are, it appears that the image is then -- goes down into the

19  pubic area of the child.  But it does appear, by looking at

20  Exhibit 6, that it is the same clothing that are in the other

21  pictures.

22  Q.  And can you venture as to what that little clear cylinder

23  is?

24  A.  It appears to be a clear button that's on the inside of

25  the pants.

1  Q.  The front or the back?

2  A.  On the inside of the front of the pants.

3  Q.  I ask you to look there at Exhibit 4, kind of what is the

4  blanket.

5  A.  Yes, sir.

6  Q.  Which you've got unfolded there.

7  A.  Yes, sir.

8  Q.  Does that appear consistent with any part of Exhibit 4?

9  A.  It does appear to be consistent.  The fabric in the

10  picture seems to be consistent with the solid pink portion of

11  this blanket.

12  Q.  Can you discern anything about the orientation of the

13  child depicted?

14  A.  Yeah.  It appears -- because of the blanket and where it's

15  placed, and kind of the angle of how you can see the child is

16  placed -- that the child is laying down.

17  Q.  Can you see kind of pressure, also, anywhere?

18  A.  It does appear, if you can -- if you can imagine gravity

19  and how a body would lay, it does appear that pressure is

20  pointing down in this direction, as if the child is lying

21  against the blanket.

22  Q.  Against the blanket?

23  A.  Yes.

24  Q.  Exhibit 4?  The blanket being Exhibit 4?

25  A.  Yes, sir.

1  Q.  What's the focus of this image, and why?

2  A.  Again, the focus of the image appears to be toward the

3  pubic area of the child as the child is laying down, the angle

4  of which the camera is taking the picture, the fact that the

5  pants are pulled forward.  It draws your eyes to the pubic

6  area of the child.

7              MR. SHEPARD:  Display Exhibit 10.

8  BY MR. SHEPARD:

9  Q.  What are we seeing here?

10  A.  Again, we're seeing what appears to be the pubic area of

11  the same child.  Again, the clothing is being pulled forward

12  by what appears to be a larger person's finger or thumb.  By

13  pulling the pants forward and the undergarment forward, you're

14  exposing the pubic area of the child, including the mons pubis

15  and slightly, even, the labia majora of the child.

16  Q.  The labia majora, would that be part of the vaginal area,

17  as well?

18  A.  It would be, sir.

19  Q.  Are you able to -- again, anything about this tell you the

20  age of the person depicted in the image?

21  A.  That child is prepubescent.  The child lacks -- lacks any

22  post-sexual characteristic development or pubic development.

23  Q.  What's the focus point of this image, and why?

24  A.  Again, the focal point is in the images that we saw

25  before, especially the ones where the clothing was pulled

1   forward.  With the clothing being pulled forward and the pubic

2   area of the child being geographically in the center portion

3   of the photograph, that draws the focus of the viewer, draws

4   the viewer's eyes to the pubic area of that child.

5          MR. SHEPARD:  Let's clear the image.

6   BY MR. SHEPARD:

7   Q.  I think you mentioned earlier that context is important in

8   classifying an image?

9   A.  It is, sir.

10  Q.  I'm going to give you a hypothetical.  If you knew that

11  certain images were created during the course of an incident

12  of molest, would that be important?

13  A.  Yes, sir.

14  Q.  Why?

15  A.  It would be important to know that, because it would

16  remove any doubt that the photographs may have been taken

17  accidentally, and it would lend itself to the thought process

18  of the person taking the photographs.  And that would be to

19  memorialize the molestation.

20  Q.  What would be important about memorializing a molestation?

21  A.  I know, from cases that I've worked before, that persons

22  who engage in --

23          MR. THOMAS:  I'm going to object to this at this

24  point.  Speculation about other cases I don't think has

25  relevance to this case, I don't think he's interviewed the

1  defendant.

2          THE COURT:  Would you approach?

3          (Bench conference on the record.)

4          THE COURT:  The question is, "What would be

5  important about memorializing a molestation?"

6          And then he started saying, "I know, from cases that

7  I've worked before, that persons who engage in --"  And --

8          MR. THOMAS:  My objection is talking about cases

9  that he's worked before in relation to this case, and there's

10  no correlation.

11          THE COURT:  Well, what do you want to say?

12          MR. SHEPARD:  Your Honor, I think he can draw on his

13  experience as to why it would be important in putting it into

14  context.

15          THE COURT:  Okay.  I'll give him some leeway,

16  because the question is appropriate, "What would be important

17  about memorializing a molestation?"  So I'll give him a little

18  leeway and see what he says.

19          MR. SHEPARD:  Thank you.

20          THE COURT:  Objection is overruled.

21          MR. THOMAS:  My objection is to the answer he was

22  starting to give.  I don't find the question objectionable.

23          THE COURT:  You don't think he was responsive to the

24  question?

25          MR. THOMAS:  Right.

 1          THE COURT:  Okay.  Well, ask it again, and we'll see

 2   what he says.

 3                      (Open court.)

 4          THE COURT:  All right.  Why don't you ask the

 5   question again.

 6   BY MR. SHEPARD:

 7   Q.  Why would it be important to know if images were taken

 8   during the course of --

 9          THE REPORTER:  I'm sorry?

10   BY MR. SHEPARD:

11   Q.  Why would it be important to know if images were taken in

12   the context of a molest?

13   A.  Again, because if you were able to have that information,

14   if you were able to know that that was taken during the

15   molest, it would lend itself to the purpose of the picture

16   being taken, either to memorialize the molest for the person

17   involved in the molest or also, oftentimes, to share with

18   like-minded individuals.

19   Q.  To relive it?

20   A.  Yes, sir.

21          MR. SHEPARD:  And if you could call back up

22   Exhibit 46.

23   BY MR. SHEPARD:

24   Q.  Part of the definition, would that be important, too?

25   A.  To excite the lustfulness or sexual stimulation of the

1  viewer.

2  Q.  In your experience, is it common to see a series of

3  images?

4  A.  Yes, sir.

5  Q.  And what am I meaning by, "a series of images"?

6  A.  The term "series," as we use it when we're talking about

7  the exploitative material, we're talking about a number of

8  images, be it, or videos, a number of files, a number of

9  entities involving one or a number of the same victims with

10  the same offender, the same environment, the same acts

11  involving the same victims or number of victims.

12  Q.  And when you've -- have you discovered series in the past?

13  A.  I have, sir.

14  Q.  And when you have, does every image in the series capture

15  the genitals?

16  A.  No, sir.

17  Q.  Is it often important to try and -- let me ask you this:

18           Based upon your training and experience, do

19  Exhibits 7, 8, 9, and 10 appear part of a series?

20  A.  They do, sir.

21  Q.  And what is it about them that appears part of a series?

22  A.  From what I can see in the picture, it appears to be the

23  same victim and it appears to be the same clothing.  And it

24  appears to be at least somewhat the same environment.

25  Q.  Anything about the similar nature of the image that also

1  lends to that?

2  A.  Yes, sir.

3  Q.  And what?

4  A.  That they appear to be a progression of the same incident.

5  So the pictures begin -- well, the pictures appear to begin at

6  one point and progress on.  So the genitals become -- or the

7  pubic area of the child becomes a little more in view.  The

8  picture becomes a little closer, and the clothing becomes a

9  little further pulled back as it appears in the pictures.

10  Q.  Is it important to try and determine the order of a

11  series?

12  A.  It can be, yes, sir.

13  Q.  And why would it be important?

14  A.  When we're dealing with exploitative pictures of children,

15  it's a little different than investigating a lot of other

16  crimes.  We know, from news and television and what we know,

17  that crime scene photos are often taken afterward, and things

18  are trying to reconstruct.  We have the benefit sometimes, in

19  exploitative images of children, that the crime scene has been

20  documented for us while it's going on.  So it's important for

21  us, if we're able to, to determine the order in which they're

22  taken, because it helps us better document what happened in

23  the act.

24  Q.  If you could put 4 and 6 down, just out of your way.

25  A.  Yes, sir.

1  Q.  It might be easier for you if you went ahead and took the

2  printed copies of 7, 8, 9, and 10 out of the binder and had

3  them all in front of you.  You can clear the...

4  A.  Okay.

5  Q.  Do you have a hypothesis on the possible order these

6  images were actually created?

7  A.  I do, sir.  Just a moment.

8  Q.  Which one do you believe -- or what order would that be?

9  A.  I believe that they would go with respect to 10, 8, and 7.

10 I believe they would go in that order, 10, 8 and 7.  It

11 appears that 10 is taken from more of a --

12         MR. SHEPARD:  Go ahead and display 10.  Can you put

13 it side by side with 8.

14 BY MR. SHEPARD:

15 Q.  Do you believe that to be the order?

16 A.  Yes.

17 Q.  Can you tell the jury why?

18 A.  It appears that 10 is beginning from more -- from more of

19 a distance, and that the clothing is pulled back.  If you can

20 imagine taking pictures with a mobile device, the mobile

21 device is further away from the child.  As you move to image

22 8, it gets just a little bit closer.

23         You can still see the thumb, and it's oriented in

24 somewhat the same area, but the picture then begins to get a

25 little bit closer.  And then, as you move on to image 7 --

1          MR. SHEPARD:  Clear that, please.  Please put up 7.

2   Put 8 on one side and 7 on the other, please.

3   A.  Then, as you move on to image 7, the clothing seems to be

4   oriented in the same way, but the thumb is gone, all except

5   for just a tiny little bit there, that appears to be just kind

6   of the tiptop of the skin of the thumb, if you can imagine it

7   in its same orientation.  And the image is much closer than

8   the other two images.

9          So in a progression from image 10 to image 8 to

10  image 7, we're going from further away closer, but the subject

11  of the images never really changes orientation.  It's pretty

12  consistent, other than the distance.

13          MR. SHEPARD:  Please clear the screen.

14  BY MR. SHEPARD:

15  Q.  What about Exhibit 9?

16  A.  Exhibit 9 -- in my opinion, in the order that these would

17  go, Exhibit 9 would go on either end of these.  It would make

18  sense on either end.  It would make sense that that could be

19  at the beginning of it before the clothing is grabbed --

20          MR. SHEPARD:  Display Exhibit 9.

21  A.  -- before the clothing is grabbed, before the closer

22  images are taken, or it could be at the end of the photos

23  being taken if the subject changes orientation.

24          MR. SHEPARD:  Please clear Exhibit 9.

25  BY MR. SHEPARD:

1  Q.  Is it important if there is a gap in production times --

2  A.  Yes, sir.

3  Q.  -- of images?

4        Why?

5  A.  That would lend itself to the idea that those pictures are

6  not taken accidentally.

7  Q.  Why so?

8  A.  Well, if you have a number of images taken in a very short

9  period of time, and then there's a break in time, and then you

10 have new images that are the same behavior, but there's a

11 break in time, anything that would have caused that

12 accidentally to have happened could have been corrected in

13 that period of time.  And it would not have been if they

14 were -- the behavior continued.

15 Q.  Are you familiar with a concept called grooming?

16 A.  I am.

17 Q.  What is grooming?

18 A.  With respect to crimes against children, grooming is a

19 process by which an offender will provide things to the child

20 to gain trust.  They will provide comfortable circumstances

21 for the child, will provide clothing, gifts, toys, food if

22 that's, you know, if that's something that's important and

23 sometimes lacking.

24        And then there's the idea of seduction, seduction by

25 camera, where you make -- you groom the child by making the

1  child comfortable with not only having their picture taken at

2  all, but having their picture taken by a specific person, so

3  the idea of the camera being a part of that relationship is

4  not strange, and -- by the time you get to the point where the

5  child is exploited.

6  Q.  Would that include behavior like having inside jokes with

7  a child?

8  A.  Sure.

9  Q.  Having special names for a child?

10  A.  Sure.

11          MR. SHEPARD:  Can I just have a moment, Your Honor?

12          THE COURT:  You may.

13          (Off the record.)

14          MR. SHEPARD:  Please display Exhibit 3.

15  BY MR. SHEPARD:

16  Q.  Could that be consistent with a grooming photo you talked

17  about?

18  A.  Sure.  That could be consistent with a seduction by

19  camera.  It's certainly a child and an adult.  It's a friendly

20  picture, it's a picture that they're in together.  So, yes, it

21  could certainly be that.

22          MR. SHEPARD:  I pass the witness for cross, Your

23  Honor.

24          THE COURT:  You may cross.

25          MR. THOMAS:  Thank you.

 1          THE COURT:  You may cross-examine.

 2                    **CROSS EXAMINATION**

 3  BY MR. THOMAS:

 4  Q.  Is it safe to say that there's actually kind of a whole

 5  lot of things that have to come together in order to get to

 6  the whole definition of pornography, child pornography; would

 7  you agree?

 8  A.  I guess I don't understand.  The whole definition or to

 9  make --

10  Q.  Well --

11  A.  -- the threshold?  Because I certainly don't --

12  Q.  You talked about a lot of different things that you have

13  to have.  The first thing you have to have is a visual

14  depiction, right?

15  A.  Sure.

16  Q.  You have to have -- and that's something that's made or

17  produced?

18  A.  Yes, sir.

19  Q.  It has to have sexually explicit conduct?

20  A.  It does.

21  Q.  And it has to have a minor engaging in the sexually

22  explicit conduct, right?

23  A.  Yes, sir.

24  Q.  And it has to be lascivious in order to be sexually

25  explicit conduct?

1  A.  That's one of the -- one of the portions of it, yes, sir.

2  Q.  All right.  So in this case, you have determined, in your

3  mind, that it fits the definition for you, because it is a

4  lascivious exhibition, correct?

5  A.  Yes, sir.

6  Q.  And even with that -- in that definition, there's a whole

7  set of requirements that have to be met in order to be

8  lascivious, right?

9  A.  There are.

10  Q.  One of those that you mentioned is the focus of the image

11  is on the genitals.  That can be one of them, right?

12  A.  That can be one of them, yes, sir.

13  Q.  But, in and of itself, that doesn't create child

14  pornography; would you agree?

15  A.  That's true, yes.

16  Q.  A doctor -- we had one testify today.  A doctor can take a

17  picture of a child's genitals for medical reasons.  That

18  wouldn't be child pornography?

19  A.  No, sir.

20  Q.  Even though the focus of the picture is on the genitals?

21  A.  In that context, you're correct, sir.  Yes, sir.

22  Q.  And what you have to have in addition is that -- for the

23  intent of either the producer or the viewer, the intent to

24  excite lustfulness, sexual stimulation in the viewer, so the

25  person taking it wants the person who sees it to be excited or

1  lustful, right?

2  A.  If I may, not necessarily, because the same scientific

3  photo that you were talking about, outside of that

4  environment, can be child pornography if the person possessing

5  it doesn't have the same artistic or scientific need for that

6  image.

7  Q.  That's exactly right.  So, hypothetically, if a doctor, in

8  the course of his medical job, took those photos, they're in a

9  medical file somewhere, that -- I won't pick on the doctor.

10  Let's say somebody in his office decided to take those and put

11  them on a Web site to say, "Exciting pictures."  That same

12  picture that wasn't pornography before at all suddenly is?

13  A.  Yes, sir.  Yeah, that --

14  Q.  And that has some more to do with the -- it's the intent

15  of the person posting it and also perhaps the intended

16  reaction of the viewer, right?

17  A.  I think that's what you were getting at.  And, again, if I

18  can --

19  Q.  Yes.

20  A.  -- as I described before when the government's attorney

21  asked me about, you know, the photograph of the child in the

22  bathtub.  The photograph of the child in the bathtub, in a lot

23  of family photo albums, doesn't meet that -- doesn't meet that

24  threshold.  However, that same photo posted by someone

25  on-line, using it to advertise the existence of either access

1  to that child or the existence of additional exploitative

2  photos, would make that image then cross that threshold for

3  the person possessing it, and certainly for the person

4  producing it, if that was their intent when they produced it.

5  Q.  Right.

6  A.  Yes, sir.

7  Q.  We definitely will have to look at the intent of the

8  producer in this case, because they were not shared with

9  anyone, right?

10 A.  I have no idea.

11 Q.  You talked a little bit about that this was part of a

12 "series" of images.  That was the term.  I don't know if you

13 said it first or the government said it first, but part of a

14 series.

15 A.  Yes, sir.

16 Q.  That would imply that there are more of these pictures in

17 this series when you say, "part of a series," right?

18 A.  No, sir.  A part could be the whole part.

19 Q.  Correct.  Well, just to be clear, there aren't any other

20 images, other than these four, that you've seen in this case?

21 A.  No, sir, I'm aware of no other images.

22 Q.  So I don't want any confusion.  They're not part of a

23 series?  If they are a series -- the four are the series;

24 would you agree?

25 A.  If you know that those four pictures are the only pictures

1  that are part of that series, that's correct.  I don't know

2  that.

3  Q.  When you talked about sharing with like-minded

4  individuals --

5  A.  Yes, sir.

6  Q.  -- is it fair to say that most of the cases that you deal

7  with, with production of child pornography, you find someone

8  who manifests an intent to share those pictures?

9  A.  Not necessarily the case, and especially in cases of

10  production of child pornography.  Often we find that those

11  images are not shared.  Those are kept by the person who

12  produces them, for later viewing.

13  Q.  And would you say that most of your cases have more than

14  four images, don't they?

15  A.  Yes, sir, they do.

16  Q.  In fact, I think it's safe to say most of your cases have

17  a lot more than four images, don't they?

18  A.  If you look at my cases across the board, absolutely.

19  But, again, I'm dealing with collectors that aren't involved

20  in the production of it.  I'm dealing with people who are

21  passive distributors of it.

22          I've -- in fact, you know, as we move on in the

23  digital age, we're finding people who aren't physically in

24  possession of any of them.  You know, the stuff is in the

25  cloud or they are simply passing the link of things to the

1  cloud, so...

2  Q.  And you're aware that these were never sent to the cloud

3  or sent to the Internet or sent to anybody, right?

4  A.  I'm not aware of that, sir.

5  Q.  Well, you've drawn some conclusions here about intent, the

6  intent of Mr. Al-Awadi.  Those kinds of things, that knowledge

7  of those kinds of things, would also add to your opinion about

8  his intent, would they not?

9  A.  My -- I have no opinion of Mr. Al-Awadi's intent.

10  Q.  Well, you kind of do, because when -- your definition of

11  child pornography has to do with -- you've already said it has

12  to do with what his intentions were when he took the pictures,

13  right?  What would separate the doctor from the pornography,

14  your intent and purpose for the pictures, right?

15  A.  Those pictures, as I've looked at them on their face, I

16  believe are child pornography, yes.

17  Q.  I understand.

18  A.  Yes.

19  Q.  And part of the reason that you said is because you -- in

20  your opinion, a molestation took place?

21  A.  I was told that, yes.

22  Q.  You were told that?

23  A.  Yes, sir.

24  Q.  Do you know -- you're taking that as a given, when you

25  start looking at those pictures, that a molestation took

1  place?

2  A.  Yes, sir.

3  Q.  Now, again, we talked about the doctor's pictures.

4  A.  Yes, sir.

5  Q.  In that scenario that I gave you, somebody posting those

6  on the Internet or e-mailing them to a friend or sharing them

7  in some way or cataloging them in some way, if you knew that

8  information, that would help you form your opinion, would it

9  not?

10 A.  It would.

11 Q.  You didn't know any of that in this case, did you?  You

12 didn't know -- you've already -- I think you said you didn't

13 know whether these pictures were shared with anyone?

14 A.  Yeah, I do not know that.

15 Q.  You didn't know whether they were stored anywhere?

16 A.  I do not know that.

17 Q.  You did not know whether they were cataloged in some way?

18 A.  No, sir.

19 Q.  Put on the Internet?

20 A.  No, sir.

21 Q.  E-mailed to a friend?

22 A.  I do not know that.

23 Q.  Saved in a protected place somewhere?

24 A.  I do not know that.

25 Q.  In fact, these images were erased.  The only actual images

1  were erased by the time you saw them, right?

2          MR. SHEPARD:  Objection.  Outside the scope of the

3  witness' knowledge.

4          THE COURT:  Are you able to answer that question?

5          THE WITNESS:  No, Your Honor.  I didn't do the

6  forensic exam on the digital devices.

7          THE COURT:  I'll sustain the objection.  Next

8  question.

9  BY MR. THOMAS:

10 Q.  Your definition, as you give us in Government's 46, is

11 that a lascivious display draws attention to the genitals of

12 the pubic area in order to excite lustfulness or sexual

13 stimulation, correct?

14 A.  Yes, sir.

15 Q.  If the pictures are taken for any other purpose other than

16 to excite lustfulness or sexual stimulation, by your

17 definition, they would not be lascivious; would you agree?

18 A.  Yes, sir.

19 Q.  You've told us that you didn't do the forensic report,

20 obviously?

21 A.  No, sir.

22 Q.  Did you review the forensic report?

23 A.  No, sir, I did not review the forensic report.  I reviewed

24 the images from the forensic report.

25 Q.  In your opinion that you gave us about the -- you think

1  10, 8, 7, that's just based on your visual opinion, not on

2  anything scientific from a forensic report; is that right?

3  A.  Yes, sir.  That -- yes.

4          MR. THOMAS:  And if I could approach the witness,

5  Your Honor?

6          THE COURT:  You may.

7          THE WITNESS:  Sure.

8          MR. THOMAS:  If I could see those.

9  BY MR. THOMAS:

10 Q.  You've told us that you think 10 is farther away than 8;

11 is that right?

12 A.  Yes.  I believe so.

13 Q.  Although, in looking at the image, would you agree that

14 the -- this black area, those panties, is larger in 10 than it

15 is in 8?

16 A.  Yes.  That could simply be the orientation and how far the

17 clothing is being pulled out in this one versus that.

18 Q.  I understand.  So your opinion -- thank you.

19 A.  Yes, sir.

20 Q.  Your opinion as to the order is just that, your opinion,

21 right?

22 A.  Yes, sir.

23          MR. THOMAS:  Nothing further.  Thank you.

24          THE COURT:  If you have any redirect, you may.

25          MR. SHEPARD:  No redirect, Your Honor.

1          THE COURT:  Can we release this witness?

2          MR. SHEPARD:  No, Your Honor.  I think we need to

3  hold him.

4          THE COURT:  All right.  You can go back to the

5  witness room.

6          THE WITNESS:  Thank you, Judge.

7          THE COURT:  Thank you.

8          (Witness excused.)

9          MR. SHEPARD:  Your Honor, if we could just have a

10 moment.

11         (Off the record.)

12         MR. SHEPARD:  Your Honor, the government rests.

13         THE COURT:  All right.  Thank you.  All right,

14 ladies and gentlemen, we're going to take a brief recess.  The

15 Court is going to admonish you, you are not to begin any

16 deliberation and no discussion, and we'll have you back in the

17 courtroom as soon as possible.

18         THE COURTROOM DEPUTY:  All rise.

19         (Jury out at 4:24.)

20         THE COURT:  The government has rested.  And,

21 Mr. Thomas, will you be presenting any evidence?

22         MR. THOMAS:  I will, Your Honor.  I intend to call

23 the defendant, Ali Al-Awadi.

24         THE COURT:  All right.  Mr. Ali Al-Awadi, have you

25 had an opportunity to discuss with your attorney whether

1  you're going to testify or not in your trial?

2          Can you give him the microphone, please?

3          MR. THOMAS:  Yes, Your Honor.

4          THE DEFENDANT:  Yes, I have.

5          THE COURT:  And I want to make certain that you

6  understand your rights.  You do have a right to testify in

7  your defense if you wish to testify, and no one can prevent

8  you from doing so.  If you testify, the Assistant United

9  States Attorneys will be allowed to cross-examine you.  Do you

10  understand that?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  You also have a right to decline to

13  testify.  You're presumed innocent, you don't have any burden

14  of proof.  The government alone has the burden of proving your

15  guilt beyond a reasonable doubt.  If you do not testify, this

16  fact cannot be used against you, and the jury would be so

17  instructed, because a defendant has an absolute right not to

18  testify or present evidence.  And they may not -- the jury may

19  not consider in any way if you do not testify or present

20  evidence.  Do you understand that, also?

21          THE DEFENDANT:  Yes, I do.

22          THE COURT:  And have you been advised of these

23  rights?  Do you still wish to testify?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  All right, let's bring the jury

 1  in and get started.  Oh, we need to put him on the stand.

 2          MR. THOMAS:  Oh, yes.  Your Honor.

 3          (Off the record.)

 4          THE COURT:  All right.  Go ahead and have a seat.

 5  Go ahead and have a seat.  And when we say, "Stand," you stand

 6  with everyone else, okay?

 7          All right.  Government, are you ready for the panel?

 8          MS. KOROBOV:  Yes, Your Honor.

 9          THE COURT:  Mr. Thomas, ready?

10          MR. THOMAS:  I'm ready, Judge.

11          THE COURT:  All right.  You may bring in the panel.

12          (Jury in at 4:28.)

13          THE COURT:  And, Witness, if you would remain

14  standing and raise your right hand.

15          (The witness is sworn.)

16          THE COURT:  You may have a seat.

17          Ladies and gentlemen, when we -- before we took our

18  brief adjournment, the government rested.  And the defendant

19  does not have a burden of proof.  He does not have to testify.

20  However, if he wishes to do so, he may.

21          And, Mr. Thomas, since your client has been sworn,

22  he does intend to testify, correct?

23          MR. THOMAS:  He does, Your Honor.

24          THE COURT:  All right.  You may examine your

25  witness.

1    MR. THOMAS:  Thank you.

2    **ALI AL-AWADI, DEFENDANT'S WITNESS, SWORN**

3    **DIRECT EXAMINATION**

4  BY MR. THOMAS:

5  Q.  Can you tell us your name again?

6  A.  Ali Al-Awadi.

7  Q.  Where were you born, Mr. Al-Awadi?

8  A.  I was born in Saudi Arabia.

9  Q.  And is your family from Saudi Arabia?

10 A.  No.

11 Q.  Where are they from?

12 A.  They are from Iraq.

13 Q.  How is it you ended up in Saudi Arabia?

14 A.  My parents left Iraq because of the time of Saddam

15 Hussein, as refugees.

16 Q.  Do you remember about when that was?

17 A.  I wasn't born at the time, so I have no idea.

18 Q.  And then how long were you in Saudi Arabia, if you

19 remember?

20 A.  I would say around two years.

21 Q.  And where did you go from there?

22 A.  From there, got on a plane and came to America.

23 Q.  So you have been in the United States since you were two?

24 A.  Yes.

25 Q.  And where have you lived in the United States?

1   A.  In Indiana.

2   Q.  You came -- that's where your family settled?

3   A.  Yes.

4   Q.  Okay.  And who's in your family?

5   A.  I have my father, my mother, my brother, and my sister.

6   Q.  You're how old now, Mr. Al-Awadi?

7   A.  22.

8   Q.  Do you know how your family ended up settling in

9   Indianapolis?

10  A.  No.

11  Q.  Do you have other family, other than your mom and dad,

12  that are in this area?

13  A.  Yes.

14  Q.  Were they here before or did they come after?

15  A.  They were here before.

16  Q.  How far did you go in school?

17  A.  I made it about two years in college.

18  Q.  What year did you graduate from high school?

19  A.  2012.

20  Q.  What high school did you graduate from?

21  A.  Pike High School.

22  Q.  Where -- did you go immediately to college?

23  A.  Yes.

24  Q.  And where did you go?

25  A.  Ivy Tech.

1   Q.  What were you studying?

2   A.  Computer science.

3   Q.  And how far along were you with that?

4   A.  I was still taking what they call prerequisite classes,

5   which are pretty much before you get anything into your major.

6   You take basic classes:  Some math, some English, some, you

7   know, speech.

8   Q.  Did you have a job when you were in high school?

9   A.  Yes.

10  Q.  What was that?

11  A.  I worked at a company, a small company, called Midwest

12  Telephone Company.

13  Q.  And what kind of job was that?

14  A.  My position?

15  Q.  Yeah.  What did you do?

16  A.  I was the telephone refurbisher, office telephone

17  refurbisher.

18  Q.  What kind of telephones did you refurbish?

19  A.  Office phones, the ones you would see in businesses, and

20  secretaries.

21  Q.  How long did you have that job?

22  A.  I would say I almost had that job for about two years.

23  Q.  Do you remember how old you were when you started that

24  job?

25  A.  I believe I was 17.

1  Q.  Did you work at all before that, before the telephone job?

2  A.  Yes.

3  Q.  And what did you do?

4  A.  My father opened a restaurant, and I would help him out in

5  the restaurant.

6  Q.  Were you going to college at the same time you were

7  working at the telephone repair company?

8  A.  Yes.

9  Q.  Were you a full-time student or a part-time student?

10 A.  Full-time student.

11 Q.  Did you at some point end up leaving that job?

12 A.  Yes.

13 Q.  Why?

14 A.  The owner of the company informed me that business was

15 kind of slow, and they cut my hours.

16 Q.  Did you then find a new job?

17 A.  Yes.

18 Q.  And where did you end up getting a job?

19 A.  Children's Choice Learning Center.

20 Q.  And how was it you went from television -- or telephone

21 repair to Children's Choice Learning Center?  How did you find

22 that job?

23 A.  I was looking for a job on a Web site called snagajob, and

24 I was looking at many different openings.  And there wasn't

25 really much besides fast-food or something you needed a degree

1   for.  When I stumbled upon the Children's Choice, it said,

2   "Looking for a floater," someone who doesn't need to have

3   necessarily an education other than high school.  And I looked

4   at it as kind of like, you know, as almost like baby-sitting.

5   Q.  Was it a full-time job?

6   A.  Yes.

7   Q.  And if you remember, did you -- did you apply over that

8   Web site, or how did you end up applying for the job?

9   A.  I did apply on the Web site.

10  Q.  How long did it take for them to hire you?

11  A.  I would say within two weeks after me turning in my resumé

12  and application, I was called in to observe.

13  Q.  Now, when you -- when you went there to observe, were you

14  hired?  I mean, were you on the job or was that just part of

15  the application process?

16  A.  You were hired.

17  Q.  When you first met with -- do you remember who you met

18  with at the learning center when you applied, when you went to

19  interview?

20  A.  Her name was Jennifer, and she was the director.

21  Q.  You mentioned that you didn't have any real experience.

22  Did you tell them you didn't have any experience?

23  A.  Yes.

24  Q.  Was that okay?

25  A.  Yes.

1  Q.  Had you -- you said something about baby-sitting.  Why

2  did -- why did that make a connection to you?

3  A.  Because I would sometimes baby-sit for my uncles, my

4  aunts.  Whenever they would go shopping or whatever, they

5  would leave me at home and say, "Hey, can you watch my son,"

6  or whatever.  And I would stay with them for a couple of

7  hours.  We would watch TV, play, and just, you know, what you

8  would normally do when you baby-sit.

9  Q.  Is that as close to experience as you had for this job?

10 A.  It wasn't 100 percent, but there was a lot of the same

11 things, yes.

12 Q.  And did they know, when you started, that that's -- you

13 had had no experience other than that you had baby-sat for

14 your family sometimes?

15 A.  Yes.

16 Q.  Were there any other men that worked there?

17 A.  No.

18 Q.  Did -- was that subject brought up when you applied for

19 the job?

20 A.  Yes.

21 Q.  Did that seem to be a negative or a positive?

22 A.  It was actually a positive.  I recall Jennifer telling me

23 that the male children don't really have a role model to look

24 up to, other than their parents.  And their parents are

25 usually at work almost all day.  So even the time they get to

1  spend with their family, they go home and they're tired and

2  ready to sleep, so they don't really get to spend too much

3  time with their family.  So she told me that having a male in

4  the building is a good -- is a good look for the children,

5  because it's more of a role model for them.

6  Q.  Did -- was there -- was there anything ever mentioned to

7  you about diversity at the place?

8  A.  At first, it was not.  But then I was -- I was given the

9  title diversity -- I can't remember the exact title.  I think

10 it was called diversity champion, or something, where the

11 company would actually give you the title, and you would

12 attend seminars and you would actually get to speak at the

13 employee meetings on that, because you have a small title as

14 the diversity.

15 Q.  And you did that?

16 A.  I was not able to because I had recently been given that.

17 Q.  I gotcha.  What kind of training did you get when you

18 started?

19 A.  When I first started, we were instructed to watch, I

20 believe, two or three videos and to answer a questionnaire.

21 Q.  How long were the videos?

22 A.  About an hour.

23 Q.  Was there an instructor there to explain the video or

24 answer questions?

25 A.  No.

1   Q.  Anybody else in the room with you?

2   A.  No.

3   Q.  What kind of subjects were in the videos?

4   A.  Pretty much what you would be looking forward to in the

5   particular age group of the room you were in.  One was labeled

6   "Pre-K Preschool," one was labeled "Toddler," one was labeled

7   "Infant."  You would watch all those videos, and they will

8   tell you what would be going on in the room, how to handle

9   things, like maybe how to positively, you know, teach things

10  instead of, you know, just being hard.

11          You know, you're supposed to be more of an educator

12  instead of, you know, someone who is -- like, you're not

13  supposed to be a mean person, you know.  In other words, they

14  just wanted to make sure you knew how to interact.

15  Q.  Other than the videos, mostly on-the-job training; would

16  that be fair?

17  A.  After the videos, you were to complete a couple of hours

18  of observing classrooms before you actually got in.  And then,

19  once you actually did get the position, they would do employee

20  meetings.

21  Q.  And how often would those take place?

22  A.  At first, it was just once a month, if that.

23  Q.  When you say, "At first," did something change along the

24  way?

25  A.  Along the way, the company, Children's Choice Learning

1  Center, was bought by another company, Bright Horizons.  And

2  they were told to adopt the new policies and new teachings of

3  the new company.

4  Q.  Did the other employees -- were they -- did they

5  acknowledge that you were the only male there?

6  A.  Yes.

7  Q.  Was that an issue for anybody?

8  A.  No.

9  Q.  Did your -- did your fellow employees just treat you like

10 everybody else?

11 A.  To an extent.

12 Q.  You were told the company policies, were you?

13 A.  Yes.

14 Q.  What did you understand in terms of what you could do or

15 couldn't do as a male employee as opposed to a female

16 employee?

17 A.  There was no difference.

18 Q.  Is that something that was emphasized to you by the

19 management?

20 A.  No.

21 Q.  Was that something that was discouraged by the management?

22 A.  No.

23 Q.  Did anyone that you worked with ever suggest to you that

24 being a male there, despite policy, might become an issue at

25 some point?

1   A.   Become an issue, no, but they said it would be difficult.

2   Q.   Do you remember who told you things like that?

3   A.   I remember Tyria did.  I remember there was a teacher

4   there before, but she had gotten -- I think she either quit or

5   was fired, I cannot recall.  But she told me, as well.  And,

6   basically, they would just tell me, you know, that being a

7   male, of course, you're going to be looked at differently.

8   You're going to be looked at harder than you would if you were

9   a female teacher.

10  Q.   Were you aware of that as you went through -- as you

11  continued to work there?

12  A.   Yes.

13  Q.   What about the parents?  Do you think all the parents

14  accepted you being there as an employee?

15  A.   No.

16  Q.   Did you ever have any specific complaints made by parents

17  about anything that you did prior to the accusations that were

18  made in this case?

19  A.   No.

20  Q.   We've heard about the policy about cell phones.  Were you

21  made aware of that policy when you worked there?

22  A.   Yes.

23  Q.   Was that a policy that they tried to enforce?

24  A.   Enforce, yes.  Like, they didn't want you to have your

25  phone on you, but they would -- they wouldn't make you turn it

1  in somewhere in the beginning, or anything like that.  They

2  pretty much just took your word for it.

3  Q.  Were you the only one that would have your cell phone at

4  work?

5  A.  No.

6  Q.  Did you ever see Tyria Graham with her cell phone?

7  A.  On many occasions.

8  Q.  Was it pretty common that teachers would have their phones

9  with them during the day?

10 A.  Yes.

11 Q.  But was it something that you would still want to hide or

12 could you just be blatant about it and say, "I don't care, I

13 got my cell phone"?

14 A.  You would hide it in front of the management, because if

15 they saw you, you would, of course, get in trouble for it.

16 Q.  Between the nonmanagement employees?

17 A.  It was pretty much normal, if you ever had your phone out,

18 between employees.

19 Q.  What was your understanding of the procedure for what

20 would happen, what you should do if a child is injured?

21 A.  You would fill out something called an accident report.

22 Q.  Did you ever fill those out?

23 A.  Yes.

24 Q.  And just so I remember, how long did you work there?

25 A.  I worked there for a year and maybe a month.

1  Q.  We heard mention of a counsel, as they referred to it,

2  that you had after working there for a while about picking up

3  children.  Do you remember that?

4  A.  Yes.

5  Q.  How did that -- how did that issue come about?

6  A.  It was a surprise to me, because Heidi said, "Well, I

7  would like to talk to you in my office."  And I said, "Okay."

8  So I went in there, and she closed the door.  And then, of

9  course, there was another educator in there at the time.  And

10 the educator, I think, was Kim, who was like the educational

11 coordinator.

12        And she didn't really tell me like she seen me do

13 anything wrong.  She just said, "Well, I saw, you know, you

14 picking up the children.  And I just want to let you know that

15 we've had incidents before where on the playground a child had

16 been dropped and broke their arm."  And she said, "And I want

17 to tell you, if they're old enough to walk, that they are old

18 enough for you not to pick them up."

19 Q.  Were you okay with that?

20 A.  At first I was not.

21 Q.  Why not?

22 A.  Because I felt like there was a deeper reason than that,

23 and I thought it was because I was being discriminated

24 against.

25 Q.  What do you mean by that?

1   A.  Well, all the other teachers would pick up the children

2   all day long, even the ones that were walking, even the older

3   ones in the kindergarten room, including Heidi, who was the

4   director -- assistant director.  Excuse me.  And I would see

5   this happening all day long, and no one would ever get

6   notified about it or get counseled about it, but then I get

7   counseled about it because I was a man, is what I felt.

8   Q.  And was part of the talk -- she said you had done nothing

9   wrong, but was part of it the perception that she was worried

10  about that the parents, because you were a man, might not like

11  to see you holding a kid?

12  A.  She did say that.

13  Q.  Was that something that, throughout your job, you were

14  aware of, that there were perceptions about you, and maybe you

15  had to act more carefully than the women?

16  A.  Yes.

17  Q.  Did you try to do that?

18  A.  Yes, but I also was myself.  I was -- you know, I wasn't

19  going to stop being playful with the children.  I wasn't going

20  to stop being, you know, energetic just because I wanted to be

21  cautious.

22  Q.  Did you interact well with the children, do you think?

23  A.  Yes.

24  Q.  Did all the children like you?

25          MS. KOROBOV:  Objection, Your Honor.  It calls for

1  speculation on the part of the witness.

2          THE COURT:  Sustained.

3  BY MR. THOMAS:

4  Q.  Did any of the children ever complain about you or -- to

5  your knowledge?

6  A.  No.

7  Q.  There is another issue that was discussed by Heidi

8  regarding Cathie.  Who was Cathie?

9  A.  Cathie was my head educator at the time.

10 Q.  And when you started, did you start out working with

11 Cathie?

12 A.  No.

13 Q.  What did you start out doing?

14 A.  I was what they called a floater.

15 Q.  What's that?

16 A.  A floater is the position you get, in other words, to --

17 you bounce around classrooms, you make sure ratio is kept.

18 You give people bathroom breaks, lunch breaks.  In other

19 words, you are pretty much just the helping hand around the

20 building.

21 Q.  How long were you a floater after you started?

22 A.  Until a couple months before the termination -- my

23 termination.

24 Q.  And how is it that that changed?

25 A.  There was an opening in another room.  Another teacher had

1  turned her two-week notice in and moved on from her position.

2  Q.  And what room was that in?

3  A.  The early preschool-1 room.

4  Q.  Did you specifically ask to be in the early preschool

5  class or is that where the opening was?

6  A.  That was where the opening was.

7  Q.  Was that a promotion?

8  A.  Yes.

9  Q.  I don't think I asked, but how many hours a week were you

10  working, normally?

11  A.  40 hours a week.

12  Q.  And who was the main educator in the early preschool

13  class?

14  A.  Cathie Williamson.

15  Q.  Now, so going back to her, there was mention of another

16  issue or conversation that she had had with Heidi regarding

17  you.  Did Heidi make you aware of that?

18  A.  No.

19  Q.  Did Cathie make you aware of it?

20  A.  Yes.

21  Q.  And how did she do that?

22  A.  Well, we would talk in the room all the time, and she just

23  told me, she was like, "Well, it's -- what I'm about to tell

24  you is pretty much for your protection.  I don't want you to

25  get upset about it."  And she told me that it's a bad look to

1  be around the female children all day instead of the whole

2  group of children, which I didn't understand at the time,

3  because I was really around all of them all day, pretty much.

4  Q.  Did you get in any trouble for that?

5  A.  No.

6  Q.  Did anybody ever talk to you about that?

7  A.  No.

8  Q.  Just kind of between you and her?

9  A.  Yes.

10 Q.  What was the policy regarding, as you understood it,

11 regarding injuries to the genitals or pain in the private

12 area, however we want to put it?  Were you specifically told

13 how to deal with a situation like that in your job?

14 A.  No.

15 Q.  What did you understand the policy to be?

16 A.  Just inform the nurse.

17 Q.  Did -- was it made clear to you that you weren't supposed

18 to examine an injury like that?

19 A.  Yes.

20 Q.  Were there ever situations where you were told to provide

21 first aid?

22 A.  Yes.

23 Q.  What were those?

24 A.  Well, if a child was running around and they fell and

25 scraped their elbow, and it was just a little scrape or

1   something like that, you would clean the area off first and

2   then you would put a Band-Aid on.  And then you would fill out

3   what they call an accident report.

4   Q.  Were you told to fill out an accident report for every

5   complaint of every child?

6   A.  No.

7   Q.  What kind of things did they tell you not to report?

8   A.  You know, if the child complains about a stomach pain,

9   just, you know, maybe a little bit after eating, or if they,

10  you know, "My head hurts," or, you know, sometimes they just

11  say, "My finger hurts."  You know, it's -- and, really,

12  sometimes it's nothing, other than they just, you know,

13  want -- just want to say something hurts.

14  Q.  And specifically about a -- were there specific rules

15  about complaints about injuries to the genitals?

16  A.  Not that I was aware of.

17  Q.  Were there rules about taking pictures?

18  A.  Yes.

19  Q.  And what did you understand those rules to be?

20  A.  On a personal device or on the devices they --

21  Q.  Well, both.

22  A.  Well, they provided some -- some cameras.  And what they

23  had were iPads at the center, as well.  And you were able to

24  take pictures and send them to the family via what they called

25  Baby Connect.  And the Baby Connect would allow you to even

1  receive instant messages, and you could post photos.  They

2  could -- you could write what they ate, what they -- when the

3  last time they went to the restroom.  And that was really in

4  the smaller classrooms.  But you could still use the iPads

5  for pictures, and they would take pictures on those.

6            And there were also cameras, digital cameras, that

7  you could get from the office.  And they would use those for

8  making -- at least with the new Bright Horizons, they made you

9  make bulletin boards outside.  And you would take pictures and

10 then put a label under it, like, "This is so-and-so doing

11 this."

12 Q.  I'll ask you about August 21st of 2014.  Did you go to

13 work that day?

14 A.  Yes.

15 Q.  Anything unusual about that day going in?

16 A.  Nothing at all.

17 Q.  What class were you working in?

18 A.  The early preschool-1 room.

19 Q.  That's your regular class?

20 A.  Yes.

21 Q.  Even when you were assigned to one class, did you still

22 move around and help people at times?

23 A.  Yes.

24 Q.  Is that something that you did or is that kind of

25 something everybody did?

1  A.  It was a little bit of both.  They would really rely on me

2  a lot because I was already a floater before, so I was kind of

3  already used to being in all the classrooms.

4  Q.  And how would they -- how would you help those folks?

5  A.  Well, if they needed to go to the restroom or if they were

6  out of ratio, or even if they just needed a hand with

7  something in the room, I would go in there, and any way I

8  could provide assistance, I would.

9  Q.  On that August 21st, did you help anybody out that way?

10  A.  I relieved Ms. Tyria for her lunch break.

11  Q.  Tell me about that.  Is that something that was scheduled

12  ahead of time or did she just come and ask you, or was that

13  your regular -- were you regularly assigned to do that?  How

14  does that come about?

15  A.  I usually give Ms. Emily her lunch break, but Ms. Emily

16  had not been in that day, or the previous day.

17  Q.  So would it -- when Ms. Emily was there, how long had you

18  been giving her her break?

19  A.  I don't recall the exact number of --

20  Q.  Was it a couple days or a month or --

21  A.  It was going on for a couple of weeks.

22  Q.  Is that something that was worked out between you guys or

23  is that something that was told to you by management?

24  A.  That was told to me by management.

25  Q.  On this day when you went to work, were you expecting to

1  help Tyria?

2  A.  Yes.

3  Q.  And that's something you had done many times before?

4  A.  Yes.

5  Q.  In that -- what class was she in that day?

6  A.  She was in the kindergarten room.

7  Q.  And that was regularly whose class?

8  A.  Ms. Emily's.

9  Q.  Were you familiar with the kids in the class?

10  A.  Yes.

11  Q.  Do you remember about what time you went to her class?

12  A.  I believe I went around -- it was lunchtime, for sure.  I

13  think it was 12:30.

14  Q.  What happens in your classroom when you leave to go give

15  someone a break?  Who's in your classroom?

16  A.  It was Cathie.  But the daycare had this rule that if the

17  children were asleep, as long as the ones that were awake

18  didn't put you out of ratio, you were okay.  So if you had a

19  roomful of ten children and your ratio was one to five, and

20  five was asleep, they said you were okay to be in there alone.

21  Q.  You didn't have anything to do with that policy, right?

22  A.  No.

23  Q.  If you remember on that particular day, what do you

24  remember about going to Ms. Emily's class that day?

25  A.  It was just another normal day.

1  Q.  And tell me what you did when you got there.

2  A.  Well, when I first got in the room, I noticed they were

3  still awake, and --

4  Q.  Who is "they"?

5  A.  The children.  And I believe one of the -- or one of them

6  said, "Mr. Ali," and then all of them started, you know,

7  repeating pretty much like, you know, acknowledging I came

8  into the room.  And I go and I look for the clipboard so I

9  could sign in and so Ms. Tyria could sign out and go on her

10  lunch break.

11  Q.  Was that normal, that they would be awake when you got

12  there, or is it -- is that nap time?  Were you expecting that?

13  A.  It was nap time, but kindergarten does not always take

14  naps.

15  Q.  Did Tyria leave immediately or did she hang around?

16  A.  She left pretty quick.

17  Q.  Okay.  How long were you expecting to stay in that room?

18  A.  For as long as she was on her lunch break.

19  Q.  How long was that, usually?

20  A.  One hour.

21  Q.  And what do you remember doing after you got the

22  clipboard?

23  A.  Well, I signed in; saw who was in the room, of course;

24  made sure, you know, everything was okay; and then I go and

25  take a seat.

1  Q.  Where did you sit, if you remember?

2  A.  On the carpet.

3  Q.  Why did you sit on the carpet?

4  A.  Pretty much because that was what most of the educators

5  usually did.  They would interact with the children.  Plus,

6  that was where Ms. Tyria just was.

7  Q.  And which children were in the area around the carpet, if

8  you remember?

9  A.  E.C. and M.R.

10  Q.  Were they still awake?

11  A.  Yes.

12  Q.  What did you do after you sat down?

13  A.  Well, I sat down and I started joking around with them.  I

14  would pretend to steal their pillows and act like I was going

15  to sleep on them.  And they would go, "Hey, that's my pillow."

16  And, you know, once you did it with one of them, the other one

17  wanted you to do it.  And when I first did it, I did it with

18  E.C., and then M.R. said, "Well, don't take mine, Mr. Ali."

19  And then I would do it.  And then S.LNU would be across and

20  she would be like, "Don't take mine."  And I would -- you

21  know, I would just interact with the children and --

22  Q.  How long did that go on?

23  A.  Five minutes, ten minutes.

24  Q.  You mentioned E.C. and M.R. and S.LNU?

25  A.  Yes.

1  Q.  What were the other seven children doing?

2  A.  They were watching and giggling and laughing.  I believe

3  maybe one of them might have been asleep, if I recall.

4  Q.  What do you remember happening next?

5  A.  I remember when -- right after S.LNU said, "Well, don't

6  take mine, Mr. Ali," that's when M.R. gets up and sits in my

7  lap, like she didn't want me to get up over there.

8          MS. KOROBOV:  I'm sorry.  What was the last part of

9  that answer?  I didn't hear it.

10         THE COURT:  Can you repeat your answer?

11         THE WITNESS:  After S.LNU told me not to -- or not

12  to take hers, in other words, M.R. got up and sat on my lap,

13  almost like not wanting me to get up.

14  BY MR. THOMAS:

15  Q.  Were there any kind of rules about the kids sitting on

16  your lap?

17  A.  Not that I was aware of.

18  Q.  Is that something that commonly happened with boys and

19  girls?

20  A.  Yes.

21  Q.  Did anybody ever counsel you or write you up or say, "Kids

22  can't sit on your lap"?

23  A.  No.

24  Q.  Did you commonly, as you've described, interact with the

25  kids on the floor with them?

1   A.  Every day.

2   Q.  Did you ever have any issues about that --

3   A.  No.

4   Q.  -- before that day?

5   A.  No.

6   Q.  Okay.  What happened next?

7   A.  Well, then I started telling M.R., "M.R., you need to get

8   on your mat.  It's nap time, it's time to go to sleep."

9   Q.  And how did she respond to that?

10  A.  She kind of just looked at me and, like disapproval,

11  didn't want to get up; kind of like, you know, defiant, as

12  well, like, "I'm not getting up."

13  Q.  And what do you remember happening after that?

14  A.  That's when I went to pick her up like she was a baby,

15  like cradle her.  And that's when she -- that's when she

16  wrapped her legs around my arm.

17  Q.  Okay.  And show me with your arms, if you could, show the

18  jury with your arms, how your arms were positioned.

19  A.  Well, she was in my lap, and then I went like this to

20  almost scoop her up.  So her head would be over here and then

21  her legs would be on that side.

22  Q.  And was your hand -- was your arm under her legs at that

23  point?

24  A.  Yes -- or, yes.

25  Q.  And then what happened?

1   A.  That's when she -- she threw her leg around my arm.  So,

2   in other words, I couldn't place her down.

3   Q.  What did you think at that point in terms of what was

4   going on?

5   A.  It was obviously something different.  She's never done

6   that.  And I -- it was surprising at the time.

7   Q.  Did you feel that she was being playful?

8   A.  Yes.

9   Q.  And how did you -- how did you respond to that?

10  A.  Well, I told her, you know, "You need to let go," and,

11  "No, thank you."  But she kept laughing and giggling about the

12  situation.

13  Q.  You said, "No, thank you"?

14  A.  Yes.

15  Q.  What's that about?

16  A.  "No, thank you," was a term we generally used with the

17  children.  We didn't tell them, "No, don't."  You know, like

18  we would tell them, "No.  No, thank you."  Because when you

19  enforce the, "Thank you," it also teaches them to be

20  respectful, to also -- we teach them a lot of etiquette.  And

21  we would tell them, "Please," and "Thank you."  And if you

22  don't want something, you would say, "No, thank you."  There

23  was a lot of positive reinforcement.  You didn't use a lot of

24  negative reinforcement.

25  Q.  Were you told, as part of your job, that when you say,

1  "No," to a child, you should say, "No, thank you"?

2  A.  Yes.

3  Q.  Is that something you were used to saying?

4  A.  Before I started working there, no.

5  Q.  How about after you started working there?

6  A.  Yes.  You get in a routine of it.

7  Q.  So she's -- was she moving around at that point when you

8  said she had wrapped her leg over?

9  A.  She was.  She was squirming around a lot.

10  Q.  Okay.  What happened then?

11  A.  Then I go to pull my arm out.  And it was -- I put her

12  down at first, and then I would go to pull my arm out.  And

13  she says, "Ouch."

14  Q.  Okay.  What happened then?

15  A.  I said, "Are you okay?"  And she said, "You hurt me."

16  Q.  Did she say where?

17  A.  I asked, "How did I hurt you?"  She said, "You hurt me

18  down there."

19  Q.  What's your reaction when she said, "Ouch"?

20  A.  When she said, "Ouch"?

21  Q.  Yeah.

22  A.  At first I thought, you know, maybe she just got pinched

23  or something.  But when she said I hurt her, my reaction

24  almost was like, you know, I didn't really mean to.  And I

25  even told her, "I'm sorry.  I didn't mean to."

1  Q.  Where was she in relation to your arm when she said,
2  "Ouch"?
3  A.  She was on her mat, on my right side.
4  Q.  Okay.  And how were you touching her when she said,
5  "Ouch"?  What kind of contact were you having with her when
6  she said, "Ouch"?
7  A.  I had just removed my arm from her grip.
8  Q.  Was she wearing clothing at that time?
9  A.  Yes.
10  Q.  What kind of clothes were you wearing?
11  A.  The dress code.  I think it was a weekday, so I was pretty
12  sure I was wearing the blue collar button-up shirt.
13  Q.  Long sleeve or short sleeve?
14  A.  Short sleeve.
15  Q.  And the G-Shock watch that is in evidence, were you
16  wearing that?
17  A.  Yes.
18  Q.  Once she said, "You hurt me," what were you thinking then?
19  A.  I was thinking, you know, how did I hurt her?  You know,
20  what did I actually do?  I mean, what kind of injury happened?
21  Q.  And what happened then?
22  A.  After she said that, I asked her if she was okay.  She
23  said, "I'm okay."  And then she said, "It hurts when I pee."
24  Q.  All right.  Is that the first time you had heard her say
25  that?

1   A.  Yes.

2   Q.  And how did you react to that?

3   A.  I reacted like -- honestly, I didn't really react to her

4   saying it hurts to pee, because I was still worried about if

5   she was injured or not.

6   Q.  What happened then?

7   A.  Then I tell them to lay down, all of them, all the

8   children.  I tell them it's time for a nap.

9   Q.  Is -- if you remember, was E.C. still right there beside

10  you?

11  A.  Yes.

12  Q.  Was he awake during that time?

13  A.  When everything was happening --

14  Q.  Everything that you described up to this point, was he

15  awake?

16  A.  Yes.

17  Q.  Were other children awake?

18  A.  Yes.

19  Q.  Did -- well, tell me what happened.  What happened next?

20  A.  Well, I waited a couple of minutes.  I told -- I had to

21  tell some of the children to, you know, face different

22  directions, because they were still playing around, pretty

23  much, like S.LNU and G.D. and E.C. and M.R.  Like, whoever was

24  close to each other, they would just keep playing around.

25          So I would tell them, you know -- and that's

1  something all the educators would do, is tell them, you know,

2  "You face that way so you don't, you know, have to interact

3  with them so you can go to sleep."

4  Q.  Did everyone eventually lay down?

5  A.  They were already on their mats, and they all did

6  eventually lay down.

7  Q.  Did you have any more interaction with M.R.?

8  A.  Yes.

9  Q.  What happened next?

10 A.  After I -- I walked around, checked on all the kids.  I

11 sat down again between E.C. and M.R. and I checked to see if

12 she was hurt.

13 Q.  Had she told you again when you sat down, had she said

14 anything else about that you hurt her?

15 A.  Not immediately.

16 Q.  When did she say that again?

17 A.  After she squirmed around, and it was like halfway, I

18 guess, asleep, groggy, I don't know what you want to call it.

19 Q.  Tell me -- actually, let's go back.  You said you checked

20 her.  Tell me what you were doing.

21 A.  Well, I had lifted up the jeans to see if there was any

22 marks maybe that -- from what I did.

23 Q.  Why in the world did you do that?

24 A.  At the time, I wasn't thinking.  I was just acting on

25 impulse, really.  I didn't even think about it.

1  Q.  Were you scared?

2  A.  Yes.

3  Q.  Why?

4  A.  Because I thought I hurt the child.

5  Q.  And did you have your phone with you?

6  A.  Yes.

7  Q.  Why?

8  A.  I carried my phone with me all day.

9  Q.  Why did you have your phone?

10  A.  In that situation?

11  Q.  Just carrying your phone all day, what were you doing with

12  it?

13  A.  I just always kept my phone next to me in case an

14  emergency, someone called me, texted me.  Really, I just -- I

15  never really left my phone anywhere.  It was always on me.

16  Q.  As long as it stayed hidden, is that okay?

17  A.  Yes.

18  Q.  How was M.R. laying -- well, let me make sure I'm clear.

19  Was she asleep when you went back and sat down?

20  A.  I believed she was.

21  Q.  What did you do with your phone?

22  A.  I couldn't really see at the time the -- if there were any

23  injuries.

24  Q.  Was it light or dark in the room?

25  A.  It was dark because it was nap time.  We dimmed the

1  lights.  So I took my phone out and turned the camera's flash

2  on.  You could keep it on.

3  Q.  And what did you do then?

4  A.  And then I took some pictures to see if I could see any

5  injuries.

6  Q.  Did you see any injuries?

7  A.  No.

8  Q.  How many pictures did you take, if you remember?

9  A.  Four pictures.

10  Q.  Did you take them all one right after the other or --

11  A.  No.

12  Q.  How did that happen?

13  A.  Two were back to back, almost.  And then she squirmed

14  around and she said that she was -- her eyes were still

15  closed, and she said, "You hurt me, Mr. Ali."  And it shocked

16  me for a second, and I couldn't -- I looked at the pictures

17  and couldn't really notice anything.  So I wanted to make sure

18  again, and I took some more.

19  Q.  How soon -- well, after that happened, what did M.R. do?

20  A.  She fell asleep.

21  Q.  What did you do?

22  A.  It was about ten minutes before it was time for Ms. Tyria

23  to get back, so I got up, started making my rounds around the

24  room, you know, because some of the children did have

25  breathing issues.  So you want to make sure all the children

1  were okay at all times.

2  Q.  Were you still thinking about what had happened with M.R.?

3  A.  Yes.

4  Q.  What were you thinking?

5  A.  I was thinking, you know, I might have hurt her for real.

6  And then I started thinking -- you know, I said -- I did want

7  to report it, but then I realized, you know -- or I didn't

8  realize.  I felt like I would have been blamed for it and

9  gotten in trouble for it.  And that's when I pulled my phone

10  out, deleted the pictures, and I didn't mention it.

11  Q.  Were you supposed to look at her injuries?  Is that part

12  of your job?

13  A.  No.

14  Q.  Were you scared when you did that?

15  A.  I was beyond scared.

16  Q.  Why were you beyond scared?

17  A.  I mean, it was never my intention to hurt the child.  It

18  was never -- I'd never do that.  You know, of being there the

19  whole time, I never had a complaint of one similar to hers.

20  Q.  What was your intention when you took those photographs?

21  A.  First it was just to turn the light on to see if I could

22  see, but I thought maybe if I took the pictures and turned the

23  brightness on my phone up all the way, I could see a little

24  better, you know.  But even then I didn't see anything.

25  Q.  Were you trying to take pictures in a sexual way with M.R?

1  A.  No.

2  Q.  Do you realize at some point that you had done something

3  stupid?

4        MS. KOROBOV:  I'm going to object.  The question is

5  leading.

6        THE COURT:  Sustained.

7  BY MR. THOMAS:

8  Q.  Did you start thinking about what had happened after it

9  happened?

10 A.  Yes.

11 Q.  How were you feeling then?

12 A.  I felt bad about the entire situation from start to

13 finish, from her saying she got hurt, from me looking, from me

14 taking pictures, from me not even saying anything about it.

15 Q.  What's the next thing that you remember happening?

16 A.  Well, I remember Ms. Tyria came back in the room.  I

17 signed out and I proceeded out of the room.

18 Q.  When you went to take the pictures, how was M.R. laying?

19 A.  On her back.

20 Q.  Did she move at all when you went over to her?

21 A.  Yes.

22 Q.  Do you know if she was aware of what you were doing?

23 A.  To my knowledge, no.  I thought she was asleep.

24 Q.  Did you remove her clothing in any way?

25 A.  No.

1  Q.  Could you have done that?

2        MS. KOROBOV:  Your Honor, I'm going to object.  I'm

3  not exactly sure what he means by that.  I would ask him to

4  clarify what "Could" means.

5        THE COURT:  Would you rephrase the question?

6  BY MR. THOMAS:

7  Q.  Were you in a -- were you in a position to do that if you

8  had wanted to?

9  A.  Yes.

10 Q.  Did you want to do anything like that?

11 A.  No.

12 Q.  How soon after that did Tyria arrive?

13 A.  I would say anywhere -- it was maybe 10, 15 minutes.

14 Q.  What did you do after you left?

15 A.  I went to the restroom.  And then I believe I clocked out

16 for my lunch break.

17 Q.  What's going through your mind at that point?

18 A.  I was really trying to wrap my head around the whole

19 situation at first.  And then I decided, you know, maybe it

20 was nothing, you know.  Maybe she just -- it was just a little

21 injury.

22 Q.  Did you ever put your hand inside of her vagina?

23 A.  No.

24 Q.  Did you ever touch her underwear in any way, other than

25 the way you lifted them up when you tried to take pictures?

1  A.  I only touched the underwear lifting up the pictures -- or

2  lifting them up for the pictures.

3  Q.  Once the pictures were erased, you were still in the room?

4  A.  Yes.

5  Q.  Did you have access to them anymore?

6  A.  They were gone.

7  Q.  Did you try to save them in some way?

8  A.  No.

9  Q.  Did you try to send them to anyone?

10  A.  No.

11  Q.  Did you tell anyone you had them?

12  A.  No.

13  Q.  After you got back from lunch -- you did come back from

14  lunch, right?

15  A.  Yes.

16  Q.  This is after all this had happened?

17  A.  Yes.

18  Q.  What do you remember then?

19  A.  I remember clocking back in and giving Ms. Tyria the pop

20  she asked me to get her.  And then I went to my room -- or my

21  room being the EPS1 room.

22  Q.  Did Tyria say anything to you when you gave her the pop?

23  A.  She just said, "Thank you."

24  Q.  And what do you remember happening after that?

25  A.  I went to my room.  And I -- as soon as I got in there, I

1  believe Ms. Cathie told me L.LNU had wet himself.

2  Q.  That was one of the children in your class?

3  A.  Yes.

4  Q.  And so what did you do then?

5  A.  I left the room to go get an extra pair of clothing,

6  because all his clothing was either dirty or he didn't have

7  any more.

8  Q.  What happened then?

9  A.  Then that's when I walked past the front desk and

10  Ms. Chiana said, "Ms. Tyria wants to talk to you."

11  Q.  And did you know why?

12  A.  No.

13  Q.  Did you go talk to her?

14  A.  Yes.

15  Q.  What happened then?

16  A.  I went in the room and she told me, "Listen to what M.R.

17  has to say."

18  Q.  And what did M.R. say?

19  A.  She said that I put a finger in her.

20  Q.  What was your reaction to that?

21  A.  Even more terrified than the beginning.

22  Q.  Do you remember how you reacted?

23  A.  I was -- I was in shock.  I believe at the time, I almost

24  felt like -- I felt like I was going to have a panic attack.

25  It was scary, it was surreal. And I told M.R., you know, "Come

1  over here."  I was crouching down.  And I told her, you know,

2  "Come over here."  And I told her, you know, "You shouldn't

3  lie.  No, thank you."  And I did say, "No, thank you."

4           And she was almost in my lap.  She was still

5  standing, but I wasn't sitting.  I was crouching.  So she --

6  then Ms. Tyria asked her again to say what really happened,

7  and she asked her if it was just a dream.  And she said, "No."

8  And she puts her head down and she -- she was pretty upset.

9  Q.  Did you tell Tyria what had happened?

10  A.  I told her, "I believe it might have been from my watch."

11  Q.  Did you tell her about the rest of it?

12  A.  No.

13  Q.  Why not?

14  A.  I was scared to get in trouble about it.

15  Q.  What did you think would happen if you told them that you

16  had looked at M.R. and taken her picture?

17  A.  Obviously, I would have been instantly fired.  But at that

18  point, that was the least of my worries.

19  Q.  Because you had just been accused of child molesting,

20  right?

21  A.  Yes.

22  Q.  Once you were -- once that happened, did you leave the

23  room?

24  A.  Yes.

25  Q.  And where did you go then?

1  A.  I went back to the EPS1 room.

2  Q.  How long did you stay there?

3  A.  A few more hours.

4  Q.  What do you remember happening then?

5  A.  I remember -- I remember walking the children to the -- to

6  the -- to the library.  And they were using something called

7  the jelly bean, where they hold it and it kind of helps guide

8  them in a straight line.  And the front receptionist, Ms. Flo,

9  told me that she was going to switch with me so I could have a

10  conversation with Heidi.

11  Q.  Did you end up talking to Heidi about what had happened?

12  A.  Yes.

13  Q.  Did you tell Heidi about everything that happened?

14  A.  Not everything.  I didn't mention her saying she was ever

15  in pain, me looking, taking the pictures, but everything else

16  I did tell her about.

17  Q.  Were you free to go at that point and you could leave?

18  A.  At that point I was put on administrative leave, and Heidi

19  did escort me out of the building.

20  Q.  Now, at that point were you under arrest or anything like

21  that?

22  A.  No.

23  Q.  Could you have gone anywhere you wanted?

24  A.  Yes.

25  Q.  Did you still have your phone?

1  A.  Yes.

2  Q.  And where did you go?

3  A.  I went home.

4  Q.  We saw that, from the exhibits, that the next day you got

5  a text message -- text messages from work, right?

6  A.  Yes.

7  Q.  Who were they from?

8  A.  My coworkers.

9  Q.  Do you remember what their names were?

10 A.  Cathie and Karen.

11 Q.  And at that point had you had any contact with the police?

12 A.  No.

13 Q.  They told you in the messages the police were there,

14 right?

15 A.  Yes, they did.

16 Q.  What were you thinking then?

17 A.  Well, I thought back to what Heidi had told me.  She told

18 me not to say anything about the situation.  So when they said

19 there's police over there, I acted completely dumb to the

20 fact, because earlier on in the day they were texting me while

21 they were working, telling me, "Where are you," you know, "Why

22 aren't you at work?"  You know.  And I just told them -- I

23 believe I said I wasn't feeling well.  And I was doing as I

24 was told, not to say anything about what had happened that

25 night.

1  Q.  Eventually that afternoon of the next day, you're still at

2  home, the police showed up?

3  A.  Yes.

4  Q.  And where did you -- what did you do?

5  A.  Well, I answered the door.  I remember my mom asking who

6  was at the door.  I said, "I don't know."  I opened the door

7  and I see an officer at the door.  And I remember my mom

8  almost freaking out instantly.  And my mom, she tells me, she

9  said -- she said, "What happened?  What happened?"

10          I remember I didn't even tell my parents about

11  anything that happened.  I told her, "There was an incident

12  and they just want to ask me some questions."  And my mom

13  said, "Were you the one who caused the incident?  Is that what

14  happened?"  And I told my mom, "No."

15  Q.  We saw that you ended up coming to a police station,

16  right?

17  A.  Yes.

18  Q.  And Detective McAllister interviewed you?

19  A.  Yes.

20  Q.  You didn't tell him about what had happened, did you?

21  A.  No.  I did tell him about what happened, but I didn't tell

22  him the full truth about everything that had happened.  I told

23  him mainly what happened.

24  Q.  You left out some pretty important parts?

25  A.  Yes.

1  Q.  You lied to him?

2  A.  Yes.

3  Q.  Why did you do that?

4  A.  I was -- I was scared.  And I thought if I would have told

5  them, that I would have, you know, been arrested.  And I

6  remember I was so naive at that point, that I thought I would

7  be going straight to prison, not even jail.

8  Q.  At that point, you still had your phone?

9  A.  Yes.

10 Q.  Did you try to throw it away or destroy it or anything

11 like that?

12 A.  No.

13 Q.  Were you even thinking about the pictures at that point?

14 A.  No.

15 Q.  Why not?

16 A.  From my experience with pictures, if you deleted them,

17 they're gone.

18 Q.  Did you ever, ever have any intention of keeping those

19 pictures?

20 A.  No.

21 Q.  Did you ever think those pictures were porn?

22 A.  No.

23 Q.  Did you think it was a smart thing to do or a stupid thing

24 to do after the fact?

25 A.  It was the dumbest thing I could have probably ever done.

1  I remember the whole time I was in jail, I just kept thinking

2  about it, like what even made me do it, you know?  And it was

3  just acting on impulse.  I was -- she said I hurt her, and I

4  was scared.

5  Q.  When you spoke to Detective McAllister, did you think you

6  would be able to explain what happened in a way that he would

7  understand?

8  A.  No, except the way I stated in that statement.  If -- I

9  felt like if I would have told him the truth, that I couldn't

10  justify looking or I couldn't justify the pictures.  But even

11  then, the pictures were already gone, so I couldn't even tell

12  him, "Well, I took pictures, too."  So I felt like I couldn't

13  justify anything.

14  Q.  Did you ever want to hurt M.R.?

15  A.  Never.

16  Q.  Any child?

17  A.  Never.

18          MR. THOMAS:  That's all the questions I have.  Thank

19  you.

20          THE COURT:  Okay.  Let's take five minutes.

21  Unfortunately, they turned off the air or whatever at 5:00, so

22  it's very warm in here.  So get some water and we'll take a

23  five-minute break and then we'll resume.

24          THE COURTROOM DEPUTY:  All rise.

25          (Jury out at 5:40.)

1    THE COURT:  Okay, five minutes.

2         (Recess at 5:41, until 5:51.)

3    THE COURT:  Are you ready for the jury, Ms. Korobov?

4    MS. KOROBOV:  Yes, Your Honor.

5    THE COURT:  Are you ready, Mr. Thomas?

6    MR. THOMAS:  Yes, Your Honor.

7    THE COURT:  You may bring in the panel.

8         (Jury in at 5:51.)

9    THE COURT:  We are back on the record.  And,

10   Ms. Korobov, you may cross-examine the witness.

11   MS. KOROBOV:  Thank you.

12                   **CROSS-EXAMINATION**

13   BY MS. KOROBOV:

14   Q.  Mr. Al-Awadi, your last statement to the jury was that you

15   didn't want to hurt M.R. or any child; is that correct?

16   A.  That is correct.

17   Q.  Because you had a very good relationship with M.R. as of

18   October (sic) 21st of 2014; isn't that correct?

19   A.  I had a good relationship with many of the children.

20   Q.  Sir, my question to you was:  You had a good relationship

21   with M.R. as of August 21st, 2014, correct?

22   A.  Yes.

23   Q.  And you had been working with her for about a year, the

24   entire time you were there, right?

25   A.  No.

 1  Q.  You hadn't been with her for a year?

 2  A.  She was in the preschool room, and I started in the pre-K

 3  room.

 4  Q.  Okay.  But you floated between rooms, correct?

 5  A.  Correct.

 6  Q.  So there were times you had interaction with her over that

 7  full year, correct?

 8  A.  When I first floated.  I did not fully start in the

 9  preschool room.  I ended up floating around in there after.

10  They mainly kept me in the pre-K room.

11  Q.  Sir, for the entire time you knew M.R., you had a good

12  relationship with her, didn't you?

13  A.  Yes.

14  Q.  And you shared inside jokes with her, right?

15  A.  Yes.

16  Q.  You called each other "Baby," didn't you?

17  A.  "Little Baby."

18  Q.  "Little Baby," is what you called each other?

19  A.  Yes.

20  Q.  Okay.  And when you walked into the classroom on that day,

21  on August 21st of 2014, you chose to go sit by her and E.C.,

22  correct?

23  A.  Correct.

24  Q.  You liked her family, right?

25  A.  Yes.

1  Q.  In fact, when her dad came to pick her up on the night of

2  August 21st, you waved to him, right?

3  A.  Yes.

4  Q.  Okay.  She had never accused you of anything before

5  August 21st of 2014, correct?

6  A.  Correct.

7  Q.  I also want to talk about your relationship with your

8  coworkers.  You didn't have any reason to fear them, did you?

9  A.  No.

10 Q.  Okay.  They on various occasions told you that they were

11 looking out for you, right?

12 A.  Yes.

13 Q.  Okay.  Sometimes even pulled you aside and said, "Hey I

14 just want to give you some inside information on something,"

15 right?

16 A.  Uh-huh.

17 Q.  Is that yes?

18 A.  Yes.

19 Q.  Okay.  And, in fact, when you had picked up G.F. and there

20 was the conversation about not picking up the kids, you were

21 specifically told, "Hey, I know you didn't mean anything by

22 that," right?

23 A.  Yes.

24 Q.  And Cathie Williamson specifically offered to take the

25 girls to the bathroom so that you wouldn't be put in a bad

 1  position, correct?

 2  A.  Yes.

 3  Q.  And when Heidi was having you fill out your statement, she

 4  specifically said, "Make sure you put everything in it,"

 5  correct?

 6  A.  Yes.

 7  Q.  "Because we don't want anything to come back and bite you

 8  in the butt," right?

 9  A.  Yes.

10  Q.  On the day in question, the day that the police came to

11  the daycare, on the 22nd, your coworkers were telling you

12  what's going on at the daycare, right?

13  A.  Yes.

14  Q.  And you were the diversity champion, correct?

15  A.  Yes.

16  Q.  You said that the employees really relied on you a lot,

17  right?

18  A.  Yes.

19  Q.  And it's your -- previously, when you spoke to Detective

20  McAllister, you told him that after Tyria had let M.R. tell

21  you what it is that you had done to her, that Tyria said,

22  "Hey, I'm going to go and I'm going to clear everything up,"

23  correct?

24  A.  Yes.

25  Q.  So as of that moment, you believed that Tyria is going to

1  go and at least she's willing to speak on your behalf,

2  correct?

3  A.  Correct.

4  Q.  So on that day, August 21st, 2014, you believe you have a

5  lot of friends at that daycare, right?

6  A.  Yes.

7  Q.  Speaking of friends, the two people who called you from

8  the daycare, you described them to the jury as coworkers; is

9  that correct?

10  A.  Yes.

11  Q.  Cathie is a coworker, correct?

12  A.  Yes.

13  Q.  Who is Karen to you?

14  A.  She was -- an ex-girlfriend of mine now.

15  Q.  Now, correct?

16  A.  Yes.

17  Q.  So when you told the jury that Karen was your coworker,

18  she was actually your girlfriend at the time, wasn't she?

19  A.  She was also my coworker.

20  Q.  Okay.  You didn't tell the jury that, did you?

21  A.  No, I did not.

22  Q.  And, in fact, she's listed in your phone under a pet name,

23  isn't she?

24  A.  Yes.

25  Q.  "Habibti" means my love, doesn't it?

1  A.  Yes.

2  Q.  I want to talk about August 21st, that day in particular.

3  You knew that that was a hectic day at the daycare because of

4  short staffing, right?

5  A.  Yes.

6  Q.  And the director was gone on that day, right?

7  A.  Yes.

8  Q.  Two teachers had called off?

9  A.  Yes.

10 Q.  But you knew that you were going to be in the lunch -- or

11 you were going to be covering lunch in the kindergarten room,

12 right?

13 A.  Yes.

14 Q.  In fact, for two weeks, you had been covering that lunch

15 period, correct?

16 A.  Yes.

17 Q.  And you knew that you would be the only teacher in there

18 during the lunch time, right?

19 A.  Yes.

20 Q.  And when you're the teacher in that room over lunch time,

21 you're kind of in control of that room, right?  You have to be

22 with ten kids, right?

23 A.  Yes.

24 Q.  Okay.  So you decide whether the lights are up or the

25 lights are down, correct?

1  A.  You would follow the instructions of the educator before

2  you.

3  Q.  Okay.  You make that decision about whether the lights are

4  going to be on or the lights are going to be off, right?

5  A.  Yes.

6  Q.  Okay.  Because when you walked into the room, the lights

7  were on, correct?

8  A.  No.

9  Q.  The lights were off when you walked into the room?

10 A.  I believe they were off.  To my recollection, they were.

11 Q.  Didn't you tell the jury that you dimmed the lights in the

12 room?

13 A.  We dim the lights when it's nap time.

14 Q.  So you didn't tell the jury today that you dimmed the

15 lights on August 21st of 2014?

16 A.  I may have been the one who dimmed them, but I don't think

17 I did that day.  But what I was trying to say is, when we get

18 to the nap time period, that's when the lights are dimmed or

19 turned off.

20 Q.  Okay.  So you know that the room is going to be dark when

21 you go into that room, or able to be darkened, correct?

22 A.  Yes.

23 Q.  And you decide kind of, to some degree, when the kids go

24 to sleep, right?

25 A.  To an extent.

1  Q.  Because if you clown around and you're playing with them,

2  they're not going to go to sleep at that time, right?

3  A.  Unless they're very tired.

4  Q.  Okay.  But if you're making noise and laughing and joking

5  with the kids, they're going to stay up, right?

6  A.  Yes.

7  Q.  So when you say it's time to go to sleep and you shut off

8  the playtime, it's time to go to sleep; is that correct?

9  A.  That is correct.

10 Q.  And you, as a teacher in that room, you provide direction

11 to the kids as to even which direction they should look,

12 correct?

13 A.  That was something the educators would do, yes.

14 Q.  Okay.  And you did that in particular, correct?

15 A.  Yes.

16 Q.  And in particular, you did that on August 21st of 2014,

17 right?

18 A.  Yes.

19 Q.  You told E.C. to look away from M.R., correct?

20 A.  Yes, because they were playing around, holding hands, and

21 they wouldn't stop scooting their mats together.  So I told

22 them to stop interacting with each other.

23 Q.  Okay.  So let's talk about that.  You're telling me that

24 this occurs now after there's been this injury and M.R. said

25 you had hurt her, right?

1  A.  Yes.

2  Q.  So after that, where you're so terrified that she's hurt,

3  been hurt by you, she's laughing and playing with E.C., isn't

4  she?

5  A.  Yes.

6  Q.  And they're holding hands, right?

7  A.  Yes.

8  Q.  And there's no complaint of pain, correct?

9  A.  There was an initial complaint of pain.

10  Q.  Not at the time she's holding hands with E.C., is there?

11  A.  No.

12  Q.  Okay.  So at that point, then, you decide that they're

13  going to face away from each other, correct?

14  A.  Yes.

15          MS. KOROBOV:  Can I call up Exhibit 24, please?

16  BY MS. KOROBOV:

17  Q.  Let me ask this:  Before the kids went to sleep is when

18  you say that M.R. wrapped her legs around your arm, correct?

19  A.  Could you repeat that question?

20  Q.  Sure.  Before the kids went to sleep is when you say that

21  M.R. had wrapped her legs around your arm, correct?

22  A.  In my statement, yes.

23  Q.  Well, is that true?

24  A.  Yes.

25  Q.  Okay.  So when that happened, nine out of the ten kids

1  were wide awake during this time, correct?

2  A.  Correct.

3  Q.  And they are all focused on you and what you're doing with

4  M.R. and E.C. and S.LNU, right?

5  A.  Yes.

6  Q.  Every eye, except for the two eyes of the one child who is

7  sleeping, are focused on you and what's going on, correct?

8  A.  Yes.

9  Q.  So they all witnessed, then, this leg around the arm,

10  correct?

11  A.  Yes, but they were laughing at her doing it, thinking it

12  was just a joke.

13  Q.  Okay.  So they're thinking it's a joke, they're laughing.

14  There's no problem at that point, right?

15  A.  No.

16  Q.  And so -- and you say immediately, though, M.R. says, "You

17  hurt me," right?

18  A.  Yes.

19  Q.  And at the time she says that, every one of those kids is

20  awake, correct?

21  A.  Yes, but she doesn't like blurt it out like she's yelling

22  it, but she did tell me I hurt her.

23  Q.  Right.  And at that time, nine out of the ten kids are

24  awake, correct?

25           MR. THOMAS:  I think that's been asked and answered

1  a couple three times.

2          THE COURT:  Overruled.  It's cross-examination.  She

3  may.

4  BY MS. KOROBOV:

5  Q.  Nine out of the ten kids are awake, right?

6  A.  Yes.

7  Q.  So you have nine witnesses that you didn't just assault

8  this child in some way, correct?

9  A.  Yes.

10 Q.  Okay.  In Exhibit Number 24, at the time that you wrote

11 this statement, this is the statement that you wrote out for

12 the daycare, correct?

13 A.  Yes.

14 Q.  It wasn't a statement to law enforcement, right?

15 A.  Yes.

16 Q.  And you didn't like get Mirandized or anything like that

17 before you wrote it, correct?

18 A.  Correct.

19 Q.  And you could write as much as you wanted, right?

20 A.  Yes.

21 Q.  Give as many details about what it is that had happened

22 there?

23 A.  Yes.

24 Q.  Okay.  So could you point out for the jury where it is

25 that you said that M.R. said, "Ouch," when the thing happened

1  with the watch?  Could you just -- you know how this works.

2  Just circle on there where the word "Ouch" is.

3  A.  I did not tell them.  I did not write it down.

4  Q.  You didn't write that in that statement?

5  A.  No, I did not.

6  Q.  Okay.  So you left that out of there.  And did you write

7  anything in there about wanting to physically look at her for

8  injuries?

9  A.  No.

10  Q.  Okay.  And you certainly didn't write anything in there

11  about snapping off the photos of her, did you?

12  A.  No.

13          THE REPORTER:  I'm sorry.  I didn't get that.

14  BY MS. KOROBOV:

15  Q.  You certainly didn't write anything in there about

16  snapping off the photos of her injuries, did you?

17  A.  No.

18  Q.  Now -- and at the time you made the statement, you're

19  making it for people who like you, right?

20  A.  Yes.

21  Q.  People who trust you with children every single day,

22  correct?

23  A.  Yes.

24  Q.  And you told the detective that you gave your full

25  cooperation to the daycare at the time that you went in there,

1  correct?

2  A.  I did.

3  Q.  At the time that you were giving this statement, you were

4  not on any kind of suspension with the daycare, right?

5  A.  No.

6  Q.  Not like you were on strike three and ready to get the old

7  heave-ho, right?

8  A.  No.

9  Q.  Okay.  In fact, you had just been promoted at the daycare,

10  correct?

11  A.  A couple of months, yes.

12  Q.  Okay.  So a new job, they've given you more

13  responsibility, right?

14  A.  Yes.

15  Q.  And you said you've just been named this diversity

16  champion, correct?

17  A.  Yes.

18  Q.  And even though there are some rules of the daycare that

19  you decide not to follow, you're still moving up at the

20  daycare, correct?

21  A.  Correct.

22  Q.  Now, at this point in time there's no police

23  investigation, is there?

24  A.  No.

25  Q.  No one is -- not a -- not Detective McAllister standing

1  outside waiting for Heidi to give up your statement, correct?

2  A.  Correct.

3  Q.  And, in fact, Heidi tells you, "Hey, we're just going

4  to -- we're going to take care of this, we're going to figure

5  out what happened.  We'll put you on leave."  Right?

6  A.  Yes.

7  Q.  Okay.  So at this point, the only thing that you risk

8  having lost is potentially your job by telling them the truth,

9  correct?

10  A.  Correct.

11  Q.  Okay.  And let's talk about the job.

12          MS. KOROBOV:  Could I call up Exhibit Number 23.

13  BY MS. KOROBOV:

14  Q.  This is the application that you submitted when you

15  started at Bright Horizons, right?

16  A.  Yes.

17  Q.  Okay.  And for your education, I'll go down to the bottom

18  there.

19          MS. KOROBOV:  If you could just enlarge that.

20  BY MS. KOROBOV:

21  Q.  With respect to this, you told the people at Bright

22  Horizons Daycare that you had studied computers at Pike High

23  School, correct?

24  A.  Yes.

25  Q.  And then you were at Ivy Tech studying computers, as well,

1  correct?

2  A.  Correct.

3         MS. KOROBOV:  Can we back out, please.

4  BY MS. KOROBOV:

5  Q.  And your previous job experience, you had worked at a

6  phone company, right?

7  A.  Yes.

8  Q.  And you had also worked at a family restaurant, correct?

9  A.  Correct.

10 Q.  Okay.  So prior to this, it's not like you had had a long

11 history of working at daycares, right?

12 A.  No.

13 Q.  This wasn't your life mission, to become an educator, was

14 it?

15 A.  No, it was not.

16 Q.  Okay.  So at worst, you might lose your job if you say to

17 them, "Hey, look, I did something really stupid.  The kid said

18 she was injured, I took some photos.  Really, though, nothing

19 happened."  That's what you risked losing at that point in

20 time, correct?

21 A.  I risked losing that, and I was also scared of being

22 blamed for hurting her.

23 Q.  For actually causing an injury to her?

24 A.  Correct.

25 Q.  Okay.  But, again, no one is accusing you of causing an

1  injury with your watch at that point, are they?

2  A.  No.

3  Q.  All right.  And so if you perhaps lose your job at that

4  point, that's -- that at this point is all you've lost, right?

5  A.  Yes.

6  Q.  August 22nd, 2014, so we're at a new day here, right?  You

7  go home, you go to sleep, don't tell anyone at home about it,

8  do you?

9  A.  No, I do not.

10 Q.  You don't call any friends and say, "Hey, look, I may have

11 done something dumb, give me a little bit of advice"?

12 A.  I didn't tell anybody about it.

13 Q.  Okay.  And there's kind of an emergency number that you

14 can call into the daycare if, say, you're going to be sick or

15 out or something like that, right?

16 A.  There's just the -- you call the front office, the front

17 desk --

18 Q.  Okay.

19 A.  -- which is the general number.

20 Q.  All right.  And, actually, the daycare is open until

21 8:00 at night, right?

22 A.  Yes.

23 Q.  Okay.  So there are employees there that late, correct?

24 A.  Correct.

25 Q.  So during that period up at least until 8:00, you could

1  have picked up the phone and said, "You know what, that thing

2  I wrote out, that Exhibit 24, I need to fill in some more

3  information on that," right?

4  A.  I could have, yes.

5  Q.  You didn't do that?

6  A.  I did not.

7  Q.  The daycare opens what time on August 22nd?

8  A.  6:30 is the usual time they open up.

9  Q.  Okay.  You didn't place any calls to anyone at the daycare

10  about your role in what happened to M.R., did you?

11  A.  I did not.

12  Q.  Okay.  And at 1:30, you start getting text messages

13  saying, "Hey, the cops are here," right?

14  A.  I did.

15  Q.  From your girlfriend and from Cathie, correct?

16  A.  Correct.

17  Q.  Okay.  And at that time, again, you don't pick up the

18  phone and call Heidi and say, I've got more information for

19  you, I'm -- please, send the police my way.  I've got some

20  things to tell them."  You don't do that, do you?

21  A.  No, I do not.

22  Q.  Lieutenant Madison comes to your door to take you down to

23  the police station, right?

24  A.  Yes.

25  Q.  And you don't tell him, "Hey, look, I've got to tell you

1  something that happened.  I've got this phone, I took some

2  pictures on it."  You don't have that conversation with him,

3  do you?

4  A.  I do not.

5  Q.  At the Child Advocacy Center, your time down there -- it

6  looks like a giant warehouse when you pull up to it, right?

7  A.  Pretty much.

8  Q.  Okay.  You can see where you're going when you go there,

9  right?

10  A.  I didn't know where I was going exactly.

11  Q.  Okay.  You're not brought underground, though, and brought

12  into a building like here, right?

13  A.  No.

14  Q.  Okay.  So you know what it is, you know what the

15  environment is, when you're brought in, correct?

16  A.  Correct.

17  Q.  Okay.  And they treated you well, right?

18  A.  Yes.

19  Q.  You weren't even handcuffed on the way down, were you?

20  A.  I was not.

21  Q.  Okay.  You weren't shackled to anything, correct?

22  A.  No.

23  Q.  They didn't do some kind of full body cavity search on

24  you, right?

25  A.  No.

1  Q.  They even let you keep your phone, didn't they?

2  A.  Yes.

3  Q.  And, in fact, the very first thing that happens, really,

4  your first interaction with Detective McAllister, is when you

5  ask him, "Hey, can I use my phone," right?

6  A.  Yes.

7  Q.  And he says, "Hold on, hold on.  I don't want to get in

8  trouble.  I need to take that phone from you."  Right?

9  A.  Yes.

10  Q.  So your very first interaction with Detective McAllister

11  deals with what?

12  A.  We were talking about sports and something at first.  It

13  wasn't directly that.  His phone kept vibrating, and he

14  kept -- he said, "I need to take this."  And I had told him,

15  "Well, is it okay if I check my phone?"

16  Q.  You had a long conversation with Detective McAllister,

17  before you ever got to anything here, about things like

18  soccer, right?

19  A.  Correct.

20  Q.  About your upbringing and how it is you came to be in the

21  country?

22  A.  Correct.

23  Q.  He treated you with the utmost respect, didn't he?

24  A.  Yes.

25  Q.  He told you a number of times, "Mr. Al-Awadi, if this is a

1  mistake, please help me clear it up," correct?

2  A.  I believe so.

3  Q.  All right.  Let's talk about what it is that you told

4  Detective McAllister.  It's a little bit different than what

5  you've told here today, isn't it?

6  A.  Yes.

7  Q.  In fact, your attorney said that you lied to him because

8  you didn't tell him certain things, correct?

9  A.  Correct.

10 Q.  But there's other details that you added in, that never

11 happened, correct?

12 A.  Well, correct.

13 Q.  Okay.  Because you decided that as he started talking to

14 you about physical evidence, that you had to give him an

15 innocent explanation for the physical evidence, right?

16 A.  I was explaining what had happened when -- in the

17 statement, when I even told him about the watch, I was not

18 lying about that.  I had told him about the incident, but I

19 did not tell him she had said that she was hurt.

20 Q.  Okay.  Well, let's talk about this, sir.  You told

21 Detective McAllister on that day that you may have -- that you

22 did, not, "may have," that you did tickle M.R. on her bare

23 skin, correct?

24 A.  Yes.

25 Q.  And that's a lie?  That didn't happen, did it?

1  A.  That did happen.

2  Q.  When did that happen, sir?

3  A.  That happened along with the taking of the pillows.  It

4  was like they would take their pillows back and hold onto it

5  tight.  And then I would be like, "You give it to me."  And

6  they wouldn't give it to me, so then I would tickle them until

7  they let go, and then I would take it.

8  Q.  You didn't tell the jury that today, did you?

9  A.  I didn't go into very much detail, no.

10  Q.  Well, sir, it was your attorney asking you questions,

11  right?

12  A.  Yes.

13  Q.  And you had a chance to give as much information as you

14  wanted as he asked you questions, correct?

15  A.  Yes.

16  Q.  You never told the jury that you tickled her, correct?

17  A.  I did not.

18  Q.  And you never told the jury that she said, "Look, Mr. Ali,

19  I've got new panties," did you?

20  A.  I did not.

21  Q.  And you said that she, in fact -- what you told Detective

22  McAllister is that she lifted up her shirt to try to show you

23  her panties, correct?

24  A.  She did.

25  Q.  You're saying now that she did that?

1  A.  She did.  That was just -- when my attorney was asking me

2  questions, he did not specifically ask me about it.  And I may

3  have neglected to inform the jury about that, yes.

4  Q.  Well, why don't you tell the jury now when that happened

5  in this scheme of events.

6  A.  When she told me about her panties?

7  Q.  Uh-huh.

8  A.  It was upon the first inspection, right before I did the

9  first inspection.  You know, I sat down, and she was -- she

10  was almost asleep the first time.  So she tells me, "Well, I

11  got new panties."  It was -- it was -- she was telling me, "I

12  got new panties."  And then I let her go to sleep, and then I

13  did the inspection.

14  Q.  Okay.  Well, according to the version you gave Detective

15  McAllister, though, that would be leaving out some details

16  from what you told him, right?

17  A.  Definitely.

18  Q.  Because what you told Detective McAllister was that when

19  she said, "I got new panties," you said, "M.R., no, thank

20  you," correct?

21  A.  Yes.

22  Q.  And you told Detective McAllister that then she pulled up

23  her shirt to try to show you, correct?

24  A.  Correct.

25  Q.  And that after that, you were telling her, "No, thank you,

1  no, thank you," and you told Detective McAllister that that

2  made you very uncomfortable, didn't it?

3  A.  Yes.

4  Q.  It made you so uncomfortable, in fact, that you then

5  decided to put a finger at the top of her jeans to show her

6  that her pants didn't fit her, right?

7  A.  I did say that, yes.

8  Q.  Okay.  You didn't tell the jury that today, did you?

9  A.  No, I did not.

10  Q.  Okay.  And the -- so did that happen or didn't that

11  happen?

12  A.  It did happen.

13  Q.  Okay.  That's also another fact that you've added today,

14  correct?

15  A.  It was just something I was not asked about specifically.

16  I was answering the questions I was asked about.

17  Q.  So at that point, when you are putting your fingers in her

18  pants after she has said, "Ouch, you hurt me," you knew that

19  her pants were loose, didn't you?

20  A.  After she said it, yes.

21  Q.  Well, after you put your fingers in her pants to pull on

22  them, right?

23  A.  Well, she -- the reason I did that was because she wanted

24  to show me.  And I noticed she wasn't wearing her belt.  And

25  that's when I said, "Well, where is your belt?"  And she

1   said -- well, I told her, "They're loose.  Where is your

2   belt?"  And she said, "My daddy forgot to give me my belt this

3   morning."

4   Q.  Okay.  So are you now saying that the reason you put your

5   fingers in her pants is because she wanted to show you her

6   underwear?

7   A.  That wasn't the reason they were in there.

8   Q.  You did tell the detective, at least three times, that you

9   never saw her underpants, correct?

10  A.  I did.

11  Q.  And that was a lie, wasn't it?

12  A.  Yes.

13  Q.  And you talked about -- when you talked to the detective

14  about tickling her, again, you reiterated you never saw the

15  underpants, correct?

16  A.  I did.

17  Q.  In fact, at one point when you were speaking to the

18  detective, you suggested to the detective that by wrapping her

19  legs around your arm and your watch, that M.R. was sexually

20  experimenting, didn't you?

21  A.  I said that could have been a possibility.

22  Q.  Okay.  You said that you thought she was enjoying it,

23  correct?

24  A.  She was moving back and forth, rubbing pretty much.

25  Q.  Okay.  So it's your testimony today that -- your watch is

1  just like mine, right, a similar watch?

2  A.  It's noticeably bigger in size, but --

3  Q.  Your watch is noticeably bigger?

4  A.  Yes.

5         MS. KOROBOV:  Okay.  May I approach the witness?

6         THE COURT:  You may.

7         MS. KOROBOV:  I'm just going to get it.

8  BY MS. KOROBOV:

9  Q.  For the record, I have retrieved Exhibit 28, the G-Shock

10  watch.  Your watch is noticeably bigger than mine?

11  A.  From right here, it does look bigger.

12  Q.  Okay.  Bigger, all right.  So you're saying she wraps her

13  legs around this watch, right?

14  A.  Correct.

15  Q.  And that she's wiggling up and down on it, isn't she?

16  A.  She was squirming around, yes.

17  Q.  And you believed that she was sexually pleasuring herself

18  at that time, didn't you?

19  A.  I said it could have been a possibility.

20  Q.  You said, "Kids do like to experiment," right?

21  A.  I did say that.

22  Q.  You said, "Maybe she liked how it felt," correct?  You

23  told the detective, "She was just enjoying it," right?

24  A.  Yes.

25  Q.  And then you told the detective, "And then she fell

1  asleep," right?

2  A.  Yes.

3  Q.  At the time that she's got her legs wrapped around your

4  watch, sexually pleasuring herself, to your estimate, she is

5  fully clothed, correct?

6  A.  Yes.

7          MS. KOROBOV:  May I approach again, Your Honor?

8          THE COURT:  You may.

9  BY MS. KOROBOV:

10  Q.  Referring to Government's Exhibit Number 6, M.R. is

11  wearing these jeans, right, at the time that she's got her

12  legs wrapped around you, correct?

13  A.  Yes.

14  Q.  Now, in looking at the jeans, there are no tears in the

15  crotch, correct?

16  A.  Correct.

17  Q.  No damage to them anywhere, right?

18  A.  No.

19  Q.  And I can look at that -- and can you notice that here --

20  excuse me.  I'll step back to the podium.

21          Even from as far away as here, sir, you can see that

22  there's nothing torn or nothing damaged about the jeans,

23  correct?

24  A.  It's a little far, but I don't think you can.

25          MS. KOROBOV:  May I approach the witness again, Your

 1  Honor?

 2          THE COURT:  You may.

 3  BY MS. KOROBOV:

 4  Q.  When you put your hands down M.R.'s pants to take the

 5  photos, could you show the jury how close you were to her

 6  jeans?

 7  A.  Where I was sitting?

 8  Q.  How close you were to the jeans when you put your hands in

 9  her pants.

10  A.  Well, when I put my hands, my hands were here.

11  Q.  Okay.  So how far were you, then, physically from her

12  jeans?  Is that how far you kept her when you took the

13  pictures?

14  A.  She would have been -- her body was laying down right

15  here.  I would have been about right here, yes.

16  Q.  Okay.  You could have used your cell phone to look on the

17  outside of the jeans, right?

18  A.  Yes.

19  Q.  And see whether there was any damage, correct?

20  A.  Correct.

21  Q.  Okay.  You can fully inspect the outside of the jeans and

22  see if there's any blood or anything coming out of the jeans,

23  right?

24  A.  Yes.

25  Q.  You didn't do that, though, did you?

1   A.  I did not.

2   Q.  And just a size comparison for M.R.  When the jurors saw

3   her today, she's bigger than she was back in August of 2014,

4   right?

5   A.  I honestly cannot recall.

6   Q.  You don't remember how big she was back then?

7   A.  I mean, I wasn't really paying attention to how tall she

8   has gotten now.

9   Q.  Okay.  Out of curiosity, before I continue with more on

10  that day, you said you have a brother, right?

11  A.  Correct.

12  Q.  How old is your brother?

13  A.  He is 20 now.

14  Q.  20 now, okay.  Did he work at the daycare on August 21st

15  of 2014?

16  A.  No.

17  Q.  Okay.  Did you have any other male relatives that ever

18  worked at the daycare on August 24th of 2014?

19  A.  No.

20  Q.  They never visited the daycare either, did they?

21  A.  My brother has visited the daycare.

22  Q.  Did he ever have contact with M.R.?

23  A.  He may have.  He was in the class interacting with the

24  children; reading them books, too.

25  Q.  When was that?

1  A.  Once before.

2  Q.  Not August 21st of 2014, right?

3  A.  I -- no.

4  Q.  Okay.  And you never saw him put his hands down M.R.'s

5  pants, correct?

6  A.  Correct.

7  Q.  You spent two years on a job working refurbishing phones,

8  you said, correct?

9  A.  Correct.

10 Q.  And during that time, you never took pictures of anyone's

11 genital area on that job, correct?

12 A.  No.

13 Q.  Okay.  And you felt that you were well trained to do that

14 job, correct?

15 A.  Yes.

16 Q.  Okay.  And then you also worked at a restaurant, right?

17 A.  Yes.

18 Q.  And this is a family restaurant, correct?

19 A.  Correct.

20 Q.  You worked as a cashier and a cook, right?

21 A.  Yes.

22 Q.  You had contact with members of the public?

23 A.  Yes.

24 Q.  Okay.  You never took pictures of anyone's genitals on

25 that job, right?

1   A.  No.

2   Q.  Okay.  You said that you baby-sat kids within your family,

3   right?

4   A.  Yes.

5   Q.  Okay.  And you also took care of a child who wasn't in

6   your family, named B.N., correct?

7   A.  No.

8   Q.  You never took care of B.N.?

9   A.  No.  He was at the daycare.

10  Q.  He was a child at the daycare?

11  A.  Yes.

12  Q.  Right?  And it's your -- you're saying that you never took

13  care of him?

14  A.  Outside?

15  Q.  Correct.

16  A.  No.

17  Q.  Do you remember sending an e-mail to a woman about a job

18  at the Goddard School?

19  A.  Yes.

20  Q.  And do you remember telling her that you took care of a

21  little boy named B.N.?

22  A.  That was her son.

23  Q.  That was the son of the woman you were e-mailing about the

24  job at the daycare?

25  A.  Yes.

1  Q.  Okay.  So you've taken care of kids, obviously, both in

2  and out of your family, right?

3  A.  No.  He was at the daycare, and I was employed at the

4  daycare.  And she had told me she actually worked at the

5  Goddard School and had an opening.  I inquired about that

6  after they had left the daycare.  And I have never taken care

7  of him outside of school, no.

8          MS. KOROBOV:  May I approach the witness, please?

9          THE COURT:  You may.

10  BY MS. KOROBOV:

11  Q.  I'll show you what I've marked as Government's Exhibit 36.

12  I'll ask you to read that to yourself.

13          Do you recognize Government's 36?

14  A.  Yes.

15  Q.  And what is Government's 36?

16  A.  Me writing an e-mail to the HR person that worked at the

17  Goddard School.

18  Q.  Okay.  And is that a true and accurate copy of the e-mail

19  that you sent on April 1st of 2014?

20  A.  Yes.

21          MS. KOROBOV:  At this time, the government moves to

22  admit Government's Exhibit 36.

23          THE COURT:  Any objection to 36?

24          MR. THOMAS:  No, not at all.

25          THE COURT:  36 is admitted into evidence without

1  objection.

2                    (Government's Exhibit 36 was

3                    received in evidence.)

4  BY MS. KOROBOV:

5  Q.  "Hello, Rachel" --

6          MS. KOROBOV:  Permission to publish, Your Honor, by

7  reading?

8          THE COURT:  You may.

9  BY MS. KOROBOV:

10 Q.  "Hello, Rachael, My name is Ali Al-Awadi.  I am an

11 educator at Bright Horizons.  I used to care for B.N. in the

12 evenings and Mrs. Newkirk informed me of an opportunity to

13 work at the Goddard School.  I have given her a call and she

14 told me to e-mail you," with, "my resumé.  Thank you for your

15 time."  You wrote that e-mail?

16 A.  Yes, I did.

17 Q.  Okay.  And this was when you were trying to apply for work

18 at the Goddard School, correct?

19 A.  Correct.

20 Q.  When you cared for children in your family, could you tell

21 the jurors which children you cared for?

22 A.  My uncle's -- on my dad's side, my dad's brother's

23 children; my mom's brother's children; anyone who was pretty

24 much related to me.

25 Q.  Okay.  About how many children?

1  A.  I would say more than five, but never more than two at a

2  time.

3  Q.  Okay.  More than five kids total, not at one setting, but

4  five different children?

5  A.  Yes.

6  Q.  Okay.  Can you give an estimate about how many different

7  children?  Is it just five or more than just five?

8  A.  It's more than five.

9  Q.  Can you give us an estimate?

10  A.  I would say maybe around -- between eight to ten.

11  Q.  Eight to ten children in your family you cared for, right?

12  A.  Different ones, yes.

13  Q.  Okay.  And other children -- you didn't receive any formal

14  training on how to take care of them, right?

15  A.  No.

16  Q.  Okay.  It was stuff you learned by interacting with your

17  family, correct?

18  A.  Correct.

19  Q.  And by interacting with those kids, right?

20  A.  Yes.

21  Q.  Can you tell the jury how many times you took pictures of

22  their genitals in order to document something?

23  A.  Never.

24  Q.  Let's talk a little bit about the cell phone policy.  The

25  cell phone policy wasn't something that you were worried

AL-AWADI - CROSS/KOROBOV          Vol. 3-636

1  about, right?

2  A.  I was, but I wasn't very -- it wasn't a rule I followed

3  too much.

4  Q.  Okay.

5  A.  It still did concern me.

6  Q.  It's a rule that concerned you, but not enough to follow

7  the rule, right?

8  A.  Only because everyone else would still have their phone on

9  them.

10  Q.  Okay.  So everyone else is breaking the rule, so it wasn't

11  a policy that really worried you, right?

12  A.  It worried me in the sense if I were to keep getting

13  caught, I would eventually get disciplined for it.

14  Q.  Okay.  Well, how many times had you been caught?

15  A.  I've been caught with it, I would say, maybe twice.

16  Q.  Okay.  Ever written up for it?

17  A.  No.

18  Q.  Okay.  So even -- you heard Ms. Heidi testify earlier,

19  right?

20  A.  Yes.

21  Q.  Sorry to call her "Ms. Heidi," but you heard her testify,

22  and she said, "Look, you get kind of like one free" --

23          THE REPORTER:  I'm sorry.  I lost you.

24          MS. KOROBOV:  I'm sorry.

25  BY MS. KOROBOV:

1  Q.  You said you heard Ms. Heidi testify about the policy that

2  you get one freebie, right?

3  A.  Uh-huh.

4  Q.  And after that, you're supposed to start getting written

5  up, correct?

6  A.  That was the new policy, yes.

7  Q.  Okay.  You had never even been written up for this, had

8  you?

9  A.  No.

10  Q.  Okay.  How many accident reports do you think you had

11  filled out during your time at Bright Horizons Daycare?

12  A.  Plenty.  I mean, it's hard to even give you a number.

13  Q.  Because it's a lot, isn't it?

14  A.  Yes.

15  Q.  Okay.  Kids say they get hurt or they're injured or

16  they're in pain on a routine basis, right?

17  A.  Well, yes.

18  Q.  They're kids, right?

19  A.  Yes.

20  Q.  Okay.  And some of these kids, when they come to you and

21  say, "I'm hurt," or, "I'm in pain, I've hurt myself," they're

22  in your care at the time that that happens, correct?

23  A.  Correct.

24  Q.  But despite the fact that they were in your care at the

25  time you got -- they got hurt, that didn't stop you from going

1  and filling out an accident report, did it?

2  A.  No.

3  Q.  Okay.  And on how many of those accident reports, could

4  you tell the jury, that you took photos to document what it is

5  that had happened to the child?

6  A.  None.

7  Q.  And so you mentioned some of the daycare's policies.  You

8  tried to make sure that anytime that there was interaction

9  between -- of a disciplinary nature, even between adults, that

10  there was a witness to it, right?

11  A.  Yes.

12  Q.  Okay.  So when you were counseled, I think by Heidi, there

13  was another educator, Kim, in the room, correct?

14  A.  Correct.

15  Q.  And that was something that was emphasized as kind of

16  following policies on certain things, correct?

17  A.  Correct.

18  Q.  Not on other things, though, right?

19  A.  Correct.

20  Q.  And, in fact, the policy regarding injuries, you knew that

21  you needed to inform the nurse, correct?

22  A.  Yes.

23  Q.  Okay.  Now, there wasn't a nurse working, though, in

24  August of 2014, correct?

25  A.  No, there was not.

1  Q.  But in that kindergarten room, you're the only teacher,

2  right?

3  A.  Yes.

4  Q.  Right outside of the kindergarten room is the reception

5  desk, correct?

6  A.  Correct.

7  Q.  Who is sitting at the reception desk on August 21st, 2014?

8  A.  Chiana.

9  Q.  Okay.  And you'd previously made reports to Chiana about a

10  child having genital pain, correct?

11  A.  Correct.

12  Q.  Okay.  And the child made the comment about having genital

13  pain while in your care, correct?

14  A.  It was as soon as I got in the room, though.

15  Q.  Okay.  But when the child is really holding herself and

16  rocking back, she had made that complaint to you, correct?

17  A.  Yes.

18  Q.  And you went and you notified who?

19  A.  Chiana.

20  Q.  And Chiana went and told the nurse, right?

21  A.  Yes.

22  Q.  Did you get in any trouble over that?

23  A.  No.

24  Q.  Did anyone say, "Hey, Mr. Ali, I really wish you would

25  have taken some photos so that we would know that you're not

1  the source of this child's genital pain"?

2  A.  No.

3  Q.  So there was nothing that prevented you on August 21st of

4  2014 from opening that door and saying, "Chiana, get in here,"

5  right?

6  A.  No.

7  Q.  And at the time you would have asked her to come in there,

8  nine of the ten children were awake, correct?

9  A.  Correct.

10  Q.  You could have said, "Hey, Chiana, please talk to these

11  kids.  She's saying she's hurt.  I didn't do anything wrong.

12  Get someone in here."  Correct?

13  A.  Correct.

14  Q.  You didn't do that, did you?

15  A.  I was panicking at the time.

16  Q.  You indicated that there are devices, though, in the room

17  for taking photos, correct?

18  A.  In the younger classrooms, yes.

19  Q.  Right, some cameras or iPads, right?

20  A.  Yes.

21  Q.  And those, you're supposed to take photos that, like, can

22  be put up on bulletin boards, right?

23  A.  Yes.

24  Q.  You didn't take these photos to put them up on a bulletin

25  board, did you?

1  A.  No.

2  Q.  When you came into the room, you indicated that M.R. was

3  happy, correct?

4  A.  Yes.

5  Q.  She was laughing, right?

6  A.  Yes.

7  Q.  And she was playful, correct?

8  A.  Yes.

9  Q.  M.R. wasn't complaining of any kind of genital pain when

10 you walked into the room, was she?

11 A.  No.

12 Q.  And, in fact, you said that M.R. sat on your lap like she

13 didn't want to get up, right?

14 A.  Correct.

15 Q.  You indicated that you kept your phone on you in case of

16 an emergency, correct?

17 A.  Yes.

18 Q.  And that phone had the numbers of other employees of the

19 daycare, correct?

20 A.  Yes.

21 Q.  And your phone was with you at the time that M.R. said,

22 "Ouch," right?

23 A.  Yes.

24 Q.  Your phone was with you at the time that she said, "You

25 hurt me," correct?

1  A.  Yes.

2  Q.  You did not pick up that phone to call anyone to come in

3  there to provide assistance, did you?

4  A.  No.

5  Q.  Instead, you turned down the lights and took photos of her

6  genitals, correct?

7  A.  The lights were already off.

8  Q.  What kind of mark were you expecting to see on M.R's body?

9  A.  I thought she might have got pinched or something.

10  Q.  Why did you think that?

11  A.  Because it was -- as soon as I removed my arm from her

12  grip is when she said, "Ouch, you hurt me."

13  Q.  Okay.  She didn't say, "Ouch, you hurt my tito," though,

14  did she?

15  A.  No.

16  Q.  She didn't say, "You hurt my privacy," or anything like

17  that, did she?

18  A.  No.

19  Q.  She just said, "You hurt me," correct?

20  A.  "Down there."

21  Q.  Oh, so now you're saying she (sic) hurt you down there?

22  A.  And I believe I did say that when I was asked.

23  Q.  I want to talk a little bit about the confrontation.  You

24  were called into the room by Chiana, correct?

25  A.  Correct.

1  Q.  And she told you to go into the room after -- where M.R.

2  was located, right?

3  A.  Because Ms. Tyria was located there, as well, yes.

4  Q.  Right.  So you knew that you were going into a room with

5  M.R. and Tyria in that room, right?

6  A.  Yes.

7  Q.  And E.C. was in the room, too, correct?

8  A.  Correct.

9  Q.  And when you walked in there, M.R. is in there and E.C. is

10 in there and Tyria is in there, and they are all sitting down,

11 right?

12 A.  Yes.

13 Q.  On the mats, correct?

14 A.  Correct.

15 Q.  And you went into the room, right?

16 A.  Yes.

17 Q.  And that's when Tyria told M.R., "Tell him what happened,"

18 correct?

19 A.  Yes.

20 Q.  Okay.  And M.R. said that you had touched her down there

21 and it hurt, right?

22 A.  Yes.

23 Q.  Okay.  And at that time, M.R. is on her mat, correct?

24 A.  I believe she was -- I do not recall.

25 Q.  Okay.  Well, you describe that you walk into the room;

1  Tyria is there, M.R. is there, E.C. is there; they're sitting

2  on either side of her, right?  Correct?

3  A.  Yes.

4  Q.  Okay.  And Tyria just says, "Tell him what happened,"

5  right?

6  A.  Yes.

7  Q.  M.R. doesn't stand up to give a book report, does she?

8  A.  No.

9  Q.  M.R. remains sitting down, didn't she?

10  A.  What I'm saying is, I can't remember if she was standing

11  already or if she was sitting.

12  Q.  Okay.  So you don't remember what position she was in?

13  A.  No.

14  Q.  Do you remember telling Detective McAllister, though, that

15  the reason you pulled her to you is because you didn't want

16  her to fall on a plate?

17  A.  I believe so.

18  Q.  The truth is, Mr. Ali, that you put her in your lap,

19  didn't you?

20  A.  She was right next to my lap, but she was -- I was

21  crouching.  I couldn't actually pick her up and sit her down

22  in my lap.  She was in the general area, yes.

23  Q.  So if your coworker, Tyria, came into court and said that

24  man put her on his lap, it's your recollection that that is

25  simply not accurate?

1  A.  My recollection is, if she did see her on my lap, then it

2  was because she was maybe even standing so close she was

3  almost on my lap instead of actually sitting-sitting on my

4  lap.

5  Q.  Regardless, is it your testimony that at the point that

6  the child is accusing you of sexually molestive touching, you

7  physically pulled her closer to you?

8  A.  Yes.  Yes.

9  Q.  And at that point, you accused her of lying to you, didn't

10  you?

11  A.  I asked her if she was dreaming.

12  Q.  Okay.  Because you knew that when you touched her, she was

13  sleeping, wasn't she?

14  A.  When I examined -- when I took the pictures, she was

15  asleep, yes.

16  Q.  When you touched her, she was sleeping, right?

17  A.  I --

18          MR. THOMAS:  Objection, asked and answered.

19          THE COURT:  He didn't answer that question.  The

20  question was, "When you touched her, she was sleeping?"  You

21  need to answer that.

22  A.  Could you clarify by "touching" if I was -- if you mean

23  what she was accusing me of doing?

24  BY MS. KOROBOV:

25  Q.  When you touched her -- did you touch her on August 21st,

1  2014?

2  A.  I did not molest her.  I did not fondle her.  But I did,

3  of course, touch her, but not in a sexual manner.

4  Q.  Okay.  And when that happened, she was sleeping, right?

5  A.  Correct.

6  Q.  You knew, from the very beginning, that what you were

7  asking her about is something that happened when she was

8  sleeping?

9  A.  Correct.

10  Q.  And in front of all those people, you accused her of lying

11  to you, didn't you?

12  A.  I asked if she was dreaming.  And I said, "We're not

13  supposed to lie."

14  Q.  "We're not supposed to lie."  Interesting words, Mr. Ali,

15  because from there, what did you proceed to do in front of

16  that classroom full of people?

17  A.  I do not recall.

18  Q.  You lied, didn't you?

19  A.  You mean --

20  Q.  Did you tell any of those people, "I just snapped off some

21  pictures of this child's vagina"?

22  A.  No.

23  Q.  Okay.  Did you tell any of those people, "Hey, she said,

24  'Ouch, you hurt me down there'"?  Did you tell any of them

25  that?

1  A.  No.

2  Q.  Okay.  And then, when -- and for then the next what,

3  couple of hours, when you're talking to Heidi, when you're

4  talking to Chiana, when you're talking to Tyria, you never

5  told any of them that, did you?

6  A.  No, I didn't, but I didn't lie to them.  I didn't -- I

7  just did not tell them.

8  Q.  You didn't tell them the whole truth; is that your

9  testimony?

10  A.  What I'm saying is I did not lie to them.

11  Q.  So it's not a lie, in your opinion, to fail to disclose

12  information that would better give a full picture of what

13  happened?

14  A.  I'm not saying it's not a lie.  I'm just saying I didn't

15  tell them because I was scared at the time.

16  Q.  Okay.  Counsel asked if you could have removed M.R.'s

17  clothes, correct?

18  A.  Correct.

19  Q.  All right.  So let's talk a little bit about that scenario

20  in the room.  In the room, there are ten sleeping children at

21  this point, including M.R., right?

22  A.  Yes.

23  Q.  Okay.  And you know that you are approaching the end of

24  the lunch hour, right?

25  A.  Yes.

1  Q.  Okay.  And so if you take off M.R.'s pants and someone

2  walks in, what's going to happen?

3  A.  Someone is going to see.

4  Q.  Someone is going to see it, aren't they?

5  A.  Of course.

6  Q.  Okay.  But what you weren't worried about was opening up

7  her pants and snapping off some photos, right?

8  A.  I was worried about that, but I -- I was also more worried

9  about if she was okay, if I actually did hurt her.

10 Q.  Not worried enough to tell anyone about whether you did

11 hurt her, right?

12 A.  No, because she was accusing me.

13 Q.  Accusing you of what?

14 A.  Hurting her.

15 Q.  She just said, "You hurt me down there," right?

16 A.  Yes.

17 Q.  At that point, she didn't say, "You put your fingers in

18 me," did she?

19 A.  No.

20 Q.  And, actually, by your definition, it was true, you had

21 hurt her down there, right?

22 A.  Yes.

23 Q.  So M.R. wasn't falsely accusing you of anything, right?

24 A.  No.

25 Q.  So your testimony at that point, "Yeah, I've got an

1  innocent explanation.  It's just -- it's my watch.  Take this

2  thing away from me.  It's a crotch killer"?

3  A.  I just felt like, telling them I would inspect and when --

4  and if I took pictures or not, I could not justify it to them,

5  regardless if they were my closest friends, my mother, my

6  father, my family.  I felt like I couldn't justify telling

7  anyone that.

8  Q.  Because it's shameful to do what you did, isn't it?

9  A.  Not as much shameful as it would look bad.  It would make

10 me look like I, of course, did something wrong, that I wasn't

11 supposed to do it, even if I had pure intentions.

12 Q.  When the police came to the door, you told your parents,

13 or your mom, that there was an incident and the police wanted

14 to talk to you about it, right?

15 A.  Yes.

16 Q.  And your mom says to you, "You didn't cause the incident?"

17  Correct?

18 A.  Correct.

19 Q.  A little bit about the phone.  You believed you deleted

20 the images from the phone, right?

21 A.  I knew I did.

22 Q.  Okay.  And it's your testimony that you didn't believe at

23 that point that they could be recovered, right?

24 A.  Correct.

25 Q.  So when counsel asked, "You didn't throw away your phone,

1  did you," you don't believe you had to throw away your phone,

2  right?

3  A.  Correct.

4  Q.  Because you believed they were gone, correct?

5  A.  Correct.

6  Q.  After you took the images of M.R., you went to the

7  bathroom, correct?

8  A.  Yes.

9  Q.  And you brought your phone with you into that bathroom,

10 right?

11 A.  It was on me at the time, yes.

12 Q.  You brought your phone with you into the bathroom,

13 correct?

14 A.  My phone was always on me, so, yes, it was in the

15 bathroom.

16 Q.  Okay.  And then you went to your car with that phone,

17 correct?

18 A.  I went on break and I went to, I believe it was the gas

19 station or the Marsh.  I don't recall.  I got her her pop.

20 And then I stayed in the car the rest of the day -- or the

21 rest of the break.

22 Q.  Okay.  So you sat out in that car with your phone, right?

23 A.  Yes.

24 Q.  The phone you had used to take those images of M.R.,

25 correct?

1  A.  Yes.

2  Q.  So you were alone in that car with your phone for at least

3  a half-hour?

4  A.  You could say that, yes.

5  Q.  Okay.  It's your testimony that you -- or you previously

6  told the detective you were actually using the phone at that

7  time, right?

8  A.  Yes.

9  Q.  This thing that you just used to create these awful images

10  and make this terrible mistake, you sit in the phone -- car

11  and just kind of keep thumbing through your phone, right?

12  A.  Yes.

13  Q.  The one that you used to take pictures of M.R.'s genitals,

14  right?

15  A.  Yes.

16  Q.  You heard M.R.'s testimony in here in court, right?

17  A.  Yes.

18  Q.  And you heard her say that you put your hand in her

19  underwear, right?

20  A.  Yes.

21  Q.  Okay.  And so when M.R. says that, that's accurate, isn't

22  it?

23  A.  I did lift up the underwear.  I put my hand on the inside

24  to lift it up, yes.

25  Q.  Okay.  Do you recall your counsel asking the detective if

1   there were any eyewitnesses to what had happened in the

2   daycare?  Do you remember him asking that?

3   A.  Yes.

4   Q.  And on that day, you had the opportunity to essentially

5   create eyewitnesses by calling Chiana into the room, right?

6   A.  I had the opportunity, yes.

7   Q.  But you didn't do that, did you?

8   A.  No.

9   Q.  It is true that you opened up her pants, right?

10  A.  Yes.

11  Q.  It is true that you pulled back her underwear, correct?

12  A.  Pulled up, upwards; not back.

13  Q.  Up?

14  A.  Yes.

15  Q.  Okay.  You pulled her underwear away from her skin,

16  correct?

17  A.  Yes.

18  Q.  Pulled it away enough that you could put your camera down

19  there, right?

20  A.  The camera wouldn't be down anywhere in there.

21  Q.  Right.  You pulled it enough so that the camera could get

22  an angle of her genitals, correct?

23  A.  To look for the injury, yes.

24  Q.  Okay.  And you're telling us that you snapped off a couple

25  of those shots, right?

1  A.  Yes.

2  Q.  And you didn't see anything there, right?

3  A.  No.

4  Q.  Okay.  So at that point, "Whew, I'm done, no injuries.

5  She doesn't have any blood on her jeans," right?  You're out,

6  correct?

7  A.  Correct.

8  Q.  That's not what you did, was it?

9  A.  No.

10  Q.  You decided to take two more photos of her genitals,

11  correct?

12  A.  After she complained about more pain.

13  Q.  Did you see any evidence on that camera, or when you were

14  looking at her skin, of any injuries?

15  A.  No.

16  Q.  Okay.  And so at this point, the area that you've now

17  looked at, what, up here, the mons pubis, across the thighs,

18  through here, no injury on it, right?

19  A.  No.

20  Q.  Okay.  So you didn't at this point wiggle her pants down

21  to try to get a better angle of what might be between her

22  legs, did you?

23  A.  No.

24  Q.  You didn't call someone in to say, "Hey, look, check out

25  this kid," right?

1   A.  No.

2   Q.  There are some other things that you weren't honest with

3   the detective about that day, correct?

4   A.  I don't know what you're talking about exactly.

5   Q.  Okay.  Well, the detective asked you about your Internet

6   history, correct?

7            MR. THOMAS:  Objection.  May we approach, Your

8   Honor?

9            THE COURT:  Do you want to approach?

10           (Bench conference on the record.)

11           MR. THOMAS:  Your Honor, this is an attempt by the

12  government to bring in his Internet browser history, which

13  showed that he looked at legal pornography at various times,

14  which is -- which he did not lie about.  He told the officer

15  that he looked at pornography.  And --

16           THE COURT:  Yeah, I think that's in evidence, that

17  he said he did --

18           MS. KOROBOV:  May I show the Court what it is that

19  we're talking about?

20           THE COURT:  Yes.

21           MS. KOROBOV:  Because the defendant has now

22  testified that he -- that he lied to the detective, yes, but,

23  "I wouldn't hurt M.R. or any child."  The sites referenced in

24  here are incest pornography, which I would contend is perhaps

25  not at all legal.  But, regardless, if his testimony is, "I

1  wouldn't hurt any child" -- and, additionally, he's admitted

2  at this point to every element of production except intent.

3  So at this point his intent becomes relevant.

4          MR. THOMAS:  Your Honor, this is not illegal

5  pornography.  These are not things that have been charged.

6  The dates on these have nothing to do with this case.  This is

7  an attempt to taint the jury.  There's been no evidence

8  regarding this at all.  And there's no evidence that looking

9  at legal pornography indicates you're going to hurt a child.

10  It's prejudicial.

11          MS. KOROBOV:  The question is whether it's unfairly

12  prejudicial.  The defendant said, "I would never hurt any

13  child."  And given the images here -- and, additionally he

14  told the detective that he -- that he would look at Reddit and

15  he used Reddit to look at porn, and that sometimes there would

16  be incest sites on there, "but I didn't go to any of them."

17  Well, that's a lie, so it goes to his credibility.  It goes to

18  show, as well, what his intent was at the time he took those

19  pictures.

20          MR. THOMAS:  I didn't ask him any questions about

21  his history on direct, first of all.  The fact that --

22          THE COURT:  You did ask him had he ever hurt any

23  other child, which wasn't a good question to ask.

24          MR. THOMAS:  I'm sorry, but the government's

25  contention that looking at legal pornography is hurting a

1  child is not true.

2          THE COURT:  Well, it says incest.  Is that legal?

3  Incest is a crime.

4          MR. THOMAS:  That is all legal.  No one is having

5  incest in that pornography.  It's all -- it's all fake.  I've

6  dealt with those cases before, Your Honor.  That's not --

7          THE COURT:  You've seen these videos?

8          MR. THOMAS:  I've certainly not seen those

9  particular videos, but if the government is alleging new

10  crimes here, that he committed a crime in looking at these

11  videos, they know for a fact, as an officer of the court, she

12  knows that's not illegal, Your Honor.  She's being

13  disingenuous with The Court.  She knows that that's not

14  illegal.

15          THE COURT:  Did you look at -- do you know what

16  these are?

17          MS. KOROBOV:  Do I know --

18          THE COURT:  Did you all see what they are?

19          MS. KOROBOV:  No.  We haven't gone to those sites.

20          THE COURT:  Okay.

21          MS. KOROBOV:  The issue isn't, quite frankly,

22  whether he -- whether the porn is legal or illegal.  That's

23  not my issue.  If it's legal, I don't care one way or the

24  other.  The issue is, "I would never hurt any child."  This is

25  his area of interest.  If he's saying that, "When I pulled

```
 1  down her pants, it was just to take photos to document

 2  injuries as opposed to I was sexually interested in that

 3  child," there it is.

 4            MR. THOMAS:  There's no evidence that that

 5  involves --

 6            THE REPORTER:  I'm sorry.  I cannot hear you.

 7            MR. THOMAS:  There's no evidence that anything that

 8  he looked at involved children at all.

 9            THE COURT:  Oh, you're saying it might be adult

10  incest?

11            MR. THOMAS:  Yeah.  There's no --

12            MS. KOROBOV:  That's not what --

13            MR. THOMAS:  If it was --

14            MS. KOROBOV:  This is --

15            MR. THOMAS:  If it was children -- if it's child

16  pornography, he would be charged.  None of it is child

17  pornography, Your Honor.

18            THE COURT:  "The First Time with My Daddy."

19            MS. KOROBOV:  "The First time with My Daddy," who --

20            MR. THOMAS:  Well, listen --

21            THE COURT:  Okay.  Listen, this is what I will let

22  you do.  Don't -- don't get that in, but you can read the

23  titles of those three, and the date --

24            MR. THOMAS:  What?

25            THE COURT:  -- to show --
```

 1           MR. THOMAS:  What -- and just so I'm clear for the

 2   record, Your Honor, what is the government relying on to

 3   show --

 4           THE COURT:  You're offering those to show what?

 5           MS. KOROBOV:  I'm using it to show, first of all,

 6   his intent when he took the pictures of M.R..  And I'm also

 7   using it to contradict his statement to counsel that, "I would

 8   never hurt M.R. or any child."  And, finally, it goes to show

 9   that when he talked to the detective and he said, "Oh, yes, I

10   go to Reddit, but not to these sites," that that was a lie.

11   It's another thing he lied about.  His credibility is the sole

12   issue here today.

13           MR. THOMAS:  Well, Your Honor, if I may respond,

14   first of all, I will again object that looking at legal

15   pornography, it's not evidence that you have hurt a child.  So

16   the idea that he opened the door to his looking at legal

17   pornography -- and if she wants to say --

18           THE COURT:  It's just the title, the title, "My

19   First Time with Daddy."  That's why --

20           MS. KOROBOV:  We asked --

21           MR. THOMAS:  Looking --

22           THE REPORTER:  I cannot hear you.

23           THE COURT:  What's it say?

24           MS. KOROBOV:  "B.S. Used to Play Truth or Dare as

25   Young Kids."

1      MR. THOMAS:  He didn't have anything to do with

2  creation of this pornography.  He looked at it legally on the

3  Internet.  He didn't hurt a child by doing that.

4      THE COURT:  Agree, but she's -- well, she's trying

5  to show that his intent in this case was for sexual --

6      MR. THOMAS:  Well, there's no --

7      THE COURT:  -- lascivious purposes.

8      MR. THOMAS:  There's no evidence that any of that is

9  child pornography.  In fact, the evidence is the opposite, and

10  the government knows it.  None of this is child pornography.

11  The implication from those titles, which he had nothing to do

12  with creating, is that it is child pornography.  The fact is,

13  it is not.  None of it is, and the government knows it.

14      THE COURT:  Where is the one that says, Young

15  Child?"

16      MS. KOROBOV:  The one that says, "Young Child" --

17      THE REPORTER:  I cannot hear you.

18      MR. THOMAS:  I don't care what the titles say, Your

19  Honor.  This is legal pornography.

20      THE COURT:  We're just going by the titles.  That's

21  fine.  Let me see what the --

22      MS. KOROBOV:  The red highlighted ones are the

23  ones --

24      THE REPORTER:  I did hear you.

25      MS. KOROBOV:  The red highlighted pages on there are

1  the ones he was looking at.

2          THE COURT:  Okay.  I didn't see that one.

3          MR. THOMAS:  Your Honor, this is legal pornography.

4  The government --

5          THE COURT:  Okay.  I'll let you ask him about one,

6  "I'm Attracted to My Little Sis."

7          MR. THOMAS:  And is this -- and how is this related

8  to direct?

9          MS. KOROBOV:  On direct, you were asking your client

10 questions, and the very last thing that your client said to

11 the jury is, "I would never hurt M.R. or any child."

12 Additionally, he repeatedly put his intent at issue.  "It

13 wasn't for sexual attraction, it was because I was documenting

14 an injury."

15         THE COURT:  So, for intent, the Court is going to

16 allow it.

17         MR. THOMAS:  Okay.  And --

18         THE COURT:  And your objection is noted for the

19 record.  Let's get on.

20                         (Open court.)

21         THE COURT:  The objection --

22         MR. SHEPARD:  If I can confer very briefly, Your

23 Honor.

24         (Off the record.)

25         THE COURT:  The objection is overruled --

 1          MR. THOMAS:  In full, Your Honor?

 2          THE COURT:  -- with a limited -- with a limited

 3   allowance.

 4   BY MS. KOROBOV:

 5   Q.  Detective McAllister asked you some questions regarding

 6   the use of the Web site Reddit, correct?

 7   A.  Correct.

 8   Q.  And you responded to his questions about your use of the

 9   Web site Reddit, correct?

10   A.  Correct.

11   Q.  Specifically he asked you questions about certain types of

12   Web sites on Reddit, or certain links to Reddit, correct?

13   A.  Yes.

14   Q.  And you told him that you didn't visit any particular

15   sites on Reddit that were anything beyond, like, legit porn,

16   correct?

17   A.  I did say that, yes.

18   Q.  But on August 14th of 2014, you visited a specific portion

19   of Reddit with the title "reddit.com/R/incest/comments/2DV --

20   2DEVPQ/SS_ I'm_attracted_to_my_little_sis_2," correct?

21          THE REPORTER:  I'm sorry.  You've got to slow down.

22   BY MS. KOROBOV:

23   Q.  The Web site, to be repeated, is

24   www.reddit.com/R/incest/comments/2DEVPQ/SS_

25   I'm_attracted_to_my_little_sis_2.  Is that correct?

```
 1  A.  I guess.
 2           MS. KOROBOV:  I pass the witness.
 3           THE COURT:  And, ladies and gentlemen of the jury,
 4  that evidence is offered for the limited purpose of showing
 5  intent.
 6           MR. THOMAS:  She passed the witness, Your Honor?
 7           THE COURT:  She passed the witness.  You may
 8  cross -- I'm sorry.  You may redirect.
 9                      REDIRECT EXAMINATION
10  BY MR. THOMAS:
11  Q.  How old were you at the time of this incident?
12  A.  20 years old.
13  Q.  Did you look at porn when you were 20?
14  A.  Yes.
15  Q.  Was any of it child porn?
16  A.  No.
17  Q.  Were any of the Web sites that you ever visited child
18  porn?
19  A.  No.
20  Q.  Would the government be able to produce any evidence
21  whatsoever that any of the porn you ever looked at on your
22  phone, on Web sites, was child porn?
23           MS. KOROBOV:  Objection, Your Honor --
24           THE REPORTER:  I cannot hear you.
25           MS. KOROBOV:  I don't believe he can testify --
```

1        THE REPORTER:  I cannot hear you.  You need to use

2   your microphone.

3        MS. KOROBOV:  I don't believe counsel --

4        THE COURT:  It's not on yet.

5        MS. KOROBOV:  Because I'm out of batteries.

6        THE COURT:  Tanesa, will you give her some

7   batteries?

8        MS. KOROBOV:  Actually, let me just trade with

9   Mr. Shepard.

10        I don't believe that counsel --

11        MR. THOMAS:  I'll withdraw the question, Judge.

12   Let's move on.

13        THE COURT:  Okay.  The question is withdrawn.

14   BY MR. THOMAS:

15   Q.  Do you think if you had viewed child pornography on your

16   phone that has been examined by the government to the -- down

17   to the smallest portion, do you think if you had viewed child

18   pornography on your phone, that you would not have been

19   charged with that?

20        MS. KOROBOV:  Objection, calls for speculation.

21        THE COURT:  I'll let him answer it.

22        THE WITNESS:  Could you ask again?

23   BY MR. THOMAS:

24   Q.  Do you think if you had viewed child pornography on the

25   same telephone that Detective Melton examined down to its

1  core, that you would not have been charged with that?

2  A.  No.

3  Q.  And, in fact, you were not, were you?

4  A.  No.

5  Q.  Because you had never looked at child pornography, did

6  you?

7  A.  No.

8  Q.  How many shifts at the daycare?

9  A.  It just depended on some people who worked part time and

10  some people worked full time, but, really, it was two shifts.

11  Q.  When you first started -- well, what time did the first

12  shift go and what time did the second shift go?

13  A.  The first shift would be around the morning time, anywhere

14  between 6:30 to, I would say, 8:00.  Some people would come in

15  early, because not all the children would be there, and all

16  the kids would be in, like, the gym until the teachers got

17  there, or any -- so anywhere between, I would say, 6:30 to

18  8:00 was anytime the first shift would start.  And it would

19  end around 3:00, 4:00ish, maybe 5:00.

20  Q.  What about the second shift?

21  A.  A lot of the people on the second shift would either start

22  anytime after noon and go until 8:00.

23  Q.  What shift did you work when you started there?

24  A.  The 12:00 to 8:00.

25  Q.  Did you ever refer to that as the evening, evenings?

1  A.  Yes.

2  Q.  I'm going to show what you I think was entered as

3  Government's Exhibit 36, again.  You told us that -- you told

4  us that B.N. was a student at Bright Horizons, right?

5  A.  Yes.  He was in the kindergarten room.

6  Q.  And you sent this e-mail April 1st of 2014, correct?

7  A.  Correct.

8  Q.  Was that before or after you got the full-time position in

9  Cathie's class?

10  A.  Before.

11  Q.  And were you working the evening shift then?

12  A.  Yes.

13  Q.  And when you had cared for B.N., would that have been

14  during the evening shift?

15  A.  Yes.  Sometimes he would be one of the last ones picked

16  up.

17  Q.  So when you said in 36, "I am an educator at Bright

18  Horizons.  I used to care for B.N. in the evenings," were you

19  lying to Rachel?

20  A.  No.

21  Q.  You did care for him in the evenings at the school, right?

22  A.  Correct.

23  Q.  You worked till 8:00 at night?

24  A.  Yes.

25  Q.  Did you send this e-mail to try to lie or trick anybody?

1  A.  Not at all.

2  Q.  She just didn't know what she was talking about, right?

3          MS. KOROBOV:  Objection, leading.

4          THE COURT:  And that is an argumentative question

5  that the government didn't know what they were talking about.

6  So --

7          MR. THOMAS:  Fair enough.

8          THE COURT:  -- we'll strike that question.  Do you

9  have any other questions --

10          MR. THOMAS:  I do.

11          THE COURT:  -- on redirect?

12          MR. THOMAS:  I do.

13  BY MR. THOMAS:

14  Q.  You were asked on cross that -- about these were all

15  people that like you?

16  A.  Yes.

17  Q.  Would they still like you if you told them that you had

18  looked at M.R.?

19          MS. KOROBOV:  Objection, Your Honor.  It calls for

20  speculation.

21          THE COURT:  Sustained.

22  BY MR. THOMAS:

23  Q.  What do you think would have happened if you had told your

24  bosses what had really happened?

25  A.  Well, I believed they would have looked into the situation

1  and probably even fired me first, because it was going against

2  policy and procedure.

3  Q.  It wouldn't have mattered -- would it have mattered what

4  your intentions were?

5  A.  No.

6  Q.  Did you think anybody was going to believe you after you

7  had been accused of child molesting?

8  A.  No.

9  Q.  All those other accident reports that you filled out, did

10 any of those children say you hurt them?

11 A.  No.

12 Q.  In fact, was M.R. the only one who said that, "You hurt

13 me"?

14 A.  She was the first one.  And then I was terminated after,

15 so that made her the only one.

16 Q.  When you described her on your arm --

17 A.  Yes.

18 Q.  -- did you -- she told you that she had been hurt?  She

19 said, "Ow"?

20        MS. KOROBOV:  Your Honor, I'm going to object.

21 Counsel is leading.

22        MR. THOMAS:  I am.

23        THE COURT:  You are.

24 BY MR. THOMAS:

25 Q.  When she was on your arm, how did you know that she might

1  be hurt?

2  A.  It wasn't until after I put her down and pulled my arm

3  free when she said, "Ow."

4  Q.  At any -- she was showing you the jeans and how -- whether

5  they were ripped.  I mean, did you ever think that you had

6  done anything that would rip her jeans?

7  A.  No.

8  Q.  Anything close to that?

9  A.  No.  I thought at the time she might have gotten pinched

10  or something.

11  Q.  Did you really know?

12  A.  I did not know.

13  Q.  I think you were asked on cross whether you opened her

14  pants.  Did you ever open her pants?

15  A.  I did not open her pants if you mean by like unbuttoning

16  and -- no.  If -- by lifting, yes.

17  Q.  You had a girlfriend who worked with you?

18  A.  Yes.

19  Q.  Is there a particular reason that you described her as

20  your coworker and not your girlfriend when I asked you the

21  question before?

22  A.  It was off and on.

23  Q.  But you had a girlfriend.  How old was she?

24  A.  Either 19 or -- no.  She was 17, but we were together

25  before I even turned 18.

1   Q.  And you were 19 when you started, right?

2   A.  Yes.  And --

3           THE COURT:  There's no question before you.  Wait

4   for the question.

5           THE WITNESS:  Okay.

6   BY MR. THOMAS:

7   Q.  Did you ever consider after what happened, as was

8   suggested, going and telling Tyria or going and telling Heidi

9   what happened?

10  A.  Did you ask if I ever considered it?

11  Q.  Yeah.  Did you consider it?

12  A.  I did consider it, but I thought about how they would have

13  looked at the situation.  And I -- like I said, I felt like I

14  couldn't justify what I did.

15  Q.  You were asked on cross, you could have immediately gone

16  and said, "This is what happened," right?

17  A.  Yes.

18  Q.  Do you wish you had done that?

19  A.  Definitely.

20          MR. THOMAS:  That's all.  Thank you.

21          THE COURT:  Okay.  You have some questions?

22          MS. KOROBOV:  Very briefly, Judge.

23          THE COURT:  Okay.  Very briefly.

24

25

1                **RECROSS-EXAMINATION**

2  BY MS. KOROBOV:

3  Q.  Counsel asked you, "What did you think would happen if you

4  told Heidi and the people at the daycare what you had done,"

5  correct?

6  A.  Yes.

7  Q.  And your answer to him was, "I was afraid I would be

8  fired," right?

9  A.  At the moment, yes.

10 Q.  Okay.  At the time of this, you lived with your family,

11 right?

12 A.  Yes.

13 Q.  So if you got fired, you weren't going to be homeless,

14 correct?

15 A.  No.

16 Q.  Your family wasn't going to kick you out because you got

17 fired, right?

18 A.  No.

19 Q.  Not going to stop giving you food or shelter or anything

20 like that, right?

21 A.  I was helping pay bills, though.

22 Q.  Right, but you weren't going to be homeless or anything

23 along those lines, correct?

24 A.  What I was trying to say is, I was helping pay bills so my

25 father -- he had -- he was laid off a little before, and I

 1  was -- me and him were pitching in on bills.  And so, as far

 2  as saying I can't go homeless, I mean, I can't say no to that.

 3  Q.  Okay.  So your concern at that point is, you were more

 4  worried about this whole situation than a child who's saying,

 5  "He put his fingers inside me"?

 6  A.  No.  I was -- I was pretty worried about both situations.

 7  Q.  In fact, you just said that you were worried about how

 8  Tyria and Heidi would look at you if you did decide to come

 9  clean with them, correct?

10  A.  Yes.

11  Q.  And Tyria and Heidi weren't people that you hung out with

12  outside of work, correct?

13  A.  No.

14  Q.  Not in a social circle with you, right?

15  A.  No.

16  Q.  And not people who hang out with you even now, right?

17  A.  No.

18  Q.  You only knew them from the daycare, correct?

19  A.  Correct.

20  Q.  And yet you were so worried about how they would look at

21  you, that you say you decided not to tell them, right?

22  A.  Yes, because if they were to ever say -- if I was ever

23  accused of it, I didn't know if they would actually have my

24  back or not, because out of work, I was never really close

25  with them.  Yes, we were friends at work, but that's why I was

AL–AWADI– RECROSS/KOROBOV          Vol. 3-672

1  afraid of what they were thinking.  Maybe they would go and

2  tell them, you know, "He did this," and they would say, "Yeah,

3  he was known to do this, that, or that."  I don't know what

4  they would say.

5  Q.  So they had never falsely accused you of anything, had

6  they?

7  A.  No, but what I'm saying is, I didn't know if they would or

8  wouldn't.

9  Q.  You said, actually, that you were afraid that if you told

10  them, that you wouldn't like what they would think of you

11  because you couldn't justify what it is you had done, right?

12  A.  Correct.

13  Q.  Because there is no justification for what it is you did

14  on that day, is there?

15  A.  There was no justifying me examining and taking pictures.

16          MS. KOROBOV:  Thank you.  Pass the witness.

17          THE COURT:  Nothing further?

18          MR. THOMAS:  Nothing further, Judge.

19          THE COURT:  All right.  Okay, ladies and gentlemen

20  of the jury, I'm going to send you home, and I'll need you

21  back in your jury room -- I'm going to say 10:00 a.m.  And I'm

22  hoping -- that's like a two-hour delay, so I'm hoping that the

23  weather won't be bad.  You can be here as early as -- Tanesa,

24  what time will you get here?

25          (Off the record.)

 1          THE COURT:  Okay.  Unless you get a telephone call

 2   from Tanesa telling you otherwise, you can come in as early as

 3   7:30, but you all need to be here by no later than 10:00 a.m.

 4   So maybe 9:45 be your goal to be in the jury room, and then

 5   we'll get you into the courtroom promptly at 10:00 a.m.

 6          During this period of time that you are allowed to

 7   separate for overnight, remember not to have any discussion

 8   about the case among yourselves or with anyone else.  No

 9   conversation with your family or friends about what's going on

10   with your trial.  Once the trial is over, you may talk about

11   it as much as you like and Google about it and put it on

12   Facebook, but until then, you may not do so.

13          If anyone does attempt to talk to you about the

14   matter, refuse, report that attempt to me or Tanesa at your

15   earliest opportunity.  Don't read or listen to anything in the

16   newspaper, radio, or television.  Under this admonishment, you

17   are allowed to separate for overnight, and we'll see you in

18   your jury room, hopefully, by 9:45, no later than 10:00.  Have

19   a good night and be careful.

20          THE COURTROOM DEPUTY:  All rise.

21          (Jury out at 7:07.)

22          THE COURT:  Mr. Al-Awadi, you may go back over there

23   to your table with your lawyer, and you may be seated.

24          Counsel, what I've done is, I have the final

25   instructions.  I hope you don't have any objections, but I

1  tried to formulate them as to what you all tendered.  So Kelly

2  is going to give you those copies.  Take them home.

3          And, lawyers, I need you all here at 9:00 a.m.  If

4  you all could be here at 9:00 a.m. and we'll settle final

5  instructions in the morning before we get started.  And you

6  need to leave your -- Tanesa, do you need to take the jury

7  out?

8          (Off the record.)

9          THE COURT:  Go take the jury out.

10         What we're going to do, Counsel, is -- let's see.

11  You need to leave your cell phone numbers with Tanesa.  I

12  think, Kelly, she said there's a legal pad.  Get everybody's

13  phone number.  Hopefully the weather will be fine and we can

14  start as scheduled.  If there's anything that comes up, she'll

15  give you a phone call.

16         Did either party have any additional instructions

17  you wanted to tender based on the testimony --

18         Go ahead, Kelly.  You can go.

19         Did you have anything, Government, that you think

20  you need to add to the packet?

21         Why don't we start with the defendant.

22         MR. THOMAS:  Judge, I --

23         THE COURT:  Did you have anything you think you want

24  to add, other than what you all tendered in your joint packet?

25         MR. THOMAS:  Judge, I don't at this -- I don't have

1  anything prepared at this point.  I don't think so.  So my

2  answer is, at this moment, is no.

3          THE COURT:  Okay.

4          MR. THOMAS:  But I will think about it overnight

5  before our --

6          THE COURT:  Right.  And you can review what's in the

7  packet that the Court gave you.

8          MS. KOROBOV:  The government doesn't think it has

9  anything, Your Honor.

10          THE COURT:  All right.  If you do, have it here at

11  9:00 a.m., okay?

12          MR. THOMAS:  And, Judge, I --

13          THE COURT:  How much time will you need for your

14  closing argument?  Government, how much time do you think

15  you'll need?

16          MS. KOROBOV:  We're requesting an hour, Your Honor.

17          THE COURT:  Oh, my God.  You can have 45 minutes.

18  How much do you think you need?

19          MR. THOMAS:  If he gets an hour, I get an hour.

20          THE COURT:  Well, you're not -- none of you are

21  getting an hour.  I'll give you 45 minutes.  That's plenty.

22          MR. THOMAS:  That's plenty, Judge.  I don't --

23          THE COURT:  That's plenty, 45 minutes per side.

24  Okay.  Anything further tonight?

25          MR. THOMAS:  I did not rest in front of the jury,

1  Your Honor, but I do intend to.

2          THE COURT:  Okay.  I'm sorry.

3          MR. THOMAS:  That's okay.

4          THE COURT:  We'll let you do that in the morning.

5  Anything further, Government, tonight?

6          MS. KOROBOV:  No, Your Honor.

7          THE COURT:  Okay.  All right.  We are adjourned.

8  See everyone at 9:00 a.m.

9          THE COURT CLERK:  All rise.

10          (Proceedings adjourned at 7:10 p.m.)

11

12          CERTIFICATE OF COURT REPORTER

13

14      I, David W. Moxley, hereby certify that the

15  foregoing is a true and correct transcript from

16  reported proceedings in the above-entitled matter.

17

18

19

20  /S/ David W. Moxley _____   August 1, 2016
    DAVID W. MOXLEY, RMR/CRR/CMRS
21  Official Court Reporter
    Southern District of Indiana
22  Indianapolis Division

23

24

25