Vol. 4-677

1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
2                  INDIANAPOLIS DIVISION

3

4  UNITED STATES OF AMERICA,        )
                           ) Cause No.
5        Plaintiff,         ) 1:15-cr-0072-TWP-DML
                           ) Indianapolis, Indiana
6    vs.                   ) **February 25, 2016**
                           ) 10:07 a.m.
7  ALI AL-AWADI (01),        )
                           )  **VOLUME IV**
8        Defendant.        )

9

10                 **Before the Honorable**
                 **TANYA WALTON PRATT**
11

12       OFFICIAL REPORTER'S TRANSCRIPT OF
                   JURY TRIAL

13

14  **For Plaintiff:**               Bradley Paul Shepard, Esq.
                        Kristina M. Korobov, Esq.
15                     Assistant U.S. Attorneys
                        United States Attorney's Office
16                     Suite 2100
                        10 West Market Street
17                     Indianapolis, IN  46204

18  **For Defendant:**              Ross G. Thomas, Esq.
                        Attorney at Law
19                     3728 North Delaware Street
                        Indianapolis, IN  46205-3434
20

21

22  Court Reporter:            David W. Moxley, RMR, CRR, CMRS
                        United States District Court
23                     46 East Ohio Street, Room 340
                        Indianapolis, Indiana  46204
24

25      PROCEEDINGS TAKEN BY MACHINE SHORTHAND
    TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

1          **I N D E X**

2                                                          **PAGE**

3  Closing Argument by Ms. Korobov              682
   Closing Argument by Mr. Thomas               708
4  Closing Argument by Mr. Shepard              731

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1               (In open court.)

 2          THE COURT:  We are on the record.  This is the

 3  United States of America versus Ali Al-Awadi.

 4               And, Counsel, when we adjourned last evening, the

 5  government had rested, the defendant testified.  I need to

 6  allow you to rest on the record, because you've indicated you

 7  will not be presenting any additional evidence.  Is that

 8  correct, Mr. Thomas?

 9          MR. THOMAS:  That is correct, Your Honor.

10          THE COURT:  Okay.  And, Government, you've indicated

11  you have no rebuttal; is that correct?

12          MS. KOROBOV:  Yes, Your Honor.

13          THE COURT:  All right.  Before we bring in the jury,

14  the Court -- earlier this morning we talked about the final

15  instructions, and you've got copies.  For the record,

16  Mr. Shepard, does the government have any objection to the

17  final instructions?

18          MR. SHEPARD:  None, Your Honor.

19          THE COURT:  And, Mr. Thomas, any objections to any

20  of the final instructions?

21          MR. THOMAS:  No objection to the final instructions,

22  Your Honor.

23          THE COURT:  All right.  Counsel, you've each had an

24  opportunity to review the verdict forms.  Does the government

25  have any objection to the verdict forms?

 1          MR. SHEPARD:  None, Your Honor.

 2          THE COURT:  And, Mr. Thomas, do you have any

 3   objection to any of the verdict forms?

 4          MR. THOMAS:  No objection.

 5          THE COURT:  All right.  Any other matters before we

 6   begin?  We're going to do closing argument, and that will be

 7   followed by the Court reading the jury instructions.  And the

 8   Court will -- has already indicated you will have 45 minutes

 9   per side.

10          MS. KOROBOV:  Your Honor, the only thing we want to

11   make a record on is the prior *Brady* objection and the request

12   for a mistrial.  At this point, the defendant has taken the

13   stand in the matter and has said, unequivocally, that he is

14   the one who on that date, in some way or form, had his hands

15   on the child.  So identity isn't at all an issue in this case.

16          So any prior statements about whether she remembered

17   Mr. Ali or didn't remember Mr. Ali, he's not contesting that

18   he's the one who was with her that day in the room.  So we

19   just wanted to make sure that the record was clear on that,

20   that there's no possible way at this point that identity could

21   be an issue.

22          MR. THOMAS:  Your Honor, I don't know that I ever

23   stated that my issue was identity.  It was the overall memory

24   of the witness.

25          THE COURT:  And the ability to recall?

Vol. 4-681

1          MR. THOMAS:  Yes.

2          THE COURT:  Okay.  And you were able to question and

3    cross-examine the detective on that incident, so the Court

4    believes that there was no mistrial, there should be no

5    mistrial.  And I still do not believe there was a *Brady*

6    violation.  And in the event there was a violation, the Court

7    did offer you remedies of recalling the child if you wanted to

8    impeach her or cross-examine her regarding her memory.  And

9    the Court also offered -- I offered you something -- oh, a

10   continuance so that you could do some investigation, if you

11   wished to investigate that issue further.

12          All right.  Anything further before we bring in the

13   panel?

14          MR. SHEPARD:  Nothing further, Your Honor.

15          THE COURT:  All right.

16          MR. THOMAS:  No, Your Honor.  We're ready.

17          THE COURT:  All right.  You may bring in the panel.

18          And, Government, you do go first.  Do you want to

19   reserve some of your 45 minutes?

20          MR. SHEPARD:  Yes, Your Honor.

21          THE COURT:  When do you want me to give you a

22   warning?

23          MS. KOROBOV:  If you could give me a warning when I

24   have 20 minutes left, please.

25          THE COURT:  Okay.

CLOSING ARGUMENT / MS. KOROBOV        Vol. 4-682

```
 1              (Jury in at 10:10.)
 2              THE COURT:  Good morning, ladies and gentlemen of
 3  the jury.  We are back on the record, the United States of
 4  America versus Ali Al-Awadi.
 5              And, Mr. Thomas, do you wish to present any further
 6  evidence on behalf of the defendant?
 7              MR. THOMAS:  Your Honor, at this time the defense
 8  rests.
 9              THE COURT:  Thank you.  And does the government have
10  any rebuttal evidence?
11              MS. KOROBOV:  No, Your Honor.  The people rest in
12  rebuttal.
13              THE COURT:  Okay.  All right, ladies and gentlemen,
14  at this time you're going to hear the closing argument of
15  counsel.  Because the government has the burden of proof,
16  they're allowed to go first.  And if they reserve some of
17  their time, they will also present to you some final rebuttal
18  argument.
19              And who's going to begin for the government?
20              MS. KOROBOV:  I will, Your Honor.
21              THE COURT:  You may, Ms. Korobov.
22                     **CLOSING ARGUMENT BY**:
23              MS. KOROBOV:  May it please the Court, counsel, when
24  Ali Al-Awadi sat down to talk to Detective McAlister, he had
25  no intention of telling the truth.  He had already destroyed
```

1   what he believed was his protective evidence of whatever it is

2   that he thought he might or might not have seen.  He went in

3   there with every intention of repeatedly lying to this man,

4   who only wanted the truth from him, who repeatedly offered him

5   opportunities to just come clean and, "Tell me what happened."

6          That is, we're going to talk about today, in closing

7   argument, the defendant had numerous tells throughout his

8   statement, numerous times that now we can look back and say,

9   aha, something he said gave him away.

10         And one thing in particular stands out, that when he

11  is talking about how much M.R. likes it to have her legs

12  wrapped around his arm, how sexually experimenting she is, and

13  he says, "Because maybe she just liked how it felt."  And then

14  after that, "I just -- well, I just started walking around to

15  make sure all the kids were okay.  She fell asleep.  I didn't

16  notice anything unordinary.  I mean, it looked like she

17  shifted around a couple of times, but, I mean, I just thought

18  it was normal.  And she didn't even say anything about hurting

19  or anything."  So then, when Ms. Tyria comes in, "Like I said,

20  it freaked me out."

21         If all you did was put a child down to bed, and she

22  had said something about it hurting, and you had done nothing

23  untoward, why would you be freaked out when Tyria Graham walks

24  into the room?  Why?  Because just minutes earlier, according

25  to that report from Grant Melton, just minutes earlier, you

1  had had your hand in that child's pants, touching her hymen,

2  taking photos of her.  And, literally, your hands are still

3  warm from the touching when Tyria Graham walks in.  And, "Like

4  I said, it freaked me out."  That, ladies and gentlemen, is

5  who Ali Al-Awadi is.

6         He is a man who will change his story, who will fit

7  his version of events to adapt whatever evidence it is that

8  walks into this courtroom.  Whatever you throw at him, he's

9  got an answer for it, and he wants you to consider it

10  credible.  And that, ladies and gentlemen, is simply not

11  plausible and it isn't reasonable.

12         What this case really comes down to is 90 seconds,

13  that 90-second time period between the time that he took the

14  first two images and the time he took the second two images.

15         Because what he wants you to believe is, "I'm just

16  looking for evidence there.  Is she hurt?  Did I do something

17  wrong?"  And then he's got 90 seconds of dead space.  Now, he

18  wants you to believe he's just kind of looking at the images.

19         But does that take 90 seconds to do?  Does it take

20  90 -- did it take -- did it take three seconds for you all,

21  looking at images 7, 8, 9, and 10, to realize, "Oh, that's

22  bad"?  But does he say, "Oh, that's bad, I shouldn't do this.

23  I" -- no, no, no, oh, mistake, delete, delete, no, no, no.  He

24  snaps off two more.

25         I submit, ladies and gentlemen, in that time that he

1  is snapping off the photos, that's when he's also fondling

2  her.  And that's what tells you what it is he's thinking when

3  he takes those images.  That's what those 90 seconds are

4  about.  Is this case about a man who was so worried about M.R.

5  because of an accident, or is it about a man who is trying to

6  create images and fondle a child, and to do it all under cover

7  of darkness and trust?

8       You see, that's really what's at the heart of this

9  case, and what makes it so difficult, is that we want to

10 believe that we can trust people with our children.  We want

11 to believe that during periods of time when we can't be around

12 them, that no one would ever hurt them.  And so that's -- kind

13 of makes it appealing to believe his defense, right, to

14 believe that this is not an act of sexual misconduct in some

15 way, but rather just a mistake.

16      Oh, and if only we put a sign at the entrance to the

17 daycare, that says, "Don't take pictures of kids' genitals,"

18 he wouldn't have done that.  But, ladies and gentlemen, that's

19 not reality.  That's fantasy.  And in this courtroom today,

20 you have to make your decision based on evidence, evidence of

21 the acts as they exist, not the way that we want them to be,

22 the evidence that exists.

23      So if it's true, if the defendant was just really

24 worried that he had somehow hurt M.R., think about what he

25 should have done immediately.  Stick your head out that door

Case 1:15-cr-00073-TWP-DML Document 148 Filed 12/12/16 Page 10 of 100 PageID #72

1 and start yelling for Chiana. "Come on in here." The kids

2 are all still awake. It's only been a matter of minutes,

3 really, since you've been in the room and you've been playing

4 with these kids. They're up, they're playing, the lights are

5 somewhat on. "Come on, come in here. Let's talk about this.

6 I've got nine people who can tell you I didn't do anything

7 wrong." But he didn't do that. He could get on his cell

8 phone and call for someone to come in.

9          Look through the employment records in there,

10 because guess who's working at the time that this happens.

11 His girlfriend of two years, Karen, is working at the time.

12 So if he's so scared and worried that these other people won't

13 have his back, you know, his coworker Karen, yeah, she's there

14 at the time. "Come on in, Karen. You can talk to this little

15 girl. Take her in the bathroom, look at her. Someone get

16 help, because I didn't do anything to her."

17          He doesn't do that. He could have looked, even on

18 the outside of her jeans, to see if she somehow -- "Is it

19 ripped? Did my watch go through? Did it do something?" He

20 doesn't do that either.

21          And upon M.R.'s first disclosure, why not just say

22 what happened? Here's this child who walks in and says, "You

23 put your finger in me."

24          "Oh, hold up, hold up, hold up, blah-blah-blah.

25 That's not what happened. Let's talk about what -- hey,

1  Tyria, please, go get Heidi and bring her in here, because

2  that's not what happened, and I want to talk about it."  He

3  doesn't talk about the watch.  That never comes up.  You heard

4  Tyria Graham's testimony about what the defendant said when he

5  got caught, and he never says word one about the watch or her

6  being in pain or anything along those lines.

7          And, quite frankly, ladies and gentlemen, when her

8  dad walks in that night to pick her up, "Hey, sir, I know you

9  don't speak a lot of English, but I need to -- something

10  happened with your daughter today.  I think she's hurt."  He

11  says he has a good relationship with these people.  Why not

12  tell her dad?  Why not own up?

13          The daycare certainly isn't going to tell, because

14  they're doing their own investigation at the moment.  But the

15  reality is that he very easily could have simply stepped out

16  and said, "I need to talk to you," and found a way to

17  communicate with her dad about what it is that had happened

18  that day.

19          If it's true that he only wanted to know if he had

20  injured her, well, quite frankly, ladies and gentlemen,

21  there's a lot of things you can do besides snap off some

22  photos.  Look at the outside of her clothes, ask M.R. some

23  questions.  As the defendant found out in watching her

24  forensic interview, M.R. is quite capable of disclosing, and

25  she's quite capable of telling someone what happened to her

 1  and how it felt.

 2          So if all this is a watch pinch after she's been all

 3  sexually excited by grinding on your arm, why not just come

 4  clean?  "Hey, M.R., what happened?  Where does it hurt?  Show

 5  me."  Again, let's get Chiana or Tyria or someone in this room

 6  to talk about what happened.  He could have asked a female to

 7  come in and take her to the bathroom and see, you know, "Hey,

 8  look, could she go to the bathroom still okay?  Is there

 9  anything in her underwear?"  Something allowing those lines.

10  But he doesn't do that.

11          He could have called her mom, he could have made an

12  accident report.  All of those things are plausible things

13  that a person could do if you actually thought that you had

14  hurt a child, a child that you care so much about.

15          "I used the camera to see if I hurt her because it

16  was dark."  Oh, that's why, it was dark in the room.  And

17  rather than, I don't know, just raise the lights a little bit,

18  or maybe carry her somewhere to look at her stomach to see if

19  there's any mark, you know, because she's lifting up her shirt

20  so much to show off.

21          He could have used, like, the screen light on his

22  phone, right?  Anytime you turn on your phone in the dark,

23  what happens?  The screen lights up.  You don't need a flash

24  photography in order to see something if that's really what it

25  was about.  The reason he took that picture wasn't so he could

 1   see if he had hurt her.  It was so he could see what he had

 2   done previously and enjoy it.

 3          And rememberer, ladies and gentlemen, round one of

 4   the photos doesn't show any injury.  Look at -- it -- look at

 5   the photos.  There's not a mark on that child.  So why don't

 6   you -- I don't know.  At that point, stop taking images,

 7   right?  There's nothing there.  "Whew, I -- that watch session

 8   didn't hurt her at all," move on.  But, no, he doesn't.

 9          And she's still saying, "You hurt me," when he's

10   (sic) sleeping?  So if she's still saying that, wouldn't you

11   keep those pictures to protect yourself?  "Go on, go show --

12   show them to" -- if you ever get caught and called on

13   something, "Hey, look -- you know, look, there was nothing

14   there then.  I didn't do anything to her."  He knew it was

15   wrong to take those pictures, he knew he shouldn't do it, and

16   he knew he never should have put his finger in her vagina, to

17   begin with.

18          Then he wants you to believe that he lied because he

19   was scared of getting fired.  "My family needed the money.  I

20   was so scared of being fired, that I did this awful thing and

21   then I kept it a secret."  Well, that's also ridiculous.

22   First of all, he's not so scared of getting fired that he

23   bothers to obey the cell phone policy.  He's told you, "We

24   repeatedly violated that.  I just hid the phone from them.

25   I've been caught twice.  I didn't care."  He wasn't one bit

1    worried about getting fired over that phone.

2            He's not so scared that he stops putting kids in his

3    lap.  You heard, by his own -- he had been cautioned about

4    doing that, that, "Hey, you know, really, we shouldn't be

5    doing that."  But he keeps doing it anyway.  He's not scared

6    of getting fired.

7            Or he's not so scared, that he would stop picking up

8    kids.  Remember when he tells you about, "Hey, the teachers

9    told us, 'Don't pick up the kids because, like, what if they

10   fall on the playground and they hurt themselves?'"  All right?

11   So why is it, then, that that becomes important?  He says, "I

12   wasn't going to stop being playful."  He's not so scared of

13   the rules that he will stop doing things that he thinks are

14   perfectly acceptable to do.

15           And he's not so scared of that policy that he

16   doesn't take a picture of M.R..  Nothing wrong with that

17   photo, in theory, right?  Nothing sexual about it.  So why

18   delete it?  Unless you knew, all along, that your intentions

19   with respect to this child were sexual.  And on that day, you

20   decided to erase any trace of what it is you had done to her.

21   Too bad he couldn't shut her up.

22           The only element, issue in this case, ladies and

23   gentlemen, as you go back to deliberate is, did the defendant

24   used M.R. to create images that incited lustfulness or sexual

25   stimulation in the viewer?  That being him, the viewer.

 1   That's what you're here to debate.  No other arguments about

 2   where this happened, whether something happened in interstate

 3   commerce, whether M.R. is a minor.  Those issues aren't before

 4   you, because they're largely uncontested.

 5        When you look at Counts 1 through 4, that's the

 6   actual production.  Did he succeed in producing child

 7   pornography, that the defendant used Victim One -- a minor, we

 8   know that she's underage -- to engage in sexually explicit

 9   conduct, specifically the lascivious exhibition of the

10   genitals or the pubic area for the purposes of producing

11   visual depictions of such conduct?  So, again, the question

12   there is:  What's his intent?  Was he merely trying to take

13   medical photos or is he trying to take those lascivious images

14   to sexually arouse?

15        And when you're talking about intent, sexually

16   explicit conduct includes -- specifically it's the lascivious

17   exhibition of the genitals or the pubic area of any person.  A

18   lascivious display is one that draws attention to the genitals

19   or pubic area of the subject in order to incite lustfulness or

20   sexual stimulation of the viewer.  And you've got to have more

21   than mere nudity.  The focus of the images must be on the

22   genitals or the image must be otherwise sexually suggestive.

23        Ladies and gentlemen, that's the only purpose of

24   those photos.  That's it.  That's all that's in those images

25   are the camera repeatedly directed towards her genitals.  You

1  see the top of her mons pubis, you see the top of her labia in

2  those images.

3          Counts 5 through 8, however, refer to an attempt.

4  If you look at a particular image and you say, "You know what?

5  He missed the mark here.  He was trying, but he didn't quite

6  succeed with this image," then those are the attempt counts.

7  As long as you believe that his intent was to create sexual

8  images, that's what we're talking about with these counts.

9          So for the counts where you believe he succeeded

10 with the image, those are convictions on Counts 1 through 4.

11 If you believe he just made an attempt, but the pictures

12 didn't quite hit the mark, but he wanted to, he took that

13 substantial step, then that's the language you're going to

14 look at.  Did the defendant engage in a purposeful act, under

15 the circumstances as he believed them to be, that they

16 amounted to a substantial step towards the commission of the

17 crime?  If he did that, then you convict on Counts 5 through

18 8.

19         So, ultimately, how do you know what's in the

20 defendant's mind when he took pictures of M.R.'s pubic and

21 genital area?  You could say, "Well, he told us, he told us

22 what was in his mind.  Whew, that's easy, I'm done.  It was

23 all just a big mistake, Ms. Korobov.  Just relax, chill out."

24         Ladies and gentlemen, that story on the witness

25 stand was ludicrous.  It was tailored to meet the evidence as

CLOSING ARGUMENT / MS. KOROBOV          Vol. 4-693

1  it's come before you and as it was presented to him.  And,

2  quite frankly, he couldn't keep even what was on the stand

3  straight.  He had to keep going back and filling in details as

4  I asked questions.

5          So when you think about witness credibility -- you

6  will get an instruction on how it is that you determine

7  credibility, and it lists out those factors, including memory,

8  demeanor, whether they have any bias, prejudice, or reason to

9  lie or slant the testimony, and the truthfulness and accuracy

10 of the witness' testimony in light of all the other

11 presented -- oh, and inconsistent or consistent statements or

12 conduct by the witness.  This man is a walking inconsistency.

13 He tries to get consistent with the evidence, but he can't

14 keep his own story straight.  And that's what it is, it's a

15 story.  It's not an account.  It's a story of what happened.

16          In this case, you will receive a specific

17 instruction that says you've heard the evidence that before

18 the trial, the defendant made statements that may be

19 inconsistent with his testimony here in court.  And you may

20 consider an inconsistent statement made by the defendant

21 before the trial to help you decide how believable the

22 defendant's testimony was here in court, and also as evidence

23 of the truth of whatever the defendant said in that earlier

24 statement.  So you've got to weigh everything together, and

25 none of that adds up.

CLOSING ARGUMENT / MS. KOROBOV        Vol. 4-694

1            So let's talk about the defendant's ever-evolving

2  story.  And let's begin with M.R., because when he walks out

3  of the room on that day, he walks out silent.  He could have

4  piped up, could have said something if this really happened

5  the way he said it did.  But he didn't say a word, because he

6  believed she would be quiet.

7            "Shh, M.R.  You're just dreaming.  Don't tell

8  anyone.  You're just dreaming, M.R."  That's what he told her.

9  And it's one of the first questions he asked her when she came

10 with her allegations against him.  "Were you dreaming?"  Let's

11 reiterate it, let's say it over and over again.  "You're

12 dreaming, M.R., you're dreaming."

13           MR. THOMAS:  I'm going to have to object, Your

14 Honor.  She's misstating the evidence.

15           THE COURT:  Objection overruled.  The jury has been

16 instructed that, and will be again, that this is argument.

17 You've heard the evidence and it will be your determination of

18 what the evidence is.  And we'll give counsel another minute.

19           MS. KOROBOV:  Within an hour, M.R. has disclosed.

20 "Umm, I thought she would be quiet about it."  She didn't.

21 But this man is speechless still.  What's he say?  When M.R.

22 says, "My private area is hurting" -- and here's perhaps the

23 most interesting quote of the whole case for M.R, is that when

24 he says -- he's talking about her confronting him, he says,

25 "When M.R. tells me that her private area is hurting, 'from

1    when I touched her'" -- another little verbal tell.  Not,

2    "from when she said I touched her," "from when I touched her."

3           And, ladies and gentlemen, this doesn't cause any

4    pain.  His hand was in her pants, his finger was in her

5    vagina, just like she said, just like she had the courage to

6    come in here and tell you on the witness stand.

7           So what happens within the hour?  What's his

8    response?  "No, thank you."  And he wants you to believe he's

9    trained to say that, so that's why he says it, just like a

10   parrot.  "Hey, Mr. Al-Awadi, did you kill someone?"

11          "No, thank you."

12          Come on.  Ridiculous to believe that.  He's saying

13   that because he believes he can still quiet her by pulling her

14   onto his lap.  "Don't lie.  Were you dreaming?"  Tell her the

15   story, keep her on the party line.

16          And at the point where he then walks out of the room

17   and she's talking to Tyria, he's just left a little girl with

18   her head down, who's with Tyria.  No one has called the

19   police, no one has called Heidi into the room.  And I promise

20   you, ladies and gentlemen, he thought that would be the end of

21   it.  "Got her under control, whew."

22          But, mentally, he's still working on a story, just

23   like Heidi said.  Do you remember her testimony?  You could

24   tell he had been thinking about it.  So three to four hours

25   later, he gets called into Heidi's office, and that's three to

1  four hours after he leaves that room.  And now it's physical

2  pain that they're investigating.  She said, "It hurts from

3  where you put your fingers in me."  Heidi told you she's got

4  statements from the other employees and she's been asked to

5  call him in and have him give a statement at that point.

6        So what's his story?  First of all, "I knew you

7  would want to talk to me."  You know you want to talk to me?

8  Why not come forward yourself?  Why wait to be called in?  And

9  that's exactly what he did.  He didn't volunteer, he didn't go

10  down to the office on his own.  He waited until he was brought

11  in.

12        And now it's the G-shock watch.  This must be what's

13  done it, and he starts telling this story to Heidi.  He never

14  told that to Tyria Graham, never told that to Chiana, never

15  said, "Hey, M.R., you know it was the watch.  I'm sorry,

16  Honey.  I didn't mean to hurt you."  Not a word about that.

17        And then think about the statement he gave.  And you

18  will have that back there to look at, but he told you, when I

19  quizzed him about it on the stand -- so what's missing from

20  this statement?  Four hours later, all the things that are

21  missing: no mention of any physical pain that M.R. was in, no

22  mention of her saying, "You hurt me," and certainly no mention

23  of the pictures that he had taken of M.R.'s genitals and pubic

24  area, not a one.

25        So now let's talk about his ever-evolving story to

1  the detective.  26 hours later, he's brought into that station

2  house and he starts talking with the detective.  And the

3  detective is like, "Hey, look, just lay it out, tell me what

4  happened," gives him a completely open opportunity to say it.

5          He starts talking about nap time, Tyria being there,

6  going on break.  "It wasn't the first time.  I always just lay

7  on the pillows.  The kids were there, they're watching us,

8  they're laughing.  I'm taking their pillow and fake sleeping.

9  They start giggling and they can't breathe anymore."  Right?

10  So all is good in Ali Al-Awadi's world.

11          "And then M.R. gets up and sits on my lap.  I tell

12  her to lay back down, time to take a nap.  She wasn't

13  listening.  And I had to pick her up and put her down on the

14  mat when she locks her leg around my arm.

15          "And when I go to work, I have a pretty big G-shock

16  watch on.  She was pretty much around that, as well.  So I

17  was, like, kind of panicking because my arm was around her

18  private area, and I didn't want any intentions of them being

19  there.  So I told her to get off and get off, and she wasn't

20  listening.  And then I had to maneuver my arm out of there.

21  And all the kids thought it was a joke and playing.  She

22  thought it was the same thing.  And then she kept trying to

23  get in my lap."

24          Where's the pain?  Where's the, "Ouch, you hurt me"?

25  Where's the, "She lays down right away"?  Where's the, "She

1  starts holding hands with E.C. at that point"?  No, no, no,

2  no, no.  He says, after she gets off his arm, where she's had

3  her arm around his watch, that she starts trying to crawl back

4  in his lap again, because Mr. Ali is playful and fun, and, "I

5  wouldn't hurt her."  That's what he's trying to portray at

6  that point.  26 hours later, the detective is saying, "Well,

7  what's between your legs -- between her legs?"

8          "I said, 'No.'  I said, 'It's time to take a nap.'

9  I covered them up, the other kids.  The other kids are

10  starting to sleep."  He knows that there's a couple of kids in

11  the center that have breathing treatments, so he's walking

12  around.  "I make sure the kids are safe, for sure."  Doesn't

13  that sound like the exact language he used on the stand

14  yesterday?

15          Some of the phrasing, ladies and gentlemen, was just

16  sometimes exactly the same.  "And that was pretty much it.  I

17  didn't notice anything else other than they were falling

18  asleep.  They all fell asleep.  And Tyria comes back in the

19  room, so I go on my break."  That's version number one that he

20  gives to the detective.

21          Now I call it version number two, M.R. likes it,

22  because now is where he tries to convince the detective that

23  M.R. is sexually stimulated and sexually excited by rubbing on

24  his arm.  And why?  Because Ali Al-Awadi thinks of this child

25  in a sexual way.

 1          So let's look at what he says where he talks about

 2   the fake snoring with the kids.  "It's probably uncomfortable

 3   because she was right on my watch.  And I told her she needs

 4   to get off, but it seems like she's enjoying it and thinking

 5   it's a game.  And E.C. is sitting there laughing, too, and

 6   S.LNU.

 7          "So I told her after I finally managed to get it

 8   out, I put her head down and moved her leg a little bit and

 9   moved it out.  And there was a little bit of struggling at

10   first, because I wasn't trying to stay there as long as I

11   could, obviously.  And then I put her down and she kept trying

12   to do it again and again on my lap.

13          "And I said, 'No, you got to take a nap.'"

14          "And then she kept saying, 'Well, I want to sit on

15   your lap.'"

16          "And I said, 'Well, not right now.  You need to take

17   a nap.'  Which, for me, is pretty much saying, 'No, just take

18   a nap.'  When I say, 'Not right now,' it's like, pretty much,

19   me telling the kids, 'No,' in a nicer way."

20          So on this version, after he's somehow able to

21   extricate her from sexually stimulating herself on his arm,

22   she wants to do it again.  She keeps asking for it, and she

23   crawls into his lap.  No pain, no injury, nothing.  "Hey,

24   Detective, she's sexual."

25          Then she (sic) goes into, "She's smiling.  I think

1  she was still thinking it was a game, where she's enjoying it.

2  Kids do like to experiment at that age."

3          So the detective says, "You think she was

4  experimenting with you?"

5          He says, "It may have been.  Maybe she just liked

6  how it felt.  And then after that, just -- I just started

7  walking around to make sure the kids were okay.  She fell

8  asleep.  It looked like she shifted around a couple of times.

9  I thought it was normal."

10          "She didn't say anything about it or hurting or

11  anything?"

12          "And then, when Tyria comes in like -- like I said,

13  it freaked me out."

14          "You said earlier she grabbed your arm and put it

15  between your legs.  Is this the second time you're talking

16  about with your right arm, or are you talking about --"

17          "With my right arm.  She still thought it was a

18  game, I guess."  So what he's saying is, she got this left arm

19  and now she's asking for the right arm.

20          "So she probably -- yeah, so she grabbed your --"

21          "She kept trying to put it between her legs.  She

22  would grab it and then she would open up her legs.  And I

23  said, 'No, it's time to take a nap.'  And that's when I

24  covered her up.  And then I got up and let her take a nap."

25          "I thought you said she got -- actually got it

1  between her legs that second time and wrapped her leg?"

2           "No, no.  She was really trying to, though, got it

3  really close."  Not, "She's hurt," not, "It pinched," not,

4  "Ouch, you hurt me."  "Where?"  "Down there."  None of that.

5           "So the first time when she had it wrapped around

6  your left arm, the left arm," he asked, "what made you think

7  maybe she was sexually, you know, interested in it?"

8           "Because she wanted it right there again with my

9  other arm."

10          This isn't just leaving out a fact with the

11  detective.  This is creating a whole other scenario in which

12  this child is sexually stimulated.

13          "So when she tried to put your (sic) other arm

14  there, I didn't think much of it, other than I thought she was

15  just trying to hold on at first.  And then, maybe, once she

16  grabbed my other arm or tried to put it between, that's when I

17  thought maybe she was trying to experiment a bit."

18          So, wait.  But he's told you already that she thinks

19  she's trying to experiment on her arm, and that's why he needs

20  to get her off right away.  But now he's saying, "No, I didn't

21  think that until she tried to grab for the other arm."

22          "Did she say something like, 'Put your arm back

23  here," or, 'Let me -- let me feel something again'?"

24          "Actually, she did."

25          "What did she say?"

1          "She said, 'Give me your arm, give me your arm.'

2  And then, at first, I thought she was not doing anything much

3  with it.  And then she was like -- she grabbed it and went

4  closer."

5          "So when she asked for your arm, you --"

6          "I just stuck it out because I thought maybe she

7  wanted to see something."

8          That isn't the story he told on the stand.  The --

9  which version?  Who knows?  But, "I just stuck it out," okay?

10 And then, "She actually grabs it and tries to put it down."

11 You see, what this is about, every account that he gives is

12 when he needs to explain things.  And there comes a time

13 when --

14          THE COURT:  You have 20 minutes left, Counsel.

15          MS. KOROBOV:  Thank you.

16          There comes a time in that statement when now he's

17 got to explain the DNA evidence.  And what does he say?  Well,

18 he starts talking about the panties.  The detective says,

19 "Hey, are we going to find your DNA in her underwear?"

20          "Oh, well, yeah.  She was telling me about her

21 panties, how I have new panties on."

22          "Did she show you her panties?"

23          "No."  So at this point, no statement about anything

24 like that.

25          "She told me she had new panties.  I was like,

1  'Okay, M.R.  I'm not comfortable with this subject.'  I don't

2  even want to talk about this kid's underwear."  But the next

3  thing you know, remember, "I'm pulling up the shirt, tickling

4  their bellies.  I'm putting my fingers in her pants to show

5  her that her pants are too big."  Is that someone who is so

6  uncomfortable with the subject that he can't even go near her

7  at all?  It's crazy.

8          "M.R.'s shirt was up a little bit.  I tickled her."

9  He also tells the detective that he knows exactly what to do

10 if a child is injured, even in her genital area.  He was

11 certain about that.  He's reported it before.  He never got in

12 any trouble.

13         No one said, "Hey, you know that kid squatted down

14 over there rocking back and forth, holding her genitals,

15 really clutching it?  Snap off some photos so we can make sure

16 that you didn't do anything to her, Ali."  No one said that,

17 because it didn't happen.  No one ever suggested that to him.

18 And, quite frankly, they shouldn't have to tell him not to do

19 that.

20         M.R. is telling the truth.  How do we know M.R. is

21 telling the truth?  Because she gives an immediate disclosure,

22 she gives a completely consistent disclosure, and one that is

23 supported by the physical evidence.  And, ladies and

24 gentlemen, we're not talking about times for things or whether

25 something is up or down, or -- a lot of questions to a kid --

1  don't you think -- she's a six-year-old kid on the stand.  And

2  so being asked, "Was this before or was this after?  That day?

3  The incident?"  What do words like that mean to a

4  six-year-old?

5       I remember at that moment when M.R. was on the

6  stand, I'm thinking about the exchange that occurred with the

7  detective about the future tense or the conditional tense.

8  And, like, M.R. doesn't have those words to defend herself.

9  She just, "Look, he stuck it in me and it hurt."

10       How do you know she's telling the truth?  She gives

11  a feeling associated with what happened.  She is describing

12  something sensory, not something that someone has told her to

13  say.  What she remembers is, "He put his fingers in me while I

14  was sleeping, and it hurt."  And when words failed M.R., her

15  body started telling what was happening, specifically at

16  Chick fil A.  She is sad, she is withdrawn.  It's her favorite

17  place, but she wouldn't play.  She's hurting in the bathroom.

18       Ladies and gentlemen, all those things, please think

19  about the fact that every one of the -- her body is screaming,

20  "Something is wrong, Dad."  She's already told, "That's not

21  from I pinched myself on the watch."  Who cares?  Kids get

22  their fingers caught places, someone steps on them, someone

23  bites them at school.  Would you expect those behaviors at her

24  favorite place to suddenly materially change?

25       And then, when her mom says, "M.R., what's going

1   on?" she's crying, she runs to her bedroom.  Mom pulls her

2   onto her lap.  "Honey, what's wrong?"

3        "I can't tell."  And her body tells when she

4   physically releases, on her mother, urine.  And she says,

5   "Mr. Ali touched me."  That's the truth, ladies and gentlemen.

6   It's not that he took a couple of pictures, it's not a G-shock

7   watch.  It's that he put his finger on her hymen, and it hurt

8   her.

9        The medical exam also supports her account.  You saw

10  the nurse's findings in this case.  There's no external

11  findings, because there's nothing external that would leave

12  any kind of mark.  This isn't about a watch pinching her, it's

13  not about clothes that are too tight, or any other kind of

14  condition.  You didn't hear that she had a urinary tract

15  infection or a yeast infection or anything else that would

16  account for those findings.

17       The only thing there, what was Dr. Hicks' language?

18  The findings are consistent with acute trauma.  That's why

19  M.R. was in pain that day after he touched her.  Maybe she had

20  made some statements about being in pain beforehand.  Okay.

21  Who cares?  It has nothing to do with what happened in the

22  room on that particular day when he touched her, and what

23  those findings were.

24       The physical evidence also supports her account in

25  the form of DNA evidence.  Now, what defense counsel wants you

 1  to believe is that these jeans, who were covering M.R.'s

 2  private area, along with her underwear, that the defendant,

 3  merely pulling them out to take a photo -- and he says he does

 4  it twice, not repositioning her hands, but that he pulls them

 5  out once, takes a couple of photos, stops and looks at the

 6  photos, and then, again, pulls them out twice, and he's out.

 7        And he wants you to believe that that leaves behind

 8  so much touch DNA that it's able to migrate to the crotch of

 9  her underwear, which consistently is the place where M.R. says

10  he touched her, and is not so overwhelmed by M.R.'s DNA that

11  it can't be located with Y-STR testing.  And think about how

12  much longer she wears these underwear, how much of her DNA is

13  going to overwhelm.  There had to be more there than just the

14  two-time pull in order to get her DNA exact -- or his DNA

15  exactly where said he would find it.

16        What are these images, ladies and gentlemen?  These

17  images are of the genital and pubic area.  They are the focus

18  of the photo.  There is no legitimate purpose in taking them.

19  The only way you can believe that there is a legitimate

20  purpose in taking them is if you believe that man who got up

21  there on the stand and told you a completely different story

22  than has been told before.  You have to believe him in order

23  to believe that there's a legitimate purpose for those photos.

24  And quite frankly, ladies and gentlemen, that's not there.

25        The burden is the government's.  We have to prove to

1  you that he took these photos for a lascivious purpose.  And

2  we did that.  We did that through M.R.'s testimony, we did

3  that through the testimony of the sexual assault examiner,

4  followed up by Dr. Hicks.  We did that with DNA.  That man had

5  his hands in her pants, as she said, in and out, touching her

6  in a way that hurt her.

7          That's why he took those photos, to document what it

8  is he did.  These photos were done in conjunction with the

9  sexual and touching.  They were performed on a child that he

10  had been grooming, grooming with little nicknames.  You heard

11  about the camera seduction, getting her used to the camera,

12  playing with her, touching her physically, tickling, pulling

13  on her pants to show her that the pants are too big.  Ladies

14  and gentlemen, that's all designed to eventually put his hand

15  in her pants and then convince her that it's nothing more than

16  a dream, "because we're friends.  Little baby, I would never

17  hurt you."  That's what all that is designed to show for her.

18          And he completely covers over and over again with

19  stories and excuses.  This man's version is reactive and

20  adaptive.  Whatever evidence you throw at him, he's going to

21  come up with an excuse to meet it.  It has nothing to do with

22  the truth.  That is irrelevant to him.  The question is, "Can

23  I think of something fast enough to answer whatever question

24  gets thrown at me?"

25          Those photos were done to satisfy his lust for a

1  child that he had sexualized.  And you know exactly what he

2  thought of her when he goes through that whole diatribe about

3  grinding or moving up and down on his leg -- or on his arm.

4          Ladies and gentlemen, there's no more evidence to

5  give you, because these photos, quite frankly, they say it

6  all.  In these photos, you know it, you've documented them.

7  We're not going to leave them up for any period of time.

8          Because here's the reality, ladies and gentlemen.

9  When you think about what more evidence could you possibly

10 have, here's what it comes down to.  The only other evidence I

11 could give you, in some perfect world, would be a video of him

12 putting his finger in and out of her vagina.  And I submit

13 that the only reason we don't have that is because on

14 August 21st of 2014, his phone was in picture mode as opposed

15 to in video mode.  Those stills tell you the truth.  M.R. told

16 you the truth.  And the truth requires a guilty verdict.

17 Thank you.

18          THE COURT:  Thank you, Counsel.

19          All right.  Mr. Thomas?

20          MR. THOMAS:  Thank you, Your Honor.

21          THE COURT:  You may present an oral argument to the

22 jury.

23          **CLOSING ARGUMENT BY**:

24          MR. THOMAS:  Good morning, ladies and gentlemen.  I

25 want to start out by talking about a couple of things about

1  your job and what you're going to be told about your job, that

2  you have to keep in mind as a juror.

3          One of the things that you're going to be told is

4  that you should not let sympathy, prejudice, fear, or public

5  opinion influence you.  Every jury is told that in every case.

6  And most cases, it really doesn't matter.  A case like this,

7  it matters a lot, because you're going to have sympathy, every

8  one of you.  You may have prejudice, but you're certainly

9  going to have sympathy.

10          You may also have fear, and you may worry about

11  public opinion in a case like this more than just about any,

12  worried that, well, something could have happened here.  I

13  mean, something probably happened here, I don't feel

14  comfortable with this, this is bad.  Whatever it is, it is

15  bad.  So, you know, I'm worried if I don't find this person

16  guilty, that, you know, I'm going to have to answer to the

17  public, or I'm going to have to -- I've done something wrong,

18  that the only thing I can do here is find someone guilty,

19  because whatever, it's something bad.  Because I'll agree with

20  you, you know, this is all bad.

21          But you can't do that.  You told us at the beginning

22  you wouldn't do that.  That's a hard thing to ask, but it's

23  what you have to do.  It's what you promised to do.  You

24  cannot use sympathy, you cannot use fear or worry about public

25  opinion.  You have to look at the evidence, not what I say,

 1  not what she says, but what the evidence is.  And keep that in
 2  mind as you go forward.
 3        And then the other thing is just the nature of the
 4  job itself.  It's so different than anything else you probably
 5  ever do.  It's not the way we deal with everyday life.  What
 6  you're asked to do, sitting in a jury in a criminal case, is
 7  not what we do in everyday life.
 8        You're going to be told about this presumption of
 9  innocence.  You're going to be told that the burden is on the
10  government to prove its case beyond a reasonable doubt, and
11  the burden is to prove the defendant's guilt.  And he's not
12  required to prove his innocence.  And that's important.
13        When you get your verdict forms in this case,
14  there's not going to be a check box for guilty and a check box
15  for innocent.  It's not what you're asked to do in a criminal
16  case.  Nobody is asking you to come to a conclusion at the end
17  and say, "I'm absolutely sure he's done nothing wrong."  No,
18  no one is going to ask you to do that.
19        The question is going to be whether the government
20  has proven its case that he is guilty.  If they haven't, then
21  he's not guilty.  It's as simple as that.  That's what the
22  rules are.  So nobody is asking you to say, "Well, I'm
23  absolutely sure that he's done nothing wrong in this case."
24  You're not going to be absolutely sure.  You're not going to
25  be absolutely sure either way once you examine the evidence

1  objectively.

2          And we need to go through what some of that evidence

3  is and what that's about.  Some of the things that are implied

4  in the argument -- and that's what argument is, giving you our

5  version, our -- what we think the evidence shows.  That's

6  perfectly acceptable, of course, but the only evidence is what

7  you've heard in the courtroom from this stand.  The only

8  evidence is what you interpret it as, not how we do.  But you

9  want to look at what happened here.

10          It's correct, this is not a child molesting case.

11  It kind of felt like it, because we talked a lot about child

12  molesting.  It's not a child molesting case.  Why is that

13  important?  Why is the child molesting aspect of it so

14  important?

15          Well, part of the reason, one of the main reasons,

16  that the officer who told you about his opinion -- which was

17  just that, his opinion about child pornography, as well, that

18  a molest took place.  Well, a molest has been alleged, and so

19  you're going to have to, in the course of figuring out whether

20  this is pornography -- the government themselves said part of

21  the intent, part of the purpose, is because this went along

22  with a molest.  So it's perfectly reasonable for you, as

23  jurors, to decide.  And you're not going to be asked to find

24  Mr. Al-Awadi guilty or not guilty of touching that child, but

25  you are going to have to look at that evidence.  And I would

1  submit that it all kind of runs together.

2          I'll tell you what I mean.  We tend to make

3  assumptions in life and we tend to have a focus when we're

4  doing something.  And I would submit that investigators and

5  attorneys are no different.  And sometimes if you start out

6  with a preconceived idea, you kind of lose your objectivity.

7          And what you tend to do is something that

8  scientists, psychiatrists, psychologists tend to call

9  "confirmation bias."  And confirmation bias says, well, if I

10 have a preconceived idea in my head, then everything that

11 confirms what I already think, I'm going to focus on.  And

12 everything that doesn't confirm what I'm focused on, I'm going

13 to ignore or I'm going to explain away.  That definitely

14 happened in this case.

15         One of the things that I wrote down on my pad in the

16 government's close, the acknowledgment that M.R. was in pain

17 before she ever saw Mr. Ali.  And the government's response to

18 that is, "Who cares?"  Who cares if she was in pain before?

19 Why?  Why do they not care?  Because it does not help their

20 case, it doesn't fit their theory.  It doesn't fit what

21 they've already decided happened.

22         I would submit to you that that's real important,

23 because the idea that only Mr. Al-Awadi could have caused this

24 pain, could have caused this injury, is not supported by the

25 evidence.  The evidence shows that M.R. was in pain that day,

1  at least, before she ever saw Mr. Al-Awadi.  We know that.

2          The day after the event, we know that Tyria gave a

3  statement to the police and told him, as was pointed out to

4  her on three different occasions, that at 11:30 -- she knew

5  the time, she knew the circumstance -- at 11:30, he sent her

6  to the bathroom.  She was taking too long.  "I went into the

7  bathroom.  You're taking too long, M.R."

8          M.R. says, "It hurts when I pee," at 11:30.  And we

9  know from the records that Mr. Al-Awadi didn't get in the room

10  until an hour later.  So she was in pain prior to ever seeing

11  Mr. Al-Awadi.  Why?  I don't know.  But I do know that she was

12  in pain.  We have evidence to that that's uncontradicted.

13          Had she been in pain before that?  She told us that

14  she had.  She told those people that she had.  Now, Mom says,

15  "No."  Mom says she had never been in any pain before.  This

16  is -- she told you all that, she told the doctors that, she

17  may have told her lawyers that, but remember, the -- both

18  Tyria Graham -- the first people that she talked to, Tyria

19  Graham and then later when she talked to Heidi Conces, she

20  said, "It hurts down there."

21          And this is Tyria, if you remember.  "Why does it

22  hurt, M.R.?"

23          She said, "It hurts down there because Mr. Ali put

24  his finger all the way in and it hurts."  And then immediately

25  she said, "Mommy said I can't get bubbles in the tub because

 1  it's going to get worse."

 2          "Who cares?"  I care.  If the injury -- if the pain

 3  was caused by Mr. Ali, how would she have been able to talk to

 4  her mom about it?  "Mom says I can't have bubbles in the tub

 5  because it's going to get worse."  What's going to get worse?

 6  How could she have talked to Mom about bubbles in the tub

 7  about an injury that Mr. Ali, as she says, caused a few

 8  minutes ago?  Of course, she had not.

 9          Was she lying about that?  Did she make that up?  Is

10  it just something in her imagination?  I suppose if it doesn't

11  fit your theory, and we've seen that a few times, if she says

12  something that doesn't fit, we're just going to discount it.

13  But it's a pretty specific thing.  "Mommy said I can't have

14  bubbles in the tub because it's going to get worse."

15          If you remember when she spoke to Heidi later in the

16  day, the first thing she said, when she was asked, "What's

17  upsetting you?  Why are you upset?" her answer to her was,

18  "Well, it hurts to pee."

19          "Why does it hurt to pee?"

20          And the first thing she said was, "Mommy told me

21  that I can't have any bubbles in the bath with me, because

22  that's what's making it hurt to pee."

23          So she's had pain before.  Why is that important?

24  Because we cannot simply say, "Well, obviously he did this,

25  obviously he touched her because he's there, she's in pain,

1   and who else could it be?"  Well, we don't know.  We don't

2   know what caused the pain, but we know that he wasn't with her

3   until 12:00, 12:30 that day.  And on two occasions when she's

4   talking about it hurting, she's talking about a conversation

5   that she had previously had with her mother, "It hurts, no

6   bubbles in the tub because it hurts."

7        That raises a question, ladies and gentlemen.  That

8   raises a question as to did he cause the injury?  And I don't

9   say, "Who cares?"  I say you cannot ignore those things.  You

10  cannot ignore the testimony that at 11:30 she was already in

11  pain.  We cannot just say, "Well, we know that he caused it."

12  You can't.  Now, what caused her pain?  I don't know.  But I

13  think you can conclude that something caused pain before

14  Mr. Al-Awadi ever had even a chance to.

15       Now, we also can see lots and lots of that bias when

16  we look at the statement that M.R. gave the next day, that was

17  recorded, that you all watched.  Now, listen, this is a

18  four-year-old girl.  She's not a liar.  She's not -- she

19  doesn't have an agenda.  Nobody is going to say that.  She's a

20  four-year-old girl.  And, sure, she can say all kinds of

21  things.

22       But, remember, in interviewing her, was there an

23  agenda of the person interviewing her?  And I would say yes.

24  And I would say that that person wanted to find out

25  information about what she was saying about Mr. Al-Awadi and

1    wasn't much interested about anything else.

2           And the detective, if you remember, for things that

3    didn't quite fit, those were ignored or explained away.

4    "Well, she was tired.  She's four years old.  Now, it didn't

5    matter."  But, you see, you can't have it both ways.  When she

6    says in the first interview, "He touched me lots of times,"

7    and then a few minutes later says, "It happened one time,"

8    again, it can't be both.

9           And so after she has said it happened lots of times

10   and then later says it happened one time, would you follow up

11   and say, "Well, wait.  Let's clear this up"?  No.  She says

12   just, "I'm confused."  You hear a lot of that, "I'm confused,"

13   and then just move on to the next question.

14          I understand.  Look, nobody is trying to interrogate

15   a four-year-old girl.  But the point is, when we are going to

16   rely on what a four-year-old girl says to convict this man, we

17   can't just focus on what confirms our bias and then explain

18   away and ignore the rest.  We can't do that.

19          So when she says, "He told me not to tell," and then

20   later says, when asked, "Did he say anything to you about

21   telling or not telling?"  "No."  Lots of things that you might

22   follow up on to find out what they mean.  "Was it hot outside

23   or cold outside?"  "Hot outside and cold outside," she said.

24   Okay.  No follow-up.

25          And that could just be a little girl, hot outside,

1  cold outside, or maybe it means that something happened --

2  this was August.  Maybe it means something happened when it

3  was cold outside months before.  I don't know.  Nobody

4  bothered to ask.  Nobody cared.  Who cares?  We know when this

5  happened.  It happened yesterday, it was hot outside.  But,

6  just because the girl says it was hot outside and cold

7  outside, who cares?

8          No, you've got to care, you've got to ask.  "What do

9  you mean by that?"  Maybe there's an explanation.  Maybe

10  there's not.  Maybe it's because she's four.  Maybe it's

11  because something happened when it was cold outside.  We don't

12  know, because, again, who cares?  They already know when it

13  happened and what happened.

14          "Ms. Tyria was in the room."  No, she wasn't.  We

15  know she wasn't.  What difference does it make?  We already

16  know who was there.  What difference does it make that she

17  said Tyria was in the room?

18          Well, again, if you're going to take the word of the

19  four-year-old, you have to take all of it.  And you can't just

20  say, "Well, I'm positive of what happened, so the part about

21  him we're going to believe without doubt.  The parts where she

22  says Tyria was in the room, oh, well, that doesn't make any

23  difference anyway."  Well, she's wrong about that.  We can't

24  assume she's right about one and wrong about the other.  It

25  makes it very difficult.

1    Yes, she accuses Mr. Al-Awadi.  Yes, she says, "He

2  put his finger inside and it hurt.  He stuck his finger in."

3  She says that, she says that a lot.  She's asked about it a

4  lot.  But, you know, she also, in her statement on two other

5  occasions, if you will recall, talks about someone putting

6  their finger inside her.  "The other teacher was hurting me,

7  too."  We remember that.  You all heard it.  Now -- and no

8  real follow-up, because she didn't just say -- she didn't just

9  say somebody might have done something sometime.  She

10  specifically said teacher, E.R.'s teacher, "Ms. Anna touched

11  me with her fingers, stuck it in, stuck it out, in and out."

12    Now, look, do I think Ms. Anna touched her?  I have

13  no idea.  I don't even know if there is a Ms. Anna.  Nobody

14  bothered to find out, did they?  Because a few minutes later,

15  the four-year-old said, "It was a trick."  Okay, good.  That

16  was a trick.  We'll just ignore that.

17    But the fact is, she could easily -- and you see in

18  the video, she could easily say, "Somebody else touched me,

19  Ms. Anna touched me."  When she says it about Mr. Al-Awadi,

20  well, it's because it happened.  When she said it about, just

21  as easily out of her mouth, about Mr. -- or about Anna, "Well,

22  that was a trick.  She told us it was a trick."  She told us

23  Tyria was in the room, too.  She told us a lot of things.  We

24  didn't bother to find out.

25    So when she immediately says, "No, it didn't

1  happen."

2          "Are you sure it didn't?"

3          "No, it didn't happen."

4          "Okay.  I will believe you."

5          But the fact is, she could easily say, in the course

6  of a conversation, "Someone else touched me," and describe it

7  in just as graphic detail as she described it about

8  Mr. Al-Awadi.

9          We know that she was asked again at the end, "Has

10  anybody else ever touched you?"

11          And her answer is pretty disturbing when she says,

12  "When I go to sleep at home, when somebody knock on the door

13  and has already had a key and it looks like a monster."  What?

14  What?  "When somebody at home who already has a key knocks on

15  the door and looks like a monster."  I'm concerned about that.

16          I think if you are a parent and your child comes to

17  you and says, "There's a monster that comes in my room at

18  night and touches me," you're going to -- you're going to

19  wonder about that.  You're going to worry about that.  You're

20  going to ask about that.  Of course, she says it was a dream.

21  Maybe it was.  There's no follow-up, though, none at all.

22  "Oh, well, that was a dream.  We only want to talk about real

23  things.  I don't want to talk about a dream."

24          Well, can a four-year-old always distinguish between

25  dreams and reality?  I don't think so.  And, again, is this a

1   recurring dream?  Is this a dream that happened last night?

2   That might be relevant to them.  Is it a dream that she's had

3   repeatedly?  Did Mom ever know she had the dream?  Well, you

4   know, they didn't even tell Mom that she said it.  If you

5   remember, they didn't show Mom the video, they didn't talk to

6   Mom about the video, didn't tell Mom, "Oh, by the way, your

7   daughter also says she dreams at night that a monster comes in

8   her room with a key and knocks on the door and comes in and

9   touches her."

10          "Who cares?"  Right?  "That's not fitting our theory

11  of the case."  And you can't have it both ways.  You can't say

12  we believe her when it helps us and we write it off when it

13  doesn't.  "Well, she said it was a dream.  Good enough for me.

14  Well, she was really tired.  You know, she was tired that

15  second interview.  She was tired, so you can pretty much

16  ignore everything."

17          No.  They control that.  If they wanted to speak to

18  her again, if they wanted to let her sleep for days and come

19  back and speak to them again, they could have done that.  They

20  could have followed up on that to see if that meant anything

21  at all.  "No, we're focused on Mr. Al-Awadi.  We know what

22  happened.  We're just going to ask the girl to confirm."  And

23  she's asked again and again.

24          Now, add to that the DNA evidence.  Now, remember,

25  no male DNA on her body at all.  No male DNA in her body at

1   all.  Male DNA on the underwear.  One of the things that was

2   said by the government in their argument is, "Well, there had

3   to be way more DNA.  It couldn't have come from just

4   touching."

5          That's one of those times when that instruction that

6   what we say is not evidence is real important, because you all

7   know, sitting here listening, that nobody testified about how

8   much DNA is left by touching.  Nobody testified that he had

9   too much DNA to be caused by touching or that it wouldn't move

10  around.  You know that.  So that's the government's opinion,

11  or their remembering of the evidence.  But you know what the

12  evidence was, and the evidence was there was no DNA on her

13  body, and that there was trace DNA on the sample.

14         And, remember, the sample was chosen and sent.

15  There's no -- and not because it was covered with trace DNA

16  and they said, "Well, this is where all the DNA is."  The

17  serologist, remember, she didn't know there was any DNA at all

18  at that point.  She sent it forward because of the diaper rash

19  powder -- or diaper rash stuff, right, that Dad gave.  "I saw

20  this stain, it's a white stain.  I don't know what it is.  I'm

21  going to check that out, I'm going to send that on."  It

22  wasn't because she said, "Wow, there were a lot of trace DNA

23  there."

24         No, that was the piece she chose.  And, of course,

25  the piece that she chose showed his DNA, not that it was

1  overwhelmingly intense in a certain area.  That's not what the

2  evidence was.  And she did testify, "Yeah, you know,

3  friction," she said.  "You know, if I touch here," remember,

4  "yeah, it would go there.  If that touches here, it could go

5  over here."

6          "Does it move around?"

7          "Yes."

8          "Was it on -- would it move between her body and the

9  underwear?"

10         "Yes."

11         "Would it -- could it move from one place to the

12  other?"

13         "Yes.  It's mobile."

14         "Would wetness make it move more readily?"

15         "Yes."

16         So when the government says, and remember the

17  question, "Well, when she urinated, could that have washed it

18  completely off her body and onto the underwear?" you know,

19  they didn't answer that in the affirmative.  They said, "It

20  could have moved some from there.  It could have moved.  Maybe

21  it did."  But, of course, she said, "Would have moved back."

22         So ask yourselves, as far as the DNA goes, since

23  there's no DNA on her body, since there's DNA on the

24  underwear, if it was moving back and forth, wouldn't there

25  have been DNA on both?  Isn't it more likely that the DNA was

1   on another part of the underwear that was not touching her

2   genitals, which were tested for DNA, and that when they were

3   wet -- remember how they were described being brought to the

4   hospital?  They were wet.  They were in a Ziploc bag together.

5          Now, is it more likely that the DNA transferred from

6   another part of the underwear?  I would say yes.  Why?

7   Because there was no DNA on her body.  If it was transferring

8   between her body and the underwear, it would have been on

9   both.

10          Question:  Is it possible?  And the bigger question:

11  Does the DNA prove that Mr. Al-Awadi touched her on the inside

12  of her vagina?  The answer, of course, is that it does not

13  prove that.  And, in fact, in many ways, it contradicts that,

14  because there's no DNA moving between the underwear and her

15  genitals.  Important.

16          The examination, again, a little bit of confirmation

17  bias, I think.  Who's doing this evaluation?  The forensic

18  nurse.  You saw what a big part of her job was.  It was an

19  evidence collector.  And that's an important job, I'm glad

20  she's doing it, but that's her job, is to look for evidence,

21  is to -- of sexual abuse.  She's looking for evidence of

22  sexual abuse.

23          And she writes a report that says, "Redness,

24  swelling, evidence of abuse, could be evidence of abuse."

25  Takes pictures.  Interestingly, sends those on to the doctor.

1   And I'll talk about that for a little bit, because, you know,

2   when the doctor saw the little girl, she had no injuries,

3   which was to be expected.  That doesn't mean she didn't have

4   injuries before.  She had no injuries.  He had to rely on her

5   report.  And her report said, "Redness, swelling, irritation."

6          He didn't even look at the photos in performing his

7   evaluation.  He admitted that.  "I never saw them.  They never

8   sent them to me.  I didn't want them."  He didn't look at them

9   until he was preparing for trial.  And guess what?  When he

10  looked at them, he said, "I didn't see all that.  I just saw

11  redness."  The pictures didn't support the rest.

12         So even Nurse Bates said this could have been caused

13  by a man's finger, could have been caused by a woman's finger,

14  could have been caused by the child's finger, could have been

15  caused by no finger at all, it could have been caused by a lot

16  of things.  There's no way to tell what caused that injury or

17  when it was caused.  She specifically said, "Now, an injury

18  like that could last several days.  There's nothing time

19  specific about that."

20         So the medical evidence -- and the doctor, I think

21  importantly, said, you know, that it was, "consistent, but not

22  specific."  That was the doctor's terminology.  "It's

23  consistent but not specific."  What does that mean?  Well, it

24  could have been caused by that, it could have been caused by

25  something else.  It could have been caused by something else

1  before 11:30 that morning or when she was talking to Mom about

2  it hurting in the tub.  It could have been caused a lot of

3  times.  So the evidence, the physical evidence, does not

4  support a conclusion, beyond a reasonable doubt, that he had

5  to cause that injury, for all of those reasons that I've

6  stated.

7          It's interesting that -- what the doctor said about

8  the pictures, and that goes a long way to wrapping this up.

9  He didn't look at the pictures.  "I don't normally.  They

10 don't send those along.  I don't want those in my file."  And

11 he said, rightly, you know, "I'm concerned about privacy."

12 But, you know, he also said, "I don't want those in my file.

13 I don't want people getting the wrong idea."

14         Yeah, you're right.  He agreed with me.  He was so

15 worried about what someone might think about medical pictures

16 showing genitalia that he didn't even want those around.  A

17 doctor is so concerned.  And does that mean that a 20-year-old

18 kid might be concerned?  Yeah, I think it does.  Might he be

19 freaked out?  Yeah, he might.

20         Now, listen.  Nobody is suggesting that those

21 injuries were caused by his watch.  I would submit to you that

22 he didn't know what caused her injuries.  He knew that she was

23 on his watch when she said, "Ow."  It could have caused her

24 injuries.  He's not suggesting that he knew what caused her

25 injuries, only that the first time she said, "Ow," was when

1   she was on his watch.

2          So here's a 20-year-old kid, starts on the job at

3   19, no training, really.  And, yes, there had been numerous

4   times when he's had accidents happen before and people have

5   gotten hurt, even people hurt in the genitals.  And he's

6   filled out reports and does what he's supposed to do.  But

7   this is the first time that a child has said, "You hurt me.

8   You, you hurt me down there."

9          "Whoa.  What?"

10          "Yeah, it hurts."

11          Now, I would submit it's probably the same hurt she

12   was talking about at 11:30, but he doesn't know that.  Nobody

13   told him that.  She's already complaining about pain.  And

14   when he comes in, "Ow, it hurts.  You hurt me."  So when he

15   says, "She was on my watch, she got hurt," she just said, "It

16   hurts," and then, "It hurts down there, it hurts when I pee."

17          Is it possible, ladies and gentlemen, that a stupid

18   kid could do a stupid thing?  Yeah, it is.  It is.  We know,

19   when Heidi talked to the detective, the detective said, "Well,

20   wait a minute.  You mean this child came to you and said she

21   was hurt?  Did anybody bother to check?"

22          "Well, no.  No, of course not.  We're not going to

23   do that.  We're going to get sued.  We're not going to do

24   that."  Nobody is going to -- yeah.  You know, the natural

25   reaction might be to look and see, "Is she okay?"  But, no,

1  you're not going to do that. It's a stupid thing to do. We

2  all know that sitting here, it's a stupid thing to do. I

3  would submit that soon after he did that, he knew it was a

4  stupid thing to do.

5          Now, was he worried about her being hurt? Perhaps.

6  Was he really concerned about being accused? Yeah. "You hurt

7  me, Mr. Ali." He's a dumb kid, freaked out, because he's

8  already been warned, remember, by the staff informally, "Hey,

9  you know, people look at you sideways because you're a guy.

10  You know, parents don't -- you know, don't be around the

11  girls. You haven't done anything wrong, but, you know, people

12  get the wrong idea." And, all of a sudden, you've been

13  accused.

14          And all of the talk about, "Well, you could have

15  gone immediately and said, 'This is what just occurred.'"

16  Really? After you do the stupid thing, after you look, after

17  you take the pictures? Are you really -- you think if he had

18  done that, we wouldn't still be sitting here? Yeah, we would.

19          After you do the stupid thing, you're done. There's

20  no explaining that away. He said, himself, that there was no

21  justifying that. He didn't say, "Touching her on her vagina."

22  We know that the physical evidence doesn't really support

23  that. "But after I had done that, I couldn't justify that."

24  Of course, he couldn't. He's not going to go tell his

25  coworkers, "Well, she said she was hurt. I checked to look

1  and see, and took pictures.  I erased them.  She still said,

2  'You hurt me.'  I looked at it, freaked out."

3          Of course, he was freaked out.  Is that possible?

4  Yeah.  Is it -- is it a reaction that, after it's done, you're

5  going to tell a cop about?  Probably not when you're 20 years

6  old.  You know, you're in a bad spot.  Is it possible that it

7  happened that way?  Well, that's what you have to decide.  Is

8  it guaranteed, is it beyond a reasonable doubt, that these

9  pictures were taken for a sexual purpose?  Are they child

10  pornography?

11          Well, I would submit to you, the government is not

12  sure.  They've told you they're going to hedge their bets.  It

13  may be pornography.  If it is, find him guilty.  But, even if

14  it's not pornography, find him guilty of attempt.  You've got

15  all those charges.  They're not even sure.  You think if the

16  government was sure, they would waste their time with an

17  attempt?  They're not sure.

18          You look at those pictures.  Once it's explained --

19  remember that on the stand?  Everybody is like, "What is

20  that?"

21          "Well, if you turn it --"

22          "Okay, I see.  I see what it is, yeah.  What is

23  that?  Okay.  That's the body."

24          You look at the pictures.  Now, in context, when you

25  say, "Well, I know what I'm looking at now," but you look at

1 those pictures in and of themselves, for a sexual purpose?

2 Possibly. Could they have been for another incredibly stupid

3 purpose? Yeah, they could have been.

4          And erased. That's important, too. And they have

5 told you that there's no evidence that he erased them anytime

6 other than when he said. There's no evidence to the contrary.

7          One of the things that Detective Melton talked about

8 is, you know, people sharing, people uploading, people

9 trading --

10          MR. SHEPARD: Objection. He mischaracterized

11 Detective Melton's testimony.

12          THE COURT: I'll overrule. The jury heard the

13 testimony and evidence.

14          And you will make the determination as to what you

15 heard the detective testify to.

16          MR. THOMAS: None of that in this case talked about

17 putting pictures on the Internet, you know, kids in the

18 bathtub, to lure someone in for more pictures, nothing like

19 that. Four pictures. Out of all of his electronics that was

20 tested, his phone, four pictures all taken within a few

21 minutes. Not somebody who is a collector of child porn, not

22 somebody who has taken pictures before like that. Because had

23 it been on any of his electronics, it would have been found.

24 Certainly, if he had been uploading things to the cloud, as he

25 said, none of that. Nothing like that. Nothing before.

1         So he doesn't fit that profile in any way.  Did he

2    lie to Detective McAlister?  He did, quite a bit.  I wouldn't

3    say everything he said was a lie.  And a lot of the things

4    that were talked about -- you saw it and you can see it again.

5    A lot of those things he was led into in asking questions.

6    You know, the government said, "Well, you said she was

7    sexual."  He never said that.  He was asked, "Do you think she

8    was sexual?"

9         "Maybe.  I don't know."

10        He was scared.  He had done an incredibly stupid

11   thing.  There was no coming back.

12        THE COURT:  You have a minute and a half.

13        MR. THOMAS:  Thank you, Your Honor.

14        So I would ask you, ladies and gentlemen, don't have

15   that bias, because you would be breaking the rules.  You're

16   not allowed to have that bias.  People in these kind of cases,

17   when you've got allegations like this, do not get the benefit

18   of the doubt.  The doctor kind of told us that.  "I don't want

19   those pictures.  I'm not going to get" -- he's a doctor, he's

20   a pediatrician.  He's worried, "I'm not going to get the

21   benefit of the doubt."

22        Well, guess what?  He gets it, the benefit of the

23   doubt.  That's the way it works.  That's the way it has to be.

24   And when you look at this evidence and see that it all doesn't

25   fit, that there are alternative possibilities -- the fact that

1  he lied about being stupid is not what should convict him.

2  And ask yourself whether that 90 seconds of stupidity makes

3  him guilty.

4         Ask if they have proven to you that there's no other

5  possibility.  And I would submit to you that if they have not

6  proven that he molested the child -- and there's certainly

7  plenty of reason to doubt that.  Is it a possibility?  Yes.

8  But that's not what your job is.  Possibilities aren't it.  So

9  when you go back, remember, consider the evidence.  If you

10 can't find beyond a reasonable doubt, you've got to vote not

11 guilty.  Thank you.

12         THE COURT:  Thank you, Counsel.

13         All right.  You have 12 minutes and 37 seconds.

14                **CLOSING ARGUMENT BY**:

15         MR. SHEPARD:  Whenever you're ready, Your Honor.

16         THE COURT:  You may.  I'm sorry.

17         MR. SHEPARD:  Let's be clear right off the bat.

18 He's not charged with possession of child pornography.  He's

19 not charged with distribution of child pornography.  He's not

20 charged with collecting child pornography.  He's charged with

21 producing it, and he's charged with producing the four images,

22 and attempting to produce the four images, that you saw; the

23 four pictures that were taken when he had access and control

24 of his intended victim, the victim he had groomed, given pet

25 names to, camera seduced her, got her alone in the dim lights

1   when he was the only adult in the room, while everyone was

2   sleeping, and when he molested her.  Everyone's got to start

3   somewhere.  This is Al-Awadi's start.

4           Let's talk a little bit about what the defendant

5   said -- or, excuse me, what the defense counsel said.  "It

6   hurt to pee in the morning."  The government says it's not

7   important.  Here's what's important about it hurting.  What's

8   important is that M.R. Guevara, over and over and over again,

9   repeatedly doesn't change the fact that she says,

10  "Mr. Al-Awadi" -- or she said "Mr. Ali touched me.  He touched

11  me.  He put his finger inside me, he moved it in and out."

12          She said that to Tyria, who -- by the way, an

13  agenda?  Preconceptive (phonetic) bias?  Tyria had no agenda.

14  She didn't even know what happened. She just said, "M.R., what

15  happened?"  Here was a person who, according to the defense,

16  knew that she had been hurting.  She said, "What happened?"

17          "Mr. Ali touched me.  He touched me down there."

18          She didn't leave it at that.  "What did you say?"

19          "He touched me.  He touched me down there."

20          "Chiana, go get Mr. Ali."

21          Mr. Ali comes in, the person who had just molested

22  her comes in.  "M.R., tell Mr. Ali what you just told me."

23  Did she back off of it?  Did she shut up?  No, "Mr. Ali

24  touched me.  He touched me down there."

25          And then what does he do?  He comes up to her, he

1 puts her in his lap, gets as close as he can, "You're

2 dreaming.  I didn't do it."  Just what he tried to suggest to

3 her when she woke up in the middle of it about an hour

4 beforehand.

5          To Heidi.  When Heidi asked her, "What happened?"

6          "Mr. Ali touched me."

7          To her mother, "Mr. Ali touched me."

8          To Jessica Woodall.  And, again, you know, we can't

9 believe Jessica Woodall, because she's trying to plan it.

10          Could you queue up 42?  And please just play right

11 where it starts.

12          (Video playing in open court.)

13          MR. SHEPARD:  All right.  Go ahead and stop it.

14          You remember this clip?  It's one of the first

15 things M.R. says.  Jessica barely gets the question out.  "Do

16 you know why you're here?"

17          "Because Mr. Ali touched me."

18          It wasn't a suggestion.  You remember it, you

19 watched it right there.  There's no suggestion, no

20 confirmation bias, as he says.

21          She says it to you.  She comes in here, sat in that

22 witness stand and told you, "Mr. Ali touched me.  He touched

23 me at naptime.  He touched me while I'm sleeping."  She said

24 it when Mr. Thomas got up and asked her questions, tried to

25 confuse her.  Did she get confused?  Yes, she did.  She's six.

1  But what was she not confused about?  "Mr. Ali put his finger

2  in me, inside."  That's what's important about that.

3          Maybe she did it to herself.  Dr. Hicks says it's

4  acute trauma.  He says children don't touch themselves there,

5  because it causes pain.  Justo didn't say anything about

6  hearing her scream out as she applied the doctor (sic) cream.

7  Don't you think that when he's talking to his wife and saying,

8  "Hey, I'm concerned, M.R. doesn't feel good," he would have

9  mentioned it if she did something like that?  She didn't touch

10  herself, she didn't do this to herself.  Ali Al-Awadi did it

11  to herself -- or, excuse me, did it to her.

12          The DNA.  First, the defendant gives us a couple of

13  different ways throughout the evolution of his story.  "She

14  tried to show me her underwear," but we don't really know when

15  this happens because it keeps changing.  To the detective, "It

16  was right when she walked in the door."  To Heidi and Tyria,

17  "It didn't happen at all."  To Mr. Thomas, apparently it

18  wasn't important enough to even mention.  Oh, but then we go

19  back to what he told -- "Oh, well, maybe it could have been

20  the tickling."

21          And then there's this ridiculous story about, "Just

22  touching the waistband, just a little bit, to take some

23  medical photos."  And then they -- you know, these skin cells,

24  they get up, they migrate right down to the place your hand

25  would be if you just, you know, I don't know, put your finger

1   inside her over and over again, like she has said repeatedly.

2   How unlucky that that's the one place that these walking,

3   migrating skin cells just happened to end up.

4           Found nothing inside her.  She urinated multiple

5   times.  You remember Angela Bates up there.  Remember she was

6   talking about that saline drip?  "We do the saline drip of the

7   hymen."  Why did she say that's important?  We put the saline

8   drip over the hymen to try and flush that external material

9   down to try and get it, to try and catch it.  That's what she

10  was doing when she was urinating.

11          And thank God that last time when she peed all over

12  herself, her underwear was there to act kind of like a filter,

13  just like that collection vial that Angela Bates wanted there

14  when she did the drip.  It was there, it collected it.  It got

15  those skin cells, skin cells with the Y-STR profile that

16  matched who?  That guy, right there, the person she had said

17  had touched her, over and over and over.

18          And then that brings us to his version of events.

19  Two words:  Utterly ridiculous.  He has the audacity to come

20  in here and try and spin that yarn and hope you all believe

21  it.  You can't believe a word he says.  He's an admitted, on

22  that stand, liar.  He starts with Tyria and M.R., tried to

23  suggest to her she's dreaming, trying to plant the idea in her

24  head to shut her up.  Like I said, pulled her close, put her

25  on his lap, trying to silence her.

1          He tells Tyria he didn't do anything.  He's got

2     three hours.  He doesn't tell Chiana, he doesn't tell Heidi,

3     he doesn't tell Cathie, people who have always tried to

4     protect him, who have always looked after him.  "I know you

5     didn't mean anything.  I know -- you know, hey, no one is

6     saying you did anything."  Why in the world would they think

7     that they would do anything less?  This is their friend, this

8     is their coworker, this is the person they've always

9     protected.  He doesn't go to them.  He sits and he thinks

10    about his story.  He's got to come up with something.

11          And he doesn't tell Heidi the truth.  He doesn't

12    mention anything about a camera.  She says to him, "I know you

13    don't mean anything.  This has happened in the past.  Make

14    certain you write it all down.  You don't want this come beat

15    you in the butt -- or bite you in the butt."  Well, at this

16    point, all he knows is she's said pain, so he addresses pain,

17    and that's it, nothing else.

18          Over a day goes by and he gets warned the police are

19    coming.  And then he gets to Detective McAlister.  Their whole

20    interaction starts with the phones.  He talks about the watch.

21    This doesn't seem to be working, so throw him a curve ball,

22    direct his attention.  "Oh, she might have been sexually

23    experimenting."  Do you think that was a Freudian slip?

24          He gets confronted with possible DNA.  Oh, now a new

25    story, it's the underwear.  "Uh, she tried to show me.  She

CLOSING ARGUMENT / SHEPARD          Vol. 4-737

1   came in, she tried to lift her shirt."  But he stopped her.

2   Three times, he said he stopped her, never saw the underwear.

3   "No, M.R., no, thank you."

4          Didn't quite buy that, so he started talking about

5   the tickling.  Move on to the phone.  He knows they haven't

6   looked at it yet.  Besides, this may be the one truthful thing

7   he said.  "If deleted, they were gone.  I thought if deleted,

8   they were gone."

9          Talked about the Internet browsing.  He doesn't

10  mention anything bad.  "You won't find anything bad, you know,

11  nothing like 'I'm attracted to my little sis, too,' nothing

12  like that.  That's not going to be on there."

13         He told them everything was fine, no pain, no

14  nothing.  Then we get to his version.  He said, "Ouch" -- she

15  said, "Ouch."  Then, of course, she gets up, she goes around,

16  she plays with her friends, she goes down, she sleeps,

17  everything is fine.  But, "Oh, my gosh, she said 'Ouch.'  I

18  better look."  He doesn't just lift open her pants.  He

19  doesn't look around.  No.  What's he do?  Click, click.  And

20  then he will have you believe that --

21         THE COURT:  You have two minutes.

22         MR. SHEPARD:  Thank you, Your Honor.

23         It took about 20 seconds.  Then he goes back and

24  click, click again.  I'll tell you what was happening right

25  there.  It was this:  Click, click.  And then, just as he

1  said, moving down, gently opening the pants, pulling the

2  underwear aside, looking at what he's been grooming her for,

3  waiting for, trying to get the right opportunity the whole two

4  weeks.  He's alone with her, it's dim.  Then he molests her,

5  puts his finger right inside of her, moves it around.  And it

6  wakes her up.  Why does it wake her up?  Because it hurts.

7          "Shh, shh, shh.  You're dreaming.  You're dreaming.

8  Nothing is happening.  Don't tell anyone.  You're dreaming.

9  Go back to sleep."  Whew, but it was so great.  He, again,

10 click, click, the other two images.  That's what was going on.

11 That is absolutely what happened.

12          The only way you can believe that's not what

13 happened is if you don't believe M.R., the only person in here

14 who has consistently said what happened to her.  He used her

15 to create the visual depictions of sexually explicit conduct

16 while he was molesting her during naptime when he had control.

17 Find him guilty.

18          THE COURT:  All right.  Would counsel approach?

19          (Bench conference on the record.)

20          THE COURT:  Tanesa told me that you're not going to

21 send the physical exhibits back.  And so since they've been

22 told they will get all the exhibits, any objection if we add

23 this one?  Any objection if we add this exhibit -- I mean this

24 instruction, I'm sorry, since you're not going to send the

25 physical exhibits back?

```
 1            MR. THOMAS:  The government had a concern, Your
 2   Honor, that those exhibits may be used in the other trial.
 3            THE COURT:  The civil?
 4            MR. THOMAS:  No, the criminal.  He has a state
 5   criminal case what hasn't resolved.
 6            THE COURT:  Oh, I didn't know that.  For child
 7   molest?
 8            MR. THOMAS:  Yeah.
 9            THE COURT:  Oh, I didn't know that.  Poor thing.
10   Okay.  So they will need the same exhibits.
11            MR. THOMAS:  So if we just -- what she had suggested
12   was, you know, if they don't need them, there would be less
13   risk of contamination and that kind of thing.  So, rather than
14   sending them back -- if they ask for them, obviously, they can
15   have them, but if they don't, then it's just, I think --
16            THE COURT:  Well, this says that they will come in
17   here and view them.  Is that fine?
18            MR. THOMAS:  That's fine.
19            THE COURT:  And the same thing with the -- if they
20   want to hear or see a DVD, we'll play them in the courtroom.
21            And one more thing.  In your exhibit binder, you
22   have the demonstrative exhibits.  Is that your intent?
23   Because, typically, we don't send back demonstratives.  They
24   were the definitions, and then there's a --
25            MR. THOMAS:  Those shouldn't go back.
```

Vol. 4-740

1        THE COURT:  Okay.  Well, they're in your book.

2   We'll take them out.  The demonstratives are in here.

3        MR. THOMAS:  I didn't see those.  I'm sorry.

4        THE COURT:  And that's 44, 45, 46, 47, and 70, which

5   was the DNA chart.  You want those removed?

6        MR. THOMAS:  Yes.

7        THE COURT:  We'll get those removed.  Okay.  All

8   right.

9                    (Open court.)

10       THE COURT:  All right.  Ladies and gentlemen, at

11  this time I'm going to give you your final instructions.  You

12  may sit back and listen or you may follow along on your

13  screens.

14       Members of the jury -- I don't think the screen is

15  on.

16       Members of the jury, I will now instruct you on the

17  law that you must follow in deciding this case.  You must

18  follow all of my instructions about the law, even if you

19  disagree with them.  This includes the instructions I gave you

20  before the trial, any instructions I gave you during the

21  trial, and the instructions I am giving you now.

22       As jurors, you have two duties.  Your first duty is

23  to decide the facts from the evidence that you saw and heard

24  here in court.  This is your job, not my job or anyone else's

25  job.

1      Your second duty is to take the law as I give it to

2  you, apply it to the facts, and decide if the government has

3  proved the defendant guilty beyond a reasonable doubt.

4      You must perform these duties fairly and

5  impartially.  Do not let sympathy, prejudice, fear, or public

6  opinion influence you.  In addition, do not let any person's

7  race, color, religion, national ancestry or gender influence

8  you.

9      You must not take anything I said or did during the

10  trial as indicating that I have an opinion about the evidence

11  or about what I think your verdict should be.

12      The charges against the defendant are in a document

13  called an indictment.  The indictment in this case charges

14  that the defendant committed the crimes of sexual exploitation

15  of a child and attempted sexual exploitation of a child.  The

16  defendant has pled not guilty to the charges.

17      The indictment is simply the formal way of telling

18  the defendant what crimes he is accused of committing.  It is

19  not evidence that the defendant is guilty.  It does not even

20  raise a suspicion of guilt.

21      The defendant is presumed innocent of each and every

22  one of the charges.  This presumption continues throughout the

23  case, including during your deliberations.  It is not overcome

24  unless, from all of the evidence in the case, you are

25  convinced, beyond a reasonable doubt, that the defendant is

1   guilty as charged.

2        The government has the burden of proving the

3   defendant's guilt beyond a reasonable doubt.  This burden of

4   proof stays with the government throughout the case.

5        The defendant is never required to prove his

6   innocence.  He is not required to produce any evidence at all.

7        You must make your decision based only on the

8   evidence that you saw and heard here in the court.  Do not

9   consider anything you may have seen or heard outside of court,

10  including anything from the newspaper, television, radio, the

11  Internet, or any other source.

12       The evidence includes only what the witnesses said

13  when they were testifying under oath, the exhibits that I

14  allowed into evidence, and the stipulations that the lawyers

15  agreed to.  A stipulation is an agreement that certain facts

16  are true or that a witness would have given certain testimony.

17       In addition, you may recall that I took judicial

18  notice of certain facts that may be considered as matters of

19  common knowledge.  You may accept those facts as proved, but

20  you are not required to do so.

21       Nothing else is evidence.  The lawyers' statements

22  and arguments are not evidence.  If what a lawyer said is

23  different from the evidence as you remember it, the evidence

24  is what counts.  The lawyers' questions and objections,

25  likewise, are not evidence.

1    A lawyer has a duty to object if he thinks a

2  question is improper.  If I sustained objections to questions

3  the lawyers asked, you must not speculate on what the answers

4  might have been.  If, during the trial, I struck testimony or

5  exhibits from the record, or told you to disregard something,

6  you must not consider it.

7    You may have heard the terms "direct evidence" and

8  "circumstantial evidence."  Direct evidence is evidence that

9  directly proves a fact.  Circumstantial evidence is evidence

10 that indirectly proves a fact.  You are to consider both

11 direct and circumstantial evidence.  The law does not say that

12 one is better than the other.  It is up to you to decide how

13 much weight to give to any evidence, whether direct or

14 circumstantial.

15    Do not make any decisions simply by counting the

16 number of witnesses who testified about a certain point.  You

17 may find the testimony of one witness or a few witnesses more

18 persuasive than the testimony of a larger number.  You need

19 not accept the testimony of the larger number of witnesses.

20 What is important is how truthful and accurate the witnesses

21 were and how much weight you think their testimony deserves.

22    Part of your job as jurors is to decide how

23 believable each witness was and how much weight to give each

24 witnesses' testimony, including that of the defendant.  You

25 may accept all of what a witness says or part of it or none of

Vol. 4-744

1  it.

2          Some factors you may consider include:

3          The intelligence of the witness;

4          The witness' ability and opportunity to see, hear,

5  or know the things the witness testified about;

6          The witness' memory;

7          The witness' demeanor;

8          Whether the witness had any bias, prejudice, or

9  other reason to lie or slant the testimony;

10          The truthfulness and accuracy of the witness'

11  testimony in light of the other evidence presented;

12          And inconsistent or consistent statements or conduct

13  by the witness.

14          It is proper for an attorney to interview any

15  witness in preparation for trial.

16          You have heard evidence that before the trial,

17  witnesses made statements that may be inconsistent with their

18  testimony here in court.  You may consider an inconsistent

19  statement made before the trial to help you decide how

20  believable a witness' testimony was here in court.

21          You have heard evidence that before the trial, the

22  defendant made statements that may be inconsistent with his

23  testimony here in court.  You may consider an inconsistent

24  statement by the defendant made before the trial to help you

25  decide how believable the defendant's testimony was here in

1  court, and also as evidence of the truth of whatever the

2  defendant said in the earlier statement.

3  You may have heard testimony that the defendant made

4  a statement to the Indianapolis Metropolitan Police

5  Department.  You must decide whether the defendant actually

6  made these statements and, if so, how much weight to give the

7  statement.  In making these decisions, you should consider all

8  of the evidence, including the defendant's personal

9  characteristics and circumstances under which the statement

10  may have been made.

11  You have heard testimony and evidence that the

12  defendant committed crimes, acts, and/or wrongs other than the

13  those charged in the indictment.  Before using this evidence,

14  you must decide whether it is more likely than not that the

15  defendant did the crimes, acts, and/or wrongs that are not

16  charged in the indictment.

17  If you decide that he did, then you may consider

18  this evidence to help you decide the defendant's intent to

19  produce or attempt to produce child pornography, absence of

20  mistake in dealing with the alleged victim or opportunity.

21  You may not consider it for any other purpose.  Keep in mind

22  that the defendant is on trial here for sexual exploitation

23  and attempted sexual exploitation of a child, not for the

24  other crimes, acts, or wrongs.

25  You have heard testimony of an identification of a

Vol. 4-746

1    person.  Identification testimony is an expression of the

2    witness' belief or impression.  In evaluating this testimony,

3    you should consider the opportunity the witness had to observe

4    the person at the time and to make a reliable identification

5    later.  You should also consider the circumstances under which

6    the witness later made the identification.

7              The government must prove, beyond a reasonable

8    doubt, that the defendant is the person who committed the

9    crime that is charged.

10             You have heard witnesses who gave opinions and

11   testimony based on their scientific, technical, or otherwise

12   specialized knowledge.  You do not have to accept the witness'

13   opinions or testimony.  You should judge the witnesses'

14   opinions and testimony the same way you judge the testimony of

15   any other witness.  In deciding how much weight to give to

16   these opinions and testimony, you should consider the witness'

17   qualifications, how the witness reached his or her opinions or

18   conclusions, and the factors I have described for determining

19   the believability of testimony.

20             You have seen video recordings.  This is proper

21   evidence that you should consider together with and in the

22   same way you consider the other evidence.

23             There were also transcripts of the conversations on

24   the video recordings to help you follow the recordings as you

25   listened to them.  The recordings are the evidence of what was

1    said and who said it.  The transcripts are not evidence.  If

2    you notice any differences between what you heard in a

3    conversation and what you read in the transcripts, your

4    understanding of the recording is what matters.  In other

5    words, you must rely on what you heard, not what you read.

6         And if you could not hear or understand certain

7    parts of a recording, you must ignore the transcripts as far

8    as those parts are concerned.  You may consider a person's

9    actions, facial expressions, and lip movements that you are

10   able to observe on a video recording to help you determine

11   what was said and who said it.

12        If, during your deliberations, you wish to have

13   another opportunity to view any transcripts as you listen to a

14   recording, send a written message to the bailiff, and I will

15   provide you with the transcripts.

16        Certain summaries and charts were admitted in

17   evidence.  You may use those summaries and charts as evidence.

18        The accuracy of the summaries and charts has been

19   challenged.  The underlying documents and evidence have also

20   been admitted so that you may determine whether the summaries

21   are accurate.  It is up to you to decide how much weight to

22   give to the summaries.

23        Certain summaries and charts were shown to help you

24   explain other evidence that was admitted.  These summaries and

25   charts are not themselves evidence or proof of any facts, so

1  you will not have these particular summaries and charts during

2  your deliberations. If they do not correctly reflect the

3  facts shown by the evidence, you should disregard the

4  summaries and charts and determine the facts from the

5  underlying evidence.

6        If you have taken notes during the trial, you may

7  use them during deliberations to help you remember what

8  happened during the trial. You should use your notes only as

9  aids to your memory. The notes are not evidence. All of you

10  should rely on your independent recollection of the evidence,

11  and you should not be unduly influenced by the notes of other

12  jurors. Notes are not entitled to any more weight than the

13  memory or impressions of each juror.

14        The indictment charges the defendant in Counts 1

15  through 4 with the crime of sexual exploitation of a minor.

16  In order for you to find the defendant guilty of this charge,

17  the government must prove the following elements beyond a

18  reasonable doubt:

19        One, at the time, Victim One was under the age of 18

20  years;

21        And, two, the defendant, for the purpose of

22  producing a visual depiction of such conduct, used Victim One

23  to take part in sexually explicit conduct;

24        And, three, the visual depiction was produced using

25  materials that had been mailed, shipped, transported across

 1  state lines or in foreign commerce.

 2          If you find from your consideration of all the

 3  evidence that the defendant has proved each of these elements

 4  beyond a reasonable doubt, then you should find the defendant

 5  guilty.  If, on the other hand, you find from your

 6  consideration of all the evidence that the government has

 7  failed to prove any one of these elements beyond a reasonable

 8  doubt, then you should find the defendant not guilty.

 9          The indictment charges the defendant in Counts 5

10  through 8 with the crime of attempted sexual exploitation of a

11  minor.  In order for you to find the defendant guilty of this

12  charge, the government must prove each of the following

13  elements beyond a reasonable doubt:

14          One, that the defendant intended to employ, use,

15  persuade, entice, induce, or coerce Victim One to engage in

16  sexually explicit conduct for the purpose of producing a

17  visual depiction of such conduct;

18          Two, that the defendant engaged in a purposeful act

19  that, under the circumstances as he believed them to be,

20  amounted to a substantial step towards the commission of that

21  crime and strongly corroborated his criminal intent;

22          Three, that the visual depiction would have been

23  produced using materials that had been mailed, shipped, or

24  transported in interstate and foreign commerce.

25          If you find from your consideration of all the

Vol. 4-750

1 evidence that the government has proved each of these elements

2 beyond a reasonable doubt, then you should find the defendant

3 guilty of that charge.

4      If, on the other hand, you find from your

5 consideration of all the evidence that the government has

6 failed to prove any one of these elements beyond a reasonable

7 doubt, then you must find the defendant not guilty.

8      "Minor" means any person under the age of 18 years.

9      "Sexually explicit conduct" includes the lascivious

10 exhibition of the genitals or pubic area of any person.

11      The termed "producing" includes producing,

12 directing, manufacturing, issuing, publishing, or advertising.

13      "Computer," as used in this instruction, means an

14 electronic, magnetic, optical, electrochemical, or other

15 high-speed data processing device performing logical

16 arithmetic or storage functions, and includes any storage

17 facility or communications facility directly related to or

18 operating in conjunction with such a device, but such term

19 does not include an automated typewriter or typesetter, a

20 portable handheld calculator, or other similar device.

21      A lascivious display is one that draws attention to

22 the genitals or pubic area of the subject in order to excite

23 lustfulness or sexual stimulation in the viewer.

24      More than nudity is required to make an image

25 lascivious. The focus of the image must be on the genitals or

1   the image must be otherwise sexually suggestive.

2          The term "visual depiction" includes undeveloped

3   film and videotape, data stored on computer disk or by

4   electronic means which is capable of conversion into a visual

5   image, and data which is capable of conversion into a visual

6   image that has been transmitted by any means, whether or not

7   stored in a permanent format.

8          Computerized and digital visual depictions are

9   produced when they are transferred and stored on computer

10  media, including hard drives and flash drives, that have

11  traveled in interstate commerce.

12         "Interstate commerce" means commerce or travel

13  between one state of the United States and another state of

14  the United States.  "Foreign commerce" includes commerce with

15  a foreign country.

16         Thus, the phrase, "shipped or transported in

17  interstate commerce or foreign commerce," means that the items

18  used to produce the visual depiction at any time traveled or

19  moved between one state or foreign country and another.

20         The defendant has been accused of more than one

21  crime.  The number of charges is not evidence of guilt and

22  should not influence your decision.  You must consider each

23  charge and the evidence concerning each charge separately.

24  Your decision on one charge, whether it is guilty or not

25  guilty, should not influence your decision on any other

Vol. 4-752

1   charge.

2          Alternate jurors, you may not participate in

3   deliberations unless you replace a member of the jury.  Any

4   replacement would be done in open court.  You will be provided

5   separate facilities during deliberations and will be brought

6   into court once the jury has reached a verdict.

7          Ladies and gentlemen of the jury, once you are all

8   in the jury room, the first thing you should do is choose a

9   foreperson.  The foreperson should see to it that your

10  discussions are carried on in an organized way and that

11  everyone has a fair chance to be heard.  You may discuss the

12  case only when all jurors are present.

13         Once you start deliberating, do not communicate

14  about the case or your deliberations with anyone except other

15  members of the jury.  You may not communicate with others

16  about the case or your deliberations by any means.  This

17  includes oral or written communication, as well as any

18  electronic method of communication, such as telephone, cell

19  phone, smartphone, iPhone, BlackBerry, computer, text

20  messaging, instant messaging, the Internet, chat rooms, blogs,

21  Web sites, or services like Facebook, MySpace, LinkedIn,

22  YouTube, Twitter, Snapchat, or any other method of

23  communication.

24         If you need to communicate with me while you are

25  deliberating, send a note through the bailiff.  The note

1  should be signed by the foreperson or by one or more members

2  of the jury.  To have a complete record of this trial, it is

3  important that you do not communicate with me except by a

4  written note.  I may have to talk to the lawyers about your

5  message, so it may take me some time to get back to you.  You

6  may continue your deliberations while you wait for my answer.

7           Please be advised that transcripts of trial

8  testimony are not available to you.  You must rely on your

9  collective memory of the testimony.

10           If you send me a message, do not include the

11  breakdown of any votes you may have conducted.  In other

12  words, do not tell me that you are split six to six or eight

13  to four, or whatever your vote happens to be.

14           Verdict forms have been prepared for you.  You will

15  take these forms with you to the jury room.

16           When you have reached unanimous agreement, the

17  foreperson will fill in, date, and sign the verdict forms.

18           Please advise the bailiff once you have reached a

19  verdict.  When you come back to the courtroom, I will read the

20  verdict aloud.

21           Your verdict must represent the considered judgment

22  of each juror.  Your verdict, whether it is guilty or not

23  guilty, must be unanimous.

24           You should make every reasonable effort to reach a

25  verdict.  In doing so, you should consult with each other,

1   express your own views, and listen to your fellow jurors'

2   opinions.  Discuss your differences with an open mind.  Do not

3   hesitate to reexamine your own views and change your opinion

4   if you come to believe it is wrong.  But you should not

5   surrender your honest beliefs about the weight or effect of

6   evidence just because of the opinions of your fellow jurors or

7   just so that there can be a unanimous verdict.

8         The 12 of you should give fair and equal

9   consideration to all the evidence.  You should deliberate with

10  the goal of reaching an agreement that is consistent with the

11  individual judgment of each juror.

12        You are impartial judges of the facts.  Your sole

13  interest is to determine whether the government has proved its

14  case beyond a reasonable doubt.

15        Ladies and gentlemen, you will have photographs of

16  all of the physical evidence that has been admitted into

17  evidence with you during your deliberations.  If you desire to

18  listen to any recordings or view the physical evidence, please

19  put that request in writing and you will be allowed to review

20  that evidence in the courtroom.

21        And at this time, I need the bailiffs to come

22  forward to be sworn.

23        Kelly, come down here.

24        If you two raise your right hand, please.

25        (The bailiffs are sworn.)

```
 1          THE COURT:  Ladies and gentlemen of the jury, you
 2   may now retire for your deliberations.
 3          THE COURTROOM DEPUTY:  All rise.
 4          (Jury out at 12:10.)
 5          THE COURT:  Lawyers, you've indicated that you do
 6   not want the demonstrative exhibits to go back.  Is that
 7   correct, Mr. Thomas?
 8          MR. THOMAS:  That is correct, Your Honor.
 9          THE COURT:  So -- I don't know where the book is.
10   Is it over there?  Kelly, go see if the exhibit binder is over
11   there.
12          MS. KOROBOV:  Is that (unintelligible)  --
13          THE REPORTER:  I'm sorry?
14          THE COURT:  Do you see it?  Oh, here it is.  Okay.
15          Well, Mr. Thomas and Ms. Korobov, why don't you all
16   pull out the ones you want to take out.  I believe it's 44,
17   45, 46, 47, and 70.  Those were the demonstratives.  And I
18   believe they're still in the notebook.
19          MR. THOMAS:  I'm sorry.  I didn't pay attention to
20   that before.
21          THE COURT:  And, other than that, was there anything
22   else on the exhibits?  You're going to -- we're not going to
23   send the physical --
24          MS. KOROBOV:  45.
25          THE COURT:  -- documents, the physical exhibits
```

Vol. 4-756

1    back, the pants, the panties, the --

2              MS. KOROBOV:  That's correct, Judge.

3              THE COURT:  Okay.  44, 45, 46, and 47, and 70 were

4    the demonstrative exhibits.

5              (Off the record.)

6              THE COURT:  Okay.  So our exhibit binders -- no

7    objection to the exhibits that are going back, Government?

8              MS. KOROBOV:  No, Your Honor.

9              THE COURT:  Defendant?

10             MR. THOMAS:  No.  Thank you.

11             THE COURT:  Okay.  All right.  Is there anything

12   else?

13             Okay.  We will be adjourned until we get a verdict.

14   And, lawyers, make sure Tanesa has your cell phone numbers.

15   You did a very good job, both sides, and we are in recess.

16             THE COURT CLERK:  All rise.

17             (Recess at 12:13, until 3:18.)

18             THE COURT:  We are back on the record.  This is the

19   United States of America versus Ali Al-Awadi.  And counsel is

20   present for the record.

21             The jury has sent out a note, and it states that,

22   "We want to see the following:  Both...M.R.'s videos" -- "both

23   of M.R.'s videos and Ali's interview."  And it's signed by the

24   foreperson.

25             So, Counsel, what I propose is that we bring the

Vol. 4-757

1  jury in and allow them to see those videos.  They last how

2  long, Mr. Shepard?  They want to see all three.

3          MR. SHEPARD:  About two hours, Your Honor.

4          THE COURT:  Okay.  Well, we'll let them watch those

5  videos.  I'm going to continue to work.  We won't need the

6  court reporter.  We'll just allow the attorneys.

7          I'm sorry, Marshals, you will have to sit in here,

8  also, unless you want your client to waive his right to be

9  present.

10          MR. THOMAS:  No.  He would prefer to be here, Judge.

11          THE COURT:  Okay.  And then Tanesa will be in the

12  courtroom, and she will give me a message when it's time for

13  me to come back in.  But any objection to that procedure?

14          MR. SHEPARD:  No, Your Honor.

15          MS. KOROBOV:  No.

16          MR. THOMAS:  No, Your Honor.  I --

17          THE COURT:  They want to see both of M.R.'s videos

18  and Ali's interview.

19          MR. THOMAS:  Right.  And his whole video did come

20  into evidence.  The jury didn't actually -- the whole thing

21  wasn't played for them.  I don't know if they realize maybe

22  how long the whole video is, but that's what we'll have to do.

23          THE COURT:  Yeah, that is true.  You just did

24  experts.  But they have the CD.  They have the disk in

25  there --

1      MR. SHEPARD:  What is it that they -- I guess, what

2  is it -- do they want to see the entire interview of Ali

3  Al-Awadi or just --

4      THE COURT:  Right, because they have the -- they

5  have a -- I have a picture, but they have an actual

6  Exhibit 25, and it says, "Audio of interview and transcripts

7  of Ali Al-Awadi."  So it would be virtually impossible for you

8  to find the excerpts that you showed during trial; is that

9  correct?

10      MR. SHEPARD:  No.  We have the experts (sic) where

11  it individually clips out --

12      THE COURT:  Excerpts?

13      MR. SHEPARD:  -- and they're still existing in that

14  clipped form.

15      THE COURT:  All right.  I'll ask them do they want

16  to just see the excerpts or do they want to see the entire DVD

17  of Mr. Ali's interview.  Is that fine, Mr. Thomas?

18      MR. THOMAS:  Yes, Your Honor.  I think that --

19      THE COURT:  And I can tell them that the entire

20  interview of Mr. Ali is --

21      MR. SHEPARD:  That, in and of itself, is five hours

22  long, Your Honor.

23      THE COURT:  Oh, but what's on the disk is two hours?

24      MR. SHEPARD:  It's approximately -- no.  What's on

25  the disk is five hours long.  There's a lot of it that's just

1  him sitting there doing nothing.  There's approximately three

2  hours of actual interview.  That has never been clipped.

3  There's about one hour worth of the interview that I used in

4  presentation, and I have those.  And then M.R.'s two videos

5  are about 40 minutes total.

6          THE COURT:  Okay.

7          MR. THOMAS:  I assumed that the actual video that

8  was entered here was the redacted video.

9          THE COURT:  What's in that -- what did you offer

10 into evidence?

11         MR. SHEPARD:  I offered the --

12         THE COURT:  What do they have?

13         MR. SHEPARD:  They've got the whole thing.

14         MR. THOMAS:  That's not -- that's a problem.

15         THE COURT:  Well, not really, because they can't

16 look at it unless we show it to them.  I will ask them, are

17 they asking to view the videos that were shown in court during

18 the trial, proceedings during the trial.

19         MR. THOMAS:  And, Your Honor, we by -- there were --

20 there were portions of his interview that were redacted by

21 agreement --

22         THE COURT:  Because they're not relevant and --

23         MR. THOMAS:  -- for fair and --

24         THE COURT:  -- prejudicial?

25         MR. THOMAS:  -- prejudicial and for various reasons.

Vol. 4-760

1  My assumption was the -- what was entered into evidence was

2  that redacted interview, not the whole interview.  So --

3          THE COURT:  Okay.  And so I agree.  But the only

4  thing in play should be the redacted video, which you say is

5  two hours, of Mr. Ali -- of Mr. Ali Al-Awadi.

6          MR. SHEPARD:  It's an hour.

7          THE COURT:  Okay.  So they can see the one-hour

8  redacted video of your client.

9          MR. THOMAS:  Or the excerpts.

10          THE COURT:  And the 40-minute total of M.R.

11          MR. SHEPARD:  (Nods head up and down.)

12          THE COURT:  Okay.  Agree, Government?

13          MR. SHEPARD:  Yes, Your Honor.

14          THE COURT:  Agree, Mr. Thomas?

15          MR. THOMAS:  Yes, Your Honor.

16          THE COURT:  Okay.  You may bring in the panel.

17  We'll do M.R. first since that's easy and probably ready.

18          And, Court Reporter, you may leave, also, during the

19  video.

20          (Jury in at 3:24.)

21          THE COURT:  We are back on the record, the United

22  States of America versus Ali Al-Awadi.

23          And, ladies and gentlemen of the jury, the Court has

24  received your correspondence, which states that you want to

25  see the following:  Both of M.R. videos and Ali's interview.

 1  And so we're going to display, first of all, M.R.'s two

 2  interviews, which I've been told are approximately 40 minutes?

 3          MR. SHEPARD:  Correct, Your Honor.

 4          THE COURT:  And then the video of Mr. Al-Awadi is

 5  approximately one hour; is that correct?

 6          MR. SHEPARD:  That's correct, Your Honor.

 7          THE COURT:  Okay.

 8          MR. THOMAS:  Your Honor, if I may, did we inquire of

 9  the jury as to whether they wanted to see the excerpts or the

10  full video, as we discussed?

11          THE COURT:  Well, I thought this was the excerpts,

12  were one hour.

13          MR. THOMAS:  Well, what was --

14          THE COURT:  Come up.  Come up.

15          (Bench conference on the record.)

16          THE COURT:  I thought the full video is five hours

17  and the excerpts are one hour.

18          MR. SHEPARD:  That's correct, Your Honor.

19          MR. THOMAS:  I guess what I'm saying is --

20          THE COURT:  Well, we're not going to tell them it's

21  redacted.  They don't know that.

22          MR. THOMAS:  I understand, but the point -- he

23  didn't play the whole video to the jury.  They've only seen

24  the excerpts that he played.  I guess my question was:  Were

25  they looking to see the excerpts they've already seen or were

1  they looking to see the whole redacted video?

2          THE COURT:  And is the whole redacted -- the

3  excerpts is one hour?

4          MR. SHEPARD:  That's correct, Your Honor.

5          THE COURT:  He says the excerpts are an hour.

6          MR. THOMAS:  What I mean, when I say the "excerpts,"

7  I mean -- he didn't play the whole video, even the redacted.

8  He didn't play the redacted video to them.  They've only seen

9  the excerpts that he played.  There's -- if you recall, he

10 played -- started a minute here and played and then started

11 here and started here.  Am I making any sense?

12         MR. SHEPARD:  Your Honor, the way that I remember

13 everything, Mr. Thomas and I had talked about things that were

14 on the video -- or, excuse me, the transcript of the interview

15 that were not relevant and I think that were prejudicial.  I

16 agreed that I wasn't going to play those, and I clipped it

17 accordingly.  We put the thing in because we never knew what

18 become relevant when it comes back to cross.  We never sat

19 down and said, "This is out, this is in, this is out, this is

20 in, and so there's not a true redaction.  What we have is the

21 full video or we have the clips that I can just play in the

22 same succession that was played at trial.

23         THE COURT:  Okay.  They have the full -- they have

24 these transcripts of M.R. --

25         MR. SHEPARD:  No, they don't, Your Honor.

```
 1              THE COURT:  You took those out?

 2              MR. SHEPARD:  That one, yeah.  The transcript never

 3    went --

 4              THE COURT:  Of M.R.?

 5              MR. THOMAS:  M.R. had --

 6              THE COURT:  These are M.R.'s transcripts --

 7              MR. SHEPARD:  No --

 8              THE REPORTER:  I'm sorry.  You're speaking at the

 9    same time.

10              MR. SHEPARD:  What was admitted and went back was a

11    CD that has the video file of M.R.'s two interviews.  They

12    never got the transcripts.  Your version has the transcript,

13    Your Honor, because I think you've got an older version of the

14    book.

15              MR. THOMAS:  When I said "excerpts or clips," if the

16    Court will recall, the redacted video that was entered was

17    not -- the jury has not seen that, even the redacted version.

18    They only saw --

19              THE COURT:  Clips of the --

20              MR. THOMAS:  -- clips that were -- so I'm not sure

21    if they want to see what they've already seen.  I think

22    they're entitled to see the entire, because it's in evidence,

23    but --

24              THE COURT:  Okay.

25              MR. THOMAS:  I don't know if they want to see that
```

1   or if they want to see what they've already seen.

2           THE COURT:  Okay.  All right.

3                   (Open court.)

4           THE COURT:  All right.  Ladies and gentlemen, with

5   respect to the interview of Mr. Al-Awadi, you -- the entire

6   video is one hour.  In court, the parties played certain

7   excerpts.  Are you asking to see just what you've seen already

8   or do you want to see the entire video?  And let's hand the

9   microphone to -- who's the juror -- oh, to your spokesperson.

10          JUROR:  We wanted to see the excerpts as we saw them

11  in court originally --

12          THE COURT:  Okay.

13          JUROR:  -- so not necessarily the entire footage,

14  but the pieces that we were originally shown.

15          THE COURT:  All right.  Okay.  All right.  And then

16  they were shown the entire videos of M.R., correct?

17          MR. SHEPARD:  Other than the blank space where there

18  was no one in the room at the very beginning, that's correct,

19  Your Honor.

20          THE COURT:  Okay.  All right.  Well, the Court is

21  going to allow you to view those things.  I am going to step

22  off of the bench, because I'm working.  The lawyers will be in

23  here.  The court reporter is going to leave, also, because

24  he's doing other work.  And Tanesa will be in the courtroom.

25              And if anyone -- so there will be no comments or

Vol. 4-765

1  talking during the viewing.  And I will come back in to excuse

2  you and send you back into the jury room once you've completed

3  viewing the videos.

4          So you may get things set up.  Do you have it all

5  set up?

6          MR. SHEPARD:  I do, Your Honor.

7          THE COURT:  All right.  Go ahead and get started.

8  Are you going to start with the M.R. interview?

9          MR. SHEPARD:  (Nods head up and down.)

10          THE COURT:  All right.  You may.

11          (Video playing in open court.)

12          THE COURT:  Ladies and Gentlemen of the Jury, you

13  have reviewed the evidence that you requested an opportunity

14  to review.  You may now return to your jury room and resume

15  your deliberations.

16          THE COURTROOM DEPUTY:  All rise.

17          (Jury out at 4:52.)

18          THE COURT:  All right.  Lawyers, we'll be in recess

19  until we hear from the jury.  So just stay close to your cell

20  phones.

21          MR. SHEPARD:  Thank you, Your Honor.

22          THE COURT CLERK:  All rise.

23          (Off the record.)

24          THE COURTROOM DEPUTY:  Attorneys, everyone stay put

25  for awhile.

1    THE COURT:  Counsel, the jury has sent out another

2  note.  They are asking for the JPEG number versus the evidence

3  numbers of the four photos.

4    You need to cut your mic on.

5    And they should have that based on the indictment.

6    MR. SHEPARD:  They have the JPEG numbers, yes.  I

7  think they were asking -- or if I'm interpreting the question

8  right, which file is which exhibit.  Is that what -- is that

9  the question?

10    THE COURT:  I believe so, matching with the

11  indictment for each count.

12    MR. SHEPARD:  That is correct, Your Honor.  And the

13  order would be Exhibit 7 corresponds to Counts 2 --

14    THE COURT:  How do they know that?  Because I can't

15  tell them that.

16    MR. SHEPARD:  Okay.

17    THE COURT:  What I'm hoping my answer can be is

18  that, "You have that evidence before you" --

19    MR. THOMAS:  I think that's the only answer, Your

20  Honor.

21    MR. SHEPARD:  They --

22    THE COURT:  Well, let's see.  Do they have it?

23    MR. SHEPARD:  Yes.  It was -- yes.

24    THE COURT CLERK:  Where --

25    MR. SHEPARD:  Grant Melton testified to it, Your

1   Honor.

2           THE COURT:  What did he say?

3           MR. SHEPARD:  He testified as to which exhibit was

4   which file.  He gave the names in his direct testimony.

5           THE COURT:  Okay.  So which -- you mean which

6   photograph of the exhibit matches with the JPEG numbers in the

7   indictment?

8           MR. SHEPARD:  He was asked, "What is the file name

9   of Exhibit 7?"  And he gave what the file name was.

10          THE COURT:  What is the file name of Number 7, just

11  so that I --

12          MR. SHEPARD:  Imagecache.0_embedded_329; and then 8

13  he testified was everything 330; 9, 331; and 10, 332.

14          THE COURT:  Okay.

15          MR. THOMAS:  Is that --

16          MR. SHEPARD:  And those correspond -- and then the

17  indictment lists out the file names, as well.

18          MR. THOMAS:  That's testimony, Your Honor.  There's

19  not an exhibit that they need to see.

20          THE COURT:  Well, Counsel, they have all of the

21  exhibits --

22          MR. THOMAS:  Right.

23          THE COURT CLERK:  -- they have the photographs,

24  they've heard the testimony, they have the indictment that

25  they can match the -- hopefully, if they took notes or have a

1  recollection of which photograph goes with each -- because it

2  says the four photos.  "JPEG number versus evidence number of

3  the four photos," is what the -- it's not even in a question.

4  Well, then there's a question mark.

5          MR. THOMAS:  I think the answer is, "You have all

6  the evidence."

7          THE COURT:  And that's what I'm trying to determine,

8  Mr. Thomas.  Do they have all the evidence?  And Mr. Shepard

9  is indicating that they did receive that evidence, so you're

10 right.  We're on the same page.

11         MR. THOMAS:  Absolutely.

12         THE COURT:  All right.  Okay.  So I'll just write on

13 the note that, "You have all of the evidence before you.

14 Please continue to deliberate."

15         MR. SHEPARD:  Thank you, Your Honor.

16         MR. THOMAS:  Thank you.

17         THE COURT:  All right.  We're in recess.

18         THE COURTROOM DEPUTY:  All rise.

19         (Recess at 4:57, until 5:52.)

20         THE COURT:  We are back on the record.  This is the

21 United States of America versus Ali Al-Awadi.

22         And, Counsel, the bailiff advises the Court that the

23 jury has reached a verdict.  Is the government ready for the

24 jury?

25         MR. SHEPARD:  Yes, Your Honor.

Vol. 4-769

1    THE COURT:  Defense, ready for the jury?

2    MR. THOMAS:  We are, Your Honor.

3    THE COURT:  All right.  Tanesa, you may bring in the

4  panel.

5    And this is for everyone in the audience.  There

6  will be no outburst in the courtroom, whether you're happy or

7  sad, about the verdict.  Thank you very much.

8    (Jury in at 5:53.)

9    THE COURT:  We are back on the record, the United

10  States of America versus Ali Al-Awadi.  And Mr. Al-Awadi

11  appears in person and with his attorney, Ross Thomas.  And on

12  behalf of the government, Brad Shepard and Kristina Korobov

13  are present.

14    And juror number 12, are you the foreperson?

15    JUROR:  I am.

16    THE COURT:  The bailiff advises the Court that the

17  jury has reached a verdict; is that correct?

18    JUROR:  We have.

19    THE COURT:  Would you please hand the form of the --

20  oh, alternates, come on and have a seat.  I'm sorry.  We

21  didn't mean to leave you out.

22    And, Tanesa, you can go ahead and get the forms of

23  the verdict.

24    And for the record, the alternates have rejoined the

25  jury panel.

Vol. 4-770

1          Verdict, Count 1.  On the charge of sexual

2   exploitation of a minor, as alleged in Count 1 of the second

3   superseding indictment, we, the jury, unanimously find the

4   defendant, Ali Al-Awadi, guilty.  Dated February 25th, 2016,

5   signed by the foreperson.

6          Verdict, Count 2.  On the charge of sexual

7   exploitation of a minor, as alleged in Count 2 of the

8   superseding indictment, we, the jury, unanimously find the

9   defendant Ali Al-Awadi guilty.  Dated February 25, 2016,

10  signed by the foreperson.

11         Verdict, Count 3.  On the charge of sexual

12  exploitation of a minor, as alleged in Count 3 of the second

13  superseding indictment, we, the jury, unanimously find the

14  defendant, Ali Al-Awadi, not guilty.  Dated February 25th,

15  2016, signed by the foreperson.

16         On the verdict, Count 4.  On the charge of sexual

17  exploitation of a minor, as alleged in Count 4 of the second

18  superseding indictment, we, the jury, unanimously find the

19  defendant, Ali Al-Awadi, guilty.  Dated February 25th, 2016,

20  signed by the foreperson.

21         Verdict, Count 5.  On the charge of attempted sexual

22  exploitation of a minor, as alleged in Count 5 of the

23  superseding indictment, we, the jury, unanimously find the

24  defendant, Ali Al-Awadi, guilty.  Dated February 25th, 2016,

25  signed by the foreperson.

 1                Verdict, Count 6.  On the charge of attempted sexual

 2   exploitation of a minor, as alleged in Count 6 of the second

 3   superseding indictment, we, the jury, unanimously find the

 4   defendant, Ali Al-Awadi, guilty.  Dated February 25th, 2016,

 5   signed by the foreperson.

 6                Verdict, Count 7.  On the charge of attempted sexual

 7   exploitation of a minor, as alleged in Count 7 of the

 8   superseding indictment, we, the jury, unanimously find the

 9   defendant, Ali Al-Awadi, guilty.  Dated February 25th, 2016,

10   signed by the foreperson.

11                Verdict, Count 8.  On the charge of attempted sexual

12   exploitation of a minor, as alleged in Count 8 of the

13   superseding indictment, we, the jury, unanimously find the

14   defendant, Ali Al-Awadi, guilty.  Dated February 25th, 2016,

15   signed by the foreperson.

16                And, Mr. Thomas, do you wish for the Court to poll

17   the jury on these verdicts?

18                MR. THOMAS:  I do, Your Honor.

19                THE COURT:  Okay.  Juror number 1, are these your

20   verdicts?

21                JUROR:  Yes.

22                THE COURT:  Juror number 2?

23                JUROR:  Yes.

24                THE COURT:  Juror number 3?

25                JUROR:  Yes.

```
 1              THE COURT:  Juror number 4?

 2              JUROR:  Yes.

 3              THE COURT:  Juror number 5?

 4              JUROR:  Yes.

 5              THE COURT:  Juror number 6?

 6              JUROR:  Yes.

 7              THE COURT:  Juror number 7?

 8              JUROR:  Yes.

 9              THE COURT:  Juror number 8?

10              JUROR:  Yes.

11              THE COURT:  Juror number 9?

12              JUROR:  Yes.

13              THE COURT:  Juror number 10?

14              JUROR:  Yes.

15              THE COURT:  Juror number 11?

16              JUROR:  Yes.

17              THE COURT:  And juror number 12?

18              JUROR:  Yes.

19              THE COURT:  All right.  Ladies and gentlemen of the

20   jury, thank you very much for your four days of very diligent

21   service and hard work.  You are very much appreciated.  Tanesa

22   has some nice certificates for you, and she will return your

23   cell phones.  And I will be back to speak with you in just a

24   few moments before we send you home.  But thank you all very

25   much.
```

1      THE COURTROOM DEPUTY:  All rise.

2      (Jury out at 5:59.)

3      THE COURT:  Government, what is your position on how

4   the Court should enter judgment of conviction?

5      MR. SHEPARD:  At sentencing, the attempts and the

6   guilties on which they received the same will merge into one

7   another, and it will end up being just four total counts of

8   conviction.

9      THE COURT:  So it's your position that at this time

10  the Court should enter a judgment of conviction on Counts 1,

11  2, 3 --

12     MR. SHEPARD:  No.  1, 2, 4 --

13     THE COURT:  1, 2, 4, 5, 6, 7, and 8, and a judgment

14  of acquittal on Count 3?

15     MR. SHEPARD:  Correct.

16     THE COURT:  Mr. Thomas, do you agree?

17     MR. THOMAS:  I don't agree.  I think 5, 6, and 8 are

18  lesser included offenses of 1, 2, and 4, and that the judgment

19  should not be entered.  There should be a judgment of --

20  judgment should not be entered on those because they are

21  lesser includeds of 1, 2 and 4.

22     THE COURT:  Okay.  What do you have to say to that,

23  Government?

24     All right.  Lawyers, what I'm going to do is take

25  entering a judgment under advisement until tomorrow.  And then

1  you submit something to me, Government, because I tend to

2  agree with defense counsel.

3          MR. SHEPARD:  Yes, Your Honor.

4          THE COURT:  Okay.  And if you want to respond to

5  whatever they file, I'll give you until Monday, okay --

6          MR. THOMAS:  Fair enough, Judge.  Thank you.

7          THE COURT:  -- so we can get a judgment on the

8  record.  The Court is going to order a Presentence

9  Investigation Report.

10          Mr. Ali Al-Awadi, someone from the Probation

11  Department is going to contact your lawyer and schedule a time

12  to come and interview you and prepare a report about you that

13  will assist me in determining what sentence to impose.  And

14  your attorney will have a right to be present with you during

15  that interview.

16          And Tanesa has given me a date of a potential

17  sentencing, in the event we needed one, of Thursday, June 2nd.

18  And we can either do that at 9:00 a.m. or 10:00 a.m.

19          MR. THOMAS:  Your Honor, may I use my telephone?

20          THE COURT:  You may.  You may cut on your telephone

21  so we can get this date.

22          Is that a good -- oh, you're still powering up?

23          MR. THOMAS:  It just came up.

24          THE COURT:  Okay.  Thursday, June 2nd, 9:00 a.m. or

25  10:30 a.m.?  Is that good for the government?

Vol. 4-775

1          MR. SHEPARD:  Yes, Your Honor, either time.

2          MR. THOMAS:  What were the times?  I'm sorry, Judge.

3          THE COURT:  Either 9:00 a.m. or 10:30 a.m.

4          MR. THOMAS:  Yeah.  Either time would work for me.

5          THE COURT:  Okay.  Let's do it at 10:30 a.m.,

6  10:30 a.m. on Thursday, June 2nd.

7          All right.  Lawyers, you did a very good job, it was

8  very good lawyering.  Is there anything further before we

9  adjourn for the day?

10          MR. SHEPARD:  Nothing from the government, Your

11  Honor.

12          MR. THOMAS:  No.  Thank you, Your Honor.

13          THE COURT:  Okay.  We are adjourned.

14          THE COURT CLERK:  All rise.

15          (Proceedings adjourned at 6:03 p.m.)

16

17

18

19

20

21

22

23

24

25

Vol. 4-776

1          CERTIFICATE OF COURT REPORTER

2

3      I, David W. Moxley, hereby certify that the

4  foregoing is a true and correct transcript from

5  reported proceedings in the above-entitled matter.

6

7

8

9  /S/ David W. Moxley            August 1, 2016
   DAVID W. MOXLEY, RMR/CRR/CMRS
10 Official Court Reporter
   Southern District of Indiana
11 Indianapolis Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25